# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PETER D. MAINS and LORI M. MAINS    :    CASE NO.  3:01cv2402 (AWT)
                                     :
                  Plaintiffs,        :
                                     :
v.                                   :
                                     :
SEA RAY BOATS, INC.                  :
                                     :
                  Defendant.         :    AUGUST 30, 2006

## AFFIDAVIT OF JAMES H. ROTONDO

I, James H. Rotondo, being first duly sworn, depose and say that:

1.    I am over eighteen years of age and understand and believe in the obligations of an oath.

2.    I am an attorney with the law firm of Day, Berry & Howard LLP, and represent the Defendant, Sea Ray Division of Brunswick Corporation (improperly designated in the Complaint as "Sea-Ray Boats, Inc.") ("Sea Ray"), in this action.

3.    I make this affidavit based on my own personal knowledge and upon a review of correspondence between counsel for Plaintiffs and counsel for Sea Ray.

## EXPERT DISCLOSURE

4.    On or about October 19, 2004, Sea Ray provided to Plaintiffs its expert disclosure concerning Marine Surveyor Mr. Gregory T. Davis.  That disclosure consisted of Mr. Davis' report dated October 15, 2004, and a copy of Mr. Davis' curriculum vitae that was current as of the time at which it was provided to Plaintiffs.  Mr. Davis' report set forth the opinions that he intends to offer at trial and the grounds upon which those opinions are based.

5.    After Sea Ray provided that expert disclosure on or about October 19, 2004, Sea Ray had no further contact with the Plaintiffs or their counsel until earlier this year, when counsel for

Sea Ray sought to obtain Plaintiffs' portion of the Joint Trial Memorandum ordered by the Court on February 1, 2006.

6.    Plaintiffs first asserted that Sea Ray's expert disclosure was deficient in some respect in a memorandum sent on June 5, 2006.  A true and accurate copy of that memorandum is attached hereto as Exhibit A.  In that memorandum, Plaintiffs' counsel stated that "a review of the file indicates that although we ultimately received copies of the survey report from Sea Ray's surveyors, no Rule 27 [sic] reports were ever provided by Sea Ray . . . ."  (See Ex. A at 2.)

7.    On June 19, 2006, the undersigned responded to Plaintiffs' memorandum of June 5, 2006.  A true and accurate copy of that letter is attached hereto as Exhibit B.  That letter noted that Plaintiffs' counsel had not indicated in what respect Sea Ray's expert disclosure was allegedly deficient.  (See Ex. B at 3.)

8.    Despite this, Plaintiffs have not identified, either in response to that letter, or in their subsequently filed Motion to Compel and Memorandum of Law, any alleged deficiency in Sea Ray's expert disclosure.

9.    Sea Ray has produced a supplemental expert disclosure concerning Mr. Davis dated July 12, 2006.  A true and accurate copy of that supplemental expert disclosure is attached hereto as Exhibit C.

10.    That supplemental expert disclosure consists of:  (1) a copy of Mr. Davis' report dated October 15, 2004, which was previously provided to Plaintiffs' counsel on or about October 19, 2004; (2) copy of Mr. Davis' current curriculum vitae, a prior version of which was provided to Plaintiffs' counsel on or about October 19, 2004, and which includes a list of publications authored by him and a list of cases in which he has testified at trial or by deposition; and (3) a copy of correspondence signed by Mr. Davis, which sets forth the rates at which Mr. Davis is to

be compensated for services rendered in connection with this case, and to which is attached

copies of the two invoices setting forth the total amounts billed for Mr. Davis' services to date.

## INTERROGATORY 12

11.   Plaintiffs' Motion to Compel states that Sea Ray's response to an Interrogatory served

by Plaintiffs on Sea Ray ("Interrogatory 12") was "evasive or incomplete" because Sea Ray had

not identified all law suits brought against Sea Ray involving certain issues with Sea Ray boats

that were the subject of Interrogatory 12.  (Mot. to Compel at 4.)

12.   Sea Ray objected to Interrogatory 12 on a number of grounds, including that it

requested information concerning law suits that did not involve the same model of boat as the

Plaintiffs' boat, namely, model 330 DA.  (Mot. to Compel at 3; see also Ex. A to Mot. to Compel

(Sea Ray's Responses to Interrogatories) ¶ 12.)

13.   In their Motion to Compel, Plaintiffs state that they "recently came to be aware of the

existence of law suits in the states of Ohio, California, Georgia, and Florida" which are allegedly

within the scope of Interrogatory 12.  (Mot. to Compel at 4.)

14.   On July 5, 2006, the undersigned sent a letter to Plaintiffs' counsel asking that Plaintiffs

identify the law suits referred to in their Motion to Compel.  A true and accurate copy of that

letter is attached hereto as Exhibit D.

