# EXHIBIT G

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PETER D. MAINS and            :    CASE NO. 301 CV 2402 (AWT)
LORI M. MAINS                   :
                                    :
             Plaintiffs,        :
vs.                                 :
                                    :
SEA RAY BOATS, INC.            :
                                    :
             Defendant.        :    DECEMBER 20, 2002

**PLAINTIFFS' RESPONSES TO DEFENDANT'S**
**FIRST SET OF INTERROGATORIES DIRECTED**
**TO PLAINTIFFS PETER D. MAINS AND LORI M. MAINS**

The Plaintiffs in the above entitled action hereby respond to the Defendants' First Set of

Interrogatories as follows:

1.     Please state your full names, including maiden and/or married names, aliases, or

nicknames; dates of birth; home and business addresses for the past 10 years; social security

numbers; and driver's license numbers.

RESPONSE:

      Peter D. Mains
      5 Old Town Road
      Avon, CT 06001
      DOB: 090454
      Soc. Sec. 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
      Drivers Lic. No. 212631411

Lori M. Mains
5 Old Town Road
Avon, CT 06001
DOB: 120657
Soc. Sec. 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
Drivers Lic. No. 1123162579

    2.      Identify all persons, other than yourself, who have any knowledge or information concerning the subject matter of the Complaint and, for each person identified, describe the nature and subject matter of such information or knowledge.

RESPONSE:

a.    <u>Al Chianese</u>, selling agent, Surfside 3 Marina, Norwalk, CT, numerous phone conversations and correspondences relative to the extensive problems with the 1998 vessel. On delivery date we granted his request for an In-Service checklist and listed deficiencies on the list. As problems worsened he required us to deal with Sea Ray directly. He also received copy of our attorney's letter dated July 18, 2001 trying to reach settlement.

b.    <u>Dean Beckman</u>, service manager and chief mechanic of Surfside 3 Marina, Norwalk, CT. We had numerous conversations with him while he was servicing numerous problems on the vessel. He was also copied in on some correspondence. On one occasion while servicing this vessel he said, "we've been replacing a lot of exhaust systems."

c.    <u>David Marlow</u>, Director of Customer Service, Sea Ray, Knoxville, TN. Mr. Marlow became aware of problems and seemed to be the decision maker regarding the buy-back of the 1996 vessel and subsequent replacement with this 1998 vessel. He also received numerous phone calls and correspondences on all of the extensive problems with the 1998 vessel.

d.    <u>Sean Stubblefield</u>, Customer Service, Sea Ray, Knoxville, TN. Mr. Stubblefield was made aware of virtually every problem via phone calls, correspondences. In one conversation he stated, "there was a run of this model that was lacking proper core material which lead to cockpit floor weakness, cracking and related problems".

e.    <u>David Wade</u>, Customer Service, Sea Ray, Knoxville, TN. Mr. Wade was made aware of every problem via phone calls and correspondence. He was apparently responsible for arranging

repair trips by Sea Ray personnel and subcontractors to CT and orchestrated repairs while boat was at the factory.  In March, 2001, prior to the boat being returned to us from the factory, he told Peter Mains in a phone conversation "We decided to remove your current exhaust system and installed a 'retrofit' exhaust system, a water lift system, which is the system we are now installing on our boats."

f.    <u>Greg Wilson</u>, traveling service rep for Sea Ray, Knoxville, TN.  Mr. Wilson came to Connecticut a number of times to service problems on the vessel.  He also concluded that initial attempt at repair of deficient cockpit floor and surrounding areas by Atlantic fiberglass Repair, subcontractors for Sea Ray, was substandard.  He addressed chronic exhaust resonance complaint by replacing both relief port baffles with a new double baffle design and also installed 4 Mercruiser reversion baffles (exhaust resonator kit), but these did not stop loud, intermittent exhaust resonance noise problem.

Also, Mr. Wilson also deemed ineffective the two previous attempts at repair of the water absorption problem in the bilge core pad and stringer area after he took core samples.  At that point, Mr. Wilson said the boat needed to go back to the factory in Tennessee for repairs.  Mr. Wilson was also involved singularly and jointly in many other items needing repair or replacement.

g.    <u>Tim Mills</u>, owner of Atlantic Fiberglass Repair, a subcontractor of Sea Ray and two of his employees, Dan and Whitey, came to CT twice to attempt repairs to core voids, cracked components, windshield replacement, etc. outlined in numerous correspondences.

h.    <u>Todd Stooksbury</u>, Customer Service, Sea Ray, Knoxville, TN.  Mr. Stooksbury was copied in on numerous correspondences and involved in several phone conversations regarding extensive deficiencies and problems with the vessel.

