UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PETER D. MAINS and LORI M. MAINS | : | CIVIL ACTION NO.: |
| | : | |
| Plaintiffs, | : | 3:01CV2402 (AWT) |
| | : | |
| v. | : | |
| | : | |
| SEA RAY BOATS, INC., | : | |
| | : | |
| Defendant. | : | March 27, 2008 |

**MOTION TO RECONSIDER RULING ON MOTION IN LIMINE TO EXCLUDE
EVIDENCE OF COMPLAINTS BY OTHER CONSUMERS**

Plaintiffs Peter D. Mains and Lori M. Mains respectfully move this Court to
reconsider the ruling set forth in its Order Regarding Defendant's Motion in Limine to
Exclude Evidence of Complaints by Other Consumers issued on March 5, 2008.

This Motion will be based upon this notice, the accompanying Memorandum of
Points and Authorities in support thereof, all pleadings, papers and records on file in this
action and such oral argument and other evidence as may be allowed at the hearing.

**ORAL ARGUMENT REQUESTED**

**TESTIMONY NOT REQUIRED**

Respectfully submitted,

PLAINTIFFS,
PETER D. MAINS and LORI M. MAINS

By _____/s/ Richard J. Nikas_____
     Richard J. Nikas, Esq.
     Connecticut Federal Bar Number PHV02528
     HERRICK NIKAS
     1201 Dove Street, Suite 560
     Newport Beach, California 92660
     Telephone:  (714) 546-1400
     Facsimile:  (714) 546-4111
     rnikas@herricknikas.com
     Their Attorney

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PETER D. MAINS and LORI M. MAINS | : | CIVIL ACTION NO.: |
| | : | |
| Plaintiffs, | : | 3:01CV2402 (AWT) |
| | : | |
| v. | : | |
| | : | |
| SEA RAY BOATS, INC., | : | |
| | : | |
| Defendant. | : | March ____, 2008 |

**[PROPOSED] ORDER**

Having considered the motion filed by Plaintiffs Peter D. Mains and Lori M. Mains to reconsider this Court's previous ruling on Defendant's Motion In Limine To Exclude Evidence Of Complaints By Other Consumers, the order granting said motion in limine is hereby withdrawn and the Motion In Limine To Exclude Evidence Of Complaints By Other Consumers is hereby denied.

It is so ordered.

Dated this _____ day of _____ 2008 at Hartford, Connecticut.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PETER D. MAINS and LORI M. MAINS :     CIVIL ACTION NO.:
                               :

         Plaintiffs,            :     3:01CV2402 (AWT)

                               :

v.                                     :

                               :

SEA RAY BOATS, INC.,            :

                               :

         Defendant.           :     March 27, 2008

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
TO RECONSIDER RULING ON MOTION IN LIMINE TO EXCLUDE
EVIDENCE OF COMPLAINTS BY OTHER CONSUMERS**

## I.
## INTRODUCTION

This is an action to enforce various warranties that were breached when Defendant defectively designed, manufactured, and sold a 1998 Sea Ray 330 fiberglass motor yacht (hereinafter referred to as the "Vessel") to Plaintiffs Lori and Peter Mains (hereinafter referred to collectively as the "Plaintiffs") without disclosure of their prior knowledge concerning the defective manufacture and condition of the Vessel.

The Vessel was defective as designed, defective as built, and defective when sold to Plaintiffs and the existence of such defects were concealed by Defendant who was aware more than four decades prior of the propensity of the Vessel, as equipped and manufactured, to ingest salt water into her marine engines leading to the catastrophic failure of both her port and starboard engines with hardly any running hours on them.

Despite the several decades during which Defendant Sea Ray Boats, an unincorporated division of the Brunswick Corporation (hereinafter referred to as "Sea Ray), was aware of this potentially catastrophic defect which affected almost every recreational boat that it built with an inboard engine, Sea Ray has attempted to sweep this highly probative and damaging evidence under the proverbial rug by seeking to exclude evidence of the multitude of consumer complaints related to this defect.

The Motion in Limine To Exclude Evidence Of Complaints By Other Consumers filed by Defendant on May 29, 2007 requested the exclusion of evidence regarding "any alleged consumer complaints."

In addition, Defendant surreptitiously included a plea to exclude evidence not referenced in the title of their pleading, namely, evidence of "any . . . alleged problems with boats manufactured by Sea Ray." Just as this second request is absent from its motion in limine, no justification exists anywhere in the body of the motion for the broad exclusion of problems with boats manufactured by Sea Ray.

The Order issued by this Court on March 5, 2008 granting Defendant's Motion In Limine to Exclude Evidence Of Complaints By Other Consumers mirrors Defendant's motion in that it: (1) addresses only evidence of other consumer complaints provided by Thomas Wicander and Russell Rackcliffe; and (2) does not address Defendant's request to exclude evidence of problems with boats manufactured by Sea Ray, thus leaving Plaintiffs confused as to the scope of the exclusions granted.

Evidence of (1) complaints by other consumers and (2) of problems with boats manufactured by Sea Ray is both relevant and highly probative in this product defect action and should not be excluded under any rule.

Therefore, and for the reasons set forth more fully below, Plaintiffs respectfully request that this Court reconsider its ruling and deny Defendant's motion in limine as to evidence both of complaints by other consumers and problems with Sea Ray boats.

## II.
## FACTUAL BACKGROUND

### Sea Ray Was Aware of the Water Ingestion Problem for More Than Forty Years

During the course of more than four decades, both Sea Ray (the boat manufacturer) and MerCruiser (the engine manufacturer and sister division within the Brunswick Corporation), issued multiple service and information bulletins to their authorized dealers and component manufacturers concerning the propensity of their inboard engines to ingest salt water through the exhaust system.

Yet despite this knowledge and awareness of a problem that usually resulted in rendered these pleasure craft incapable of operation on the water (the only use they have), Defendant continued to sell its defective product to consumers and made every effort to conceal the breadth and depth of its knowledge of these defects from its customers and the courts.

Curiously, Sea Ray failed to disclose the existence of these service bulletins related to this issue (and dating back to 1963) during the course of discovery in the matter, despite specific questions and requests posited by Plaintiffs. Incredulously, Defendant was somehow rewarded (in the form of sanctions against previous counsel) for hiding not just one ball, but dozens and dozens of them.

### Defendant Has Been Aware of These Defects Since 1963

As early as 1963, MerCruiser was aware of water ingestion problems in its exhaust systems:

6

**We have received complaints from some consumers that installation of some V-8 model MerCruiser Marine Engines** – especially in deep "V" boats – **permits sea water to run back into the exhaust manifolds, thereby causing damage to the engine**.

A safe condition is determined by engine position in the boat and by the loading and movement within the boat. To prevent water from entering the engine through the exhaust manifold when boat is at rest, outside water level must be low enough, with respect to water trap in engine exhaust elbows, that water cannot run back into exhaust manifolds under any conditions of loading or rocking of the boat. Exhaust outlets must be located so that they are always lower than the exhaust manifold to assure proper draining of discharge water. (Emphasis added.)

See MerCruiser Service Bulletin No. 63-13, Section C, attached hereto as Exhibit "A".

**Defendant Remained Aware of These Defects Throughout the Seventies**

The importance of proper installation in protecting the engines against water ingestion was clearly stated by MerCruiser in 1971:

**We have received reports of water entering the exhaust manifolds and combustion chambers of MerCruiser V-8 Stern Drive and Inboard Engines**. This problem is caused by exhaust elbows which are not located a sufficient distance above the boat's highest water line when boat is at rest in the water. **It is the obligation of the boat manufacturer or installing dealer to correctly locate the engine for installation**. (Emphasis added.)

