Vol. II - Page 96

1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF CONNECTICUT

3

4    - - - - - - - - - - - - - - - x
                                   :
5    PETER D. MAINS and LORI M. MAINS:  No. 3:01CV2402(AWT)
                                   :
6                    Plaintiffs,   :
                                   :
7               vs                 :
                                   :
8    SEA RAY BOATS, INC.           :
                                   :  HARTFORD, CONNECTICUT
9                    Defendant.    :  APRIL 2, 2008
                                   :
10   - - - - - - - - - - - - - - - x

11

12

13                        **<u>JURY TRIAL</u>**

14                        <u>VOLUME II</u>

15

16        BEFORE:

17                    HON. ALVIN W. THOMPSON, U.S.D.J.

18

19                    and a Jury of Nine

20

21

22

23                              Diana Huntington, RDR-CRR
                                Official Court Reporter
24

25

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    APPEARANCES:

 2         FOR THE PLAINTIFFS:

 3                  JOHN L. SENNING, ESQ.
                        16 Saybrook Road
 4                      Essex, Connecticut 06426

 5                  HERRICK NIKAS, LLP-CA
                        1201 Dove Street, Suite 560
 6                      Newport Beach, California 92660
                    BY:  RACHEL D. LEV, ESQ.
 7                       RICHARD J. NIKAS, ESQ.

 8         FOR THE DEFENDANT:

 9                  DAY PITNEY, LLP
                        CityPlace I
10                      Hartford, Connecticut 06103-3499
                    BY:  JAMES H. ROTONDO, ESQ.
11                       DANIEL J. FOSTER, ESQ.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

## TABLE OF CONTENTS

2

3

PLAINTIFFS'

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PETER MAINS | 109 | 209 | 267 | -- |
| LORI MAINS | 273 | 285 | 288 | -- |
| THOMAS WICANDER | 289 | -- | -- | -- |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com

1                        **9:24 A.M.**

2              THE COURT:  I told the jurors we'd be a little

3    delayed this morning getting started.

4              I have a few points I want to cover with counsel

5    before we get started.  I'll be quick.

6              I did get the response from the plaintiff to the

7    defendant's objections, thank you.  That was helpful.

8              I didn't finish rereading everything with

9    respect to Mr. Verone until late last night, and I didn't

10   have a chance to write anything out yet, but I'm going to

11   give you the broad parameters so you have an idea where we

12   are.

13             The most important point is the motion in limine

14   that was filed with respect to evidence of complaints by

15   other consumers, which is Document Number 107, was a

16   motion in limine to exclude evidence of any alleged

17   consumer complaints or alleged problems with boats

18   manufactured by Sea Ray other than those made by the

19   plaintiffs concerning boats owned by them.  In addition,

20   Sea Ray seeks an order of this Court prohibiting

21   plaintiffs' counsel from inquiring regarding these

22   complaints in his examination and cross-examination.

23   That's the motion that was filed.  That's the motion I

24   granted.

25             Now, there's an augmentation in other papers

1    that have been submitted by the plaintiffs about

2    misunderstanding as to the scope of the order.  There was

3    a request filed in a motion.  I granted that motion.  And

4    then I explained my reasoning with respect to certain

5    points that had been raised in opposition to the motion,

6    but by only commenting on certain points that had been

7    raised in opposition to the motion, that didn't mean I

8    wasn't reaching the rest of the motion.  I didn't think I

9    had to address things where there had been no argument

10   made in opposition to the request for relief that was

11   granted.  That's the most important point.

12            And that ruling applies not only to Mr. Verone

13   but any witness.  The purpose of filing a motion in limine

14   is to get a determination before trial as to how certain

15   aspects of the trial will be conducted.  And so that's the

16   most important point to keep in mind, because parameters

17   of that ruling control everything.  We're not talking

18   about Mr. Verone, not talking about Mr. Wicander, we're

19   talking about what's covered by the scope of the motion.

20            Secondly, we had a lot of discussion about

21   Mr. Verone having personal knowledge relating to things --

22   related to the boat at issue here, sorry.  I see a big

23   problem, having gone through all of the comments that were

24   made yesterday under Rule 701.  And I don't know, based on

25   most of the things that were said, whether the plaintiff

PDF created with pdfFactory trial version www.pdffactory.com

1    can get around 701, I think the third clause.  Okay.

2            And I am going to write up something on this

3    because it's an important issue.  I wanted to give you all

4    the benefit of where I was.

5            And then I was anxious to get to the objections

6    to the exhibits, which I did.  I'm going to talk about

7    that next.

8            How many copies of the plaintiffs' exhibits are

9    there, Mr. Nikas?

10           MR. NIKAS:  We have several sets, Your Honor.

11   We just handed the courtroom clerk one set.  There's one

12   set that I'll be using to examine the witness and I have

13   one set myself.

14           THE COURT:  Is there a set that has original

15   stickers on the first 40 documents?

16           MR. NIKAS:  Unfortunately, there is, Your Honor,

17   and that's the set that the Court has been using.  We will

18   provide a duplicate original set after the close of court

19   today or before start of court tomorrow.

20           THE COURT:  My set, which is the set that

21   arrived Monday, has original stickers on exhibits above

22   Number 40, but copies of 1 through -- and I didn't know if

23   there was a set that had original stickers for those.  If

24   it is, it would be best to use those.

25           MR. NIKAS:  Apparently there is, Your Honor.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  Great.  The courtroom deputy will

2    use those, and that's what she will mark and that's what

3    will go into the jury.  You can return that to whoever

4    else would like another set.

5          I didn't have a chance to mark all of these up,

6    but I want to give a little guidance as to some of the

7    rules of evidence that I think may be at issue here.

8          I think the plaintiff is seeking to offer some

9    documents under 803(1), the present sense impression

10   exception.  I'll tell you what has to be satisfied there.

11   Not only must the declarant have personally perceived the

12   event, the declaration must be a simple explanation or

13   description of the event, and the declaration and event

14   described must be contemporaneous.  And I know there's

15   some problems on some of the points that the -- where that

16   one has been listed by the plaintiffs.  And also there

17   must be little or no time for calculated misstatement, and

18   the statement is often made to one who has equal

19   opportunity to observe and check misstatements.  There's a

20   Seventh Circuit case that says the statement must describe

21   an event or condition without calculated narration.  Okay?

22          So those conditions will have to be satisfied in

23   order for something to come in under 803(1).

24          There are a couple of points I think where the

25   plaintiff referred to 803(5), recorded recollection.  And

PDF created with pdfFactory trial version www.pdffactory.com

1    there are three requirements that must be satisfied.  The

2    memorandum or record must concern a matter about which the

3    witness once had knowledge but now has insufficient

4    recollection to testify fully and accurately.

5         I see at least one exhibit where I don't think

6    the plaintiff wants to try and get something in under

7    803(5) because it's basically going to mean the witness is

8    going to be saying she can't remember anything.  It must

9    have been made or adopted by the witness when the matter

10   was fresh in the witness's memory and it must reflect that

11   knowledge correctly.  And the showing of impaired memory

12   is something that is usually a pretty important part of

13   the analysis there.

14        There are also elements of the exception under

15   803(6), and I assume everybody's generally familiar with

16   that.  You have to establish that the document was

17   prepared in the normal course of business, made at or near

18   the time of the events it records, based on the personal

19   knowledge of the entrant or informant who had a business

20   duty to transmit the information.  And for each one of

21   these, there's going to have to be an adequate foundation

22   laid.

23        There was a reference, I believe, to 803(14) in

24   one of the plaintiffs' responses.  I don't see how that

25   even comes close to applying, so I'm not going to waste

PDF created with pdfFactory trial version www.pdffactory.com

1    time on it.  But, suffice it to say, that it basically

2    relates to deeds and other documents affecting property

3    interest.  It's not a broad definition of property

4    interest.

5            And then there is also a reference to 803(17),

6    the market reports and commercial publications.  And there

7    is some judicial gloss on that rule as well.  But the most

8    important point is that it's something that has to be in

9    general use by an industry, with the emphasis on "general

10   use by an industry."  An example that is given in -- or

11   the public, but I don't think we're talking about the

12   public here.  An example would be market reports,

13   telephone directories, weather reports, mortality tables.

14   And there was another one that I didn't want to mark up my

15   treatise so I didn't jot that one down.  Database used by

16   the National Insurance Crime Bureau.  Things like that.

17   So it's not just something that happens to be used

18   commercially.  The exception is not that broad.

19           There's also a reference in the reply to the

20   objections as to something being admissible because it's

21   the basis for the expert's opinion.  I think if you look

22   at that rule, I'm pretty sure it's 703, you're going to

23   see that things need not be admissible in order to be the

24   basis for an expert witness.  So you can't say because the

25   expert relied on it, it's admissible.  That doesn't work.

PDF created with pdfFactory trial version www.pdffactory.com

1          I do want to make sure that counsel understand

2     four other points.  Number one, it may be that at some

3     point counsel are going to seek to refresh the

4     recollection of a witness.  Refreshing the recollection of

5     a witness requires that you first establish that the

6     witness can't remember.  And secondly, when you refresh

7     the witness's recollection with a document, the witness

8     doesn't then testify from the document.  And I think in

9     order to manage that, it's probably easiest if you give

10    the witness the document, the witness refreshes his or her

11    recollection, and then you take the document away.  Then

12    we don't have anybody inadvertently sort of looking down

13    and talking from the document while they're testifying.

14    It will be clear to the jury their recollection has been

15    refreshed and to what extent.

16          MR. ROTONDO:  If we're using a document to

17    refresh a witness's recollection that hasn't been marked

18    as an exhibit --

19          THE COURT:  It should be marked for

20    identification.

21          MR. ROTONDO:  Thank you.

22          THE COURT:  Secondly, there's certain documents

23    that have been excluded because of a late attempt to

24    supplement the plaintiffs' trial memorandum, but I want to

25    make sure everybody is clear that under our order, that

1   order applies to documents that are going to be used in

2   the plaintiffs' case in chief.  So if we're not talking

3   about the plaintiffs' case in chief, I should not be

4   getting objections that those documents had not be been

5   produced.  Really, they need not have been disclosed at

6   all to be used for rebuttal or impeachment.  That's what

7   our standing order says.

8           Thirdly, there may be points in time, probably

9   will be, where there's a disagreement whether there's been

10  an adequate foundation laid for admissibility of a

11  document.  My practice -- and I don't think it's

12  uncommon -- is I allow counsel who disputes whether

13  there's been an adequate foundation laid to voir dire the

14  witness.  And if I think it's sort of heading in the right

15  direction or I'm not sure, I'll look at one of you and

16  I'll say, Do you want to voir dire?  That means you can

17  get up and you can examine the witness yourself to

18  determine whether there is an adequate foundation.  You're

19  not stuck with the questions asked by opposing counsel.

20  So if I look at you and say, Do you want to voir dire,

21  that's what that means.  Okay?

22          And then, finally, procedure for offering

23  exhibits, has to be marked for identification, you lay a

24  foundation.  Once it's admitted, if it is admitted, make

25  sure it gets to the courtroom deputy so she can mark it as

1    full, and then you can take it back and use it for your

2    own purposes, if you want to.

3         I'm assuming, based on our discussion yesterday,

4    that there will be -- I'm assuming there will be no 408

5    objections based on what was said yesterday.

6         With that, I think I'm anxious to get the jury

7    in.  Do we have our witnesses lined up?

8         MR. NIKAS:  We do, Your Honor.  Just one point

9    of clarification.

10        We talked about marking exhibits for

11   identification rather than for admission as evidence.

12   What protocol would you like to use between the parties in

13   terms of marking them?

14        THE COURT:  If you have an additional document,

15   just start with the next number that hasn't been used in

16   your binder, give it to the courtroom deputy, she'll mark

17   it for you unless you premarked it.

18        Same thing for the defense.

19        MR. NIKAS:  Thank you, Your Honor.

20        THE COURT:  So are we ready to go with our first

21   witness?

22        I think we'll just stick to our schedule which I

23   have modified so it's easy.  I told the jurors we probably

24   will only go to 4:00 today.

25        We'll bring the jury in.

PDF created with pdfFactory trial version www.pdffactory.com

1        There is a question from the jury, and I'm going
2   to tell them that I'll instruct them on the law at the end
3   of the case.  I'll try to remember to do that first.
4            (Whereupon, the jury entered the
5            courtroom.)
6        THE COURT:  Good morning, ladies and gentlemen.
7        Please be seated everyone.
8        Let me address a couple of things.
9        First of all, there was a question from a juror
10  asking about a lemon law.  And my response to you is that
11  at the end of the case, I will instruct you on what law
12  applies to this case.  So you can look forward to hearing
13  from me, how's that?
14       Secondly, we are refining our schedule.  We have
15  posted a revised schedule that has you ending at 4:00.  I
16  don't think we'll need quite as much time for evidence as
17  we originally projected yesterday.  And we'll see in terms
18  of people's travel arrangements, if we finish evidence
19  early on a day, we'll just give you some time off.  Okay?
20       I think we're ready for the plaintiffs' first
21  witness.
22       Mr. Nikas.
23       MR. NIKAS:  Your Honor, the plaintiffs would
24  lake to call Peter Mains to the stand.
25       THE CLERK:  Please remain standing and raise

1  your right hand, sir.

2

3                          PETER MAINS,

4         called as a witness, having been first duly

5            sworn, was examined and testified as follows:

6

7            THE CLERK:  Please be seated.

8            Would you state your name and spell your name

9  forward record, sir.

10           THE WITNESS:  Peter Mains, M-a-i-n-s.

11           THE CLERK:  City and state of residence?

12           THE WITNESS:  Avon, Connecticut.

13           THE COURT:  Whenever you're ready, Mr. Nikas.

14

15                       DIRECT EXAMINATION

16  BY MR. NIKAS:

17  Q.   Good morning, Mr. Mains.

18  A.   Good morning.

19  Q.   Mr. Mains, I understand you're the owner of the boat

20  in question?

21  A.   That is correct.

22  Q.   What type of boat did you buy?

23  A.   It's a 1998 Sea Ray 330 Sundancer.

24  Q.   And is this the first boat that you've owned?

25  A.   No, it is not.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   What was the first boat that you've owned?

2  A.   First boat that I owned that was a power boat was a

3  1991 Chris-Craft Crown, Model 252.

4  Q.   And how big was that boat?

5  A.   Overall, 25 feet with an 8 1/2 foot beam.

6  Q.   What is an 8 1/2 foot beam?

7  A.   The overall width from starboard to port.

8  Q.   And that's from right to left?

9  A.   Yes.

10  Q.   Relatively speaking, was that a very large boat?

11  A.   No, it was not.  It was trailable sized.

12  Q.   Was it trailered?

13  A.   Yes, it was.

14  Q.   How many passengers could be carried on board that

15  boat?

16  A.   I don't believe that had a passenger tag.  Some of

17  the smaller vessels around 21 feet and under do have a

18  maximum capacity, but in general, the seating would allow

19  for eight people up in the cockpit area.

20  Q.   And how long did you own that boat?

21  A.   Not quite two seasons.

22  Q.   And that boat was kept in Connecticut?

23  A.   It was kept at our house.

24  Q.   What is a season or a boating season in Connecticut?

25  A.   Pretty much all the contracts at different marinas

PDF created with pdfFactory trial version www.pdffactory.com

1    agree that May 1 through November 1, that six-month

2    period, is the period in which you can rent a slip.

3    Q.    What happens between November 2nd and April 30th?

4    A.    People typically winterize their boats and lay them

5    up for the winter.

6    Q.    What does winterizing mean?

7    A.    That's where any water that remains in the cooling

8    systems is evacuated and replaced with a red-type

9    antifreeze.

10   Q.    So after two seasons of owning this Chris-Craft, what

11   happened to it?

12   A.    It was taken by back Chris-Craft in Sarasota,

13   Florida.

14   Q.    What does "taken back" mean?

15   A.    Purchased back by them from us.  Contract apparently

16   was rescinded.

17   Q.    And why was that vessel purchased back by the

18   factory?

19   A.    They had decided not to produce it any longer because

20   it had severe porpoising issues, number one.

21   Q.    What is porpoising?

22   A.    Porpoising is when you get an undulation of the bow

23   which cannot be eliminated by adjustment of the hydraulic

24   trim tabs or the trimable stern drive.  And the

25   explanation that I was given was that the -- in the design

1  process, the center of gravity and the center of buoyancy

2  were too far apart from each other in order to allow the

3  boat to operate as it should.

4          MR. ROTONDO:  Move to strike.  Hearsay.  The

5  question was why -- he's talking about what Chris-Craft

6  did.

7          THE COURT:  Is it offered for the truth of the

8  matter, Mr. Nikas?

9          MR. NIKAS:  No, it's not.

10  BY MR. NIKAS:

11  Q.   First off, if you can give everybody a lesson --

12          THE COURT:  It will be helpful if you make the

13  objection sooner.

14          MR. ROTONDO:  I appreciate that, Your Honor.  I

15  didn't want to interrupt the witness, but I should.

16          THE COURT:  You should, yes.

17  BY MR. NIKAS:

18  Q.   We tried to do this yesterday, but let's get this

19  started today.  Can you generally describe a boat and the

20  terms that you're going to use?  In other words, the bow

21  is the what?

22  A.   Forward section.

23  Q.   The front, the point end?

24  A.   Yes.

25  Q.   And what's the back called?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.    The after or the stern.

2  Q.    And when you talked about porpoising, could you just

3  describe that with your hand?

4  A.    (Indicating.)

5  Q.    So it would go up and down through the waves?

6  A.    Uh-huh.  It wouldn't even require waves to do that.

7  Flat water conditions would allow it to do that.

8  Q.    And how much money did you receive from Chris-Craft

9  when the vessel was repurchased?

10            MR. ROTONDO:  Objection.

11            THE COURT:  Sustained.

12  A.    Approximately --

13            THE COURT:  When I sustain an objection, that

14  means you don't answer the question, sir.

15            THE WITNESS:  Sorry.

16  BY MR. NIKAS:

17  Q.    When the vessel is repurchased by Chris-Craft, did

18  you decide to repurchase another vessel?

19  A.    Yes, years after that.

20  Q.    How many years elapsed between the time the boat was

21  purchased back by Chris-Craft to the time you bought

22  another boat?

23  A.    Four years, I think.

24  Q.    And four years later what did you buy?

25  A.    We bought a 1996 330 Sea Ray Sundancer.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   Is that the same model of the boat that we're talking

2   about here?

3   A.   Yes, it is.

4   Q.   Two years older?

5   A.   That's correct.

6   Q.   Was it equipped similarly?

7   A.   Yes, it was.  The engines were the same 7.4-liter but

8   the output levels had gone from 340 horsepower to 380

9   horsepower.

10  Q.   In the newer boat?

11  A.   In the newer boat.

12  Q.   How long did you own the 1996 Sea Ray?

13  A.   Two seasons.

14  Q.   And what happened at the end of the second season?

15  A.   At the end of the second season -- actually it was

16  after the end of the first season, the boat was deemed

17  irreparable by the selling dealership, Surfside 3 in

18  Norwalk, Connecticut.

19          MR. ROTONDO:  Objection.  Move to strike.

20  Surfside 3 is not a party in this case.

21          THE COURT:  Sustained.  Motion granted.

22  BY MR. NIKAS:

23  Q.   Did you have any criticisms about the boat?

24  A.   Yes, we did.

25  Q.   To whom did you voice those criticisms?

```
 1   A.    To Al Chianese.

 2   Q.    Who is he?

 3   A.    The general manager at Surfside 3.

 4   Q.    And what is Surfside 3?

 5   A.    It's a large group, possibly seven or eight

 6   dealerships, owned by the Barbera Brothers.

 7   Q.    Were they the dealership that sold you the boat?

 8   A.    No, they were not.  It was Surfside 3 in Lindenhurst,

 9   Long Island.

10   Q.    Was the Surfside 3 that Mr. Chianese worked at the

11   dealership the dealership that serviced your boat?

12   A.    Yes.

13   Q.    And when you brought the boat in for service, how

14   often did you do that?

15   A.    Typically they would come to the slip where the boat

16   was kept to do service work.

17   Q.    How often did you have it serviced?

18   A.    As often as I could get them to come.

19   Q.    And did you have complaints about this boat?

20   A.    Yes, we did.

21   Q.    What complaints did you have?

22   A.    The boat has twin engines, twin transmissions, twin

23   drive shafts and twin propellers.  Each of those

24   assemblies are fastened to the stringer system through a

25   motor mount setup.  So we had received the boat and we had
```

PDF created with pdfFactory trial version www.pdffactory.com

1  driven it back to our port of call, and there was

2  tremendous vibration experienced.  We placed a call to Al

3  Chianese, and he stated that that's the way the boat runs.

4      The following week when I had someone come look at

5  it, one of the fellow dock personnel, he said all of

6  your -- six of your lock down --

7              MR. ROTONDO:  Objection.

8              THE COURT:  Sustained.  Motion granted.

9  BY MR. NIKAS:

10 Q.  What service was performed or what inspections were

11 done on the boat?

12             THE COURT:  I should explain to the jurors, when

13 there's a motion to strike and I grant the motion, that

14 means I'm striking the testimony.

15 BY MR. NIKAS:

16 Q.  When you reinspected the boat after the service was

17 performed, what service had been done to the boat?

18 A.  What service had been -- I don't quite understand

19 your question.

20 Q.  What did you observe them having done when they came

21 out to the boat?

22 A.  They had to realign both engine assemblies.  And at

23 that point it was apparent to them that the engines had

24 never --

25             MR. ROTONDO:  Move to strike.

PDF created with pdfFactory trial version www.pdffactory.com

1            THE COURT:  Motion granted.

2    BY MR. NIKAS:

3    Q.    Was it apparent to you?

4    A.    Oh, yes.

5    Q.    And how did this change the operation of the boat,

6    this alignment that was performed?

7    A.    It created vibration that transferred all the way

8    from the propellers and all the reciprocating and

9    rotational parts in the transmissions, the drive shaft,

10   the Cutlass bearing, the through-hull fitting, and even to

11   the moving engine components.

12   Q.    Are and were you dissatisfied with this?

13   A.    Absolutely.

14   Q.    Did you relate these concerns to anybody other than

15   this dealership?

16   A.    I mentioned it to Dean Beckman and I even showed him

17   my owner's manual which stated that preliminary settings

18   would be set at the factory for these alignment issues and

19   then the boat should be put in the water for 24 hours

20   minimum.  And then those adjustments should be made once

21   again.

22   Q.    Who is Dean Beckman?

23   A.    He is the customer -- not the customer service, the

24   head of the mechanics and maybe now the customer service

25   person at Surfside 3.

1   Q.   So you actually read the manual?

2   A.   Yes.

3   Q.   Did you read all your manuals?

4   A.   Absolutely.  That's the type of person I am.

5   Q.   Okay.  And was any further work performed to this

6   boat?

7   A.   At that point?

8   Q.   At any point.

9   A.   Oh, yes.  Numerous attempts at other minor repairs

10   were made.  We continually complained about issues of

11   water getting into the finished cabin area.  Repairs were

12   made in the vicinity of the aft cabin especially where

13   water was building up in compartments that did not have

14   limber holes draining back to the engine compartment.

15   Q.   What is a limber hole?

16   A.   I'll have to describe how the boat was assembled in

17   order to --

18   Q.   Okay.

19   A.   Basically, a boat is three components:  The hull,

20   which is laid up in a form; and then the deck --

21   Q.   What's the hull?

22   A.   The hull is the riding surface of the boat and the

23   sides of the boat and the prow of the boat.

24   Q.   The prow is the front?

25   A.   Yeah.

PDF created with pdfFactory trial version www.pdffactory.com

1        And then the deck assembly, which later on ends up on

2   top of the boat, that's laid upside you down.  But prior

3   to that being put on the hull of the boat, a stringer

4   assembly is hoisted in and tabbed into place which offers

5   a backbone, in affect, to give the vessel some rigidity.

6   Q.   What's a stringer assembly?

7   A.   Stringer assembly I think in our particular case was

8   a type of excel 100 plywood, which is a waterproof

9   plywood, and it's encapsulated with a fiberglass mat.  And

10  then it's glassed in to the hull bottom.  So it

11  essentially becomes one more-rigid component.

12  Q.   So what are the limber holes now, having gone through

13  this?

14  A.   The limber holes are holes down in the lower portions

15  of the stringers that will allow any water that will

16  infiltrate to work it's way down to the lowest portion of

17  the bilge so that the bilge pumps can evacuate it.

18  Q.   Some water actually does get into the hull, correct?

19  A.   Typically when they design a boat, I don't think they

20  intend for water to get into the boat.

21  Q.   Why do they have bilge pumps?

22  A.   In case you have engine hatch leaks or rudder posts

23  that go through the bottom of the boat, there are packing

24  nuts that need to be adjusted to prevent that weak water

25  from building up to a level to cause harm to other

1  components.

2  Q.   So you have water getting into places it shouldn't,

3  in your opinion, right?

4  A.   Yes.

5  Q.   And were these problems fixed to your satisfaction?

6  A.   No, they were not.

7  Q.   But two years later, after buying this boat, you

8  bought another Sea Ray, correct?

9  A.   Correct.

10  Q.   Why did you do that?

11  A.   The '96 was so problematic that it was deemed

12  necessary to send it all the way back to Palm Coast,

13  Florida, its point of origin, in order to have extensive

14  repairs done.  At that point toward the end of the winter

15  lay-up season, Sea Ray flew me down and I met Frank

16  Osiniak, Dan Stanley, and Steve Holland.  They gave me a

17  plant tour and they took my so-called repaired vessel out

18  for a test drive on the intercoastal waterway, and I made

19  them aware that it was still vibrating seriously.

20       At that point we went back to their office.  Steve

21  Holland stated to me, "We're very sorry, Mr. Mains, but

22  due to the number of issues found with your boat,

23  including the fact that the deck hull joint was only half

24  sealed around its perimeter, that this boat never should

25  have left the factory."  And he said, "Please allow us

1  further attempts at repair so that" --

2  Q.   Did you allow any further repair attempts?

3  A.   Yes.

4  Q.   Did these repair attempts fix the boat to your

5  satisfaction?

6  A.   No, they did not.

7  Q.   What eventually happened to the boat?

8  A.   The boat was negotiated with David Marlow from

9  Sea Ray, and he and my wife decided that we were going to

10  take Steve Holland up on his offer because there were

11  still issues, especially the sudden loud resonance exhaust

12  noise.  And at that point he made arrangements with

13  Surfside 3 to come up with some money and we would make up

14  the difference for upgrading to a 1998 model that had a

15  few extra options which we, of course, paid for on our

16  own.

17  Q.   So, in affect, you traded in that boat, used that

18  boat, to get into the '98?

19  A.   That's correct.

20  Q.   And you purchased your 1998 Sea Ray, what we're

21  talking about in this case, from which dealership?

22  A.   That was Surfside 3 in Norwalk, Connecticut.

23  Q.   When did you get your boat?

24  A.   I don't know the exact date.  I'm going to estimate

25  around April, May -- early May.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   Of what year?

2  A.   Of '98.

3  Q.   May of '98.

4       Where did you actually take delivery of this boat?

5  A.   Norwalk, Connecticut.

6  Q.   And when you took delivery of the boat, did you

7  inspect it?

8  A.   Yes, we did.

9  Q.   What did you do on your inspection?

10  A.   We opened all compartments.  We checked for quality

11  issues.  We reviewed things with both Dean Beckman and Al

12  Chianese and had him make some notes on the sales

13  agreement where deficiencies were apparent.

14  Q.   Were these deficiencies apparent to you or other

15  people?

16  A.   They would be apparent to anyone.

17            MR. ROTONDO:  Objection.

18            THE COURT:  Sustained.

19  BY MR. NIKAS:

20  Q.   Were these deficiencies that you noted?

21  A.   I noticed them.  Al noted them.

22  Q.   So you saw the deficiencies and you told them to

23  Mr. Chianese, who wrote them down?

24  A.   That's correct.

25  Q.   What deficiencies did you note?

PDF created with pdfFactory trial version www.pdffactory.com

```
1   A.   The boat apparently had been lifted by its stern
2   eyes, which are tow eyes.
3   Q.   So there were little metal --
4   A.   Not little.  They're substantial.  They're made for
5   towing another vessel that might be in distress.
6   Q.   There are metal -- steel, I assume?
7   A.   Stainless steel.
8   Q.   Stainless steel circles that are drilled --
9        MR. NIKAS:  Actually, Your Honor, can I use the
10  easel here?
11       THE COURT:  You may.
12       Can the witness see from that angle?
13       Any member of the jury who cannot see, raise
14  your hand.
15  BY MR. NIKAS:
16  Q.   So the stern is the back part here?
17  A.   That's correct.
18  Q.   And the towing eyes you're referring to are located
19  where?
20  A.   The deck-to-hole joint is covered by the rub strip.
21  Q.   That's this silver thing here?
22  A.   That's correct.
23       And the tow eyes are at each corner, port and
24  starboard, aft corner.
25  Q.   Okay.  Port and starboard, left and right, in the
```

1    back here?

2    A.    Correct.

3    Q.    So what did you find at these towing eye points?

4    A.    The boat had been lifted by those tow eyes and it had

5    crushed the rub strip and fractured the fiberglass -- not

6    just the gelcoat, not just the outer coating, but actually

7    had cracked the laminants, approximately 11 inches long on

8    each side of the deck, which is above the rub strip.

9    Q.    So that would be this area here?

10   A.    Yes.

11   Q.    And did Mr. Chianese write down or note this defect?

12   A.    Yes, he did.

13   Q.    What else did you find on your inspection?

14   A.    We found a collapsing cockpit floor.

15   Q.    What is a cockpit?

16   A.    The cockpit is the upper -- typically on this boat,

17   the open area of the boat where the helm position is.

18   Q.    Helm is what?

19   A.    It's the place where someone would operate the boat.

20   Q.    Is that where the steering wheel is?

21   A.    Steering wheel, throttles and shifters and gauges and

22   electronics.

23   Q.    On this boat, which side of the boat is the steering

24   wheel on?

25   A.    Starboard.   Right side.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   There's a wind screen here?

2  A.   Yes.

3  Q.   And the cockpit you're referring to is the floor?

4  A.   That's correct.

5  Q.   You said a collapsing cockpit area?

6  A.   Yes.

7  Q.   What does that mean?  What did you see?  What did you

8  feel?

9  A.   As you walked from the aft section of the boat toward

10  the companion way --

11  Q.   As you walked forward?

12  A.   As you walked forward, the floor would depress under

13  my weight.  And if you were to stand and watch someone

14  else walk over that same area, you would notice that they

15  would do the same thing, depress the floor structure.

16  Q.   Did you experience that in the '96 Sea Ray you had?

17  A.   No, we did not.

18  Q.   How much do you weigh now?

19  A.   Do I weigh now?  Unfortunately, about 250.

20  Q.   Under oath?

21  A.   251.

22  Q.   Were you substantially larger at the time you bought

23  this boat?

24  A.   No.  Probably a shadow of myself now.

25  Q.   You didn't weigh 400 or 500 pounds at that time?

1    A.    No.

2    Q.    Did you observe Mr. Chianese and -- who is the other

3    individual with you?

4    A.    Dean Beckman.

5    Q.    -- mr. Beckman walk on the cockpit floor?

6    A.    Yes, I did.

7    Q.    Did it deflect under their weight?

8    A.    Yes, it did.

9    Q.    They were of average or normal weight?

10   A.    More average, yes.

11   Q.    Did you notice any other defects?

12   A.    There were a number of defects related to that

13   cockpit floor area.  Other module components that were

14   inset into the cockpit area were bolted to that floor

15   area.

16   Q.    Like what do you mean, "module components"?

17   A.    Other fiberglass components that were made up

18   separately and later installed into the cockpit space.

19   Q.    Like?

20   A.    The three-seat -- three-person helm seat on the

21   starboard side and the large single port side seat, and a

22   module behind that which housed a refrigerator and a sink.

23        That specific area also was adjacent to the

24   approximately 4-foot by 7 1/2-foot cockpit -- I'm sorry,

25   engine compartment access door.  And because that area was

PDF created with pdfFactory trial version www.pdffactory.com

1    deflecting so much, the engine hatch cover would bind.

2    And after the engines had been shut down and the heat had

3    built up inside the engine compartment, that large hatch

4    would expand and bind up and the hydraulic lift cylinder

5    that opened it up was incapable of opening it.

6    Q.    When you talk about the engine hatch, that's like the

7    hood of the car?

8    A.    Pretty much so on a boat, yes.

9    Q.    But unlike the hood, you actually stand on it?

10   A.    Yes.  A number of people could stand on it.

11   Q.    But it's actually part of the area -- where would it

12   be on this photograph?

13   A.    Forward of the transom and aft of the radar arch.

14   Q.    So behind this big thing and in front of this thing?

15   A.    That's correct.

16   Q.    Is this something that you would open by hand?

17   A.    You could open it by hand if -- I don't know how to

18   explain this.  Someone my size could with an optional

19   pull.

20   Q.    Was it designed to open by hand?

21   A.    No.

22   Q.    How was it designed to be open on this boat?

23   A.    From the helm position with a rocker switch which

24   provided electricity to a hydraulic lift cylinder.

25   Q.    So if you wanted to open the hatch in this boat, you

PDF created with pdfFactory trial version www.pdffactory.com

1   pushed a button, effectively, a switch, and it opened?

2   A.    That's correct.

3   Q.    And so your complaint was there were times when --

4   A.    You could not open the engine hatch.

5   Q.    Is that important on a boat?

6   A.    Absolutely.  If there's a condition where you have a

7   fuel leak or you have a breach in the hull and water is

8   leaking in beyond the capacity of your bilge pumps, you

9   need to tend to those issues before they become a real big

10  problem.

11  Q.    How often did you open the engine hatch on the two

12  Sea Rays?

13  A.    Every time before I left port I would check fluid

14  levels in the transmissions, in the overflow coolant

15  containers, and in the engines.

16  Q.    Every time?

17  A.    Every time.  I knew my manuals forward and backward.

18  I had even made some calls to America Cruiser and to Sea

19  Ray people in order to get further information about

20  issues that weren't completely covered.  And I even

21  purchased, maybe at a cost of around $50, an additional

22  owner's maintenance manual.

23  Q.    They must have loved you -- withdrawn.

24        So every time you went out, you had to open the

25  engine hatch to inspect the engine and conduct whatever

1   fluid checks you did?

2   A.   That's actually a recommended procedure.

3   Q.   That's in the manual?

4   A.   Yes.

5   Q.   What other defects did you find?

6   A.   May I follow up with one other point?

7   Q.   Sure.

8          MR. ROTONDO:  Excuse me, Your Honor.  I think

9   the witness should be answering the questions asked by

10  counsel.

11         THE COURT:  I suspect he'll ask another

12  question.

13  BY MR. NIKAS:

14  Q.   If you want to continue, go ahead.

15  A.   This has to do with the engine hatch being able to be

16  opened or not opened.  I have in duplicate in my Sea Ray

17  owner's pack MerCruiser directions to back-flush the sea

18  water out of my engines after each leg of each trip.

19  Therefore, when you arrived at your destination and you

20  pulled in dockside, you would typically hook up your shore

21  power cord and then hook up your fresh water hose and

22  back-flush each engine for five minutes at full water

23  pressure without the engine running.  And that was all to

24  preserve the integrity of the motors and slow down any

25  degradation from saltwater corrosion.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    So you were flushing the saltwater out of the exhaust

2    system with fresh water?

3    A.    Yes.   At times when we got to our destination you

4    could not get the engine hatch open, it was bound up.

5    Numerous attempts at repair were made at that issue, and

6    Dean Beckman was witnessed to --

7    Q.    When you were there?

8    A.    I was there also.

9            THE COURT:   One second.

10           MR. ROTONDO:   Move to strike the witness's

11   testimony as to what Mr. Beckman saw or didn't see.

12           MR. NIKAS:   He hasn't testified yet.

13   BY MR. NIKAS:

14   Q.    When Mr. Beckman was in your presence, what did you

15   see?

16   A.    Dean Beckman and Dan -- I don't recall his last name,

17   an employee of Atlantic Boat Repair, from Knoxville

18   Tennessee, hired by Sea Ray.   Dan stated --

19   Q.    No.   What did you observe when you were with them?

20   A.    What did I observe?   Dan took these two fingers and

21   drove them right through the floor, right through the

22   cockpit floor, into the aft cabin headliner and said, Yes,

23   we've seen --

24           MR. ROTONDO:   Objection.

25

1  BY MR. NIKAS:

2  Q.   Don't tell us what he said.

3       He stuck the two fingers through what?

4  A.   Through the fiberglass laminant.

5  Q.   Was this through a hole in the laminant that was

6  supposed to be there?

7  A.   Oh, no.  In the cockpit floor in a normal position

8  where you would be walking.

9  Q.   Okay.  All right.  So you said in the materials

10 received when you got the boat, it had this recommended

11 flushing procedure to flush out the salt water with the

12 fresh; is that right?

13 A.   That's correct.  And the optional manual that I also

14 purchased had the exact same instructions.

15 Q.   Was this like a car that you got a little owner's

16 manual when you bought the boat?

17 A.   No.  It wasn't a little owner's manual.  In fact,

18 it's right to the side of Mr. Rotondo.

19      MR. NIKAS:  Your Honor, may I approach?

20      THE COURT:  You may.

21 BY MR. NIKAS:

22 Q.   Are those the materials that you received when you

23 bought the boat?

24 A.   Yes, they are.

25 Q.   Did you read them all?

1  A.   Yes.  Took me a long time, but I would say yes, each

2  and every one.

3  Q.   What other material did Sea Ray provide you when you

4  bought the boat or did the dealership provide you when you

5  bought the boat?

6  A.   What other literature did they provide?

7  Q.   Was there anything else in addition to all that?

8  A.   I think that's pretty much complete.  The

9  MerCruiser's installation manuals, the operation manuals,

10 all the Sea Ray components, all the components that are

11 purchased and installed by Sea Ray, and we're talking

12 systems that include a vacu flush head, which is a toilet

13 system with a holding tank.  We're talking about heat and

14 air-conditioning.  Television.  Electric winlass, which is

15 an anchor hoist.

16 Q.   So you got it all?

17 A.   It's all right there.

18 Q.   Did you also get something from Sea Ray that said

19 they'd inspected the boat before they sent it to you?

20 A.   Yes.  There was a final checklist that they provided.

21 And they also belonged to ISO 2000.

22 Q.   I'd like to show you an exhibit which has been marked

23 as Plaintiffs' Exhibit Number 2.  Is this a copy --

24         THE COURT:  Do you want to offer the exhibit

25 first, before you show it to the jury, and have it

1   admitted?

2           MR. NIKAS:  I'd like to offer this inservice

3   checklist as Plaintiffs' Exhibit Number 2.

4           THE COURT:  Plaintiffs' Exhibit Number 2 is

5   admitted.

6           MR. ROTONDO:  Yes, Your Honor.  There was an

7   issue with respecting to number of pages, but that's now

8   been fixed.

9           MR. NIKAS:  We fixed that.

10          THE COURT:  So Plaintiffs' 2 is admitted.

11  BY MR. NIKAS:

12  Q.   Do you recognize this?

13  A.   Yes, I do.

14  Q.   Can you read the date in the upper right-hand corner?

15  A.   5/21/98.

16  Q.   Does that refresh your recollection as to the date

17  that you got the boat?

18  A.   Yes.  I would say that's correct.

19  Q.   Did you get the checklist on the day you got the

20  boat?

21  A.   Yes.

22  Q.   So this checklist actually appears to come from

23  Sea Ray, correct?

24  A.   Yes.

25  Q.   And it goes through, I guess, all the components in

PDF created with pdfFactory trial version www.pdffactory.com

1    the boat?

2    A.    That's correct.

3    Q.    And all these things are things that were installed

4    on your boat?

5    A.    Yes.

6    Q.    You had batteries, generator, you had

7    air-conditioning, electrical components, et cetera?

8    A.    Yes, we did.

9    Q.    When you read this, you didn't note any defects that

10   were noted by Sea Ray on this?

11   A.    No, I don't.  No, I didn't.

12   Q.    Did you have to sign a copy of the checklist or do

13   you recall that?

14   A.    I'm not certain, but I think we did.

15   Q.    This is the second page of that document.  Is that

16   your signature?

17   A.    Yes, it is.

18   Q.    And are these criticisms that you had noted on top of

19   this document?

20   A.    I didn't make those notations.  I did not.

21   Q.    Had you seen those notations when you signed this?

22   A.    Yes.

23   Q.    Were these things that you had told somebody about?

24   A.    Yes, they were.

25   Q.    What's the second thing say?

1   A.    Plenums in poor condition.

2   Q.    A plenum is?

3   A.    In laymen's terms, it's a -- I'll have to back up.

4         These engines were cross ram, fuel-injected engines.

5   And the cast aluminum component that capped off the intake

6   manifold, they were damaged from people walking on them

7   with gravel on their shoes.

8   Q.    This is the top of the engine, essentially?

9   A.    Yes.

10  Q.    After you took delivery, did you -- having had some

11  time to spend with the boat, did you notice any other

12  defects?

13  A.    Yes, we did.

14  Q.    Did you write them down?

15  A.    Yes, we did.  And I think we were pretty fair in our

16  attempts at trying to be very specific, searching for the

17  right nomenclature so there would be no issues about what

18  we were trying to get at.

19  Q.    To whom it you provide these complaints to?

20  A.    Mostly to Al Chianese at Surfside 3.  Even though

21  Dean Beckman was service manager, I never understood why

22  someone of Dean's ability was not allowed to handle

23  customer complaints.  They were always filtered through

24  Al.

25            MR. ROTONDO:  Move to strike.

1            THE COURT:  Motion granted.

2   BY MR. NIKAS:

3   Q.   Mr. Beckman will be displeased to find out that.

4        Did you eventually write these down and send them to

5   Mr. Chianese?

6            THE COURT:  We need to --

7            MR. NIKAS:  Your Honor, I'd like to --

8            THE COURT:  Before we publish it to the jury, we

9   have to have it admitted.  We shouldn't put it on the

10  screen until it's been admitted.

11           MR. NIKAS:  Your Honor, I would like to move

12  into evidence Plaintiffs' Exhibit 3 --

13           MR. ROTONDO:  No objection.

14           MR. NIKAS:  -- which is correspondence from

15  Mr. Mains --

16           THE COURT:  Just say Plaintiffs' 3 and then

17  there's no objection, we're all set.

18           No objection, Mr. Rotondo?

19           MR. ROTONDO:  Yes, Your Honor, no objection.

20           THE COURT:  Plaintiffs' Exhibit 3 is admitted.

21  BY MR. NIKAS:

22  Q.   Is this a copy of that first letter?

23  A.   It's a copy of a letter, I don't know if that's a

24  first letter.

25  Q.   This would have been, looks like the first week you

1   had the boat if you bought the boat on the 21st?

2   A.   Yes.

3   Q.   So it looks like you have problems with rpm?

4   A.   Yes.

5   Q.   What does that mean?

6   A.   It could mean a great number of things.

7   Q.   What does "rpm" mean?

8   A.   Revolutions per minute.  Revolutional speed of the

9   crank shift.

10  Q.   How fast engine is turning?

11  A.   That's correct.

12  Q.   Do you remember what the red line on this engine was?

13  A.   These were upgraded 7.4-liter motors.  We paid an

14  additional fifteen or $1800 apiece more for each one.

15  Their operating range was different from the standard

16  7.4-liter motors.  I think those were 4400 and these were

17  supposed to be -- I'm not certain, but I think 4800.

18  Q.   So what you're saying is, at least in these first two

19  items, is you could not reach the maximum output of the

20  engine?

21  A.   That's correct.  And that was with a light load,

22  meaning probably half a tank of water, no waste material

23  in the holding tank, and maybe half gas tank full, and two

24  people on board.  Those numbers are typically what you'd

25  see in a boat that was heavily loaded.  As you increase

PDF created with pdfFactory trial version www.pdffactory.com

1   the load, the engines work much harder and they do not

2   reach their recommended rpm.

3             THE COURT:  Mr. Nikas, you asked did he know

4   what the red line was.  Nobody explained what a "red line"

5   was.

6   BY MR. NIKAS:

7   Q.   Can you tell me what a red line is on an engine?

8   A.   The red line on an engine is the manufacturer's

9   recommended maximum rotational speed.  Anything beyond

10  that could cause components to fail.  These particular

11  motors had -- these particular motors had rev limiters,

12  revolution limiters.  So if for some reason the -- the

13  boat were to crest off a wave and the propellers were to

14  suddenly become unloaded, the rev limiters would kick in

15  and reduce the amount of revolutions so no internal

16  component damage would occur.

17  Q.   Since you brought it up, let's clear up two things.

18       It's called a red line, why?

19  A.   Red meaning warning.  Don't exceed this.

20  Q.   Did your boat have tachometers?

21  A.   Yes, it did.

22  Q.   A tachometer is a rev counter?

23  A.   Yes, it is.

24  Q.   So it tells you how many revolutions the engine is

25  turning?

1    A.    That's correct.

2    Q.    Above the maximum manufacturer's limit, what color is

3    the dial?

4    A.    Red.

5    Q.    It's red.

6          And then you talked about the boat coming out of the

7    water, correct?  How does that happen?

8    A.    If an operator is not paying careful attention to

9    wave conditions in front of him -- and I'm speaking if

10   you're traveling at a planing speed, which this boat would

11   typically run at, that would have been about 26 miles an

12   hour.  If you hit a crested wave that was high enough, and

13   I'm talking about probably 4 1/2 feet, you could launch

14   the boat so that it left the water.  Not a recommended

15   thing to do.

16   Q.    Like a stone skipping over a pond?

17   A.    That's correct.

18   Q.    Why would the engines be turning faster if the vessel

19   was in air or water?

20   A.    Water is much more dense than air.  The task that

21   they're performing is thrusting water backwards so the

22   boat can be propelled forward.  When they relieve

23   themselves of that pressure on the water, then the engines

24   will suddenly be unloaded and can rev wildly.

25   Q.    But you had something to prevent that on this boat?

1  A.   That's the way these new engines, which we waited

2  for, that's what they came with.

3  Q.   Of the other things on this list of defects or

4  criticisms, what were the most important ones to you?

5           THE COURT:  You know what?  We were scheduled

6  for a break at 10:30.  Why don't we take a 15-minute break

7  now and you can pick up with that line of questioning.

8           We'll take a 15-minute break.

9               (Whereupon, a recess followed.)

10

11           THE COURT:  We'll ask our witness to retake the

12  stand and bring in the jury.

13               (Whereupon, the jury entered the

14               courtroom.)

15           THE COURT:  Please be seated everyone.

16           Whenever you're ready, Mr. Nikas.

17  BY MR. NIKAS:

18  Q.   Mr. Mains, we were talking about the letter that you

19  sent the dealership that sold the you the boat apparently

20  the first week you had it; is that correct?

21  A.   Yes, it is.

22  Q.   What are these items?

23       Are these criticisms?  Are these deficiencies that

24  you noted?  What are they?  What do they reflect?

25  A.   Observations.  Possible deficiencies, as in the case

1  of the engine rpms.  Some more serious issues, like the

2  carbon monoxide detector being faulty, that's a safety

3  issue.  There are a number of minor issues there.

4  Probably gelcoat cracks that didn't appear when the boat

5  was first delivered.

6  Q.   So there's cosmetic issues, some safety issues, some

7  other things?

8  A.   That's correct.

9  Q.   Like you asked for an additional handrail?

10 A.   That was just an issue for when my small nieces and

11 nephews would be coming so they could make it up and down

12 the steep companionway stairs without being unable to

13 reach the one provided.

14 Q.   And when service is done to a boat, do you take the

15 boat somewhere or does the repairer or the mechanic come

16 out to the boat?

17 A.   If the boat had been purchased closer to Norwalk,

18 Connecticut, then I'm sure they would require that you

19 bring it to them for repair.  But seeing as our marina,

20 which was Deep River Marina in Deep River, Connecticut,

21 had so many of their boats there also, they would try to

22 group together repair trips so that they could knock off a

23 few of these on the same day or more.

24 Q.   So who conducted the repairs to this boat?

25 A.   Mostly Dean Beckman and Fred -- I don't recall his

1  last name.

2  Q.   What entity?  What company?

3  A.   Surfside 3.  And also Greg Wilson from Sea Ray, who I

4  understood traveled the countryside taking care of more

5  serious issues.

6  Q.   So after sending this letter of the 27th, did

7  Surfside 3 come out and look at the boat and repair the

8  boat?

9  A.   Yes, I'm sure they must have.

10        MR. NIKAS:  Your Honor, I'd like to offer

11 Plaintiffs' Exhibit Number 4.

12        MR. ROTONDO:  No objection, Your Honor.

13        THE COURT:  Plaintiffs' Exhibit 4 is admitted.

14 BY MR. NIKAS:

15 Q.   This looks like the same letter with some additional

16 handwriting?

17 A.   That's correct.

18 Q.   Is any of this handwriting yours?

19 A.   Yes.  The real scribbly looking script there is.

20 Q.   What is scribbly looking script, this stuff or this

21 stuff?

22 A.   The one on the left.

23 Q.   So this?

24 A.   That's mine.

25 Q.   And what are these check marks?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    The check marks are probably -- they probably mean

2    that the issue was either looked at or repaired.

3    Q.    Did you write these notes after Surfside 3 had come

4    out to look at the boat?

5    A.    Yes.

6    Q.    And after this time that Surfside 3 had come to look

7    at the boat, did you still have criticisms about the boat?

8    A.    Yes, we did.

9    Q.    What were those?

10    A.    There were so many, to be honest.  I would have to

11    look at each successive follow-up letter.

12    Q.    Every time you had a concern or criticism, did you

13    write a letter?

14    A.    No, we did not.  We had many phone communications

15    with Al.  On occasion he would put Dean on the line.

16    Q.    But you always notified the dealership when there was

17    some problem?

18    A.    Yes, we did.  There was a concern that because we had

19    an issue with our last boat and this one was already

20    showing signs of more serious issues, there was great

21    concern that we had to get all of our complaints

22    registered to them during that first six-month period of

23    ownership where the boat was in operation, because

24    essentially when the boat is laid up for the remaining six

25    months of the year, mechanical issues, electrical issues

PDF created with pdfFactory trial version www.pdffactory.com

1    and that sort of thing aren't going to appear to you.  The

2    Sea Ray warranty was a one-year warranty and the engine

3    warranty was a three-year warranty.

4    Q.   So I'd like to show you an exhibit which is marked as

5    Number 5.

6              THE COURT:  Any objection?

7              MR. ROTONDO:  No objection, Your Honor.

8              THE COURT:  Plaintiffs' Exhibit 5 is admitted.

9    BY MR. NIKAS:

10   Q.   And is this another one of your communications with

11   the dealership?

12   A.   Yes, it is.

13   Q.   And these are more deficiencies that you noted?

14   A.   Yes, they are.

15   Q.   So we've got some fiberglass issues, some engine

16   issues, the soft spot on the cockpit floor and some water

17   leaks; is that correct?

18   A.   And air-conditioning.

19   Q.   Were these deficiencies fixed to your satisfaction?

20   A.   No, they were not.  Maybe a few might have been.

21   Q.   Next I'd like to show you Plaintiffs' Number 6?

22              MR. ROTONDO:  No objection.

23              THE COURT:  Plaintiffs' Exhibit 6 is admitted.

24   BY MR. NIKAS:

25   Q.   This is from September it looks like; is that right?

1    A.    That's correct.

2    Q.    And what's noted in this letter?  Are these more

3    deficiencies?

4    A.    Yes, they are.

5    Q.    So we've got, looks like leaks?

6    A.    Yes, water level gauge.

7    Q.    Some coolant leaks.

8          On the second page, can you describe in greater

9    detail what is listed in that last item?

10   A.    The "six times during"?

11   Q.    Yes.  What does that mean?

12   A.    May I read it?

13   Q.    Sure.  I'd like you to actually expand on it?

14   A.    I am having difficulty seeing it, it's far away.

15         That's better.

16         Okay, I've read it.

17   Q.    What are you talking about here?

18   A.    As with the '96, the '98 boat did the exact same

19   thing.  Periodically, and to my best estimate, every one

20   and three quarters' to two and a quarter's hours of

21   operation, there would be a sudden loud resonance noise

22   atypical of the way the exhaust normally performed, and it

23   would be coming from either starboard or port side, never

24   both, one or the other.  And once it began -- once it

25   began, you couldn't get rid of it.  And many, many times

PDF created with pdfFactory trial version www.pdffactory.com

1    we would have people on board and if they were seated,

2    especially on the transom seat, which is in the back of

3    the boat, they would get up and come up to me and say,

4    "Something's wrong with your boat."  I would say, "It does

5    this and nobody can tell me why."

6    Q.   When you describe a loud resonance noise, what does

7    that mean?  What did it sound like?

8    A.   It was very much off normal tone.  And it was much

9    louder than it was just prior to when it started.

10   Q.   Could you tell the difference in your exhaust noise

11   between low throttle or medium throttle or high throttle?

12   Would you be able to note -- did you know the boat well

13   enough?

14   A.   Oh, yes, absolutely.

15   Q.   How would you fix this problem?

16   A.   Everyone else noticed it too.

17             MR. ROTONDO:  Move to strike.

18   A.   Lay people, our guests --

19             THE COURT:  One second, please.

20   A.   Our guests who knew nothing --

21             THE COURT:  We have an objection.  When there's

22   an objection, you stop.

23             Objection sustained.  Motion to strike granted.

24             You can lead him through it, Mr. Nikas.

25             MR. NIKAS:  That's all right, Your Honor.

1    BY MR. NIKAS:

2    Q.    How did you fix this problem?  How would you get rid

3    of it?

4    A.    The only way to get rid of it was to throttle back

5    and come off plane, which would mean the boat would go

6    from planing mode to displacement mode, it would settle

7    into the water.  As it came to a stop, put the boat in

8    reverse for a short moment, back to neutral, back to

9    forward, and proceed to get back up on plane.

10          We tried to -- we tried to determine if this was a

11    product of the underwater exhaust system, which also had

12    above-water relief ports, by turning the boat sharply

13    where it would heel to take a corner.  And that was -- we

14    determined early on that that was not the cause of the

15    issue.

16    Q.    So you went through and conducted your own experiment

17    as to whether it happened if you're going left or right?

18    A.    That's correct.  May I add, this is a cruising

19    vessel.  It's not a performance high-speed boat.  It's a

20    relatively low-speed cruising vessel.

21    Q.    How fast would you normally cruise at?

22    A.    24 to 26 statute miles per hour, that's discreet

23    miles per hour.  Nauts would be 20, 21.

24    Q.    I'd like to show you Plaintiffs' Number 7.

25              MR. ROTONDO:  No objection.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  Plaintiffs' Exhibit 7 is admitted.

2     BY MR. NIKAS:

3     Q.    Now, is this the same letter?

4     A.    I can't see the date.

5     Q.    September 1st.  And here is Number 6.

6     A.    Yes.

7     Q.    What makes Number 7 different is there appears to be

8     some writing on it?

9     A.    Could you expand that once again?

10          Yes, that's correct.

11    Q.    Whose writing is that?

12    A.    That's mine.

13    Q.    What do the check and the circle signify?

14    A.    The checks mean that attempts at repair had been

15    provided, and the zeros mean that they have not.

16    Q.    And so the check is the repairs have been provided to

17    your satisfaction?

18    A.    No.

19    Q.    They don't mean that?

20    A.    Not necessarily.

21    Q.    What does the circle mean then?

22    A.    Needs attention.

23    Q.    What does a really big circle mean?

24    A.    I don't know.  A goof.

25    Q.    Now, there's a cc at the bottom of this letter, which

PDF created with pdfFactory trial version www.pdffactory.com

1  is right here.  Who are these individuals?

2  A.   Sean Stubblefield was our Sea Ray boat customer

3  service representative.  And P. Moore, he might have held

4  a little bit higher position up.

5  Q.   These were people employed by Sea Ray?

6  A.   That's correct.

7  Q.   So you sent them a copy of this letter?

8  A.   Yes.

9  Q.   Where is 423?  Do you know where you sent the letter?

10  A.   I don't understand your question.

11  Q.   The Area Code, what state did you send these to?

12  A.   Knoxville, Tennessee.

13  Q.   That's where their factory is?

14  A.   World headquarters and the point of origin where this

15  boat was manufactured.

16  Q.   It's where the boat was built?

17  A.   Yes.

18  Q.   So I'd like to show you another exhibit which will

19  have been marked as Plaintiffs' Number 8.

20          MR. ROTONDO:  No objection, Your Honor.

21          THE COURT:  Plaintiffs' Exhibit 8 is admitted.

22  BY MR. NIKAS:

23  Q.   This is a three-page letter.  And to whom did you

24  send this letter?

25  A.   Mr. Sean Stubblefield.

1   Q.   At Sea Ray?

2   A.   That's correct.

3   Q.   So why did you send this letter to Mr. Stubblefield

4   rather than to the dealership at this point?

5   A.   We had lost some faith in the dealership because

6   there were a number of times previous where Al Chianese

7   either did not understand or didn't want to understand

8   what our complaints were.

9            MR. ROTONDO:  Move to strike.

10           THE COURT:  Motion granted.

11  BY MR. NIKAS:

12  Q.   Were you satisfied with the repairs performed by the

13  dealership?

14  A.   No.

15  Q.   And was that dissatisfaction a basis for your writing

16  directly to Sea Ray?

17  A.   Yes, it was.

18  Q.   So you sent this list on October 5th to

19  Mr. Stubblefield.  And in the first sentence you say, "We

20  hope the following will aid in the preparation process for

21  the repair that is scheduled."  What had you scheduled for

22  the boat?  What repair are you talking about?

23  A.   I'm sure the cockpit floor deficiency was the most

24  major one at that time.  And the mounting of the

25  windshield frame had led to these large looping cracks

1    that would go from screw fastener to screw fastener to

2    screw fastener.  There were four of them in front of where

3    the windshield was mounted to the slightly raised portion

4    of the foredeck.

5    Q.    And this is in October of '98; is that right?

6    A.    Yes.

7    Q.    That nears the end of your season?

8    A.    Pretty close.  Within three weeks, yes.

9    Q.    And you also -- did you send this letter to anybody

10    else?

11    A.    Yes, I included Al Chianese from Surfside 3.

12    Q.    And Mr. Moore?

13    A.    And P. Moore, yes.

14    Q.    Were you satisfied with the repairs that followed

15    this letter?

16    A.    No, we were not.

17    Q.    Mr. Mains, I'd like to show you Plaintiffs' Number 9,

18    a four-page letter.

19         MR. ROTONDO:  No objection, Your Honor.

20         THE COURT:  Plaintiffs' Exhibit 9 is admitted.

21    BY MR. NIKAS:

22    Q.    And this is being sent to whom?

23    A.    David Wade.

24    Q.    Who is Mr. Wade?

25    A.    He seemed to be the replacement for Mr. Sean

PDF created with pdfFactory trial version www.pdffactory.com

1    Stubblefield.

2    Q.    And what did you tell him in this letter, generally?

3    A.    Well, it's pretty much summed up in the first

4    paragraph.

5    Q.    Which is?  Without reading it, what were you trying

6    to express?

7    A.    The quality control, which Sea Ray so heavily

8    advertises and quotes with the ISO 9002 standard, is way

9    off base.  And I recommended that wouldn't it be more

10   beneficial to the corporation to monitor quality control

11   instead of having to spend all this additional time to

12   perform repairs.  As in most things, most repairs

13   typically cannot be graded as good as if things were done

14   correctly in the first place.

15   Q.    So this is in the winter of '98, correct?

16   A.    I can't see the date.

17         Yes.

18   Q.    So it goes on and there's another list and another

19   list.  You talk about the core material and water getting

20   in there.  What does that mean?

21   A.    Which bullet point are you looking at?

22   Q.    This one right here.

23   A.    Yes.

24   Q.    What are you referring to there?

25   A.    Briefly or in detail?

1    Q.    Briefly.

2    A.    Briefly.  Can I use my hands?

3    Q.    Sure.

4    A.    The boat is configured in a V shape (indicating) and

5    the lowest part of the boat is where the engines are

6    seated on the stringers.  It's typically known as the

7    bilge compartment.  And we had a four-stringer system,

8    like so, and then the hull sides (indicating).

9        It was apparent after the first season of ownership

10   that this large cored section, which has been referred to

11   by many different names, hull stiffener, core pad, and I'm

12   sure there are others, it was noticed that when the boat

13   was hauled and the bilge was cleaned out that water was

14   coming out from this laminated area, which is adjacent to

15   the structural stringers.

16   Q.    What do you mean "when the boat was hauled"?

17   A.    When the boat was taken off the water and prepared

18   for winter storage.

19   Q.    So you take the boat out of the water when winter

20   comes?

21   A.    Almost everyone does in this climate.

22   Q.    Because?

23   A.    Ice can destroy a vessel.

24   Q.    So where do you store it?

25   A.    At that time it was stored at Midway Marina in

1    Haddam, Connecticut, indoors, by the way.  You had a

2    choice of keeping it outdoors and having it shrink-wrapped

3    or pay a little extra and have it stored indoors.

4    Q.   Why do you store it indoors?

5    A.   I just felt it was better for it, all and all.  It

6    wouldn't be subject to heavy snow loads.  The shrink wrap,

7    snow and ice can accumulate.  That can become an issue.

8    Q.   So did you receive anything in response to this

9    letter?

10   A.   Could you put it back on the screen?

11   Q.   Sure.

12        You sent this four-page letter to Sea Ray.  Did they

13   do anything about it?

14   A.   I'm sure I got a response letter.

15   Q.   I'd like to show you an exhibit marked Number 10.

16             MR. ROTONDO:  No objection, Your Honor.

17             THE COURT:  Thank you.  Plaintiffs' Exhibit 10

18   is admitted.

19   BY MR. NIKAS:

20   Q.   Is this the letter that you received on December 15?

21   A.   Yes, it is.

22   Q.   What does it mean that the Knoxville facility will

23   work to ensure that all outstanding issues are addressed

24   in the spring?

25             MR. ROTONDO:  Objection, Your Honor.

1          THE COURT:  Want to rephrase that?

2          MR. NIKAS:  Sure.

3    BY MR. NIKAS:

4    Q.   After receiving this letter, what did you do with the

5    boat?

6    A.   I'm not certain.  I think you're asking me was the

7    boat stored indoors for the rest of that season?

8    Q.   What happened to the boat?  What repair attempts

9    followed this letter?

10   A.   Atlantic Boat Repair, under the direction of Tim

11   Mills, sent out two repairman, Ed Whitey and Dan, who

12   attempted structural issue repairs and cosmetic repairs.

13   Q.   They came out to the boat?

14   A.   Yes, they did.

15   Q.   After they left, did you inspect those repairs?

16   A.   Yes, I did.

17   Q.   And were you satisfied with those repairs?

18   A.   Not at all.

19   Q.   I'd like to show you an exhibit marked 11.

20          MR. ROTONDO:  No objection.

21          THE COURT:  Plaintiffs' Exhibit 11 is admitted.

22   BY MR. NIKAS:

23   Q.   This looks to be like -- looks to be a copy of your

24   December 9 letter except on the successive pages 2, 3 and

25   4, it looks like there are some letters, some circles, and

PDF created with pdfFactory trial version www.pdffactory.com

1  some writing.  And can you tell me whose writing that is

2  or do you recognize that writing?

3  A.   I think it says "repairs complete to" -- I don't know

4  what the last word is.

5  Q.   And the date?

6  A.   4/21/99.

7  Q.   Do you know what these initials are, these PMs?

8  A.   That means that we spoke of what attempt was pursued.

9  Q.   What does the PM stand for?

10  A.   That's my initial, Peter Mains.

11  Q.   Did you write those initials?

12  A.   Yes, I did.

13  Q.   So you went through the list and initialed those

14  things that had been fixed?

15  A.   I was not in attendance when the final repairs were

16  being done.  If my memory serves me right, those repair

17  people were there for two or three days and there were

18  three of them.  Tim Mills, Whitey, and Greg Wilson from

19  Sea Ray.  When they shoved that in front of me, they were

20  late for a plane and they just briefly went over the list

21  and said, "We did this, this, this, this and this."  The

22  things that I could look at quickly, I did.  And they were

23  off.

24  Q.   Okay.  So spring comes, you use the boat when it was

25  warm enough to do so?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes.

2    Q.    And did you continue to note defects in 1999?

3    A.    Yes, we did.

4    Q.    I'd like to show you an exhibit marked Plaintiffs'

5    13.

6              MR. ROTONDO:  No objection to 13, Your Honor.

7              THE COURT:  Plaintiffs' Exhibit 13 is admitted.

8    BY MR. NIKAS:

9    Q.    Is this a letter you sent in October of '99?

10   A.    Yes.

11   Q.    So you actually got through -- did you get through

12   the whole season until the end of the season before you

13   had a problem or before you sent off a letter?

14   A.    That may be possible, but I'm absolutely certain that

15   there were many phone calls in between probably to

16   Mr. Wade and to Al Chianese.

17   Q.    You were extremely diligent about noting these

18   deficiencies?

19   A.    Oh, sure.

20   Q.    Why?

21   A.    Why were we persistent?

22   Q.    You've got -- I couldn't tell you, I think

23   Mr. Rotondo did yesterday, there are a lot of deficiencies

24   noted here.

25   A.    No one ever disputed any of the observations that I

1  made.

2  Q.   Was this typical behavior for you, to be this

3  diligent?

4  A.   No, I wouldn't say it's typical, but there were so

5  many issues at hand that if you accepted some of them,

6  you'd be looking at serious issues down the line.

7  Q.   Okay.

8  A.   Where you'd be footing the bill to repair all this

9  stuff at tens of thousands of dollars possibly to repair

10  the flexing cockpit floor and so on.

11  Q.   So following this letter which was sent it looks like

12  to Sea Ray, was the boat repaired to your satisfaction?

13  A.   Could you below it up just a little bit?

14  Q.   Sure.

15  A.   We weren't satisfied with repairs that were attempted

16  on those specific issues.

17  Q.   I'd like to show you Plaintiffs' Number 14.

18       MR. ROTONDO:  No objection, Your Honor.

19       THE COURT:  Plaintiffs' Exhibit 14 is admitted.

20  BY MR. NIKAS:

21  Q.   And this is the same date but looks like there's

22  handwriting on this?

23  A.   Yes.

24  Q.   Does this follow the same convention, that you went

25  through the list of problems you had and made further

1  notes to see if they were completed to your satisfaction?

2  A.   Yes.

3  Q.   Well, in the next year, 2001, did you use the boat in

4  the spring?

5  A.   Yes, we did.

6  Q.   And I'd like to show you an exhibit which is marked

7  Number 16.

8            MR. ROTONDO:  No objection.

9            THE COURT:  Plaintiffs' Exhibit 16 is admitted.

10  BY MR. NIKAS:

11  Q.   Can you explain, then, what you mean in the third

12  sentence of the first paragraph?

13  A.   "Please make every effort to return our boat

14  undamaged and in spotless condition, which is the way you

15  received it."

16       That was a request from us after it had been

17  determined that the vessel could not substantially be

18  repaired by local efforts, Surfside 3 specifically.

19  Q.   Are you saying that Sea Ray took your boat?

20  A.   Yes.

21            MR. ROTONDO:  Your Honor, I object to the

22  question.

23  BY MR. NIKAS:

24  Q.   Did Sea Ray take your boat?

25  A.   Yes, they did.  I did not make that request that they

1  take it.

2  Q.   But they took it?

3  A.   They shipped it back to Knoxville, Tennessee.

4  Q.   Were you there when it was picked up?

5  A.   Yes, I was.

6  Q.   How did they get it there?

7  A.   They have their own transport system, tractor trailer

8  type, customized trailer for hauling vessels.

9  Q.   Did 12 guys pick it up and put it on the trailer?

10  Was there a crane?

11  A.   No.  The Davidson brothers, Scott and Elliot

12  Davidson, owners of the Midway Marina, they assisted the

13  transport driver in putting it on the tractor trailer.

14  Q.   And did you expect that when the boat was returned to

15  you from the Sea Ray factory, that all of these two years

16  of deficiencies would be fixed?

17  A.   Of course.  Assurances were made that that would

18  happen.

19  Q.   And it says, "We would like to be kept abreast of

20  progress"?

21  A.   That's correct.

22  Q.   What did you ask?

23  A.   I asked that Mr. Wade, who was handling the issue,

24  would keep us notified as to where he was in regard to

25  going through the checklist.

1      I mentioned early on that I would make myself
2  available at my own expense to fly to Atlanta where we
3  have relatives and then drive to Knoxville to inspect the
4  boat prior to its return to make certain that everything
5  was -- we were in agreement that everything was taken care
6  of.
7      And could you repeat the question again?
8  Q.   Sure.  That's what you meant by being kept abreast.
9      Were you kept abreast during the repairs?
10 A.   No.  I called probably on a monthly basis.  I
11 never -- I don't recall him ever calling me other than the
12 very last call that I received.
13 Q.   What do you mean by a monthly basis?  How long was
14 the boat gone?
15 A.   Approximately five and a half months.
16 Q.   When did they pick the boat up?
17 A.   November -- somewhere around November 10 I'm
18 recalling.
19 Q.   And you wanted it back by?
20 A.   Mid-April so that it could be reoutfitted with some
21 of the items that were affixed to the radar arch.  All of
22 them had to be removed by Mike and Joe Sperzel from Essex
23 Marine in order that the boat would be transport-wrapped.
24 Q.   Transport-wrapped, meaning?
25 A.   Shrink-wrapped.

PDF created with pdfFactory trial version www.pdffactory.com

Vol. II - Page 162

```
 1   Q.   When did you get the boat back?

 2   A.   April 20?  I'm not certain.  April 20 is my guess.

 3   Q.   Of 2001?

 4   A.   That's correct.

 5   Q.   Were you there when it arrived?

 6   A.   Yes, I was.

 7   Q.   Was it wrapped?

 8   A.   It was wrapped.

 9   Q.   So it looked like it was covered in white plastic?

10   A.   Yes.  Down below the rub rail.  Everything above that

11   point was covered with white translucent.

12   Q.   So everything above this point is wrapped in plastic?

13   A.   Yes.

14   Q.   Were you there when they took the plastic off?

15   A.   They didn't take the plastic off at that point.

16   Q.   When was the plastic removed?

17   A.   I'm going to guess anywhere from three days to seven

18   days later, the following weekend.

19   Q.   Did you remove it personally?

20   A.   Yes.

21   Q.   Were you excited to remove it?

22   A.   Sure.

23   Q.   When you removed it, what did you do?

24   A.   Inspected everything that was requested to be

25   repaired.
```

1          I might mention also that an inspection of the

2    exposed portion of the boat was done.  And the transport

3    truck driver and Scott Davidson, the owner of Midway

4    Marine, verified all --

5               MR. ROTONDO:  Objection.

6               THE COURT:  Sustained.

7    BY MR. NIKAS:

8    Q.   What did you find during your inspection?

9    A.   The inspection that occurred when the boat first

10   arrived was only to the area exposed below the shrink

11   wrap.

12   Q.   After you removed the shrink wrap, what did you find

13   in your inspection?

14   A.   Loose railings, the stanchion plates where they

15   fastened to the deck --

16   Q.   You're talking about these handrails here?

17   A.   That's correct.

18   Q.   What else?

19   A.   Numerous areas of new damage.

20   Q.   What kind of damage?

21   A.   Scuffs, scratches, hull gouges.  Transducer ring was

22   cracked.  The transducer is a depth sounder, which is a

23   through-hull fitting.  And there's a water-type ring.

24   That was cracked.  And also one of the coolant water

25   inlets was crushed.  And then one of the underwater

PDF created with pdfFactory trial version www.pdffactory.com

```
 1  exhaust bullets was damaged, dented.
 2       At that point I got on the phone and I called
    Mr. Wade and he got Mr. Marlow on the phone.
 3
 4  Q.   Did you tell them about all this damage?
 5  A.   I told him about all the damage.  He said, "Please
 6  put the truck driver on the phone."  I passed him the
 7  phone and they went through my observations and there was
 8  no disagreement whatsoever.
 9       Mr. Davidson, I asked if he would verify, and he did
10  also.
11            MR. ROTONDO:  Your Honor, I move to strike what
12  Mr. Davidson supposedly said or didn't say.
13            THE COURT:  Motion granted.
14  BY MR. NIKAS:
15  Q.   You asked Mr. Davidson to verify?
16  A.   Yes.
17  Q.   And this was your list on February 12 of things that
18  needed to be addressed, right?
19  A.   Yes.
20  Q.   I'd like to show you Plaintiffs' Number 17.
21            THE COURT:  Plaintiffs' 17?
22            MR. ROTONDO:  No objection, Your Honor.
23            THE COURT:  Plaintiffs' 17 is admitted.
24  BY MR. NIKAS:
25  Q.   And this has the same date and appears there's
```

1   handwriting on it?

2   A.   That's correct.

3   Q.   Is that your handwriting?

4   A.   Yes, it is.

5   Q.   This talks about the transportation damage?

6   A.   Yes, it does.

7   Q.   Did you continue to inspect the boat after its return

8   from Sea Ray?

9   A.   If you're asking me once the shrink wrap was off did

10  I inspect the topsides and the cockpit area, yes.  And the

11  engine compartment, yes.

12  Q.   Did you eventually put the boat in the water?

13  A.   Yes.

14  Q.   And attempted to use it?

15  A.   Once.

16  Q.   You used it once?

17  A.   Yes.

18  Q.   Did that lead you to write another letter?

19  A.   I'm sure.

20  Q.   I'd like to show you Plaintiffs' 18.

21          MR. ROTONDO:  No objection to Plaintiffs' 18,

22  Your Honor.

23          THE COURT:  Plaintiffs' 18 is admitted.

24  BY MR. NIKAS:

25  Q.   Now, it looks like we're complaining to more than one

1  person?

2  A.   That's correct.

3  Q.   Who were you complaining to now?

4  A.   We had included Mr. Marlow and Mr. Stooksbury and

5  Mr. Wade, and I think the chain of command started at the

6  top.

7  Q.   You're complaining to everybody now?

8  A.   Yes.  I previously talked to those people anyhow.

9  Q.   And these are the cracks and the damaged broken

10 piece, right?

11 A.   Uh-huh.

12 Q.   On the first page?

13 A.   Yes.

14 Q.   On the second page, looks like we've got more

15 denting, crushing, cracking, bending, overspray in the

16 first set of bullets, right?

17 A.   That's correct.

18 Q.   Explain the first bullet after this line?

19 A.   The retrofit exhaust system now makes the strut

20 mounting bolts inaccessible.

21 Q.   What do you mean "retrofit"?

22 A.   The exhaust system, which was named a collector

23 system, was changed out during the period of time that the

24 boat was at the factory to a lift-style system.  My

25 immediate observation was that this new system created

PDF created with pdfFactory trial version www.pdffactory.com

1    inaccessibility to some very important components, namely

2    the autopilot.  In that case, the strip mounting bolts and

3    the rudder post packing nuts, all terms that are

4    confusing, I know, but that's the only way I know how to

5    describe them.

6    Q.    When the boat left your marina to go to Tennessee,

7    did you know that the exhaust system was going to be

8    changed?

9    A.    No.  That was never mentioned.

10   Q.    Did you authorize that work?

11   A.    No, I did not.

12   Q.    At any time were you notified that the exhaust system

13   had changed until you actually saw it for the first time?

14   A.    A few days before we took delivery, I received a call

15   from Mr. Wade saying that the boat was being loaded for

16   transport as we speak.

17   Q.    So when you opened the engine hatch, was what

18   Mr. Wade had told you correct, that the exhaust system had

19   been changed?

20   A.    Yes, it had.  In fact, I had asked him to describe

21   during that conversation how it had changed.  And he was

22   using terms that I was unfamiliar with, like "a can" and

23   "a pot," terms I had never heard before and I had no clue.

24   The only thing I did ask him that I was reassured of was

25   that the above water relief outlets and the underwater

1    exhaust bullets were still the point of exit for the

2    engine's exhaust.

3    Q.    Did Sea Ray provide you with the old exhaust system

4    that had been removed?

5    A.    No, they did not.

6    Q.    Did they provide you with a new owner's manual with

7    the new exhaust system?

8    A.    No, they did not.

9    Q.    Did anybody tell you or were you provided any

10   instructions how to maintain the new exhaust system?

11   A.    No, they did not.

12   Q.    So why did you only use the boat once after you got

13   it back?

14   A.    If I recollect correctly, we had two rainy weekends

15   following that launch date in which repairs -- just after

16   temporary repairs were made by Mike Sperzel and his

17   brother George so the boat could be put in the water.  And

18   then we, as typically we have done with our boating

19   friends, gone on an early season trip that was fairly

20   close to home port.

21   Q.    So on April 30th you sent that letter to all those

22   people and the next day -- I'd like to show you

23   Plaintiffs' Exhibit Number 19.

24            THE COURT:  Defendants' Exhibit 19?

25            MR. NIKAS:  Plaintiffs' Exhibit 19.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. ROTONDO:  Plaintiffs' Exhibit 19, no

2    objection, Your Honor.

3          THE COURT:  Plaintiffs' Exhibit 19 is admitted.

4    BY MR. NIKAS:

5    Q.   So this was the day following that.  And looks like

6    you're sending photos to the factory?

7    A.   That's correct.

8    Q.   And this is the damage?

9    A.   I think this is the damage that occurred -- I'm

10   sorry, that was visible below -- I'm sorry.  It includes

11   both when the shrink wrap was removed and prior photos.

12   Q.   So these are the shipping damage photographs?

13   A.   That's correct.

14   Q.   So after you used the boat this one time, that was

15   in, what, May?

16   A.   June 9 -- June.

17   Q.   So you used the boat in June.  What happened?

18   A.   The boat was used in June to take a trip to Pilots

19   Point Marina South Yard in Westbrook, Connecticut, where

20   six or seven of our boating companions were to meet up.

21   Q.   So June 9th was the first time you used the boat?

22   A.   Yes.

23   Q.   And it got back in April, end of April?

24   A.   That's correct.

25   Q.   So I'd like to show you Plaintiffs' 20.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. ROTONDO:  One second, please.

2          No objection.

3          THE COURT:  Plaintiffs' Exhibit 20 is admitted.

4  BY MR. NIKAS:

5  Q.   Says this is a list of problems for Dean Beckman?

6  A.   That's correct.

7  Q.   Mr. Beckman is whom?

8  A.   He's the service manager for Surfside 3 in Norwalk,

9  Connecticut.

10 Q.   So you hadn't yet used the boat at this point?

11 A.   No, we had not.

12 Q.   I'd like to show you Plaintiffs' 21.

13         MR. ROTONDO:  Your Honor, I don't have an

14 objection to 21, but I think the letter of May 24 needs to

15 be offered to put it in context.  It's responding to a

16 letter from Mr. Wade.

17         MR. NIKAS:  What number is the May 24 letter?

18         MR. ROTONDO:  You don't have it on your list.

19         MR. NIKAS:  Can you provide me a copy?

20         MR. ROTONDO:  It's Defendant's Exhibit 17.

21         MR. NIKAS:  May I approach?

22         THE COURT:  You may.

23         So you would like Defendant's --

24         MR. NIKAS:  One second, Your Honor.

25         MR. ROTONDO:  I can't count, I'm sorry.

1   BY MR. NIKAS:

2   Q.   Mr. Mains, Mr. Rotondo has asked that I put your

3   letter of May 1st into context; is that correct?

4            MR. ROTONDO:   June 6th.

5            MR. NIKAS:   Excuse me, June 6th.

6            THE COURT:   So I assume at this point we're

7   going to admit, is it Defendant's 17?

8            MR. NIKAS:   Yes.  Do we admit that as

9   Defendant's 17 or Plaintiffs' 41.

10           THE COURT:   Defendant's 17.

11           And then also Plaintiffs' 21?

12           MR. NIKAS:   Correct.

13           THE COURT:   Defendant's 17 and Plaintiffs' 21

14   are admitted.

15  BY MR. NIKAS:

16  Q.   I'd like to show you Defendant's 17.  It's dated May

17  24, 2001.  Let me make this bigger.

18       Is this a letter that you received from Sea Ray?

19  A.   Yes, it is.

20  Q.   It looks like it says as a gesture of goodwill,

21  Sea Ray has agreed to repair the boat beginning the week

22  of June 11; is that right?

23  A.   That's correct.

24  Q.   It says you ought to go and enjoy the boating season?

25  A.   Correct.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   So there's an attached list of repairs from your

2   April 30th fax, and I guess you had been in phone contact

3   with Mr. Wade?

4   A.   Yes.

5   Q.   And on the second page of this is a long list of

6   repairs?

7   A.   That's correct.

8   Q.   And also on the third page and also on the fourth

9   page?

10  A.   That's correct.

11  Q.   So they're going to repair all these things on June

12  11?

13  A.   That's what they planned, yes.

14  Q.   And so let me show you Plaintiffs' 21.  This is the

15  response that you made to that letter?

16  A.   Yes, it is.

17  Q.   So when you wrote this letter, you were responding to

18  this one?

19  A.   That's correct.

20  Q.   So you state the boat was damaged while in Sea Ray's

21  care.

22       And then in the third paragraph you talk about

23  limiting your ability to complain.  See that there?

24  A.   Yes, I do.

25  Q.   While understandable, what does it mean?  How did

1  they try to do that?

2  A.    They were trying to get us to sign a nondisclosure

3  agreement.

4  Q.    Did you sign that?

5  A.    No, we did not.  If my memory serves me correctly, we

6  made some alterations to that nondisclosure agreement.

7  Q.    So you didn't sign the one that was provided to you?

8  A.    That's correct.

9  Q.    And then after talking about them limiting your

10  ability to complain, you complained some more?

11  A.    Yes, we did.

12  Q.    So we talked about cosmetic repairs, water intrusion,

13  retrofitting, braces, headliners, exhaust system, and your

14  inability to move around; is that right?

15  A.    Not just to move around but to service important

16  subassemblies that need constant attention when you own a

17  boat such as this.

18  Q.    I don't understand.  How does an exhaust system

19  affect your inability to move around?

20  A.    Prior to the change of the exhaust system, I could

21  stand behind the engines to perform oil changes or spark

22  plug changes or whatever needed to be done.  Once these

23  new units were put in, you no longer had access to the

24  whole aft area, back area, of the boat.  There was a

25  hydraulic system there that needed to be checked.  And I

1    think I mentioned before the autopilot.  Most importantly,

2    if the boat were ever to be grounded, the rudder posts, if

3    they were ever pulled out, you need to get back there to

4    plug those holes so the boat doesn't sink.

5    Q.    What does that mean, "grounded"?

6    A.    If the boat ever ran into an object, submerged

7    object, or run aground, run into shallow water by

8    accident, those two rudder post areas need to be stopped

9    from leaking.

10   Q.    So just so I'm clear and the jury is clear, you

11   actually stand inside the engine compartment?

12   A.    Yes, it was big enough to stand inside.  There's a

13   Westerbeke generator on the starboard side and other

14   components.  It was a pretty tight assembly.

15        And if I may mention one other point, one of the

16   other pieces of real estate between the engines was no

17   longer available forward of the engines because Greg

18   Wilson had to put a support strut down on top of one of

19   the main stringers in order to hold up the rear portion of

20   that collapsing floor.

21   Q.    So what you're saying is that at the Sea Ray factory,

22   when you got the boat back, there was something else

23   there?

24   A.    No, he had purposely come to do that on one occasion

25   and add some additional exhaust components.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   This is Sea Ray's person coming out to the boat and

2   fixing it?

3   A.   That's correct.   That's correct.

4   Q.   Getting back to the accessibility issue in the engine

5   compartment, if this was a car, it would be equivalent to

6   standing inside the hood?

7   A.   That's correct.

8   Q.   And you're supposed to do that?

9   A.   Yes.

10  Q.   Is that something that you did regularly?

11  A.   Yes.

12  Q.   So Defendant's 17 was May 24.  Plaintiffs' 21 was

13  June 6.  And the first paragraph, it looks like you refer

14  to rain and having other things to do?

15  A.   That's correct.

16  Q.   Is that why on June 9th you took the boat out?

17  A.   I don't understand the question.

18  Q.   You said you took the boat out for the first time a

19  June 9th; is that correct?

20  A.   That's correct.

21  Q.   So it says up until looks like June 6 there was rain

22  and you were busy.  And this says that on June 11 the

23  boat's going away for repairs, right?

24  A.   That's correct.

25  Q.   So the only time you could have used it was that

1  weekend?

2  A.   At that point I think the June 11th date had been

3  pushed back somewhat.  Plans had already been made to go

4  to that marina and those plans were not induced by us.

5  Another member of the group had asked us to attend and to

6  go to that location.

7  Q.   Okay.  So how did the boat run on June 9th?

8  A.   Satisfactorily.

9  Q.   Okay.  And when you returned from your trip -- where

10  did you go on June 9th?

11  A.   June 9th was Westbrook, Connecticut, South Yard

12  Pilots Point Marina.

13  Q.   How far is that from where you started?

14  A.   Time-wise or distance?

15  Q.   Distance.

16  A.   Sixteen or 17 miles.

17  Q.   How long were you out?

18  A.   A little over an hour.

19  Q.   When you got back, what did you do?

20  A.   When I got back to --

21  Q.   Did you make a round trip?  Did you go one way?

22  A.   No, we never made it back.

23  Q.   You never made it back?

24  A.   The boat has been there for seven years.  Never made

25  it back to our marina.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    So on June 9th you left where?

2    A.    Deep River Marina in Deep River Connecticut, which is

3    9 miles upstream on the Connecticut River.

4    Q.    And you were going to?

5    A.    Pilots Point Marina, Westbrook.

6    Q.    And did you get to Pilots Point Marina?

7    A.    Yes, we did.

8    Q.    Was this intended to be a round trip?

9    A.    Of course.

10    Q.    Why wasn't it a round trip?

11    A.    We pulled in on June 9th, which was a Saturday.  And

12    as we had typically done, I flushed the engines.  And both

13    engines became hydrolocked.

14    Q.    What does it mean "flush the engines"?

15    A.    Hook up your dockside water hose, which is just a

16    white garden hose.  And thread a fitting on that Sea Ray

17    provides.  And plug it into this port.  And go back and

18    turn the water on at the dock.  And flush each motor in

19    that same manner for five minutes.

20    Q.    What are you flushing?  Are you flushing the exhaust?

21    Are you flushing the water jackets?  What are you

22    flushing?

23    A.    We're flushing the raw water, which in this case is

24    seawater, out of engine passages and coolant passages that

25    are not in contact with the closed coolant part of the

PDF created with pdfFactory trial version www.pdffactory.com

1    system.

2    Q.    Is this something you're supposed to do?

3    A.    Yes.

4    Q.    Is this a recommended procedure?

5    A.    Yes, it is.

6    Q.    And is this procedure discussed anywhere by Sea Ray?

7    A.    Yes, it is.

8    Q.    Where?

9    A.    In the Horizon MerCruiser Owner's and Maintenance

10   Manual, operations manual.

11   Q.    So when you get the boat, it's one of the materials

12   that's provided to you?

13   A.    That's correct.

14   Q.    And is it a required maintenance to be done or

15   suggested maintenance to be done following use in

16   saltwater?

17   A.    It's suggested.

18   Q.    And you did this every time?

19   A.    Yes, I did.

20   Q.    So after having performed this suggested procedure,

21   why did the boat hydrolock?

22           MR. ROTONDO:  I object, Your Honor, to the

23   extent that the question asks the witness for what may be

24   an expert opinion.  He knows he flushed it and it

25   hydrolocked.  I think the question, as phrased, may ask

1    for an expert opinion.

2    BY MR. NIKAS:

3    Q.    You flushed the engine, right?

4    A.    Can I answer?

5    Q.    Uh-huh.

6    A.    Yes, I did.

7    Q.    After flushing the engine, did you try to start it

8    again?

9    A.    Not until the following day when we were scheduled to

10   leave at -- I think check out time at that marina was

11   11:30.

12   Q.    So this was intended to be a round trip?

13   A.    That's correct.

14   Q.    You start the engines, what happened?

15   A.    Neither engine started.  In fact, I thought I had --

16   battery banks were dead, that's what my first impression.

17   There was no activity.

18   Q.    Did you check the batteries?

19   A.    Yes, I did.

20   Q.    And?

21   A.    All the fluid levels were good.  At that time there

22   was a Captain Dave Poutney, who was the dockmaster on the

23   weekend.  That's a large fuel dock.  He came to offer

24   assistance and got a jumper pack to help what we thought

25   was a low battery condition.

1  Q.   Did the jump start work?

2  A.   Not at all -- I'm sorry.  Can I finish?

3  Q.   Sure.

4  A.   One of the engines finally with the jumper pack

5  applied was able to turn over, but it ran poorly.  Very

6  rough and undoubtedly damaged.

7  Q.   What about the other engine?

8          MR. ROTONDO:  Move to strike the last part of

9  that answer.

10         THE COURT:  Sustained.  And motion to strike

11  granted.

12  BY MR. NIKAS:

13  Q.   When you started the engine, how did it run?

14  A.   Very poorly.  Very rough.

15  Q.   When you say "rough," what does that mean?

16  A.   Not like the smooth idle that you experience in your

17  car.  It was stumbling, vibrating.

18  Q.   Vibrating differently than normal?

19  A.   Irregularly, yes.

20  Q.   Did the other engine start at all?

21  A.   No, it did not.

22  Q.   Did you shut the engine down that was operating?

23  A.   Yes, I did.

24  Q.   What did you do then?

25  A.   Dave Poutney tried to contact a marine mechanic.

1    That's a very large -- thousand-plus slip marina.  Nobody

2    was on duty.  He put a call in to someone and they said

3    they could be there Monday.

4    Q.    So obviously no one helped you on Sunday.  What did

5    you do on Monday?

6    A.    On Monday we went back to the boat and we had already

7    been in contact by phone with Tom Wicander, who was the

8    yard manager of Pilots Point Marina East Yard in

9    Westbrook, Connecticut.

10   Q.    That's where you were?

11   A.    Yes.  Well, there are three large marinas that make

12   up the whole.

13   Q.    You're in the Pilots Point Marina generally?

14   A.    Yes.

15   Q.    He's was the mechanic there at whatever marina you

16   just said?

17   A.    He was the mechanic and also the manager of the East

18   Yard.

19   Q.    Did he come out and inspect the boat?

20   A.    Yes, he did.

21   Q.    Did he confirm your original diagnosis that the boat

22   had hydrolocked?

23            MR. ROTONDO:  Objection.

24            THE COURT:  Sustained.

25

1   BY MR. NIKAS:

2   Q.    When you went to -- were you there when the

3   inspection occurred?

4   A.    Yes.

5   Q.    And could you tell that the boat had hydrolocked

6   following that inspection?

7   A.    Following his inspection, yes.

8   Q.    Did you contact Sea Ray?

9   A.    Yes, we did.

10  Q.    What do you mean "we"?

11  A.    My wife and I were in attendance on June 11 and we

12  placed a call to Dave Wade.

13  Q.    So the day after it didn't start the mechanic came,

14  it didn't start, you called Sea Ray.   Right?

15  A.    Right.

16  Q.    What did you tell them?

17  A.    I told them that our engines had suffered a hydrolock

18  due to back-flushing the engines.

19  Q.    And?

20  A.    And I think he -- at that point he got Mr. Marlow on

21  the line and possibly Cynthia Frame from MerCruiser.

22  Q.    Were you upset?

23  A.    Very much so.   After all we had gone through prior to

24  this with this vessel, then this would occur.   It's

25  heartbreaking.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   So how many hours after -- how many hours had the

2  boat run after it had been turned from Tennessee?

3  A.   Maybe an hour and a half.

4  Q.   Did you try to fix the damage?

5  A.   No, we did not.

6  Q.   How did you intend for the boat to get fixed then?

7  A.   The recommendation by Mr. Wicander was --

8        MR. ROTONDO:  Objection to what Mr. Wicander

9  recommended.

10        MR. NIKAS:  Actually, I don't want to offer it

11 for the truth of the matter asserted.  I want to offer it

12 to note the plaintiffs' reliance in not commencing

13 litigation at that point.

14        THE COURT:  Well, did Mr. Wicander make a

15 recommendation, yes or no?  Then what did you do?

16 BY MR. NIKAS:

17 Q.   Did Mr. Wicander make a recommendation?

18 A.   Yes, he did.

19 Q.   Was that recommendation to contact Sea Ray for

20 further repairs?

21        MR. ROTONDO:  Objection.

22        THE COURT:  Sustained.

23        Why don't you just find out what he did.

24 BY MR. NIKAS:

25 Q.   What did Mr. Wicander do?

1          THE COURT:  No.

2   BY MR. NIKAS:

3   Q.   What did you to following that recommendation from

4   Mr. Wicander?

5   A.   I'm confused.

6   Q.   After Mr. Wicander gave you a recommendation as to

7   what to do, what did you do?

8   A.   I gave him the go-ahead to pickle the engines.

9   Q.   What does that mean?

10  A.   That's where the spark plugs are removed and the

11  engines are turned over.  They won't start without the

12  spark plugs, but the engines will roll over and they will

13  eject water that has accumulated in the top of the

14  cylinders.

15  Q.   Why did you authorize this to be done?

16  A.   That's what his recommendation was.

17  Q.   And after the engines were pickled, what did you do?

18  A.   Spoke with him further about what issues would need

19  to be performed in order to assess what the health of the

20  engines were at that point.

21  Q.   And after the health of the engines was assessed,

22  what did you do?

23  A.   That didn't occur right away.  His recommendation was

24  to have --

25          MR. ROTONDO:  Objection.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:   Sustained.

2    BY MR. NIKAS:

3    Q.    What did you do?   What happened to the engines after

4    Mr. Wicander had spoken to you?   What did you authorize

5    him to do?

6    A.    Pickle the engines.

7    Q.    Following the engines being pickled, what did you

8    authorize?   What further work was performed on the

9    engines?

10   A.    Test procedures.

11   Q.    What test procedures were performed?

12   A.    Three in particular.   A compression test of each

13   cylinder, and there are 16 total.   And a leak-down test of

14   the valve drain, of which there are 32.   And also a

15   monometer test, which shows the relevant height of the

16   exhaust system to the outside water level when the boat is

17   static and loaded.

18   Q.    And following these tasks, were you then able to

19   operate the engines?

20   A.    Of course not.   Oh, I'm sorry, after those tests?

21   Yes.

22   Q.    And were they operated for the purpose of completing

23   the tests?

24   A.    It's my impression that they were run in order to see

25   if they would hold together.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Is that what compression tests are?

2    A.    Compression tests, leak-down tests, those are true

3    values of the --

4    Q.    Health of the engines?

5    A.    -- health of the engines.

6    Q.    Were you there when these tests were performed?

7    A.    Yes, I was.

8    Q.    And what did the compression tests reveal?

9         MR. ROTONDO:    I object, Your Honor, to the

10    extent it's asking this witness to essentially give an

11    expert opinion.

12    BY MR. NIKAS:

13    Q.    When the compression test was performed, how did it

14    give a number?  Was there a dial that you could see?

15    A.    There was a dial.  Tom assisted another mechanic,

16    Dave, in performing these tests.

17    Q.    Did you observe the dial when these tests were

18    performed?

19    A.    Yes.  And I observed the numbers which they recorded.

20    Q.    And were the compressions that were found on each

21    cylinder satisfactory such to allow you to use the engines

22    without replacing them?

23         MR. ROTONDO:    Objection.

24         THE COURT:    We have an objection.    Sustained.

25

1    BY MR. NIKAS:

2    Q.    What did the compression tests show?    What numbers

3    did you get?

4    A.    We got a variety of numbers.

5    Q.    What was the range?

6    A.    Somewhere at 100 psi up to maybe 135 psi, if I

7    recollect correctly.

8    Q.    Did you ask Tom Wicander to continue to perform work

9    to try to determine the extent of the damage done to the

10   engines?

11   A.    Could you repeat that?

12   Q.    Did you ask Tom Wicander, the mechanic at the marina,

13   to continue to perform work to determine what repairs were

14   needed for the engines?

15   A.    After he had performed those three tests, I asked him

16   to -- previous to that we had asked him to get involved

17   with conversations with MerCruiser and Sea Ray, all in a

18   large conference call, maybe six people involved at once.

19   Q.    I'd like to show you an exhibit which is marked

20   Plaintiffs' 22.

21            MR. ROTONDO:    There's an objection pending with

22   respect to that.

23            THE COURT:    We'll need to lay a foundation for

24   that without putting it on the screen.

25

1   BY MR. NIKAS:

2   Q.   Do you remember --

3             THE COURT:  Maybe you should give the witness a

4   copy so he knows what you're talking about and you're not

5   describing something that's not in evidence.

6             THE WITNESS:  I know what it is.

7             MR. NIKAS:  Before I get to that, I have a

8   question.

9             THE COURT:  Okay.

10  BY MR. NIKAS:

11  Q.   Did you ever ask at any time what it would cost to

12  repair the damage that had happened or to repair the

13  engines such that the boat could run again?

14  A.   I'm sure I asked what his assessment would be at

15  repair or replacement, yes.

16  Q.   So at that point you didn't limit your options to one

17  or the other, either repair or replacement?

18  A.   No, we did not.

19  Q.   I'd like to show you an exhibit which has been

20  identified as Plaintiffs' 22.

21            MR. NIKAS:  May I approach, Your Honor?

22            THE COURT:  You may.

23  BY MR. NIKAS:

24  Q.   Did you receive an estimate from Pilots Point Marina

25  for repairs or replacement of those engines?

1   A.    Did I receive a written estimate of repair or

2   replacement of the engines?

3   Q.    Correct.

4   A.    No.

5   Q.    Did you ever receive an estimate from anybody for the

6   repair or replacement of those engines?

7   A.    A written assessment, no.

8   Q.    Did you ever get an estimate for completion or the

9   remedy of all the other repairs that existed on the boat?

10  A.    Yes.  Tom Wicander of Pilots Point provided a

11  detailed list, this one here, showing 38 different items

12  totalling 18,000 --

13              MR. ROTONDO:  Objection, Your Honor.

14              THE COURT:  It's not in evidence.  Objection's

15  sustained.

16  BY MR. NIKAS:

17  Q.    What amount were you quoted when you asked for that

18  estimate?

19              THE COURT:  Objection's sustained.

20  BY MR. NIKAS:

21  Q.    Why did you ask Mr. Wicander to prepare some

22  breakdown for what the non-engine repairs would be?

23  A.    I don't think I was the one that asked him for the

24  repair estimate.  I think it was Sea Ray who asked him to

25  provide their services to do these repairs that occurred

Vol. II - Page 190

1    during the time period that the boat was at their factory

2    and --

3    Q.    So you didn't ask him to do that?  You didn't ask him

4    to provide you any quote or estimate for services to

5    repair the hull defects?

6    A.    I'm not certain that I was the one that asked him.  I

7    know Sea Ray was involved.  I think they were the one that

8    requested that he go up and look at the boat prior to its

9    launch in Haddam after it had been returned from the

10   factory.

11   Q.    During your further conversations with Sea Ray

12   following the failure of both engines, the engines were

13   never replaced?

14   A.    No, they were not.

15   Q.    Were they ever repaired?

16   A.    No, they were not.

17   Q.    Why not?

18   A.    During our first day of conversation on June 11 in

19   which there were a number of people on the line, David

20   Marlow reassured us that our engines were fine.  And

21   Mr. Mains, you should just run your boat.  He said, If

22   there's any issue, we will remove your heads, send them to

23   an engine remanufacturing site or a machine shop and have

24   them remanufactured to acceptable specs.

25   Q.    Did you accept that offer?

1    A.    No, we did not.

2    Q.    Why not?

3    A.    Because it had become apparent to us that the damage

4    that was done to our vessel over the entire period of

5    ownership was due to the fact that water had been being

6    ingested all along by the --

7              MR. ROTONDO:  Move to strike that, Your Honor.

8    This is a fact witness, not an expert witness.  I don't

9    think he's qualified to offer that.

10             THE COURT:  The motion is granted.

11             I think the witness is entitled to testify as to

12   his own understanding of why he proceeded in a certain

13   way.

14             MR. ROTONDO:  Thank you, Your Honor.

15             THE COURT:  So it's clear he's not giving an

16   opinion, he's just stating his belief and understanding

17   for why he proceeded the way he did.

18             MR. ROTONDO:  So the testimony is not offered

19   for the truth of the matter asserted.

20             THE COURT:  Correct.  It's not offered for the

21   truth of the matter asserted.

22   BY MR. NIKAS:

23   Q.    You can continue.  Let me go back.

24   A.    I lost my rhythm.  Can you repeat?

25   Q.    I rarely do this.  I also have lost my rhythm.

PDF created with pdfFactory trial version www.pdffactory.com

1      May I ask, Mr. Mains, why did you not accept repair

2    or replacement of the engines as the solution for what had

3    happened in the failure of both engines?

4    A.    It was very clear that we were being duped by this

5    corporate executive who had no understanding of engines --

6              MR. ROTONDO:  I object to that, Your Honor.

7    That's just not fair.  It's a characterization and

8    character attack.

9              THE COURT:  I'll leave that to

10   cross-examination.

11             MR. ROTONDO:  Thank you.

12   BY MR. NIKAS:

13   Q.    Go on.

14   A.    And what he was trying to do was state that no damage

15   had occurred.  And in reality, all the test numbers showed

16   that the engines were seriously damaged and were later

17   found out to be beyond repair.

18   Q.    But if they were beyond repair, wouldn't replacement

19   of the new engines fix that?

20   A.    They didn't offer that.  They didn't offer to replace

21   the engines.  They offered to remove the heads and send

22   them out for remanufacture.

23   Q.    Did they offer to change the exhaust system?

24   A.    No.

25   Q.    So did they offer at that time -- when the offer was

PDF created with pdfFactory trial version www.pdffactory.com

1    made, what did you do?  What was your response to what

2    Sea Ray had offered you?

3    A.   We thought it was completely unacceptable.  From

4    information we had gathered from a fellow named Rocky in

5    Stillwater, Oklahoma --

6              MR. ROTONDO:  I object, Your Honor.

7              THE COURT:  Sustained.

8              MR. NIKAS:  Your Honor, again, this is not being

9    offered for the truth of the matter asserted.  It's going

10   to merely why he failed to do anything beyond the point at

11   which the engines were determined to be inoperable.

12             MR. ROTONDO:  I don't think Rocky from Oklahoma

13   told him --

14             THE COURT:  It's not apparent to me why that is.

15   I'll sustain the objection.

16   BY MR. NIKAS:

17   Q.   What's in Stillwater, Oklahoma?

18   A.   Mercury Marine headquarters.

19   Q.   Who was Mercury Marine?

20   A.   Mercury Marine is a subsidiary of Brunswick

21   Corporation and a sister company of Sea Ray.

22   Q.   Great.  What's their import in this case?  What did

23   they do?  What did they build?

24   A.   They provided Sea Ray with the MerCruiser inboard

25   power plants.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   They built your engines?

2  A.   That's correct.

3  Q.   After those engines were built, okay, they were

4  installed by Sea Ray in your boat.  Four years later,

5  three years later, okay, did you have a conversation with

6  anybody from Mercury Marine?

7        MR. ROTONDO:  We object to conversations with

8  Mercury Marine.

9        THE COURT:  Yes or no.  I believe he's being led

10  through this.

11        MR. ROTONDO:  All right.

12        THE COURT:  You can answer yes or no.

13  A.   Yes.

14  BY MR. NIKAS:

15  Q.   Did this conversation occur after the failure of both

16  engines?

17  A.   After.

18  Q.   Did this conversation affect your decision to not

19  repair or replace the engines?

20  A.   Yes, it did.

21  Q.   And what about that conversation led you to believe

22  that or led you to the decision you used?

23        THE COURT:  Sustained.

24  BY MR. NIKAS:

25  Q.   What did you rely on when you made that decision?

1           MR. ROTONDO:  This is the same conversation.  I

2    object to that.

3           THE COURT:  Sustained.

4           MR. NIKAS:  Your Honor, it's not being offered

5    for the truth of the matter asserted.  Now he's just

6    talking about those elements of which --

7           THE COURT:  We don't need a speech.  I think

8    there's probably a 403 objection and that's sustained.

9    BY MR. NIKAS:

10   Q.   What did you do after you had the discussion with the

11   MerCruiser person, and how did you find the MerCruiser

12   person?

13   A.   I was able to get that number from Mark Verone.

14   Q.   Who is Mark Verone?

15   A.   Mark Verone is the service manager for Bassett Boat

16   Company, a large Sea Ray dealership which is in the

17   East Yard at Pilots Point Marina in Westbrook,

18   Connecticut.

19   Q.   So in the same place --

20   A.   Right across the parking lot from Mr. Wicander's East

21   Yard office.

22   Q.   So Mr. Verone works for the Sea Ray dealer,

23   Mr. Wicander works for the Mercury mechanic?

24   A.   No.  Mr. Wicander is an employee of Jack Brewer,

25   Brewer's Yacht Yards, to which there are 21 or 22 members

1  now, member yacht yards.  And Bassett Boat rents the

2  property from Jack Brewer and Brewer Yacht Yards.  Does

3  that help?

4  Q.   Sure.

5       Are they a mechanic that works on Mercury engines?

6  A.   Tom Wicander?

7  Q.   Yes.

8  A.   Yes.

9  Q.   So did your decision to not repair or replace the

10 engines, was that based on the conversations you had had

11 with Sea Ray, MerCruiser, and the mechanics?

12 A.   Yes.

13 Q.   And has the vessel been used since?

14 A.   No, it has not.

15 Q.   So for the last six and a half years or so?

16 A.   It will be seven years on this coming June 9.

17 Q.   It's at the same point it was when you got to Pilots

18 Point Marina?

19 A.   Yes, it is.

20 Q.   Were you present at every engine disassembly where

21 inspection was performed?

22 A.   Yes, I was.  In fact, I videotaped the engines being

23 disassembled.

24 Q.   Why did you do that?

25 A.   I believe Mr. Senning recommended that I do so.

1    Q.    That was your attorney?

2    A.    Yes.

3    Q.    Did you ever form an opinion yourself, as the boat's

4    owner, as to what happened that caused this failure?

5            MR. ROTONDO:  Objection.

6            THE COURT:  Sustained.

7    BY MR. NIKAS:

8    Q.    Not as an expert, as the owner?

9            MR. ROTONDO:  Same objection.

10           THE COURT:  Sustained.

11   BY MR. NIKAS:

12   Q.    When you were present during these engine

13   disassemblies, what did you observe, if anything, that was

14   within your understanding as the owner?

15   A.    My own observations led me to believe that --

16           MR. ROTONDO:  I'm going to object.  He's only

17   being asked about what he observed, not what he believed

18   based on his observations.  I don't think it's fair.

19           THE COURT:  Objection's sustained.

20           Actually, it is time for the jury's lunch break.

21   We'll excuse the jury until 1:00, and I'll just address

22   this point with counsel briefly.

23           The witness may step down.

24           The jury may go for lunch.  Thank you.

25           (Whereupon the jury left the courtroom.)

1    THE COURT:  That was a good effort, but it's
2  still eliciting an expert opinion.
3    MR. NIKAS:  I actually need to have him declared
4  as a hostile witness and we'll move on.
5    THE COURT:  We'll go off the record for that.
6    MR. NIKAS:  We're done -- let me just do one
7  follow up and we're done.
8    THE COURT:  Certainly.  And then we'll get to
9  the cross.
10    How do we look in terms of the projection that
11  we might finish today with the plaintiffs' witnesses?
12    MR. NIKAS:  I had not anticipated -- I thought
13  this would be a half hour rather than the marathon
14  exercise that was.  We do have -- whatever we do run over
15  I don't anticipate will be long.
16    Mr. Rotondo and I had a conversation this
17  morning during which we determined that there are
18  witnesses that will be available tomorrow.  And I believe
19  he represented if he does go long, it won't be very long
20  on the other side of that.
21    THE COURT:  We'll touch base at the end of the
22  day.
23    We'll take our lunch break.  I have the
24  courtroom deputy determining whether the jurors want 45
25  minutes for lunch or an hour.  She'll let you know.  We'll

PDF created with pdfFactory trial version www.pdffactory.com

1   start at 1:00 or 1:15.  We'll recess.

2              (Whereupon, a recess followed.)

3

4              THE COURT:  I think we're ready for the jury.

5              MR. NIKAS:  Your Honor, do you want him to take

6   the stand now?

7              THE COURT:  Yes, please.

8              (Whereupon, the jury entered the

9              courtroom.)

10             THE COURT:  Please be seated, everyone.

11             Whenever you're ready, Mr. Nikas.

12  BY MR. NIKAS:

13  Q.   Mr. Mains, right before the break we were talking

14  about what your options were in terms of repair or

15  replacement.  Did you ever determine what the replacement

16  cost of these engines was?

17             MR. ROTONDO:  Objection.

18             THE COURT:  Sustained.

19  BY MR. NIKAS:

20  Q.   Did you conduct any personal research on what these

21  engines would cost to replace?

22  A.   Yes, I did.

23  Q.   What did your research show you?

24             MR. ROTONDO:  Objection.

25             THE COURT:  Let's see what the research was.

1  BY MR. NIKAS:

2  Q.   What did you do, Mr. Mains, to determine this?  Did

3  you look up a catalog, look on the internet?

4  A.   I used the catalog.

5  Q.   Did you price out the cost of each component?

6  A.   The complete package, yes.

7  Q.   What did the complete package cost?

8        MR. ROTONDO:  I'm just going to object to, we

9  still don't have an idea what he priced out and what

10  package he's referring to.

11  BY MR. NIKAS:

12  Q.   Are you referring to the engine package?

13  A.   That's correct.

14  Q.   The engines are sold as a crate?

15  A.   That's correct.

16  Q.   And by "the crate," I mean a complete engine with

17  heads and valves and everything else that is part of the

18  engine?

19  A.   Yes, that's correct.

20  Q.   And you had two of these engines on board, correct?

21  A.   Yes, we did.

22  Q.   So to replace both engines, what was the cost for

23  these kits?

24  A.   $42,000 installed.

25  Q.   $42,000 to replace both engines.

 1       You got the boat back when from Tennessee?

 2   A.   April 20th, I believe.

 3   Q.   So about five weeks before the engine failure

 4   occurred?

 5   A.   That's correct.

 6   Q.   You bought the boat new?

 7   A.   Yes, we did.

 8   Q.   And it came with a warranty?

 9   A.   The boat came with a warranty.

10   Q.   Was there more than one warranty?

11   A.   Yes, there was.

12   Q.   How many were there?

13   A.   Two.

14   Q.   What were the two warranties?

15   A.   Sea Ray's one-year warranty and MerCruiser's

16   three-year warranty.

17   Q.   I'd like to show you an exhibit marked Plaintiffs'

18   32.

19            THE COURT:  Give me a second to get set up here,

20   please.

21               (Pause)

22            MR. ROTONDO:  No objection to Plaintiffs' 32.

23            THE COURT:  Plaintiffs' Exhibit 32 is admitted.

24   BY MR. NIKAS:

25   Q.   Can you tell what this letter is?

1    A.   Looks to be a congratulatory letter for being the new

2    owner of a MerCruiser Horizon inboard engine.

3    Q.   It says, though, in the third paragraph, it says:

4    "In addition to the limited one year standard warranty and

5    the extended maintenance features," blah-blah-blah.  "Your

6    Horizon is also covered by an additional Two Year Mercury

7    Marine Q-Guard extended engine protection plan for a total

8    of three years."

9    A.   That's correct.

10   Q.   So you had a three-year -- a one-year standard and a

11   two-year extended warranty?

12   A.   Correct.

13   Q.   And when you received this letter, did you also get a

14   copy of the warranty card?

15   A.   Yes, we did.

16   Q.   This is your Mercury Marine extended warranty card?

17   A.   Yes, it is.

18   Q.   What's the expiration date?

19   A.   May 21, '01.

20   Q.   This was only -- the boat was gone for five months

21   with Sea Ray in Tennessee, right?

22   A.   Yes.

23   Q.   You got the boat back at the end of April, correct?

24   A.   Correct.

25   Q.   You didn't use it in May?

1   A.   Correct.

2   Q.   You used it once on June 9 and that's when the

3   failure happened?

4   A.   Yes.

5   Q.   That's only two weeks after this date?

6   A.   That's correct.

7   Q.   Did you make a warranty claim?

8   A.   Yes, we did.

9   Q.   What happened?

10  A.   We were informed that we were --

11          MR. ROTONDO:  Objection.

12  BY MR. NIKAS:

13  Q.   Was it accepted or denied?

14          THE COURT:  I'm sorry.  We have an objection.

15  What's the basis?

16          MR. ROTONDO:  He was about to describe what he

17  was told, so it's hearsay.

18          THE COURT:  Let's find out who he was told by

19  first.

20          MR. NIKAS:  Well, I actually didn't ask what he

21  was told by anybody.

22  BY MR. NIKAS:

23  Q.   I said, Did you make a warranty claim?

24  A.   Yes.

25  Q.   Was it accepted or denied?

1   A.    Denied.

2   Q.    Do you know why it was decide?

3   A.    They claimed that we were --

4             MR. ROTONDO:  Objection.

5             THE COURT:  Sustained.

6   BY MR. NIKAS:

7   Q.    Do you believe -- what were the reasons that you

8   believe your warranty claim was denied?

9             MR. ROTONDO:  Objection.

10            THE COURT:  Sustained.

11            MR. NIKAS:  I'm not offering it for the truth of

12  the matter.

13            THE COURT:  We have no idea who you're talking

14  about.

15  BY MR. NIKAS:

16  Q.    Who did you make this warranty claim to?

17  A.    Mercury Marine.

18  Q.    So you contacted Mercury Marine after the engine

19  failure?

20  A.    Yes.

21  Q.    And they're the ones that manufactured the engine?

22  A.    That's correct.

23  Q.    And were you aware at the time you made the

24  application for warranty coverage that it expired a couple

25  weeks earlier?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    No, I was not.  But it became apparent when they told

2    us we were two weeks out of warranty.

3              MR. ROTONDO:  Move to strike.

4              THE COURT:  Sustained.

5    BY MR. NIKAS:

6    Q.    Did you go to Sea Ray then?

7    A.    Yes, we talked to Sea Ray.

8    Q.    Did Sea Ray remedy this problem?

9    A.    No, they did not.

10   Q.    Did you ever ask Sea Ray to extend the warranty

11   coverage on the engines by the time that it had been in

12   Sea Ray's custody?

13             MR. ROTONDO:  Can we get a time frame?  I'm not

14   sure of the time frame.

15   BY MR. NIKAS:

16   Q.    After the failure of both engines when you contacted

17   Sea Ray, did you ask them to extend the engine warranty

18   coverage for the period of time that Sea Ray had the boat

19   in Tennessee?

20   A.    Yes, we did.

21   Q.    Did they extend the warranty coverage?

22   A.    No, they did not.

23   Q.    Did you have any further contact with MerCruiser

24   following the time that your warranty claim was denied?

25   A.    Yes, we did.

1    Q.    Did you contact MerCruiser or did they contact you?

2    A.    No, we contacted them.

3    Q.    And did you ever get a satisfactory response to your

4    request for a remedy?

5    A.    No, we did not.

6    Q.    At any time did Sea Ray tell you that something was

7    wrong with your old exhaust system?

8    A.    No, they did not.

9    Q.    In any of the materials that you'd been provided when

10   you bought the boat, owner's manuals, whatever that big

11   stack of paper is in front of you, was there anything that

12   talked about the propensity of the exhaust system to

13   ingest water?

14          MR. ROTONDO:  Objection, leading.

15          THE COURT:  Sustained.

16   BY MR. NIKAS:

17   Q.    Was there any discussion about water intrusion in any

18   of those manuals?

19          MR. ROTONDO:  Objection, leading.

20          THE COURT:  Sustained.

21   BY MR. NIKAS:

22   Q.    Was there anything about the maintenance and care of

23   the exhaust system in the manuals?

24   A.    Yes.

25   Q.    What did it discuss?

```
 1   A.   It discussed installation procedures and guidelines
 2   for the engine installer.
 3   Q.   Are you saying that Sea Ray provided you with
 4   Mercury's engine installation guidelines?
 5   A.   That's correct.
 6   Q.   What did the guidelines discuss?
 7   A.   Lots of different parameters regarding down angle,
 8   siphon breaks, things of that nature.
 9   Q.   When you talk about "down angle," you're referring to
10   the down angle of what?
11   A.   The exit exhaust hose coming from the riser.
12   Q.   That's from the exhaust elbow back?
13   A.   That's correct.
14   Q.   Anything else in any of these materials on the
15   maintenance of the exhaust system?
16   A.   There are other issues that were apparent to me where
17   Sea Ray didn't follow the guidelines that were set.
18            MR. ROTONDO:  Move to strike.
19            THE COURT:  I'll allow that question.
20   BY MR. NIKAS:
21   Q.   How did it become apparent to you?
22   A.   I read and became educated about the issues that they
23   were dealing with.  Sea Ray, what they were dealing with
24   in regard to water ingestion.
25   Q.   And then what?
```

1   A.    And at that point I was able to formulate that the

2   engines that we received back from the factory had been

3   severely damaged and would continue to be damaged.

4             MR. ROTONDO:  Move to strike.

5             THE COURT:  Motion to strike is granted.

6             MR. NIKAS:  I have nothing further, Your Honor.

7             MR. ROTONDO:  Your Honor, I'm not sure what your

8   practice is with respect to deposition transcripts.  If it

9   is acceptable, I could break open the envelopes and leave

10  it with Mr. Mains so if I have questions about the

11  depositions he could have them in front of him.

12            THE COURT:  That would be fine.  That would be

13  helpful.

14            Does plaintiffs' counsel have a copy of the

15  transcript handy?

16            MS. LEV:  I think we're looking into that right

17  now, Your Honor.

18            MR. NIKAS:  Yes, Your Honor.

19            THE COURT:  So you'll get notice as to what page

20  Mr. Rotondo is on if he's using it.

21            MR. ROTONDO:  Do I need to mark these as

22  exhibits for identification?

23            THE COURT:  Certainly.

24            MR. ROTONDO:  If we could mark as Defendant's

25  Exhibit 102 for identification.

1          Mr. Mains, I'm not sure you'll need any of

2   these, but here are copies of your transcripts.

3          Your Honor, I'd like to move into evidenced

4   admission of several exhibits.  I'd like to identify them.

5          Sea Ray Exhibit 2 --

6          THE COURT:  Defendant's Exhibit 2.

7          MR. ROTONDO:  Sea Ray Exhibit 3, 4, Sea Ray

8   Exhibits 19 and 94 and 100.

9          THE COURT:  So Defendant's Exhibits 2, 3, 4, 19,

10  94 and 100 are admitted.

11          MR. ROTONDO:  It will take me a second to get

12  set up.

13              (Pause)

14          MR. ROTONDO:  May I begin, Your Honor?

15          THE COURT:  Please do, whenever you're ready.

16

17                  CROSS-EXAMINATION

18  BY MR. ROTONDO:

19  Q.   Mr. Mains, I may have missed it in your testimony,

20  but did you tell the members of the jury what you do for a

21  living?

22  A.   I'm a tradesman.  A carpenter.

23  Q.   Have you ever had any other profession?

24  A.   No, I have not.

25  Q.   Have you ever worked as a salesman?

1    A.    Yes, briefly.

2    Q.    Okay.  And did you in fact work as a salesman at 70

3    Riverside Drive in Clinton, Connecticut?

4    A.    That's correct.

5    Q.    And when you worked at that location, you were

6    working for Connecticut Marine One; is that correct?

7    A.    That's their current name, that's correct.

8    Q.    When you worked for them, they were known as Serino's

9    Marine?

10   A.    That's correct.

11   Q.    Serino's Marine sold boats?

12   A.    Yes, they did.

13   Q.    They were a dealer of something called a Regal boat;

14   isn't that right?

15   A.    Yes.

16   Q.    That's also a pleasure boat, isn't it?

17   A.    Yes, it is.

18   Q.    In some respects it's a competitor of Sea Ray, isn't

19   it?

20   A.    Somewhat.

21   Q.    And you worked as a salesman for Serino's Marine; is

22   that right?

23   A.    Yes, just at boat shows.

24   Q.    But you were listed on their web site, for example,

25   weren't you?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    That's correct.

2    Q.    And your picture was on the web site?

3    A.    That's correct.

4    Q.    Serino's not only sold Regal boats, but it also sold

5    used boats, didn't it?

6    A.    Yes, it did.

7    Q.    And did you sell both new and used boats when you

8    worked there?

9    A.    No, I did not.

10    Q.    You only sold new boats?

11    A.    In fact, I never had any sales.

12    Q.    You never had any sales when you worked there, okay.

13          But Serino's sold both new and used boats?

14    A.    Yes.

15              MR. NIKAS:  Objection, Your Honor.  Relevance.

16    This is entirely outside the scope of the direct

17    examination.

18              THE COURT:  Overruled.

19    BY MR. ROTONDO:

20    Q.    Serino's also did repair work, didn't it?

21    A.    Yes, they did.

22    Q.    And it repaired Mercury engines, didn't it?

23    A.    Mercury and Volvo Penta.

24    Q.    Serino's sold -- when it sold used boats, among the

25    used boats it sold were Sea Ray boats, weren't they?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   Yeah, statements.

2  Q.   Now, you told us about your Chris-Craft boat,

3  remember that?

4  A.   Yes, I do.

5  Q.   And that was a Chris-Craft Crown 252, correct?

6  A.   That's correct.

7  Q.   25-foot boat?

8  A.   Yes.

9  Q.   And when you dealt with Chris-Craft about that boat,

10  you wrote letters to them complaining about their boat as

11  well, didn't you?

12  A.   Yes, to Tim Reid.

13  Q.   And if we can -- I'm sorry.  Excuse me for a minute.

14         MR. ROTONDO:  I forgot to move the admission of

15  one of our exhibits, Sea Ray Exhibit 1.

16         THE COURT:  Defendant's Exhibit 1 is admitted.

17  BY MR. ROTONDO:

18  Q.   In case your eyes are as bad as mine, here's the file

19  copy.

20      Do you recognize what has been marked as Exhibit 1?

21  A.   Yes, I do.

22  Q.   This is a letter you wrote to Chris-Craft in 1992; is

23  that correct?

24  A.   That's correct.

25  Q.   And if we can go to the bottom paragraph of this

1    letter -- bottom half of the first paragraph -- bottom

2    half of the bottom paragraph.  Start with, "This was our

3    third visit."

4         In this letter you tried to be accurate, didn't you?

5    A.   As always.

6    Q.   In this letter you accused the dealer of unethical

7    conduct, didn't you?

8    A.   That's correct.

9    Q.   If we go to the last page of Exhibit 1, page 8,

10   second paragraph, you complained that that product had

11   been misrepresented to you, didn't you?

12   A.   Yes, we did.  And because of that misrepresentation,

13   it led to the vessel not being able to plane, get up on

14   plane with more than four people on board.

15   Q.   You discussed the issues that you had with your

16   Chris-Craft 252 and you talked about it porpoising; do you

17   recall that?

18   A.   Yes.

19   Q.   Those vessels are still being sold today, used

20   vessels; isn't that correct?

21   A.   I don't know.  I haven't seen one in years.

22   Q.   Would you agree with me that Chris-Craft didn't

23   recall all of their 252 vessels?

24   A.   I don't know that.

25   Q.   You don't know one way or the other?

1    A.    Pardon?

2    Q.    You don't know that one way or the other?

3    A.    I don't know that they recalled it, but I was told

4    they discontinued the manufacture of that model, it lasted

5    one year.

6    Q.    If we could go to the inservice checklist.  That was

7    Plaintiffs' Exhibit 2.

8          Do you have a copy or do you need a copy?

9    A.    I need a copy.  That's very blurry.

10   Q.    If you need a copy of any documents I'm talking

11   about, let me know.

12   A.    Unless that's enlarged.

13   Q.    It will be enlarged later.  This is the document.

14         This is the document that you told us about, do you

15   recall?

16   A.    Yes, it is.

17   Q.    This is a document that you received when you walked

18   through the boat as part of your accepting the boat from

19   Surfside 3; is that correct?

20   A.    That's correct.

21   Q.    All right.

22         Cathy, could you go to page 3 of our version of this.

23         It's page 2 on yours, Mr. Mains.  There was an extra

24   page inserted.

25         Okay.  And if you can blow up the customer's

 1    acceptance.

 2         Under Customer's Acceptance, it says, "I have

 3    inspected the boat and find the boat acceptable as per our

 4    sales agreement.  All equipment is functioning and I

 5    understand the operation of this equipment per the owner's

 6    manual and the dealer's explanation.  I have received a

 7    copy of the Sea Ray limited warranty and I understand my

 8    rights under this program."

 9         Did I read that correctly?

10    A.    Yes.

11    Q.    That's your signature?

12    A.    That's correct.

13    Q.    And your wife's signature next to it?

14    A.    That's correct.

15    Q.    And then above that you have, "Engine hatch not

16    aligned."  And that's what you told us before, that you

17    went through this with Mr. Chianese?

18    A.    Chianese.

19    Q.    Thank you.

20         And you pointed out things that you had issues with,

21    is that correct?

22    A.    That's correct.

23    Q.    And one of those was the engine hatch not being

24    aligned?

25    A.    Yes.

1    Q.    And then there's something about a plumes?

2    A.    Plenums in poor condition.

3    Q.    Okay.  And this was Mr. Chinese's handwriting, but

4    your comments; is that right?

5    A.    That's correct.

6    Q.    If we can go back to page 1.

7          Go to the bottom third of the page.

8          In handwriting it says, "No problems reported on

9    diagnostic"; is that correct?

10   A.    I can't find that.

11         That is Mr. Beckman's entry, I'm sure.

12   Q.    That's not your entry, okay.

13         And then underneath that, hard to read, something bay

14   path to depth switch?

15   A.    "Ray data to depth switch."

16   Q.    And then "PS mid-cabin cushion," correct?

17   A.    That's correct.

18   Q.    And I believe you also have a copy -- there it is

19   over in the lower right-hand about floor flex.  You told

20   us about that?

21   A.    I believe it says floor flex at helm and walk

22   through, with carpet.  I don't know what he meant by that.

23   Q.    Now, you told us -- there's something about the

24   propeller size, 17 X 17 instead of 17 X 19?

25   A.    That is correct.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   You told us that you also made complaints about stern

2   eyes and that the stern eyes, those complaints were

3   reflected in this document.  Isn't that what you testified

4   to on direct examination?

5   A.   Stern eyes or propellers.

6   Q.   Didn't you tell us when you first walked through this

7   boat and did the inspection as part of this checklist that

8   you made complaints about the stern eyes and there were

9   cracks that were 11-inches long and you said that was part

10  of this inspection; isn't that part of your testimony?

11  A.   That's correct.  And I don't think that was entered.

12  Q.   That's not there?

13  A.   Correct.

14  Q.   If we can go to Defendant's Exhibit 3.

15       The 1998 boat you told us was part of a trade-in; is

16  that correct?

17  A.   Could I have Exhibit 3?

18  Q.   I think you do.  I meant to give it to you.  It

19  should be part of the stack.  Maybe I didn't give it to

20  you.  Sorry.

21       This is the trade-in agreement?

22  A.   Yes, it is.

23  Q.   And your name and signature is down on the lower

24  right-hand corner, customer's signature?

25  A.   That's correct.

1    Q.    And then the dealer's signature was Mr. -- you call

2    him Chianese?

3    A.    Chianese.

4    Q.    So you signed it on behalf of you and your wife, and

5    Mr. Chianese signed it on behalf of Surfside 3?

6    A.    Correct.

7    Q.    Now, as part of this trade-in agreement, Sea Ray

8    agreed to buy back the 1996 boat; is that correct?

9    A.    That's correct.

10   Q.    And you were given a trade-in allowance; is that

11   correct?

12   A.    Yes.

13   Q.    If we can now go to Exhibit 4.

14         You should have Exhibit 4 in front of you.

15         So you received in credit $114,240 for your old boat,

16   the '96 boat, correct?

17   A.    420 dollars, yes.

18   Q.    And the total price of the 1998 was $132,919; is that

19   correct?

20   A.    That's correct.

21   Q.    Now, I'd just like to talk to you a little about

22   something I don't remember you talking about in direct

23   examination, which is you actually used this boat; didn't

24   you?

25   A.    Actually use the '96 boat?

1  Q.   '98 boat, the one that's the subject of this lawsuit.

2  A.   Yes.

3  Q.   In fact, you had somewhere around 170 hours on it

4  after three years, didn't you?

5  A.   That's correct.

6  Q.   In 1998 you used the boat every weekend when you had

7  good weather out unless you had work obligations or family

8  plans?

9  A.   That's accurate.

10  Q.   You took trips to a number of different places,

11  correct?

12  A.   Yes.

13  Q.   I think you said you had it moored or docked, I'm not

14  sure of the exact word, in Deep River?

15  A.   Slipped.

16  Q.   Okay, slipped in Deep River in the marina there?

17  A.   Yes.

18  Q.   That was 9 miles up on the Connecticut River?

19  A.   Yes.

20  Q.   You took trips in 1998 to places like Montauk and

21  Coecles Harbor?

22  A.   Coecles Harbor.

23  Q.   Did you also take trips to Greenport, New York?

24  A.   Yes.

25  Q.   And Deering Harbor, New York?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   That's correct.

2   Q.   Sag Harbor?

3   A.   Uh-huh.

4   Q.   Three Mile Harbor?

5   A.   Yes.

6   Q.   Narragansett Bay?

7   A.   Yes.

8   Q.   Newport?

9   A.   Yes.

10  Q.   Have you also taken that '98 boat up the

11  Thames River?

12  A.   Yes.

13  Q.   Did you take it to Martha's Vineyard?

14  A.   Yes.

15  Q.   And to Falmouth?

16  A.   Yes.

17  Q.   And you took it up as far as Cape Cod and south as

18  far as New York; is that correct?

19  A.   As far northeast as Martha's Vineyard and as far

20  south as Orient Point.

21  Q.   On Martha's Vineyard you went to Edgartown and

22  Oak Bluffs and Vineyard Haven?

23  A.   Yes.

24  Q.   On Cape Cod you went to Buzzards Bay?

25  A.   Yes.

1    Q.    And you used the boat during the 1998 boating season,

2    correct?

3    A.    Yes.

4    Q.    And you also used it during the 1999 boating season?

5    A.    Yes.

6    Q.    And during the 2000 boating season?

7    A.    Yes.

8    Q.    I'd like to show you what's been marked as

9    Exhibit 94.  You have it there.  It's the Sea Ray

10   warranty, the one you talked about.

11       If we can start by blowing up the top there about 2

12   inches down.

13       Do you recognize what's been marked as Exhibit 94?

14   A.    Yes, I do.

15   Q.    This was your Sea Ray warranty; is that correct?

16   A.    Yes, it was.

17   Q.    This was the warranty that you received from Sea Ray,

18   correct?

19   A.    This was the actual one or duplicate of it?

20   Q.    This is a copy.

21   A.    The actual one is in this stack.

22   Q.    What we've marked as Exhibit 94 is a true and

23   accurate copy of the warranty that you received with your

24   1998 boat?

25   A.    I would say it is.

1    Q.    And the warranty provides in the beginning that Sea

2    Ray boats warrants to the original retail purchasers of

3    its 1998 boats, if purchased from an authorized Sea Ray

4    dealer and operated under the normal noncommercial use,

5    that the selling dealer will:  A) repair any structural

6    fiberglass deck or hull defect which occurs within five

7    years of the date of delivery; repair or replace any parts

8    found to be defective in factory material or workmanship

9    within one year of date of delivery; and C) repair any

10   gelcoat surface of the hull that has laminate blisters

11   which occurred as a result of defects in the material and

12   workmanship within five years of the date of delivery

13   based on the following prorated scheduled.  And it

14   continues, correct?

15        What I'd like to do is just go down to the heading of

16   what is not covered.  Just go up where it says, "The

17   remedy described in this paragraph."  Start there.

18        All right.  Says:  The remedy described in this

19   paragraph shall be the exclusive and sole remedy provided

20   by Sea Ray.  Correct?

21        And then it says what is not covered.  This warranty

22   does not apply to:  1) engines, stern drives, controls,

23   propellers, batteries, trailers or other equipment or

24   accessories carrying their own individual warranties; 2)

25   engines, parts, or accessories not installed by Sea Ray;

1   3) window breakage; 4) cosmetic gelcoat finish, i.e.,

2   cracks or crazing.

3       And then there's some other things, correct?

4   A.   Yes, there is.

5   Q.   You also -- we can take down exhibit.

6       You also received with the Sea Ray boat a warranty

7   from MerCruiser or Mercury Marine?

8   A.   That's correct.

9   Q.   And you reviewed with Mr. Nikas the warranty cards,

10  that was Exhibit 32; do you remember that?

11  A.   Yes.

12  Q.   But the warranty itself was contained within your

13  manual; isn't that right?

14  A.   Are you asking if the warranty was in the MerCruiser

15  manual that was in the Sea Ray packet?

16  Q.   Yes.

17  A.   Yes, that's correct.

18  Q.   If we could pull up Exhibit 100.

19      And if we can go to page 48.

20      And does this look like the warranty information you

21  received?

22  A.   Yes, it does.

23  Q.   All right.  And I think you told us before that the

24  typical warranty for the Mercury engines was a year, but

25  you bought an additional package so it was extended to

1   three years; is that right?

2   A.    Could you repeat that.

3   Q.    I think you told us that the warranty that you

4   received was three years on the Mercury engine?

5   A.    For the '98?

6   Q.    For the '98 boat.

7   A.    The Horizon engine package had a three-year warranty.

8   Q.    It was a three-year warranty that came with that

9   standard Horizon package?

10  A.    That's correct.

11  Q.    Okay.   Thank you.

12        I'd like to talk a little about your experience.   You

13  told us some of the places you went with the boat.   When

14  you were using the 1998 Sundancer, you didn't have any

15  occasions where the boat quit on you out in the water; is

16  that correct?

17  A.    That's correct.

18  Q.    And the boat obviously never sank, correct?

19  A.    That's correct.

20  Q.    And you never had any situations where you had to be

21  towed back to the marina?

22  A.    That's correct.

23  Q.    And you're not making any claims in this case for any

24  personal injuries?

25  A.    That's correct.

1    Q.    Now, you reviewed at some length with Mr. Nikas your

2    letters setting forth complaints you had about the 1998

3    Sundancer, correct?

4    A.    Yes.

5    Q.    Wouldn't you agree that Sea Ray made arrangements for

6    a large amount of work that was done between 1998 and 2001

7    to your Sundancer?

8    A.    A large amount of necessary work.

9    Q.    A large amount of work?

10   A.    None of my complaints were ever disputed.

11   Q.    I think you said that before.

12         Your testimony here today is that no one ever took

13   issue with any of the complaints that you made?

14   A.    Correct.

15   Q.    Do you recall ever having any discussions with Dean

16   Beckman where, in fact, he did disagree with you about

17   your complaints?

18   A.    No, I do not.

19   Q.    Now, Mr. Beckman was the chief mechanic at

20   Surfside 3?

21   A.    Yes, he was.

22   Q.    And you considered him to be capable?

23   A.    Seemed to be.

24   Q.    And Sea Ray made arrangements through Surfside 3 to

25   have Mr. Beckman come out and make repairs, correct?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   That's correct.

2   Q.   And in addition to having Mr. Beckman come out and

3   make repairs, Sea Ray also made arrangements to have

4   Atlantic Boat Repair come out and perform work on your

5   boat; is that correct?

6   A.   And Greg Wilson also.

7   Q.   I was going to get to Greg Wilson in a second.

8   A.   Yes.

9   Q.   Sea Ray made arrangements to have Atlantic Boat

10  Repair come out?

11  A.   Yes.

12  Q.   And the person at Atlantic Boat Repair that seemed to

13  be in charge, at least from your dealings with the

14  company, was Tim Mills?

15  A.   I was told he was the owner.

16  Q.   In addition to Mr. Beckman, Mr. Mill, Sea Ray also

17  made arrangements to have Greg Wilson come out and make

18  repairs?

19  A.   That's correct.

20  Q.   And Mr. Wilson came out on two occasions, came to

21  Connecticut on two occasions to perform work on your boat;

22  is that right?

23  A.   No.  I would say if he checked his records, it would

24  be quite a few more times than that.

25  Q.   You think it was more than two?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.    I can recall once he came to work on the radar arch

2  in Deep River.   Another time he came to put in the support

3  strut in the engine compartment.   Another time he came to

4  put four 4-inch diameter baffles in the 4-inch --

5  17-inches back from the riser in the rubber exhaust hoses.

6  Two weeks later he came back to put in two new Vernatone

7  resonator mufflers in the above water relief side of the

8  exhaust system.   And then he was there during the period

9  that Tim Mills and Whitey were there, which was at least a

10  couple of days.

11  Q.    So that sounds like six or seven times, according to

12  your count?

13  A.    I think that would be at least five.

14  Q.    You were not charged for any of this work that was

15  done by Surfside 3, Atlantic Boat Repair, or Mr. Wilson;

16  is that correct?

17  A.    That's correct.

18  Q.    If we can just pull Plaintiffs' Exhibit 4.   It's your

19  May 27 letter.   I'm using the Plaintiffs' Exhibit, I don't

20  know that I -- we don't have copies, or do we?

21      Can you work off of this?   We need to enlarge it.

22  A.    If you enlarge it, yes.

23  Q.    I don't know that I need to enlarge anything yet, but

24  at the time you wrote this letter, you literally had the

25  boat for six days; is that correct?

1   A.   I would say that's accurate.

2   Q.   Because the checklist when you accepted the boat from

3   Surfside 3 was dated May 21?

4   A.   Okay.

5   Q.   And as of May 27, you'd taken the boat back from

6   Norwalk, is that correct, to Deep River?

7   A.   Yes.

8   Q.   And had you used it for any other purpose in those

9   six days other than the trip from Norwalk to Deep River?

10   A.   I don't think so.

11   Q.   Isn't it true that on the way back from Norwalk to

12   Deep River you contacted a submerged object that deformed

13   the propeller?

14   A.   Yes.  Unfortunately, my wife took the wheel in rough

15   choppy water condition, couldn't see a piece of floating

16   debris.  I think it was the starboard side propeller hit a

17   floating block of wood that caused that propeller to need

18   removal and repair.

19   Q.   All right.

20   A.   Not an uncommon experience in boating to hit floating

21   objects.

22   Q.   I'm going to direct your attention to this.  You

23   mentioned it on direct examination.  You asked here, May

24   we get an additional companion right handrails?

25   A.   Yes.

1    Q.   At that point you were asking Mr. Chianese whether

2    you could get an additional handrail for the boat; is that

3    right?

4    A.   Yes, something we would pay for.

5    Q.   Did you indicate in the letter that you were going to

6    pay for it?

7    A.   No, but I wasn't asking for it for free.

8    Q.   Were you offering to pay for any of these other items

9    on this list?

10   A.   No.

11   Q.   All right.  Now, on page 2 -- if we can go to page 2

12   of Plaintiffs' Exhibit 4.  I'm sorry.  I think I have to

13   go back up.

14        Here it is, bottom of the line here.

15        Did you hear anything regarding the scratched

16   manifold and gold lettering remedy?  What you're talking

17   about there is the manifold of the engine; is that right?

18   A.   That's correct.

19   Q.   And there was a decal on the top of the engine that

20   was scratched; is that right?

21   A.   They were large decals like this (indicating) and

22   they were embossed with a gold print.  And each engine had

23   one I'd say 8-inches wide and 2-feet long.

24   Q.   If we can go to Plaintiffs' Exhibit Number 6.

25        This is your letter of September 21, 1998.  Remember

1    talking about this?  You recall we talked about this

2    exhibit?

3    A.   Yes.

4    Q.   If you can now turn to page 2.  If we can blow up the

5    last where it says six times, the last item here.

6         This is the first time in writing that you complain

7    about exhaust resonance; is that right?

8    A.   Yes, it was.  But we had made numerous phone calls to

9    Al and to Dean inquiring as to what this was.

10   Q.   All right.  And you indicate the circumstance under

11   which you encountered this exhaust resonance here; is that

12   right?

13   A.   That's correct.

14   Q.   You said you had a four-hour trip from Massachusetts,

15   correct?

16   A.   That's correct.

17   Q.   And you were in 3-foot seas?

18   A.   Yes, that's correct.

19   Q.   And six times during that trip you encountered loud

20   exhaust noise; is that right?

21   A.   Sudden intermittent.  It would appear from nowhere.

22   Q.   And in order -- and you describe this as an

23   annoyance, correct?

24   A.   Annoyance, distraction.

25   Q.   You said in order to stop it, you would have to come

1  to a stop, correct?

2  A.   Come off plane, come to a stop.

3  Q.   I want to go back for a second.  That's what I

4  thought you said before.

5       When you're on plane you're going I think you said

6  26 miles an hour?

7  A.   I wasn't throttle chopping, if that's what you're

8  suggesting.

9  Q.   I wasn't suggesting anything.  I'm trying to

10  understand the speed.

11  A.   Normal cruising speed, 24 miles per hour.

12  Q.   24 miles an hour.

13      So you were on plane at 24 miles an hour.  In order

14  to get this exhaust resonance to stop, you would have to

15  bring the boat to a stop, correct?  That's what you say

16  here?

17  A.   Yes.

18  Q.   And then shift momentarily into reverse and proceed

19  to get back on plane.  That's what you had to do?

20  A.   After you went reverse, you went back to neutral and

21  then back into forward to get back up on plane.

22  Q.   Was that your standard procedure from 1998 until

23  2000 when you encountered exhaust resonance on the boat?

24  A.   Yes, it was.

25  Q.   Now, you considered this exhaust resonance to be an

 1   embarrassing annoyance, correct?

 2   A.   Yes, it was.

 3   Q.   It never stopped you from using the boat?

 4   A.   No, but it diminished the times that we would ask

 5   people to come with us.  I got tired of hearing people

 6   say, "What is that noise?  What's wrong with your boat?

 7   You must have an issue with something in your engines."

 8   Q.   You talked with David Wade about this; is that right?

 9   A.   Numerous times, yes.

10   Q.   And in the course of one or more of those

11   discussions, did you tell David Wade that the exhaust

12   resonance was not performance related?

13   A.   Not related to performance in regard to a change in

14   speed.

15   Q.   Now, you also complained about exhaust resonance with

16   respect to your 1996 Sea Ray, didn't you?

17   A.   Yes, we did.

18   Q.   Now, I believe that you said that you had, in

19   addition to this 1998 boat -- I want to focus on that time

20   frame, 1998 to 2001 -- you also -- and we can take that

21   down.  You also had a 9 1/2-foot rigid inflatable tender;

22   is that correct?

23   A.   Initial rigid inflatable boat, yes.

24   Q.   That had an engine at the end?

25   A.   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   It had a motor on it?

2   A.   Small, yes.

3   Q.   And did you use that as a tender, is that the right

4   word?

5   A.   It's referred to as a tender at times.

6   Q.   What does that mean when you have a tender?

7   A.   If you select to use a mooring instead of a slip when

8   you go to a different location, you have no way of getting

9   ashore.  So you tie up to a mooring ball and then you get

10  in the dingy or the rig and you can go ashore.

11  Q.   So if you're going to stay at a mooring, you have to

12  drag the tender behind you; is that correct?

13  A.   You don't drag it.  As you can see, it's --

14  Q.   It's attached in the back?

15  A.   That's correct.

16          MR. ROTONDO:  Your Honor, can we mark this?

17          THE COURT:  Yes, you may.

18          MR. ROTONDO:  It's a plaintiffs' exhibit.

19          MR. NIKAS:  Next in line would be 41.

20          THE COURT:  We'll ask the courtroom deputy to

21  come up with a number for you.

22          We'll mark it Plaintiffs' 159 for

23  identification.

24          MR. ROTONDO:  Are we all set?

25

1  BY MR. ROTONDO:

2  Q.   If you can pull up Plaintiffs' Exhibit 8.  Actually,

3  I think I'll skip Plaintiffs' Exhibit 8.

4       I want to go to Plaintiffs' Exhibit 11.  This is your

5  December 9, 1998 letter; do you remember this?

6  A.   I can't see that far.

7  Q.   Okay.  Mr. Nikas has agreed to let me use his set if

8  you promise not to mix them up.

9       If I can direct your attention to Plaintiffs'

10  Exhibit 11.

11       Recognize it now?

12  A.   Yes, I do.

13  Q.   If we can go to page 3, I believe.

14       And this marked-up version of Exhibit -- of your

15  December 1998 letter is the one that you've completed

16  after certain work was done in April of 1999; isn't that

17  right?

18  A.   April '99?  I'm not sure.

19  Q.   Why don't we go to the next page.

20       If you can look at the bottom screen near where your

21  last -- says 4/21/99; do you see that?

22  A.   Yes, I do.

23  Q.   If we can blow up, Cathy, the bottom quarter of the

24  page.

25       Now, your name appears under the words that say

1    "Repairs completed to satisfaction"; isn't that right?

2    A.    Yes.

3    Q.    And then it's dated 4/21/99?

4    A.    That's correct.

5    Q.    Now, if we can scroll back to the third page.

6          Blow up the top quarter.

7          In December of 1998 you were complaining about damage

8    caused by the repair people; is that correct?

9    A.    Yes.

10   Q.    All right.  And you were complaining that they

11   scratched the stainless steel threshold at the companion

12   way entry with dirty shoes, correct?

13   A.    The boat was a mess, period.

14   Q.    Mr. Mains, I'm asking you, was that your complaint?

15   A.    That's one of the complaints.

16   Q.    And then you complained that the black rubber treads

17   on the swim platform ladder are scratched from dirty

18   shoes?

19   A.    Yes, and I still have those.

20   Q.    And then you complained that there was a screen cover

21   that had a 4-inch scratch in it?

22   A.    Yes, it did.

23   Q.    And then you complained that the fuel fill labels

24   were ripped from the workmen climbing over the sides of

25   the boat into the cockpit?

1   A.    Yes.  The boat was in an outside shelter.  The ground

2   surface was gravel and sand.  These people had work shoes

3   on.  If you've ever gone to a boat show, almost all boat

4   purveyors will put a sign up, "Boat Shoes Only."  These

5   people didn't know enough to wear boat shoes, which have

6   nonmarking soles.

7   Q.    Did you at some point in time, Mr. Mains, insist that

8   workmen who came to perform work on your boat work in

9   their stocking feet?

10  A.    No, I did not.  I asked them to bring boat shoes.

11  Q.    So your testimony is you never insisted that a

12  workman work in his stocking feet when he worked on your

13  boat?

14  A.    If he didn't have boat shoes, I would ask that he

15  would, as long as weather was permitting, absolutely.

16  Q.    Did you do that on this boat?

17  A.    Did I request that they use boat shoes?

18  Q.    Did you insist that a workman work in his stocking

19  feet?

20  A.    If he had work boots on, yes.

21  Q.    If we can go back to the full-page 3.

22        There's a bunch of initials, see those?

23  A.    Yes, I do.

24  Q.    Those are your initials?

25  A.    Yes, they are.

1    Q.    And so you initialed these pages or these bullet

2    points indicating that you reviewed the repairs; is that

3    correct?

4    A.    When this was passed to me, the repair people,

5    including Greg Wilson, Tim Mills, and Whitey, who had

6    arrived in two cars from two different areas of the

7    country, they called me over and they put this in front of

8    me, We're in a hurry, we need you to look at this list.

9    We need you to go through it with us before we leave.  We

10   don't have any time.  We're going to be missing our plane

11   flight.

12        So I never read that it was -- I just initials things

13   that were discussed, and I didn't even have time to go

14   through this lengthy list and inspect everything that they

15   did.

16   Q.    There were certain things you didn't initial; is that

17   correct?

18   A.    Yes.

19   Q.    So you didn't initial things that you did not agree

20   with; isn't that correct?

21   A.    If things were not completed, if they notified me

22   that they needed to do more on that specific item, then I

23   probably put an asterisk next to it or circle.

24   Q.    So there were things that you put a circle next to or

25   an asterisk next to if you didn't agree that the work had

1    been done to your satisfaction?

2    A.    Or needed to be looked at.

3    Q.    Your testimony is that in the spots where you did put

4    your initials on, it doesn't mean that the work was done

5    to your satisfaction?

6    A.    That's correct.

7    Q.    If we can now go to -- I misplaced my piece of paper

8    here.

9         Plaintiffs' Exhibit 13.

10        Oh, I'm sorry.  I think we need to introduce

11   Sea Ray's Exhibit 12.

12            THE COURT:  Defendant's 12 was admitted.

13            MR. ROTONDO:  I'm sorry.  We can work off the

14   Plaintiffs' Exhibit 14.  They're the same.  So I'll

15   withdraw 12.  Plaintiffs' Exhibit 14.

16   BY MR. ROTONDO:

17   Q.    Here again, this is another letter that you wrote

18   asking that certain work be done, correct?

19   A.    Yes.

20   Q.    All right.  And you put check marks and notes on

21   this; is that right?

22   A.    Yes.

23   Q.    And the check marks indicate that the work was done

24   to your satisfaction; isn't that right?

25   A.    I'm not sure.  I'm not sure what they mean.

1  Q.   The work that was done in the fall of 1999 in

2  response to your letter of October 20 was done by Dean

3  Beckman of Surfside 3 and Greg Wilson from Sea Ray; is

4  that correct?

5  A.   I'm sorry, I missed the first part of your --

6  Q.   The work that was done in a response to your letter

7  of October 20, 1999 was done by Dean Beckman of Surfside 3

8  and Greg Wilson of Sea Ray; is that correct?

9  A.   Yes, I would think so.

10  Q.   And it was at that time that Greg Wilson installed

11  the single baffle resonator; is that correct?

12  A.   Do you see that somewhere?

13  Q.   I do see it, it's in your deposition.  But do you

14  recall that Greg Wilson installed baffles on your exhaust?

15  A.   He installed six parts.  And to my recollection, it

16  was at two different times.  And there could have been two

17  or three weeks in between.  Put four of the reversion

18  baffles in at one point and then asked me to monitor those

19  and see if they created any improvement in the resonance

20  noise issue.  And when I had tested the boat, I called him

21  back and said they had not.

22       And later he installed two double-baffled Vernatone

23  mufflers provided by Centrex Corporation in the above

24  water relief part of the exhaust.

25  Q.   That work was also done to address your comments and

1   complaints about exhaust resonance; is that correct?

2   A.   Yes.  And at that point when he did that final

3   installed, I asked him if he had a handle on what was

4   causing this issue.  And he wouldn't answer me right off

5   the bat.  So I pressed him.  I said, "Please tell me what

6   you're thinking."  He says, "Well, we think we have an

7   issue with the collectors running dry."

8   Q.   Now, your boat -- Sea Ray agreed to take your boat

9   back to Knoxville, Tennessee, in November of 2000; is that

10  right?

11  A.   That's correct, they took both boats back.

12  Q.   They took the '96 boat back in '97?

13  A.   '96 went to Palm Coast, Florida.  '98 went to

14  Knoxville, Tennessee.

15  Q.   '98 went to Knoxville, Tennessee, in November 2000?

16  A.   That's correct.  And those were never at my request.

17  That was their recommendation.

18  Q.   Did you agree with that?

19  A.   Yes, I did.

20  Q.   And did you want Sea Ray to take the boat back?

21  A.   To do repairs?

22  Q.   To do work on the boat.

23  A.   I did if they would have been successful, yes.

24  Q.   If we can pull up Plaintiffs' Exhibit 16.

25       Do you recognize this?  This is your February 12,

1    2001 letter?

2    A.    Yes.

3    Q.    All right.   And on page 1 in the first bullet point,

4    you were again complaining about the cockpit floor; is

5    that correct?

6    A.    That's right.

7    Q.    That cockpit floor had been addressed before by

8    Mr. Mills and his crew; is that right?

9    A.    By Mr. Mills' crew.   The first attempt was by Dan and

10   Whitey.   Mr. Mills wasn't in attendance.

11   Q.    But his crew?

12   A.    His crew.

13   Q.    And then Sea Ray agreed to take the boat back in

14   November of 2000 and you had a request for work to be done

15   on the cockpit floor again; is that correct?

16   A.    That's correct.

17   Q.    Now, I thought I understood you to testify this

18   morning that Sea Ray did work on your exhaust and that in

19   2000 or 2001, and it was a surprise to you, you didn't

20   know they were going to do that.   Did I understand that

21   correctly?

22   A.    When it was at the factory?

23   Q.    Yes.

24   A.    Never notified that they were going to do that.

25   Q.    You never knew they were going to do any work on your

PDF created with pdfFactory trial version www.pdffactory.com

1    exhaust; is that right?

2    A.    Just prior to the boat being shipped back.

3    Q.    You had complained about your exhaust resonance,

4    exhaust noise in 1998; is that right?

5    A.    That's correct.

6    Q.    And you complained in writing once in 1998 and

7    complained several times you said over the telephone,

8    correct?

9    A.    Not several.  Many.

10   Q.    Many.

11         And then in 1999 you had other complaints about the

12   exhaust resonance, more complaints; is that right?

13   A.    I'm sure.

14   Q.    And that's why Mr. Wilson went out and put those

15   baffles on in the fall of 1999, to address your complaints

16   about the exhaust resonance; isn't that right?

17   A.    Yes, I would say so.

18   Q.    And then in 2000 you were still complaining about the

19   exhaust resonance, weren't you?

20   A.    They were in effective.

21   Q.    You were still complaining about the exhaust noise,

22   weren't you?

23   A.    They were legitimate complaints.

24   Q.    I'm not getting into a debate with you at this point.

25   I'm asking you:  You were making complaints about the

PDF created with pdfFactory trial version www.pdffactory.com

1   exhaust resonance in 2000, weren't you?

2   A.   Yes.

3   Q.   Okay.  And in your letter of February 12, 2000, you

4   continued to make complaints about the exhaust resonance,

5   didn't you?

6   A.   Apparently.

7   Q.   Well, let's turn to page 2.  Go to the fourth bullet

8   down.

9        You state the intermittent, suddenly loud exhaust

10  noise problem has been unremedied after new fiberglass

11  resonators and 4/4 inch exhaust baffles were installed.

12  The newly designed underwater exhaust foot was mentioned

13  as a possible next step to solve this annoying problem.

14       Do you see that?

15  A.   Yes, I had asked Mr. Beckman about that.

16  Q.   You asked Mr. Beckman.  Didn't you write this letter

17  to Mr. Wade?

18  A.   I wrote the letter to Mr. Wade, but I had

19  experienced -- I had seen boats out of the water with a

20  newly-designed cast exhaust foot and asked him if the

21  change in shape had anything to do with eliminating the

22  sudden loud exhaust noise.

23  Q.   When you made this request or when you raised this

24  issue with Mr. Wade, you expected him to do something

25  about it, didn't you?

PDF created with pdfFactory trial version www.pdffactory.com

     1  A.    No.

     2  Q.    So you expected him to ignore it?

     3  A.    I expected him to process that.  I didn't expect him

     4  to do anything without notification.

     5  Q.    Didn't you expect Sea Ray to respond to this request

     6  in some fashion?

     7  A.    I don't know how to answer your question.

     8  Q.    You will not answer my question?

     9  A.    I don't know how to.

    10  Q.    I'll try again.

    11        You wrote this letter on September 12 -- excuse me,

    12  on February 12, 2001, to address issues with your boat;

    13  isn't that correct?

    14  A.    Correct.

    15  Q.    You were raising these issues with Sea Ray because

    16  you wanted Sea Ray to take some action regarding those

    17  issues, didn't you?

    18  A.    Apparently.

    19  Q.    Isn't that why you wrote the letter, because you

    20  wanted Sea Ray to do something with the boat they had down

    21  in Knoxville?

    22  A.    I required an explanation of what was going on, why

    23  their remedies weren't working.

    24  Q.    Well, didn't you expect Sea Ray to do something about

    25  this latest complaint about the exhaust noise?

1   A.    I didn't expect them to, but they went ahead and did

2   it.

3   Q.    And Sea Ray put on the new model exhaust system, the

4   lift system, didn't they?

5   A.    That's correct.

6   Q.    Now, as I understood your testimony, you were

7   interested in going down to Knoxville and seeing the

8   progress on your boat?

9   A.    That's correct.

10  Q.    You say you communicated that to Mr. Wade; is that

11  right?

12  A.    Mr. Wade.

13  Q.    That request is not contained in this letter, is it?

14  A.    Apparently not.

15  Q.    Now, the 1998 Sea Ray Sundancer was returned to you

16  in Connecticut on April 21, 2001; is that right?

17  A.    Yes.

18  Q.    If we can go to Plaintiffs' Exhibit 18.

19       You talked about this letter, which is April 30, 2001

20  letter, on direct examination.  Do you recall that?

21  A.    Yes.

22  Q.    Now, after you wrote that letter, Mr. Beckman came

23  out to look at your 1998 boat, didn't he?

24  A.    Yes, he did.

25  Q.    And he replaced the crushed sea strainer, didn't he?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   Yes.

2   Q.   He replaced the transducer ring?

3   A.   Yes.

4   Q.   He wiped some caulking material around the loose

5   substantial bases?

6   A.   That's correct.

7   Q.   And during this period of time you had conversations

8   with Mr. Wade; is that right?

9   A.   I'm sure.

10  Q.   And on or about May 24, 2001 you reached an agreement

11  with Mr. Wade by which he agreed to -- on behalf of

12  Sea Ray to have the boat taken to Brewer Pilots Point

13  Marina for some repairs?

14  A.   That's correct.

15  Q.   Sea Ray recommended that the boat be taken to Pilots

16  Point, the East Yard, have Mr. Wicander, their supervisor,

17  do the work?

18  A.   That's correct.

19  Q.   And on May 24, you agreed to have the boat repaired

20  at Brewer Pilots Point consistent with Sea Ray's offer?

21  A.   I'm not sure if that's the correct date, but that's

22  true.

23  Q.   If we can put up exhibit -- Defendant's Exhibit 17.

24       This was Mr. Wade's letter to you; is that right?

25  A.   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.    And in this letter Sea Ray agreed to make

2   arrangements of additional work performed; is that

3   correct?

4   A.    That's correct.

5   Q.    If we can go to the middle paragraph.

6         In this letter of May 24, Mr. Wade on behalf of

7   Sea Ray says, "In order to bring this matter to a close,

8   Sea Ray Boats, Inc. has offered the following."

9         First item is:  "Pay for the repairs by Brewers per

10  an agreed-upon list of items."

11        Did I read that correctly?

12  A.    Yes.

13  Q.    The second thing was pay for Brewers to complete

14  bottom paint on the hull.

15  A.    Yes.

16  Q.    Third, Pay for Brewers to clean and detail the boat

17  after repairs are completed?

18  A.    Yes.

19  Q.    Provide two months' boat payments to you?

20  A.    Yes.

21  Q.    Finally, provide two months' slip fees to you?

22  A.    That's correct.

23  Q.    Now, you responded to that letter with your own

24  letter dated June 6, 2001, correct?

25  A.    I'm not sure of the date.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   It's Plaintiffs' Exhibit 1.

2       And does this now look familiar, your June 6, 2001

3  letter?

4  A.   Yes, it does.

5  Q.   Second paragraph.  We can blow up the second

6  paragraph.

7       In the second paragraph, you state:  "Your offer of

8  May 24, 2001" -- that's Mr. Wade's letter that we just

9  reviewed?

10  A.   Yes.

11  Q.   All right.  So you say in that letter in the second

12  paragraph:  "Your offer of May 24, 2001 is nothing more

13  than a deceptive, rhetorical trick showing a complete lack

14  of ethics."

15       That's what you said there, isn't it?

16  A.   Lack of ethics.

17  Q.   You called the May 24, 2001 offer by Sea Ray a

18  receptive, rhetorical trick showing a complete lack of

19  ethics; that's what you said?

20  A.   Okay.

21  Q.   Do you agree with me that's what you say?

22  A.   That's what it says.

23  Q.   You wrote it, didn't you?

24  A.   My wife and I wrote it.

25  Q.   You signed it?

1   A.    Lori's signature appears on it.

2   Q.    Are you saying you don't stand by that letter?

3   A.    I stand by it.

4   Q.    All right.  Now, was it a deceptive, rhetorical trick

5   for Sea Ray to pay for the repairs by Brewer Pilots Point

6   Marina pursuant to an agreed-upon list?  Do you call that

7   a deceptive, rhetorical trick?

8   A.    I'm not sure that's what that refers to.

9   Q.    Do you call it a deceptive, rhetorical trick for

10  Sea Ray to pay Brewer to complete the bottom paint on the

11  hull?

12  A.    The bottom painting on the hull was not the solution

13  to the damage they had caused.

14  Q.    Do you call it a deceptive, rhetorical trick for

15  Sea Ray to agree to pay for the bottom paint on the hull?

16  A.    Yes.

17  Q.    Do you call it a deceptive, rhetorical trick for

18  Sea Ray to pay for the cleaning and details of the work

19  after Brewer completed the repairs?

20  A.    I'm not sure what you're getting at.

21  Q.    Was it a deceptive, rhetorical trick for Sea Ray to

22  offer to provide two months' boat payments or two months'

23  slip fees to you?

24  A.    These were all inadequate offers, as far as we were

25  concerned.

1    Q.    You viewed these as being inadequate offers because

2    by June 6 you had already made a demand of Sea Ray to

3    provide you with a new 2006 Sea Ray 340; isn't that

4    correct?

5                 THE COURT:   What year?

6                 MR. ROTONDO:   Thank you.   I misstated.

7    BY MR. ROTONDO:

8    Q.    Isn't it true by June 6, 2001, you had already made a

9    demand on Sea Ray to have Sea Ray provide to you, at no

10   cost, a 2001, a new 2001 Sea Ray?

11   A.    A replacement for this damaged vessel, I would say

12   that's accurate.

13   Q.    So you made that demand on Sea Ray before June 6,

14   2001; isn't that correct?

15   A.    Yes.

16   Q.    And you knew full well when you made that demand on

17   Sea Ray that the new boat that you wanted Sea Ray to

18   provide you cost $206,000, didn't you?

19   A.    Yes.   The dealership is right next to where the boat

20   was.

21   Q.    So you paid $132,000 for a boat, you used it for

22   three years, and then you demanded that Sea Ray provide

23   you with a brand new boat that cost $206,000; is that

24   right?

25   A.    Our boat was severely defective.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    You used it for three years, didn't you?

2    A.    On a limited basis, yes.

3    Q.    You had 170,000 hours on the boat, didn't you?

4          MR. NIKAS:  Objection, Your Honor.

5          THE COURT:  How many hours?

6          MR. NIKAS:  Misstates prior testimony.

7    BY MR. ROTONDO:

8    Q.    I may have miscounted the dates.  How many hours did

9    you have on the boat by June 2001?

10   A.    170.

11   Q.    And you took it to various points up near Martha's

12   Vineyard, Cape Cod, and up on Long Island Sound, correct?

13   A.    Yes.  The '96 boat had over a hundred hours on it the

14   first year.

15   Q.    Now, you talked about the trip that you took in

16   June 9th down to Pilots Point Marina in Westbrook?

17   A.    Yes.

18   Q.    And it took you 50 minutes to make that trip or about

19   an hour to make that trip?

20   A.    It's about an hour to the mouth of the river and then

21   maybe another 15 minutes on the ocean.

22   Q.    And this was the first trip that you had taken with

23   the new exhaust system that Sea Ray had installed?

24   A.    That's correct.

25   Q.    And during that trip you did not experience any of

 1   the loud resonance noise that you'd been concerned about

 2   before?

 3   A.    That's correct.

 4   Q.    And you didn't have any problems with the exhaust

 5   system on that trip, did you?

 6   A.    No, we did not.

 7   Q.    And you told us that after that trip, you used the

 8   flushing engine kit that had been supplied by Sea Ray with

 9   the boat?

10   A.    That's correct.

11   Q.    And you didn't have any need -- let me restate the

12   question.

13        You didn't look at the directions on how to use the

14   flush kit that time, did you?

15   A.    There were no new directions.  The directions we had

16   were in triplicate in our owner's manual.  And those

17   directions that were provided in the Sea Ray packet were

18   deemed the wrong flushing directions from day one.

19   Q.    Let me -- maybe my question wasn't very clear.

20        You did not look at the flush kit instructions on

21   June 9?

22   A.    No, I did not.

23   Q.    And you don't recall the last time you looked at the

24   directions or instructions on how to use the flush kit; is

25   that correct?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Could you repeat?

2    Q.    Maybe I didn't ask you very clearly.

3          You don't recall the last time before June 9, 2001,

4    when you looked at the flush kit instructions?

5    A.    I don't recall.

6    Q.    And you said that on June 10, the next day was a

7    Sunday; is that right?

8    A.    That's correct.

9    Q.    When you went to start the engines, one turned over

10   sluggishly and the other you couldn't get to turn over at

11   all?

12   A.    Additionally, it didn't turn at all and then it did

13   turn over.

14   Q.    And then you told us about efforts that Mr. Wicander

15   made; is that correct?

16   A.    Yes.

17   Q.    And isn't it true that Mr. Wicander had to change the

18   oil?

19   A.    Yes, he did.

20   Q.    And you used the oil -- excuse me.  Withdraw that.

21         You purchased the oil that Mr. Wicander used, didn't

22   you?

23   A.    That is possible.  The ship's store is right in front

24   of their building.

25   Q.    If Mr. Wicander said that you did purchase it, would

PDF created with pdfFactory trial version www.pdffactory.com

1  you disagree with him?

2  A.   I don't recall that I did.  It's possible.  I know I

3  bought 16 new platinum tip spark plugs.

4  Q.   Okay.  I was going to get to that next.

5       MR. ROTONDO:  If we can mark two documents,

6  they're invoices, as exhibits for identification.

7       THE COURT:  Certainly.  This will be -- do you

8  have the number, Sandy?

9       THE CLERK:  104 is the next one, and 105.

10 BY MR. ROTONDO:

11 Q.   As you sit here right now, Mr. Mains, do you recall

12 the dates on which you bought the oil and the spark plugs?

13 A.   I do not.

14 Q.   All right.  I'm going to show you what have been

15 marked as Exhibits 104 and 105, ask you to take a look at

16 them, and I'll ask you some questions afterwards.

17 A.   Yes, the dates are 6/15/01 --

18 Q.   Let me do it one step at a time.

19      104, do you recognize that document?

20 A.   Yes.

21 Q.   That's your receipt for the purchase of the oil; is

22 that right?

23 A.   Oil and filters.

24 Q.   Okay.  And then Exhibit 105 is the receipt for the

25 purchase of the spark plugs?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    That's correct.

2    Q.    And does looking at Exhibits 104 and 105 refresh your

3    recollection that you purchased the oil and stark plugs on

4    June 15, 2001?

5    A.    Apparently that's when it occurred.

6              THE COURT:   We're due for a break sometime in

7    the next couple of minutes.

8              MR. ROTONDO:   I can stop here.

9              THE COURT:   We'll take a 15-minute break.

10             (Whereupon, a recess followed.)

11

12             THE COURT:   Ready for the jury?   Our witness can

13   retake the stand.

14               (Whereupon, the jury entered the

15               courtroom.)

16             THE COURT:   Please be seated everyone.

17             Whenever you're ready, Mr. Rotondo.

18             MR. ROTONDO:   Your Honor, I move the admission

19   of Defendant's Exhibits 104 and 105.   I understand from

20   Mr. Nikas there's no objection.

21             THE COURT:   Defendant's Exhibit 104 and 105 are

22   admitted.

23   BY MR. ROTONDO:

24   Q.    To go back for one second, Mr. Mains, June 15 was

25   five days after the hydrolock; is that correct?

1    A.    June 9 to June 15.

2    Q.    You told us the trip to Westbrook was on June 9?

3    A.    That's correct.

4    Q.    That on June 10 when you tried to get the engine

5    started, you couldn't get it?

6    A.    That's correct.

7    Q.    That's when the hydrolock occurred?

8    A.    That's correct.

9    Q.    So from June 10 to June 15 there were five days in

10   between?

11   A.    That's correct.

12   Q.    Mr. Wicander tried to get the engines started on

13   June 11, correct?

14   A.    That's correct.

15   Q.    So you purchased the spark plugs four days after

16   Mr. Wicander tried to start the engines, correct?

17   A.    Correct.

18   Q.    I was asking you some questions earlier this

19   afternoon about your concerns about the exhaust resonance,

20   the noise, what you did when you found it.  There was a

21   letter you wrote in September when you were talking about

22   a trip that you'd taken, either a four- or six-hour trip

23   back from the Cape and on six occasions you had to

24   basically stop the boat, put it in reverse and then

25   proceed.  Do you recall that testimony?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   Yes.

2  Q.   All right.  You were very emphatic at one point that

3  you did not chop the throttle; do you recall that?

4  A.   That's correct.

5  Q.   For those of us who are not mariners, what does it

6  mean to chop the throttle?

7  A.   Pull them back quickly from their cruise setting to

8  idle.

9  Q.   So it just means rapidly pull the throttle back?

10  A.   Yes.

11  Q.   Did you know in 1998 that that was a bad idea?

12  A.   Yes, I think it's -- it appears in some of the

13  operation manuals.

14  Q.   During the week of June 11, 2001, you had a number of

15  discussions with Sea Ray personnel; is that right?

16  A.   Yes.

17  Q.   Including David Wade and Dave Marlow?

18  A.   That's correct.

19  Q.   And on June 11th itself, June 11, 2001, you had a

20  discussion with the people at Sea Ray and you renewed your

21  demand for a new 2001 Sea Ray 340; isn't that correct?

22  A.   Yes.

23  Q.   And you understood in June of 2001 that the value of

24  your 1998 boat diminishes over time simply because it had

25  more years on it; is that correct?

1    A.    Yes.

2    Q.    And you had discussions on June 11th, 12th, 13th and

3    14th with people at Sea Ray, didn't you?

4    A.    Yes.

5    Q.    And there were a number of different topics discussed

6    during those discussions, correct?

7    A.    Yes.

8    Q.    And on June 11th or 12th, Mr. Marlow indicated to you

9    that he thought that you should come up with what you felt

10   the value of your boat was?

11   A.    That's correct.

12   Q.    And he told you that Sea Ray, he and/or others at

13   Sea Ray would come up with what they felt a fair market

14   value of the boat was?

15   A.    Yes.

16   Q.    And you understood that the idea there was to have

17   Sea Ray buy back the boat?

18   A.    That's correct.

19   Q.    And Mr. Marlow either on June 11th or 12th made an

20   offer to buy back the boat for $100,000?

21   A.    Yes.

22   Q.    All right.  And you rejected that and said that was a

23   ridiculous offer, correct?

24   A.    That's correct.

25   Q.    And you made a counteroffer, didn't you?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes, we did.

2    Q.    You and your wife looked into it and you made a

3    counteroffer of about $175,000; isn't that correct?

4    A.    That's correct.

5    Q.    And you would agree with me that's about $43,000 more

6    than you paid for the boat in the first place?

7    A.    Yes.

8    Q.    And Mr. Marlow told you on June 14 that Sea Ray was

9    going to make a final offer of $105,000; is that right?

10   A.    That's right.

11   Q.    That offer was to buy back your boat, correct?

12   A.    That's correct.

13   Q.    You have Exhibit 19 there.  Would you put

14   Exhibit 19 --

15           THE COURT:  Defendant's or Plaintiffs'?

16           MR. ROTONDO:  Defendant's Exhibit 19.

17   BY MR. ROTONDO:

18   Q.    Those are the plaintiffs' exhibits.  The defendant's

19   exhibits should be here.

20       We may have to work off the screen.  Let me see if I

21   can find it here.

22       Showing you Exhibit 19, Defendant's Exhibit 19, you

23   received that letter from Mr. Wade?

24   A.    Yes.

25   Q.    All right.  And if we can blow up the second

PDF created with pdfFactory trial version www.pdffactory.com

1    paragraph.

2         It says, "We regret that our repair efforts have not

3    met your expectations.  It is apparent that with regard to

4    repairs on your vessel, we are at an impasse.  In an

5    effort to resolve this matter amicably, Sea Ray Boats,

6    Inc. is making a very generous offer to repurchase your

7    vessel in the amount of $105,000."

8         You receive this letter, didn't you?

9    A.   Yes.

10   Q.   And the letter indicates later on in the bottom

11   paragraph that you were asked to contact Sea Ray by

12   June 25 --

13   A.   That's correct.

14   Q.   -- if you intended to accept it?

15   A.   That is correct.

16   Q.   Isn't it true you contacted Sea Ray twice to obtain

17   extensions with respect to that offer?

18   A.   I'm not certain, but it's probably true.

19             MR. ROTONDO:  We can mark as Exhibits 106 and

20   107 for identification, two letters.

21   BY MR. ROTONDO:

22   Q.   Mr. Mains, I'm showing you what has been marked as

23   Exhibits 106 and 107 for identification.  If you could

24   just take a look at them and tell me if it refreshes your

25   recollection as to whether you and your wife asked for

1   extensions of time to consider Sea Ray's offer?

2   A.   Yes.

3   Q.   Does it refresh your recollection?

4   A.   Uh-huh.

5   Q.   In fact, you did ask for extensions of time?

6   A.   That's right.

7   Q.   Now, you received this letter dated -- marked as

8   Defendant's Exhibit 19, which is dated June 14th of 2001?

9   A.   Yes.

10  Q.   And June 14th, 2001 is the last date that you had

11  discussions with the people at Sea Ray about your

12  situation with them; isn't that correct?

13  A.   Yes, it is.

14  Q.   All right.  And you told us during your direct

15  examination about a conversation that you had with

16  Mr. Marlow.  Do you recall that?

17  A.   Yes.

18  Q.   All right.  You did not talk to Mr. Marlow after

19  June 14th of 2001, did you?

20  A.   Not that I recall, no.

21  Q.   All right.  And when you told us about the

22  conversation you had with Mr. Marlow, you said something

23  to the effect that his statements about what should be

24  done made no sense in light of the test results.  Do you

25  recall having said something to that effect?

1   A.   Yes, that was probably a misstatement.  Not the test

2   results but the results of speaking to knowledgeable

3   people like Tom Wicander, Rocky at MerCruiser, Cynthia

4   Frame.

5   Q.   This is really my point.  You said that Mr. Marlow's

6   statements made no sense to you in light of the test

7   results, and you were referring to test results you got

8   from Mr. Wicander; isn't that right?

9   A.   That was probably a misstatement on my part.  Not the

10  test results but the observations from these people that

11  are in the know.

12  Q.   Well, Mr. Wicander performed the compression and the

13  leak down tests on June 18, 2001?

14  A.   That's correct.

15  Q.   2001?

16  A.   I am know that.

17  Q.   That was four days after you talked to Mr. Marlow?

18  A.   That's correct.

19  Q.   You talked about making some investigation into the

20  cost of new engines; do you recall that?

21  A.   Yes.

22  Q.   All right.  And that was one of my questions.  You

23  gave a figure of $42,000 to replace the engines, correct?

24  A.   To remove the damaged engines and to install new

25  ones.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    All right.  And you said that you learned that number

2    based on research that you it?

3    A.    Yes.

4    Q.    All right.  Because you're not a mechanic, correct?

5    A.    No, I'm not.

6    Q.    And you're not a marine surveyor?

7    A.    No, I'm not.

8    Q.    And would you expect either a mechanic or marine

9    surveyor would be more knowledgeable about the cost of

10   repairs than you would be?

11   A.    Oh, certainly.

12   Q.    Now, where did you do this research?

13   A.    I spoke with Mark Verone.

14   Q.    So the research you're talking about is not

15   investigation in the sense of looking at documents,

16   getting bids and that sort of thing; this is

17   communications you had with other people, is that right?

18   A.    Not only that, but also the -- I can't recall the

19   name right now, but they're in central Massachusetts,

20   they're a large marine engine replacement dealer.  I

21   called them also.

22   Q.    Okay.  So your testimony was based on hearsay, is

23   that right, statements of other people out of court?

24             MR. NIKAS:  Objection.  Calls for a legal

25   conclusion.

1          MR. ROTONDO:  I'll withdraw it.

2    BY MR. ROTONDO:

3    Q.    Your testimony was based upon statements from other

4    people not in court; isn't that correct?

5    A.    Not exclusively, no.

6    Q.    You were talking about new engines; isn't that right?

7    A.    Yes, new engines.

8    Q.    When did you make this investigation?

9    A.    Probably right after we had our communication on the

10   14th.

11   Q.    Now, so you made this investigation in 2001?

12   A.    Yes, after June 14.

13   Q.    And you were talking about brand new engines; is that

14   right?

15   A.    That's correct.

16   Q.    Did you make any notes or do you have any -- did you

17   have anything in your file or documents that you produced

18   to us with this number $42,000 in it?

19   A.    I'm not sure.

20   Q.    Do you recall being asked questions under oath about

21   what the cost -- what your damages were in this case?

22   A.    Was that from Mr. Bransen?

23   Q.    Well, you were asked questions under oath at a

24   deposition by Mr. Bransen, but I'm asking you if you

25   recall -- put it this way:  Do you recall answering

1    interrogatories under oath, written interrogatories?

2    A.    Yes.

3    Q.    And you answered those written interrogatories in

4    2002, didn't you?

5    A.    Yes.

6    Q.    And at that time you indicated the cost of new

7    engines was 30,000+ estimated, didn't you?

8    A.    That's correct.

9    Q.    So I take it you made an investigation into the cost

10   of new engines, right?  That's what you looked into?

11   A.    That's correct.

12   Q.    You didn't investigate what the cost of

13   remanufactured engines was, did you?

14   A.    No.  And those would be nonacceptable anyhow.

15   Q.    Nonacceptable to whom?

16   A.    To anyone in the know.

17   Q.    To you they would be not acceptable?

18   A.    No.  We have two acquaintances that were --

19   Q.    I don't mean to cut you off, I really don't, but I'm

20   not asking you to tell me about what you talked to other

21   people about.  I'm really not.  I'll rephrase my question.

22   A.    How about with what I observed happening to other

23   people?

24   Q.    Remanufactured engines were not acceptable to you;

25   isn't that correct?

1   A.    That's correct.

2   Q.    You told us you haven't replaced the engines,

3   correct?

4   A.    That's correct.

5   Q.    You testified under oath that you're not asking

6   Sea Ray to replace the engines on the boat, didn't you?

7   A.    That's correct.

8   Q.    And you've testified under oath that you no longer

9   want to keep the Sea Ray boat?

10  A.    No.    We have no faith in it with its past history of

11  flaws and defects and water ingestion issues.

12  Q.    You are aware that you've disclosed a number of

13  experts in this case; is that right?

14  A.    Yes.

15  Q.    And you're going to have at least two of them

16  testify, Mr. Wicander and Mr. Greaves?

17  A.    That's correct.

18  Q.    And you are aware that each of them have offered

19  opinions about repairs that could in fact be done to the

20  boat?

21  A.    Yes.

22  Q.    And you have not made any of those repairs yourself?

23  A.    No.

24        MR. ROTONDO:    I don't have anything further.

25  Thank you very much.

```
 1              THE COURT:  Any redirect?

 2              MR. NIKAS:  A little more, Your Honor.

 3

 4                      REDIRECT EXAMINATION

 5  BY MR. NIKAS:

 6  Q.   Mr. Mains, Mr. Rotondo asked you during the first

 7  part of your examination about the language in the

 8  warranties and the manuals that you received when you

 9  bought the boat.  Do you remember that?

10  A.   Yes.

11  Q.   Can you look at Defendant's Exhibit 100, which is the

12  MerCruiser Owner Operation Manual.  And I think you may

13  have the original in front of you.

14  A.   MerCruiser Owner Operation Manual.

15  Q.   Mr. Mains, when you purchased the boat, did all the

16  manuals and pamphlets come in plastic?

17  A.   I think these did.

18  Q.   So can you turn to page 23.

19              MR. ROTONDO:  Are we referring to Defendant's

20  Exhibit 100?

21              MR. NIKAS:  Correct.

22  A.   Not the same page.

23  BY MR. NIKAS:

24  Q.   Is that a different page than you have in your

25  manual?
```

1    A.    Apparently.

2              MR. NIKAS:  Your Honor, may I approach?

3              THE COURT:  You may.

4    BY MR. NIKAS:

5    Q.    This is the owner's manual that you received?

6    A.    Yes.

7    Q.    On page 23, it is different than this exhibit.

8              MR. ROTONDO:  100 is the Mercury manual.

9    BY MR. NIKAS:

10   Q.    Do you have in your stack of materials anything that

11   looks like this on the cover?

12             THE COURT:  Don't we have an extra copy?

13             That folder he has is not in evidence, is it?

14             Let's use Defendant's Exhibit 100, since you're

15   following up to a question.

16             MR. NIKAS:  That is in evidence.  And I'm just

17   trying to find --

18             THE COURT:  Why don't you give him a copy of 100

19   and then we don't have to see if he can find something in

20   his envelope there.

21   BY MR. NIKAS:

22   Q.    On page 23 of this exhibit, it has a section on

23   starting, shifting, and stopping; is that correct?

24   A.    Yes.

25   Q.    And when you purchased the vessel, did you review

PDF created with pdfFactory trial version www.pdffactory.com

1  those recommendations?

2  A.   I'm sure I did.

3  Q.   And on the next page --

4        MR. ROTONDO:  Excuse me.  Can we coordinate?  I

5  don't seem to have the same pages.

6        MR. NIKAS:  Apologize, Your Honor.  It appears

7  that the Defense Exhibit 100 that I have was substituted

8  for another 100 that's the same number but different.

9        THE COURT:  I wasn't following you either.

10 BY MR. NIKAS:

11 Q.   I can now give this back to you.

12      On page 26, do you see the bold type there?

13 A.   Yes, I do.

14 Q.   It says, "Do not start engine without water being

15 supplied to seawater pickup pump."

16      Did you ever operate the boat under those conditions,

17 operate the engine out of water?

18 A.   No, we did not.

19 Q.   Did you ever shift the drive unit unless the engine

20 was at idle?

21 A.   No, we did not.

22 Q.   I assume you did not operate the starter motor

23 continuously for more than 30 seconds?

24 A.   No, we did not.

25 Q.   The warranty that was shown to you --

1          MR. ROTONDO:  I do object.  That's my working

2   copy.  We'll put that page up on the screen if you'd like.

3          MR. NIKAS:  Sure.  Could I have 48, please.

4          Could I have the next page, please.

5          Can I have 48 again back.

6          It's easier with paper.

7   BY MR. NIKAS:

8   Q.    This is the MerCruiser warranty, correct?

9   A.    Yes.

10  Q.    And can you read paragraph 3, the last item?

11  A.    "Water entering engine cylinders through the exhaust

12  system or carburetors."

13  Q.    So the MerCruiser warranty doesn't cover water

14  ingestion, correct?

15  A.    That's correct.

16  Q.    And the exhaust system's attached to the engine?

17  A.    Yes.

18  Q.    This is the Sea Ray warranty which Mr. Rotondo showed

19  you as Exhibit 94, and I'm sorry this copy is light.  Can

20  you read the first line of what is not covered?

21  A.    "This warranty does not apply to:  1) engines, stern

22  drives, controls, propellers, batteries, trailers" --

23  Q.    That's okay.

24          So if the MerCruiser warranty doesn't cover water in

25  the exhaust and the Sea Ray warranty doesn't cover the

PDF created with pdfFactory trial version www.pdffactory.com

1    engines at all, when you got the boat, were you provided

2    with anything that warrantied that component?

3              MR. ROTONDO:  Objection.

4              THE COURT:  Sustained.

5    BY MR. NIKAS:

6    Q.   Did you receive anything in the materials -- did you

7    see any other warranties other than the two you discussed?

8    A.   No, I did not.

9    Q.   Following the incident on June 10, did you pay

10   Mr. Wicander for his services?

11   A.   Yes, we did.

12   Q.   And were you initially put into contact with

13   Mr. Wicander?  How did you find him?

14   A.   Through Sea Ray.

15   Q.   And when you say "through Sea Ray," what does that

16   mean?

17   A.   Probably through the customer service rep, David

18   Wade.

19   Q.   You didn't know Mr. Wicander before that time?

20   A.   No.

21             MR. NIKAS:  I have no further questions,

22   Your Honor.

23             THE COURT:  Any recross, Mr. Rotondo?

24             MR. ROTONDO:  No, Your Honor.

25             THE COURT:  Thank you, sir.  You may step down.

Vol. II - Page 272

1        We're ready for the plaintiffs' next witness.

2        MR. NIKAS:  Your Honor, we're informed that

3   Mr. Verone has been waiting since noon, which was the time

4   that his testimony was anticipated.  And rather than send

5   him home and have him come back, we'd like to call him out

6   of order and testify at this time if the defendant has no

7   objection.

8        MR. ROTONDO:  I don't know that we've resolved

9   the issue of what the scope of Mr. Verone's testimony is.

10        THE COURT:  It's going to be quite short, I

11   assume?

12        MR. NIKAS:  I hope so.  And hopefully be done

13   today so we don't have to bring him back.

14        THE COURT:  Okay.

15        While he's waiting, I'll mention something to

16   counsel at the sidebar.  It will be off the record.  I'll

17   put it on later.

18        MR. NIKAS:  Your Honor, could I have a

19   two-minute recess?

20        THE COURT:  We'll just meet at the sidebar.

21            (Sidebar discussion off the record.)

22        MR. NIKAS:  Your Honor, the plaintiffs would

23   like to call Lori Mains to the stand.

24

25

```
 1                         LORI MAINS,

 2           called as a witness, having been first duly

 3           sworn, was examined and testified as follows:

 4

 5               THE COURT:  Please state your name for the

 6   record, please.

 7               THE WITNESS:  I'm sorry, I didn't hear.

 8               THE COURT:  Please state your full name for the

 9   record.

10               THE WITNESS:  Lori Mains.

11               MR. NIKAS:  Ms. Lev is going to conduct the

12   direct examination of Ms. Mains.

13               THE COURT:  Whenever you're ready, Ms. Lev.

14

15                      DIRECT EXAMINATION

16   BY MS. LEV:

17   Q.   Ms. Mains, you purchased this vessel in 1998; is that

18   correct?

19   A.   Correct.

20   Q.   Why did you purchase the boat?  Why did you want one?

21   A.   My husband and I wanted to have an activity we could

22   do as a family with our daughter and family and relatives.

23   Q.   How old is your daughter?

24   A.   Right now?

25   Q.   Sure.
```

1    A.    Eleven and a half.

2    Q.    So back in 1998 --

3    A.    In 1998 she was two years old.

4    Q.    Did she come on the boat with you at all?

5    A.    She did when we had the boat from 1998 through 2001,

6    she did come out on the boat with us.

7    Q.    So those years that Mr. Rotondo was talking to you

8    about when you took the boat out, she was with you on it?

9    A.    Always, yes.

10   Q.    Anyone else come out on the boat with you?

11   A.    Yes.  We have some nieces and nephews that we would

12   invite to come with us.  We'd have -- Peter has brothers

13   and sisters.  I have a brother.  My mom and dad.  Peter's

14   mom and dad.  We would invite family and friends to go out

15   with us.

16   Q.    And did any of these issues that we've seen listed in

17   the multiple letters that your husband shared with us, did

18   those affect your ability to bring passengers on board and

19   enjoy your boat?

20   A.    The intermittent exhaust resonance noise was an issue

21   that made us not invite people as often as we would have

22   liked because it was noticed by them.

23   Q.    I know we've talked about exhaust resonance noises a

24   little bit.  Can you explain more about what you mean?

25   Where is that sound coming from?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    It wasn't there all the time, but while using the

2    boat with the boat up on plane all of a sudden a loud,

3    intermittent exhaust noise would occur and it would be at

4    the back of the boat, the stern of the boat.

5    Q.    From the exhaust system?

6    A.    Yes.  It appeared to be from the exhaust system.

7    Q.    And did other people notice this?

8    A.    Yes.

9          MR. ROTONDO:  Objection.

10   BY MS. LEV:

11   Q.    Did you observe other people to notice this?

12   A.    Yes.

13   Q.    How, in observing people, could you tell?

14   A.    Their facial expressions.  They'd look at each other.

15   They'd talk amongst each other.  Then they would come up

16   to the front where my husband was driving the boat and

17   speak to him and say, "What is that noise we're hearing?"

18         MR. ROTONDO:  Move to strike, hearsay.

19         THE COURT:  Motion granted.

20   BY MS. LEV:

21   Q.    So back in 1998 you got this new boat.  How often

22   would you say you took it out?

23   A.    Just about every weekend from the start of the

24   boating season in May through the end of the season, which

25   was November.  We would use it as often as we could on the

1    weekends.

2    Q.    For long journeys?

3    A.    Not always a long journey, but if we weren't going on

4    a trip, we'd use it as a camper in the water.  We'd sleep

5    on the boat to be away from home as a family.

6    Q.    Were you ever concerned about safety while you were

7    on the boat?

8                MR. ROTONDO:  Objection.

9                THE COURT:  Sustained.

10   BY MS. LEV:

11   Q.    What was your reaction to these exhaust resonance

12   noises that you heard?

13   A.    Was there something wrong?  Is this a safety issue?

14   Q.    Why would you be concerned about safety when you hear

15   that?

16               MR. ROTONDO:  Objection.

17               THE COURT:  I'll allow that question.

18   A.    The concern about safety mainly is when you're out on

19   the water, something goes wrong, technically you could

20   become injured or drown.  Family is important.  We have

21   one daughter.  We were concerned about her safety, mostly,

22   as well as ours.

23   BY MS. LEV:

24   Q.    I'd like you to take a look at Exhibit 9, Plaintiffs'

25   Exhibit 9, which we already discussed with your husband.

1        Do you recognize this letter?

2   A.   Yes, I do.

3   Q.   What is that?

4   A.   It's a letter dated December 9, 1998, addressed to

5   David Wade at Sea Ray boats.

6   Q.   Now, at the bottom of that first paragraph beginning

7   with the words "It's also extremely disappointing," what

8   did you mean by those last two sentences of that first

9   paragraph?

10  A.   Could you make it a little bit larger?

11       I'm sorry, what was your question?

12  Q.   In this letter when you wrote "It's also extremely

13  disappointing to be told our replacement boat would be

14  carefully controlled during manufacturing, only to have

15  thus far spent hours writing letters, meeting repair

16  people, and losing time from work to address problem

17  areas, it's both extremely frustrating and disappointing,"

18  what did you main by that?

19  A.   Well, we had a 1996 boat that had a lot of problems.

20  The Sea Ray -- Sea Ray, who manufactured the boat, said

21  that boat never should have left the factory, We'll

22  replace it for you, we'll watch over the manufacturing

23  process of your 1998 vessel with a fine-toothed comb so

24  you wouldn't have a similar experience with the

25  replacement boat.  What that is stating is that it's been

1    a disappointing experience thus far.

2    Q.   So this letter was dated December of 1998, correct?

3    A.   Yes.

4    Q.   Now I'm going to refer to Plaintiffs' Exhibit 18,

5    which was also discussed earlier.

6        Do you recognize this letter?

7    A.   Yes.

8    Q.   So what was the purpose of this letter?

9    A.   I'm having a difficult time seeing it.

10       The purpose of the letter is to outline issues with

11   the boat that need to be repaired.

12   Q.   So between 1998 and 2001, these problems were still

13   continuing?

14   A.   Correct.

15   Q.   What had happened in between that time?  What had

16   Sea Ray done to make efforts to repair your boat?

17   A.   From date of ownership through this letter,

18   April 2001, they repeatedly assured us that they would fix

19   the problems that we were having.

20   Q.   I believe you said back in November of 2000 the boat

21   was taken to Tennessee for some repairs?

22   A.   Yes, it was.

23   Q.   Had you discussed or had any communications occurred

24   regarding the exhaust system?

25   A.   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   Or the replacement of the exhaust system before it

2    was taken in for repairs?

3    A.   We had expressed many times in writing as well as

4    verbally that the boat was experiencing intermittent loud

5    exhaust resonance noise.  Sea Ray sent people out to try

6    and remedy that noise.  Those efforts didn't solve the

7    problem.  Sea Ray determined that the boat needed to go

8    back to their manufacturing facility in Tennessee to

9    address the major problems with the boat.

10   Q.   Were you ever given any explanation by Sea Ray as to

11   what was causing those noises?

12   A.   They did not know why the boat was making those

13   noises.

14   Q.   Did you ask?

15   A.   Yes, we did.

16   Q.   So what happened while the boat was in Tennessee?

17   A.   They repaired what we call major problems as well as

18   some minor problems.  But the bigger problems that they

19   addressed were the bilge area in the boat below the engine

20   hatch was absorbing water.  They determined the boat had

21   to go back to the factory.  They rebuilt that area, put in

22   new gelcoat, things of that nature down there.  They

23   addressed some minor things and then they swapped out the

24   exhaust system to a retrofit new exhaust system.

25   Q.   So you just referred to major problems?

1    A.    Yes.

2    Q.    Is that the exhaust system that you're referring to

3    when you say "major problems"?

4    A.    I would say it is a major problem.

5    Q.    Would you say that -- were you ever given the

6    opportunity to inspect the boat while it was at the

7    factory in Tennessee?

8    A.    No.  We had requested the opportunity to inspect the

9    boat before it came back and that was not given to us.

10   Q.    Of whom did you request?

11   A.    David Wade of Sea Ray Boats was the person who

12   arranged to have the boat returned to the factory.  He was

13   the main person who was responsible for orchestrating the

14   repairs while it was down there.

15   Q.    At what point did you request to be able to inspect

16   the boat?

17   A.    I'm not sure of the exact dates, but from November of

18   2001 through April -- I'm sorry, November 2000 through

19   April 2001, for that five-and-a-half-month period while

20   the boat was in Tennessee, we had asked several times,

21   "Please allow us an opportunity to come down and inspect

22   the repairs so that we're sure that they have been taken

23   care of."

24   Q.    And you've already said that you did not?

25   A.    We were not given that opportunity.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   What happened instead?

2    A.   Probably a week or even less than a week before the

3    boat was returned to us, David Wade called and spoke to my

4    husband and stated --

5              MR. ROTONDO:  Objection.  Relating conversation

6    David Wade had.

7              THE COURT:  Sustained.

8    BY MS. LEV:

9    Q.   There were communications between you and Sea Ray?

10   A.   Yes.

11   Q.   Just before the boat was returned to you?

12   A.   During the whole period of time that the boat was at

13   the factory.

14   Q.   At what point during that five-and-a-half-month

15   period, I believe we said it was, were you informed that

16   the exhaust system had been completely overhauled?

17             MR. ROTONDO:  Objection.

18             THE COURT:  Sustained.

19   BY MS. LEV:

20   Q.   At what point did you become aware that the exhaust

21   system had been replaced?

22   A.   Probably one week before it came back to Connecticut.

23   Q.   Did you ask at this point why it had been replaced?

24   A.   Yes.

25   Q.   Was an explanation given?

1    A.    The only thing that Mr. Wade stated was that, "We put

2    a different exhaust system on your boat."

3    Q.    Was there any explanation given as to what was wrong

4    with the old exhaust system?

5    A.    No.

6    Q.    Then why did they replace it?

7            MR. ROTONDO:  Objection.

8            THE COURT:  Sustained.

9    BY MS. LEV:

10   Q.    So the boat came back to you in April of 2001.  What

11   happened next?

12   A.    We noticed that there was some inadequate repairs

13   made while at the factory, one of which was the retrofit

14   exhaust system installation.  We had questions about why

15   was it changed?  How is it different?  We can't access

16   certain components in the engine compartment.

17   Q.    Why is it important for you to access components in

18   the engine compartment?

19   A.    It's a safety issue.  It's important to be able to

20   get to your mechanical items for safety.

21   Q.    How so?

22   A.    It's -- if you have a problem out on the water, you

23   can't access important mechanical things, you're subject

24   to risking your existence, your family's existence.

25   Q.    And had access to this compartment been a problem

1    before the boat was taken to the factory?

2    A.    No, it was not.  Well, actually a little bit.  The

3    engine hatch after operation, the engines produce heat.

4    The engine hatch would expand and we could not lift the

5    engine hatch, so there were times when we could not access

6    the engine compartment.

7    Q.    What was the nature of your difficulty in accessing

8    the compartment when it came back from the factory?

9    A.    What was the nature of the difficulty?

10   Q.    Uh-huh.

11   A.    The engine hatch would not open.

12   Q.    This is before the factory or after?

13   A.    During ownership.  I believe they did correct that

14   engine hatch problem.

15   Q.    When did they correct it?

16   A.    I'm not sure exactly when.

17   Q.    But in 2001 was the engine hatch problem still

18   present?

19   A.    I am not remembering the engine hatch being a problem

20   in 2001.  But I do remember after the new exhaust system

21   was installed there was no longer access to areas in the

22   engine compartment that we would normally be able to get

23   into.

24   Q.    So before there was a problem in opening the hatch

25   and later there was not space to access the engine?

1    A.    Exactly, yes.

2    Q.    What was the first voyage that you took on the boat

3    upon its return from the factory?

4    A.    Probably that June 9, 2000 one, first trip of the

5    season for us.

6    Q.    Have you taken any other voyages on the boat since it

7    was returned to you from the factory?

8    A.    We did not.

9    Q.    What was the purpose of that trip?

10   A.    To use the boat as a family, get outside, use the

11   boat, be with family, be with friends.

12   Q.    Were there scheduled repairs?

13   A.    There was supposed to be scheduled repairs to the

14   boat on or around June 11, but there was disagreement

15   between us and Sea Ray as to what the final list was.  So

16   to my recollection, that date was moved back.

17   Q.    Who moved that back?

18   A.    I think it was between Sea Ray and us.  There was

19   that disagreement about items to be repaired.  Until we

20   were going to come to a final list of things to be

21   addressed, to my recollection, that date was moved.

22   Q.    Who proposed the initial June 11 date?

23   A.    Sea Ray did.

24   Q.    When did your warranty expire?

25   A.    The warranty was three years, so roughly May 25,

1   2001.

2   Q.   And Sea Ray proposed to have the repairs begin two

3   weeks after that?

4   A.   Roughly, yes.

5           MS. LEV:   No further questions.

6           THE COURT:   Whenever you're ready, Mr. Rotondo.

7

8                    CROSS-EXAMINATION

9   BY MR. ROTONDO:

10  Q.   Good afternoon, Mrs. Mains.

11       You have legal training, don't you?

12  A.   I have what?

13  Q.   Legal training.

14  A.   Yes, I do.

15  Q.   Okay.  You graduated from Briarwood College with an

16  associate's degree in legal assistance?

17  A.   Yes.

18  Q.   At one point in time you worked as a legal assistant

19  at Otis Elevator?

20  A.   Yes.  I'm still at Otis Elevator.

21  Q.   You've been there about five years now?

22  A.   Yes.

23  Q.   And before that, you worked for a law firm by the

24  name of Litchfield Cavo?

25  A.   Correct.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    That firm did litigation work?

2    A.    Yes, they did.

3    Q.    And before that you worked for a general law office

4    that had two attorneys; is that correct?

5    A.    That was very early on.  That was probably 1989 to

6    1991.

7    Q.    You and your husband obviously brought this lawsuit

8    against Sea Ray, which is why we're here.  But your

9    husband described or mentioned that you and your husband

10   had made a claim against Mercury Marine as well; is that

11   right?

12   A.    Yes, we tried to.

13   Q.    So you made a claim in connection with the

14   hydrolocking incident against Mercury Marine; is that

15   right?

16   A.    Yes.

17   Q.    Did you and your husband make any claims against

18   anyone else in connection with the hydrolocking situation?

19   A.    I don't believe so.

20   Q.    Now, you said something about having concerns for

21   your safety; do you recall that?

22   A.    Yes.

23   Q.    Now, you would agree with me that there was never a

24   situation when you were out at sea when the engines quit;

25   is that right?

1   A.    The engines never quit while we were on the boat.

2   Q.    Never had to call assistance while you were out on

3   the water?

4   A.    No, we didn't.

5   Q.    The boat obviously never sank?

6   A.    No, it didn't.

7   Q.    And I take it you love your daughter?

8   A.    Greatly.

9   Q.    And you brought her out on that boat, and that was

10  one of the purposes of having the boat was having these

11  family get-together times?

12  A.    That's correct.

13  Q.    So you felt comfortable enough about the safety of

14  your boats to bring your daughter out for each of those

15  trips, didn't you?

16  A.    Yes, we did.

17  Q.    You talked about repairs that had to be done, work

18  that had to be done?

19  A.    Yes.

20  Q.    And you and your husband didn't have to pay for any

21  of the work that was done by Surfside 3 on the 1998 boat,

22  did you?

23  A.    No, we didn't.

24  Q.    And you didn't have to pay for any of the work that

25  was done by Atlantic Boat Repair?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    No, we didn't.

2    Q.    And you didn't have to pay for the work that was done

3    by Sea Ray at the Knoxville plant?

4    A.    No, we didn't.

5    Q.    And Sea Ray offered in the letter of May 24, it

6    offered to have work done at Brewer Pilots Point Marina,

7    too, didn't it?

8    A.    Yes.

9    Q.    Pursuant to an agreed-upon list?

10   A.    Yes.

11   Q.    I don't have anything further, thank you.

12            THE COURT:   Any redirect?

13            MS. LEV:   Yes, Your Honor.

14

15                    REDIRECT EXAMINATION

16   BY MS. LEV:

17   Q.    When you took your family out onto the boat before

18   the boat was taken to Tennessee, aside from the exhaust

19   resonance noises, were you aware of any problems with an

20   exhaust system?

21   A.    No, we weren't.

22            MS. LEV:   No further questions.

23            MR. ROTONDO:   Nothing further.

24            THE COURT:   Thank you, ma'am.   You may step

25   down.

PDF created with pdfFactory trial version www.pdffactory.com

 1          We're ready for the plaintiffs' next witness.

 2          MR. NIKAS:  Call Thomas Wicander to the stand.

 3          THE CLERK:  Please remain standing and raise

 4   your right hand, sir.

 5

 6                    THOMAS WICANDER,

 7       called as a witness, having been first duly

 8       sworn, was examined and testified as follows:

 9

10          THE CLERK:  Please be seated.

11          State your name and spell your last name,

12   please.

13          THE WITNESS:  My name is Thomas Wicander,

14   W-i-c-a-n-d-e-r.

15          THE CLERK:  The city and state of your

16   residence, please.

17          THE WITNESS:  City is Moodus, Connecticut.

18          THE CLERK:  Thank you.

19

20                  DIRECT EXAMINATION

21   BY MR. NIKAS:

22   Q.   Good afternoon, Mr. Wicander.

23   A.   Hi.

24   Q.   Can you tell me what your current employment position

25   is?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   I am general manager of Brewer Ferry Point Marina in

2  Old Saybrook.

3  Q.   Brewer --

4  A.   -- Ferry Point Marina.

5  Q.   How long have you had that position?

6  A.   Been there almost two years.

7  Q.   And before that, by whom were you employed?

8  A.   Brewer Pilots Point Marina in Westbrook.

9  Q.   Are those associated entities?

10  A.   Yes, they are.

11  Q.   And as general manager, what are your general duties?

12  A.   I oversee the entire operation.  I oversee my

13  mechanics and any repairs that are done, facility repairs.

14  Q.   Do you have supervisory responsibility for all of the

15  mechanics at that facility?

16  A.   Yes, I do.  I oversee any work that's done at the

17  yard.

18  Q.   When you were at Brewer Pilots Point Marina in

19  Westbrook, what was your position?

20  A.   I was yard manager in the East Yard.

21  Q.   What are the duties of a yard manager?

22  A.   Very similar.  Basically a service manager.  I

23  oversaw all the operations of the marina, but also oversaw

24  the repairs that were done.

25  Q.   And so when you say oversaw the repairs, you had

PDF created with pdfFactory trial version www.pdffactory.com

1    supervisory responsibility for the mechanics?

2    A.    Yes, I did.  I also did some of the repairs myself.

3    Q.    And how long were you at Brewer Pilots Point Marina?

4    A.    Fourteen years.

5    Q.    And during those 14 years, did you have the same

6    position?

7    A.    Actually, I started out as a mechanic.  I was a

8    certified MerCruiser mechanic, moved on to yard foreman,

9    and then became yard manager.

10   Q.    When you say you were a certified MerCruiser

11   mechanic, that means you were a Mercury certified

12   technician?

13   A.    Yes, that's correct.

14   Q.    What was involved in the certification process to

15   become a Mercury certified technician?

16   A.    For the first year before I became certified, I

17   worked alongside a mechanic that was certified.  Then I

18   went to school for a couple of years -- for a couple of

19   weeks after I worked with that mechanic for a year.  From

20   there on, I did retraining every year.

21   Q.    Who conducted the annual retraining?

22   A.    It would have been Mercury.

23   Q.    And were all the materials provided to you during the

24   certification process produced by Mercury?

25   A.    Yes.

1  Q.   And how long ago was it that you first obtained that

2  certification?

3  A.   I believe it was 1989.

4  Q.   So 19 years ago?

5  A.   Yes.

6  Q.   Prior to your employment at Brewer Pilots Point

7  Marina I guess 16 years ago, were you also employed in the

8  marine industry?

9  A.   Yes, I was.  Just prior to that -- let's see.  After

10  college I worked in the marine industry on commercial end

11  of it doing survey work, hydrographic survey work.  From

12  there in 1998, I went to work for Bassett Boat Company

13  which was a Sea Ray dealership in Westbrook.  That's where

14  I became a certified technician and certified Sea Ray

15  technician at that point as well.  And left there as a

16  service manager.

17  Q.   So in 1988 you were hired by Bassett Boat Company?

18  A.   Yes.

19  Q.   They are a Sea Ray dealer?

20  A.   Yes, they are.

21  Q.   They were a Sea Ray dealer at that time?

22  A.   Yes, they were.

23  Q.   When you were employed by them you were a service

24  technician; is that correct?

25  A.   Correct.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    A mechanic?

2    A.    A mechanic, yes.

3    Q.    When you talk about being certified by Sea Ray, that

4    means you're a graduate of Sea Ray Dealer Service School?

5    A.    Yes, that's correct.

6    Q.    And what is involved in that certification process?

7    A.    We go down, tour the plant it used to be for a couple

8    of days.  First three years I went -- first three times

9    that I went.  And then the last time I went in I believe

10    it was '96 we went down for one day for training.  Plant

11    tours and that sort of thing, go over new items, new

12    models, that sort of thing.

13    Q.    How many times have you been to the Sea Ray factory?

14    A.    Four times.

15    Q.    And the Sea Ray factory is located in what state?

16    A.    Tennessee.

17    Q.    Each time you visited the Sea Ray factory you visited

18    the Tennessee plant?

19    A.    Correct.

20    Q.    As opposed to the Florida one?

21    A.    No, I never went to Florida.

22    Q.    After having received your Sea Ray certification, did

23    you have to undergo annual retraining similar to what

24    MerCruiser offered?

25    A.    No, it was a little looser than that.

1    Q.    Would they provide you with reference materials or

2    updates as to their products so you could stay abreast of

3    whatever changes were made?

4    A.    Yes.  We received Infograms, that sort of thing.

5    Q.    And since, I guess, 1988, have you continually worked

6    on Sea Ray boats and MerCruiser-engined vessels?

7    A.    Yes, I have.

8    Q.    You referenced a college.  Do you have a degree?

9    A.    Yes, I do.  I have an associate's degree in

10   electrical engineering.

11   Q.    From where?

12   A.    Waterbury State Technical College.

13   Q.    What year did you graduate?

14   A.    1984.

15   Q.    Your Honor, at this time I'd like to have

16   Mr. Wicander admitted as an expert under Federal Rule of

17   Evidence 702.

18           THE COURT:  Mr. Rotondo?

19           MR. ROTONDO:  I guess I would just object to the

20   question.  When he's going to ask the question, I'll

21   object.  I don't know that I have to agree that he's an

22   expert.

23           THE COURT:  I wanted to make sure before I told

24   him to proceed that you didn't would not want to voir

25   dire.

```
 1            MR. ROTONDO:  Not on that issue, Your Honor.  I
 2   don't know what the proffer is at this point.
 3            THE COURT:  Okay.
 4   BY MR. NIKAS:
 5   Q.   Mr. Wicander, initially what was your first
 6   involvement with this vessel?
 7   A.   I was contacted by Sea Ray to perform some cosmetic
 8   repairs and finish up some repairs that hadn't been done
 9   at the plant.
10   Q.   And do you remember what year that was?
11   A.   It was 2001, I believe.
12   Q.   Who at Sea Ray contacted you?
13   A.   David Wade.
14   Q.   So your first exposure to this boat wasn't as an
15   expert witness, it was as a mechanic?
16   A.   Correct, yes.
17   Q.   Did you perform those repairs?
18   A.   No, we did not.
19   Q.   Why not?
20   A.   We had written estimates and had made arrangements
21   for the vessel to come to us for repairs down in
22   Westbrook.  Upon the vessel coming to us to Westbrook we
23   had other issues, we had hydrolocking issues.
24   Q.   When the vessel became inoperable, when both engines
25   became inoperable, where was it located relative to your
```

1  facility?

2  A.    It was located in our South Yard, which is by the

3  fuel dock.  Customary the boats, upon arrival to our

4  marina, would pull into that dock.  That's where they

5  typically spent the night.

6  Q.    Was your service facility the closest one that had

7  factory-certified technicians?

8  A.    No, I don't think we're the closest facility, but we

9  were recommended to do the repairs.

10  Q.    When did you first meet Peter Mains?

11  A.    I met Peter Mains right around the time that his

12  vessel had come to us for repairs.  I don't remember

13  exactly.

14  Q.    When you first went on board this boat, what did you

15  observe?

16  A.    I had gotten a list from David Wade on some items

17  that needed taken care of, some cosmetic issues, rug

18  rails, some gelcoat damage, that sort of thing.

19  Q.    Did Sea Ray ask you for an estimate?

20  A.    Yes, they did.

21  Q.    Did you prepare one?

22  A.    Yes, I did.

23  Q.    I'd like to show you an exhibit marked as

24  Plaintiffs' 22.

25            THE COURT:  That has not been admitted, has it?

1          MR. ROTONDO:  No, it has not.

2          MR. NIKAS:  It has not, apparently.

3  BY MR. NIKAS:

4  Q.   Did the estimates you prepared for Sea Ray get sent

5  to Sea Ray?

6  A.   I'm sure it did, yes.

7  Q.   And did you address it to Sea Ray at that time?

8  A.   I would have.  I believe I would have faxed it down

9  to David Wade.

10 Q.   Were you routinely requested by Sea Ray to perform

11 work?

12 A.   We didn't typically work directly for the factory.  I

13 did a lot more of the work through Bassett Boat Company.

14 Q.   But on occasion you would be consulted or requested

15 to do work by the factory?

16 A.   Sure.

17 Q.   Was that work always performed to the factory's

18 satisfaction?

19          MR. ROTONDO:  Objection.

20 A.   To the best of my knowledge.

21          THE COURT:  I'm sorry?

22          MR. ROTONDO:  Objection.  It's been answered.

23          THE COURT:  Sustained.

24 BY MR. NIKAS:

25 Q.   Did you ever have to review any of the work that you

PDF created with pdfFactory trial version www.pdffactory.com

1  had done because of concerns about the satisfactory

2  completion of the work?

3  A.   Can you repeat that?

4  Q.   Did you ever have to redo work that you had done?

5  A.   No.

6  Q.   When the boat came to you -- in fact, did the boat

7  come to you after the failure of the engines to start?

8  A.   Yes.

9  Q.   How did it get to you?

10  A.   We towed it, actually.

11  Q.   So it didn't run on its own power?

12  A.   No.

13  Q.   Were you there when it was towed?

14  A.   Yeah, I did the towing, I'm sure of it.

15  Q.   And where did you tow it to?

16  A.   To the East Yard, which is the yard I manage.

17  Q.   When you towed it, did it stay in the water?

18  A.   Yes, it did.

19  Q.   What did you do upon its arrival?

20  A.   We pickled the engines.

21  Q.   What does that mean?

22  A.   Basically pickling engines is pulling spark plugs

23  out, rolling the engines over to get as much water out as

24  we can, and then putting storage oil in the cylinders to

25  try and preserve the engines.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.    And is this your standard procedure in response to an

2   engine that has had some sort of water ingestion?

3   A.    Yes.

4   Q.    When you turn the engine over, did you notice any

5   water being expelled?

6   A.    Absolutely.

7   Q.    Were you able to ascertain the type of water that was

8   being expelled at this time?

9   A.    We believed it to be fresh water, considering how it

10  happened.

11  Q.    What led you to believe it was fresh water?

12  A.    Because the boat was flushed, the engines were

13  flushed with fresh water from the dock.

14  Q.    Did you see any physical evidence that let you to

15  believe it was anything other than fresh water at that

16  time?

17  A.    Not at that time, no.

18  Q.    So following this procedure that you call pickling,

19  which is removing the spark plugs, expelling the water by

20  turning the engine over -- you're turning the engine over

21  not to start it, correct?  You're just turning it over to

22  move the pistons?

23  A.    Turning it over to move the pistons to get the water

24  out.  Eventually it was started.

25  Q.    Once all the water was out, then you were able to

1    actually turn it over?

2    A.    Yes.

3    Q.    What did you do then in terms of these engines?

4    A.    After we pickled it, we were then instructed, I don't

5    know exactly the time frame, but we were instructed to

6    perform a leak down test and compression test.

7    Q.    What's a leak down test?

8    A.    A leak down test is when we pressurize the cylinder,

9    both intake and exhaust valves are closed, we bring the

10   cylinder up to top dead center, we pressurize it to -- we

11   put 100 psi of compressed air into it and we measure how

12   much air is leaking past rings, valves, that sort of

13   thing.

14   Q.    What's the purpose of the test?  What does it tell

15   you?

16   A.    It's like doing a checkup on an engine.  It will

17   determine how well valves are seating, how well the rings

18   are seating, that sort of thing.

19   Q.    Did you perform this test personally?

20   A.    One of my men did, actually.

21   Q.    Did you supervise him?

22   A.    Yes, I did.

23   Q.    And do you recall what the results of this test were?

24   A.    I don't recall the exact numbers, no, but I do recall

25   both engines failed the tests.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.    I'd like to show you Plaintiffs' Exhibit Number 26.

2            THE COURT:  Actually, can we pause for a second?

3               (Pause.)

4            THE COURT:  We're going to go to 4:15.

5  BY MR. NIKAS:

6  Q.    You personally observed the percentages of air that

7  was leaking from the engine leak down test; is that

8  correct?

9  A.    That's correct.

10 Q.    Did you also perform a compression test on the

11 engine?

12 A.    Yes, we did.

13 Q.    And were you present during the performance of the

14 compression test?

15 A.    Yes, I was.

16 Q.    And how is the compression test performed?

17 A.    We have an instrument that we pull the spark plugs

18 out.  We open up the intake throttle body as far as we can

19 to allow as much air into the engine.  We screw a pressure

20 gauge into the cylinder.  We crank the engine over until

21 we have three or four pulses, which is the cylinder coming

22 up three or four times, and then we take a reading.

23 Q.    The instrument that you're screwing in you're

24 actually screwing into the hole that was vacated by the

25 spark plug that was removed?

1    A.    Correct.

2    Q.    So it's entirely closed as if the plug had been

3    there, correct?

4    A.    Absolutely.

5    Q.    And how many cylinders are involved in this testing

6    process?

7    A.    There's eight per engine.

8    Q.    You did this 16 times?

9    A.    Correct.

10   Q.    When performing a compression test, do you anticipate

11   that the readings that you get will be consistent across

12   the board?

13   A.    Yes.  We like to see them all within plus or minus

14   5 pounds of each other.

15   Q.    So there is some variance that you would expect?

16   A.    Absolutely.

17   Q.    When you performed the compression test, what were

18   the results?

19   A.    They were all over the board.  Some of the pressures

20   were okay and others were way too low.  And none within

21   5 percent of each other, plus or minus 5.

22   Q.    And were these results that you received during the

23   leak down test and the compression test the same for both

24   port and starboard engines?

25   A.    As far as which cylinders were failing?

1    Q.    Not if terms of the same cylinders failing on the

2    port and starboard, but were they both irregular?

3    A.    Both engines were, yes.

4    Q.    As these tests were being performed, did you record

5    what the results were for each cylinder for each test?

6    A.    Yes, we did.

7    Q.    And you did that contemporaneously with the execution

8    of the test?

9    A.    Yes, absolutely.

10    Q.    And following the execution of a compression test and

11    leak down test, would you then draft up some more formal

12    memorialization of what the results were?

13    A.    Yeah, we had field notes and then we go back and

14    write a report, absolutely.

15              MR. NIKAS:  On that basis, Your Honor, I'd like

16    to have Plaintiffs' Exhibit 26 moved into evidence.

17              THE COURT:  Which exception are you heading

18    towards?

19              MR. NIKAS:  It's a business record.  If he does

20    this every time following --

21              THE COURT:  Give me a number and that's good

22    enough.

23              Mr. Rotondo?

24              MR. ROTONDO:  I think it's hearsay.

25              THE COURT:  You're saying he hasn't established

```
 1   the exception.
 2               MR. NIKAS:   802 clearly sets forth the
 3   terms of --
 4               THE COURT:   I know what 802 says.
 5               You're objecting that he hasn't laid an adequate
 6   foundation?
 7               MR. ROTONDO:   Correct.
 8               THE COURT:   Sustained.
 9   BY MR. NIKAS:
10   Q.   Did you prepare the report yourself?
11   A.   Yes, I did.
12   Q.   And in preparing the report, did you personally
13   transcribe the numbers that you had observed during the
14   execution of the test to the final version of your report?
15   A.   Yes, I did.
16   Q.   And in drafting the report, did you rely entirely on
17   things that you had observed during the execution of these
18   tests?
19   A.   Yes.
20   Q.   And do you always prepare a report following tests of
21   these type?
22   A.   Yeah, absolutely.
23   Q.   Does your employer require you to maintain a formal
24   record of the results of these tests?
25   A.   We always have a copy of the tests in a customer's
```

1    file, sure.

2    Q.    And this is something you would do as a matter of

3    routine?

4    A.    Absolutely.

5    Q.    And you would maintain a copy of these reports?

6    A.    Yes.

7              MR. NIKAS:  Your Honor, at this time I'd like to

8    move again.

9              THE COURT:  Seems to me he's satisfied the

10   elements this time.  That's Plaintiffs' Exhibit 26?

11             MR. NIKAS:  That's correct, Your Honor.

12             THE COURT:  Plaintiffs' Exhibit 26 is admitted.

13   BY MR. NIKAS:

14   Q.    The first page is labeled "Port Engine"; is that

15   correct?

16   A.    Correct.

17   Q.    And there are two different looks like things noted

18   here.  What does the first grouping of numbers represent?

19   A.    That would be the compression test on the port

20   engine.

21   Q.    So eight cylinders, and you're noting the compression

22   in each?

23   A.    Yes, correct.

24   Q.    And so the high pressure we have is?

25   A.    135.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    And the low pressure we have is?

2    A.    105 it looks like.

3    Q.    In your experience, is that a significant variance?

4    A.    Oh, absolutely.

5    Q.    And below that it says "leak down percentages."  Are

6    those the percentages you got from the leak down tests?

7    A.    Yes, they are.

8    Q.    The high, this one is?

9    A.    90.

10   Q.    And the low is?

11   A.    20.

12   Q.    Is that a significant variance, in your experience?

13   A.    Yes, absolutely.

14   Q.    On the top here it looks like you have what the

15   standards that you use are.  What are acceptable

16   compression pressures, in your experience?

17   A.    Like to see them above 130 psi.

18   Q.    And the plus or minus 5 psi discusses the variance

19   between what?

20   A.    Between each cylinder.  Never is a cylinder exactly

21   the same as another.

22   Q.    Why aren't they the same?

23   A.    They're fit -- their rings are custom fit.

24   Dimensions are a little different, tolerances are a little

25   different from cylinder to cylinder.

1   Q.   This engine's -- what type of engine is it?

2   A.   Gasoline four-stroke.

3   Q.   Four-stroke gasoline engine with eight cylinders.

4   How are those cylinders aligned?

5   A.    It's a V8.  Four cylinders on either side.

6   Q.    Just briefly can you walk -- very briefly walk us

7   through the four-stroke process?

8   A.    Sure.  The four-stroke process is intake,

9   compression, power, and exhaust.

10        And what that is, initially with intake, the intake

11  valve is open and the piston starts traveling downward,

12  and it draws air and a fuel mixture into the cylinder.

13        Then that valve closes as the cylinder starts coming

14  up and it gets to the top, and as it's coming to the top,

15  that's press compressing the air fuel mixture within the

16  cylinder.

17        The power stroke is after the spark plug fires,

18  pushing that cylinder down into the cylinder.

19        And then the exhaust is as that piston comes back up

20  inside the cylinder and the exhaust valve opens up,

21  forcing the hot gases out.

22  Q.    So these valves you're talking about, the intake and

23  the exhaust valve, is there a set of valves for every

24  cylinder?

25  A.    Yes, there is.

1    Q.    How many are there for each cylinder?

2    A.    There's one intake and one exhaust for each cylinder.

3    Q.    So the intake valve draws air into each cylinder and

4    the exhaust valve allows spent gas to come out?

5    A.    Correct.

6    Q.    Based on the numbers that you got that you observed

7    in the compression test performed on the port engine, what

8    was your diagnosis for what had happened?

9    A.    My diagnosis, that we had a sick engine, there's some

10   internal damage to it.

11   Q.    The compression test doesn't reveal the cause of what

12   happened, did it?

13   A.    No, it does not.

14   Q.    But it is indicative of the health of the engine?

15   A.    Correct.

16   Q.    And then based on the numbers received, was this, to

17   use that analogy, somewhat sick or very sick?

18   A.    Definitely requires disassembly to figure out what's

19   going on.

20   Q.    And the results that you got and that you observed

21   from the leak down test, were they consistent with results

22   you received in the compression test?

23   A.    Yes.

24   Q.    And did the performance of the leak down test give

25   you any idea as to the cause of the failure?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Not the cause, no.

2    Q.    On the second page of this report is another set of

3    numbers.  And this looks like this is the starboard

4    engine; is that correct?

5    A.    Yes, it is.

6    Q.    And here the compression test shows a high of 132 and

7    a low of 125; is that correct?

8    A.    That's correct.

9    Q.    So based on your earlier analysis, this engine was

10   relatively healthier?

11   A.    Definitely healthier, yes.

12   Q.    And did the leak down test give results that were

13   consistent with the results that you achieved on the

14   compression test?

15   A.    Fairly consistent, yes.

16   Q.    Did you have any numbers in the leak down test that

17   were as low as the lowest numbers you got on the port

18   engine?

19   A.    No, not as well, no.

20   Q.    When you conduct these tests, where are you standing?

21   A.    We're right in the bilge of the boat.  We're with the

22   engine.

23   Q.    Are you at the same level as the engines?  Are you

24   like a mechanic in a car looking down over them from

25   outside?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    No, you're standing next to them, typically, either

2    in front or the side, wherever you can squeeze yourself

3    into.

4    Q.    Was the engine compartment on board this boat

5    relatively spacious?

6    A.    No.  Definitely not.  Very tight bilge.

7    Q.    Where were you standing when you performed the leak

8    down test on the port engine?

9    A.    I would have been standing -- I, myself, being

10   observing, I would have been up on deck.  I was probably

11   turning the ignition key.  But the mechanic would have

12   been in the bilge either standing on the transmission or

13   standing next to it.  Wherever you can really fit.

14   Q.    When you performed these tests, do you have to

15   actually look at the entire engine compartment at any

16   point of time?

17   A.    You're always observing what's going on, sure.

18   Q.    I'd like to draw your attention to Item 4.  It says,

19   "During the mechanical inspection, it was noted that the

20   overboard relief hose in both exhaust systems is higher

21   than the top of the exhaust elbows."  What does that mean?

22   A.    That means the exhaust hose was taller than -- the

23   exhaust hose was taller than the exhaust system in the

24   boat, the elbows on the engine.

25   Q.    Is that significant in any way?

1  A.    This is something we always look for because you're

2  not supposed to have any part of the exhaust system higher

3  than the exhaust elbow.

4  Q.    Why not?

5  A.    Because it can cause water ingestion.

6  Q.    How does it do that?

7  A.    Water flows downhill.  If you have any water that's

8  higher than an engine, the exhaust gases, it can sometimes

9  flow back into the engine.

10          MR. NIKAS:  Your Honor, I've exceeded the time.

11          THE COURT:  I noticed.

12          MR. NIKAS:  Do you want me to stop at this

13  point?

14          THE COURT:  Yes.

15          MR. NIKAS:  Mr. Wicander, if we can continue

16  tomorrow.

17          THE WITNESS:  Sure.

18          THE COURT:  You may step down, sir.  Thank you.

19          Ladies and gentlemen, before you go, I just want

20  give you a few reminders.

21          I want to remind you that you must keep an open

22  mind throughout the trial and reach any decisions only

23  after you've heard all the evidence, the arguments of

24  counsel, and my instructions to you on the law.

25          Also, you're not to discuss the case either

PDF created with pdfFactory trial version www.pdffactory.com

1    amongst yourselves or with anyone else.  You're not to

2    permit any third person to discuss it in your presence.

3            I remind you also that you're not to have any

4    contact with the parties, attorneys, or witnesses in the

5    case, and you should not be exposed to anything in the

6    media concerning this case or any similar matter.

7            We will have our schedule from 9:00 to

8    4:30 tomorrow, the one I originally selected.

9            And with that, I'd just like to thank you for

10   your hard work today, and we'll see you tomorrow morning.

11   Have a good evening.

12               (Whereupon the jury left the courtroom.)

13

14           THE COURT:  Could someone close the door at the

15   back of the courtroom, please.

16               Please be seated everyone.

17               If we could just have a summary of what

18   witnesses I should be thinking about for tomorrow, that

19   would be helpful to me.

20           MR. NIKAS:  The only witnesses, Your Honor,

21   remaining on plaintiffs' case in chief are the remainder

22   of Mr. Wicander's testimony, Mr. Greaves, and then,

23   depending on logistical issues, Mr. Wade's testimony,

24   which --

25           THE COURT:  I assume everybody got my order that

1   went out last night?

2             MR. NIKAS:  Yes, Your Honor.

3             MR. ROTONDO:  Yes, Your Honor.

4             MR. NIKAS:  So tomorrow I guess I would only

5   anticipate the testimony of two witnesses, Mr. Wicander

6   and Mr. Greaves, unless Mr. Wade is anticipated to be

7   here.

8             MR. ROTONDO:  Mr. Wade is not anticipated.

9             MR. NIKAS:  Two witnesses, Your Honor.

10            The pace that we're setting now, I would surmise

11  it would be much faster than the first two witnesses by

12  order of magnitude.

13            THE COURT:  Have you been able to arrange for

14  any witnesses to be here, Mr. Rotondo?

15            MR. ROTONDO:  We thought we were going to be

16  done today so we really pushed to get people from

17  Illinois, Tennessee.  We'll be ready to go tomorrow.

18            THE COURT:  Okay.

19            MR. ROTONDO:  And we'll have to figure out who

20  is going to go first.

21            MR. NIKAS:  Do you have a general idea of who

22  will be here?

23            THE COURT:  I'll let you all talk about that and

24  just report to chambers since you're still figuring it

25  out.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              MR. ROTONDO:  My question, though, is how long

 2      do you expect the plaintiffs' case to go?  Another two

 3      witnesses, but are we talking 9:00 to 11:00 or 1:00 or

 4      2:00?

 5              MR. NIKAS:  Go from 9:00 to 12:00; is that

 6      correct, Your Honor?

 7              THE COURT:  We'll go from 9:00 to 10:30, then

 8      10:45 to 12:15.

 9              MR. NIKAS:  With the caveat that I don't know

10      how long cross-examination will take, I anticipate their

11      direct testimony no more than four, four and a half hours.

12              THE COURT:  Direct four and a half hours?

13              MR. NIKAS:  No more than.  I'm being overly

14      cautious.

15              MR. ROTONDO:  If that's true, I'm probably not

16      going to get to my case tomorrow.

17              THE COURT:  Okay.

18              MR. ROTONDO:  I would just say, based on

19      representations we were going to be done today, we have

20      spent a lot of money changing airfares, getting people out

21      here, interrupting their schedules.

22              THE COURT:  Would you like me to take some of

23      them out of order?

24              MR. ROTONDO:  No.  I'm just frustrated, that's

25      all.
```

1           MR. NIKAS:  Let me apologize to everybody

2    involved.  I had not anticipated this morning's testimony

3    would have taken the amount of time that it did.

4           THE COURT:  That's why they're called estimates.

5           Okay.  I'll see you all in the morning.  We'll

6    be here quarter to 9:00 unless I hear from you that there

7    are issues that we need to resolve earlier.  Thank you.

8           MR. NIKAS:  Thank you, Your Honor.

9               (Proceedings adjourned at 4:21 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Vol. II – Page 316

1

2

3                           C E R T I F I C A T E

4

5

6

7              I, Diana Huntington, RDR, CRR, Official Court

8    Reporter for the United States District Court for the

9    District of Connecticut, do hereby certify that the

10   foregoing pages are a true and accurate transcription of

11   my shorthand notes taken in the aforementioned matter to

12   the best of my skill and ability.

13

14

15

16

                    /s/ _____

17
                    DIANA HUNTINGTON, RDR, CRR
18                    Official Court Reporter
                    450 Main Street, Room #225
19                  Hartford, Connecticut 06103
                         (860) 547-0580
20

21

22

23

24

25

Vol. III – Page 317

1                  UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF CONNECTICUT

3

4    - - - - - - - - - - - - - - - - x
                                      :
5    PETER D. MAINS and LORI M. MAINS:  No. 3:01CV2402(AWT)
                                      :
6                     Plaintiffs,   :
                                      :
7              vs                     :
                                      :
8    SEA RAY BOATS, INC.             :
                                      :  HARTFORD, CONNECTICUT
9                     Defendant.    :  APRIL 3, 2008
                                      :
10   - - - - - - - - - - - - - - - - x

11

12

13                    **JURY TRIAL**

14                    **VOLUME III**

15

16      BEFORE:

17

18              HON. ALVIN W. THOMPSON, U.S.D.J.

19                  and a Jury of Nine

20

21

22

23                          Diana Huntington, RDR-CRR
                             Official Court Reporter
24

25

```
 1   APPEARANCES:

 2       FOR THE PLAINTIFFS:

 3               JOHN L. SENNING, ESQ.
                     16 Saybrook Road
 4                   Essex, Connecticut 06426

 5               HERRICK NIKAS, LLP-CA
                     1201 Dove Street, Suite 560
 6                   Newport Beach, California 92660
                 BY:  RACHEL D. LEV, ESQ.
 7                    RICHARD J. NIKAS, ESQ.

 8       FOR THE DEFENDANT:

 9               DAY PITNEY, LLP
                     CityPlace I
10                   Hartford, Connecticut 06103-3499
                 BY:  JAMES H. ROTONDO, ESQ.
11                    DANIEL J. FOSTER, ESQ.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                      TABLE OF CONTENTS

2

3    PLAINTIFFS'
     WITNESS           DIRECT    CROSS    REDIRECT    RECROSS
4
     THOMAS WICANDER     321      403       440         --
5
     THOMAS GREAVES      449      474       482         --
6

7


8    DEFENDANT'S
     WITNESS           DIRECT    CROSS    REDIRECT    RECROSS
9
     DEAN BECKMAN        485      507       --          --
10
     GREGORY DAVIS       538      --        --          --
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **9:04 A.M.**

2               THE COURT:  I believe we may be waiting for a

3     juror.  We are waiting to get the equipment fully

4     operable.

5                    (Pause.)

6               THE COURT:  Before our jury comes in, just let

7     me ask, I know there was an objection to the admission

8     offering of the expert's report.  Are you going to try to

9     offer that, Mr. Nikas?  Just so I know.

10              MR. NIKAS:  We probably will, Your Honor.

11              THE COURT:  Because I have never admitted one.

12              MR. NIKAS:  Then no, Your Honor.

13              THE COURT:  You're free to go ahead and try to

14    lay a foundation.  It's not a business record.

15              MR. NIKAS:  We can do it through testimony,

16    Your Honor.

17              THE COURT:  Okay.  That's the way it's usually

18    done.

19                    We'll bring the jury in.

20                    You can retake the witness stand, sir.

21                    (Whereupon, the jury entered the

22                    courtroom.)

23              THE COURT:  Good morning, ladies and gentlemen.

24    Please be seated everyone.

25                    Whenever you're ready, Mr. Nikas.

1                    MR. NIKAS:  Thank you, Your Honor.

2

3                         THOMAS WICANDER,

4        called as a witness, having been previously duly

5        sworn, was examined and testified further as follows:

6

7                    DIRECT EXAMINATION (Continued)

8   BY MR. NIKAS:

9   Q.   Good morning, Mr. Wicander.

10  A.   Good morning.

11  Q.   How are you today?

12  A.   All right.  Yourself?

13  Q.   All right.

14       Yesterday we were talking, I think the last issue we

15  were discussing was this issue of pickling the engines?

16  A.   Yes.

17  Q.   We were up against a deadline and I'm not sure we

18  went into that in the depth it probably required.  Can you

19  summarize what that process is and what that procedure

20  consists of?

21  A.   Sure.  Essentially we pull the spark plugs out of the

22  engine, crank the engine over with the starter, get as

23  much water out as we possibly can, and then we introduce

24  oil into the cylinders, either down into the intake or in

25  this case we did it through the spark plug holes.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   Q.   What's the purpose behind this?
 2   A.   We like to coat the internal workings of the engine
 3   with oil so it doesn't rust or get damaged any further.
 4   Q.   You were able to tell that the procedure was at least
 5   somewhat successful in that water was expelled from the
 6   engine?
 7   A.   Yes, I believe it was.
 8   Q.   Now, at the time you performed this procedure, would
 9   it have been possible to determine with complete accuracy
10   as to the cause of the engine's failure?
11   A.   No.  I mean, we assumed that it was the hydrolocking
12   at that point.
13   Q.   Why did you assume that?
14   A.   The cylinders were full of water.
15   Q.   Were you able to tell -- were you able to look into
16   the cylinders at that time?
17   A.   No.
18   Q.   Why not?
19   A.   Spark plug hole was very small, less than a half inch
20   in diameter.
21   Q.   Are you able to look onto the top of the cylinder
22   from any other advantage point?
23   A.   Only if you disassemble the engine.
24   Q.   Had you disassembled the engine at that time in June
25   of 2001?
```

1    A.    No, we had not.

2    Q.    What would the process of disassembly consist of?

3    A.    First we'd drain the engine down as much as we could

4    of antifreeze, remove exhaust manifolds, remove an intake

5    manifold and pull cylinder heads.

6    Q.    What is the cylinder head?

7    A.    Cylinder head is basically the cap that goes over the

8    top of the pistons in the cylinders.  It houses the

9    valves, exhaust valves and intake valves.

10    Q.    And the valves were the items that you were talking

11    about as part of the compression process?

12    A.    Correct.

13    Q.    The intake of the exhaust valves?

14    A.    Yes.

15    Q.    When was the pickling of the engine completed?

16    A.    I believe it was done on that Monday.

17    Q.    And as part of that process, did you change any

18    components or renew any components or replace any

19    components?

20    A.    No, we would not.

21    Q.    The oil you added to the cylinder, what type of oil

22    was that?

23    A.    Typically we use a mixture of Marvel Mystery Oil and

24    lay-up oil that we use for winter.

25    Q.    And the purpose of that is to displace the moisture?

1    A.    Displaces the moisture, it's a little bit stickier

2    oil that coats the walls and stays there.

3    Q.    Is it higher viscosity oil?

4    A.    I wouldn't say higher viscosity, but the consistency

5    of it makes it hang better on the cylinder walls.

6    Q.    Just to make it clear, that time in June when you

7    performed the procedure on the engine was not the first

8    time you had actually seen this boat, correct?

9    A.    No.  I had actually inspected the vessel up in

10   Haddam, Connecticut.

11   Q.    When was that?

12   A.    Would have been a few weeks earlier.

13   Q.    And the purpose behind that inspection?

14   A.    I had gotten a verbal list from Mark Verone at

15   Bassett Boat through Sea Ray, there were a few items that

16   were damaged and maybe not repaired properly at the

17   factory, and they wanted me to look at it.

18   Q.    Who at Sea Ray authorized that work for you?

19   A.    That was David Wade.

20   Q.    That's from the Sea Ray factory?

21   A.    Yes.

22   Q.    Was that work ever performed?

23   A.    No, it was not.

24   Q.    Do you know why it wasn't performed?

25   A.    They were bringing the boat to us 11th of June to

1   start the work, and then they had the hydrolocking issue

2   and then we just went on from there.  We never took care

3   of those repairs.

4   Q.   Now, the very last thing that we discussed yesterday

5   were the results of the leak down and compression tests?

6   A.   Yes.

7   Q.   I believe you testified as a result of the readings

8   that you got while performing those tests, that the

9   engines were damaged and unhealthy; is that correct?

10  A.   Correct.

11          MR. NIKAS:  Your Honor, I believe we laid the

12  inspection for the mechanical inspection report yesterday.

13  I'd like to admit Plaintiffs' 26 in evidence.

14          THE COURT:  I'm pretty sure we admitted it.

15  Which one are we talking about?

16          MR. NIKAS:  The mechanical inspection report.

17  It would have been the last thing we did, and I'm not sure

18  we had time.

19          MR. ROTONDO:  I don't remember whether it was in

20  or not.  I would object to the introduction of an expert

21  report.

22          THE COURT:  This isn't the expert report.  This

23  is the inspection report.  Plaintiffs' 26, by my notes,

24  was admitted yesterday afternoon.  It was towards the end

25  of the day.

1        MR. NIKAS:  It would have been the last thing

2    admitted.

3        THE COURT:  There was an objection, I said you

4    hadn't laid an adequate foundation.  You then asked

5    several other questions, and I said I think he's laid an

6    adequate foundation now, and I admitted it.

7        MR. NIKAS:  I was confused about your comments

8    this morning --

9        THE COURT:  That was 27.

10       MR. NIKAS:  Which we had no intention of

11   introducing.  I thought maybe you thought that this was

12   that.  I just want to make sure it was clear that this was

13   part of the work that he performed.

14       THE COURT:  Twenty-six was admitted yesterday.

15   BY MR. NIKAS:

16   Q.   Looking at Exhibit 26, both the leak down and

17   compression test on both the port and starboard engines

18   confirmed that damage had occurred to them?

19   A.   Yes.

20   Q.   And as part of your work as a mechanic and also

21   supervising other mechanics in the repair and maintenance

22   of Mercury engines, everything was consistent with the

23   fact that there was water in the engine?

24       MR. ROTONDO:  Your Honor, I object to the

25   leading nature of this series of questions.

 1          THE COURT:  Sustained.

 2  BY MR. NIKAS:

 3  Q.   When you performed the pickling of the engine, what

 4  results did you see?

 5  A.   Results from pickling?  We saw water in the cylinders

 6  when we first initially pulled the spark plugs out and

 7  were cranking the engine over.

 8  Q.   And that physical evidence would lead you to believe

 9  what?

10  A.   It had ingested water, absolutely.

11  Q.   That issue of water ingestion, had that ever been

12  covered in any of the materials that you were provided by

13  Mercury Marine either through the certification process or

14  in your work as a mechanic for Mercury?

15          MR. ROTONDO:  Objection, Your Honor.

16          THE COURT:  I'll allow that.

17  A.   Yes.  We have a system called MercNet that whenever

18  we do repairs on an engine, we go on MercNet, put in the

19  serial number of engine, and it comes up with a list of

20  bulletins that apply to that engine.  And one of those

21  bulletins was a water ingestion bulletin.

22  BY MR. NIKAS:

23  Q.   Was there one water ingestion bulletin or were there

24  several?

25  A.   There have been several over the years, absolutely.

1          THE COURT:  We're talking about Mercury at this

2    point, correct?

3          MR. NIKAS:  For the Mercury engines.

4          THE COURT:  Not Sea Ray?

5          MR. NIKAS:  Correct.

6    BY MR. NIKAS:

7    Q.   The answer was several?

8    A.   Yes, there were several.

9    Q.   You were first certified as a Mercury technician in

10   what year?

11   A.   I believe it was 1989.

12   Q.   And from that time until 2001, how many service

13   bulletins, approximately, discussed this issue of water

14   ingestion?

15         MR. ROTONDO:  Objection.

16         THE COURT:  Sustained.

17   BY MR. NIKAS:

18   Q.   When reviewing these materials provided you by

19   Mercury, did these materials indicate what the cause of

20   this problem was?

21         MR. ROTONDO:  Objection.

22         THE COURT:  Sustained.

23         MR. NIKAS:  Your Honor, it's not being offered

24   for the truth of the matter asserted, but merely provide

25   notice or knowledge for the witness.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  Sustained.

2    BY MR. NIKAS:

3    Q.   In the course of your education, how often do you

4    consult these Mercury materials?

5    A.   Typically every time we work on an engine if there's

6    a problem that we don't know, other than a minor tune-up

7    or something like that.

8    Q.   Are these bulletins issued on a regular basis or are

9    they issued on occasional basis?

10   A.   They're issued on occasional basis when there's a

11   need for it.

12   Q.   When a new service bulletin is issued, do you have an

13   opportunity to review them?

14   A.   Yes.  Typically they're mailed to us and we also

15   review them on MercNet.

16          THE COURT:  Let me ask counsel a question at

17   sidebar.

18          (Sidebar discussion off the record.)

19   BY MR. NIKAS:

20   Q.   Notwithstanding what is contained within the

21   manufacturer's service bulletins, would there be any other

22   way to confirm --

23          THE COURT:  Just so we're clear, when we talk

24   about manufacturer, there are two manufactures here.

25

1  BY MR. NIKAS:

2  Q.   The engine manufacturer's service bulletins issued by

3  MerCruiser, would there be any way to determine, either

4  through physical evidence or any other type of evidence,

5  what had caused the water ingestion in this case?

6           MR. ROTONDO:  Objection.

7           THE COURT:  The basis is?

8           MR. ROTONDO:  The basis is, A, the question is

9  confusing and vague, and I think it suggests certain

10  things about what way or what may not be in manuals

11  included in the question.

12           THE COURT:  Sustained.

13  BY MR. NIKAS:

14  Q.   Is there any physical evidence that you could look at

15  in the engine to determine what the cause of the water

16  ingestion was?

17  A.   Not without disassembly.

18  Q.   If you do disassemble the heads, is it possible to

19  determine what the cause is?

20  A.   Typically.

21  Q.   And in this particular case, were the engines ever

22  disassembled?

23  A.   Not until later.

24  Q.   When were they disassembled?

25  A.   A couple years later.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   And in the process of disassembly, can you talk about

2  what you did specifically in terms of removing components

3  and then what you found physically when you looked at

4  them?

5  A.   Sure.

6       As we removed the exhaust elbows, we took the exhaust

7  elbows off the exhaust manifolds and the inside of the

8  exhaust manifolds where the exhaust should be and no water

9  should be, it was very rusted, leading us to believe that

10  water came in through the exhaust.

11  Q.   Actually, I don't want to discuss any of your

12  opinions yet.  I just want to talk about what you did.

13  A.   Okay.

14  Q.   And what you saw.

15       Did you remove the exhaust trunking?

16  A.   The hoses?

17  Q.   The hoses.

18  A.   Yeah, that would have been first.

19  Q.   Then what would the next item to be removed?

20  A.   The exhaust elbows.

21  Q.   On that issue, I'd like to show you something as a

22  demonstrative exhibit.

23       Your Honor, we received permission from the defense

24  to use this just as a display piece.  May I approach?

25            THE COURT:  Have we marked it for

```
 1    identification?
 2              MR. NIKAS:  Plaintiffs' next, which would be 42.
 3              THE COURT:  It will be a higher number than
 4    that.
 5              160 for identification.
 6              MR. NIKAS:  I put it on the paper, Your Honor.
 7    BY MR. NIKAS:
 8    Q.   Now, even though I represented this is an exhaust
 9    elbow, that's not entirely accurate.  What is it really?
10    A.   It's half of one.
11    Q.   Half of an exhaust elbow.
12         Can you show the jury the inside portion of the
13    exhaust elbow and explain how it's situated?
14    A.   Sure.
15         The exhaust elbow, the other half would be here, of
16    course, sits on top of the exhaust manifold like this.
17         The exhaust would travel out of the manifold up
18    through this passage here and out this way.
19         In this area here is water jacket, keeps the exhaust
20    elbow cool, and exits here just at the end and mixes with
21    the exhaust gases in the hose.
22    Q.   Now, on an automobile exhaust, there's no water
23    flowing around the exhaust pipe, correct?
24    A.   Correct.
25    Q.   Why is there water flowing around this one?
```

1   A.   Well, they need to keep the entire exhaust system

2   cool until it exits the boat.  It's a fire hazard.

3   Q.   Why is that?

4   A.   The extreme heat of the engine, the exhaust.  It's

5   all contained inside the boat under the hatches.

6   Q.   So where exactly is water introduced in the exhaust

7   gas?

8   A.   Right up top here.  It exits the elbow right here and

9   mixes in with the exhaust gases in the hose itself.

10  Q.   Under the manifold on the, I guess, taller part of

11  the elbow, what's underneath that manifold?

12  A.   Under this manifold here, this would bolt to the top

13  of the manifold.  Under the manifold is the cylinder head.

14  Q.   The cylinder head contains --

15  A.   Contains the valves and the ports for allowing the

16  air in and fuel mixture and the exhaust out.

17  Q.   And I think you explained yesterday on the intake

18  stroke, the intake valve opens and it draws in air?

19  A.   Correct.

20  Q.   And on the power stroke, the exhaust valve opens

21  expelling gas, correct?

22  A.   On the exhaust stroke, right.

23  Q.   Exhaust stroke.

24       When either of those two valves is open, is there an

25  opening essentially from the elbow all the way down to the

PDF created with pdfFactory trial version www.pdffactory.com

1  top of the piston?

2  A.   If the exhaust elbow is open -- or exhaust valve is

3  open, yes, absolutely.

4  Q.   Or the intake valve?

5  A.   The intake valve, yeah, if that were open it would be

6  through the intake, correct.

7  Q.   Typically would the intake and exhaust valves be open

8  at the same time?

9  A.   Typically you don't want them to, but in reality they

10  are for a short duration, yes.

11  Q.   Where both would be open?

12  A.   Yes.

13  Q.   Now, can you explain to the jury, to go back to

14  hydrolocking, how flushing fresh water to clean out I

15  guess the saltwater out of the system could result in

16  flooding the cylinders underneath those elbows?

17  A.   Sure.  With the system -- the exhaust system with a

18  lift muffler system, basically a canaster like a 5-gallon

19  bucket, say, and it has hoses coming from this exhaust

20  elbow on the opposite side into that bucket, and then it

21  has a hose going up and out of the boat and then a

22  separate one that goes off to the side.  If any point of

23  that exhaust system is near the same height as this

24  exhaust elbow, without this engine running, you're

25  injecting water into that system, you're essentially

1    filling that bucket, it fills the hoses, and then it will

2    run right back into the engine because that exhaust system

3    is a little bit higher.  Similar to like a gutter on your

4    house running the opposite direction.

5    Q.    Now, this boat in June of 2001 had what type of

6    exhaust system?

7    A.    In June 2000 it had a lift system in it.

8    Q.    And that requires the engine to be running or not

9    running when flushing it out?

10   A.    It should be running, absolutely.

11   Q.    Why is that?

12   A.    Because part of the exhaust system is higher.  And

13   you're filling that container with water, you need the

14   exhaust pressure to push the excess water out of the boat

15   rather than have it come back towards the engine.

16   Q.    As originally designed, this boat had a collector?

17   A.    I believe so, yes.

18   Q.    That would have been how it would have been from the

19   factory?

20   A.    Yes, I believe so.

21   Q.    When flushing a collector exhaust system, is the

22   engine running or not running?

23   A.    In the manual it says not to run.

24   Q.    Why is that?

25   A.    That was -- the reason they don't want it to run or

1    you don't need to run it is because all the exhaust

2    components are a little bit lower and theoretically the

3    water is going to flow out of the boat, out of the engine.

4    Q.    So when Mr. Mains flushed the exhaust with fresh

5    water, it got into the exhaust hoses?

6    A.    Yes.

7    Q.    And then how did it get into the cylinders?

8    A.    Well, it filled up the exhaust system coming out of

9    here, would drain into the exhaust system itself into that

10   bucket, say.  Once it filled up to a certain point that

11   was higher than this level here, it flowed back in through

12   the exhaust.

13   Q.    And then did it drop down that vertical passageway?

14   A.    Correct.  It would drop down through here into the

15   exhaust manifold and then into the cylinders.

16   Q.    Now, during this process, would water have gotten

17   into every cylinder?

18   A.    Not necessarily.

19   Q.    Why is that?

20   A.    If one -- if any of the cylinder's exhaust valves

21   were closed at the time, those cylinders typically

22   wouldn't be flooded.

23   Q.    Aren't all the exhaust valves open at the same time?

24   A.    No.

25   Q.    Why is that?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    If they all open and close at the same time, that

2    means all the pistons would have to be firing at the same

3    time and it would vibrate right out of the boat, it would

4    not run smoothly.  So they time them to open and close at

5    different times so the engine runs smoothly.

6    Q.    Mr. Wicander --

7              MR. NIKAS:  Your Honor, can I have the witness

8    draw something for us?

9              THE COURT:  You may.

10   BY MR. NIKAS:

11   Q.    I'm going to move this closer to you.

12         Can you kind of give us a layout of an engine like

13   this, just a V-type engine.

14   A.    Excuse my drawing.  Sure.

15   Q.    Where would the exhaust elbows be?

16   A.    Actually, the exhaust elbows would be mounted right

17   here typically.

18   Q.    And the exhaust valves?

19   A.    Exhaust valves would be here, lower valve here and

20   here.

21   Q.    Intake?

22   A.    Intake valve up on top, here and here.

23   Q.    And where is the piston and the cylinder?

24   A.    This would be the piston here and here.

25   Q.    What's the circle on the bottom?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   This would be the crankshaft.  And this would be the

2   camshaft.

3   Q.   Crankshaft turns what?

4   A.   Pistons are connected to the crankshaft.

5   Q.   And the camshaft?

6   A.   Camshaft actually is what we call pushrods, push up

7   and they open and close the valves.

8   Q.   So could you, using a different color, trace the path

9   of water from the elbow to wherever it was in Mr. Mains'

10  boat?

11  A.   When the water came back in through the exhaust?

12  Q.   Yes.

13  A.   Okay.

14       Say the end of the exhaust elbow is here and here.

15  The water would have come down in through the exhaust,

16  flowed in through this valve and then on top of the

17  piston.

18  Q.   And sitting on top of the piston water is bad?

19  A.   Very bad.

20  Q.   Why wouldn't the engine be able to start with water

21  sitting on top of the pistons?

22  A.   Well, water is a very dense liquid, it's very dense,

23  unlike air.  And if this whole cavity were to fill up with

24  water, it would be essentially very strong and you can't

25  compress water at all, it wouldn't allow it to roll over.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    That's the locking that you're talking about?

2    A.    That's called hydrolock, correct.

3    Q.    Thank you, sir.

4            THE COURT:  Do counsel want that labeled for

5    identification like we did the others?

6            MR. ROTONDO:  I think it should be.

7            THE COURT:  We'll use the next number.

8    BY MR. NIKAS:

9    Q.    In your inspection report, you noted that you saw the

10   overboard relief hose in both I guess the port and

11   starboard engines was higher than the top of the exhaust

12   elbows?

13   A.    Yes.

14   Q.    Is that why water would flow back down into the

15   elbow?

16   A.    Yes.

17   Q.    Is that a typical installation?

18   A.    Typically we don't like to see anything higher than

19   the exhaust elbows for this reason.

20   Q.    Would that also be a problem if the engine is

21   running?

22   A.    May not be a problem when it's running.  Not a great

23   plan though.  Not a good way to have it.

24   Q.    There's always some water in the exhaust?

25   A.    Yes, there is.

1    Q.    That's the water that's expelled from the water

2    jackets?

3    A.    For the coolings, correct.

4    Q.    Going back to the disassembly process, we removed the

5    exhaust hose, we removed the elbows.  What would have been

6    taken off next?

7    A.    The exhaust manifolds.

8    Q.    And the exhaust manifold is -- looks like what or

9    what does it do?

10    A.    It's yea long (indicating) and has four ports in it

11    for the exhaust gases to come out of each of the cylinders

12    on that one side of the engine and then it connects with

13    the exhaust elbow.

14    Q.    After you remove the manifold for the exhaust, what

15    would have been -- what did you remove next?

16    A.    The intake manifold.

17    Q.    The intake manifold does what?

18    A.    That's what directs the air fuel mixture into the

19    engine.

20    Q.    Does air come in through the intake manifold through

21    the intake valve into the cylinder?

22    A.    Yes, it does.

23    Q.    And I assume, then, that exhaust gas comes out from

24    the cylinder through the exhaust valve into the exhaust

25    manifold through the elbow?

1    A.    Correct.

2    Q.    So now that's removed.  What would go next?

3    A.    The cylinder heads would be removed next.

4    Q.    And is that a relatively simple procedure?

5    A.    I don't know how many fasteners there are, but

6    probably 18 or 20 off the top of my head.

7    Q.    When you talk about fasteners, what are you talking

8    about?

9    A.    Bolts.  Yea long (indicating).

10   Q.    How long did it take you -- how long does it take to

11   unscrew all those bolts and remove the head?

12   A.    Twenty minutes or so.

13   Q.    This isn't something you would routinely do as part

14   of an inspection every week or every month?

15   A.    No, absolutely not.

16   Q.    Is there a gasket between the head and like a

17   cylinder block?

18   A.    Yes, there is.

19   Q.    Is that gasket reusable?

20   A.    No, it's not.

21   Q.    Every time someone removes the head, they have to get

22   rid of the gasket?

23   A.    Yes.

24   Q.    Gasket is made of what?

25   A.    I believe it's a graphite material but has stainless

1    steel rings around each cylinder.  The whole gasket and

2    those rings get crushed as they are torqued down.

3    Q.   When you talk about torquing down, if I've got my

4    piece of Ikea furniture and you have little bolts put

5    together and you tighten them, is the tightening process

6    or unloosening process different on the bolts on the

7    cylinder head?

8    A.   Certainly.  You want all the fasteners to be

9    tightened the same amount, so they give you a torque spec

10   out of the manual, service manual, what to tighten them

11   and the sequence to tighten them.

12   Q.   Where did do you get the sequence?

13   A.   It's out of the service manual.

14   Q.   Service manual is provided by?

15   A.   Mercury Marine.

16   Q.   The manufacturer?

17   A.   Correct.

18   Q.   So you remove these, I guess, nuts from the studs?

19   A.   Bolts.

20   Q.   Bolts from the studs.  Sorry, bolts.

21        And then how heavy is the head?

22   A.   Very heavy.  80, 90 pounds, typically.

23   Q.   How many heads are there?

24   A.   Two per engine.

25   Q.   On this boat there were?

1    A.    Four.

2    Q.    Are the valves in the head?

3    A.    Yes, they are.

4    Q.    So once you remove the head, you also get rid of the

5    valves?

6    A.    Correct.

7    Q.    And then if you take out the head and after you

8    removed the head on this vessel, what did you see when you

9    looked down into the cylinders?

10   A.    We saw little bit of rust, saw scoring on the

11   cylinder walls, that sort of thing.

12   Q.    You saw what on the cylinder walls?

13   A.    Scoring.  Scratches in the cylinder wall.

14   Q.    Is that something you would expect to see?

15   A.    No.  No.

16   Q.    Is that something you would see in a healthy engine?

17   A.    No, definitely not.

18   Q.    What causes the scoring?

19   A.    Scoring is typically caused by lack of lubrication

20   between the piston and the cylinder wall.

21   Q.    What's the lubrication between the piston and the

22   cylinder wall?

23   A.    Engine oil.  Without the engine oil you would have

24   metal to metal, essentially.

25   Q.    So if you ran an engine, say, without the drain plug

1    in the sump and all the engine oil left the engine by

2    gravity, that would cause scoring?

3    A.    Absolutely.

4    Q.    But if all the engine oil that was supposed to be in

5    the engine is still in the engine, how do you get scoring?

6    A.    Scoring would be caused by water getting into the

7    cylinder to wash away any of the oil lubrication.

8              MR. NIKAS:  Your Honor, could I show the witness

9    this glass filled with oil?

10             THE COURT:  You may.

11   BY MR. NIKAS:

12   Q.    If this is a cylinder and that's a piston, how does

13   the piston fit into the cylinder and how does the oil get

14   coated around it?

15   A.    Piston obviously goes down into the cylinder, much

16   tighter fit than this, of course, and the oil could come

17   up alongside the piston.

18   Q.    And if I introduce some water, oil and water do what?

19   A.    They don't mix very well.

20   Q.    So what's the water doing to the oil?

21   A.    The water is washing the oil away from between the

22   cylinder wall and the piston.

23   Q.    Does the water displace the oil immediately and

24   remove any lubrication from the cylinder?

25   A.    Pretty quickly, yes.

1  Q.   And once that lubrication is gone, that results in

2  the scoring?

3  A.   Correct.

4  Q.   Did you see scoring in both engines?

5  A.   Yes, I did.

6  Q.   And did you also see rust in both engines?

7  A.   A little bit, yes.

8  Q.   And rust, I guess, is a by-product of corrosion?

9  A.   Yes.

10 Q.   During the process, from the time the boat first got

11 to you in June through the time the engine was

12 disassembled, it looks like you completed what's called, I

13 guess, an inboard water damage worksheet?

14 A.   Yes.

15 Q.   What's the purpose of that document?

16 A.   To get facts on as far as what weather conditions

17 were like and that sort of thing, engine serial numbers,

18 all that.

19 Q.   And would this be something that you would fill out

20 every time you had a case of water ingestion?

21 A.   Typically, yes.

22 Q.   This is something that you want to fill out to

23 determine what?

24 A.   We're trying to determine the source of the water.

25 Q.   So you're just collecting information at this point?

1    A.    Correct.

2    Q.    Who provided you with the water damage worksheet that

3    you completed for this boat?

4    A.    I believe Mark Verone from Bassett Boat Company.

5    Q.    Bassett Boat is the --

6    A.    MerCruiser Sea Ray dealership.

7    Q.    And did you personally fill out the water damage

8    worksheet in this case?

9    A.    I filled out the copy, I believe.

10   Q.    You filled out a copy --

11   A.    To neaten it up.  We had one in the field and I

12   recopied it to neaten it.

13   Q.    So actually two copies?

14   A.    Yeah, I believe so.

15   Q.    One more legible than the other?

16   A.    Correct.

17   Q.    Did any of the numbers change --

18   A.    No.

19   Q.    -- during the transcription process?

20   A.    No.

21   Q.    And then is the completion of the worksheet

22   contemporaneous or very close to contemporaneous with the

23   inspection that's performed?

24   A.    Yeah.

25   Q.    And is this something that is provided by Sea Ray or

1  MerCruiser?

2  A.   I believe it was supplied -- I know I got it from

3  Mark, and I don't recall whether it was MerCruiser or

4  Sea Ray.

5          MR. NIKAS:  Your Honor, at this time I'd like to

6  have Plaintiffs' 29 admitted.

7          THE COURT:  Mr. Rotondo?

8          MR. ROTONDO:  I have a question and I'm not sure

9  it would be appropriate --

10         THE COURT:  Do you want to voir dire the

11  witness?

12         MR. ROTONDO:  Briefly.

13         THE COURT:  You can voir dire, certainly.

14         Mr. Nikas, it wasn't clear it me what subsection

15  of the rule you were proceeding under.

16         MR. NIKAS:  We are trying to submit this as a

17  business record, Your Honor.

18         THE COURT:  Okay.

19

20                 VOIR DIRE EXAMINATION

21  BY MR. ROTONDO:

22  Q.   I'm going to show you what has been marked for

23  identification as Plaintiffs' Exhibit 29 and 30.

24  A.   Okay.

25  Q.   I want to ask you questions about these two

1    documents.

2        Those are the documents you were referring to in

3    responding to the questions by Mr. Nikas?

4    A.    Yes.

5    Q.    As I understand your testimony, Exhibit 30 is in your

6    handwriting; is that correct?

7    A.    Yes, it is.

8    Q.    Exhibit 29 is in somebody else's handwriting?

9    A.    Yes.

10   Q.    Somebody else put those notations there?

11   A.    Yes.

12   Q.    And you just copied them onto what's been marked as

13   30 for identification?

14   A.    Correct.

15   Q.    Do you know who did 29?

16   A.    One of my mechanics.

17   Q.    Do you know which one?

18   A.    I believe it was David Bird.

19   Q.    And were you present at each and every moment when he

20   made all those notations?

21   A.    I was present during all the testing.

22   Q.    But you didn't make these notations?

23   A.    No, I did not.  He did.

24            THE COURT:  Do you remember when we went over

25   the elements of the exception?

1          MR. NIKAS:  I do, Your Honor.

2          THE COURT:  You haven't covered them all.

3          MR. NIKAS:  It's a record made --

4          THE COURT:  Don't argue.  You haven't covered

5   them all.  I don't want you making speeches, I'm just

6   telling you you haven't covered them all.

7

8                  DIRECT EXAMINATION (Resumed)

9   BY MR. NIKAS:

10  Q.   Mr. Wicander, is the inboard water damage worksheet

11  that was completed something that would have been done and

12  performed in the case of any water ingestion case that you

13  had?

14  A.   Typically, yes.

15  Q.   And is it a regular practice of your yard to complete

16  one in the case of a water ingestion case?

17  A.   Yes.

18  Q.   And you were personally present at the time that the

19  readings that are contained on that sheet were conducted

20  and written down?

21  A.   Yes.

22  Q.   And I presume that once it's shown to you, you can

23  establish this as an accurate copy of the sheet that was

24  completed?

25  A.   Yes.

1    Q.   And the second part of the exhibit, which I guess is

2    the attachment because it says "Attach a sketch with

3    location of the canaster or water lift muffler," is that

4    document or is that sketch something that you drew

5    yourself?

6    A.   Yes, it is.

7    Q.   Are the readings contained on that sketch

8    measurements that you made personally?

9    A.   I was there, yes.

10   Q.   You personally observed them being made?

11   A.   Yeah, I actually helped make the measurements.

12   Q.   So you can verify the accuracy of those measurements?

13   A.   Yes.

14        MR. NIKAS:  Your Honor, at this time I'd like to

15   admit this as exception to hearsay rule as a record of

16   regularly recorded activity and a business record.

17        THE COURT:  It's admitted.

18        MR. ROTONDO:  No objection.

19        THE COURT:  We're talking about 29 and 30?

20        MR. NIKAS:  I'd like to move 30 next.

21        THE COURT:  Well, I think we've covered the

22   questioning for 30 as well.  So Plaintiffs' Exhibit 29 and

23   Plaintiffs' 30 are admitted.

24   BY MR. NIKAS:

25   Q.   Just so the jury can see the difference between the

1  two, this is the earlier exhibit and this is the revision.

2  The only purpose in doing this was to make it more

3  legible?

4  A.    Correct.

5  Q.    Readable?

6  A.    Yes.

7  Q.    What happens with the worksheet?  What does -- who is

8  it transmitted to?

9  A.    Typically, it would be transmitted to Mercury Marine

10  and definitely is put in their file.

11  Q.    Do you know if that was done in this case?

12  A.    I'm not certain.  I know I told Mr. Verone about it.

13  Q.    So it wouldn't be your responsibility; it would have

14  been the dealer's responsibility?

15  A.    Yes.

16  Q.    Now, from the time that the vessel got to your

17  marina, which I guess could have been June 9, engines

18  failed on the 10th, you first looked at it on the 11th for

19  the engine problem?

20  A.    Yes.

21  Q.    Did you have any contact with either Mr. or

22  Mrs. Mains after that point?

23  A.    I'm sure I did.

24  Q.    Was it sporadic contact or did you see them often?

25  A.    Quite often.

1  Q.    What did they do when they came to visit the boat?

2  What was the purpose of their visits?  What did you see

3  them doing?

4  A.    On a weekly basis they were cleaning the boat before

5  it was covered.  Coming down, they were talking to me in

6  the office about everything going on, that sort of thing.

7  Q.    Why were they washing the boat if it wasn't being

8  used?

9  A.    They're very, very particular people.  They like

10  their boat clean and they had a lot of pride in that boat.

11  Q.    Did you see them too much?

12  A.    You might say that.

13  Q.    Did you ever do anything to minimize the time you

14  spent with them?

15  A.    A couple times I give them a pool pass to go use the

16  pool.

17  Q.    Okay.  Now, having performed the mechanical

18  inspection, the pickling of the engine, and completing

19  this worksheet, were you then retained to provide an

20  opinion as to the cause of the water ingestion suffered by

21  this boat?

22  A.    Yes.

23  Q.    Now, I'd like to discuss those opinions.

24          MR. NIKAS:  Before I do, Your Honor, I'd like to

25  offer this witness as an expert under 702.

 1          MR. ROTONDO:  Your Honor, I object.  I object to

 2   the witness offering any opinions about the subject to

 3   which Mr. Nikas wants to offer him on the grounds -- well,

 4   I can argue it, but I have a grounds for that objection.

 5          THE COURT:  Okay.  It sounds to me like this is

 6   something we probably need to have on the record.  I'm

 7   going to ask the jury to step next door for a minute.

 8              (Whereupon the jury left the courtroom.)

 9          MR. NIKAS:  Your Honor, is there a motion in

10   limine or an objection I didn't receive?

11          MR. ROTONDO:  It's simply that the witnesses has

12   been disclosed in his report to testify that he found

13   water ingestion that he says predates the hydrolock.  All

14   right.  So that's what he can testify about, the fact that

15   there was water ingestion that predates the hydrolock, not

16   that there was any defective condition, not that there was

17   any problem in the exhaust system.  That's the only thing

18   he can testify about.  It's the last two lines of his

19   report.

20          THE COURT:  The report does have to state what

21   the opinion is that's going to be given.

22          MR. NIKAS:  Which states that, "In my opinion,

23   both engines have ingested a period water over a period of

24   time prior to the hydrolocking on or about June 9, 2001.

25   No single ingestion incident could have caused the damage

1    present."  That's pretty clear.

2            MR. ROTONDO:  And I would agree he can say that.

3    What he can't say is what Mr. Nikas wants him to say.

4            THE COURT:  Which is?  What does Mr. Nikas want

5    him to say?

6            MR. ROTONDO:  I don't mean to --

7            THE COURT:  Or you're concerned that he wants

8    him to say?

9            MR. ROTONDO:  I'm concerned that he wants him to

10   talk about existence of a defect.  Water ingestion can

11   occur for several different reasons.  If the witness is

12   being proffered to offer the testimony that there was a

13   defect in the design or manufacture of this engine, I

14   think that's outside of the scope of his report.

15           MR. NIKAS:  Your Honor, there are several causes

16   of water ingestion.  All of them are related to the fact

17   that the design of the system is what it is and -- there's

18   no issue as to the design defect.  The manufacturer's

19   admitted it in several service bulletins.  If it's the

20   basis for his opinion that this engine suffered --

21           THE COURT:  I doubt that that would have been

22   admitted in a service bulletin.  But even if it were, the

23   question is what can this witness -- when you say there's

24   no issue, then I want to hear that the defense is

25   stipulating to it.

PDF created with pdfFactory trial version www.pdffactory.com

1              Are you stipulating to that, Mr. Rotondo?

2              MR. ROTONDO:  No.

3              THE COURT:  Then there is an issue.

4              Then you have to go to your expert report and

5    show where the opinion that's being offered has been

6    disclosed as an opinion that will be offered at trial.

7              Mr. Rotondo has pointed to "it is my opinion,"

8    which is the usually the way an expert report is set up,

9    "It is my opinion that" -- and then that's the opinion

10   that's offered at trial.

11             Are you planning to offer more than that?

12             MR. NIKAS:  No.  The only thing he's going to

13   testify to --

14             THE COURT:  Okay.  So all he's going to say is

15   what is here is his opinion.

16             MR. NIKAS:  But in establishing that opinion, he

17   should be able to testify as to the materials that he

18   relied on in determining that the water ingestion had

19   occurred previous to the hydrolocking incident, and that's

20   going to necessarily cover the service bulletins provided

21   by the manufacturer as to water ingestion.

22             MR. ROTONDO:  That's not a report.  And his

23   report in fact says the basis for his opinion is that he

24   sees damage present in the engine based upon his

25   inspection.  That's what his report says.

1          THE COURT:  Rule 26(a)(2)(B) discusses the

2     written report of an expert.  It says, "The report must

3     contain a complete statement of all opinions the witness

4     will express and the basis and reasons for them."

5          So if there is a basis that's not in the report,

6     it cannot be gone into.

7          It says also, Clause (2), "the data and other

8     information considered by the witness in forming them, any

9     exhibits that will be used to summarize or support them,

10    the witness's qualifications, including a list of all

11    publications authored in the previous ten years, a list of

12    all other cases in which during the previous four years

13    the witness testified, and a statement of the compensation

14    to be paid for the study and testimony in the case."

15         And it says "and" not "or."  So it means that

16    each one of these items must be included in the report.

17    In the report, not in the deposition testimony.

18         MR. NIKAS:  In his expert report, his Rule 26

19    disclosure, Mr. Wicander states, "In connection with the

20    2003 report," which is --

21         THE COURT:  I'm not following you.  As I

22    understand it, his expert report is the October 7, 2003

23    document.

24         MR. NIKAS:  Correct, Your Honor.

25         In his disclosure under Rule 26 he sets forth

PDF created with pdfFactory trial version www.pdffactory.com

1  the additional bases for his opinion and his

2  qualifications.

3          THE COURT:  You're talking about something other

4  than the October 7, 2003 report?

5          MR. NIKAS:  I'm talking about the pleading, his

6  disclosure statement under Rule 26 that was filed in this

7  case.

8          THE COURT:  I'm talking about the report.  I'm

9  literally reading the rule.  Are you operating within

10 what's in the rule here?

11         MR. NIKAS:  I have a document titled Supplement

12 to Expert Report.

13         THE COURT:  Supplement to Expert Report, thank

14 you.  That's helpful.

15         MR. NIKAS:  I assume it's been filed.

16         THE COURT:  What's the date of that document?

17         MR. NIKAS:  November 13, 2003.

18         THE COURT:  And how come it's not attached to

19 the report and your exhibit?

20         MR. NIKAS:  Well, we never intended to introduce

21 the expert report in any event.

22         THE COURT:  Well, it would have been helpful for

23 me to have all of the report in one place.

24         Where in the papers can I see what you're

25 talking about?  I don't want you to read it to me, I want

1    to read it myself.  Why don't you hand it up to me, if

2    that would be acceptable to you.

3            You're saying this is a supplement to his

4    report, correct?  So it's part of his report.

5            MR. NIKAS:  I'm reading the title, Your Honor.

6    To be honest, I had not seen this before.  It says

7    "Supplemental to Expert Report," I assume that's

8    "Supplement to Expert Report."

9            THE COURT:  Can I see it, please.

10           MR. NIKAS:  I'll try to remove it.

11           THE COURT:  You have what he's talking about,

12   Mr. Rotondo?

13           MR. ROTONDO:  I believe I do.  If I can just

14   compare.

15           THE COURT:  Let me ask, Mr. Rotondo, when you

16   look at that document, does that resolve the objection

17   that you have?

18           MR. ROTONDO:  No, it doesn't change anything,

19   Your Honor.

20           THE COURT:  Why not?

21           MR. ROTONDO:  Because it doesn't indicate the

22   other opinions that are now being proffered or the bases.

23           THE COURT:  Okay.  Have you had a chance to look

24   at that, Mr. Nikas?  You said you had not seen it.

25           MR. NIKAS:  I had not seen it.

1          THE COURT:  Take a second and look at it and

2     tell me whether you think it states the other opinions and

3     the bases for those opinions.

4          Can I ask the courtroom deputy to give him some

5     flags.

6          MR. NIKAS:  I have some.

7          THE COURT:  Where you think it does, if you

8     think it does, put a little flag next to that.

9          Why don't you show it to Mr. Rotondo so he knows

10    what I'm looking at.

11         MR. NIKAS:  Unfortunately, Your Honor the report

12    does not track --

13         THE COURT:  This is it where you have this

14    sticker?

15         MR. NIKAS:  What I'm referring the Court to is

16    the certification from Mercury Marine and certification

17    from Sea Ray which he discloses as the basis for his

18    qualifications.  That experience, he's allowed to testify

19    as to what material he was provided for and provided with

20    as part of that certification process.

21         THE COURT:  This is under the section on

22    qualifications as an expert.

23         MR. NIKAS:  Correct, Your Honor.

24         THE COURT:  How does that address at all what

25    opinions he's giving or --

PDF created with pdfFactory trial version www.pdffactory.com

1       MR. NIKAS:  The only opinion this witness will

2  testify to is that the water ingestion occurred over a

3  historic period of time, as is stated in his report, could

4  not have been caused by the hydrolocking incident, and

5  that the replacement of both engines is necessary.

6       THE COURT:  Okay.  Fine.

7       MR. NIKAS:  But, Your Honor, during the voir

8  dire process as part of his qualifications, will the Court

9  prevent me, since he has not been proffered as an expert

10 witness yet, to go into, as the voir dire process, his

11 background, his experience, the materials he was exposed

12 to as part of his Mercury training and Sea Ray training?

13      THE COURT:  I allowed you to do that, I thought.

14 I gave you latitude.  I let you do it over objection even

15 though I thought we were veering into him testifying as a

16 fact witness or at least along the line.

17      MR. NIKAS:  Well, he is partially a fact

18 witness.

19      THE COURT:  He wasn't disclosed as one.  He's

20 only disclosed as an expert witness.  That was a big issue

21 we had in the motion in limine.  You probably didn't see

22 the ruling, but that was one of the points I made in my

23 ruling in the motion in limine was that he was not

24 disclosed as a fact witness, only as an expert witness.

25 But I allowed you some latitude there because I thought it

PDF created with pdfFactory trial version www.pdffactory.com

1    was necessary or at least fair in terms of providing the

2    basis for what he did leading up to the expert work he

3    did.  But that doesn't allow you to go forward and convert

4    him into a fact witness.

5            MR. NIKAS:  What I'm saying, Your Honor, is

6    since he has not been offered as an expert and I haven't

7    completed the voir dire process of qualifying him as an

8    expert, because that qualification is relevant --

9            THE COURT:  You offered him as an expert

10   yesterday.

11           MR. NIKAS:  No, I withdrew because we weren't

12   getting to the opinion point.  Mr. Rotondo objected and I

13   withdrew.

14           THE COURT:  To his being offered as an expert?

15           MR. ROTONDO:  I didn't object.  I didn't

16   stipulate until I heard the question he was asked.

17           MR. NIKAS:  And I said we won't go into opinion

18   yet then.  I have not formally submitted him.

19           THE COURT:  I put down that he had been offered

20   and Mr. Rotondo simply was reserving the right to

21   cross-examine him.  I didn't understand that, sorry.

22           MR. NIKAS:  I never heard a ruling, so I stopped

23   the voir dire process at that time.

24           THE COURT:  I said you can go on and question

25   him.  That was my ruling.  I guess you want --

1         Mr. Rotondo, you're assuming I haven't ruled
2    yet; is that correct?
3         MR. ROTONDO:  No, I understand he's been
4    designated as an expert.  My only issue with respect his
5    offering opinions is what those opinions are that he's
6    going to offer and whether they've been disclosed.  That's
7    my issue.
8         THE COURT:  That's what I thought you were
9    saying.
10         MR. ROTONDO:  Yes.
11         THE COURT:  Okay.
12         MR. NIKAS:  Notwithstanding --
13         THE COURT:  So if what you're going to try to do
14    is under the guise of voir dire get in things that
15    otherwise would not be admissible because they were not
16    disclosed as his expert opinion, you're going to get cut
17    off from doing that, just so we're clear.
18         MR. NIKAS:  I'm not trying to be argumentative,
19    I just want to be sure I don't incur the Court's ire any
20    further --
21         THE COURT:  You haven't incurred any ire.  I'm
22    telling you where the lines are.
23         MR. NIKAS:  If no opinion is offered -- in other
24    words, I don't ask him any opinion questions outside the
25    scope of the opinion offered in his report, during voir

1  dire I can discuss his education, his background, the

2  components of that education and background, anything that

3  qualifies him as an expert.

4          THE COURT:  Yes.  And I thought you did all that

5  yesterday, to my satisfaction at least.

6          MR. NIKAS:  But I haven't completed it to mine.

7  Part of the voir dire process is building him up as an

8  expert in front of the jury.  Since we started with the

9  fact issues, I hadn't gotten to that point.

10          THE COURT:  You didn't start with the fact

11  issues.  You started with his qualifications and then even

12  went back and went over his education.

13          My concern is that -- I mean, I understand you

14  sort of find yourself in a box.  But that's not my

15  concern.  I have to make sure that you don't use voir dire

16  as a back door to do something you're not allowed to do.

17  And you're not going to be allowed to do that.  It's not

18  fair.  I mean, he was disclosed as an expert and he was

19  disclosed for certain opinions.  And you can't get certain

20  evidence in that you otherwise would have liked to have

21  gotten in as an opinion, but it wasn't disclosed as an

22  opinion, as part of his background.

23          MR. NIKAS:  I'm not talking about an opinion.

24  I'm talking about documents that he's reviewed, materials

25  that he's been provided, written documentation that make

1    up the certification process by MerCruiser and Sea Ray

2    since he holds both certifications.  We didn't go into

3    those issues yet.

4         THE COURT:  But he has not disclosed in the

5    report the basis for his opinions.

6         MR. NIKAS:  But not the basis for his

7    qualifications.  And so if I just limit my questioning to

8    his qualifications --

9         THE COURT:  It seems to me you're being more

10   than a little cute here, Mr. Nikas.  It sounds to me that

11   what you're saying is there are things that happen to be

12   the basis for his opinion and, by the way, they also

13   happen to be the basis for his qualifications.

14        MR. NIKAS:  But that's true.

15        THE COURT:  Is that what you're saying?

16        MR. NIKAS:  That's true.  It's not being cute,

17   it just happens to be a fact.  I'm not in a box,

18   Your Honor, I'm in a box below the ground and we call that

19   something else.  So to the extent that what I'm asking for

20   is permissible and certainly justifiable under Rule 11,

21   this isn't even being somewhat aggressive in terms of

22   presenting the evidence.

23        If these materials, these documentary materials

24   were reviewed during the course of his education and we

25   can say have you reviewed, you know, X's publications

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    regarding this, X's publications regarding that, X's
 2    publications regarding whatever, that should be
 3    permissible under the scope of voir dire.
 4              THE COURT:  It depends how much detail you go
 5    into in terms of what's in the publications.
 6              MR. NIKAS:  I'm not going to ask him to read
 7    them.  I'm not even going to ask him to summarize what
 8    they say.  I can ask them has he seen them and reviewed
 9    them.
10              THE COURT:  It depends -- I understand what
11    you're saying you're not going to do, but there are other
12    things that skillful counsel do to sort of -- you don't
13    ask him to read it, you don't ask him to summarize it, but
14    in your question you basically testify.  You've done that
15    a few times, okay?  And that's okay with me as long as
16    there's no objection.  But we're in a very -- we are at a
17    point here where it's a highly-contested point.  I just
18    want to make sure that you understand the grounds rules
19    before we bring the jury in.
20              MR. NIKAS:  Your Honor, I think at every point I
21    have tried to be extremely cautious and to the point where
22    I've gone before the Court prior to beginning any line of
23    questioning or prior to the use of anything that might
24    even be considered to be outside the scope of the Court's
25    permissible testimony.  But --
```

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  Okay.  Mr. Rotondo has been waiting

2     patiently.  Let me so what he has to say and then I want

3     to get the jury back in.  I think I understand where

4     people are coming from and I know enough to make rulings.

5          Mr. Rotondo?

6          MR. ROTONDO:  My point is if it's not an opinion

7     that he has been disclosed to testify about, then all

8     these documents that form the basis of his background are

9     irrelevant, particularly given that those documents

10    weren't disclosed in a disclosure either.  I think it's

11    all irrelevant.  It's not relevant to his qualifications

12    because we're not contesting his qualifications as a

13    mechanic.  It's all irrelevant because it really goes to

14    opinion evidence.

15         THE COURT:  It goes to his qualifications to

16    give an opinion he has not been disclosed to give.

17         MR. NIKAS:  Actually, Your Honor, even though --

18         THE COURT:  So what you're going to have to do,

19    so I have a basis for knowing what you're doing, is you're

20    going to have to link up -- if you're going to go into

21    qualifications -- I mean, I would prefer, actually --

22    well, I guess I know what opinion he's going to give.  I'm

23    just going to have this page open here.  And if there's an

24    objection, then you'll have to lay a foundation as to why

25    a qualification that you're going into relates to the

PDF created with pdfFactory trial version www.pdffactory.com

 1  opinion he's going to be given, okay?

 2          MR. NIKAS:  No, no, Your Honor.  I'm not going

 3  to offer any -- I want to make it very clear, that I won't

 4  even approach that territory.  In fact, I'm going to

 5  separate the two.  Any questions that we get at this

 6  juncture will be solely related to his qualifications as

 7  an expert.  And I will ensure that they don't even come

 8  close to his opinion, you know, so there's no question

 9  about the effect on the jury of hearing that evidence in

10  close connection with the opinion that's offered.

11          THE COURT:  Well, I'll let you proceed the way

12  you want to proceed.  All I'm saying is if it's not

13  apparent to me how a qualification that you're going into

14  is somehow relevant to an opinion he's giving and there's

15  an objection, I'm going to sustain the objection,

16  particularly if it's a qualification that relates to

17  opinions that it seems like you'd like him to give and he

18  hasn't been disclosed to give and hasn't provided the

19  basis for giving them.

20          MR. NIKAS:  What I don't understand, is his

21  opinion, we can all see, since it's only nine words long,

22  is ingested water over a period of time prior to the

23  hydrolocking, then voir dire as to his qualifications

24  regarding water ingestion should be acceptable.

25          THE COURT:  It is.

PDF created with pdfFactory trial version www.pdffactory.com

1           MR. NIKAS:  Because the jury has to make a

2   determination whether that conclusion is valid and whether

3   he possesses the qualifications to do it.

4           THE COURT:  It is.  It is.  Part of my problem

5   is that I think you covered that yesterday.  And you may

6   say you haven't covered it to your satisfaction --

7           MR. NIKAS:  We didn't cover that at all.

8           THE COURT:  Don't cut me off.  I'm telling you

9   what my problem is so you can be aware of it.

10          It seems to me you covered his qualifications

11  yesterday and now that you have a problem in terms of

12  trying to get in opinions that you can't get in, you're

13  going back to cover things under the guise of his

14  qualifications.  You told me that when I looked at this

15  supplemental disclosure, I would see things that show his

16  other opinions he was going to give.  All I saw when you

17  handed up that sheet to me was an arrow that went to

18  qualifications.  That's your only path to get where you

19  want to get.  That's not what you told me before when we

20  first started the discussion.  So I'm naturally skeptical.

21  You're going to have to really show me that what you're

22  doing is relevant to his qualifications to give the

23  opinion that he's been disclosed to give and the bases for

24  those opinions that have been disclosed in the report.

25          We'll bring the jury in.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. NIKAS:  Your Honor, actually, can I ask you

2    one question?  This is out of respect for the Court, not

3    for a request.

4          The opinion he's been offered for is water

5    ingestion.  He holds the factory certification which we

6    pointed to as a Mercury-certified technician.  Am I

7    allowed to solicit testimony regarding any materials he's

8    been provided by Mercury regarding water ingestion?

9          THE COURT:  I'll rule as the questions come out.

10   I'm not going to give you a blanket authorization.

11         MR. NIKAS:  I'm just trying to be cautious,

12   Your Honor.

13         THE COURT:  I understand your concern, but I

14   can't give you a blanket authorization.

15              (Whereupon, the jury entered the

16              courtroom.)

17         THE COURT:  Please be seated, ladies and

18   gentlemen.

19         We'll continue on and go until -- we'll go to

20   10:35, how's that?

21   BY MR. NIKAS:

22   Q.   Mr. Wicander, you were retained to provide an expert

23   opinion in this case; is that correct?

24   A.   Yes.

25         MR. NIKAS:  Your Honor, may I show the witness

```
 1   his expert witness report --
 2           THE COURT:  Yes.
 3           MR. NIKAS:  -- so he can offer that opinion
 4   within the strict guidelines imposed.
 5           THE COURT:  Yes.
 6   BY MR. NIKAS:
 7   Q.   Mr. Wicander, can you please tell us what that
 8   opinion is, what your conclusion reached was?
 9   A.   Want me to just read it?
10   Q.   Sure, that would probably be safest.
11           THE COURT:  Acceptable to counsel?
12           MR. ROTONDO:  If we're talking about page 3.
13           THE COURT:  "It is my opinion."
14           MR. ROTONDO:  I don't have any objection.
15   A.   It is my opinion that both engines have bee --
16           THE COURT:  Can you do it slowly, sir, so the
17   jury can follow you?
18   BY MR. NIKAS:
19   Q.   In fact, slowly, loudly, and make sure everybody
20   hears it because this is going to be --
21   A.   Sure.
22        It is my opinion that both engines have ingested
23   water over a period of time prior to the hydrolocking on
24   or about June 9.
25           THE COURT:  2001.
```

Vol. III - Page 371

1  A.    2001, sorry.

2        No single ingestion incident could have caused the

3  damage present.  Both engines need to be replaced.

4             MR. NIKAS:  May I, Your Honor?

5             THE COURT:  You may.

6  BY MR. NIKAS:

7  Q.    Now, before we get into the bases for your opinion or

8  for the reasons that you've come to that conclusion or the

9  evidence supporting that conclusion, I'd like to go back,

10 and we started this yesterday, to talk about your

11 qualifications to render that opinion.  And yesterday you

12 mentioned that you're a Mercury-certified technician; is

13 that correct?

14 A.    I was at the time, yes.

15 Q.    And you were first certified when?

16 A.    I believe it was 1989.

17 Q.    What topics were included in the training you

18 received prior to and in order to maintain that Mercury

19 certification?

20 A.    Topics, anything from new products to maintenance

21 to -- we went through disassembly of engines, stern

22 drives, that sort of thing.

23 Q.    Did you have to review service bulletins,

24 installation manuals, parts manuals, all those types of

25 materials attended to that certification?

1    A.    Certainly.

2    Q.    And although your background is as an engine

3    technician or engine mechanic, that's rather broad, this

4    opinion is rather specific in terms of identification of

5    water ingestion and then a determination that water

6    ingestion in this case was historical rather than as a

7    result of a single incident; is that true?

8    A.    Yes.

9    Q.    Then did you receive or review -- did you receive any

10    training or did you review any materials during the

11    process of your Mercury certification that dealt with

12    water ingestion?

13            MR. ROTONDO:   Objection.

14            THE COURT:   Do you want to rephrase the

15    question?

16            MR. NIKAS:   Sure.

17            THE COURT:   Why don't you make it not leading.

18    BY MR. NIKAS:

19    Q.    Mr. Wicander, did you review any materials --

20            THE COURT:   I said why don't we make it not

21    leading.

22            MR. NIKAS:   I'm trying to be -- I'm trying to

23    ensure that the witness does not inadvertently violate any

24    restrictions.

25

1    BY MR. NIKAS:

2    Q.   Mr. Wicander, what materials did you review?

3    A.   Certainly.

4              MR. ROTONDO:  Object.

5              THE COURT:  We're talking about his

6    qualifications and certification.  So what was involved in

7    his certification is where we're going, right?

8              MR. NIKAS:  Sure, Your Honor.

9    BY MR. NIKAS:

10   Q.   During the certification process, what materials did

11   you review that are relevant to your qualification as an

12   expert to testify about water ingestion?

13   A.   Service bulletins.

14   Q.   What did the service bulletins discuss?

15             MR. ROTONDO:  Objection.

16             THE COURT:   Sustained.

17   BY MR. NIKAS:

18   Q.   Now, did all service bulletins discuss water

19   ingestion?

20             MR. ROTONDO:  Objection.

21             THE COURT:  He can answer that yes or no.  Did

22   they all discuss it?

23   A.   No.

24   BY MR. NIKAS:

25   Q.   Were there specific service bulletins that discussed

PDF created with pdfFactory trial version www.pdffactory.com

1    the topic of water ingestion?

2          MR. ROTONDO:  I object to that.

3          THE COURT:  I'll allow that.

4    A.   Yes.

5    BY MR. NIKAS:

6    Q.   Were there specific service bulletins that discussed

7    how to identify water ingestion?

8    A.   Yes.

9    Q.   And were there specific service bulletins that

10   discussed how to identify the point of entry of water

11   ingestion?

12          MR. ROTONDO:  Objection.

13          THE COURT:  I'll allow that one too.

14   A.   Yes.

15   BY MR. NIKAS:

16   Q.   Were there service bulletins that discussed the

17   causes of water ingestion?

18   A.   Yes.

19   Q.   And did you review all of these materials during the

20   course of your certification as a Mercury-certified

21   technician?

22   A.   I'm sure I did, yes.

23   Q.   And they form a basis for your qualifications as an

24   expert to testify in this case?

25   A.   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   You were also designated by defendant as a graduate

2   of their training program, correct?

3   A.   Yes.

4   Q.   And I think you talked about graduating from their

5   Sea Ray Service School; is that correct?

6   A.   That's correct.

7   Q.   Did you also receive a service training award from

8   Sea Ray?

9   A.   That was something we got after -- we received after

10  we had the training, yes.

11  Q.   The engine installed on board Sea Ray boats if

12  powered by gasoline is manufactured by whom?

13  A.   Mercury.

14  Q.   And that's exclusively, correct?

15  A.   Yes.

16  Q.   During the course of your Sea Ray certification did

17  you review materials provided by Sea Ray that included

18  MerCruiser materials regarding the engine?

19  A.   Repeat that.

20  Q.   Sure.

21       During your Sea Ray certification, in reviewing those

22  materials, did you also include materials produced by

23  MerCruiser but provided to you by Sea Ray as part of that

24  training?

25  A.   I don't believe so.

1  Q.   What work did you perform for Sea Ray and what type

2  of Sea Ray service work did you do?  Did you do engine

3  work on Sea Rays?

4  A.   Sure.

5  Q.   Where would Sea Ray, then, have expected you to

6  look --

7            MR. ROTONDO:  Objection.

8            THE COURT:  Sustained.

9            Want to rephrase that, maybe?

10            MR. NIKAS:  Sure, Your Honor.

11  BY MR. NIKAS:

12  Q.   You performed engine work on Sea Rays, correct?

13  A.   Yes.

14  Q.   In performing engine work on Sea Rays and during the

15  certification process, what materials did you consult?

16  A.   Would be service bulletins and we have service books,

17  yes.

18  Q.   And those would be produced by?

19  A.   Both MerCruiser and Sea Ray.

20  Q.   In terms of market penetration, by holding a

21  MerCruiser certification, you have a gasoline

22  certification, correct?

23  A.   Yes.

24  Q.   What percentage of the market does MerCruiser hold

25  for gasoline engines, inboard?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Huge.   Probably 90 percent or better.

2    Q.    So any material provided by MerCruiser can be

3    accessed by any mechanics that work on MerCruiser engines?

4    A.    Yes.

5    Q.    And are those materials published in some form?

6    A.    Typically, originally back when I was first

7    certified, it was all in print.   Now it's on MercNet,

8    which is their computer-based system.

9    Q.    In order to maintain your certification through

10   Mercury, does Mercury require you to consult service

11   bulletins and other material that's posted on MercNet?

12   A.    Sure.

13   Q.    Is MercNet available to anybody with a password and a

14   pin code?

15   A.    Yes.

16   Q.    It's not limited to Mercury employees, is it?

17   A.    No, it's limited to Mercury dealers.

18   Q.    And that would be any Mercury dealer, correct?

19   A.    Yes.

20   Q.    And the information on MercNet is historical,

21   correct?

22   A.    Yes, it is.

23   Q.    Meaning it goes from today back to --

24   A.    Whenever.

25   Q.    Whenever.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. NIKAS:  Your Honor, at this time I'd like to

2     offer this witness as an expert to testify as to the topic

3     of water ingestion under Rule 702.

4          THE COURT:  He's accepted as an expert to give

5     the opinion that he's given.

6          MR. ROTONDO:  He's already given his opinion and

7     I didn't object to his reading his opinion, but to the

8     extent he's going to go into other topics not disclosed, I

9     will object.

10          MR. NIKAS:  May I continue, Your Honor?

11          THE COURT:  Yes, please.

12     BY MR. NIKAS:

13     Q.   Now, there are two types of exhaust systems in use on

14     boats, correct?  Generally in terms of whether they use

15     cooling water on are not into the exhaust and where that

16     cooling water is injected?

17     A.   I'm confused.

18     Q.   Well, are there -- this is a wet system; is that

19     right?

20     A.   Yes.

21     Q.   What is a dry system?

22     A.   A dry system would be something similar to your car.

23     Q.   When would that be used?

24     A.   Boats that I work on, it's not used.

25     Q.   Are all MerCruiser exhausts wet system?

1    A.    I'm sure some in their performance are not, but most

2    are, yes.

3    Q.    The boat owned by Lori and Peter, that wouldn't be

4    considered performance in terms of exhaust system setup,

5    would it?

6    A.    No.

7    Q.    If there's water surrounding the manifold, I guess in

8    the water jackets to cool the outside of it, and then it's

9    shot into the hose at the end to cool the exhaust gas,

10   would you expect to find rust inside the elbows?

11              MR. ROTONDO:  Objection, leading.

12              THE COURT:  I'll allow that question.

13   A.    No.  Typically not.

14   BY MR. NIKAS:

15   Q.    Why not?

16   A.    You don't want water inside here.  If there's water

17   getting in here, it's going to get into the engine.

18   Q.    But there's water on the other side of that wall

19   right there?

20   A.    Yes.

21   Q.    Is there no way for that outside water to get into

22   this --

23              MR. NIKAS:  May I approach, Your Honor?

24              THE COURT:  You may.

25

1    BY MR. NIKAS:

2    Q.    -- into this channel here?

3    A.    It can be -- I mean, with the engine in the Mainses'

4    boat, it certainly can.  At idle speeds there's pulses in

5    the exhaust system because there is both the intake and

6    exhaust valves are open at the same time for a very short

7    duration which causes a pulsing in the exhaust.  So if

8    there is some water present, it could possibly be sucked

9    back in.

10   Q.    Why does the engine pulse at an idle and not pulse,

11   say, at half throttle or full throttle?

12   A.    Because at half throttle or full throttle there's so

13   much exhaust gases coming out at such a high rate because

14   of the rpms of the engine, it won't allow it.

15   Q.    Even if, I guess, at idle water got back, you said

16   both intake and exhaust valves could be open at the same

17   time?

18   A.    Yes.

19   Q.    When you were discussing yesterday about a

20   four-stroke engine, I understood the intake valve to be

21   open to suck in air, system draws down and gas exploded,

22   exhaust valves then open pushing out exhaust gas.  Why

23   would both valves be open at the same time if that's the

24   four-stroke cycle?

25   A.    Well, it's based on the mechanics of how those valves

PDF created with pdfFactory trial version www.pdffactory.com

1    are opened.  These particular engines are what they call

2    roller lifter engines.  The lifter, which pushes the push

3    rod which opens up the valve, that lifter has to stay in

4    constant contact with the camshaft.  So you don't get a

5    real sharp open-close.  You do get a -- because it has to

6    be -- it's almost like egg shaped where this lifter, just

7    an item like that where the push rod mounts into, has to

8    stay in constant contact with that cam.  Because of that,

9    there is a short maybe five-, 6-degree of that rotation

10   that actually both are open at the same time.

11   Q.   So both valves are open at the same time, any water

12   that's present in the cylinder will actually get in --

13            MR. ROTONDO:  Objection.

14            THE COURT:  You know what?  I'm going to let the

15   jury take their morning recess now.  It's a good time.

16   And the witness may step down.

17            (Whereupon the jury left the courtroom.)

18            THE COURT:  Please be seated everyone.

19            Just so counsel know how I'm trying to manage

20   this exchange, I sustained the objection -- I overruled

21   the objection to the question on rust because looking at

22   the report I saw this mention of internal rusting

23   throughout the elbow.  And when we have questions that are

24   asked, I'm going to be looking it the report.  So it might

25   be helpful if plaintiffs' counsel, when you're going into

1    an area, can just say, I want to direct your attention to,

2    you know, middle of page 2 of the report, so I know what

3    you're talking about because that's what I'm going to be

4    looking for.

5             We'll recess.

6             MR. NIKAS:  So by directing the witness, I'll be

7    directing -- notifying the Court of where I'm looking?

8             THE COURT:  Yes, and counsel.

9             We'll recess.  We'll take our full recess.

10             (Whereupon, a recess followed.)

11             THE COURT:  We'll have our witness retake the

12    stand.

13             Just so the record is clear, I think Mr. Nikas

14    misspoke when he said he never intended to offer

15    Mr. Wicander's report, because the plaintiffs' reply to

16    defendant's objections makes it clear that it was intended

17    to be offered.

18             Let's bring the jury in.

19             MR. NIKAS:  I didn't draft that reply,

20    Your Honor.  I apologize for any confusion.

21             (Whereupon, the jury entered the

22              courtroom.)

23             THE COURT:  Please be seated everyone.

24             Whenever you're ready, Mr. Nikas.

25

1   BY MR. NIKAS:

2   Q.   Mr. Wicander, to go back, I guess, to the disassembly

3   that you performed on this engine.  When you removed the

4   exhaust elbows, you found rust in both of them, port and

5   starboard?

6   A.   Yes.

7   Q.   And what is that rust indicative of?

8   A.   That tells me that there's water in the exhaust

9   system.  You know, where it shouldn't be, obviously, in

10  the elbow.

11  Q.   And so can you, using that elbow in front of you,

12  show the jury where the rust was found?

13  A.   Rust was found all throughout this area inside, which

14  should only have exhaust gases in it.

15  Q.   Would you expect to find rust or at least some type

16  of corrosion in the water jacket areas?

17  A.   Certainly.

18  Q.   And the water jackets are where?

19  A.   Right up in here.

20  Q.   The rust you found, though --

21  A.   Was inside the hot gas area.

22  Q.   At the time that you first conducted the leak down

23  and compression test, which I guess, according to

24  Exhibit 26, was the week, week and a half or so -- no,

25  week after the Mains arrived, I guess, at the middle of

1   their intended round trip, you didn't pull the head off at

2   this time, correct?

3   A.    No, we did not.

4   Q.    I'd like to draw your attention, though, to what

5   looks like an apparent discrepancy between Exhibit 26 and

6   Exhibit 27.

7              THE COURT:  27 has not been admitted.

8              MR. NIKAS:  My apologies, Your Honor.

9   BY MR. NIKAS:

10  Q.    In Exhibit 26, you come to the conclusion -- or

11  excuse me, you come to the opinion that the damage to both

12  engines was a result of hydrolocking?

13  A.    Yes.

14  Q.    And was that your opinion at the time?

15  A.    At the time it definitely was.

16  Q.    What did you base that opinion on?

17  A.    Based upon the situation when we -- we had water in

18  the cylinders, that sort of thing.

19  Q.    What changed by the time you had come to your opinion

20  that the water ingestion on both engines in this boat was

21  historical rather than the result of just one incidence of

22  water ingestion?

23  A.    It was the scoring on the cylinder walls.  When you

24  get water over a long period of time while the engines are

25  running, like we did before, it washes away the oil from

1    the cylinder walls.  So over time it starts to wear and

2    starts to scratch the cylinder walls.

3    Q.   This is a tough thing to describe?

4    A.   It is, yes.

5    Q.   But the cylinder walls are made of what?

6    A.   Hardened -- partially steel and hardened.

7    Q.   And is it soft steel or is it --

8    A.   It's a very hard material.  It needs to be.  Very

9    strong material as well.

10   Q.   At full throttle how many times approximately per

11   minute is this engine turning around?

12   A.   4500 to 4800, typically.

13   Q.   And is the operation of a boat engine similar to the

14   operation of a car engine where it starts and stops and

15   starts and stops?

16   A.   Typically, you get the engine, you know, if you're in

17   the slip or moving the boat, parking the boat, that sort

18   of thing.  You're not starting and stopping the engine,

19   but you're going from idle to a little higher rpms, that

20   sort of thing.

21   Q.   When you're traveling any distance, are you at a

22   constant?

23   A.   Typically, yes.

24   Q.   Is it unusual for a marine engine to be running for

25   hours on end?

1    A.    It is, yes.

2    Q.    It's not unusual?

3    A.    Not unusual, I'm sorry.

4    Q.    So when you did the disassembly, you found exhaust in

5    the elbows, was there also exhaust in the manifold?

6    A.    Water or exhaust?

7    Q.    I'm sorry, rust in the manifold?

8    A.    Yes, there was.

9    Q.    What did that physical evidence indicate to you?

10   A.    That definitely indicated that water had been coming

11   down through the exhaust system.

12   Q.    Did you inspect the gaskets between the elbows and

13   the manifold?

14   A.    We did.  We observed that the gaskets were of an

15   older style, more original with the engine.

16   Q.    What's a gasket?  What does it do?

17   A.    Gasket is when you have two metal surfaces and you

18   need to seal them, you don't want any leaks, you install a

19   gasket.  You don't want water leaking where it shouldn't

20   be and exhaust.

21   Q.    Did the gaskets indicate failure or leakage of some

22   sort?

23   A.    We saw some leakage, yes.  Some evidence of some

24   leakage, yes.

25   Q.    Did you find scoring -- I guess there are 16

PDF created with pdfFactory trial version www.pdffactory.com

1    cylinders?

2    A.    Yes, between the two.

3    Q.    Did you find scoring in just one or several or all of

4    the cylinders?

5    A.    I believe it was most of them.

6    Q.    What did that scoring indicate?

7    A.    It indicated to me that over a long period of time

8    water was coming into the cylinders and washing away the

9    lubrication.  It takes a long time because it is a very

10   hard material.  As the piston's going up and down and you

11   start losing lubrication, it creates heat and it scratches

12   the cylinder wall.

13   Q.    Is it possible that the scoring you observed was

14   caused by that single instance of hydrolocking on June 9?

15   A.    No.  Definitely not.

16   Q.    And why not?

17   A.    Because in a hydrolocking situation, the piston can't

18   move.  So even when you try and start it, the piston is

19   not able to move.  So -- and with the scoring, the scoring

20   was on the cylinder walls, the full stroke of the pistons.

21   So that would tell me that it was happening when the

22   engine was running and not while it couldn't run.

23   Q.    So I guess that makes sense.  When the engine's

24   running, the piston is going up and down, correct?

25   A.    Yes.

1    Q.   So that, I guess, movement between the piston and the

2    cylinder wall is what creates that scoring, the friction?

3    A.   Yes, it is.

4    Q.   When this boat had its system flushed by Mr. Mains,

5    was the engine running or not?

6    A.   It was not running.

7    Q.   So if this engine was not running at the time that it

8    was flushed, is there any way that that scoring could have

9    been caused at that time?

10   A.   No.  Definitely not.

11   Q.   And then while conducting your compression test and

12   your leak down test, was the engine turned over

13   sufficiently to cause the scoring that you saw?

14   A.   No.  I mean, we did run the engines just, you know,

15   getting all the water out of them as well, but no, that

16   certainly wouldn't have done it.  It happens over a very

17   long period of time.

18   Q.   And I guess on the port engine you found all but one

19   cylinder was significantly scored and on the starboard

20   engine half of the eight cylinders had significant

21   scoring.  Given, I guess, the time frame involved from the

22   time that you started your leak down and compression test

23   and the time you were expending all this water, would it

24   have been possible to have that level of scoring on I

25   guess 12 of the 16 cylinders?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.    No, definitely not.

2  Q.    You noted in your inspection report -- not your

3  expert report, but the one you did when you were, I guess,

4  trying to determine how severely the engines had been

5  damaged, the exhaust hoses were higher than the elbows?

6  A.    Yes.

7  Q.    Was that angle severe or was it fairly moderate?

8  A.    Fairly moderate.  But things that can happen when --

9  we measured the angles of the hoses when the boat's

10  sitting at the dock.  I mean, if you're idling and you're

11  in a sea situation or people move around on the boat, the

12  boat will tend to rock.  And this angle is all over the

13  place.  So, you know, if it's at a -- say it's sitting at

14  the dock, it's an okay angle.  Once you go out to sea and

15  you hit some waves and you're going up and down the waves,

16  this elbow can pitch along with the whole boat, of course,

17  so the angle is constantly changing.

18  Q.    Where is the hose attached to the elbow, what part of

19  it?

20  A.    Right here, right around here (indicating).

21          MR. NIKAS:  Your Honor, may I approach?

22          THE COURT:  You may.

23  BY MR. NIKAS:

24  Q.    If this were the hose, could you put it in the proper

25  place?

1  A.    Okay.   Just like that.

2      And what happens with -- say this is water.  I can't

3  put water in here.  Say this is water and it's in -- now

4  you can't see it.  If it's inside pitching back and forth,

5  it can go out like that or it come back towards the

6  engine.

7  Q.    Is there a running condition where that problem is

8  exacerbated?

9  A.    Definitely at lower speeds, idle speeds, that sort of

10  thing.

11  Q.    Why is that?

12  A.    Because there's so little back pressure in the

13  exhaust system it can't always force out all the water.

14  And you also have that valve overlap situation which is

15  causing that suction that we talked about in the exhaust

16  system.

17  Q.    Actually, that's right.  That's actually the question

18  we were talking about right before the break was the

19  pulsing, I guess?

20  A.    Yes.

21  Q.    What causes the pulsing, first, I guess?

22  A.    You basically have cylinders that possibly have the

23  valves open at the same time, which they do shortly.  And

24  two at the same time or three at the same time all on the

25  same side and you get -- you're getting basically --

1   cylinder is basically a pump.  If you have both valves

2   open, intake and outflow of the pump, it's going to pulse

3   if they're both open as the pistons are going up and down.

4   That causes this pulsing sensation in the exhaust system

5   at low speeds.

6   Q.    How does that pulsing sensation effect water

7   ingestion?

8             MR. ROTONDO:  Objection.

9             THE COURT:  Basis?

10            MR. ROTONDO:  Not disclosed.

11            MR. NIKAS:  Your Honor --

12            THE COURT:  One second.

13            MR. NIKAS:  -- we talked about very

14   significantly --

15            THE COURT:  You just point me to where in the

16   report is the basis for the opinion.  Just give me a page

17   number, please, part and page.

18   BY MR. NIKAS:

19   Q.    Actually, Mr. Wicander, do you have the revised water

20   ingestion worksheet that we had used?

21   A.    I have the copy of my October 7 report.

22   Q.    No, the water ingestion worksheet actually has the

23   timing written on it.

24            THE COURT:  Looking for the number for that?  Is

25   that 29 and 30?

PDF created with pdfFactory trial version www.pdffactory.com

1           MR. NIKAS:  It was the second of the two, which

2    would have been 30, dated February 12, 2004 -- I guess

3    they both have the same date.

4           THE COURT:  One's 29 and one is 30.

5           MR. NIKAS:  It would have been the more recent

6    of the two.

7           THE COURT:  I thought 29 was done by a person

8    and the witness copied to create 30.

9           MR. NIKAS:  That's correct.

10   BY MR. NIKAS:

11   Q.   Mr. Wicander, if you look at Exhibit 30, which has

12   been admitted, although this is a poor photocopy, for

13   which I apologize, do you see that notation of the

14   8 degrees?

15   A.   Yes.

16   Q.   What does that mean?

17   A.   That is the base ignition timing.  They want the

18   number one spark plug -- there's eight cylinders, they

19   want the number one cylinder to be firing 8 degrees before

20   that cylinder actually gets all the way up to the top of

21   its stroke.  So before -- so it's 8 degrees of the

22   rotation of the bouncer on the front of the engine or the

23   crankshaft.  So as the piston's coming up, just prior to

24   it -- in the compression state where it already has the

25   gas air mixture, and just before that spark is going to

PDF created with pdfFactory trial version www.pdffactory.com

1    fire to push that piston back down, they want it to fire

2    8 degrees of that rotation just prior to that reaching the

3    top.

4    Q.   That's for the number one cylinder?

5    A.   That's for the number one cylinder.

6    Q.   Are all the cylinders connected to the same piece of

7    equipment?

8    A.   Yes, they are.

9    Q.   So if you know the timing on that first cylinder, it

10   will determine what happens to the other seven?

11   A.   Correct, yes.

12   Q.   And so that's what will dictate the opening of the

13   intake and exhaust valves?

14   A.   Yes, it does.  They're all mechanically connected.

15   Q.   These are fixed components?  In other words, they

16   don't, other than through, I guess, wear or -- what

17   effects their movement?

18   A.   All eight pistons are connected through connecting

19   rods to the crank and the camshaft, which is opening and

20   closing all the valves, is connected through a chain

21   drive.  So nothing variable in the mechanics of it.

22   Q.   So like a skeleton, I guess, the valves are connected

23   to the pushrods which are connected to the camshaft which

24   is connected to the chain drive, to the crankshaft, to the

25   connecting rods, to the pistons?

1  A.   Correct.

2  Q.   So because this is the timing of this specific

3  engine, that's what will dictate the opening and closing

4  of the intake and exhaust valves, the timing that happens?

5  A.   Yes.

6           MR. NIKAS:  May I continue, Your Honor, on that

7  issue of the pulse created by the opening of the intake

8  and exhaust valves?

9           MR. ROTONDO:  Still not disclosed in the report.

10           THE COURT:  Objection's sustained.

11  BY MR. NIKAS:

12  Q.   Mr. Wicander, going back to the leak down test that

13  you performed on the engine, the significance of the air

14  leaking into the manifolds is what?

15  A.   Well, that's one nice thing about the leak down test.

16  You have a constant pressure that you're applying to the

17  cylinder.  So you can actually hear where some of the air

18  may be leaking.  If you have a failing cylinder, you can

19  actually hear, either through the intake, you can hear it

20  out of your ear that air is rushing into the intake or you

21  can hear it coming out of the valve cover, which would

22  mean -- if it were coming out of the intake, it would be

23  leaking past the intake valve.  If you could hear air

24  rushing into the exhaust, it would be leaking past the

25  exhaust valve.  And also if you hear air leaking into the

1    crank case, which in this case you can hear out through

2    the cover that goes over the top of the engine, then it

3    tells me it's leaking past the rings on the piston.

4    Q.   So based on what you found, you knew that there was

5    damage caused in the places where you had, I guess,

6    excessive percentages?

7              MR. ROTONDO:  Objection.

8              THE COURT:  Basis?

9              Where are we in the report, I'm sorry?

10             MR. NIKAS:  We're on page 2 of the report.

11    Cylinder number, leak down percentages, notes.  Or page 1,

12    same.

13             THE COURT:  I'll allow that.

14    BY MR. NIKAS:

15    Q.   So the significance of the numbers that you received,

16    they were excessive or outside of, I guess, spec?

17    A.   Oh, definitely, yes.

18    Q.   If there was any way that hydrolocking could have

19    scored the cylinder walls in this case, would you have

20    been able to note that from your physical inspection?

21    A.   Yes, absolutely.

22    Q.   And did you find any evidence that that was the case?

23    A.   No, I did not.

24    Q.   Did you ever read the report of the expert witness

25    that was hired to testify in this case by Sea Ray,

1  Mr. Davis?

2  A.   Yes, I did look it over.

3  Q.   Did you see that Mr. Davis was of the opinion that

4  perhaps the job of pickling the engine that you had done

5  was performed improperly?

6             MR. ROTONDO:  Objection.  Leading.

7             THE COURT:  Sustained.

8  BY MR. NIKAS:

9  Q.   Did you see Mr. Davis's opinion regarding the

10  pickling of the engine?

11  A.   Yes, I did.  I did read it and I definitely disagree

12  with the pickling, what he feels we didn't properly pickle

13  the engine.

14  Q.   Was that his opinion?

15  A.   That was his opinion, yes.

16  Q.   Did you follow -- what procedures did you follow to

17  pickle the engine?

18  A.   Followed standard procedures that we've done for

19  years.

20  Q.   Who issued those procedures?

21  A.   Actually, Mercury has their own procedure, it's

22  identical to ours.

23  Q.   In your report, you also are of the opinion that both

24  engines need to be replaced.  And the last sentence of the

25  last paragraph on the last page, why do you come to that

1    opinion or are you of that opinion?

2    A.   Through my experience over all the years I've been

3    working on engines, when you see scoring in the cylinders

4    that deep, it definitely needs to be replaced.  It will

5    never run right in that condition.

6    Q.   How does -- scoring is scratches, right?

7    A.   Same, yes.

8    Q.   How does scratches in a metal surface, I guess in a

9    metal glass or pipe, affect the operation of the engine?

10   A.   Well, say this being the piston again, there's metal

11   rings that go around the piston that are very tight

12   tolerance between the piston and the cylinder wall.  The

13   piston itself is only a thousandths of an inch smaller in

14   diameter than the actual cylinder, very small.  And then

15   you have three rings, two which are for compression, that

16   seal that surface up.  And so if what happens -- if you

17   have a nice smooth surface, it will be a nice seal.  But

18   if you have scratches in the side of the cylinder wall, it

19   will allow the gases to go past.  So you'll have less

20   compression and consequently the engine won't run

21   properly.

22   Q.   Do I want less compression or more compression?

23   A.   More the better.

24   Q.   Why?

25   A.   Because more compression takes more advantage of the

1   explosion that is occurring inside that cylinder.  When

2   you have that nice air fuel mixture inside on top of this

3   piston and the spark plug fires, it forces this piston

4   down, thus turning the crank and thus turning the

5   propeller.  If you have poor compression, a lot of those

6   gases will go past that piston and not be used to force it

7   down.  So you'll lose power.

8   Q.   If the scratching in the cylinders is uneven, let's

9   say it's in some cylinders and not in all, and it's more

10  severe in some cylinders than others, does that have an

11  effect?

12  A.   Yeah, that will cause the -- you'll have different

13  pressures in each of the pistons, so it will cause the

14  engine to vibrate because they're not all firing evenly

15  and have all the same power.  It will definitely run

16  erratically.

17  Q.   Does that vibration stress the components?

18  A.   Absolutely.  It will stress the crank because it's

19  getting uneven pressures.  It can do all that.  Twist the

20  crank.

21  Q.   What happens if the crank is stressed?

22  A.   If the crank is stressed, at some point it will

23  break.

24  Q.   And then?

25  A.   Catastrophic failure.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   By catastrophic --

2   A.   Engine stops and you're stuck wherever you are.

3   Q.   Is it possible that the scoring in a cylinder wall is

4   so severe that it causes failure of the piston?

5   A.   It can cause failure of the piston, the piston can

6   actually seize to the inside of the cylinder wall.  You

7   can get excessive fuel going past.  If it stops firing

8   properly, you can get fuel going past that piston getting

9   into the crank case and oil.  Can make a mess.

10  Q.   What is seizing?

11  A.   Seizing is when the piston actually welds itself to

12  the cylinder wall just because of the sheer heat, because

13  no lubrication.

14  Q.   What happens then?  Isn't it still trying to be

15  turned by the crankshaft?

16  A.   It's still trying to turn.  And the connecting rod

17  that attaches the piston to the crankshaft will typically

18  break at that point and sometimes go right outside the

19  cylinder block.

20  Q.   So pieces can go through the engine block?

21  A.   Sure.  I've seen it plenty of times.

22  Q.   The engine block is made of?

23  A.   Cast iron.

24  Q.   How thick is it?

25  A.   Typically quarter inch to three-eighths.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   So it can pierce that?

2  A.   Absolutely.  There's a lot of force in there.

3  Q.   Well, as the water that's present in the cylinder

4  displaces the oil, does it do that uniformly or does it do

5  that, I guess, irregularly?

6  A.   Definitely irregularly.  It really depends on

7  latitude of the boat and where the water is when it's

8  running.  It won't pick the same cylinder every time.  It

9  can go to a different cylinder.  Depends on how it is.

10  Depends on the rolling and pitching of the boat and all

11  that.

12  Q.   Is the scoring that would occur from, say, saltwater

13  different than scoring you would get from, say, fresh

14  water?

15  A.   Typically the saltwater, being that it's more

16  corrosive, would act a little faster, yes.  And there's

17  more in it.  You have salt in it and you have debris and

18  that sort of thing.

19  Q.   Why is saltwater more corrosive than fresh?

20  A.   Because of the salt itself in the water.  Similar to

21  your car.  You look at a California car that doesn't see

22  salt on the roads, it's spotless.  You look at a car in

23  New England, it has rust on it.

24  Q.   Could you just -- the damage that you saw, what

25  components were damaged?  What components had rust?  What

1  components were affected by this water?

2  A.   We saw rust inside the exhaust elbows.  We saw a

3  little bit of rust down inside the pistons, certainly

4  inside the manifolds, exhaust manifolds.

5  Q.   Could you remanufacture these components?  Could you

6  take some WD40 and scratch off the rust and then machine

7  it?  What would be the procedure for trying to save the

8  components that had been exposed to water?

9  A.   Well, like when we did the hydrolocking, you're

10  trying to put oil on them to save them.  Something that's

11  been damaged over time, you just can't save.

12  Q.   Did the oil that you had put in when the engine was

13  pickled prevent the damage that had occurred from the

14  hydrolocking?

15  A.   It didn't prevent the initial damage if there was any

16  damage from the hydrolocking, but it kept it from being

17  damaged further because of the water that was in there, it

18  dispersed the water to get it out of there.

19  Q.   Could the oil that you put in when you pickled the

20  engine remedy the damage that had been caused by the

21  historic ingestion of water in this engine?

22  A.   No, definitely not.  Once the damage is done, it's

23  done.

24  Q.   Is the cylinder liner in this engine dry or wet?

25  A.   The cylinder wall -- outside the cylinder wall?

1  Q.   Between the piston and the cylinder.

2  A.   Between the piston and cylinder should have a film of

3  oil for lubrication.

4  Q.   If there's damage in the cylinder wall, you just

5  can't put in a new liner in the cylinder?

6  A.   No, you cannot.

7  Q.   You have to get a new block?

8  A.   Typically, if the scratches were deep enough, like in

9  their situation, they can't be machined out and you'd have

10 to replace it, yes.

11 Q.   Would the valves had to have been relaced in the

12 Mainses' vessel?

13 A.   Yes.  Once valves get seawater on them, they really

14 should be replaced.

15 Q.   Could the manifolds have been saved?

16 A.   Possibly, yes.

17 Q.   What about the elbows?

18 A.   Exhaust elbows, probably, because of their age.

19 Typically, exhaust elbows and manifolds survive about five

20 to seven years' of use.

21 Q.   What about the rotating parts, like the pistons and

22 those types of things?

23 A.   Typically, they wouldn't be saved either.  If the

24 cylinder walls were damaged, certainly the pistons are

25 damaged.

1    Q.    If the cylinder wall is scratched, does that mean the

2    piston's also scratched?

3    A.    Absolutely, yes.

4            MR. NIKAS:  I have no further questions,

5    Your Honor.

6            THE COURT:  You can start whenever you're ready,

7    Mr. Rotondo.

8            MR. ROTONDO:  Thank you, Your Honor.

9            Could we marked for identification

10   Mr. Wicander's deposition?  It should be Defendant's 108

11   for identification.

12           Mr. Wicander, I'm going to give you a copy of

13   your deposition transcript in the event that you may need

14   it during the questions.

15

16                    CROSS-EXAMINATION

17   BY MR. ROTONDO:

18   Q.    Mr. Wicander, you said that in 2001 you were the yard

19   manager for Pilots Point Marina in Westbrook; is that

20   correct?

21   A.    Yes, that's correct.

22   Q.    You were the yard manager from 2001 to 2003?

23   A.    Yes, during that time, yes.

24   Q.    And you were the yard manager for the East Yard; is

25   that right?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.    That's correct.

2   Q.    And as a yard manager, I take it you had supervisory

3   responsibilities?

4   A.    Absolutely.

5   Q.    And how many people did you supervise?

6   A.    I had a crew of seven.

7   Q.    And the crew, were they all mechanics?

8   A.    Not all mechanics.

9   Q.    How many mechanics were on your crew?

10  A.    I had three.

11  Q.    And what were their names?

12  A.    Dave Bird, Dave Quandt and Wayne Coban.

13  Q.    Now, you told us on direct examination that David

14  Wade from Sea Ray contacted you in May of 2001 because he

15  wanted you to do some work on the Mains's boat; is that

16  right?

17  A.    Yes.

18  Q.    And you told us that you went out to Haddam in May of

19  2001 and looked at the boat?

20  A.    Yes, I did.

21  Q.    After looking at the boat, you told David Wade that

22  you thought that you could do the work that needed to be

23  done on the boat?

24  A.    Yes.

25  Q.    And Sea Ray was going to pay you for that work,

1    correct?

2    A.    Yes, that was the agreement.

3    Q.    Sea Ray provided you with parts and materials for you

4    to do that work?

5    A.    Provided me with some gelcoat and rub rail.

6    Q.    And Sea Ray agreed to pay to haul the boat out of the

7    water so you could perform the work?

8    A.    I believe so, yes.

9    Q.    And Sea Ray also agreed to pay to have you make

10   arrangements to clean and detail the boat after you did

11   your work?

12   A.    I believe so, yes.

13   Q.    And you were scheduled to start your work on

14   June 11th?

15   A.    Yes.

16   Q.    And you never did that work; isn't that right?

17   A.    No, we did not.

18   Q.    You never returned the materials?

19   A.    No, I believe they're still there.  Other than the

20   gelcoat, I know that was disposed of.

21   Q.    The first time you saw the Mains's boat was in May of

22   2001, correct?

23   A.    Yes, I believe so.

24   Q.    So you didn't see the boat in its original condition

25   in 1998 after it left the factory; is that right?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    That is right.

2    Q.    And you didn't see the original exhaust on the 1998

3    Sea Ray owned by the Mains?

4    A.    No, I did not.

5    Q.    Now, I believe you said on direct examination that

6    you've worked with people from Sea Ray for more than 20

7    years; is that right?

8    A.    Twenty years?  I don't know if it was that duration.

9         I've been working with people from Sea Ray since

10   1988, so it would be 20 now, yes.

11   Q.    I think you told us you toured the factory?

12   A.    Yes.

13   Q.    I take it you like working with people from Sea Ray;

14   is that correct?

15   A.    They were fine, yes.

16   Q.    Now, I want to make sure I get the timeline down a

17   little bit, because I was a little confused during your

18   direct examination.

19        The first work that you did on this case, the Mains's

20   boat, was on June 11, 2001; is that right?

21   A.    Yes.

22   Q.    And then on June 18, 2001 -- let me stop.

23        On June 11, you worked on the dewatering, the

24   pickling, correct?

25   A.    Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    And there was a mechanic that did that with you,

2    wasn't there?

3    A.    Yes.

4    Q.    Who was that?

5    A.    I believe it was Dave Bird, but I'm not certain, I

6    don't have any reports in front of me.

7    Q.    In terms of him working with you, he was actually the

8    guy on the ground with the wrenches and whatever doing

9    that work, wasn't he?

10   A.    Actually we both probably were.

11   Q.    Your next activity on the Mains's boat was the

12   compression and leak test; is that right?

13   A.    I believe so, yes.

14   Q.    That was on June 18, a week later?

15   A.    I believe so, yes.

16   Q.    And you told us there was a mechanic that worked with

17   you then as well, didn't you?

18   A.    Yes.

19   Q.    Was that David Bird as well?

20   A.    It probably was, yes.

21   Q.    And then you wrote your report, your mechanic's

22   report which was Exhibit 26; is that correct?

23   A.    Yes.

24   Q.    All right.  And then you didn't do anything else on

25   this case for more than two years; isn't that correct?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.   That is correct.

2    Q.   So you did this disassembly some two years later in

3    August of 2003?

4    A.   Yes.

5    Q.   And you had a mechanic helping you with that as well,

6    didn't you?

7    A.   Yes, I did.

8    Q.   Who was that?

9    A.   That was David Bird.

10   Q.   Have you seen the videotape of that disassembly?

11   A.   I have not.

12   Q.   Well, was David Bird the man who was actually

13   disassembling the engines?

14   A.   Yes.

15   Q.   All right.  So you have those four dates.  Let me

16   focus on the June 11 date.  But before we do, I want to

17   make sure about something.

18        You told us several times on direct examination that

19   you were a Merc-certified mechanic; is that correct?

20   A.   That is correct.

21   Q.   All right.  You're not a Merc-certified mechanic any

22   longer, are you?

23   A.   No, I'm not.

24   Q.   Your Merc certification expired in 2002; isn't that

25   correct?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes, it did.

2    Q.    Going back to June 11, Mr. Mains contacted you on

3    June 11 and told you that he was able to get one of his

4    engines started but not the other; is that correct?

5    A.    I believe it was, yes.

6    Q.    And then he told you that the one engine he could get

7    started he couldn't get to run very well?

8    A.    Right, that's what I remember.

9    Q.    So you and David Bird then checked the engines that

10   Monday morning; is that correct?

11   A.    Yes.

12   Q.    And someone cranked the starboard engine; is that

13   right?

14   A.    I'm sure it was attempted, yes.

15   Q.    Was that you or was that Mr. Bird?

16   A.    Well, cranking the engine to do the dewatering, is

17   that what you're asking?

18   Q.    Yes.

19   A.    I would have been doing the cranking.

20   Q.    What about the port engine, did anybody crank that?

21   A.    Yes.

22   Q.    Who would have done that?

23   A.    I would have done the cranking.

24   Q.    You started the dewatering process as -- dewatering

25   was one step and pickling was the next; is that correct?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.    Yes, it's done at the same time.

2  Q.    Are they both together called pickling?

3  A.    Yes.

4  Q.    Okay.  You knew it was important to do the pickling

5  process correctly, didn't you?

6  A.    Yes.

7  Q.    And you knew if you didn't do the pickling process

8  correctly, damage could result to the engines which

9  needn't occur?

10  A.    Sure.

11  Q.    Now, when you cranked -- as I understand it, the port

12  engine was dry; is that right?

13  A.    I believe it was.

14  Q.    So the engine that you really -- the engine that you

15  cranked was the starboard engine, right?

16  A.    We would have done both.

17  Q.    All right.  When you cranked the starboard engine,

18  when you or Mr. Bird cranked the starboard engine, there

19  was fresh water coming out of several of the cylinders; is

20  that right?

21  A.    Yes.

22  Q.    In fact, you could tell it was fresh; isn't that

23  right?

24  A.    It appeared to be fresh, yes.  It was clean.

25  Q.    Didn't you tell us at your deposition, Mr. Wicander,

1    you could tell that the water coming out of those

2    cylinders was fresh?

3    A.    It appeared to be fresh, yes.

4    Q.    Didn't you tell us under oath at the time of your

5    deposition that the water coming out of those cylinders --

6              MR. NIKAS:  Objection, Your Honor,

7    argumentative.  The witness already testified and agreed.

8              THE COURT:  Overruled.

9    A.    I didn't have the water tested, if that's what you're

10   asking, to verify that it was fresh water, no.  It was

11   water.  Plain and simple, it was where it shouldn't be and

12   we were getting it out of there.

13   BY MR. ROTONDO:

14   Q.    Mr. Wicander, can you turn to page 38 of your

15   deposition?

16   A.    Sure.

17   Q.    And before I ask you questions about page 38, you

18   came to our office back in February of 2004 to give

19   testimony under oath; is that correct?

20   A.    That's correct.

21   Q.    And it was under oath just like it is today?

22   A.    Yes.

23   Q.    All right.  And you understood it was under oath,

24   didn't you?

25   A.    Yes.

1  Q.   If we turn to page 38, beginning at lines 11, you

2  were asked -- I'm going take start back up on line 7.

3       Question:  Okay, at that point you said you took the

4  sparkplugs out and cranked the engine over?

5       And your answer was:  Yes.

6  A.   Yes.

7  Q.   Next question:  What happened?

8       And your answer was:  We had water coming out of the

9  cylinders.

10 A.   Yes.

11 Q.   Next question:  Do you remember which ones?

12      Answer:  It's in my report.  We had fresh water

13 coming out of I believe it was two, four, six and eight

14 and number one cylinder was all wet on the starboard

15 engine.

16      Did I read that correctly?

17 A.   Yes.

18 Q.   And then you were asked, if we skip down -- well,

19 we'll continues on.

20      Line 17:  How about the port engine?

21      Your answer was:  It shows dry.  I believe that was

22 the one that was started.

23      Remember that question?

24 A.   Yes.

25 Q.   Then you were asked:  How were you able to tell that

PDF created with pdfFactory trial version www.pdffactory.com

1  it was fresh water?

2      And your answer at that time was:  You can tell by

3  the consistency of the water whether it's fresh or not.

4  A.   Yes.

5  Q.   That's what you said?

6  A.   Yep.

7  Q.   So at that time you could tell that it was fresh

8  water; isn't that correct?

9  A.   It appeared to be fresh water, yes.

10 Q.   In fact, you told us not only -- at the time of your

11 deposition, not just that it appeared to be, but you could

12 tell it was fresh water because of its consistency.

13 That's what you said under oath at your deposition over

14 four years ago.

15 A.   Sure.

16 Q.   The fact that it was fresh water in those cylinders

17 indicated that the water was taken in during the flushing

18 process; isn't that correct?

19 A.   That's what we assumed, yes.

20 Q.   That's what you concluded?

21 A.   Well, yeah.

22 Q.   In fact, you concluded that this hydrolock was caused

23 by flushing and not by water ingested from the exhaust

24 system; isn't that correct?

25 A.   It was from flushing, yes.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   It was from flushing and not from water ingested

2  through the exhaust system; isn't that right?

3  A.   Well, the water would have been ingested through the

4  exhaust system even during the flushing.

5  Q.   But you concluded that the water that was in those

6  cylinders came into those cylinders as a result of

7  flushing?

8  A.   Yes.

9  Q.   Now, was it you or Mr. Bird who took out the

10  sparkplugs?

11  A.   Mr. Bird.

12  Q.   Was it you or Mr. Bird who dewatered the starboard

13  engine?

14  A.   I was cranking, so I was part of the dewatering,

15  absolutely.

16  Q.   How about changing the oil, was that you or Mr. Bird?

17  A.   Would be Mr. Bird.

18  Q.   And the process involved taking out the sparkplugs,

19  dewatering the starboard engine and changing the oil to

20  take care of the hydro; is that right?

21  A.   Yes.

22  Q.   After those things were done, you or Mr. Bird were

23  able to get the engines running again; isn't that right?

24  A.   That is correct.

25  Q.   But at that point the engines weren't running very

1  well, were they?

2  A.   I remember they weren't, no.

3  Q.   And those engines not running well may well have been

4  because there was moisture on the sparkplugs; isn't that

5  right?

6  A.   I suppose it's possible, yes.

7  Q.   Didn't you tell us at your deposition that might have

8  been the reason the engines didn't run well?

9  A.   Yes, it's definitely possible.

10 Q.   But you or Mr. Bird didn't replace the sparkplugs on

11 June 11, did you?

12 A.    No, not at that point.

13 Q.   So on June 11, you left the engine that you knew

14 wasn't running well knowing that you might have moisture

15 in the sparkplugs; is that correct?

16 A.   I'm not certain of the exact sequence of things, but

17 yeah.

18 Q.   And you knew at that point on June 11 that if you

19 didn't get all of the water out of the engine quickly it

20 could damage the engine, correct?

21 A.   It can damage the engine, yes.

22 Q.   And you knew that it could happen fast?

23 A.    Yes.

24 Q.   And sparkplugs were not purchased for Mr. Mains'

25 engine until June 15; isn't that right?

1    A.    I'm not sure of that.  I don't have that in front of

2    me.

3    Q.    Isn't it true that your shop, Pilots Point Marina,

4    did not purchase the sparkplugs that were used?

5    A.    I don't recall.

6    Q.    If your company had purchased the sparkplugs that

7    were used, they would show up on your invoices; isn't that

8    right?

9    A.    Yes.

10              MR. ROTONDO:  If we can mark for identification

11   Defendant's Exhibit 109 for I.D.

12   BY MR. ROTONDO:

13   Q.    Mr. Wicander, I'm going to show you what's been

14   marked as Defendant's Exhibit 109 for I.D. and ask if you

15   recognize that.

16   A.    What's that?

17   Q.    Do you recognize that document?

18   A.    Yes, I do.

19   Q.    And is that document something called a ledger card?

20   A.    Yes, it is.

21   Q.    Does that ledger card indicate the work that's

22   performed?

23   A.    Yes.  It's -- basically it's a record of debits and

24   credits to the Mainses' accounts and for what.

25   Q.    And that ledger card -- is Exhibit 109, that's a true

1    and accurate copy of the ledger card relating to the

2    Mainses' boat?

3    A.    Yes.

4    Q.    That was prepared on or about the time indicated in

5    the document?

6    A.    Yes.

7    Q.    If your company at Pilot's Point Marina had purchased

8    the sparkplugs, that would be reflected on this document,

9    right?

10   A.    It should be, yes.

11   Q.    It's not there, is it?

12   A.    I don't know the parts -- there were parts signed out

13   to that engine, but I don't know what they are from this

14   document.

15   Q.    All right.

16             MR. ROTONDO:  If we can mark as Exhibit 110

17   another document.

18   BY MR. ROTONDO:

19   Q.    I'm going to show you now what's been marked as

20   Exhibit 110 for identification.  Do you recognize that

21   document?

22   A.    Yes.  It's a work order.

23   Q.    And was this document prepared at or about the time

24   reflected on the document?

25   A.    Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    It was prepared in the ordinary course of Pilot

2    Point's business?

3    A.    Yes.

4    Q.    And it was prepared by someone who had a business

5    duty to prepare it?

6    A.    Yes.

7    Q.    This document does describe the parts that Pilot

8    Point put on or used in the course of doing work for

9    Mr. Mains, doesn't it?

10    A.    Yes, it does.

11    Q.    And that document does not indicate that Pilot Point

12    purchased any sparkplugs, does it?

13    A.    No, it does not.

14            MR. ROTONDO:    I move the admission of

15    Exhibits 109 and 110.

16            THE COURT:    Defendant's Exhibits 109 or 110 are

17    admitted.

18    BY MR. ROTONDO:

19    Q.    Now, you said that there was a protocol that you used

20    and it was the same protocol that Merc used in terms of

21    pickling the engines; isn't that right?

22    A.    Yes.

23    Q.    And that protocol makes it clear -- your protocol and

24    the one for Merc indicates that speed is an important

25    factor?  You have to act quickly?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes.

2    Q.    And that you need to check for water at the top of a

3    piston?

4    A.    Yeah, you want to see if there's water in the

5    cylinder.

6    Q.    And you need to install new sparkplugs and start the

7    engine?

8    A.    You wouldn't put new sparkplugs in if there was still

9    water in the engine.  You'd ruin the new sparkplugs.

10   Q.    After you dewater it, you need to install new

11   sparkplugs and run the engine; isn't that part of the

12   protocol?

13   A.    You are not going to put new sparkplugs in an engine

14   you're not sure the water's all out of yet.

15   Q.    Isn't it protocol to install new sparkplugs and run

16   the engine?

17   A.    You should try and run it first.

18          MR. ROTONDO:  Can I see plaintiff's 33.

19   BY MR. ROTONDO:

20   Q.    Have you ever seen a protocol from Mercury --

21   A.    I'm sure I have.

22   Q.    -- that told you that you needed to change the

23   sparkplugs and run the engine?

24   A.    That's after the total dewatering was done, yes.

25   Q.    And you finished your dewatering on June 11?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Part of the dewatering is actually running the

2    engines.    You want to make sure -- you can't get all of it

3    out just by cranking the engine over.

4    Q.    And you ran the engine, and don't you need to run the

5    engine to 1300 rpm until it reaches its normal operating

6    temperatures?

7    A.    You'd like to get it there, yes.

8    Q.    And on June 11, you did not install new sparkplugs,

9    did you?

10    A.    I believe not.

11    Q.    And you did not run the engine until you achieved

12    1300 rpm's and achieved the normal engine temperature, did

13    you?

14    A.    That I don't recall.

15    Q.    Now, on June 11, did you tell Mr. Mains that he

16    couldn't wait for several days to go get new sparkplugs?

17    A.    I don't recall any conversations about the

18    sparkplugs.

19    Q.    Did you tell Mr. Mains on June 11, 2001, that you

20    needed to put sparkplugs in immediately so you could run

21    that engine to achieve the normal engine temperature?

22    A.    I don't recall.

23    Q.    After the work that you did on June 11, did you

24    decide that you needed to disassemble the engine?

25    A.    Not at that point, no.

1  Q.    In fact, June 11, you couldn't tell whether there was

2  damage to the engines, could you?

3  A.    Not at that point, no.

4  Q.    Now, you told us about the compression tests and leak

5  down tests?

6  A.    Yes.

7  Q.    Now, those tests were run on June 18; is that right?

8  A.    Yes.  I believe so.

9  Q.    And do you know one way or the other whether you

10  obtained new sparkplugs between June 11 and June 18?

11  A.    I honestly don't recall.

12  Q.    Now, you recommended the compression test because of

13  the hydrolock; isn't that right?

14  A.    That's correct.

15  Q.    And I believe you told us that the compression tests

16  were run with you and David Bird; is that right?

17  A.    I believe so, yes.

18  Q.    And before I do that, I move the admission of

19  Defendant's Exhibit 20, which are a series of seven to

20  eight photographs.

21        THE COURT:  Defendant's Exhibit 20 is admitted.

22  BY MR. ROTONDO:

23  Q.    As I understood your testimony from direct

24  examination, you indicated David Bird worked with you on

25  the compression test?

1   A.   I believe so.

2   Q.   I think you said David Bird was down putting things

3   into the spark plug holes; is that right?

4   A.   Yes.

5   Q.   And you were at the helm?

6   A.   Yes, I would have been, yes.

7   Q.   For those of us who are not real boaters, let me make

8   sure you understand.  Is that the helm?

9   A.   I believe so, yes.

10  Q.   Basically I'll call it the steering wheel.

11       So you were there?

12  A.   Yes.

13  Q.   And you were working the ignition I believe you said

14  on direct examination?

15  A.   Yes.

16  Q.   And Mr. Bird was in the engine compartment?

17  A.   Yes.

18  Q.   And the engine compartment, if you were facing -- if

19  you were facing the steering wheel, the engine compartment

20  would be behind you?

21  A.   That's correct.

22  Q.   And there was a hinge, there was a hinge that had to

23  be raised in order to get access to the engine?

24  A.   The hatch, yeah.

25  Q.   And the hatch opened toward you, didn't it?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   No.   The hatch -- the hinge was at the back of the

2  boat.

3  Q.   So you were at the helm and Mr. Bird was down in the

4  engine compartment?

5  A.   Yes.

6  Q.   You reviewed with Mr. Nikas some of these pressure

7  readings that you had.  Each one of the cylinders recorded

8  compression readings of at least 105; isn't that right?

9  A.   Yes.

10  Q.   And most of them were above 115?

11  A.   Yes.

12  Q.   All right.  And if we look on the port side, they

13  ranged from 105 to 135, right?

14  A.   Yes.

15  Q.   All right.  And if we look at the starboard side,

16  they ranged from 125 to 132?

17  A.   Yes.

18  Q.   And the engines on this boat you told us were made by

19  Mercury?

20  A.   Made by General Motors for Mercury, yes.

21  Q.   They're Mercury engines, labeled Mercury engines?

22  A.   Yes.

23  Q.   And Bassett Boats is a MerCruiser dealer?

24  A.   Yes, they are.

25  Q.   And your yard or marina is somehow connected to

1    Bassett; is that right?

2    A.    Their building was actual -- we own the building,

3    they lease it from us.

4    Q.    And so you work out of the same building; is that

5    right?

6    A.    Actually we do share part of the building, yes.

7    Q.    And you're aware that MerCruiser had a service

8    bulletin regarding compression tests, aren't you?

9    A.    Yeah, I'm sure they did.

10    Q.    And are you aware that the MerCruiser service

11    bulletin indicates that compressions above 100 pounds per

12    square inch are acceptable?

13    A.    Acceptable, yeah, that is their specifications.

14    Q.    And you know that Bassett Boats would have had that

15    MerCruiser service bulletin available to them, if you

16    wanted to look at it?

17    A.    Sure.

18    Q.    You also told us about the leak down tests.

19    A.    Yes.

20    Q.    And those are reflected on Plaintiff's Exhibit 26 as

21    well?

22    A.    Yes.

23    Q.    And you testified that acceptable leak down

24    percentages are less than 18 to 20 percent?

25    A.    Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    And that's not based on any Mercury standard, is it?

2    A.    No, that's from industry standard.

3    Q.    That's not based on a GM standard?

4    A.    I don't know what their standard is.

5    Q.    In fact, you told us you don't know what the Mercury

6    GM standards are, didn't you?

7    A.    That's correct.

8    Q.    Now, based on the compression and leak down tests,

9    you recommended taking the engines apart and looking

10    inside to determine what was causing those test results,

11    didn't you?

12    A.    Correct.

13    Q.    All right.  And when you finished your mechanical

14    inspection report -- and this was done in June or July you

15    prepared this report?

16    A.    Yeah.  I don't have the dates in front of me.

17    Q.    It's not dated.

18         But you had a conclusion there and you state -- now,

19    you've done your dewatering at this point, you've done

20    your pickling at this point, you've done your compression

21    test at this point and you've done your leak down test at

22    this point?

23    A.    Yes.

24    Q.    You then write this report, which you told us was

25    prepared in the ordinary course of business; is that

PDF created with pdfFactory trial version www.pdffactory.com

1   right?

2   A.   Yes.

3   Q.   It wasn't prepared because there was litigation

4   involved.  You didn't know anything about that?

5   A.   No.

6   Q.   So in June or July of 2001, you stated, "On the basis

7   of the mechanical inspections reported above, we are of

8   the opinion that both engines have been seriously damaged

9   as a result of the hydrolocking that occurred on or about

10  June 9, 2001 and require replacement."

11       That's what you said then?

12  A.   Yes.

13  Q.   You said that the damage occurred because of the

14  hydrolocking, correct?

15  A.   Correct.

16  Q.   And the hydrolocking that you saw was fresh water

17  from the flushing; isn't that right?

18  A.   Yes.

19  Q.   Now, in your view, these compression and leak down

20  tests that are reflected in your mechanical report

21  indicate there was damage to the engine, correct?

22  A.   Yes.

23  Q.   Those tests by themselves don't tell you whether the

24  damage occurred as a result of the hydrolocking itself or

25  as a result to properly pickle the engines, do they?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    I disagree with that.  The pickling was done

2    properly.  I don't understand where you're going with

3    that.

4    Q.    Well, my question -- your compression tests and your

5    hydrolock test report results, correct?

6    A.    Correct.

7    Q.    They report that there are certain things that don't

8    meet certain specifications that you believe were

9    required?

10    A.    Yes.

11    Q.    All right.  Those tests by themselves do not tell you

12    what caused that failure, that damage; isn't that right?

13    A.    That's correct.

14    Q.    But you concluded, based on everything that you knew,

15    you thought that it was the hydrolock?

16    A.    I assumed the hydrolocking caused it, yes.

17    Q.    But that damage could also have been caused, could it

18    not, by the failure to properly pickle the engines; isn't

19    that correct?

20    A.    We didn't -- we definitely pickled the engines

21    correctly.

22    Q.    So you disagree with the idea that you didn't pickle

23    the engines correctly?

24    A.    I know we pickled them correctly, yes.

25    Q.    Even though you didn't put new sparkplugs in them

PDF created with pdfFactory trial version www.pdffactory.com

1   until about a week later in the event.

2   A.   I don't recall the timing on that, no.

3   Q.   Now, did you make arrangements to put shrinkwrap on

4   the boat in 2001?

5   A.   I believe it was 2001, yes.

6   Q.   I'm sorry, you said something and I missed it.

7   A.   I believe it was 2001.

8   Q.   You didn't put the shrinkwrap on yourself?

9   A.   I may have helped.

10  Q.   You didn't go back over and look at the engines until

11  August of 2003?

12  A.   I believe so, yes.

13  Q.   And you then were involved I guess with Dave Bird

14  again disassembling the engine; is that correct?

15  A.   Yes.

16  Q.   And that process I believe took what, two days; is

17  that your testimony?

18  A.   It was over two days, yes.

19  Q.   I want to make sure, did it take place on two

20  separate days or was it more than two days?

21  A.   We did one engine one day and one engine the other

22  day.

23  Q.   So your memory is it took place on two different

24  dates?

25  A.   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    And not more than two different days?

2    A.    That's my recollection.

3    Q.    And you only went out to the site on two days to do

4    that disassembly work; is that right?

5    A.    Yes.

6    Q.    You know that the disassembly was videotaped?

7    A.    Yes.

8    Q.    If the videotape shows people were disassembling that

9    engine over four days, does that mean you weren't there on

10   two of the four days it was disassembled?

11   A.    If it was more than two days, I don't recall.  I was

12   there during the disassembly of both engines.

13   Q.    And the person who was doing the primary

14   disassembling then was David Bird and you were observing

15   the work that he was doing?

16   A.    Correct.

17   Q.    You talked to us about rust that you observed during

18   your 2003 disassembly, correct?

19   A.    Yes.

20   Q.    You talked about rust on a bunch of different spots.

21   A.    Uh-huh.

22   Q.    And by the time of your disassembly, the Mains's boat

23   had been sitting idle under shrinkwrap for two years?

24   A.    Yes.

25   Q.    And it was sitting in your dock area; isn't that

1    right?

2    A.    It was sitting on our on-land storage area.

3    Q.    How far was that from the water, the ocean?

4    A.    A few hundred feet.

5    Q.    Okay.  And I take it that's a very corrosive

6    environment being right next to the sea like that?

7    A.    Exposed, yeah.

8    Q.    Would you expect that certain kinds of metal in

9    proximity to the ocean would rust?

10    A.    I suppose they would.

11    Q.    When they're under shrinkwrap, that could be in a

12    humid environment?

13    A.    It can be, if there's water in the boat.

14    Q.    That can cause rusting, can't it?

15    A.    I suppose, yes.

16    Q.    Now, at the time that you did the disassembly in

17    2003, you were no longer a Merc-certified mechanic, were

18    you?

19    A.    That's correct.

20    Q.    When you did your disassembly work, did you find

21    water in the engines?

22    A.    I don't recall finding water.  I do remember, as we

23    disassembled, some of the antifreeze that was in the

24    engine could have gotten into the cylinders, absolutely.

25    Q.    You found liquid in the cylinders; is that correct?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    I do recall that.

2    Q.    You didn't note that anyplace on your report?

3    A.    Probably not.  It was general disassembly.

4    Q.    But doesn't the videotape show water in the

5    cylinders?

6    A.    I never saw the videotape.

7    Q.    Now, you noted rust at the time you did this work in

8    August of 2003, the disassembly work, you observed it?

9    A.    Yes.

10   Q.    You had not observed that rust before?

11   A.    Didn't disassemble it, so, yes.

12   Q.    You told us that scoring inside of cylinders can be

13   caused either by lack of lubrication or foreign objects in

14   the cylinder?

15   A.    Yes.

16   Q.    And is it your testimony that scoring can never

17   happen in the ordinary course of operating an engine?

18   A.    Not if it's running properly, no.

19   Q.    Now, you told us that you ran the engine in June of

20   2001; is that right?

21   A.    Yes.

22   Q.    And you know that Mr. Mains ran the engine in June of

23   2001?

24   A.    One engine, I believe, yes.

25   Q.    He ran the port engine?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes.

2    Q.    And you ran both engines?

3    A.    Yes.

4    Q.    Do you know how long he ran the engines?

5    A.    I do not.

6    Q.    You know when he was running the engines there was

7    water in the cylinders?

8    A.    At that point, yes.  Assuming.  Yes.

9    Q.    When you were running the engines, you thought there

10   was water in those cylinders too?

11   A.    When we ran the engine was after we did the

12   dewatering, so it shouldn't have been very much if any in

13   there.

14   Q.    You thought there might be some water?

15   A.    Sure, you can never get it all out.

16   Q.    That water would cause damage depending how long you

17   ran the engines?

18   A.    Not likely.  Small amounts, no.

19   Q.    How long did you run those engines in June of 2001?

20   A.    My recollection, we ran them -- I don't remember if

21   it was that day or what day -- over an hour probably.

22   Q.    And you were trying to get up to 1300 rpm's to get

23   the normal engine temperature, weren't you?

24   A.    We were trying to get normal engine temperature,

25   yeah.

1   Q.    In June of 2003 you didn't find any rust in the

2   cylinder boards, did you?

3   A.    I don't recall.  I don't believe so.

4   Q.    Now, you concluded in 2001 in your mechanical report

5   that you'd have to look -- disassemble the engine to look

6   for the damage that you said was caused by the hydrolock;

7   is that correct?

8   A.    Yes.

9   Q.    So in -- and you knew that bearings, connecting rods

10  and valves can be bent or damaged as a result of a

11  hydrolock?

12  A.    Yes.

13  Q.    When you did your 2003 inspection, you didn't look

14  for those things, did you?

15  A.    We pulled it apart as far as we saw the scoring in

16  the cylinders and at that point determined that the

17  engines couldn't be repaired.

18  Q.    When you were deposed in 2004 in this case, didn't

19  you tell us that you didn't check to see if the bearings

20  were damaged, the connecting rods were damaged or the

21  valves were; didn't you tell us that?

22  A.    I'm sure I did, yeah.

23  Q.    You talked about determining the elbow exhaust pipe;

24  do you recall that?

25  A.    Yes.

1  Q.   All right.  And you made measurements of that.  And I

2  believe that's Plaintiffs' 30.  Second page.

3       These are the diagrams that were prepared?

4  A.   Yes.

5  Q.   All right.  And what you found was you found

6  differences in the height between the elbow exhaust and

7  something called the overboard discharge; is that right?

8  A.   Yes.

9  Q.   Okay.  And on one side -- on the port side you found

10 this overboard discharge was a quarter of an inch higher

11 than this exhaust elbow; is that right?

12 A.   Roughly, yeah.

13 Q.   And on the starboard side it was either an eighth or

14 three-eighths of an inch?

15 A.   Yeah.

16 Q.   Now, what's the diameter of that overboard discharge?

17 A.   I believe it's two, two and a half inches ID.

18 Q.   And is it flexible?

19 A.   Sure.

20 Q.   Now, you actually made the measurements of that --

21 that we see here at some point in June of 2001; is that

22 right?

23 A.   Yes.

24 Q.   June or July?

25 A.   I believe so.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   You did not make the measurements of the exhaust

2   system at the time you did your June 18 compression test

3   or leak down test?

4   A.   I don't recall exactly when we did the measurements.

5   Q.   But you testified at your deposition that you didn't

6   make those measurements on June 18.

7   A.   That's fine.  No, I didn't.  I'm not disagreeing.

8   Q.   You faxed these results to Mr. Mains on July 10 of

9   2001?

10  A.   Okay.

11  Q.   So that means you must have done this at some point

12  before July 10, 2001.

13  A.   Sure.

14  Q.   Now, before you made these measurements, David

15  Bird -- was it David Bird?

16  A.   Yes.

17  Q.   He was in this engine area?

18  A.   Yes.

19  Q.   And he was involved in dewatering?

20  A.   Sure.

21  Q.   And he was also involved in doing the compression

22  test?

23  A.   Yes.

24  Q.   As I understand it, it's kind of a tight space in

25  here?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   Yes, it is.

2  Q.   So he was walking and putting his feet on different

3  spots in that area; wasn't he?

4  A.   I'm sure he was.

5  Q.   Now, Pilots Point hauled Mr. Mains' boat out of the

6  water at the end of June; isn't that right?

7  A.   I believe so, yes.

8  Q.   So the boat wasn't in the water at the time you made

9  these measurements, was it?

10  A.   We must have relaunched it to determine waterline.

11  Q.   There's no -- if you relaunched it, you would have

12  had to charge for that?

13  A.   Possibly, yeah.   Typically, yeah.

14  Q.   But in order to do this test right, you need to have

15  it in the water?

16  A.   Needed to determine waterline, yes.

17  Q.   Did you testify in your deposition that the boat was

18  on land stored in the yard between sometime in July and

19  October of 2001?

20  A.   I may have.

21  Q.   Turn to page 88 of your deposition.

22  A.   Sure.

23       THE COURT:  And when you're finished with that

24  question, it will probably be time for our lunch break,

25  12:15.

1          MR. ROTONDO:  Thank you, Your Honor.

2     BY MR. ROTONDO:

3     Q.   Turn to line 4.

4          Question was:  So where was the boat between

5     July 2001 and October if we can say that's when --

6          And your answer was:  On land, stored in the yard.

7     A.   Yes.

8          MR. ROTONDO:  I'll break here, Your Honor.

9          THE COURT:  We'll take an hour for lunch.  I'll

10    see you all at 1:15.  We'll recess.

11              (Whereupon the jury left the courtroom.)

12              (Whereupon, a recess followed.)

13

14         THE COURT:  We'll have our witness retake the

15    stand and bring in the jury.

16              (Whereupon, the jury entered the

17               courtroom.)

18    BY MR. ROTONDO:

19    Q.   Good afternoon, Mr. Wicander.

20    A.   Good afternoon.

21    Q.   When we broke we were talking about the exhaust elbow

22    height.

23    A.   Yes.

24    Q.   You would agree that the measurements should be taken

25    with the boat in the water?

1    A.    Yes, it's a measurement from the water line to the --

2    Q.    You're not saying that the height of the exhaust

3    elbow in the overboard discharge hose caused any of the

4    rust that you observed in August 2003, are you?

5    A.    Can you repeat that?

6    Q.    You're not saying that the height of the exhaust

7    elbow in the overboard discharge hose caused any of the

8    rust that you observed in August of 2003?

9    A.    I'm not sure of that.

10   Q.    And that's because you have no way of knowing when

11   that rust actually happened; isn't that correct?

12   A.    That's correct.

13   Q.    You talked about flushing instructions; do you recall

14   that?

15   A.    Yes.

16   Q.    And you know those flushing instructions were issued

17   by Mercury, correct?

18   A.    Yes.

19   Q.    Now, as I understand your testimony, you said that

20   the overboard discharge hose was a quarter to

21   three-eighths of an inch higher than the exhaust elbow

22   height?

23   A.    That's correct.

24   Q.    And you said there was some instruction or indication

25   by MerCruiser not to do that?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.    Correct.

2  Q.    And you saw that in the publication somewhere?

3  A.    Yes.

4  Q.    Have you ever seen a Mercury publication showing a

5  discharge hose above the height of an exhaust elbow?

6  A.    No.

7  Q.    I'm going to show you what's been marked as

8  Exhibit -- Plaintiffs' Exhibit 30 for identification.

9  Mine's marked up, but let me ask you if you take a look at

10  it and ask if that refreshes your recollection of whether

11  or not you've ever seen a MerCruiser publication showing a

12  discharge hose with the discharge hose which is higher

13  than the exhaust elbow height?

14  A.    Kind of hard to tell in this picture, to be honest.

15       Where's the exhaust elbow in that picture?

16       It's not very clear.

17       It does show that in this manual.

18  Q.    So that manual does show exhaust elbow height which

19  is lower than a discharge hose; is that correct?

20  A.    It does show that.

21            MR. ROTONDO:  I have nothing further.  Thank you

22  very much.

23            THE COURT:  You can start whenever you're ready,

24  Mr. Nikas.

25            MR. NIKAS:  Thank you, Your Honor.

1                    REDIRECT EXAMINATION

2    BY MR. NIKAS:

3    Q.   Good afternoon, Mr. Wicander.

4    A.   Good afternoon.

5    Q.   We've been talking with Mr. Rotondo this morning

6    during his examination about your response procedures to

7    the water ingestion, to flushing instructions, to the

8    height of the exhaust elbows and measurements of the

9    exhaust system; do you recall that?

10   A.   Yes.

11   Q.   Mr. Rotondo also referred to several service

12   bulletins that contain the MerCruiser's procedures as to

13   how to handle these things, correct?

14   A.   Correct.

15   Q.   In fact, when he's talking about the criticism of the

16   pickling procedures that you used, that's part of your

17   response to the water intrusion that MerCruiser sets out

18   in its service bulletin as to how to deal with an instance

19   of this, correct?

20   A.   Correct.

21            MR. NIKAS:  Your Honor, I'd like to introduce as

22   plaintiff's next in number MerCruiser Service Bulletin

23   2001-13 which discusses --

24            THE COURT:  Well, wait a minute.  It's not in

25   evidence.  You have an exhibit number, just tell me.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. NIKAS:  It has I guess been assigned in the

2     old numbering system Exhibit Number 135.

3          THE COURT:  It's the current numbering system.

4          You want to offer Exhibit 135?  I don't have

5     copies of those.  They were in the binders that were down

6     here.

7          MS. LEV:  Your Honor, it was also Plaintiffs'

8     Exhibit Number 33 in the initial 40 exhibits.

9          THE COURT:  Okay.  That's good.

10         Can I ask counsel a question at the sidebar?

11              (Sidebar discussion off the record.)

12         MR. NIKAS:  Now, Your Honor?

13         THE COURT:  Let's lay a foundation.

14    BY MR. NIKAS:

15    Q.   We were talking to Mr. Wicander when Mr. Rotondo was

16    questioning you about procedures for pickling the engine,

17    about whether it should be started or not, whether the

18    plugs should be removed or not, whether the plugs should

19    be exchanged or not, whether it's okay to start the engine

20    with -- possibly if some water present in the system; do

21    you recall all that?

22    A.   Yes, I do.

23         MR. ROTONDO:  Objection.  Those weren't my

24    questions.  Mischaracterizing the questions.

25         THE COURT:  Why don't we -- let's -- why don't I

1    let counsel confer for a second, okay?  Confer with each

2    other and you can identify for me where the area of

3    controversy is.

4                    (Pause.)

5              THE COURT:  It might be easier if we don't have

6    a compound question as we're doing this.

7              MR. NIKAS:  Certainly, Your Honor.

8    BY MR. NIKAS:

9    Q.   Mr. Rotondo asked about the distinctions between your

10   procedure for pickling or responding to water intrusion in

11   an engine and MerCruiser's procedure; do you recall that?

12             MR. ROTONDO:  Objection.

13             THE COURT:  Basis?

14             MR. ROTONDO:  That wasn't my question either.

15             THE COURT:  What was your question?

16             MR. ROTONDO:  He said there was accepted

17   protocols that he followed and that Mercury followed.

18   That's what I asked him about.

19             THE COURT:  What were the accepted protocols?

20             MR. ROTONDO:  Yes.  That's what I thought my

21   questions were.

22             MR. NIKAS:  Mr. Rotondo just said "and that

23   Mercury followed."  So I'm asking about Mercury's

24   procedures.  Is that somehow not the topic that was --

25             THE COURT:  I'm not sure I understand.

PDF created with pdfFactory trial version www.pdffactory.com

1           Mr. Rotondo, can you say what your question was

2      again?

3           MR. ROTONDO:  My question was about the

4      protocols or procedures that the witness talked about,

5      which he said were the same as Mercury's.  That's what I

6      asked him about.

7           THE COURT:  Whether the protocols he followed

8      were the same as --

9           MR. ROTONDO:  And then I went through them,

10     which was change the oil, change the spark plugs, run it

11     to the standard temperature.

12          THE COURT:  But did you ask him to compare them

13     with Mercury's?  I'll have to look at my notes.

14          MR. ROTONDO:  It's not my recollection, I didn't

15     ask him to compare --

16          THE COURT:  He said his protocol -- that he

17     followed was the same as Mercury's when he was up here on

18     direct.

19          MR. ROTONDO:  That's correct.

20          THE COURT:  You then asked him about the

21     protocols he went through.

22          MR. ROTONDO:  And the fact that he said they

23     were the same as Mercury's, and I went through those.

24          THE COURT:  Okay.

25          MR. NIKAS:  Your Honor, the door has to be

1    reasonably shaped, correct?  It doesn't have to sliver

2    through the exact question that was asked, just the topic

3    area.

4            THE COURT:  You have to be within the scope of

5    the cross.

6            MR. NIKAS:  And the scope of the cross was the

7    pickling procedures.

8            THE COURT:  The protocol that he went through in

9    the pickling procedure and what he did, not getting into

10   Mercury's protocol.  He said that it was the same as

11   Mercury's protocol on direct?  Do you have a different

12   recollection as to what he said on direct?

13           MR. NIKAS:  I have a different recollection as

14   to the questions, because Mr. Rotondo said, Do you know,

15   sir, that MerCruiser requires you to act with speed?  And

16   he said yes.

17           THE COURT:  We're going to have to have the jury

18   next door.  I'm going to have to go back and look at the

19   questions.

20               (Whereupon the jury left the courtroom.)

21           THE COURT:  I'll need to look at my notes.

22           So you're referring to the questions about

23   having to act with speed.  I do recall a question about

24   that.

25           MR. NIKAS:  He would say MerCruiser requires you

1    to do this and that and that and that.

2          THE COURT:  Could you be more specific?  "Act

3    with speed," I recall.  I don't remember "that and that

4    and that."

5          MR. NIKAS:  He said changing the plugs, then he

6    talked about starting the engine with the possibility of

7    oil still remaining in the cylinder.  The whole discussion

8    took place about the procedures to be used for pickling,

9    and there was reference to both the actual procedure that

10   was used and MerCruiser's procedures.

11         THE COURT:  Okay.

12         Mr. Rotondo, I do recall the question about

13   being required or being recommended or something like that

14   to act with speed.

15         MR. ROTONDO:  There were three questions,

16   Your Honor.  One was speed, checking for water at the top

17   of the pistons, installing new spark plugs, and running at

18   1300 rpm, I asked him those questions.  And he said -- I

19   know he said those were -- he recognized that acting with

20   speed was important, checking for water at the top of the

21   cylinder was important.  As I stand here right now, I

22   don't remember if there was a reference to Mercury -- on

23   installing spark plugs or not, but he agreed he needed to

24   install new spark plugs, and running at it 1300 rpms.

25         I don't think there was any difference between

1    what he said he needed to do and what Mercury said needed

2    to be done.

3              THE COURT:  But the point of this line of

4    questioning that the plaintiff wants to go into is that if

5    the question was not only Do you recognize that you have

6    to do this but you recognize you have to do it because

7    it's in the Mercury guidelines.  Then he wants to go into

8    the Mercury guidelines.

9              Have I captured the issue?

10             MR. NIKAS:  Yes.

11             THE COURT:  I think I'm going to have to ask our

12   court reporter to try to find those questions.  I don't --

13             MR. NIKAS:  Your Honor, I hate to do this also,

14   but this issue will come up again on the other areas of

15   discussion.  So maybe it would be prudent, rather than

16   having to stop again when the next area of inquiry begins,

17   to maybe determine what the scope of the cross-examination

18   was so as not to run afoul of any restrictions on the

19   redirect.

20             THE COURT:  Why don't you tell me what the areas

21   of inquiry are going to be that we need to be aware of?

22             MR. NIKAS:  The water ingestion response

23   procedures.  The pickling procedures.  The exhaust elbow

24   height requirements and the determination whether that

25   should be performed in the water, whether -- I think he

1    also asked questions about MerCruiser's requirements for

2    that determination.

3              THE COURT:  For whether it should be in the

4    water?

5              MR. NIKAS:  Talking about how you measure

6    exhaust height.  I can't remember exactly what the

7    question was.

8              THE COURT:  I remember the question.

9              MR. NIKAS:  Was it in the water, was it this,

10   you know, what the procedure was that he used to measure.

11   Did it conform with Mercury's requirements, because he

12   said, Do you know that Mercury requires this test be to be

13   done from the water line?

14             THE COURT:  Okay.

15             MR. NIKAS:  Flushing instructions.  And also,

16   Your Honor, Mr. Rotondo asked specifically --

17             MS. LEV:  Mr. Rotondo asked specifically whether

18   the exhaust elbow height was the cause of the rust that

19   was found in the cylinders.

20             THE COURT:  How does that tie in to MerCruiser?

21             MR. NIKAS:  It doesn't.  It should, however,

22   open the door to causation as to what did cause the rust.

23             THE COURT:  It does not.

24                  (Pause.)

25             THE COURT:  We're going to interrupt this

```
 1    witness's testimony.
 2              MR. NIKAS:  Should I put him on the stand to do
 3    that?
 4              THE COURT:  We'll put him on the stand, bring
 5    the jury in, and I'll tell them that we're going to
 6    resolve these issues later and bring him back after we've
 7    resolved them.   Then we'll take the next plaintiffs'
 8    witness.
 9                   (Pause.)
10              THE COURT:  We'll bring the jury back in.
11                   (Whereupon, the jury entered the
12                   courtroom.)
13              THE COURT:  Ladies and gentlemen, so we can keep
14    moving, we're going to interrupt this witness's testimony
15    and take our next witness from the plaintiffs, okay?
16              You may step down, sir.
17              MR. NIKAS:  Your Honor, before I call the next
18    witness, may I police that area?
19              THE COURT:  You mean you want to clean off the
20    witness stand?  You may remove the exhibits.
21              I try criminal cases, too, so you have to be
22    careful what terminology you use.
23              Our next witness is?
24              MR. NIKAS:  Thomas Greaves.
25              Plaintiffs wish to call Thomas Greaves to the
```

```
 1   stand.
 2              THE CLERK:  Please raise your right hand.
 3
 4                        THOMAS GREAVES,
 5         called as a witness, having been first duly
 6         sworn, was examined and testified as follows:
 7
 8              THE CLERK:  Please be seated.
 9              Please state your name and spell your last name.
10              THE WITNESS:  Thomas Greaves, G-r-e-a-v-e-s.
11              THE CLERK:  Please state your city and state of
12   residence.
13              THE WITNESS:  Westbrook, Connecticut.
14              THE COURT:  Whenever you're ready, Mr. Nikas.
15
16                     DIRECT EXAMINATION
17   BY MR. NIKAS:
18   Q.   Mr. Greaves, could you tell the jury what it is you
19   do for a living?
20   A.   Marine surveying.
21   Q.   Mr. Greaves, what is a marine surveyor?
22   A.   We perform inspections on boats inside and out,
23   including the hull, electrical, wiring, and plumbing
24   systems.
25   Q.   And why do you do that?
```

1   A.    To determine the condition of the vessel, the boat,

2   and make sure it's in good shape.

3   Q.    And is this something that occurs routinely that

4   people order marine surveys or maybe insurance companies

5   order marine surveys?

6   A.    Insurance companies require them quite often.

7   Q.    And did you perform a marine survey in this case?

8   A.    I did.  Yes.

9   Q.    When did you perform your survey?

10  A.    June of '01.

11  Q.    So that was the same month that the engine failure

12  happened on board this boat to the two engines, correct?

13  A.    Correct.  Yes, sir.

14  Q.    So this wasn't a report that you prepared for a

15  lawsuit or any other purpose other than to determine the

16  condition?

17  A.    Correct.

18  Q.    Mr. Greaves, when you talk about a marine surveyor,

19  is that just something you could describe yourself as or

20  is there any certification process that goes along with

21  that?

22  A.    There is a certification process that goes along with

23  that.

24  Q.    What is the certification process to become a marine

25  survey?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.    Five years working with a surveyor and an exam at the

2  end of the five years.

3  Q.    Five years as an apprentice?

4  A.    Correct, uh-huh.

5  Q.    And then examination on what topics?

6  A.    On boat construction and materials in the boat, and

7  so forth.

8  Q.    Do marine surveyors have specific, I guess, areas of

9  expertise or do they survey all types of boats?

10  A.    They survey all types of boats.

11  Q.    And so do you have to be familiar with all types of

12  boats?

13  A.    You do, yes.  All types of boats, yes.

14  Q.    Do you survey both power boats and sailboats?

15  A.    Power boats and sail, yes.

16  Q.    Are you accredited by any marine surveying society?

17  A.    Accredited by SAMS, which is Society of Accredited

18  Marine Surveyors.

19  Q.    Society of Accredited Marine Surveyors?

20  A.    Yes.

21  Q.    Mr. Greaves, could you perhaps maybe slow down your

22  speech just a little bit?

23  A.    Okay.

24  Q.    It might help the court reporter.

25        What education do you have, sir?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1  A.   For surveying?  I'm a certified boat builder.
 2           MR. NIKAS:  May I approach the witness,
 3  Your Honor?
 4           THE COURT:  He's all right.
 5  BY MR. NIKAS:
 6  Q.   So when did you serve -- make sure I'm right.  You're
 7  a certified boat builder?
 8  A.   Correct, uh-huh.
 9  Q.   When were you -- when did you become certified as a
10  boat builder?
11  A.   Back in '58.
12  Q.   1958?
13  A.   Uh-huh.
14  Q.   And what were the requirements to becoming certified
15  as a boat builder?
16  A.   Apprenticeship of five years and night school for
17  naval architectural courses.  That was mainly it.
18  Q.   So your apprenticeship began in 1953?
19  A.   Probably '56, '57, in that area.
20  Q.   You completed that.
21           Where did you take your naval architectural courses?
22  A.   In Dublin, Ireland, as a matter of fact.
23  Q.   In Dublin, Ireland?
24  A.   Uh-huh.
25  Q.   When did you come to the United States?
```

1  A.    1960.

2  Q.    What were you working as in 1960 when you came here?

3  A.    As a boat builder -- (cell phone rings).  Excuse me.

4  Sorry.

5        As a boat builder.

6  Q.    How long did you work as a boat builder in the

7  United States?

8  A.    I've been working in boat building and repairs from

9  1960 to 1980.

10 Q.    1980?

11 A.    Uh-huh.

12 Q.    What did you do in 1980?

13 A.    Became a surveyor.

14 Q.    And you served your apprenticeship as a surveyor in

15 the U.S.?

16 A.    Yes.

17 Q.    And you successfully passed your examination as a

18 surveyor?

19 A.    Yes, yes.

20 Q.    Does the Society of American Marine Surveyors require

21 you to have a continuing education?

22 A.    Every five years we have to do 62-hour course.  Over

23 a period of five years, have to do 62 hours of training.

24 Q.    So that is your continuing education component?

25 A.    Correct.  We have to do a couple of -- every five

PDF created with pdfFactory trial version www.pdffactory.com

1    years, national convention with the society.

2    Q.   And you've been a surveyor now for, I guess, 28

3    years?

4    A.   Twenty-eight years, correct.

5    Q.   After you complete a survey, what happens?  Do you

6    draft anything?  What's the purpose of the inspection?

7    A.   We put a heading on there what the survey is, if it's

8    a condition survey, purchase survey, or insurance survey.

9    And we draft up a report.

10   Q.   So after every single inspection, you'll produce a

11   survey entitled value or condition or inspection?

12   A.   Correct.

13   Q.   And that happens in every instance?

14   A.   In every instance, correct.  Unless the boat fails

15   survey, then we don't write a report.  It depends.

16   Q.   And to whom do you send this report?

17   A.   To the prospective buyer or owner of the vessel.

18   Q.   If the insurance company orders a survey, does the

19   insurance company get a copy?

20   A.   Not necessarily.  The survey will go to the owner of

21   the boat and he will, in turn, send it to the insurance

22   company.

23   Q.   Do you disclose within the text of the survey what

24   you've been requested to do in terms of looking at and

25   coming to conclusions about?

1  A.    I do, yes.

2  Q.    Mr. Greaves, have you ever qualified as an expert

3  witness in any other cases?

4  A.    I have, yes.

5  Q.    Before what courts have you testified as an expert?

6  A.    New York City; Suffix County, Massachusetts;

7  Middletown and Hartford.

8  Q.    Is that in both state and federal courts?

9  A.    Correct, uh-huh.

10        MR. NIKAS:  Your Honor, at this time I'd like to

11  have Mr. Greaves certified as an expert witness under

12  Federal Rule of Evidence 702.

13        THE COURT:  Any voir dire?

14        MR. ROTONDO:  No, Your Honor.  I'm not objecting

15  to Mr. Greaves' qualifications as a surveyor.

16        THE COURT:  He's certified as a marine surveyor.

17  BY MR. NIKAS:

18  Q.    Mr. Greaves, I'd like to offer into evidence

19  Plaintiffs' Exhibit 23, which is your survey report that

20  was performed on June 30 of 2001.

21        MR. ROTONDO:  No objection.

22        THE COURT:  Plaintiffs' Exhibit 23 is admitted.

23  BY MR. NIKAS:

24  Q.    Now, I believe it's a four-page report followed by a

25  fifth page that looks like scribbling.

1    A.    What it is, it's the HIM number of the vessel, the

2    hull identification number.

3    Q.    Is this a photograph?

4    A.    No, this is a rubbing of the HIM number.

5    Q.    What is a rubbing?

6    A.    Put a piece of paper over the HIM number and use a

7    pencil and get a tracing of it.  That's what it mainly is,

8    a tracing.

9    Q.    Why do you do that?

10   A.    Just to verify you did the right boat.

11   Q.    Is every boat assigned a particular or unique hull

12   identification number?

13   A.    It is.

14   Q.    This prevents transcription errors or any other

15   errors?

16   A.    Correct.

17   Q.    Is this number bolded in?

18   A.    It is.

19   Q.    So it cannot be altered?

20   A.    No.

21   Q.    So you went to go inspect the vessel where?

22   A.    This vessel was inspected on 6/30/01 at Pilots Point

23   Marina in Westbrook, Connecticut.

24   Q.    And was she in the water at the time of your

25   inspection?

1  A.   Briefly in the water for one hour.  The inspection

2  was in the water and out of the water.

3  Q.   Why would you conduct your inspection both in and out

4  of the water?

5  A.   We do some testing on the hull.  We do testing for

6  stray current corrosion.

7  Q.   Sorry, what was that?

8  A.   Stray current corrosion from electrical.

9  Q.   Which is what?

10  A.   Just checking to see if the boat's been eaten up from

11  stray current, from corrosion from bad wiring or leakage

12  from the dockage or, you know, a bad ground in the vessel,

13  and so forth.

14         THE COURT:  I still haven't gotten one word.

15  Are you saying the word "current"?

16         THE WITNESS:  Current, correct.

17  BY MR. NIKAS:

18  Q.   Are you saying "stray current"?

19  A.   Stray current.

20  Q.   Is that corrosion due to stray current or stray

21  current corrosion?

22  A.   Corrosion as a result of stray current.

23  Q.   So if, I guess -- how does stray current corrosion

24  work?

25  A.   If you have a reverse polarity on the boat there

1    could be stray current.

2    Q.   And then the purpose of taking the boat out of the

3    water and inspecting it is what?

4    A.   Is to inspect the bottom and the topsides.

5    Q.   Bottom and the topsides.

6         You can't inspect the bottom --

7    A.   Not in the water.

8    Q.   So you inspected the vessel.  And, I guess, what did

9    you find -- the general description is a 33-foot Sea Ray

10   built in 1998?

11   A.   Correct.

12   Q.   And that information was received from what?

13   A.   Received from the boat, the HIM number, and from

14   documents I have, books I have to correspond with that

15   number and the size of this boat.

16   Q.   Does the hull identification number tell you the

17   length and the manufacturer?

18   A.   It does.

19   Q.   That was consistent with what you had?

20   A.   Correct.

21   Q.   What did you find when you inspected -- in fact,

22   since it may not be clear --

23            MR. NIKAS:  Your Honor, may I approach?

24            THE COURT:  You may.

25

1  BY MR. NIKAS:

2  Q.   As we go through your reports, since your report's

3  fairly technical, maybe you can point to the areas that

4  we're going to discuss so the jury can see.

5          MR. NIKAS:  Actually, maybe I could put it on an

6  easel and have him stand.  Is that fine, Your Honor?

7          THE COURT:  That's fine.

8  BY MR. NIKAS:

9  Q.   Mr. Greaves, why don't you come down here.

10     Looks like the first area you inspected or at least

11  described in your survey on are the topsides?

12  A.   Correct, sir.

13  Q.   Which are where?

14  A.   That is the area between the rub rail and water line.

15  Q.   Where's the rub rail?

16  A.   Rub rail is the hull-to-deck connection.

17  Q.   Why don't you explain that to the jury and I'll try

18  to get it to the court reporter in a way that she can get

19  it down.

20     So the rub rail's where?

21          THE COURT:  Why don't we do this.  You know

22  where all the parts on the boat are, right?

23          MR. NIKAS:  I do.

24          THE COURT:  Take the pointer, stand there.  He

25  talks so the court reporter can hear him and he can direct

1    you where to point.

2            THE WITNESS:  Want me to stand?

3            THE COURT:  You can stand here or sit down.

4    Whatever you prefer.

5    BY MR. NIKAS:

6    Q.   The rub rail and the water line?

7    A.   The water line.

8    Q.   Down here?

9    A.   Correct.

10   Q.   So what did you find out about the topsides here?

11   A.   Topsides were in good condition.  They were sounded

12   out and tested with a moisture meter and they were in

13   really good condition.

14   Q.   What's a moisture meter?

15   A.   Moisture meter is a unit we have for measuring

16   moisture content in laminants.

17   Q.   Why do you want to measure moisture content in this

18   area here?

19   A.   Because the hull has got coring in it.

20   Q.   What's coring?

21   A.   The hull is made up of sandwich construction,

22   fiberglass -- wood and fiberglass parts.  Got to make sure

23   no water has entered into the wood coring.

24   Q.   Okay.  So you inspected that.

25           It looks likes you noted gelcoat stress cracks around

PDF created with pdfFactory trial version www.pdffactory.com

1  the lift rings?

2  A.    That's on the steering of the boat, back end of the

3  boat.

4  Q.    What are gelcoat stress cracks?

5  A.    The gelcoat is a finish almost like a paint finish.

6  What happens with stress, the gelcoat will crack and it

7  will show cracks in different places.  The problem with

8  gelcoat stress crack is water can permeant into the cracks

9  if you don't seal them.

10  Q.    Next we went to the bottom, next thing in our report.

11  A.    Correct.  Which is a part under water we can't see on

12  this drawing.

13  Q.    Under here what did you find out about the bottom

14  here?

15  A.    The bottom paint had a problem.  It was delaminating,

16  coming off in flakes.  The moisture meter on the bottom

17  and the tapping with a metal hammer proved that the

18  laminant was in good shape.  There were a couple of gouges

19  on the font of the boat from some collision damage, maybe

20  hitting a log or object in the water.  But there was no

21  significance.

22  Q.    Did you find any evidence of grounding?

23  A.    No.  No evidence of grounding.

24  Q.    Then the deck, which is, I guess, the horizontal

25  surface like the top floor of the boat?

1    A.    Yes.

2    Q.    Was the area you looked at next.  What did you find

3    there?

4    A.    On the decks we found moisture around the anchor

5    locker -- not the anchor locker but the anchor windlass.

6    Q.    So the windlass is right here?

7    A.    It's situated on the front of the boat.

8    Q.    What does the windlass do?

9    A.    Windlass is used to raise and lower an anchor.

10   Q.    Is this a mechanical piece of equipment?

11   A.    Operated electrically.  Mechanically, yes.

12   Q.    So it's a mechanical piece of equipment operated

13   electrically?

14   A.    Electrically.

15   Q.    Is that because the anchor and chain is heavy?

16   A.    It is.

17   Q.    So around that mechanism which raises and lowers the

18   anchor, you found delamination?

19   A.    Delaminations were high in moisture, had high

20   moisture readings.

21   Q.    So delamination with high moisture readings.

22         What is delamination?

23   A.    Separation of a deck section, which is cord also.

24   It's a sandwich construction.  And delaminations means

25   that the two surfaces have come apart with voids.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   What's this boat made out of?

2   A.   Fiberglass.

3   Q.   So those of us unfamiliar with fiberglass, if this

4   book -- what's the thickest part of fiberglass, is it the

5   core?

6   A.   Core, correct.

7   Q.   What goes on top of the core?

8   A.   Fiberglass.  Three-sixteenths of an inch.

9   Q.   And are there multiple layers?

10  A.   Of fiberglass, correct.

11  Q.   So they're sheeted on top of the core?

12  A.   Of the coring, uh-huh.

13  Q.   And the more layers, the stronger the fiberglass?

14  A.   Correct, uh-huh.

15  Q.   So delamination, which you talked about, is what?

16  A.   Separation of these two surfaces.

17  Q.   Is when the sheets come up off the core?

18  A.   Correct, uh-huh.

19  Q.   Is that bad?

20  A.   It is, yes.

21  Q.   Why is it bad?

22  A.   Well, you could get a weak spot on the deck and it's

23  going to be spongy.  And also water can permeant down

24  through those cracks and travel.

25  Q.   What happens if water gets down through those cracks

1    and travels?

2    A.    It it's going to rot the coring.

3    Q.    Then what?

4    A.    Then you got a problem, you got delaminations.  The

5    worse it gets, the more costly it's going to be to fix it.

6    Q.    You always want to fix that, I guess?

7    A.    You would, yes.

8    Q.    Is there any significance to the fact the

9    delamination was occurring on the foredeck up here where

10   the windlass is?

11   A.    The reason it was -- moisture was getting in

12   delaminations because the windlass wasn't bedded properly.

13   Q.    What does that mean to be not bedded properly?

14   A.    The material they use for bedding is like a rubber

15   caulking compound.  And sometimes run the bolts in the

16   windlass, they neglect to put caulking and bedding in

17   there so water enters through those bolt holes.

18   Q.    When you pull the anchor up on the windlass since the

19   anchor and the chain's in the water, is there water in

20   that area?

21   A.    There is.

22   Q.    Is there also water in that area because it's in the

23   front?

24   A.    Correct.  Correct, yes.

25   Q.    You found, I guess, new paint.  Repairs in the

1    cockpit, good repairs in the cockpit.  Done

2    satisfactorily.  And the hatches were good.  The bow rail,

3    stainless steel, found loose on the bases?

4    A.    That is this.  Rail right here.  It's a handrail,

5    stainless steel.  And all the stanchion bases were loose.

6    Q.    The stanchion bases were loose.  Could they be

7    tightened?

8    A.    They could be tightened.  Before they were tightened,

9    you have to re-bed them again like I said before with a

10   rubber solution.

11   Q.    So you can't just screw them in tighter?

12   A.    No.  They're going to leak if you do that.

13   Q.    What happens if they leak?

14   A.    Water gets into the deck laminant.  That's a problem.

15   Q.    Okay.  You also found apparently high moisture

16   readings in the decks under the windshield?

17   A.    On the starboard windshield, correct.  On the right

18   side, right-hand side.

19        Down in this area on the other side.

20   Q.    And those high moisture readings were indicative of

21   what?

22   A.    Water getting in and around the base of the

23   windshield and around the windshield wipers.

24   Q.    Should that happen?

25   A.    No.

1  Q.   Looks like the interior was all good and clean?

2  A.   Yes, it was good.

3  Q.   It says in the engine, which is the next area you

4  inspected -- how did you get into the engine?

5  A.   By lifting the hatch.

6  Q.   And the engine is located --

7  A.   The engines are located in the aft end of the boat,

8  the back end of the boat.

9  Q.   And they're kind of --

10 A.   Low down, correct.

11 Q.   So when you did that, did you go into the engine

12 compartment yourself?

13 A.   No.  It was impossible to get in there, as a matter

14 of fact.

15 Q.   It was impossible to get in there?

16 A.   Yeah.

17 Q.   Why is that?

18 A.   Because of the configuration of the exhaust system.

19 Q.   How did the exhaust make it impossible to get into

20 the engine compartment?

21 A.   It covered the entire space.  You have to be about

22 2 feet tall to get in there.

23 Q.   Could you inspect --

24 A.   You could look down in there, but you couldn't

25 physically climb in that area.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   If you were able to get into the engine compartment,

2   what would you have inspected by getting in there?

3   A.   Would have inspected the exhaust connections.

4   Q.   Exhaust connections.

5   A.   The shaft stuffing boxes.

6   Q.   Mr. Greaves, if you list them once, I'll repeat them.

7   A.   Stuffing boxes.

8   Q.   Okay.

9   A.   Exhaust connections.

10  Q.   Exhaustion connections.

11  A.   Slut-off valves for the engine intakes.

12  Q.   Shut-off valves for the engine intakes?

13  A.   Rudder ports.

14  Q.   Rudder ports.

15  A.   And strut connections on the inside.

16  Q.   Strut connections.

17       Why is it important to inspect these as part of the

18  survey?

19  A.   Because there's a possibility of only having single

20  hose clamps and they could come apart and you could have a

21  little bit of a problem when you're out in the ocean.

22  Q.   You want to inspect these things?

23  A.   On a regular basis, correct.

24  Q.   So the installation of the engine itself you found to

25  be satisfactory, you found the beds and mounts in good

PDF created with pdfFactory trial version www.pdffactory.com

1   condition?

2   A.    Yes.

3   Q.    The exhaust you found is what type of system?

4   A.    Exhaust?

5   Q.    Yes.

6   A.    Water cooling exhaust.  To a fiberglass muffler.

7   Water lift muffler.

8   Q.    Water lift muffler.

9        You say the exhaust system was upgraded by Sea Ray

10  from the original installation?

11  A.    Correct.

12  Q.    Could you see evidence of the modification?

13  A.    I could see the new exhaust system.  I couldn't tell

14  if it was a modification or not.  I didn't see the

15  existing system.

16  Q.    You never saw the original system?

17  A.    No.

18  Q.    The new exhaust installation prohibits access to the

19  interior transom?

20  A.    In the back end of the boat.

21  Q.    And that's the discussion we just had about you

22  couldn't get in unless you were small?

23  A.    Correct.

24  Q.    You also note that the exhaust hoses to the mufflers

25  are higher than the manifolds in the risers?

1    A.    That is correct.

2    Q.    Is that significant in any way?

3    A.    I've never seen it before.

4    Q.    Okay.

5          The stuffing box was good.  The shift throttles were

6    good.  The port engine was out of alignment?

7    A.    Correct, yes.

8    Q.    The electrical system was good and the battery was

9    still charging, correct?

10   A.    They were, yes.

11   Q.    Fuel system was good, conformed to standards.  And

12   there were fire extinguishers and the ventilation was

13   good?

14   A.    Yes.  Correct.

15   Q.    Did you run the engines during the survey?

16   A.    No, no.

17   Q.    Why not?

18   A.    The engines at that time had a little problem and

19   couldn't be start.

20   Q.    So they were inoperable?

21   A.    Inoperable at that time, yes.

22   Q.    Would you normally do a sea trial or at least start

23   the engines during a survey?

24   A.    Not necessarily, but on a purchase survey we would.

25   Q.    Of these recommendations, some appear to be

PDF created with pdfFactory trial version www.pdffactory.com

1    relatively minor, at least apparently.  Could you at least

2    point out those items which you feel were significant?

3    A.    I would say all of them.

4    Q.    Okay.  Are some more significant than others?

5    A.    I would say the rub rail bases -- we had damage to --

6            THE COURT:  Maybe I could ask the witness, as

7    he's talking about them, use the number.  It would be

8    easier for people to follow.

9    A.    Number one.

10   BY MR. NIKAS:

11   Q.    Number one you thought was serious?

12   A.    Showing some damage.

13   Q.    And the stress cracks?

14   A.    Stress cracks around the lift rings needed attention.

15   Q.    Okay.

16   A.    Number two.

17   Q.    Gelcoat stress cracks?

18   A.    Yeah, both sides above the rub rails needed

19   attention.

20   Q.    That's to prevent the water --

21   A.    Water seepage into the laminant.

22   Q.    Actually, if I'm going to do this, let me do this.

23           So that was number two.

24   A.    Number three, yeah.

25   Q.    Strip bottom paint?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   Yeah.  Bottom paint was in pretty bad condition.  It

2  was flaking and discolored.

3  Q.   Is bottom paint important?

4  A.   Very important.

5  Q.   Why?

6  A.   It keeps particles out of the bottom, for one thing.

7  Q.   That would be something that it was the owner's

8  responsibility to do?

9  A.   Perhaps, yes.

10  Q.   That's something you replace how often?

11  A.   Yearly basis most of the time.

12  Q.   So that wasn't something -- she didn't wear her

13  original bottom paint?

14  A.   No, that wasn't the original bottom paint I don't

15  think.

16  Q.   This is something you have to keep on doing?

17  A.   Uh-huh.

18  Q.   Repair the remote spotlight?

19  A.   It wasn't operating properly at this time, so it

20  needed repair.  It would work intermittently.  It needed

21  replacing and repairing.

22  Q.   Repair the windlass?

23  A.   It wasn't working.

24  Q.   Would the water leaking into the area around the

25  windlass affect its operation?

PDF created with pdfFactory trial version www.pdffactory.com

 1   A.    No.   I think it may have been a solenoid or a part

 2   broken in the windlass.   We didn't take it apart to look

 3   at it.

 4   Q.    The solenoid was potentially bad?

 5   A.    Or some other part in there, maybe electrical part.

 6   Q.    And then number six?

 7   A.    Oh, yeah, exhaust system.   The installation of the

 8   exhaust system didn't look right.   I recommended that a

 9   certified MerCruiser mechanic take a look at it and figure

10   out proper installation and the configuration so the

11   engine spaces could be accessed.

12   Q.    Seven?

13   A.    Seven.   Oh, yeah, bow rail, which is the safety rail

14   forward on the boat.   The bases were loose.   That had to

15   be re-bedded and fastened.

16   Q.    And I guess aligning the port engine is pretty

17   self-explanatory.   What is the item in 11?

18   A.    The bronze fixture on the starboard side was damaged

19   and restricted the water flow from the exhaust pipe on

20   that starboard engine to a certain extent, and that needed

21   to be replaced.

22   Q.    Number 12?

23   A.    Number 12, stiffener between the engine stringers

24   that had been repaired I guess by Sea Ray which I was told

25   about.   And I figured that should have covered the entire

PDF created with pdfFactory trial version www.pdffactory.com

1   space between the engine screws.

2   Q.   A stringer is to provide what?

3   A.   Stringers are stiffeners and they also support the

4   engines.

5   Q.   So it's a --

6   A.   It's a combination.

7   Q.   Like in a dirigible?  Like the Hindenburg, the long

8   things you see underneath it?

9   A.   Ribs.  Longitudinal ribs.

10  Q.   And then the last page of your report has this

11  language.  Is this standard language that you would use?

12  A.   It is.

13  Q.   Does it appear in every survey report?

14  A.   Just about, yes.  Sometimes a little longer for

15  different types of boats.

16  Q.   And says you can only look at the things you can see?

17  A.   Correct, uh-huh.

18  Q.   And you didn't survey the engines?

19  A.   No.

20  Q.   What are auxiliaries?

21  A.   Like a generator.

22  Q.   And no warranty or guarantee is given, and you don't

23  assume any liability?

24  A.   Correct.

25  Q.   And that's your, I guess, stamp?

1   A.    That's a seal from the Accredited Marine Surveyors

2   Association.

3   Q.    That means it's an official survey?

4   A.    Yes.

5              MR. NIKAS:  I have no further questions.

6              THE COURT:  Whenever you're ready, Mr. Rotondo.

7              You can retake the stand if you want, sir.

8

9                         CROSS-EXAMINATION

10  BY MR. ROTONDO:

11  Q.    Good afternoon, Mr. Greaves.

12  A.    Good afternoon.

13  Q.    I've got a few questions for you.  Hopefully it won't

14  take too long.

15  Q.    You largely went through your report with Mr. Nikas,

16  and I will a try not to repeat some of the things he did.

17  I'd like to cover a few things.

18        You said you examined the topsides?

19  A.    Correct, yes.

20  Q.    And topsides, just so we have a frame of reference,

21  can you direct me?

22  A.    From the rub rails to the water line.

23  Q.    Here to here?

24  A.    Correct.

25  Q.    And when you examined the topsides, you found the

1    original gelcoating had not been painted and was found in

2    overall good condition.

3    A.    Overall good condition, correct.

4    Q.    You also observed the decks, that's this area?

5    A.    We did all that, correct.

6    Q.    And the decks were fiberglass core sandwich

7    construction?

8    A.    Correct, sir.

9    Q.    And you found overall condition of the decks to be

10   good as well?

11   A.    Except for the little areas I pointed out on the

12   windlass and the windshield area.

13   Q.    But the overall condition?

14   A.    Overall condition was pretty good, yes.

15   Q.    When you were on the water and on the land, you

16   walked on the cockpit floor; is that correct?

17   A.    Yes.

18   Q.    You didn't notice any flexing of the floor?

19   A.    No.  They had a repair in the floor that was pointed

20   out to me.

21   Q.    You looked at the interior of the boat?

22   A.    Correct, uh-huh.

23   Q.    And you found all of the interior plywood bulkheads

24   and stringers to be properly attached to the hull with no

25   delaminations?

1   A.   Yes.

2   Q.   And that means there were no leaks in the interior

3   that caused damage to the interior of the boat?

4   A.   No, not at this time.

5   Q.   And you looked at the repairs or work that had been

6   done to the interior of the boat?

7   A.   On the interior?  Oh, you mean the engine

8   compartment?

9   Q.   Yes.

10  A.   Yes.

11  Q.   Okay.  And you found all of those repairs to be

12  satisfactory?

13  A.   Adequate, perfect, yes.

14  Q.   You talked about the stiffener, you just mentioned

15  that with Mr. Nikas?

16  A.   Indeed.  Correct.

17  Q.   The lack or absence of that stiffener that you

18  suggested didn't cause any weak spots; isn't that correct?

19  A.   No, no.  The stiffeners are put in there for a

20  reason, just to stop the sound from the hull resonating

21  inside.

22  Q.   And the absence of this extended stiffener that you

23  talked about didn't cause any problems with respect to the

24  performance?

25  A.   No.

1    Q.    Now, when you did your survey in June of 2001, you

2    thought the boat was repairable?

3    A.    Yes, uh-huh.

4    Q.    That's why you made the 12 recommendations?

5    A.    That's right.

6    Q.    If you hadn't thought the boat could be worked on,

7    you wouldn't have said that?

8    A.    Correct, yeah.

9    Q.    Now, you got your information about the history of

10   the boat from Mr. Mains; is that correct?

11   A.    After the survey, correct.

12   Q.    After the survey before you wrote your report?

13   A.    I can't remember.  I didn't get very much history on

14   it at that time.  I knew it had been back to the factory

15   for repairs.  But all the repairs had been carried out.

16   Q.    The only information you got about the boat, the

17   prior use of it, for example, came through Mr. Mains?

18   A.    Correct, uh-huh.

19   Q.    Now, you made reference in your testimony to the port

20   engine being out of alignment; do you recall that?

21   A.    Correct, yes.

22   Q.    You didn't take any pictures of that?

23   A.    No.

24   Q.    And you didn't do any measurements of that?

25   A.    No.

1   Q.   You talked a little bit about some moisture readings

2   that you made.  Do you recall that?

3   A.   Moisture readings on the forward deck and around the

4   windshield wiper on the starboard side, correct.

5   Q.   Did you make moisture readings on the bottom?

6   A.   I did.

7   Q.   And the moisture readings on the bottom proved to be

8   good, didn't they?

9   A.   The bottom was dry, correct, yes.

10  Q.   And you said that you took some moisture readings in

11  the area of the windlass?

12  A.   Correct.

13  Q.   And you didn't write down the moisture readings near

14  the windlass?

15  A.   I use a special meter, the scale is 1 to 10.

16  Readings are around 5 and then you have a lot of moisture.

17  2 and 1, you don't have a problem.  In around 5 it is a

18  problem.

19  Q.   So when you were measuring at the bottom and you had

20  a good reading, you were able to measure it?

21  A.   It was 0 at the bottom, correct.

22  Q.   In fact, wasn't it 2?

23  A.   1 or 2, I guess.  Somewhere.  It was a good reading.

24  Q.   And in your survey you did not find any evidence of

25  core damage as a result of the high moisture that you say

1  you found in the windlass?

2  A.    Not on the hull, but on the deck forward we found

3  some core damage.  Some delaminations there.  But you

4  couldn't tell it was core damage, but there were

5  delaminations in that area.

6  Q.    Excuse me for a second.

7  A.    No problem.

8          MR. ROTONDO:  If we can mark this as defendant's

9  exhibit for identification.

10 BY MR. ROTONDO:

11 Q.    Mr. Greaves, I'd like to go over some things in your

12 deposition.

13 A.    Okay, no problem, yes.

14 Q.    Do you recall having been deposed in this case?

15 A.    Yes.

16 Q.    And did you say at the time of your deposition you

17 didn't find any evidence of any core damage as a result of

18 the high moisture that you recorded?

19 A.    That's right.

20 Q.    That's what you said at that time?

21 A.    Yes.

22 Q.    Didn't you tell us in your deposition that you didn't

23 look for evidence of core damage as a result of high

24 moisture?

25 A.    Unless you do some tests with drilling and so forth,

1    you can't tell.

2    Q.   All right.  And so to look for evidence of core

3    damage, you need to do drilling?

4    A.   Or take something apart and visually look in there,

5    yeah.

6    Q.   And you didn't do that?

7    A.   No, no.

8    Q.   You said that there was some discoloration and

9    flaking in the bottom paint in some parts?

10   A.   Correct, uh-huh.

11          MR. NIKAS:  Objection.  He's trying to impeach

12   the witness for something he didn't say.  He said --

13          THE COURT:  Just tell me you have an objection.

14          MR. NIKAS:  Objection, Your Honor.  The

15   impeachment misstates the testimony.

16          THE COURT:  Overruled.

17   BY MR. ROTONDO:

18   Q.   The discoloration and flaking that you found on the

19   bottom paint, did you conclude that that was caused by

20   poor adhesion?

21   A.   I would say so, yes.

22   Q.   And would you agree the core adhesion was not caused

23   by any repair work that had been done by Sea Ray?

24   A.   Correct.  May have been discolored.  Different

25   paints, you know, with the -- not combining properly.

1    Q.    And the issue with the bottom paint was largely

2    cosmetic; isn't that correct?

3    A.    It was cosmetic, yeah.

4    Q.    And the boat could still run with a poorly-painted

5    bottom?

6    A.    It can, yes.

7    Q.    You talked about the damage to bronze exhaust port?

8    A.    There is a bronze exhaust port on the bottom.  I

9    think it's on the -- what did I say, port side?  That is

10   main exhaust outlet on the bottom.  And that had been

11   damaged, restricts the flow of moisture or water coming

12   through the exhaust system.

13   Q.    You didn't take any pictures of that?

14   A.    No.

15   Q.    You said you obviously didn't run the boat.

16   A.    Beg pardon?

17   Q.    You said before you didn't run the boat?

18   A.    No, no.

19   Q.    You talked about some gouges on the bottom surface?

20   A.    Forward, correct.

21   Q.    Those gouges indicated that there had been some

22   damage at some point in time and the bottom painted over?

23   A.    I think they filled in with poxy and painted over.

24   They were obvious, you could see them, but probably from

25   striking something.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. ROTONDO:  Thank you very much.  I don't have

2    any further questions.

3          THE WITNESS:  Thank you.

4

5                    REDIRECT EXAMINATION

6    BY MR. NIKAS:

7    Q.   Mr. Greaves, I just want to ask one thing so nobody

8    is misled by this.  When you talk about your repair

9    recommendations --

10         THE COURT:  Let me just -- objection's

11   sustained.  You know it's inappropriate, right?

12         MR. NIKAS:  Apologize, Your Honor.

13   BY MR. NIKAS:

14   Q.   Your repair recommendations, when you deemed the

15   vessel repairable, exclude on page 4 of your exhibit the

16   engines which were not surveyed, correct?

17   A.   Yeah, didn't include any engines or mechanical

18   equipment.

19   Q.   So your opinion of repairability goes only to those

20   issues on --

21   A.   On the recommendations, correct.

22   Q.   The fiberglass, the rub rails, the windlass, the

23   outlet, the bottom paint, those issues?

24   A.   That's correct.

25   Q.   They do not include the engines?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   No.

2            MR. NIKAS:  No further questions, Your Honor.

3            MR. ROTONDO:  Nothing further.

4            THE COURT:  Thank you, sir.  You may step down.

5            THE WITNESS:  Thank you, Your Honor.

6            THE COURT:  I believe that's an exhibit for

7   identification the witness has with him.

8            MR. NIKAS:  He's returning it to Mr. Rotondo.

9            THE COURT:  Mr. Nikas?

10            MR. NIKAS:  Our two remaining witnesses,

11   Your Honor, are Mr. Wade, who will be called out of

12   sequence, and the remainder of Mr. Wicander's testimony,

13   which I understand will now take place tomorrow.

14            THE COURT:  Yes.

15            Subject to that, you're resting?

16            MR. NIKAS:  That's correct.  Subject to those

17   two witnesses, we rest.

18            THE COURT:  Do we have defense witnesses

19   available?

20            MR. ROTONDO:  We do have witnesses, Your Honor.

21   We need to go get them and to set up.

22            THE COURT:  Why don't we take a 20-minute break

23   now and then we'll go into our normal end time.

24            MR. ROTONDO:  Thank you.

25            THE COURT:  We'll recess, ladies and gentlemen.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              (Whereupon, a recess followed.)

 2

 3         THE COURT:  Ready for the jury?

 4         MR. ROTONDO:  Yes, Your Honor.

 5         THE COURT:  Bring in the jury.

 6         MR. ROTONDO:  Your Honor, will the Court explain

 7  that we're taking these witnesses out of order and

 8  starting our case because of issues with witnesses?

 9         THE COURT:  I'll try to remember to do that.  I

10  told them that -- I think when Mr. Nikas was there, we

11  explained.

12         MR. ROTONDO:  In the presence of the jury?

13         THE COURT:  That was in the presence of the

14  jury.  He was resting subject to.

15              (Whereupon, the jury entered the

16               courtroom.)

17         THE COURT:  Please be seated everyone.

18         Ladies and gentlemen, you understand plaintiff

19  has not yet rested, but we have some witnesses who are not

20  yet available for the plaintiffs' case so we're going to

21  have some defense witnesses.

22         MR. ROTONDO:  Your Honor, Sea Ray calls Dean

23  Beckman.

24         THE CLERK:  Please raise your right hand.

25
```

```
 1                        DEAN BECKMAN,
 2           called as a witness, having been first duly
 3           sworn, was examined and testified as follows:
 4
 5               THE CLERK:  Please be seated.
 6               Please state your name and spell your last name.
 7               THE WITNESS:  My name is Dean Beckman,
 8   B-e-c-k-m-a-n.
 9               THE CLERK:  City and state of residence?
10               THE WITNESS:  Danbury, Connecticut.
11
12                        DIRECT EXAMINATION
13   BY MR. ROTONDO:
14   Q.   Good afternoon, Mr. Beckman.
15   A.   Good afternoon.
16   Q.   Have you ever testified in court before?
17   A.   No, sir.
18   Q.   If my questions aren't clear to you, please let me
19   know and I'll try to rephrase them, okay?
20   A.   Okay.
21   Q.   All right.  Mr. Beckman, you said you live in
22   Danbury?
23   A.   Yes.
24   Q.   Where are you employed at the present time?
25   A.   I'm self-employed and I work in Shelton, Connecticut,
```

1  and also I have a shop of my own in Danbury, Connecticut.

2  Q.   What kind of work do you do?

3  A.   In the summertime I repair boats.  And in the

4  wintertime I work for a car collector restoring cars.

5  Q.   And for how long have you been self-employed in the

6  fashion you just described?

7  A.   Since April of 2007.

8  Q.   And before that time, where were you employed?

9  A.   I was employed by Surfside 3 in Norwalk, Connecticut,

10  from 1994 until March of 2007.

11  Q.   And what jobs or positions did you hold at

12  Surfside 3?

13  A.   The first few years I was there I was a boat

14  mechanic.  And then as the business grew, I became the

15  service manager and held that position for approximately

16  ten years.

17  Q.   So from about 1997 until 2007?

18  A.   Yes, sir.

19  Q.   All right.  And during the period of time that you

20  worked at Surfside 3, did you have occasion to deal with

21  Peter and Lori Mains?

22  A.   Yes.

23  Q.   And specifically, did you have occasion to deal with

24  them in connection with the 1998 Sundancer, Sea Ray

25  Sundancer that they bought?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes, I did.

2    Q.    I'm going to put a couple of exhibits in front of you

3    that I'm going to put up on the screen.  It might be

4    easier for you to look at these.

5    A.    Sure.

6    Q.    All right.  Showing you what's been marked as

7    Plaintiffs' Exhibit 2, do you recognize this document?

8    A.    Yes, I do.

9    Q.    All right.  Can you tell us what it is?

10   A.    That's an inservice checklist for a boat that we went

11   through -- when a person would buy a new boat and we would

12   have it ready for them in the water, the day they came to

13   pick it up, it would be an orientation checklist.  We

14   would go through all the systems on the boat with the

15   customer and then when we were completed to their

16   satisfaction, then they would sign the bottom.  And we

17   would turn this form in to Sea Ray and that would put

18   their warranty into effect.

19   Q.    There's some handwriting down bottom part of the

20   page; do you see that?

21   A.    Yes.

22   Q.    Lower right-hand corner.  Something about floor flex

23   at helm; do you see that?

24   A.    Yes.

25   Q.    Do you recall there being any discussion with

PDF created with pdfFactory trial version www.pdffactory.com

1    Mr. Mains about floor flex at the helm?

2    A.    Yeah.  That would have been a concern that he would

3    have voiced when he got the boat.  When we prepped a boat,

4    if we -- I wouldn't say missed something, but if a

5    customer had a concern, we always wrote it on this sheet

6    so that it could be addressed at sometime.

7    Q.    With respect to his concern about floor flex, did you

8    check it out?  Did you see what he was talking about?

9    A.    At that time we would have basically just noted it.

10   I mean, we would have observed it and noted it.

11   Q.    All right.  At some later point in time did you walk

12   across the helm?  Did you determine what --

13   A.    Yes, we would have done that, you know.

14   Frequently -- we would look at a boat and assess if there

15   was a fix we need to do or if something's loose.  So,

16   yeah, we would have definitely looked at it.

17   Q.    All right.  Did you determine what the nature of the

18   issue, if any, was with respect to the floor flex?

19   A.    I think at that time the nature of it was the

20   customer felt that when he walked across the floor, it

21   maybe squeaked, made a squeaking noise.

22   Q.    Did you find there to be any problem with the floor

23   flex?

24   A.    No, I think at that point we didn't -- as a dealer,

25   we didn't find that there was anything wrong with the

1    boat.  And we would have made an effort to, you know, find

2    loose screws or maybe missing caulk or something to try to

3    rectify the problem that way.

4    Q.    Engine hatch not aligned; do you see that?

5    A.    Yes, sir.

6    Q.    And do you recall there being any discussion about

7    the engine hatch with Mr. Mains either at the time of the

8    delivery in May of 1998 or at some point later on?

9    A.    I think probably both.  I think at that time the

10   concern would have been that when you closed the engine

11   hatch, it would be tight and it would, you know, it would

12   squeak if you had fiberglass rubbing against fiberglass.

13   Q.    Did you address that at some point in time?

14   A.    Yeah, I think we probably wouldn't have addressed it

15   the day the people were taking delivery of the boat.

16   That's the day they actually would be leaving and going to

17   their dock.  These items that would be on this list like

18   that, we would subsequently make a work order and then

19   visit the boat as soon as possible to try to figure out an

20   acceptable remedy.

21   Q.    If we can now go to Plaintiffs' Exhibit 3.  It's a

22   May 27 -- if you can blow up the bottom half of the

23   letter.

24        See the list of items there, starboard engine only

25   reaches 4200, port engine reaches 4300?

1  A.   Yes.

2  Q.   Did you do anything to investigate those complaints

3  or respond to them?

4  A.   Well, once we got this letter, a letter from a

5  customer, we would -- it was our policy to create a work

6  order and we would address the problems as soon as we

7  possibly could, yes.

8  Q.   What did you do with respect to those two issues

9  about the engines and the rpms?

10  A.   Well, typically, on a new boat, because it is a new

11  boat and a new motor, this would be really a fairly common

12  thing.  Since the motor really takes about 20 hours to

13  break in.  At this point we would really urge the customer

14  to use the boat for approximately that time and then when

15  it was time for a 20-hour service, we'd come up and go

16  over the whole boat at their expense and make adjustments

17  to the motors now that it's been broken in.  So it

18  wouldn't really be practical to try to make any more

19  adjustments at that point because you'd wind up doing it a

20  few hours later.

21  Q.   And did you go out at some point in time and

22  investigate those issues at the time of your 20-hour

23  service?

24  A.   Yeah, typically the way we would do that is we would

25  have a small computer electronic box that we would plug

1    into the motor that would give us a digital readout of the

2    engine rpms.  And then if we found that they were correct,

3    we could actually adjust the tachometers on the boat a bit

4    and make them match.

5    Q.    And do the throttles -- no.  Okay.

6          You said there's a 20-hour service that was typically

7    provided?

8    A.    Well, that was not provided for free.  It was at the

9    customer's expense.  But since it was a new motor, we

10   would instruct everybody when they were picking up their

11   new boat that after running it for 20 hours, it would need

12   to have the timing adjusted, the oil changed, all sorts of

13   fittings on the motor or hose clamps tightened up, you

14   know, idles adjusted, throttles adjusted.

15   Q.    If we can go to page 2.

16         There's a reference here to a scratched manifold and

17   gold lettering remedy; do you see that?

18   A.    Yes.

19   Q.    Do you know what that referred to?

20   A.    I think it was a label that was on top of the air

21   intake on top of the motor.  And I believe that it was a

22   plastic logo or lettering that could be changed.

23   Q.    If we could now go to Plaintiffs' Exhibit 5.

24         There's a reference at the top about raw fiberglass

25   showing in starboard cockpit drain at transom.  Do you see

1    that?

2    A.    Yes.

3    Q.    Did you go out and look into that concern in any way?

4    A.    Yeah, that was something that we would have looked at

5    at the customer's slip where he kept his boat.  We would

6    have made a service call up there to look at that.

7    Q.    Where was that piece of rear fiberglass?

8    A.    I believe that it was underneath the rear seat toward

9    the back of the boat.

10   Q.    What did you have to do to find it?

11   A.    Well, you would have to lay on the floor of the boat

12   and sort of put your head underneath the seat to look for

13   it.

14   Q.    Okay.  All right.

15        If we can go back, there's another entry regarding

16   air-conditioning.  It's at the bottom there.  Did you

17   respond to that concern?

18   A.    Yeah, I guess we did.  And we would have looked at

19   the air conditioner to see if it was working.  However, I

20   believe that I hadn't had a complaint that was -- or

21   normally, you know, people would complain that an air

22   conditioner just didn't work.  It cooled the boat or it

23   did not.  But this was kind of an unusual complaint

24   because the temperature of cooling the boat didn't match

25   what was on the unit on itself or on the gauge.

PDF created with pdfFactory trial version www.pdffactory.com

 1   Q.   All right.  We can now look -- go back.  Bottom

 2   bullet point says water leaks onto tops of both helm seat

 3   backrests.  Do you see that?

 4   A.   Yes.

 5   Q.   Do you recall what, if anything, that related to?

 6   A.   I believe that would have been an item where

 7   something would have been leaking from the fiberglass

 8   arch, wouldn't have been maybe caulked correctly or

 9   enough, and we would have just checked the arch on top of

10   the boat and put new silicone caulk on it, refastened a

11   few items.

12   Q.   The arch is the arch literally at the back of the

13   boat?

14   A.   It's a big arch, covers the whole boat.

15   Q.   Was there any equipment up on that arch?

16   A.   Yeah, there would be radar and some antennas that we,

17   as a dealer, would have to install up there.  Even though

18   it was an item that might have been installed by Sea Ray,

19   we, as part of our dealer prep, would have to remount

20   those items.  That's why, you know, we would have to caulk

21   them.

22   Q.   Okay.  If we can go to the next page.  At the top of

23   the page there's a circle and a bullet, A & B leaks are

24   flooding dash panel and cockpit carpet.  Do you see that?

25   A.   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Did you investigate or look into that complaint or

2    comment?

3    A.    Yes.

4    Q.    What did you learn?

5    A.    I believe that we -- with a complaint like that, we

6    would check the boat for any breaks in caulk after it's

7    been run and bounces around on the waves.  We would

8    re-caulk.  We would make sure that the canvass was fitting

9    properly and would be properly affixed to the boat because

10   quite often the windows are made to be -- not the glass

11   window, but the window above it would be made to take out.

12   Q.    Did you figure out whether the leaks referenced here

13   were caused by being exposed to rainfall or something

14   else?

15   A.    Well, I think -- normally when you go up and

16   re-caulk, after you caulk something, you couldn't really

17   test it with water until the caulk would dry.  And we

18   would caulk lots of boats.  And I think that we would --

19   after it was dry, you would try to simulate rain and see

20   if it would leak again.

21   Q.    And did you do that?

22   A.    Yeah, I believe that we -- actually, I believe we did

23   the whole boat that way.  As long as you would simulate

24   that it was rain and let the water fall on the boat I

25   believe it was fine.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Was there another scenario in which it was not fine?

2    A.    Yeah, I think I remember that, you know -- well,

3    generally, if you spray water directly at a boat through a

4    hose like you're washing the boat or something, the

5    canvass is really not designed to stop water at that

6    point.

7    Q.    If we can go back to -- I believe the first page --

8    I'm sorry, second page.  There's a reference here to the

9    exhaust clamps being sloppily installed; do you see that?

10   A.    Yes.

11   Q.    Did you look into that?

12   A.    Yeah.  We would have looked into that because

13   anything that has to do with exhaust could be potentially

14   dangerous because of carbon monoxide.  Any complaint that

15   we would have about exhaust would be pretty serious.

16   Q.    Did you determine what the nature of complaint was or

17   the concern was with respect to the exhaust clamps?

18   A.    Yeah.  I think that -- well, going by what it says in

19   here, that the customer wasn't happy about the exhaust

20   clamps -- on a boat exhaust everything is doubled-clamped

21   and if the clamps weren't evenly spaced across all the

22   fittings, it was a concern to the customer.

23   Q.    Mr. Mains?

24   A.    Yes, sir.

25   Q.    Go to Plaintiffs' Exhibit 6.

1      This is a letter dated September 1, 1998.  Top bullet

2  point says, Throttle lever positions are poorly matched

3  and to different degrees at various rpm settings.  Do you

4  see that?

5  A.   Yes.

6  Q.   Did you look into that?

7  A.   Yes.  By now it's -- going by this, it's already

8  September.  So the customer would have already used his

9  boat 20 hours, we would have been there to make

10  adjustments.  So we would have looked at those again.

11  Since there are two separate engines and mechanical

12  cables, they're never 100 percent even.  You know, we

13  strive to get them as close as we can, but -- so that

14  would have been an adjustment.

15  Q.   Okay.  The throttle levers are the things that

16  control the power that goes to the engines?

17  A.   Yes, sir.  Just like the gas pedal in the car.

18  Q.   If we can go to the second page, the bottom bullet

19  point.

20      This refers to exhaust resonance; do you see that?

21  A.   Yes.

22  Q.   All right.  And did you talk with Mr. Mains about his

23  concern about exhaust resonance?

24  A.   Yeah, I believe that we did.  I believe that was a

25  fairly -- something that he was very concerned about the

1   noise.  And I think that in order to really check that

2   out, I believe that Mr. Mains and I went for one, possibly

3   two boat rides in his boat, he and I, on the Connecticut

4   River to just see if there was anything wrong.

5   Q.   Did you find anything wrong in terms of exhaust

6   noise?

7   A.   No.  At that point I didn't find anything that I felt

8   was a defect or loose or leaking.  And felt that exhaust

9   system that was on the boat was in good working order.

10  Q.   The second item, the second bullet point, makes

11  reference to something called limber holes, the absence of

12  limber holes.  Do you see that?

13  A.   Yes.

14  Q.   Did this -- first of all, what are limber holes?

15  A.   A limber hole is just a hole in a stringer that would

16  allow trapped water from one bulkhead to get into a lower

17  section where it could be pumped out.  It's basically a

18  drain hole.

19  Q.   Did this boat come with limber holes?

20  A.   Well, it had limber holes elsewhere in the bilge, but

21  in this area it did not.

22  Q.   Okay.  We can go to Plaintiffs' Exhibit 8.

23       The first bullet point is the raw fiberglass, you

24  already talked to us about that, correct?

25  A.   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Then the second one is the cockpit floor, issue about

2    the cockpit floor depressing?

3    A.    Yes.

4    Q.    Did you have any discussion with Mr. Mains about that

5    issue?

6    A.    Yeah, I think it had been a concern and it was one of

7    the concerns he was focused on.  I think ultimately I

8    felt, being the service manager --

9              MR. NIKAS:  Objection, Your Honor.  The witness

10   is offering opinion for which he has not been qualified as

11   an expert.

12             THE COURT:  Want to rephrase the question, I was

13   looking at a document.  Why don't you restate the

14   question.

15   BY MR. ROTONDO:

16   Q.    Did you have any discussions with Mr. Mains about his

17   concern about the cockpit floor depressing?

18   A.    Yes, sir.

19   Q.    And what was the substance of your discussions?

20   A.    Determining whether or not it was a defect.

21   Q.    What did you determine?

22   A.    I felt that it wasn't and --

23             MR. NIKAS:  Objection, Your Honor.  The witness

24   is offering opinion for which he's not been qualified as

25   an expert.

1   BY MR. ROTONDO:

2   Q.   Mr. Mains told you that he thought that the cockpit

3   floor depressed under his weight when he stood on one

4   foot.  Did you walk across that same area yourself and

5   draw any conclusions about what happened when you walked

6   across that area?

7   A.   I guess I just observed -- at that point I would have

8   just observed what he felt was a concern.

9   Q.   And did you see there to be a problem with respect to

10  what you observed?

11  A.   At that point, if I didn't feel in my mind that I had

12  a specific fix for the boat, then I would have -- we would

13  have simply offered this concern to Sea Ray and get their

14  input on it because they're the ones that built the boat.

15  Q.   Okay.  We can now go to Plaintiffs' Exhibit 9.

16       If we can go to the end.  Last page.  I believe it's

17  four pages long.

18       This letter was cc-ed to Mr. Chianese?

19  A.   Yes.

20  Q.   And he was your boss at Surfside 3?

21  A.   Yes.  He was the general manager.

22  Q.   Okay.  And when Mr. Chianese received letters on

23  these types of issues, did he typically forward them on to

24  you?

25  A.   Oh, yes.  That was my job.

1  Q.   So if we can go back one page to page 3.

2       Top of the page -- additional damage caused by repair

3  people.

4       Do you recall the situation where repair people came

5  and there were complaints by Mr. Mains about damage that

6  the repair people had caused, in Mr. Mains's view?

7  A.   Yes, sir.

8  Q.   All right.  What, if anything, did you do to respond

9  to that?

10  A.   Well, with a concern like that, I would have gone to

11  visit the boat, see if the concerns were warranted, and

12  basically try to rectify them.

13  Q.   And the concerns that there was scratches, for

14  example, on black rubber treads, these are pads that

15  people typically step on?

16  A.   Yes.

17  Q.   Stainless steel threshold, that's also essentially a

18  step?

19  A.   That's correct.

20  Q.   Fuel fill labels, are those are things like "Unleaded

21  Fuel Only," that kind of thing?

22  A.   Yes, sir.

23  Q.   Let's go on to -- let's go on to page 4.  There's a

24  complaint here about salon table; do you see that?

25  A.   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   Did you investigate that?

2   A.   Yes, we would.

3   Q.   And what did you do or what did you find?

4   A.   We would just try to tighten up the screws or replace

5   the screws and make it stable.

6   Q.   Now, do you recall a time when some repair people

7   came from Atlantic Boat Company to perform certain repairs

8   to the Mainses' boat?

9   A.   Yes, sir.

10  Q.   All right.  And do you recall Mr. Mains complaining

11  about them not -- people from Atlantic Boat not cleaning

12  up well?

13  A.   Yes.

14  Q.   And what, if anything, did you do about that when you

15  found out about it?

16  A.   Well, ultimately, I would have gone up there and

17  tried to clean up as best we could for them to rectify

18  that situation.

19  Q.   Do you recall Mr. Mains at some point in time

20  complaining about water leaking into the bilge?

21  A.   Yes.

22  Q.   All right.  And did you go up to his boat?  Did you

23  observe what was happening?

24  A.   I observed that with him.  He would have been there

25  and showed me what his concern was.

1  Q.   Can you describe what you saw when you went up there?

2  A.   Yeah.  Small area in the engine compartment that a

3  little bit of water was weeping out of an area, small

4  amount of water.  We would dry it up and a couple minutes

5  later, a small amount of water would appear there.  I

6  don't remember if it was saltwater or fresh water.

7  Q.   Did you have a discussion with Mr. Mains about the

8  volume of water you were looking at or seeing?

9  A.   Yes.  And I felt that it was pretty insignificant,

10 and I didn't feel that the boat was leaking.

11 Q.   If we can now go to Plaintiffs' Exhibit 13.

12      The first bullet item says, Starboard cockpit

13 compartment has severe water leak during rainstorm.

14      And did you do anything to investigate that

15 complaint?

16 A.   Yeah.  In that case, starboard cockpit we would have

17 probably checked the caulking on the side of the boat,

18 checked the canvass fit and that type of thing.  And if it

19 was practical, we would try to hose the boat down and

20 recreate the leak.

21 Q.   Do you recall there came a point in time when

22 Mr. Mains had his boat returned from -- had his boat sent

23 to Knoxville and then returned from Knoxville to

24 Connecticut?

25 A.   Yes.

1    Q.    All right.  And do you recall that Mr. Mains had

2    complaints about the condition of the boat when it came

3    back from Knoxville?

4    A.    Yes, sir.

5    Q.    Why don't we go to Plaintiffs' Exhibit 20.

6          Do you recall there being a complaint of a starboard

7    exhaust bullet?

8    A.    Yes.

9    Q.    All right.  And had you been made aware of Mr. -- by

10   the way, did you go out to the Mainses' boat in response

11   to this?

12   A.    Yes.

13   Q.    All right.  And had you been made aware of a concern

14   that Mr. Mains had regarding the starboard exhaust bullet?

15   A.    Yes.  He had let us know that item was damaged and we

16   had ordered another one quickly to replace it because it

17   had to be replaced before the boat went into the water.

18   Q.    You said it had to be replaced quickly.  Did you get

19   a replacement starboard exhaust bullet before you went to

20   his boat?

21   A.    Yes.  That one shipped to us and I brought it with me

22   prepared to change it.

23   Q.    And when you got to Mr. Mains' boat, did you actually

24   make the change?

25   A.    No.  Because I got there and found that the other one

PDF created with pdfFactory trial version www.pdffactory.com

 1   had just scratched paint on it and it didn't warrant

 2   changing.  At that point I felt it was in our best

 3   interest to not change it.  And so I didn't to it.

 4   Q.   All right.  And did you tell Mr. Mains that you

 5   weren't going to replace the starboard exhaust bullet?

 6   A.   Right.

 7   Q.   Did you tell him why?

 8   A.   Yes.

 9   Q.   What did you tell him?

10   A.   I told him it was just lightly scratched on the paint

11   and that it was a big job to change that and it didn't

12   warrant changing it.  Even though I had the part, I

13   wasn't -- I didn't want to do it.

14   Q.   Now, the starboard exhaust bullet, this is a piece

15   that goes on the bottom of the boat; is that correct?

16   A.   Yes.

17   Q.   Is it a piece when the boat is in the water it's

18   literally underwater?

19   A.   Yes, it is.

20   Q.   So Mr. Mains had found a scratch on the piece of the

21   boat that would normally be under the water and nobody

22   could see it?

23   A.   Right.

24   Q.   And you decided that it didn't need to be replaced?

25   A.   No, it did not.

1  Q.   Okay.  Did you do anything else when you went up to

2  Mr. Mains' boat, see Mr. Mains' boat at that time?  Were

3  there any other complaints or concerns that you addressed

4  or reviewed with him?

5  A.   Well, whenever we went to the boat, I would have

6  looked at every item on his list.  And if there were items

7  there that we could address at that time and rectify, we

8  would do that.  I'd have to read this thing and figure out

9  specifically what we may have done.

10  Q.   Would you read through it for a second.

11  A.   We would have looked at any of the leaks or the

12  portholes that may have been leaking at that point and

13  looked at anything that might cause water damage.  Because

14  that's, you know, a concern.  So any of those items we

15  would have.  I certainly wouldn't have tried to address

16  any fiberglass issues because I wasn't really trained to

17  do that.

18       And we would have -- so if there are small items that

19  we could address at that time, we would do that.

20  Otherwise, I would go through the list and make sure that

21  the -- that I understood what the complaints were at that

22  time.

23  Q.   I'd like to show you something that's been marked as

24  Exhibit 20-23.

25            THE COURT:  Defendants' exhibit?

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. ROTONDO:  Defendant's Exhibit 20-23.

2    BY MR. ROTONDO:

3    Q.   Is that the starboard bullet that you are were

4    talking about?

5    A.   Yes.

6    Q.   Is this the scratches and the paint that you were

7    talking about?

8    A.   Yes.  I would say -- well, actually, that picture

9    looks a little different.  But, yeah, it was a bullet and

10   it would have had one scratch in the paint and that's

11   about it.

12   Q.   This was taken a couple of years later, this was

13   taken in 2003?

14   A.   Right.

15   Q.   Did you see Mr. Mains' boat at any time after May of

16   2001?

17   A.   I'd have to be honest, I'm not a hundred percent sure

18   with that date.  So I couldn't say for sure if that was

19   the last time I saw the boat or not.

20          MR. ROTONDO:  Thank you very much.  I don't have

21   any further questions.

22          THE COURT:  Start whenever you are a ready,

23   Mr. Nikas.

24          MR. NIKAS:  Thank you, Your Honor.

25

```
 1                          CROSS-EXAMINATION

 2     BY MR. NIKAS:

 3     Q.    God morning, sir -- good afternoon.

 4           I believe you stated you were a mechanic for three

 5     years at Surfside 3 and then you were the service manager?

 6     A.    Yes.

 7     Q.    What years were you the service manager?

 8     A.    '97 to 2007.

 9     Q.    So at the time that Lori and Peter Mains purchased

10     this boat, you were the service manager?

11     A.    Yes, sir.

12     Q.    The boat they purchased was new?

13     A.    Yes.

14     Q.    And it was in your inventory at the time of its

15     purchase?

16     A.    I don't remember that.  I don't remember if it was a

17     boat that was in inventory or if it was a special order

18     boat.

19     Q.    One of the first things you discussed with

20     Mr. Rotondo was, I guess, an inspection that you performed

21     wherein you completed Plaintiffs' Exhibit Number 2, which

22     was the inservice checklist.  Is that right?

23     A.    Yes, sir.

24     Q.    Would the inservice checklist be completed when the

25     boat arrived from the factory or only when it had been
```

1   sold and was going to the hands of the consumer?

2   A.   We actually filled this checklist out while the

3   customer was there.

4   Q.   Is that the first inspection that takes place on a

5   boat when it arrives from the factory?

6   A.   No.

7   Q.   So this just happened to be the record of the

8   inspection that was conducted with the owner?

9   A.   That inservice checklist is really a checklist that

10  shows that we went over all these items so our customers

11  understood how to use the boat.

12  Q.   But it looks like many of these items checked appear

13  to go towards the operability of the item rather than the

14  an explanation of how the item works.  If you look at Oil

15  Leaks, it says, None found.  If you look at Alignment, it

16  says, Completed.

17  A.   Right.

18  Q.   If you look at Fresh Water System, it says, No leaks.

19  That wouldn't be explaining to the owner how oil leaks

20  work, right?  That would be checking physically for oil

21  leaks?

22  A.   No.  We go over the whole boat with the customer when

23  we deliver it.  We show them this.  Last thing we do is

24  take them out and run on the water.  That's in the bottom

25  right-hand corner we have performance specifications like

1    top speed attained or maximum rpm.  And because we show

2    them that the boat operates the way it should.

3    Q.   Can you show me where you would have indicated or

4    where you did indicate things like top speed attained and

5    maximum rpm?

6    A.   It would be -- should be in the bottom right-hand

7    corner.  I can't see the writing from here.

8            MR. NIKAS:  Your Honor, may I approach?

9            THE COURT:  You may.

10   A.   Okay, I don't see those numbers here.

11   BY MR. NIKAS:

12   Q.   Did you do that in this case?

13   A.   Well, we did that on every boat.  We are required to

14   do that.

15   Q.   So you took Mr. Mains out on a sea trial?

16   A.   Yes, sir.

17   Q.   I guess you were saying before we talked about this

18   checklist that you completed other inspections of the boat

19   when it arrived at the factory?

20   A.   Well, for the most part when the boat arrives from

21   the factory, we have to put a certain amount of items

22   together.

23   Q.   Right.  You told Mr. Rotondo that you had to, I

24   guess, reinstall some components?

25   A.   We have to put the propellers on.  We have to put the

1    arch on.  Any items that would be mounted on the arch,
2    like radar antenna or GPS antenna, we would have to put
3    all that back on and wire it.  We would have to put all
4    the canvass back on the boat.  It would generally take one
5    man about eight hours to put the boat together when we
6    received it from the factory.
7    Q.    Did it come with propellers and those things, or are
8    those things installed from your inventory?
9    A.    No, the boat came complete.
10   Q.    They're just removed for transportation?
11   A.    Yes.
12   Q.    How does the boat get there?
13   A.    Truck.
14   Q.    In a cradle?
15   A.    Yes.  And it's lifted off of the hoist and then
16   generally we would put the boat on dry land and put it
17   together.  Sometimes we would pick them up in the hoist,
18   put them together, and set them in the water and finish
19   them in the water.
20   Q.    Now, you were the service manager at this time.  So
21   would this reinstallation of these peripheral components
22   have been part of your responsibility?
23   A.    No.  Not at that point.  We would have had -- we had
24   three or four different rigors, mechanics that would do
25   those functions.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.    So these are people that work for you under your

2   supervision?

3   A.    Yes.

4   Q.    And after all these components were installed on

5   board the boat, then at any time did you ever conduct an

6   inspection to make sure that everything was complete and,

7   I guess, correct?

8   A.    After the boat was put together, we would have to --

9   the mechanic would have to drive it, fill it up with fuel,

10  and test run it.  And then when the boat came back before

11  we cleaned it and detailed it for the customer, it was

12  part of my responsibility to go down and go over the boat

13  and check that the boat was in nice condition and that

14  everything would work.  And I would make checks, I would

15  start up the boat at the dock, you know, run all the

16  systems, and just make sure that it was good to go.

17  Q.    Would that be before it was sold, like when it was in

18  inventory?

19  A.    No.  Generally it would be -- my final check would be

20  a day or two before the customer came to pick it up.

21  Q.    When the boats are being shown to customers or

22  customers are looking at the boats, do they take them out

23  and sea trial them?

24  A.    Typically, a customer could only sea trial a boat if

25  he had made -- he'd have to make a deposit on a particular

PDF created with pdfFactory trial version www.pdffactory.com

1  boat or if we had particular model in the water, then he

2  we could take them for a ride, yes.

3  Q.    Now, when you say you are a mechanic and then you're

4  the service manager, that would be for repairs on, I

5  guess, boats that you had either sold or that you service

6  as a maintaining dealer?

7  A.    Yes.

8  Q.    Are the majority of repairs that you performed as a

9  mechanic mechanical?  In other words, do they mostly

10  pertain to machinery installed on board?

11  A.    Most of it.  Most of the work we did was dealer prep

12  and not just the mechanical aspect but all the systems on

13  the boat.

14  Q.    Did you also perform like routine maintenance to or

15  for your customer's vessels?

16  A.    Yes.

17  Q.    So you work for a Sea Ray dealer, correct?

18  A.    That's correct.

19  Q.    Were you a certified Sea Ray technician?

20  A.    Sea Ray, we were a factory-trained technician.  They

21  didn't certify you to do that kind of work.

22  Q.    Okay.  Now, who built the engines that were installed

23  on these Sea Rays?

24  A.    MerCruiser Brunswick Corporation.

25  Q.    And they made all of them; is that correct?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   Well, they -- yeah, I mean, the motor was made by

2   General Motors, but they made it a marine motor.  Yes,

3   they made them all.

4   Q.   The General Motors you're referring to is just the

5   block?

6   A.   That's right.

7   Q.   So every Sea Ray with an inboard gas engine had a

8   MerCruiser engine?

9   A.   At the time I was working there, yes, they did.

10  Q.   So from whenever it was --

11  A.   '94 to 2007, MerCruiser.

12  Q.   Were you also a MerCruiser or Mercury-trained

13  technician or certified technician?

14  A.   I had gone to service school a couple of times when I

15  first started working for Surfside, yes.  But I was not

16  certified.  That's something that takes quite a while to

17  do.

18  Q.   So when you were a mechanic, you weren't certified?

19  A.   No.

20  Q.   And when you were a service manager, you weren't

21  certified?

22  A.   No, but our mechanics were.

23  Q.   When you were supervising -- how big was your Service

24  Department?

25  A.   At that time we had -- well, it varied.  Three to

1  four mechanic rigors, which did both jobs.  We had four

2  boat cleaner laborers and two boat handlers.  So there was

3  ten people.

4  Q.    Pretty big department?

5  A.    Yes.  We sold quite a few boats.

6  Q.    You told Mr. Rotondo that when Mr. Mains sent you his

7  several lists for review by you to either remedy or, I

8  guess, pass up to Sea Ray --

9  A.    Yes.

10 Q.    -- that there were things like throttle position,

11 securing of the exhaust, exhaust resonance, I guess some

12 flexing in the floor, those types of things?

13 A.    Yes.

14 Q.    Mr. Chianese --

15 A.    Yes, Al Chianese.

16 Q.    If the letter was addressed to him as service

17 manager, would it have been immediately then delivered to

18 you?

19 A.    Yes.  He would have retained a copy for his file, and

20 then he would have sent that to me and we would have

21 created a work order and made an appointment with

22 Mr. Mains to go see his boat.

23 Q.    Mr. Chianese wouldn't have physically done any of

24 this work himself?

25 A.    No, not at all.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    In delivering it to you, you were expected or you

2    felt it was your duty to then go down to the boat with the

3    vessel owner, in this case Peter and Lori Mains, to try to

4    go through the list of things and determine whether they

5    could be fixed?

6    A.    Yes.

7    Q.    I think you said -- maybe you can clarify this.  You

8    evaluated the complaint and if you couldn't fix it, you

9    said, then you sent it to Sea Ray; is that right?

10   A.    Yes.  If we didn't -- for an example, the exhaust.

11   If we looked at the exhaust and found everything that we

12   saw on the exhaust to be intact and working, and if the

13   customer still felt there was something wrong, then we

14   would forward that complaint to Sea Ray and ask them if

15   they had any additional instructions or suggestions for

16   fixing it.

17   Q.    To whom would you pass those, I guess, items of

18   concern to?

19   A.    To customer service personnel at Sea Ray.

20   Q.    And do you remember to whom you spoke to at Sea Ray

21   regarding the boat owned by Peter and Lori Mains?

22   A.    I do not.

23   Q.    You didn't have at Surfside 3 one customer service

24   rep that dealt with just your dealership?

25   A.    No.

1    Q.    It was just whomever you got?

2    A.    Well, no.  They had five different plants.  And they

3    sold a lot of boats, so they had quite a number of service

4    representatives.

5    Q.    Did you have to send these concerns that you talked

6    about with Mr. Rotondo to the specific plant that -- that

7    this particular boat came from?

8    A.    Yes.

9    Q.    So on this boat, these concerns would have been sent

10   to where?

11   A.    I believe this boat, they were getting sent to

12   Merritt Island.

13   Q.    Which is in Florida?

14   A.    Florida.  Actually, they made this particular model

15   boat in two different plants.

16   Q.    Which are where?

17   A.    They were making them in Knoxville and in Merritt

18   Island, Florida.

19   Q.    When you're evaluating the list, especially let's

20   talk about the list provided to you by Peter and Lori

21   Mains.  This is Exhibit 3.  There are a number of items on

22   the first page and a few items on the second.  This is

23   Exhibit 4 and then it goes on.  Actually, that one does

24   not.  This is the one I think Mr. Rotondo spent some time

25   with, this is Plaintiffs' Exhibit 5.  And it goes on and

1    then it goes on again about the exhaust and water leaks.

2        When evaluating the complaints, because you said you

3    looked at them all to determine whether they could be

4    fixed or if they were -- did you ever determine for

5    Mr. Mains or for yourself going through this list that

6    something just wasn't a valid criticism?

7    A.   Well, I think -- we would have both.  Whenever I

8    worked on his boat, I would have been addressing all of

9    these complaints in his presence.  He was always there.

10   And so we would have discussed them.  And at some point I

11   would have said, "There's nothing more I can do with this.

12   This is what it is."  And at that point we would decide if

13   we -- if it was acceptable or if we needed to contact

14   Sea Ray and see if they could help us.

15   Q.   Was Mr. Mains always with you when you went through

16   this litany of concerns?

17   A.   I would have to say yes.  He -- normally on our boats

18   if we had work to do on a boat we'd send out one of the

19   mechanics.  And Mr. Mains didn't want one of the

20   mechanics.  He wanted me to come since I was in charge of

21   that department.  And so I always -- we got along well and

22   I always did that.  I took time out of my schedule to go

23   and do that.  So I can't -- the only time I can recall

24   that I ever went to his boat without him was maybe one

25   time to look at it after the subcontractors had left it a

PDF created with pdfFactory trial version www.pdffactory.com

1  mess -- left it messy.

2  Q.   Was it messy?

3  A.   Yes.

4  Q.   That's unusual, then, for you to actually yourself go

5  down and deal with these concerns?

6  A.   Well, it was because we sold 200 boats a year.

7  That's a lot of customers.

8  Q.   So that would be 17 a month or so, give or take?

9  A.   Yeah.  Well, the boat business, you'd have to deliver

10 all 200 in about four months.  So you would be very busy.

11 Q.   Here nothing in the winter and then, I assume, spring

12 and fall stuff happens.  Of all those boats you sold, and

13 I assume that's 200 a year, so over your 15 or so years

14 you've got a lot of customers?

15 A.   Yes, sir.

16 Q.   How many of them did you personally attend to to

17 address any concerns they had?

18 A.   Probably two or three, four per year.

19 Q.   Out of a couple of hundred or so?

20 A.   Yeah.

21 Q.   So was Mr. Mains, I guess, a difficult customer?

22 A.   Well, I wouldn't --

23 Q.   How would you describe him?

24 A.   He was picky I guess you could say and -- but he was

25 a very good guy to work with.  And probably more demanding

1   than most of our customers.

2   Q.   The great majority of them?

3   A.   Yes.

4   Q.   All but two or three?

5   A.   Yes, sir.

6   Q.   Was he pretty knowledgeable?

7   A.   Yes.

8   Q.   Did you find yourself with him during these times or

9   receiving these complaints that he drafted out having to

10  research or determine how to fix some of these things?

11  A.   No.  They were pretty common items.  We didn't -- I

12  don't think there was too many items that we never really

13  completed.  No, I won't say a lot of research went into

14  it, no.

15  Q.   When you were service manager, did you consult

16  whatever technical materials were available to you on a

17  fairly regular basis?

18  A.   Yes.

19  Q.   And by viewing these materials, you were able to

20  perform your job function of supervising both mechanics,

21  the rigors and dealing with customer complaints?

22  A.   Yes.

23  Q.   I assume that -- how do you distinguish in your

24  service facility between hull items, I guess, and then

25  mechanical items?  Do rigors that you talked about work on

```
 1   substantials and rigging and tackle and that type of

 2   stuff, and then mechanics only work on the power plant?

 3   A.    Most of the time in the marine business you would

 4   have a rigger would be the guy that put the boat together.

 5   Then he would also be a trained mechanic and would work on

 6   the engine also.

 7   Q.    So he would do both?

 8   A.    Yes, sir.

 9   Q.    If he was going to be consulting any technical

10   materials on, say, on rigging issue, say how a stanchion

11   was put together or a wind screen was installed, the

12   textbook materials would be published by whom?

13   A.    It would be on the internet, on the web site.

14   Q.    It he was also trained as a mechanic what material

15   would he consult?

16   A.    We had -- well, we had service manuals for the engine

17   in print form, but then we also would have the items

18   either on the internet or on compact disk.

19   Q.    And on the internet or compact disk, what is that

20   called, that system?

21   A.    For MerCruiser it was Midas.  And for Sea Ray it was

22   called Compass.

23   Q.    What's MercNet?

24   A.    MercNet is the -- MercNet is the order and parts.

25   MercNet would be all of our parts manual on line and
```

PDF created with pdfFactory trial version www.pdffactory.com

1    ability to order the parts.

2    Q.   And you can go on line and look at, I guess,

3    literature produced by Mercury?

4    A.   Oh, yeah, we could look at the literature.  All the

5    literature service bulletins, warranty claims on a

6    particular boat.

7    Q.   Just one thing, right?

8    A.   Yes.

9    Q.   So there would be no real distinction, then, between

10   whether a material or a technical manual was issued by

11   Sea Ray or whether it was issued by MerCruiser, was there?

12           MR. ROTONDO:  Objection.

13   BY MR. NIKAS:

14   Q.   Was there any distinction or did you draw any

15   distinction as to whether a particular manual or bulletin

16   had been drafted by Sea Ray or MerCruiser?

17           MR. ROTONDO:  Objection.

18           THE COURT:  Sustained.

19   BY MR. NIKAS:

20   Q.   You consulted both Sea Ray and MerCruiser manuals in

21   your work, correct?

22   A.   Yes.

23   Q.   And if it was hull related, you consulted Sea Ray

24   manuals?

25   A.   Yes.

1   Q.   And if it was engine related, you consulted

2   MerCruiser manuals?

3   A.   Yes.

4   Q.   When you received the concern about exhaust

5   resonance --

6   A.   Yes.

7   Q.   -- you told Mr. Rotondo that you couldn't find

8   anything you thought was defective, loose, or leaking; is

9   that right?

10  A.   That's correct.

11  Q.   How did you perform that evaluation of the exhaust

12  system?

13  A.   By physically climbing in the engine compartment,

14  looking at it, physically tightening hose clamps, and then

15  observing the motor when it was running with Mr. Mains.

16  And then later taking the boat out for a test drive on the

17  river.

18  Q.   You physically got in the engine compartment?

19  A.   Oh, yes, quite often.

20  Q.   And you had the ability to do that?  You had the

21  room, the space?

22  A.   Yeah.  For the most part.  It's never easy.

23  Q.   Not a place for a really big guy, but you could do

24  it?

25  A.   Yeah.

1  Q.   Do you recall what type of exhaust system the boat

2  had on the occasions that you inspected it or you were in

3  the engine compartment?

4  A.   Had the Sea Ray factory-installed exhaust system.

5  Q.   Do you know what type of exhaust that is, how to

6  describe it?  I mean, there are different types of exhaust

7  systems.  Can you describe this one?

8  A.   Yeah.  This boat was equipped with Sea Ray's

9  underwater exhaust.  Had an exhaust pod on it and it had

10 an exhaust port out the side of the boat.

11 Q.   Are you familiar with the term "water lift"?

12 A.   Yes.

13 Q.   Did this have a water lift exhaust?

14 A.   I think originally when he -- let's see.  Yes.  I

15 think originally when he got the boat, it had an exhaust,

16 and then -- it had one exhaust, and then when it went back

17 to the factory and came back, they had tried to address

18 Mr. Mains' concerns about the sound, I think they put a

19 water lift muffler in it.

20 Q.   Okay.  So were you aware that this boat that you had

21 serviced in '98, '99, 2000, 2001 had been sent back to the

22 factory for attempted repairs?

23 A.   Oh, yeah.  I was one of the people that was an

24 advocate to do that.

25 Q.   You were actually involved in that process?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   Well, that's -- I, in working with Mr. Mains and

2   working with Sea Ray, I was more responsible for his first

3   boat going back to the factory.  The second boat I don't

4   know if I suggested that or not.  But I know specifically

5   the first boat I worked with Mr. Mains and told him I was

6   going to be an advocate for doing that.

7   Q.   What happened with the first boat?

8   A.   We sent it back to the factory so they could repair

9   some items on it that we felt we didn't need to address or

10  couldn't address in the field as a dealer.

11  Q.   When you say you served as an advocate, what does

12  that mean?  To advocate what?

13  A.   I told Mr. Mains I felt that that boat should go back

14  to the factory for some cosmetic defects to be repaired.

15  Q.   Were there any other defects other than cosmetic

16  ones?

17  A.   No, I don't believe that either boat had any defects

18  other than cosmetic.

19  Q.   Okay.  So when you were examining the exhaust system

20  to try to address the complaints that Mr. Mains had, did

21  you follow any procedure?

22          MR. ROTONDO:  Objection.

23          THE COURT:  Sustained.

24          You can rephrase the question, if you like.

25

1  BY MR. NIKAS:

2  Q.   How did you inspect the exhaust system?  What steps

3  did you take?

4  A.   Physically looking at the exhaust, checking the fit

5  and the hose clamps and tightening them and looking for --

6  making sure it didn't have any leaks.  And then later

7  taking the boat for a ride with the customer to listen to

8  the resonance, which we didn't find.

9  Q.   What did you understand that term to mean,

10  "resonance"?

11  A.   Resonance?  The noise that the exhaust system made

12  when the boat was being operated.

13  Q.   Okay.  And did you consult -- would you have

14  consulted a Sea Ray manual or a MerCruiser manual if you

15  wanted to look up technical information on the exhaust?

16          MR. ROTONDO:  Objection.

17          THE COURT:  Want to lay a foundation?

18          MR. NIKAS:  Sure.

19  BY MR. NIKAS:

20  Q.   I assume every component on this boat has some

21  literature attached to it, correct?

22  A.   Yes.

23  Q.   Certainly all of the systems have some literature or

24  some manual attached to it, correct?

25  A.   Yes, although they wouldn't give you directions how

PDF created with pdfFactory trial version www.pdffactory.com

1   to inspect an exhaust system.  You would only get that at

2   a point where they had issued a service bulletin.

3   Q.   Did you consult any service bulletins?

4            MR. ROTONDO:  Objection, relevance.

5            THE COURT:  Sustained.

6   BY MR. NIKAS:

7   Q.   Well, you said that there are no procedures for

8   inspecting the exhaust, but if there were, they'd be in

9   service bulletins.  Is that what you said?

10  A.   No, generally they didn't issue a service bulletin

11  unless they were redesigning something.

12           THE COURT:  I think the problem here is we're

13  talking about what did this witness do, not general

14  procedures.  So let's focus on what this witness did.

15           MR. NIKAS:  I asked him specifically did you

16  consult the service.

17           THE COURT:  The question is:  Did he do this

18  kind of work?  When I said lay a foundation, I meant start

19  there.

20  BY MR. NIKAS:

21  Q.   You addressed personally the concerns on this list,

22  correct?

23  A.   Yes.

24  Q.   And you personally conducted the inspection of the

25  exhaust, correct?

1   A.    Yes.

2   Q.    So in doing that inspection either before or at the

3   same time, did you look to see whether there was a

4   procedure for inspecting the exhaust system?

5   A.    I don't recall.  However, I didn't find anything

6   wrong with the exhaust system.  And when we demonstrated

7   the boat -- I think for the most part the complaint about

8   the exhaust and the resonance was actual exhaust venting,

9   getting louder if you were turning the boat one way or the

10  other.  And that was a condition that just happens

11  occasionally depending on how the boat's loaded or how the

12  water is.  And I don't think that the exhaust ever had any

13  problems where a manual needed to be consulted.

14  Q.    You said you looked at the exhaust and it looked

15  right?

16  A.    Yes, sir.

17  Q.    Maybe I mischaracterized that, maybe you said you

18  found nothing wrong.  What was your frame of reference for

19  making that determination?

20  A.    Dozens of dozens of boats that we had in the same

21  model that we had rigged and prepped and driven.  Just a

22  number of boats we had worked on.

23  Q.    You said you checked the connections, correct?

24  A.    Yes, sir.

25  Q.    How did you -- by connections --

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              MR. NIKAS:  Your Honor, may I approach?
 2              THE COURT:  You may.
 3   BY MR. NIKAS:
 4   Q.   You're talking -- what connections were you checking?
 5   A.   Well, this would be the riser on the top of the
 6   motor.  Actually, there would be rubber hoses here.  And
 7   there would be two hose clamps and it would go to
 8   fiberglass parts of the muffler system.  And everywhere
 9   there was a joint, there would be hose clamps.  And that's
10   what we would be checking.
11   Q.   So how the hoses attached to the elbow?
12   A.   Yes.  From here until it went out the bottom or the
13   side of the boat.
14   Q.   Did you just check for tightness?  Is this a band
15   clamp?
16   A.   Yes.
17   Q.   So it's just a circle with some notches that you
18   tighten the screw and that makes it tighter?
19   A.   That's correct.
20   Q.   Did you just check for tightness or did you check to
21   see how the hose was installed on the elbow?
22   A.   Well, that would have -- you would have looked to see
23   how the hose was installed on the whole system.  I know
24   that Mr. Mains, one of the things on his list was the hose
25   clamps weren't even.  So I believe at some point I
```

PDF created with pdfFactory trial version www.pdffactory.com

1  loosened them all up, evened the gaps between the two hose

2  clamps so everything was nice and even, and then

3  retightened all the hose clamps on both motors.

4  Q.   When you did that, how did you position -- to do

5  that, you actually had to kind of move the hose, right?

6  A.   No, we really just moved the hose clamps.

7  Q.   Did you check to see whether the hose was properly

8  seated on the elbow?

9  A.   Yes.  I would have to say we would -- you just push.

10  You can clearly see -- you can clearly see on this piece

11  that the hose would come up to here and stop.  You'd have

12  just enough room here for two hose clamps.  So if the hose

13  wasn't in the right position, you couldn't get both clamps

14  on.

15  Q.   Did you check whether the reference line on the

16  exhaust hoses was parallel to the crankshaft center line?

17  A.   Nos.

18  Q.   Did you check whether the center line of the exhaust

19  hose were at the same plane?

20          MR. ROTONDO:  Objection, relevance.

21          THE COURT:  I'll allow it.  It's within the

22  scope.

23          THE WITNESS:  Could you repeat that question?

24  BY MR. NIKAS:

25  Q.   Did you check to see whether the center line of the

PDF created with pdfFactory trial version www.pdffactory.com

1  exhaust outlet and hose were on the same plane?

2  A.    No, sir.

3  Q.    Did you check to see whether the hose was at a

4  7-degree down angle?

5  A.    I don't remember if we would have done that or not.

6  Q.    Did you consult any MerCruiser literature or manuals

7  regarding how the hose should be attached to the elbow?

8  A.    It's pretty much common knowledge throughout the

9  industry, and we had a gauge that we would put on the

10  exhaust to check the down angles of the exhaust.

11  Q.    Did you check the down angles on this exhaust system?

12  A.    You know, I don't remember that.  The most specific

13  thing I remember about this exhaust system is checking all

14  the hose clamps and making sure they were all even for

15  Mr. Mains.

16  Q.    Whether the clamps were even, not the hoses?

17  A.    That's correct.

18  Q.    Are you familiar with the MerCruiser Inboard

19  Technician Guide?

20  A.    Yes, sir.

21  Q.    And you consult that?

22  A.    We did.  We had them in our offices and used them

23  fairly regularly.

24  Q.    Because that's the manufacturer's what?  What is --

25  what are in the contents of this technician guide?

1  A.   Engine alignments, engine settings, general

2  instructions as to how to put things together that are

3  actually already together when we get the boat.

4  Q.   So they're together when you get the boat.  And if

5  you're going to alter, adjust around remover anything you

6  should go back and consult the manual?

7  A.   Yeah, generally we didn't alter anything on a boat,

8  on a new boat.  It was our job to just make sure that it

9  was up and running and everything was adjusted correctly.

10  But we did not redesign or alter the way Sea Ray built the

11  boat.

12  Q.   I'd like to show the witness an excerpt from the

13  MerCruiser Inboard Technician Guide, which was originally

14  Plaintiffs' Number 157.  And show him the --

15       THE COURT:  Why don't we not have a speech and

16  let's have questions and answers.

17       MR. NIKAS:  I'd like to show him the exhaust

18  connection guidelines.

19       THE COURT:  What exhibits do you want to show

20  him?

21       MR. NIKAS:  Page 531 of that exhibit.

22       THE COURT:  Show him page 531 and we'll take it

23  from there.

24       MR. ROTONDO:  I object on the grounds of

25  relevance, Your Honor.

1            THE COURT:  Sustained.

2    BY MR. NIKAS:

3    Q.   We're talking about the exhaust hoses on the elbows,

4    correct?

5    A.   Well, actually, I thought we were talking about the

6    exhaust resonance and the position of the clamps.

7            THE COURT:  What I'm going to ask you to do,

8    because I'm not sure how you're within the scope of the

9    direct, is as you're teeing up on line of questioning,

10   refer back to something that was asked on direct.

11           MR. NIKAS:  I did.  I said you told Mr. Rotondo

12   that you had checked the exhaust system to try to address

13   Mr. Mains' concerns about exhaust resonance.  And then the

14   witness said, I did.  And then with Mr. Rotondo he talked

15   about looking through and he couldn't find anything.  What

16   he specifically said was, I didn't find anything, I

17   thought, he thought was a defect, loose, or leaking.

18           THE COURT:  You're still within that?

19           MR. NIKAS:  Yes.

20           THE COURT:  We started that line quite a while

21   ago.  You're still within that line?

22           MR. NIKAS:  I'm talking about his inspection.

23           THE COURT:  You're still within that line?

24           MR. NIKAS:  Yes, Your Honor.

25           THE COURT:  That's why I sustained the

Vol. III - Page 533

1   objection, okay?

2              MR. NIKAS:   Because I'm still within the line?

3              THE COURT:   No, because you've more than

4   exhausted the line and you were going well outside the

5   scope with the question you asked.

6              MR. NIKAS:   Okay, Your Honor.

7   BY MR. NIKAS:

8   Q.   Would it surprise you to know that there's specific

9   procedure for tightening the hoses on that exhaust elbow?

10  A.   No.

11             MR. ROTONDO:   Objection.

12             THE COURT:   I'll allow that question and then

13  that's it.

14             MR. NIKAS:   For questions or for just this line?

15             THE COURT:   That line.  That line.  If you're

16  going to start a new line, let me know, please.

17  BY MR. NIKAS:

18  Q.   So no, it would not surprise you?

19  A.   No, sir.

20  Q.   Now, when the boat went back to the factory, was it

21  your understanding that it was going back solely for

22  cosmetic repairs?

23  A.   At that time I think Mr. Mains had really started

24  corresponding with Sea Ray directly and I knew we were

25  going to prep the boat for going back to Sea Ray, and they

PDF created with pdfFactory trial version www.pdffactory.com

1    were taking it back to do some work.  But I'm not aware of

2    what the whole scope of the repairs were going to be, no.

3    I can't recollect.

4    Q.   You prepped the boat for transport back to the

5    factory?

6    A.   Yeah, I believe we would have had to take off the

7    radar and the antennas off the arch and pulled the

8    propellers off the boat.  If we did that.  That was eight

9    years ago and a lot of boats.  I can't remember that

10   specific.  And I can't remember a hundred percent if we

11   did that or not.

12   Q.   Do you know whether you also received the boat when

13   it came back from the factory?

14   A.   No, I believe that boat went directly to his marina,

15   not to us.

16   Q.   How then were you made aware that the exhaust system

17   had been changed?

18   A.   I think that we had been told about that by a Sea Ray

19   representative that would have been corresponding with our

20   manager, Al Chianese, and in an effort to address

21   Mr. Mains' concerns about the resonance or noise that the

22   exhaust system made.

23   Q.   Was that a concern that he voiced to you just once or

24   is that something he discussed with you several times?

25   A.   No, I think we talked about it a couple of times.

PDF created with pdfFactory trial version www.pdffactory.com

1   And I believe we went for a ride, he and I, in his boat in

2   Deep River once or possibly twice to really check it out

3   and see if we could duplicate the concerns or if I felt

4   there was a defect there.  And at that time I told him I

5   felt it was just like every other 33 Sea Ray that we had

6   had.  It sounded the same.  I didn't feel it was a issue.

7   Q.   Had you ever been informed by MerCruiser or seen a

8   service bulletin that discussed exhaust resonance?

9   A.   No, sir.

10  Q.   Do you read all the service bulletins?

11  A.   We would try to read as many as we possibly could,

12  yes.

13  Q.   In a given year, service bulletins are identified

14  with a two-digit number that would indicate the year that

15  it came out?

16  A.   Yes.

17  Q.   And then a dash?

18  A.   And two more digits.

19  Q.   Which is how many have come out?

20  A.   Yes.

21  Q.   For a typical year, how many service bulletins do you

22  receive from the factory?

23          MR. ROTONDO:  Objection, relevance.

24          THE COURT:  Sustained.

25

1    BY MR. NIKAS:

2    Q.    Well, as the service manager, was it your

3    responsibility to disseminate service bulletins?

4    A.    Yes.  Well, when we got them in, we put them in a

5    folder and we had them out in our Service Department so

6    all the mechanics could leaf through them and look at

7    them.

8    Q.    And you did that?

9    A.    Yes, sir.

10   Q.    And you never found a service bulletin that talked

11   about resonance?

12   A.    I can't recall, no.

13   Q.    You said something earlier I wanted to follow up

14   really quickly.  You said you checked the down angle on

15   the exhaust system, you said you had a tool for that?

16   A.    Yes.

17   Q.    What was the name of the tool?

18   A.    It was a magnetic angle finder that you -- I don't

19   know if it had a specific name.  We bought ours at the --

20   I think we got it from MerCruiser.

21   Q.    What was magnetic about it?

22   A.    Had a magnetic base.  I mean, you used it for not

23   just exhaust, but you could use it for a number of things.

24   Q.    Where would you measure on the exhaust system?

25   A.    Off of this -- this item here, you would measure the

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   hose coming off of here and going down with the exhaust.
 2   Q.   The hose is rubber though, right?
 3   A.   Yes.
 4   Q.   You'd have to hold it there?
 5   A.   Yes.
 6   Q.   Do you know when you started to check for that angle,
 7   what year that was?
 8           MR. ROTONDO:  Objection, scope.
 9           THE COURT:  Sustained.
10   BY MR. NIKAS:
11   Q.   Do you know if you did it in 1998 when this boat was
12   sold?
13           MR. ROTONDO:  Objection, relevance.
14           THE COURT:  Can you show me what you're talking
15   about in terms of the scope of the direct?
16           MR. NIKAS:  It's one of the components he
17   discussed with Mr. Rotondo on his checklist.
18           THE COURT:  Okay.  Fine.
19           Do you disagree, Mr. Rotondo?
20           MR. ROTONDO:  I don't remember there being any
21   item of the checklist about angle.
22           MR. NIKAS:  It's larger, engine and engine
23   compartment.
24           THE COURT:  Sustained.
25           MR. NIKAS:  I have no further questions.
```

1              MR. ROTONDO:  I have nothing further,

2    Your Honor.

3              THE COURT:  You may step down, sir.

4              It's 4:17.  Do we have time to make a meaningful

5    start on another witness or not?

6              MR. ROTONDO:  Whatever's Your Honor's pleasure.

7    We could start with Mr. Davis and do qualifications.

8              THE COURT:  Sure, why don't we do the

9    qualifications.

10             THE CLERK:  Please raise your right hand.

11

12                      GREGORY DAVIS,

13        called as a witness, having been first duly

14        sworn, was examined and testified as follows:

15

16             THE CLERK:  Please be seated.

17             Please state your name and spell your last name.

18             THE WITNESS:  Gregory G. Davis, D-a-v-i-s.

19             THE CLERK:  Please state your city or state of

20    residence.

21             THE WITNESS:  Aurora, Illinois.

22

23                   DIRECT EXAMINATION

24    BY MR. ROTONDO:

25    Q.   Good afternoon, Mr. Davis.

1    A.    Good afternoon.

2    Q.    How are you employed, Mr. Davis?

3    A.    I'm a marine surveyor.

4    Q.    And what is a marine surveyor?  What do you do?

5    A.    A definition of marine surveyor is an impartial

6    party, one of good personal integrity who is hired by one

7    party of two usually involved in some type of transaction

8    to accomplish a particular purpose.  Most often what I get

9    hired to do is ascertain the cause of why a boat's or

10   engine's been damaged, and then what the cost of repair

11   will be.  That's generally for insurance companies on

12   damage appraisals.  And then I also do inspections for

13   people that are buying used boats.  Those are condition

14   surveys to determine what shape the boat's in, in general,

15   and then make recommendations on things that I believe

16   need to be corrected.  And then for used boat purchases,

17   there's a value component to that where we'll run a

18   comparative market analysis and render an opinion on what

19   the market value is for the boat.

20   Q.    And for how long have you been employed as a marine

21   surveyor?

22   A.    This is my 35th year.

23   Q.    How did you get into this line of work?

24   A.    Pretty much by accident.  I grew up around boats,

25   worked in a boat yard as a smaller young child.  Fixed

PDF created with pdfFactory trial version www.pdffactory.com

1  boats along with my father, who was a licensed marine

2  engineer, he was a merchant seaman during World War II.  I

3  race sailboats and things like that.

4      When I got older and into college, got interested in

5  girls, went off to college and did my thing there, and

6  when I got back I was working in the insurance adjusting

7  business.  And sitting in the lunch room and the marine

8  guy, the boat expert in the office, was sitting talking

9  about a particular boat inspection that he had done, I

10 made the mistake of voicing my opinion.  And all of a

11 sudden I became the boat expert for that particular

12 office.

13 Q.   So at that point in time -- let me take a step back.

14 What did you get your degree in in college?

15 A.   I have a Bachelor of Arts with a composite history

16 major and a science minor.

17 Q.   And what school did you receive your degree from?

18 A.   College of Santa Fe, Santa Fe, New Mexico, in 1973.

19 Q.   You said at some point in time you were working for

20 an insurance company and you became involved in some

21 discussions about marine work, and did you then begin

22 investigating claims involving boats?

23 A.   Because of putting my two cents in, I ended up

24 getting most of the boat claims that came into the office.

25 I liked them.  I enjoyed it much more than what they hired

PDF created with pdfFactory trial version www.pdffactory.com

1  me for.  And I left that company after about a year and

2  went to work for a British company that specialized just

3  in marine.  And worked for them until November of 1972

4  where they laid me off at the end of November.  And I had

5  actually met an attorney in the course of my work and he

6  became something of a mentor for me.  And he advised me to

7  set up a business on my own, which I did January 1st of

8  1977.  I've been in business now 34 years.

9  Q.    What's the name of your company?

10 A.    It's Davis & Company.

11 Q.    I take it you're the Davis, you started it?

12 A.    I'm the Davis.

13 Q.    And how many professionals work there now?

14 A.    Between the survey company, which is the larger part

15 of us, and then we have the Davis Consulting Group, which

16 is engineers, primarily, we have about 86 people total

17 that work for us.  We're the largest of our type of

18 company in North America.

19 Q.    And what types of boats does your company survey?

20 A.    The bulk of what we look at is recreational boats,

21 similar to the one in question here today.  All the way

22 down to very small boat, 16-foot, to boats that are 65 to

23 120 feet.  We also work in commercial vessels through the

24 engineering side on boats that are much larger.  We do

25 ferry boat inspections, dinner cruise boat inspections.

PDF created with pdfFactory trial version www.pdffactory.com

1  We've inspected the ferry boats that go out to Block

2  Island for an insurance carrier, as an example.  But the

3  bulk of what we do is recreational boats.

4  Q.   You said you've been doing this work for 35 years.

5  How many boats have you surveyed?

6  A.   I couldn't give you an exact figure.  Last year the

7  company, it's around September 1st we got to 50,000 on

8  inspections that we had completed, different boats that

9  we'd looked at.  Since we went to computer records and

10  computer records went into place at about 1989, and right

11  now we're at about 54,000.  So we've gone that much

12  further over that.

13      I'm not directly involved in -- I'm not out in the

14  field as much on inspections as I used to be, but I look

15  at, on average, 100 to 130 boat surveys a the year.  Over

16  my career I had to have done somewhere between ten and

17  20,000.

18  Q.   And the bulk of these have been pleasure boats?

19  A.   The bulk is pleasure boats, yes.  80 percent of the

20  inspections are pleasure boats.

21  Q.   And have you surveyed -- is that the right word,

22  "surveyed"?  Have you surveyed boats made by a number of

23  different manufacturers?

24  A.   Yes.

25  Q.   And who are some of the major manufacturers of

1  pleasure boats in North America?

2  A.   Well, Sea Ray would be one.  We see quite a few of

3  theirs because they're the number one selling recreational

4  boat manufacturer in the country and have been for at

5  least ten years, possibly more than that.  I'm going based

6  upon recollection.  So we've looked at quite a few of

7  their boats just because there's a lot of them out there.

8  We've looked at Bayliner, we've looked at Wall Craft.

9  Regal, Crownline, Classic, Reinell -- more so many years

10  ago.  They were a large manufacturer then, they're back in

11  business now.  That's an example of some that I can think

12  of off the top of my head.

13  Q.   And I think you said when you do a survey, you can do

14  a survey in a couple of different situations, one is where

15  someone either wants to buy or sell a boat and you may be

16  hired by the buyer or seller?

17  A.   Yes, hired by either.  In a practical instance we are

18  hired most of the time, 99 percent of the time, by the

19  buyer of the used boat.

20  Q.   And when you're hired by a buyer of a used boat, what

21  is it you're looking to determine?

22  A.   The point that we get involved in being hired, this

23  buyer has decided they want to purchase this particular

24  boat.  And they've signed a contract.  They've put a

25  deposit down and the contract says subject to survey.  The

PDF created with pdfFactory trial version www.pdffactory.com

1    analogy that I would use for you is similar to a home

2    inspection.  If you were buying a house, you would have a

3    home inspection.  That's the condition part of the survey.

4    And then the bank, your lender, probably wants an

5    appraisal.  They want to know what the market value is.

6    That's the value side of this particular type of survey

7    inspection.  That's the services we're providing for that

8    particular buyer.

9        If the survey comes in and there's a lot of things,

10   recommendations, things that we found that need to be

11   corrected, the deal may terminate just like in a house

12   purchase.  If the value comes in at substantially lower,

13   they may renegotiate the price under the contract.  If it

14   comes in higher, then I'm going to assume the buyer of the

15   boat is kind of happy because you qualify for a higher

16   loan but also getting a really good deal.

17   Q.    And when you make these surveys in a situation where

18   you are hired by the prospective buyer, do you

19   recommend -- do you identify the condition of the boat?

20   A.    Yes.

21   Q.    All right.  And do you also recommend things that

22   need to be fixed?

23   A.    Yes.  We make recommendations on what needs to be

24   repaired.

25   Q.    And does that apply to the hull and to the engines

1    and all the systems on the boat?

2    A.    In a condition and value survey, generally we are not

3    completing an engine survey.  So we are oftentimes looking

4    at the boat out of the water only.  It's not in the water.

5    So the engines and the equipment can't be operated.  So

6    we're doing a visual inspection on the boat to tell the

7    buyer what potential problems exist.  The buyer doesn't

8    own the boat either, so there's limitations on how far we

9    can go on the testing that we're doing.  Generally we are

10   not doing any mechanical testing at all unless the boat's

11   afloat.  If it is, then we will take the boat out for a

12   sea trial, assuming the buyer has asked for that service

13   to be done as part of the engagement.

14   Q.    In that situation you would do that kind of

15   evaluation?

16   A.    Yes.

17            THE COURT:  And we're at a good spot.

18            MR. ROTONDO:  We can stop right here,

19   Your Honor.  I can pick it up right here tomorrow morning.

20            THE COURT:  Okay.  The witness may step down.

21            Ladies and gentlemen, before you leave, I do

22   want to remind you that you've only heard some of the

23   evidence and you have to hear all the evidence, the

24   arguments of counsel, and my instructions to you on the

25   law before you come to any conclusions.

1            And I remind you not to have any discussions

2    about the case amongst yourselves or with anyone else, not

3    to have any contact with the parties, attorneys, or

4    witnesses, and not to be exposed to anything in the media

5    concerning this case or any similar matter.

6            Thank you very much for your hard work today.

7    We'll see you tomorrow morning at 9 o'clock.

8                (Whereupon the jury left the courtroom.)

9            THE COURT:  We'll take a 20-minute recess.  I

10   want you all to come back and be prepared -- maybe you can

11   talk with my law clerk.  We'll end the transcript here.

12   I'll tell the law clerk what I want you all to discuss.

13                (Proceedings adjourned at 4:30 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

Vol. III – Page 547

1

2

3                          C E R T I F I C A T E

4

5

6

7              I, Diana Huntington, RDR, CRR, Official Court

8    Reporter for the United States District Court for the

9    District of Connecticut, do hereby certify that the

10   foregoing pages are a true and accurate transcription of

11   my shorthand notes taken in the aforementioned matter to

12   the best of my skill and ability.

13

14

15

16

                /s/_____
17
                  DIANA HUNTINGTON, RDR, CRR
18                   Official Court Reporter
                  450 Main Street, Room #225
19                Hartford, Connecticut 06103
                       (860) 547-0580
20

21

22

23

24

25

Vol. IV – Page 548

1                    UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF CONNECTICUT

3

4    - - - - - - - - - - - - - - - x
                                   :
5    PETER D. MAINS and LORI M. MAINS:   No. 3:01CV2402(AWT)
                                   :
6                        Plaintiffs,   :
                                   :
7              vs                  :
                                   :
8    SEA RAY BOATS, INC.           :
                                   :   HARTFORD, CONNECTICUT
9                        Defendant.   :   APRIL 4, 2008
                                   :
10   - - - - - - - - - - - - - - - x

11

12

13                        **JURY TRIAL**

14                        **VOLUME IV**

15

16       BEFORE:

17

18                   HON. ALVIN W. THOMPSON, U.S.D.J.

19                        and a Jury of Nine

20

21

22

23                              Diana Huntington, RDR-CRR
                                Official Court Reporter
24

25

```
 1   APPEARANCES:

 2       FOR THE PLAINTIFFS:

 3               JOHN L. SENNING, ESQ.
                     16 Saybrook Road
 4                   Essex, Connecticut 06426

 5               HERRICK NIKAS, LLP-CA
                     1201 Dove Street, Suite 560
 6                   Newport Beach, California 92660
                 BY:  RACHEL D. LEV, ESQ.
 7                    RICHARD J. NIKAS, ESQ.

 8       FOR THE DEFENDANT:

 9               DAY PITNEY, LLP
                     CityPlace I
10                   Hartford, Connecticut 06103-3499
                 BY:  JAMES H. ROTONDO, ESQ.
11                    DANIEL J. FOSTER, ESQ.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                           TABLE OF CONTENTS

2

3    PLAINTIFFS'
     WITNESS            DIRECT     CROSS    REDIRECT    RECROSS
4
     THOMAS WICANDER       --        --
5        (Resumed)                              557        578

6    DAVID WADE           661       708        719         --

7


8    DEFENDANT'S
     WITNESS            DIRECT     CROSS    REDIRECT    RECROSS
9
     GREGORY DAVIS
10       (Resumed)        587       614         --         --

11   GREGORY WILSON       721       730         --         --

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com

1                          **9:06 A.M.**

2            THE COURT:  A couple of things I'm going to

3    squeeze in before we bring the jury in and pick up with

4    our redirect examination.

5            Just so you all know, based on discussions, I'm

6    planning that we'll have closing arguments on Monday and

7    I'm hoping to get the charge in.  If I don't finish it on

8    Monday, I'll finish it on Tuesday morning.  For a case

9    like this, typically closings are about an hour for each

10   side.  I will try to remember before we leave today to

11   give you some -- I have some procedures for closing.  I

12   will try to give you those before you go today so that

13   over the weekend you have time to fine tune your thinking

14   about how you do that.

15           I have some questions concerning what I read in

16   the jury charge.  I'm going to do that -- I'll fit that --

17   I can do it more efficiently if I wait until after lunch

18   because I didn't have time to organize my notes on that.

19           As to the matter we discussed last night at some

20   length -- I seem to be missing one folder.  Let me see if

21   I can find it on my desk.  Sorry.

22           I did get defense counsel's letter and I've gone

23   back and looked at the documents.

24           Defense counsel cites to the Paolitto case,

25   151 F.3d 60, which happens to also cite to Rosa, which was

1   pointed out by plaintiffs' counsel last night, and it says

2   that -- let me see.  Rosa had more complete language on

3   that point.

4           Rosa said the rule of opening the door or

5   curative admissibility -- we're talking about

6   admissibility there -- gives the trial court discretion to

7   permit a party to introduce otherwise inadmissible

8   evidence on issue:  A, when the opposing party has

9   introduced inadmissible evidence on the same issue; and B,

10  when it is needed to rebut a false impression that may

11  have resulted from the opposing party's evidence.

12          The defense did not admit inadmissible evidence

13  yesterday during the cross, so the first prong for

14  application of the curative admissibility standard is not

15  met.

16          Also I have serious questions as to whether the

17  second prong is satisfied based on going back and looking

18  at these documents to the extent I've been able to

19  determine what they say.  There's some I can't find model

20  numbers, but I do see the years.  They are very clearly

21  spelled out.

22          So this is what I'm going to do.

23  Plaintiffs' 33, the pickling area, plaintiffs' counsel

24  will be allowed to inquire, but I don't think we've had

25  the door opened for admissibility.

PDF created with pdfFactory trial version www.pdffactory.com

1          On the compression test issue where defense

2    counsel used Defendant's 95, if plaintiffs' counsel wants

3    to inquire into that area, I ordinarily let counsel

4    inquire.  It seems to me, though, from what I've looked at

5    in terms of the years of the documents, I haven't been

6    able to find engine models.  But I'm going to just leave

7    that to counsel to put in front of the jury.  The years

8    and engine models, if plaintiffs' counsel wants to go into

9    it, they can, and then defense counsel can go into it

10   also.  Now, that's 74, 112, and 113.

11          150, I'm not allowing inquiry on because it's

12   incomplete.  I think it jumps from page 1 to page 10.

13          And then when we get to the flushing

14   instructions, I believe I said there was nothing that was

15   presented in terms of opening the door there.

16          And with respect to the location of the

17   discharge hose and the exhaust elbow, the conditions for

18   admitting Plaintiffs' 38 have not been satisfied under the

19   curative admissibility doctrine.

20          I will allow plaintiffs' counsel to inquire as

21   to Plaintiffs' 28, but only with respect to the points

22   that were addressed on cross-examination, not with respect

23   to this -- the point that's mentioned in the last

24   paragraph of defense counsel's letter.

25          And then Plaintiffs' 47, plaintiffs' counsel can

1    inquire.

2           Plaintiffs' 49, plaintiffs' counsel cannot

3    inquire.  I haven't received any showing that it's not

4    barred by a protective order.

5           Plaintiffs' 60, plaintiffs' counsel can inquire.

6           So that's where we are.

7           MR. NIKAS:  Your Honor, if I may?

8           THE COURT:  Yes.

9           MR. NIKAS:  I'd like to state for the record

10   that yesterday afternoon we requested the opportunity to

11   provide a more detailed analysis of our arguments.

12   Following court we were informed that the Court would not

13   permit such analysis.

14           We received this morning an ex parte

15   communication in the form of a letter from defense counsel

16   to the Court.  This is not filed on PACER, it was not

17   filed as a pleading, but rather to perform a

18   correspondence.  Within such letter was contained

19   testimony regarding the contents of certain documents and

20   representations as to their appropriate use therein.

21           Plaintiff objects to the Court's consideration

22   of this ex parte communication.

23           Plaintiff further objects to the Court's

24   determination that Exhibit 38 is barred by the doctrine of

25   collateral -- excuse me.

1          THE COURT:  Curative.

2          MR. NIKAS:  -- curative admissibility.

3          THE COURT:  I didn't say it was barred.  I said

4    it was not permitted to be admitted pursuant to the

5    doctrine.

6          MR. NIKAS:  It should be permitted due to the

7    doctrine of waiver since defense counsel actually showed

8    the witness the exhibit in the presence of the jury for

9    the purpose of impeaching his prior testimony.

10          Furthermore, given that defense counsel has been

11    able to testify as to the contents as to the admissibility

12    of certain documents, any document marked "subject to

13    protective order," more than enough testimony has been

14    received from the various witnesses that all these

15    documents are available to anybody on the internet with

16    access to MercNet, and whatever copies that were provided

17    were done so in the interest of convenience because extra

18    copies were available.  If the Court so wishes, we can

19    provide them copies obtained from other sources that do

20    not have any indication as to their use in prior cases.

21          THE COURT:  Are you representing that

22    Plaintiffs' 49 is not subject to a protective order?

23          MR. NIKAS:  It's not, Your Honor, because if we

24    obtained it from separate sources --

25          THE COURT:  In that case, you can inquire as to

PDF created with pdfFactory trial version www.pdffactory.com

1    Plaintiffs' 49.  My understanding was that you were asked

2    about the issue of protective order, had not responded to

3    it.

4              Let me just say one thing or two things.

5              I think plaintiffs' counsel was allowed to give

6    an explanation for their position.  We got the transcript,

7    we were here in court for I don't know how long, but we

8    had quite an extensive discussion.  Plaintiffs' counsel

9    made several arguments where they persuaded me to head in

10   a direction that would have allowed the admissibility of

11   some of these documents.  And they told me that the use of

12   those documents was necessary to correct the misleading

13   impression that had been created by the defense.  And for

14   that reason, I indicated I was giving more latitude, but

15   defense counsel didn't have copies of the documents, so I

16   said defense counsel can look at the documents and if

17   defense counsel disagreed with where I was going, submit

18   something to me.  And the letter was faxed in, and I

19   specifically said, "Fax it in, do not e-mail it."  We had

20   that conversation.

21             In addition, it was not ex parte because it was

22   copied to opposing counsel.

23             Let's bring the jury in.

24             We'll have our witness retake the stand.  And

25   we'll finish up with his redirect.

Vol. IV - Page 557

1                    (Whereupon, the jury entered the

2                    courtroom.)

3           THE COURT:  Please be seated everyone.

4       I just need one second to get to my notes.

5                    (Pause.)

6           THE COURT:  Mr. Nikas, whenever you're ready.

7

8                    THOMAS WICANDER,

9       called as a witness, having been previously duly

10      sworn, was examined and testified further as follows:

11

12                REDIRECT EXAMINATION (Resumed)

13  BY MR. NIKAS:

14  Q.   Good morning, Mr. Wicander.

15  A.   Good morning.

16  Q.   Before your testimony was interrupted yesterday, I

17  believe we were talking about your procedures that you

18  used when pickling the engine; is that correct?

19  A.   I believe so, yeah.

20  Q.   Mr. Rotondo went into great detail about the issue of

21  sparkplugs and whether new sparkplugs were purchased on

22  the 11th or the 13th or some time period in between; do

23  you remember that?

24  A.   Yes, I do.

25  Q.   Do you know why the MerCruiser procedures state that

1   plugs should be changed when an engine has suffered water

2   ingestion from hydrolocking?

3   A.   I assume they want to make sure there's a dry set of

4   plugs in the engine.

5   Q.   Is that to allow the engine to start?

6   A.   Yes, to allow it to run properly.

7   Q.   In this case were you able to start the engines

8   without having to put in new plugs?

9   A.   Yes, we were.

10  Q.   Mr. Rotondo showed you an exhibit yesterday which was

11  Defendant's 109.  And I believe he described this as a

12  ledger -- that may be your term for it.

13       On the 31st of July, what test did you perform on the

14  vessel?

15  A.   I don't recall if it was the 31st, that's when that

16  was billed.  We performed a water ingestion checklist.

17  Q.   What else?

18  A.   We had -- actually in order to do that, we had

19  launched the boat and had done a monometer test.

20  Q.   A what?

21  A.   Monometer.  Establishes water line inside the bilge

22  of the boat.

23  Q.   Why is that important?

24  A.   That's what we based all our measurements of the

25  exhaust system on.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   When you measure the exhaust system and the relative

2   heights contained therein, you did that with the boat in

3   the water?

4   A.   Yes, we did.

5   Q.   That's the appropriate procedure per MerCruiser?

6   A.   Absolutely.

7           MR. NIKAS:   Your Honor, I'd like to approach the

8   witness.

9           THE COURT:   You may.

10  BY MR. NIKAS:

11  Q.   Did Mr. Rotondo show you this diagram yesterday?

12  A.   Yes, he did.

13  Q.   And did he ask you -- his question was:   Have you

14  ever seen a Mercury publication showing a discharge hose

15  above the height of an exhaust elbow?

16      And you replied, No.

17      And then he showed you this exhibit to refresh your

18  recollection.   And you answered, Kind of hard to tell in

19  this picture, to be honest.

20      Where is the exhaust elbow on the picture?

21      It's not very clear.   It does show that in this

22  manual.

23      Mr. Rotondo followed up with, So that manual does

24  show exhaust elbow height which is lower than a discharge

25  hose; is that correct?

PDF created with pdfFactory trial version www.pdffactory.com

1          And you said, It does show that.

2          Do you remember that?

3     A.   Yes, I do.

4     Q.   On the same sheet of paper where this sketch is, what

5     does that point right there say?

6     A.   The exhaust hoses and pipes must not be higher than

7     the exhaust elbows at any point.

8     Q.   Is that consistent with what you believed?

9     A.   Yes, it is.

10    Q.   So now that we've answered that question, when you

11    measured the exhaust system, what was your purpose in

12    doing that?

13    A.   To establish, to make sure that the proper exhaust

14    elbow heights were on this boat.

15    Q.   And why would that have been important in a water

16    ingestion case?

17    A.   Well, if the exhaust elbow height is below the

18    minimum, water can be easily ingested.

19              MR. NIKAS:  Your Honor, I just want to confirm

20    that 47 is acceptable?

21              THE COURT:  As to inquiry?

22              MR. NIKAS:  As to inquiry.

23              THE COURT:  Yes.  Plaintiffs' 47, so the record

24    is clear.

25              MR. NIKAS:  Sorry, Plaintiffs' 47.

1    BY MR. NIKAS:

2    Q.    Mr. Wicander, have you seen the installation manual

3    published by MerCruiser for the 7.4-liter engine?

4    A.    Yes, I have.

5    Q.    Just so we're clear, what's the distinction between a

6    7.4-liter Blue Water engine and a 7.4-liter Horizon

7    engine?

8    A.    What's the distinction?  Horsepower and warranty

9    packages that are permitted with it.

10   Q.    Is the block the same?

11   A.    Yes, they are.

12   Q.    Engines are the same, dimensions are the same?

13   A.    Yes, they are.

14   Q.    Exhaust systems the same?

15   A.    Yes.

16   Q.    In fact, does MerCruiser actually make this block?

17   A.    No, it's made by General Motors.

18   Q.    And this is the classic General Motors long block?

19   A.    454 block, yes.

20   Q.    And when you talk about 8.1-liter engines and other

21   derivatives thereof, is it the same block?

22   A.    Yes, it is.

23   Q.    And they obtained different capacities how?

24   A.    Through cylinder heads and fuel injection, that sort

25   of thing.

1   Q.   They could increase the stroke, I guess?

2   A.   Yes.

3   Q.   Increase the bore?

4   A.   Absolutely, yes.

5   Q.   Dimensions never change, do they?

6   A.   External no, definitely not.

7   Q.   When looking at that installation manual, can you

8   recall what it says about the importance of the exhaust

9   system to the issue of water ingestion?

10            MR. ROTONDO:  Objection.

11            THE COURT:  I'll allow the question.

12            THE WITNESS:  Can you repeat that?

13  BY MR. NIKAS:

14  Q.   Sure.

15       In reviewing the installation manual for the

16  7.4-liter engine, can you recall what MerCruiser states or

17  what the manual states is the importance of the exhaust

18  system to the issue of water intrusion?

19  A.   Yes.  That the exhaust system must be properly

20  installed to their specifications to not allow water

21  ingestion.

22  Q.   What do they say happens if it's not properly

23  installed?

24            MR. ROTONDO:  Objection.

25            THE COURT:  Sustained.

1    BY MR. NIKAS:

2    Q.   Well, when you did this exhaust system measurement on

3    the boat, you did it for a reason, correct?

4    A.   Yes.

5    Q.   And you stated the reason was because it was

6    important to the issue of water ingestion if we an engine

7    that ingests water, correct?

8    A.   Yes.

9    Q.   So obviously it's important to know why it's

10   important.  Correct, Mr. Wicander?

11          THE COURT:  The question is scope and the

12   objection's sustained.

13   BY MR. NIKAS:

14   Q.   Do you recall what that installation manual says

15   should be the relationship between the exhaust outlet and

16   the exhaust elbow?

17   A.   Yes.  No part of the exhaust system should ever be

18   higher than the exhaust elbow.

19   Q.   The reason for that is what?

20   A.   To prevent --

21          MR. ROTONDO:  Objection.

22          THE COURT:  Sustained.

23          MR. NIKAS:  Mr. Rotondo yesterday --

24          THE COURT:  Sustained.  We had a long discussion

25   about this.  I made it clear what the scope was.

1          MR. NIKAS:  Forty-nine?

2          THE COURT:  Subject to the same limitations.

3          MR. NIKAS:  Actually, Your Honor, does defense

4   counsel have any objection to showing this?

5          MR. ROTONDO:  I don't think -- I do object.  I

6   don't think it's within the scope.  And the other

7   objections that were stated.

8          MR. NIKAS:  Your Honor, can I show the witness

9   this sheet of paper?

10          THE COURT:  Show the witness, certainly.

11   BY MR. NIKAS:

12   Q.   Mr. Wicander, what's on that paper?

13   A.   Diagram of a collector exhaust system.

14   Q.   Can you at least describe verbally what is depicted

15   in that diagram?

16          MR. ROTONDO:  Objection.  It is beyond the

17   scope, the purpose of the document.

18          THE COURT:  It is.  Sustained.

19          You can refine your question, perhaps.

20   BY MR. NIKAS:

21   Q.   Well, I'd like to show you, then, another page of

22   that exhibit.  And can you tell me what's in this diagram?

23   A.   Lift style exhaust system.

24   Q.   And a lift style exhaust is the kind of exhaust that

25   was on board the boat at the time that it had the water

1    ingestion, correct?

2    A.   Yes, that's correct.

3    Q.   And is that diagram consistent, looking at it with

4    your understanding that the hose angle should all be

5    downhill or down?

6    A.   It should be, yes.

7    Q.   And there's nothing in that diagram published by

8    Sea Ray which contradicts that understanding?

9                MR. ROTONDO:  Objection.

10                THE COURT:  I haven't seen the diagram.  So I am

11    at a bit of a loss.  What exhibit are we in?

12                MR. NIKAS:  We are in 49.

13                THE COURT:  What's your objection, Mr. Rotondo?

14                MR. ROTONDO:  The scope related to the elbow

15    height, not to down angles.  That's what the question is

16    about.

17                THE COURT:  Why don't you make it height just so

18    I'm sure we're in the right ballpark there.

19                MR. NIKAS:  Your Honor, if I may, we

20    specifically made it clear yesterday that the issue was

21    not elbow height, it was the exhaust system measurements,

22    not just the height of the elbow.  Mr. Rotondo

23    specifically asked about the relationship between the

24    outlet and the elbow.  That implies an angle.

25                THE COURT:  I'll allow that question.

1  BY MR. NIKAS:

2  Q.    If I can recall that question, is there anything in

3  that document published by Sea Ray which diagrams the

4  water lift system which contradicts your testimony that

5  the angles should be flowing downhill out the boat?

6  A.    No.

7           MR. NIKAS:  Your Honor, may I take a brief

8  moment?

9           THE COURT:  Yes.

10              (Pause.)

11          MR. NIKAS:  Your Honor, I wanted to confirm on

12  scope.

13  BY MR. NIKAS:

14  Q.    Mr. Rotondo talked yesterday about the necessity of

15  speed, that the MerCruiser checklist for water intrusion

16  response or pickling, it is emphatic that speed is of the

17  essence; do you remember that?

18  A.    Yes.

19  Q.    On Monday the 11th when you started the engine, I

20  believe you testified that you expelled the water,

21  correct?

22  A.    Yes.

23  Q.    And then you ran the engine, correct?

24  A.    That's correct.

25  Q.    And I believe the next -- I seem to recall -- let me

1    just say this then.  Is running the engine consistent with

2    MerCruiser's procedures for pickling the engine?

3    A.   Yes, it is.

4    Q.   And in fact, isn't it true that the MerCruiser

5    service bulletin on gasoline engines and water intrusion

6    says to check for water and start the engine?

7    A.   Yes.

8    Q.   Now, after it was clear that having performed the

9    compression and leak down test that the engine was

10   unhealthy, I believe -- what determination did you make

11   about the engines?

12   A.   That we needed to disassemble them to determine what

13   the damage was.

14   Q.   Now, have you been able to locate any document

15   published by MerCruiser which states what the compression

16   of the engine should be rather than minimums?

17   A.   Not under that particular engine number.

18   Q.   Have you been able to locate compression ratios for

19   similar V8 engines that MerCruiser builds or has used in

20   some time?

21   A.   Yes.

22   Q.   What is the spec or the specified compression ratio

23   for those engines?

24              MR. ROTONDO:  Objection.

25              THE COURT:  Sustained.  The question was not

1    this engine but, quote, similar engines.  Is that the

2    question?

3              MR. NIKAS:  Let me rephrase the question,

4    Your Honor.

5    BY MR. NIKAS:

6    Q.   Are the compression ratios that you cited as being

7    necessary, your compression test, consistent with the

8    MerCruiser standards for the V8 engines that are published

9    with a specified compression ratio?

10             MR. ROTONDO:  I'm going to object to that

11   open-ended question.

12             THE COURT:  Sustained.

13   BY MR. NIKAS:

14   Q.   I'll just ask this:  Is there a specified compression

15   ratio that you can find that MerCruiser publishes for this

16   engine?

17             MR. ROTONDO:  Objection.

18             THE COURT:  For this engine.  I'll allow that

19   question.

20   A.   For a 454 block, the compression pressure for a new

21   block should be around 150 psi.

22   BY MR. NIKAS:

23   Q.   Is that the number that you used when performing your

24   compression test?

25   A.   That's the number we rate it on, yes.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Now, kind of lost in the testimony yesterday, I

2    guess, was approximately how many operating hours are on

3    this engine?

4    A.    I believe 180.  I'm not certain of the exact number.

5    I believe it's around 180.

6    Q.    In terms of a marine engine, where is that in the

7    life span of the designed life span of that engine?

8    A.    Probably about 10 percent.  Usually marine engine

9    with closeness in cooling like this, fourteen, 1600 hours

10   at least, depending on how they're run.

11   Q.    So we're about 10 percent of the way along?

12   A.    Yeah, about that.

13   Q.    When you pulled the head and were able to look inside

14   the cylinders, you testified that you saw scoring,

15   correct?

16   A.    That's correct.

17   Q.    I believe there were some criticism yesterday about

18   your efforts to preserve the engine.  What did you do

19   following the disassembly of the engine and why did you do

20   it?

21   A.    Well, after we disassembled the engines and

22   discovered the excessive scoring and the severity of the

23   scoring in the cylinders, we deemed the engines not

24   serviceable.

25   Q.    Why is that?

1    A.    At that point those engines could not be reused.

2    Q.    What is it about the cylinder scoring that makes that

3    engine block unrepairable or irreparable?

4    A.    The scoring was so deep it would have had to be

5    machined and oversized pistons and would not bring it to

6    specs.

7    Q.    So when you say "machined," what did that mean?

8    A.    Means removing the engine blocks from the boat and

9    put them on a boring machine, actually changing the engine

10   block.

11   Q.    Changing it how?

12   A.    Dimensions of the cylinders.

13   Q.    How would they change?

14   A.    They'd have to be increased.  I don't any if they

15   could have been increased enough to even have those engine

16   blocks work.

17   Q.    So it's like repairing a gouge by sanding it and

18   sanding it until you get to where you can't see it

19   anymore?

20   A.    Correct.

21   Q.    Does that require the use of different pistons then?

22   A.    Yes, it would, definitely.

23   Q.    Different rings?

24   A.    Definitely.

25   Q.    And in terms of good practice, would you just -- I

1    guess on one engine it was seven of the eight were scored,
2    but four of the eight on the other.  Would you just
3    overbore some cylinders and not others?
4    A.    No, you can't do that.
5    Q.    Why is that?
6    A.    The engine won't have the same power, it won't run
7    right, it won't be balanced.
8    Q.    That's why you decided to halt your preservation
9    efforts?
10   A.    Absolutely.
11   Q.    Now, you were talking to Mr. Rotondo about the
12   scoring and he asked you about the conclusion about
13   hydrolocking that you had in your first inspection report
14   done before the heads were removed; do you remember that?
15   A.    Yes.
16   Q.    The flushing of the system performed by Peter Mains
17   took place with the engine not returning, correct?
18   A.    That's correct.
19   Q.    Could the scoring have occurred with the engine not
20   running?
21   A.    Definitely not.
22   Q.    Any possibility?
23   A.    No.  No possibility.
24   Q.    Why is that?
25   A.    Because when an engine's hydrolocked, it cannot

PDF created with pdfFactory trial version www.pdffactory.com

1   rotate.  So the pistons cannot go up and down inside their

2   cylinders.

3   Q.   Is it possible that when you were turning the engine

4   over for the compression test and the leak down test and

5   to expel the water which was part of the pickling process,

6   that that operation caused the scoring of the cylinders?

7   A.   Absolutely not.

8   Q.   Why is that?

9   A.   The engine wasn't under load and it was slow cranking

10  speed.  And this is something that occurs over a long

11  time, long period.

12  Q.   So the hydrolocking could not have caused the

13  scoring?

14  A.   No, definitely not.

15  Q.   And the scoring of the cylinders, cylinder walls, was

16  fatal to these engines?

17  A.   Yes, it was.

18  Q.   And the water that flooded the cylinders came from

19  where or came through where?

20          MR. ROTONDO:  Objection -- I'll withdraw the

21  objection.  I don't know if we're talking about the

22  flushing from Mr. Mains or talking about something else.

23  So I object to the question.

24          THE COURT:  He just wants the question refined.

25

1   BY MR. NIKAS:

2   Q.    In every case, what is the path of ingress of water

3   through these engines?

4   A.    Through the exhaust system.

5   Q.    Specifically through the elbows?

6   A.    Yes, exactly.

7   Q.    And that would have been true, just to save

8   Mr. Rotondo some time, in the hydrolocking instance and in

9   the historical water ingestion; is that true?

10  A.    Yes, that's correct.

11  Q.    And the hydrolocking instance where we're flushing

12  the entire system through with fresh water, that water

13  fills up and I guess you testified that it rolled back?

14  A.    Yes.  It flowed back into the engines, yes.

15  Q.    Now, this engine block essentially could not have

16  been saved, correct?

17  A.    That's correct.

18  Q.    The elbows could be saved I guess you testified,

19  correct?

20  A.    Yes.

21  Q.    Manifold?

22  A.    Typically, yes.

23  Q.    Heads?

24  A.    They'd have to be reworked.

25  Q.    Valves?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   Again, that's part of the cylinder heads, so yes.

2  Q.   What about the rockiers?

3  A.   I'm sure, yep.

4  Q.   Crank?

5  A.   Probably.  Don't know that, but --

6  Q.   So what you would be repurchasing is a new, I guess,

7  long block?

8  A.   Yes.

9  Q.   And that would mean that all these other appertinents

10 could just all go onto the long block and the long block

11 would have new cylinders, pistons and everything else as

12 new, correct?

13 A.   Yes, that's correct.

14 Q.   What's the cost of a new 454?

15        MR. ROTONDO:  Objection.

16        THE COURT:  Basis?

17        MR. ROTONDO:  Outside the scope and not

18 disclosed.

19        THE COURT:  Sustained.

20        MR. NIKAS:  May I respond, Your Honor?

21        THE COURT:  It's outside the scope.  I'm

22 sustaining it on that basis.  Can you point to me -- just

23 give me a page number and I'll look at it to see where it

24 is in the scope.

25        And then I guess the second objection was not

1    disclosed.

2            MR. ROTONDO:  Correct.

3            THE COURT:  I assume we're talking about

4    Plaintiffs' 27.

5            MR. ROTONDO:  Correct.

6            MR. NIKAS:  In his expert report --

7            THE COURT:  Let's not speak to the jury.  It's

8    Plaintiffs' 27.

9            MR. NIKAS:  Last sentence of his expert report,

10   Your Honor.

11           THE COURT:  Okay.

12           Objection's sustained.

13   BY MR. NIKAS:

14   Q.   Mr. Rotondo asked you if you visited the Sea Ray

15   factory; is that correct?

16   A.   Yes, he did.

17   Q.   I'm not sure he made that clear in the question --

18   how many times have you been to the factory?

19   A.   I believe it's four times.

20   Q.   And this is a Sea Ray factory?

21   A.   Yes, it is.

22   Q.   In Tennessee?

23   A.   Yes, Knoxville.

24   Q.   That's where this boat was built, right?

25   A.   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

Vol. IV - Page 576

1    Q.   When you were at the Sea Ray factory, did you see

2    MerCruiser personnel at that factory?

3              MR. ROTONDO:  Objection.

4              THE COURT:  Sustained.

5              MR. NIKAS:  Your Honor, does not page 5, line 23

6    through page 6, line 2 --

7              THE COURT:  It does not.  I'm looking at it.  It

8    doesn't.  And this is your expert witness, okay?

9    BY MR. NIKAS:

10   Q.   When you were pickling the engine, on page 11, line

11   16, Mr. Rotondo asked you if you removed the sparkplugs

12   and then turned the engine over.  Do you recall that?

13   A.   Yes.

14   Q.   You removed the sparkplugs for what purpose?

15   A.   So that the water would have someplace to go.

16   Q.   How do you turn the engine over then?

17   A.   With a starter motor, just like you would start your

18   car.

19   Q.   So the starter -- starter is mechanical, isn't it?

20   A.   Mechanical and electrical.

21   Q.   Electrical impulse pushes the starter -- injects the

22   starter and the starter gear turns?

23   A.   Yes, that's correct.

24   Q.   So when you push the starter without the sparkplugs,

25   what happens?

1    A.    The engine rolls over freely.

2    Q.    And does that enable you to move the pistons and the

3    cylinders?

4    A.    Yes, that's correct.

5    Q.    So you can actually look at each cylinder as you're

6    doing that process?

7    A.    We can see what comes out, yes.

8    Q.    And then when you remove the heads you can do the

9    same thing?

10   A.    Yes, that's correct.

11   Q.    You can turn it so you can see the cylinders?

12   A.    Yes, that's correct.

13   Q.    And is that the process you used when you determined

14   the extent of the scoring?

15   A.    Yes.

16   Q.    By the way, when you were seated at the helm of the

17   boat to turn the starter over --

18   A.    Yes.

19   Q.    -- how far is it to the engine?

20   A.    Maybe 4 or 5 feet at the most.

21   Q.    Can you see that far?

22   A.    Yes, I can.

23         MR. NIKAS:  No further questions, Your Honor.

24         THE COURT:  Thank you.

25         Mr. Rotondo, you can start whenever you're

1    ready.

2              Do you want to take that exhibit off the screen?

3              MR. NIKAS:  Certainly.

4              THE COURT:  Is that your copy or the official

5    copy?

6              MR. NIKAS:  My copy.

7              THE COURT:  Thank you.

8

9                    RECROSS-EXAMINATION

10   BY MR. ROTONDO:

11   Q.   Mr. Wicander, did you testify this morning that the

12   specification for compression for this particular engine

13   was 150 psi; was that your testimony?

14   A.   For a 454, that was my testimony, yes.

15   Q.   Plaintiffs' 26, which I believe is your mechanical.

16       All right.  If we can go up to the top part of

17   Plaintiffs' 26.  Where it says "acceptable."

18       At the time you were doing these tests you thought

19   the acceptable compression pressures were 130; is that

20   right?

21   A.   That would be acceptable for a used engine.

22   Q.   That's what you testified to, correct?

23   A.   Yes.

24   Q.   And in fact, when you testified yesterday about this

25   report, that's the number you used, 130 psi, isn't it?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.    That was -- yes.

2  Q.    You didn't testify about 150 yesterday, did you?

3  A.    No.

4  Q.    And when you testified at your deposition about

5  compression tests in 2004, you used the number 130 again,

6  didn't you?

7  A.    Yes, I did.

8  Q.    And yesterday when you testified, do you recall being

9  asked a question about what MerCruiser, what its service

10  bulletins indicate that the compressions should be?

11  A.    As far as a minimum, yes.

12  Q.    Well, do you remember being asked the question

13  yesterday, Are you aware that MerCruiser service bulletin

14  indicates that compressions above 100 pounds per square

15  inch are acceptable?

16  A.    Yes.

17  Q.    And you said, Acceptable, yeah, that is their

18  specification.  Wasn't that what you said?

19  A.    Yeah, I believe it is.

20  Q.    And so today your opinion is that it's 50 percent

21  higher than what you said yesterday; is that right?

22  A.    I believe the question that I was asked was what a

23  new 454 would have for compression.  That was the way I

24  understood it.

25  Q.    A new one.  But didn't you say yesterday that this

PDF created with pdfFactory trial version www.pdffactory.com

1    MerCruiser service bulletin indicates compressions above a

2    hundred pounds per square inch are acceptable?

3    A.    Yes, that's correct.

4    Q.    And you knew that?

5    A.    Yes.

6    Q.    And it's true that every single one of those

7    cylinders that you tested, all 16 of them were above a

8    hundred pounds per square inch; isn't that right?

9    A.    That's correct.

10   Q.    We can go back to 26.

11       The bottom sentence of your -- on page 2 states, On

12   the basis of the mechanical inspections reported above, we

13   are of the opinion that both engines have been seriously

14   damaged as a result of hydrolocking that occurred on or

15   about June 9, 2001 and require replacement.  Correct?

16   A.    Yes.

17   Q.    And you told us yesterday that the hydrolocking

18   occurred because of fresh water being put in the system?

19   A.    Yes.

20   Q.    And you're not aware of those engines never -- let me

21   not have three negatives in one sentence.

22       You're not aware of any situation where the engines

23   did not work before June 10, 2001; isn't that correct?

24   A.    That's correct.

25   Q.    You were asked some questions about pickling; do you

PDF created with pdfFactory trial version www.pdffactory.com

1    recall that?

2    A.    Yes.

3    Q.    All right.  And you told us yesterday that both --

4    that you and MerCruiser had the same protocol?

5    A.    Yes.

6    Q.    And that you understood that the protocol required

7    you, when you were pickling, to put in new sparkplugs and

8    run the engine until you got to 1300 rpms and you were at

9    the normal engine temperature; isn't that right?

10   A.    I don't recall the changing of the sparkplugs.  We

11   always try to get the engines running first.

12   Q.    But we talked about this yesterday.  You understood

13   the protocol required you to change the sparkplugs, right?

14   A.    At some point, yes.

15   Q.    And you did not change the sparkplugs on June 11 when

16   you got the engine running; isn't that right?

17   A.    That is correct.

18   Q.    And you did not -- you told us yesterday that the

19   engine was not running well?

20   A.    That's correct.

21   Q.    And you also told us yesterday that you thought there

22   might be moisture in those sparkplugs, correct?

23   A.    I believe so, yeah.

24   Q.    You were looking at your ledger when you were talking

25   to Mr. Nikas; do you recall that?

1  A.   Yes.

2  Q.   And he pointed out to you an entry for 7/31?

3  A.   Yes.

4  Q.   And it was a reference to launching a boat?

5  A.   Yes.

6  Q.   All right.  You did your measurements -- you told us

7  yesterday that you did your measurements on or before

8  July 10, correct?

9  A.   I don't remember the date.

10  Q.   Let me just show you your transcript.

11  A.   If I said it, I said it, that's fine.

12  Q.   If I can ask you to turn to page 74 of your

13  transcript.  Look at lines 12 through 16.

14       Does that refresh your recollection that you

15  performed those measurements of the exhaust system at some

16  point on or before --

17  A.   Yes, I faxed in the results, correct.

18            MR. ROTONDO:  I don't have anything further,

19  thank you.

20            THE COURT:  Whenever you're ready, Mr. Nikas.

21

22            FURTHER REDIRECT EXAMINATION

23  BY MR. NIKAS:

24  Q.   Very quickly and hopefully we'll get you out of here

25  never to return.

1        Going back to the issue that Mr. Rotondo started

2   with, if we can go back a little bit further and give it

3   some context.  The cylinders you said the other day go up

4   and down, they turn the crank shaft which is in turn

5   connected to the propeller shaft which moves the boat

6   through the water, correct?

7   A.    Yes.

8   Q.    These parts rotate?

9   A.    Yes, they do.

10  Q.    Is that the correct term?

11  A.    Yes.

12  Q.    And when things are moving around in a circle, is

13  balance important?

14  A.    Very important.

15  Q.    How important?

16  A.    Extremely important.  It's like having a tire out of

17  balance on your car, you'll feel it thumping and

18  vibrating.  An engine definitely has to be balanced.

19  Q.    Does the fact that the compression ratios in the port

20  engine vary as much as -- these are the same figures that

21  appear in your inspection report.  The high is what on

22  this port engine?

23  A.    135.

24  Q.    And the low is?

25  A.    105.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.    Is that a significant difference?

2  A.    Yes, it is.

3  Q.    That would be a threat -- would that difference be a

4  threat to the long-term integrity and operation of the

5  engine?

6  A.    Absolutely.

7  Q.    What about on the starboard engine?

8  A.    Not as bad, no.

9  Q.    So the starboard engine was relatively in good shape

10 compared to the port?

11 A.    Yes.

12         MR. NIKAS:  Your Honor, at this time we'd like

13 to introduce Plaintiffs' 33 into evidence.  It's now been

14 referenced by Mr. Rotondo --

15         THE COURT:  You can just -- you want to offer 33

16 because it's been referenced by Mr. Rotondo?

17         MR. NIKAS:  Twice now.

18         THE COURT:  That's not a sufficient basis.

19         MR. NIKAS:  In the Second Circuit it should

20 constitute waiver, Your Honor.

21         THE COURT:  I said that's not a sufficient

22 basis.  You made your waiver argument outside the presence

23 of the jury and it was rejected.  Don't repeat it now.

24 It's preserved.

25

1    BY MR. NIKAS:

2    Q.   Mr. Rotondo went through the protocols contained in

3    Exhibit 33, which is the MerCruiser service bulletin on

4    gasoline engines and water intrusion?

5              MR. ROTONDO:  Objection.

6              THE COURT:  Sustained.  Why don't you go to what

7    he asked.

8    BY MR. NIKAS:

9    Q.   Well, he started with the first few steps of the

10   pickling procedure, correct?

11   A.   Yes.

12   Q.   Which would be determine if there was water present,

13   try to expel the water, start the engine, run it at 1300

14   rpms until it reaches normal operating temperature; do you

15   recall that?

16             MR. ROTONDO:  I object.  One or two questions

17   that were asked today about putting the sparkplugs and

18   1300 rpms, but I didn't go through the whole list today.

19             THE COURT:  That's correct.  I have notes as to

20   exactly what's covered.  Sustained.

21             MR. NIKAS:  Under Rule 106, Your Honor --

22             THE COURT:  Sustained.  It's outside the scope.

23             MR. NIKAS:  No further questions.

24             MR. ROTONDO:  Nothing further.

25             THE COURT:  Thank you, sir.  You may step down.

```
 1              THE WITNESS:  Thank you.

 2              THE COURT:  Mr. Rotondo, I thought the witness

 3   was sort of fast yesterday.

 4              MR. ROTONDO:  Ask him to slow down?

 5              THE COURT:  Yes, please.

 6              MR. NIKAS:  Your Honor, one moment, please.

 7                    (Pause.)

 8              MR. ROTONDO:  Your Honor, we had Mr. Davis wait

 9   outside.  So we just went to get him.

10              THE COURT:  We're not sequestering witnesses.

11              MR. ROTONDO:  Mr. Nikas and I agreed that we

12   would keep our expert witnesses outside.

13              THE COURT:  Okay.  Thank you.  I didn't know

14   that.

15              Could I have our witness take the stand, please.

16              THE CLERK:  May I remind you, sir, that you

17   remain under oath.

18              THE WITNESS:  Yes.

19

20

21

22

23

24

25
```

1                          GREGORY DAVIS,

2          called as a witness, having been previously duly

3          sworn, was examined and testified further as follows:

4

5                     DIRECT EXAMINATION (Resumed)

6    BY MR. ROTONDO:

7    Q.   Mr. Davis, I'd like to pick up where we left off

8    yesterday, but I'd like to ask you to slow down just a

9    little bit when you speak.

10   A.    Okay.

11   Q.    All right.  We've reviewed a fair amount of your

12   background, Mr. Davis, and you told us a lot of different

13   types of survey work that you do.  You mentioned that you

14   also do something called appraisals --

15   A.    Yes.

16   Q.    -- is that correct?

17         What are appraisals?

18   A.    It's a damage appraisal.  We generally get hired by

19   the insurance company when there's been a claim reported

20   to the insurance company, some type of damage to the boat

21   or the motors.  And we will go out and look at the damage

22   to assess what the cause was.  And then we'll write an

23   estimate to complete the repairs and submit that

24   information to the insurance company.

25   Q.    And what different types of boats do you do

1    appraisals on?

2    A.    Mostly recreational boats.

3    Q.    What different parts of the boat do you do those

4    appraisals on?

5    A.    We do them both on the hull and also on the

6    machinery, the engines and the equipment, whether it be an

7    inboard, a stern drive, or an outboard.

8    Q.    For how long have you done that kind of work?

9    A.    Since the company started, so 34 years -- 31 years.

10    Q.    And you told us that you've looked at, I believe you

11    said, thousands of boats?

12    A.    Yes.

13    Q.    All right.  And of those sort of -- of that number,

14    how many, breakdown roughly between surveys and

15    appraisals?  Surveys as in talking to people who are

16    buying or selling a boat as apposed to appraising for

17    damage?

18    A.    The majority of our work is done for insurance

19    companies on damage appraisals.  70 percent, probably, of

20    our total volume is done as damage appraisals for

21    insurance companies.

22    Q.    Do you have any professional certifications?

23    A.    Yes, I do.

24    Q.    And what are they?

25    A.    I'm a certified marine surveyor by the National

1    Association of Marine Surveyors.  I was certified in 1978.

2    And I have other certifications in other things, but

3    they're not directly related to being a marine surveyor.

4    Q.    And what is the National Association of Marine

5    Surveyors?

6    A.    National Association of Marine Surveyors is the

7    oldest professional organization for marine surveyors in

8    the United States.  There are members outside of the

9    United States.  It was founded in 1960.  And it is a

10   professional association for education of its members

11   and -- the members participate in various organizations,

12   other organizations related to boating safety or the

13   manufacture or safety standards recommended for both

14   recreational boats, commercial hall, and then also cargo.

15   Q.    Have you held any positions in the National

16   Association of Marine Surveyors?

17   A.    Yes, I have.

18   Q.    Can you describe what positions you've held?

19   A.    I have been the chairman of their Insurance

20   Committee, which is organized to solicit benefits for the

21   members from a professional insurance basis and also

22   health insurance, whatever.  I'm currently chair of the

23   Yachts and Small Craft Technical Committee.  I am also

24   currently chair of the Education Committee.  I have served

25   in the past on the Communications Committee.  And I was

1    recently elected the national vice president and will take

2    office in about a week as national vice president.

3    Q.   Do you belong to any other professional groups other

4    than the National Association of Marine Surveyors?

5    A.   I'm a member of the Society of Naval Architects and

6    Marine Engineers and I serve on the Safety Committee for

7    them also.

8    Q.   And what does your work on the Safety Committee

9    entail?

10   A.   It has to do with fire safety standards on

11   passenger-carrying vessels.

12   Q.   And did you go on to any other professional groups?

13   A.   Yes.  I'm a member of the National Association of

14   Fire Investigators, I'm a certified fire and explosion

15   investigator.

16        I have -- the company is a member of the American

17   Boat and Yacht Council.  They write the safety standards

18   for recreation boats.  I have served on their board of

19   directors and currently serve on their technical board.

20        I'm a member of the International Association of

21   Arson Investigators.

22        And there are others that are not coming to mind off

23   the top of my head.

24   Q.   You said you have served on two different technical

25   committees, the American Boat and Yacht --

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Council.

2    Q.    -- Council and then the National Association of

3    Marine Surveyors; is that right?

4    A.    Yes.

5    Q.    What does your work on those committees generally

6    involve?

7    A.    The National Association of Marine Surveyors, Yachts

8    and Small Craft Technical Committee, I chair that, and

9    it's my job to disseminate information to our membership

10   that pertains to yachts and small craft, answer questions

11   from our members when they're out on survey.  I get calls

12   asking for technical advice.  I host a web site for the

13   Yachts and Small Craft Technical Committee as a part of my

14   company's web site, which is available through -- to our

15   members through the organization's web site.

16        The American Boat and Yacht Council is a nonprofit

17   organization.  And as I said earlier, their job is to

18   author and maintain safety standards regarding

19   recreational boats.  There's a process for that.  The

20   compliment -- there's a requirement in the American Boat

21   and Yacht Council that the members of their organization

22   be -- there are boat manufacture members, there are

23   government members, and then there are members that

24   represent the public.  And in my position as a marine

25   surveyor I am the, quote/unquote, public representative

1    compliment they have to have for validity to their

2    standards.

3        On their technical board, it is my job on the

4    technical board to review all of the standards that come

5    through each year in cycle for renewal.  Once they've been

6    completed by a committee, the technical board reviews each

7    one of the standards and can make specific line item

8    suggestions or you don't make any line item suggestions

9    and you approve or don't approve the standard prior to it

10   being published.  That publishing cycle is coming through

11   for July of this year, so so far since about November I've

12   reviewed about 28 standards and there will be 34 that will

13   come up for publication in this cycle in July.

14   Q.   Have you ever testified as an expert witness before?

15   A.   Yes.

16   Q.   And is that in state court or federal court, or both?

17   A.   It's both.

18        MR. ROTONDO:  Your Honor, I'm not sure if your

19   practice requires it, but if it does, we offer Mr. Davis

20   as an expert witness.

21        THE COURT:  He's accepted as such unless you

22   want to voir dire.

23        MR. NIKAS:  I would like to voir dire, actually.

24        THE COURT:  Oh, okay.

25

 1                    VOIR DIRE EXAMINATION

 2   BY MR. ROTONDO:

 3   Q.   Good morning, Mr. Davis.

 4   A.   Good morning.

 5   Q.   I just wanted to clear up some things that were said

 6   yesterday during your initial examination.

 7        You were in what position when you started in the

 8   marine industry?

 9   A.   I started out -- marine industry, as a surveyor.

10   Marine surveyor.

11   Q.   Did you have a mechanical background before that or a

12   licensed officer's background before that, or any other

13   background?

14   A.   No.

15   Q.   What training did you have, then -- what specialty do

16   you have, actually, in surveying?

17   A.   Yachts and small craft.

18   Q.   Do you have any instruction in naval architecture?

19   A.   No.

20   Q.   Do you have any instruction in construction of small

21   boats?

22   A.   No.

23   Q.   Do you have any instruction in the installation of

24   component systems on small craft?

25   A.   No.

1    Q.    Do you have any instruction in engineering?

2    A.    No.

3    Q.    Did you have any instruction in mechanics?

4    A.    No.

5    Q.    Have you ever had any instruction on exhaust system

6    installation?

7    A.    No.

8    Q.    Have you ever had any instruction on inspection of

9    fiberglass composite systems?

10   A.    Yes.

11   Q.    What instruction have you had?

12   A.    Review of the Marine Survey Manual by Gibbs & Cox in

13   1960 and then instruction on the job be as an apprentice

14   under other senior surveyors.

15   Q.    That's the FRP Manual by Gibbs & Cox?

16   A.    Yes.

17   Q.    Published?

18   A.    1960.

19   Q.    Forty-eight years ago?

20   A.    Yes.

21         There are other manuals out there that I've reviewed,

22   other books.

23   Q.    To whom did you serve your apprenticeship prior to

24   becoming a marine surveyor?

25   A.    The companies that I worked for, my job designation

1    was marine surveyor, okay, even though I was apprenticing.

2    When I worked for the British firm, I apprenticed under

3    two surveyors.  One was Homer Marxer and the other was

4    Irv Frigon.

5    Q.    What was the British firm?

6    A.    Graham, Miller & Company.

7    Q.    What was your -- isn't Graham, Miller & Company a

8    cargo surveying firm?

9    A.    Yes.

10   Q.    Correct me if I'm wrong, but Graham Miller doesn't do

11   any recreational craft, at least they did not at that

12   time, correct?

13   A.    They did in the office in Chicago.

14   Q.    You've been retained to offer an opinion on what

15   topics?

16             MR. ROTONDO:  Objection, Your Honor.

17             THE COURT:  Sustained.

18             MR. NIKAS:  It goes to the issue of his

19   qualifications.

20             THE COURT:  Sustained.

21   BY MR. NIKAS:

22   Q.    Did you perform the mechanical inspection on board

23   this vessel?

24   A.    No.

25   Q.    How long have you been a member of NAMS?

1    A.    Since 1978.

2             MR. ROTONDO:   Objection, Your Honor.   This is

3    going beyond the basic voir dire.

4             THE COURT:   He asked how long has he been a

5    member of this association.

6    BY MR. NIKAS:

7    Q.    How long have you been a member of the ABYC?

8    A.    You know, I can't tell you for sure because I don't

9    remember exactly when I joined.   But it's at least 20

10   years.

11   Q.    And what's the BoatU.S. Speakers Bureau listed on

12   your CV?

13   A.    That's an organization BoatU.S. actually invites you

14   to participate in their speakers bureau.   They set up the

15   arrangements, basically groups contact them looking for

16   speakers to speak before them.

17   Q.    And just so the jury understands, what is BoatU.S.?

18   A.    BoatU.S. is the boat owners association of the United

19   States.   It is a nonprofit organization set up in the

20   '70s, I believe, sometime in the early '70s, with an

21   interest in being a boater's advocate on Capitol Hill.

22   They have another division called the Insurance Division

23   where they offer insurance to their members at preferred

24   rates.   And that's how I got to know them, was through

25   their Insurance Division.

1  Q.   They're pretty much like AAA?

2  A.   In some ways, yes, I'd say it's a lot like AAA.

3  Q.   They lobby, they advocate, they publish technical

4  things, they provide insurance, they do all sorts of

5  things, correct?

6  A.   Correct.

7  Q.   Are you a member of BoatU.S.?

8  A.   Yes.

9  Q.   How long have you been a member?

10  A.   Since the '80s.  I have the membership card in my

11  wallet, I can look.

12  Q.   It's all right.  Long time?

13  A.   Yeah.

14  Q.   You testified -- you told Mr. Rotondo that you've

15  been an expert before?

16  A.   Yes.

17  Q.   In the last 12 months how many times have you been

18  retained to provide expert testimony?

19  A.   How many times retained?  Fifteen or 20, somewhere in

20  there.

21         MR. NIKAS:  I have no objection to this witness

22  being certified.

23         THE COURT:  I want to be certain based on one of

24  the questions that was just asked, the defendants

25  disclosed the expert report to the plaintiffs?

1           MR. ROTONDO:  Yes.

2           THE COURT:  Do you have an extra copy in case I

3   need one?

4           MR. ROTONDO:  I do believe I have an extra copy.

5   I don't think there are any marks on there.

6           THE COURT:  Thank you.  He's qualified as an

7   expert.

8

9                   DIRECT EXAMINATION (Resumed)

10  BY MR. ROTONDO:

11  Q.   Mr. Davis, by whom were you hired in this case?

12  A.   We were hired by your law firm.

13  Q.   And you knew that we were representing Sea Ray; is

14  that correct?

15  A.   Yes.

16  Q.   Have you ever been hired by either a lawyer or by

17  Sea Ray in connection with any other case?

18  A.   Yes.

19  Q.   All right.  And have you ever had a case adverse to

20  Sea Ray?

21  A.   Yes.

22  Q.   And in general terms, what were you asked to do in

23  this case?

24  A.   We were asked to inspect Mr. Mains' vessel, his boat,

25  and to render an opinion on the condition and the value of

1    that boat at the time we inspected it.  And then an

2    opinion as to the cause of the damage and repair costs for

3    all the damage.

4    Q.    And what steps did you take to carry that out?

5    A.    We came out here to Hartford.  And myself and an

6    employee, Jerry Starczowsky, met up with an attorney from

7    your office.  And then we went to Brewer Pilots Point,

8    Mr. Mains met us there.  And we completed an inspection of

9    the boat and the engines in the boat.  The inspection that

10   I completed was what I would do if I was doing a condition

11   inspection on a used boat for a potential purchaser.

12        And then after that was completed, we followed or --

13   I believe we followed Mr. Mains to his home, I know we got

14   to his home, I wasn't driving, and inspected the engine

15   parts in the basement of his house.  Those parts that had

16   been removed.  Not all of the engine parts.  Some of the

17   engine was still in the boat.  Inspected those parts in

18   the basement of his house.  And then we went back to the

19   airport and ultimately wrote our report.

20   Q.    Approximately how long did the inspection take?

21   A.    We were here in Hartford for one day.

22   Q.    And did you make an assessment of the overall

23   condition of the boat?

24   A.    Yes, I did.

25   Q.    And I'm going to put down on the screen here

PDF created with pdfFactory trial version www.pdffactory.com

1    Exhibit 20-1.  Is that one of your photographs?

2    A.    Yes, it is.

3    Q.    And when you were doing your inspection of the boat,

4    did you walk around the boat?

5    A.    Yes, I did.

6    Q.    All right.  And did you -- were you aware of concerns

7    about moisture content, moisture in parts of the boat?

8    A.    Yes, I was.

9    Q.    All right.  And what did you do to assess -- let me

10   ask you this.  First of all, you inspected the entire boat

11   as part of your inspection?

12   A.    Yes, I did.

13   Q.    And what did you do to investigate the concerns or

14   issues about moisture?

15   A.    The boat was examined visually, sounded with a

16   phenolic hammer, which is a plastic hammer, and then it

17   was tested for moisture with a GRP33 moisture meter.

18   Q.    Why did you use a hammer?

19   A.    Hammer sounding is to test for delamination.  You'll

20   get a dull retort.  Retort is like the ringing of a bell.

21   If the -- the fiberglass material that the boat's made out

22   of is a cloth, fiberglass cloth, and then a liquid resin,

23   which is like a glue.  Those two materials don't have very

24   good structural properties by themselves, but joined

25   together they do.  It's kind of like reinforced concrete

PDF created with pdfFactory trial version www.pdffactory.com

1    would be the principle behind it.  If you don't get a good

2    bond -- and these are done in individual layers, there's a

3    lay-up schedule in how you build a boat -- if you don't

4    have a bond between those layers, you'll get a dull sound

5    and also you've lost strength in the hull.  That's why you

6    hit it with a hammer to determine if there's any

7    delaminations because that can be an area where you've got

8    a problem structurally with the boat.

9    Q.    And you talked about a moisture meter.  Is this a

10   picture of the moisture meter?  It's 20-26.

11   A.    Yes, it is.

12   Q.    Did you put the moisture meter on different parts of

13   the boat; is that how it works?

14   A.    Yes, the moisture meter was run over all of the

15   surfaces of the boat except where the bottom paint was at

16   on the bottom of the point.  I put the moisture meter on

17   the bottom of the boat, the meter has a scale from zero to

18   15.  This is a relative scale.  The meter is actually

19   gauged out for dry, moist, and wet.  Placing the meter on

20   the bottom of the boat pegged the meter up in the wet

21   range, up in the 15 area.  That is indication that there

22   is metal in the bottom paint.  Bottom paints often have

23   metal in them.  Bottom paints are there to keep algae and

24   barnacles and marine growth from growing on the bottom of

25   the boat.  Since the meter was getting pegged no matter

1    where I put in on the bottom where the bottom paint was

2    at, I did not test the bottom of the boat because I was

3    getting skewed results.  But I did test all the other

4    areas of the boat.

5    Q.    Showing you now what's been marked as Defendant's

6    Exhibit 20-28, that's your moisture meter in a particular

7    location.  Can you tell us what's shown here?

8    A.    What I've done here is underneath this particular

9    windshield wiper arm base, which is at the mid-top of that

10   photograph, just underneath the brownish area which is a

11   canvass that's covering the wind screen, I've marked out

12   the water or the wet area that's shown up on that meter at

13   that particular location.  So the triangle that's marked

14   in the tape is what came out wet.  And then when you go

15   outside of the tape area, it's dry, the meter's reading

16   dry.

17   Q.    And can you tell us what the size of that area is?

18   A.    I think the -- the tape area is less than 1 square

19   foot.  And total area of that portion of the deck, that's

20   the top of the deck house, what I did is estimated the

21   total area of the deck at 130 square feet because that's

22   all one part, the deck is made separately from the hull.

23   Q.    Let me just -- let me show you what's marked as

24   30-34.  Does this show the total area of the deck?  Is

25   that this part here?

1    A.    Yes.   The total area of the deck is from that area

2    all the way up to the pointy part, the bow.

3    Q.    And so what was the point, then, in putting the tape

4    and the measurements in 20-28?

5    A.    Well, the first reason for putting the tape there was

6    to determine what's the size of the wet area that I'm

7    getting with the meter.   And then once that's determined,

8    I'm looking at that particular size of area in

9    relationship to the total deck area to get an idea of

10   what's the scope of the potential problem.

11   Q.    And what did you find?

12   A.    It's less than -- well, there are two areas -- three

13   areas that had moisture.   And in total, those three areas

14   are less than 1 percent of the total square foot area of

15   the deck.

16          THE COURT:   When you're at a good point, it will

17   be time for our morning break.   Is this a good time?

18          MR. ROTONDO:   Yes, Your Honor.

19          THE COURT:   We'll take a 20-minute recess.

20             (Whereupon, a recess followed.)

21

22          THE COURT:   Please be seated everyone.

23          Bring the jury in.

24             (Whereupon, the jury entered the

25             courtroom.)

1          THE COURT:  Please be seated everyone.

2    BY MR. ROTONDO:

3    Q.    Before we broke, Mr. Davis, I think we were talking

4    about the area near the windshield that you talked about;

5    do you recall that?

6    A.    Yes.

7    Q.    I think you said you found another area on the deck

8    you said had a moisture reading of some sort.  I'm going

9    to show you what's been marked as 20-31.

10   A.    Yes.

11   Q.    Okay.  And can you tell us what that depicts?

12   A.    In the far right of that photograph, the shiny round

13   object is the anchor windlass.  And directly behind that

14   all the way to the left in the photograph is the bow

15   cleat.  And the yellow tape areas are where the meter read

16   moisture or wet.

17   Q.    All right.  Does 20-30 give you a better orientation

18   in terms of where that area is?

19   A.    Yes.  If you look all the way forward of the wooden

20   stick, you can actually see the tape over to the left of

21   the cleat.

22   Q.    Okay.  So the two areas that you've identified are

23   the two areas where you found elevated moisture on the

24   deck; is that correct?

25   A.    Yes.

1    Q.    Again, if I look at 20-34, that was a small

2    percentage of the area on the deck; is that correct?

3    A.    Yeah, less than 1 square foot.

4    Q.    And of what significance did you find that moisture

5    on the deck to be?

6    A.    Every used boat that we look at, there are areas of

7    moisture on the deck that we find, every boat that we look

8    at.    In this instance with the areas that were found, this

9    is a much smaller area than we find generally on used

10   boats that we look at.    So, in my opinion, the moisture

11   readings are insignificant.

12   Q.    You also looked at the bottom of the boat; is that

13   correct?

14   A.    Yes.

15   Q.    And we have a few pictures of the bottom of the boat.

16   I'd like to find them and show them to you.

17        This is one photograph showing conditions of the

18   bottom of the boat; is that right?

19   A.    Yes.    That photograph is indicating a nick area where

20   the tape is at from striking something in the water while

21   the boat was under way.

22   Q.    What did you determine the condition of the bottom of

23   the boat?

24   A.    The bottom paints need to be renewed.    There's too

25   many coats.    It's poor application, it's peeling off.

1  Other than that, there is some collision damage on the

2  bottom of the boat, minor collision damage from operating.

3  That was it.

4  Q.   You also examined the bilge or the engine area of the

5  boat; is that correct?

6  A.   Well, there's a bilge in the cabin area, I looked at

7  that.  Then there's a bilge in the engine room.

8  Q.   Let's start with the bilge in the cabin area.

9  A.   Okay.

10  Q.   Showing you 20-47, what does that show?

11  A.   That is the box to the left of the photograph is a

12  sump for the shower drain.  The tape that's in the

13  bilge -- the bilge is the bottom of the boat where water

14  that accumulates in the normal operation of the boat, the

15  boat will sweat due to temperature differences between the

16  inside of the boat and the water that it's in.  You can

17  get water leaks inside boats.  That water is designed to

18  go in this area.  The tape is marking out an air where

19  repairs have been done and there's brush strokes in the

20  gelcoat, which is the gray color that you're looking at.

21  Instead of paint it's actually a resin-based material

22  called gelcoat, and it's got brush strokes in it.

23  Q.   Why is that significant?

24  A.   It shouldn't have brush strokes in it.  It's a

25  poorly-completed repair.

1  Q.    So that was one of the things you took into account

2  in doing your analysis?

3  A.    Yes.

4  Q.    And what did you determine the overall condition of

5  the boat to be?

6  A.    Overall the boat was in what we call bristol

7  condition.   The definition of bristol is excellent

8  condition, bristol being very shiny or great in

9  appearance.

10 Q.    Did you make a determination of the value of the

11 boat?

12 A.    Yes, I did.

13 Q.    And how did you go about doing that?

14 A.    Actually, I computed a value.   The methodology used

15 was twofold.

16       The first set of methodology in valuation was using

17 valuation books.   The first one I used was BUC, which is

18 often used by boat brokers in determining value on what's

19 called a yacht, anything pretty much over 25-foot.

20       The BUC book publishes -- the BUC data comes from

21 brokers that report the data back into the BUC system, BUC

22 member brokers.   And then BUC has an algorithm, which is

23 proprietary, that they use to adjust the prices based on

24 each year, it's some type of depreciation scheme.

25       I took the model boat with the engines that were in

1    it based upon what the book said, and it will have a

2    published high and a published low.  Then I adjusted that

3    to the area that the boat is in.  And then I made a

4    condition adjustment to it based upon the bristol

5    condition that I found the boat to be in when I looked at

6    it.  And that gave me a range of roughly 122,000 to

7    134,000, roughly.

8    Q.   Let me stop you there.

9         Before you made your bristol adjustment, what was

10   the -- using the BUC system, what was the range that you

11   came up with?

12   A.   I don't have those figures with me, the working

13   figures.  I'm going based on what's in my report.  They

14   would have been -- usually the area adjustment can be

15   anywhere from the published figures up to 10 to

16   15 percent, depending on what area of the country you're

17   in.  The condition adjustment can range from minus, if

18   it's in bad condition, to plus 25 to -- I believe 25 might

19   be the top end of condition, and I added 25 percent for

20   condition.

21   Q.   If you added 25 percent and came up with something --

22   A.   122 to roughly 134.

23   Q.   Before you made the bristol adjustment, the number

24   would have been around $99,000; is that right?

25   A.   Somewhere in there.

1   Q.   Did you use any other kind of book analysis?

2   A.   Yes.  I used NADA, which is the abbreviation for the

3   National Automobile Dealers Association.  They publish a

4   used boat price guide.  I used this -- my report was being

5   done in October of 2004.  So I used the book that was

6   specific for September-December of 2004.  The average

7   retail in that book was roughly $99,000.  And then I added

8   for optional equipment that this boat had on it, using the

9   formula that you're supposed to use that NADA tells you

10  use.  That value with the adjustments came out to roughly

11  $106,000.

12  Q.   And then was there any other type of book analysis

13  that you considered for the value?

14  A.   The third book is published by a company called ABOS

15  and it's commonly referred to as the blue book because the

16  cover of the book is blue.  And I used -- that one

17  published an average retail value of roughly $99,000.  And

18  after condition adjustment, I came up with roughly

19  $124,000 in value.

20  Q.   In addition to the book analyses that you just

21  described, did you do anything else to try to come up with

22  a value of the boat?

23  A.   Yes.

24  Q.   What was that?

25  A.   I checked the marketplace to see what were boats of

 1   this type, this model, similar equipment actually selling

 2   for.  First I looked at listings, what were they listed

 3   for?  That's called a comparative market analysis.

 4        And I found four Sea Rays in this general area, two

 5   in New York and two in Rhode Island, from 400 hours on the

 6   engines, that's use time on the engines, to 250 hours.

 7   And they were listing for -- this is the asking price for

 8   these boats -- at roughly $100,000 for one, $99,000 for

 9   two of them, $105,000 for the last one.  That's asking

10   prices.

11        Then I looked -- we subscribe to a multiple listing

12   service called Sold Boats.  My company subscribes to it.

13   That has actual reports from brokers and dealers of what

14   they sold boats for, gives me the actual selling price.

15   Searching that out again for the same model, same year --

16   in this instance I only was able to get the hours for one

17   of these three selling prices.  That was 190 hours.  I

18   found one boat in Missouri selling for $125,000 in April

19   of 2003.  I found one in Florida, I don't know the number

20   of hours on the engine, selling for $129,000 in June of

21   2004.  And one in Connecticut selling in September of

22   2004, again I don't know the number of hours on the

23   engine, selling for $118,000.

24   Q.  So based on the book analysis and the comparative

25   analysis, did you reach a conclusion either as to a range

1    or specific number as to the value?

2    A.    Yes.  Weighting the comparables, the actual selling

3    prices and market listings, giving them more weight than

4    the book values because the information is more current, I

5    came up with a market value opinion of $125,000 low to

6    $130,000 high, with an average of roughly $127,000.

7    Q.    And did that valuation assume that certain types of

8    repairs were to be done on the boat?

9    A.    Yes, it does.

10   Q.    And did those repairs fall into two categories?

11   A.    Yes.

12   Q.    One would be the engine and one would be the hull?

13   A.    That's correct.

14   Q.    Did you form an opinion as to what it would cost to

15   acquire and install remanufactured engines?

16   A.    Yes.

17   Q.    What was that cost?

18   A.    Roughly $12,000.

19   Q.    What are remanufactured engines?

20   A.    Remanufactured engines are rebuilt engines,

21   essentially.  They come with a warranty from the

22   remanufacturer, the person who rebuilt the engines.

23   Q.    And why did you think remanufactured engines were

24   appropriate for this boat?

25   A.    It's a faster way to execute the repair.  It gets

PDF created with pdfFactory trial version www.pdffactory.com

1   completed relatively quickly.  Because the rebuilder gives

2   you a warranty you've got someone to go back to if the

3   engine fails within the warranty period.  It's just

4   quicker, simpler, easier.

5   Q.    And the other area of the repairs or work that would

6   be done would be to the hull; is that correct?

7   A.    That's correct.

8   Q.    Did you make a determination as to what the cost

9   would be to do those repairs to the hull?

10  A.    Yes.

11  Q.    And can you generally describe -- well, first, what

12  was the cost of that work to the hull?

13  A.    Roughly $5,000.

14  Q.    Can you generally describe what was involved in that

15  work?

16  A.    There was some damage at the stern of the vessel,

17  that's the back, the flat part of the back of the boat.

18  There are two eye rings at the stern of the boat.  One of

19  them damaged -- actually both had some damage, but there

20  was damage to the fiberglass adjacent to those rings.

21  That was, in my opinion, related to transport of the

22  vessel on the truck when they lashed it down.  That needed

23  to be repaired.  So I estimated repairing that.

24      I estimated the repairs to the bottom of the boat

25  from the, in my opinion, striking an object, some type of

1    submerged object while the boat was under way.

2        I estimated replacing the anchor windlass because

3    there was a part that was broken in it.

4        And I estimated repairing the brush strokes and other

5    areas of damage in the bilge both in the cabin and the

6    engine room that were poor repairs that had been executed

7    by Sea Ray's people, poorly completed.

8        And that's what constituted my $5,000 of repair.

9    Q.   When you're talking about those repairs, you're

10   talking about the things like the brush strokes that you

11   mentioned earlier?

12   A.   Yes.

13   Q.   So.  You concluded that the value of the boat was

14   approximately what?

15   A.   Roughly $127,000.

16   Q.   And that it would cost what to make the repairs to

17   put it into that condition?

18   A.   Roughly $17,000.

19        MR. ROTONDO:  Thank you very much.  I don't have

20   anything further.

21        THE COURT:  Whenever you're ready, Mr. Nikas.

22        MR. NIKAS:  Thank you, Your Honor.

23

24

25

1                          CROSS-EXAMINATION

2     BY MR. NIKAS:

3     Q.    Good morning.

4     A.    Good morning.

5     Q.    Going back to your report and I guess the CV that

6     accompanied that report, Mr. Rotondo asked whether you'd

7     worked for Sea Ray before; is that correct?

8     A.    Yes.

9     Q.    How many times have you been retained by Sea Ray?

10    A.    I think I have personally done three projects.

11    Q.    How many times has your firm been retained by Sea

12    Ray?

13    A.    Probably around eight times.

14    Q.    Were any of those water ingestion cases?

15    A.    Not that I'm aware of.

16    Q.    How many times has your firm handled a water

17    ingestion case for an owner?

18              MR. ROTONDO:  Objection.

19              THE COURT:  Sustained.

20    BY MR. NIKAS:

21    Q.    Mr. Davis, the report that you prepared and provided

22    to Mr. Rotondo, is that a survey report?

23    A.    Yes.

24    Q.    What type of survey report is it?

25    A.    Condition and value survey.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Does it state that somewhere?

2    A.    The purpose of the report is stated on page 2 under

3    the caption "Purpose."

4    Q.    You're a member of NAMS.

5    A.    Yes.

6    Q.    Are you aware of the NAMS guidelines for condition

7    and valuation surveys for small craft and yachts?

8    A.    Yes.

9    Q.    And are you familiar with requirement that the title

10   of the survey appear on the top of the document so as not

11   to be misleading?

12   A.    I think you're confusing the SAMS regulations or

13   guidelines for survey reports with NAMS.  They aren't the

14   same.  Two different organizations.

15   Q.    Let me show you a document that may help refresh your

16   recollection.  In fact, I'll show you two.

17        These are both NAMS documents, are they not?

18   A.    Yes, they are.

19   Q.    If you go through the NAMS documents, one of the main

20   criteria for survey is the objectivity of the survey,

21   correct?

22   A.    Yes.

23   Q.    And in fact, one of the requirements is to disclose

24   owner's information, at whose request the survey is

25   performed for, the documents used, the guidelines, the

PDF created with pdfFactory trial version www.pdffactory.com

1  standards used to evaluate your opinions.  Do you see the

2  list of guidelines that are recommended or that could be

3  used to help form a surveyor's opinions?

4  A.    Yes.

5  Q.    ABYC.  What else is there?

6  A.    National Fire Protection Association.

7  Q.    Which you're a member of?

8  A.    Yes.

9  Q.    And you're a member of ABYC?

10 A.    Yes.

11 Q.    What else is listed there?

12 A.    United States Coast Guard requirements.

13 Q.    Anything else?

14 A.    State and local laws.

15 Q.    Now, when you were asked to perform this inspection

16 of the vessel, did you consult any guidelines that may be

17 germane?

18 A.    Specifically for this inspection?  No.

19 Q.    You were informed generally of the condition of the

20 boat, correct?

21 A.    Yes.

22 Q.    What were you advised?

23 A.    We were told that Mr. Mains had indicated there were

24 problems with his boat.  Essentially what's the substance,

25 I guess, of this lawsuit.

1   Q.   Were they specific about the problems?

2   A.   Well, the specifics that we had were we were aware

3   that there was moisture in the deck and that had been

4   inspected already by other parties.  We were aware that

5   the boat had been returned to the factory and repairs done

6   there and brought back to Connecticut, so we had some

7   sense of what the situation was.

8   Q.   When you were informed about the repairs that took

9   place at the factory, what repairs were those?  What were

10  you advised?

11  A.   Well, we were advised that the boat had been returned

12  to the factory for repairs and then brought back to

13  Connecticut.  Specifically what was done, we weren't

14  specifically told exactly what was done at the factory.

15  Just that it had been returned and brought back here.

16  Q.   Did you read the report of Tom Greaves?

17  A.   Yes.

18  Q.   And have you looked at his recommendations?

19  A.   Yes.

20  Q.   Do you disagree with any of them?

21  A.   I don't understand the question.

22  Q.   Well, this is in evidence, actually.  It's

23  Plaintiffs' 23.  And by our collective difficulty in

24  understanding Mr. Greaves, in written form these are his

25  recommendations.  Looking at these recommendations, do you

1  disagree with any of the conclusions as to the opinions

2  raised therein?

3  A.    I don't agree with some of the recommendations in

4  relationship to what I saw.

5  Q.    Which ones?

6  A.    I agree with number 1.

7        I agree with number 2.

8        I agree that number 3, the bottom paint needs to be

9  stripped and refinished, but I don't think it has anything

10 to do with the transport of the boat or anything.

11 Q.    What's the job of a marine surveyor?

12 A.    As indicated in the purpose of this survey report, we

13 were to complete an inspection of the vessel and render an

14 opinion as to present condition and value, an opinion as

15 to the cause of the damage found, and an opinion as to the

16 repair cost.

17 Q.    And it's her condition and value, correct?

18 A.    Yes, the vessel's.

19 Q.    What difference would it make whether bottom paint

20 affected transport if we're trying to assess the

21 condition, the overall condition and value of the vessel?

22 A.    Part of our job is to also determine the cost.

23 Q.    Right.  I just said, do you disagree with any of the

24 repair recommendations made by Mr. Greaves?

25 A.    Just as far as condition goes?

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   As far as these 12 recommendations go, is there any

2    recommendation that you disagree with?

3    A.   No.  They all can be done, certainly.

4    Q.   So every recommendation you agree with?

5    A.   Yes.

6    Q.   And you also agree in your report with number 6,

7    correct, regarding the improper installation of the

8    exhaust?

9    A.   I don't believe so because the engine exhaust system

10   had been disassembled when we inspected the boat.

11   Q.   Really?

12   A.   Yes.  The engines, actually the heads were off and

13   the exhaust systems would have to be removed in order to

14   get the heads off.

15   Q.   Can you turn to page 5 of your report?

16   A.   Yes.

17   Q.   Eighth paragraph.

18   A.   Yes.

19   Q.   It says, The installation of the water separating

20   lift mufflers has reduced the accessibility to the trim

21   tab oil reservoirs and rutter stuffing boxes in

22   relationship to the previous muffler system.

23   A.   Yes.

24   Q.   So Mr. Greaves in his report talked about the

25   difficulty that the new installation made -- in fact his

PDF created with pdfFactory trial version www.pdffactory.com

1    exact words were -- in fact, we can look at them.

2         "New exhaust installation prohibits access to

3    interior transom area, rudder ports, strut bolts and trim

4    tab reservoir without system removal."

5         Isn't that the exact same conclusion you reached?

6    A.    That's correct.

7    Q.    So you agree with that too?

8    A.    I agree with that statement, yes.

9    Q.    But how could you have come to that conclusion, you

10   just said that it wasn't there when you looked at it?

11   A.    The question that I believe -- my understanding of

12   your question was about the exhaust system.  This

13   particular statement of Mr. Greaves and also of myself in

14   this report relates to the exhaust canister, which is a

15   part of the exhaust system.

16   Q.    Actually, the question was the installation of the

17   exhaust system.

18   A.    Correct.

19   Q.    Where it was installed impeded the access to the

20   engine compartment.

21   A.    I misunderstood your question.  My understanding --

22   if the question is, is the exhaust canister in this

23   particular location, then yes, I agree, it obstructs the

24   ability to access other mechanical portions of the boat

25   that need to be maintained.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.    Okay.  Now, when we first talked this morning, I

2  believe you had said that you hadn't received any

3  education in naval architecture, construction,

4  installation, mechanics, engineering, et cetera.  What was

5  your specific role in this survey that you performed that

6  was the substance of your report that was submitted to

7  Mr. Rotondo?

8  A.    First off, the question that you asked me earlier was

9  about instruction.  I have no formal instruction.  That

10  doesn't mean I don't have any education in those areas.

11      My job on this assignment was to inspect the hull,

12  complete the survey on the hull.  And Jerry Starczowsky,

13  my employee, completed the inspection of the engine and

14  the engine parts.

15  Q.    So you provided an opinion to Mr. Rotondo as to the

16  cause of damage?

17  A.    For the hull, yes.

18  Q.    You didn't mention hydrolocking?

19  A.    No, not in my testimony this morning.

20  Q.    It's in your report.

21  A.    Yes.  My employee Jerry Starczowsky was in charge of

22  the mechanical inspection and the mechanical opinions.

23  Q.    You're in charge of the value portion?

24  A.    I'm in charge of the entire project.  I'm supervising

25  my employee.  I wrote the report.  But the inspection of

1   the mechanical parts was completed by Jerry Starczowsky

2   and the opinion on the mechanical parts is from Jerry

3   Starczowsky, my employee, under my supervision.

4   Q.   Does it say that in your report?

5   A.   Yes.

6   Q.   Where?

7   A.   Well, in the surveyor's worksheet it states it in

8   notes.

9   Q.   Where?

10  A.   In the notes section of the surveyor's worksheet,

11  page 3.  That's the enclosure of surveyor's worksheet

12  where the estimates are.

13  Q.   I see the estimate was prepared by Mr. Starczowsky.

14  A.   For the mechanical portion.

15  Q.   What about the report?

16  A.   The report has both of our signatures on it.  And I'm

17  the one who is writing the report.

18  Q.   Is there anything in the report, the body of the

19  report, that makes clear that Mr. Starczowsky did the

20  engine analysis and engine inspection and you did

21  something else?

22  A.   I'm not sure.

23  Q.   Can you find it?

24  A.   I am not finding a specific reference in the report

25  stating that.

PDF created with pdfFactory trial version www.pdffactory.com

Vol. IV - Page 623

1  Q.   Is there a general reference anywhere in there?

2  A.   The only general reference that I could say is Jerry

3  Starczowsky's signing off on it as the ABYC gasoline

4  engine certified technician.

5  Q.   Isn't that just a listing of what his qualifications

6  are?

7  A.   Yes.

8  Q.   Well, okay.  When you came up with a value, I believe

9  you told Mr. Rotondo this vessel was bristol?

10  A.   Yes.

11  Q.   And just so I don't misquote you, what was your

12  definition of bristol?

13  A.   Better than average, excellent condition, shiny like

14  new, something along those lines.

15  Q.   First thing you said was better than average,

16  correct?

17  A.   Yes.

18  Q.   And then you said excellent condition and then shiny

19  like new?

20  A.   Yes.

21  Q.   At least one of those three appears to be in conflict

22  with the other, would you agree?

23  A.   No.

24  Q.   You used the term bristol to mean excellent

25  condition, correct?

1    A.    Yes.

2    Q.    Not better than average?

3    A.    Better than average could be excellent condition.

4    Q.    Could be, but isn't the real definition of bristol --

5    in fact, where did you get that definition?

6    A.    It's right in the BUC book.  The term bristol is in

7    the BUC book.

8    Q.    When's the first time you heard that term?

9    A.    Oh, probably when I was eight or ten years old.  I'm

10   56 right now.  Forty-some years ago.

11   Q.    Forty-eight years ago?  What was your understanding

12   then?

13   A.    Excellent condition, above average.

14   Q.    Would you agree the definition of bristol is well

15   found, excellent in all respects and seaworthy?

16   A.    I don't know that to be a fact.  I don't know that I

17   saw in the BUC book seaworthy.  And I don't know that I've

18   seen it in any other texts seaworthy.  Seaworthy is an

19   extremely broad term, has a lot more to do than just a

20   boat.

21   Q.    You're a marine surveyor, right?

22   A.    Yes.

23   Q.    And to you and I seaworthy has a specific meaning,

24   correct?

25   A.    I have my idea of what seaworthy is.  I'm not sure I

1    know what yours is.

2    Q.    What's seaworthy?

3    A.    Seaworthy has to do with the fitness of a vessel for

4    any particular voyage or use that it's defined for, but

5    seaworthy is affected by the actions of the crew on board

6    the vessel at any time during the voyage.  So it is a very

7    broad term and it's one that we do not use in any reports

8    that we issue.  When we inspect a hull, we never refer to

9    it as being seaworthy.

10   Q.    Let's use the first definition you used, which was --

11   help me out again, fit for its use?

12   A.    For seaworthy?  A vessel that's fit for its intended

13   or specified purpose.

14   Q.    What was the specified purpose of this vessel?  What

15   is she?

16   A.    Recreational boat.

17   Q.    Which means?

18   A.    It's used for recreational purposes.  It's not

19   engaged in congress.

20   Q.    And by "use," we mean transport on navigable waters?

21   A.    Well, this boat could be used on more than navigable

22   waters.  While afloat.  Use while afloat.

23   Q.    While moving?

24   A.    Well, okay.  Moving preferable under her own power.

25   Q.    Motor boat, right?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Right.

2    Q.    Not a row boat?

3    A.    Yes.

4    Q.    When you assessed this vessel's condition as bristol,

5    was she in fact capable of any usage at all for her

6    intended purpose?

7    A.    The engines would have to have been --

8    Q.    As -- yes or no, as you found her during your

9    inspection, was she capable of her intended use?

10   A.    At that moment in time, no.

11   Q.    Now, when you went ahead and did your conditioned

12   calculation, you actually increased the value of the

13   vessel by a quarter, correct?

14   A.    Yes.  Well, in the books' value, yes.  In the books.

15   Q.    You took the BUC or NADA or ABOS value, correct?

16   A.    Yes.

17   Q.    And you adjusted it up?

18   A.    That's correct.

19   Q.    For the vessel's condition?

20   A.    Yes.

21   Q.    Meaning she was incredibly well-maintained?

22   A.    Yes.

23   Q.    Shiny like new?

24   A.    Yes.

25   Q.    And I think you noted in your report, just so I'm

PDF created with pdfFactory trial version www.pdffactory.com

1    clear, The vessel's in excellent condition except for the

2    current engine condition?

3    A.    Pardon me?

4    Q.    Except for the current engine condition.  The first

5    line of the opinion, page 4.

6    A.    Yes.

7    Q.    So in your experience, how many valuation surveys do

8    you do a year?

9    A.    Personally, around 60, 80, somewhere in there.

10   Q.    How many does your firm do a year?

11   A.    About 850.

12   Q.    A lot, right?

13   A.    Yes.

14   Q.    What's the value of a fiberglass recreational yacht

15   with inoperable engines, generally?  How significantly

16   does that affect value?

17   A.    Oh, it can have a fairly significant impact on value.

18   Q.    What's fairly significant?

19   A.    Well, depending on the overall condition of the boat

20   and the engines, if the engines are inoperable, it could

21   drop the value of the vessel not dollar for dollar for the

22   cost to repair, but somewhere in that dollar figure, that

23   frame, that dollar frame of mind, it will drop the value.

24   Q.    Mr. Davis, it's your testimony that a vessel -- a

25   motor boat with inoperable engines is diminished in value

PDF created with pdfFactory trial version www.pdffactory.com

1    only by the amount of repairs -- actually less the amount

2    of repairs?

3    A.    The antithesis is equally true.  If I have a boat

4    that's worth $60,000 and I put $20,000 worth of repair and

5    electronics, that doesn't give me an $80,000 boat.

6         If I have a $60,000 boat that needs $10,000 in engine

7    repairs, just because I put $10,000 in repairs doesn't

8    make the $60,000 boat worth $70,000.

9    Q.    Right.  But in your great experience, are there a lot

10   of buyers for boats that don't go anywhere unless they

11   need repairs?

12   A.    There are buyers for them, but not a lot.

13   Q.    Supply and demand, doesn't that mean the values would

14   be even more reduced?

15   A.    Given the -- the values can get reduced based upon

16   the circumstances of any particular sale.  The valuation

17   computations that I have done are based on a willing buy,

18   a willing seller with no undue influences.

19   Q.    So, actually, the opinion you have here isn't even

20   this boat.

21   A.    It is for this boat.

22   Q.    Let me do this.  Can you provide me your best opinion

23   as to the current value of this vessel in the condition

24   that you saw her in rather than the condition that you

25   hypothetically placed her in?

1    A.    Today?  Is that the question you're asking me?

2    Because I don't have any materials here to be able to

3    compute that today.

4    Q.    Give me your educated analysis, having done this for

5    40 years, you're the head of the largest marine surveying

6    company in the country, you do this 80 times a year

7    personally.  You've got, as an attachment, the values,

8    right?

9    A.    Yes.

10    Q.    You should be able to extrapolate based on your

11    experience, consistent with the guidelines that NAMS

12    provides you.

13    A.    So you're asking me to extrapolate based upon the

14    inspection that was done in 2004.

15    Q.    Yes.

16    A.    Not today sitting here in this chair.

17    Q.    What was the value -- what was the actual value of

18    the vessel, as you saw it?

19    A.    Well, the assumptions in the value that I presented

20    here include that the equipment and cushions and

21    accessories that have been removed from the boat, the

22    electronics, et cetera, that were in the basement of

23    Mr. Mains' house are available and can be put back.  Are

24    you asking me to make my value determination on exactly

25    what I saw at the time I was on that boat with all of that

1    equipment gone?

2    Q.    I want you to render an opinion consistent with what

3    you wrote word-for-word on page 2 of your report.    Under

4    "Purpose," it said, "To complete an inspection of the

5    subject vessel and render an opinion as to her present" --

6    is that what you used, the word?

7    A.    Yes.

8    Q.    -- "present condition and value."

9         Isn't it true that the value that you opined on on

10   page 4 is inconsistent with the purpose you stated on

11   page 2?

12   A.    No, I don't think it is.

13   Q.    What does "present" mean?

14   A.    "Present" means what were the facts at hand at the

15   time I looked at that boat.

16   Q.    What does "condition" mean?

17   A.    What condition was it in at the time I looked at that

18   boat.

19   Q.    So facts of the time, condition when you saw it.  Is

20   the opinion that you express on page 4 of 6 consistent

21   with what you just told me?

22   A.    Yes.

23   Q.    Read the first word of the second sentence in

24   Opinion.

25   A.    Once.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   What does that word mean to you?

2   A.   Upon.  To be.  Something along those.

3   Q.   To be.

4   A.   Yes.

5   Q.   Something that happens in the future?

6   A.   Yes.

7   Q.   Right?  That's not present.

8   A.   Well, there are many definitions to "present."  If

9   the definition is present being here, that's what I'm

10  using.  Given these circumstances that all of this

11  equipment, although it's not on the boat, is present, the

12  radar, the microwave, the cushions, all of those things

13  were not on the boat when I looked at it but they were

14  present in the basement of Mr. Mains' house.

15  Q.   What about the engines?

16  A.   The engine blocks were present.

17  Q.   Okay.

18  A.   Other parts of the engine were in Mr. Mains'

19  basements, so they are present.

20  Q.   Fine, engine blocks were present.  Let's go to the

21  value of those engine blocks.  What type of engines?

22  A.   7.4-liter MerCruisers.

23  Q.   Wet liner cylinders or dry?

24  A.   I'm not the mechanical person.

25  Q.   I understand that Mr. Starczowsky did the mechanical

1    component, but I presume, since you testified that the

2    most significant factor affecting value was the

3    operability of the engine, and you just said the engine

4    blocks are there so they're present, you said you were

5    going to assess the condition of the parts presents.  What

6    was the condition of that engine block?

7    A.    The heads were removed.  There was oil and water

8    present on top of the cylinders.  There was rust present

9    on the valves and on the heads.  There was scoring in the

10   cylinder walls.

11   Q.    Okay.  Now, all the other stuff can be wiped off,

12   right?

13   A.    What other stuff?

14   Q.    Oil on top of whatever, okay.

15         Rust can be scaled off.  Rust isn't normally fatal,

16   correct?  Depends on where it is?

17   A.    The engines need to be rebuilt.

18   Q.    Okay.  You saw the scoring, right?

19   A.    Yes.

20   Q.    With your own eyes?

21   A.    Yes.

22   Q.    How did you do that?

23   A.    Looked at it with my eyes.

24   Q.    Looked at it?

25   A.    Yes.

1    Q.    What did you think when you saw that scoring?

2    A.    That there was water in the engine.

3    Q.    Okay.  Is that it?

4    A.    Yes.

5    Q.    You're a professional surveyor.  I think your

6    qualification actually is, if I get this right, you're a

7    fellow of the American --

8    A.    -- College of Forensic Examiners.

9    Q.    Fellow of the American College of Forensic Examiners?

10   A.    Yes.

11   Q.    What is a forensic examiner?

12   A.    It's our job to look at things that are broken and

13   determine why they broke.

14   Q.    Okay, that's true.

15        And then look at your report, page 2, first

16   subordinate clause, what does it say?

17   A.    What do you mean by "first subordinate"?

18   Q.    Sorry.  After the first comma.

19   A.    What line is it that you're referring to?

20   Q.    There's only one sentence under Purpose on page 2.

21        THE COURT:  You only said page 2.  You didn't

22   say under Purpose.

23        MR. NIKAS:  I apologize.

24   A.    Where are we at again?

25

PDF created with pdfFactory trial version www.pdffactory.com

1   BY MR. NIKAS:

2   Q.   Under Purpose.

3   A.   Yes.

4   Q.   That's the reason you were there, right?

5   A.   Correct.

6   Q.   So this was the whole point about going out there?

7   A.   That's correct.

8   Q.   Okay.  After the comma.

9   A.   Yes.

10  Q.   When what did you say your job was?

11  A.   An opinion as to the cause of damage(s) found.

12  Q.   An opinion as to the cause of the damage found?

13  A.   Yes.

14  Q.   That was your job?

15  A.   Yes.

16  Q.   I assume Mr. Rotondo or somebody else -- in fact, I

17  think you actually say Deborah Russo, right?

18  A.   That's correct.

19  Q.   At Mr. Rotondo's firm contacted you on behalf of the

20  firm and asked you to do what's found under Purpose,

21  correct?

22  A.   That's correct.

23  Q.   Is scoring in a cylinder damage?

24  A.   Yes.

25  Q.   Significant damage, isn't it?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    It can be, yes.

2    Q.    You know what the tolerance of these cylinders to the

3    pistons are?

4    A.    No.

5    Q.    Did you see?

6          You looked?

7    A.    Yes.

8    Q.    Were they extremely tight tolerances?

9    A.    I didn't measure the tolerances.

10   Q.    I didn't ask you what the measurement was.  Were they

11   extremely tight?

12   A.    Well, a piston rides inside the cylinder with three

13   rings.  So the rings are there to -- well, there's an oil

14   ring, a compression ring, and another oil ring.  So those

15   tolerances are going to be close, they have to be.

16   Q.    Very close, right?

17   A.    Yes.

18   Q.    So scoring in a cylinder, right, would indicate what?

19   A.    There was water present on the top of the piston --

20   Q.    What causes scoring?

21   A.    There can be a number of things that cause scoring.

22   Q.    Actually, I'll ask you something and you agree with

23   me.  Not what caused the conditions that allowed the

24   scoring to occur, but what causes scoring:  Isn't it true

25   that scoring can only occur, at least in an engine like

1    this, through metal-to-metal contact or metal-to-debris

2    contact?

3            MR. ROTONDO:  There's about four questions

4    there.  Can we have one question?

5    BY MR. NIKAS:

6    Q.   Doesn't scoring indicate metal-to-metal or

7    metal-to-foreign body conduct?

8    A.   I will agree that there's a foreign substance in

9    there that is causing the scoring, yes.

10   Q.   Has to be a foreign substance of grit or something,

11   abrasive substance?

12   A.   Something that has a greater hardness than the liner

13   of the cylinder, which is either steel or chrome, which is

14   pretty tough stuff.  Chrome is very hard.

15   Q.   This is a marine engine, right?

16   A.   Yes.

17   Q.   Marine engines operate for long periods at a time,

18   correct?

19   A.   Yes.

20   Q.   So they're designed to be reliable, correct?

21   A.   Yes.

22   Q.   And do you know enough about engine operation to

23   determine whether the extent of the scoring that you saw

24   would have had a significant impact on the operation of

25   the engines?

1    A.    No.

2    Q.    So when you looked into the engines and you noticed

3    the scoring, that was it?  You didn't think about anything

4    else?

5    A.    Well, we looked at more than just the pistons and

6    cylinders.

7    Q.    Did you ask yourself what caused this damage?

8    A.    Yes.

9    Q.    So you did, right?

10   A.    Yes.

11   Q.    I thought you would have.  It doesn't make sense,

12   with your background, not to have.  What did you

13   determine?

14   A.    It's our conclusion that the engine had become

15   hydrolocked.  Water on top of the pistons, water won't

16   compress so the engine won't turn over.

17   Q.    Are you familiar with friction?

18   A.    Yes.

19   Q.    For friction to occur, you need what?

20   A.    We have to have close tolerance, things have to be

21   very close together without any lubrication.

22   Q.    You just need movement, right?

23   A.    Yes.

24   Q.    And in fact, in your report -- let me find it.

25         On page 5 again -- sorry to bring you back to that

1  page.  The second to last paragraph, right?

2  A.   Yes.

3  Q.   You blame the hydrolocking and the water ingestion on

4  the flushing, correct?

5  A.   That's correct.

6  Q.   And you in fact go so far to say the instructions

7  weren't followed, right?

8  A.   Yes.

9  Q.   You do say that, right?

10  A.   Yes.

11  Q.   So you consulted the instructions, right?

12  A.   Yes.

13  Q.   What instructions did you consult when forming this

14  opinion?

15  A.   There's a set of instructions from Mercury for fresh

16  water flushing on water lift muffler systems.  And then

17  there's a set of instructions from Mercury for flushing --

18  fresh water flushing of this engine with the water

19  separating water lift muffler system.

20  Q.   What instructions did you consult?

21  A.   Both.

22  Q.   And where did you find them?

23  A.   The water lift muffler instructions, we actually had

24  those in our office.

25       The water separating water lift muffler instructions

1    were supplied to us by Deborah Russo.

2    Q.    Okay.  What instructions were supplied with the boat?

3    A.    As I understand it, the water lift muffler

4    instructions were supplied with the boat.

5    Q.    Wow.  Sea Ray was so prescient that three years

6    before that exhaust system was installed on board this

7    boat they happened to put a copy of those instructions on

8    board for the owner?

9    A.    I think you're misunderstanding.  I said for the

10    water lift muffler, which was the muffler system that was

11    originally on that boat.  I believe that the instructions

12    were shown to us by Mr. Mains when we were in the basement

13    of his house.

14    Q.    Were you the picture taker?

15    A.    Yes.

16                MR. NIKAS:  May I approach?

17                THE COURT:  You may.

18    BY MR. NIKAS:

19    Q.    These are your photographs I believe marked

20    Defendant's Exhibit 20 through 35.  And these are color so

21    they're probably more legible.

22         See if you can find something that shows what type of

23    exhaust was installed on board.

24    A.    There's no photographs of the exhaust system that we

25    took.

1    Q.   Did you take any pictures of the engine?

2    A.   There's a photograph of the engine, that's

3    Exhibit 20-56, with the sheets over the top of it.

4    Q.   All right.  I'm informed by my colleague that maybe

5    you should look at page 2 of your report, maybe that will

6    help refresh your recollection.

7    A.   Page 2 of --

8    Q.   Your report.  First full sentence.

9    A.   Yes.

10   Q.   Maybe you could read it to yourself.

11   A.   Yes.

12   Q.   Does it help refresh your recollection that when

13   built this boat had a collector exhaust?

14   A.   That is a water lift muffler.

15   Q.   Do you have a distinction between -- in your sentence

16   you say the exhaust system mufflers were changed to water

17   separating?

18   A.   Yes.  That's a different muffler than the water lift

19   muffler.

20   Q.   How does Sea Ray describe this exhaust system?

21   A.   I don't have any paperwork from them on what words

22   they used.

23   Q.   How many Sea Rays have you inspected?

24   A.   Quite a few.

25   Q.   Over a hundred, I assume, in your career?

1    A.    Yes.

2    Q.    Over a couple hundred?

3    A.    Yes.

4    Q.    I'd like to show you a document just to refresh your

5    recollection and for no other purpose.

6              MR. ROTONDO:  Can I ask if this document has

7    been marked as an exhibit?

8              MR. NIKAS:  It has been.

9                (Pause.)

10   BY MR. NIKAS:

11   Q.    How does Sea Ray identify these mufflers or this

12   exhaust?

13   A.    Is the diagram in this photograph the muffler system

14   that you're referring to?

15   Q.    Yes.

16   A.    On one page that you've given me there's a diagram

17   and it says a water lift exhaust system.

18         And on the other page it's a collector or horizontal

19   collector exhaust system.

20   Q.    Let's use those names.  When built at the factory,

21   what exhaust system was on this boat?

22   A.    The horizontal collector.

23   Q.    When you saw it, it had a water lift, correct?

24   A.    It had a water lift -- what was the term I used?

25   Q.    The term you used was water lift-type muffler.

PDF created with pdfFactory trial version www.pdffactory.com

1  Page 5 of your report, second paragraph.

2  A.   It's a water lift exhaust -- water separating water

3  lift muffler is what it had on it.

4  Q.   Can you show me where you use that terminology

5  anywhere in your report?

6  A.   Page 3 of 6, last paragraph, second sentence.

7  Q.   Water separating lift type.  All right.

8       So if you use the flushing procedures for the exhaust

9  system that was installed on this boat at the factory,

10  what would happen?

11  A.   Are you referring to the original exhaust system?

12  Q.   Yes.  I'm referring to your paragraph on page 5 of 6

13  where you say, Water ingestion during engine flushing is

14  probable if the MerCruiser flushing instructions for

15  engines with water lift type --

16            MR. ROTONDO:  I object as being outside of the

17  scope of direct.

18            THE COURT:  He says he's referring to

19  something -- what paragraph are you on on page 5 of 6?

20            MR. NIKAS:  Second to the last paragraph on

21  page 5.

22            THE COURT:  And your objection, Mr. Rotondo?

23            MR. ROTONDO:  Outside the scope of direct.

24            MR. NIKAS:  Goes to value, Your Honor.

25            THE COURT:  That's your basis?  Overruled.  Your

1  argument's overruled.  Objection's sustained.

2  BY MR. NIKAS:

3  Q.  Let's go back to the original value question then.

4      The engine blocks, if the hydrolocking occurred or if

5  the scoring occurred during hydrolocking, when this engine

6  was flushed, were the engines running?

7  A.  No.

8  Q.  If the engines weren't running, how did the scoring

9  happen?

10            MR. ROTONDO:  Objection, again outside the scope

11  of direct.

12            THE COURT:  Do you want to give me something

13  that fits within the scope?

14            MR. NIKAS:  He stated on direct that these

15  engines should be replaced and remanufactured.  I'm going

16  to establish that the damage --

17            THE COURT:  Don't tell me what you're going to

18  establish.  That's what he stated and that's what you're

19  basing --

20            MR. NIKAS:  Yes.

21            THE COURT:  Objection's sustained.

22  BY MR. NIKAS:

23  Q.  You talked about remanufactured engines, correct?

24  A.  Yes.

25  Q.  You said that was great because there was someone --

PDF created with pdfFactory trial version www.pdffactory.com

1    what was the term?

2    A.    One, there's a warranty.

3    Q.    Right, a warranty.  Who is the warranty offered by?

4    A.    Depends on who remanufactured the engines.  We used

5    remanufactured engines from MerCruiser in our estimate.

6    Q.    And the cost of the remanufactured engines you found

7    was $6,000 apiece or so?

8    A.    Roughly $12,000.

9    Q.    Installation?

10   A.    That's included.

11   Q.    Exhaust?

12   A.    Putting it back together is included.

13   Q.    Is there any effect on value caused by the

14   replacement engines?

15   A.    Well, the remanufactured engines -- I think I have

16   reference in here.

17   Q.    You'd have to disclose that, right, when you sold it?

18   A.    I don't know that you have to disclose anything, but

19   I think you should disclose it.

20   Q.    Well, do boats have an odometer?

21   A.    They have an hour meter.

22   Q.    They have an hour meter.

23         So let's say in 2001 the boat was three years old,

24   right?

25   A.    That's correct.

1   Q.    And with remanufactured engines, the hour meter would

2   show --

3   A.    The hour meter won't change.  The hour meter at the

4   time we looked at the boat was roughly 150 hours.  There's

5   a different between the two engines but roughly 150 hours.

6   And the remanufactured engine would have zero hours on it.

7   It's similar to a brand new engine but it isn't because

8   some used parts are used in remanufactured engines.

9   Q.    What used parts are reused?

10  A.    It's up to whoever the remanufacturer is.  Sometimes

11  they'll use an old engine block.  This estimate that we

12  prepared is predicated on returning the blocks that are in

13  the engine, it's called a core credit, it's a thousand

14  dollars per engine.

15  Q.    I'm sorry?

16  A.    Returning the engines that are there, just the blocks

17  have to be sent back to get a core credit.

18  Q.    Your estimate actually was based on using these

19  engines?

20  A.    No, no, no, no, no.  The estimate is based upon new

21  remanufactured engines complete.  But you have to

22  return -- you have to send the old engines back to the

23  factory, the person that you bought them, because they'll

24  rebuild those themselves.  But you're not using those over

25  again, you're getting all different components.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Does the price you quoted include a core?

2    A.    Yes, it includes a core credit.

3    Q.    Did you disclose that?

4    A.    That's part of remanufacturing.  That's how you do an

5    estimate for remanufactured engines.

6    Q.    What happens -- let's say I want to return brake

7    drums, brake disks, something with a core deposit.

8    A.    Yes.

9    Q.    And the component is too damaged to be rebuilt.  What

10   happens?

11   A.    There would be an increase in the cost because you

12   wouldn't get the core credit.

13   Q.    In this case, how much would the cost have increased

14   if these engines could not be remanufactured?

15   A.    The core credit is a thousand dollars per engine.

16   Q.    Okay.  And what led you to believe that these engines

17   could be submitted as cores?

18   A.    Well, we wrote this estimate two ways.  We also wrote

19   it to rebuild the existing engines.  It's our opinion that

20   the engines can be rebuilt so there shouldn't be any

21   problem with the core credit.

22   Q.    It's your opinion that these engines could be

23   rebuilt?

24   A.    Yes.

25   Q.    How?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Same way you rebuild any engine.

2    Q.    I don't want to know about any engine.  I'm very

3    limited.  I can only talk about this one.  How would you

4    rebuild this one?

5    A.    You'd remove the engine blocks, take the parts out of

6    them.  Get a debris machine and clean all of the block

7    parts.  Clean up the crank shaft and camshaft.  Put in new

8    bearings, new pistons with new rings.  And put it all back

9    together and off you go.

10   Q.    What about the scoring?

11   A.    That's part of the machining, honing down the

12   cylinder walls.

13   Q.    So what pistons would you put in there?

14   A.    Well, depending on what the machining was, you can

15   either go with slightly oversized or from 10-thousandths

16   to 20- or 30-thousandths, depending what the machining

17   turned up.

18   Q.    You'd have to put in oversized pistons, right?

19   A.    Yes.  Depending on how badly -- how much machining

20   has to be done.  If you're just honing the cylinders,

21   which means you're just cleaning the inside of them, you

22   could go back with the original pistons.  But if the

23   damage is severe where you have to take down more

24   material, then you're going to have to go with oversized

25   pistons if you rebuilt this engine.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   You saw the scoring?

2  A.   Yes.

3  Q.   Did you believe from the scoring that you saw that

4  the cylinders could be honed?

5  A.   Yes.

6  Q.   That's your opinion?

7  A.   Yes.

8  Q.   When considering value, you also have to consider the

9  marketplace, correct?

10  A.   Yes.

11  Q.   And just like with automobiles, there are certain

12  automobiles that have a bigger demands than others,

13  correct?

14  A.   Yes.

15  Q.   And you have to consider those factors when

16  determining the value, right?

17  A.   Yes.

18  Q.   And in cases where boats have known problems, you

19  have to adjust for that, correct?

20  A.   Yes.

21  Q.   Big Uniflite built in the early '70s, super big

22  blisters, everybody knows it, what happens to the value?

23  A.   Value goes down.

24  Q.   When considering value in this case, were there any

25  factors that you considered regarding the market or

1  regarding demands or any factors that would affect demand?

2  A.   Those factors are considered in the valuation

3  computation because I'm using actual selling prices so I

4  know what that model with those engines is selling for at

5  the time the value was completed, so those market

6  considerations are already taken into account.

7  Q.   So you never adjust personally for market

8  considerations?

9  A.   I will make an adjustment for market considerations

10 if I do not have current selling prices for the particular

11 boat that I'm dealing with.  But if I've got current

12 selling prices, then I've got a true reflection of what

13 the market is telling me it will sell for.  Those are

14 actual selling prices.

15 Q.   How many exemplars did you have?  How many examples

16 of other sold boats did you rely on?

17 A.   It's in my report.  There are four boats used for

18 market listings, that's asking prices.  And I had three

19 boats in that time frame that I had selling prices on.

20 Q.   Over about a year and something months -- actually,

21 more than a year and a half you had three examples to look

22 at, right?

23 A.   The data was pulled up at the time the report was

24 written.

25 Q.   Right.  And the report was written in when?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   October of 2004.

2   Q.   Okay.  And your range of sales goes from April of

3   2003 to October of 2004?

4   A.   Actually, September of 2004.

5   Q.   Okay.  Nine months.  That's a year and a half, right?

6   A.   Yes.  Those are the most current sales for that

7   particular model that I could pull up.

8   Q.   I'm not disputing that.  So you had three exemplars

9   with which to compare this boat, right?

10  A.   Yes.

11  Q.   Then you also compared this boat with four other

12  boats that were actually offered for sale, correct?

13  A.   Yes.

14  Q.   Was this boat really comparable to those?

15  A.   It's the same model, same engines.  So it's

16  comparable, yes.

17  Q.   Same condition?

18  A.   Well, the particular boats that I have listed there,

19  there's one at 250 hours, which is roughly 100 more hours

20  of use than the subject.  And the one with the most number

21  of hours is 400 hours.  So I would say all of these boats

22  have more use on them than the subject boat.

23  Q.   That's right.  In fact, isn't it true that this boat

24  had less than half and some more usage than the highest

25  hour boat and had, just like you said, a hundred fewer

1    hours than the next closest boat?

2    A.    Of the market value boats, yes.

3    Q.    Of the boats you compared it with?

4    A.    On the market listing boats, yes.

5    Q.    You testified to Mr. Rotondo, and I didn't catch it

6    all, something about disseminating information.  Can you

7    refresh my recollection as to what that was?

8    A.    I'm sorry, I don't understand the question.

9    Q.    One of your jobs, you said you disseminated

10   information maybe from one of your organizations or one of

11   your committees?

12   A.    I disseminate information to other yacht and small

13   craft surveyors that are members of the National

14   Association of Marine Surveyors as a part of my duties as

15   chair of the Yachts and Small Craft Technical Committee.

16   Q.    What kinds of stuff do you disseminate?

17   A.    Actually, I publish a web site for the surveyor

18   members.  And the information on there is links to

19   organizations both in the United States, Canada, Britain,

20   and the European union where their duties as yachts and

21   small craft surveyor would put them in contact with the

22   rules or regulations or whatever that these organizations

23   disseminate.  I publish information guidelines for

24   surveyors that are part of NAMS structure or just general

25   guidelines.  Sometimes I -- I believe I have some NAVECS,

PDF created with pdfFactory trial version www.pdffactory.com

1    which are U.S. Coast Guard publications pertaining to

2    particular things with particular types of vessels, it's

3    technical publications.  Things along those lines.

4    Q.    So you've got a pulse on the entire recreational

5    marine industry?

6    A.    I try to keep in touch, yes.

7    Q.    If you're distributing this information out, you're,

8    gosh, a member of 20 or so committees and organizations?

9    A.    Yes.

10   Q.    And you're distributing information out to other

11   surveyors, right?

12   A.    Yes.

13   Q.    And then one of the things that you're considering,

14   right, one of the biggest jobs of a surveyor is to issue

15   condition and value surveys?

16   A.    It is a function of the job.  It's not the biggest

17   job for us, but it is a function of being a marine

18   surveyor.

19   Q.    Okay.  What do you know about the installation of

20   water lift mufflers into Sea Rays?

21           MR. ROTONDO:  Objection, outside the scope.

22           THE COURT:  Can you tie it to the scope somehow?

23           MR. NIKAS:  I can, if I can just get --

24           THE COURT:  No, you tell me first, what are we

25   talking about in terms of the direct?

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. NIKAS:  It's going to go to value as to the

2     suppression of demand in the marketplace due to the 2001

3     conversion to the water lift muffler.

4          THE COURT:  As long as it stays narrowly on that

5     track.

6     A.   Can you repeat the question?

7     BY MR. NIKAS:

8     Q.   Sure.

9          What do you know about Sea Ray's adoption of the

10    water lift muffler in 2001?

11    A.   All I know is that they started installing water lift

12    mufflers.

13    Q.   Do you know why?

14          MR. ROTONDO:  Objection, Your Honor.

15          THE COURT:  Sustained.

16    BY MR. NIKAS:

17    Q.   You're a member of BoatU.S., right?

18    A.   Yes.

19    Q.   In fact, did the ABYC or the consumer -- or general

20    public -- what was it, representative?

21    A.   How their rules are set up, yeah, I would essentially

22    be the public, representing the public.

23    Q.   Because the ABYC, the membership is divided amongst

24    architects, engineers, licensed officers, right?

25    A.   Not in ABYC it's not, no.

1  Q.    How is ABYC divided?

2  A.    The structure for ABYC, it's set up to represent

3  essentially three segments of the industry.  One is the

4  manufacturer, they participate.  So figure it's one-third.

5  This is the ideal:  One-third manufacturer; one-third

6  government or industry, maybe insurance would be part of

7  that; and then one-third public.  And all of the

8  subcommittees are supposed to have that kind of complement

9  so when you're making these safety standards, essentially,

10  that you don't have the agenda of any one segment of the

11  industry unduly influencing the safety standard.  That's

12  the goal.

13  Q.    Were you president of the ABYC?

14  A.    Was I president?  No.  I was on their board of

15  directors and I'm on their technical board.

16  Q.    Board of directors, that's big?

17  A.    Yes.

18  Q.    In fact, ABYC is probably the oldest organization of

19  its kind in the U.S., right?

20  A.    Yes, they are.

21  Q.    In fact, ABYC actually promulgates the standards used

22  by most manufacturers, right?

23  A.    Yes, they do.

24  Q.    In fact, MerCruiser actually states that they adhere

25  to ABYC standards, don't they?

1    A.    I don't know specifically if MerCruiser does say

2    that.

3    Q.    You're on the technical committee?

4    A.    Yes.

5    Q.    So the ABYC actually publishes technical standards,

6    right?

7    A.    That's correct.

8    Q.    And they print them?

9    A.    Yes.

10   Q.    And they publish them for use by boat builders,

11   engine manufacturers, ship yards, mechanics, surveyors,

12   attorneys?

13   A.    Yes.

14   Q.    Do you look at all the standards that come out?

15   A.    Yes, I do.

16   Q.    And in fact, in the NAMS guidelines for preparation

17   of a survey, they actually recommend that you look at the

18   ABYC guidelines, correct?

19   A.    That's correct.

20   Q.    In fact, is it the first thing listed, I think?

21   A.    It is 2(a), so the first one in the sublist.

22   Q.    You know this boat had a water ingestion problem,

23   right?

24             MR. ROTONDO:  Objection.

25             THE COURT:  Sustained.

1   BY MR. NIKAS:

2   Q.    When you inspected the boat, you saw that it ingested

3   water, right?

4   A.    There was water on top of the pistons.  It had

5   ingested water, yes.

6              THE COURT:  Are we still on the track for

7   valuation?  Because it's taking a long time to get to the

8   point.

9              MR. NIKAS:  Well, let me skip ahead and I'll

10  actually move this along.

11             THE COURT:  It's 12:09, by the way.

12             MR. NIKAS:  12:15 is my --

13             THE COURT:  Yes.

14  BY MR. NIKAS:

15  Q.    There are ABYC standards for the exhaust, right?

16  A.    Yes, there are.

17  Q.    And they do recommend -- withdrawn.

18        Do you read BoatU.S. publications?

19  A.    Yes, I do.

20  Q.    Do you read BoatU.S. Consumer Protection Bureau

21  bulletins and reports?

22  A.    Yes.

23  Q.    That would be a necessary part of actually providing

24  research and background for your values, correct?

25  A.    Yes.

1  Q.   Did you ever read an article called *Engine Blocks*

2  *Choke on Water*?

3              MR. ROTONDO:  Objection, Your Honor.

4              THE COURT:  Sustained.

5  BY MR. NIKAS:

6  Q.   Mr. Davis, is BoatU.S. the largest boating

7  organization in the world?

8  A.   I don't know if they are in the world.  But they're

9  about 650,000 members, so certainly the largest in the

10 U.S.

11 Q.   And it's comprised almost entirely of recreational

12 boaters, correct?

13 A.   That's my understanding, yes.

14 Q.   And those 700,000, slightly less than, 650,000

15 members, are potential buyers in the marketplace for this

16 boat, are they not?

17 A.   Yes.

18 Q.   And if BoatU.S. were to publish something regarding a

19 defect in the condition of a boat, given the size of the

20 organization, wouldn't that have a significant impact on

21 the value of the boat in question?

22              MR. ROTONDO:  Objection.

23              THE COURT:  Sustained.

24              MR. NIKAS:  It's a hypothetical.

25              THE COURT:  Sustained.

1   BY MR. NIKAS:

2   Q.   Mr. Davis, in any of the committees that you serve on

3   in the organizations you belong to, any Sea Ray people on

4   those boards or those committees with you?

5   A.   Yes.

6   Q.   Who?

7   A.   Dave Marlow.

8   Q.   How many?

9   A.   How many what?

10  Q.   How many committees does he serve on with you?

11  A.   Two.

12  Q.   How long have you known him?

13  A.   About ten years.

14  Q.   Friend?

15  A.   Yes.  Personal friend, yes.

16  Q.   Good friend?

17  A.   Yeah, he's a good friend of mine.

18          MR. NIKAS:  No further questions.

19          THE COURT:  It's 12:12 so I think I'll let the

20  jurors take their break.

21          Are you going to have redirect, Mr. Rotondo?

22          MR. ROTONDO:  If I do, it will be very short.

23  I'd like to think about it over lunch.

24          THE COURT:  Okay.

25          You're not excused yet, sir.

1           We'll let the jurors go next door to lunch.

2           I'll have a question for counsel just in terms

3    of who the other witnesses are.

4                (Whereupon the jury left the courtroom.)

5           THE COURT:  You can step down, sir.

6           THE WITNESS:  Thank you.

7           THE COURT:  Mr. Rotondo, how are we doing in

8    terms of your projection in terms of the schedule?

9           MR. ROTONDO:  There are two witnesses left for

10   today.  Mr. Wade, who plaintiffs are going to call as a

11   result of Your Honor's order, and Mr. Wilson.

12          THE COURT:  How about Monday?

13          MR. ROTONDO:  At the end of the day today we

14   should be able to tell the Court whether we're going to

15   call any other witnesses.

16          THE COURT:  Thank you.

17          I expect everybody to be back at 1:15 because

18   the jury will be in the box about a minute after that if

19   you're not.

20          MR. NIKAS:  Does that mean Mr. Wade will

21   testify?

22          MR. ROTONDO:  He's in the courtroom.

23          THE COURT:  We'll recess.

24                (Whereupon, a recess followed.)

25

Vol. IV - Page 660

1          THE COURT:  We'll bring the jury in.

2          Are we going to continue with this witness?

3          MR. ROTONDO:  No, Your Honor.  We decided not to

4   do any redirect on Mr. Davis.

5          The next witness the plaintiff is calling is

6   David Wade.

7               (Whereupon, the jury entered the

8               courtroom.)

9          THE COURT:  Please be seated everyone.

10         Ladies and gentlemen, you will recall that I

11  believe yesterday we said that the plaintiff was resting

12  subject to finishing the redirect and also calling a

13  witness, Mr. Wade, I believe.

14         At this time, Mr. Nikas, you can call your

15  witness.

16         MR. NIKAS:  Plaintiffs would like to call

17  Mr. Wade, please.

18         THE CLERK:  Raise your right hand, sir.

19

20                   DAVID WADE,

21      called as a witness, having been first duly

22      sworn, was examined and testified as follows:

23

24         THE CLERK:  Please be seated.

25         Could you state your name and spell your last

PDF created with pdfFactory trial version www.pdffactory.com

1   name for the record, please.

2          THE WITNESS:  David Wade.  Last name is W-a-d-e.

3          THE CLERK:  City and state your of your

4   residence.

5          THE WITNESS:  Seymour, Tennessee.

6          THE CLERK:  Thank you, sir.

7

8                    DIRECT EXAMINATION

9   BY MR. NIKAS:

10  Q.   Good afternoon, Mr. Wade.

11  A.   Good afternoon.

12  Q.   Mr. Wade, can you tell us what your current

13  occupation is?

14  A.   Yeah, my current position is working with Sea Ray

15  Boats as a product quality manager.

16  Q.   And what facility do you work at?

17  A.   I work out of the corporate office.

18  Q.   Which is where?

19  A.   Knoxville, Tennessee.

20  Q.   Is the corporate office also located at the same

21  facility as the production facility in which this boat was

22  built?

23  A.   No.  It's adjacent to it.

24  Q.   By adjacent, how close is that?

25  A.   A quarter mile.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.    You stated your position was?

2   A.    Product quality manager.

3   Q.    What are the duties of a product quality manager?

4   A.    Currently I work with the plant's quality teams to

5   look at product quality issues such as if there is a light

6   switch that continues to fail on us, we will work with

7   those suppliers to try and improve the quality on those

8   items.

9   Q.    And do your duties extend to the whole of the vessel?

10  A.    Yeah.  I do have some leeway for the entire vessel,

11  yes.

12  Q.    So there are no components that are excluded from

13  your responsibilities?

14  A.    No.

15  Q.    So it's safe to assume, then, that you have

16  responsibility then for the engines and the quality of the

17  engines?

18  A.    I don't have responsibility for the quality of the

19  engines.  I have responsibility if there are issues with

20  those engines of working with the manufacturer to correct

21  issues.

22  Q.    So I understand, is your position reactive rather

23  than pro-active, meaning you respond to only to complaints

24  rather than trying to ensure that certain quality

25  standards are adhered to?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   Yeah, I respond to -- respond to.

2   Q.   So you're not like quality control like on the

3   factory floor as things are being built to determine --

4   A.   No.

5   Q.   So you respond just to either customer concerns or

6   identification of problem areas by factory employees?

7   A.   Correct.

8   Q.   At your facility, which is the Sea Ray headquarters,

9   you maintain an office there?

10  A.   Yes.

11  Q.   How often are you at the factory?

12  A.   I go out to the facilities -- I'm usually in one of

13  the facilities at least once a week.

14  Q.   So it's fair to state that you actually work at both

15  places?

16  A.   No, I actually work at the corporate office.

17  Q.   Is it fair to say that your job responsibilities take

18  you to the factory on a regular basis?

19  A.   Yes.

20  Q.   Now, when were you appointed the product quality

21  manager for Sea Ray?

22  A.   Approximately last October.

23  Q.   Which would have been '07?

24  A.   '07, correct.

25  Q.   And before then, what was your job title?

1  A.    Gelcoat quality manager.

2  Q.    And when you were gelcoat quality manager, were you

3  subordinate to the person that was the product quality

4  manager?

5  A.    No, I was subordinate to another gentleman who was

6  with our technology center.

7  Q.    What were your responsibilities then as the gelcoat

8  quality manager?

9  A.    It was to review fiberglass gelcoat issues and to

10  work with the plants on action items to try and improve

11  gelcoat quality.

12  Q.    And when did you get that job as gelcoat quality

13  manager?

14  A.    Approximately April 2007.

15  Q.    And before April 2007, were you employed by Sea Ray?

16  A.    Yes.

17  Q.    And what was your position then?

18  A.    Manager of the dealer service team.

19  Q.    Manager of the dealer service team?

20  A.    Yes.

21  Q.    And what were the duties of the manager of the dealer

22  service team?

23  A.    To administer the warranty policy for the product.

24  Q.    What does that mean?

25  A.    I supervised the employees, the warranty

1   representatives who fielded the dealer calls and worked

2   through warranty claims.

3   Q.   And would that be dealing with the dealerships

4   directly or would that be dealing with the customers

5   directly?

6   A.   Dealerships.

7   Q.   Is it typical in your job or in your job then that a

8   customer would have a repair item under warranty and they

9   would take it to the dealer?

10  A.   Correct.

11  Q.   And then the dealer would contact you?

12  A.   Yes.

13  Q.   And would they be contacting you for technical

14  assistance?

15  A.   At times.

16  Q.   Would they be contacting you for payment?

17  A.   Yes.

18  Q.   What other items would they be contacting you with?

19  A.   Sometimes just pre-approval for the item prior to the

20  payment.

21  Q.   And so for every repair performed under warranty for

22  a Sea Ray boat, did that warranty claim go through your

23  department?

24  A.   Yes.

25  Q.   And you held that position up until April of 2007?

1    A.    Correct.

2    Q.    When did you start in that position?

3    A.    Approximately early 2005.

4    Q.    First quarter?

5    A.    Yeah, first quarter.

6    Q.    And prior to the first quarter of 2005, were you

7    employed by Sea Ray?

8    A.    Yes.

9    Q.    Good advancement at Sea Ray.

10         Prior to that point, what was your job at Sea Ray?

11   A.    I was a customer service representative.

12   Q.    And when were you hired in that position?

13   A.    I was hired in that position, I'm going to say

14   mid-'90s.  '95, '96.

15   Q.    So approximately ten years?

16   A.    Yeah, approximately.

17   Q.    So '95 through somewhere in 2005?

18   A.    Uh-huh.

19   Q.    And was that your first job at Sea Ray?

20   A.    No.

21   Q.    No.  What was your first job at Sea Ray?

22   A.    I was hired in quality control in 1981.

23   Q.    Was that at the Knoxville facility?

24   A.    Yes.

25   Q.    And did you hold that position in quality control

1    from 1981 to 1995?

2    A.    No.

3    Q.    What was your second position at Sea Ray?

4    A.    Second position, I transferred to the mold

5    maintenance department.

6    Q.    Mold maintenance department?

7    A.    Mold maintenance department, yes.

8    Q.    I assume that's maintaining the fiberglass molds?

9    A.    Yes, that's maintaining the molds.

10    Q.    Just in case somebody on the jury isn't familiar with

11    the process, can you just very briefly explain how the

12    fiberglass boats are made?

13    A.    Yes.  The boats or the molds?

14    Q.    The boats.  I assume you use the molds to make the

15    boats?

16    A.    Yes.

17          In short, the molds are, in essence, you take like a

18    cup or a dish and you're going to make a jello dish.  The

19    molding process for the boats is very similar.  You wax

20    the mold to where it's a very slick surface.  You would

21    spray the mold with gelcoat.  Then you wold laminate

22    layers of fiberglass over the gelcoat until you build up

23    sufficient thickness.  Then you would add bracing.

24    Depending on the structure of the item you're building,

25    whether it's the hull or the deck, you would add the

PDF created with pdfFactory trial version www.pdffactory.com

1    bracing and supports as needed.  And then you would

2    eventually pull them out of the mold and release them.

3    And then you would marry the two parts together to make

4    the boat.

5    Q.   And Mr. Wade, if I can give you this pointer.  That

6    photograph there, the two parts you're talking about

7    marrying, is that the topsides and the hull?

8    A.   Yes, that would be the topside deck structure and the

9    hull.

10   Q.   So that's the, I guess, outside body of the boat,

11   right?

12   A.   Correct.

13   Q.   And so you were in charge, I guess, with maintaining

14   the molds to make sure that after repeated usage they

15   still held their form?

16   A.   Yes.  The mold maintenance position, basically, we

17   recycled the molds and reconditioned them so they would

18   last longer through the production phase.

19   Q.   Did they eventually wear out?

20   A.   Yes.

21   Q.   Now, following that job as the mold maintenance

22   supervisor, what did you do?

23   A.   I was actually a mold maintenance technician, I was

24   not supervisor.

25   Q.   Sorry.  Mold maintenance technician, what did you do

PDF created with pdfFactory trial version www.pdffactory.com

1    then for Sea Ray?

2    A.    I moved to the PI department.  PI is what we call

3    piece inspection.  That's where you -- after the parts go

4    through the lamination process, you pull them out of the

5    mold, we would look at the parts to ensure that the parts

6    were free of any major defects or anything like that and

7    we would correct those items or fix them on line in

8    process before the hull and the deck and the small parts

9    went to the assembly building.

10   Q.    So these are fiberglass pieces?

11   A.    Correct.

12   Q.    And following that position, what was your job at

13   Sea Ray?

14   A.    I don't recall exactly the order.  I moved to the

15   final finish area.  Final finish was the last assembly

16   station where we did all the finish work on the boat after

17   it went through the assembly process to basically clean

18   the boat up, fix any damages that may have occurred on the

19   line from dragging a screw gun or dropping something like

20   that, we would make those repairs.  And then we would

21   clean, detail and prep the boat for shipment to the

22   dealer.

23   Q.    Now, when these two parts are married that you talked

24   about, the hull and the topsides, the boat's empty inside,

25   right?

1   A.    No.

2   Q.    What's inside?

3   A.    Before it got to the point where those parts would

4   actually be married together, they would go through

5   pre-build on the deck line to where some of the hardware

6   components to be installed.

7   Q.    Like handrails?

8   A.    Handrails.  Windshields in some applications were

9   even set prior to capping the entire structure.  Inside

10  the hull it would have the carpets laid in some area of

11  the floor.  The engine bilge area would have the engine

12  set.  It would have all of the wiring harnesses and fuel

13  tanks already laid in place and secured.  And the main

14  interior structure of the boat was put together.

15  Q.    So you say the engines were set?

16  A.    Yes.

17  Q.    Who installed the engines?

18  A.    The engine team at one of the hull stations.

19  Q.    Sea Ray installed the engines?

20  A.    Yes.

21  Q.    And Sea Ray installed the exhaust?

22  A.    Yes.

23  Q.    Who makes the gasoline engines for Sea Rays?

24  A.    We use MerCruiser.

25  Q.    And MerCruiser is another Brunswick entity?

1  A.   Yes.

2  Q.   And does MerCruiser have a presence at the Knoxville

3  plant?

4  A.   They do currently, yes.

5  Q.   How long have they been there?

6  A.   I don't know that for sure.

7  Q.   More than ten years?

8  A.   I really don't know.

9  Q.   If you have questions about the engines, who do you

10  go to?

11  A.   We would probably contact MerCruiser directly.

12  Q.   Would that involve just walking around to wherever

13  they were?

14  A.   No.  Because they weren't -- at that time I don't

15  know if they were on site.  I know they are currently.

16  There is one rep that handles -- there's three plants in

17  the Tennessee area.  There is one MerCruiser technician

18  that is stationed up in the Tennessee area to service our

19  facilities if any questions come up.

20  Q.   Now, in your role -- actually, in your roles for

21  quality control and management of product quality and

22  customer service and all the other positions you've held

23  at Sea Ray for almost 30 years, I guess, you have to

24  determine whether the product, as constructed, is

25  constructed right, correct?

1  A.   Correct.

2  Q.   How would you do that?

3  A.   I guess -- what do you mean?  As far as from a

4  standpoint of when I was in quality control or in my job

5  current?

6  Q.   When you were actually in quality control rather than

7  being the manager -- supervisor of that department, how

8  would a quality control inspector or technician inspect

9  something for quality?  Would they look at it?  How would

10  they do it?

11  A.   At the various stations we had various check points

12  to do quality control inspections.  Depending on the

13  station, there is some criteria of whether or not

14  something is just a hard stop, meaning this either is

15  fixed or the boat doesn't move, or this can be corrected

16  but yeah, you can correct it off the line, it is still

17  written up as a gig on line but it has to be completed

18  before the boat would be signed off and moved either

19  through the testing or at the end of the process to the

20  dealer, it would have to be corrected.  Some of the areas

21  are cosmetic in nature, meaning when you build the boat

22  and you have the interior and the cabinets and the

23  cushions, how some of those things fit into the boat, some

24  of that turns into perception and it's learned based on

25  your experience with the product and working with the

PDF created with pdfFactory trial version www.pdffactory.com

1    management staff on where they set some of those quality

2    standards.

3    Q.   Now, a boat is a pretty complex piece of equipment,

4    correct?

5    A.   Uh-huh.

6    Q.   Sea Ray does not manufacture all of the components,

7    correct?

8    A.   Correct.

9    Q.   I assume the electronics come from various

10   electronics manufacturers?

11   A.   Yes.

12   Q.   And the engine is built by MerCruiser?

13   A.   Uh-huh.

14   Q.   Are there other subcontractors for major components?

15   A.   Yeah.

16   Q.   Who determines what the procedures are for the

17   installation of those components?

18   A.   That's left up to our PD&E and engineering staff to

19   determine those.

20   Q.   When you're inspecting for quality, though, how do

21   you determine whether something has been installed

22   correctly?

23   A.   We would refer to the prints.

24   Q.   What are the prints?

25   A.   The construction diagrams for building the boat.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   That's how you check?

2   A.   That's how some of those areas would be checked.

3   Q.   In this case how would you check, say, the

4   installation of the exhaust?

5   A.   We didn't check the installation of the exhaust on

6   the line with the exception of verifying and making sure

7   that all the clamps were in place and secured, and that

8   the components were in the boat and in place.

9   Q.   Was it ever your responsibility to inspect the engine

10   installation?

11   A.   Yes.  During one period it was, yes.

12   Q.   And certainly now, as manager of this department,

13   that would be within your area of responsibility, correct?

14   A.   Not directly.

15   Q.   How indirectly would it be?

16   A.   Indirectly from the standpoint that the plants

17   themselves at this time are responsible for the

18   installation of the product into the boat.  I work to

19   facilitate when there's issues that arise on the boat as a

20   result of field issues or internal issues that they have

21   as they're building the boat.

22   Q.   Okay.  So when you were inspecting the exhaust

23   system, what were you looking for again?  Clamps?

24   A.   I would look for clamps to be tightened in proper

25   distance.  As far as when you slide it up on an exhaust

```
 1   elbow, there's a predetermined place where the hose will
 2   fit.  And making sure it wasn't too short on there to
 3   where it improperly engaged the entire flange or it wasn't
 4   pushed up too hard on it that it got up on like a rib that
 5   when you tightened the clamp it wouldn't sufficiently
 6   clamp down and result in a leak.
 7   Q.   Why was it important to properly inspect the exhaust
 8   system to ensure the exhaust system was properly
 9   installed?
10   A.   I'm not sure what you mean.
11   Q.   You're inspecting this component for a reason,
12   correct?
13   A.   Right.
14   Q.   Why was it important to ensure the exhaust system was
15   properly installed?
16   A.   We checked it for the typical installation items that
17   we would normally do, the setup and -- the initial setup
18   of it was all given to us from PD&E from an engineering
19   staff.  For that stuff we would have limited amounts that
20   we would be able to check.
21   Q.   Did you ever know why it was important to check?
22   A.   Through experience I learned why, yes.
23   Q.   Why?
24   A.   I mean, as I said, for the exhaust hoses and clamps
25   and things of that nature, we checked for those.  And that
```

1  was the gist.  We made sure the engines ran properly.  You

2  would check also too to make sure that once the engines

3  were running the tank or whatever that you didn't have oil

4  leaks that showed up immediately on the product.

5  Q.    Well, whose responsibility is it to install the

6  engine and exhaust properly?

7  A.    The technicians at the engine station were

8  responsible for installing the engines and the exhaust.

9  Q.    That's Sea Ray, correct?

10  A.    Correct.

11  Q.    And do you agree that it's important to determine the

12  correct installation of the exhaust system to prevent

13  water ingestion?

14          MR. ROTONDO:  Objection.

15          THE COURT:  Basis?

16          MR. ROTONDO:  Outside the scope of what this

17  witness has been disclosed to testify, factual

18  description.

19          MR. NIKAS:  Mr. Wade will be asked to testify --

20          THE COURT:  Why don't I read -- tell me what

21  paragraph.

22          MR. ROTONDO:  Page 16, Your Honor, bottom of the

23  page.

24          MR. NIKAS:  With no objection.

25          THE COURT:  What page was that?

1          MR. NIKAS:  Page 16 of the joint trial
2    memorandum.
3          THE COURT:  Sustained for now.  You'll have to
4    lay a foundation if you want to get to where you are.
5          MR. NIKAS:  Well --
6          THE COURT:  Are you reading the second line of
7    that disclosure?  You need to lay a foundation.
8    BY MR. NIKAS:
9    Q.    You were the customer service rep when Lori and Peter
10   Mains provided you their criticisms regarding this boat,
11   correct?
12   A.    That's correct.
13   Q.    And you had primary responsibility for dealing with
14   those criticisms, correct?
15   A.    Correct.
16   Q.    And to whom did you speak to regarding these
17   criticisms?
18   A.    Various people within the department, one, just
19   because with certain things you would maybe bounce
20   something off somebody else from an experience standpoint
21   at times.  And also just to the extent of it.  But for the
22   most part I had called up to a certain point on most of
23   the issues.
24   Q.    There were a lot of criticisms, correct?
25   A.    Yes.

PDF created with pdfFactory trial version www.pdffactory.com

Vol. IV - Page 678

1   Q.    List upon list upon list, right?

2   A.    Correct.

3   Q.    Some of the criticisms were relatively minor,

4   correct?

5   A.    Yes.

6   Q.    Cosmetic issues?

7   A.    Uh-huh.

8   Q.    Would you agree that the two most serious criticisms

9   voiced by Lori and Peter Mains were the issues regarding

10  the integrity of the structure of the fiberglass and

11  issues regarding the exhaust; is that fair?

12  A.    You need to be more specific.

13  Q.    Well, of those concerns that they had, which did you

14  feel were most serious?

15  A.    Of the concerns that they raised, they had a

16  continuing complaint of a weak cockpit floor, which was

17  the area between the helm seat and the dash area where a

18  customer would oftentimes stand to operate the boat.  That

19  area right there was a concern.

20       There was a concern regarding some water leaking out

21  of the bilge, which is the engine area in between the

22  engines.  The engines rest on stringers and there was an

23  area in between there where there was a complaint of water

24  weeping out of that area to the degree we didn't know at

25  the time.

PDF created with pdfFactory trial version www.pdffactory.com

1          Those were the two main concerns.  The one other

2     concern that he brought up was loud exhaust noise.

3     Q.    Let me put it this way:  This boat was at your

4     factory in Tennessee?

5     A.    Yes.

6     Q.    After it was built?  Meaning, it came back for

7     repairs in 2001?

8     A.    Yes, that's correct.

9     Q.    And when it came back to you for repairs, you were

10    the customer service representative in charge of this

11    account, correct?

12    A.    Correct.

13    Q.    In fact, you arranged for the transportation of this

14    boat from Connecticut to Tennessee?

15    A.    Correct.

16    Q.    You had possession of the list of complaints

17    presented to you by the owners, right?

18    A.    Yes.

19    Q.    Of those repairs that were completed while the boat

20    was in Tennessee, which of the repairs were the most

21    significant in terms of time and money expended?

22    A.    I would say the cockpit floor, time-wise and

23    cost-wise, was probably the most costly.  The change out

24    of the exhaust system would have been the second.  And

25    then the repair to the bilge would have been the last.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.    So when the boat went in for repairs, what type of

2   exhaust did it have?

3   A.    It had a collector-style exhaust.

4   Q.    When it left, what did it have?

5   A.    It had a lift-style exhaust.

6   Q.    Before the repair was completed, did you ever

7   disclose to Lori and Peter Mains that that change was

8   going to be made?

9   A.    Can you repeat the question, please?

10  Q.    Before the water lift exhaust was installed on this

11  boat, did you ever inform Lori and Peter Mains that that

12  change would be made?

13  A.    I really do not recall if I informed them before that

14  was changed out or not.

15  Q.    Why was that change made?

16  A.    The change was made simply in response to the loud

17  exhaust noise that they had complained about since early

18  on.

19  Q.    What effect -- actually, before you went through the

20  expense of changing out the type of exhaust, did you check

21  to see whether it had been properly installed, the

22  original exhaust?

23  A.    No.  I mean, I didn't personally.

24  Q.    Did you ever ask anybody to?

25  A.    As I recall, I know that we sent a technician up to

1    his boat on a couple different occasions to look at the

2    exhaust.

3    Q.    And did he report to you that the exhaust was

4    properly installed?

5    A.    Yeah, I don't recall any abnormalities to it.

6    Q.    Why would it have been important to determine if the

7    exhaust was properly installed on this boat?

8    A.    I'm not sure what you mean.

9    Q.    Why would it have been important for the exhaust to

10   have been properly installed on this boat?  What effect

11   would an improper installation have had?

12   A.    Well, when I said we looked at it, we would have gone

13   up and looked for the typical things that we would have

14   looked for on an initial inspection through the facility.

15   We would have looked at the clamp situation, make sure

16   those were good.  We would have checked for leaks if a

17   boat was in a position where we could have ran it.  And

18   they would have gone through those checks.

19   Q.    Why?  Why would you have done all those things?  Why

20   is it important to check these things?

21   A.    To see if there was something they could just -- if

22   there was something there that they could point to that

23   says that's the reason for a loud exhaust noise.

24   Q.    I'd like to show you page 13 of Exhibit 145 which may

25   refresh your recollection as to the importance of the

1    proper installation of the exhaust.  Actually, let me give

2    you the entire document.

3              MR. NIKAS:  Your Honor, can I refer to this

4    document by name?

5              THE COURT:  Why don't -- I assume it's not in

6    evidence?

7              MR. NIKAS:  It's not in evidence.

8              THE COURT:  No, you cannot.

9    BY MR. NIKAS:

10   Q.   Does that refresh your recollection as to why it's

11   important to have the proper installation of the exhaust?

12   A.   No.

13   Q.   Was water ingestion ever a concern of yours?

14   A.   No.

15   Q.   Never?

16             MR. ROTONDO:  Objection, Your Honor.  The

17   question -- first question presumably related to re -- if

18   it didn't relate to Peter or Lori Mains, that's

19   irrelevant.

20             THE COURT:  I'll sustain the objection.

21             And you can start over again and be more clear

22   with the question, Mr. Nikas.

23   BY MR. NIKAS:

24   Q.   You have a complaint about an exhaust system,

25   correct?

1  A.    Yes, a loud exhaust noise.

2  Q.    Did that tip you off as to anything that might be

3  causing that?

4  A.    No.

5  Q.    You were at Sea Ray from 1981 until 2001 when this

6  boat came in 20 years, correct?

7  A.    Correct.

8  Q.    And is it your testimony that when a customer, in

9  this case Peter Mains, came to you with a complaint about

10  exhaust noise, that that did not in any way set off any

11  alarm bell regarding water ingestion?

12  A.    No.

13            THE COURT:  To be clear, the question was is

14  that your testimony.  So can we --

15            MR. NIKAS:  Yes, I'll correct it.

16  BY MR. NIKAS:

17  Q.    That was your testimony?

18  A.    Repeat the question.

19  Q.    Your testimony was that you did not think about water

20  ingestion when you heard the complaint voiced by Mr. Mains

21  about the exhaust?

22  A.    That's correct.

23  Q.    In 2001 how many people were in the customer service

24  department?

25  A.    I want to say approximately six or seven.

1    Q.    How were you guys situated?

2    A.    Cubicles.

3    Q.    One right next to the other?

4    A.    Yeah.  We were in a small trailer and pretty much

5    lined up down one side.

6    Q.    What kind of engine was on -- what kind of engines

7    were installed on the boat owned by the Mainses?

8    A.    7.4 V-drive inboards.

9    Q.    MIEs?

10   A.    If that stands for V-drive inboards, then yes.

11   Q.    When it left the factory, what type of exhaust did it

12   have?

13   A.    Which time?

14   Q.    The first time, when it was built.

15   A.    Collector style.

16   Q.    When every boat that had a 7.4-liter engine with

17   inboard installation left the factory in 1997, did it have

18   a collector-style exhaust?

19   A.    I wouldn't know that a hundred percent.

20   Q.    In 1998 did every Sea Ray with a 7.4-liter inboard

21   engine leave the factory with a collector-style exhaust?

22   A.    I do not know.

23   Q.    In 2000 did every Sea Ray with a 7.4-liter engine

24   leave the factory with an inboard exhaust?

25   A.    Repeat that question again, please.

1    Q.    In the year 2000 did every Sea Ray built with a

2    7.4-liter engine with an inboard installation leave the

3    factory with a collector-style exhaust?

4    A.    I do not know.

5    Q.    2001, same answer?

6    A.    Yes, I don't know.

7    Q.    This boat came with a collector-style exhaust and

8    when it came to the factory in 2001 it had a

9    collector-style exhaust, and what it left five and a half

10   months later it had a water lift; true?

11   A.    True.

12   Q.    As a customer service rep, why would they have

13   changed the original equipment the boat was manufactured

14   with?

15        MR. ROTONDO:    Objection to the form.    I'm

16   objecting to the question.

17        THE COURT:    Could you rephrase that, please.

18   BY MR. NIKAS:

19   Q.    Why did they change the style of the exhaust on this

20   boat from the one that it had when it originally left the

21   factory?

22   A.    To try and correct his complaint regarding loud

23   exhaust noise.

24   Q.    Was Mr. Mains' boat the only boat that came back for

25   repairs in the factory in 2001 that came in with a

PDF created with pdfFactory trial version www.pdffactory.com

1    collector-style exhaust and left with a water lift?

2              MR. ROTONDO:  Objection.

3              THE COURT:  Because of --

4              MR. ROTONDO:  Prior rulings.

5              THE COURT:  Sustained.

6    BY MR. NIKAS:

7    Q.   Does the phrase "water ingestion team" or "water

8    ingestion subcommittee" mean anything to you?

9              MR. ROTONDO:  Objection.

10             THE COURT:  Sustained.

11   BY MR. NIKAS:

12   Q.   Did Sea Ray use a water lift exhaust prior to 2001?

13   A.   I don't know.

14   Q.   I'd like to show you an exhibit to refresh your

15   recollection.

16             THE COURT:  Could you tell me what number we're

17   dealing with?

18             Is the answer he doesn't know or he doesn't

19   recall?  Can we clarify that before you go down that road?

20   And can I have a number?

21             MR. NIKAS:  Thirty-six.

22             THE COURT:  Thank you.

23   BY MR. NIKAS:

24   Q.   Presumably you would have seen boats built that year,

25   correct, in 2001?

1    A.   I'm sure I would have seen some built, yes.

2    Q.   You would have seen them leaving the factory, you

3    would have seen them as part of your job, correct?

4    A.   Yes, at times.

5    Q.   And do you remember if prior to that time whether you

6    ever saw a water lift muffler in a Sea Ray boat with a

7    7.4-liter engine?

8    A.   I don't recall.

9    Q.   Can you remember?

10   A.   I don't.  I don't recall.

11            THE COURT:  I think that's sufficient to refresh

12   his recollection.

13   BY MR. NIKAS:

14   Q.   I'd like to show you a document, Plaintiffs' Exhibit

15   Number 36, it has not been introduced into evidence but

16   I'd like to use it to refresh your recollection.  Spend

17   some time with it.

18        Does that refresh your recollection?

19   A.   I'm not sure what you're asking.

20   Q.   Well, does that refresh your recollection that

21   sometime in 2001 there may have been a change from the

22   collector style to the water lift?

23   A.   Yes, that refreshes my recollection.

24   Q.   And in 2001 was there a change?

25   A.   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   Why was the change made?

2            MR. ROTONDO:  Objection.

3            THE COURT:  Let's, first of all, remove the

4   document since he's not supposed to be testifying from the

5   document.

6            And then your objection is based on?

7            MR. ROTONDO:  Scope of what they've indicated

8   the witness is supposed to testify about, which is his

9   dealings with the Mainses.

10           THE COURT:  Sustained.

11           MR. NIKAS:  Your Honor, this goes to why the

12  exhaust in the Mainses' boat was changed in 2001.

13           THE COURT:  You get to it that way as opposed to

14  with a broad question, then.  Although I think you've

15  asked him that.

16           MR. NIKAS:  He didn't remember then.

17           THE COURT:  He did remember.  He gave you a

18  specific answer twice.  Third time will be the last time

19  we'll go over this.

20  BY MR. NIKAS:

21  Q.   Why was the exhaust changed on the boat owned by Lori

22  and Peter Mains?

23  A.   In response to his loud exhaust noise.

24  Q.   That's the complaint.  What was wrong -- strike that.

25           As a customer service representative, it's your job

1   both to, A, keep the customer happy, correct?

2   A.   Correct.

3   Q.   And B, ensure that Sea Ray doesn't end up repairing

4   every niggling concern that a customer might have bleeding

5   the company dry, correct?

6   A.   No, I wouldn't -- I didn't view my position that way.

7   Q.   If a customer hypothetically came to you saying I

8   have a noise in my engine, without determining the cause

9   of the noise you would replace the engine?

10  A.   No.

11  Q.   So why in this case was there no determination made

12  by you as to what was causing the noise?

13  A.   We couldn't find the reason for it.

14  Q.   What did you do to check?

15  A.   As I said, we sent a representative up to his boat a

16  couple times.

17  Q.   When the boat got back to the factory, now it's

18  here --

19  A.   Right.

20  Q.   -- in front of you with all the technical knowledge

21  that implies, the people that built the boat were there,

22  the people who built the motor were there.  Is your

23  testimony that there was never any inquiry into the actual

24  cause of the complaint, not one?

25            THE COURT:  You mean the cause of the noise?

1          MR. NIKAS:  Excuse me, the noise.

2          THE WITNESS:  Can you repeat the question,

3   please?

4   BY MR. NIKAS:

5   Q.   Sure.

6        You sent a technician up to Connecticut?

7   A.   Right.

8   Q.   When the boat got back to Tennessee to the place of

9   its birth, where the people that built it were located,

10  where the people that built its engine had a

11  representative and it was in front of you physically, did

12  you ever make an inquiry into the cause of the noise?

13  A.   When it was back at the factory I know the issue was

14  discussed.  Whether or not the plant -- because the boat,

15  as it was back, was in the care of the plant for repair.

16  Yes, I was communicating with them what the customers'

17  concerns were, what their main concerns.  In regard to

18  that, I don't know what steps or measures they went to at

19  that point to make any other determinations.

20  Q.   As a customer service rep, was it your job to try to

21  investigate the merit of the claims?

22  A.   In most instances, yes.

23  Q.   As customer service rep, was it your job to try to

24  find solutions to the concerns of your customers?

25  A.   Not in every case, no.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   I said "try to find"; I didn't say "find."

2  A.   I guess at times, yes.

3  Q.   In this case, in this specific case involving the

4  boat owned by Peter and Lori, what did you do to determine

5  what could be done about their concern?

6  A.   Beyond sending the inspections, I don't know what may

7  have been done while it was back at the plant.

8  Q.   Do you read MerCruiser service bulletins?

9  A.   Do I, as in every day?

10 Q.   No, but do you regularly consult them?  If a customer

11 comes to you with a complaint or a concern about engine

12 component, would you consult a service bulletin to see if

13 perhaps the engine manufacturer had some instruction for

14 you?

15 A.   I have read MerCruiser service bulletins.

16 Q.   And would that be a logical step you would have taken

17 if you had a concern about an engine component?

18 A.   It's a logical step.

19 Q.   Did you take it in this case?

20 A.   I didn't look at it from an engine standpoint.

21 Q.   Did you look at it from an exhaust standpoint?

22 A.   I looked at it from something that could cause a loud

23 exhaust noise.

24 Q.   And what could that something be?

25 A.   Beyond our normal checks, I don't know.

1  Q.   Did you look at any written material?  Did you ever

2  ask anybody in the factory, anybody from MerCruiser,

3  anybody about the exhaust noise complained of by Peter and

4  Lori?

5  A.   I know that it was discussed at the factory.  I do

6  not recall -- at the factory, meaning internally with my

7  boss at the time.  But beyond that, I don't recall

8  consulting anybody else.

9  Q.   With whom did you discuss this issue with?

10 A.   I don't recall.

11 Q.   How many people are at the Sea Ray headquarters?

12 A.   At headquarters?

13 Q.   That you would deal with in the ordinary course of

14 your business.

15 A.   Are you talking at that time or now?

16 Q.   At that time, 2001 whenever the boat got there, how

17 many people would have been involved, possibly, in this

18 decision?

19 A.   I don't know that anybody at the corporate level

20 would have been.  That would have been handled at the

21 plant level between myself and probably Todd Stooksbury,

22 who was my boss.

23 Q.   So at the plant, how big is the galaxy of people you

24 would have discussed this with or could have discussed

25 this with?

1    A.    I don't know.  I mean, there's -- the basic chain of

2    command would have been at that point from myself to Todd,

3    who was my boss.  And then Todd would have taken that

4    probably to engineering and then to the management staff,

5    which would have been probably the plant manager.

6    Q.    If you wanted to change a major component of the

7    boat, would you have had to justify that decision to

8    anybody?

9    A.    If I wanted to personally?

10   Q.    Sure.

11   A.    Yeah, I would have to -- I would have to discuss that

12   with my boss.

13   Q.    And would you have to justify that decision?

14   A.    I would have just quantified it by saying we have the

15   opportunity with a customer's boat here at the facility.

16   This is one of his concerns of loud exhaust noise.

17   Potentially this exhaust we were told would be quieter.

18   While it was back at the factory, the decision was made to

19   install it in the boat.

20   Q.    Who made the decision?

21   A.    Between myself and Todd Stooksbury, we probably did.

22   Q.    Do you remember?

23   A.    I remember that the recommendation came from me.

24   Q.    Why did you recommend it other than a customer had a

25   complaint?

1    A.    Simply because in some cases we try to satisfy the

2    customer almost to whatever end we need to to try and

3    satisfy them.

4    Q.    I want to make sure you understand this.  So in 2001

5    your testimony is when the decision was made to replace

6    this exhaust, it was made entirely as a result of a

7    customer complaint with no other factors coming into that

8    decision?

9    A.    Yes, the customer complained of loud exhaust noise.

10   Q.    And that decision was based solely on that complaint

11   and nothing else?

12   A.    That's correct.

13           MR. NIKAS:  Your Honor, just out of an abundance

14   of caution, and I know this is unfavored but I don't want

15   to potentially prejudice anything, can we have a very

16   brief sidebar?

17           THE COURT:  Okay.

18             (Sidebar discussion off the record.)

19   BY MR. NIKAS:

20   Q.    You testified that changing the exhaust system to the

21   water lift collector was a response to the concern voiced

22   by Peter Mains about exhaust noise, correct?

23   A.    Correct.

24   Q.    And you made that decision yourself?

25   A.    I made that recommendation.

1   Q.   Yourself?

2   A.   Yes.

3   Q.   Without consulting any other materials?

4   A.   Yeah, based on my knowledge and knowing that I had

5   sent a technician up there to look at the boat, yes.

6   Q.   How did the water lift muffler remedy that complaint?

7   A.   I don't know.

8   Q.   You said you made that recommendation based on your

9   experience and on the fact that the technician you sent up

10  to Connecticut didn't have anything negative to say, so

11  how would the installation of this different type of

12  exhaust system remedy the complaint voiced by Peter Mains?

13  A.   As I recall, there was -- we never could substantiate

14  the initial claim of loud exhaust noise.  He had just had

15  it as a complaint several times over the life of the boat.

16  We never substantiated.  We could not duplicate it to that

17  effect.  So I don't know if this ultimately corrected it

18  or not.

19  Q.   Why did you replace it with a collector?

20  A.   Because there was nothing wrong with the collector.

21  Q.   If you knew there was nothing wrong with it, why did

22  you change it?

23  A.   Customer satisfaction.

24  Q.   Mr. Wade, does the term "water ingestion

25  subcommittee" mean anything to you?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    No.

2    Q.    In 2001 did you review any Mercury service bulletins?

3    A.    I don't recall.

4    Q.    Mr. Wade, your current position is product quality

5    manager?

6    A.    Yes.

7    Q.    And you have responsibility for dealing with all

8    customer complaints?

9    A.    No.   Currently?

10   Q.    What's your current responsibility?

11   A.    My responsibility is to review the data that comes in

12   from warranty failures as well as internal plant concerns

13   and work with those suppliers to correct issues.

14   Q.    As customer service rep, the title of the person you

15   reported to was what?

16   A.    At that time just referred to him as a supervisor.

17   It may have technically been called a team leader.   I

18   always referred to it as supervisor.

19   Q.    That's Mr. Stooksbury?

20   A.    That's correct.

21   Q.    That would have been to determine warranty repairs,

22   whether warranty repairs were acceptable?

23   A.    I don't understand what you're asking.

24   Q.    I think you said that person determines whether a

25   repair will be covered under warranty, dealing with the

1  dealers; is that right?

2  A.    No.    At that time I would also -- part of the job

3  scope at that time within customer service was also

4  reviewing dealer claims as well.  So we would do that as

5  well.  Each individual claim.  It was not my supervisor's

6  responsibility to review each claim.  That was our job as

7  customer service and dealer service representatives.

8  Q.    In 2001, did you review any service bulletins in

9  regards to exhaust systems or water ingestion?

10  A.    I don't recall.

11  Q.    I'd like to show you Plaintiffs' Exhibit 33, which

12  may help refresh your recollection.  Review it carefully.

13      Do you recall having seen that document?

14  A.    No, I do not.

15  Q.    What's the Sea Ray warranty?

16  A.    In general terms, it's 12 months from the original

17  date of purchase or from the inservice checklist date and

18  five years structural hull.

19  Q.    It says, We'll repair or replace any defects which

20  exist within one year of purchase; is that right?

21  A.    Yes, something to that effect.

22  Q.    One year?

23  A.    Correct.

24  Q.    2001, same year Peter's boat was there?

25  A.    Uh-huh.

1    Q.   Did Sea Ray extend the warranty or at least offer the

2    repair and replacement of major components beyond that

3    one-year date?

4             MR. ROTONDO:  Objection.

5             THE COURT:  Sustained.  Are you talking about

6    the plaintiffs?

7    BY MR. NIKAS:

8    Q.   At the time that Peter Mains' boat was at the

9    factory, when was that?

10   A.   What time frame?

11   Q.   Sure.  In 2001, how long did you have it?

12   A.   As I recall, I think it may have come back late

13   2000 and the repairs were made and it was returned early

14   2001.

15   Q.   May, late April?

16   A.   Yeah.

17   Q.   You had the boat about five and a half months?

18   A.   That sounds about right.

19   Q.   You were aware that the Horizon package provides an

20   extended warranty of two additional years beyond the first

21   for a total of three years, correct?

22   A.   I do recall that.

23   Q.   That's something you looked at?

24   A.   With some of the engine packages, yes.

25   Q.   As a customer service rep trying to satisfy the

1  customer, that would have been something you would have

2  looked at, right?

3  A.    I'm not sure what you mean.

4  Q.    If a boat comes back to the factory for repairs, you

5  would have looked at the warranties to determine whether

6  they were going to be paid for by the customer or paid for

7  by you, correct?

8  A.    If you're talking Sea Ray's warranty or MerCruiser's

9  warranty, the boat coming back to the facility was based

10  on Sea Ray's customer relations trying to satisfy the

11  customer.

12  Q.    And if it had needed an engine repair, it would have

13  been done there, correct?

14  A.    We didn't have that there, so we wouldn't have had to

15  cross that bridge.  There was no repair I was aware of.

16  Q.    If it needed an exhaust repair, it would have been

17  done there, correct?

18  A.    Yes.

19  Q.    It was done there, right?

20  A.    Not a repair.  We changed out the exhaust in response

21  to his loud exhaust complaint.

22  Q.    You removed and replaced it?

23  A.    Correct.

24  Q.    Who paid for those repairs?

25  A.    Sea Ray.

1    Q.   When did his warranty expire?

2    A.   His one-year warranty would have expired 12 months

3    after his date of purchase.

4    Q.   Which would have been when?

5    A.   I don't recall the actual date.  I want to say

6    somewhere around May of '98, something like that.

7    Q.   That's about right, I think.  So would have expired

8    in May of --

9    A.   2000 -- or excuse me, May of '99.

10    Q.   May of '99.

11        And the Sea Ray warranty covers everything but the

12    engines, right, and any other component that has its own

13    warranty like the electronics or some other thing, right?

14    A.   Yeah, and some pro-rating on blistering and things of

15    that nature.

16    Q.   The hull repairs that you did, right?

17    A.   Okay, what hull repairs?

18    Q.   Well, let me ask.  What did you do to the boat when

19    it was there five and a half months?

20    A.   I remember there was a tick list of some issues that

21    had some concerns.  The main concern again was the cockpit

22    sole being weak and spongy as it was described a couple

23    different tiles.  The exhaust, loud exhaust noise.  And

24    some water still weeping in the bilge, as I recall.  Those

25    were the main issues.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.    Wouldn't those repairs have been outside the warranty

2   period?

3   A.    Technically outside of the warranty period, yes, but

4   not outside of our -- as a customer service rep and

5   outside of what Sea Ray will try to do to satisfy a

6   customer.

7   Q.    You're talking about, gosh, more than a year, right?

8   A.    Uh-huh.

9   Q.    Well, did you promise -- did you talk to Mr. Mains a

10  lot?

11  A.    Yeah.

12  Q.    How much?

13  A.    We talked quite a bit.

14  Q.    More than other customers?

15  A.    Yes, more than most.

16  Q.    A lot more than most, right?

17  A.    Yep.

18  Q.    And was he knowledgeable?

19  A.    Seemed to be, yes.

20  Q.    Knew the boat?

21  A.    Yep.

22  Q.    And in fact, he actually wanted to go visit the

23  factory while the boat was repaired, right?

24  A.    I don't recall that.

25  Q.    Do you recall him -- do you recall you promising him

1    that he would have an opportunity to come down --

2    A.    I don't recall that.

3    Q.    Would that have been an unusual request to grant?

4    A.    No.  We've had customers at the plant before.

5    Q.    Well, given your experience of dealings with

6    Mr. Mains, right, wouldn't he seem to be the type of

7    customer that would have wanted to go see the boat being

8    repaired?

9              MR. ROTONDO:  Objection.

10              THE COURT:  I'll allow that question.

11    A.    I don't know.

12    BY MR. NIKAS:

13    Q.    Mr. Wade, collectively during your time as customer

14    service rep, how many customers did you talk to more than

15    Peter Mains?

16    A.    I would have no way of knowing.

17    Q.    A lot, not many, a handful?

18    A.    I would say there's probably only a few that I talked

19    to more than him.

20    Q.    And everybody believes you on that.

21         So --

22              MR. ROTONDO:  Your Honor, I move to strike that.

23    That's unfair.

24              THE COURT:  Motion granted.

25              MR. NIKAS:  Not fair to my client.

1  BY MR. NIKAS:

2  Q.    In talking to him -- on a fairly regular basis, is

3  that fair?

4  A.    Yeah.

5  Q.    -- would you keep him apprized of what was happening

6  with the boat?

7  A.    In regard to what time frame?

8  Q.    Every time he called, I'm sure he asked what was

9  happening with the boat.

10  A.    Are you talking when the boat was back for repairs?

11  Q.    Yes, when it was with you for that five and a half

12  months.

13  A.    We would some.  I don't recall the extent of that,

14  but yeah, I mean there was calls and conversations.  I

15  don't recall to what degree.  There would have been some

16  communication.

17  Q.    And it would have been about the boat, right?

18  A.    Yeah.

19  Q.    You weren't friends?

20  A.    No.  It would have been about the boat.

21  Q.    So do you recall when you told him that the exhaust

22  had been replaced?

23  A.    No, I don't.

24  Q.    Do you know why -- let me ask you this.  Were you

25  aware that with the change in the exhaust system from the

1    collector to the water lift, the flushing procedures were

2    completely different?

3    A.    No, I was not aware.

4    Q.    Would it surprise you to know that on the collector

5    system flushing is done with the engine not running and

6    with the water lift, the flushing must be done with the

7    engine running?

8    A.    I was not aware either way.

9    Q.    Weren't you concerned -- you said that your goal, and

10   I'm paraphrasing you, was to satisfy your customers?

11   A.    Yes.

12   Q.    And in fact, you went so far as to pay for these

13   repairs more than a year after the expiration of the

14   warranty?

15   A.    Yes.

16   Q.    Why didn't you investigate at least whether the

17   change to this new type of exhaust system that you thought

18   was going to cure this noise required a completely

19   different maintenance procedure than the one that he had?

20   A.    I was simply not aware.

21   Q.    But don't you look at the MerCruiser materials?

22   A.    Not in depth, no.

23   Q.    Are they available to you?

24   A.    Not directly.  I mean, I wouldn't be able to just

25   pull one out.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Is there a library?

2    A.    No.

3    Q.    There's no technical library at the factory?

4    A.    Probably the closest thing to that would probably be

5    the engineering department.  But I don't know if that even

6    existed over there.

7    Q.    When the change was made to the water lift from the

8    collector, did you ever discuss it with anybody from

9    MerCruiser?

10   A.    Can you repeat that again, please?

11   Q.    When you made the decision to change the muffler

12   system, the exhaust system on Peter and Lori's boat, did

13   you consult anybody from MerCruiser prior to arriving at

14   that decision?

15   A.    No, I don't recall talking with MerCruiser regarding

16   that.

17   Q.    At any time following the installation of the new

18   exhaust system into Peter and Lori's boat, did you discuss

19   that with anybody from MerCruiser in case there were any

20   issues regarding the ownership or operation of that

21   exhaust?

22   A.    Not until after we were informed that he had

23   hydrolocked the engine.

24   Q.    Isn't that a little late?

25   A.    That's the first time I recall a conversation per

PDF created with pdfFactory trial version www.pdffactory.com

1    your question.

2    Q.   Well, did you ever read the report prepared by the

3    surveyor hired by your attorneys, Greg Davis?

4    A.   Did I read that report?  No, I did not.

5    Q.   When you found out this news, did you feel any

6    responsibility for it?

7    A.   Not initially.

8    Q.   How about later?

9    A.   No, not later.

10   Q.   Were you eventually informed that the procedures for

11   flushing the two exhausts are completely different?

12   A.   I'm aware of the documents out there, but I don't

13   know the relevance to them.  I don't know that part of it.

14   Q.   Hypothetically, if you assume that the two procedures

15   are completely different --

16          THE COURT:  Sustained.

17   BY MR. NIKAS:

18   Q.   You were made aware, though, that the boat had

19   hydrolocked, correct?

20   A.   Correct.

21   Q.   How were you made aware?

22   A.   I believe via a phone call, I believe.  As I recall.

23   Q.   Were you informed that the boat had hydrolocked after

24   just about an hour and a half of operation?

25   A.   I knew that it was after one of the initial times

PDF created with pdfFactory trial version www.pdffactory.com

1    Mr. Mains had run the boat after it returned.

2    Q.    With the new exhaust system that had been installed?

3    A.    Correct.

4    Q.    Did you at any time, in the interest of customer

5    service, think about calling Mr. Mains or Mrs. Mains and

6    extending an offer to replace the damaged components?

7    A.    I don't recall -- I don't recall anything along those

8    lines at that point.

9    Q.    I assume at the factory you guys have specific terms

10   for words that are specific to your industry or specific

11   to boat building; is that right?

12   A.    I found there's a lot of terminology in the marine

13   industry, in general, and in boat building, yes.

14   Q.    Like stringers and transoms and through holes and

15   plinths and pintles and gudgeons.

16         Have you ever heard the term "resonance"?

17   A.    Heard the term.

18   Q.    In what context did you hear that term or where were

19   you employed when you heard that term?

20   A.    I was employed at Sea Ray.  But the first time I

21   heard it was with the comment of the loud exhaust noise.

22   Q.    What is resonance?  What do you understand it to be?

23   A.    I just took it as a loud shrill, a change in the

24   exhaust noise to where it was annoying and bothersome.

25   Q.    You never understood that to be a term of art?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    No.

2    Q.    You never asked anybody what that meant?

3    A.    No, I can't recall asking.

4           MR. NIKAS:  I have no further questions at this

5    time, Your Honor.

6           THE COURT:  Are you going to have any questions?

7           MR. ROTONDO:  I will have some questions and it

8    will take me probably -- why don't --

9           THE COURT:  Why don't we get started.

10          Just so we clear, we had the witness examined in

11   the plaintiff's case.  Is this going to be a cross or

12   combined cross and direct?

13          MR. ROTONDO:  I think that Mr. Nikas has covered

14   most of the topics I planned to ask about, so I think it

15   would be in the form of cross.

16          MR. NIKAS:  We would never object, Your Honor,

17   as far as scope.

18          THE COURT:  Okay.

19

20                   CROSS-EXAMINATION

21   BY MR. ROTONDO:

22   Q.    Good afternoon, Mr. Wade.

23   A.    Good afternoon.

24   Q.    You work at the Sea Ray plant.  You said that you

25   worked there 27 years?

1    A.    Yes.

2    Q.    All right.   And are you married?

3    A.    Yes, I am.

4    Q.    Do you have any children?

5    A.    Yes, two.

6    Q.    And you've described for the members of the jury all

7    of the different jobs that you've had; is that correct?

8    A.    Most of them.

9    Q.    At Sea Ray?

10   A.    Yes.

11   Q.    And you indicated you had a number of communications

12   with Peter and Lori Mains; is that correct?

13   A.    Yes, I have.

14   Q.    And you talked about sending one or more people out

15   to deal with issues concerning their boat; is that

16   correct?

17   A.    Yes.

18   Q.    Was one of those people who was sent out the group

19   from Atlantic Boat Repair?

20   A.    Yes, that's correct.

21   Q.    Who was the principal or the person you dealt with

22   there?

23   A.    Tim Mills.

24   Q.    What type of work did Mr. Mills do?

25   A.    Their basic background was to do fiberglass repair.

1    Q.    And did you also make arrangements to send someone

2    from the Sea Ray factory or plant --

3    A.    Yes.

4    Q.    -- to look at Mr. Mains' boat?

5    A.    Yes, I did.

6    Q.    Who was that?

7    A.    Greg.  Greg Wilson.

8    Q.    And if you recall, what was his position at the time?

9    A.    His position was -- he did various ones as fill-in,

10   but the main one he was used for at that time was our S&U

11   crew, which is service and utility.  He was often called

12   upon to go out to dealers to help them with difficult

13   issues or warranty issues they might have.

14   Q.    Now, when you sent people like Tim Mills or Greg

15   Wilson out to look at the customer's boat, what was the

16   purpose of doing that?

17   A.    In most cases sometimes it was to go investigate the

18   issues.  Like in Greg's case, at times we would send him

19   to go investigate the issues.  If we had a list of the

20   issues, at times we would make sure that he took items

21   with him that he could make certain repairs, if he felt he

22   could do it in a timely manner and it was conducive to the

23   environment.  Usually with someone like Tim Mills or

24   whatever, we pretty much had an idea what the scope of the

25   repairs were and the amount that we were going to

1    contribute toward that, and we would go ahead and make

2    that arrangement and send them and use their services for

3    repairs.

4    Q.    You talked with Mr. Nikas about Mr. Mains' complaints

5    about loud exhaust noise?

6    A.    Uh-huh.

7    Q.    Did you have discussions with Mr. Mains about that

8    subject?

9    A.    Yeah, we had some conversations about it.

10   Q.    And did Mr. Mains ever tell you that the loud exhaust

11   noise was annoying but not performance-related?

12   A.    Yes.  I do recall that.

13   Q.    Now, you said that you sent a technical person out

14   to -- on one occasion to deal with Mr. Mains' complaint

15   about an exhaust noise.  Do you recall who that was?

16   A.    Yeah, Greg Wilson.

17   Q.    And do you have a memory of what Mr. Wilson -- do you

18   have a memory what it was he was going to do when he was

19   out there?

20   A.    Yeah.  Just basically take a look at the exhaust

21   system, and one of the exhaust components is a small

22   bypass muffler which we often refer to it as a football

23   muffler just because of its size and shape.  We had looked

24   at the possibility of installing a slightly larger one to

25   see if that would help reduce this loud exhaust noise he

1    complained about.

2    Q.   Did that effort prove to be successful?

3    A.   I don't recall if that actually ever was installed.

4    I mean, there was some issues with getting it installed

5    and we had to send up a second set.  So I'm a little

6    unclear if we actually ever got that installed on the boat

7    or not.

8    Q.   Did Mr. Mains continue to have complaints or raise

9    issues with you concerning the loud exhaust noise?

10   A.   Yeah, it seems to me we did continue to have a

11   complaint on that.

12   Q.   If we can pull up Plaintiffs' Exhibit 16.

13       Mr. Wade, this is a letter to you -- let me see if I

14   have a copy.

15       This is a letter that was written to you by Mr. Mains

16   on February 12, 2001.  Do you recall having received this

17   letter?

18   A.   Yes.

19   Q.   And at this point Mr. Mains' boat was already back in

20   Knoxville; is that correct?

21   A.   Yes, I believe so.

22   Q.   And if we can go to page 2 of the letter.  And the

23   middle of the page, fourth bullet point.

24       As of February 12, 2001, Mr. Mains was still making a

25   complaint about the intermittent sudden loud exhaust

1    noise?

2    A.   That's correct.

3    Q.   And did you -- when you read this, did you expect he

4    wanted you to do something about that?

5    A.   Yeah, as I did with everything else on the list.

6    Q.   Now, while the boat was in Knoxville, did you have

7    occasion to look at it?

8    A.   Yeah.

9    Q.   All right.  And were you doing an inspection or was

10   people just working on it when you happened to be around?

11   A.   Yeah, it was more just going out to look and see how

12   the boat was progressing as far as repairs and what was

13   being done on it.

14   Q.   Who was doing the work on the boat?

15   A.   That was in the charge of the assembly department.

16   Q.   And these would be the regular production --

17   A.   Regular production line workers, yes.

18   Q.   And you're aware that the boat was returned back to

19   Mr. Mains?

20   A.   Uh-huh.

21   Q.   And that Mr. Mains then had complaints about the

22   condition of the boat when it was returned?

23   A.   Correct.

24   Q.   Did you have discussions with Mr. Mains about his

25   complaints and concerns about the condition of the boat

Vol. IV - Page 714

1   after it was returned?

2   A.   Yeah, I remember having discussions about it.

3           MR. ROTONDO:  If we could pull up Defendant's

4   Exhibit 17.

5           THE COURT:  Actually, it's 2:45, so why don't we

6   start with that after we come back from our break?  We'll

7   take a 20-minute break.

8               (Whereupon, a recess followed.)

9

10          THE COURT:  We'll have our witness retake the

11  stand and bring the jury in.

12              (Whereupon, the jury entered the

13               courtroom.)

14          THE COURT:  Please be seated everyone.

15          Whenever you're ready, Mr. Rotondo.

16  BY MR. ROTONDO:

17  Q.   Mr. Wade, I'm going to ask you some questions about

18  some letters.  Let me give them to you.

19       Mr. Wade, after the boat was sent back from Knoxville

20  to Connecticut, you received a letter from Mr. Mains

21  regarding complaints and concerns that he had regarding

22  the boat; is that correct?

23  A.   Correct.

24  Q.   That was set forth in what's marked as Plaintiffs'

25  Exhibit 18?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   Yes.

2   Q.   All right.  And if we can now go to Defendants'

3   Exhibit 17.

4        In response to that letter and other communications

5   you had with Mr. Mains, did you then write what's been

6   marked as Defendants' Exhibit 17 to your letter of May 24,

7   2001?

8   A.   Yes.

9   Q.   And in connection with that -- pull out the center

10  section where it says, "In order."

11       You made an offer to Peter and Lori Mains about what

12  Sea Ray would be willing to do in connection with their

13  boat; is that right?

14  A.   Correct.

15  Q.   And this was pay for repairs by Brewers per an

16  agreed-upon list of items?

17  A.   That's correct.

18  Q.   And why is it that you wanted an agreed-upon list of

19  items?

20  A.   Just so we knew exactly what our target was to try to

21  make the customer satisfied.  We wanted a list to know

22  everything that was on the list so we could address it at

23  one time.

24  Q.   So you wanted a final list?

25  A.   Correct.

1  Q.   Was the reason you wanted a final list?

2  A.   Yeah, just because we continued to get lists and

3  every conversation we had with Mr. Mains there always

4  seemed to be something that got added to it.

5  Q.   And you also agreed to pay for the bottom paint to

6  the hull and pay to clean and detail the boat and then two

7  months' boat fees and slip fees, correct?

8  A.   Correct.

9  Q.   If we can go to the second page of Defendant's

10  Exhibit 17.

11      On the second page you begin the list of -- you have

12  a list running from 1 to 11 here.  Did that list

13  essentially track the items that Mr. Mains had put in his

14  letter to you?

15  A.   As I recall, it was from that.

16  Q.   And this is the -- the bullet points underneath the

17  list were your action steps; is that right?  So for

18  example, number 1 said, "Replace transducer."  And you

19  wrote, "Part was mailed next day air to Essex Marine"?

20  A.   Yes, that's correct.

21  Q.   "Replace stainless rubrail insert."

22      And then "Parts to be sent."

23      "Repair gel crack under caulk."

24      "Mr. Mains to show or provide location of the crack

25  to Brewers."

1          And so on.

2    A.    Correct.

3    Q.    And then "Sand and Re-bed starboard exhaust bullet."

4          And there's a note, "We do not feel this should be

5    changed.  No evidence that it is loose or the sealant is

6    broken."

7          Is that based on reports you got back from Dean

8    Beckman?

9    A.    Correct.

10   Q.    If we can go to the next page on Exhibit 24.

11         And then we go down to 18, and these are the 18 items

12   that Mr. Mains had identified in his letter of April 30,

13   correct?

14   A.    Correct.

15   Q.    And then again here the bullets are your action

16   points where you identified action points?

17   A.    Yes.

18   Q.    And then there's a dotted line that goes right here.

19         And then you have -- it says, "Items per Monday,

20   May 21st phone conversation and conference call Wednesday,

21   May 23rd."

22   A.    Yes.

23   Q.    And then there was eight new items here; is that

24   right?

25   A.    Yes, I believe so.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    And these were not items that had been on the

2    previous list?

3    A.    Correct.

4    Q.    Okay.  And if we go to the next page, there is

5    another four or five items; is that right?

6    A.    Yes.

7    Q.    And was that one of the reasons why you wanted an

8    agreed-upon list in your letter of May 24?

9    A.    Yes.

10          THE COURT:  I think you may have called this

11   Exhibit 24.  Is it 17?

12          MR. ROTONDO:  It's Exhibit 17, it's a May 24

13   letter.  I apologize.

14   BY MR. ROTONDO:

15   Q.    After this May 24 letter, you became aware of a

16   situation where the Mainses called you and said that there

17   had been a hydrolock situation related to flushing?

18   A.    I recall that afterward, yes.

19   Q.    And after that conversation where they told you about

20   that situation, did you have a series of -- you and other

21   people from Sea Ray have a series of discussions with the

22   Mainses about what should be done?

23   A.    Yes.

24   Q.    And did those discussions quickly reach an impasse on

25   how to deal with their particular boat?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   Yes.

2   Q.   And if we can now pull up Defendant's Exhibit 19.

3        If we can -- is this a letter that you wrote dated

4   June 14 -- letter you signed dated June 14, 2001 addressed

5   to Mr. and Mrs. Mains?

6   A.   Yes, that is.

7   Q.   In the middle paragraph here you made a formal offer

8   to Mr. and Mrs. Mains to buy back their boat --

9   A.   Yes.

10  Q.   -- for $105,000?

11  A.   That's correct.

12            MR. ROTONDO:  I don't have anything further,

13  Your Honor.

14            THE COURT:  Any redirect?

15

16                  REDIRECT EXAMINATION

17  BY MR. NIKAS:

18  Q.   When you made the offer that Mr. Rotondo was just

19  talking about in Exhibit Number 19, was that an offer that

20  you made on your own?

21  A.   No.  That was a letter that we sent in follow-up to a

22  phone conversation, as I recall, where there was a couple

23  other people on the phone on a conference call.

24  Q.   Who was on that conference call?

25  A.   I believe Mr. and Mrs. Mains.  At Sea Ray it was

PDF created with pdfFactory trial version www.pdffactory.com

1    myself, Dave Marlow, and I think Nancy Luster.

2    Q.    What's Nancy Luster's position?

3    A.    At that time I believe her position was Director of

4    Customer Dealer Service.

5    Q.    And what was your role in developing this offer?

6    A.    Basically to distribute the letter.

7    Q.    Were you involved in any of the discussions?

8    A.    I was involved in the discussions with them in regard

9    to the offer, but, you know, when I believe Mr. Marlow

10   made the actual offer or whatever, then my letter is just

11   confirmation of that.

12              MR. NIKAS:  I have no further questions.

13              THE COURT:  Anything further, Mr. Rotondo?

14              MR. ROTONDO:  Not of Mr. Wade.

15              THE COURT:  Thank you, sir.  You may step down.

16              MR. ROTONDO:  Your Honor, I take it the

17   plaintiff is going to now rest?

18              THE COURT:  I think that completes the

19   plaintiffs' case.  Any motions can be made later.

20              MR. ROTONDO:  That's fine, later.

21              THE COURT:  All rights are preserved.  We won't

22   waste the jury's time at this time.

23              We'll take the defense next witness.

24              MR. ROTONDO:  Greg Wilson, please.

25              THE CLERK:  Please raise your right hand, sir.

Vol. IV - Page 721

1                    GREGORY WILSON,

2          called as a witness, having been first duly

3          sworn, was examined and testified as follows:

4

5              THE CLERK:  Please be seated.

6              Would you state your name and spell your last

7    name, sir.

8              THE WITNESS:  Gregory P. Wilson, W-i-l-s-o-n.

9              THE CLERK:  Your city and state of residence,

10   please?

11             THE WITNESS:  Seymour, Tennessee.

12             THE CLERK:  Thank you.

13

14                  DIRECT EXAMINATION

15   BY MR. ROTONDO:

16   Q.   Good afternoon, Mr. Wilson.

17   A.   Good afternoon.

18   Q.   Where is Seymour, Tennessee?

19   A.   South of Knoxville.

20   Q.   I take it you're a native of Tennessee?

21   A.   Yes, sir.

22   Q.   Were are you employed at the present time?

23   A.   I am at the Knoxville plant.

24   Q.   Of Sea Ray?

25   A.   Yes.

1    Q.   How long have you worked there?

2    A.   Be 21 years this year, since '87.

3    Q.   Are you married?

4    A.   Yes.

5    Q.   Do you have any children?

6    A.   Two kids.

7    Q.   Boys or girls?

8    A.   Two boys.

9    Q.   What's your current position at Sea Ray?

10   A.   A yacht specialist.

11   Q.   What does that mean?

12   A.   Basically just supporting a new yacht coming up from

13   Florida, supporting a line, getting it up going.

14   Something new for us that we're starting to build this

15   year.

16   Q.   Is a yacht a power boat?

17   A.   Yes.

18   Q.   Is it just longer than most other boats?

19   A.   It's bigger.

20   Q.   And can you generally describe what other positions

21   you've held at the company over the past 21 years?

22   A.   Well, I started out in the hulls, working on the

23   hulls, the motorails, putting in gas tanks, water systems,

24   electrical systems, doing 110, set the head units, I set

25   the galleys in.  Basically built the boat from the front

1    to the back before it was capped, married together.

2        Worked in that three years, then I went to the front

3    line, basically doing all the material and glass and

4    putting the cabinets in.  Worked in there for about three

5    years.  Come back to the motors and set motors for about

6    six years.

7        And then I went into service and utility.  I've

8    worked in service and utility about four years.  I've been

9    back in the plant where I am now.

10   Q.   Were you in service and utilities between 1998 and

11   2000, 2001?

12   A.   Yes.

13   Q.   And in general terms, what were your responsibilities

14   in service and utilities?

15   A.   We went out in the field and assisted in warranty

16   stuff, warranty claims, helping the dealers trying to do

17   repairs and stuff.

18   Q.   Between 1998 and 2001 or so, in that time frame, did

19   you have any contact with Peter Mains and his 1998

20   Sundancer boat?

21   A.   Yes.

22   Q.   Can you generally describe the contact you had?

23   A.   The first time we went up sometime in '99, I think, I

24   can't remember what dates it was, but the first trip we

25   went was to follow up on a sublet we had who had left the

1   boat dirty and stuff.  And I went up to meet him at the

2   sublet, which is Atlantic Boat Repairs and I met him at

3   the boat.  We cleaned the boat up, done some other repairs

4   that was on it.

5   Q.   All right.  And if we can pull up Plaintiffs'

6   Exhibit 11.  I'm going to show you what has been marked as

7   Plaintiffs' Exhibit 11.

8        And do you recognize what's been marked as

9   Plaintiffs' Exhibit 11?

10  A.   Yes, sir.

11  Q.   Okay.  And when you went up to Connecticut in the

12  spring of 1999, was this document or a version of this

13  document something you had in your possession?

14  A.   Yes.  It was something that we normally got prior to

15  making a trip, we would get this, a punch list to gather

16  parts or look at what we had to do, get us prepared for

17  the trip.

18  Q.   How long were you up in Connecticut in the spring of

19  1999?

20  A.   I believe we were there for about three or four days.

21  Q.   And did you deal with the punch list that was

22  contained in --

23  A.   Yes, sir.

24  Q.   -- Plaintiffs' Exhibit 11?

25  A.   Yes, sir.

1  Q.   Now, so you were then on the Mainses' boat for some

2  period of time between two or three or four days,

3  something like that?

4  A.   Yes, sir.

5  Q.   Did you have any discussion -- and you were doing

6  work on the boat?

7  A.   Yes, sir.

8  Q.   And Mr. Mills was doing work on the boat?

9  A.   Yes, sir.

10  Q.   Did he have anybody else with him?

11  A.   He had another employee with him.

12  Q.   And what was the weather like when you were doing the

13  work?

14  A.   About like it is now.  Kind of cool in the mornings,

15  warmed up in the afternoon or whatever.

16  Q.   And how were you dressed when you went to work on the

17  boat?

18  A.   Well, they took the boat inside the shop.  Wore a

19  jacket in the morning and short sleeves in the afternoon

20  once it started warming up.

21  Q.   Did you have any discussion with Mr. Mains about what

22  you should be wearing on your feet when you were working

23  on his boat?

24  A.   He didn't want any shoes or nothing on his boat.

25  Q.   Can you describe what kind of work shoes you had?

PDF created with pdfFactory trial version www.pdffactory.com

Vol. IV - Page 726

1    A.    I wore tennis shoes and docksides, boat shoes.

2    Q.    So you were wearing boat shoes in the first place?

3    A.    I can't remember if I was using tennis shoes or boat

4    shoes, either one.

5    Q.    Either way Mr. Mains insisted that --

6    A.    Take our shoes off.

7    Q.    Did that apply both to you and Mr. Mills?

8    A.    Yes.

9    Q.    And if we can now go to the second page of

10   Exhibit 11.

11        Actually, why don't he go to the last page.

12        And there's a signature there at the bottom?

13   A.    Yes, sir.

14   Q.    And do you recognize what's written here?

15   A.    Yes, sir.

16   Q.    And what does it say?

17   A.    It says, "Repairs completed to satisfaction."

18   Q.    All right.  And do you know how that came to be

19   written at the bottom?

20   A.    Tim Mills was -- he was the one doing the repairs the

21   first time.  And I come in to make sure he done it right

22   the second time.  And he made Peter Mains -- he wrote that

23   up there and that's Peter Mains' signature below it.

24   Q.    And when you say he made him, did he put him in a

25   headlock?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   No, sir.  He just requested that he do it.

2  Q.   Okay.  Now, there are some initials -- let me put it

3  this way.  At some point in time was the work completed

4  when you were there?

5  A.   Yes, sir.

6  Q.   And did you go through the boat with Mr. Mains?

7  A.   Yes, sir.

8  Q.   And do you know how these initials P.M. came to be

9  placed in different spots?

10 A.   That's where Peter Mains was signed making sure we

11 were doing the repairs.  After we completed the repairs on

12 the boat, it's just like we do at the plant when we have

13 employees come up and do repairs, we make them sign their

14 initials beside saying they agree with the repairs that

15 were done.

16 Q.   Now if we can scroll down page 3, does that apply to

17 all the other initials that are here?

18 A.   Yes.

19 Q.   I see some asterisks in spots, two or three, maybe

20 four down here and one up here and another one up here.

21 Do you know what those are about?

22 A.   That's something that I've made for years.  When I'm

23 looking over a repair sheet and I'm going out there like I

24 maybe started doing this on Monday, doing this repair, and

25 that's something I would have made that little mark saying

1    that I didn't do it, I would come back later and address

2    it.

3    Q.    Later, when you're talking about later in the same

4    visit?

5    A.    Later in the same visit.  Something I had to order a

6    part for or get something to work on it with.

7    Q.    And the initials again here mean the same thing, at

8    the end of the work that you did, Mr. Mains initialed

9    these items?

10   A.    Right.

11   Q.    If we can scroll back to page 2.

12         The asterisk on this page, the two of them, the same,

13   those are your marks?

14   A.    Yes.

15   Q.    Again the initials?

16   A.    Yes.  Completed the work.

17   Q.    How long did this process take where Mr. Mains walked

18   through the boat with you and Mr. Mills and initialed the

19   page?

20   A.    After we cleaned it up that day, Mr. Mains was there.

21   We got him to come in the boat and look it over.  We spent

22   another hour or so looking over the boat and making sure

23   the repairs were made.  Hour, two hours, something like

24   that.

25   Q.    Now, did you make any other trips to see Mr. Mains'

1   boat?

2   A.   Yes, I did make a second trip.

3   Q.   And was that a special trip to deal with his boat or

4   was that part of some other project?

5   A.   I was up -- actually, I was up north at another boat

6   looking at it.  And since I was close, David wanted me to

7   come by since he was complaining about the exhaust noise

8   and try some new football mufflers in it.

9   Q.   When you say "David," who are you referring to?

10   A.   David Wade.

11   Q.   Now, did you have this football muffler, however you

12   refer to it, did you have it with you?

13   A.   I didn't have it with me.  They sent it up here UPS.

14   Q.   Did you do any -- did you install it?  What did you

15   do when you got there?

16   A.   The ones I originally had the first day I was there

17   was too big.  They overnighted me some more and I had them

18   the next day.

19   Q.   Then what did you do?

20   A.   I went in and put the other ones in, they were small

21   enough to go in there.

22   Q.   Where was the boat when you did this?

23   A.   Deep River, the marina where he kept it at.

24   Q.   Was it in the water or on land?

25   A.   Out of the water.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   Did you take the boat out and try to verify the

2  complaint about the exhaust noise?

3  A.   No, sir.

4  Q.   Now, on the second trip did you work outside the boat

5  or inside the boat?

6  A.   Worked inside the motorail.

7  Q.   Motorail, is that sometimes called the engine bilge?

8  A.   Engine room, right.

9  Q.   How long were you there doing that work?

10  A.   Couple days.

11  Q.   And what's the surface like inside that engine area?

12  A.   Kind of rough.  Like walking around on river rock,

13  whatever.

14  Q.   What were you wearing on your feet when you did that

15  work?

16  A.   Sock feet.

17  Q.   What was that?

18  A.   No shoes on the boat.

19        MR. ROTONDO:  I have nothing further.

20        THE COURT:  Whenever you're ready, Mr. Nikas.

21

22                    CROSS-EXAMINATION

23  BY MR. NIKAS:

24  Q.   Mr. Wilson --

25  A.   Yes, sir.

1    Q.    -- you told Mr. Rotondo that you made some

2    preparations for making the trip before going out to see

3    the boat owned by Peter and Lori; is that correct?

4    A.    Yes, sir.

5    Q.    What preparations were those?

6    A.    Just making sure that we was going to have the parts

7    that we were going to need when we get there to repair it.

8    Q.    How would you know before you arrived what types of

9    parts or equipment would be needed to effect a repair?

10   A.    We had a repair sheet.

11   Q.    And would that be the list provided by Mr. Mains?

12   A.    Yes, sir.

13   Q.    And when he listed this issue regarding exhaust

14   noise, did you respond by attempting to address that

15   issue?

16   A.    This wasn't on my first trip.  That was the second

17   trip.

18   Q.    So on the second trip, what did you do to prepare to

19   address that issue?

20   A.    I didn't even have a repair sheet or nothing.  I was

21   in the area and David wanted me to go by and put these

22   mufflers in.

23   Q.    Were these mufflers or baffles?

24   A.    Baffles.

25   Q.    And when you got the phone call, you had no idea you

PDF created with pdfFactory trial version www.pdffactory.com

1    were going to stop by?

2    A.    I think David had been preparing for the trip, but it

3    was kind of -- I was up here and I didn't know if he was

4    going to send somebody else in service or utility or what.

5    I was in the area and he said go ahead and get it up here

6    since you're there and take care of it.

7    Q.    And did you have the baffles with you?

8    A.    No.

9    Q.    Where did you pick them up?

10    A.    They were sent to the marina.

11    Q.    And for the jury's benefit, unless they're boat

12    owners or drive Harley Davidsons, what exactly are

13    baffles?

14            MR. NIKAS:    Your Honor, may I approach?

15            THE COURT:    You may.

16    BY MR. NIKAS:

17    Q.    They would be further down the line from this, but

18    they're familiar with this component.

19    A.    Basically this has nothing to do with a baffle.    The

20    baffle's on the two and a half inch pipe that's coming

21    from the collector resonator.

22    Q.    The only component we've actually seen are those

23    elbows.    So the elbows were on top of the engine, the

24    exhaust hose comes out from the elbow into the collector?

25    A.    Right.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.    And then the baffles were installed where from there?

2  A.    There's -- there's the football type of muffler

3  baffle is on the 2-inch exhaust, it leaves that and goes

4  outside of the boat.

5  Q.    The baffle is really just a component that's inserted

6  into the tubing to try to break up the resonance of the

7  exhaust?

8  A.    No.  It's a fiberglass muffler.  You have to cut the

9  hose to actually put it inside of.  Not inside of, but

10 actually it's on the outside.  You got to push the hose on

11 both sides of the two clamps and you can see the mufflers.

12 It's about the size of two milk jugs end to end.

13 Q.    How does it work?

14 A.    Fills up with water and baffles the sound.

15 Q.    And the water comes from the elbow right there?

16 A.    Yes, sir.

17 Q.    And did you physically yourself install these

18 baffles?

19 A.    Yes, sir.

20 Q.    When you did that, you paid particular attention to

21 ensure that at least at the time you were on board -- I

22 want to make clear, the time you were on board this boat

23 had what type of exhaust system?

24 A.    Resonator exhaust system.

25 Q.    Collector?

1    A.    Collector.  Not the water lifting.

2    Q.    So it had the exhaust system it had when it heft the

3    factory after it was built?

4    A.    Yes.

5    Q.    And you never saw the boat after the water lift

6    muffler had been installed?

7    A.    When it was at the factory, yes.

8    Q.    What was your involvement with this boat at the

9    factory?

10   A.    I didn't work on the boat at the factory.  I overseen

11   some of the stuff like David Wade would.  I'd go inside of

12   it and make sure they were doing the work, but most of the

13   time I was out on the road.  Just when I was at the plant

14   I may touch base and see if anybody needed help.  I didn't

15   work on the assembly line.

16   Q.    So you were just ensuring the work was done properly?

17   A.    Not really.  We had inspectors doing that.

18   Q.    Maybe you can clarify, what was your job there?

19   A.    Service and utility.

20   Q.    What was your role with this boat?  When you went to

21   go look at it, what were you doing that for?

22   A.    When I come up to make the trip up here?

23   Q.    No, no.  In the factory.

24   A.    I didn't have a role in this boat, no.  I would

25   just -- if I was in the factory for a couple days, I was

1    support.  When I was not on the road, I was support there.

2    So I didn't work on the boat.  I would just -- basically

3    walking by and seeing how it was going.

4    Q.   Were you ever informed of the reason for the change

5    from the collector to the water lift exhaust?

6    A.   I was aware they done the change trying to take care

7    of the noise problem.

8    Q.   And did you have an opinion whether that would be

9    effective?

10   A.   We were just told that the water lift was a quieter

11   type exhaust.

12   Q.   Who were you told that by?

13   A.   Just from their engineering department.

14   Q.   Whose engineering department?

15   A.   Sea Ray's.

16          MR. NIKAS:  No further questions.

17          MR. ROTONDO:  No redirect, Your Honor.

18          THE COURT:  Thank you, sir.  You may step down.

19          MR. ROTONDO:  Your Honor, the defense rests.

20          THE COURT:  Let's caucus at the sidebar for a

21   minute.

22          (Sidebar discussion off the record.)

23          THE COURT:  Ladies and gentlemen, I should put

24   on the record, no rebuttal witnesses, so the evidence is

25   now closed.  And Monday morning you will come in and we

1    will have closing arguments of counsel and my instructions

2    to you on the law.

3          I do want to build in some time for us to --

4    when I say "us," I mean counsel and myself to talk about

5    the instructions and the law.  We have to have a

6    conference to review them.  And I think we'll probably

7    have that conference 8:30 on Monday.  So that we don't

8    keep you waiting or at least waiting too long, why don't

9    we plan on you being here at 9:30.  If you want to get

10   here earlier, fine.  We'll try and get extra coffee.

11         The other thing I think is we'll make sure that

12   they fill out orders for lunch so we can make sure you

13   don't waste time standing in line any place on Monday,

14   you'll be provided with lunch.

15         I do want to remind you that although you've

16   heard all the evidence, you have not yet heard the

17   arguments of counsel or my instructions to you on the law.

18   And therefore you should not come to any conclusions.

19         You should also continue not to discuss the case

20   amongst yourselves or with anyone else.  You should not

21   have any contact with the parties, attorneys, or

22   witnesses.  And you should not be exposed to anything

23   outside this courtroom relating to this case or any

24   similar matter.  It is essential that your verdict in this

25   case be based solely on the evidence that has been

1   admitted here in the courtroom.

2           I want to thank you all for your hard work this

3   week and we'll see you Monday morning at 9:30.

4               (Whereupon the jury left the courtroom.)

5           THE COURT:  We'll take a 20-minute recess and

6   come back and argue the Rule 50 motion.  Okay?  After that

7   we'll talk about my questions on the charge.

8               (Whereupon, a recess followed.)

9

10          THE COURT:  What I think I'd like to do is do it

11  count by count.

12          MR. ROTONDO:  May I begin?

13          THE COURT:  Yes.

14          MR. ROTONDO:  Your Honor, with respect to Count

15  One, which is the product liability count, Sea Ray submits

16  that it's entitled to judgment as a matter of law with

17  respect to that count because the plaintiff has an

18  obligation to prove that the product is defective and

19  unreasonably dangerous to the consumer or user, and that's

20  under Sharp v. Wyatt, 31 Conn. App. 824, 833.

21          This case involves mechanical issues and issues

22  relating to maritime engines and exhaust systems, which

23  are subjects to which an ordinary consumer is not able to

24  form expectations of safety.  And the plaintiff has

25  offered no expert testimony that the boat was unreasonably

PDF created with pdfFactory trial version www.pdffactory.com

1  dangerous and defective.  Mr. Wicander simply testified

2  that he thought the cylinders had scored as a result of

3  water ingestion over some period of time that pre-dated

4  the hydrolock incident, but didn't offer any testimony as

5  to causation of that, when that occurred, how that

6  occurred, or that the ingestion was in fact the result of

7  any sort of a defect.

8          In addition, plaintiffs haven't offered any

9  expert testimony that the boat itself was unreasonably

10  dangerous.  And there's been a fair amount of testimony to

11  the fact that plaintiffs thought the boat was safe and

12  acted as if the boat was safe by taking their family out

13  on it.

14          In the addition, to the extent the plaintiffs

15  tried to curl the negligible repair claims under the

16  Product Liability Act, those claims are expressly barred

17  by the Product Liability Act because the issue is the

18  condition of the boat at the time it was sold and not

19  repairs that took place later.

20          THE COURT:  Can you say that part again?  I was

21  just thinking, we have three theories under the Product

22  Liability Act claim:  Strict liability, implied warranty

23  merchantability, and express warranty.

24          MR. ROTONDO:  Yes.

25          With respect to the --

PDF created with pdfFactory trial version www.pdffactory.com

 1           THE COURT:  Yes, Mr. Nikas?

 2           MR. NIKAS:  Excuse me, Your Honor.  Actually

 3    also a fourth one, which is failure to warn that was pled.

 4           THE COURT:  I know it was pled, but I was

 5    operating on what the parties put in the trial memo and

 6    requested in the jury charge.

 7           MS. LEV:  The joint trial memorandum references

 8    Section (q) of the Product Liability Act, which is that

 9    section, failure to warn.

10           THE COURT:  I didn't get a request to charge on

11    it.  I guess I'll want you all to get me one if it's in.

12           MR. ROTONDO:  The next argument is --

13           THE COURT:  Failure to warn is what you're

14    saying?

15           MS. LEV:  Yes, subsection (q).

16           THE COURT:  I know what you're talking about.  I

17    just -- I got a joint proposal for jury instructions and

18    it said there were three theories.

19           So can we go back to the point -- I got lost,

20    I'm sorry.

21           MR. ROTONDO:  I was about to start my next

22    argument with respect to the express warranty claim.

23           THE COURT:  What was the second point you were

24    making, though?

25           MR. ROTONDO:  The second point I was making was

PDF created with pdfFactory trial version www.pdffactory.com

1    that to the extent that the claims of negligence in the

2    first count related to repairs, those claims are in fact

3    outside the scope of the Product Liability Act.

4           THE COURT:  Because that's the negligence count,

5    which is Count Two.

6           MR. ROTONDO:  Right.

7           THE COURT:  Okay.  Thank you.

8           MR. ROTONDO:  With respect to the express

9    warranty count, there's an express warranty claim within

10   the product liability count.  And with respect to that

11   claim, the only evidence of an express warranty here by

12   Sea Ray is that there was a one-year warranty and that

13   one-year warranty was an express limited transferable

14   warranty, and it indicates it doesn't cover repairs after

15   the applicable period of time.  And it's expired.  It was

16   one year and it expired.  And we rely on Abraham v.

17   Volkswagen of America, 795 F.2d 250 for that proposition.

18           With respect to the claim of breach of implied

19   warranty of merchantability, we submit there's no evidence

20   to support the plaintiffs' claim that Sea Ray breached an

21   implied warranty of merchantability, because to be

22   merchantable means that it has to pass without objection

23   in the trade under a contract description fit for the

24   ordinary purpose for which such goods are used.  In fact,

25   this boat was used for an extended period of time.  The

1   complaints that the plaintiffs are really making are not

2   with respect to the condition -- the reason they're

3   claiming the boat did stop working is the hydrolock which

4   occurred in 2001 unrelated to the condition of the boat as

5   it was originally sold.  And in support of that

6   proposition, we rely on Standard Structural Steel Company

7   v. Bethlehem Steel, 597 F.Supp. 164, 185.

8           THE COURT:  On the implied merchantability, one

9   of the things I wanted to know whether I had to do,

10  Defendant's 49 --

11          MR. ROTONDO:  Defendant's 49?

12          THE COURT:  I think it's 49.

13          MR. ROTONDO:  94, Your Honor, the exhibit?

14          THE COURT:  The warranty itself.

15          MR. ROTONDO:  I think it's 94.

16          THE COURT:  That's the language containing the

17  express warranty, but it also has a disclaimer in it.

18          MR. ROTONDO:  It does.

19          THE COURT:  And when I was writing the charge, I

20  didn't know if I should be putting in the standard

21  language about if there's no disclaimer -- that's what

22  I've been researching.

23          The second sentence under "Other Limitations," I

24  was trying to decide how to draft the charge language

25  because that's in the document, but from the research I

PDF created with pdfFactory trial version www.pdffactory.com

1    had seen, that's a question of law as to whether there's

2    been an adequate disclaimer.  That's what I've been

3    checking on.  That was one of the things I wanted to

4    mention to you all.

5                 MR. ROTONDO:  Okay.

6                 THE COURT:  I started on this because I had a

7    question because the request to charge used the same

8    formulation in terms of -- sort of as the summary.

9    Defective and unreasonably dangerous as sort of the

10   touchstone for all three of strict product liability and

11   express warranty and implied warranty of merchantability.

12   And just reading the language, I wound up looking at some

13   cases.  And I ran across one that mentioned -- I was

14   looking to see whether it is in fact accurate to

15   articulate it in the same terms.  And I did find a Second

16   Circuit case that was actually from the District of

17   Connecticut from 1969, Basko v. Sterling Drug which says

18   it is the same.  So I would have to go back and change

19   what I put in my draft.

20                 But it led me to the threshold question of

21   whether, when I was trying to write in the -- describe

22   disclaiming, whether it might be error of law for me to

23   submit that to the jury, I think.  That's what I'm

24   concerned about.

25                 MR. NIKAS:  Your Honor --

1          THE COURT:  Yes?

2          MR. NIKAS:  Isn't the Connecticut Product

3    Liability Act a state statute?

4          THE COURT:  Yes, it is.

5          MR. NIKAS:  Would it not be interpreted by

6    Connecticut state law?

7          THE COURT:  Yes, it is.  And we have a

8    Connecticut Supreme Court case.  And if I start with the

9    state cases, I think that claim just drops out altogether.

10         MR. NIKAS:  You'll explain your basis?

11         THE COURT:  I can tell you.  If there's a

12   disclaimer under 2 dash 3 -- hold on.  I didn't bring my

13   state statutes in with me.

14         2-316(2) is the standard.  And the cases that I

15   had been reading said it's a question of law for the Court

16   to decide.  So that may moot the question I was starting

17   to look at.

18         And there's also a Connecticut Supreme Court

19   case where they decided not to -- they discussed it but

20   didn't reach a formal conclusion.

21         Can you all get me a charge on the failure to

22   warn?  I didn't get that from the parties.

23         MR. ROTONDO:  That was not provided, Your Honor.

24         Can I address that failure?  Maybe I ought to

25   hear what the failure to warn claim is, because I'm not so

1    sure what the failure to warn claim is that the plaintiffs

2    are asserting.  If they're claiming a failure to warn of

3    water ingestion, I don't think there's any basis for that

4    as a product liability claim.  There's simply no evidence

5    to support there's a defect, just simply --

6                THE COURT:  I'm sorry.  We don't do that here.

7                MR. NIKAS:  I apologize, Your Honor.

8                MR. ROTONDO:  There's no basis for asserting

9    that failure to warn of water ingestion is a defect here.

10   There's no testimony to that effect.

11           To the extent that the plaintiffs are claiming

12   failure to warn about the changeover from the so-called

13   collector style to the water lift style, if that's the

14   claim, that's a repair that was made later and doesn't

15   give rise to a product liability claim.

16           Unless they have some other failure to warn

17   claim, I can't see how they establish a failure to warn

18   claim for purposes of the Product Liability Act.

19   Mr. Nikas may --

20                THE COURT:  Okay.  Do you want to address the

21   Product Liability Act, Mr. Nikas?  Take them one theory at

22   a time, if you don't mind.  Strict liability first, if you

23   don't mind.

24                MR. NIKAS:  As to strict liability, Your Honor,

25   there's uncontroverted testimony by Mr. Wicander that the

PDF created with pdfFactory trial version www.pdffactory.com

1    physical evidence that was discovered during the

2    inspection of the engine following its failure on July 9

3    was longstanding.  And given the fact that there's no

4    evidence to the contrary that the water entered the engine

5    through anything other than the exhaust elbow, the jury is

6    entitled to infer that that condition would not have

7    occurred absent defective product.  And given the duration

8    of it, the jury should be allowed to determine whether

9    that defect existed at the time of its sale.

10            As to the warranty limiting the duration of the

11   time that defect would be covered --

12            THE COURT:  You're moving to express warranty

13   now?

14            MR. NIKAS:  Correct, Your Honor.

15            It's clear that that would toll, based on the

16   fact that the warranty guarantees that the product will be

17   free from defect for a period of at least one year.  In

18   Standard Alliance v. Black Clawson Company,

19   587 F.2d 813 --

20            THE COURT:  Slow down for a second, please.

21            MR. NIKAS:  Standard Alliance v. Black Clawson

22   Company, 587 F.2d 813, Sixth Circuit, 1978, the court held

23   that the future performance exception to a warranty time

24   period applies when the seller explicitly agrees to warn

25   its product for a defined period of time.  Moreover,

PDF created with pdfFactory trial version www.pdffactory.com

1   because the defect was not discoverable during the time
2   period argued by defendant, the court should be allowed --
3   the warranty is tolled until the defect manifests itself
4   and it's possible to determine what the defect is.  That
5   is Pacific Gas & Electric Company v. Westinghouse, 1
6   Fed.Appx. 623, Ninth Circuit, 2001.  Also Kaiser Cement &
7   Gypsum v. Allis-Chalmers, 35 Cal.App.3d. 948, 1973,
8   determining that it was prospective warranty because it
9   stated the goods will operate in a specified fashion for a
10  period extending into the future and that the warranty
11  will not expire until it's reasonably discoverable, the
12  defect or the failure of the goods performance is
13  reasonably discoverable to the party bringing the claim.
14          THE COURT:  Okay.  And did you want to address
15  implied warranty?  And also failure to warn.
16          MR. NIKAS:  The defendant's own expert testified
17  that the vessel was not fit for its intended purpose and
18  usage certainly at the time of its inspection dating back
19  to the time of its failure.  Plaintiffs also testified
20  that they were unable to use the vessel as intended in
21  that the concealment of the defect which caused this
22  failure should toll any warranty period or any attempted
23  waiver of that implied warranty due to the fact that the
24  defect existed prior to the time of the sale to
25  plaintiffs.  And the jury can reasonably infer such facts

1    from the uncontroverted testimony that was proffered.

2         Similarly, defendants did not warn plaintiff

3    regarding propensity or the possibility of the ingestion

4    of water through the exhaust system and exhaust elbows and

5    that Mr. Wicander testified without contest that the

6    engine scoring in the cylinder walls would eventually lead

7    to decreased engine performance and possibly catastrophic

8    engine failure.  Such failure, if it occurred at sea,

9    would necessarily cause an unreasonable danger of injury

10   to either the owners or any other persons on board.

11        THE COURT:  Ms. Lev was going to point out

12   something to me in the joint trial memorandum, and I just

13   want to make a note as to where that is.

14        MS. LEV:  Yes, Your Honor, at the bottom of

15   page 4, the citations to the Connecticut General Statute

16   pertaining to product liability cite to Section 52-572q,

17   which is the failure to warn statute.  Specifically it's

18   the liability --

19        THE COURT:  I'm going to read, okay?

20             (Pause.)

21        THE COURT:  Did you say the bottom of page 4?

22        MS. LEV:  Yes, it's in Footnote 6.

23        THE COURT:  I'm looking at the joint trial

24   memorandum dated May 29.

25        MS. LEV:  I'm sorry, Your Honor.  I was

1    referring to the proposed jury instructions.  It's on

2    page 4 of those proposed jury instructions.  I apologize.

3            THE COURT:  The problem I have with what you're

4    telling me is that you've got a footnote that cites the

5    Act and then on the next page it says the plaintiffs have

6    brought their claim under the Act on three different

7    grounds: strict liability, breach of implied warranty

8    merchantability, and breach of express warranty.  To say

9    that that little citation to the --

10           MS. LEV:  Your Honor, this is coupled with

11   assertions made --

12           THE COURT:  That's a citation to the Act as a

13   whole.  Under that theory you would have claimed in the

14   joint trial memorandum, you told me you were going to

15   be -- you could pull out any theory you want you find

16   anywhere in the Act.  That's totally deceptive.

17           MS. LEV:  Your Honor, this is coupled with

18   assertions that have been made since the original

19   Complaint was filed and throughout --

20           THE COURT:  Why do I have a set of jury

21   instructions that tell me there are going to be three

22   theories?

23           MS. LEV:  I can't explain that.  I didn't draft

24   those, Your Honor.

25           THE COURT:  Can you explain that, Mr. Rotondo,

PDF created with pdfFactory trial version www.pdffactory.com

1    why I have three theories and I don't have anything about

2    failure to warn here?

3           MR. ROTONDO:  I think that, at least from our

4    perspective, we prepared what we thought the issues in the

5    case were based on what the evidence was.  And plaintiffs

6    didn't suggest anything different.

7           MR. SENNING:  Your Honor, I was involved solely

8    in the case at the time the joint trial memorandum had

9    been finalized.  I thought that that had been included.

10   And I saw the section cited at the bottom of 6 and I was

11   thinking, because of that, knowing what that section

12   meant, I was thinking that that was included.  I didn't

13   catch the three theories on the next page.

14          THE COURT:  Well, you didn't see also that there

15   was no section on failure to warn anywhere in the charge?

16          MR. SENNING:  No, I didn't, Your Honor.

17          THE COURT:  What is the claim in the -- I'm

18   looking -- I just don't like having people switch things

19   on me, okay?

20          Where in the text of the plaintiffs' contentions

21   is the reference to failure to warn so I know exactly what

22   was claimed?

23          MR. NIKAS:  Page 5 at the end of Section A,

24   line 3.

25          THE COURT:  You're in the joint trial

Vol. IV - Page 750

1    memorandum?

2            MR. NIKAS:  Correct, Your Honor.

3            THE COURT:  Page 5.

4            MR. NIKAS:  Page 5, last paragraph of section

5    (a).

6            THE COURT:  Let me read that.

7                (Pause.)

8            THE COURT:  Are you claiming all of those?

9            MS. LEV:  Your Honor, the last sentence of that

10   paragraph says explicitly --

11           MR. NIKAS:  Third line, breach of or failure to

12   discharge a duty to warn or instruct.

13           THE COURT:  It also says misrepresentation or

14   nondisclosure.

15           MS. LEV:  That pertains to the negligence claim

16   as well, Your Honor, but that would fall under subsection

17   (q).

18           THE COURT:  In the Complaint where's the duty to

19   warn allegation?  Maybe page 14, subparagraph (b), (c).

20           MR. NIKAS:  Page 14, paragraph 60(b), (c),

21   ostensibly (d).

22           THE COURT:  I see fail to warn in (b).  I see

23   fail to warn in (c).  And I don't see fail to warn --

24           MR. NIKAS:  Misrepresented regarding the safety

25   and fitness for use.

1           THE COURT:  Which paragraph are you reading

2    there?

3           MR. NIKAS:  That's the paragraph immediately

4    following, the (d) paragraph.

5           THE COURT:  I'm going to go with where it says

6    fail to warn.  That's pled properly.

7           So the answer to the question as to what the

8    claims are in terms of failure to warn are paragraph 60(b)

9    and (c).

10          Do defense counsel have the Complaint there?

11          MR. ROTONDO:  In front of us, yes, Your Honor.

12          THE COURT:  Everybody now is on the same page as

13   to what the failure to warn claims are?

14          MR. ROTONDO:  Yes.

15          THE COURT:  Okay.  Good.  Let me mark that page.

16          And you think you covered one of those in your

17   argument, Mr. Nikas, and the other one is apparent to me.

18          MR. NIKAS:  Furthermore, Your Honor, in regards

19   to the product liability claims, the fact that defendants

20   made literally from the first nine days of operation of

21   the vessel until well over almost a year and several

22   months past the expiration of the purported warranty

23   expiration date, continued to make warranty repairs to

24   this vessel on their own and extended the warranty past

25   the expiration date should act as a waiver of any attempt

PDF created with pdfFactory trial version www.pdffactory.com

1    to limit the warranty to a one-year period.

2           Additionally, the repeated repair attempts from

3    the first nine days of the vessel's operation should also

4    serve to explain plaintiffs' reliance on those repeated

5    promises that were testified to by both plaintiffs and the

6    two Sea Ray witnesses as well as the dealership witness

7    about repeated attempts to satisfy the concerns raised by

8    plaintiffs.

9           THE COURT:  I'd like to make sure you all get me

10   a charge on the duty to warn pretty soon.  Okay?  Or I'll

11   send you a charge with a blank spot in it.  It all sort of

12   flows, so I need it.

13          Okay, let's go to Count Two.  I'm reserving

14   ruling on those, but if the implied warranty

15   merchantability drops out of the draft that you get, it

16   was intentional, okay?

17          MR. ROTONDO:  May I respond to one of the points

18   made by Mr. Nikas?

19          THE COURT:  Yes.

20          MR. ROTONDO:  With respect to the warranty

21   claim, first of all, Exhibit 94 says that the warranty

22   says that Sea Ray will repair and it's not a future

23   performance warranty.  It doesn't guarantee or even say

24   that the product is not defective.

25          THE COURT:  Okay.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. ROTONDO:  The second thing, to respond

2    perhaps to Your Honor's question directly of me a couple

3    of minutes ago when you talked about the difference --

4    perhaps different standards that might apply under the

5    Product Liability Act with regard to the strict liability

6    and the --

7          THE COURT:  Implied.

8          MR. ROTONDO:  I think, Your Honor, since they're

9    bringing the claim under the Product Liability Act, they

10   still have to meet the standard of it being defective and

11   unreasonably dangerous.  That's what they have to prove

12   because it's a Product Liability Act claim.  They might be

13   able to make a claim that there is a -- or can make the

14   claim that there's either implied or express warranty, but

15   the standard in terms of what the requirements of the Act

16   are are the same, at least in terms of the issue of

17   defect.

18         MR. NIKAS:  Excuse me, what did you say?

19         MR. ROTONDO:  What I said was the standard of

20   defect is still the same.

21         MR. NIKAS:  Your Honor, may I respond just to

22   that point?

23         THE COURT:  Yes.

24         MR. NIKAS:  The jury's entitled, in fact the

25   Supreme Court has said credibility determination is a

1    weighing of the evidence and the drawing of legitimate

2    inferences from the facts are jury functions, not those of

3    the judge.   The only evidence as to the issue of danger

4    was provided by plaintiffs' expert witness, that testimony

5    was unconverted.   The jury should be allowed, in fact,

6    since there's no evidence to the contrary, to determine

7    the severity of the risk or the existence of the danger.

8              THE COURT:   I don't think you understood the

9    point.   He was talking about what the standard is, not

10   whether I decide it or not.   Okay?

11             I had said I was reserving ruling on those with

12   the possible exception of the implied warranty claim,

13   which I think our law says is a matter for the Court to

14   decide.

15             MR. ROTONDO:   To respond to that last point, I

16   understand Your Honor's reserving ruling, but so the

17   record is clear, Mr. Wicander's testimony that the

18   cylinders or the engine may at some point fail in the

19   future doesn't constitute a harm within the meaning of the

20   Act.   You actually have to have a failing.   So this water

21   ingestion theory, while being nice, it doesn't constitute

22   a harm.

23             And in addition, the Abraham v. Volkswagen of

24   America case I cited before, 795 F.2d 238, 250 makes clear

25   that a manufacturer does not have an obligation to design

1    a product in such a way that it will never wear out in the

2    future.  So Mr. Wicander, in the first place, didn't say

3    it was defective.  He didn't use the magic words, he

4    wasn't disclosed to use the magic words, he doesn't get

5    them across the line with respect to the issue of

6    defective design.

7            MS. LEV:  Your Honor, may I respond?

8            THE COURT:  I'm reserving.  They'll file their

9    papers; you can file some.

10           I gather the argument that I'm hearing is

11   that -- first of all, there was an objection filed by the

12   plaintiffs as to the definition of "harm."  And I do find

13   persuasive the plaintiffs' version of the definition of

14   "harm," it's right out of the statute.  Includes harm to

15   the product.

16           MR. ROTONDO:  Correct.

17           THE COURT:  Okay.

18           MR. ROTONDO:  But Mr. Wicander -- the issue

19   there is really -- the issue there was really the issue of

20   whether or not the hydrolocking, the fact that the engine

21   stopped, whether or not that constitutes harm.

22   Mr. Wicander's testimony that there's scoring that doesn't

23   result in a failure, it's our position that that doesn't

24   constitute harm.  Some gradual process by itself literally

25   isn't harm within the meaning of the Act.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  I understand.  I think I want to

2    have a transcript and go through things to make a decision

3    on that myself.

4          MR. ROTONDO:  With respect to the negligence

5    claim, Your Honor, we submit that there are two

6    deficiencies with respect to that.

7          First, the plaintiffs haven't introduced any

8    expert evidence that Sea Ray breached any applicable

9    standard of care here with respect to the issue of

10   negligence.  And expert testimony is required when a

11   request involved goes beyond the fields of the ordinary

12   knowledge and intent of jurors.  We rely on the LePage v.

13   Horne case.

14          THE COURT:  Just so we're clear here, the

15   gravamen of the negligence claim is not supervising

16   repairs done to the boat, performing repairs that were not

17   done in appropriate and workmanlike manner, failing to

18   provide proper instructions for flushing the boat's

19   engines.  And I think the plaintiffs had objected to

20   certain other -- four other items not being included.

21          I did have a question about the first thing that

22   was added by the plaintiffs, Mr. Senning.

23          MR. SENNING:  Yes, Your Honor?

24          THE COURT:  In your objection, I think you're

25   referring to things from paragraph 58 of the Complaint.

1    And you're saying that you'd like four additional items

2    added.  If you have the joint trial memo and the jury

3    charge instructions, your objections at the end, Objection

4    Number 4.  And you reference paragraph 58 of the

5    Complaint.

6              MR. SENNING:  What page, Your Honor?

7              THE COURT:  Your objections.  Your objections

8    are only three pages.  I'm on the second page at the top.

9              So Objection Number 4.

10             MR. SENNING:  Yes, Your Honor.

11             THE COURT:  The first bullet point, when?  What

12   point in time are we talking about?

13             MR. SENNING:  We're talking about when the boat

14   was at the Sea Ray facility in Knoxville.  There was no

15   evidence --

16             THE COURT:  When when it was at the Sea Ray

17   facility?  Was it there when it was made?

18             MR. SENNING:  I'm sorry, when it was returned to

19   Sea Ray.

20             THE COURT:  So that would have been in 2000,

21   2001?

22             MR. SENNING:  That's correct.  Also when the

23   boat was constructed there's no evidence --

24             THE COURT:  Well, isn't the construction date

25   past the statute?

1        MR. SENNING:  Well, if you can't discover the

2    defect, then the statute is tolled.

3        THE COURT:  Well, if there's a possibility of a

4    finding on this one, I'm going to want to have a special

5    interrogatory -- if there were to be a finding on this

6    basis, I need to know which basis it was on.

7        I thought the negligence claim -- actually, I

8    withdraw the question.  Because it really can only be the

9    2000, 2001 period because I believe it says negligent in

10   making repairs to the boat.  Okay.  So that would be in

11   2000, 2001.  Okay.

12       I'm sorry, I cut you off, Mr. Rotondo.

13       MR. ROTONDO:  The other argument, Your Honor, is

14   plaintiffs --

15       THE COURT:  Your first argument was no expert

16   testimony --

17       MR. ROTONDO:  About a breach of the applicable

18   standard of care.

19       Second argument was plaintiffs have introduced

20   no evidence that Sea Ray acted negligently in relying on

21   the original flushing instructions provided by MerCruiser

22   or not supplementing those original instructions.  Those

23   are the two arguments with respect to negligence,

24   Your Honor.

25       THE COURT:  Okay.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. NIKAS:  Your Honor, there's no expert

2     testimony required when Mr. Wade, who was the customer

3     service director charged with supervising repairs,

4     disclosed that he made no inquiry as to whether the

5     instructions had changed.  He made no inquiry as to

6     whether the retrofitted exhaust system was even necessary

7     or even recommended as a replacement for the

8     collector-style exhaust.  In fact, I think he stated that

9     he consulted nobody, he consulted nothing, and then failed

10    to notify plaintiffs that the modification had even been

11    made.  And then once the modification had been made, he

12    said, well, he didn't know that it required different

13    maintenance.  And so the failure to do so resulted in use

14    by plaintiff of the existing instructions having no notice

15    that those instructions would no longer be effective for

16    this exhaust system which resulted in the hydrolocking

17    incident of June 9.  To argue that some form of expert

18    testimony is required for the jury to understand that's

19    negligent is just not reasonable.

20          Moreover, the entire process by which the vessel

21    was repaired, not just while it was at the factory, but

22    from the time the first repairs were attempted right after

23    Mr. Mains owned the boat, I think Mr. Rotondo put up

24    dozens and dozens of repair requests.  It's clear by the

25    fact that those requests kept on appearing again and again

 1   and the fact that when the boat was returned following its

 2   trip to Tennessee it had damage from incorrect lifting, it

 3   had damage from contact, the negligence claim is

 4   relatively clear without any referral to expert testimony.

 5          And the simple fact of the matter is that

 6   there's no testimony whatsoever contradicting the

 7   testimony of plaintiffs, the testimony of Mr. Wicander,

 8   the testimony of Mr. Greaves.  In fact, the testimony of

 9   their expert confirms in its entirety the conclusions

10   drawn by Mr. Greaves. And Mr. Wade testified that he did

11   nothing and Mr. Wilson testified that he did nothing past

12   that point.

13          THE COURT:  I'm going to reserve ruling on that

14   count.

15          MR. ROTONDO:  Your Honor, with respect to Count

16   Three, there are really two arguments.

17          THE COURT:  And before you start, I think this

18   is another one that there was an objection filed by

19   Mr. Senning.  It had to do with the concept of agency.

20          MR. ROTONDO:  Yes.

21          THE COURT:  Okay.

22          MR. ROTONDO:  Another three arguments, I guess.

23          First of all, relying on the Conte v. Dwan

24   Lincoln-Mercury case, Your Honor, 172 Conn. 112, we submit

25   that the plaintiffs must prove that there must be a

1    buyer-seller relationship.  Must be privity in order to

2    invoke this remedy.  In addition -- and there isn't any

3    privity, the testimony was uncontradicted that the

4    plaintiffs bought the boat from Surfside 3.  There's no

5    dispute about that.

6              To respond to the second, to the agency concept

7    that's in the plaintiffs' objection, there's no evidence

8    that Surfside 3 was acting as an agent with respect to

9    this transaction with respect to the sale for Sea Ray.

10   There's simply no evidence whatsoever to support that.

11             Third, the plaintiffs under the Conte case must

12   prove revocation within a reasonable time after a

13   nonconformity was discovered.  There is absolutely no

14   evidence whatsoever in this case of a revocation.  And

15   without that evidence, they're not entitled -- Sea Ray's

16   entitled to judgment as a matter of law with respect to

17   that claim.

18             THE COURT:  Whenever you're ready, Mr. Nikas.

19             MR. NIKAS:  There's no evidence, Your Honor,

20   that there is no privity between Sea Ray and plaintiffs.

21   Sea Ray's witness was queried as to whether plaintiffs

22   ordered the boat directly from Sea Ray or from the dealer.

23   And he was unable to recall what the circumstances of that

24   purchase were.

25             THE COURT:  Don't we have to have something that

PDF created with pdfFactory trial version www.pdffactory.com

1    would support a jury concluding that that requirement has

2    been satisfied?

3              MR. NIKAS:  Which would then go back to the

4    plaintiffs' original testimony which was consistent --

5              THE COURT:  You said no evidence from Sea Ray --

6    I misheard you, okay.

7              MR. NIKAS:  Which was consistent that the

8    representations that were made and that the assurances

9    that he relied upon in that the individuals he had

10   discussions with were from Sea Ray, because this is unlike

11   a typical transaction in which a boat would be purchased.

12   This transaction was actually arranged by the factory

13   because the 1996 Sea Ray was being returned due to the

14   conditions that existed in it, and the witnesses testified

15   that that was arranged for by the factory.  And in fact,

16   the witness from Surfside 3 testified only that this boat

17   was dropped off at his facility and that the entire

18   transaction had been arranged for by Sea Ray.

19             THE COURT:  That's Mr. Beckman?

20             MS. LEV:  Beckman.

21             MR. NIKAS:  Because plaintiffs testified, and

22   you could just read the joint trial memo to see what the

23   anticipated testimony was of the Sea Ray witnesses that

24   weren't called, and you can look at Mr. Wade's testimony

25   today that plaintiffs had that '96 330 Sundancer as an

1    accord of satisfaction, some sort of settlement, they

2    turned that vessel in to the factory where they received

3    credit for it which makes them privy -- have direct

4    privity with the factory rather than with the dealership,

5    and that should overcome any issue.

6            THE COURT:  Do I need to include the agency

7    language in the charge?

8            MR. NIKAS:  I don't think so.  I don't think

9    it's been contested that that transaction was arranged for

10   through the factory.

11           THE COURT:  So I won't bother researching a

12   charge for that.

13           MR. NIKAS:  Moreover, as to the revocation,

14   timeliness of that revocation, the vessel failed on

15   June 9, 2001, which is the first time it had become

16   apparent that there was something wrong with the engines

17   installed on board.  Within a year of that time, in fact

18   substantially less than one year, the Complaint was filed

19   requesting revocation.

20           THE COURT:  I think the Complaint was filed

21   December 2001, right?  That would be six months.

22           MR. NIKAS:  Within one year of the failure.  And

23   that was explicitly set forth in the text of the Complaint

24   that that was a remedy sought for.

25           MR. ROTONDO:  May I respond briefly, Your Honor?

1          THE COURT:  Yes.

2          MR. ROTONDO:  The fact that the plaintiffs in

3   their Complaint alleged the revocation doesn't mean

4   there's any evidence in front of this jury upon which they

5   could conclude there was a revocation.  The Complaint

6   isn't evidence because it wasn't put into evidence.

7          Second, with respect to this triangular

8   arrangement that Mr. Nikas has argued about, both of the

9   plaintiffs testified clearly and unequivocally that they

10  purchased this boat from Surfside 3.  There was no

11  equivocation about that whatsoever.  And both the statute,

12  which is Section 42a-2-608 and the Conte case, which I

13  mentioned before, are clear that there must be a

14  buyer-seller relationship.

15         THE COURT:  That part of the arguments I would

16  reserve on.  But I am concerned about the point in terms

17  of there being evidence of revocation because the

18  Complaint is not in front of the jury.  So maybe Mr. Nikas

19  can address that.

20         MR. NIKAS:  Mr. Mains in his direct testimony --

21  in fact, if I recall correctly, it was actually in his

22  cross-examination by Mr. Rotondo, Mr. Rotondo put forth

23  evidence that following the engine failures on June 9 that

24  Mr. Mains had attempted to get a new boat or otherwise get

25  a refund for the money that was paid for the boat.  And

1    the jury can reasonably infer that as a revocation of the

2    original sales contract, given that the vessel had just

3    failed, and then contacted Sea Ray asking for either

4    replacement or reimbursement of those monies.  And that

5    was on cross-examination.

6              THE COURT:  So it sounds like I need a

7    definition of "revocation."

8              MS. LEV:  Your Honor, it's also evidenced by the

9    fact that --

10             THE COURT:  Well, I said I need a definition of

11   "revocation," so I'm going to reserve on that.  But I will

12   want a definition of "revocation."  I'll let you know if I

13   find one.

14             MR. ROTONDO:  We will look for one.

15             If we come up with additional authority, Your

16   Honor, should we fax that to the Court?

17             THE COURT:  Yes.

18             MR. ROTONDO:  And plaintiffs' counsel.

19             THE COURT:  Since we may be -- I'll be checking

20   the docket.  Why don't we just file everything.  I'll have

21   my computer with me.

22             MR. ROTONDO:  As to the Fourth Count,

23   Your Honor --

24             THE COURT:  I'm sorry, just let me finish making

25   a note.

1              Now we're on Count Four, which is the CUTPA

2    claim.

3              MR. ROTONDO:  Yes.

4              THE COURT:  Maybe before we start the argument

5    on that, I can hear from the plaintiffs what the basis is

6    for the CUTPA claim.  We do have a pretty clear line in

7    terms of the statute of limitations.  I don't want to

8    spend time talking about that if we don't have to.

9              So what is the conduct that is the basis for the

10   CUTPA claim that falls within the statute, within the

11   three-year period?

12             MR. NIKAS:  The unfair trade practice alleged is

13   that under the guise of returning the vessel back to

14   Tennessee for cosmetic repairs, defendants, without the

15   authorization or even notice to plaintiffs, decided to

16   remove a substantial component of the vessel structure and

17   replace it with another without offering any consideration

18   as to its suitability, as to its operability, or as to its

19   safety in this specific instance, such that when plaintiff

20   attempted to maintain that component, it failed, which

21   resulted in the exposure of the underlying defect which

22   was the historical water ingestion causing scoring into

23   the engines, that defendant's misrepresentations as to

24   whether this repair would be effected --

25             THE COURT:  Well, what are you talking about in

PDF created with pdfFactory trial version www.pdffactory.com

1    terms of misrepresentations as to whether this repair

2    would be effected?

3              MR. NIKAS:  Effected, meaning performed.

4              Mr. Mains testified that the items that they

5    discussed with individuals from Sea Ray and from the

6    dealership all dealt with the fiberglass pouring, dealt

7    with the cosmetics, dealt with gelcoat issues.  At no time

8    did anybody from the factory inform them that they were

9    going to be removing this component and replacing it with

10   another without, A, notice, or B, an explanation as to why

11   it was going to be performed other than "we did it for

12   you."  Not one witness has testified as to the cause for

13   the change other than to go into the circular argument

14   that it was in response to the Complaint.  Not one witness

15   testified for the defense as to the justification behind

16   this change.  And the jury should be reasonably allowed to

17   infer that a party would not typically make a change like

18   that for no reason at all unless there was some unfair

19   trade practice or some attempt to mislead the consumer by

20   changing this component without notice.

21             THE COURT:  Doesn't all of this come down to

22   your evidence that the change was made without consulting

23   with the plaintiff in advance?  And then you're saying

24   from that, well, that's evidence that there was some

25   nefarious motive to -- when you say "under the guise" --

PDF created with pdfFactory trial version www.pdffactory.com

1    what's the evidence other than the fact that the change

2    was made without specific notification to the plaintiffs

3    that there was going to be a substitution of the systems?

4           MR. NIKAS:  Because they didn't consult

5    anything.  Both Sea Ray witnesses, in fact Mr. Wade

6    primarily, because Mr. Wilson testified he had very little

7    involvement other than to look at it, Mr. Wade testified

8    that he made the decision to install the water lift

9    muffler in replace of the collector-style exhaust.

10          THE COURT:  Only one person argues, Ms. Lev.

11   You can sit down.

12          MR. NIKAS:  And he testified that he consulted

13   no individual, no reference materials, no standards, no

14   nothing.  He just arbitrarily made this decision to

15   replace this major component.

16          THE COURT:  He didn't testify that he

17   arbitrarily made it.  I want to focus on the evidence, not

18   the arguments you're going to make from the evidence.  And

19   the evidence I hear is that the change was made without

20   notice to the plaintiff in advance that it would be done.

21          MR. NIKAS:  And --

22          THE COURT:  But the evidence is also undisputed,

23   because it's in the plaintiff's own letter, that he was

24   complaining about that system, the resonance in the

25   system.  And it's also undisputed that there was no effort

1    to hide it from him before the boat got back to him.  If

2    I'm remembering the testimony correctly, he didn't learn

3    about it until the boat was about to come back from the

4    factory.  That's the evidence that I see.

5              MR. NIKAS:  Mr. Wade testified that he had

6    regular conversations with plaintiff as to the condition

7    of the boat and the status of repairs.  And at no time

8    except immediately prior to the time the boat was already

9    on its way --

10             THE COURT:  You're just repeating what I said.

11             MR. NIKAS:  -- did he report that it was done.

12             It's also true that he testified that he did not

13   consult anybody or anything to determine if this was even

14   an appropriate response to plaintiffs' complaint.

15             THE COURT:  That wasn't his testimony.  Okay.

16             Let me hear from Mr. Rotondo.

17             MR. ROTONDO:  Your Honor, this argument is based

18   on complete speculation.  There's absolutely nothing

19   whatsoever about what Mr. Nikas has said in support of

20   this claim that in any way supports it.  He talks about

21   things that are concealed.  He talks about

22   misrepresentations.  He talks about things that were

23   hidden.  There's no evidence whatsoever to support this

24   claim whatsoever.  In order to satisfy the standard, the

25   plaintiff must prove that there was some sort of immoral,

1    unethical, oppressive or unscrupulous practice or conduct,

2    and that's under Williams Ford v. Hartford Courant.  And

3    Williams Ford also makes clear that simple negligence or

4    breach of contract doesn't rise to the level of a CUTPA

5    claim.  And we also rely on Boulevard Associates v.

6    Sovereign Hotels.

7         The evidence in this case is clear that

8    Mr. Mains complained and complained and complained about

9    this exhaust resonance.  And the evidence is also clear

10   that Sea Ray tried to respond in one fashion or another.

11   There was testimony by Mr. Beckman that he went out, road

12   the boat with Mr. Mains, didn't hear anything, tightened

13   belts up and hoses and whatnot, nothing happened, didn't

14   make any change.

15        Then there's testimony by Mr. Wilson that he

16   went out and added this device and that didn't make any

17   change, Mr. Mains still complained.  Then we have the boat

18   going back and Mr. Mains writes his letter of February 12,

19   which is -- I don't remember what exhibit number it is,

20   but it's February 12, 2001 where he complains again about

21   the exhaust resonance and talks about possibly there was

22   some footer or something that could be done.  Mr. Mains

23   said he wanted something to be done, that's why he

24   included it in his letter.

25        Mr. Nikas has talked about somehow Mr. Wade

1    hiding this.  Mr. Wade said he didn't recall discussions

2    with Mr. Mains on this particular issue.  That's what he

3    said.  Mr. Mains recalls that he wasn't consulted

4    beforehand on this, but he was told when the boat was

5    coming back.  There's nothing whatsoever that supports an

6    unfair trade practice claim here.  Mr. Wade was very clear

7    in his testimony that the reason he did this was because

8    he was trying to find some solution to Mr. Mains'

9    complaint about exhaust resonance and he thought this

10    exhaust system would be quieter.  That was his testimony.

11         We have raised, Your Honor, the issue of the

12    statute of limitations based on the fact that Sea Ray's

13    sale of the boat -- well, they've made it clear they --

14         THE COURT:  Well, that's why I asked first so I

15    know whether we need to deal with the sale of the boat and

16    we don't.

17         MR. ROTONDO:  Next, Your Honor, we submit that

18    plaintiffs -- the plaintiffs haven't suffered any harm

19    compensable under CUTPA with respect to this.  They have

20    to show an ascertainable loss.  Macquire v. Citicorp.

21    Retail Services, 147 F.3d. 232, 238, says a plaintiff

22    claiming damages has the burden --

23         THE COURT:  You can give me the name of the

24    case -- I've got it.

25         MR. ROTONDO:  I gave you the name already?

1          THE COURT:  Yes.

2          MR. ROTONDO:  In addition, the loss the

3   plaintiffs are really claiming here, Your Honor, if they

4   state a viable product liability claim, which we've

5   disputed, but if they do state a viable product liability

6   claim, that product liability claim preempts and bars and

7   occupies the field.  And there are a number of Connecticut

8   Supreme Court cases that are on point with respect to

9   that, I hope they're cited here.

10          THE COURT:  I have some.  I have a CUTPA

11  treatise.

12          MR. ROTONDO:  In addition, Your Honor, the

13  plaintiffs -- this is the more general point.  If we're

14  done arguing the CUTPA claim, I've got some more general

15  points.

16          Plaintiffs failed to prove the amounts of their

17  alleged damages.  In order for the plaintiffs to recover

18  damages, they must present evidence that provides the

19  finder of fact a reasonable basis upon which to calculate

20  the damages.  What the plaintiffs have essentially done

21  here is to leave any award of damages to speculation in

22  terms of their presentation of the evidence.  And we would

23  rely on Sir Speedy v. L & P Graphics, 957 F.2d 1033, 1038

24  and Gaudio v. Griffin Health Services Corp., 249 Conn.

25  523, 554.

PDF created with pdfFactory trial version www.pdffactory.com

1          In that regard, we would rely on the Restatement

2     (Second) Torts.  The plaintiffs in some respects would

3     need to prove either the diminution of value of the boat

4     or the cost of repairs.  Here the plaintiffs have just

5     rejected the whole idea of cost of repairs.  They've said

6     they don't want it repaired and haven't offered into

7     any -- they have not offered into evidence any evidence of

8     the diminution in value of the boat.

9          To the extent the plaintiffs are seeking to

10    recover for loss of use, plaintiffs have not provided any

11    evidence of loss of use of the boat.  They haven't offered

12    it in terms of what they didn't do, what they would have

13    done, what they could have done.

14         To the extent that the plaintiffs had an

15    alternate form of evidence with respect to the loss of

16    use, that might have been something such as rental value

17    for the period for which the boat wasn't used, but they

18    haven't offered any evidence of that.  And we would cite

19    to Johnson v. Flammia, 169 Conn. 491 and Restatement

20    (Second) Torts Section 928.

21         Finally, Your Honor, the plaintiffs have sought

22    to recover punitive damages, interest, attorneys' fees or

23    costs, and we submit there's no basis for awarding any of

24    those damages in light of the evidence and, more

25    accurately, the lack of evidence in this case.  In order

1    to award punitive or exemplary evidence, the evidence must

2    reveal a reckless indifference to the rights of others or

3    intentional, wanton violation of those rights.  And in

4    support of that, we rely on Gargano v. Heyman,

5    203 Conn. 616, 622, and that sets forth the standard for

6    punitive damages under CUTPA.  And Berry v. Loiseau,

7    223 Conn. 786, which is a standard for punitive damages

8    under common law.  And also Connecticut General Statutes

9    52-240b.

10            In addition, even if the plaintiffs -- even if

11   the level of conduct could somehow be interpreted to the

12   level to warrant attorneys' fees, which we obviously

13   dispute, the plaintiffs haven't presented any evidence of

14   attorneys' fees in this case and therefore cannot collect.

15   Connecticut imposes a requirement that the reasonableness

16   of attorneys' fees and costs be proven by evidence by the

17   finder of fact.  And we cite Smith v. Snyder,

18   267 Conn. 456.

19            THE COURT:  Can you give me that cite again?

20            MR. ROTONDO:  I'm sorry, 267 Conn. 456.

21            Case law is also clear that for purposes of

22   punitive damages under state law that plaintiffs must

23   introduce evidence of attorneys' fees as part of their

24   case in chief.  They haven't done that.

25            I have one last argument, Your Honor.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  Sure.

2          MR. ROTONDO:  Which is that plaintiffs have

3    attempted to -- well, plaintiffs have presented a case and

4    they're going to argue that this is a water ingestion

5    case, the boat started failing from day one.  And they

6    talk about Mr. Wicander's scoring of the cylinders and the

7    boat would -- the engines at some date in the future would

8    fail.

9          The testimony from Peter Mains was that the boat

10   was used on the Connecticut River, on the Thames River, in

11   Long Island Sound, down as far as New York, up to Cape Cod

12   and Martha's Vineyard, and all those other places.  The

13   reason that I asked those questions, Your Honor, is

14   because if they rely on this theory of water ingestion,

15   which is what they set their stock on, that they have put

16   this case squarely within maritime jurisdiction, because

17   the water ingestion occurred on navigable waters.  It

18   occurred on the Connecticut River.  It occurred on the

19   Thames River.  It occurred on Long Island Sound and the

20   Atlantic Ocean.  These were issues that we raised at the

21   outset in the motion to dismiss.  The Court dismissed it

22   finding that --

23          THE COURT:  Denied it.

24          MR. ROTONDO:  I'm sorry, rejected the argument,

25   finding that we hadn't established our case at that point

1    with respect to this issue.  But the plaintiffs have

2    provided the basis for this in their own testimony with

3    respect to their theory of the case, which is water

4    ingestion, which is water coming in while the boat is on

5    navigable waters.  And the focus for this, Your Honor, is

6    not where these repairs were made, the focus is where the

7    injury occurs.  And here the injury occurs, this water

8    ingestion occurs while they're on navigable waters.  And

9    our authority for this, Your Honor, we cite a number -- a

10   number of different cases that we rely on.

11            THE COURT:  Are these different than what was in

12   the motion?

13            MR. ROTONDO:  There are at least one or two

14   other cases that have come out.  I apologize, I can't

15   remember exactly which cases we've cited.

16            MR. NIKAS:  Your Honor, what motion are you

17   referring to?

18            THE COURT:  There was a motion to dismiss, I

19   believe.

20            MR. ROTONDO:  Motion to dismiss in 2001.

21            THE COURT:  Early on in the case.

22            MR. NIKAS:  Based on lack of jurisdiction?

23            THE COURT:  Yes.

24            MR. SENNING:  May I clarify that, Your Honor?  I

25   believe the motion was that the defendant was arguing

PDF created with pdfFactory trial version www.pdffactory.com

1    that --

2             THE COURT:  Well, it doesn't matter.  I think

3    our court reporter has probably heard enough.  You're

4    going to submit something in writing at some point?

5             MR. ROTONDO:  Yes.

6             THE COURT:  Okay.  This will be in your written

7    submission and then the plaintiffs can reply.  Okay.

8             That's an interesting point.

9             I think I'm going to ask counsel to start

10   thinking about -- I may take a crack at a verdict form,

11   but I always try to identify issues where I'm going to

12   want to have special interrogatories.  I think this might

13   be one where I am going to want one.

14            I have some things I want to discuss with you

15   all about argument.  I think we'll take a short break for

16   the court reporter's sake.

17            MR. NIKAS:  Am I not allowed to respond to the

18   last argument made by Mr. Rotondo?

19            THE COURT:  About the navigable waters?

20            MR. NIKAS:  No, I wouldn't even attempt to argue

21   that.  Loss of use, amount of damages, the water

22   ingestion.

23            THE COURT:  The only one that I'm really

24   prepared to focus on at this point would be punitive

25   damages.  I want to think about that, so we'll talk about

PDF created with pdfFactory trial version www.pdffactory.com

 1   that when we come back from our break, okay?

 2                    (Whereupon, a recess followed.)

 3              THE COURT:  Mr. Nikas, you had one more point

 4   you were going to address?

 5              MR. NIKAS:  Actually, I'll let Ms. Lev make it.

 6              THE COURT:  Okay.

 7              MS. LEV:  Your Honor, Mr. Rotondo went through a

 8   great list of things, including loss of use, damages,

 9   punitive damages, addressal of the scoring in the

10   testimony of witnesses.

11              First off, just to go through the list really

12   quickly, to explain the unfair trade practices that we're

13   referring to, there's a failure, although it seems clear

14   that Mr. Wade testified that he was responding to

15   sounds -- complaints of sounds of exhaust --

16              THE COURT:  We finished the unfair trade

17   practices.  We're now on the miscellaneous category.

18              MS. LEV:  Okay.  Then I believe next Mr. Rotondo

19   addressed the loss of use claiming that we had not shown

20   any evidence of loss of use.  It was very clear from both

21   the Mainses' testimony that their intended use of this

22   vessel from day one was to be able to take the boat out

23   and enjoy it with their family, their relatives, and their

24   friends.  Not only were they inhibited in their ability to

25   do that between 1998 and 2000 when the boat was taken to

1    Tennessee for repairs by all of the damages, the problems

2    that were occurring with the vessel at the time, and the

3    fact that it was subject to repairs at so many points

4    during those years, but furthermore after the vessel was

5    returned from the factory, they were only able to use it

6    on one voyage before the loss of use was complete in June

7    of 2009.  Since June of 2009 they have not been able to

8    use the vessel once.  That seems to be clear evidence of

9    loss of use.

10            Moving on to the fact that Mr. Rotondo addressed

11    damages claiming that we did not discuss damages or a

12    value of the vessel or value of damages, we believe we did

13    that.

14            First of all, there were multiple opinions given

15    as to the value of the vessel even by defense's own expert

16    claiming that I believe he said somewhere between, what

17    was it, 125, $142,000.  I might be slightly off on

18    numbers, but it was in that ballpark.

19            We also discussed the value that was paid for

20    the vessel.  That was introduced by the defense

21    themselves.  Those values could very reasonably be

22    considered by a jury to address damages.  Furthermore, a

23    jury could attribute damages to the inability of the

24    plaintiffs to use their property, to interest from not

25    having been able to use their property this whole time,

1    from a failure to get a refund earlier.  There are many

2    inferences that can be drawn by the jury with regard to

3    damages just based on the sales price and the valuations

4    of the expert alone.

5            With reference to punitive damages, the defense

6    themselves referenced that one of the bases for punitive

7    damages was reckless indifference to the rights of others.

8    We're dealing in this matter with a vessel that's

9    operating on water, which means that safety is at issue,

10   which means that when you have a factory that is making

11   repairs without giving any explanation for why they have

12   tried to replace a whole entire system in order to rectify

13   something as basic as a noise.  To do so indicates that

14   there's -- and without informing plaintiffs of that fact

15   and asking their permission to do so or keeping them

16   abreast despite their request to come to factory and

17   inspect the vessel, these are things that the Mains

18   testified to when they took the stand.  When you're doing

19   these things in conjunction with a vessel that's operated

20   on water where plaintiffs have testified that if something

21   goes wrong, they can't do anything about it.  You can't

22   just park a vessel at the side of the road like you can a

23   car.

24           They've stated in addition that by replacing the

25   exhaust system, defendant inhibited plaintiffs' access to

PDF created with pdfFactory trial version www.pdffactory.com

1    the key mechanisms and machinery on board the vessel that

2    they would need in order to respond to problems.  Their

3    replacement at the factory without notifying plaintiffs of

4    that and having their consent with regard to the nature of

5    the changes that were being made and the nature of the

6    alterations that were being done was very recklessly

7    indifferent to the rights of plaintiffs to make decisions

8    that would affect their welfare in their subsequent use of

9    the vessel and the welfare of those on board with them.

10           Finally, I believe Mr. Rotondo discussed the

11    scoring, asserting that Mr. Wicander merely testified that

12    the scoring was caused over a -- or had occurred over a

13    long period of time.  But the jury is free to infer, based

14    on the facts in this case, that when the boat has only

15    been used once since its return from the factory and you

16    have an expert witness testifying that scoring occurred

17    over a long period of time, that that scoring occurred

18    prior to the boat's being brought into the factory.

19    Indeed, we have testimony from the plaintiffs and from

20    other experts indicating that the total hours on this

21    vessel before it became completely inoperable in June of

22    2001 was somewhere around 150 miles -- excuse me,

23    150 miles, is that right?

24           THE COURT:  Hours, I thought.

25           MS. LEV:  Which is insignificant over a period

PDF created with pdfFactory trial version www.pdffactory.com

1    of three years.  We have testimony that that's only

2    10 percent of the life of an engine is 150 hours.  And the

3    fact that this -- the fact that the vessel was only used

4    about an hour and a half total from the journey upon being

5    returned to the factory to the marina where the

6    hydrolocking occurred and where it remains today is clear

7    evidence that can be inferred -- the jury can clearly

8    infer from that that the scoring, coupled with that

9    information on the hours of the vessel, coupled with the

10   information on the fact that only an hour and a half of

11   use occurred after the return from the factory, that an

12   inference can clearly be made by the jury that there was

13   long-term defects, that there was evidence of longer-term

14   problems with the vessel than just the hydrolocking

15   itself.

16         THE COURT:  Is that part of your punitive

17   damages argument or is that another point that you're

18   addressing?

19         MS. LEV:  I wasn't clear as to whether

20   Mr. Rotondo was bringing that up as part of his punitive

21   damages.

22         THE COURT:  He wasn't arguing for them, I don't

23   think.

24         MS. LEV:  I agree.  I wasn't clear, Your Honor,

25   as to whether he was bringing that up as to the discussion

PDF created with pdfFactory trial version www.pdffactory.com

1   on punitive damages or if I -- I more had the impression

2   that he brought it up as a side point.  Correct me if I'm

3   wrong.

4           THE COURT:  I guess I will put in the charge the

5   jury's not being asked to consider the issue of attorneys'

6   fees because there is no evidence on them.  I'm not going

7   to say that, I'll just -- my standard charge says they're

8   not being asked to look at attorneys' fees.

9           Okay.  Let me go over a few procedural points

10  with counsel, because customs vary from district to

11  district.

12          When I have counsel from out of the district, I

13  give them -- we're going to have closing statements, I

14  always hand them my little thing I have in my little

15  folder for closings so you know what is in my head in

16  terms of what I'm expecting and not expecting or hoping I

17  don't see.  So I thought you might want that.

18          I also have a couple of idiosyncrasies that I'll

19  explain to you.  You may think there are more than a

20  couple, but at least relating to the closings and the

21  charge conference, I have a couple of things.

22          I'm just checking to see if I addressed all of

23  the objections that the plaintiff had to the -- there is a

24  sixth objection that the plaintiff filed to the proposed

25  jury instructions, and I thought what the plaintiff was

PDF created with pdfFactory trial version www.pdffactory.com

1    asking for was appropriate because it really sort of

2    balanced things and I will be adding that -- not

3    necessarily the same formulation because I didn't use

4    exactly what was in the request, but I will have some

5    language that balances it.

6              And I think I forget what the fifth objection

7    was.  But I have it here.  Hold on.

8              Oh, we covered that.  We don't need to do

9    anything on that one.

10             Okay.  We go to my checklist for this.

11             I guess we did have some objections during the

12   openings, I guess I would prefer not to have to rule on

13   any objection -- I hope there aren't any.  If there are

14   any, I think what I would do is if you have an objection,

15   you can stand, just state objection.  And I'll note it.

16   And we'll keep going, and then I'll deal with them at the

17   end.  I'll discuss some with counsel if we have them and

18   decide what to do.  If I think a curative instruction is

19   necessary, I'll give one.  Or some other technique I've

20   used in the past I would use if necessary.

21             You'll have a copy of the charge in pretty much

22   final form if we get our work done this weekend.

23             And I prefer that counsel not tell the jury

24   basically, "the judge is going to tell you this."  Because

25   I don't like to be used to prop up anybody's argument.

PDF created with pdfFactory trial version www.pdffactory.com

1    And I have had situations where people have been a little

2    casual -- the reason I adopted this procedure is I had

3    people say, "the judge is going to tell you this" and they

4    got it wrong, and I can't manage to sit by quietly when

5    that happens.  So my procedure is that you can certainly

6    tell the jury what you think the law is.  You can

7    certainly explain -- and most people will explain to the

8    jury that the judge will be explaining the law.  If I say

9    something different, what the judge says counts because

10   I'll be emphasizing that anyway.  And then they can go on

11   and talk about the law.  But I don't want people to say,

12   "the judge is going to tell you this" and I don't want

13   people to say something like "the charge will say,"

14   because I view that as my -- that's mine.  And that's

15   between me and the jury, and I don't like the lawyers

16   getting in that relationship.

17        Same thing with the verdict form.  I don't like

18   lawyers to use the verdict form.  I like to explain the

19   verdict form to the jury myself.  I don't want them

20   confused by getting instructions from counsel.

21        When you all have time, and maybe today would be

22   a good time to do it because you'll want to use the

23   exhibits in your closings, you should go over with the

24   courtroom deputy what's a full exhibit.  Although she may

25   not want to do it right now.

PDF created with pdfFactory trial version www.pdffactory.com

1          And then the other thing you should be aware of

2   is I send the charge in to the jury room.

3          With that, I guess I'm looking for a couple

4   things from counsel.  I don't know -- I could give you all

5   what I use as a sort of a general format for a verdict

6   form or I could try and get something up, and then it

7   would be good if counsel could get the charge and confer.

8   And if there are changes you agree on, let me know and

9   send me a consolidated submission as to what I have to

10  consider.

11         And I think what I'm looking for is definition

12  of "revocation" and a charge on the failure to warn.

13         Where did you all get the products liability

14  charge that you submitted?

15         MR. ROTONDO:  I believe that we drafted it and

16  Mr. Senning either assented to it or objected to it.

17         THE COURT:  All right.  So maybe people could

18  start working on that quickly.

19         Okay, I think we're all set then.

20         MR. ROTONDO:  Your Honor, you indicated we

21  should file the motion, that's electronical?

22         THE COURT:  Yes, I'll have my computer with me.

23         MR. ROTONDO:  Is there any particular time by

24  which you need to have us file that?

25         THE COURT:  This is the responses to the charge?

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. ROTONDO:  No.  This is the Rule 50 papers

2    that we talked about.

3          THE COURT:  Whenever.

4          MR. ROTONDO:  What about the responses to the

5    charge?

6          THE COURT:  I'd like to have those by the end of

7    Saturday.

8          MR. ROTONDO:  And do we understand correctly you

9    reserved on all of the oral argument?

10         THE COURT:  When I send out the charge, I'll

11   tell you any that I've decided to act on.

12         MR. ROTONDO:  Thank you.

13         MR. NIKAS:  So, Your Honor, will we be allowed

14   an opportunity to provide written responses?

15         THE COURT:  I usually don't get written briefs.

16   So I'm -- if I make a decision, it's based on my analysis

17   based on the oral argument.  On the matters I've reserved

18   on, I will be looking at the written decision, but I won't

19   be making any decision -- I'm sorry, written submission.

20   But I would not be making any decision based on that

21   written submission until you've had a chance to file

22   something in writing too.

23         MR. NIKAS:  What's the procedure for doing so,

24   Your Honor?

25         THE COURT:  Well, I would get it in as soon as

1   you can, but you won't have it in before closings.

2          MR. NIKAS:  I meant, Your Honor, is it faxed to

3   your chambers?

4          THE COURT:  File it electronically.  We're

5   talking about your response to their written Rule 50

6   motion?

7          MR. NIKAS:  Correct.

8          THE COURT:  They're going to file it now and

9   then you'll file also.

10          MR. NIKAS:  And we send a courtesy copy by fax?

11          THE COURT:  I think a courtesy copy by mail will

12   be fine.

13          MR. NIKAS:  Very well.

14          THE COURT:  But for -- I'd like to know, in

15   terms of the reactions to the charge, you know, whether we

16   have a lot of stuff to discuss Monday morning or not.  I

17   mean, I'm hoping that we won't because I have pretty much

18   followed the joint submission with the exception of the

19   places where I've told you I've adopted the objection that

20   was made by the plaintiffs.  And I haven't seen the duty

21   to warn, but I assume you all can confer on that and get

22   me something that's not too controversial.  Since you were

23   able to work out something on the other ones, I'm hopeful

24   there.  Okay?

25          MR. ROTONDO:  Thank you, Your Honor.

1          THE COURT:  And my law clerk has cell phone

2    numbers so she can track you all down if I'm anxious to

3    hear from you.  Cell phone, e-mail, whatever you guys use.

4    Thank you.

5              (Proceedings adjourned at 6:00 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com

1

2

3                    C E R T I F I C A T E

4

5

6

7            I, Diana Huntington, RDR, CRR, Official Court

8    Reporter for the United States District Court for the

9    District of Connecticut, do hereby certify that the

10   foregoing pages are a true and accurate transcription of

11   my shorthand notes taken in the aforementioned matter to

12   the best of my skill and ability.

13

14

15

16

              /s/_____

17
                 DIANA HUNTINGTON, RDR, CRR
18                  Official Court Reporter
                 450 Main Street, Room #225
19               Hartford, Connecticut 06103
                    (860) 547-0580
20

21

22

23

24

25

1                    UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF CONNECTICUT

3

4    - - - - - - - - - - - - - - - x
                                   :
5    PETER D. MAINS and LORI M. MAINS:  No. 3:01CV2402(AWT)
                                   :
6                      Plaintiffs,  :
                                   :
7              vs                  :
                                   :
8    SEA RAY BOATS, INC.           :
                                   :  HARTFORD, CONNECTICUT
9                      Defendant.  :  APRIL 7, 2008
                                   :
10   - - - - - - - - - - - - - - - x

11

12

13                       **JURY TRIAL**

14                        **VOLUME V**

15

16       BEFORE:

17

18               HON. ALVIN W. THOMPSON, U.S.D.J.

19                    and a Jury of Nine

20

21

22

23                              Diana Huntington, RDR-CRR
                                Official Court Reporter
24

25

```
1   APPEARANCES:

2        FOR THE PLAINTIFFS:

3             JOHN L. SENNING, ESQ.
                  16 Saybrook Road
4                 Essex, Connecticut 06426

5             HERRICK NIKAS, LLP-CA
                  1201 Dove Street, Suite 560
6                 Newport Beach, California 92660
             BY:  RACHEL D. LEV, ESQ.
7                 RICHARD J. NIKAS, ESQ.

8        FOR THE DEFENDANT:

9             DAY PITNEY, LLP
                  CityPlace I
10                Hartford, Connecticut 06103-3499
             BY:  JAMES H. ROTONDO, ESQ.
11                DANIEL J. FOSTER, ESQ.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          TABLE OF CONTENTS

2

3                                                          PAGE

4    CLOSING ARGUMENT BY THE PLAINTIFFS............. 823

5    CLOSING ARGUMENT BY THE DEFENDANT............. 842

6    REBUTTAL ARGUMENT BY THE PLAINTIFFS........... 873

7    JURY CHARGE................................... 877

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        **9:05 A.M.**

2              THE COURT:  Good morning.

3              We have a few thing to cover this morning.  I'm

4      going to try to cover them in a certain order, but if I

5      miss one, let me know at the end.

6              First, I should mention to defense counsel that

7      Attorney Nikas called chambers on Saturday around 5:00.  I

8      was the only one here, I answered the phone.  The whole of

9      our conversation was that he told me that at that point he

10     had no objections to the charge, he was trying to reach my

11     law clerk, and I believe that was the end of the

12     conversation.

13             MR. ROTONDO:  Thank you, Your Honor.

14             THE COURT:  Secondly, in terms of the objections

15     to the charge, we sent an e-mail out from chambers and

16     there was a request by each side with respect to

17     definition of "revocation."  Both sides had the same first

18     sentence.  I used the second sentence from the defendant's

19     request and then I used language from White and Summers'.

20     It was page 572 of the 5th Edition.  So that's the

21     definition of "revocation" that we have in the charge.

22             The objections to the verdict form were by

23     Sea Ray.  I think you now have the revised draft and you

24     should have a markup of the draft showing the changes that

25     were made.

PDF created with pdfFactory trial version www.pdffactory.com

1           MR. ROTONDO:  Yes, Your Honor.

2           THE COURT:  I did make one change or a couple of

3    changes that weren't mentioned.  I changed the language,

4    which I did not mention before this morning, in paragraph

5    IV.C to say what percentage is the plaintiffs' share.  And

6    I just want to make sure I flag that for counsel's

7    attention because I did not mention that before this

8    morning.  I thought it read better that way.

9           And I think the other objections to the verdict

10   form I agreed with the defendant's first objection which

11   related to Question I.C, and I just shortened that.

12          The second objection wanted me -- was a request

13   that I break down the question into two parts.  I thought

14   it would be more consistent to simply break down and make

15   in the charge the section on revocation similar in format

16   to breaking down the elements in the charge on strict

17   liability and breach of express warranty.  And having done

18   that, I don't believe it's appropriate to break it down in

19   the verdict form.  I didn't catch it when we were doing

20   the charge Friday night.

21          Objections to the charge, the duty to warn, you

22   read the Giglio vs. CL&P case, 180 Conn. 235, which cited

23   to Prosser on law of torts.  I also read a Second Circuit

24   case, Basko vs. Sterling Drug Company -- I think the

25   language that is cited to by the defendant is correct,

PDF created with pdfFactory trial version www.pdffactory.com

1  there must be evidence that there was a danger which the

2  defendant knew or should have known.  And here there is no

3  evidence that the defendant knew or should have known of

4  unreasonable dangers involved with use of the boat.

5         And I think the defendant is also correct that

6  this claim or theory, rather, of the products liability

7  claim was not included in the joint trial memorandum.  We

8  had some discussion about that on Friday.  Plaintiffs'

9  counsel pointed to a footnote.  Having gone back and

10  looked at that, that footnote is in the defendant's

11  request, which makes it clear it's only based on three

12  theories of liability.  I think it's inappropriate for the

13  plaintiffs to argue that that somehow included a request

14  on a duty to warn theory.

15         Objection number two dealt with comparative

16  responsibility.  And I did make a change but not the

17  language that the -- I made it consistent with the

18  instruction on comparative negligence, but I think the

19  language there that was suggested or requested by the

20  defendant doesn't make it as consistent as the language

21  that I used, and I'll point that out to you.

22         Objection number three dealt with revocation.  I

23  said on page 22 I do agree with the first point in terms

24  of the revocation is for purchase of the boat, not seeking

25  to do so in the lawsuit.  That's a more accurate

1    formulation.

2             Page 24, that is the definition of "revocation"

3    or the language describing revocation.  And I used the

4    White and Summers', I discussed that earlier.

5             And then objection number four dealt with

6    damages on page 25.  And I think that objection was a

7    valid one.

8             Counsel should have gotten now the final draft

9    of the charge.

10            The next thing I pointed out to you was that in

11   revocation, what I did to -- when I said I was making it

12   consistent, if you look at the current draft on pages 22

13   to 25, you'll see that I have the introductory paragraph

14   at the bottom of page 22.  And I added the language on

15   page 23 on revocation.  Then I put "first" instead of that

16   paragraph.  And then we had language on notice within a

17   reasonable time, you put "second" in front of that.  And I

18   then I put "third" on the top of page 24, and then

19   "fourth" and "fifth," just so it's consistent with the

20   form at I used -- well, it's my normal format.  I was

21   following what was in the request.

22            So that's the -- that covers my responses to the

23   things that were filed.

24            Now, I believe there's a request from the

25   plaintiffs for two additional charges.  Do I understand it

1    to be missing witness and failure to produce evidence,

2    specifically service bulletins?

3              MR. NIKAS:  That's correct, Your Honor.

4              THE COURT:  Let's talk about the missing

5    witness.  You said Mr. Marlow, I understand?

6              MR. NIKAS:  Mr. Marlow, Mr. Stooksbury and

7    Mr. Brown were the three Sea Ray exhibit identified on

8    their witness list but did not testify at trial.

9    Specifically, Mr. Marlow's referenced by one of the

10   defendant's witnesses, the expert witness, Gregory Davis.

11   And he did not testify later that afternoon when trial

12   closed.  We should be entitled to the inference that any

13   testimony he would have provided would have been

14   unfavorable or else he would have testified.

15             THE COURT:  I understood it was Marlow, so I

16   went through and did a search for when Mr. Marlow was

17   mentioned.  Mr. Marlow was mentioned on April 2nd.  It was

18   by the plaintiff in terms of the discussions with

19   Mr. Marlow.  Mr. Marlow was mentioned by Mr. Davis.  I

20   think he's on a committee with Mr. Marlow.  That's the

21   note that I have.

22             MR. NIKAS:  And described him as a personal

23   friend.

24             THE COURT:  Yes.

25             And then Mr. Wade was talking about who was on a

1    conference call and he mentioned Marlow, Luster, and the

2    plaintiffs and himself.

3             How does that justify a missing witness

4    instruction?

5             MR. NIKAS:  The fact that he was party to many

6    of the actions which are subject to this case, ostensibly

7    has knowledge, was listed by defendants in their witness

8    list, was under their sole control.  And by not calling

9    him, removed the availability of him for

10   cross-examination, should entitle us to an adverse

11   interest.

12            THE COURT:  Can you take out of your analysis

13   the fact that he was on their witness list?  Because the

14   trial memorandum order says you have to list people who

15   you may call.  So if you don't list them, you can't call

16   them.  So the fact that they're on the trial memorandum

17   order and not called doesn't mean anything.

18            So he was mentioned as being involved in some

19   conversations.  Other than that, I didn't catch everything

20   you said.

21            MR. NIKAS:  As I understand the rule, generally

22   counsel in a civil trial may comment on the failure of a

23   party to call an available witness whose testimony the

24   party would naturally be expected to provide if available

25   to him.  It is presumed that if Mr. Marlow would have

1    testified, that he would have provided favorable evidence

2    for Sea Ray.

3            THE COURT:  Are you asking for permission to

4    make reference to him in your closing or are you asking

5    for a missing witness instruction in the jury charge?

6            MR. NIKAS:  I ask for two things.  One, I'd like

7    to make note in closing that he did not testify even

8    though he was listed as a possible witness.

9            THE COURT:  You can't mention he was listed as a

10   possible witness.

11           MR. NIKAS:  I'd like to mention that he did not

12   testify despite his mention by other witnesses having been

13   a party to some of these telephone conversations and

14   certainly the Mainses discussed that he was a party to

15   these conversations.  Both plaintiffs and defendant's

16   exhibits have letters from Mr. Marlow to the plaintiffs.

17           THE COURT:  Okay.

18           MR. NIKAS:  Additionally, Mr. Wade mentioned

19   Mr. Stooksbury, who was a supervisor to whom he testified

20   went to when he was having discussions as to whether to

21   replace the collector-style exhaust with the water lift

22   exhaust.  In fact, that's the only person he had

23   conversations with regarding the background as to that

24   change.  The fact that he did not testify we should be

25   allowed to comment on.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  But I still don't see how we merit a

2    charge on it, though.

3          MR. NIKAS:  If I can mention it in closing,

4    we'll take that.

5          THE COURT:  Then the second point, I understood

6    there was going to be a request for charge on failure to

7    produce evidence.  Is that a request for charge or is that

8    an argument issue?

9          MR. NIKAS:  We'd like to reference it both in

10   closing and, if possible, to get an instruction on it.

11   But given the fact that defendants specifically referenced

12   these materials, used them to attempt to impeach

13   plaintiffs' witnesses but then refused to allow the

14   documents to be submitted into evidence so that we could

15   discuss what else is contained within those materials

16   should entitle us to a presumption that the failure to

17   produce that available evidence --

18          THE COURT:  When you say "that available

19   evidence," what are you talking about?

20          MR. NIKAS:  Referred to by Mr. Rotondo.

21          THE COURT:  Defendants' Exhibit 59?

22          MR. NIKAS:  2001-13 service bulletin.  Two

23   different service bulletins he referred to.  One goes to

24   the list of compression ratios on engine specifications,

25   the second goes to water ingestion procedures, pickling

1    procedures.  And actually the third one, which is the

2    diagram of the exhaust system, side view.  The Court will

3    recall that we were only allowed to point out the

4    diagramming system on that page and there was language on

5    that page that contradicted that diagram.  There was other

6    information on that page which we felt would have been

7    important to prove notice of the defect but because

8    defendants chose to refer to it but not produce it in

9    evidence, we should be allowed to refer to that and also

10   get a positive charge.

11          THE COURT:  That was the pressure ratio, the

12   diagram and the --

13          MR. NIKAS:  2001-13 service bulletin, water

14   ingestion, entitled "Gasoline Engines and Water

15   Ingestion."

16          THE COURT:  I'm going over the topics.

17          MR. NIKAS:  First one --

18          THE COURT:  It was the diagram.

19          MR. NIKAS:  First one is engine specifications

20   is what the service bulletin is.

21          THE COURT:  That deals with compression ratio.

22          MR. NIKAS:  Correct.

23          THE COURT:  What does the second deal with?

24          MR. NIKAS:  The second is gasoline engines and

25   water ingestion.

1          THE COURT:  What was the question he asked about

2    that?

3          MR. NIKAS:  Well, it was partially used to

4    discuss the first few steps of the water ingestion,

5    pickling procedure.  Mr. Rotondo limited his questions

6    only to the first steps and did not discuss the rest of

7    the bulletin.

8          THE COURT:  And he mentioned the service

9    bulletin at that point?

10          MR. NIKAS:  He showed it to the witness.

11          THE COURT:  Okay.

12          MR. NIKAS:  And the third is --

13          THE COURT:  The diagram.

14          MR. NIKAS:  Which had the text on the left-hand

15    side.

16          THE COURT:  It's not necessary when counsel uses

17    a document to impeach a witness that it be introduced.

18    And in fact, in many circumstances it cannot be introduced

19    because that witness is not competent to bring it in.

20          MR. NIKAS:  We understand that, Your Honor,

21    but --

22          THE COURT:  So you're not going to get a missing

23    evidence instruction, okay?  You haven't satisfied the

24    grounds for missing evidence instruction.

25          MR. NIKAS:  Appears the grounds are a party

1    fails to produce evidence under his control and reasonably

2    available to him and not reasonably available to the

3    adverse party, then you may infer the evidence is

4    unfavorable to the party who could have produced it but

5    did not.

6              THE COURT:  So you want the instruction and you

7    want to refer to it in your closing?

8              MR. NIKAS:  Correct, Your Honor.

9              THE COURT:  What do you want to say in your

10   closing, just so I can get it all responded to at once?

11             MR. NIKAS:  Well, all I want to say is -- and

12   I'll even be exceedingly cautious, that you had witnesses

13   shown various service bulletins.  We were not allowed to

14   review the full content of those bulletins with the

15   witnesses.

16             THE COURT:  You can't say that.  You're

17   commenting on my ruling.  That's why you weren't allowed.

18             MR. NIKAS:  Then we'd like to point out that the

19   defendant did not proffer those exhibits into evidence

20   given -- I'd like to refer to them by title at least.

21             THE COURT:  Is that in evidence?

22             MR. NIKAS:  I think it's in the record.  I know

23   we referred to 2001-13 as gasoline engines and water

24   ingestion.

25             THE COURT:  Who referred to that by that title?

1              MR. NIKAS:  It was the title which the document

2    was identified.  When we were identifying the document,

3    that's what it was identified as.  It's the pickling

4    procedures.

5              THE COURT:  And the title of the document was

6    used?

7              MR. NIKAS:  I believe so, Your Honor.

8              THE COURT:  By Mr. Rotondo?

9              MR. NIKAS:  I don't know, Your Honor.  Either I

10   or he did.  I don't know how he did it, but I know I did.

11             THE COURT:  So what do you want to argue again?

12             MR. NIKAS:  We'd like to bring the jury's

13   attention to the fact that there were other materials

14   contained in those documents that were never reviewed by

15   the witnesses or presented to the jury.

16             THE COURT:  That's the basic point you want to

17   make?

18             MR. NIKAS:  Correct.

19             THE COURT:  Other materials were contained in

20   those documents which have not been admitted into

21   evidence.

22             Mr. Rotondo?

23             MR. ROTONDO:  It's clear, Your Honor, that

24   Mr. Nikas wants to use the documents for improper purpose.

25   He wants to comment and argue about things which are not

1    in the record, and he's not allowed to do that.

2            To go through -- there are four exhibits for

3    identification that Mr. Nikas is referring to.  The first

4    one is a list of compression ratios, which is Defendant's

5    Exhibit 95.  The second is the pickling procedures, which

6    is Plaintiffs' Exhibit for Identification 33.  The diagram

7    in the side drawn that was reference is Plaintiffs'

8    Exhibit for Identification 38.

9            THE COURT:  38 is which one?

10           MR. ROTONDO:  It's the diagram of the elbow

11   height.

12           THE COURT:  Okay.

13           MR. ROTONDO:  Plaintiffs' 38 for identification.

14           And this water ingestion service bulletin was

15   Plaintiffs' Exhibit 36 for identification.

16           To go in reverse order, Plaintiffs' Exhibit 36,

17   I never used that document.  I never referenced that

18   document.  I never showed that document to anybody.

19   That's a document that plaintiffs apparently want to use.

20   There's nothing I did that would in any way open the door

21   to the plaintiffs.

22           MR. NIKAS:  I only referenced three documents,

23   not four.  I didn't reference that document.  Three

24   documents, not four.

25           THE COURT:  But I thought you were talking about

1    water ingestion procedures.  And you said the title was

2    used, if you didn't use it, Mr. Rotondo did.

3              MR. NIKAS:  That's the 33 document, Your Honor.

4              MR. ROTONDO:  Okay.  I may have misunderstood.

5              With respect to 38, Your Honor, we had a long

6    argument about Exhibit 38 for identification.  And based

7    on my cross-examination of Mr. Wicander, plaintiff was

8    specifically given the opportunity to introduce parts of

9    that evidence into evidence and the plaintiff elected not

10   to do it.  So there's no basis for plaintiff to now to get

11   some sort of negative inference against defendant for not

12   introducing into evidence a document which he had in front

13   of him --

14             THE COURT:  Isn't Plaintiffs' 38 -- wasn't -- I

15   have a slightly different recollection.  I want to check.

16             MR. NIKAS:  Again, Your Honor --

17             THE COURT:  One second, please.

18                  (Pause.)

19             THE COURT:  You're talking about plaintiffs'

20   Exhibit 38?

21             MR. ROTONDO:  Yes, Your Honor.

22             THE COURT:  We had the discussion in the

23   evening, and then the defense went back and then sent a

24   letter and the responses.  The defense cited to the -- I'm

25   going to mispronounce this -- Paolitto case.  I came in

1    the next morning and I said that the conditions for

2    curative admissibility had not been satisfied so the

3    plaintiff was limited to inquiring about it but not

4    permitted to admit it.

5              MR. ROTONDO:  You're right, I'm sorry.  You're

6    right.  The plaintiff was allowed to inquire.

7              THE COURT:  But not admit it.

8              MR. ROTONDO:  Plaintiff was allowed to inquire

9    and did inquire about it.

10             THE COURT:  Yes.

11             MR. ROTONDO:  With respect to the pickling

12   procedures, that's Plaintiffs' Exhibit 33, plaintiff was

13   again allowed to inquire about the pickling procedures

14   with respect to Mr. Wicander.  And I don't remember

15   whether they did or they did not, but they had full access

16   to do the same thing that I did, which was to inquire

17   about the pickling procedures.

18             And then with respect to Exhibit -- Defendant's

19   Exhibit 95 for identification, different compression

20   ratios, I asked the question of the witness was he aware

21   that Mercury had a compression ratio of 100 psi, and he

22   said that he was aware of it.  I don't think I could have

23   established the evidentiary basis to get that document in

24   through Mr. Wicander.

25             THE COURT:  You could not have.

1           MR. ROTONDO:  I don't think there's any sort of

2    negative inference in my not doing so.

3           MR. NIKAS:  Mr. Wicander could have gotten the

4    documents in.  He did testify in his direct testimony that

5    he was a MerCruiser certified mechanic, that he did have

6    access to service bulletins, that he did have access to

7    MercNet, that he did read the service bulletins and relied

8    on the service bulletins.  And in fact --

9           THE COURT:  Let me say this.  The posture that

10   we're in now is that the plaintiff didn't or could not

11   have gotten certain evidence in in its case on direct

12   examination of this witness.  The plaintiff then argued

13   that the documents were admissible under the doctrine of

14   curative admissibility.  After reviewing the law, I ruled

15   it was not.  So it's now inappropriate for the plaintiff

16   to comment on the fact that the document's not in when the

17   reason they're not in is because of my rulings, my

18   evidentiary rulings.  It's a comment on my rulings, not a

19   comment on the defendant's actions in this case.

20          So the answer is no.  I will not give an

21   instruction and it would be inappropriate to comment on

22   anything that is not in evidence.

23          MR. NIKAS:  I can refer to the fact that the

24   witnesses were examined about the service bulletins?

25          THE COURT:  You can talk about things that are

PDF created with pdfFactory trial version www.pdffactory.com

1    in evidence.

2         MR. NIKAS:  And their testimony certainly --

3         THE COURT:  I'm not going to rule now as to

4    what's in evidence because I don't have a transcript in

5    front of me.

6         So we've taken care of that.  And now we have

7    to -- before I lose track of this, I have two other

8    things.

9         Each side has an hour.  Plaintiffs' counsel, I

10   assume, is going to reserve some of that for rebuttal?

11        MR. NIKAS:  We will.

12        THE COURT:  You're responsible for keeping track

13   of that.  I track the time.  If people go over, I cut them

14   off.

15        MR. NIKAS:  We will not come anywhere close to

16   that hour.

17        Did the Court rule on the missing witness?

18        THE COURT:  I did.  I said there is no basis for

19   missing witness instruction.

20        MR. NIKAS:  But you --

21        THE COURT:  In terms of your argument?

22        MR. NIKAS:  Correct.

23        THE COURT:  You're going to refer to certain

24   people whose names were mentioned and you didn't hear from

25   them, that's the argument?  I don't hear an objection and

1    I don't see a problem, depending on exactly what you say.

2    You've told me -- I think you've told me what you're going

3    to say.  At least I have an understanding of what you're

4    going to say based on what you've said, but I'm not

5    blessing in advance whatever you say.

6              MR. NIKAS:  I'm trying to be overly cautious.

7    I'd like to mention they did not testify and the jury is

8    free to draw whatever conclusions they want to from that

9    fact.

10             THE COURT:  Am I going to get an objection to

11   that, Mr. Rotondo?

12             MR. ROTONDO:  He is inviting the jury to

13   speculate and decide the case based on something that's

14   not in evidence, what people who weren't here didn't say.

15             MR. NIKAS:  The doctrine exists for some reason,

16   Your Honor.

17             THE COURT:  The doctrine exists to be used when

18   the groundwork is laid for it.

19             MR. NIKAS:  The jury's entitled to infer --

20             THE COURT:  They can't infer whatever they want

21   to.  They have to draw reasonable inferences and you have

22   to argue reasonable inferences.  You cannot argue

23   unreasonable inferences.  I mean, there are lots of people

24   who could have come to testify who didn't.

25             We need to go through the current draft of the

1   charge.  I'm going to try to point out to you where

2   changes were made.  Quickly, if I can.

3           Oh, another important point.  The juror who had

4   a question about a lemon law concerning boats has written

5   another -- he asked is there a lemon law concerning boats,

6   he asked that question before.  I am not giving a charge

7   on the law on a lemon law concerning boats.  And then

8   something about, do the conduct there a recall on motor

9   and exhausts if there is several -- this may say

10  propellers.  I'll have copies made of this note.

11          My answer is there will be no charge on the law

12  involving anything that would be called a lemon law on

13  boats.  And to be honest, I don't know if there is such a

14  thing, although I have never heard of one.

15          MR. ROTONDO:  I've never heard of one either.

16          THE COURT:  Mr. Senning, have you heard of one?

17  You're an expert in this area, Connecticut law.

18          MR. SENNING:  The Connecticut lemon law is

19  generally considered to pertain to vehicles.

20          THE COURT:  Just so there's no confusion --

21          MR. SENNING:  The language is a bit vague.  I

22  think that an argument might be made that it could, but

23  there's no case law that decided that.

24          THE COURT:  There's no claim here under any such

25  law.  So I'm going to just tell them no, just to make it

PDF created with pdfFactory trial version www.pdffactory.com

1    simple.  I don't want any speculation back in the jury

2    room.

3            And I don't understand the second half of the

4    question, so I'm going to let you all see it.

5            Are the plaintiffs going to be here soon?

6            MR. NIKAS:  They're waiting in the counsel's

7    office.

8            THE COURT:  Okay.  On page 16, just above the

9    caption, I revised that to say there are two theories,

10   strict liability and breach of express warranty.

11           On page 17, I took out duty to warn.

12           On page 19 under comparative responsibility,

13   four lines down -- no, three lines down it says all the

14   elements of one or both of their theories of liability.

15   And then that language, "and that defendant's actions

16   caused the plaintiffs to suffer damages."  That's the

17   language I put it which wasn't what the defense asked for,

18   but I think in substance covers that ground.

19           There's a typo on page 20, I won't bother you

20   with that.

21           Then we get to -- whoops, some pages are out of

22   order.

23           We took out the language that was in brackets

24   concerning including wrongful death.  My understanding is

25   that both sides agreed with me that it was not an issue in

1    this case.  Based on that, I believe it's appropriate to

2    take that out.

3              Page 22, revocation of acceptance.  The first

4    two paragraphs on 22 and 23 have a lot of changes in them.

5    And the paragraph at the bottom that says "second" has a

6    new first sentence.  And then after that it picks up with

7    what was there before.  So you all might want to focus on

8    that.  Do you all have time to read that now?

9              Then I added "third," I added "fourth" and I

10   added "fifth" on page 24.

11             Under "fifth," the second sentence is new

12   because I needed to make a transition, "thus the

13   plaintiffs must prove that they gave notice of revocation

14   prior to any substantial change in the condition of the

15   boat."

16             And then we have just a few other minor changes.

17             On page 26, Section E, first paragraph, the last

18   sentence I added "with the exception of the issue of

19   mitigation of damages, the plaintiffs have the burden of

20   proving damages by a preponderance of the evidence."

21             And those are the changes from the prior draft.

22             Usually I have counsel tell me what their

23   objections are, but I got written objections.  I think

24   I'll just take them -- why don't we get a list now just so

25   I'm sure there's no misunderstanding.

PDF created with pdfFactory trial version www.pdffactory.com

1          Plaintiffs' objections to the charge are as

2    follows.

3          MR. NIKAS:  Your Honor, we wish to renew our

4    objection as to the failure to warn issue.

5          We'd also like to direct the Court's attention

6    to an affidavit by Mr. Senning which is attached as an

7    exhibit to Plaintiffs' Opposition to Defendant's Motion

8    for Judgment as a Matter of Law which the Court received

9    this morning, which explains the factual circumstances

10   surrounding the drafting of the jury instructions and an

11   explanation for a footnote and the reference in the

12   footnote to Section Q and describes the circumstances

13   surrounding how those drafts were exchanged between

14   counsel immediately prior to submission of the joint trial

15   memorandum.

16          THE COURT:  Okay.

17          MR. NIKAS:  We'd also like to object on the

18   basis of the instruction as to the component of failure to

19   warn and the Connecticut products liability statute as a

20   separate component, a failure to warn and negligence cause

21   of action.  Both we feel should be present in the special

22   verdict form.

23          THE COURT:  Okay.

24          MR. NIKAS:  Those are our objections,

25   Your Honor.

1           THE COURT:  And defense objections you want to

2    preserve, Mr. Rotondo?

3           MR. ROTONDO:  Yes.  The written ones, yes, I do.

4           THE COURT:  Which ones?

5           MR. ROTONDO:  Your Honor, actually -- I don't

6    have any.

7           THE COURT:  Anything in your Rule 50 papers is

8    preserved so we have it simple for you all.

9           MR. ROTONDO:  I have no objections as to the

10   charge.

11          THE COURT:  So let's see if we can make heads or

12   tails out of this second sentence in the -- I told you

13   what I'm going to do on the first sentence.

14          MR. NIKAS:  The question, Your Honor, asked:  Do

15   they conduct a recall on motor and exhaust if there are

16   several problems?  I believe is how that should read.

17          THE COURT:  Or, Do they conduct a recall on a

18   motor and exhaust if there is several propellors --

19   problems.

20          MR. NIKAS:  Problems.

21          THE COURT:  Okay.  Upside down, okay.

22          MR. NIKAS:  Either of the first two words could

23   be interpreted under either of those readings.  But I

24   think it's "conduct recall on motors and exhausts if there

25   are several problems."

1           THE COURT:  Okay.  That would seem to suggest

2    that if the plaintiff failed to put in evidence of a

3    recall, this juror would say, well, the plaintiff hasn't

4    produced evidence the plaintiff should have produced.

5    That would be improper for the juror to conclude -- to

6    draw any adverse inference because there's no evidence of

7    a recall.

8           MR. NIKAS:  And there are no nationwide recalls.

9    They're strictly voluntary under the Federal Building and

10   Safety Act.

11          THE COURT:  My answer to the first question, so

12   there's no potential for mischievous inferences, is a

13   simple no.

14          What's the clearest answer I can give to the

15   second question to achieve the same result?

16          MR. NIKAS:  It's a more complex answer because

17   it gets into issues of why there are no recalls in the

18   boat arena as there are in motor vehicle arena because

19   states -- in the maritime arena only Federal Building

20   Safety Act issues, which up to now are related to

21   propeller guards, are subject to those types of recalls.

22          THE COURT:  Maybe I should tell the jurors that

23   this is not an appropriate question or something like

24   that.

25          MR. ROTONDO:  Perhaps just tell the juror the

PDF created with pdfFactory trial version www.pdffactory.com

1    juror has to decide the case based on the evidence that

2    the juror has heard in the courtroom and the law given to

3    him by the Court.  Can't speculate as to other things.

4         THE COURT:  First part will be no.  I'll

5    reconfirm my understanding of the question.  I'll tell the

6    juror they must decide the case only on the evidence

7    submitted in the courtroom and my instructions on the law

8    and they cannot speculate as to other things.  Okay.

9         I think that was everything I had on my list to

10   address before we picked up.  I need a few minutes to

11   organize.  Are you all set in terms of --

12        MR. NIKAS:  Your Honor, we have -- I don't know

13   about Mr. Rotondo, but we have, I guess, four issues.

14        One is, we would like to use two demonstrative

15   exhibits, both of which are distillations of exhibits that

16   were used in testimony of the witnesses.  The first is a

17   better representation of Plaintiffs' Exhibit for I.D. 162

18   which shows the compression strokes of the engine.

19   Mr. Rotondo had a question about the photograph, we

20   removed that photograph.  It basically shows the side view

21   of the cylinder and then each of the four strokes,

22   compression cycle, and then identifies those parts.

23        THE COURT:  Okay.

24        MR. NIKAS:  The second is a larger

25   representation of the glass within the glass with the oil

1  and the water.

2          THE COURT:  The glass that Mr. Wicander was

3  using?

4          MR. NIKAS:  Correct.  Just a larger version of

5  that.

6          THE COURT:  Okay.

7          MR. NIKAS:  And then we understood, Your Honor,

8  that we would get written rulings on the Court's curative

9  admissibility findings.

10          THE COURT:  You will.

11          MR. NIKAS:  And then also on the inability to

12  introduce evidence on impeachment.  We just wanted to --

13          THE COURT:  That's all the same thing, isn't it?

14          MR. NIKAS:  Well, curative admissibility goes

15  to --

16          THE COURT:  I mean, that's all that same

17  discussion, isn't it?

18          MR. NIKAS:  Well, the impeachment issue didn't

19  arise until the day after the curative admissibility issue

20  arose.  The impeachment issue didn't arise until Friday

21  afternoon when we were attempting to impeach the witnesses

22  with documents and we were not allowed --

23          THE COURT:  I told you to go back and ask

24  whatever questions you wanted to ask.  So I ruled on --

25  you wanted me to say I'm going to let you do things, and I

1  said I don't see the basis for it.  And I told you to go

2  back and do whatever you wanted to do and I'll rule on

3  questions and objections as they came up.

4          MR. NIKAS:  If we could get a written ruling on

5  that.

6          THE COURT:  I'm not going to do a written ruling

7  on that, I don't know what questions to address.

8          MR. NIKAS:  Very well, Your Honor.

9          THE COURT:  Mr. Rotondo, any response to --

10          MR. ROTONDO:  With respect to the two

11  demonstrative objections?

12          THE COURT:  Or any objection, let me just ask.

13          MR. ROTONDO:  I was shown five or six things

14  these morning, diagrams, do I have objections because they

15  were not in evidence.  Now I'm told there are two.  I

16  didn't see a glass within a glass.

17          THE COURT:  The glass within the glass is

18  something that Mr. Wicander used.

19          MR. ROTONDO:  I didn't see a diagram of a glass

20  within a glass.

21          MR. NIKAS:  No, it's actually just a bigger

22  glass within a glass.

23          THE COURT:  I don't see a problem with that.

24          Let's talk about the first issue, then.

25  Plaintiffs' I.D. 162.

PDF created with pdfFactory trial version www.pdffactory.com

1           MR. NIKAS:  May I, Your Honor?

2           THE COURT:  Sure.

3           That's going to be used for demonstrative

4    purposes only?

5           MR. NIKAS:  If I can actually show the Court

6    162.

7           MR. ROTONDO:  I didn't make the connection.

8           THE COURT:  I didn't either.  I understand why

9    you say it's clearer.

10          MR. NIKAS:  I'll use them both in conjunction.

11          THE COURT:  And then say here's a clearer since

12   he did disclaim having artistic talented when he drew it.

13          MR. NIKAS:  Because we only had one question,

14   you can see the different colors, trying to distinguish

15   the four strokes.  This actually sets them out as four

16   different things rather than four things written on the

17   same cylinder.

18          THE COURT:  And he did testify about the

19   strokes, as I recall.

20          MR. NIKAS:  Several times, just to make sure

21   it's clear.  This way they at least can see it.

22          THE COURT:  I remember him testifying about it.

23   You can use that as a demonstrative exhibit.

24          So I think counsel will be ready in a few

25   minutes after I give the court reporter a break?

1          MR. NIKAS:  Yes, Your Honor.

2          MR. ROTONDO:  Your Honor, is it your practice to

3    go immediately to plaintiffs', to defense, and back?

4          THE COURT:  I usually take plaintiffs', then

5    take a short break.  Depending on how long defense

6    argument is, I may go straight to rebuttal.

7          MR. ROTONDO:  Thank you.

8          THE COURT:  We'll take a ten-minute recess and

9    the courtroom deputy will let the jurors know we'll be

10   ready in about ten minutes.

11         Thank you.

12              (Whereupon, a recess followed.)

13

14         THE COURT:  Ready to bring the jury in?

15              (Whereupon, the jury entered the

16              courtroom.)

17         THE COURT:  Please be seated everyone.

18         We're going to move the thing here so I can see

19   all the jurors.

20         Good morning, ladies and gentlemen.

21         Ladies and gentlemen, I got a follow-up note

22   from a juror.

23         The first question of the note was:  Is there a

24   lemon law concerning boats?

25         And the answer is no.

1          I think the second question states something

2     like:  Do they conduct a recall on motor exhausts if there

3     are several problems?

4          And my response to you there is that you must

5     decide this case only on the evidence admitted here in the

6     courtroom and my instructions to you on the law.  And you

7     cannot speculate as to other things.  So that's the best I

8     can do in terms of responding to that question.

9          This morning you're going to hear closing

10    arguments of counsel.  Each side has up to an hour.

11    Counsel for the plaintiff goes first and reserves some

12    time for rebuttal.  So you'll hear from counsel for the

13    plaintiffs, then you'll hear from counsel for the

14    defendant, and then counsel for the plaintiffs will have

15    saved some time for rebuttal.

16         We'll probably take a break at the end of the

17    plaintiffs' first statement, and then we'll see how long

18    the defendant's statement is to determine whether we take

19    a break before we hear the rebuttal.  Most likely we'll go

20    straight through.

21         Mr. Nikas.

22         MR. NIKAS:  Good morning.

23         Just about a week ago we started this trial and

24    we heard from the first of our witnesses.  Given the time

25    that's past and given the weekend, I'd like to review the

PDF created with pdfFactory trial version www.pdffactory.com

1    testimony that you heard and go over the things that

2    everybody said so you can remember who said what and what

3    evidence is there before you.

4            The first person you heard from was Peter Mains.

5    And he told you that he bought this boat with his wife to

6    enjoy it with their daughter.  And having owned two

7    previous boats, he wanted to continue to enjoy an outdoor

8    activity.

9            Well, shortly after that, I guess we all heard

10   about the laundry list of problems that he had and the

11   complaints that he made.  And you saw the letters and we

12   saw the responses, and there were item after item after

13   item.  And it was a long list sometimes.

14           In fact, if you consider Peter's testimony in

15   light of some of the testimony you heard afterwards from

16   witnesses for both plaintiffs and the defendant, one thing

17   was clear:  Peter Mains was fussy.  He was very, very

18   fussy.  He and his wife paid just shy of $140,000 for this

19   boat.  And having returned their previous boat to Sea Ray

20   and having used that as a down payment on this one, he

21   testified that he had the expectation that he would be

22   able to get many years of use out of it.

23           They bought the boat in May of 1998.  From that

24   first week up until the time the engines failed in June of

25   2001, there were several repair attempts.  Sea Ray flew a

1    mechanic up.  The boat was taken to Haddam for repairs.
2    And finally in 2000 the boat disappeared for five and a
3    half months.  From the boating season supposedly lasting
4    six months, as Mr. Mains said, the boat was out of
5    commission for an awfully long time.
6            And when his wife, Lori, testified, she
7    corroborated that her husband was particular.  She
8    corroborated that the family used the boat with their
9    daughter, their daughter's friends and other relatives.
10   And everybody agreed that when these engines failed on
11   June 10, 2001, it was rather unexpected.  What was
12   unexpected was they had fewer than 180 hours on it.  One
13   expert testified that's about 10 percent of the expected
14   usage one would get from engines like these.
15           Well, that's two of the witnesses, both
16   plaintiffs.  Who else did we hear from?
17           We heard from Thomas Wicander.  Even though he
18   testified as an expert on the basis of his background,
19   Thomas Wicander was contacted by Sea Ray to coordinate the
20   repairs that would have started the date after these
21   engines failed.  They failed on June 10, 2001.  Work was
22   supposed to begin on June 11.  And he was the person that
23   was charged with doing this work.
24           He didn't get a chance to because on June 10
25   Peter Mains tried to start the engines and could not.  Why

1    not?  Well, initially I guess Mr. Wicander, Mr. Mains all

2    thought it was because the engine had hydrolocked.  The

3    boat was meticulously maintained.  In fact, I think

4    Mr. Wicander testified that even when both engines were

5    not working and apart, Mr. Mains went down with his family

6    to go wash the boat while it was in dry storage.  I guess

7    he did that so often that Mr. Wicander testified he had to

8    give him a pool key to get him to go away sometimes.

9            But why did the boat hydrolock?  Well, when

10   Peter and Lori bought the boat, it came with a

11   collector-style exhaust.  And I know you've heard those

12   terms a lot: collector-style and water lift.  But the

13   collector-style exhaust was the exhaust system that the

14   boat came with.  And when the boat was at the factory,

15   unbeknownst to Mr. Mains or his wife or anybody else, at

16   least as far as the owners are concerned, Sea Ray decided

17   to change out that exhaust system.

18           I'm going to skip ahead a little bit.

19           The second to last witness we heard from on

20   Friday was a gentleman named David Wade.  David Wade was

21   the customer service rep from Sea Ray.  And you'll recall

22   when he was asked, Were you aware that the flushing

23   procedures for the collector-style exhaust and the

24   flushing procedures for the water lift muffler were

25   different, he replied, No, I didn't know that.  I didn't

1    recall that.  Why is that important?  Well, if you're

2    going to flush the collector-style, the engines should not

3    be running.  If you're going to flush it with the water

4    lift, which is what Sea Ray installed when the boat was

5    back at Tennessee, it should be running.

6              Thomas Wicander and Thomas Greaves, who was the

7    marine surveyor with the Irish accent, both testified that

8    the exhaust hoses were higher than the exhaust elbows.

9    And you'll recall with the rolled-up tube of poster board

10   and the tennis ball, when that happens, it allowed water

11   to run downhill into the exhaust elbows and into the

12   engine.  And all that water, you recall Thomas Wicander

13   say, was sitting on top of that piston preventing it from

14   moving up.  That's the hydrolock.

15             At this time Thomas Wicander's only a mechanic.

16   Granted, he was a Mercury-certified mechanic, he was a

17   Sea Ray-certified technician, but his only role up until

18   now was to try to find out what was wrong with these

19   engines.  He turned them over, got water to come out,

20   started them.  And at this point nothing tells him --

21   there's no evidence before him to suggest anything other

22   than those engines had hydrolocked.  Why is that?  Well,

23   if you remember, in his drawing he said the pistons are

24   sitting in the cylinders and the head sits over both.  He

25   couldn't see through the head until it's removed.  And

1    until it's removed nobody -- not Mr. Mains, not

2    Mr. Wicander, not the Sea Ray people that Mr. Mains had

3    spoken to, not the people at the dealership -- nobody had

4    any idea that there was a problem beyond the hydrolocking.

5            When Mr. Wicander pulled that head off and was

6    able to look into the cylinders, what did he find?  You

7    heard this term.  He found scoring.  One engine, seven

8    cylinders out of eight were scored, and the other, half.

9    Why was that significant?  He testified that the scoring

10   proved that the ingestion occurred when the engine was

11   running.  Without the engine running, the water just

12   stayed on top of the piston, preventing it from starting,

13   sure, that's a problem, but not causing the internal

14   damage.  And when he looked into the cylinders, he found

15   significant scoring that was historical, meaning it

16   happened over time that those engines had been ingesting

17   water.  What were they ingesting water through?  The

18   exhaust elbow sitting right on top of the cylinder.  And

19   given the layout, allowing water to flow back.

20           The scoring was significant.  And he testifying

21   that there was no way possible that that scoring could

22   have occurred without the engine running.

23           He also testified that in their attempts to

24   follow the MerCruiser procedures and pickle the engine and

25   start it, that the level of scoring found could not have

1    been caused by that.

2          How'd the water get in?  This is a better

3    example of the picture you have there.  The red and blue

4    things are the valves, the "I" is the intake valve, the

5    "E" is the exhaust valve; the "P" is the piston.  With one

6    of those valves open, water is allowed to go through, sit

7    on top of the piston.  And when the engine is running, it

8    ate away the oil that protects the piston as it moves

9    through the cylinder.  After enough time, that water

10   eroded away the lubrication and allowed metal-to-metal

11   contact.

12         Let's fast forward just a bit to defendant's

13   expert, Mr. Davis.  Even though Mr. Davis said he didn't

14   really look at the engines, in fact somebody else

15   completed that part of his report, he said the only thing

16   that can scratch the cylinder walls, which he said was

17   hard metal, was something harder than that.  Water is not

18   harder than metal.  Neither is salt.  You know that.  The

19   only thing that's harder than the metal in the cylinder

20   wall would have been the metal in the piston adjacent to

21   it.  And after time, with that lubrication worn away by

22   the water, it allowed the piston to contact the cylinder

23   and scratch it.  The tolerance, unlike our pitcher in the

24   vase, is one-thousandths of an inch.  That scoring

25   prevented the repair of the block and, Mr. Wicander

1    testified, would eventually have led to catastrophic

2    failure of the engines.

3            It was fortunate that the engines failed where

4    they did, at the dock.  If they had failed at sea, if

5    they'd failed in heavy weather, if they'd failed at night,

6    what would the Mainses have done?  That danger presented

7    by the failure of the engines -- well, that's a problem.

8            Thomas Wicander explained how the process

9    worked.  He drew pictures.  He tried to explain how water

10   got into the engine, and he explained how it was

11   impossible to tell at the time the original diagnosis was

12   made what the problem was.  Because without removing the

13   head, there was no way to be able to look down into those

14   cylinders.

15           Well, this was a big problem.

16           The boat had other problems.  You heard about

17   gelcoat cracks and water in the core and anchor windlasses

18   and all sorts of things.

19           Well, Thomas Greaves was the marine surveyor.

20   At the time that he was hired, that's all he was: a marine

21   surveyor.  He inspected the boat within two weeks of its

22   failure.  He wasn't an expert witness.  He was just trying

23   to give an accurate description of the condition of the

24   boat.  And what did he find?  He found water in the core.

25   He found handrails that were improperly secured.  He found

PDF created with pdfFactory trial version www.pdffactory.com

1    that as small a man as he was, he testified he couldn't

2    access the parts of the engine that you needed to access

3    to inspect the boat.  He was forthright.  He listed them

4    all in 12 bullet points.

5          Well, how serious were those problems?  How

6    accurate were they?  If you don't believe Thomas Greaves,

7    let's go to defendant's expert, Mr. Davis.

8          Mr. Davis, when asked, Do you agree with all the

9    conclusions in Mr. Greaves report, he said, Not all of

10   them.  I want you to remember, as we walk through that

11   list, 1 through 12, that he conceded that he agreed with

12   each and every one, including the issue of the exhaust

13   system restricting his access to the engine compartment.

14   Each and every one.

15         Well, what was Mr. Davis's job?  You'll recall

16   that he had a lot of credentials, but he didn't look at

17   the engines except superficially.  I asked him, What was

18   the purpose of you being hired as an expert?  And he said,

19   To complete inspection of the subject vessel and render an

20   opinion as to her present condition and value.  That was

21   one.  Two, provide an opinion as to the cause of the

22   damage found.  And three, provide an opinion as to the

23   repair cost.

24         Let's take those in order.

25         Let's talk about his opinion as to her present

1    condition and value.  Maybe you remember the discussion

2    about "to be" and "once."  Because the fact of the matter

3    is, the value that Mr. Davis concluded was not based on

4    the condition of the boat as he inspected her on.  The

5    value he provided was a boat with two good engines.

6            And then he went so far as to corroborate the

7    care that Peter and Lori took of the boat.  Remember he

8    came up with a value.  And then he said it was in such

9    excellent condition that he increased the value by

10   25 percent.  Increased the value of a boat in good

11   condition by a quarter because it was in excellent

12   condition.  And I asked him what his opinion was.  His

13   opinion was the vessel is in excellent condition except

14   for the current condition of the engines.  That's a lot

15   like, Other than that, Mrs. Lincoln, how was the play?

16           He testified that the purpose of this boat was

17   to be able to provide transportation on the water.  And

18   ever since June 9, 2001, the only time the boat had seen

19   water was to run tests on her.  It's been almost seven

20   years since she's been used for her intended purpose.

21           Well, the second thing he was asked to do was to

22   provide an opinion as to the cause of the damage found.

23   Remarkably, he found that the cause of the water in the

24   hull core was by water.  And he never provided an opinion

25   as to the cause of the water in the engines other than to

1    state that he was informed it was because it was

2    hydrolocked.

3         He was critical of the pickling procedures that

4    Tom Wicander used even though they followed the MerCruiser

5    guidelines.  He was critical even though he didn't see the

6    boat until more than two years after Tom Wicander removed

7    the heads.  And Tom Wicander himself said at the point at

8    which he saw the scoring on the cylinders there was no

9    point in going any further.

10        And then the last thing he was asked to do was

11   provide an opinion as to the repair cost.  What was his

12   solution to this?  The boat, he said, was in excellent

13   condition.  Had less than 200 hours on the engines.  So

14   his recommendation was we get remanufactured engines and

15   we put them in there for I think he said $12,000, and the

16   boat will be worth $127,500 if we do that.

17        So let's replace the engines that came with it

18   from the factory that had less than 10 percent of their

19   expected life used, and that is supposed to make sense.

20        Well, not a lot made sense.  The biggest problem

21   with the boat was the engines and the water that was in

22   the engines.  He never provided us with an opinion, a

23   guess, even a whim as to how that had happened.

24        That's Greg Davis.  That was witness number one

25   for the defendant.  He was the expert.  At least he was

1    candid.  He told us that David Marlow at Sea Ray, who was

2    the director of customer service and he corresponded with

3    Peter Mains, was a personal friend of his.  He said that.

4    And he admitted that, well, we didn't come up with an

5    opinion as to the water damage.  And the value we got,

6    well, that's for a boat in a different condition other

7    than the one he looked at.

8            Well, who was witness number two?  Well, Dean

9    Beckman.  Dean Beckman worked at the dealership.  What did

10   Dean Beckman say?  Well, let's try to remember.  So Dean

11   Beckman is from the dealership.  He said that he had all

12   but a handful of customers that were as knowledgeable and

13   as attentive and contacted him as much as Peter Mains.

14   All that's consistent with what everybody else said.  Said

15   he got along with him.  Talked at the factory about

16   Peter's problems with the boat.  That was pretty much the

17   testimony.

18           Now we get to David Wade.  David Wade testified

19   for plaintiff even though he was an employee of defendant.

20   It was his job to deal with the boat when it got to

21   Tennessee.  He had a long list of items.  They did hull

22   repairs.  They put in a new stringer.  They sprayed on

23   some gelcoat.

24           And oh, yeah, David Wade said he decided to

25   change the exhaust.  David Wade was a customer service

PDF created with pdfFactory trial version www.pdffactory.com

1    rep.  When asked if David consulted any engineers, he said

2    no.  When asked if he consulted any materials, any

3    literature, any service bulletins, any technical manuals

4    before he suggested this repair, he said no.  When I asked

5    him, Then why did you change this exhaust system, he said,

6    To deal with Peter's complaint about noise.  How would he

7    know that this new different exhaust would even address

8    those concerns about noise?  He didn't know anything about

9    the exhaust.  He didn't know the purpose behind it.  He

10   didn't consult any materials.  He didn't consult any

11   engineers.  And he didn't consult MerCruiser.  And we're

12   to believe he made this decision all by himself, changing

13   a major component of the boat because nothing was wrong

14   with it, he just did it because he thought it would fix

15   the noise.  All on his own.  Didn't tell anybody, didn't

16   talk to anybody.  He said he went to his boss and the

17   change was made.  Didn't tell Peter and Lori.  I know you

18   brought your car in for a flat tire, we thought we'd

19   change the interior, too, because you complained about the

20   smell.  Well, it would have been helpful to Peter and Lori

21   if David Wade understood the difference in the flushing

22   procedures.  Because remember when I started, I asked him,

23   Do you know the difference?  He said, No.

24           Well, a month later, Peter uses the boat the

25   first time.  He uses the boat the first time since it gets

1  back from Tennessee.  It runs for an hour and a half.

2         You heard about Peter's tendencies towards

3  cleanliness.  He flushes the exhaust using the procedure

4  that he was provided with at the factory.  Except that

5  procedure no longer works.  Why doesn't it work?  Because

6  Sea Ray changed the exhaust.  When David Wade was asked

7  whether he notified Peter, he said no.  Didn't appreciate

8  why he should have notified him.

9         By the way, the boat failed to start on June 10,

10  2001.  The MerCruiser engine warranty expired about two

11  weeks earlier.

12         And even though -- let's think about this.  It's

13  the first time Peter and Lori have used the boat.  What

14  about the repairs in Tennessee?  They happened after the

15  Sea Ray warranty had supposedly expired.  The hull

16  repairs.  The gelcoat.  Changing the exhaust.  Did Lori

17  and Peter pay for that?  No.  Sea Ray did.  A year after

18  the warranty had supposedly expired.

19         Well, surely there's got to be another witness

20  that helps explain all this.  There's got to be another

21  witness that explains why the exhaust was changed,

22  explains why the water got in the engine when it was

23  running.  There's got to be a witness that explains why

24  all the repairs have been covered.  There's got to be a

25  witness that makes sense of all this.  Who is the last

PDF created with pdfFactory trial version www.pdffactory.com

1    witness for defendant?  Who is it?  It is Greg Wilson.

2    Last witness we heard from.

3            He's in the area.  He gets a call to go out to

4    the boat to deal with this exhaust noise issue.  He's

5    going to install some baffles to try to fix this problem.

6    Does he refer to any materials?  Does he refer to any

7    service bulletins?  Does he contact MerCruiser?  No.  Does

8    he know why the water lift muffler and exhaust was

9    exchanged for the collector?  He says no.  Did you see the

10   boat when it was in Tennessee?  He says yes.  But I just

11   looked at it.

12           So the remainder of the questions that

13   Mr. Wilson answers, do you remember what they were?  They

14   were about his shoes.  He had to take off his shoes.  He

15   was wearing boat shoes and he had to take off his shoes.

16   He said it was like standing on river rock.  I don't know

17   what that has to do with water in the engine, but it is

18   consistent with the type of care that Peter and Lori took

19   of the boat.  They were incredibly meticulous.

20           Well, surely Davis, Beckman, Wade, and Wilson,

21   none of those witnesses helps us understand this problem.

22   Maybe ours do.

23           Peter Mains, on corrosion, is asked about

24   sparkplugs.  When were the sparkplugs purchased?  Four

25   days after the hydrolocking incident.

1          Tom Wicander explains, We started the engine

2     with the old plugs.  I wouldn't put new plugs in, he said,

3     until after the problem had been fixed.

4          Thomas Greaves, well, everything he said was

5     agreed to by Mr. Davis.

6          Well, who's left?

7          Tom Wicander said the scoring could only have

8     occurred while the engine was running.  It could only have

9     occurred while the engine was running and the damage that

10    he saw could not have occurred from the hydrolocking.  Did

11    any Sea Ray witness testify to the contrary?

12         Both Tom Greaves and Tom Wicander said even

13    after the change of exhaust, the outlet was higher than

14    the elbow which would allow water to roll back into the

15    engine.  Did any witness from Sea Ray contradict that

16    testimony?

17         Tom Greaves and defendant's expert, Greg Davis,

18    both testified that the new exhaust system prevented

19    access to the engine compartment and prevented access to

20    the parts that needed to be inspected.  Not only did no

21    witness from Sea Ray contradict that, their expert agreed.

22         Did we hear from David Marlow, who is the

23    director of customer service who wrote Peter the letter,

24    who was there at the factory?

25         Did we hear Mr. Todd Stooksbury, who was David

1   Wade's boss who supposedly was the only other person that

2   this exhaust change was discussed?  We didn't.

3           Tom Wicander, Tom Greaves, Greg Davis, to the

4   extent that he agreed with everything that Tom Greaves

5   said, all concurred.  The water got in the engine when it

6   was running.  It scored the cylinders preventing the

7   engine blocks from being reused and damaging them fatally.

8   That's the evidence you heard.  And that's the evidence

9   nobody contradicted.  Instead, they came after Peter for

10  being fussy, for making people take off their shoes, and

11  for buying sparkplugs four days too late.

12          They responded to the water ingestion with shoes

13  and sparkplugs.

14          And as fussy as he was and, yeah, the two prior

15  boats had been returned, and yeah, the list of repairs

16  that he wanted were long, think about this:  Did you hear

17  one witness, from the mechanic that worked on the boat to

18  defendant's expert to the two Sea Ray employees, did

19  anybody say Peter was wrong?  Did anybody ever say that

20  the list of items he wanted repaired were not valid?

21  Think about it.  They put the boat on a trailer and they

22  took it 1200 miles to Tennessee and it was there almost

23  six months repaired at their expense.  They did this for

24  customer service?  That's really good customer service.  A

25  year after the warranty expires.  They'll fix all the hull

1   items, they'll address all those issues.  And by the way,

2   we through in a whole new exhaust system for you, hope it

3   works.

4           Well, after the engines had failed, they went

5   back and forth with Sea Ray.  Peter said, Take back the

6   boat, I want another one.  And they offered him money.  By

7   their own admission they offered him $105,000.  By their

8   own expert, he said he thought the boat was worth 130.

9   That's not a very good deal.  They wanted to send the boat

10  back.  In fact, from the first week until the last, they

11  went back and forth, back and forth.

12          What did they get?  They got a boat that doesn't

13  run.  They got a boat that could have stopped running at

14  sea.  And they have a boat that's been on dry land for

15  almost seven years.

16          When you deliberate, think about the testimony

17  you heard and then think if anybody contradicted that

18  testimony.  That's your universe of witnesses for the

19  defense.  The expert, the guy from the dealership that all

20  he testified was that Peter was fussy, appeared

21  knowledgeable, and was around an awful lot.  David Wade,

22  who talked to nobody, read nothing, consulted nothing, and

23  changed the second biggest component in that engine

24  department.  And then Greg Wilson, who had to take off his

25  shoes.

1          That's all there is.  There were no other

2    witnesses.

3          The burden here is by a preponderance of the

4    evidence.  It's not a reasonable doubt.  It's not a

5    certainty.  It's just more likely than not.  If you put

6    them on a scale and both sides are exactly equal and if a

7    feather landed on one side of the scale, that would be a

8    preponderance of the evidence.  That may be helpful, maybe

9    not.

10          But look at those witness and think, what did

11   they say?

12          You all can remember Davis, the expert.  He gave

13   an opinion based on a condition that didn't exist, he gave

14   an opinion as to cause except for the big one, and he gave

15   repair cost based on remanufactured engines in place of

16   two new factory installed, high-output Horizon engines.

17          And just remember David Wade.  You only heard

18   from two Sea Ray employees and he was the one that didn't

19   take off his shoes, he didn't know the difference in

20   flushing instructions, he didn't know why he changed the

21   exhaust other than to say to take care of the noise.  How

22   did it take care of the noise?  How would it take care of

23   the noise?  Gee, I don't know.  Had he ever heard the term

24   "water ingestion"?  He said no.  Had he ever seen service

25   bulletins that dealt with the topic?  He said no.  Had he

PDF created with pdfFactory trial version www.pdffactory.com

1    seen the installation manual?  He said no.  Had he ever

2    seen the diagram of the two components he was swapping

3    out?  He said no.  And despite the fact that he didn't

4    know anything about the exhaust, he didn't ask anybody

5    either.  And when Peter and Lori got the boat, he didn't

6    tell them about the instructions, didn't tell them why

7    other than to say, Well, I hope this fixes your problem.

8    Well, we know what happened then.

9            Peter was fussy, but not wrong, and they came

10   after us with sparkplugs and shoes.

11           I'm sure you can all figure this out.  Thanks.

12           THE COURT:  Thank you, Mr. Nikas.

13           We'll take a short break.  We'll take a

14   15-minute recess.

15               (Whereupon, a recess followed.)

16

17           THE COURT:  By my tally, the plaintiffs' closing

18   went from 10:19 to 11:08, so I count 11 minutes left for

19   rebuttal.

20           We'll bring the jury in.

21               (Whereupon, the jury entered the

22               courtroom.)

23           THE COURT:  Please be seated everyone.

24           Mr. Rotondo, whenever you're ready.

25           MR. ROTONDO:  May it please the Court, members

1    of the jury:

2         On behalf of the defendant, Sea Ray, I'd like to

3    thank each of you for the time that you've spent sitting

4    here as jurors listening to the evidence and to the

5    attention that you've paid to the evidence in the case.

6         This is my only opportunity to review the

7    evidence with you and to describe to you what we think the

8    evidence in this case has shown.  In the course of my

9    comments, I may refer from time to time to different legal

10   principles, and the judge is the final arbiter of what the

11   law is.  If what I say differs from what the judge says,

12   you obviously have to follow what the judge says.

13        The plaintiffs have just told you that the

14   defense case here was about sparkplugs and stocking feet.

15   That's not what the defense's case here was at all.  And

16   what I'd like to do is review the claims with you and to

17   discuss the evidence under the different claims that

18   you're going to have to decide in this case.

19        And there are three different claims that you're

20   going to have to decide in this case.  You're going to

21   have to decide claims relating to what's called product

22   liability, negligence, and revocation of contract.  And so

23   that's the order in which I would like to review them.

24        I'll start with sort of an overview, which is

25   that there's no evidence in this case that the boat itself

1    was unreasonably dangerous and defective at the time it

2    was sold.  Plaintiffs haven't presented any evidence of

3    that.

4            Second, plaintiffs are not entitled to what's

5    called revocation of contract.  They're not entitled to a

6    revocation of contract because the plaintiffs didn't have

7    a contract with Sea Ray to buy the boat.  They had a

8    contract with Surfside 3.

9            In addition, this claim of revocation wasn't

10   timely.  Plaintiffs had used the boat for three years.

11           And finally, the damages here that you've heard

12   so much about are at most $17,000.  That's what the

13   damages are.  For the non-engine work, it's $5,000.  And

14   to replace the engines with remanufactured engines is

15   $12,000.

16           Starting with the product liability claim, to

17   make things perhaps even a little more confusing, there

18   are two parts to the product liability claim.  There's

19   something called strict liability and then there's breach

20   of express warranty.  Those are two different theories

21   under product liability.  I'm going to start with the

22   strict liability theory.

23           And going back to what I said before, there's no

24   evidence that this boat was defective and unreasonably

25   dangerous back in May of 1998.

PDF created with pdfFactory trial version www.pdffactory.com

1            What evidence do you have of that?  You have the
2    affirmative evidence that the plaintiffs safely used the
3    boat for three boating seasons.  They had 170 hours on the
4    boat.  They took trips as far south as New York and as far
5    north as Cape Cod and Martha's Vineyard.  They didn't have
6    any injuries.  They didn't have any accidents.  The boat
7    didn't sink.  And they weren't stranded at sea.
8            We could take it from the other side.  Who came
9    into this courtroom and testified that this boat was
10    defective and unreasonably dangerous?  The answer is
11    clear:  No one.  No one testified that this boat was
12    unreasonably dangerous and defective.
13            Mr. Mains' complaints -- and we can talk about
14    those because there obviously were a lot of them.  But his
15    complaints don't prove the existence of a defect and they
16    certainly don't prove the existence of something that is
17    unreasonably dangerous and defective.  In addition, his
18    complaints were all unrelated to what now is the
19    plaintiffs' theory of the case.  His complaints related to
20    what people sometimes call -- well, a lot of them were
21    cosmetic.  A lot of them related to gelcoat.  A lot of
22    them related to seats.  There were a laundry list of
23    complaints.  But they didn't relate to the performance of
24    the engines, which is now what plaintiffs want to have you
25    believe this whole case is all about.  The fact is that

PDF created with pdfFactory trial version www.pdffactory.com

1    the engines worked well until June 10, 2001 when there was

2    this fresh water hydrolock and a failure to properly

3    pickle the engines.  The engines worked fine until that

4    point.  In fact, there were no complaints about the engine

5    the day before.

6            Mr. and Mrs. Mains testified that on June 9 they

7    went from their home marina, which I believe was in

8    Haddam, went down to Pilots Point in Westbrook and the

9    engines worked fine, they didn't hear any of this exhaust

10   resonance which they described as being annoying.

11           So that then takes us to Mr. Wicander.  He's the

12   plaintiffs' engine expert.

13           Now, it's our position, as you can tell from

14   cross-examine, that he improperly pickled the engines.

15   I'll talk more about that later.  But if we just focus on

16   some of the other things that he did here, he performed

17   tests a week after he tried to start the engines.  He

18   performed those tests on June 18.

19           And in looking at Mr. Wicander, I think it's

20   important to look at what he said about those tests.  On

21   direct examination, he said, I could tell that the

22   compression tests were off and I could tell that they were

23   off because I didn't get a consistent reading of

24   130 pounds per square inch on the compression read.  If

25   you look at his report which is in evidence, you'll see

1    one engine really is very close to being at around 130
2    because there's a plus or minus part to this, and the
3    other one does show a lot of variation.
4          Then on cross-examination Mr. Wicander agreed
5    that in fact the specification or the acceptable limit
6    wasn't 130, it wasn't his number, but that Mercury had
7    said it was 100.  And all of the readings were well above
8    100.
9          So then what happens?  Well, on redirect
10   examination the next day, Mr. Wicander says, It was 150.
11   That's what you're really looking for, 150.
12         But then on recross, he admitted, no, the
13   acceptable limit is 100.
14         So we have this back-and-forth testimony by
15   Mr. Wicander.
16         So then if we take the time line, in June of
17   2001 he does his compression leak tests.  Then he
18   shrinkwraps or has somebody in his yard shrinkwrap the
19   boat.  And they leave it on land a couple hundred feet
20   from the shore for over two years.  And then Mr. Wicander
21   comes back two years later and disassembles the engine,
22   he's got another mechanic with him, may have been the same
23   one who worked with him before, they disassemble the
24   engines.  This time he finds rust.  He says that is
25   significant.  I found rust in all sorts of different

1   places, and he found that to be important.

2          But on cross-examination he admitted, yeah, it

3   was right near the ocean for two years, that's a very

4   corrosive environment, and metal rusts in a corrosive

5   environment.  So what did that rust prove?  We submit it

6   proved nothing.

7          So let's look at Mr. Wicander.  He says that in

8   2003 -- again, this is two years after his examination, he

9   says he saw scoring on the cylinders that he attributed to

10  water ingestion over time.  That was his testimony.  He

11  saw scoring that he attributed to water ingestion over

12  time.

13         Let's look at what he didn't say.  He didn't say

14  the engine and exhaust system were defective, he didn't

15  use those words.  He didn't say that water ingestion

16  equals a defect, he didn't say that.  He didn't say that

17  it was possible to prevent all water ingestion through the

18  exhaust.  And the very fact that there was a standard

19  protocol, he testified there was a standard protocol that

20  he used and that Merc had, he said they were the same,

21  isn't consistent with the idea that that's the only

22  possible explanation for water ingestion.  And he didn't

23  say that the water ingestion related to the intermittent

24  exhaust noise that Mr. Mains complained about.

25         One other important aspect of this, Mr. Wicander

PDF created with pdfFactory trial version www.pdffactory.com

1   never saw the original exhaust installation.  Mr. Wicander

2   saw the exhaust system in this boat and this engine for

3   the first time in 2001.  There's been a lot of testimony,

4   a lot of discussion about the retrofit or the new exhaust

5   system that was put on in 2001.  And there's no dispute

6   that it was different than the one that had been put on in

7   1998.  Mr. Wicander never testified about the original

8   exhaust system, the original collector-style system.  He

9   didn't give any testimony about that at all.

10          So there is an inference, a suggestion in the

11  plaintiffs' case that the water ingestion is somehow

12  related to Mr. Mains' complaints about exhaust noise.  And

13  we submit that the connection between those two is

14  complete speculation.  Mr. Wicander never said it existed.

15  Mr. Wicander never heard that exhaust noise.  So there's

16  no logical connection between those two things.

17          Looking again at Mr. Wicander, it's important to

18  recognize that what he said at different times was very

19  different.

20          In 2001 he testified unequivocally -- let me

21  back up.

22          In 2001 he indicated that the engine stopped

23  because of water that came into the system as a result of

24  flushing when Mr. Mains did his fresh water flush on

25  June 9 after he finished the trip, that the water

1   ingestion there, that was a fresh water ingestion.  And he

2   said he could tell.  Mr. Wicander said he could tell the

3   difference between fresh water and saltwater.  And he knew

4   that the water that he saw come out of those cylinders,

5   the cylinder heads, was fresh water because there was a

6   consistency of fresh water as opposed to saltwater.

7          In addition, Mr. Wicander wrote a report that's

8   in evidence, it's Plaintiffs' Exhibit 26.  And

9   Mr. Wicander said that "On the basis of the mechanical

10  inspections reported above, we are of the opinion that

11  both engines have been seriously damaged as a result of

12  the hydrolocking that occurred on or about June 9, 2001

13  and require replacement."

14         So Mr. Wicander concluded in 2001 that the

15  hydrolocking occurred because of fresh water, not because

16  of saltwater, and that the engines had been damaged and

17  needed to be replaced.  That was his statement.  And at

18  trial he admitted that he knew that the water that he saw

19  coming out of those cylinders was fresh water, he could

20  tell that because of its consistency.

21         Let's roll forward two years.  So in 2003,

22  Mr. Wicander does an inspection.  He does another

23  inspection after the boat's been sitting for two years,

24  sitting near the ocean on land, he does an inspection to

25  search for damage.  What he said in 2001 was these engines

1   have been seriously damaged.  So when he goes to look for

2   the damage to the engines, it's curious that he didn't

3   look to the damage to the engines as a result of the

4   hydrolock.  He testified that he knew that when you have

5   damage from a hydrolock, you have damage to the bearings,

6   connection rods, and valves.  But Mr. Wicander didn't look

7   for that.  He didn't even look for damage relating to the

8   hydrolock.  Instead he said he saw scoring of the

9   cylinders that would at some point in time lead to the

10  failure of the engines.  That's what he said.

11          All right.  And ask yourself, what difference

12  does that make?  Why is that in any way relevant

13  whatsoever?  He had already determined that the engines

14  had been damaged from hydrolock.  So now what he's saying

15  is, hey, I found this other damage that could at some

16  point in time lead these engines to fail.

17          The engines were already broken.  He testified

18  that the engines were broken.  He indicated in his report

19  in 2001 that the engines needed replacement.  He knew

20  that.  He knew they needed replacement.  So his opinion

21  about this scoring in the cylinders is irrelevant to what

22  happened to these engines.  Because these engines worked

23  each and every time until Mr. Mains flushed the engines on

24  the night of June 9 and they didn't start on the morning

25  of June 10, 2001.

PDF created with pdfFactory trial version www.pdffactory.com

1          Let's talk about the exhaust noise.  There's no

2    doubt that Mr. Mains complained about the exhaust noise.

3    There's a lot of evidence about the exhaust noise.

4    Mr. Mains testified that it was annoying.  He testified

5    that he had telephone conversations about this exhaust

6    noise.  And Mr. Mains felt strongly enough about this so

7    that he included his complaints about exhaust noise in two

8    of his letters.  In September of 2001, Plaintiffs' Exhibit

9    Number 6, he said, Six times during our four-hour return

10   trip from Massachusetts in 3-foot seas, a loud resonant

11   exhaust noise would appear.  And then he says in order to

12   stop it, he had to take all these procedures.

13          And then you heard evidence that Mr. Beckman

14   went out and road with Mr. Mains on his boat.  And

15   Mr. Beckman didn't hear it.  Mr. Beckman said it sounded

16   completely normal.  Mr. Beckman said there was nothing

17   unusual about it.  You heard plaintiffs argue today that

18   no one ever disputed any of Mr. Mains' complaints.

19   Mr. Beckman disputed one of their key complaints that

20   there was something wrong with their exhaust system in

21   1998, early on.  Mr. Beckman didn't have to get up and

22   say, I'm arguing with you, but he said he didn't hear it,

23   he didn't see anything wrong with it.

24          Now, these complaints about the exhaust didn't

25   go away.  And you'll recall that Mr. Wilson testified, in

PDF created with pdfFactory trial version www.pdffactory.com

1  fact, Mr. Mains agreed that Mr. Wilson came out and put on

2  some sort of football muffler kind of exhaust arrangement.

3  And Mr. Wade called it a football.  I believe Mr. Wilson

4  referred to it as something else.  But anyway, sometime

5  around 1999 Mr. Wilson went out to the boat and put on

6  this new exhaust system.  Not exhaust system, a new

7  feature which Mr. Wade described as a football.  That

8  didn't work.

9         And Mr. Mains complained -- you've got this as

10  Plaintiffs' Exhibit 16, a February 12, 2001 letter.

11  That's the letter that was written while the boat was in

12  Knoxville, Tennessee, for a series of repairs.  So what

13  does Mr. Mains say then?  He says, The intermittent

14  suddenly loud exhaust noise problem has been unremedied

15  after new fiberglass resonators and 4 X 4 exhaust baffles

16  were installed.  That's the work that Mr. Wilson did.

17         So what we have here is complaints about the

18  exhaust system that are not verified.  No one else other

19  than Mr. Mains says he hears these things.  And Mr. Mains

20  admitted in a telephone conversation with Mr. Wade that

21  these complaints were not performance related.  But even

22  though Mr. Mains said that to Mr. Wade, Sea Ray was still

23  trying to fix the problem, the problem being Mr. Mains'

24  complaint.

25         Now, that's a strict warranty claim, strict

1    liability claim.  I'd like to turn now to express warranty

2    claim.

3            And the evidence that you've heard about an

4    express warranty in this case is really one thing.  The

5    express warranty that you heard in this case is

6    Exhibit 94.  That's the only express warranty that you've

7    seen in this case.  And that's the Sea Ray express limited

8    warranty.  Sea Ray warranted to original retail purchasers

9    to repair or replace -- I highlighted the part that I

10   thought to be important.  But you can look at the entire

11   document and see if there are other things that you find

12   to be important.

13           "Repair or replace any parts to be found

14   defective in factory material or workmanship within one

15   year of the date of delivery."

16           "The obligation of Sea Ray Boats under this

17   warranty shall be limited to the repair or replacement of

18   parts."

19           "The remedy described in this paragraph shall be

20   the exclusive and sole remedy" -- that's under "Warranty."

21   It continues and has some other language.

22           It says, This warranty does not apply to:

23   Engines, stern drives, cosmetic gelcoat finish, cracks or

24   crazing, and other limitations, all other warranties are

25   expressly excluded.

1          That's the warranty in this case.  And there's

2     no doubt but that Sea Ray, in responding to Mr. Mains'

3     complaints, did do things like make arrangements for

4     cosmetic gelcoat finishes and cracks and things like that.

5     In fact, you heard testimony from Mr. Davis that's one of

6     the things he didn't like.  Mr. Davis being Sea Ray's own

7     expert, said he didn't like some of the gelcoat repairs.

8     You heard him say that yesterday.

9          So what I'd like to do now is to turn to the

10    next claim, which is the negligence claim.  There are two

11    parts to this, in our view.

12          First you have the punch lists, and these are

13    Mr. Mains' letters which has all of these different items

14    on it.  I believe Mr. Wilson referred to it as a punch

15    list too.  And then the engines.

16          And the complaints before April 30th of 2001,

17    generally were these punch lists.  And what I've done here

18    is list out all of the dates of either the initial -- this

19    was the initial checklist when Mr. and Mrs. Mains were at

20    the dealer, May 21st.  May 27th is one of Mr. Mains'

21    letters, and we've got all these different dates of

22    letters.  And if you look at the dates of the letters,

23    you'll recall that Mr. Mains testified that the season was

24    six months long, it ended on October 30th, so it must have

25    begun around April 30th.  And many of these complaints

1    were written near the end of the season, at the end of the

2    season, near the end of the season or while the season is

3    over.

4          Now, there is also no dispute that Sea Ray paid

5    for all this work to be done.  Plaintiffs have suggested

6    to some ulterior motive.  It couldn't have been to satisfy

7    the customer, which is what Mr. Wade said, We're trying to

8    do this to satisfy the customer.  There's no dispute that

9    Sea Ray paid for this work even beyond the one-year

10   warranty and it also addressed work that wasn't covered

11   under the warranty, such as the gelcoat work.

12         Now, if you look at the complaints and think

13   about the testimony you heard.  You heard testimony about

14   engine noise.  And Mr. Mains testified that the engine

15   noise was annoying.  In his letters he described it as

16   annoying, but also told Mr. Wade it was not performance

17   related.  He also complained about the flex in the floor.

18   And you heard testimony I believe from Mr. Beckman that it

19   wasn't observed.  They didn't observe this flexing.  You

20   heard complaints about decals, decals on the engines were

21   scratched.  And you heard complaints about dirty shoes.

22   And Mr. Mains was described as being picky or demanding,

23   one lawyer referred to him as being fussy.  This goes to

24   the plaintiffs' argument this morning, he was required to

25   work in his socks.  Well, the fact that he was required to

1    work in his socks really shows two things:  One, it shows

2    the extent to which Mr. Mains was fussy, the extent to

3    which he required people to do certain things; and also

4    what Sea Ray was willing to do to try to respond.

5    Mr. Wilson didn't say, No, I'm not doing that.  I'm not

6    walking on river rock in stocking feet.  He did it.  In

7    fact, he did it twice.

8            After April 2001, Mr. Mains wrote a letter dated

9    April 30, you have it in evidence, showing 18 complaints.

10    Mr. Beckman traveled to the boat, he testified about that.

11    Mr. Beckman testified that there was something called an

12    exhaust bullet that had been shipped up to him overnight

13    or somehow expressed to him.  And that he brought this

14    with him to put on the boat when he went out there.  And

15    then -- because it had been crushed, damaged, according to

16    Mr. Mains.

17            But then when Mr. Beckman got there and when he

18    looked at it, he said it wasn't crushed, there was a

19    scratch on a paint on a bronze piece that sits in the

20    water and he wasn't going to do it, he wasn't going to put

21    this new piece on.  So Mr. Beckman also described doing

22    other work at the scene when he went out.

23            So then we have Mr. Wade's letter, which is

24    Sea Ray Exhibit Number 17.  And Mr. Mains -- excuse me,

25    Mr. Wade identified 18 complaints that Mr. Mains had put

PDF created with pdfFactory trial version www.pdffactory.com

1    into his April 30 letter because Mr. Wade was trying to

2    come up with a list.  And that letter, Exhibit 17, also

3    then identifies 14 new items that Mr. Mains had complained

4    about in May.  So he listed those out.  And Sea Ray was

5    still trying to satisfy this customer.

6            We're now two years out of the warranty period

7    because the boat was purchased in 1998, the warranty

8    period was a year.  So it ended in 1999.  Now we're two

9    years out of the warranty.  Mr. Wade is still offering to

10   do these things.  He said that Sea Ray would make

11   arrangements to have Brewers perform upon a final

12   agreed-upon list.  It also include bottom paint, would

13   include cleaning and detailing, slip fees and rental fees.

14           So think about the response that Mr. Wade gets

15   to this letter when he makes this offer.  And the response

16   is in the letter dated June 6, 2001, Plaintiffs'

17   Exhibit 121.  And the response is, This is a deceptive,

18   rhetorical trick showing a complete lack of ethics.

19           Now, when Mains when he testified, I asked him,

20   I went through that list, each of those four or five items

21   and said, Is this a deceptive, rhetorical trick?  Was that

22   a deceptive, rhetorical trick?  What was his answer?  Hey,

23   I didn't write the letter, my wife wrote the letter.

24   That's what he said.

25           I also ask you to consider the fact that this

PDF created with pdfFactory trial version www.pdffactory.com

1    kind of letter was similar to his letter to Chris Craft

2    years earlier, which is Defendant's Exhibit 1.  And in

3    that letter, Mr. Mains said, A test ride would be arranged

4    only upon Statewide -- who was the dealer -- receiving a

5    $6,000 nonrefundable deposit.  This seemed highly

6    unethical.  Then he said, We feel this product was

7    misrepresented to us.

8            So if we go back now to the June 6 letter, Mr.

9    and Mrs. Mains capped that off, they end that by saying,

10   We've got 13 new complaints for you.

11           Now, there was a lot of discussion this morning

12   about why did Mr. Wade make arrangements to change the

13   exhaust system.  Why didn't he do this?  Why didn't he do

14   that?  Mr. Wade told you, you sat here and listened to him

15   and heard him say that the reason for the exhaust change

16   was that Mr. Mains complained about it.  He complained

17   about it repeatedly.  He said he was trying to satisfy the

18   customer by providing what he thought was a quieter

19   exhaust system.  That's what he said.  He was asked that

20   question five or six times by plaintiffs' counsel and that

21   was his answer each and every time.

22           I'd like you to go back -- we talked about this

23   before, but Mr. Mains repeatedly had these complaints.  He

24   wrote the letter dated September 1 where he complained

25   about the loud resonant exhaust system on his four-hour

PDF created with pdfFactory trial version www.pdffactory.com

1    boat ride or six-hour boat ride back from somewhere in

2    Massachusetts.  And Mr. Beckman testified that he was

3    unable to find the problem.  Mr. Wilson testified that he

4    installed this baffle.  Plaintiffs acknowledge that the

5    baffle was installed.

6            We then have the February 12, 2001 letter,

7    Plaintiffs' Exhibit 16.  The boat is now in Knoxville.

8    The boat was picked up in November, was returned --

9    November of 2000 and was returned in April of 2001,

10   April 20th.  Mr. Mains again repeats his complaint about

11   the intermittent suddenly loud exhaust noise problem,

12   saying it's been unremedied.  What did Mr. Mains expect

13   Sea Ray to do about this problem that Mr. Mains is writing

14   about?  Mr. Mains said he expected Sea Ray to address that

15   complaint.

16           Plaintiffs have suggested that there was

17   something secret about the way Mr. Wade worked.  Well,

18   Mr. Wade testified, in fact Mr. Mains testified that

19   Mr. Wade advised Mr. Mains of the change before the boat

20   was received back in Connecticut.  And this was not a

21   change that anybody could slip by anybody.  You heard

22   testimony by Mr. Mains and by Mr. Greaves that this new

23   exhaust system was bigger and it was in the engine

24   compartment and it made access to things tighter.  So it

25   wasn't like this was something you could slip by anybody.

PDF created with pdfFactory trial version www.pdffactory.com

1    It was obvious.  But in any event, there's no dispute that

2    Mr. Wade told Mr. Mains about this change before the Mains

3    received the boat back.

4            And then there was a suggestion that, Hey, I

5    wanted to come down and look at the boat to make sure it

6    met my requirements.  That's Mr. Mains' suggested

7    something along those lines.  And Mr. Wade said he never

8    called Mr. Mains -- recall Mr. Mains ever making such a

9    request.  If you look at the February 12, 2001 letter

10   where Mr. Mains makes a complaint about the exhaust noise,

11   there's no request in that letter that Mr. Mains be

12   allowed to come down and look at it.  And Mr. Wade said

13   it's not uncommon for owners to come down to the factory

14   or plant and look at these kinds of things, if that's what

15   you recall.  He just didn't recall whether Mr. Mains ever

16   made such a request.

17           All right.  Now he we get pack to the hydrolock

18   incident again.  And it happened on June 10th,

19   Mr. Wicander said it was fresh water in the engines, had

20   the consistency of fresh water.  And you heard testimony

21   that there were different flushing instructions.  That's

22   what you heard.  Plaintiffs didn't introduce either set of

23   instructions.  There's no evidence that Mr. Wade knew

24   about these instructions.  It's important to recognize

25   that these instructions were Mercury instructions, they

PDF created with pdfFactory trial version www.pdffactory.com

1    were not Sea Ray instructions.  There was a standard

2    protocol to deal with the situation which was you have to

3    de-water the engines and Mr. Wicander was very clear on

4    this.  He said that he and MerCruiser had the same sets of

5    protocols.

6            MR. NIKAS:  Your Honor, we object his reference

7    to plaintiffs not introducing either set of instructions.

8    Both sets of instructions were subject to the Court's

9    order that we could not introduce them.

10           THE COURT:  That's an improper objection.  The

11   jury is instructed to disregard it.

12           MR. ROTONDO:  Let me take a step back.

13           Standard protocol to deal with the situation

14   required de-watering -- it required speed.  And it

15   required de-watering.  It required new sparkplugs and

16   running the engines to 1300 rpm at normal engine

17   temperature.

18           And what happens when the pickling occurs in

19   June of 2001?  The so-called standard protocol is not

20   followed.  It's not followed because the engines didn't

21   run well on June 11 when Mr. Wicander was doing his

22   pickling.  The new sparkplugs weren't purchased by

23   Mr. Mains -- there's no dispute that Mr. Mains purchased

24   the sparkplugs.  They weren't purchased by him until

25   June 11, and that's Sea Ray Exhibit 105.  And that's four

1   days after the effort was made to put the -- to run the

2   engines.  The engines were never run with the new

3   sparkplugs on June 11 and the engines weren't run at 1300

4   rpms up to normal engine temperature on June 11.  Those

5   were the things that were required to be done.  And the

6   engines were damaged by June 18, 2001 when Mr. Wicander

7   did his tests, whatever you may think of his tests.

8              The evidence shows that the engines were damaged

9   as a result of Mr. Wicander failing to properly pickle the

10  engines.

11             All right.  Let's talk about damages.  Let's

12  talk about the damages that the plaintiffs have proven or

13  haven't proven in this case.  What have they shown?

14             All right.  And I'm going to break this down

15  into the engine and non-engine repairs.  Non-engine is the

16  first item.

17             Plaintiffs' expert was Mr. Greaves.  And

18  plaintiffs argued this morning Mr. Greaves found water in

19  the core.  And this is a little bit of a detour from what

20  I have on the screen here and what I was going to talk

21  about.  But plaintiffs argued that Mr. Greaves found water

22  in the core.  And we submit to you that's not what

23  Mr. Greaves said.  It's not what Mr. Greaves testified to.

24  And it's not in Mr. Greaves' report.  Mr. Greaves said he

25  found certain areas of high moistures with a moisture

PDF created with pdfFactory trial version www.pdffactory.com

1    meter.  To figure without whether there was damage in the

2    core, he had to do drilling and he didn't do that drill,

3    so he didn't know.

4           But in any event, Mr. Greaves was the

5    plaintiffs' expert on non-engine issues.  He offered no

6    recommendations on the cost of the work that he

7    recommended.  You got his report, you've go those 12

8    recommendations, there's no number there.  But he

9    acknowledged that all that work was repairable.  All those

10   things could be done to repair the boat.

11          The only evidence on cost of the non-engine

12   repairs came from Mr. Davis.  And Mr. Davis has 34 years

13   as a marine surveyor.  You heard about his qualifications,

14   what he's done, how he's seen thousands of boats over the

15   years, how he's examined boats for purposes of a survey

16   between buyers and sellers to figure out what the value of

17   a boat is.  He's examined boats when he's been hired by

18   insurance companies to figure out what the cost should be

19   to repair boats.  What did he testify to about the

20   non-engine cost of repairs?  He said that to repair those

21   items -- and he didn't disagree with Mr. Greaves about

22   Mr. Greaves' list.  He said to repair those non-engine

23   things was $5,000.  That's what he said.

24          So let's turn to the engine repairs.  We do have

25   some sources of information about this.  Mr. Mains

PDF created with pdfFactory trial version www.pdffactory.com

1    testified that he'd looked into this himself and he'd done

2    research and he determined that the cost of new engines

3    was $42,000.  That's what he said.

4         And then when we probed a little bit on

5    cross-examination, we asked him, What's this research that

6    you're talking about?  And then it turned out that he had

7    two phone conversations with people who didn't come to

8    court, who we don't any what they did, who we don't know

9    what kind of engines they were talking about, we don't

10   know anything about them.  But they didn't come to court

11   to testify about what the cost of the repairs would be.

12        Then we have Mr. Wicander.  He didn't agree with

13   Mr. Mains and he didn't agree with the report.  He didn't

14   testify that new engines were required.  He said you

15   needed new something called long blocks.  That's what he

16   felt was needed.  And he indicated certain parts could be

17   reused, but he didn't testify about what the cost of that

18   work was.

19        So now we have Mr. Davis again.  And plaintiffs,

20   by the way, argued that Mr. Davis criticized the way the

21   pickling procedure worked.  We ask you to go back and

22   think about Mr. Davis' testimony and ask yourself whether

23   Mr. Davis said anything about the pickling procedures.  We

24   submit that he could not.  Obviously, your memories

25   govern.

PDF created with pdfFactory trial version www.pdffactory.com

1          In any event, on the cost of the engine repairs,

2     Mr. Davis said it cost $12,000 to purchase and install

3     remanufactured engines.  These engines would come with a

4     one-year warranty from the manufacturer.  He thought that

5     was an appropriate solution.  And there's no dispute here

6     that the Mains' boat was not brand new at the time this

7     happened.  The engines -- the boat was three years old.

8          Now what I'd like to do is to turn to the

9     plaintiffs' other theory in this case and that's the

10    so-called revocation theory.  Under this doctrine, the

11    plaintiffs are seeking a return of a purchase price of

12    their boat.  And you heard evidence that the purchase

13    price was about $133,000 in 1998.  And a revocation is

14    either an annulment or a cancellation or a reversal of

15    some original contract.  And requires that the buyer

16    notify a seller in a timely fashion that he's cancelling

17    acceptance.  And the buyer needs to do more that simply

18    notify the seller of an alleged breach.

19         So what do we have here?  Now, Sea Ray obviously

20    manufactured the boat, put the boat together.  But Sea Ray

21    wasn't the seller, the direct seller of the boat to the

22    Mainses.  When you look at the evidence in this case, you

23    will not see a contract between Mr. and Mrs. Mains and

24    Sea Ray to buy the boat.  You'll see that Surfside 3 --

25    it's undisputed that Surfside 3 is the entity that sold

1    the boat to the Mainses.  Mr. and Mrs. Mains both

2    testified that they bought the boat in 1998 from

3    Surfside 3.  They didn't suggest they bought it from

4    anybody else.  They bought that boat from Surfside 3 from

5    a dealer just like they bought their other boats from

6    dealers.  They bought the 1996 boat from Surfside 3.  And

7    they bought the Chris Craft from a dealer known as

8    Stateside, I believe.  And that's in Exhibit 1, the letter

9    that I referred to earlier.

10          In addition, Mr. Mains is very knowledgeable

11    about these arrangements.  He testified that he himself

12    had been a salesman for a dealer, a boat dealer called

13    Connecticut Marine One or Serino's Marine.

14          And in addition to the testimony, the documents

15    themselves establish that the agreement here to buy the

16    boat was between Surfside 3 and the Mainses.  And you've

17    got two documents in particular, Sea Ray Exhibit 3, which

18    is the trade-in agreement, and there's been a lot of

19    testimony about that, and Plaintiffs' Exhibit 2, which is

20    the checklist.  And this is a -- you've got the complete

21    document.  What I've done here is to cut off -- this is

22    the top portion of the trade-in agreement.  This is the

23    bottom portion of the trade-in agreement.  Defendant's

24    Exhibit 3, you've got the whole thing.  That trade-in

25    agreement was entered into in February of 1998.  And the

PDF created with pdfFactory trial version www.pdffactory.com

1  parties to that were the dealer, and that's Al Chianese's

2  signature, we've heard about him, and the customers, Peter

3  and Lori Mains.  So that was who was involved in this

4  agreement.

5        In addition, you have Defendant's Exhibit 2,

6  which is the -- I'm sorry, Plaintiffs' Exhibit 2, which is

7  the inservice checklist.  And again what we've done just

8  to fit it on the screen is to give you the top half of it

9  here, cut out the middle, and this is the bottom half.

10  Plaintiffs' Exhibit 2, this is actually the second page.

11        In any event, this is the inservice checklist

12  where the Mainses are accepting, customer's acceptance,

13  they're accepting the boat.  And they sign on the line

14  that says, "I have inspected the boat and find the boat

15  acceptable as per our sales agreement."  Their signatures

16  are below it.  Their names are here.  And again, the

17  dealer signs there.

18        So the contract -- the parties to the contract

19  are the ones that can revoke the agreement.  And Sea Ray

20  was not the seller within this contract.  That was a deal

21  between Surfside 3 and the Mainses.

22        Now, we also submit that this revocation wasn't

23  timely, that the plaintiffs had to make a timely

24  revocation.  Even if Sea Ray had sold the boat to the

25  Mainses, which it didn't, that it had to be timely.

PDF created with pdfFactory trial version www.pdffactory.com

1   That's because the Mainses used the boat for three years,

2   they used it for its intended purpose, for family outings

3   with their young daughter, and they complained about it --

4   and you've heard a lot about those complains, I'm not

5   going to review them.  There are nine different letters.

6   Those letters all seek to have work done by Sea Ray, not

7   to have the boat taken back.  None of them revoke

8   acceptance of the boat.  There were requests -- and you

9   heard about them -- to have Sea Ray provide a new boat at

10  no cost to them.  That's not -- that kind of a request is

11  not revocation.

12          In addition, there's no evidence -- this is

13  another element of the revocation claim.  There's no

14  evidence that the condition of the boat at the time of the

15  sale substantially impaired the value.  The engines worked

16  fine until the failure as a result of the failure to

17  properly pickle after the hydrolock.  And the hydrolock

18  didn't occur because of a condition of the boat at the

19  time of sale.  The plaintiffs' claim is that the hydrolock

20  occurred because of these two -- because of changes in

21  flushing instructions.  That's their claim.  And those

22  changes in flushing instructions came about, according to

23  the plaintiffs, because of the new exhaust system.

24          I'd like to talk to you about the buy-back

25  offer, you've heard about it.  The evidence has been that

1    there was an impasse.  There were discussions between the

2    plaintiffs and a number of different people at Sea Ray.

3    And those discussions reached an impasse in June.  And the

4    evidence was that Sea Ray took the initiative and offered

5    to buy the boat back.  The evidence was not that the

6    plaintiffs cancelled the agreement.

7            Now, the plaintiffs have made an argument, hey,

8    where was Mr. Marlow?  Where was Mr. Stooksbury?  Well,

9    ask yourself, what role -- what did they have to say that

10   would make any difference?  You heard the testimony from

11   Mr. Wade about what Mr. Stooksbury did, and Mr. Wade said

12   he made the recommendation to put the new exhaust system

13   on it and he did that in response to complaints about the

14   exhaust noise and that he talked to his boss.  That was

15   it.

16           Mr. Marlow, what -- you know, what was the

17   testimony about Mr. Marlow?  Mr. Marlow had discussions

18   and Mr. Wade was part of those discussions in June of

19   2001.  Mr. Mains made statements about somehow

20   Mr. Marlow -- you may remember this on direct

21   examination -- said Mr. Marlow was trying to dupe him

22   because Mr. Marlow is saying pickle the engines, the

23   engines should be fine.  And Mr. Mains said, You know

24   what?  We've got test results that show that's not true.

25   You may recall that.  But then Mr. Mains on corrosion

1    admitted that in fact the last time he ever talked to

2    Mr. Marlow was on June 14, 2001.  And those tests that he

3    was talking about weren't done until four days later.  So

4    those test results didn't exist at the time he talked with

5    Mr. Marlow.

6            Now, just on Sea Ray's offer of $105,000, that

7    was rejected.  They offered to buy back the boat and the

8    plaintiffs said gee, what about Mr. Davis?  Mr. Davis came

9    up with a higher number.  Remember what Mr. Davis said.

10   Mr. Davis said his methodology was to look at various book

11   sources first.  He called it BUC and then NADA.  And those

12   estimates started around $99,000 and worked their way up.

13   Mr. Davis arrived at his figure after adding 25 percent

14   for the bristol condition of the boat and that was after

15   the repairs that he had talked about, work that he had

16   talked about, both engine and non-engine parts were done.

17           Now, plaintiffs said that they were given the

18   opportunity to respond to Sea Ray's initiative where they

19   said we'll make you an offer to buy the boat back.  But

20   they didn't say, okay, you know, we want our purchase

21   price back.  No, they said two things.  They said they

22   wanted $175,000, 40-some-odd thousand dollars more than

23   they paid for the boat.  And they also demanded that

24   Sea Ray provide them with a new 2001 Sundancer that was

25   worth $206,000 at no cost to them.  We submit to you those

1    kind of demands are not revocation.

2            Plaintiffs have failed to prove their revocation

3    claim.  They've failed to prove that there was a contract

4    between Sea Ray and the Mainses, and they can't prove

5    there was a contract between Sea Ray and the Mainses

6    because the contract was between -- the purchase of this

7    boat was between the Mainses and Surfside 3.  They can't

8    prove that their demand was timely, they used the boat for

9    three years, and they cannot prove that the condition that

10   they're complaining about existed at the time of the sale.

11           So in conclusion, we submit to you that at most

12   the plaintiffs have shown that work that was done by

13   Sea Ray in 2001 caused problems.  And that the cost of

14   that work was $5,000 for the non-engine repairs, $12,000

15   for the engine repairs, for a total of $17,000.  That's

16   what they have a shown at most.  That's what the evidence

17   shows.

18           The plaintiffs have failed to prove, however,

19   that the boat was defective and unreasonably dangerous at

20   the time it was sold, and they have failed to prove that

21   they're entitled to revocation of the contract and return

22   of the purchase price.

23           Now, I cannot anticipate everything that

24   plaintiffs' counsel will say in his rebuttal period.  He

25   has some period of time to make comments, but we submit to

PDF created with pdfFactory trial version www.pdffactory.com

1  you that all of the answers to these issues and arguments

2  that he makes can be found in the evidence that you've

3  heard in this case so far.  So we request that the --

4  after you hear the judge's charge, his instructions, that

5  you decide the case in accordance with the instructions of

6  law that you will be receiving and in accordance with the

7  evidence that you've heard so far.

8           Thank you very much.

9           THE COURT:  Thank you, Mr. Rotondo.

10          I think we can go to the rebuttal.

11          Mr. Nikas.

12          MR. NIKAS:  Well, Mr. Rotondo repeated the

13  testimony.  Tom Wicander did say that he saw fresh water.

14  He saw fresh water because it was fresh water.

15          You also heard him say that until the cylinder

16  head was removed from the engine, there was no way to tell

17  about the scoring in the cylinder.  The scoring in the

18  cylinder rendered the engine irreparable, not the

19  hydrolocking.

20          You heard Mr. Davis, you heard Mr. Wicander talk

21  about having to rebore the cylinders.  That's not

22  acceptable.

23          But what about this issue of what the defect

24  was?  You heard Tom Wicander tell you the scoring had to

25  have occurred when the engine was running.  The engine was

1    not running at the time the flushing occurred.  All that

2    water was just sitting there on top of the piston.  Just

3    sitting there on top of the piston.  And until the piston

4    goes up and down, that water doesn't have a chance to

5    remove that oil and score the cylinder wall.

6            Let's go back and ask ourselves:  Mr. Mains

7    admitted that this exhaust resonance which he complained

8    about from day one, from the time he had the boat, he

9    complained about this exhaust noise.  Now, he's not an

10   engineer.  Mr. Rotondo pointed that out.  He conceded it

11   was not performance related.  He had no idea what it was.

12   Let's ask.  Did somebody at the factory know?  David Wade

13   said he didn't know what resonance was, maybe it related

14   to noise.  Hadn't read anything about water ingestion.

15   Yet somehow out of good customer service they replace this

16   exhaust system.  And you ask yourself:  Why didn't they

17   replace it with a new one of the same type?  If something

18   was wrong with it, that makes sense.  How did this new

19   exhaust system come into being in 2001?  Where'd it come

20   from?

21           And Sea Ray was so committed to good customer

22   service that they had David Wade, who is not an engineer,

23   never read a service bulletin, never looked at the

24   manuals, never looked at the guides, they had him make the

25   decision to not only replace the exhaust in response to

1    this concern for noise, but he replaced it with a
2    completely different system that he thought would be
3    quieter.  What does he base that on?  Nothing.  Did he
4    know it was quieter?  Did he know it would fix the
5    problem?  No.  They would have you believe that it's just
6    coincidence when that boat was in the factory in response
7    to this request about noise that without telling the owner
8    they changed it and they changed it to a new exhaust, a
9    different system.  But they didn't talk to anybody about
10   it, didn't consult anything, never heard of water
11   ingestion.
12            That water was historical.  The boat had barely
13   been run.  Twenty-one days of eight-hour running, that's
14   it.
15            Sure, the engine ran fine and it would have
16   until those engines failed.  Whether the compression ratio
17   was 150, 130, 100, 70, you heard that the issue is the
18   relationship of the compression ratios to the other
19   cylinders.  The parts move in rotation.  They had to be
20   balanced.
21            And this talk about Sea Ray not being involved
22   in this transaction, let's remember they had another boat,
23   a '96, that went back to the factory.  The new boat is
24   delivered to the dealer and who paid the dealer?  Do you
25   remember?  Sea Ray paid the dealer.  Not the Mainses.

1  That sounds an awful lot like Sea Ray is involved in that

2  transaction.  In fact, look at the exhibits, it says the

3  boat is delivered at the dealer.  No money came out of

4  their pocket, it came out of Sea Ray's.

5          You're allowed to make reasonable inferences.

6          The cylinders were scored and it had been

7  happening for a long period of time.  You can talk about

8  the hydrolocking, you can talk about the fresh water.  It

9  didn't matter.  The cylinder's been scored by saltwater

10  ingestion, they got in through the elbows.  The outlet was

11  higher than the elbows.  And it only had been run an hour

12  and a half.  Where did that water come in before?  It

13  could only have come in through the exhaust.  The problem

14  had existed and existed for a long time, and the warranty

15  says they'll repair defects within one year of the date of

16  delivery, if it exists within one year of the date of the

17  delivery.  That defect existed the day that boat was

18  built, the day that boat was delivered, and it existed

19  every single day of their ownership until those engines

20  failed.  That warranty should have covered this.  This

21  problem should have been disclosed and should never have

22  happened in the first place.

23          I thank you for your time.

24          THE COURT:  Thank you, Mr. Nikas.

25          I'm going to let the jurors go next door for

1    five minutes.  Your lunch isn't due until 1:00.  I'll

2    start the charge and get through the first third of it.

3    If your lunch is here, we'll stop, and then I'll pick up

4    with the rest of the charge after lunch.  So if you go

5    next door for five minutes, I'll get all set up to give

6    the charge, okay?

7              (Whereupon the jury left the courtroom.)

8              THE COURT:  Well, it's a three- or four-minute

9    recess because the courtroom will be sealed in case

10   anybody needs water or anything like that.

11             MR. NIKAS:  Courtroom being sealed meaning?

12             THE COURT:  People cannot get in or out.

13             We'll take a three-minute recess.

14             (Whereupon, a recess followed.)

15

16             THE COURT:  We'll bring the jury in.  The CSO

17   seem to be missing but the courtroom deputy will make sure

18   no one comes in.

19             (Whereupon, the jury entered the

20             courtroom.)

21             THE COURT:  Ladies and gentlemen, now that

22   you've heard the evidence and the arguments of counsel for

23   each party, it is my duty to give you the instructions of

24   the Court as to the applicable law in this case.

25             You have faithfully discharged your duty to

1  observe and listen carefully to each witness who

2  testified.  I have been impressed by how attentive you've

3  been.  I ask that you give me that same careful attention

4  as I instruct you on the law.

5            My instructions will be delivered in three

6  parts, some of which will be a reminder and some of which

7  will be new:

8            First, I will give you some instructions on

9  general rules that define and control the role of the

10 Court and the duty of the Jury in a civil case.

11            Second, instructions that define the issues in

12 this case and set out the specific questions of fact that

13 you must answer from the evidence that has been introduced

14 at trial.

15            Third, some instructions for your deliberations.

16            I'm going to cover the first third, and then

17 we're going to break for lunch on the assumption that your

18 lunch will have arrived by then.

19            A few moments ago you were given a copy of the

20 verdict form and you should feel free to refer to that

21 verdict form as I go through the second part of the

22 instructions.  And in the third part of the instructions,

23 I will review the verdict form with you.

24            When I finish giving you these instructions and

25 you retire to deliberate, please leave the copies that you

PDF created with pdfFactory trial version www.pdffactory.com

1    are now reviewing in your seat to be collected by the

2    courtroom deputy.  And you should also leave them when you

3    take the break in the middle of the charge.

4          While you are deliberating, you will have with

5    you in the jury room the original verdict form along with

6    the exhibits that have been admitted in this case.  And

7    you will also have a copy of these instructions that I'm

8    now giving to you.

9          For the moment, I hope that your brief review of

10   the verdict form will help you better understand these

11   instructions and the tasks that you will perform when you

12   retire to deliberate.  And as I mentioned, as I go through

13   the second part of the instructions, you shall feel free

14   to refer to the verdict form as I give you those

15   instructions.

16         I want to give you some instructions about the

17   province of the Court and that of the Jury.

18         It is your duty as jurors to follow the law as I

19   shall state it to you and to apply that law to the facts

20   as you find them from the evidence in the case.  You are

21   not to single out one instruction alone as stating the

22   law, but you must consider these instructions as a whole.

23         You will determine the facts from all of the

24   testimony you have heard and from the other evidence that

25   has been admitted.  You are the sole and exclusive

1    weighers of the facts, and in that area neither I nor are

2    anyone else may invade your province.  On the other hand,

3    and with equal emphasis, I instruct you that you are bound

4    to accept the rules of law that I give you whether or not

5    you agree with them.

6         The law of the United States permits the judge

7    to comment on the evidence in the case during the trial or

8    in instructing the jury, but these comments are only

9    expressions of the judge's opinion of the facts.  You may

10   disregard any such comments entirely, since you are the

11   sole judges of the facts in this case.

12        Now, counsel have quite properly referred to

13   some of the governing rules of law in their arguments.

14   If, however, any difference appears to you between the law

15   as stated by counsel and that stated by the Court in these

16   instructions, you are to be governed by the Court's

17   instructions.

18        Similarly, statements as to the facts made by

19   counsel during the course of the trial or in closing

20   argument, including those statements made in the form of a

21   question, do not constitute evidence, and

22   characterizations of the evidence by counsel should be

23   considered by you only if supported by your recollection

24   of the evidence.

25        I have tried to preside impartially and not to

PDF created with pdfFactory trial version www.pdffactory.com

1    express an opinion one way or the other as to what you

2    should find the facts to be.  You must not infer from any

3    ruling I have made or from anything I have said or done

4    during the course of the trial that I hold any views for

5    or against any party.

6             Also, nothing I say in these instructions is to

7    be taken as an indication that I have any opinion about

8    the facts of the case or what the opinion is.  Again, it

9    is not my function, but yours, to determine the facts.

10            Let me talk about how important it is that there

11   be no bias on the part of any member of the jury.

12            Your verdict must be based solely upon the

13   evidence developed at this trial or the lack of evidence.

14   You must perform your duties as jurors without bias or

15   prejudice as to any party.  It would be improper for you

16   to consider any personal feelings you may have about the

17   race, religion, national origin, sex, age, wealth,

18   life-style, or other features of the parties.  It would

19   also be improper for you to allow any feelings you may

20   have about the nature of the claims against the defendant

21   to influence you in any way.

22            You have been chosen to try the issues of fact

23   and reach a verdict on the basis of the evidence presented

24   here.  If you let sympathy for, or prejudice against, any

25   party interfere with your clear thinking about the facts,

PDF created with pdfFactory trial version www.pdffactory.com

1    there is a risk that you will not arrive at a just

2    verdict.

3            The parties to this case must be regarded as

4    equals by you.  That is the agreement you made when you

5    were selected as jurors and it is the position that must

6    guide your deliberations.  Each of the parties must be

7    viewed as equal in your eyes and in your deliberations.

8    In this case, the defendant is a corporation.  This fact

9    must not influence your decision in this case.  In the

10   eyes of the law, a corporation is entitled to the same

11   fair trial at your hands as a private individual.  All

12   parties stand equal under the law and are to be dealt with

13   as equals in a court of justice.

14           Also, I want to remind you that it is the duty

15   of the attorney on each side of a case to object when the

16   other side offers testimony or other evidence that the

17   attorney believes is not properly admissible.  Counsel

18   also have the right and duty to ask the Court to make

19   rulings of law and to request conferences at the bench out

20   of the hearing of the jury. All those questions of law

21   must be decided by the Court.  You must not show any bias

22   against an attorney or his or her client because the

23   attorney objected to the admissibility of evidence or

24   asked for a conference out of the hearing of the jury or

25   asked the Court for a ruling on the law.

```
 1          Next I want to talk with you about evidence.
 2          You must consider only the evidence or lack of
 3  evidence in deciding this case.  You may, however, draw
 4  reasonable inferences from the testimony and other
 5  evidence as you feel are justified in the light of common
 6  experience.  You may make deductions and reach conclusions
 7  that principles of reason and common sense lead you to
 8  make from all of the evidence presented.
 9          There are two kinds of evidence that you may
10  consider.  One is direct evidence.
11          Direct evidence is where a witness testifies to
12  what he or she saw, heard, or observed.  In other words,
13  when a witness testifies about what the witness asserts is
14  known to the witness of his or her own knowledge by virtue
15  of his or her own senses -- what the witness claims he or
16  she saw, felt, touched or heard -- that is called direct
17  evidence.
18          The other kind of evidence is called indirect or
19  circumstantial evidence.
20          Circumstantial evidence is the proof of certain
21  circumstances that tends to prove or disprove the presence
22  or lack of certain other facts.  To remind you of the
23  example I gave you in the preliminary charge, if you see
24  water on the street outside your window, you can infer
25  that it has rained.  On the other hand, there might be
```

PDF created with pdfFactory trial version www.pdffactory.com

1   other plausible reasons for water being on the street.

2   The point being made here is that you may infer on the

3   basis of reason and experience and common sense from an

4   established fact the existence or nonexistence of some

5   other relevant fact.  It is a general rule that the law

6   makes no distinction between direct and indirect evidence.

7   The law, rather, requires that the jury find the facts

8   from the evidence, including direct and indirect evidence,

9   and leaves it to the discretion of the jury to make such

10   findings.

11        Now, the evidence from which you are to decide

12   what the facts are comes in two forms:

13        First, there is the sworn testimony of witnesses

14   both on direct and cross-examination.

15        Second, there are the exhibits that have been

16   received into the trial record.

17        Now, certain things are not evidence and are not

18   to be considered as such:

19        First, arguments or statements by lawyers are

20   not evidence.  They are designed and permitted to give the

21   lawyers the opportunity to tell you how they think you

22   should evaluate the evidence.

23        Second, the questions to the witnesses are not

24   evidence.  I instructed you earlier, in substance, that my

25   questions and comments are not evidence.  Let me also

PDF created with pdfFactory trial version www.pdffactory.com

1    emphasize that a lawyer's question is not evidence.  At

2    times a lawyer on cross-examination may have incorporated

3    into a question a statement which assumed certain facts to

4    be true and asked the witness if the statement was true.

5    If the witness denied the truth of a statement and if

6    there is no evidence in the record proving that the

7    assumed fact is true, then you may not consider the fact

8    to be true simply because it was contained in the lawyer's

9    question.  In short, questions are not evidence; answers

10   are.

11              Third, objections and arguments are not

12   evidence.

13              Fourth, testimony that has been excluded,

14   stricken, or that you have been instructed to disregard is

15   not evidence and must be disregarded.  You should have no

16   concern with the reasons for any rulings I have made as to

17   evidence, and you are not to draw any inferences from my

18   rulings.  Issues concerning the admissibility of evidence

19   are questions of law for the Court to decide.  In

20   admitting evidence to which objection has been made, the

21   Court does not determine what weight should be given to

22   the evidence in question or pass on the credibility of the

23   evidence.  These are matters for you to decide.  You must

24   disregard any evidence that has been ruled out of the case

25   by the Court and you must refrain from speculation about

PDF created with pdfFactory trial version www.pdffactory.com

1    any communications between the lawyers and the Court that

2    were held out of your presence or hearing.

3            Fifth, any exhibits marked for identification

4    but not admitted as evidence may not be considered as

5    evidence.  And where I have given any limiting instruction

6    about evidence that you heard or saw, you must follow it.

7            Sixth and finally, anything you may have seen or

8    heard outside the courtroom is not evidence and must be

9    disregarded entirely.

10           You are to decide the case solely on the

11   evidence offered and received in the trial.  Of course,

12   you should consider the evidence presented in light of

13   your own common sense and experience.  And you may draw

14   reasonable inferences from evidence.  However, your

15   verdict must be based solely on the evidence presented in

16   this courtroom in accordance with my instructions.  I

17   remind you that you must completely disregard any media

18   reports or other material outside the courtroom regarding

19   this matter or any similar matter.  It would be unfair to

20   consider any such materials since they are not evidence

21   and the parties have no opportunity of challenging their

22   accuracy or otherwise explaining them away.  Indeed, it

23   would be a violation of your oath as jurors to allow

24   yourselves to be influenced in any manner by any

25   information you received outside the courtroom about this

PDF created with pdfFactory trial version www.pdffactory.com

1    case or any similar matter.

2         Also, I note that you are not permitted to bring

3    anything into the courtroom for the purpose of assisting

4    in your deliberations without the prior permission of the

5    Court and notice to the parties.

6         Next I want to talk with you about credibility

7    of witnesses.

8         In deciding the facts of this case, you will

9    have to decide which witnesses to believe and which

10   witnesses not to believe.  You, as jurors, are the sole

11   judges as to the credibility of the witnesses and the

12   weight that their testimony deserves.  You may accept as

13   true everything a witness says, only part of it, or none

14   of it.

15        In deciding what part of a witness's testimony

16   to believe, you may consider a number of factors,

17   including the following:

18        1) the witness's ability to see or hear or know

19   the things to which the witness testified;

20        2) the quality of the witness's memory;

21        3) any bias the witness may have;

22        4) the witness's manner while testifying;

23        5) whether the witness was contradicted by

24   anything the witness said or wrote before trial or by

25   other evidence; and

1          6) how reasonable was the witness's testimony

2    when considered in light of other evidence which you

3    believe.

4          Inconsistencies or discrepancies in the

5    testimony of a witness or between the testimony of

6    different witnesses may or may not cause you to discredit

7    such testimony.  Two or more persons witnessing an

8    incident or a transaction may see or hear it differently.

9    An innocent misrecollection, like failure of recollection,

10   is not an uncommon experience.  In weighing the effect of

11   a discrepancy, always consider whether it pertains to a

12   matter of importance or an unimportant detail, and whether

13   the discrepancy results from innocent error or intentional

14   falsehood.

15          In evaluating the credibility of the witnesses,

16   you should take into account any evidence that the witness

17   who testified may benefit in some way from the outcome of

18   this case.  Such interest may sway the witness to testify

19   in a way that advances his or her own interest.

20   Therefore, if you find that any witness whose testimony

21   you are considering may have an interest in the outcome of

22   this trial, then you should bear that factor in mind when

23   evaluating the credibility of his or her testimony.  This

24   is no to suggest that a witness who has an interest in the

25   outcome of this case will testify falsely.  It is for you

PDF created with pdfFactory trial version www.pdffactory.com

1    to decide to what extent, if at all, the witness's

2    interest has affected or colored his or her testimony.

3              Also, the weight of the evidence is not

4    necessarily determined by the number of witnesses

5    testifying to the existence or nonexistence of any fact.

6    You may find that the testimony of a small number of

7    witnesses as to any particular fact is more credible than

8    the testimony of a larger number of witnesses to the

9    contrary.

10             Next I want to talk with you about the concept

11   of impeachment of a witness.

12             A witness may be discredited or impeached by

13   contradictory evidence by showing that he or she testified

14   falsely concerning a material matter or by evidence that

15   at some other time the witness had said or done something

16   or has failed to say or do something which is inconsistent

17   with the witness's present testimony.  If you believe that

18   any witness has been so impeached, then it is your

19   exclusive decision to give the testimony of that witness

20   such credibility or weight, if any, as you think it

21   deserves.

22             In determining the weight to give the testimony

23   of a witness, you should ask yourself whether there was

24   evidence tending to prove that the witness testified

25   falsely about some important fact or whether there was

PDF created with pdfFactory trial version www.pdffactory.com

1    evidence that at some other time the witness said or did

2    something or failed to say or do something that was

3    different from the testimony he or she gave at the trial.

4    Where a witness testified inaccurately and you do not

5    think that the inaccuracy was consciously dishonest, you

6    should bear this inaccuracy in mind and scrutinize the

7    whole testimony of the witness.  If, however, you conclude

8    that a witness has not only testified inaccurately but

9    that he or she has done so intentionally or willfully,

10   this casts a very serious doubt on all of his or her

11   testimony, and you are entitled to conclude that you

12   cannot accept any of the witness's testimony.  Whether you

13   should disregard all the witness's testimony or believe

14   some parts of it is for you to decide.

15         You should remember that a simple mistake by a

16   witness does not necessarily mean that the witness was not

17   telling the truth.  People may tend to forget some things

18   or remember other things inaccurately.  If a witness has

19   made a misstatement, you must consider whether it was

20   simply an innocent lapse of memory or an intentional

21   falsehood, and that may depend upon whether it concerns an

22   important fact or an unimportant detail.

23         And lastly in this section, I want to talk with

24   you about expert witnesses.

25         The rules of evidence ordinarily do not permit

1    witnesses to testify about opinions or conclusions.  An

2    exception to this rule exists for those whom we call

3    expert witnesses.  Witnesses who, by education, training

4    or experience, have become expert in some art, science, or

5    profession may state their opinions as to relevant matters

6    in which they profess to be expert, and also may state the

7    reasons for their opinions.  You should consider each

8    expert opinion received during the trial and give it such

9    weight as you think it deserves.  If you should decide

10   that an expert witness's opinion is not based upon

11   sufficient education, training or experience, or if you

12   conclude that the reasons given in support of the opinion

13   are not sound, or if you feel that the expert's testimony

14   is outweighed by other evidence, you are free to disregard

15   the testimony just as you are free to disregard the

16   testimony of any other witness you do not find reliable.

17          We're going to take a break for lunch now.  I'll

18   ask the courtroom deputy to go in and find out for you how

19   long you want for lunch and we'll wait here to hear.

20          (Whereupon the jury left the courtroom.)

21          THE COURT:  Please be seated everyone.

22          They've been given a choice between 45 minutes

23   and an hour.  We'll see what their preference is.

24          MR. ROTONDO:  Your Honor, page 15, I may have

25   missed it when you said it, but breach of duty to warn is

1    still on page 15.

2            THE COURT:  I'll have to correct that.  Thank

3    you.

4            MR. ROTONDO:  Okay.

5            THE COURT:  And the "S" on the second and third

6    should be capitalized also.

7            Forty-five minutes.  We'll be back in 45

8    minutes.

9            (Whereupon, a recess followed.)

10

11            THE COURT:  We'll bring the jury in and continue

12    on.

13            (Whereupon, the jury entered the

14            courtroom.)

15            THE COURT:  Please be seated everyone.

16            Ladies and gentlemen, I'm now going to the

17    second section of the charge which relates to the issues

18    in this case.  And you will see some similarity between

19    the structure of this section of the instructions and the

20    structure of the verdict form.

21            You are being asked to consider three claims

22    being made by the plaintiffs, Peter Mains and Lori Mains,

23    against the defendant, Sea Ray, as follows:

24            First, the plaintiffs' claim that the defendant

25    is subject to liability pursuant to the Connecticut

1    Product Liability Act, based on two separate theories:

2              (i) strict liability, and

3              (ii) breach of express warranty.

4              Second, the plaintiffs claim that the defendant

5    was negligent during the course of making repairs to their

6    boat.

7              Third, the plaintiffs seek -- I have to just

8    check the wording on one thing there.

9              The plaintiffs claim that they revoked their

10   contract for the purchase of the boat because the boat was

11   not in the condition that they understood it would be in

12   when they agreed to purchase it.

13             First I want to talk with you about the claim

14   under the Connecticut Product Liability Act.

15             The plaintiffs claim that their boat was damaged

16   because it was defective and unreasonably dangerous at the

17   time they purchased it, and their first claim is brought

18   pursuant to a Connecticut law known as the Connecticut

19   Product Liability Act.  Under the Connecticut Product

20   Liability Act, one who sells a product in a defective

21   condition, unreasonably dangerous to the user, is subject

22   to liability for harm caused by the product.  A product

23   liability claim is the exclusive claim that can be

24   asserted against product sellers for harm caused by a

25   product, and for that reason, plaintiffs may base a

PDF created with pdfFactory trial version www.pdffactory.com

1    product liability claim on various theories, for example,

2    negligence, strict liability, and warranty.  Here, the

3    plaintiffs base their product liability claim on two

4    theories:  (i) strict liability; and (ii) breach of

5    express warranty.

6              First I'm going to talk with you about the two

7    theories of liability.  And the first theory is strict

8    liability.

9              To prevail on their product liability claim

10   under the theory of strict liability, the plaintiffs must

11   prove each of the following elements by a preponderance of

12   the evidence:

13             First, that the defendant sold the boat at

14   issue;

15             Second, that the boat was expected to and did

16   reach the plaintiffs without substantial change in its

17   condition from the time of its sale by the defendant;

18             Third, that the boat was in a defective

19   condition that was unreasonably dangerous to the ordinary

20   consumer;

21             Fourth, that the defective condition existed at

22   the time the boat was sold by the defendant; and

23             Fifth, that defective condition of the boat was

24   the proximate cause of the harms for which the plaintiffs

25   seek compensation.

1      Even if you find that the boat was deficient in
2  some respect, you may only find that the boat was
3  defective if you find that the boat was unreasonably
4  dangerous.  A product is unreasonably dangerous to the
5  user when it has the potential for causing harm greater
6  than that which the ordinary user who purchases the
7  product would contemplate.
8      The seller of a product, however, is not an
9  insurer.  The law does not require that a product be
10  perfect or accident proof or incapable of causing harm.
11  Nor is a product seller required to incorporate the
12  ultimate safety features in its product.  In other words,
13  a product seller is not required to use all means to make
14  its product safe nor is it necessarily required to use the
15  latest or the most modern means.  Rather, a product seller
16  is required to use only such means as are necessary to
17  make the product reasonably safe for its intended use.
18      I now want to talk about the theory of breach of
19  express warranty.
20      To prevail on their product liability claim
21  under the theory of breach of express warranty, the
22  plaintiffs must prove the following elements by a
23  preponderance of the evidence:
24      First, that the defendant made a statement of
25  fact or a promise to the plaintiffs that the boat was safe

1    and effective for its intended use; and

2          Second, that at the time of sale the boat was

3    not safe and effective for its intended use because it was

4    defective and unreasonably dangerous.

5          The plaintiffs do not claim that the defendant

6    stated or promised that the boat would be perfect.  In any

7    event, the plaintiffs cannot prevail on their claim for

8    breach of express warranty merely by proving that the boat

9    was not perfect.

10         I want to talk with you now about the definition

11   of the term "harm."

12         Under the Connecticut Product Liability Act, the

13   plaintiffs may only recover damages for harm caused by a

14   product.  The product in this case is the boat.  "Harm"

15   includes damage to property, including the product itself,

16   and personal injuries.  The plaintiffs do not claim that

17   they have suffered any personal injuries or that the boat

18   has caused property damage other than the alleged harm to

19   the boat itself.  If you find that the condition of the

20   boat at the time of sale was defective and unreasonably

21   dangerous and you find that the defective and unreasonably

22   dangerous condition of the boat caused harm to the boat

23   itself, you may award damages to the plaintiffs for those

24   damages to the boat that were caused by any defective and

25   unreasonably dangerous condition.

1          Not every kind of alleged problem with the boat,

2     however, is a kind of harm caused by the boat.  If you

3     find that the boat suffered from some form of deficiency

4     at the time of sale, you may not award damages to the

5     plaintiffs for that deficiency under the Product Liability

6     Act because that deficiency would not be harm caused by

7     the boat.  In addition, if you find that the boat suffered

8     from a deficiency that was caused by a defective and

9     unreasonably dangerous condition of the boat, but you also

10    find that the deficiency was merely cosmetic, you may not

11    award damages to the plaintiffs for that cosmetic

12    deficiency under the Product Liability Act.

13          Now, we've been dealing with Part I of the

14    verdict form and subparts A, B, and C.  I'm now going to

15    go on to what relates to Part II of the verdict form, and

16    I want to talk to you about comparative responsibility.

17          The defendant denies that the boat was defective

18    or unreasonably dangerous.  If the plaintiffs prove by a

19    preponderance of the evidence all the elements of one or

20    both of their theories of liability and that the

21    defendant's actions caused the plaintiffs to suffer

22    damages, then the defendant has the burden of proving its

23    claim that any damages the plaintiffs may have sustained

24    were caused in whole or in part by the plaintiffs' own

25    negligence.  Under such circumstances, if you find that

PDF created with pdfFactory trial version www.pdffactory.com

1    the plaintiffs sustained damages that were caused in part

2    by the defective and unreasonably dangerous condition of

3    the boat and in part by the plaintiffs' own negligence,

4    then you may award damages to the plaintiffs, but any

5    damages that you award must be reduced in proportion to

6    the degree to which the plaintiffs were responsible for

7    those damages.

8         I'm now going to go to Part III of the verdict

9    form and deal with the plaintiffs' second claim, which is

10   a claim for negligence.

11        First I want to talk with you about the

12   plaintiffs' burden, which is Part III of the verdict form,

13   and then I will talk with you about Part IV, which is

14   comparative negligence.

15        The plaintiffs claim that the defendant was

16   negligent during the course of making repairs to the boat,

17   and that the defendant's negligence caused them to suffer

18   damages.  This claim is separate and distinct from the

19   plaintiffs' claim that the boat was defective and

20   unreasonably dangerous when it was first sold by the

21   defendant.

22        Negligence is the doing of something which a

23   reasonably prudent person would not do under the

24   circumstances, or the omitting to do what a reasonably

25   prudent person would do under the circumstances.  It is

PDF created with pdfFactory trial version www.pdffactory.com

1    the breach of a legal duty owed by one person to another,

2    and such legal duty is the exercise of reasonable care.

3    The use of proper care in a given situation is the care

4    which an ordinarily prudent person would use in view of

5    the surrounding circumstances.

6            The plaintiffs claim that the defendant was

7    negligent in making repairs to the boat in the following

8    ways:

9            A) by failing to perform a proper inspection of

10   the boat;

11           B) by failing to supervise repairs done to the

12   boat by others to make ensure that those repairs were done

13   in an appropriate and workmanlike manner;

14           C) by performing repairs itself that were not

15   done in an appropriate and workmanlike manner;

16           D) by failing to properly instruct, warn and

17   inform the plaintiffs of the repairs and changes made to

18   the boat;

19           E) by failing to properly secure and safeguard

20   the boat while it was in its possession; and

21           F) by failing to provide proper instructions for

22   flushing the boat's engines after the defendant replaced

23   the exhaust system.

24           To prevail on their claim for negligence, the

25   plaintiffs must prove that the defendant was negligent in

PDF created with pdfFactory trial version www.pdffactory.com

1    making the repairs to the boat in at least one of the six

2    ways I have just reviewed.

3            I want to talk with you about the concept of

4    comparative negligence, and I'm in Part IV of the verdict

5    form now.

6            The defendant denies that it was negligent, and

7    it also claims that any damages that the plaintiffs may

8    have sustained were caused in whole or in part by the

9    plaintiffs' own negligence in failing to de-water the

10   engines after they became hydrolocked.  If the plaintiffs

11   prove to you by a preponderance of the evidence that the

12   defendant was negligent in one or more of the ways I have

13   just reviewed, and that the defendant's negligence caused

14   the plaintiffs to suffer damages, then the defendant has

15   the burden of proving its claim that any damages were

16   caused in whole or in part by the plaintiffs' own

17   negligence.  If you find that the defendant was not

18   negligent, then you must render a verdict for the

19   defendant on this count.  If you find that the plaintiffs'

20   share of the responsibility for causing those damages is

21   51 percent or more, then you must find in favor of the

22   defendant on the plaintiffs' negligent claim.  If you find

23   that the plaintiffs sustained damages that were caused

24   partly by their own negligence but that those damages were

25   caused primarily by the defendant's negligence, then you

1   may award damages to the plaintiffs, but any damages that

2   you award must be reduced in proportion to the degree to

3   which the plaintiffs were responsible for those damages.

4           And that's Part IV of the verdict form, and

5   you'll see Part A and B and C, and that tracks the

6   structure of what I've just covered with you.  You'll see

7   in B the reference to 51 percent or more, and you'll see

8   in C, if you get to C, you would put in the percentage.

9           I now want to go to the plaintiffs' third claim,

10  revocation of acceptance.

11          The plaintiffs claim that they revoked their

12  contract for the purchase of the boat because the boat was

13  not in the condition that they understood it would be in

14  when they agreed to purchase it.  When a seller delivers

15  to a buyer a product that does not conform with the terms

16  agreed to, the buyer may revoke his or her acceptance of

17  the product within a reasonable time after the buyer

18  discovers or should have discovered the ground for

19  revoking the contract, and have the purchase price

20  returned to the buyer.

21          To prevail on their claim for revocation of

22  acceptance, the plaintiffs must prove five elements by a

23  preponderance of the evidence.

24          First, the plaintiffs must prove that they

25  revoked their contract for the purchase of the boat.  A

1    revocation is an annulment, cancellation, or reversal.

2    Revocation requires more than notifying the seller of the

3    goods -- I'm sorry, I'll start over again.  Revocation

4    requires more than notifying the seller that the goods are

5    in breach of the purchase agreement.  The notice must

6    unequivocally inform the seller that the buyer does not

7    wish to keep the goods.  If the buyer equivocates in word

8    or in deed, the purported revocation may be invalid.

9    While the buyer's notice of revocation needs to be

10   unequivocal, it need not be formal.  And if the buyer,

11   after sending a valid notice of revocation, thereafter

12   reaccepts the goods, the earlier revocation notice will be

13   superseded.  Such a re-acceptance need not be explicit but

14   may be implied from conduct such as continued use of the

15   goods.

16          Second, the plaintiffs must prove that they gave

17   notice of revocation within a reasonable time after they

18   discovered or should have discovered the ground for

19   revoking the contract.  What is a reasonable time for

20   taking action to revoke acceptance depends on the nature,

21   purpose, and circumstances of such action.

22          Third, in order to revoke acceptance, the

23   plaintiffs must prove more than that the boat was

24   nonconforming.  They must show that the boat's

25   nonconformity substantially impaired its value to them and

PDF created with pdfFactory trial version www.pdffactory.com

1    that they initially accepted the nonconformity because

2    they reasonably expected the seller to cure any

3    deficiencies or because they could not immediately

4    discover such deficiencies.

5            Fourth, in addition, the law allows revocation

6    only against the person who sells the product in question.

7    It is not enough that the defendant manufactured the boat

8    if the plaintiffs bought the boat from another entity.  To

9    be entitled to the remedy of revocation, there must be a

10   buyer-seller relationship between the plaintiffs and the

11   defendant.

12           Fifth, a buyer may only revoke acceptance before

13   there is any substantial change in the condition of the

14   product other than a substantial change caused by the

15   product's own defects.  Thus, the plaintiffs must prove

16   that they gave notice of revocation prior to any such

17   substantial change in the condition of the boat.  The

18   defendant claims that the boat underwent a substantial

19   change in condition before the plaintiffs attempted to

20   revoke their acceptance of the boat in that the engine

21   suffered extensive rusting because the plaintiffs

22   permitted the boat's engines to sit with water in them for

23   an extended period.  The plaintiffs claim that the boat

24   did not undergo any substantial change that was not caused

25   by the product's own defects before they gave notice of

PDF created with pdfFactory trial version www.pdffactory.com

1   revocation, and that if the boat underwent any substantial

2   change in its condition that was not caused by the

3   product's own defects, that change was after the time the

4   plaintiffs gave notice of revocation.

5         Next I'm going to talk with you about the

6   concept of proximate cause.

7         If you find that the boat was defective and

8   unreasonably dangerous or that the defendant was negligent

9   in making repairs, you may not award a recovery for the

10  plaintiffs on that basis alone.  The plaintiffs also must

11  prove to you by a fair preponderance of the evidence that

12  they were harmed by the alleged defect or by the

13  defendant's misconduct, and that that defect or misconduct

14  was both the cause in fact and the proximate cause of the

15  alleged damages.

16        To determine whether cause in fact exists, you

17  must ask yourself whether the damages would have occurred

18  were it not for the claimed defect or misconduct.  A

19  finding of cause in fact alone does not mean that the

20  defendant is legally responsible for the plaintiffs'

21  damages.  Cause in fact is only one part of the two-part

22  inquiry you must make to determine whether the defendant

23  is legally responsible for the plaintiffs' damages.  You

24  must also determine whether the defendant's alleged

25  misconduct was the proximate cause of those damages.  To

1    make that determination, you must decide whether the

2    alleged defect or misconduct was a substantial factor in

3    causing the damages complained of by the plaintiffs.  A

4    substantial factor is one that continues down to the

5    moment of damage or at least down to the setting in motion

6    of the final active injurious force which immediately

7    produced the damage.  Unless you find that the alleged

8    defect or misconduct is both the cause in fact and a

9    proximate cause of the damages complained of, you must

10   find that the defendant is not legally responsible for any

11   damages to the plaintiffs.

12        Next I want to talk with you about the concept

13   of damages.  And here we're in Part VII of the verdict

14   form.

15        If you find the defendant is liable to the

16   plaintiffs, you must then consider the issue of damages.

17   In this regard, please note that the mere fact that I

18   instruct you on damages does not mean that you should

19   award damages or that I have any opinion as to whether you

20   should award damages.  Also, please note that you are not

21   to consider whether anyone other than the defendant did

22   anything wrong.  With the exception of the issue of

23   mitigation of damages, the plaintiffs have the burden of

24   proving damages by a preponderance of the evidence.

25        Based on the claims you are considering, the

1    only type of damages you can award to the plaintiffs are

2    compensatory damages.  Compensatory damages are intended

3    to make a plaintiff whole; that is, to fairly and justly

4    compensate him for any injury he sustained as a direct

5    result of the responsible party's unlawful actions.

6              You may not award damages in this case that

7    cover any period beyond the date of your verdict.  Nor may

8    you award in this case any damages for emotional harm to

9    the plaintiffs, such as emotional distress, pain,

10   suffering, personal indignity, fear, anxiety, or anguish

11   the plaintiffs suffered.  Also, you may not award as a

12   component of damages any sum intended to cover prejudgment

13   interest or any sum intended to cover attorneys' fees that

14   may have been incurred by the plaintiffs in this lawsuit.

15   These issues will be dealt with, if necessary, in a

16   separate proceeding.

17             You are also instructed that the plaintiffs have

18   a duty under the law to mitigate their damages; that is,

19   to exercise reasonable diligence under the circumstances

20   to minimize their damages.  Therefore, if you find that

21   the defendant has proven by a preponderance of the

22   evidence that the plaintiffs failed to seek out or take

23   advantage of an opportunity to minimize their damages that

24   was reasonably available to them, you must reduce their

25   damages by the amount they reasonably could have avoided

PDF created with pdfFactory trial version www.pdffactory.com

1    if they had sought out or taken advantage of such

2    opportunity.  On the issue of mitigation of damages, the

3    defendant has the burden of proof.

4         The plaintiffs are entitled to compensatory

5    damages only for injuries caused by unlawful acts.

6    Damages must not be based on speculation or sympathy.

7    They must be based on the evidence presented at trial.

8         The damages you award should be proportional to

9    the actual loss sustained and should not result in double

10   recovery with respect to any one item of damage.

11        And when you look at Part VII of the verdict

12   form, you'll see that there are -- there's a line for

13   Connecticut Product Liability Act, there's a line for

14   negligence.  And then there's a line that makes reference

15   to not double-counting and filling in a number without any

16   double-counting.

17        That's the end of the second section of the

18   instructions.

19        I now have some instructions for your

20   deliberations.  First I want to talk to you about the

21   concept of burden of proof.

22        I will now explain to you certain rules that

23   apply in civil cases generally.  In a civil action such as

24   this, the plaintiffs must prove the facts on which they

25   rely by a preponderance of the evidence.  On the issues of

PDF created with pdfFactory trial version www.pdffactory.com

1    comparative responsibility, comparative negligence, and

2    mitigation of damages, however, the defendant has the

3    burden of proof.

4         This rule does not require proof to an absolute

5    certainty.  Proof to an absolute certainty is seldom

6    possible in any case.  This rule does not even require

7    proof beyond a reasonable doubt, which is the rule in

8    criminal cases.  In a civil case, such as this one, you

9    must weigh the evidence in support of a particular claim

10   against the evidence opposed to it and consider which

11   evidence is more convincing.  To prove a fact by a

12   preponderance of the evidence means to prove that the fact

13   is more likely true than not true.

14        It may be helpful to ask yourselves, with

15   respect to each disputed issue of fact, how all the

16   credible evidence would balance if you placed it on an

17   imaginary pair of scales.  If all the evidence presented

18   by both sides on a particular issue of fact would cause

19   the scales to strike an even balance, then the party with

20   the burden of proof would have failed to meet their or its

21   burden of proof with regard to that issue of fact.  On the

22   other hand, if the evidence would cause the scales to tip

23   in favor of the party with the burden of proof, then they

24   or it would have met their or its burden of proof on that

25   issue of fact.

1          I now want to talk to you about your duty to

2     deliberate.

3          The verdict must represent the considered

4     judgment of each juror.  To return a verdict, it is

5     necessary that each juror must agree.  Thus, your verdict

6     must be unanimous.

7          It is your duty, as jurors, to consult with one

8     another and to deliberate with a view toward reaching an

9     agreement, if you can do so without compromising

10    individual judgment.  You must each decide the case for

11    yourself, but only after an impartial consideration of the

12    evidence in the case with your fellow jurors.  In the

13    course of your deliberations, do not hesitate to reexamine

14    your own views, and change your opinion, if convinced it

15    is erroneous.  But do not surrender your honest conviction

16    as to the weight or effect of evidence solely because of

17    the opinion of your fellow jurors or for the mere purpose

18    of returning a verdict.

19         Remember at all times that you are not

20    partisans.  You are judges, because in this case you are

21    the judges of the facts.  And your sole interest is to

22    seek the truth from the evidence in this case.

23         Please remember my instructions about notes

24    given at the beginning of the case.  When you retire to

25    deliberate, if a fellow juror claims that a certain fact

PDF created with pdfFactory trial version www.pdffactory.com

1    exists because he or she has it written down on his or her

2    notepad, remember that it is your own recollection that

3    must control, as that person simply may have made some

4    inaccurate notes.  Similarly, none of you must use the

5    mere fact that you took notes to try and influence any

6    other juror.  Notes can be used to refresh one's own

7    recollection, but it is what each of you remembers that

8    counts, not anyone's notes.

9         Let me talk about electing a foreperson and

10   using the verdict form.

11        Upon retiring to the jury room, you will select

12   one person to act as your foreperson.  The foreperson will

13   preside over your deliberations and will speak for you

14   here in court.

15        Any communications with the Court during

16   deliberations must be in writing and signed by the

17   foreperson.  No member of the jury should ever attempt to

18   communicate with me except by a writing signed by the

19   foreperson.

20        I will never communicate with any member of the

21   jury on any subject touching the merits of the case other

22   than orally here in open court in the presence of counsel

23   and the parties.

24        Now, if you do send a note to me, please do not

25   disclose in your note or otherwise anything about your

PDF created with pdfFactory trial version www.pdffactory.com

1    deliberations.  Specifically, do not disclose to anyone --

2    not even to me -- how the jury stands, numerically or

3    otherwise, on the question of the liability of the

4    defendant until after you have reached a unanimous

5    verdict.

6         A verdict form has been prepared for your

7    convenience.  You will note that the interrogatories or

8    questions call for either a "yes" or "no" answer or, if

9    appropriate, a dollar amount or a percentage.

10        Your foreperson will write the unanimous answer

11   of the jury in the space provided for each question, will

12   date and sign the completed verdict form, and then return

13   to the courtroom with the verdict form.

14        As I mentioned earlier, you will have with you

15   in the jury the original verdict form.  I hope you will

16   find it to be straightforward, but I will now summarize

17   the form for you, and I invite you to review it with me.

18        You will recall that when I went through

19   Section II of the instructions which relates to the issues

20   in this case, I told you that there were three claims

21   being brought by the plaintiffs.  The first claim is the

22   claim under the Connecticut Product Liability Act.  And

23   Question 1.A asks you whether the plaintiffs have proven

24   the defendant is liable to them pursuant to the

25   Connecticut Product Liability Act.  You will recall that I

1    explained that there were two theories for the plaintiffs'

2    claim under the Product Liability Act: Strict Liability

3    and Breach of Express Warranty.  So Section I.B, you would

4    get to if you answer "yes" to I.A.  And at that point you

5    would be asked to say "yes" or "no" with respect to each

6    of the two theories.  If you answer "no" in I.A -- in

7    other words, the plaintiffs did not prove the defendant is

8    liable to them under the Act -- you would proceed to

9    Part III because you would be going on to discuss the

10   second claim.  Now, if you answer "yes" to Part I.A, you

11   would not only answer I.B, but you would also answer I.C,

12   which is an interrogatory that asks have the plaintiffs

13   proven the boat was defective and unreasonably dangerous

14   at the time they purchased it.  And then whether you

15   answer that "yes" or "no," you would go to Part II.

16          And you'll see that II.A says has the defendant

17   proven -- and you may recall that when I was explaining to

18   you who has the burden of proof on what, I explained that

19   the defendant has the burden of proof on comparative

20   responsibility, comparative negligence, and mitigation of

21   damages.  So that's why II.A says has the defendant

22   proven, and you reach the issue of comparative

23   responsibility, you have to answer "yes" or "no" whether

24   the defendant has proven the plaintiffs were comparatively

25   responsible for the damages they sustained.  If you answer

PDF created with pdfFactory trial version www.pdffactory.com

1    "yes," then you have to go to Part B and fill in the

2    percentage.  If you answer "no," then you would go to Part

3    III, which is the plaintiffs' second claim, Negligence.

4    And either way you eventually get to Part III, which is

5    the second claim.

6            When you get to the second claim, you have to

7    answer whether the plaintiffs have proven that the

8    defendant was negligent during the course of making

9    repairs to the boat and that the defendant's negligence

10   caused them to suffer damages.  If you answer "no," then

11   you would skip over Part IV and go to Part V, which is the

12   third claim.  If you answer "yes," you would then have to

13   address the issue of comparative negligence.

14           When you look at the first line of Part IV.A,

15   which is Comparative Negligence, you'll see once again it

16   says has the defendant proven, as opposed to have the

17   plaintiffs proven.  And if you answer "no" to IV.A, you

18   would go on to the third claim in Part V of the verdict

19   form.  If you answer "yes," then you would have to go to B

20   and answer the question with respect to the plaintiffs'

21   share of responsibility and whether it was 50 percent --

22   51 percent or more.  If you answer "yes," you would skip

23   down to Part V, because if it's 51 percent or more, the

24   defendant cannot be held responsible.  If it's "no," then

25   you would go to Part C and you would fill in the

PDF created with pdfFactory trial version www.pdffactory.com

1    percentage.

2            Then no matter how you go through these

3    questions, you get to the third claim, which is Part V,

4    Revocation of Acceptance.

5            And there the question is:  Have the plaintiffs

6    proven by a preponderance of the evidence that they

7    revoked their contract for purchase of the boat?

8            And then you proceed to Part VI.  And it says,

9    If you have concluded the defendant is not liable on any

10   of their claims -- any of the plaintiffs' claims -- you

11   proceed to Part VIII, which tells you to sign and date the

12   verdict form.  If you conclude there is liability, you

13   would continue on to Compensatory Damages.  And you'll see

14   for Revocation of Acceptance what the plaintiffs seek is

15   simply return of the purchase price.  You don't have to

16   compute that.  For the Connecticut Product Liability Act,

17   you would have to determine what amount of compensatory

18   damages you determine to be fair, just, and reasonable.

19   And if you find for the plaintiffs on Negligence, you

20   would also have to complete that.

21           And then if you found for the plaintiffs on both

22   of these claims and awarded damages, there's a question

23   here that makes sure there's no double-counting of any

24   damages that are awarded.  All of the numbers that would

25   go into this section of the verdict form would be after

1    any percentage reduction that would be appropriate for you

2    to make.

3           Then in any event, you get to the last part of

4    the verdict form, which should say Part VIII.  I think

5    we'll fix that little typo.  It says, You have now

6    completed your deliberations.  Please sign and date this

7    form.

8           At the completion of your deliberations, the

9    foreperson should communicate to the Court through a

10   signed writing indicating that a unanimous verdict has

11   been reached.  The foreperson should not give the verdict

12   form to the courtroom deputy or to the court security

13   officer for this purpose, but should write a separate

14   signed note to me indicating that a unanimous verdict has

15   been reached.  And you would simply bring the verdict form

16   in with you and hold it until I ask to have it handed over

17   to the courtroom deputy at the appropriate time.

18          We've now reached the point where the jury

19   should retire to the jury room.  When you go into the jury

20   room, please to not begin to deliberate until you receive

21   from the courtroom deputy all of the exhibits you are to

22   consider.  And when she does that, she will give you a

23   formal direction to begin your deliberations.  I think

24   she'll probably be bringing in the exhibits in about five

25   minutes.

Vol. V - Page 916

1           I'd like to thank you all very much for your

2  attention, and you can retire to the jury room at this

3  time.

4                (Whereupon the jury left the courtroom.)

5           THE COURT:  Please be seated everyone.

6           I think people put their objections to the

7  charge on the record earlier and those are preserved.

8           I have a couple of additional changes that I

9  thought -- I tried to catch them as I was going through,

10  and I'll have these made before it goes in to the jury

11  room.

12           I guess on page 15 we have two separate

13  theories, we take out breach of duty to warn and then

14  capitalize "second" and "third."

15           On page 16 at the top, that first full sentence

16  was a generic sentence, and when I delivered it, I said

17  "and for that reason plaintiffs may base a product

18  liability claim."

19           And then the caption on page 16 instead of

20  saying "The Three," should say "The Two" theories of

21  liability.

22           On page 18, first sentence under Definition of

23  "Harm," I added the word under "the" Connecticut Product

24  Liability Act.

25           On page 21, just above the caption where it says

1    "one of six ways," I inserted the word "the" six ways.

2              And on page 32, first full paragraph, I made it

3    defendant, singular.  And in the next paragraph I added in

4    the second sentence after a dollar amount or a percentage.

5              And there's one thing I must not have put a flag

6    on -- oh, on page 15, I conformed that because I recognize

7    that I have not -- under third, the draft said the

8    plaintiffs seek to revoke their contract.  I went back to

9    page 22 and read the first sentence.  I'm going to say the

10   plaintiffs claim that they revoked their contract for the

11   purchase of the boat.

12             MR. NIKAS:  Your Honor --

13             THE COURT:  Yes, let me just finish a note,

14   please.

15             Mr. Nikas, yes?

16             MR. NIKAS:  Just for the record, on

17   Section II.A --

18             THE COURT:  Yes?

19             MR. NIKAS:  -- last sentence, under the

20   Connecticut Product Liability Act one who sells a product

21   in defective condition.

22             THE COURT:  You're in the last -- when you

23   say -- what page are you on?

24             MR. NIKAS:  Page 15, Section II, Heading A,

25   heading has Connecticut Product Liability Act.  That last

1    sentence is not a complete sentence.  Under the

2    Connecticut Product Liability, one who sells a product in

3    defective condition, we would like to state for the record

4    that the Act defines product seller as any person or

5    entity including a manufacturer, wholesaler, distributor,

6    or retailer.

7              THE COURT:  Okay.  That's accurate.

8              Mr. Rotondo, do you have anything?

9              MR. ROTONDO:  I don't have anything with respect

10   to the charge, Your Honor.  I did have a general comment

11   with respect to the verdict form.

12             THE COURT:  Okay.

13             MR. ROTONDO:  And that is, Your Honor, I think

14   that the plaintiff is not entitled to recover both

15   revocation and damages.  So that if the plaintiff were to

16   recover -- I read the form incorrectly when I read it

17   before, but that would lead me to the subject of

18   post-trial motions as to whether the plaintiffs would be

19   entitled to recover for both.

20             THE COURT:  Yes, Mr. Nikas?

21             MR. NIKAS:  I guess I see Mr. Rotondo's point.

22   I guess the question is, does the jury get an instruction

23   to decide all claims independently from one another such

24   that there could be an election or some other event so

25   that does not happen?

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  Well, I think this does require them

2   to do that.  I mean, they have to decide revocation.

3   They're not asked to put any dollar amount down for

4   revocation because that's a set dollar amount.  And then

5   if they award damages for Connecticut Product Liability

6   Act or negligence, we would know exactly how much went to

7   each claim.  So I figured we would be able -- I was trying

8   to -- I always try and ask myself what might I have to

9   answer once this is over?  And I think I could answer the

10  questions.  From this verdict form would you be able to

11  answer the questions or point to the information that

12  should be looked at to answer the questions?

13          MR. ROTONDO:  Yes, I think you could.

14          THE COURT:  Mr. Nikas, would you, too?

15          MR. NIKAS:  I think so, Your Honor.

16          THE COURT:  You were just making a point.

17          MR. ROTONDO:  Yes.  It may have been obvious to

18  everybody, but I just wanted to make it.

19          THE COURT:  I never assume that anything is

20  obvious to everybody.

21          Okay, I'm going to go ahead and make these

22  changes then.

23          Have you all finished going over the exhibits

24  with the courtroom deputy?

25          MR. ROTONDO:  Not today, Your Honor.

 1          THE COURT:  Why don't you double-check that.
 2   While you're doing that, I'll get the verdict form
 3   revised.  I'll have Amy come in, show you the final and my
 4   markup so you can see where the changes were made.  Okay.
 5   Obviously I need someone to help me proofread it.  All
 6   right.  We'll recess.
 7                 (Recess while jury deliberates.)
 8
 9          THE COURT:  We'll be excusing the jury for the
10   day.
11          Bring the jury in.
12                 (Whereupon, the jury entered the
13                  courtroom.)
14          THE COURT:  Please be seated everyone.
15          Ladies and gentlemen, I've been informed that
16   you want to report tomorrow morning at 8:45, which is
17   fine.
18          I'll just remind you that you should not discuss
19   the case with anyone else and you should not allow anyone
20   to discuss it in your presence.  You should continue to
21   not have any contact with the parties, attorneys, or
22   witnesses in the case, and also you should not allow
23   yourself to be influenced by anything outside the evidence
24   in the case.  In other words, don't be influenced by
25   anything in the media concerning this matter or any

PDF created with pdfFactory trial version www.pdffactory.com

1    related matter.

2            Other than that, I just want to say thank you

3    very much for your hard work.  We all appreciate it.  And

4    when you come in tomorrow at 8:45, you should just get

5    right to work as soon as everybody is here.

6            Have is restful evening.

7                (Whereupon the jury left the courtroom.)

8            THE COURT:  Please be seated everyone.

9            At this stage of the proceeding, we reverse the

10   order, the lawyers get to come later.  If you're here by

11   9:30, I think that should be fine.

12           I'll just ask you to wait for maybe ten minutes

13   or so to let the jurors clear the building so you minimize

14   the risk of running into anyone.

15           See you all tomorrow morning.  Have a restful

16   evening, at least more restful than the past few days.

17   Good night.

18                (Proceedings adjourned at 4:32 p.m.)

19

20

21

22

23

24

25

Vol. V - Page 922

1

2

3                         C E R T I F I C A T E

4

5

6

7          I, Diana Huntington, RDR, CRR, Official Court

8   Reporter for the United States District Court for the

9   District of Connecticut, do hereby certify that the

10  foregoing pages are a true and accurate transcription of

11  my shorthand notes taken in the aforementioned matter to

12  the best of my skill and ability.

13

14

15

16

17         /s/_____

              DIANA HUNTINGTON, RDR, CRR
18              Official Court Reporter
             450 Main Street, Room #225
19           Hartford, Connecticut 06103
                  (860) 547-0580
20

21

22

23

24

25

Vol. VI - Page 923

1              UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF CONNECTICUT

3

4  - - - - - - - - - - - - - - - x
                                 :
5  PETER D. MAINS and LORI M. MAINS:  No. 3:01CV2402(AWT)
                                 :
6                 Plaintiffs,    :
                                 :
7            vs                  :
                                 :
8  SEA RAY BOATS, INC.           :
                                 :  HARTFORD, CONNECTICUT
9                 Defendant.     :  APRIL 8, 2008
                                 :
10 - - - - - - - - - - - - - - - x

11

12

13                  **JURY TRIAL**

14                  **VOLUME VI**

15

16     BEFORE:

17

18             HON. ALVIN W. THOMPSON, U.S.D.J.

19                and a Jury of Nine

20

21

22

23                         Diana Huntington, RDR-CRR
                           Official Court Reporter
24

25

```
 1   APPEARANCES:

 2        FOR THE PLAINTIFFS:

 3                JOHN L. SENNING, ESQ.
                     16 Saybrook Road
 4                   Essex, Connecticut 06426

 5                HERRICK NIKAS, LLP-CA
                     1201 Dove Street, Suite 560
 6                   Newport Beach, California 92660
                  BY:  RACHEL D. LEV, ESQ.
 7                     RICHARD J. NIKAS, ESQ.

 8        FOR THE DEFENDANT:

 9                DAY PITNEY, LLP
                     CityPlace I
10                   Hartford, Connecticut 06103-3499
                  BY:  JAMES H. ROTONDO, ESQ.
11                     DANIEL J. FOSTER, ESQ.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

TABLE OF CONTENTS

2

3                                                          PAGE

4    QUESTION FROM THE JURY......................... 926

5    VERDICT....................................... 930

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    __10:05 A.M.__

2            THE COURT:  We have a note from the jury.  It's

3   been marked as Court Exhibit 5.

4            It says:  "Under Connecticut Liability Act do

5   both strict liability and breach of express warranty need

6   to be satisfied, or will either substantiate the claim?"

7            I believe the answer is either will substantiate

8   the claim.

9            The only concern I would have is I would like

10  them to answer both questions.  I would like under I.B for

11  them to answer both questions and that's what I would

12  intend to say.

13           MR. NIKAS:  That's fine.

14           Given the fact that this arises under the

15  Connecticut Liability Act, Your Honor, we'd like to repeat

16  our request from yesterday regarding the definition of

17  "product seller" under that Act which includes

18  manufacturer in both the definition of 52-572m and also

19  52-572m(e) just to be sure that there is no

20  misunderstanding as to what the statute provides.

21           THE COURT:  Are you concerned because of the

22  issue that was argued with respect to revocation?

23           MR. NIKAS:  No.  This has nothing to do with the

24  revocation argument, Your Honor.  In the charge under the

25  Connecticut Product Liability Act it uses the generic term

PDF created with pdfFactory trial version www.pdffactory.com

 1   "seller."  My concern is that they would confuse that for

 2   the description of the term "seller" contained in the

 3   revocation argument.

 4        THE COURT:  That's what I asked.  So it does

 5   have something to do with that.  My question was:  Were

 6   you concerned that there would be confusion with the

 7   Revocation Act?

 8        MR. NIKAS:  That's correct.  Because the statute

 9   is very clear that the seller in the statute encompasses a

10   manufacturer because subsection (e) states --

11        THE COURT:  That's obvious.

12        I think the second element makes it clear

13   enough.  It says that the boat was expected to and did

14   reach the plaintiffs without substantial change in its

15   condition from the time of its sale by the defendant.

16        MR. NIKAS:  I'm not sure it does, Your Honor, if

17   they conclude, for purposes of revocation, that the

18   defendant was not the seller.  They might be led to

19   believe that since it's not the seller, there's no

20   liability that arises under the Act.

21        THE COURT:  Well, I'm reluctant to give a

22   supplemental charge at this time, especially with a

23   question pending.  Yesterday I thought your point went to

24   revocation, and I didn't understand what point you were

25   making.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. NIKAS:  Specifically, Your Honor --

2          THE COURT:  I know what you said yesterday.  I

3    thought it went to revocation.  And it is that you're

4    concerned about confusion with revocation.  I'm not going

5    to give a supplemental charge at this time because they're

6    in the middle of deliberations and I don't want to be

7    perceived as suggesting something to them.  And I think

8    the fact that they are asking this question signals to me

9    that they don't have a concern about that issue.

10          We'll bring the jury in.

11              (Whereupon, the jury entered the

12              courtroom.)

13          THE COURT:  Good morning, ladies and gentlemen.

14          Please be seated everyone.

15          Ladies and gentlemen, I've received a question

16    from the jury.  It reads as follows:

17          "Under Connecticut Liability Act do both strict

18    liability and breach of express warranty need to be

19    satisfied, or will either substantiate the claim?"

20          The answer is:  Either.

21          Is that clear?

22          However, it will be helpful if you answer both

23    questions in Part I.B of the verdict form.

24          And it looks like I've responded to your

25    inquiry.  If you have a follow-up question, please send

1    another note out.

2              Okay, thank you very much.

3                   (Whereupon the jury left the courtroom.)

4              THE COURT:  We'll recess.  We'll wait to hear

5    from the jury again.  Thank you.

6                   (Whereupon, a recess followed.)

7

8              THE COURT:  Good afternoon.  Please be seated.

9              We've received a note from the jury.  It has

10   been marked as Court Exhibit 6.

11             It reads as follows:  "A unanimous verdict has

12   been reached."

13             So we'll bring the jury in.

14                   (Whereupon, the jury entered the

15                   courtroom.)

16             THE COURT:  Good afternoon, ladies and

17   gentlemen.

18             Please be seated everyone.

19             Mr. Foreperson, has the jury unanimously agreed

20   upon its verdict?

21             THE FOREPERSON:  They have.

22             THE COURT:  Would you please deliver the verdict

23   form to the courtroom deputy.

24                   (Pause.)

25             THE COURT:  I'm going to confirm on the record

1    one thing with respect to the verdict form.

2          There is one question where the foreperson had

3    one response marked and then crossed that out, initialed

4    it, and put in the opposite response.  And I read that as

5    you mean the response that you have not initialed.

6          THE FOREPERSON:  Correct.

7          THE COURT:  Okay.

8          Ladies and gentlemen, at this time your verdict

9    will be published.  That means it will be read aloud in

10   open court.

11         You should pay close attention as the verdict is

12   published.  Following publication, I will ask whether any

13   party would like to have the jury polled.

14         If the jury is polled, that means that each one

15   of you would be asked whether the verdict, as published by

16   the courtroom deputy, constitutes your individual verdict

17   in all respects.

18         Madam Clerk, would you please publish the

19   verdict.

20         THE CLERK:  The case is Peter D. Mains and Lori

21   M. Mains, Plaintiffs, v. Sea Ray Boats, Defendant,

22   Civil No. 3:01CV2402(AWT).

23         Special Verdict Form reads as follows:

24         We the jury unanimously find as follows:

25         Part I.  Connecticut Product Liability Act.

PDF created with pdfFactory trial version www.pdffactory.com

1          A.  Have the plaintiffs proven by a

2    preponderance of the evidence that the defendant is liable

3    to them pursuant to the Connecticut Product Liability Act?

4          The jury's response is:  Yes.

5          B.  Under which of their theories have the

6    plaintiffs proven the defendant is liable to them?

7          Strict liability.  And the jury's response is:

8    No.

9          Breach of express warranty.  The jury's response

10   is:  Yes.

11         C.  Have the plaintiffs proven that the boat was

12   defective and unreasonably dangerous at the time they

13   purchased it?

14         The jury's response is:  Yes.

15         Part II.  Comparative Responsibility.

16         A.  Has the defendant proven that the plaintiffs

17   were comparatively responsible for the damages they

18   sustained?

19         The jury's response is:  Yes.

20         B.  If the answer to the preceding question was

21   "yes," what is the percentage of the plaintiffs'

22   responsibility for their own injuries?

23         The jury's response is:  3 percent.

24         Part III.  Negligence.

25         Have the plaintiffs proven by a preponderance of

1    the evidence that the defendant was negligent during the

2    course of making repairs to the boat and that the

3    defendant's negligence caused them to suffer damages?

4             The jury's response is:  Yes.

5             Part IV.  Comparative Negligence.

6             A.  Has the defendant proven by a preponderance

7    of the evidence that any damages suffered by the

8    plaintiffs were caused in whole or in part by their own

9    negligence?

10            The jury's response is:  Yes.

11            Part B.  If the answer to the preceding question

12   was "yes," is the plaintiffs' share of responsibility for

13   causing those damages 51 percent or more?

14            The jury's response is:  No.

15            Part C.  If the answer to the preceding question

16   was "no," what percentage is the plaintiffs' share of the

17   responsibility for the damages they sustained?

18            And the jury's response is:  3 percent.

19            Part V.  Revocation of Acceptance.

20            Have the plaintiffs proven by a preponderance of

21   the evidence that they revoked their contract for purchase

22   of the boat?

23            The jury's response is:  No.

24            And I'm going to go to Part VII.  Compensatory

25   Damages.

1          What is the total amount of compensatory damages

2     you determine to be fair, just and reasonable?

3          Connecticut Product Liability Act.  And the

4     jury's response is:  $15,500.

5          Negligence.  The jury's response is:  $15,500.

6          If you awarded damages on both claims, please

7     state the total amount of damages awarded without double

8     counting any particular item of damage.

9          The jury's response is:  $31,000.

10          And it's all signed and dated by the foreperson,

11     Your Honor, on today's date.

12          THE COURT:  Thank you.

13          Would either side like the jury polled?

14          MR. NIKAS:  No, Your Honor.

15          MR. ROTONDO:  No, Your Honor.

16          THE COURT:  Thank you.

17          Ladies and gentlemen, you have now done your

18     duty.  It is inevitable that a decision by a jury will

19     gratify one party and disappoint the other.  Making

20     decisions such as those that you've made, decisions which

21     are important to the parties but also important to our

22     society, is not easy.  All of us know that and all of us

23     understand that.  So all of us, the Court and the parties,

24     must be grateful to you for performing this important and

25     very difficult assignment.  And the reason that we must be

PDF created with pdfFactory trial version www.pdffactory.com

1    grateful to you is really quite simple.  All of us believe

2    in a system of law that places in our fellow citizens the

3    responsibility for administering justice.  All of us

4    believe in a system of self government, and that is a

5    system in which jurors drawn from our community play a

6    central role.

7              So I thank you on behalf of the court system and

8    the parties in this case for your contribution to our

9    American system of justice.

10             You are now discharged.  Please note that you

11   are under no obligation to discuss this case with anyone,

12   including the parties, the lawyers, or any members of the

13   press.

14             And in a moment after court adjourns or actually

15   recesses, because I have something else scheduled, I'm

16   going to come back so I can thank each of you

17   individually.

18             You may retire to the jury room.

19                 (Whereupon the jury left the courtroom.)

20         THE COURT:  Please be seated everyone.

21         Any questions from counsel?

22         MR. ROTONDO:  No, Your Honor.

23         MR. NIKAS:  No, Your Honor.

24         THE COURT:  Well, thank you all very much.  I

25   hope you get home soon.

PDF created with pdfFactory trial version www.pdffactory.com

1           The courtroom deputy will work on the judgment

2    probably by Monday.   Thank you.

3           We'll recess.

4               (Proceedings adjourned at 3:04 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com

1

2

3                      C E R T I F I C A T E

4

5

6

7              I, Diana Huntington, RDR, CRR, Official Court

8    Reporter for the United States District Court for the

9    District of Connecticut, do hereby certify that the

10   foregoing pages are a true and accurate transcription of

11   my shorthand notes taken in the aforementioned matter to

12   the best of my skill and ability.

13

14

15

16

17         /s/_____

18           DIANA HUNTINGTON, RDR, CRR
             Official Court Reporter
             450 Main Street, Room #225
19           Hartford, Connecticut 06103
                (860) 547-0580
20

21

22

23

24

25