15.   On July 19, 2006, the undersigned sent a letter to Plaintiffs' counsel indicating that,

although Sea Ray stood by its position that any evidence of problems with other models of Sea

Ray boats is irrelevant, Sea Ray was willing to identify the names of law suits involving claims

relating to exhaust resonance, water ingestion, and wet core for model years 1996 to the present

for models 310 DA, 330 DA, 340 DA, 330 EC, 340 AJ and 370 EC.

16.   On July 20, 2006, the undersigned received an e-mail from Plaintiffs' counsel

identifying two of those four law suits.  A true and accurate copy of that e-mail is attached hereto

-3-

as Exhibit E.

17.   On August 23, 2006, Sea Ray produced a supplemental response to Interrogatory 12.  A true and accurate copy of that memorandum is attached hereto as Exhibit F.

## PLAINTIFFS' PRIOR AWARENESS OF OTHER COMPLAINTS

18.   On December 20, 2002, Plaintiffs served on Sea Ray their responses to Sea Ray's First Set of Interrogatories.  A true and accurate copy of Plaintiffs' responses to those Interrogatories is attached hereto as Exhibit G.

19.   In their responses to Sea Ray's Interrogatories dated December 20, 2002, Plaintiffs claimed that they were aware of "numerous" engine replacements and other repairs performed on Sea Ray boats at just one marina in Connecticut as a result of to engine failures purportedly similar to their own.  (Pls' Response to Interrog. 2, ¶ (u) (describing Plaintiffs' expert Mr. Tom Wicander as General Manager of a marina located in Westbrook, Connecticut, that "has done numerous exhaust replacements and/or engine replacements or repair . . . on Sea Ray's with similar engine failures to [Plaintiffs'].''))

20.   In those same responses, Plaintiffs identified five individuals whom Plaintiffs described as having owned Sea Ray boats and whom Plaintiffs described as having had engines replaced on those Sea Ray boats.  (Id. ¶¶ (ee) –(hh).)  With respect to three of these individuals, one of whom owned two Sea Ray boats, Plaintiffs explicitly asserted that their engines had been replaced by Sea Ray due to water ingestion.  (Id. ¶¶ (ee) – (gg).)

21.   Subsequently, in response to certain of Plaintiffs' Interrogatories, and subject to its objections to those Interrogatories and a confidentiality agreement entered by the Court, Sea Ray provided to Plaintiffs a list of individuals who had made complaints concerning certain alleged problems with Sea Ray boats.  (See Ex. A to Mot. to Compel (Sea Ray's Objections and Answers to Plaintiffs' First Set of Interrogatories) ¶¶ 6-11; Ex. C to Mot. to Compel.)

-4-

22.   In a memorandum dated May 20, 2004, Plaintiffs counsel stated that "we noticed that the list [identified in Paragraph 20 above] did not include a number of Sea Ray owners known by the Mains to have had problems of the same or similar type about which discovery was sought . . . ." A true and accurate copy of that memorandum is attached hereto as Exhibit H.   The other owners of Sea Ray boats referred to in that memorandum, who are identified by name, are the same individuals previously identified in Plaintiffs' Interrogatory responses dated December 20, 2002.  (Pls' Response to Interrog. 2, ¶ (ee)-(gg).)

23.   On May 20, 2004, counsel for Sea Ray responded to Plaintiffs' counsel by e-mail.  A true and accurate copy of that e-mail is attached hereto as Exhibit I.

## PLAINTIFFS' EXPERT DISCLOSURE

24.   On July 30, 2003, Plaintiffs served on Sea Ray their Disclosure of Experts and Damages Analysis.  A true and accurate copy of Plaintiffs' Disclosure of Experts and Damages Analysis is attached hereto as Exhibit J.

25.   On November 17, 2003, Plaintiffs' counsel sent a letter to counsel for Sea Ray indicating that one of the five experts disclosed by the Plaintiffs, Mr. David Pascoe, would not be offering expert testimony in this case "due to logistical and availability issues."  A true and accurate copy of that letter is attached hereto as Exhibit K.

James H. Rotondo

Subscribed and sworn to before me this 30th day of August, 2006.

Notary Public
My Commission Expires:

-5-

# EXHIBIT A

**The Essex Law Group**

# Memo

**To:**     Daniel J. Foster

**From:**   John L. Senning, Esq.

**Date:**   June 5, 2006

**Re:**     Mains v. Sea Ray Boats

There follows here with a copy of the First Set of Requests for Production Directed to the Defendant, Sea Ray Boats, Inc. dated November 30, 2002, which accompanied the First Set of Interrogatories of same date, both of which were transmitted to Attorney Maxwell Branson, then of your firm, as indicated in their respective certifications of service. As to Interrogatory 6, the March 21, 2003 response from Sea Ray indicated that a list of persons (i.e. boat owners) along with corresponding years, models, H.I.N.'s and complaints would be produced upon execution of a suitable protective order. Subsequently, on or about April 20, 2003, Sea Ray produced a seven (7) page schedule listing approximately 130 boat owners names, who purportedly experienced exhaust systems and/or water ingestion problems or fiberglass delamination problems. In subsequent conversations with Attorney Branson, it was represented that the schedule was all inclusive of any such problems and that contact information as to each owner would be provided in order to enable the plaintiffs counsel to investigate the nature and handling of such claims. The information purportedly produced in response to Interrogatory 6 was further represented as addressing Interrogatories 7, 8, 9, 10 and 11.