i.    <u>Nancy Lester</u>, VP of Customer Service, Sea Ray, Knoxville, TN.  Ms. Lester received copy of our entire file of correspondences on numerous problems with the vessel.  Also she was involved in several phone conversations.

j.    <u>Blake Moore</u>, Sea Ray, Knoxville, TN.  Mr. Moore was copied in on some correspondences regarding problems with the vessel.

k.    <u>Attorney Allen McDonald</u>, Sea Ray, Knoxville, TN.  Attorney McDonald received letters from our attorney, John Senning outlining issues and trying to reach settlement.

l.    Robert Parmentier, Sr. VP of Operations, Sea Ray, Knoxville, TN.  Attorney Parmentier received copy of our attorney's letter dated July 18, 2001 outlining issues and trying to reach settlement.

m.    Mr. Marchall Smith, Legal Counsel, Brunswick Corporation.  Attorney Smith received copy of our attorney's letter dated July 18, 2001 outlining issues and trying to reach settlement

n.    Cindy Frame, Customer Service, Mercruiser.  Ms. Frame was involved in numerous phone conversations on or about June 25 – July 11, 2001.  She was faxed a copy of Brewer Pilot's Point mechanical report stating engines are ruined.  She reviewed and concurred.  Ms. Frame also received copies of conflicting engine flushing instructions and said Sea Ray was responsible for hydro locked engines because they did not give us new instructions for the retrofitted water lift exhaust system installed by Sea Ray at the factory.  Ms. Frame also stated that our original instructions that came with the boat for flushing motors are incorrect.  In one conversation she said she was going to call David Marlow to "give him a pinch" and if necessary she would go to Original Equipment Manufacturer Service Group and get permission "to take out the big hammer".  We asked her if she would take her family out in this boat with these ruined engines and she replied "no I would not".

o.    Rocky, Customer Service at Mercruiser.  We were involved in numerous phone calls with him providing him with compression test and leak down test on our hydro locked motors.  During one conversation he said "Mercruiser has been telling Sea Ray to get rid of their patented underwater exhaust system for years".

p.    Rhonda, Don Smith, Tom, of Mercruiser, involved in phone conversations, referred us to Cindy Frame.

q.    Jay Bradley, of Mercruiser.  Mr. Bradley was faxed a copy of a water ingestion checklist by Mark Verrone of Bassett Boat Co. in Westbrook, CT.

r.    Dan Huck, Mercruiser.  Extended Warranty Department:  Cindy Frame of Mercruiser called him to ask for extension on warranty for the November 2000 through April 2001 period that the boat was at the factory for repairs and his department replied "we do not extend warranties".  He said this is a Sea Ray problem.  Ms. Frame told us her department, on a 1-year warranty situation, would extend the warranty while issues were being serviced at the factory.

-4-

s.    Scott and Elliott Davidson, owners of Midway Marina, Haddam, CT, and Ellen, office manager, where vessel was stored, knew of subcontractors for Sea Ray coming to CT to do repairs on vessel at numerous times, at this location.  The Davidson brothers verified new damages on vessel's return from factory in April 2001 and spoke with Sea Ray customer service regarding same.  The delivery truck driver also verified new damages to Sea Ray via phone and stated that Mr. Mains was accurate with his descriptions.

t.    Mike Sperzle and George Sperzle, owners of Essex Marine, Inc., knew this vessel well, having provided winterization service and were fully aware of all its major and minor problems. Upon re-delivery of vessel from factory in April 2001 they became aware of damages incurred in Tennessee and while being shipped.   They performed some temporary repairs upon re-delivery.

u.    Tom Wicander, General Manager, Brewer Pilot's Point Marina, East Yard, Westbrook, CT, certified Mercruiser technician (he and his staff Dave, Dave and Wayne, provide all new Sea Ray boat prep and repairs for Bassett Boat Co, Westbrook, CT, a Sea Ray dealer).  Brewer Pilot's Point has done numerous exhaust replacements and/or engine replacements or repair for this dealership as well as others on Sea Ray's with similar engine failures to ours.  Mr. Wicander performed  compression, leak down and monometer tests on our engines and stated that the damage caused to our engines was due to improper design. Mr. Wicander was Sea Ray's choice to provide damage repair that occurred at the Sea Ray factory and during transit.  He subsequently performed professional engine and exhaust component analysis.  A repair estimate of $19,000+ for damages by Sea Ray and its transporter was also prepared by Mr. Wicander.

v.    Betsy, office assistant, Brewer Pilot's Point Marina, privy to problems and numerous phone conversations with Sea Ray.

w.    Reaves Potts, Brewer's Pilot's Point Marina, Inc. shared conversations with us.

x.    Captain David Poutney, Brewer's Pilot's Point South Yard, assisted us in attempts to start our engines on June 9, 2001.