See MerCruiser Service Bulletin No. 71-08, attached hereto as Exhibit "B".

**Defendant Remained Aware of These Defects Throughout the Eighties**

MerCruiser's 81-27 Bulletin dated November 2, 1981 referenced the reasons why water continued to enter its engines through the exhaust manifolds. See MerCruiser Service Bulletin No. 81-27, attached hereto as Exhibit "C".

7

Additional concerns regarding water ingestion in the exhaust system were again addressed by MerCruiser in 1982: "**Under certain operating conditions and / or with certain exhaust collector systems, water can be drawn back into the engine** during idle speed. (Emphasis added.)" See MerCruiser Service Bulletin No. 82-3, attached hereto as Exhibit "D".

In 1984, MerCruiser again acknowledged that it was aware of the likelihood of water intrusion damage to its engines as a result of improper installation of the exhaust system noting that "[i]t is the responsibility of the boat manufacturer or installing dealer to properly locate the engine and install the exhaust system. **Improper installation may allow water to enter the exhaust manifolds and combustion chambers and severely damage the engine**. (Emphasis added.)" See MerCruiser Service Bulletin No. 84-1, attached hereto as Exhibit "E".

Surprisingly, MerCruiser points the finger for the primary cause of the water ingestion problems at the engine installer (which in this case was its corporate sibling Sea Ray) ignoring that in many instances (as here) it had representatives at the boat manufacturers' facilities (who presumably were in a position to identify cases of improper installation).

Three years later, MerCruiser issued an advisory that an exhaust pipe repair was necessary to remedy "**reports of water entering the engine** (emphasis added)." See MerCruiser Service Bulletin No. 87-4, attached hereto as Exhibit "F".

Again, in 1989, MerCruiser warned, in no uncertain terms, its dealers and boat manufacturers using MerCruiser engines that:

"[u]nder certain operating conditions, V6/V8 engines
equipped with thru transom exhaust systems may ingest
(suck) water back into the exhaust manifold.    This
condition is **caused by the design of the exhaust system**
from the exhaust manifold elbow back. (Emphasis added.)"
See MerCruiser Service Bulletin 89-32, attached hereto as
Exhibit "G".

## Defendant Remained Aware of These Defects Throughout the Decade in Which the Subject Vessel Was Sold

In 1996, while Plaintiffs were negotiating with Sea Ray for the replacement of their first boat due to irremediable defects, Defendant was still issuing warnings regarding water ingestion problems with exhaust systems on its boats:

> **! WARNING**
> **Avoid water in engine and/or serious engine damage. . .**
> **The customized system should be thoroughly tested to**
> **make sure there are no water ingestion problems.**

See MerCruiser Service Bulletin No. 96-1, attached hereto as Exhibit "H".

Water Ingestion had become such a pervasive issue in Sea Rays equipped with inboard MerCruisers that the engine manufacturer conveniently attempted to exclude water ingestion damage from coverage under its warranty.  See MerCruiser Service Bulletin Nos. 96-4 and 96-7, attached collectively hereto as Exhibit "I".  See also, MerCruiser Service Bulletin No. 98-4, attached hereto as Exhibit "J".  ("Without the use of both internal exhaust shutters and external flappers, water reversion may occur. . .  It is the responsibility of the engine installer to test for water reversion into the engine. . .

9

The MerCruiser Hi-Performance Limited Warranty **does not** cover engine damage claims due to water ingestion or reversion.").

By the time the engines were installed in the Vessel and by the time of the subsequent factory repairs and exhaust retrofit, MerCruiser had established clear instructions to prevent water intrusion. The 1998 MerCruiser Installation Manual for 5.7 L/7.4 L Bluewater Inboard Models, first released to installers in 1995, made clear that the possibility of water ingestion was a real and significant threat to engine operability:

> **IMPORTANT: It is the responsibility off the boat manufacturer, or installing dealer, to properly locate the engine and install the exhaust system. Improper installation may allow water to enter the exhaust manifolds and combustion chambers, and severely damage the engine. Damage caused by the water in the engine will not be covered by MerCruiser Warranty, unless this damage is the result of defective part(s). . .**
>
> When designing and installing exhaust system, it is very important that the following points be taken into consideration:
>
> **NOTE:** Information given applies to all engines unless otherwise stated.
>
> - System layout and construction must prevent cooling system discharge water from flowing back into engine and also must prevent seawater from entering engine via exhaust system
> - The exhaust hoses and pipes must not be higher than exhaust elbows at any point.
> - The exhaust outlet (for routing exhaust outside the boat) must be located so that a minimum of ½ inch (13 mm) per foot (305 mm) downward pitch (drop) exists in drop of 4 in. (100 mm) overall. (This is an American Boat and Yacht Council recommendation). The drop must be constant so that a low spot does not exist at any point in the exhaust hose or pipe.

See 1998 MerCruiser Installation Manual for 5.7 L/7.4 L Bluewater Inboard Models, attached hereto as Exhibit "K", page 11.

**Sea Ray Remains Aware of the Design and Manufacturing Defects Causing Water Ingestion and Subsequent Engine Failure**

Around the time of the original factory and subsequent repairs performed on the Vessel in 2000 and 2001 by Sea Ray and its associated service providers, MerCruiser and Sea Ray, were publishing a barrage of bulletins and warnings relating to water ingestion issues.

Even while the Vessel was at Defendant's factory in 2000 and 2001 (at the same time that Sea Ray unilaterally decided to replace the Vessel's defective original exhaust system), Defendant was issuing cautionary messages relating to severe engine damage caused by defective and improperly installed exhaust systems:

> **IMPORTANT: It is the responsibility of the boat manufacturer and/or the installing dealer to properly locate the engine and install the exhaust system. Damage caused by water in the engine will not be covered by the Mercury MerCruiser warranty, unless this damage is the result of defective parts or workmanship on the part of Mercury MerCruiser.**
>
> ## ! CAUTION
> **Avoid severe engine damage. Proper installation of the engine and/or exhaust system may allow water to enter the exhaust manifolds and combustion chambers and severely damage the engine. Install the engine and exhaust system according to Mercury MerCruiser instructions and procedures, and according to recommended practices.**

See MerCruiser O.E.M. Service Bulletin No. 2000-9, attached hereto as Exhibit "L".

In June of 2001, while Sea Ray had sent the Vessel to Pilots Point Marina for further repairs following the discovery of fatal water ingestion, MerCruiser issued a service bulletin entitled *"Gasoline Engines with Water Damage."*

11

It states, "[u]se this bulletin when working on an engine that is still within the warranty period." The bulletin contains cursory instructions on troubleshooting and identifying the cause of water ingestion in MerCruiser engines. See MerCruiser Service Bulletin Number 2001-10, attached hereto as Exhibit "M".

Shortly thereafter, MerCruiser announced the discovery of water and corrosion in starter motors returned for warranty repairs:

> **We also have found either water or corrosion inside starter motors returned for warranty. Condensation will not cause the amount of damage found.** (Emphasis added).

See MerCruiser Service Bulletin No. 2001-11, attached hereto as Exhibit "N".

The same bulletin implied that water damage was the number one cause of shortening the life expectancy of these starters. Id ("Other than water damage, low voltage is the number one cause of shortening the expected life of a starter motor.").

MerCruiser also issued another bulletin which was geared specifically to the rampant water intrusion problems and which noted, "[t]his bulletin is meant to help marine dealers troubleshoot engines, in or out of the warranty period, that have water intrusion . . . Marine engines are built to perform in harsh conditions, including saltwater. Occasionally, an engine inadvertently will have water enter it and this water has the potential to cause damage." See MerCruiser Service Bulletin number 2001-13, attached hereto as Exhibit "O", page 1 (emphasis added).