The information recently obtained from collateral sources, including Pilots Point Marina indicates a substantial number of other boats and/or boat owners who experienced similar engine exhaust/water ingestion problems, which were not disclosed by Sea Ray in its responses made on or about April 20, 2003 and Sea Ray has also failed to provide supplementary responses regarding Sea Ray boats, which experienced similar such problems subsequent to April 20, 2003.

In response to Interrogatory 12 of the November 30, 2002 Interrogatories, Sea Ray expressly represented that there were no additional consumer complaints other said than those to be identified upon execution of a suitable protective order. Sea Ray further represented "There have been no such lawsuits or arbitration proceedings brought against Sea Ray". Upon further subsequent inquiries of Attorney Branson, it was again represented that Sea Ray was not involved in any lawsuits pertaining to any of the subject categories listed in Interrogatory 12. At no time since then has Sea Ray ever disclosed that there have been a number of other lawsuits against Sea Ray pertaining to one or more of the subcategories listed in Interrogatory 12. Only recently through other sources, have we learned of cases in Florida, Georgia, Ohio and California, which involve one or more of these issues, but as to which Sea Ray has made no disclosures.

1

Prior and subsequent to the parties reaching an agreement as to the terms of the Stipulation Regarding Confidentiality, discussions were had with Sea Ray's Counsel regarding outstanding discovery issues. It was contemplated that, since that stipulation as finally agreed upon in February and March of 2004 made reference to Sea Ray's production of documents in response to plaintiffs discovery requests, documents would be produced to the extent that any existed in the context of outstanding discovery requests.

Attorney Russo subsequently appeared in this case and Attorney Branson withdrew. When Attorney Russo was queried about Sea Ray's lack of document production, she requested time to review the file and outstanding requests. I was subsequently under the impression that Sea Ray would supplement its prior response with additional document production, when it produced other materials with its Rule 27 expert reports. However, a review of the file indicates that although we ultimately received copies of the survey report from Sea Ray's surveyors, no Rule 27 reports were ever provided by Sea Ray, nor were requested documents produced or previous responses ever supplemented.

After I mentioned the absence of supplemental responses and document production to you in one of our first telephone conferences and again mentioned same in a number of further communications, I was surprised to learn for the very first time from Attorney Rotondo's memo of June 1, 2006 that your files do not reflect the first document production request. It has been my standard practice without exception to prepare and serve Interrogatories and Requests for Production together in all discovery proceedings. The Requests for Production in this case were closely keyed to specific Interrogatories of same date and which our file indicates were sent out together. I have no idea why your file does not reflect both discovery requests.

# EXHIBIT B

# Day, Berry & Howard LLP

### COUNSELLORS AT LAW

James H. Rotondo
Direct Dial: (860) 275-0197
E-mail: jhrotondo@dbh.com

June 19, 2006

**VIA E-MAIL AND REGULAR MAIL**

John L. Senning, Esq.
The Essex Law Group
16 Saybrook Road
Essex, CT 06426

   Re:  Mains v. Sea Ray Boats, Inc.

Dear Attorney Senning:

   This letter will respond to your Memorandum of June 1, 2006, to my colleague Dan Foster, in which you assert that Sea Ray has not complied with discovery served by your clients.

   First, you assert that Sea Ray has not "fully or truthfully responded to" certain Interrogatories, excerpts of which are set forth in your Memorandum. What you have failed to acknowledge, however, is that Sea Ray interposed objections to those Interrogatories. Subject to those objections, Sea Ray has provided responses. If it was your position that those objections were improper, you should have moved to compel a long time ago.

   Second, you assert that Sea Ray has not provided a complete response to Interrogatories 7, 9 and 10, each of which asks that Sea Ray identify persons who have knowledge of efforts by Sea Ray to repair problems with Sea Ray boats. Sea Ray's response to each of those Interrogatories incorporated by reference its objection and answer to Interrogatory 6, which stated in pertinent part:

     Sea Ray objects to interrogatories 6-11 on the grounds that they are overly broad and unduly burdensome. Sea Ray's records regarding consumer service have been kept on its CRMS system since approximately 1999. Information contained on this system may be searched via computer word searches. Searching records kept prior to the implementation of the CRMS system would involve a lengthy search through voluminous paper records, which are not organized according to specific complaints.

     . . . .