y.    Mark Verrone, Customer Service, Bassett Boat Co., a Sea Ray dealer in Westbrook, CT, was aware of all problems through Tom Wicander and us and made numerous, unsuccessful attempts at getting a Mercruiser regional representative to assess ruined engines and retrofitted exhaust installation.

z.    Tom Greaves, marine surveyor, surveyed our vessel after its return from the factory and looked at all the problems.

aa.    Scott Masse, owner of Oak Leaf Marina, Old Saybrook, CT and President of Connecticut Marine Trades Association. Mr. Masse reviewed the results of the compression and leak down tests and stated "Your engines have been ingesting water since first day of ownership".

bb.    Scott Pesonen, Chief Engineer at General Motors Power Train. Mr. Pesonen was provided with our engines' and vessel's specifications. He performed a lengthy calculation and determined that our engines were destroyed, only reaching 8-9% of their life expectancy of 1600-1800 hours.

cc.    Ross Szarenski, Marine Engine Sales, General Motors Power Train, provided us with engine testing documentation.

dd.    Caroline Ajootian, Assistant Vice President, Director, Consumer Protection Bureau, Boat Owners Association of the U.S. We discussed our engine/exhaust system issues with Ms. Ajootian. She provided us with two articles referencing exhaust resonance noise problems and a resonator kit intended to remedy such problems. This kit was not installed on our vessel until Greg Wilson of Sea Ray came to CT. Therefore, our boat was ingesting water from the first day of ownership.

ee.    Joseph Civitollo, owner of two 1998 380 Sundancers. Mr. Civitollo shared conversations with us while at Bassett Boat this summer about his own personal experience with engine and exhaust replacements due to ruined engines and water ingestion. The replacements were paid for by Sea Ray, even though his engines were out of warranty. This involved four engine replacements, a "collector" style exhaust system being changed to a "water lift" style system, four (4) head replacements as well as exhaust manifold and risers being replaced on his boat.

ff.    Paul L'Annunziata, owner of a Sea Ray Sundancer. Mr. L'Annunziata shared conversations and his own personal situation about engine replacements due to water ingestion. The replacement work was authorized by Sea Ray and performed by Tom Wicander at Brewer Pilots Point Marina.

gg.    Greg Machinski, owner of a Sea Ray Sundancer, shared conversations and his own personal situation about engine replacements due to water ingestion. The replacement work was authorized by Sea Ray and performed by Brewer Pilots Point Marina.

hh.    <u>John Novicki and Janice Novicki,</u> owners of a 380 Sea Ray Sundancer.  Mr. and Mrs. Novicki had an engine replaced in 2002 and exhaust system changed to a "water lift exhaust system".

ii.    <u>Bobbie Joe Reale,</u> a boating friend, know of our problems from being on the boat.

jj.    <u>Mark and Joyce Marino,</u> boating friends, witnessed and questioned loud exhaust resonance noise while on an outing with us on our boat and also know of our problems through witnessing the repair process

3.    Identify every defect, "item requiring repair," and/or problem with the condition of the 1998 33' Sea Ray Model 330DA Power Boat, Hull Identification Number SERT3801C898 described in the Complaint ("the subject boat"), stating for each:

(a)    the date on which it was first discovered or determined to be in need of repair;

(b)    whether it was brought to the attention of Sea Ray (or any other person or entity that you allege was acting on behalf of Sea Ray);

(c)    when and how it was brought to the attention of Sea Ray (or any other person or entity that you allege was acting on behalf of Sea Ray), including the identity of the person to whom it was reported;

(d)    whether it was resolved and/or repaired;

(e)    when and how it was resolved and/or repaired, including the identity of the person or entity who performed such repairs; and

(f)    an itemized list of all costs and/or expenses incurred by you as a result of its resolution and/or repair.

RESPONSE:

A. Item requiring repair: Loud exhaust resonance noise/need for replacement of boat's two engines due to water ingestion.
a.    Reported in many phone conversations and in writing in summer 1998.
b.    Yes, brought to attention of Surfside and Sea Ray.

    c.       Verbally and in written correspondence dated 9/1/98 to Al Chianese; Sea Ray's Sean Stubblefield 9/1/98; Blake Moore 9/1/98; verbally and in correspondence to David Wade.

    d.       No.

    e.       Greg Wilson of Sea Ray came to CT to install exhaust baffles and exhaust resonator kits, but this did not stop noise. We have information that this loud, intermittent exhaust "tuning effect" is a sound pulse resonance in the exhaust system that enables water to travel back up and over the riser and into the engine; Sea Ray installed "retrofit" water lift exhaust system while the boat was at the factory for repairs; Sea Ray did not provide us with new flushing instructions for a "water lift system". As a result, the engines became hydro locked and are ruined and need to be replaced.

    f.       It will cost approx. $30,000 to replace our engines and the manufacture of these particular power plants has ceased.