This bulletin provides detailed instructions for diagnosing the cause of the water ingestion:

> When working on an inboard engine powered boat, check the boat's exhaust system also [to determine the cause of water ingestion].

12

1. The muffler, collector and exhaust hoses must be supported adequately to maintain proper orientation and to prevent overstressing any exhaust component.

2. The drop in the exhaust hose must be continuously sloping downward so that a low spot does not exist at any point. The exhaust collector or y-pipe must also have the proper downward slope to prevent the retention of water.

   a. Boats built prior to March 2001: ABYC recommends a minimum drop of ½ in. per 1 foot (42 mm per 1 m) with an overall drop of not less than 4 in. (102 mm) between the exhaust elbow and the boat outlet.

   b. Boats built after March 2001: MerCruiser recommends a minimum of 18 inc. (457 mm) of exhaust hose be used between the exhaust elbows and the collector y-pipe, first angular fitting or muffler. This portion of the exhaust must have a 6° downward slope for conventional inboards, including ski models, and 4° for V-drives. Id at page 8.

Notably, this bulletin calls for dealers to cross-examine its customers as to whether their boats "had a lot of water in the bilge" – one of the problems which prompted the transportation of Plaintiffs' Vessel to the Sea Ray factory for repairs. Id at page 1.

Although this same bulletin professes the importance of "saving the engine" by noting details of the problems and repairs on the repair order, and determining the root cause of the water intrusion so that the problem will not repeat, Sea Ray has failed to preserve any evidence, including any records related to the repairs it performed on the Vessel or even keep for use at trial the exhaust system that was replaced without the knowledge or consent of Plaintiffs. Id at pages 7-8.

**The Water Ingestion Hotline and Response Team:**
**Sea Ray and MerCruiser Acknowledge the Need for Extraordinary Measures**

A Sea Ray InfoGram issued on October 11, 2001, (the same year as the overhaul of the exhaust system and continuing repairs to the Vessel) reveals the true depth of the problems surrounding water ingestion in MerCruiser and Sea Ray inboard engine applications and exhaust systems:

> **Over the past several months, we have received numerous reports of Water Ingestion issues** in salt-water applications occurring with V-Drive models equipped with MerCruiser power packages . . . **Sea Ray recognizes the critical importance of correct exhaust system set-up** . . . As a result of **extensive investigation and testing with Mercury Marine,** Sea Ray has changed the exhaust configuration on V-Drive and Inboard product . . . Our goal in doing this is to eliminate the possibility, however small, that water could potentially travel the length of the exhaust system and damage the engine valve train, which in turn could lead to outright engine failure. (Emphasis added.)
> See Sea Ray InfoGram #02-07, attached hereto as Exhibit "P" at page 1.

Indeed, the water ingestion epidemic among Sea Ray boats was of sufficient concern to force Sea Ray and MerCruiser to form a special team to respond to the issue:

> **Should water ingestion occur**, the following process applies:
>
> 1. Contact MerCruiser OEM Customer Service @ 405-743-6555. A **special phone access option has been set up for Sea Ray Dealers who have a water ingestion issue**. You will not be prompted for this access option. During the announcement, please identify yourself as a dealer. The next announcement will offer you seven options to identify why you have called. Please press "8" at anytime during this announcement and your call will be directed to a **specially designated MerCruiser service team**.
> 2. MerCruiser will assist Sea Ray dealers in diagnosis and proper repair procedures. MerCruiser will contact Sea Ray if a retrofit exhaust kit is needed for the vessel in question.
> 3. MerCruiser and Sea Ray will handle dealer compensation separately. All engine related claims will be submitted to MerCruiser for reimbursement and all boat exhaust system claims will be submitted to Sea Ray.

Note: In order to qualify for this program, the boat has to be a 1999 model year boat (models noted in this infogram) or newer with a collector style exhaust. The boat must be registered for less than 36 months from the time the dealer requests an exhaust system replacement.
See Sea Ray InfoGram #02-07, page 4 (emphasis added).

This InfoGram and special engine and exhaust system service program is highly suggestive of a defective product design and demonstrates the close communications and imputation of knowledge as between the MerCruiser and Sea Ray divisions of Brunswick Corporation.

By establishing a separate "hotline" with a special water ingestion menu option hidden from the main menu and by designating a "special team" to deal with water ingestion problems in MerCruiser engines installed on Sea Ray boats, MerCruiser and Sea Ray acknowledge their role in the problem. It is also noteworthy that MerCruiser service bulletins routinely assign all liability for water ingestion on the engine installer and boat manufacturer.

The inclusion of boats that are out of their purported one year manufacturer's warranty period also establishes that both Sea Ray and MerCruiser accepted joint and several liability for the defective inboard exhaust system design in excess of the original warranty.

### This Evidence of Problems With Sea Ray Vessels Was Not Addressed In the Motion in Limine or in the Court Order:

Defendant knew or should have known of the existence of the above evidence because:

(1) Many of these bulletins and other documents were on the exhibit list;

(2) *all* of the above evidence was authored by Defendant (in that Sea Ray and MerCruiser are both divisions of the same company, Brunswick Corporation); and

(3) the Sea Ray InfoGram itself demonstrates that the two divisions work closely together on consumer complaints relating to defective exhaust systems and MerCruiser's knowledge of product defects was imputed to Sea Ray.

Nonetheless, Defendant's motion in limine failed to address whether or why any of this evidence of problems with Sea Ray boats should be excluded. As the moving party, the burden was (and is) on Defendant to identify and establish which evidence should be excluded.

Similarly, this Court's ruling on the motion does not address this evidence.

**Defendant's Failure to Identify the Bulletins and InfoGrams on Its Own Accord Demonstrates a Failure to Comply With Plaintiffs' Prior Discovery Requests:**

Curiously, Defendant failed to identify any of the above bulletins and other documents or the names of their authors in response to the first set of interrogatories propounded upon Defendant. These interrogatories requested information relating to persons with knowledge or information (and the nature and subject matter of the information or knowledge) concerning efforts by or on behalf of Defendant to repair or remedy any engines and exhaust system problems relating to resonance, water ingestion, moisture ingestion, and condensation in the engines of the same or similar model boats and in the engine and exhaust system models installed in the Vessel. The relevant portions of these interrogatories are attached hereto as Exhibit "Q".

16

Defendant objected to these interrogatories on the grounds that they were overly broad and unduly burdensome (citing only the possibility of searching its consumer service database but failing to acknowledge the existence of other Brunswick Corporation records relating to the information sought).

Meanwhile, the undersigned was able, in less than a week, to locate the above bulletins which the MerCruiser and Sea Ray divisions customarily distributed to their dealers, service centers, and customers.

### The Marine Industry Is Well Aware of Problems with Sea Ray Exhaust Systems Similar to that of the Subject Vessel and Have Notified Sea Ray of the Same:

This need for warnings and bulletins pertaining to an endemic water ingestion problem in Sea Ray boats is coupled with the fact that water ingestion problems in Sea Ray boats is common knowledge among those in the yacht repair industry.

For example, Thomas Wicander, the expert witness for the Mains, can testify to numerous instances of water ingestion problems in other Sea Ray boats with the same collector style exhaust system which he and his employer marina have witnessed first-hand and have documented during the course of their business. See Wicander Deposition, pages 99, 101-103, 117, 128.

The Deposition of Mr. Wicander lays the foundation for applying his personal experience with the same problematic exhaust system in Sea Ray boats owned by other consumers.  His testimony illustrates that other Sea Ray boats, sharing a common "collector style" exhaust system are substantially similar in all material aspects so as to make the comparison to the exhaust system originally installed in the Mains' new yacht highly probative of defective design and manufacturing:

17

Q       Did they tell you that they had suspicions about water ingestion with the engines in this boat?