Day, Berry & Howard LLP

John L. Senning, Esq.
June 19, 2006
Page 2

Subject to and without waiving the above objection, Sea Ray has run computer word searches of consumer service records kept on its CRMS system to find the information requested by interrogatories 6-11. A list of persons (i.e. boat owners) identified as a result of these searches, along with corresponding years, models, H.I.N.'s, and complaints will be produced upon execution of a suitable protective order. To the extent Plaintiffs reasonably request additional information concerning any of these specific persons, Sea Ray will make a reasonable search of its records for the requested information.

(Obj. and Ans. to Pls.' Interrog. 6 (emphasis added).)

Subject to its objections, Sea Ray provided information responsive to Interrogatories 6 through 11, including Interrogatories 7, 9 and 10. As you are aware, following the execution of a protective order, Sea Ray did in fact provide a list of approximately 133 consumer complaints. In addition, while your Memorandum repeatedly underscores the fact that the Interrogatories requested information concerning incidents of "water ingestion," most of the complaints listed concerned "Engine/Water Ingestion." Because there are many possible causes of water ingestion, Sea Ray's response does not indicate that any of those other complaints arose under circumstances similar to those alleged by the Plaintiffs in the present case. Sea Ray's response does, however, demonstrate that Sea Ray has provided information responsive to the pertinent Interrogatories.

Third, you claim that Sea Ray has not provided a complete response to Interrogatory 12, which requests that Sea Ray identify certain "consumer complaints, law suits or arbitration proceedings" not already identified in response to Interrogatories 6 through 11. You have indicated that you were aware of other lawsuits in several other states, presumably relating to this same model boat and the same issues listed in Interrogatory 12. As you know, Sea Ray objected to Interrogatory 12 based on relevance to the extent that it requested information concerning other models. Subject to this objection, Sea Ray stated that "there have been no such law suits or arbitration proceedings brought against Sea Ray." Since receiving your June 1, 2006 Memorandum, Sea Ray has made an investigation to determine whether there have been any lawsuits filed since 2003 involving the Model 330DA concerning the "problems" listed in Interrogatory 12, and has determined that no such lawsuits have been filed making those allegations. Accordingly, Sea Ray does not believe that it needs to file any supplemental responses. It is possible that the lawsuits you claim to know about involve boats other than the 330DA. Also, there may have been a previous version of the 330DA, built in the late 80's or early 90's. The 330DA at issue was manufactured between circa 1995 and 2000.

Fourth, you assert that Sea Ray has not complied with Plaintiffs' Requests for Production. As we have previously advised you on a number of occasions, we have no record of having received any Requests for Production in this case before Monday, June 5, 2006, at which

## Day, Berry & Howard LLP

John L. Senning, Esq.
June 19, 2006
Page 3

time you sent an electronic copy of such Requests via e-mail. Specifically, we have no record of having previously received the Requests for Production that you claim were served on November 30, 2002.

Your Memorandum also does not state whether you claim to have ever received any response to any Requests for Production that were allegedly served on Sea Ray. We specifically requested that you provide us with this information in our earlier correspondence. We assume from your response that there was no response, which would be consistent with our records indicating that we did not receive any such Requests. If you do claim that you have received responses to any Requests for Production allegedly served on Sea Ray, I will once again ask that you please provide a copy of any such response to us at your earliest convenience.

Fifth, in a subsequent Memorandum dated June 5, 2006, you assert that you have not received "Rule 27 experts reports" from Sea Ray. To the extent that you assert that Sea Ray has failed to provide expert reports to which you are entitled, your position is contradicted by your statement that you received "copies of the survey report from Sea Ray's surveyors." The survey report to which you refer was signed by Sea Ray's expert, Gregory Davis, and sets forth all of the opinions that he intends to offer at trial. In addition, you were provided with the curriculum vitae of Mr. Davis. To the extent that you may claim that this disclosure was insufficient, you have not told us in what respect you claim that it is insufficient.

For the foregoing reasons, Sea Ray stands by its position that it has fully responded to all discovery requests served upon it.

Very truly yours,

James H. Rotondo

cc:    Daniel J. Foster (via e-mail)

# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PETER D. MAINS and LORI M. MAINS | : | CASE NO. 3:10cv2402 (AWT) |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| SEA RAY BOATS, INC. | : | |
| | : | |
| Defendant. | : | JULY 12, 2006 |

## DEFENDANT'S SUPPLEMENTAL DISCLOSURE OF EXPERT WITNESS

Defendant Sea Ray Division of Brunswick Corporation (improperly designated in the

Complaint as "Sea-Ray Boats, Inc."), having previously disclosed its expert witness on or about

October 19, 2004, hereby supplements its disclosure of the following expert, whom it expects to

call as a witness at trial:

> Gregory T. Davis
> Davis Consulting Group
> 1989 University Lane, Suite I
> Lisle, Illinois 60532

A copy of Mr. Davis' report dated October 15, 2004, which was previously provided to

Plaintiffs' counsel on or about October 19, 2004, is attached hereto as Exhibit A.