B. Item requiring repair: Flexing, soft cockpit floor, causing helm seat to crack and creak, companionway door to sometimes be inoperable; cockpit refrigerator door to not seal correctly; engine hatch to not open.

    a.       5/21/98, delivery date.

    b.       Yes, brought to attention of Al Chianese.

    c.       On delivery date of 5/21/98, Al Chianese wrote it in on "In Service Checklist"; he said this needed to be brought to attention of Sea Ray; via fax to Al Chianese dated 5/27/98, 6/16/98; 10/5/98; to Dean Beckman via correspondence dated 10/20/99, 5/10/01; To Sea Ray's attention via fax to Sean Stubblefield dated 10/5/98; to David Wade via faxes dated 12/9/98, 10/22/99, 2/12/01, 6/6/01; carbon copied David Marlow on fax dated 10/20/99; Blake Moore 10/5/98; and Nancy Lester received a copy of all correspondences referenced above.

    d.       No.

    e.       Numerous poor attempts at repair by traveling subs of Sea Ray starting 10/98; attempted repairs at factory in Tennessee which includes non-stock supports, patched cockpit floor that is an eyesore, lumpy aft cabin overhead with non-stock caulking throughout.

    f.       Not known at this time.

C. Item requiring repair: Core material in bilge area saturated with water because of lack of gel coat coverage on coring and fiberglass chop.

    a.       Verbally in phone conversations in October 1998 and in writing 12/9/98.

    b.       Yes, brought to the attention of Surfside 3 and Sea Ray.

     c.      Reported verbally to David Wade in October 1998 and in writing dated 122/9/98; David Marlow copied in on correspondence 12/9/98; Dean Beckman 10/20/99.

     d.      No.

     e.      Poor attempt at spreading caulk over area by Tim Mills, Atlantic Fiberglass Repair in October 1998; unacceptable repairs were done at factory in early 2001, very visible repair work indicates a problem area.

     f.      Not known at this time.

D. Item requiring repair: Leaking windshield.

     a.      5/98

     b.      Yes.

     c.      Reported to Al Chianese and Sean Stubblefield, Blake Moore, David Wade, David Marlow via faxes dated 5/27/98, 6/16/98, 9/1/98, 10/5/98,12/9/98.

     d.      Yes/No.

     e.      Subcontractors of Sea Ray came to CT to install new windshield and patched gel coat cracks on deck from improperly installed windshield are visible.

     f.      Not known at this time.

E. Items requiring repair: Brewer's Pilot's Point Repair Estimate dated September 10, 2001.

     a.      Some items on this estimate were items to be taken care of while vessel was at the factory; most items were for new damages incurred while at the factory and in transit.  These were discovered April 20, 2001 when vessel was returned.

     b.      Yes

     c.      Via  phone calls on or about April 20, 2001 and in faxes dated 4/30/01 and 6/6/01 to Sea Ray's David Marlow, Todd Stooksbury, David Wade, Nancy Lester via fax dated 5/15/01 and 6/6/01; Dean Beckman of Surfside 3 received copy of fax  on 4/30/01;  photos to David Wade on May 1, 2001.

     d.      No.

     e.      Repairs were scheduled to be performed by Brewer Pilots Point Marine, East Yard.

     f.      Total cost not known at this time.  Estimate of $19,000+ did not include many items to be billed on a time and materials basis.

F. The above referenced items represent the major problems with the vessel.  There are numerous additional items which have been identified and made known to Sea Ray through various correspondence to them.  There may be additional deficiencies with the structural and/or mechanical components of the vessel which have yet to be identified.

4.    Identify every obligation or duty you claim Sea Ray breached with respect to you or the subject boat, along with the specific basis for the existence each obligation or duty. If any such obligation or duty is based on a document, identify that document. If any such obligation or duty is based on representations made by a person, identify that person.

RESPONSE:

Sea Ray breached its duty to provide the Plaintiffs with a seaworthy vessel in a merchantable condition fit for the purpose its use was intended. Sea Ray breached its duty to provide the Plaintiffs with a vessel free of material defects and deficiencies. Sea Ray breached its duty to disclose to the Plaintiffs material defects and deficiencies in the vessel which would effect the Plaintiffs' reasonable use. Sea Ray breached its duty to use reasonable care with respect to its taking control and custody of the vessel and the undertaking of attempted repairs. Sea Ray breached its duty to exercise good faith and fair dealing with the Plaintiffs as consumers and to disclose defects and deficiencies in the vessel of which it had or should have had knowledge and which would affect the Plaintiffs' reasonable use and enjoyment.