A.      I don't know if they told me or I told them. *We had seen so many problems by the time we took theirs apart with other Sea Rays that it was definitely a concern of mine.*

Q.      Is this a problem that's limited to Sea Rays?

A.      It is because *they have a unique exhaust system. It's their own.*

Q.      You haven't seen any water ingestion problems with any other boats?

. . .

A.      I mean, not like – not from their style exhaust system. *They're the only ones that I've seen with their style exhaust system.* Other manufacturers have had water ingestion problems, but they're typically from improper installations or what have you or poor maintenance.

Q.      And which style exhaust system are you talking about?

A.      The collector system that the boat was originally shipped with.

. . .

Q.      Okay.   And you've seen water ingestion problems with the collector-style exhaust system used by Sea Ray?

A.      Yes, I have. . . .

. . .

Q.      And when you say problems like this, you're referring to the problems that you observed with the Mains boat?

A.      Yeah, problems with hydrolocking, and we've seen a lot of boats with similar collector-style exhausts going through engine failure and water ingestion.

Wicander Deposition, pages 101-103, attached hereto as Exhibit "R".

Despite this ongoing knowledge of problems with Sea Ray boats and their engines and exhaust systems, and despite representations made by Sea Ray and MerCruiser of catering to their customers' interest in having the "finest and most technologically advanced, and easy to operate inboard engine available today that would be trouble-free and have extended maintenance intervals," Defendants delivered to Plaintiffs a new boat, the engines, exhaust system, and installment of which were plagued with catastrophic defects and deficiencies  See Letter from John Winter to Peter Mains, dated July 13, 1998, attached hereto as Exhibit "S".

### This Vessel Was Plagued With Manufacturing and Design Defects Of Which Sea Ray and MerCruiser Were Or Should Have Been Aware:

Plaintiffs fell victim to Defendant's sale of defective products.

In or around 1996, Plaintiffs purchased a 1996 330 Sea Ray Sundancer from Sea Ray. This yacht suffered from numerous design and manufacturing defects, prompting them to seek a replacement.

On or about May 21, 1998, they purchased a 1998 Sea Ray Model 330DA Power Boat from Surfside 3 Marina in Norwalk, Connecticut, an authorized Sea Ray dealer (hereinafter referred to as "Surfside 3").

Problems with the manufacture and condition of the new boat and its equipment were apparent as early as the date of delivery and additional defects became evident as the months progressed. These defects included, but were not limited to, problems with the hull, exhaust system, and saturation of the bilge area with water. Plaintiffs' concerns regarding the defective condition of the Vessel were temporarily placated by reassurances and warranties by Sea Ray that the defects in their new boat would be cured.

The Mains continued to communicate their concerns until approximately October 28, 1998, when subcontractors acting on behalf of Sea Ray began to attempt various repairs to the Vessel. Subsequently, on or about December 9, 1998, Plaintiffs were again forced to write the builder, notifying it that the condition of the Vessel and the repairs attempted were unsatisfactory. In response, they were assured that Sea Ray would renew its repair efforts and effect such work as necessary to return the Vessel to seaworthiness. See Correspondence from Peter Mains dated December 9, 1998, attached hereto as Exhibit "T".

Subsequent unsuccessful efforts at remedying the defects were made by Sea Ray throughout the 1999.  Unfortunately Sea Ray and its personnel were unable to remedy the problems with the exhaust system and water saturation of the hull core.

Indeed, the damage was so extensive that it was deemed necessary to return the Vessel to the Sea Ray factory in Tennessee at the conclusion of the 2000 boating season to attempt to effect the needed repairs to problems relating, but not limited to the bilge, cockpit floor defects, and exhaust system.

In the meantime, Plaintiffs were unable to fully use their boat for the purpose for which it was intended, namely, waterborne transport, due to the continued problems with the exhausts and hull deficiencies.

On or about November 18, 2000, more than two years after its purchase, the Vessel was loaded onto a trailer hired for its return to the factory.  Plaintiffs were assured by Sea Ray that it would be fully repaired and returned by the next March.

**Defendant Deprived Plaintiffs Access to Crucial Evidence By Replacing the Vessel's Original Exhaust System Without Their Knowledge or Consent:**

Although Plaintiffs had identified multiple problems with the Boat including water saturation of the bilge area, they were unaware of the defects in the design and installation of the Vessel's exhaust system.  As such, Plaintiffs had not asked Defendant to replace the exhaust system, and the installation of a new exhaust system was not among the list of requests which Plaintiffs had sent to Sea Ray prior to the transportation of the Boat to the factory.  Similarly, a different style or retrofit exhaust system had not been discussed between Plaintiffs and Sea Ray.

While their Boat was at the factory, Plaintiffs continued to check on the progress of the repairs via telephone conferences with David Wade of Sea Ray.

They requested, and were informed that they would be given, access to the factory to inspect the Boat before it was returned them from the factory.

At some point during the course of inspecting the Vessel at its facilities and attempting to cure the ongoing problems, Sea Ray determined, sua sponte, that the exhaust system required replacement.

Rather than installing or substituting a new replacement engine or parts in conjunction with the "collector" style exhaust system which was originally manufactured and sold onboard the new yacht, Sea Ray deemed the collector style exhaust sufficiently defective to necessitate the complete replacement of the original exhaust system with a materially different "retrofit," a "water lift style" exhaust system.

Plaintiffs were never consulted as to whether they would consent to the complete overhaul of the exhaust system which they had purchased with their new Boat. Nor were Plaintiffs given the opportunity to examine or document the placement, installation, or defects that had been revealed in the old exhaust system.

Instead, after months at Defendant's facilities and mere days before the repaired Vessel was to be returned to them, the Mains were suddenly informed that the exhaust system onboard their yacht had been replaced with a system of an entirely different style. This unauthorized action and unforeseen announcement was coupled with a blanket assurance that this new exhaust system would remedy any and all problems, without interfering with or altering any other aspects of the boat's operation, maintenance or performance. No other explanation for the mysterious installation of this unrequested new exhaust system was provided by Defendant.

Defendant did not document the defects present in the original exhaust system or otherwise inform the Mains or provide them with access to the Vessel when these defects were discovered or anytime before the exhaust system had been replaced. Thus, the evidence of the design, measurements, and installation of this defective exhaust system has been under Defendant's exclusive control since it was removed.

As Plaintiffs have not been provided access to this key evidence to date, they can only presume that it has been intentionally withheld or destroyed.

This spoliation of significant evidence by Defendant coupled with its failure to identify the number and probative value of the Service Bulletins and other internal documents is indicative of a defective product and deficient and negligent manufacture and design.

**Defendant's Failure to Warn Plaintiffs of the Differences Between the Original and Retrofit Exhaust Systems Caused Additional Damages:**

At no point prior to June 9, 2001 did Sea Ray inform Plaintiffs that the newly installed retrofit, water lift-style exhaust system required different procedures for "flushing" the engines than those instructions that originally accompanied the Vessel at the time of sale.

This failure to provide them with material instructions resulted in additional damage to the Vessel.

Upon the completion of their journey to the repair destination on June 9, 2001, Plaintiffs used the engine flushing kit which had been supplied by Sea Ray at the time of the Boat's purchase as a standard feature of the 1998 454 Horizon engines to flush the raw water from portions of the engine's cooling system.

In performing this flushing of both the port and starboard engines, Plaintiffs followed exactly the same procedure that they had employed after each and every trip that involved the use of the Boat's engines in salt water since the Boat was purchased. This flushing was in accordance with the written instructions provided by Sea Ray at the time of purchase.