A copy of Mr. Davis' current curriculum vitae, a prior version of which was provided to

Plaintiffs' counsel on or about October 19, 2004, and which includes a list of publications

authored by him and a list of cases in which he has testified at trial or by deposition, is attached

hereto as Exhibit B.

A copy of correspondence signed by Mr. Davis, which sets forth the rates at which Mr.

Davis is to be compensated for services rendered in connection with this case, and to which is

attached copies of the two invoices setting forth the total amounts billed for Mr. Davis' services

to date, is attached hereto as Exhibit C.

DEFENDANT,
SEA RAY BOATS, INC.

By _____
James H. Rotondo (ct05173)
Daniel J. Foster (ct24975)
Day, Berry & Howard LLP
CityPlace I
Hartford, Connecticut 06103-3499
(860) 275-0100
(860) 275-0343 (fax)
Its Attorneys

## **CERTIFICATION**

THIS IS TO CERTIFY that, on this date, a copy of the foregoing was mailed by first class mail, postage prepaid, to:

John L. Senning, Esq.
The Essex Law Group
16 Saybrook Road
Essex, CT 06426

_____
James H. Rotondo

-2-

# EXHIBIT A



a division of Davis and Company, Ltd.

**MARINE TECHNICAL AND ENGINEERING SERVICES**
630-852-7944   630-852-7128 Fax     Website: www.daviscoltd.com
1989 University Lane, Suite I, Lisle, Illinois 60532 USA and Ft. Lauderdale, Florida
800-223-8816   800-852-7128 Fax     Email: dcg@daviscoltd.com

October 15, 2004

Deborah Russo
Day, Berry & Howard, LLP
City Place I
Hartford, CT 06103

Re: Mains v Sea Ray
Case #: 301 CV 2402 (AWT)
Project #: 35957-04

Dear Ms. Russo:

This is to certify that Mr. Gregory T. Davis and Jerry M. Starczowski, **D**avis **C**onsulting **G**roup, Lisle, Illinois, did attend at the request of Deborah Russo, Day, Berry & Howard, LLP, inspection for and on behalf of that firm and whom it may concern.

The inspection was held at Pilots Point Marine, Westbrook, CT under the date of July 14, 2004 and was held to be without prejudice to the rights of any party concerned.

## NAMES OF PRINCIPLES IN ATTENDANCE:

Gregory T. Davis, **D**avis **C**onsulting **G**roup

Jerry M. Starczowski, **D**avis **C**onsulting **G**roup

Deborah Russo, Day, Berry & Howard, LLP

Peter Mains and his counsel

## GENERAL INFORMATION:

The subject vessel is a replacement for a previous vessel that Mr. Mains was not satisfied with. The subject vessel was delivered in May of 1998 and, shortly after receipt of the subject, Mr. Mains found issues and notified the selling dealer. The subject was returned

Page 1 of 6

October 15, 2004                                    Re: Mains v Sea Ray
File Number: 35957-04                               Case #: 301 CV 2402 (AWT)

to the factory for repairs over the winter season to address these issues. While at the factory over the winter/spring of 2000/2001, the exhaust system mufflers were changed to water separating lift type mufflers (consistent with the 2001 and forward models). The boat was then returned. Upon return, Mr. Mains found issues with the vessel and it was agreed the vessel could be brought to Pilots Point Marine to address these additional issues. The boat was transported under her own power to Pilots Point and, upon arrival, the engines fresh water flushed by Mr. Mains (June 9, 2001). On June 10, 2001, it was discovered the engines would not start. It was later determined the engines were hydro-locked. Mr. Mains discontinued use of the vessel at this time.

## PURPOSE:

To complete an inspection of the subject vessel and render an opinion as to her present condition and value, an opinion as to the cause of damage(s) found, and an opinion as to the repair cost(s).

## INSPECTION:

The subject vessel was inspected at Pilots Point Marine, Westbrook, CT on July 14, 2004. The vessel was found in outside storage resting on jack stands. Mr. Mains removed full canvas cover from the boat before allowing us to board (plates 1-3). The vessel was identified as a Sea Ray Sundancer 330, 1998, HIN: SERT3801C898, USCG Doc #: 1067637, powered by twin Mercruiser Horizon 7.4 Liter gasoline inboard engines S/N: OL007684 and OL007676.

The exterior of the vessel was inspected visually, sounded, and with a GRP 33 moisture meter. The visual inspection of the bottom indicated there to be at least two coatings of two different types of bottom paint. The original coating was a smooth finish and the second a textured coating. The soundings of the bottom produced no abnormal retorts. The moisture meter was "pegged" at any point on the bottom indicating the metal in the bottom paint was affecting the readings. Therefore, the bottom was not tested with the moisture meter. The trim tab planes and trim cylinders were painted with the bottom paint and a green patina was found in these areas. A sample of the green patina was secured and placed into a boron silicate trace clean Teflon seal vial (plate 24). A sample of the bottom paint coating was secured and placed into a boron silicate trace clean vial (plate 25). We found impact damage to the bottom of the boat on the starboard side forward, midships, and on the exhaust cowl in line fore and aft (plates 14-23).