The specific basis for the existence of such duty arises from, inter alia, the fact that the Defendant Sea Ray, as the designer and manufacturer of the product, had a duty to all consumer purchasers, including the Plaintiffs as such, to produce and sell a seaworthy product, free of material defects and deficiencies and fit for the purposes intended. The Defendants own materials, brochures and advertising expressly represent assurances to consumers that it has

-10-

"...the knowledge, talent, infrastructure, resources, design and engineering capabilities, and dealer organization to insure an outstanding ownership experience."

5.      For each obligation or duty identified in response to the preceding interrogatory, please identify each and every occasion when you claim that obligation or duty was breached by Sea Ray.

RESPONSE:

See response to Interrogatories 2 and 3 above which summarize the course of dealings between the Plaintiffs and the Defendant and its agents, etc.

6.      Identify every express representation and/or warranty that you claim was breached by Sea Ray, as alleged in paragraph 60(i) of Count I of the Complaint.  If any such representation or duty is contained in a document, identify that document.  If any such obligation or duty is based on representations made by a person, identify that person.

RESPONSE:  See responses to Interrogatories 2 and 3

7.      Do you claim that Surfside 3 Marina in Norwalk, Connecticut ("Surfside 3"), was an agent of Sea Ray or that it was acting with the apparent authority of Sea Ray?  If so, identify all facts and/or evidence supporting this claim.

RESPONSE:  Objection:

This interrogatory seeks a legal conclusion which is beyond the scope of a permitted Interrogatory.

-11-

However, without waiving said objection and without prejudice to the Plaintiffs revising their response at a later date, the Plaintiffs contend that Sea Ray acted as a principal placing Surfside 3 as its agent in dealing with customers on its behalf. The conduct of Surfside 3's Al Chianese, as described elsewhere in this response to Interrogatories, indicates clearly that he held himself out and was acting with apparent authority on behalf of Sea Ray itself. The conduct of Sea Ray's David Marlow, who was in direct contact with the Plaintiffs and Al Chianese as well as other Sea Ray personnel affirmed and ratified the conduct and representations made by Surfside 3 personnel.

8.    Identify every express assurance and/or representation made by Sea Ray's personnel and/or Surfside 3, which you claim induced you to accept delivery of the subject boat in 1998, as alleged in paragraph 60 of Count III of the Complaint. For each, identify the person who made the assurance and/or representation, the document it is contained in, and describe how you relied on it.

RESPONSE:

A.    Al Chianese, General Manager of Surfside 3, Norwalk, CT, informed us that he had been assured by Sea Ray personnel that the new, replacement 1998 Sundancer's production would be watched over with a fine toothed comb because they realized that the 1996 Sundancer that they took back should never have left the factory.

B.    David Marlow of Sea Ray. Mr. Marlow, who negotiated to take back our defective 1996 Sundancer, said "we didn't meet your expectations and want you to be satisfied. The 1998 vessel will be watched over carefully during the manufacturing process."

C.     Frank Oswiniak and Steve Holland of Sea Ray, Palm Coast, FL.  Both Mr. Oswiniak and

Mr. Holland said our 1996 Sundancer "should not have left the factory", which lead us to believe

that the new, 1998 replacement would not have major problems.

9.     Identify every "representation," whether direct or indirect, explicit or implicit,

which you claim was made or caused to be made by Sea Ray and which was likely to mislead

you, as alleged in paragraph 63(a) of Count IV of the Complaint.  For each, identify the person

who made the representation, the document it is contained in, and describe how it misled you.

RESPONSE:  See responses to Interrogatories 2 and 8 above which summarize the course of

dealings between Plaintiffs and the Defendants and its agents, etc. who include, but may not be

limited to,  Al Chianese, Greg Wilson, David Marlow, Sean Stubblefield, David Wade and Dean

Beckman all of whom purported as acting under apparent authority of Sea Ray.


10.     Identify every "misrepresentation" and/or "distortion" you claim was made by Sea

Ray with respect to the Waiver and Release attached as Exhibit A to the Complaint, as alleged in

paragraph 63(e) of Count IV of the Complaint.  For each, identify the person who made the

misrepresentation or distortion, and/or the document it is contained in.

RESPONSE:

Exhibit "A" to the Complaint in part states "if repairs are completed and the boat is
tendered to Releasor in conformance with Sea ray's Express Limited Warranty, Releasor agrees
to accept the repairs as compliance with Sea Ray's obligations under its Express Limited
Warranty."

-13-

This means we were required to accept repairs whether done correctly or not, even though some of the repairs to be done at the factory would have been the 3rd attempt at repair. Sea Ray wanted a release <u>before</u> any work was done and was asking us to accept their repairs, whether done properly or not, and whether the repairs resolved the problem or not.