When Plaintiffs attempted to start the engines on or about the morning of June 10, 2001, the engines would not start. The services of Pilot's Point personnel were engaged, and it was determined that the engines had become "hydrolocked."

Plaintiff's expert witness, Thomas Wicander (hereinafter referred to as Mr. Wicander"), was the yard manager of the east yard of Pilots Point Marina at the time of this engine failure.

On or about June 11, 2001, arrangements were made for Pilots Point personnel to "pickle" (oil) both engines and to remove the water ingested into the engines. On the same day, Plaintiffs also notified Sea Ray and Bassett Boats of the hydrolocking and requested that the engines be inspected by representatives of Sea Ray and MerCruiser (the engine manufacturer) to determine the cause of the water ingestion and the extent of the damages to the engine. These attempts to elicit assistance from Sea Ray continued in the ensuing days and weeks.

On or about June 14, 2001, representatives of Sea Ray advised Plaintiffs that the flushing procedure prescribed in the written instructions first provided by Sea Ray were not compatible with the retrofit lift style exhaust system which Sea Ray had recently installed and that hydrolocking of the engines would occur if Plaintiffs employed the instructions that had accompanied their new purchase.

**The Retrofit Lift Style Exhaust System Designed and Installed in the Boat by Sea Ray Is Also Defective**

In the days and weeks that ensued, compression tests and "leak-down" tests were performed by Mr. Wicander and Pilots Point personnel in an effort to determine the extent of the damage to the Boat and its engines relating to water ingestion. The engines' compression pressure and leak-down percentages did not satisfy industry standards. See Wicander Deposition, pages 61-62, 67, 70, excerpts of which are attached hereto as Exhibit "U".

Furthermore, a diagnosis of the water ingestion problems was performed in accordance with a standard "Inboard Water Damage Worksheet" which had been created by MerCruiser for such occasions and Mr. Wicander and the Pilots Point staff recorded key measurements. The relative heights of the overboard relief hose and the exhaust elbows as designed, manufactured, and installed by Sea Ray failed to comply with relevant provisions of the MerCruiser installation manuals which apply to the Vessel. Wicander Deposition, pages 71, 76-79, 127, excerpts of which are attached hereto as Exhibit "V".

The disassembly of the exhaust system revealed corrosion inside the exhaust elbows and extensive scoring in the cylinders, suggesting long-term leakage and water ingestion problems beyond the types of damage that would have occurred from a single incident of hydrolocking. See Wicander Deposition, pages 105-108, 112-113, 115; Report, pages 2-3, attached hereto as Exhibit "W".

Just as Defendant itself had determined that the original collector style exhaust system was sufficiently defective as to necessitate its replacement by a different retrofit system, the Pilots Point mechanics contracted by Sea Ray to effect the repairs to the Boat in June of 2001 determined that:

(1) Sea Ray's failure to properly instruct Plaintiffs as to the changed flushing methods applicable to the newly retrofitted exhaust system caused the hydrolocking of the engines and related damage on that single instance (See, e.g., Wicander Deposition, page 126; Wicander Report on compression and leak-down tests, before disassembly, p. 2 " . . . we are of the opinion that both engines have been seriously damaged as a result of the hydrolocking that occurred on or about June 9, 2001 and require replacement"); and

(2) Subsequent disassembly of the exhaust system revealed additional damage including extensive scoring in the cylinders, indicative of a chronic water ingestion problem originating during the Boat's prior utilization of the defective collector style exhaust system. (See Wicander Report Dated October 7, 2003, p. 3 "[Starboard Engine] Cylinder #'s 1,2,3,4, all have significant scoring present. . All [Port Engine] cylinders except # 7 have significant scoring . . . It is my opinion that both engines have ingested water over a period of time prior to the hydrolocking on or about June 9, 2001. No single ingestion incident could have caused the damage present."); Wicander Deposition, pages 109, 112-113, attached as Exhibit "W", and Wicander Deposition, page 99, attached as Exhibit "X".

Furthermore, Wicander's expertise to assess these chronic problems affecting Sea Ray boats derives from his certification and training by Sea Ray and MerCruiser and his extensive experience dealing with the exhaust systems on similar vessels. See, e.g. Wicander Deposition, pages 99 ("extensive number of . . . *similar* boats (emphasis added), 100, 117 (Q "And how many times did you say you've performed *those types of repairs* or replacing engines in boats *like that* (emphasis added)" A " . . . I believe it's mid-20's, 25, 26 boats"), 128.

In the aggregate, these tests and measurements revealed severe and chronic problems with the exhaust system suggesting defective design, manufacture, and installation of the original collector style exhaust system which was not repairable without completely overhauling the system and replacing it with a lift style system.

## III.
## GOOD CAUSE EXISTS TO GRANT THIS MOTION, TO EXTEND ANY NECESSARY FILING DEADLINES, AND TO EXPEDITE THE RULING ON THIS MOTION

Should the Court determine that this Motion for Reconsideration was not timely filed, Plaintiffs respectfully request that this Court exercise its authority and discretion pursuant to Federal Rule of Civil Procedure 6(b)(1) and Local Rule 7(b) to modify any deadline relevant to the filing of this motion so as to deem this motion timely filed.

The undersigned was not admitted *pro hac vice* until March 25, 2008.

Plaintiffs' new attorneys have not asked this Court for a continuance of the trial dates despite this recent admittance to joint the legal team in this trial.

Nonetheless, upon agreeing to represent Plaintiffs in this matter, the undersigned attorneys have been surprised to discover a significant number of peculiar challenges as they attempt to prepare for trial and to ensure that their clients are fairly and thoroughly represented. These challenges include but are not limited to:

(1) Defendant's failure to disclose all relevant evidence (including many of the bulletins listed above) at the time of discovery, requiring Plaintiffs' new counsel to perform considerable additional work at this late hour to procure documents, the existence of which Plaintiffs' former counsel was unaware;

(2) The spoliation of evidence caused by the removal of the original exhaust system by Sea Ray, requiring the undersigned to seek alternate forms of evidence and to file additional documents at this late hour;

(3) The disputed failure of prior counsel to compel the production of documents in addition to the propounded interrogatories;

(4) The failure of prior counsel to depose any of the defense witnesses;

(5) The failure of prior counsel to plead additional causes of action available to Plaintiffs under the present facts; and

(6) The failure of prior counsel to correctly name Defendant.

Notwithstanding these obstacles, Plaintiffs ask that this Court exercise its authority in the interest of justice by considering this motion since no undue surprise or prejudice would be caused to Defendant because:

(1) the documents referenced herein were authored by Defendant and it is well aware of their contents, development, and history.

(2) this lengthy motion is necessitated in large part by Defendant's own failure to preserve evidence and disclose relevant documents in response to discovery requests; and

(3) Plaintiffs do not seek any delay in trial.

In the alternative, Plaintiffs respectfully request that, if the Court is unwilling to extend the time for consideration of this motion, that the Court clarify its prior order on the exclusion of evidence of complaints by other consumers is applicable only to the Mr. Wicander's specific testimony relating to the approximately twenty-seven instances of complaints regarding other Sea Ray vessels and to the testimony of Mr. Rackcliffe regarding his own problems with Sea Ray products.

## IV.
### THE TESTIMONY OF THOMAS WICANDER PERTAINING TO HIS OPINIONS, CONSUMER COMPLAINTS AND PROBLEMS WITH SEA RAY VESSELS SHOULD BE ALLOWED

A. Mr. Wicander was properly disclosed as an expert on the defects present in Plaintiffs' boat and the design and installation issues and damages related thereto.

Mr. Wicander submitted a statement pursuant to Rule 26 of the Federal Rules of Civil Procedure. A copy of this statement and the accompanying and referenced documents are attached hereto as Exhibit "Y".