The topsides were inspected visually, sounded and tested with a GRP 33 moisture meter. The visual inspection indicated a color differential between the arch, vent cowl, and trim piece on the engine room vents (plates 5-9). The topsides were visually in excellent condition. The soundings returned no abnormal retorts. The moisture meter readings were in the "dry" range.

October 15, 2004                                    Re: Mains v Sea Ray
File Number: 35957-04                               Case #: 301 CV 2402 (AWT)

The transom was inspected visually, sounded and tested with a GRP 33 moisture meter. The visual inspection found it to be in overall excellent condition. There is damage to the gelcoat above the port stern ring, damage to the starboard stern ring, a dent in the rub rail in this area and a crack in the deck mold (plate 10). The inside (back) of the stern ring was inspected and it was found to exhibit compression damage to at the top bolt (plate 11). The transom was sounded with no abnormal retorts. The moisture meter readings were in the "dry" range. The swim platform was inspected in the same manner finding "moist" readings on the platform support frames and "moist" readings on the surface in way of the supports underneath (plates 12-13).

The deck was inspected visually, sounded and tested with a GRP 33 moisture meter. The visual inspection found it to be in excellent condition. The soundings indicated dull retorts along the windshield to starboard, the fore deck, and the deckhouse. Not one of these three areas exceeded 1 foot square. The moisture meter readings were "dry" except in two locations. The starboard windshield wiper area and previous drill hole (plates 26-27) metered "dry". The port windshield wiper area metered "moist/wet" in the area outlined with tape (plate 28). The fore deck metered "moist/wet" near the deck cleat and near the anchor windless (plates 31-32). The areas metering "moist/wet" on the deck are .7 (seven tenths) square foot of an approximate 130 square foot deck as illustrated in (plate34).

The fore deck anchor windlass was mechanically damaged with a part missing (brake) (plate 33).

The cockpit was inspected finding it in excellent visual condition (plates 35, 36, 39 & 40). The cockpit was sounded with no abnormal retorts and GRP 33 moisture meter readings were in the 'dry" range.

The engine hour meter readings were recorded as 184.2 starboard and 178.3 port (plates 37-38).

The interior was inspected visually and the bilge spaces tested with a GRP 33 moisture meter. The interior was found with all cushions, and galley appliances removed. The interior presented in excellent condition visually (plates 41-46, 50-52). The cabin bilge space tested "dry" on the meter. This area showed linear and transverse cracking (plates 47-49) in the gelcoat.

The engine room was inspected visually. We found a loose hose clip fitting with abrasion damage to the gelcoat nearby (plate 53). The area around the depth finder transducer was poorly gelcoat finished (plate 54). We found gelcoat brush strokes in way of the bilge pump float switches (plate 55).

The engines and exhaust systems were found disassembled (plate 56). The exhaust system in place was noted as the water separating lift type. The canister locations are over the stringers covering the shaft struts and forward of the rudder stuffing boxes. Mr. Mains reported this exhaust system prevented his access to the trim tab oil reservoirs and rudder stuffing boxes in relationship to the previous mufflers. The engine blocks were inspected in

October 15, 2004                           Re: Mains v Sea Ray
File Number: 35957-04                      Case #: 301 CV 2402 (AWT)

the vessel and the removed engine parts were inspected at the Mains residence (plates 57-67). Mr. Mains reported a videotape was available of the disassembly.

The piston crowns and cylinder walls showed the introduction of an oil substance post disassembly as it was not noted during the later viewing of the video taped disassembly. The videotape did show water on at least one piston crown in the starboard engine, which would suggest no restarting of the engine as is done during preservation (de-watering). Further inspection of the engines revealed cylinder wall scoring and water related rust. Watermarks were noted on several of the cylinders indicating that the pistons sat against the cylinder walls for a period of time with water trapped between.

Inspection of the cylinder heads, exhaust manifolds and risers removed during engine disassembly revealed dry rust and scale in the exhaust ports and passages, much the same seen in the disassembly video, which would indicate the lack of fogging oil/rust preservative use as is normally done during preservation (de-watering) of the engines. The water related rust and scale found in the exhaust ports and passages is consistent with water ingestion during flushing of the engines if the exhaust manifold drain plugs were not removed and/or the engines were not running.