11.    Please list the dates when you claim you were unable to use the subject boat

because of alleged defects, "items requiring repair," and/or problems with its condition.

RESPONSE:

We often did not use the boat with guests due to the embarrassing and annoying loud exhaust resonance noise.

Additional loss of use periods include the following:

From October 2, 1998 through October 28, 1998, because the boat was hauled out of water for repairs by subcontractors of Sea Ray, who did not come until October 28, 1998, nearly 1 month after they were scheduled to begin repairs.

November 18, 2000 to April 20, 2001, while boat was at factory for repairs.

April 21, 2001 – May 25, 2001  - waiting for repairs to damages incurred while at the factory and during transit. There was hull damage that needed to be fixed before launching.

June 9, 2001 to present date  - vessel rendered useless because of ruined engines.

12.    Please provide an itemized list of all damages, costs, or expenses incurred by you

for which you seek compensation in this lawsuit.

RESPONSE:

| A. | Cost/Expense of new engines | $30,000 + Estimated |
| | Cost/Expense to repair items on Brewer estimate | $19,000 + Estimated |
| | Legal fees to date | $13,571 |
| | Fees for tests, surveys, parts etc. | $ 3,213 |
| | Loss of Use | T/B/D |
| | Missed time from work to attend to repair issues, meeting service people, etc. T/B/D |
| | Refund of purchase price plus interest | $149,000 plus interest |

      13.    Please state the purchase price you paid for the subject boat.

RESPONSE:

$142,000 plus $7,000 in electronics

      14.    To the extent not already identified above, please identify the basis for any other claims for damages in connection with this lawsuit.

RESPONSE:

At this time, the Plaintiffs are not aware of the basis for any other claims than those set forth in this Complaint.  However, the Plaintiffs reserve their right to do so if and when the basis for any additional claims becomes known to them.

      15.    Please identify all consumer complaints, workers' compensation claims, lawsuits, or other claims brought on your behalf.  For each, please state the subject matter of the claim, the person or entity against whom your complaint was made, the date your claim was made, and the result of your claim.

RESPONSE:

A. Purchased a 1991 Chris Craft 252 Crowne sport cruiser. The dealer would not give a test ride without a non-refundable $2,000 deposit. This boat was delivered with a lesser engine than had been represented. It could not get up on plane with 4 adults on board. The hull rode with a perpetual porpoising motion which could not be eliminated. Chris Craft voluntarily took back the boat and refunded the full purchase price. We never threatened or made mention of bringing any legal action.

B. Purchased a 1996 Sea Ray 330 Sundancer from Surfside 3 Marina, Norwalk, CT. In 1997 Sea Ray took back this vessel for many defects and problems, including a loud, intermittent exhaust resonance noise, the same as the one occurring on the replacement, 1998 vessel. Sea Ray and Surfside 3 split the costs of the take back and applied the value toward the 1998 replacement vessel. This was not a lawsuit.

THE PLAINTIFFS

*Peter D. Mains*
Peter D. Mains

*Lori M Mains*
Lori M. Mains

-16-

## <u>CERTIFICATION</u>

THIS IS TO CERTIFY that, on this date, a copy of the foregoing was mailed by first class mail, postage prepaid, to:

Maxwell Branson, Esq.
Day, Berry & Howard LLP
City Place I
Hartford, Connecticut 06103-3499

Dated: December 23, 2002

John L. Senning

# EXHIBIT H

**Senning & Rieder**

# Memo

**To:**     Max Branson, Esq.

**From:**   John L. Senning, Esq.

**Date:**   5/20/2004

**Re:**     Mains v. Sea Ray – Discovery Issues

I realize you must have a number of matters to attend to. However, I am under time constraints as well and need to move this matter forward. Mr. Greaves cannot keep his schedule for next week open any longer and now only has Thursday, May 27th available. The following week only Thursday, June 3rd is available. Please advise as soon as possible regarding which date you wish to use.

Also, in reviewing the list of Sea Ray matters you recently disclosed, we noticed that the list did not include a number of Sea Ray owners known by the Mains to have had had problems of the same or similar type about which discovery was requested nor did the list include the names of a number of Sea Ray owners whose boats were repaired and/or serviced by Pilots Point Marina's East Yard for problems of the same nature. This would include the Civitello, L'Annunziata, Machinski and Novicki matters. The Civitello and Novicki matters involved the 380 model with exhaust system/water ingestion problems. We are aware of many other 380 models having similar problems as to which no discovery production has been provided. I ask that you contact your client as soon as possible and inquire as to the completeness and accuracy of the disclosure most recently provided. It is also requested that the inspection of the Mains' boat be scheduled as soon as possible so that we can keep our schedule open in advance and eliminate scheduling conflicts and further delays.