His testimony is relevant to the material issues of the existence of exhaust system design defects, the damage caused by said defects, the magnitude of danger of the defects, the consequences of Defendant's failure to warn Plaintiffs of the necessity of utilizing a different flushing process in the retrofit exhaust system, as well as Defendant's negligence in repairing the Vessel and performing installations in conjunction therewith.

28

Mr. Wicander's expert report dated October 7, 2003 states that:

> This testing was conducted to determine the condition of both engines due to the occurrence of both engines hydro locking on or about June 9, 2001 and the possibility of water ingestion over a period of time resulting from a defective exhaust system. On the basis of that testing the following results were determined: . . . Based upon the noted test results, it was my opinion that the condition of the engines had been seriously compromised. . . . Exhausts Manifolds . . . have heavy rust, mainly under exhaust elbows . . . Cylinders . . . have significant scoring present. It is my opinion that both engines have ingested water over a period of time prior to the hydro locking on or about June 9, 2001. No single incident could have caused the damage present.

Contrary to Defendant's contention that Mr. Wicander never offered any opinion that the boat or exhaust system suffered from any design defect, that the defect could have been corrected, or that any alleged defect rendered the boat dangerous or unsafe, his report explicitly identifies fault and dangerous problems with the design and installation of the exhaust system, including problems relating to the "old" style exhaust elbows and gaskets, and indicates the possibility of correction by stating that the elbows "should have been upgraded when exhaust retrofit was performed." See Report, page 3.

The Report clearly opines that the hydrolocking on June 9, 2001 was not the sole cause of damage, implying that the engines' problems of water ingestion spanned a greater timeframe as indicated by the wide-spread and extensive scoring in the cylinders. Also, the data noted in the report relating to compression pressure and leak down percentages as well as the diagrams and paperwork accompanying the report illustrate the magnitude and danger of the defects and represent the consequences and damages resulting from the hydrolocking and longer-term water ingestion caused by the faulty exhaust system and failure to amend the flushing instructions.

Furthermore, in February of 2004, Defendant deposed Mr. Wicander, conducting more than three hours and more than one hundred and thirty pages worth of detailed questioning and dialogue regarding his opinions, reports, and the bases thereof. Therefore, the allowance of this testimony on these matters does not pose any danger of "surprise."

Mr. Wicander's situation in the present matter is distinguishable from the cases cited by Defendant in this regard.[1]

In his deposition, Mr. Wicander clearly explained how he determined that there were chronic water ingestion issues, design and installation defects, and damage to the engines based on the following considerations and findings:

(1)    The overboard relief hose in the new exhaust system was designed and or installed by Sea Ray in both the port and starboard engine exhaust systems to be higher than the top of the exhaust elbows, contrary to indications for safe installment found in the relevant MerCruiser installation manuals (Wicander deposition, page 71-72, 76-79);

(2)    The compression pressure measures were below the General Motors standard of 130 psi plus or minus 5 appearing in various cylinders during the compression test (Wicander deposition, pages 61-62, 67);

---

[1]    In its reply to Plaintiff's Opposition to the motion in limine, Defendant references Doe v. Johnson, 52 F.3d 1448, 1464 (7th Cir. 1995) as an example of expert opinion formed after the expert's deposition being excluded because it was not disclosed before trial. Mr. Wicander's testimony is distinguishable in at least two regards: (1) Mr. Wicander's opinions were formed and articulated prior to and during the deposition; and (2) Trial has not yet begun, therefore this Court could still grant Plaintiffs the opportunity to clarify or disclose Mr. Wicander's opinions.

Similarly, Defendant cites to the unpublished opinion of another district court in In re Omeprazole Patent Litig., MDL Docket No. 1291, 2002 U.S. Dist. LEXIS 3225, 16-17 (S.D.N.Y. Feb. 26, 2002) for the proposition of illustrating the exclusion of opinions not previously disclosed in expert reports, but disclosed on the eve of the expert's direct testimony. Such is not the case with Mr. Wicander who: (1) disclosed his opinions in his deposition more than four years prior to trial; and (2) still has more than a week before he could be called to the stand.

(3)     Leak-down percentages were significantly higher than the acceptable percentages of eighteen to twenty percent (Wicander deposition, page 71) ;

(4)     His expertise as a Sea Ray and MerCruiser Certified mechanic (Wicander Deposition, pages 12-13);

(5)     The extent and location of "Significant scoring" in the cylinders indicated a longer-term water ingestion problem, predating the factory repairs and the single hydro-locking incident (Wicander Report, p. 3; Wicander Deposition, pages 116-112-113, 117);

(6)     His observations and awareness of similar water ingestion defects in other Sea Ray boats with the same unique Sea Ray collector style exhaust system which had originally been installed in the Vessel (Wicander deposition, pages 99, 101-103);

(7)     The extent and location of the internal rusting of the exhaust manifolds and gaskets (Wicander deposition, pages 105-108, 115);

(8)     Sea Ray's failure to replace and update the defective MerCruiser gaskets in the course of their installation of the changed exhaust system (Wicander deposition, page 106); and

(9)     Sea Ray's failure to warn the Mains that the newly installed retrofit exhaust system required them to utilize a different flushing procedure (Wicander deposition, page 126;

These deposition passages also demonstrate Mr. Wicander's opinion that Sea Ray was negligent and or defective in its manufacturing and installation and caused damage and danger to Plaintiffs and their Vessel through their positioning of the overboard relief hoses, failure to replace and update the defective MerCruiser gaskets at the time of repairs, and failure to warn them that their retrofit replacement exhaust system was not compatible with the original flushing instructions given to them at the time of purchase.

Therefore, Defendant's contentions that Mr. Wicander's opinions and the bases thereof were not disclosed are both false and misleading and Plaintiffs respectfully request that this Court deny the motion in limine.

Alternatively, should this Court find any deficiencies in Mr. Wicander's disclosure or report, Plaintiffs respectfully request leave to amend or supplement Mr. Wicander's report to remedy any defects.

**B. Mr. Wicander's testimony and records of other consumer complaints relating to Sea Ray's exhaust systems is admissible for the non-hearsay purpose of demonstrating notice**

Evidence of complaints by other consumers and problems with their Sea Ray yachts is both relevant and probative with regard to demonstrating that Sea Ray had notice and knowledge of the defects in design, manufacture, and installation of their boats and the exhaust systems and parts contained therein.

To the extent that Mr. Wicander would be testifying *that he communicated reports* of such problems or defects to Sea Ray, his statement would not be offered to prove the truth of the matter asserted (i.e. the defects or problems themselves) but rather Defendant's knowledge and awareness thereof. See, Federal Rule of Evidence 801(c)

(restricting the definition of hearsay to evidence "offered to prove the truth of the matter asserted"); <u>Benedi v. McNeil-P.P.C., Inc.</u>, 66 F.3d 1378, 1385 (4th Cir. 1995) (case reports and summary charts were not hearsay because they were offered to prove notice).

The direct and indirect lines of communications between Mr. Wicander and Sea Ray will be established in various ways:

(1) Mr. Wicander will testify that he had direct contact with Sea Ray personnel in connection with at least one former Sea Ray engine replacement assignment involving exhaust resonance and water ingestion with the same exhaust system as that found in the Vessel purchased by Plaintiffs well before the time period in which the Boat was returned to the Sea Ray plant.

(2) Additionally, Mr. Wicander routinely interacted with Bassett Boat Company, an agent and dealer of both Sea Ray and MerCruiser.    See, e.g. Wicander deposition, pages 27, 118-119, 127, 133.) Bassett Marine, in turn sent these findings on to Sea Ray and MerCruiser. See Wicander deposition, page 118 ("I send my findings to Bassett Boat Company . . . Mark Varone usually confirms the findings, and then he contacts Sea Ray or MerCruiser). Furthermore, Mr. Varone of Bassett Boats is a fact witness in this case and can be called to testify and lay the foundation for this chain of communication of defects and problems from Mr. Wicander to Sea Ray.