During the viewing of the videotape, we did find that the date stamp on the bottom of the screen progressed forward several times. The surroundings and the individuals' appearances indicate the entire procedure took place at the same time. The first date stamp reads 8/21/03, then to 8/22, then 8/25, and finally 8/26. The amount of time needed to disassemble the two engines using the basic hand tools evident in the tape should have been a total of two to three consecutive hours. The videotape of the engine disassembly is condensed to 26 minutes indicating possible editing.


## OPINIONS:

The vessel is in excellent (Bristol) condition, except for the current engine condition of being torn down. Once the engines are addressed, as suggested, the package is as stated. The recorded engine hours are consistent with an average of 50 hours per season (see the Comps on the worksheet attached) with three seasons of use, May 1998-June 2001. Our opinion as to the market value of this vessel, repaired, is $127,500.00 (see worksheet attached).

The color differential on the arch, vents, and slats on the engine exhaust vents in comparison to the hull gelcoat color is a function of the effects of normal weathering. The gelcoat and the paint weather differently. This condition is consistent with similar boats of this age.

The stern ring damage and cracking of the deck mold is consistent with damage from lashing straps used in the truck transit.

The "moist/wet" readings on the swim platform frames do not indicate a functional problem to the platform and are consistent with readings found on similar boats of this age.

October 15, 2004                                      Re: Mains v Sea Ray
File Number: 35957-04                                 Case #: 301 CV 2402 (AWT)

The damage on the starboard hull bottom is related to striking a submerged object.

The bottom paint needs to be removed and replaced. Bottom paint by design needs periodic renewal. The effect of chlorinated water on the paint is not demonstrated. The test tank at the plant is chlorinated. The factory boats are bottom painted prior to immersion in the tank with no adverse effects.

The areas of the deck reading "moist/wet" are .005% (one five thousandth percent) of the total square foot area of the deck. The areas of dull retorts on the deck are .02% (two one hundredth percent) of the total area of the deck. These results are not significant singularly or structurally and are consistent with results found on similar boats of this age.

The anchor windlass damage is a result of improper operation or defect.

The gelcoat cracking in the cabin bilge is related to a thick coating. Gelcoat is brittle. It presents no structural problem and is commonly found in similar boats of this age.

The engine room bilge space gelcoat abrasion and area near the transducer is a result of an improperly completed previous repair.

The engine room bilge has brush strokes in the gelcoat at the float switch, which is a result of an improperly completed prior repair.

The installation of the water separating lift mufflers has reduced the accessibility to the trim tab oil reservoirs and the rudder stuffing boxes in relationship to the previous muffler system. The current installation is consistent with this model since 2001 production.

The engines were not preserved (de-watered) immediately after discovery of the hydro-lock event. If they had been properly de-watered, they would be in serviceable condition.

In review of the videotape and the Mercury Marine flushing instructions, water ingestion during engine flushing is probable if the Mercruiser flushing instructions for engines with water lift type mufflers is not followed. The flushing procedure for this type of muffler system is not consistent with the procedure for the previously installed system.

The fiberglass/hull repairs noted in this report can be done for an estimated amount of $4,905.00 (includes the SSO damage #2 of $1,200.00). We have presented two options for the mechanical repairs: 1) to rebuild $11,495.34 or 2) to replace with OEM remanufactured engines for $12,424.84.

## ENCLOSURES:

1. Photographs (67 Plates)
2. Surveyors Worksheet

October 15, 2004                                    Re: Mains v Sea Ray
File Number: 35957-04                               Case #: 301 CV 2402 (AWT)

    This report is presented and was conducted without prejudice to the rights of any party, policy of insurance or provisions of law concerned.  Davis Consulting Group, Ltd. and the attending consultant hereby certify that they have no present or contemplated future interest in the subject of this report or any other interest, which might prevent a fair and unbiased finding.  This report is the best expression of the consultant's findings and opinions and the consultant/s reserves the right to amend or extend this report upon receipt of additional information.


Sincerely,
Davis Consulting Group


Gregory T. Davis, NAMS-CMS
Marine Surveyor (reporting)


Jerry M. Starczowski, SAMS-SA
Marine Surveyor/ABYC Gasoline Engines Certified Technician

Dated: October 15, 2004
At:   Lisle, Illinois

File Number: 35957-04               Re: Mains v Sea Ray
Surveyors Worksheet           Case #: 301 CV 2402 (AWT)

1998 Sea Ray Sundancer, HIN: SERT3801C898, USCG Doc #: 1067637 with twin Mercruiser 7.4 liter gas inboards, Port S/N: OL007684, Starboard S/N: OL007676, with A/C, generator, canvas.