1

# EXHIBIT I

**Foster, Daniel J.**

| From: | Branson, Maxwell |
|---|---|
| Sent: | Thursday, May 20, 2004 6:07 PM |
| To: | 'JLSSEALAW@aol.com' |
| Cc: | amcdonald@searay.com; Russo, Deborah S. |
| Subject: | RE: Mains v Sea Ray |

John-

It looks like May 27th will work for the deposition of Mr. Greaves. Please ask Mr. Greaves to hold the date and we will send out a notice of deposition. With this deposition scheduled, we will be able to provide you with some dates for the inspection of the boat. We will get back to you as soon as possible.

As to your question about the accuracy of our discovery responses, I just want to remind you that we specifically advised you in our written responses as to exactly how we would search in Sea Ray's CRMS system for information concerning complaints about other Sea Ray boats. As you will recall, Sea Ray's record keeping system is not organized by the type of complaint. We believe that the searches we ran were a reasonable approach to gathering information that was responsive to your discovery requests, and we produced the complete list of names that resulted from those searches to you, subject to the protective order. Nevertheless, if you have a specific list of people that you would like us to search for in the system, we would be willing to discuss it.

We will also take a look at the proposed changes to the scheduling order and get back to you tomorrow or Monday.

Maxwell Branson
Day, Berry & Howard, LLP
CityPlace I
Hartford, CT 06103-3499
Phone: (860) 275-0135
Fax: (860) 275-0343
mbranson@dbh.com


-----Original Message-----
**From:** JLSSEALAW@aol.com [mailto:JLSSEALAW@aol.com]
**Sent:** Thursday, May 20, 2004 12:54 PM
**To:** Branson, Maxwell
**Subject:** Mains v Sea Ray

Please see attached.

John L. Senning, Esq.
Senning & Rieder
16 Saybrook Road
Essex, CT  06426
860 767-2618


*** eSafe scanned this email for malicious content ***
*** IMPORTANT: Do not open attachments from unrecognized senders  ***

# EXHIBIT J

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PETER D. MAINS and | : | CASE NO.  301 CV 2402 (AVC) |
| LORI M. MAINS | : | |
| | : | |
| Plaintiffs, | : | |
| vs. | : | |
| | : | |
| SEA RAY BOATS, INC. | : | |
| | : | |
| Defendants. | : | JULY 30, 2003 |

## PLAINTIFFS' DISCLOSURE OF EXPERTS AND DAMAGES ANALYSIS

Pursuant to the Federal Rules of Civil Procedure, the Plaintiffs in the above-entitled action hereby submit their Disclosure of Experts and Damages Analysis as follows:

A.    **Disclosure of Expert Witnesses**

I.    1.    Name of Expert:  Thomas Greaves, Marine Surveyor, Westbrook, CT

2.    The subject matter on which the Expert is expected to testify:  The condition of the subject Sea Ray boat including, but not limited to, numerous material construction defects in the vessel and its inferior condition.

3.    Substance of the facts and opinions to which the Expert is expected to testify:  That the subject vessel as constructed contained numerous material defects which adversely effected its condition, suitability for use and intended purpose, safety of operations, longevity of useful life, resaleability and seaworthiness.

II.    1.    Name of Expert:  Anthony Knowles, Marine Surveyor, Newport Marine Surveyors Group, Newport, Rhode Island.

2.    The subject matter on which the Expert is expected to testify:  The condition of the subject Sea Ray boat including, but not limited to, numerous material construction defects in the vessel and its inferior condition and the presence of excessive amounts of moisture in the vessel's deck and hull.

3.    Substance of the facts and opinions to which the Expert is expected to testify:  That the subject vessel as constructed contained numerous material defects which adversely effected its condition, suitability for use and intended purpose, safety of operation, longevity of useful life, resaleability and seaworthiness.

III.    1.    Name of Expert:  Thomas Wycander, Manager, East Yard, Brewer Pilots Point Marina, Westbrook, CT

2.    The subject matter in which the Expert is expected to testify:  The design an installation of the subject vessel's retro-fit exhaust system as installed by Sea Ray after recalling the vessel to its construction facility in Tennessee; the condition of the subject vessel's engines after June 9, 2001.

3.    Substance of the facts and opinions to which the Expert is expected to testify:  That the retrofit exhaust systems were incorrectly designed and/or installed in the subject vessel and as such resulted in damages to the vessel's engines; that the vessel's engines as tested after June 9, 2001 evidence clear signs of material damages rendering them unsafe to use and further operate.

IV.    1.    Name of Expert:  Bruce Pfund, Marine Surveyor / Hull Core Expert, Westerly, Rhode Island.

2.      The subject matter on which the Expert is expected to testify:  The condition of the subject vessel's hull and/or deck core as a result of extensive/extended moisture saturation as a result of construction and/or design defects.