(3) Mr. Wicander was in communication with Sea Ray because he was contacted by David Wade, a Sea Ray customer service representative regarding Mr. Wicander's opinions of the damage.  (See Wicander deposition, page 27.)

Contrary to Defendant's assertion that such evidence would constitute hearsay, Mr. Wicander's testimony would not be hearsay to the extent that he was describing his own first-hand observations of damaged or deficient exhaust systems while at the trial.[2] Additionally, written complaints and maintenance reports would qualify under the business records exception to the hearsay rule pursuant to Federal Rule of Evidence 803(6).

### C. Testimony and records of other consumer complaints and problems relating to Sea Ray exhaust systems are admissible as a basis for expert testimony.

The testimony and records pertaining to other consumer complaints and problems with Sea Ray vessels should be admitted because they are a proper basis for the expert opinion of Mr. Wicander, and the probative value of this evidence in assisting the jury to evaluate the expert's opinion substantially outweighs the prejudicial effect pursuant to Rule 703 of the Federal Rules of Evidence.[3]

Marine mechanics rely on industry trends and collective knowledge regarding the qualities of various brands of products in conducting their work. Multiple instances of similar water ingestion problems in the same, similar, or related exhaust systems is certainly reasonably relied upon by experts for the purpose of forming inferences and opinions pursuant to Rule 703 of the Federal Rules of Evidence.

---

[2] Rule 801(c) of the Federal Rules of Evidence defines "hearsay" as "a statement, *other than one made by the declarant while testifying at the trial* or hearing, *offered* in evidence *to prove the truth of the matter asserted*. (Emphasis added.)"

[3] Rule 703 provides that:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

Wicander's testimony regarding Sea Ray manufacturing and design problems with similar vessels is therefore admissible as a justifiable basis for his expert opinion regarding causes and valuation of damages.

Evidence of these other consumer complaints is not beyond the scope of Wicander's disclosed testimony, which relates to problems causing both engines to ingest water over a period of time, and should not come as any surprise to Defendant as it was discussed in his deposition. See Wicander Report, page 3; Wicander deposition, pages 99, 101-103, 117, 128

The first-hand knowledge of Wicander and the business records maintained by Pilots Point regarding other consumers are reliable. Additionally, the probative value of similar water ingestion issues in boats deriving from the same manufacturer and utilizing the collector style exhaust systems with the same material characteristics [4] is extremely high with regard to assessing defective design, manufacture, and installation. Furthermore, Sea Ray would have the opportunity to cross-examine Mr. Wicander regarding the same so as to prevent any unjustifiable prejudicial effect.    See, e.g. Benedi, 66 F.3d 1378, 1384-1385 (Expert testimony "need not be based upon identical case studies or epidemiological data."   The district court properly admitted expert testimony referencing sixty reports that the defendant had received which documented other cases of the same drug-alcohol interaction that was at issue in the case.  **"It was the jury's role to assess the weight and credibility of the evidence . . ."**).

---

[4] Mr. Wicander established the similarity of these other boats in his deposition. Wicander Deposition, pages 99 ("*similar* boats (emphasis added)), 100, 117 ("boats *like that* (emphasis added)"; pages 101-103 (Sea Rays have a "unique exhaust system.  It's their own."  "They're the only ones that I've seen with their [collector-style] style exhaust system").

The inclusion of testimony and other evidence by Mr. Wicander's relating to other complaints by Sea Ray consumers with boats utilizing similar exhaust systems would greatly assist the jury in evaluating his opinion.

### D. Mr. Wicander should be permitted to testify as both a fact witness and an expert witness.

Plaintiffs hereby respectfully request that this Court grant them leave to amend previous disclosures so as to add Mr. Wicander as a fact witness.

As discussed in section A herein, allowing Mr. Wicander to testify as a fact witness will not result in undue prejudice or surprise because Defendant has already conducted thorough discovery related to his opinions during a lengthy deposition and have had more than four years to review it.

Furthermore, Defendant was in direct communication with Mr. Wicander during attempts at diagnosing and repairing the Vessel and thus are well aware that he has percipient information as a witness to many of the events described herein and should have reasonably foreseen his testimony.

Sea Ray has already filed **three** supplements to the Joint Trial Memorandum, some of which proposed the addition of fact witnesses. Plaintiffs respectfully request that Defendant grant them the same courtesy.

### V.

### EVIDENCE OF OTHER CONSUMER COMPLAINTS AND EXHAUST PROBLEMS IS HIGHLY PROBATIVE AND SHOULD BE ALLOWED TO PROVE BOTH DEFECT AND NOTICE

Defendant's contentions that the instant evidence is not relevant and that the probative value is outweighed by potential prejudice are unfounded and in brazen bad faith.

It is well established that evidence of other accidents and complaints is relevant and admissible both to: (1) prove the existence of a defect or danger in a product; and (2) show that the defendant had notice of the defect or danger; so long as the other accidents are "substantially similar" to the accident at issue in the litigation. See, e.g., <u>Mihailovich v. Laatsch</u>, 359 F.3d 892, 908 (7th Cir. 2004).[5]

In assessing the potential reasons for excluding the evidence, the key consideration is substantial similarity between the other incidents and the one at issue. <u>Mihailovich</u>, 259 F.3d 892, 911.

In assessing the degree of commonality, courts will look to whether the various incidents "share a common cause." If they do, they are admissible absent other factors suggesting that their admission will result in undue prejudice.    <u>Mihailovich</u>, 259 F.3d 892, 908.

> **'Substantially similar' does not mean 'identical.'** . . . the range between similar and identical is **a matter to be addressed on cross-examination.** (Emphasis added.)

<u>Id</u>. See also, <u>Bitler v. A.O. Smith Corp.</u>, 391 F.3d 1114, 1126 (10th Cir. 2004)("we do not require a showing of exact similarity); <u>Smith v. Ingersoll-Rand Co.</u>, 214 F.3d 1235, 1248 (10th Cir. 2000) ("*The substantial similarity rule does not require identical products; nor does it require us to compare the products in their entireties. The rule requires substantial similarity among the variables relevant to the plaintiff's theory of defect.* (Emphasis added.)").

---

[5] In <u>Mihailovich</u>, the Court held that the district court had abused its discretion by excluding evidence of other accidents that had occurred the same location. 359 F.3d 892, 894, 914.

The increased number of complaints and accidents arising out of a dangerous segment of roadway and requests to remedy the situation were deemed relevant and should have been admitted, even though there was already ample evidence in the record establishing that the area was dangerous. <u>Id</u> at 906.

A lesser degree of similarity is needed when the other incidents are offered solely to establish notice of a potential danger than when they are offered as proof of a dangerous situation. See Mihailovich, 259 F.3d 892, 908; Benedi, 66 F.3d 1378, 1386.

"To be admissible on the theory of notice, the incidents must be similar enough to the event in question that they would have alerted the defendant to the problem or danger at issue." Smith v. Ingersoll-Rand Co., 214 F.3d 1235, 1248.

Whether or not a past complaint or incident resulted in litigation "really is of very limited use in weighing the probative value." Mihailovich, 259 F.3d at 912.

Differences in subsequent models of a product do not necessarily destroy similarity for purposes of determining probative value, even where the later models involve additional safety controls. See Bitler v. A.O. Smith Corp., 391 F.3d 1114 (evidence of prior accidents involving unscreened safety valves was admissible, notwithstanding the fact that the safety valve involved in the explosion contained a mesh screen).