VALUE:

BUC Used Boat Price Guide, Vol. I, 86th Ed.: $97,800-107,500 base in area; Bristol condition adj. + 25% = $122,250-134,375.00

NADA Used Boat Guide, Sept-Dec 2004: Avg. retail: $99,400.00 + optional equipment: $105,900.00

ABOS, Vol. I, 2005: Avg. retail: $99,500.00 + condition adj.: $124,375.00

Comps: Market listings, asking prices

| | | | | | | |
|---|---|---|---|---|---|---|
| Sea Ray | 330 | 1997 | IB | 400 hours | $99,900.00 | NY |
| Sea Ray | 330 | 1998 | IB | 300 hours | $99,000.00 | RI |
| Sea Ray | 330 | 1998 | IB | 320 hours | $99,000.00 | RI |
| Sea Ray | 330 | 1997 | IB | 250 hours | $105,000.00 | NY |

Comps: Sold Boats reported selling prices

| | | | | | | |
|---|---|---|---|---|---|---|
| Sea Ray | 330 | 1998 | IB | 190 hours | $125,000.00 | MO 4/03 |
| Sea Ray | 330 | 1998 | IB | N/A | $129,000.00 | FL 6/04 |
| Sea Ray | 330 | 1998 | IB | N/A | $118,000.00 | CT 9/04 |

Market Value Opinion:
$125,000.00-Low    $130,000.00-High    $127,500.00-Median Value
------------------------------------------------------------
SURVEYORS WORKSHEET
------------------------------------------------------------

| Description | Labor | Material |
|---|---|---|
| Fiberglass/Hull repairs: | | |
| | | |
| 1. Transport damage to Stbd transom lift ring and Crack in deck mold (plate 10) | | |
| R&Rpl lift ring | 2.0 | $15.00 |
| R&R rail, grind damage area, rebuild, fair, gel, buff | 12.0 | $180.00 |
| Gelcoat cracks deck mold above Port stern ring | 6.0 | $90.00 |
| | | |
| 2. SSO damage to the Stbd hull bottom, grind, fill, fair FRP 3 places. Fill gouge in exhaust cowl. Spot bottom paint (plates 14-23) | 16.0 | $240.00 |
| | | |
| 3. R&Rpl anchor windlass due to broken brake (plates 32-33) | 2.0 | $1,500.00 |

File Number: 35957-04                          Re: Mains v Sea Ray
Surveyors Worksheet                            Case #: 301 CV 2402 (AWT)

4. Grind gel cracks in cabin bilge
and re-spray due to thick gel coating
cracking  (plates 47-49)                 4.0                 $60.00

5. Sand brush strokes in gel engine
bilge at bilge pump float switch,
hose hanger, transducer and re-spray
due to poor previous repair
(plates 53-55)                           4.0                 $60.00

        Total FRP/Hull repairs          46.0              $2,145.00

          Labor: 46 X $60.00   =    $2,760.00
          Material:            =    $2,145.00

          Total:                    $4,905.00

Mechanical repairs:

Engines not de-watered properly
after hydro-lock due to improper
fresh water flushing (plates 56-67)

Two repair options presented:

Option 1 — Rebuilding of current engines

R&R both engines                   $1,530.00
Disassemble, machine, clean,
re-assemble                        $3,400.00
Pistons 16X$203.30                                  $3,252.80
Piston ring set 16X$68.30                           $1,092.80
Main bearing set                                      $126.60
Cam bearings set                                       $83.40
Rod bearing sets 16X$9.85                             $157.60
Expansion plug set                                     $64.80
Gasket sets                                         $1,089.80
Spark plugs 16X$2.95                                   $47.20
Oil filter                                             $14.06
Oil 12X$3.42                                           $41.04
Fuel filter                                            $15.44
Coolant                                                $39.80
Misc. sealants and supplies                           $200.00T

Test run and adjust                 $340.00

        Labor:                     $5,270.00

        Material:                  $6,225.34

          Total:                  $11,495.34

File Number: 35957-04                          Re: Mains v Sea Ray
Surveyors Worksheet                            Case #: 301 CV 2402 (AWT)


Option 2 — Replacement of engines with OEM remanufactured
replacements

| | | |
|---|---|---|
| R&R both engines | $1,530.00 | |
| Undress and redress engines | $1,105.00 | |
| Remanufacture engines | | $9,092.30 |
| Spark plugs 16X$2.95 | | $47.20 |
| Oil filter | | $14.06 |
| Oil 12X$3.42 | | $41.04 |
| Fuel filter | | $15.44 |
| Coolant | | $39.80 |
| Misc. sealants and supplies | | $200.00 |
| Test run and adjust | $340.00 | |

      Labor:              $2,975.00

  Material:              $9,449.84

     Total:              $12,424.84


                Davis Consulting Group



                Jerry M. Starczowski, SAMS-SA
                Marine Surveyor/ABYC Gasoline Engines
                Certified Technician



                Gregory T. Davis, NAMS-CMS
                Marine Surveyor

Dated: October 15, 2004
At: Lisle, Illinois

NOTES: Mechanical labor was calculated at $85.00/hour. Valuation
and FRP/Hull estimate prepared by Davis.  Mechanical estimate
prepared by Starczowski.


                      (Page 3 of 3)