3.      Substance of the facts and opinions to which the Expert is expected to testify:  That testing results of the vessel's hull and deck core material evidence substantial moisture saturation which has resulted in damage to the core of the hull and deck areas which materially adversely effect the condition of the vessel.

V.      1.      Name of Expert:  David Pascoe, Marine Surveyor

2.      Subject matter on which the Expert is expected to testify:  Condition of vessel's hull and deck core material; defective design, construction and installation of retrofit exhaust systems on vessel's engines; materially damaged condition of vessel's engines as a result of water intrusion into engines under previous exhaust system and further damage as a result of installation of defective retrofit exhaust systems.

**B.      Damages Analysis**

| | | |
|---|---|---|
| 1. | Original Cost of 1998 Sea Ray | $228,500.00 |
| 2. | Legal Interest Since May 1998 | $137,100.00 |
| 3. | Costs Incurred in this Action | $1,000.00 |
| 4. | Attorneys Fees to Date | $19,550.00 |
| 5. | Loss of Use, 1999 and 2000 | $10,000.00 |
| 6. | Loss of Use 2001, 2002 & 2003 | $75,000.00 |
| 7. | Punitive Damages/CUTPA | $250,000.00 |
| | TOTAL DAMAGES CLAIMED | $721,150.00 |

**THE PLAINTIFFS**
**PETER D. MAINS and**
**LORI M. MAINS**

By: _____
John L. Senning, Esquire of
Senning & Rieder
Fed Bar # ct05807
18 Saybrook Road,
Essex, CT  06426
(860) 767-2618

## CERTIFICATION

THIS IS TO CERTIFY that, on this date, a copy of the foregoing was mailed by first class mail, postage prepaid, this date to:

Maxwell Branson, Esq. (ct#20925)
Day, Berry & Howard LLP
CityPlace I
Hartford, Connecticut 06103-3499

Dated:  July 30, 2003

_____
John L. Senning

# EXHIBIT K

11/18/2003  10:27    8607672740    ESSEX LAW GROUP

# SENNING & RIEDER

## THE ESSEX LAW GROUP, LLC

16 SAYBROOK ROAD
ESSEX, CONNECTICUT 06426
(860) 767-2618
FAX: (860) 767-2740
EMAIL: jlssealaw@aol.com

JOHN L. SENNING*, P.C.

* ALSO ADMITTED IN
NEW YORK AND MAINE

WUD TELEX: 99225
ANSWER: AQUABAR
CABLE: SEA LAW

AFFILIATED OFFICES:
NEW BRITAIN, CT
NEW YORK, NY
LONDON, UK
TORTOLA, BVI

November 17, 2003

Maxwell Branson, Esq.          *By Telefax to 860-275-0343*
Day, Berry & Howard LLP
City Place I
Hartford, CT  06103-3499

RE:  Mains v. Sea Ray

Dear Attorney Branson:

There follows herewith copies of the Rule 26 Expert Statements pertaining to the experts previously disclosed in this matter together with the report and photographs submitted by Anthony Knowles of the Newport Marine Surveyors Group. This will serve to confirm that although it was previously indicated that David Pascoe was intended to be retained as an Expert in this matter, Mr. Pascoe was not engaged due to logistical and availability issues. No substantive information or materials were ever provided to him nor were any decisions made regarding this matter. Consequently, his name should be considered withdrawn from the previous Disclosure of Experts. Hard copies of the Rule 26 Statements and Mr. Knowles reports and photographs will follow under separate cover.

As I indicated in my telephone message, Mr. Knowles schedule is quite booked until December 18 or 19, after which he will be away until January 6th. Mr. Greaves has been in Florida for some time and will remain there until late March or early April. It is possible that he will be in the area for a survey on short notice. I have requested that he keep me advised of any travel to this area which would allow his presence for a deposition in this area. Messrs. Wicander and Pfund are in this area and available for a deposition upon reasonable notice.

This will also confirm my previous advices regarding the continuing availability of the boat for an inspection by a surveyor on behalf of Sea Ray. As I also indicated, the winter shrink wrap seal will shortly have to be re-secured in order to provide better protection from the winter elements. This will increase the cost of re-securing same after an inspection for which Sea Ray will be responsible. Your surveyor's inspection may take place any weekday subject to reasonable advance notice in order to assure Mr. Mains' availability s well as someone from Brewer's Pilots Point

11/18/2003  10:27    8607672740    ESSEX LAW GROUP                    PAGE  30/33

SENNING & RIEDER

marina to be in attendance.  Please advise in advance as to whether your surveyor will be structural, mechanical or both.  We will do everything possible to accommodate your surveyor's schedule.

Very truly yours,

John L. Senning

JLS/jjk