Any dissimilarities between the prior incidents can be developed on cross-examination, and they go to the weight of the evidence. See, e.g. Jones & Laughlin Steel Corp. v. Matherne, 348 F.2d 394, 400-401 (5th Cir. 1965) (evidence of other failures of the same product was properly admitted where there was no surprise because the defendant had been asked to disclose information relating to prior failures in the interrogatories and where the differences between the circumstances of the other accidents could have been developed, on cross-examination, to go to the weight to be given to such evidence by the jury); Benedi, 66 F.3d at 1386.

A balancing test of probative value of the evidence versus unfair prejudice is set forth in Rule 403 of the Federal Rules of Evidence.

Evidence that the Defendant or industry was aware of the defects or problems at issue is relevant and highly probative to the issues of notice and defect.  See, e.g. Benedi v. McNeil-P.P.C., Inc., 66 F.3d 1278; Bitler, 391 F.3d at 1126 ("Offering evidence that the industry was aware as early as 1967 [of the problem at issue] served the purpose of demonstrating notice to [defendant] and of highlighting the potential existence of a defect – part of the underlying theory of the plaintiff's case . . .")

The consideration of substantial similarity and the weighing of probative value against unfair prejudice in contexts similar to the present case is exemplified by Benedi v. McNeil P.P.C., Inc., supra.  In Benedi, as in the present case, defendants asserted that certain case reports and charts should have been excluded: (1) because the case reports were not substantially similar to the plaintiff's case and thus not admissible to prove notice; and (2) under Federal Rule of Evidence 403 because the danger of unfair prejudice outweighed any probative value.  The court determined that this evidence of was properly admitted for the purpose of proving notice, and noted that the district judge had properly given a limiting instruction to the jury that it could not consider the reports and case summaries for the truth of the matter asserted.  See Benedi, 66 F.3d 1378, 1385-1386.

> **When prior incidents are admitted to prove notice, the required similarity of the prior incidents to the case at hand is more relaxed** than when the prior incidents are admitted to prove negligence.  **The incidents need only be sufficiently similar to make the defendant aware of the dangerous situation.**  (Emphasis added.)

Benedi, 66 F.3d 1378, 1386.

Furthermore, the court noted that the dissimilarities between the plaintiff's situation and those reported in the reports and case summaries at issue went to the weight given the evidence by the jury, not to admissibility:

> The dissimilarities between Benedi's situation and those reported in the DERs do not affect the admissibility of the evidence, but rather go to the weight that the jury gives to the evidence. . . . Whether the dissimilarities were significant was for the jury to determine.

Benedi, 66 F.3d at 1386.

> The probative value of these reports was not outweighed by the danger of unfair prejudice, because **the reports were highly probative on the issue of notice** and because [the defendant] was free to, and did, offer testimony rebutting the significance of these reports. (Emphasis added.)

Benedi, 66 F.3d at 1386.

In his deposition, Mr. Wicander established that the complaints by other consumers were substantially similar in that they involved the same collector-style exhaust system which is relevant to the theory of defect in this matter. Wicander Deposition, pages 99 ("similar boats"), 100, 101-103 (Sea Rays have a "unique exhaust system. It's their own." "They're the only ones that I've seen with their [collector-style] style exhaust system"), 117 ("boats like that"); Smith v. Ingersoll-Rand Co., 214 f.3d 1235, 1248.

The bulletins authored by both the MerCruiser and Sea Ray divisions of Brunswick Corporation further illustrate that the MerCruiser engines and exhaust systems installed in Sea Ray yachts and the water ingestion problems pertaining thereto are sufficiently similar so as to warrant a common set of bulletins and instructions from the boat and engine manufacturers relating to their installation and repair.

Furthermore, the past complaints by other consumers also establish notice, which requires a lesser showing of similarity.

The great probative value of this evidence substantially outweighs any danger of prejudice, and any differences among the incidents may be developed by Defendant on cross-examination, where they will go to the weight given to the evidence by the jury.

As such, these complaints by other consumers should be admitted and the motion in limine should be denied.

## VI.

## AMBIGUITY AS TO THE SCOPE OF THE RULING

Both the Defendant's motion in limine and the Court's order granting the same specifically define the evidence to be excluded as "complaints by other consumers."

The body of the motion includes a hidden plea to exclude evidence of "alleged problems with boats manufactured by Sea Ray." Not only is this category of evidence so extraordinarily broad as to defy a logical definition, but Defendant has failed to proffer any legal justification for the exclusion of this evidence. Defendant has not even provided as an example a single piece of evidence which it intends to have excluded by this secondary plea. See Defendant's Motion in Limine to Exclude Evidence of Complaints by Other Consumers, page 1.

Although this Court's Order dated March 5, 2008 indicates, generally, that the "motion in limine to exclude evidence of complaints by other consumers is being granted," no mention is made of problems with boats manufactured by Sea Ray. Rather, the Court only identified two specific sets of evidence to be excluded:

41

(1) The complaints of the approximately twenty-seven (27) consumers whose engines were serviced by Mr. Wicander; and

(2) The testimony of Russell Rackcliffe relating to complaints and issues regarding his Sea Ray yacht.

See, generally, Order Re Defendant's Motion in Limine to Exclude Evidence of Complaints by Other Consumers, pages 1-3.

As neither the motion in limine nor the Court's ruling thereon specifically addresses the vaguely referenced category of "evidence of alleged problems with boats manufactured by Sea Ray," Plaintiffs can only assume that the Court only intended to exclude the specific evidence of consumer complaints addressed in its Order.

Furthermore, evidence of "problems with boats manufactured by Sea Ray" is unquestionably relevant and does not fall under any exclusionary rules.

Plaintiffs' claims of products liability, breach of warranty, revocation of acceptance, and negligence all turn on problems with the Mains boat which was manufactured by Sea Ray.

Given the centrality of the issue of defective products to the Mains' claims, it is unsurprising that Defendant was unable to justify the exclusion of evidence of the same in the instant motion.

In addition, Plaintiffs have ample reliable evidence of documents prepared and distributed by Sea Ray and MerCruiser indicating both that the problems afflicting the Mains' Vessel have existed in Sea Ray vessels for over twenty years and that Sea Ray and MerCruiser have had knowledge and notice of these problems since at least the early 1980's.

Therefore, Plaintiff's respectfully requests that this Court, in conjunction with its reconsideration of its ruling on the motion in limine to exclude evidence of complaints by other consumers, clarify the scope of evidence excluded, if any.

## VII.

### CONCLUSION

For all of the reasons set forth herein, Plaintiffs respectfully request that this Court reconsider its prior ruling and deny Defendant's motion in limine to exclude evidence of complaints by other consumers.

Respectfully submitted,

PLAINTIFFS,
PETER D. MAINS and LORI M. MAINS

By _____/s/ Richard J. Nikas_____
    Richard J. Nikas, Esq.
    Connecticut Federal Bar Number PHV02528
    HERRICK NIKAS
    1201 Dove Street, Suite 560
    Newport Beach, California 92660
    Telephone: (714) 546-1400
    Facsimile: (714) 546-4111
    rnikas@herricknikas.com
    Their Attorney

## CERTIFICATION

I hereby certify that on this date a copy of the foregoing **Motion to Reconsider Ruling on Motion in Limine to Exclude Evidence of Complaints by Other Consumers** and accompanying **[Proposed] Order and Memorandum of Points and Authorities in Support of Motion to Reconsider Ruling on Motion in Limine to Exclude Evidence of Complaints by Other Consumers** were filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Richard J. Nikas

Richard J. Nikas
Connecticut Federal Bar Number PHV02528
