Vol. III - Page 317

1                 UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF CONNECTICUT

3

4      - - - - - - - - - - - - - - - - x
                                       :
5      PETER D. MAINS and LORI M. MAINS:  No. 3:01CV2402(AWT)
                                       :
6                      Plaintiffs,    :
                                       :
7             vs                       :
                                       :
8      SEA RAY BOATS, INC.             :
                                       :  HARTFORD, CONNECTICUT
9                      Defendant.    :  APRIL 3, 2008
                                       :
10     - - - - - - - - - - - - - - - - x

11

12

13                       **JURY TRIAL**

14                       **VOLUME III**

15

16         BEFORE:

17                 HON. ALVIN W. THOMPSON, U.S.D.J.

18

19                     and a Jury of Nine

20

21

22

23                              Diana Huntington, RDR-CRR
                                Official Court Reporter
24

25

```
 1    APPEARANCES:

 2        FOR THE PLAINTIFFS:

 3                JOHN L. SENNING, ESQ.
                      16 Saybrook Road
 4                    Essex, Connecticut 06426

 5                HERRICK NIKAS, LLP-CA
                      1201 Dove Street, Suite 560
 6                    Newport Beach, California 92660
                  BY:  RACHEL D. LEV, ESQ.
 7                     RICHARD J. NIKAS, ESQ.

 8        FOR THE DEFENDANT:

 9                DAY PITNEY, LLP
                      CityPlace I
10                    Hartford, Connecticut 06103-3499
                  BY:  JAMES H. ROTONDO, ESQ.
11                     DANIEL J. FOSTER, ESQ.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        TABLE OF CONTENTS

2

3    PLAINTIFFS'

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| THOMAS WICANDER | 321 | 403 | 440 | -- |
| THOMAS GREAVES | 449 | 474 | 482 | -- |

4

5

6

7

8    DEFENDANT'S

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DEAN BECKMAN | 485 | 507 | -- | -- |
| GREGORY DAVIS | 538 | -- | -- | -- |

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com

1                        **9:04 A.M.**

2              THE COURT:  I believe we may be waiting for a

3    juror.  We are waiting to get the equipment fully

4    operable.

5                   (Pause.)

6              THE COURT:  Before our jury comes in, just let

7    me ask, I know there was an objection to the admission

8    offering of the expert's report.  Are you going to try to

9    offer that, Mr. Nikas?  Just so I know.

10             MR. NIKAS:  We probably will, Your Honor.

11             THE COURT:  Because I have never admitted one.

12             MR. NIKAS:  Then no, Your Honor.

13             THE COURT:  You're free to go ahead and try to

14   lay a foundation.  It's not a business record.

15             MR. NIKAS:  We can do it through testimony,

16   Your Honor.

17             THE COURT:  Okay.  That's the way it's usually

18   done.

19             We'll bring the jury in.

20             You can retake the witness stand, sir.

21                   (Whereupon, the jury entered the

22                   courtroom.)

23             THE COURT:  Good morning, ladies and gentlemen.

24   Please be seated everyone.

25             Whenever you're ready, Mr. Nikas.

1          MR. NIKAS:  Thank you, Your Honor.

2

3                    THOMAS WICANDER,

4      called as a witness, having been previously duly

5      sworn, was examined and testified further as follows:

6

7                 DIRECT EXAMINATION (Continued)

8  BY MR. NIKAS:

9  Q.   Good morning, Mr. Wicander.

10  A.   Good morning.

11  Q.   How are you today?

12  A.   All right.  Yourself?

13  Q.   All right.

14       Yesterday we were talking, I think the last issue we

15  were discussing was this issue of pickling the engines?

16  A.   Yes.

17  Q.   We were up against a deadline and I'm not sure we

18  went into that in the depth it probably required.  Can you

19  summarize what that process is and what that procedure

20  consists of?

21  A.   Sure.  Essentially we pull the spark plugs out of the

22  engine, crank the engine over with the starter, get as

23  much water out as we possibly can, and then we introduce

24  oil into the cylinders, either down into the intake or in

25  this case we did it through the spark plug holes.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    What's the purpose behind this?

2    A.    We like to coat the internal workings of the engine

3    with oil so it doesn't rust or get damaged any further.

4    Q.    You were able to tell that the procedure was at least

5    somewhat successful in that water was expelled from the

6    engine?

7    A.    Yes, I believe it was.

8    Q.    Now, at the time you performed this procedure, would

9    it have been possible to determine with complete accuracy

10    as to the cause of the engine's failure?

11    A.    No.  I mean, we assumed that it was the hydrolocking

12    at that point.

13    Q.    Why did you assume that?

14    A.    The cylinders were full of water.

15    Q.    Were you able to tell -- were you able to look into

16    the cylinders at that time?

17    A.    No.

18    Q.    Why not?

19    A.    Spark plug hole was very small, less than a half inch

20    in diameter.

21    Q.    Are you able to look onto the top of the cylinder

22    from any other advantage point?

23    A.    Only if you disassemble the engine.

24    Q.    Had you disassembled the engine at that time in June

25    of 2001?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    No, we had not.

2    Q.    What would the process of disassembly consist of?

3    A.    First we'd drain the engine down as much as we could

4    of antifreeze, remove exhaust manifolds, remove an intake

5    manifold and pull cylinder heads.

6    Q.    What is the cylinder head?

7    A.    Cylinder head is basically the cap that goes over the

8    top of the pistons in the cylinders.  It houses the

9    valves, exhaust valves and intake valves.

10   Q.    And the valves were the items that you were talking

11   about as part of the compression process?

12   A.    Correct.

13   Q.    The intake of the exhaust valves?

14   A.    Yes.

15   Q.    When was the pickling of the engine completed?

16   A.    I believe it was done on that Monday.

17   Q.    And as part of that process, did you change any

18   components or renew any components or replace any

19   components?

20   A.    No, we would not.

21   Q.    The oil you added to the cylinder, what type of oil

22   was that?

23   A.    Typically we use a mixture of Marvel Mystery Oil and

24   lay-up oil that we use for winter.

25   Q.    And the purpose of that is to displace the moisture?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   Displaces the moisture, it's a little bit stickier

2  oil that coats the walls and stays there.

3  Q.   Is it higher viscosity oil?

4  A.   I wouldn't say higher viscosity, but the consistency

5  of it makes it hang better on the cylinder walls.

6  Q.   Just to make it clear, that time in June when you

7  performed the procedure on the engine was not the first

8  time you had actually seen this boat, correct?

9  A.   No.  I had actually inspected the vessel up in

10  Haddam, Connecticut.

11  Q.   When was that?

12  A.   Would have been a few weeks earlier.

13  Q.   And the purpose behind that inspection?

14  A.   I had gotten a verbal list from Mark Verone at

15  Bassett Boat through Sea Ray, there were a few items that

16  were damaged and maybe not repaired properly at the

17  factory, and they wanted me to look at it.

18  Q.   Who at Sea Ray authorized that work for you?

19  A.   That was David Wade.

20  Q.   That's from the Sea Ray factory?

21  A.   Yes.

22  Q.   Was that work ever performed?

23  A.   No, it was not.

24  Q.   Do you know why it wasn't performed?

25  A.   They were bringing the boat to us 11th of June to

PDF created with pdfFactory trial version www.pdffactory.com

1    start the work, and then they had the hydrolocking issue

2    and then we just went on from there.  We never took care

3    of those repairs.

4    Q.    Now, the very last thing that we discussed yesterday

5    were the results of the leak down and compression tests?

6    A.    Yes.

7    Q.    I believe you testified as a result of the readings

8    that you got while performing those tests, that the

9    engines were damaged and unhealthy; is that correct?

10   A.    Correct.

11          MR. NIKAS:  Your Honor, I believe we laid the

12   inspection for the mechanical inspection report yesterday.

13   I'd like to admit Plaintiffs' 26 in evidence.

14          THE COURT:  I'm pretty sure we admitted it.

15   Which one are we talking about?

16          MR. NIKAS:  The mechanical inspection report.

17   It would have been the last thing we did, and I'm not sure

18   we had time.

19          MR. ROTONDO:  I don't remember whether it was in

20   or not.  I would object to the introduction of an expert

21   report.

22          THE COURT:  This isn't the expert report.  This

23   is the inspection report.  Plaintiffs' 26, by my notes,

24   was admitted yesterday afternoon.  It was towards the end

25   of the day.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. NIKAS:  It would have been the last thing

2     admitted.

3          THE COURT:  There was an objection, I said you

4     hadn't laid an adequate foundation.  You then asked

5     several other questions, and I said I think he's laid an

6     adequate foundation now, and I admitted it.

7          MR. NIKAS:  I was confused about your comments

8     this morning --

9          THE COURT:  That was 27.

10          MR. NIKAS:  Which we had no intention of

11     introducing.  I thought maybe you thought that this was

12     that.  I just want to make sure it was clear that this was

13     part of the work that he performed.

14          THE COURT:  Twenty-six was admitted yesterday.

15     BY MR. NIKAS:

16     Q.   Looking at Exhibit 26, both the leak down and

17     compression test on both the port and starboard engines

18     confirmed that damage had occurred to them?

19     A.   Yes.

20     Q.   And as part of your work as a mechanic and also

21     supervising other mechanics in the repair and maintenance

22     of Mercury engines, everything was consistent with the

23     fact that there was water in the engine?

24          MR. ROTONDO:  Your Honor, I object to the

25     leading nature of this series of questions.

```
 1            THE COURT:  Sustained.
 2   BY MR. NIKAS:
 3   Q.   When you performed the pickling of the engine, what
 4   results did you see?
 5   A.   Results from pickling?  We saw water in the cylinders
 6   when we first initially pulled the spark plugs out and
 7   were cranking the engine over.
 8   Q.   And that physical evidence would lead you to believe
 9   what?
10   A.   It had ingested water, absolutely.
11   Q.   That issue of water ingestion, had that ever been
12   covered in any of the materials that you were provided by
13   Mercury Marine either through the certification process or
14   in your work as a mechanic for Mercury?
15            MR. ROTONDO:  Objection, Your Honor.
16            THE COURT:  I'll allow that.
17   A.   Yes.  We have a system called MercNet that whenever
18   we do repairs on an engine, we go on MercNet, put in the
19   serial number of engine, and it comes up with a list of
20   bulletins that apply to that engine.  And one of those
21   bulletins was a water ingestion bulletin.
22   BY MR. NIKAS:
23   Q.   Was there one water ingestion bulletin or were there
24   several?
25   A.   There have been several over the years, absolutely.
```

1          THE COURT:  We're talking about Mercury at this

2    point, correct?

3          MR. NIKAS:  For the Mercury engines.

4          THE COURT:  Not Sea Ray?

5          MR. NIKAS:  Correct.

6    BY MR. NIKAS:

7    Q.   The answer was several?

8    A.   Yes, there were several.

9    Q.   You were first certified as a Mercury technician in

10   what year?

11   A.   I believe it was 1989.

12   Q.   And from that time until 2001, how many service

13   bulletins, approximately, discussed this issue of water

14   ingestion?

15          MR. ROTONDO:  Objection.

16          THE COURT:  Sustained.

17   BY MR. NIKAS:

18   Q.   When reviewing these materials provided you by

19   Mercury, did these materials indicate what the cause of

20   this problem was?

21          MR. ROTONDO:  Objection.

22          THE COURT:  Sustained.

23          MR. NIKAS:  Your Honor, it's not being offered

24   for the truth of the matter asserted, but merely provide

25   notice or knowledge for the witness.

PDF created with pdfFactory trial version www.pdffactory.com

 1          THE COURT:  Sustained.

 2  BY MR. NIKAS:

 3  Q.   In the course of your education, how often do you

 4  consult these Mercury materials?

 5  A.   Typically every time we work on an engine if there's

 6  a problem that we don't know, other than a minor tune-up

 7  or something like that.

 8  Q.   Are these bulletins issued on a regular basis or are

 9  they issued on occasional basis?

10  A.   They're issued on occasional basis when there's a

11  need for it.

12  Q.   When a new service bulletin is issued, do you have an

13  opportunity to review them?

14  A.   Yes.  Typically they're mailed to us and we also

15  review them on MercNet.

16          THE COURT:  Let me ask counsel a question at

17  sidebar.

18              (Sidebar discussion off the record.)

19  BY MR. NIKAS:

20  Q.   Notwithstanding what is contained within the

21  manufacturer's service bulletins, would there be any other

22  way to confirm --

23          THE COURT:  Just so we're clear, when we talk

24  about manufacturer, there are two manufactures here.

25

```
 1   BY MR. NIKAS:

 2   Q.    The engine manufacturer's service bulletins issued by

 3   MerCruiser, would there be any way to determine, either

 4   through physical evidence or any other type of evidence,

 5   what had caused the water ingestion in this case?

 6              MR. ROTONDO:  Objection.

 7              THE COURT:  The basis is?

 8              MR. ROTONDO:  The basis is, A, the question is

 9   confusing and vague, and I think it suggests certain

10   things about what way or what may not be in manuals

11   included in the question.

12              THE COURT:  Sustained.

13   BY MR. NIKAS:

14   Q.    Is there any physical evidence that you could look at

15   in the engine to determine what the cause of the water

16   ingestion was?

17   A.    Not without disassembly.

18   Q.    If you do disassemble the heads, is it possible to

19   determine what the cause is?

20   A.    Typically.

21   Q.    And in this particular case, were the engines ever

22   disassembled?

23   A.    Not until later.

24   Q.    When were they disassembled?

25   A.    A couple years later.
```

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    And in the process of disassembly, can you talk about

2    what you did specifically in terms of removing components

3    and then what you found physically when you looked at

4    them?

5    A.    Sure.

6          As we removed the exhaust elbows, we took the exhaust

7    elbows off the exhaust manifolds and the inside of the

8    exhaust manifolds where the exhaust should be and no water

9    should be, it was very rusted, leading us to believe that

10   water came in through the exhaust.

11   Q.    Actually, I don't want to discuss any of your

12   opinions yet.  I just want to talk about what you did.

13   A.    Okay.

14   Q.    And what you saw.

15         Did you remove the exhaust trunking?

16   A.    The hoses?

17   Q.    The hoses.

18   A.    Yeah, that would have been first.

19   Q.    Then what would the next item to be removed?

20   A.    The exhaust elbows.

21   Q.    On that issue, I'd like to show you something as a

22   demonstrative exhibit.

23         Your Honor, we received permission from the defense

24   to use this just as a display piece.  May I approach?

25                  THE COURT:  Have we marked it for

```
 1   identification?
 2              MR. NIKAS:  Plaintiffs' next, which would be 42.
 3              THE COURT:  It will be a higher number than
 4   that.
 5              160 for identification.
 6              MR. NIKAS:  I put it on the paper, Your Honor.
 7   BY MR. NIKAS:
 8   Q.   Now, even though I represented this is an exhaust
 9   elbow, that's not entirely accurate.  What is it really?
10   A.   It's half of one.
11   Q.   Half of an exhaust elbow.
12        Can you show the jury the inside portion of the
13   exhaust elbow and explain how it's situated?
14   A.   Sure.
15        The exhaust elbow, the other half would be here, of
16   course, sits on top of the exhaust manifold like this.
17        The exhaust would travel out of the manifold up
18   through this passage here and out this way.
19        In this area here is water jacket, keeps the exhaust
20   elbow cool, and exits here just at the end and mixes with
21   the exhaust gases in the hose.
22   Q.   Now, on an automobile exhaust, there's no water
23   flowing around the exhaust pipe, correct?
24   A.   Correct.
25   Q.   Why is there water flowing around this one?
```

1   A.   Well, they need to keep the entire exhaust system

2   cool until it exits the boat.  It's a fire hazard.

3   Q.   Why is that?

4   A.   The extreme heat of the engine, the exhaust.  It's

5   all contained inside the boat under the hatches.

6   Q.   So where exactly is water introduced in the exhaust

7   gas?

8   A.   Right up top here.  It exits the elbow right here and

9   mixes in with the exhaust gases in the hose itself.

10  Q.   Under the manifold on the, I guess, taller part of

11  the elbow, what's underneath that manifold?

12  A.   Under this manifold here, this would bolt to the top

13  of the manifold.  Under the manifold is the cylinder head.

14  Q.   The cylinder head contains --

15  A.   Contains the valves and the ports for allowing the

16  air in and fuel mixture and the exhaust out.

17  Q.   And I think you explained yesterday on the intake

18  stroke, the intake valve opens and it draws in air?

19  A.   Correct.

20  Q.   And on the power stroke, the exhaust valve opens

21  expelling gas, correct?

22  A.   On the exhaust stroke, right.

23  Q.   Exhaust stroke.

24       When either of those two valves is open, is there an

25  opening essentially from the elbow all the way down to the

PDF created with pdfFactory trial version www.pdffactory.com

1   top of the piston?

2   A.    If the exhaust elbow is open -- or exhaust valve is

3   open, yes, absolutely.

4   Q.    Or the intake valve?

5   A.    The intake valve, yeah, if that were open it would be

6   through the intake, correct.

7   Q.    Typically would the intake and exhaust valves be open

8   at the same time?

9   A.    Typically you don't want them to, but in reality they

10  are for a short duration, yes.

11  Q.    Where both would be open?

12  A.    Yes.

13  Q.    Now, can you explain to the jury, to go back to

14  hydrolocking, how flushing fresh water to clean out I

15  guess the saltwater out of the system could result in

16  flooding the cylinders underneath those elbows?

17  A.    Sure.  With the system -- the exhaust system with a

18  lift muffler system, basically a canaster like a 5-gallon

19  bucket, say, and it has hoses coming from this exhaust

20  elbow on the opposite side into that bucket, and then it

21  has a hose going up and out of the boat and then a

22  separate one that goes off to the side.  If any point of

23  that exhaust system is near the same height as this

24  exhaust elbow, without this engine running, you're

25  injecting water into that system, you're essentially

1    filling that bucket, it fills the hoses, and then it will

2    run right back into the engine because that exhaust system

3    is a little bit higher.  Similar to like a gutter on your

4    house running the opposite direction.

5    Q.    Now, this boat in June of 2001 had what type of

6    exhaust system?

7    A.    In June 2000 it had a lift system in it.

8    Q.    And that requires the engine to be running or not

9    running when flushing it out?

10   A.    It should be running, absolutely.

11   Q.    Why is that?

12   A.    Because part of the exhaust system is higher.  And

13   you're filling that container with water, you need the

14   exhaust pressure to push the excess water out of the boat

15   rather than have it come back towards the engine.

16   Q.    As originally designed, this boat had a collector?

17   A.    I believe so, yes.

18   Q.    That would have been how it would have been from the

19   factory?

20   A.    Yes, I believe so.

21   Q.    When flushing a collector exhaust system, is the

22   engine running or not running?

23   A.    In the manual it says not to run.

24   Q.    Why is that?

25   A.    That was -- the reason they don't want it to run or

PDF created with pdfFactory trial version www.pdffactory.com

1    you don't need to run it is because all the exhaust

2    components are a little bit lower and theoretically the

3    water is going to flow out of the boat, out of the engine.

4    Q.    So when Mr. Mains flushed the exhaust with fresh

5    water, it got into the exhaust hoses?

6    A.    Yes.

7    Q.    And then how did it get into the cylinders?

8    A.    Well, it filled up the exhaust system coming out of

9    here, would drain into the exhaust system itself into that

10   bucket, say.  Once it filled up to a certain point that

11   was higher than this level here, it flowed back in through

12   the exhaust.

13   Q.    And then did it drop down that vertical passageway?

14   A.    Correct.  It would drop down through here into the

15   exhaust manifold and then into the cylinders.

16   Q.    Now, during this process, would water have gotten

17   into every cylinder?

18   A.    Not necessarily.

19   Q.    Why is that?

20   A.    If one -- if any of the cylinder's exhaust valves

21   were closed at the time, those cylinders typically

22   wouldn't be flooded.

23   Q.    Aren't all the exhaust valves open at the same time?

24   A.    No.

25   Q.    Why is that?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    If they all open and close at the same time, that

2    means all the pistons would have to be firing at the same

3    time and it would vibrate right out of the boat, it would

4    not run smoothly.  So they time them to open and close at

5    different times so the engine runs smoothly.

6    Q.    Mr. Wicander --

7              MR. NIKAS:  Your Honor, can I have the witness

8    draw something for us?

9              THE COURT:  You may.

10   BY MR. NIKAS:

11   Q.    I'm going to move this closer to you.

12         Can you kind of give us a layout of an engine like

13   this, just a V-type engine.

14   A.    Excuse my drawing.  Sure.

15   Q.    Where would the exhaust elbows be?

16   A.    Actually, the exhaust elbows would be mounted right

17   here typically.

18   Q.    And the exhaust valves?

19   A.    Exhaust valves would be here, lower valve here and

20   here.

21   Q.    Intake?

22   A.    Intake valve up on top, here and here.

23   Q.    And where is the piston and the cylinder?

24   A.    This would be the piston here and here.

25   Q.    What's the circle on the bottom?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.    This would be the crankshaft.  And this would be the

2  camshaft.

3  Q.    Crankshaft turns what?

4  A.    Pistons are connected to the crankshaft.

5  Q.    And the camshaft?

6  A.    Camshaft actually is what we call pushrods, push up

7  and they open and close the valves.

8  Q.    So could you, using a different color, trace the path

9  of water from the elbow to wherever it was in Mr. Mains'

10 boat?

11 A.    When the water came back in through the exhaust?

12 Q.    Yes.

13 A.    Okay.

14       Say the end of the exhaust elbow is here and here.

15 The water would have come down in through the exhaust,

16 flowed in through this valve and then on top of the

17 piston.

18 Q.    And sitting on top of the piston water is bad?

19 A.    Very bad.

20 Q.    Why wouldn't the engine be able to start with water

21 sitting on top of the pistons?

22 A.    Well, water is a very dense liquid, it's very dense,

23 unlike air.  And if this whole cavity were to fill up with

24 water, it would be essentially very strong and you can't

25 compress water at all, it wouldn't allow it to roll over.

1  Q.   That's the locking that you're talking about?

2  A.   That's called hydrolock, correct.

3  Q.   Thank you, sir.

4        THE COURT:  Do counsel want that labeled for

5  identification like we did the others?

6        MR. ROTONDO:  I think it should be.

7        THE COURT:  We'll use the next number.

8  BY MR. NIKAS:

9  Q.   In your inspection report, you noted that you saw the

10  overboard relief hose in both I guess the port and

11  starboard engines was higher than the top of the exhaust

12  elbows?

13  A.   Yes.

14  Q.   Is that why water would flow back down into the

15  elbow?

16  A.   Yes.

17  Q.   Is that a typical installation?

18  A.   Typically we don't like to see anything higher than

19  the exhaust elbows for this reason.

20  Q.   Would that also be a problem if the engine is

21  running?

22  A.   May not be a problem when it's running.  Not a great

23  plan though.  Not a good way to have it.

24  Q.   There's always some water in the exhaust?

25  A.   Yes, there is.

1  Q.   That's the water that's expelled from the water

2  jackets?

3  A.   For the coolings, correct.

4  Q.   Going back to the disassembly process, we removed the

5  exhaust hose, we removed the elbows.  What would have been

6  taken off next?

7  A.   The exhaust manifolds.

8  Q.   And the exhaust manifold is -- looks like what or

9  what does it do?

10  A.   It's yea long (indicating) and has four ports in it

11  for the exhaust gases to come out of each of the cylinders

12  on that one side of the engine and then it connects with

13  the exhaust elbow.

14  Q.   After you remove the manifold for the exhaust, what

15  would have been -- what did you remove next?

16  A.   The intake manifold.

17  Q.   The intake manifold does what?

18  A.   That's what directs the air fuel mixture into the

19  engine.

20  Q.   Does air come in through the intake manifold through

21  the intake valve into the cylinder?

22  A.   Yes, it does.

23  Q.   And I assume, then, that exhaust gas comes out from

24  the cylinder through the exhaust valve into the exhaust

25  manifold through the elbow?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Correct.

2    Q.    So now that's removed.  What would go next?

3    A.    The cylinder heads would be removed next.

4    Q.    And is that a relatively simple procedure?

5    A.    I don't know how many fasteners there are, but

6    probably 18 or 20 off the top of my head.

7    Q.    When you talk about fasteners, what are you talking

8    about?

9    A.    Bolts.  Yea long (indicating).

10   Q.    How long did it take you -- how long does it take to

11   unscrew all those bolts and remove the head?

12   A.    Twenty minutes or so.

13   Q.    This isn't something you would routinely do as part

14   of an inspection every week or every month?

15   A.    No, absolutely not.

16   Q.    Is there a gasket between the head and like a

17   cylinder block?

18   A.    Yes, there is.

19   Q.    Is that gasket reusable?

20   A.    No, it's not.

21   Q.    Every time someone removes the head, they have to get

22   rid of the gasket?

23   A.    Yes.

24   Q.    Gasket is made of what?

25   A.    I believe it's a graphite material but has stainless

PDF created with pdfFactory trial version www.pdffactory.com

1    steel rings around each cylinder.  The whole gasket and

2    those rings get crushed as they are torqued down.

3    Q.   When you talk about torquing down, if I've got my

4    piece of Ikea furniture and you have little bolts put

5    together and you tighten them, is the tightening process

6    or unloosening process different on the bolts on the

7    cylinder head?

8    A.   Certainly.  You want all the fasteners to be

9    tightened the same amount, so they give you a torque spec

10   out of the manual, service manual, what to tighten them

11   and the sequence to tighten them.

12   Q.   Where did do you get the sequence?

13   A.   It's out of the service manual.

14   Q.   Service manual is provided by?

15   A.   Mercury Marine.

16   Q.   The manufacturer?

17   A.   Correct.

18   Q.   So you remove these, I guess, nuts from the studs?

19   A.   Bolts.

20   Q.   Bolts from the studs.  Sorry, bolts.

21        And then how heavy is the head?

22   A.   Very heavy.  80, 90 pounds, typically.

23   Q.   How many heads are there?

24   A.   Two per engine.

25   Q.   On this boat there were?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Four.

2    Q.    Are the valves in the head?

3    A.    Yes, they are.

4    Q.    So once you remove the head, you also get rid of the

5    valves?

6    A.    Correct.

7    Q.    And then if you take out the head and after you

8    removed the head on this vessel, what did you see when you

9    looked down into the cylinders?

10   A.    We saw little bit of rust, saw scoring on the

11   cylinder walls, that sort of thing.

12   Q.    You saw what on the cylinder walls?

13   A.    Scoring.  Scratches in the cylinder wall.

14   Q.    Is that something you would expect to see?

15   A.    No.  No.

16   Q.    Is that something you would see in a healthy engine?

17   A.    No, definitely not.

18   Q.    What causes the scoring?

19   A.    Scoring is typically caused by lack of lubrication

20   between the piston and the cylinder wall.

21   Q.    What's the lubrication between the piston and the

22   cylinder wall?

23   A.    Engine oil.  Without the engine oil you would have

24   metal to metal, essentially.

25   Q.    So if you ran an engine, say, without the drain plug

PDF created with pdfFactory trial version www.pdffactory.com

1  in the sump and all the engine oil left the engine by

2  gravity, that would cause scoring?

3  A.    Absolutely.

4  Q.    But if all the engine oil that was supposed to be in

5  the engine is still in the engine, how do you get scoring?

6  A.    Scoring would be caused by water getting into the

7  cylinder to wash away any of the oil lubrication.

8             MR. NIKAS:  Your Honor, could I show the witness

9  this glass filled with oil?

10             THE COURT:  You may.

11  BY MR. NIKAS:

12  Q.    If this is a cylinder and that's a piston, how does

13  the piston fit into the cylinder and how does the oil get

14  coated around it?

15  A.    Piston obviously goes down into the cylinder, much

16  tighter fit than this, of course, and the oil could come

17  up alongside the piston.

18  Q.    And if I introduce some water, oil and water do what?

19  A.    They don't mix very well.

20  Q.    So what's the water doing to the oil?

21  A.    The water is washing the oil away from between the

22  cylinder wall and the piston.

23  Q.    Does the water displace the oil immediately and

24  remove any lubrication from the cylinder?

25  A.    Pretty quickly, yes.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    And once that lubrication is gone, that results in

2    the scoring?

3    A.    Correct.

4    Q.    Did you see scoring in both engines?

5    A.    Yes, I did.

6    Q.    And did you also see rust in both engines?

7    A.    A little bit, yes.

8    Q.    And rust, I guess, is a by-product of corrosion?

9    A.    Yes.

10    Q.    During the process, from the time the boat first got

11    to you in June through the time the engine was

12    disassembled, it looks like you completed what's called, I

13    guess, an inboard water damage worksheet?

14    A.    Yes.

15    Q.    What's the purpose of that document?

16    A.    To get facts on as far as what weather conditions

17    were like and that sort of thing, engine serial numbers,

18    all that.

19    Q.    And would this be something that you would fill out

20    every time you had a case of water ingestion?

21    A.    Typically, yes.

22    Q.    This is something that you want to fill out to

23    determine what?

24    A.    We're trying to determine the source of the water.

25    Q.    So you're just collecting information at this point?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Correct.

2    Q.    Who provided you with the water damage worksheet that

3    you completed for this boat?

4    A.    I believe Mark Verone from Bassett Boat Company.

5    Q.    Bassett Boat is the --

6    A.    MerCruiser Sea Ray dealership.

7    Q.    And did you personally fill out the water damage

8    worksheet in this case?

9    A.    I filled out the copy, I believe.

10   Q.    You filled out a copy --

11   A.    To neaten it up.  We had one in the field and I

12   recopied it to neaten it.

13   Q.    So actually two copies?

14   A.    Yeah, I believe so.

15   Q.    One more legible than the other?

16   A.    Correct.

17   Q.    Did any of the numbers change --

18   A.    No.

19   Q.    -- during the transcription process?

20   A.    No.

21   Q.    And then is the completion of the worksheet

22   contemporaneous or very close to contemporaneous with the

23   inspection that's performed?

24   A.    Yeah.

25   Q.    And is this something that is provided by Sea Ray or

PDF created with pdfFactory trial version www.pdffactory.com

1  MerCruiser?

2  A.   I believe it was supplied -- I know I got it from

3  Mark, and I don't recall whether it was MerCruiser or

4  Sea Ray.

5            MR. NIKAS:  Your Honor, at this time I'd like to

6  have Plaintiffs' 29 admitted.

7            THE COURT:  Mr. Rotondo?

8            MR. ROTONDO:  I have a question and I'm not sure

9  it would be appropriate --

10           THE COURT:  Do you want to voir dire the

11 witness?

12           MR. ROTONDO:  Briefly.

13           THE COURT:  You can voir dire, certainly.

14           Mr. Nikas, it wasn't clear it me what subsection

15 of the rule you were proceeding under.

16           MR. NIKAS:  We are trying to submit this as a

17 business record, Your Honor.

18           THE COURT:  Okay.

19

20                   VOIR DIRE EXAMINATION

21 BY MR. ROTONDO:

22 Q.   I'm going to show you what has been marked for

23 identification as Plaintiffs' Exhibit 29 and 30.

24 A.   Okay.

25 Q.   I want to ask you questions about these two

PDF created with pdfFactory trial version www.pdffactory.com

1    documents.

2        Those are the documents you were referring to in

3    responding to the questions by Mr. Nikas?

4    A.   Yes.

5    Q.   As I understand your testimony, Exhibit 30 is in your

6    handwriting; is that correct?

7    A.   Yes, it is.

8    Q.   Exhibit 29 is in somebody else's handwriting?

9    A.   Yes.

10   Q.   Somebody else put those notations there?

11   A.   Yes.

12   Q.   And you just copied them onto what's been marked as

13   30 for identification?

14   A.   Correct.

15   Q.   Do you know who did 29?

16   A.   One of my mechanics.

17   Q.   Do you know which one?

18   A.   I believe it was David Bird.

19   Q.   And were you present at each and every moment when he

20   made all those notations?

21   A.   I was present during all the testing.

22   Q.   But you didn't make these notations?

23   A.   No, I did not.  He did.

24           THE COURT:  Do you remember when we went over

25   the elements of the exception?

PDF created with pdfFactory trial version www.pdffactory.com

1        MR. NIKAS:  I do, Your Honor.

2        THE COURT:  You haven't covered them all.

3        MR. NIKAS:  It's a record made --

4        THE COURT:  Don't argue.  You haven't covered

5   them all.  I don't want you making speeches, I'm just

6   telling you you haven't covered them all.

7

8                DIRECT EXAMINATION (Resumed)

9   BY MR. NIKAS:

10  Q.    Mr. Wicander, is the inboard water damage worksheet

11  that was completed something that would have been done and

12  performed in the case of any water ingestion case that you

13  had?

14  A.    Typically, yes.

15  Q.    And is it a regular practice of your yard to complete

16  one in the case of a water ingestion case?

17  A.    Yes.

18  Q.    And you were personally present at the time that the

19  readings that are contained on that sheet were conducted

20  and written down?

21  A.    Yes.

22  Q.    And I presume that once it's shown to you, you can

23  establish this as an accurate copy of the sheet that was

24  completed?

25  A.    Yes.

1  Q.   And the second part of the exhibit, which I guess is

2  the attachment because it says "Attach a sketch with

3  location of the canaster or water lift muffler," is that

4  document or is that sketch something that you drew

5  yourself?

6  A.   Yes, it is.

7  Q.   Are the readings contained on that sketch

8  measurements that you made personally?

9  A.   I was there, yes.

10 Q.   You personally observed them being made?

11 A.   Yeah, I actually helped make the measurements.

12 Q.   So you can verify the accuracy of those measurements?

13 A.   Yes.

14      MR. NIKAS:  Your Honor, at this time I'd like to

15 admit this as exception to hearsay rule as a record of

16 regularly recorded activity and a business record.

17      THE COURT:  It's admitted.

18      MR. ROTONDO:  No objection.

19      THE COURT:  We're talking about 29 and 30?

20      MR. NIKAS:  I'd like to move 30 next.

21      THE COURT:  Well, I think we've covered the

22 questioning for 30 as well.  So Plaintiffs' Exhibit 29 and

23 Plaintiffs' 30 are admitted.

24 BY MR. NIKAS:

25 Q.   Just so the jury can see the difference between the

PDF created with pdfFactory trial version www.pdffactory.com

1    two, this is the earlier exhibit and this is the revision.

2    The only purpose in doing this was to make it more

3    legible?

4    A.    Correct.

5    Q.    Readable?

6    A.    Yes.

7    Q.    What happens with the worksheet?  What does -- who is

8    it transmitted to?

9    A.    Typically, it would be transmitted to Mercury Marine

10   and definitely is put in their file.

11   Q.    Do you know if that was done in this case?

12   A.    I'm not certain.  I know I told Mr. Verone about it.

13   Q.    So it wouldn't be your responsibility; it would have

14   been the dealer's responsibility?

15   A.    Yes.

16   Q.    Now, from the time that the vessel got to your

17   marina, which I guess could have been June 9, engines

18   failed on the 10th, you first looked at it on the 11th for

19   the engine problem?

20   A.    Yes.

21   Q.    Did you have any contact with either Mr. or

22   Mrs. Mains after that point?

23   A.    I'm sure I did.

24   Q.    Was it sporadic contact or did you see them often?

25   A.    Quite often.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   What did they do when they came to visit the boat?

2   What was the purpose of their visits?  What did you see

3   them doing?

4   A.   On a weekly basis they were cleaning the boat before

5   it was covered.  Coming down, they were talking to me in

6   the office about everything going on, that sort of thing.

7   Q.   Why were they washing the boat if it wasn't being

8   used?

9   A.   They're very, very particular people.  They like

10  their boat clean and they had a lot of pride in that boat.

11  Q.   Did you see them too much?

12  A.   You might say that.

13  Q.   Did you ever do anything to minimize the time you

14  spent with them?

15  A.   A couple times I give them a pool pass to go use the

16  pool.

17  Q.   Okay.  Now, having performed the mechanical

18  inspection, the pickling of the engine, and completing

19  this worksheet, were you then retained to provide an

20  opinion as to the cause of the water ingestion suffered by

21  this boat?

22  A.   Yes.

23  Q.   Now, I'd like to discuss those opinions.

24          MR. NIKAS:  Before I do, Your Honor, I'd like to

25  offer this witness as an expert under 702.

1          MR. ROTONDO:  Your Honor, I object.  I object to

2    the witness offering any opinions about the subject to

3    which Mr. Nikas wants to offer him on the grounds -- well,

4    I can argue it, but I have a grounds for that objection.

5          THE COURT:  Okay.  It sounds to me like this is

6    something we probably need to have on the record.  I'm

7    going to ask the jury to step next door for a minute.

8              (Whereupon the jury left the courtroom.)

9          MR. NIKAS:  Your Honor, is there a motion in

10   limine or an objection I didn't receive?

11         MR. ROTONDO:  It's simply that the witnesses has

12   been disclosed in his report to testify that he found

13   water ingestion that he says predates the hydrolock.  All

14   right.  So that's what he can testify about, the fact that

15   there was water ingestion that predates the hydrolock, not

16   that there was any defective condition, not that there was

17   any problem in the exhaust system.  That's the only thing

18   he can testify about.  It's the last two lines of his

19   report.

20         THE COURT:  The report does have to state what

21   the opinion is that's going to be given.

22         MR. NIKAS:  Which states that, "In my opinion,

23   both engines have ingested a period water over a period of

24   time prior to the hydrolocking on or about June 9, 2001.

25   No single ingestion incident could have caused the damage

 1  present."  That's pretty clear.

 2          MR. ROTONDO:  And I would agree he can say that.

 3  What he can't say is what Mr. Nikas wants him to say.

 4          THE COURT:  Which is?  What does Mr. Nikas want

 5  him to say?

 6          MR. ROTONDO:  I don't mean to --

 7          THE COURT:  Or you're concerned that he wants

 8  him to say?

 9          MR. ROTONDO:  I'm concerned that he wants him to

10  talk about existence of a defect.  Water ingestion can

11  occur for several different reasons.  If the witness is

12  being proffered to offer the testimony that there was a

13  defect in the design or manufacture of this engine, I

14  think that's outside of the scope of his report.

15          MR. NIKAS:  Your Honor, there are several causes

16  of water ingestion.  All of them are related to the fact

17  that the design of the system is what it is and -- there's

18  no issue as to the design defect.  The manufacturer's

19  admitted it in several service bulletins.  If it's the

20  basis for his opinion that this engine suffered --

21          THE COURT:  I doubt that that would have been

22  admitted in a service bulletin.  But even if it were, the

23  question is what can this witness -- when you say there's

24  no issue, then I want to hear that the defense is

25  stipulating to it.

PDF created with pdfFactory trial version www.pdffactory.com

 1          Are you stipulating to that, Mr. Rotondo?

 2          MR. ROTONDO:  No.

 3          THE COURT:  Then there is an issue.

 4          Then you have to go to your expert report and

 5   show where the opinion that's being offered has been

 6   disclosed as an opinion that will be offered at trial.

 7          Mr. Rotondo has pointed to "it is my opinion,"

 8   which is the usually the way an expert report is set up,

 9   "It is my opinion that" -- and then that's the opinion

10   that's offered at trial.

11          Are you planning to offer more than that?

12          MR. NIKAS:  No.  The only thing he's going to

13   testify to --

14          THE COURT:  Okay.  So all he's going to say is

15   what is here is his opinion.

16          MR. NIKAS:  But in establishing that opinion, he

17   should be able to testify as to the materials that he

18   relied on in determining that the water ingestion had

19   occurred previous to the hydrolocking incident, and that's

20   going to necessarily cover the service bulletins provided

21   by the manufacturer as to water ingestion.

22          MR. ROTONDO:  That's not a report.  And his

23   report in fact says the basis for his opinion is that he

24   sees damage present in the engine based upon his

25   inspection.  That's what his report says.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  Rule 26(a)(2)(B) discusses the

2    written report of an expert.  It says, "The report must

3    contain a complete statement of all opinions the witness

4    will express and the basis and reasons for them."

5          So if there is a basis that's not in the report,

6    it cannot be gone into.

7          It says also, Clause (2), "the data and other

8    information considered by the witness in forming them, any

9    exhibits that will be used to summarize or support them,

10   the witness's qualifications, including a list of all

11   publications authored in the previous ten years, a list of

12   all other cases in which during the previous four years

13   the witness testified, and a statement of the compensation

14   to be paid for the study and testimony in the case."

15         And it says "and" not "or."  So it means that

16   each one of these items must be included in the report.

17   In the report, not in the deposition testimony.

18         MR. NIKAS:  In his expert report, his Rule 26

19   disclosure, Mr. Wicander states, "In connection with the

20   2003 report," which is --

21         THE COURT:  I'm not following you.  As I

22   understand it, his expert report is the October 7, 2003

23   document.

24         MR. NIKAS:  Correct, Your Honor.

25         In his disclosure under Rule 26 he sets forth

1    the additional bases for his opinion and his

2    qualifications.

3              THE COURT:  You're talking about something other

4    than the October 7, 2003 report?

5              MR. NIKAS:  I'm talking about the pleading, his

6    disclosure statement under Rule 26 that was filed in this

7    case.

8              THE COURT:  I'm talking about the report.  I'm

9    literally reading the rule.  Are you operating within

10   what's in the rule here?

11             MR. NIKAS:  I have a document titled Supplement

12   to Expert Report.

13             THE COURT:  Supplement to Expert Report, thank

14   you.  That's helpful.

15             MR. NIKAS:  I assume it's been filed.

16             THE COURT:  What's the date of that document?

17             MR. NIKAS:  November 13, 2003.

18             THE COURT:  And how come it's not attached to

19   the report and your exhibit?

20             MR. NIKAS:  Well, we never intended to introduce

21   the expert report in any event.

22             THE COURT:  Well, it would have been helpful for

23   me to have all of the report in one place.

24             Where in the papers can I see what you're

25   talking about?  I don't want you to read it to me, I want

1    to read it myself.  Why don't you hand it up to me, if

2    that would be acceptable to you.

3             You're saying this is a supplement to his

4    report, correct?  So it's part of his report.

5             MR. NIKAS:  I'm reading the title, Your Honor.

6    To be honest, I had not seen this before.  It says

7    "Supplemental to Expert Report," I assume that's

8    "Supplement to Expert Report."

9             THE COURT:  Can I see it, please.

10            MR. NIKAS:  I'll try to remove it.

11            THE COURT:  You have what he's talking about,

12   Mr. Rotondo?

13            MR. ROTONDO:  I believe I do.  If I can just

14   compare.

15            THE COURT:  Let me ask, Mr. Rotondo, when you

16   look at that document, does that resolve the objection

17   that you have?

18            MR. ROTONDO:  No, it doesn't change anything,

19   Your Honor.

20            THE COURT:  Why not?

21            MR. ROTONDO:  Because it doesn't indicate the

22   other opinions that are now being proffered or the bases.

23            THE COURT:  Okay.  Have you had a chance to look

24   at that, Mr. Nikas?  You said you had not seen it.

25            MR. NIKAS:  I had not seen it.

```
 1          THE COURT:  Take a second and look at it and
 2   tell me whether you think it states the other opinions and
 3   the bases for those opinions.
 4          Can I ask the courtroom deputy to give him some
 5   flags.
 6          MR. NIKAS:  I have some.
 7          THE COURT:  Where you think it does, if you
 8   think it does, put a little flag next to that.
 9          Why don't you show it to Mr. Rotondo so he knows
10   what I'm looking at.
11          MR. NIKAS:  Unfortunately, Your Honor the report
12   does not track --
13          THE COURT:  This is it where you have this
14   sticker?
15          MR. NIKAS:  What I'm referring the Court to is
16   the certification from Mercury Marine and certification
17   from Sea Ray which he discloses as the basis for his
18   qualifications.  That experience, he's allowed to testify
19   as to what material he was provided for and provided with
20   as part of that certification process.
21          THE COURT:  This is under the section on
22   qualifications as an expert.
23          MR. NIKAS:  Correct, Your Honor.
24          THE COURT:  How does that address at all what
25   opinions he's giving or --
```

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. NIKAS:  The only opinion this witness will

2     testify to is that the water ingestion occurred over a

3     historic period of time, as is stated in his report, could

4     not have been caused by the hydrolocking incident, and

5     that the replacement of both engines is necessary.

6          THE COURT:  Okay.  Fine.

7          MR. NIKAS:  But, Your Honor, during the voir

8     dire process as part of his qualifications, will the Court

9     prevent me, since he has not been proffered as an expert

10    witness yet, to go into, as the voir dire process, his

11    background, his experience, the materials he was exposed

12    to as part of his Mercury training and Sea Ray training?

13         THE COURT:  I allowed you to do that, I thought.

14    I gave you latitude.  I let you do it over objection even

15    though I thought we were veering into him testifying as a

16    fact witness or at least along the line.

17         MR. NIKAS:  Well, he is partially a fact

18    witness.

19         THE COURT:  He wasn't disclosed as one.  He's

20    only disclosed as an expert witness.  That was a big issue

21    we had in the motion in limine.  You probably didn't see

22    the ruling, but that was one of the points I made in my

23    ruling in the motion in limine was that he was not

24    disclosed as a fact witness, only as an expert witness.

25    But I allowed you some latitude there because I thought it

1    was necessary or at least fair in terms of providing the

2    basis for what he did leading up to the expert work he

3    did.  But that doesn't allow you to go forward and convert

4    him into a fact witness.

5              MR. NIKAS:  What I'm saying, Your Honor, is

6    since he has not been offered as an expert and I haven't

7    completed the voir dire process of qualifying him as an

8    expert, because that qualification is relevant --

9              THE COURT:  You offered him as an expert

10   yesterday.

11             MR. NIKAS:  No, I withdrew because we weren't

12   getting to the opinion point.  Mr. Rotondo objected and I

13   withdrew.

14             THE COURT:  To his being offered as an expert?

15             MR. ROTONDO:  I didn't object.  I didn't

16   stipulate until I heard the question he was asked.

17             MR. NIKAS:  And I said we won't go into opinion

18   yet then.  I have not formally submitted him.

19             THE COURT:  I put down that he had been offered

20   and Mr. Rotondo simply was reserving the right to

21   cross-examine him.  I didn't understand that, sorry.

22             MR. NIKAS:  I never heard a ruling, so I stopped

23   the voir dire process at that time.

24             THE COURT:  I said you can go on and question

25   him.  That was my ruling.  I guess you want --

PDF created with pdfFactory trial version www.pdffactory.com

 1          Mr. Rotondo, you're assuming I haven't ruled

 2    yet; is that correct?

 3          MR. ROTONDO:  No, I understand he's been

 4    designated as an expert.  My only issue with respect his

 5    offering opinions is what those opinions are that he's

 6    going to offer and whether they've been disclosed.  That's

 7    my issue.

 8          THE COURT:  That's what I thought you were

 9    saying.

10          MR. ROTONDO:  Yes.

11          THE COURT:  Okay.

12          MR. NIKAS:  Notwithstanding --

13          THE COURT:  So if what you're going to try to do

14    is under the guise of voir dire get in things that

15    otherwise would not be admissible because they were not

16    disclosed as his expert opinion, you're going to get cut

17    off from doing that, just so we're clear.

18          MR. NIKAS:  I'm not trying to be argumentative,

19    I just want to be sure I don't incur the Court's ire any

20    further --

21          THE COURT:  You haven't incurred any ire.  I'm

22    telling you where the lines are.

23          MR. NIKAS:  If no opinion is offered -- in other

24    words, I don't ask him any opinion questions outside the

25    scope of the opinion offered in his report, during voir

1    dire I can discuss his education, his background, the
2    components of that education and background, anything that
3    qualifies him as an expert.
4        THE COURT:  Yes.  And I thought you did all that
5    yesterday, to my satisfaction at least.
6        MR. NIKAS:  But I haven't completed it to mine.
7    Part of the voir dire process is building him up as an
8    expert in front of the jury.  Since we started with the
9    fact issues, I hadn't gotten to that point.
10       THE COURT:  You didn't start with the fact
11   issues.  You started with his qualifications and then even
12   went back and went over his education.
13       My concern is that -- I mean, I understand you
14   sort of find yourself in a box.  But that's not my
15   concern.  I have to make sure that you don't use voir dire
16   as a back door to do something you're not allowed to do.
17   And you're not going to be allowed to do that.  It's not
18   fair.  I mean, he was disclosed as an expert and he was
19   disclosed for certain opinions.  And you can't get certain
20   evidence in that you otherwise would have liked to have
21   gotten in as an opinion, but it wasn't disclosed as an
22   opinion, as part of his background.
23       MR. NIKAS:  I'm not talking about an opinion.
24   I'm talking about documents that he's reviewed, materials
25   that he's been provided, written documentation that make

PDF created with pdfFactory trial version www.pdffactory.com

1    up the certification process by MerCruiser and Sea Ray

2    since he holds both certifications.  We didn't go into

3    those issues yet.

4            THE COURT:  But he has not disclosed in the

5    report the basis for his opinions.

6            MR. NIKAS:  But not the basis for his

7    qualifications.  And so if I just limit my questioning to

8    his qualifications --

9            THE COURT:  It seems to me you're being more

10   than a little cute here, Mr. Nikas.  It sounds to me that

11   what you're saying is there are things that happen to be

12   the basis for his opinion and, by the way, they also

13   happen to be the basis for his qualifications.

14           MR. NIKAS:  But that's true.

15           THE COURT:  Is that what you're saying?

16           MR. NIKAS:  That's true.  It's not being cute,

17   it just happens to be a fact.  I'm not in a box,

18   Your Honor, I'm in a box below the ground and we call that

19   something else.  So to the extent that what I'm asking for

20   is permissible and certainly justifiable under Rule 11,

21   this isn't even being somewhat aggressive in terms of

22   presenting the evidence.

23           If these materials, these documentary materials

24   were reviewed during the course of his education and we

25   can say have you reviewed, you know, X's publications

PDF created with pdfFactory trial version www.pdffactory.com

1    regarding this, X's publications regarding that, X's

2    publications regarding whatever, that should be

3    permissible under the scope of voir dire.

4              THE COURT:  It depends how much detail you go

5    into in terms of what's in the publications.

6              MR. NIKAS:  I'm not going to ask him to read

7    them.  I'm not even going to ask him to summarize what

8    they say.  I can ask them has he seen them and reviewed

9    them.

10             THE COURT:  It depends -- I understand what

11   you're saying you're not going to do, but there are other

12   things that skillful counsel do to sort of -- you don't

13   ask him to read it, you don't ask him to summarize it, but

14   in your question you basically testify.  You've done that

15   a few times, okay?  And that's okay with me as long as

16   there's no objection.  But we're in a very -- we are at a

17   point here where it's a highly-contested point.  I just

18   want to make sure that you understand the grounds rules

19   before we bring the jury in.

20             MR. NIKAS:  Your Honor, I think at every point I

21   have tried to be extremely cautious and to the point where

22   I've gone before the Court prior to beginning any line of

23   questioning or prior to the use of anything that might

24   even be considered to be outside the scope of the Court's

25   permissible testimony.  But --

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  Okay.  Mr. Rotondo has been waiting

2    patiently.  Let me so what he has to say and then I want

3    to get the jury back in.  I think I understand where

4    people are coming from and I know enough to make rulings.

5          Mr. Rotondo?

6          MR. ROTONDO:  My point is if it's not an opinion

7    that he has been disclosed to testify about, then all

8    these documents that form the basis of his background are

9    irrelevant, particularly given that those documents

10   weren't disclosed in a disclosure either.  I think it's

11   all irrelevant.  It's not relevant to his qualifications

12   because we're not contesting his qualifications as a

13   mechanic.  It's all irrelevant because it really goes to

14   opinion evidence.

15         THE COURT:  It goes to his qualifications to

16   give an opinion he has not been disclosed to give.

17         MR. NIKAS:  Actually, Your Honor, even though --

18         THE COURT:  So what you're going to have to do,

19   so I have a basis for knowing what you're doing, is you're

20   going to have to link up -- if you're going to go into

21   qualifications -- I mean, I would prefer, actually --

22   well, I guess I know what opinion he's going to give.  I'm

23   just going to have this page open here.  And if there's an

24   objection, then you'll have to lay a foundation as to why

25   a qualification that you're going into relates to the

 1  opinion he's going to be given, okay?

 2          MR. NIKAS:  No, no, Your Honor.  I'm not going

 3  to offer any -- I want to make it very clear, that I won't

 4  even approach that territory.  In fact, I'm going to

 5  separate the two.  Any questions that we get at this

 6  juncture will be solely related to his qualifications as

 7  an expert.  And I will ensure that they don't even come

 8  close to his opinion, you know, so there's no question

 9  about the effect on the jury of hearing that evidence in

10  close connection with the opinion that's offered.

11          THE COURT:  Well, I'll let you proceed the way

12  you want to proceed.  All I'm saying is if it's not

13  apparent to me how a qualification that you're going into

14  is somehow relevant to an opinion he's giving and there's

15  an objection, I'm going to sustain the objection,

16  particularly if it's a qualification that relates to

17  opinions that it seems like you'd like him to give and he

18  hasn't been disclosed to give and hasn't provided the

19  basis for giving them.

20          MR. NIKAS:  What I don't understand, is his

21  opinion, we can all see, since it's only nine words long,

22  is ingested water over a period of time prior to the

23  hydrolocking, then voir dire as to his qualifications

24  regarding water ingestion should be acceptable.

25          THE COURT:  It is.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. NIKAS:  Because the jury has to make a

2    determination whether that conclusion is valid and whether

3    he possesses the qualifications to do it.

4          THE COURT:  It is.  It is.  Part of my problem

5    is that I think you covered that yesterday.  And you may

6    say you haven't covered it to your satisfaction --

7          MR. NIKAS:  We didn't cover that at all.

8          THE COURT:  Don't cut me off.  I'm telling you

9    what my problem is so you can be aware of it.

10         It seems to me you covered his qualifications

11   yesterday and now that you have a problem in terms of

12   trying to get in opinions that you can't get in, you're

13   going back to cover things under the guise of his

14   qualifications.  You told me that when I looked at this

15   supplemental disclosure, I would see things that show his

16   other opinions he was going to give.  All I saw when you

17   handed up that sheet to me was an arrow that went to

18   qualifications.  That's your only path to get where you

19   want to get.  That's not what you told me before when we

20   first started the discussion.  So I'm naturally skeptical.

21   You're going to have to really show me that what you're

22   doing is relevant to his qualifications to give the

23   opinion that he's been disclosed to give and the bases for

24   those opinions that have been disclosed in the report.

25         We'll bring the jury in.

PDF created with pdfFactory trial version www.pdffactory.com

 1         MR. NIKAS:  Your Honor, actually, can I ask you

 2    one question?  This is out of respect for the Court, not

 3    for a request.

 4         The opinion he's been offered for is water

 5    ingestion.  He holds the factory certification which we

 6    pointed to as a Mercury-certified technician.  Am I

 7    allowed to solicit testimony regarding any materials he's

 8    been provided by Mercury regarding water ingestion?

 9         THE COURT:  I'll rule as the questions come out.

10    I'm not going to give you a blanket authorization.

11         MR. NIKAS:  I'm just trying to be cautious,

12    Your Honor.

13         THE COURT:  I understand your concern, but I

14    can't give you a blanket authorization.

15              (Whereupon, the jury entered the

16              courtroom.)

17         THE COURT:  Please be seated, ladies and

18    gentlemen.

19         We'll continue on and go until -- we'll go to

20    10:35, how's that?

21    BY MR. NIKAS:

22    Q.   Mr. Wicander, you were retained to provide an expert

23    opinion in this case; is that correct?

24    A.   Yes.

25         MR. NIKAS:  Your Honor, may I show the witness

PDF created with pdfFactory trial version www.pdffactory.com

1    his expert witness report --

2            THE COURT:  Yes.

3            MR. NIKAS:  -- so he can offer that opinion

4    within the strict guidelines imposed.

5            THE COURT:  Yes.

6    BY MR. NIKAS:

7    Q.   Mr. Wicander, can you please tell us what that

8    opinion is, what your conclusion reached was?

9    A.   Want me to just read it?

10   Q.   Sure, that would probably be safest.

11           THE COURT:  Acceptable to counsel?

12           MR. ROTONDO:  If we're talking about page 3.

13           THE COURT:  "It is my opinion."

14           MR. ROTONDO:  I don't have any objection.

15   A.   It is my opinion that both engines have bee --

16           THE COURT:  Can you do it slowly, sir, so the

17   jury can follow you?

18   BY MR. NIKAS:

19   Q.   In fact, slowly, loudly, and make sure everybody

20   hears it because this is going to be --

21   A.   Sure.

22        It is my opinion that both engines have ingested

23   water over a period of time prior to the hydrolocking on

24   or about June 9.

25           THE COURT:  2001.

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    2001, sorry.

2         No single ingestion incident could have caused the

3    damage present.  Both engines need to be replaced.

4              MR. NIKAS:  May I, Your Honor?

5              THE COURT:  You may.

6    BY MR. NIKAS:

7    Q.    Now, before we get into the bases for your opinion or

8    for the reasons that you've come to that conclusion or the

9    evidence supporting that conclusion, I'd like to go back,

10   and we started this yesterday, to talk about your

11   qualifications to render that opinion.  And yesterday you

12   mentioned that you're a Mercury-certified technician; is

13   that correct?

14   A.    I was at the time, yes.

15   Q.    And you were first certified when?

16   A.    I believe it was 1989.

17   Q.    What topics were included in the training you

18   received prior to and in order to maintain that Mercury

19   certification?

20   A.    Topics, anything from new products to maintenance

21   to -- we went through disassembly of engines, stern

22   drives, that sort of thing.

23   Q.    Did you have to review service bulletins,

24   installation manuals, parts manuals, all those types of

25   materials attended to that certification?

1  A.    Certainly.

2  Q.    And although your background is as an engine

3  technician or engine mechanic, that's rather broad, this

4  opinion is rather specific in terms of identification of

5  water ingestion and then a determination that water

6  ingestion in this case was historical rather than as a

7  result of a single incident; is that true?

8  A.    Yes.

9  Q.    Then did you receive or review -- did you receive any

10  training or did you review any materials during the

11  process of your Mercury certification that dealt with

12  water ingestion?

13         MR. ROTONDO:  Objection.

14         THE COURT:  Do you want to rephrase the

15  question?

16         MR. NIKAS:  Sure.

17         THE COURT:  Why don't you make it not leading.

18  BY MR. NIKAS:

19  Q.    Mr. Wicander, did you review any materials --

20         THE COURT:  I said why don't we make it not

21  leading.

22         MR. NIKAS:  I'm trying to be -- I'm trying to

23  ensure that the witness does not inadvertently violate any

24  restrictions.

25

PDF created with pdfFactory trial version www.pdffactory.com

1    BY MR. NIKAS:

2    Q.   Mr. Wicander, what materials did you review?

3    A.    Certainly.

4              MR. ROTONDO:  Object.

5              THE COURT:  We're talking about his

6    qualifications and certification.  So what was involved in

7    his certification is where we're going, right?

8              MR. NIKAS:  Sure, Your Honor.

9    BY MR. NIKAS:

10   Q.   During the certification process, what materials did

11   you review that are relevant to your qualification as an

12   expert to testify about water ingestion?

13   A.   Service bulletins.

14   Q.   What did the service bulletins discuss?

15             MR. ROTONDO:  Objection.

16             THE COURT:   Sustained.

17   BY MR. NIKAS:

18   Q.   Now, did all service bulletins discuss water

19   ingestion?

20             MR. ROTONDO:  Objection.

21             THE COURT:  He can answer that yes or no.  Did

22   they all discuss it?

23   A.    No.

24   BY MR. NIKAS:

25   Q.   Were there specific service bulletins that discussed

PDF created with pdfFactory trial version www.pdffactory.com

1   the topic of water ingestion?

2           MR. ROTONDO:  I object to that.

3           THE COURT:  I'll allow that.

4   A.   Yes.

5   BY MR. NIKAS:

6   Q.   Were there specific service bulletins that discussed

7   how to identify water ingestion?

8   A.   Yes.

9   Q.   And were there specific service bulletins that

10  discussed how to identify the point of entry of water

11  ingestion?

12          MR. ROTONDO:  Objection.

13          THE COURT:  I'll allow that one too.

14  A.   Yes.

15  BY MR. NIKAS:

16  Q.   Were there service bulletins that discussed the

17  causes of water ingestion?

18  A.   Yes.

19  Q.   And did you review all of these materials during the

20  course of your certification as a Mercury-certified

21  technician?

22  A.   I'm sure I did, yes.

23  Q.   And they form a basis for your qualifications as an

24  expert to testify in this case?

25  A.   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   You were also designated by defendant as a graduate

2   of their training program, correct?

3   A.   Yes.

4   Q.   And I think you talked about graduating from their

5   Sea Ray Service School; is that correct?

6   A.   That's correct.

7   Q.   Did you also receive a service training award from

8   Sea Ray?

9   A.   That was something we got after -- we received after

10  we had the training, yes.

11  Q.   The engine installed on board Sea Ray boats if

12  powered by gasoline is manufactured by whom?

13  A.   Mercury.

14  Q.   And that's exclusively, correct?

15  A.   Yes.

16  Q.   During the course of your Sea Ray certification did

17  you review materials provided by Sea Ray that included

18  MerCruiser materials regarding the engine?

19  A.   Repeat that.

20  Q.   Sure.

21       During your Sea Ray certification, in reviewing those

22  materials, did you also include materials produced by

23  MerCruiser but provided to you by Sea Ray as part of that

24  training?

25  A.   I don't believe so.

1    Q.   What work did you perform for Sea Ray and what type

2    of Sea Ray service work did you do?  Did you do engine

3    work on Sea Rays?

4    A.   Sure.

5    Q.   Where would Sea Ray, then, have expected you to

6    look --

7              MR. ROTONDO:  Objection.

8              THE COURT:  Sustained.

9              Want to rephrase that, maybe?

10             MR. NIKAS:  Sure, Your Honor.

11   BY MR. NIKAS:

12   Q.   You performed engine work on Sea Rays, correct?

13   A.   Yes.

14   Q.   In performing engine work on Sea Rays and during the

15   certification process, what materials did you consult?

16   A.   Would be service bulletins and we have service books,

17   yes.

18   Q.   And those would be produced by?

19   A.   Both MerCruiser and Sea Ray.

20   Q.   In terms of market penetration, by holding a

21   MerCruiser certification, you have a gasoline

22   certification, correct?

23   A.   Yes.

24   Q.   What percentage of the market does MerCruiser hold

25   for gasoline engines, inboard?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Huge.   Probably 90 percent or better.

2    Q.    So any material provided by MerCruiser can be

3    accessed by any mechanics that work on MerCruiser engines?

4    A.    Yes.

5    Q.    And are those materials published in some form?

6    A.    Typically, originally back when I was first

7    certified, it was all in print.   Now it's on MercNet,

8    which is their computer-based system.

9    Q.    In order to maintain your certification through

10   Mercury, does Mercury require you to consult service

11   bulletins and other material that's posted on MercNet?

12   A.    Sure.

13   Q.    Is MercNet available to anybody with a password and a

14   pin code?

15   A.    Yes.

16   Q.    It's not limited to Mercury employees, is it?

17   A.    No, it's limited to Mercury dealers.

18   Q.    And that would be any Mercury dealer, correct?

19   A.    Yes.

20   Q.    And the information on MercNet is historical,

21   correct?

22   A.    Yes, it is.

23   Q.    Meaning it goes from today back to --

24   A.    Whenever.

25   Q.    Whenever.

1           MR. NIKAS:  Your Honor, at this time I'd like to

2     offer this witness as an expert to testify as to the topic

3     of water ingestion under Rule 702.

4           THE COURT:  He's accepted as an expert to give

5     the opinion that he's given.

6           MR. ROTONDO:  He's already given his opinion and

7     I didn't object to his reading his opinion, but to the

8     extent he's going to go into other topics not disclosed, I

9     will object.

10          MR. NIKAS:  May I continue, Your Honor?

11          THE COURT:  Yes, please.

12    BY MR. NIKAS:

13    Q.   Now, there are two types of exhaust systems in use on

14    boats, correct?  Generally in terms of whether they use

15    cooling water on are not into the exhaust and where that

16    cooling water is injected?

17    A.   I'm confused.

18    Q.   Well, are there -- this is a wet system; is that

19    right?

20    A.   Yes.

21    Q.   What is a dry system?

22    A.   A dry system would be something similar to your car.

23    Q.   When would that be used?

24    A.   Boats that I work on, it's not used.

25    Q.   Are all MerCruiser exhausts wet system?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   A.   I'm sure some in their performance are not, but most

 2   are, yes.

 3   Q.   The boat owned by Lori and Peter, that wouldn't be

 4   considered performance in terms of exhaust system setup,

 5   would it?

 6   A.   No.

 7   Q.   If there's water surrounding the manifold, I guess in

 8   the water jackets to cool the outside of it, and then it's

 9   shot into the hose at the end to cool the exhaust gas,

10   would you expect to find rust inside the elbows?

11           MR. ROTONDO:  Objection, leading.

12           THE COURT:  I'll allow that question.

13   A.   No.  Typically not.

14   BY MR. NIKAS:

15   Q.   Why not?

16   A.   You don't want water inside here.  If there's water

17   getting in here, it's going to get into the engine.

18   Q.   But there's water on the other side of that wall

19   right there?

20   A.   Yes.

21   Q.   Is there no way for that outside water to get into

22   this --

23           MR. NIKAS:  May I approach, Your Honor?

24           THE COURT:  You may.

25
```

1  BY MR. NIKAS:

2  Q.     -- into this channel here?

3  A.    It can be -- I mean, with the engine in the Mainses'

4  boat, it certainly can.  At idle speeds there's pulses in

5  the exhaust system because there is both the intake and

6  exhaust valves are open at the same time for a very short

7  duration which causes a pulsing in the exhaust.  So if

8  there is some water present, it could possibly be sucked

9  back in.

10 Q.   Why does the engine pulse at an idle and not pulse,

11 say, at half throttle or full throttle?

12 A.   Because at half throttle or full throttle there's so

13 much exhaust gases coming out at such a high rate because

14 of the rpms of the engine, it won't allow it.

15 Q.   Even if, I guess, at idle water got back, you said

16 both intake and exhaust valves could be open at the same

17 time?

18 A.    Yes.

19 Q.   When you were discussing yesterday about a

20 four-stroke engine, I understood the intake valve to be

21 open to suck in air, system draws down and gas exploded,

22 exhaust valves then open pushing out exhaust gas.  Why

23 would both valves be open at the same time if that's the

24 four-stroke cycle?

25 A.    Well, it's based on the mechanics of how those valves

PDF created with pdfFactory trial version www.pdffactory.com

1  are opened.  These particular engines are what they call

2  roller lifter engines.  The lifter, which pushes the push

3  rod which opens up the valve, that lifter has to stay in

4  constant contact with the camshaft.  So you don't get a

5  real sharp open-close.  You do get a -- because it has to

6  be -- it's almost like egg shaped where this lifter, just

7  an item like that where the push rod mounts into, has to

8  stay in constant contact with that cam.  Because of that,

9  there is a short maybe five-, 6-degree of that rotation

10  that actually both are open at the same time.

11  Q.   So both valves are open at the same time, any water

12  that's present in the cylinder will actually get in --

13               MR. ROTONDO:  Objection.

14               THE COURT:  You know what?  I'm going to let the

15  jury take their morning recess now.  It's a good time.

16  And the witness may step down.

17                    (Whereupon the jury left the courtroom.)

18               THE COURT:  Please be seated everyone.

19               Just so counsel know how I'm trying to manage

20  this exchange, I sustained the objection -- I overruled

21  the objection to the question on rust because looking at

22  the report I saw this mention of internal rusting

23  throughout the elbow.  And when we have questions that are

24  asked, I'm going to be looking it the report.  So it might

25  be helpful if plaintiffs' counsel, when you're going into

PDF created with pdfFactory trial version www.pdffactory.com

1    an area, can just say, I want to direct your attention to,

2    you know, middle of page 2 of the report, so I know what

3    you're talking about because that's what I'm going to be

4    looking for.

5              We'll recess.

6              MR. NIKAS:  So by directing the witness, I'll be

7    directing -- notifying the Court of where I'm looking?

8              THE COURT:  Yes, and counsel.

9              We'll recess.  We'll take our full recess.

10             (Whereupon, a recess followed.)

11             THE COURT:  We'll have our witness retake the

12   stand.

13             Just so the record is clear, I think Mr. Nikas

14   misspoke when he said he never intended to offer

15   Mr. Wicander's report, because the plaintiffs' reply to

16   defendant's objections makes it clear that it was intended

17   to be offered.

18             Let's bring the jury in.

19             MR. NIKAS:  I didn't draft that reply,

20   Your Honor.  I apologize for any confusion.

21                 (Whereupon, the jury entered the

22                 courtroom.)

23             THE COURT:  Please be seated everyone.

24             Whenever you're ready, Mr. Nikas.

25

 1  BY MR. NIKAS:

 2  Q.   Mr. Wicander, to go back, I guess, to the disassembly

 3  that you performed on this engine.   When you removed the

 4  exhaust elbows, you found rust in both of them, port and

 5  starboard?

 6  A.   Yes.

 7  Q.   And what is that rust indicative of?

 8  A.   That tells me that there's water in the exhaust

 9  system.   You know, where it shouldn't be, obviously, in

10  the elbow.

11  Q.   And so can you, using that elbow in front of you,

12  show the jury where the rust was found?

13  A.   Rust was found all throughout this area inside, which

14  should only have exhaust gases in it.

15  Q.   Would you expect to find rust or at least some type

16  of corrosion in the water jacket areas?

17  A.   Certainly.

18  Q.   And the water jackets are where?

19  A.   Right up in here.

20  Q.   The rust you found, though --

21  A.   Was inside the hot gas area.

22  Q.   At the time that you first conducted the leak down

23  and compression test, which I guess, according to

24  Exhibit 26, was the week, week and a half or so -- no,

25  week after the Mains arrived, I guess, at the middle of

Vol. III - Page 384

1  their intended round trip, you didn't pull the head off at

2  this time, correct?

3  A.    No, we did not.

4  Q.    I'd like to draw your attention, though, to what

5  looks like an apparent discrepancy between Exhibit 26 and

6  Exhibit 27.

7              THE COURT:  27 has not been admitted.

8              MR. NIKAS:  My apologies, Your Honor.

9  BY MR. NIKAS:

10  Q.    In Exhibit 26, you come to the conclusion -- or

11  excuse me, you come to the opinion that the damage to both

12  engines was a result of hydrolocking?

13  A.    Yes.

14  Q.    And was that your opinion at the time?

15  A.    At the time it definitely was.

16  Q.    What did you base that opinion on?

17  A.    Based upon the situation when we -- we had water in

18  the cylinders, that sort of thing.

19  Q.    What changed by the time you had come to your opinion

20  that the water ingestion on both engines in this boat was

21  historical rather than the result of just one incidence of

22  water ingestion?

23  A.    It was the scoring on the cylinder walls.  When you

24  get water over a long period of time while the engines are

25  running, like we did before, it washes away the oil from

1    the cylinder walls.  So over time it starts to wear and

2    starts to scratch the cylinder walls.

3    Q.    This is a tough thing to describe?

4    A.    It is, yes.

5    Q.    But the cylinder walls are made of what?

6    A.    Hardened -- partially steel and hardened.

7    Q.    And is it soft steel or is it --

8    A.    It's a very hard material.  It needs to be.  Very

9    strong material as well.

10    Q.    At full throttle how many times approximately per

11    minute is this engine turning around?

12    A.    4500 to 4800, typically.

13    Q.    And is the operation of a boat engine similar to the

14    operation of a car engine where it starts and stops and

15    starts and stops?

16    A.    Typically, you get the engine, you know, if you're in

17    the slip or moving the boat, parking the boat, that sort

18    of thing.  You're not starting and stopping the engine,

19    but you're going from idle to a little higher rpms, that

20    sort of thing.

21    Q.    When you're traveling any distance, are you at a

22    constant?

23    A.    Typically, yes.

24    Q.    Is it unusual for a marine engine to be running for

25    hours on end?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   It is, yes.

2   Q.   It's not unusual?

3   A.   Not unusual, I'm sorry.

4   Q.   So when you did the disassembly, you found exhaust in

5   the elbows, was there also exhaust in the manifold?

6   A.   Water or exhaust?

7   Q.   I'm sorry, rust in the manifold?

8   A.   Yes, there was.

9   Q.   What did that physical evidence indicate to you?

10  A.   That definitely indicated that water had been coming

11  down through the exhaust system.

12  Q.   Did you inspect the gaskets between the elbows and

13  the manifold?

14  A.   We did.  We observed that the gaskets were of an

15  older style, more original with the engine.

16  Q.   What's a gasket?  What does it do?

17  A.   Gasket is when you have two metal surfaces and you

18  need to seal them, you don't want any leaks, you install a

19  gasket.  You don't want water leaking where it shouldn't

20  be and exhaust.

21  Q.   Did the gaskets indicate failure or leakage of some

22  sort?

23  A.   We saw some leakage, yes.  Some evidence of some

24  leakage, yes.

25  Q.   Did you find scoring -- I guess there are 16

1    cylinders?

2    A.    Yes, between the two.

3    Q.    Did you find scoring in just one or several or all of

4    the cylinders?

5    A.    I believe it was most of them.

6    Q.    What did that scoring indicate?

7    A.    It indicated to me that over a long period of time

8    water was coming into the cylinders and washing away the

9    lubrication.  It takes a long time because it is a very

10   hard material.  As the piston's going up and down and you

11   start losing lubrication, it creates heat and it scratches

12   the cylinder wall.

13   Q.    Is it possible that the scoring you observed was

14   caused by that single instance of hydrolocking on June 9?

15   A.    No.  Definitely not.

16   Q.    And why not?

17   A.    Because in a hydrolocking situation, the piston can't

18   move.  So even when you try and start it, the piston is

19   not able to move.  So -- and with the scoring, the scoring

20   was on the cylinder walls, the full stroke of the pistons.

21   So that would tell me that it was happening when the

22   engine was running and not while it couldn't run.

23   Q.    So I guess that makes sense.  When the engine's

24   running, the piston is going up and down, correct?

25   A.    Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.    So that, I guess, movement between the piston and the

2   cylinder wall is what creates that scoring, the friction?

3   A.    Yes, it is.

4   Q.    When this boat had its system flushed by Mr. Mains,

5   was the engine running or not?

6   A.    It was not running.

7   Q.    So if this engine was not running at the time that it

8   was flushed, is there any way that that scoring could have

9   been caused at that time?

10  A.    No.  Definitely not.

11  Q.    And then while conducting your compression test and

12  your leak down test, was the engine turned over

13  sufficiently to cause the scoring that you saw?

14  A.    No.  I mean, we did run the engines just, you know,

15  getting all the water out of them as well, but no, that

16  certainly wouldn't have done it.  It happens over a very

17  long period of time.

18  Q.    And I guess on the port engine you found all but one

19  cylinder was significantly scored and on the starboard

20  engine half of the eight cylinders had significant

21  scoring.  Given, I guess, the time frame involved from the

22  time that you started your leak down and compression test

23  and the time you were expending all this water, would it

24  have been possible to have that level of scoring on I

25  guess 12 of the 16 cylinders?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    No, definitely not.

2    Q.    You noted in your inspection report -- not your

3    expert report, but the one you did when you were, I guess,

4    trying to determine how severely the engines had been

5    damaged, the exhaust hoses were higher than the elbows?

6    A.    Yes.

7    Q.    Was that angle severe or was it fairly moderate?

8    A.    Fairly moderate.  But things that can happen when --

9    we measured the angles of the hoses when the boat's

10   sitting at the dock.  I mean, if you're idling and you're

11   in a sea situation or people move around on the boat, the

12   boat will tend to rock.  And this angle is all over the

13   place.  So, you know, if it's at a -- say it's sitting at

14   the dock, it's an okay angle.  Once you go out to sea and

15   you hit some waves and you're going up and down the waves,

16   this elbow can pitch along with the whole boat, of course,

17   so the angle is constantly changing.

18   Q.    Where is the hose attached to the elbow, what part of

19   it?

20   A.    Right here, right around here (indicating).

21            MR. NIKAS:  Your Honor, may I approach?

22            THE COURT:  You may.

23   BY MR. NIKAS:

24   Q.    If this were the hose, could you put it in the proper

25   place?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Okay.   Just like that.

2         And what happens with -- say this is water.  I can't

3    put water in here.  Say this is water and it's in -- now

4    you can't see it.  If it's inside pitching back and forth,

5    it can go out like that or it come back towards the

6    engine.

7    Q.    Is there a running condition where that problem is

8    exacerbated?

9    A.    Definitely at lower speeds, idle speeds, that sort of

10   thing.

11   Q.    Why is that?

12   A.    Because there's so little back pressure in the

13   exhaust system it can't always force out all the water.

14   And you also have that valve overlap situation which is

15   causing that suction that we talked about in the exhaust

16   system.

17   Q.    Actually, that's right.  That's actually the question

18   we were talking about right before the break was the

19   pulsing, I guess?

20   A.    Yes.

21   Q.    What causes the pulsing, first, I guess?

22   A.    You basically have cylinders that possibly have the

23   valves open at the same time, which they do shortly.  And

24   two at the same time or three at the same time all on the

25   same side and you get -- you're getting basically --

Vol. III - Page 391

1  cylinder is basically a pump.  If you have both valves

2  open, intake and outflow of the pump, it's going to pulse

3  if they're both open as the pistons are going up and down.

4  That causes this pulsing sensation in the exhaust system

5  at low speeds.

6  Q.   How does that pulsing sensation effect water

7  ingestion?

8          MR. ROTONDO:  Objection.

9          THE COURT:  Basis?

10          MR. ROTONDO:  Not disclosed.

11          MR. NIKAS:  Your Honor --

12          THE COURT:  One second.

13          MR. NIKAS:  -- we talked about very

14  significantly --

15          THE COURT:  You just point me to where in the

16  report is the basis for the opinion.  Just give me a page

17  number, please, part and page.

18  BY MR. NIKAS:

19  Q.   Actually, Mr. Wicander, do you have the revised water

20  ingestion worksheet that we had used?

21  A.   I have the copy of my October 7 report.

22  Q.   No, the water ingestion worksheet actually has the

23  timing written on it.

24          THE COURT:  Looking for the number for that?  Is

25  that 29 and 30?

PDF created with pdfFactory trial version www.pdffactory.com

1        MR. NIKAS:  It was the second of the two, which

2   would have been 30, dated February 12, 2004 -- I guess

3   they both have the same date.

4        THE COURT:  One's 29 and one is 30.

5        MR. NIKAS:  It would have been the more recent

6   of the two.

7        THE COURT:  I thought 29 was done by a person

8   and the witness copied to create 30.

9        MR. NIKAS:  That's correct.

10  BY MR. NIKAS:

11  Q.   Mr. Wicander, if you look at Exhibit 30, which has

12  been admitted, although this is a poor photocopy, for

13  which I apologize, do you see that notation of the

14  8 degrees?

15  A.   Yes.

16  Q.   What does that mean?

17  A.   That is the base ignition timing.  They want the

18  number one spark plug -- there's eight cylinders, they

19  want the number one cylinder to be firing 8 degrees before

20  that cylinder actually gets all the way up to the top of

21  its stroke.  So before -- so it's 8 degrees of the

22  rotation of the bouncer on the front of the engine or the

23  crankshaft.  So as the piston's coming up, just prior to

24  it -- in the compression state where it already has the

25  gas air mixture, and just before that spark is going to

PDF created with pdfFactory trial version www.pdffactory.com

1    fire to push that piston back down, they want it to fire

2    8 degrees of that rotation just prior to that reaching the

3    top.

4    Q.    That's for the number one cylinder?

5    A.    That's for the number one cylinder.

6    Q.    Are all the cylinders connected to the same piece of

7    equipment?

8    A.    Yes, they are.

9    Q.    So if you know the timing on that first cylinder, it

10   will determine what happens to the other seven?

11   A.    Correct, yes.

12   Q.    And so that's what will dictate the opening of the

13   intake and exhaust valves?

14   A.    Yes, it does.  They're all mechanically connected.

15   Q.    These are fixed components?  In other words, they

16   don't, other than through, I guess, wear or -- what

17   effects their movement?

18   A.    All eight pistons are connected through connecting

19   rods to the crank and the camshaft, which is opening and

20   closing all the valves, is connected through a chain

21   drive.  So nothing variable in the mechanics of it.

22   Q.    So like a skeleton, I guess, the valves are connected

23   to the pushrods which are connected to the camshaft which

24   is connected to the chain drive, to the crankshaft, to the

25   connecting rods, to the pistons?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.    Correct.

2  Q.    So because this is the timing of this specific

3  engine, that's what will dictate the opening and closing

4  of the intake and exhaust valves, the timing that happens?

5  A.    Yes.

6          MR. NIKAS:  May I continue, Your Honor, on that

7  issue of the pulse created by the opening of the intake

8  and exhaust valves?

9          MR. ROTONDO:  Still not disclosed in the report.

10          THE COURT:  Objection's sustained.

11  BY MR. NIKAS:

12  Q.    Mr. Wicander, going back to the leak down test that

13  you performed on the engine, the significance of the air

14  leaking into the manifolds is what?

15  A.    Well, that's one nice thing about the leak down test.

16  You have a constant pressure that you're applying to the

17  cylinder.  So you can actually hear where some of the air

18  may be leaking.  If you have a failing cylinder, you can

19  actually hear, either through the intake, you can hear it

20  out of your ear that air is rushing into the intake or you

21  can hear it coming out of the valve cover, which would

22  mean -- if it were coming out of the intake, it would be

23  leaking past the intake valve.  If you could hear air

24  rushing into the exhaust, it would be leaking past the

25  exhaust valve.  And also if you hear air leaking into the

PDF created with pdfFactory trial version www.pdffactory.com

1    crank case, which in this case you can hear out through

2    the cover that goes over the top of the engine, then it

3    tells me it's leaking past the rings on the piston.

4    Q.    So based on what you found, you knew that there was

5    damage caused in the places where you had, I guess,

6    excessive percentages?

7              MR. ROTONDO:  Objection.

8              THE COURT:  Basis?

9              Where are we in the report, I'm sorry?

10             MR. NIKAS:  We're on page 2 of the report.

11   Cylinder number, leak down percentages, notes.  Or page 1,

12   same.

13             THE COURT:  I'll allow that.

14   BY MR. NIKAS:

15   Q.    So the significance of the numbers that you received,

16   they were excessive or outside of, I guess, spec?

17   A.    Oh, definitely, yes.

18   Q.    If there was any way that hydrolocking could have

19   scored the cylinder walls in this case, would you have

20   been able to note that from your physical inspection?

21   A.    Yes, absolutely.

22   Q.    And did you find any evidence that that was the case?

23   A.    No, I did not.

24   Q.    Did you ever read the report of the expert witness

25   that was hired to testify in this case by Sea Ray,

1  Mr. Davis?

2  A.    Yes, I did look it over.

3  Q.    Did you see that Mr. Davis was of the opinion that

4  perhaps the job of pickling the engine that you had done

5  was performed improperly?

6            MR. ROTONDO:  Objection.  Leading.

7            THE COURT:  Sustained.

8  BY MR. NIKAS:

9  Q.    Did you see Mr. Davis's opinion regarding the

10  pickling of the engine?

11  A.    Yes, I did.  I did read it and I definitely disagree

12  with the pickling, what he feels we didn't properly pickle

13  the engine.

14  Q.    Was that his opinion?

15  A.    That was his opinion, yes.

16  Q.    Did you follow -- what procedures did you follow to

17  pickle the engine?

18  A.    Followed standard procedures that we've done for

19  years.

20  Q.    Who issued those procedures?

21  A.    Actually, Mercury has their own procedure, it's

22  identical to ours.

23  Q.    In your report, you also are of the opinion that both

24  engines need to be replaced.  And the last sentence of the

25  last paragraph on the last page, why do you come to that

1  opinion or are you of that opinion?

2  A.    Through my experience over all the years I've been

3  working on engines, when you see scoring in the cylinders

4  that deep, it definitely needs to be replaced.  It will

5  never run right in that condition.

6  Q.    How does -- scoring is scratches, right?

7  A.    Same, yes.

8  Q.    How does scratches in a metal surface, I guess in a

9  metal glass or pipe, affect the operation of the engine?

10  A.    Well, say this being the piston again, there's metal

11  rings that go around the piston that are very tight

12  tolerance between the piston and the cylinder wall.  The

13  piston itself is only a thousandths of an inch smaller in

14  diameter than the actual cylinder, very small.  And then

15  you have three rings, two which are for compression, that

16  seal that surface up.  And so if what happens -- if you

17  have a nice smooth surface, it will be a nice seal.  But

18  if you have scratches in the side of the cylinder wall, it

19  will allow the gases to go past.  So you'll have less

20  compression and consequently the engine won't run

21  properly.

22  Q.    Do I want less compression or more compression?

23  A.    More the better.

24  Q.    Why?

25  A.    Because more compression takes more advantage of the

1    explosion that is occurring inside that cylinder.  When

2    you have that nice air fuel mixture inside on top of this

3    piston and the spark plug fires, it forces this piston

4    down, thus turning the crank and thus turning the

5    propeller.  If you have poor compression, a lot of those

6    gases will go past that piston and not be used to force it

7    down.  So you'll lose power.

8    Q.    If the scratching in the cylinders is uneven, let's

9    say it's in some cylinders and not in all, and it's more

10   severe in some cylinders than others, does that have an

11   effect?

12   A.    Yeah, that will cause the -- you'll have different

13   pressures in each of the pistons, so it will cause the

14   engine to vibrate because they're not all firing evenly

15   and have all the same power.  It will definitely run

16   erratically.

17   Q.    Does that vibration stress the components?

18   A.    Absolutely.  It will stress the crank because it's

19   getting uneven pressures.  It can do all that.  Twist the

20   crank.

21   Q.    What happens if the crank is stressed?

22   A.    If the crank is stressed, at some point it will

23   break.

24   Q.    And then?

25   A.    Catastrophic failure.

1  Q.    By catastrophic --

2  A.    Engine stops and you're stuck wherever you are.

3  Q.    Is it possible that the scoring in a cylinder wall is

4  so severe that it causes failure of the piston?

5  A.    It can cause failure of the piston, the piston can

6  actually seize to the inside of the cylinder wall.  You

7  can get excessive fuel going past.  If it stops firing

8  properly, you can get fuel going past that piston getting

9  into the crank case and oil.  Can make a mess.

10  Q.    What is seizing?

11  A.    Seizing is when the piston actually welds itself to

12  the cylinder wall just because of the sheer heat, because

13  no lubrication.

14  Q.    What happens then?  Isn't it still trying to be

15  turned by the crankshaft?

16  A.    It's still trying to turn.  And the connecting rod

17  that attaches the piston to the crankshaft will typically

18  break at that point and sometimes go right outside the

19  cylinder block.

20  Q.    So pieces can go through the engine block?

21  A.    Sure.  I've seen it plenty of times.

22  Q.    The engine block is made of?

23  A.    Cast iron.

24  Q.    How thick is it?

25  A.    Typically quarter inch to three-eighths.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   So it can pierce that?

2   A.   Absolutely.  There's a lot of force in there.

3   Q.   Well, as the water that's present in the cylinder

4   displaces the oil, does it do that uniformly or does it do

5   that, I guess, irregularly?

6   A.   Definitely irregularly.  It really depends on

7   latitude of the boat and where the water is when it's

8   running.  It won't pick the same cylinder every time.  It

9   can go to a different cylinder.  Depends on how it is.

10  Depends on the rolling and pitching of the boat and all

11  that.

12  Q.   Is the scoring that would occur from, say, saltwater

13  different than scoring you would get from, say, fresh

14  water?

15  A.   Typically the saltwater, being that it's more

16  corrosive, would act a little faster, yes.  And there's

17  more in it.  You have salt in it and you have debris and

18  that sort of thing.

19  Q.   Why is saltwater more corrosive than fresh?

20  A.   Because of the salt itself in the water.  Similar to

21  your car.  You look at a California car that doesn't see

22  salt on the roads, it's spotless.  You look at a car in

23  New England, it has rust on it.

24  Q.   Could you just -- the damage that you saw, what

25  components were damaged?  What components had rust?  What

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   components were affected by this water?
 2   A.   We saw rust inside the exhaust elbows.  We saw a
 3   little bit of rust down inside the pistons, certainly
 4   inside the manifolds, exhaust manifolds.
 5   Q.   Could you remanufacture these components?  Could you
 6   take some WD40 and scratch off the rust and then machine
 7   it?  What would be the procedure for trying to save the
 8   components that had been exposed to water?
 9   A.   Well, like when we did the hydrolocking, you're
10   trying to put oil on them to save them.  Something that's
11   been damaged over time, you just can't save.
12   Q.   Did the oil that you had put in when the engine was
13   pickled prevent the damage that had occurred from the
14   hydrolocking?
15   A.   It didn't prevent the initial damage if there was any
16   damage from the hydrolocking, but it kept it from being
17   damaged further because of the water that was in there, it
18   dispersed the water to get it out of there.
19   Q.   Could the oil that you put in when you pickled the
20   engine remedy the damage that had been caused by the
21   historic ingestion of water in this engine?
22   A.   No, definitely not.  Once the damage is done, it's
23   done.
24   Q.   Is the cylinder liner in this engine dry or wet?
25   A.   The cylinder wall -- outside the cylinder wall?
```

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   Between the piston and the cylinder.

2   A.   Between the piston and cylinder should have a film of

3   oil for lubrication.

4   Q.   If there's damage in the cylinder wall, you just

5   can't put in a new liner in the cylinder?

6   A.   No, you cannot.

7   Q.   You have to get a new block?

8   A.   Typically, if the scratches were deep enough, like in

9   their situation, they can't be machined out and you'd have

10  to replace it, yes.

11  Q.   Would the valves had to have been relaced in the

12  Mainses' vessel?

13  A.   Yes.  Once valves get seawater on them, they really

14  should be replaced.

15  Q.   Could the manifolds have been saved?

16  A.   Possibly, yes.

17  Q.   What about the elbows?

18  A.   Exhaust elbows, probably, because of their age.

19  Typically, exhaust elbows and manifolds survive about five

20  to seven years' of use.

21  Q.   What about the rotating parts, like the pistons and

22  those types of things?

23  A.   Typically, they wouldn't be saved either.  If the

24  cylinder walls were damaged, certainly the pistons are

25  damaged.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   If the cylinder wall is scratched, does that mean the

2  piston's also scratched?

3  A.   Absolutely, yes.

4          MR. NIKAS:  I have no further questions,

5  Your Honor.

6          THE COURT:  You can start whenever you're ready,

7  Mr. Rotondo.

8          MR. ROTONDO:  Thank you, Your Honor.

9          Could we marked for identification

10 Mr. Wicander's deposition?  It should be Defendant's 108

11 for identification.

12          Mr. Wicander, I'm going to give you a copy of

13 your deposition transcript in the event that you may need

14 it during the questions.

15

16                    CROSS-EXAMINATION

17 BY MR. ROTONDO:

18 Q.   Mr. Wicander, you said that in 2001 you were the yard

19 manager for Pilots Point Marina in Westbrook; is that

20 correct?

21 A.   Yes, that's correct.

22 Q.   You were the yard manager from 2001 to 2003?

23 A.   Yes, during that time, yes.

24 Q.   And you were the yard manager for the East Yard; is

25 that right?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.    That's correct.

2  Q.    And as a yard manager, I take it you had supervisory

3  responsibilities?

4  A.    Absolutely.

5  Q.    And how many people did you supervise?

6  A.    I had a crew of seven.

7  Q.    And the crew, were they all mechanics?

8  A.    Not all mechanics.

9  Q.    How many mechanics were on your crew?

10  A.    I had three.

11  Q.    And what were their names?

12  A.    Dave Bird, Dave Quandt and Wayne Coban.

13  Q.    Now, you told us on direct examination that David

14  Wade from Sea Ray contacted you in May of 2001 because he

15  wanted you to do some work on the Mains's boat; is that

16  right?

17  A.    Yes.

18  Q.    And you told us that you went out to Haddam in May of

19  2001 and looked at the boat?

20  A.    Yes, I did.

21  Q.    After looking at the boat, you told David Wade that

22  you thought that you could do the work that needed to be

23  done on the boat?

24  A.    Yes.

25  Q.    And Sea Ray was going to pay you for that work,

PDF created with pdfFactory trial version www.pdffactory.com

1    correct?

2    A.    Yes, that was the agreement.

3    Q.    Sea Ray provided you with parts and materials for you

4    to do that work?

5    A.    Provided me with some gelcoat and rub rail.

6    Q.    And Sea Ray agreed to pay to haul the boat out of the

7    water so you could perform the work?

8    A.    I believe so, yes.

9    Q.    And Sea Ray also agreed to pay to have you make

10   arrangements to clean and detail the boat after you did

11   your work?

12   A.    I believe so, yes.

13   Q.    And you were scheduled to start your work on

14   June 11th?

15   A.    Yes.

16   Q.    And you never did that work; isn't that right?

17   A.    No, we did not.

18   Q.    You never returned the materials?

19   A.    No, I believe they're still there.  Other than the

20   gelcoat, I know that was disposed of.

21   Q.    The first time you saw the Mains's boat was in May of

22   2001, correct?

23   A.    Yes, I believe so.

24   Q.    So you didn't see the boat in its original condition

25   in 1998 after it left the factory; is that right?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    That is right.

2    Q.    And you didn't see the original exhaust on the 1998

3    Sea Ray owned by the Mains?

4    A.    No, I did not.

5    Q.    Now, I believe you said on direct examination that

6    you've worked with people from Sea Ray for more than 20

7    years; is that right?

8    A.    Twenty years?  I don't know if it was that duration.

9         I've been working with people from Sea Ray since

10   1988, so it would be 20 now, yes.

11   Q.    I think you told us you toured the factory?

12   A.    Yes.

13   Q.    I take it you like working with people from Sea Ray;

14   is that correct?

15   A.    They were fine, yes.

16   Q.    Now, I want to make sure I get the timeline down a

17   little bit, because I was a little confused during your

18   direct examination.

19        The first work that you did on this case, the Mains's

20   boat, was on June 11, 2001; is that right?

21   A.    Yes.

22   Q.    And then on June 18, 2001 -- let me stop.

23        On June 11, you worked on the dewatering, the

24   pickling, correct?

25   A.    Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    And there was a mechanic that did that with you,

2    wasn't there?

3    A.    Yes.

4    Q.    Who was that?

5    A.    I believe it was Dave Bird, but I'm not certain, I

6    don't have any reports in front of me.

7    Q.    In terms of him working with you, he was actually the

8    guy on the ground with the wrenches and whatever doing

9    that work, wasn't he?

10   A.    Actually we both probably were.

11   Q.    Your next activity on the Mains's boat was the

12   compression and leak test; is that right?

13   A.    I believe so, yes.

14   Q.    That was on June 18, a week later?

15   A.    I believe so, yes.

16   Q.    And you told us there was a mechanic that worked with

17   you then as well, didn't you?

18   A.    Yes.

19   Q.    Was that David Bird as well?

20   A.    It probably was, yes.

21   Q.    And then you wrote your report, your mechanic's

22   report which was Exhibit 26; is that correct?

23   A.    Yes.

24   Q.    All right.  And then you didn't do anything else on

25   this case for more than two years; isn't that correct?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   That is correct.

2  Q.   So you did this disassembly some two years later in

3  August of 2003?

4  A.   Yes.

5  Q.   And you had a mechanic helping you with that as well,

6  didn't you?

7  A.   Yes, I did.

8  Q.   Who was that?

9  A.   That was David Bird.

10 Q.   Have you seen the videotape of that disassembly?

11 A.   I have not.

12 Q.   Well, was David Bird the man who was actually

13 disassembling the engines?

14 A.   Yes.

15 Q.   All right.  So you have those four dates.  Let me

16 focus on the June 11 date.  But before we do, I want to

17 make sure about something.

18      You told us several times on direct examination that

19 you were a Merc-certified mechanic; is that correct?

20 A.   That is correct.

21 Q.   All right.  You're not a Merc-certified mechanic any

22 longer, are you?

23 A.   No, I'm not.

24 Q.   Your Merc certification expired in 2002; isn't that

25 correct?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   Yes, it did.

2  Q.   Going back to June 11, Mr. Mains contacted you on

3  June 11 and told you that he was able to get one of his

4  engines started but not the other; is that correct?

5  A.   I believe it was, yes.

6  Q.   And then he told you that the one engine he could get

7  started he couldn't get to run very well?

8  A.   Right, that's what I remember.

9  Q.   So you and David Bird then checked the engines that

10 Monday morning; is that correct?

11 A.   Yes.

12 Q.   And someone cranked the starboard engine; is that

13 right?

14 A.   I'm sure it was attempted, yes.

15 Q.   Was that you or was that Mr. Bird?

16 A.   Well, cranking the engine to do the dewatering, is

17 that what you're asking?

18 Q.   Yes.

19 A.   I would have been doing the cranking.

20 Q.   What about the port engine, did anybody crank that?

21 A.   Yes.

22 Q.   Who would have done that?

23 A.   I would have done the cranking.

24 Q.   You started the dewatering process as -- dewatering

25 was one step and pickling was the next; is that correct?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes, it's done at the same time.

2    Q.    Are they both together called pickling?

3    A.    Yes.

4    Q.    Okay.  You knew it was important to do the pickling

5    process correctly, didn't you?

6    A.    Yes.

7    Q.    And you knew if you didn't do the pickling process

8    correctly, damage could result to the engines which

9    needn't occur?

10    A.    Sure.

11    Q.    Now, when you cranked -- as I understand it, the port

12    engine was dry; is that right?

13    A.    I believe it was.

14    Q.    So the engine that you really -- the engine that you

15    cranked was the starboard engine, right?

16    A.    We would have done both.

17    Q.    All right.  When you cranked the starboard engine,

18    when you or Mr. Bird cranked the starboard engine, there

19    was fresh water coming out of several of the cylinders; is

20    that right?

21    A.    Yes.

22    Q.    In fact, you could tell it was fresh; isn't that

23    right?

24    A.    It appeared to be fresh, yes.  It was clean.

25    Q.    Didn't you tell us at your deposition, Mr. Wicander,

1   you could tell that the water coming out of those

2   cylinders was fresh?

3   A.   It appeared to be fresh, yes.

4   Q.   Didn't you tell us under oath at the time of your

5   deposition that the water coming out of those cylinders --

6            MR. NIKAS:  Objection, Your Honor,

7   argumentative.  The witness already testified and agreed.

8            THE COURT:  Overruled.

9   A.   I didn't have the water tested, if that's what you're

10  asking, to verify that it was fresh water, no.  It was

11  water.  Plain and simple, it was where it shouldn't be and

12  we were getting it out of there.

13  BY MR. ROTONDO:

14  Q.   Mr. Wicander, can you turn to page 38 of your

15  deposition?

16  A.   Sure.

17  Q.   And before I ask you questions about page 38, you

18  came to our office back in February of 2004 to give

19  testimony under oath; is that correct?

20  A.   That's correct.

21  Q.   And it was under oath just like it is today?

22  A.   Yes.

23  Q.   All right.  And you understood it was under oath,

24  didn't you?

25  A.   Yes.

1   Q.   If we turn to page 38, beginning at lines 11, you

2   were asked -- I'm going take start back up on line 7.

3        Question:  Okay, at that point you said you took the

4   sparkplugs out and cranked the engine over?

5        And your answer was:  Yes.

6   A.   Yes.

7   Q.   Next question:  What happened?

8        And your answer was:  We had water coming out of the

9   cylinders.

10  A.   Yes.

11  Q.   Next question:  Do you remember which ones?

12       Answer:  It's in my report.  We had fresh water

13  coming out of I believe it was two, four, six and eight

14  and number one cylinder was all wet on the starboard

15  engine.

16       Did I read that correctly?

17  A.   Yes.

18  Q.   And then you were asked, if we skip down -- well,

19  we'll continues on.

20       Line 17:  How about the port engine?

21       Your answer was:  It shows dry.  I believe that was

22  the one that was started.

23       Remember that question?

24  A.   Yes.

25  Q.   Then you were asked:  How were you able to tell that

1    it was fresh water?

2        And your answer at that time was:  You can tell by

3    the consistency of the water whether it's fresh or not.

4    A.    Yes.

5    Q.    That's what you said?

6    A.    Yep.

7    Q.    So at that time you could tell that it was fresh

8    water; isn't that correct?

9    A.    It appeared to be fresh water, yes.

10   Q.    In fact, you told us not only -- at the time of your

11   deposition, not just that it appeared to be, but you could

12   tell it was fresh water because of its consistency.

13   That's what you said under oath at your deposition over

14   four years ago.

15   A.    Sure.

16   Q.    The fact that it was fresh water in those cylinders

17   indicated that the water was taken in during the flushing

18   process; isn't that correct?

19   A.    That's what we assumed, yes.

20   Q.    That's what you concluded?

21   A.    Well, yeah.

22   Q.    In fact, you concluded that this hydrolock was caused

23   by flushing and not by water ingested from the exhaust

24   system; isn't that correct?

25   A.    It was from flushing, yes.

1  Q.   It was from flushing and not from water ingested

2  through the exhaust system; isn't that right?

3  A.   Well, the water would have been ingested through the

4  exhaust system even during the flushing.

5  Q.   But you concluded that the water that was in those

6  cylinders came into those cylinders as a result of

7  flushing?

8  A.   Yes.

9  Q.   Now, was it you or Mr. Bird who took out the

10  sparkplugs?

11  A.   Mr. Bird.

12  Q.   Was it you or Mr. Bird who dewatered the starboard

13  engine?

14  A.   I was cranking, so I was part of the dewatering,

15  absolutely.

16  Q.   How about changing the oil, was that you or Mr. Bird?

17  A.   Would be Mr. Bird.

18  Q.   And the process involved taking out the sparkplugs,

19  dewatering the starboard engine and changing the oil to

20  take care of the hydro; is that right?

21  A.   Yes.

22  Q.   After those things were done, you or Mr. Bird were

23  able to get the engines running again; isn't that right?

24  A.   That is correct.

25  Q.   But at that point the engines weren't running very

PDF created with pdfFactory trial version www.pdffactory.com

1    well, were they?

2    A.    I remember they weren't, no.

3    Q.    And those engines not running well may well have been

4    because there was moisture on the sparkplugs; isn't that

5    right?

6    A.    I suppose it's possible, yes.

7    Q.    Didn't you tell us at your deposition that might have

8    been the reason the engines didn't run well?

9    A.    Yes, it's definitely possible.

10   Q.    But you or Mr. Bird didn't replace the sparkplugs on

11   June 11, did you?

12   A.    No, not at that point.

13   Q.    So on June 11, you left the engine that you knew

14   wasn't running well knowing that you might have moisture

15   in the sparkplugs; is that correct?

16   A.    I'm not certain of the exact sequence of things, but

17   yeah.

18   Q.    And you knew at that point on June 11 that if you

19   didn't get all of the water out of the engine quickly it

20   could damage the engine, correct?

21   A.    It can damage the engine, yes.

22   Q.    And you knew that it could happen fast?

23   A.    Yes.

24   Q.    And sparkplugs were not purchased for Mr. Mains'

25   engine until June 15; isn't that right?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   I'm not sure of that.  I don't have that in front of

2  me.

3  Q.   Isn't it true that your shop, Pilots Point Marina,

4  did not purchase the sparkplugs that were used?

5  A.   I don't recall.

6  Q.   If your company had purchased the sparkplugs that

7  were used, they would show up on your invoices; isn't that

8  right?

9  A.   Yes.

10          MR. ROTONDO:  If we can mark for identification

11  Defendant's Exhibit 109 for I.D.

12  BY MR. ROTONDO:

13  Q.   Mr. Wicander, I'm going to show you what's been

14  marked as Defendant's Exhibit 109 for I.D. and ask if you

15  recognize that.

16  A.   What's that?

17  Q.   Do you recognize that document?

18  A.   Yes, I do.

19  Q.   And is that document something called a ledger card?

20  A.   Yes, it is.

21  Q.   Does that ledger card indicate the work that's

22  performed?

23  A.   Yes.  It's -- basically it's a record of debits and

24  credits to the Mainses' accounts and for what.

25  Q.   And that ledger card -- is Exhibit 109, that's a true

PDF created with pdfFactory trial version www.pdffactory.com

1    and accurate copy of the ledger card relating to the

2    Mainses' boat?

3    A.    Yes.

4    Q.    That was prepared on or about the time indicated in

5    the document?

6    A.    Yes.

7    Q.    If your company at Pilot's Point Marina had purchased

8    the sparkplugs, that would be reflected on this document,

9    right?

10    A.    It should be, yes.

11    Q.    It's not there, is it?

12    A.    I don't know the parts -- there were parts signed out

13    to that engine, but I don't know what they are from this

14    document.

15    Q.    All right.

16          MR. ROTONDO:   If we can mark as Exhibit 110

17    another document.

18    BY MR. ROTONDO:

19    Q.    I'm going to show you now what's been marked as

20    Exhibit 110 for identification.   Do you recognize that

21    document?

22    A.    Yes.   It's a work order.

23    Q.    And was this document prepared at or about the time

24    reflected on the document?

25    A.    Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    It was prepared in the ordinary course of Pilot

2    Point's business?

3    A.    Yes.

4    Q.    And it was prepared by someone who had a business

5    duty to prepare it?

6    A.    Yes.

7    Q.    This document does describe the parts that Pilot

8    Point put on or used in the course of doing work for

9    Mr. Mains, doesn't it?

10    A.    Yes, it does.

11    Q.    And that document does not indicate that Pilot Point

12    purchased any sparkplugs, does it?

13    A.    No, it does not.

14            MR. ROTONDO:    I move the admission of

15    Exhibits 109 and 110.

16            THE COURT:    Defendant's Exhibits 109 or 110 are

17    admitted.

18    BY MR. ROTONDO:

19    Q.    Now, you said that there was a protocol that you used

20    and it was the same protocol that Merc used in terms of

21    pickling the engines; isn't that right?

22    A.    Yes.

23    Q.    And that protocol makes it clear -- your protocol and

24    the one for Merc indicates that speed is an important

25    factor?  You have to act quickly?

1   A.    Yes.

2   Q.    And that you need to check for water at the top of a

3   piston?

4   A.    Yeah, you want to see if there's water in the

5   cylinder.

6   Q.    And you need to install new sparkplugs and start the

7   engine?

8   A.    You wouldn't put new sparkplugs in if there was still

9   water in the engine.  You'd ruin the new sparkplugs.

10  Q.    After you dewater it, you need to install new

11  sparkplugs and run the engine; isn't that part of the

12  protocol?

13  A.    You are not going to put new sparkplugs in an engine

14  you're not sure the water's all out of yet.

15  Q.    Isn't it protocol to install new sparkplugs and run

16  the engine?

17  A.    You should try and run it first.

18          MR. ROTONDO:  Can I see plaintiff's 33.

19  BY MR. ROTONDO:

20  Q.    Have you ever seen a protocol from Mercury --

21  A.    I'm sure I have.

22  Q.    -- that told you that you needed to change the

23  sparkplugs and run the engine?

24  A.    That's after the total dewatering was done, yes.

25  Q.    And you finished your dewatering on June 11?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Part of the dewatering is actually running the

2    engines.  You want to make sure -- you can't get all of it

3    out just by cranking the engine over.

4    Q.    And you ran the engine, and don't you need to run the

5    engine to 1300 rpm until it reaches its normal operating

6    temperatures?

7    A.    You'd like to get it there, yes.

8    Q.    And on June 11, you did not install new sparkplugs,

9    did you?

10   A.    I believe not.

11   Q.    And you did not run the engine until you achieved

12   1300 rpm's and achieved the normal engine temperature, did

13   you?

14   A.    That I don't recall.

15   Q.    Now, on June 11, did you tell Mr. Mains that he

16   couldn't wait for several days to go get new sparkplugs?

17   A.    I don't recall any conversations about the

18   sparkplugs.

19   Q.    Did you tell Mr. Mains on June 11, 2001, that you

20   needed to put sparkplugs in immediately so you could run

21   that engine to achieve the normal engine temperature?

22   A.    I don't recall.

23   Q.    After the work that you did on June 11, did you

24   decide that you needed to disassemble the engine?

25   A.    Not at that point, no.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   In fact, June 11, you couldn't tell whether there was

2    damage to the engines, could you?

3    A.   Not at that point, no.

4    Q.   Now, you told us about the compression tests and leak

5    down tests?

6    A.   Yes.

7    Q.   Now, those tests were run on June 18; is that right?

8    A.   Yes.  I believe so.

9    Q.   And do you know one way or the other whether you

10   obtained new sparkplugs between June 11 and June 18?

11   A.   I honestly don't recall.

12   Q.   Now, you recommended the compression test because of

13   the hydrolock; isn't that right?

14   A.   That's correct.

15   Q.   And I believe you told us that the compression tests

16   were run with you and David Bird; is that right?

17   A.   I believe so, yes.

18   Q.   And before I do that, I move the admission of

19   Defendant's Exhibit 20, which are a series of seven to

20   eight photographs.

21            THE COURT:  Defendant's Exhibit 20 is admitted.

22   BY MR. ROTONDO:

23   Q.   As I understood your testimony from direct

24   examination, you indicated David Bird worked with you on

25   the compression test?

1    A.    I believe so.

2    Q.    I think you said David Bird was down putting things

3    into the spark plug holes; is that right?

4    A.    Yes.

5    Q.    And you were at the helm?

6    A.    Yes, I would have been, yes.

7    Q.    For those of us who are not real boaters, let me make

8    sure you understand.  Is that the helm?

9    A.    I believe so, yes.

10   Q.    Basically I'll call it the steering wheel.

11        So you were there?

12   A.    Yes.

13   Q.    And you were working the ignition I believe you said

14   on direct examination?

15   A.    Yes.

16   Q.    And Mr. Bird was in the engine compartment?

17   A.    Yes.

18   Q.    And the engine compartment, if you were facing -- if

19   you were facing the steering wheel, the engine compartment

20   would be behind you?

21   A.    That's correct.

22   Q.    And there was a hinge, there was a hinge that had to

23   be raised in order to get access to the engine?

24   A.    The hatch, yeah.

25   Q.    And the hatch opened toward you, didn't it?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   No.   The hatch -- the hinge was at the back of the

2  boat.

3  Q.   So you were at the helm and Mr. Bird was down in the

4  engine compartment?

5  A.   Yes.

6  Q.   You reviewed with Mr. Nikas some of these pressure

7  readings that you had.  Each one of the cylinders recorded

8  compression readings of at least 105; isn't that right?

9  A.   Yes.

10  Q.   And most of them were above 115?

11  A.   Yes.

12  Q.   All right.  And if we look on the port side, they

13  ranged from 105 to 135, right?

14  A.   Yes.

15  Q.   All right.  And if we look at the starboard side,

16  they ranged from 125 to 132?

17  A.   Yes.

18  Q.   And the engines on this boat you told us were made by

19  Mercury?

20  A.   Made by General Motors for Mercury, yes.

21  Q.   They're Mercury engines, labeled Mercury engines?

22  A.   Yes.

23  Q.   And Bassett Boats is a MerCruiser dealer?

24  A.   Yes, they are.

25  Q.   And your yard or marina is somehow connected to

PDF created with pdfFactory trial version www.pdffactory.com

1   Bassett; is that right?

2   A.   Their building was actual -- we own the building,

3   they lease it from us.

4   Q.   And so you work out of the same building; is that

5   right?

6   A.   Actually we do share part of the building, yes.

7   Q.   And you're aware that MerCruiser had a service

8   bulletin regarding compression tests, aren't you?

9   A.   Yeah, I'm sure they did.

10  Q.   And are you aware that the MerCruiser service

11  bulletin indicates that compressions above 100 pounds per

12  square inch are acceptable?

13  A.   Acceptable, yeah, that is their specifications.

14  Q.   And you know that Bassett Boats would have had that

15  MerCruiser service bulletin available to them, if you

16  wanted to look at it?

17  A.   Sure.

18  Q.   You also told us about the leak down tests.

19  A.   Yes.

20  Q.   And those are reflected on Plaintiff's Exhibit 26 as

21  well?

22  A.   Yes.

23  Q.   And you testified that acceptable leak down

24  percentages are less than 18 to 20 percent?

25  A.   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    And that's not based on any Mercury standard, is it?

2    A.    No, that's from industry standard.

3    Q.    That's not based on a GM standard?

4    A.    I don't know what their standard is.

5    Q.    In fact, you told us you don't know what the Mercury

6    GM standards are, didn't you?

7    A.    That's correct.

8    Q.    Now, based on the compression and leak down tests,

9    you recommended taking the engines apart and looking

10   inside to determine what was causing those test results,

11   didn't you?

12   A.    Correct.

13   Q.    All right.  And when you finished your mechanical

14   inspection report -- and this was done in June or July you

15   prepared this report?

16   A.    Yeah.  I don't have the dates in front of me.

17   Q.    It's not dated.

18        But you had a conclusion there and you state -- now,

19   you've done your dewatering at this point, you've done

20   your pickling at this point, you've done your compression

21   test at this point and you've done your leak down test at

22   this point?

23   A.    Yes.

24   Q.    You then write this report, which you told us was

25   prepared in the ordinary course of business; is that

1   right?

2   A.   Yes.

3   Q.   It wasn't prepared because there was litigation

4   involved.   You didn't know anything about that?

5   A.   No.

6   Q.   So in June or July of 2001, you stated, "On the basis

7   of the mechanical inspections reported above, we are of

8   the opinion that both engines have been seriously damaged

9   as a result of the hydrolocking that occurred on or about

10   June 9, 2001 and require replacement."

11       That's what you said then?

12   A.   Yes.

13   Q.   You said that the damage occurred because of the

14   hydrolocking, correct?

15   A.   Correct.

16   Q.   And the hydrolocking that you saw was fresh water

17   from the flushing; isn't that right?

18   A.   Yes.

19   Q.   Now, in your view, these compression and leak down

20   tests that are reflected in your mechanical report

21   indicate there was damage to the engine, correct?

22   A.   Yes.

23   Q.   Those tests by themselves don't tell you whether the

24   damage occurred as a result of the hydrolocking itself or

25   as a result to properly pickle the engines, do they?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   I disagree with that.  The pickling was done

2  properly.  I don't understand where you're going with

3  that.

4  Q.   Well, my question -- your compression tests and your

5  hydrolock test report results, correct?

6  A.   Correct.

7  Q.   They report that there are certain things that don't

8  meet certain specifications that you believe were

9  required?

10  A.   Yes.

11  Q.   All right.  Those tests by themselves do not tell you

12  what caused that failure, that damage; isn't that right?

13  A.   That's correct.

14  Q.   But you concluded, based on everything that you knew,

15  you thought that it was the hydrolock?

16  A.   I assumed the hydrolocking caused it, yes.

17  Q.   But that damage could also have been caused, could it

18  not, by the failure to properly pickle the engines; isn't

19  that correct?

20  A.   We didn't -- we definitely pickled the engines

21  correctly.

22  Q.   So you disagree with the idea that you didn't pickle

23  the engines correctly?

24  A.   I know we pickled them correctly, yes.

25  Q.   Even though you didn't put new sparkplugs in them

PDF created with pdfFactory trial version www.pdffactory.com

1   until about a week later in the event.

2   A.   I don't recall the timing on that, no.

3   Q.   Now, did you make arrangements to put shrinkwrap on

4   the boat in 2001?

5   A.   I believe it was 2001, yes.

6   Q.   I'm sorry, you said something and I missed it.

7   A.   I believe it was 2001.

8   Q.   You didn't put the shrinkwrap on yourself?

9   A.   I may have helped.

10   Q.   You didn't go back over and look at the engines until

11   August of 2003?

12   A.   I believe so, yes.

13   Q.   And you then were involved I guess with Dave Bird

14   again disassembling the engine; is that correct?

15   A.   Yes.

16   Q.   And that process I believe took what, two days; is

17   that your testimony?

18   A.   It was over two days, yes.

19   Q.   I want to make sure, did it take place on two

20   separate days or was it more than two days?

21   A.   We did one engine one day and one engine the other

22   day.

23   Q.   So your memory is it took place on two different

24   dates?

25   A.   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

 1  Q.   And not more than two different days?

 2  A.   That's my recollection.

 3  Q.   And you only went out to the site on two days to do

 4  that disassembly work; is that right?

 5  A.   Yes.

 6  Q.   You know that the disassembly was videotaped?

 7  A.   Yes.

 8  Q.   If the videotape shows people were disassembling that

 9  engine over four days, does that mean you weren't there on

10  two of the four days it was disassembled?

11  A.   If it was more than two days, I don't recall.  I was

12  there during the disassembly of both engines.

13  Q.   And the person who was doing the primary

14  disassembling then was David Bird and you were observing

15  the work that he was doing?

16  A.   Correct.

17  Q.   You talked to us about rust that you observed during

18  your 2003 disassembly, correct?

19  A.   Yes.

20  Q.   You talked about rust on a bunch of different spots.

21  A.   Uh-huh.

22  Q.   And by the time of your disassembly, the Mains's boat

23  had been sitting idle under shrinkwrap for two years?

24  A.   Yes.

25  Q.   And it was sitting in your dock area; isn't that

PDF created with pdfFactory trial version www.pdffactory.com

1   right?

2   A.   It was sitting on our on-land storage area.

3   Q.   How far was that from the water, the ocean?

4   A.   A few hundred feet.

5   Q.   Okay.  And I take it that's a very corrosive

6   environment being right next to the sea like that?

7   A.   Exposed, yeah.

8   Q.   Would you expect that certain kinds of metal in

9   proximity to the ocean would rust?

10  A.   I suppose they would.

11  Q.   When they're under shrinkwrap, that could be in a

12  humid environment?

13  A.   It can be, if there's water in the boat.

14  Q.   That can cause rusting, can't it?

15  A.   I suppose, yes.

16  Q.   Now, at the time that you did the disassembly in

17  2003, you were no longer a Merc-certified mechanic, were

18  you?

19  A.   That's correct.

20  Q.   When you did your disassembly work, did you find

21  water in the engines?

22  A.   I don't recall finding water.  I do remember, as we

23  disassembled, some of the antifreeze that was in the

24  engine could have gotten into the cylinders, absolutely.

25  Q.   You found liquid in the cylinders; is that correct?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.    I do recall that.

2  Q.    You didn't note that anyplace on your report?

3  A.    Probably not.  It was general disassembly.

4  Q.    But doesn't the videotape show water in the

5  cylinders?

6  A.    I never saw the videotape.

7  Q.    Now, you noted rust at the time you did this work in

8  August of 2003, the disassembly work, you observed it?

9  A.    Yes.

10  Q.    You had not observed that rust before?

11  A.    Didn't disassemble it, so, yes.

12  Q.    You told us that scoring inside of cylinders can be

13  caused either by lack of lubrication or foreign objects in

14  the cylinder?

15  A.    Yes.

16  Q.    And is it your testimony that scoring can never

17  happen in the ordinary course of operating an engine?

18  A.    Not if it's running properly, no.

19  Q.    Now, you told us that you ran the engine in June of

20  2001; is that right?

21  A.    Yes.

22  Q.    And you know that Mr. Mains ran the engine in June of

23  2001?

24  A.    One engine, I believe, yes.

25  Q.    He ran the port engine?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes.

2    Q.    And you ran both engines?

3    A.    Yes.

4    Q.    Do you know how long he ran the engines?

5    A.    I do not.

6    Q.    You know when he was running the engines there was

7    water in the cylinders?

8    A.    At that point, yes.  Assuming.  Yes.

9    Q.    When you were running the engines, you thought there

10    was water in those cylinders too?

11    A.    When we ran the engine was after we did the

12    dewatering, so it shouldn't have been very much if any in

13    there.

14    Q.    You thought there might be some water?

15    A.    Sure, you can never get it all out.

16    Q.    That water would cause damage depending how long you

17    ran the engines?

18    A.    Not likely.  Small amounts, no.

19    Q.    How long did you run those engines in June of 2001?

20    A.    My recollection, we ran them -- I don't remember if

21    it was that day or what day -- over an hour probably.

22    Q.    And you were trying to get up to 1300 rpm's to get

23    the normal engine temperature, weren't you?

24    A.    We were trying to get normal engine temperature,

25    yeah.

1    Q.    In June of 2003 you didn't find any rust in the

2    cylinder boards, did you?

3    A.    I don't recall.  I don't believe so.

4    Q.    Now, you concluded in 2001 in your mechanical report

5    that you'd have to look -- disassemble the engine to look

6    for the damage that you said was caused by the hydrolock;

7    is that correct?

8    A.    Yes.

9    Q.    So in -- and you knew that bearings, connecting rods

10   and valves can be bent or damaged as a result of a

11   hydrolock?

12   A.    Yes.

13   Q.    When you did your 2003 inspection, you didn't look

14   for those things, did you?

15   A.    We pulled it apart as far as we saw the scoring in

16   the cylinders and at that point determined that the

17   engines couldn't be repaired.

18   Q.    When you were deposed in 2004 in this case, didn't

19   you tell us that you didn't check to see if the bearings

20   were damaged, the connecting rods were damaged or the

21   valves were; didn't you tell us that?

22   A.    I'm sure I did, yeah.

23   Q.    You talked about determining the elbow exhaust pipe;

24   do you recall that?

25   A.    Yes.

1    Q.    All right.  And you made measurements of that.  And I

2    believe that's Plaintiffs' 30.  Second page.

3         These are the diagrams that were prepared?

4    A.    Yes.

5    Q.    All right.  And what you found was you found

6    differences in the height between the elbow exhaust and

7    something called the overboard discharge; is that right?

8    A.    Yes.

9    Q.    Okay.  And on one side -- on the port side you found

10   this overboard discharge was a quarter of an inch higher

11   than this exhaust elbow; is that right?

12   A.    Roughly, yeah.

13   Q.    And on the starboard side it was either an eighth or

14   three-eighths of an inch?

15   A.    Yeah.

16   Q.    Now, what's the diameter of that overboard discharge?

17   A.    I believe it's two, two and a half inches ID.

18   Q.    And is it flexible?

19   A.    Sure.

20   Q.    Now, you actually made the measurements of that --

21   that we see here at some point in June of 2001; is that

22   right?

23   A.    Yes.

24   Q.    June or July?

25   A.    I believe so.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   You did not make the measurements of the exhaust

2   system at the time you did your June 18 compression test

3   or leak down test?

4   A.   I don't recall exactly when we did the measurements.

5   Q.   But you testified at your deposition that you didn't

6   make those measurements on June 18.

7   A.   That's fine.  No, I didn't.  I'm not disagreeing.

8   Q.   You faxed these results to Mr. Mains on July 10 of

9   2001?

10  A.   Okay.

11  Q.   So that means you must have done this at some point

12  before July 10, 2001.

13  A.   Sure.

14  Q.   Now, before you made these measurements, David

15  Bird -- was it David Bird?

16  A.   Yes.

17  Q.   He was in this engine area?

18  A.   Yes.

19  Q.   And he was involved in dewatering?

20  A.   Sure.

21  Q.   And he was also involved in doing the compression

22  test?

23  A.   Yes.

24  Q.   As I understand it, it's kind of a tight space in

25  here?

1    A.    Yes, it is.

2    Q.    So he was walking and putting his feet on different

3    spots in that area; wasn't he?

4    A.    I'm sure he was.

5    Q.    Now, Pilots Point hauled Mr. Mains' boat out of the

6    water at the end of June; isn't that right?

7    A.    I believe so, yes.

8    Q.    So the boat wasn't in the water at the time you made

9    these measurements, was it?

10    A.    We must have relaunched it to determine waterline.

11    Q.    There's no -- if you relaunched it, you would have

12    had to charge for that?

13    A.    Possibly, yeah.  Typically, yeah.

14    Q.    But in order to do this test right, you need to have

15    it in the water?

16    A.    Needed to determine waterline, yes.

17    Q.    Did you testify in your deposition that the boat was

18    on land stored in the yard between sometime in July and

19    October of 2001?

20    A.    I may have.

21    Q.    Turn to page 88 of your deposition.

22    A.    Sure.

23          THE COURT:  And when you're finished with that

24    question, it will probably be time for our lunch break,

25    12:15.

Vol. III - Page 437

1          MR. ROTONDO:  Thank you, Your Honor.

2   BY MR. ROTONDO:

3   Q.    Turn to line 4.

4         Question was:  So where was the boat between

5   July 2001 and October if we can say that's when --

6         And your answer was:  On land, stored in the yard.

7   A.    Yes.

8          MR. ROTONDO:  I'll break here, Your Honor.

9          THE COURT:  We'll take an hour for lunch.  I'll

10  see you all at 1:15.  We'll recess.

11              (Whereupon the jury left the courtroom.)

12              (Whereupon, a recess followed.)

13

14          THE COURT:  We'll have our witness retake the

15  stand and bring in the jury.

16              (Whereupon, the jury entered the

17                courtroom.)

18  BY MR. ROTONDO:

19  Q.    Good afternoon, Mr. Wicander.

20  A.    Good afternoon.

21  Q.    When we broke we were talking about the exhaust elbow

22  height.

23  A.    Yes.

24  Q.    You would agree that the measurements should be taken

25  with the boat in the water?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes, it's a measurement from the water line to the --

2    Q.    You're not saying that the height of the exhaust

3    elbow in the overboard discharge hose caused any of the

4    rust that you observed in August 2003, are you?

5    A.    Can you repeat that?

6    Q.    You're not saying that the height of the exhaust

7    elbow in the overboard discharge hose caused any of the

8    rust that you observed in August of 2003?

9    A.    I'm not sure of that.

10   Q.    And that's because you have no way of knowing when

11   that rust actually happened; isn't that correct?

12   A.    That's correct.

13   Q.    You talked about flushing instructions; do you recall

14   that?

15   A.    Yes.

16   Q.    And you know those flushing instructions were issued

17   by Mercury, correct?

18   A.    Yes.

19   Q.    Now, as I understand your testimony, you said that

20   the overboard discharge hose was a quarter to

21   three-eighths of an inch higher than the exhaust elbow

22   height?

23   A.    That's correct.

24   Q.    And you said there was some instruction or indication

25   by MerCruiser not to do that?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   Correct.

2  Q.   And you saw that in the publication somewhere?

3  A.   Yes.

4  Q.   Have you ever seen a Mercury publication showing a

5  discharge hose above the height of an exhaust elbow?

6  A.   No.

7  Q.   I'm going to show you what's been marked as

8  Exhibit -- Plaintiffs' Exhibit 30 for identification.

9  Mine's marked up, but let me ask you if you take a look at

10  it and ask if that refreshes your recollection of whether

11  or not you've ever seen a MerCruiser publication showing a

12  discharge hose with the discharge hose which is higher

13  than the exhaust elbow height?

14  A.   Kind of hard to tell in this picture, to be honest.

15      Where's the exhaust elbow in that picture?

16      It's not very clear.

17      It does show that in this manual.

18  Q.   So that manual does show exhaust elbow height which

19  is lower than a discharge hose; is that correct?

20  A.   It does show that.

21          MR. ROTONDO:  I have nothing further.  Thank you

22  very much.

23          THE COURT:  You can start whenever you're ready,

24  Mr. Nikas.

25          MR. NIKAS:  Thank you, Your Honor.

```
 1                      REDIRECT EXAMINATION

 2    BY MR. NIKAS:

 3    Q.    Good afternoon, Mr. Wicander.

 4    A.    Good afternoon.

 5    Q.    We've been talking with Mr. Rotondo this morning

 6    during his examination about your response procedures to

 7    the water ingestion, to flushing instructions, to the

 8    height of the exhaust elbows and measurements of the

 9    exhaust system; do you recall that?

10    A.    Yes.

11    Q.    Mr. Rotondo also referred to several service

12    bulletins that contain the MerCruiser's procedures as to

13    how to handle these things, correct?

14    A.    Correct.

15    Q.    In fact, when he's talking about the criticism of the

16    pickling procedures that you used, that's part of your

17    response to the water intrusion that MerCruiser sets out

18    in its service bulletin as to how to deal with an instance

19    of this, correct?

20    A.    Correct.

21              MR. NIKAS:  Your Honor, I'd like to introduce as

22    plaintiff's next in number MerCruiser Service Bulletin

23    2001-13 which discusses --

24              THE COURT:  Well, wait a minute.  It's not in

25    evidence.  You have an exhibit number, just tell me.
```

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. NIKAS:  It has I guess been assigned in the

2   old numbering system Exhibit Number 135.

3          THE COURT:  It's the current numbering system.

4          You want to offer Exhibit 135?  I don't have

5   copies of those.  They were in the binders that were down

6   here.

7          MS. LEV:  Your Honor, it was also Plaintiffs'

8   Exhibit Number 33 in the initial 40 exhibits.

9          THE COURT:  Okay.  That's good.

10          Can I ask counsel a question at the sidebar?

11              (Sidebar discussion off the record.)

12          MR. NIKAS:  Now, Your Honor?

13          THE COURT:  Let's lay a foundation.

14   BY MR. NIKAS:

15   Q.   We were talking to Mr. Wicander when Mr. Rotondo was

16   questioning you about procedures for pickling the engine,

17   about whether it should be started or not, whether the

18   plugs should be removed or not, whether the plugs should

19   be exchanged or not, whether it's okay to start the engine

20   with -- possibly if some water present in the system; do

21   you recall all that?

22   A.   Yes, I do.

23          MR. ROTONDO:  Objection.  Those weren't my

24   questions.  Mischaracterizing the questions.

25          THE COURT:  Why don't we -- let's -- why don't I

Vol. III - Page 442

1    let counsel confer for a second, okay?  Confer with each

2    other and you can identify for me where the area of

3    controversy is.

4                    (Pause.)

5                THE COURT:  It might be easier if we don't have

6    a compound question as we're doing this.

7                MR. NIKAS:  Certainly, Your Honor.

8    BY MR. NIKAS:

9    Q.   Mr. Rotondo asked about the distinctions between your

10   procedure for pickling or responding to water intrusion in

11   an engine and MerCruiser's procedure; do you recall that?

12               MR. ROTONDO:  Objection.

13               THE COURT:  Basis?

14               MR. ROTONDO:  That wasn't my question either.

15               THE COURT:  What was your question?

16               MR. ROTONDO:  He said there was accepted

17   protocols that he followed and that Mercury followed.

18   That's what I asked him about.

19               THE COURT:  What were the accepted protocols?

20               MR. ROTONDO:  Yes.  That's what I thought my

21   questions were.

22               MR. NIKAS:  Mr. Rotondo just said "and that

23   Mercury followed."  So I'm asking about Mercury's

24   procedures.  Is that somehow not the topic that was --

25               THE COURT:  I'm not sure I understand.

1          Mr. Rotondo, can you say what your question was

2    again?

3          MR. ROTONDO:  My question was about the

4    protocols or procedures that the witness talked about,

5    which he said were the same as Mercury's.  That's what I

6    asked him about.

7          THE COURT:  Whether the protocols he followed

8    were the same as --

9          MR. ROTONDO:  And then I went through them,

10   which was change the oil, change the spark plugs, run it

11   to the standard temperature.

12         THE COURT:  But did you ask him to compare them

13   with Mercury's?  I'll have to look at my notes.

14         MR. ROTONDO:  It's not my recollection, I didn't

15   ask him to compare --

16         THE COURT:  He said his protocol -- that he

17   followed was the same as Mercury's when he was up here on

18   direct.

19         MR. ROTONDO:  That's correct.

20         THE COURT:  You then asked him about the

21   protocols he went through.

22         MR. ROTONDO:  And the fact that he said they

23   were the same as Mercury's, and I went through those.

24         THE COURT:  Okay.

25         MR. NIKAS:  Your Honor, the door has to be

PDF created with pdfFactory trial version www.pdffactory.com

Vol. III - Page 444

1    reasonably shaped, correct?  It doesn't have to sliver

2    through the exact question that was asked, just the topic

3    area.

4            THE COURT:  You have to be within the scope of

5    the cross.

6            MR. NIKAS:  And the scope of the cross was the

7    pickling procedures.

8            THE COURT:  The protocol that he went through in

9    the pickling procedure and what he did, not getting into

10   Mercury's protocol.  He said that it was the same as

11   Mercury's protocol on direct?  Do you have a different

12   recollection as to what he said on direct?

13           MR. NIKAS:  I have a different recollection as

14   to the questions, because Mr. Rotondo said, Do you know,

15   sir, that MerCruiser requires you to act with speed?  And

16   he said yes.

17           THE COURT:  We're going to have to have the jury

18   next door.  I'm going to have to go back and look at the

19   questions.

20               (Whereupon the jury left the courtroom.)

21           THE COURT:  I'll need to look at my notes.

22           So you're referring to the questions about

23   having to act with speed.  I do recall a question about

24   that.

25           MR. NIKAS:  He would say MerCruiser requires you

1   to do this and that and that and that.

2           THE COURT:  Could you be more specific?  "Act

3   with speed," I recall.  I don't remember "that and that

4   and that."

5           MR. NIKAS:  He said changing the plugs, then he

6   talked about starting the engine with the possibility of

7   oil still remaining in the cylinder.  The whole discussion

8   took place about the procedures to be used for pickling,

9   and there was reference to both the actual procedure that

10  was used and MerCruiser's procedures.

11          THE COURT:  Okay.

12          Mr. Rotondo, I do recall the question about

13  being required or being recommended or something like that

14  to act with speed.

15          MR. ROTONDO:  There were three questions,

16  Your Honor.  One was speed, checking for water at the top

17  of the pistons, installing new spark plugs, and running at

18  1300 rpm, I asked him those questions.  And he said -- I

19  know he said those were -- he recognized that acting with

20  speed was important, checking for water at the top of the

21  cylinder was important.  As I stand here right now, I

22  don't remember if there was a reference to Mercury -- on

23  installing spark plugs or not, but he agreed he needed to

24  install new spark plugs, and running at it 1300 rpms.

25          I don't think there was any difference between

PDF created with pdfFactory trial version www.pdffactory.com

 1   what he said he needed to do and what Mercury said needed

 2   to be done.

 3         THE COURT:  But the point of this line of

 4   questioning that the plaintiff wants to go into is that if

 5   the question was not only Do you recognize that you have

 6   to do this but you recognize you have to do it because

 7   it's in the Mercury guidelines.  Then he wants to go into

 8   the Mercury guidelines.

 9         Have I captured the issue?

10         MR. NIKAS:  Yes.

11         THE COURT:  I think I'm going to have to ask our

12   court reporter to try to find those questions.  I don't --

13         MR. NIKAS:  Your Honor, I hate to do this also,

14   but this issue will come up again on the other areas of

15   discussion.  So maybe it would be prudent, rather than

16   having to stop again when the next area of inquiry begins,

17   to maybe determine what the scope of the cross-examination

18   was so as not to run afoul of any restrictions on the

19   redirect.

20         THE COURT:  Why don't you tell me what the areas

21   of inquiry are going to be that we need to be aware of?

22         MR. NIKAS:  The water ingestion response

23   procedures.  The pickling procedures.  The exhaust elbow

24   height requirements and the determination whether that

25   should be performed in the water, whether -- I think he

PDF created with pdfFactory trial version www.pdffactory.com

1    also asked questions about MerCruiser's requirements for

2    that determination.

3                THE COURT:  For whether it should be in the

4    water?

5                MR. NIKAS:  Talking about how you measure

6    exhaust height.  I can't remember exactly what the

7    question was.

8                THE COURT:  I remember the question.

9                MR. NIKAS:  Was it in the water, was it this,

10   you know, what the procedure was that he used to measure.

11   Did it conform with Mercury's requirements, because he

12   said, Do you know that Mercury requires this test be to be

13   done from the water line?

14               THE COURT:  Okay.

15               MR. NIKAS:  Flushing instructions.  And also,

16   Your Honor, Mr. Rotondo asked specifically --

17               MS. LEV:  Mr. Rotondo asked specifically whether

18   the exhaust elbow height was the cause of the rust that

19   was found in the cylinders.

20               THE COURT:  How does that tie in to MerCruiser?

21               MR. NIKAS:  It doesn't.  It should, however,

22   open the door to causation as to what did cause the rust.

23               THE COURT:  It does not.

24                   (Pause.)

25               THE COURT:  We're going to interrupt this

1    witness's testimony.

2           MR. NIKAS:  Should I put him on the stand to do

3    that?

4           THE COURT:  We'll put him on the stand, bring

5    the jury in, and I'll tell them that we're going to

6    resolve these issues later and bring him back after we've

7    resolved them.  Then we'll take the next plaintiffs'

8    witness.

9              (Pause.)

10          THE COURT:  We'll bring the jury back in.

11             (Whereupon, the jury entered the

12             courtroom.)

13          THE COURT:  Ladies and gentlemen, so we can keep

14   moving, we're going to interrupt this witness's testimony

15   and take our next witness from the plaintiffs, okay?

16          You may step down, sir.

17          MR. NIKAS:  Your Honor, before I call the next

18   witness, may I police that area?

19          THE COURT:  You mean you want to clean off the

20   witness stand?  You may remove the exhibits.

21          I try criminal cases, too, so you have to be

22   careful what terminology you use.

23          Our next witness is?

24          MR. NIKAS:  Thomas Greaves.

25          Plaintiffs wish to call Thomas Greaves to the

1   stand.

2             THE CLERK:  Please raise your right hand.

3

4                       THOMAS GREAVES,

5        called as a witness, having been first duly

6        sworn, was examined and testified as follows:

7

8             THE CLERK:  Please be seated.

9             Please state your name and spell your last name.

10            THE WITNESS:  Thomas Greaves, G-r-e-a-v-e-s.

11            THE CLERK:  Please state your city and state of

12  residence.

13            THE WITNESS:  Westbrook, Connecticut.

14            THE COURT:  Whenever you're ready, Mr. Nikas.

15

16                    DIRECT EXAMINATION

17  BY MR. NIKAS:

18  Q.   Mr. Greaves, could you tell the jury what it is you

19  do for a living?

20  A.   Marine surveying.

21  Q.   Mr. Greaves, what is a marine surveyor?

22  A.   We perform inspections on boats inside and out,

23  including the hull, electrical, wiring, and plumbing

24  systems.

25  Q.   And why do you do that?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   To determine the condition of the vessel, the boat,

2   and make sure it's in good shape.

3   Q.   And is this something that occurs routinely that

4   people order marine surveys or maybe insurance companies

5   order marine surveys?

6   A.   Insurance companies require them quite often.

7   Q.   And did you perform a marine survey in this case?

8   A.   I did.  Yes.

9   Q.   When did you perform your survey?

10  A.   June of '01.

11  Q.   So that was the same month that the engine failure

12  happened on board this boat to the two engines, correct?

13  A.   Correct.  Yes, sir.

14  Q.   So this wasn't a report that you prepared for a

15  lawsuit or any other purpose other than to determine the

16  condition?

17  A.   Correct.

18  Q.   Mr. Greaves, when you talk about a marine surveyor,

19  is that just something you could describe yourself as or

20  is there any certification process that goes along with

21  that?

22  A.   There is a certification process that goes along with

23  that.

24  Q.   What is the certification process to become a marine

25  survey?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Five years working with a surveyor and an exam at the

2    end of the five years.

3    Q.    Five years as an apprentice?

4    A.    Correct, uh-huh.

5    Q.    And then examination on what topics?

6    A.    On boat construction and materials in the boat, and

7    so forth.

8    Q.    Do marine surveyors have specific, I guess, areas of

9    expertise or do they survey all types of boats?

10   A.    They survey all types of boats.

11   Q.    And so do you have to be familiar with all types of

12   boats?

13   A.    You do, yes.  All types of boats, yes.

14   Q.    Do you survey both power boats and sailboats?

15   A.    Power boats and sail, yes.

16   Q.    Are you accredited by any marine surveying society?

17   A.    Accredited by SAMS, which is Society of Accredited

18   Marine Surveyors.

19   Q.    Society of Accredited Marine Surveyors?

20   A.    Yes.

21   Q.    Mr. Greaves, could you perhaps maybe slow down your

22   speech just a little bit?

23   A.    Okay.

24   Q.    It might help the court reporter.

25         What education do you have, sir?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   For surveying?  I'm a certified boat builder.

2           MR. NIKAS:  May I approach the witness,

3  Your Honor?

4           THE COURT:  He's all right.

5  BY MR. NIKAS:

6  Q.   So when did you serve -- make sure I'm right.  You're

7  a certified boat builder?

8  A.   Correct, uh-huh.

9  Q.   When were you -- when did you become certified as a

10 boat builder?

11 A.   Back in '58.

12 Q.   1958?

13 A.   Uh-huh.

14 Q.   And what were the requirements to becoming certified

15 as a boat builder?

16 A.   Apprenticeship of five years and night school for

17 naval architectural courses.  That was mainly it.

18 Q.   So your apprenticeship began in 1953?

19 A.   Probably '56, '57, in that area.

20 Q.   You completed that.

21          Where did you take your naval architectural courses?

22 A.   In Dublin, Ireland, as a matter of fact.

23 Q.   In Dublin, Ireland?

24 A.   Uh-huh.

25 Q.   When did you come to the United States?

1  A.    1960.

2  Q.    What were you working as in 1960 when you came here?

3  A.    As a boat builder -- (cell phone rings).   Excuse me.

4  Sorry.

5       As a boat builder.

6  Q.    How long did you work as a boat builder in the

7  United States?

8  A.    I've been working in boat building and repairs from

9  1960 to 1980.

10  Q.    1980?

11  A.    Uh-huh.

12  Q.    What did you do in 1980?

13  A.    Became a surveyor.

14  Q.    And you served your apprenticeship as a surveyor in

15  the U.S.?

16  A.    Yes.

17  Q.    And you successfully passed your examination as a

18  surveyor?

19  A.    Yes, yes.

20  Q.    Does the Society of American Marine Surveyors require

21  you to have a continuing education?

22  A.    Every five years we have to do 62-hour course.   Over

23  a period of five years, have to do 62 hours of training.

24  Q.    So that is your continuing education component?

25  A.    Correct.   We have to do a couple of -- every five

PDF created with pdfFactory trial version www.pdffactory.com

1    years, national convention with the society.

2    Q.    And you've been a surveyor now for, I guess, 28

3    years?

4    A.    Twenty-eight years, correct.

5    Q.    After you complete a survey, what happens?  Do you

6    draft anything?  What's the purpose of the inspection?

7    A.    We put a heading on there what the survey is, if it's

8    a condition survey, purchase survey, or insurance survey.

9    And we draft up a report.

10   Q.    So after every single inspection, you'll produce a

11   survey entitled value or condition or inspection?

12   A.    Correct.

13   Q.    And that happens in every instance?

14   A.    In every instance, correct.  Unless the boat fails

15   survey, then we don't write a report.  It depends.

16   Q.    And to whom do you send this report?

17   A.    To the prospective buyer or owner of the vessel.

18   Q.    If the insurance company orders a survey, does the

19   insurance company get a copy?

20   A.    Not necessarily.  The survey will go to the owner of

21   the boat and he will, in turn, send it to the insurance

22   company.

23   Q.    Do you disclose within the text of the survey what

24   you've been requested to do in terms of looking at and

25   coming to conclusions about?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   I do, yes.

2  Q.   Mr. Greaves, have you ever qualified as an expert

3  witness in any other cases?

4  A.   I have, yes.

5  Q.   Before what courts have you testified as an expert?

6  A.   New York City; Suffix County, Massachusetts;

7  Middletown and Hartford.

8  Q.   Is that in both state and federal courts?

9  A.   Correct, uh-huh.

10        MR. NIKAS:  Your Honor, at this time I'd like to

11  have Mr. Greaves certified as an expert witness under

12  Federal Rule of Evidence 702.

13        THE COURT:  Any voir dire?

14        MR. ROTONDO:  No, Your Honor.  I'm not objecting

15  to Mr. Greaves' qualifications as a surveyor.

16        THE COURT:  He's certified as a marine surveyor.

17  BY MR. NIKAS:

18  Q.   Mr. Greaves, I'd like to offer into evidence

19  Plaintiffs' Exhibit 23, which is your survey report that

20  was performed on June 30 of 2001.

21        MR. ROTONDO:  No objection.

22        THE COURT:  Plaintiffs' Exhibit 23 is admitted.

23  BY MR. NIKAS:

24  Q.   Now, I believe it's a four-page report followed by a

25  fifth page that looks like scribbling.

1   A.   What it is, it's the HIM number of the vessel, the

2   hull identification number.

3   Q.   Is this a photograph?

4   A.   No, this is a rubbing of the HIM number.

5   Q.   What is a rubbing?

6   A.   Put a piece of paper over the HIM number and use a

7   pencil and get a tracing of it.  That's what it mainly is,

8   a tracing.

9   Q.   Why do you do that?

10  A.   Just to verify you did the right boat.

11  Q.   Is every boat assigned a particular or unique hull

12  identification number?

13  A.   It is.

14  Q.   This prevents transcription errors or any other

15  errors?

16  A.   Correct.

17  Q.   Is this number bolded in?

18  A.   It is.

19  Q.   So it cannot be altered?

20  A.   No.

21  Q.   So you went to go inspect the vessel where?

22  A.   This vessel was inspected on 6/30/01 at Pilots Point

23  Marina in Westbrook, Connecticut.

24  Q.   And was she in the water at the time of your

25  inspection?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   Briefly in the water for one hour.  The inspection

2  was in the water and out of the water.

3  Q.   Why would you conduct your inspection both in and out

4  of the water?

5  A.   We do some testing on the hull.  We do testing for

6  stray current corrosion.

7  Q.   Sorry, what was that?

8  A.   Stray current corrosion from electrical.

9  Q.   Which is what?

10  A.   Just checking to see if the boat's been eaten up from

11  stray current, from corrosion from bad wiring or leakage

12  from the dockage or, you know, a bad ground in the vessel,

13  and so forth.

14         THE COURT:  I still haven't gotten one word.

15  Are you saying the word "current"?

16         THE WITNESS:  Current, correct.

17  BY MR. NIKAS:

18  Q.   Are you saying "stray current"?

19  A.   Stray current.

20  Q.   Is that corrosion due to stray current or stray

21  current corrosion?

22  A.   Corrosion as a result of stray current.

23  Q.   So if, I guess -- how does stray current corrosion

24  work?

25  A.   If you have a reverse polarity on the boat there

PDF created with pdfFactory trial version www.pdffactory.com

1    could be stray current.

2    Q.    And then the purpose of taking the boat out of the

3    water and inspecting it is what?

4    A.    Is to inspect the bottom and the topsides.

5    Q.    Bottom and the topsides.

6          You can't inspect the bottom --

7    A.    Not in the water.

8    Q.    So you inspected the vessel.  And, I guess, what did

9    you find -- the general description is a 33-foot Sea Ray

10   built in 1998?

11   A.    Correct.

12   Q.    And that information was received from what?

13   A.    Received from the boat, the HIM number, and from

14   documents I have, books I have to correspond with that

15   number and the size of this boat.

16   Q.    Does the hull identification number tell you the

17   length and the manufacturer?

18   A.    It does.

19   Q.    That was consistent with what you had?

20   A.    Correct.

21   Q.    What did you find when you inspected -- in fact,

22   since it may not be clear --

23               MR. NIKAS:  Your Honor, may I approach?

24               THE COURT:  You may.

25

1    BY MR. NIKAS:

2    Q.   As we go through your reports, since your report's

3    fairly technical, maybe you can point to the areas that

4    we're going to discuss so the jury can see.

5            MR. NIKAS:  Actually, maybe I could put it on an

6    easel and have him stand.  Is that fine, Your Honor?

7            THE COURT:  That's fine.

8    BY MR. NIKAS:

9    Q.   Mr. Greaves, why don't you come down here.

10           Looks like the first area you inspected or at least

11   described in your survey on are the topsides?

12   A.   Correct, sir.

13   Q.   Which are where?

14   A.   That is the area between the rub rail and water line.

15   Q.   Where's the rub rail?

16   A.   Rub rail is the hull-to-deck connection.

17   Q.   Why don't you explain that to the jury and I'll try

18   to get it to the court reporter in a way that she can get

19   it down.

20           So the rub rail's where?

21           THE COURT:  Why don't we do this.  You know

22   where all the parts on the boat are, right?

23           MR. NIKAS:  I do.

24           THE COURT:  Take the pointer, stand there.  He

25   talks so the court reporter can hear him and he can direct

PDF created with pdfFactory trial version www.pdffactory.com

1    you where to point.

2              THE WITNESS:  Want me to stand?

3              THE COURT:  You can stand here or sit down.

4    Whatever you prefer.

5    BY MR. NIKAS:

6    Q.   The rub rail and the water line?

7    A.   The water line.

8    Q.   Down here?

9    A.   Correct.

10   Q.   So what did you find out about the topsides here?

11   A.   Topsides were in good condition.  They were sounded

12   out and tested with a moisture meter and they were in

13   really good condition.

14   Q.   What's a moisture meter?

15   A.   Moisture meter is a unit we have for measuring

16   moisture content in laminants.

17   Q.   Why do you want to measure moisture content in this

18   area here?

19   A.   Because the hull has got coring in it.

20   Q.   What's coring?

21   A.   The hull is made up of sandwich construction,

22   fiberglass -- wood and fiberglass parts.  Got to make sure

23   no water has entered into the wood coring.

24   Q.   Okay.  So you inspected that.

25        It looks likes you noted gelcoat stress cracks around

1  the lift rings?

2  A.   That's on the steering of the boat, back end of the

3  boat.

4  Q.   What are gelcoat stress cracks?

5  A.   The gelcoat is a finish almost like a paint finish.

6  What happens with stress, the gelcoat will crack and it

7  will show cracks in different places.  The problem with

8  gelcoat stress crack is water can permeant into the cracks

9  if you don't seal them.

10  Q.   Next we went to the bottom, next thing in our report.

11  A.   Correct.  Which is a part under water we can't see on

12  this drawing.

13  Q.   Under here what did you find out about the bottom

14  here?

15  A.   The bottom paint had a problem.  It was delaminating,

16  coming off in flakes.  The moisture meter on the bottom

17  and the tapping with a metal hammer proved that the

18  laminant was in good shape.  There were a couple of gouges

19  on the font of the boat from some collision damage, maybe

20  hitting a log or object in the water.  But there was no

21  significance.

22  Q.   Did you find any evidence of grounding?

23  A.   No.  No evidence of grounding.

24  Q.   Then the deck, which is, I guess, the horizontal

25  surface like the top floor of the boat?

PDF created with pdfFactory trial version www.pdffactory.com

 1  A.    Yes.

 2  Q.    Was the area you looked at next.  What did you find

 3  there?

 4  A.    On the decks we found moisture around the anchor

 5  locker -- not the anchor locker but the anchor windlass.

 6  Q.    So the windlass is right here?

 7  A.    It's situated on the front of the boat.

 8  Q.    What does the windlass do?

 9  A.    Windlass is used to raise and lower an anchor.

10  Q.    Is this a mechanical piece of equipment?

11  A.    Operated electrically.  Mechanically, yes.

12  Q.    So it's a mechanical piece of equipment operated

13  electrically?

14  A.    Electrically.

15  Q.    Is that because the anchor and chain is heavy?

16  A.    It is.

17  Q.    So around that mechanism which raises and lowers the

18  anchor, you found delamination?

19  A.    Delaminations were high in moisture, had high

20  moisture readings.

21  Q.    So delamination with high moisture readings.

22        What is delamination?

23  A.    Separation of a deck section, which is cord also.

24  It's a sandwich construction.  And delaminations means

25  that the two surfaces have come apart with voids.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   What's this boat made out of?

2  A.   Fiberglass.

3  Q.   So those of us unfamiliar with fiberglass, if this

4  book -- what's the thickest part of fiberglass, is it the

5  core?

6  A.   Core, correct.

7  Q.   What goes on top of the core?

8  A.   Fiberglass.  Three-sixteenths of an inch.

9  Q.   And are there multiple layers?

10  A.   Of fiberglass, correct.

11  Q.   So they're sheeted on top of the core?

12  A.   Of the coring, uh-huh.

13  Q.   And the more layers, the stronger the fiberglass?

14  A.   Correct, uh-huh.

15  Q.   So delamination, which you talked about, is what?

16  A.   Separation of these two surfaces.

17  Q.   Is when the sheets come up off the core?

18  A.   Correct, uh-huh.

19  Q.   Is that bad?

20  A.   It is, yes.

21  Q.   Why is it bad?

22  A.   Well, you could get a weak spot on the deck and it's

23  going to be spongy.  And also water can permeant down

24  through those cracks and travel.

25  Q.   What happens if water gets down through those cracks

PDF created with pdfFactory trial version www.pdffactory.com

1    and travels?

2    A.    It it's going to rot the coring.

3    Q.    Then what?

4    A.    Then you got a problem, you got delaminations.  The

5    worse it gets, the more costly it's going to be to fix it.

6    Q.    You always want to fix that, I guess?

7    A.    You would, yes.

8    Q.    Is there any significance to the fact the

9    delamination was occurring on the foredeck up here where

10   the windlass is?

11   A.    The reason it was -- moisture was getting in

12   delaminations because the windlass wasn't bedded properly.

13   Q.    What does that mean to be not bedded properly?

14   A.    The material they use for bedding is like a rubber

15   caulking compound.  And sometimes run the bolts in the

16   windlass, they neglect to put caulking and bedding in

17   there so water enters through those bolt holes.

18   Q.    When you pull the anchor up on the windlass since the

19   anchor and the chain's in the water, is there water in

20   that area?

21   A.    There is.

22   Q.    Is there also water in that area because it's in the

23   front?

24   A.    Correct.  Correct, yes.

25   Q.    You found, I guess, new paint.  Repairs in the

PDF created with pdfFactory trial version www.pdffactory.com

1    cockpit, good repairs in the cockpit.  Done

2    satisfactorily.  And the hatches were good.  The bow rail,

3    stainless steel, found loose on the bases?

4    A.    That is this.  Rail right here.  It's a handrail,

5    stainless steel.  And all the stanchion bases were loose.

6    Q.    The stanchion bases were loose.  Could they be

7    tightened?

8    A.    They could be tightened.  Before they were tightened,

9    you have to re-bed them again like I said before with a

10   rubber solution.

11   Q.    So you can't just screw them in tighter?

12   A.    No.  They're going to leak if you do that.

13   Q.    What happens if they leak?

14   A.    Water gets into the deck laminant.  That's a problem.

15   Q.    Okay.  You also found apparently high moisture

16   readings in the decks under the windshield?

17   A.    On the starboard windshield, correct.  On the right

18   side, right-hand side.

19        Down in this area on the other side.

20   Q.    And those high moisture readings were indicative of

21   what?

22   A.    Water getting in and around the base of the

23   windshield and around the windshield wipers.

24   Q.    Should that happen?

25   A.    No.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.    Looks like the interior was all good and clean?

2   A.    Yes, it was good.

3   Q.    It says in the engine, which is the next area you

4   inspected -- how did you get into the engine?

5   A.    By lifting the hatch.

6   Q.    And the engine is located --

7   A.    The engines are located in the aft end of the boat,

8   the back end of the boat.

9   Q.    And they're kind of --

10  A.    Low down, correct.

11  Q.    So when you did that, did you go into the engine

12  compartment yourself?

13  A.    No.  It was impossible to get in there, as a matter

14  of fact.

15  Q.    It was impossible to get in there?

16  A.    Yeah.

17  Q.    Why is that?

18  A.    Because of the configuration of the exhaust system.

19  Q.    How did the exhaust make it impossible to get into

20  the engine compartment?

21  A.    It covered the entire space.  You have to be about

22  2 feet tall to get in there.

23  Q.    Could you inspect --

24  A.    You could look down in there, but you couldn't

25  physically climb in that area.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   If you were able to get into the engine compartment,

2   what would you have inspected by getting in there?

3   A.   Would have inspected the exhaust connections.

4   Q.   Exhaust connections.

5   A.   The shaft stuffing boxes.

6   Q.   Mr. Greaves, if you list them once, I'll repeat them.

7   A.   Stuffing boxes.

8   Q.   Okay.

9   A.   Exhaust connections.

10  Q.   Exhaustion connections.

11  A.   Slut-off valves for the engine intakes.

12  Q.   Shut-off valves for the engine intakes?

13  A.   Rudder ports.

14  Q.   Rudder ports.

15  A.   And strut connections on the inside.

16  Q.   Strut connections.

17       Why is it important to inspect these as part of the

18  survey?

19  A.   Because there's a possibility of only having single

20  hose clamps and they could come apart and you could have a

21  little bit of a problem when you're out in the ocean.

22  Q.   You want to inspect these things?

23  A.   On a regular basis, correct.

24  Q.   So the installation of the engine itself you found to

25  be satisfactory, you found the beds and mounts in good

PDF created with pdfFactory trial version www.pdffactory.com

1  condition?

2  A.    Yes.

3  Q.    The exhaust you found is what type of system?

4  A.    Exhaust?

5  Q.    Yes.

6  A.    Water cooling exhaust.  To a fiberglass muffler.

7  Water lift muffler.

8  Q.    Water lift muffler.

9      You say the exhaust system was upgraded by Sea Ray

10  from the original installation?

11  A.    Correct.

12  Q.    Could you see evidence of the modification?

13  A.    I could see the new exhaust system.  I couldn't tell

14  if it was a modification or not.  I didn't see the

15  existing system.

16  Q.    You never saw the original system?

17  A.    No.

18  Q.    The new exhaust installation prohibits access to the

19  interior transom?

20  A.    In the back end of the boat.

21  Q.    And that's the discussion we just had about you

22  couldn't get in unless you were small?

23  A.    Correct.

24  Q.    You also note that the exhaust hoses to the mufflers

25  are higher than the manifolds in the risers?

1   A.   That is correct.

2   Q.   Is that significant in any way?

3   A.   I've never seen it before.

4   Q.   Okay.

5        The stuffing box was good.  The shift throttles were

6   good.  The port engine was out of alignment?

7   A.   Correct, yes.

8   Q.   The electrical system was good and the battery was

9   still charging, correct?

10  A.   They were, yes.

11  Q.   Fuel system was good, conformed to standards.  And

12  there were fire extinguishers and the ventilation was

13  good?

14  A.   Yes.  Correct.

15  Q.   Did you run the engines during the survey?

16  A.   No, no.

17  Q.   Why not?

18  A.   The engines at that time had a little problem and

19  couldn't be start.

20  Q.   So they were inoperable?

21  A.   Inoperable at that time, yes.

22  Q.   Would you normally do a sea trial or at least start

23  the engines during a survey?

24  A.   Not necessarily, but on a purchase survey we would.

25  Q.   Of these recommendations, some appear to be

PDF created with pdfFactory trial version www.pdffactory.com

1    relatively minor, at least apparently.  Could you at least

2    point out those items which you feel were significant?

3    A.    I would say all of them.

4    Q.    Okay.  Are some more significant than others?

5    A.    I would say the rub rail bases -- we had damage to --

6              THE COURT:  Maybe I could ask the witness, as

7    he's talking about them, use the number.  It would be

8    easier for people to follow.

9    A.    Number one.

10   BY MR. NIKAS:

11   Q.    Number one you thought was serious?

12   A.    Showing some damage.

13   Q.    And the stress cracks?

14   A.    Stress cracks around the lift rings needed attention.

15   Q.    Okay.

16   A.    Number two.

17   Q.    Gelcoat stress cracks?

18   A.    Yeah, both sides above the rub rails needed

19   attention.

20   Q.    That's to prevent the water --

21   A.    Water seepage into the laminant.

22   Q.    Actually, if I'm going to do this, let me do this.

23          So that was number two.

24   A.    Number three, yeah.

25   Q.    Strip bottom paint?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   Yeah.  Bottom paint was in pretty bad condition.  It

2   was flaking and discolored.

3   Q.   Is bottom paint important?

4   A.   Very important.

5   Q.   Why?

6   A.   It keeps particles out of the bottom, for one thing.

7   Q.   That would be something that it was the owner's

8   responsibility to do?

9   A.   Perhaps, yes.

10  Q.   That's something you replace how often?

11  A.   Yearly basis most of the time.

12  Q.   So that wasn't something -- she didn't wear her

13  original bottom paint?

14  A.   No, that wasn't the original bottom paint I don't

15  think.

16  Q.   This is something you have to keep on doing?

17  A.   Uh-huh.

18  Q.   Repair the remote spotlight?

19  A.   It wasn't operating properly at this time, so it

20  needed repair.  It would work intermittently.  It needed

21  replacing and repairing.

22  Q.   Repair the windlass?

23  A.   It wasn't working.

24  Q.   Would the water leaking into the area around the

25  windlass affect its operation?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    No.   I think it may have been a solenoid or a part

2    broken in the windlass.  We didn't take it apart to look

3    at it.

4    Q.    The solenoid was potentially bad?

5    A.    Or some other part in there, maybe electrical part.

6    Q.    And then number six?

7    A.    Oh, yeah, exhaust system.  The installation of the

8    exhaust system didn't look right.  I recommended that a

9    certified MerCruiser mechanic take a look at it and figure

10   out proper installation and the configuration so the

11   engine spaces could be accessed.

12   Q.    Seven?

13   A.    Seven.  Oh, yeah, bow rail, which is the safety rail

14   forward on the boat.  The bases were loose.  That had to

15   be re-bedded and fastened.

16   Q.    And I guess aligning the port engine is pretty

17   self-explanatory.  What is the item in 11?

18   A.    The bronze fixture on the starboard side was damaged

19   and restricted the water flow from the exhaust pipe on

20   that starboard engine to a certain extent, and that needed

21   to be replaced.

22   Q.    Number 12?

23   A.    Number 12, stiffener between the engine stringers

24   that had been repaired I guess by Sea Ray which I was told

25   about.  And I figured that should have covered the entire

1    space between the engine screws.

2    Q.   A stringer is to provide what?

3    A.   Stringers are stiffeners and they also support the

4    engines.

5    Q.   So it's a --

6    A.   It's a combination.

7    Q.   Like in a dirigible?  Like the Hindenburg, the long

8    things you see underneath it?

9    A.   Ribs.  Longitudinal ribs.

10   Q.   And then the last page of your report has this

11   language.  Is this standard language that you would use?

12   A.   It is.

13   Q.   Does it appear in every survey report?

14   A.   Just about, yes.  Sometimes a little longer for

15   different types of boats.

16   Q.   And says you can only look at the things you can see?

17   A.   Correct, uh-huh.

18   Q.   And you didn't survey the engines?

19   A.   No.

20   Q.   What are auxiliaries?

21   A.   Like a generator.

22   Q.   And no warranty or guarantee is given, and you don't

23   assume any liability?

24   A.   Correct.

25   Q.   And that's your, I guess, stamp?

 1  A.    That's a seal from the Accredited Marine Surveyors

 2  Association.

 3  Q.    That means it's an official survey?

 4  A.    Yes.

 5              MR. NIKAS:  I have no further questions.

 6              THE COURT:  Whenever you're ready, Mr. Rotondo.

 7              You can retake the stand if you want, sir.

 8

 9                      CROSS-EXAMINATION

10  BY MR. ROTONDO:

11  Q.    Good afternoon, Mr. Greaves.

12  A.    Good afternoon.

13  Q.    I've got a few questions for you.  Hopefully it won't

14  take too long.

15  Q.    You largely went through your report with Mr. Nikas,

16  and I will a try not to repeat some of the things he did.

17  I'd like to cover a few things.

18       You said you examined the topsides?

19  A.    Correct, yes.

20  Q.    And topsides, just so we have a frame of reference,

21  can you direct me?

22  A.    From the rub rails to the water line.

23  Q.    Here to here?

24  A.    Correct.

25  Q.    And when you examined the topsides, you found the

1    original gelcoating had not been painted and was found in

2    overall good condition.

3    A.    Overall good condition, correct.

4    Q.    You also observed the decks, that's this area?

5    A.    We did all that, correct.

6    Q.    And the decks were fiberglass core sandwich

7    construction?

8    A.    Correct, sir.

9    Q.    And you found overall condition of the decks to be

10   good as well?

11   A.    Except for the little areas I pointed out on the

12   windlass and the windshield area.

13   Q.    But the overall condition?

14   A.    Overall condition was pretty good, yes.

15   Q.    When you were on the water and on the land, you

16   walked on the cockpit floor; is that correct?

17   A.    Yes.

18   Q.    You didn't notice any flexing of the floor?

19   A.    No.  They had a repair in the floor that was pointed

20   out to me.

21   Q.    You looked at the interior of the boat?

22   A.    Correct, uh-huh.

23   Q.    And you found all of the interior plywood bulkheads

24   and stringers to be properly attached to the hull with no

25   delaminations?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes.

2    Q.    And that means there were no leaks in the interior

3    that caused damage to the interior of the boat?

4    A.    No, not at this time.

5    Q.    And you looked at the repairs or work that had been

6    done to the interior of the boat?

7    A.    On the interior?  Oh, you mean the engine

8    compartment?

9    Q.    Yes.

10    A.    Yes.

11    Q.    Okay.  And you found all of those repairs to be

12    satisfactory?

13    A.    Adequate, perfect, yes.

14    Q.    You talked about the stiffener, you just mentioned

15    that with Mr. Nikas?

16    A.    Indeed.  Correct.

17    Q.    The lack or absence of that stiffener that you

18    suggested didn't cause any weak spots; isn't that correct?

19    A.    No, no.  The stiffeners are put in there for a

20    reason, just to stop the sound from the hull resonating

21    inside.

22    Q.    And the absence of this extended stiffener that you

23    talked about didn't cause any problems with respect to the

24    performance?

25    A.    No.

1    Q.    Now, when you did your survey in June of 2001, you

2    thought the boat was repairable?

3    A.    Yes, uh-huh.

4    Q.    That's why you made the 12 recommendations?

5    A.    That's right.

6    Q.    If you hadn't thought the boat could be worked on,

7    you wouldn't have said that?

8    A.    Correct, yeah.

9    Q.    Now, you got your information about the history of

10   the boat from Mr. Mains; is that correct?

11   A.    After the survey, correct.

12   Q.    After the survey before you wrote your report?

13   A.    I can't remember.  I didn't get very much history on

14   it at that time.  I knew it had been back to the factory

15   for repairs.  But all the repairs had been carried out.

16   Q.    The only information you got about the boat, the

17   prior use of it, for example, came through Mr. Mains?

18   A.    Correct, uh-huh.

19   Q.    Now, you made reference in your testimony to the port

20   engine being out of alignment; do you recall that?

21   A.    Correct, yes.

22   Q.    You didn't take any pictures of that?

23   A.    No.

24   Q.    And you didn't do any measurements of that?

25   A.    No.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    You talked a little bit about some moisture readings

2    that you made.  Do you recall that?

3    A.    Moisture readings on the forward deck and around the

4    windshield wiper on the starboard side, correct.

5    Q.    Did you make moisture readings on the bottom?

6    A.    I did.

7    Q.    And the moisture readings on the bottom proved to be

8    good, didn't they?

9    A.    The bottom was dry, correct, yes.

10   Q.    And you said that you took some moisture readings in

11   the area of the windlass?

12   A.    Correct.

13   Q.    And you didn't write down the moisture readings near

14   the windlass?

15   A.    I use a special meter, the scale is 1 to 10.

16   Readings are around 5 and then you have a lot of moisture.

17   2 and 1, you don't have a problem.  In around 5 it is a

18   problem.

19   Q.    So when you were measuring at the bottom and you had

20   a good reading, you were able to measure it?

21   A.    It was 0 at the bottom, correct.

22   Q.    In fact, wasn't it 2?

23   A.    1 or 2, I guess.  Somewhere.  It was a good reading.

24   Q.    And in your survey you did not find any evidence of

25   core damage as a result of the high moisture that you say

PDF created with pdfFactory trial version www.pdffactory.com

 1  you found in the windlass?

 2  A.    Not on the hull, but on the deck forward we found

 3  some core damage.  Some delaminations there.  But you

 4  couldn't tell it was core damage, but there were

 5  delaminations in that area.

 6  Q.    Excuse me for a second.

 7  A.    No problem.

 8              MR. ROTONDO:  If we can mark this as defendant's

 9  exhibit for identification.

10  BY MR. ROTONDO:

11  Q.    Mr. Greaves, I'd like to go over some things in your

12  deposition.

13  A.    Okay, no problem, yes.

14  Q.    Do you recall having been deposed in this case?

15  A.    Yes.

16  Q.    And did you say at the time of your deposition you

17  didn't find any evidence of any core damage as a result of

18  the high moisture that you recorded?

19  A.    That's right.

20  Q.    That's what you said at that time?

21  A.    Yes.

22  Q.    Didn't you tell us in your deposition that you didn't

23  look for evidence of core damage as a result of high

24  moisture?

25  A.    Unless you do some tests with drilling and so forth,

PDF created with pdfFactory trial version www.pdffactory.com

1   you can't tell.

2   Q.   All right.  And so to look for evidence of core

3   damage, you need to do drilling?

4   A.   Or take something apart and visually look in there,

5   yeah.

6   Q.   And you didn't do that?

7   A.   No, no.

8   Q.   You said that there was some discoloration and

9   flaking in the bottom paint in some parts?

10  A.   Correct, uh-huh.

11          MR. NIKAS:  Objection.  He's trying to impeach

12  the witness for something he didn't say.  He said --

13          THE COURT:  Just tell me you have an objection.

14          MR. NIKAS:  Objection, Your Honor.  The

15  impeachment misstates the testimony.

16          THE COURT:  Overruled.

17  BY MR. ROTONDO:

18  Q.   The discoloration and flaking that you found on the

19  bottom paint, did you conclude that that was caused by

20  poor adhesion?

21  A.   I would say so, yes.

22  Q.   And would you agree the core adhesion was not caused

23  by any repair work that had been done by Sea Ray?

24  A.   Correct.  May have been discolored.  Different

25  paints, you know, with the -- not combining properly.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    And the issue with the bottom paint was largely

2    cosmetic; isn't that correct?

3    A.    It was cosmetic, yeah.

4    Q.    And the boat could still run with a poorly-painted

5    bottom?

6    A.    It can, yes.

7    Q.    You talked about the damage to bronze exhaust port?

8    A.    There is a bronze exhaust port on the bottom.  I

9    think it's on the -- what did I say, port side?  That is

10   main exhaust outlet on the bottom.  And that had been

11   damaged, restricts the flow of moisture or water coming

12   through the exhaust system.

13   Q.    You didn't take any pictures of that?

14   A.    No.

15   Q.    You said you obviously didn't run the boat.

16   A.    Beg pardon?

17   Q.    You said before you didn't run the boat?

18   A.    No, no.

19   Q.    You talked about some gouges on the bottom surface?

20   A.    Forward, correct.

21   Q.    Those gouges indicated that there had been some

22   damage at some point in time and the bottom painted over?

23   A.    I think they filled in with poxy and painted over.

24   They were obvious, you could see them, but probably from

25   striking something.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. ROTONDO:  Thank you very much.  I don't have

2    any further questions.

3               THE WITNESS:  Thank you.

4

5                     REDIRECT EXAMINATION

6    BY MR. NIKAS:

7    Q.   Mr. Greaves, I just want to ask one thing so nobody

8    is misled by this.  When you talk about your repair

9    recommendations --

10              THE COURT:  Let me just -- objection's

11   sustained.  You know it's inappropriate, right?

12              MR. NIKAS:  Apologize, Your Honor.

13   BY MR. NIKAS:

14   Q.   Your repair recommendations, when you deemed the

15   vessel repairable, exclude on page 4 of your exhibit the

16   engines which were not surveyed, correct?

17   A.   Yeah, didn't include any engines or mechanical

18   equipment.

19   Q.   So your opinion of repairability goes only to those

20   issues on --

21   A.   On the recommendations, correct.

22   Q.   The fiberglass, the rub rails, the windlass, the

23   outlet, the bottom paint, those issues?

24   A.   That's correct.

25   Q.   They do not include the engines?

setting

1  A.   No.

2           MR. NIKAS:  No further questions, Your Honor.

3           MR. ROTONDO:  Nothing further.

4           THE COURT:  Thank you, sir.  You may step down.

5           THE WITNESS:  Thank you, Your Honor.

6           THE COURT:  I believe that's an exhibit for

7  identification the witness has with him.

8           MR. NIKAS:  He's returning it to Mr. Rotondo.

9           THE COURT:  Mr. Nikas?

10           MR. NIKAS:  Our two remaining witnesses,

11  Your Honor, are Mr. Wade, who will be called out of

12  sequence, and the remainder of Mr. Wicander's testimony,

13  which I understand will now take place tomorrow.

14           THE COURT:  Yes.

15           Subject to that, you're resting?

16           MR. NIKAS:  That's correct.  Subject to those

17  two witnesses, we rest.

18           THE COURT:  Do we have defense witnesses

19  available?

20           MR. ROTONDO:  We do have witnesses, Your Honor.

21  We need to go get them and to set up.

22           THE COURT:  Why don't we take a 20-minute break

23  now and then we'll go into our normal end time.

24           MR. ROTONDO:  Thank you.

25           THE COURT:  We'll recess, ladies and gentlemen.

```
 1                    (Whereupon, a recess followed.)

 2

 3              THE COURT:  Ready for the jury?

 4              MR. ROTONDO:  Yes, Your Honor.

 5              THE COURT:  Bring in the jury.

 6              MR. ROTONDO:  Your Honor, will the Court explain

 7    that we're taking these witnesses out of order and

 8    starting our case because of issues with witnesses?

 9              THE COURT:  I'll try to remember to do that.  I

10    told them that -- I think when Mr. Nikas was there, we

11    explained.

12              MR. ROTONDO:  In the presence of the jury?

13              THE COURT:  That was in the presence of the

14    jury.  He was resting subject to.

15                    (Whereupon, the jury entered the

16                    courtroom.)

17              THE COURT:  Please be seated everyone.

18              Ladies and gentlemen, you understand plaintiff

19    has not yet rested, but we have some witnesses who are not

20    yet available for the plaintiffs' case so we're going to

21    have some defense witnesses.

22              MR. ROTONDO:  Your Honor, Sea Ray calls Dean

23    Beckman.

24              THE CLERK:  Please raise your right hand.

25
```

1                           DEAN BECKMAN,

2           called as a witness, having been first duly

3           sworn, was examined and testified as follows:

4

5                   THE CLERK:  Please be seated.

6                   Please state your name and spell your last name.

7                   THE WITNESS:  My name is Dean Beckman,

8    B-e-c-k-m-a-n.

9                   THE CLERK:  City and state of residence?

10                  THE WITNESS:  Danbury, Connecticut.

11

12                      DIRECT EXAMINATION

13   BY MR. ROTONDO:

14   Q.   Good afternoon, Mr. Beckman.

15   A.   Good afternoon.

16   Q.   Have you ever testified in court before?

17   A.   No, sir.

18   Q.   If my questions aren't clear to you, please let me

19   know and I'll try to rephrase them, okay?

20   A.   Okay.

21   Q.   All right.  Mr. Beckman, you said you live in

22   Danbury?

23   A.   Yes.

24   Q.   Where are you employed at the present time?

25   A.   I'm self-employed and I work in Shelton, Connecticut,

```
 1   and also I have a shop of my own in Danbury, Connecticut.
 2   Q.   What kind of work do you do?
 3   A.   In the summertime I repair boats.  And in the
 4   wintertime I work for a car collector restoring cars.
 5   Q.   And for how long have you been self-employed in the
 6   fashion you just described?
 7   A.   Since April of 2007.
 8   Q.   And before that time, where were you employed?
 9   A.   I was employed by Surfside 3 in Norwalk, Connecticut,
10   from 1994 until March of 2007.
11   Q.   And what jobs or positions did you hold at
12   Surfside 3?
13   A.   The first few years I was there I was a boat
14   mechanic.  And then as the business grew, I became the
15   service manager and held that position for approximately
16   ten years.
17   Q.   So from about 1997 until 2007?
18   A.   Yes, sir.
19   Q.   All right.  And during the period of time that you
20   worked at Surfside 3, did you have occasion to deal with
21   Peter and Lori Mains?
22   A.   Yes.
23   Q.   And specifically, did you have occasion to deal with
24   them in connection with the 1998 Sundancer, Sea Ray
25   Sundancer that they bought?
```

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes, I did.

2    Q.    I'm going to put a couple of exhibits in front of you

3    that I'm going to put up on the screen.  It might be

4    easier for you to look at these.

5    A.    Sure.

6    Q.    All right.  Showing you what's been marked as

7    Plaintiffs' Exhibit 2, do you recognize this document?

8    A.    Yes, I do.

9    Q.    All right.  Can you tell us what it is?

10   A.    That's an inservice checklist for a boat that we went

11   through -- when a person would buy a new boat and we would

12   have it ready for them in the water, the day they came to

13   pick it up, it would be an orientation checklist.  We

14   would go through all the systems on the boat with the

15   customer and then when we were completed to their

16   satisfaction, then they would sign the bottom.  And we

17   would turn this form in to Sea Ray and that would put

18   their warranty into effect.

19   Q.    There's some handwriting down bottom part of the

20   page; do you see that?

21   A.    Yes.

22   Q.    Lower right-hand corner.  Something about floor flex

23   at helm; do you see that?

24   A.    Yes.

25   Q.    Do you recall there being any discussion with

1   Mr. Mains about floor flex at the helm?

2   A.    Yeah.   That would have been a concern that he would

3   have voiced when he got the boat.   When we prepped a boat,

4   if we -- I wouldn't say missed something, but if a

5   customer had a concern, we always wrote it on this sheet

6   so that it could be addressed at sometime.

7   Q.    With respect to his concern about floor flex, did you

8   check it out?   Did you see what he was talking about?

9   A.    At that time we would have basically just noted it.

10  I mean, we would have observed it and noted it.

11  Q.    All right.   At some later point in time did you walk

12  across the helm?   Did you determine what --

13  A.    Yes, we would have done that, you know.

14  Frequently -- we would look at a boat and assess if there

15  was a fix we need to do or if something's loose.   So,

16  yeah, we would have definitely looked at it.

17  Q.    All right.   Did you determine what the nature of the

18  issue, if any, was with respect to the floor flex?

19  A.    I think at that time the nature of it was the

20  customer felt that when he walked across the floor, it

21  maybe squeaked, made a squeaking noise.

22  Q.    Did you find there to be any problem with the floor

23  flex?

24  A.    No, I think at that point we didn't -- as a dealer,

25  we didn't find that there was anything wrong with the

PDF created with pdfFactory trial version www.pdffactory.com

1    boat.  And we would have made an effort to, you know, find

2    loose screws or maybe missing caulk or something to try to

3    rectify the problem that way.

4    Q.   Engine hatch not aligned; do you see that?

5    A.   Yes, sir.

6    Q.   And do you recall there being any discussion about

7    the engine hatch with Mr. Mains either at the time of the

8    delivery in May of 1998 or at some point later on?

9    A.   I think probably both.  I think at that time the

10   concern would have been that when you closed the engine

11   hatch, it would be tight and it would, you know, it would

12   squeak if you had fiberglass rubbing against fiberglass.

13   Q.   Did you address that at some point in time?

14   A.   Yeah, I think we probably wouldn't have addressed it

15   the day the people were taking delivery of the boat.

16   That's the day they actually would be leaving and going to

17   their dock.  These items that would be on this list like

18   that, we would subsequently make a work order and then

19   visit the boat as soon as possible to try to figure out an

20   acceptable remedy.

21   Q.   If we can now go to Plaintiffs' Exhibit 3.  It's a

22   May 27 -- if you can blow up the bottom half of the

23   letter.

24       See the list of items there, starboard engine only

25   reaches 4200, port engine reaches 4300?

1    A.    Yes.

2    Q.    Did you do anything to investigate those complaints

3    or respond to them?

4    A.    Well, once we got this letter, a letter from a

5    customer, we would -- it was our policy to create a work

6    order and we would address the problems as soon as we

7    possibly could, yes.

8    Q.    What did you do with respect to those two issues

9    about the engines and the rpms?

10   A.    Well, typically, on a new boat, because it is a new

11   boat and a new motor, this would be really a fairly common

12   thing.  Since the motor really takes about 20 hours to

13   break in.  At this point we would really urge the customer

14   to use the boat for approximately that time and then when

15   it was time for a 20-hour service, we'd come up and go

16   over the whole boat at their expense and make adjustments

17   to the motors now that it's been broken in.  So it

18   wouldn't really be practical to try to make any more

19   adjustments at that point because you'd wind up doing it a

20   few hours later.

21   Q.    And did you go out at some point in time and

22   investigate those issues at the time of your 20-hour

23   service?

24   A.    Yeah, typically the way we would do that is we would

25   have a small computer electronic box that we would plug

PDF created with pdfFactory trial version www.pdffactory.com

1    into the motor that would give us a digital readout of the

2    engine rpms.  And then if we found that they were correct,

3    we could actually adjust the tachometers on the boat a bit

4    and make them match.

5    Q.    And do the throttles -- no.  Okay.

6          You said there's a 20-hour service that was typically

7    provided?

8    A.    Well, that was not provided for free.  It was at the

9    customer's expense.  But since it was a new motor, we

10   would instruct everybody when they were picking up their

11   new boat that after running it for 20 hours, it would need

12   to have the timing adjusted, the oil changed, all sorts of

13   fittings on the motor or hose clamps tightened up, you

14   know, idles adjusted, throttles adjusted.

15   Q.    If we can go to page 2.

16         There's a reference here to a scratched manifold and

17   gold lettering remedy; do you see that?

18   A.    Yes.

19   Q.    Do you know what that referred to?

20   A.    I think it was a label that was on top of the air

21   intake on top of the motor.  And I believe that it was a

22   plastic logo or lettering that could be changed.

23   Q.    If we could now go to Plaintiffs' Exhibit 5.

24         There's a reference at the top about raw fiberglass

25   showing in starboard cockpit drain at transom.  Do you see

1   that?

2   A.   Yes.

3   Q.   Did you go out and look into that concern in any way?

4   A.   Yeah, that was something that we would have looked at

5   at the customer's slip where he kept his boat.  We would

6   have made a service call up there to look at that.

7   Q.   Where was that piece of rear fiberglass?

8   A.   I believe that it was underneath the rear seat toward

9   the back of the boat.

10  Q.   What did you have to do to find it?

11  A.   Well, you would have to lay on the floor of the boat

12  and sort of put your head underneath the seat to look for

13  it.

14  Q.   Okay.  All right.

15       If we can go back, there's another entry regarding

16  air-conditioning.  It's at the bottom there.  Did you

17  respond to that concern?

18  A.   Yeah, I guess we did.  And we would have looked at

19  the air conditioner to see if it was working.  However, I

20  believe that I hadn't had a complaint that was -- or

21  normally, you know, people would complain that an air

22  conditioner just didn't work.  It cooled the boat or it

23  did not.  But this was kind of an unusual complaint

24  because the temperature of cooling the boat didn't match

25  what was on the unit on itself or on the gauge.

1    Q.   All right.  We can now look -- go back.  Bottom

2    bullet point says water leaks onto tops of both helm seat

3    backrests.  Do you see that?

4    A.   Yes.

5    Q.   Do you recall what, if anything, that related to?

6    A.   I believe that would have been an item where

7    something would have been leaking from the fiberglass

8    arch, wouldn't have been maybe caulked correctly or

9    enough, and we would have just checked the arch on top of

10   the boat and put new silicone caulk on it, refastened a

11   few items.

12   Q.   The arch is the arch literally at the back of the

13   boat?

14   A.   It's a big arch, covers the whole boat.

15   Q.   Was there any equipment up on that arch?

16   A.   Yeah, there would be radar and some antennas that we,

17   as a dealer, would have to install up there.  Even though

18   it was an item that might have been installed by Sea Ray,

19   we, as part of our dealer prep, would have to remount

20   those items.  That's why, you know, we would have to caulk

21   them.

22   Q.   Okay.  If we can go to the next page.  At the top of

23   the page there's a circle and a bullet, A & B leaks are

24   flooding dash panel and cockpit carpet.  Do you see that?

25   A.   Yes.

1    Q.    Did you investigate or look into that complaint or

2    comment?

3    A.    Yes.

4    Q.    What did you learn?

5    A.    I believe that we -- with a complaint like that, we

6    would check the boat for any breaks in caulk after it's

7    been run and bounces around on the waves.  We would

8    re-caulk.  We would make sure that the canvass was fitting

9    properly and would be properly affixed to the boat because

10   quite often the windows are made to be -- not the glass

11   window, but the window above it would be made to take out.

12   Q.    Did you figure out whether the leaks referenced here

13   were caused by being exposed to rainfall or something

14   else?

15   A.    Well, I think -- normally when you go up and

16   re-caulk, after you caulk something, you couldn't really

17   test it with water until the caulk would dry.  And we

18   would caulk lots of boats.  And I think that we would --

19   after it was dry, you would try to simulate rain and see

20   if it would leak again.

21   Q.    And did you do that?

22   A.    Yeah, I believe that we -- actually, I believe we did

23   the whole boat that way.  As long as you would simulate

24   that it was rain and let the water fall on the boat I

25   believe it was fine.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Was there another scenario in which it was not fine?

2    A.    Yeah, I think I remember that, you know -- well,

3    generally, if you spray water directly at a boat through a

4    hose like you're washing the boat or something, the

5    canvass is really not designed to stop water at that

6    point.

7    Q.    If we can go back to -- I believe the first page --

8    I'm sorry, second page.  There's a reference here to the

9    exhaust clamps being sloppily installed; do you see that?

10   A.    Yes.

11   Q.    Did you look into that?

12   A.    Yeah.  We would have looked into that because

13   anything that has to do with exhaust could be potentially

14   dangerous because of carbon monoxide.  Any complaint that

15   we would have about exhaust would be pretty serious.

16   Q.    Did you determine what the nature of complaint was or

17   the concern was with respect to the exhaust clamps?

18   A.    Yeah.  I think that -- well, going by what it says in

19   here, that the customer wasn't happy about the exhaust

20   clamps -- on a boat exhaust everything is doubled-clamped

21   and if the clamps weren't evenly spaced across all the

22   fittings, it was a concern to the customer.

23   Q.    Mr. Mains?

24   A.    Yes, sir.

25   Q.    Go to Plaintiffs' Exhibit 6.

1      This is a letter dated September 1, 1998.  Top bullet

2  point says, Throttle lever positions are poorly matched

3  and to different degrees at various rpm settings.  Do you

4  see that?

5  A.   Yes.

6  Q.   Did you look into that?

7  A.   Yes.  By now it's -- going by this, it's already

8  September.  So the customer would have already used his

9  boat 20 hours, we would have been there to make

10  adjustments.  So we would have looked at those again.

11  Since there are two separate engines and mechanical

12  cables, they're never 100 percent even.  You know, we

13  strive to get them as close as we can, but -- so that

14  would have been an adjustment.

15  Q.   Okay.  The throttle levers are the things that

16  control the power that goes to the engines?

17  A.   Yes, sir.  Just like the gas pedal in the car.

18  Q.   If we can go to the second page, the bottom bullet

19  point.

20      This refers to exhaust resonance; do you see that?

21  A.   Yes.

22  Q.   All right.  And did you talk with Mr. Mains about his

23  concern about exhaust resonance?

24  A.   Yeah, I believe that we did.  I believe that was a

25  fairly -- something that he was very concerned about the

PDF created with pdfFactory trial version www.pdffactory.com

1    noise.  And I think that in order to really check that

2    out, I believe that Mr. Mains and I went for one, possibly

3    two boat rides in his boat, he and I, on the Connecticut

4    River to just see if there was anything wrong.

5    Q.    Did you find anything wrong in terms of exhaust

6    noise?

7    A.    No.  At that point I didn't find anything that I felt

8    was a defect or loose or leaking.  And felt that exhaust

9    system that was on the boat was in good working order.

10   Q.    The second item, the second bullet point, makes

11   reference to something called limber holes, the absence of

12   limber holes.  Do you see that?

13   A.    Yes.

14   Q.    Did this -- first of all, what are limber holes?

15   A.    A limber hole is just a hole in a stringer that would

16   allow trapped water from one bulkhead to get into a lower

17   section where it could be pumped out.  It's basically a

18   drain hole.

19   Q.    Did this boat come with limber holes?

20   A.    Well, it had limber holes elsewhere in the bilge, but

21   in this area it did not.

22   Q.    Okay.  We can go to Plaintiffs' Exhibit 8.

23         The first bullet point is the raw fiberglass, you

24   already talked to us about that, correct?

25   A.    Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   Then the second one is the cockpit floor, issue about

2  the cockpit floor depressing?

3  A.   Yes.

4  Q.   Did you have any discussion with Mr. Mains about that

5  issue?

6  A.   Yeah, I think it had been a concern and it was one of

7  the concerns he was focused on.  I think ultimately I

8  felt, being the service manager --

9           MR. NIKAS:  Objection, Your Honor.  The witness

10  is offering opinion for which he has not been qualified as

11  an expert.

12           THE COURT:  Want to rephrase the question, I was

13  looking at a document.  Why don't you restate the

14  question.

15  BY MR. ROTONDO:

16  Q.   Did you have any discussions with Mr. Mains about his

17  concern about the cockpit floor depressing?

18  A.   Yes, sir.

19  Q.   And what was the substance of your discussions?

20  A.   Determining whether or not it was a defect.

21  Q.   What did you determine?

22  A.   I felt that it wasn't and --

23           MR. NIKAS:  Objection, Your Honor.  The witness

24  is offering opinion for which he's not been qualified as

25  an expert.

PDF created with pdfFactory trial version www.pdffactory.com

1   BY MR. ROTONDO:

2   Q.   Mr. Mains told you that he thought that the cockpit

3   floor depressed under his weight when he stood on one

4   foot.  Did you walk across that same area yourself and

5   draw any conclusions about what happened when you walked

6   across that area?

7   A.   I guess I just observed -- at that point I would have

8   just observed what he felt was a concern.

9   Q.   And did you see there to be a problem with respect to

10  what you observed?

11  A.   At that point, if I didn't feel in my mind that I had

12  a specific fix for the boat, then I would have -- we would

13  have simply offered this concern to Sea Ray and get their

14  input on it because they're the ones that built the boat.

15  Q.   Okay.  We can now go to Plaintiffs' Exhibit 9.

16       If we can go to the end.  Last page.  I believe it's

17  four pages long.

18       This letter was cc-ed to Mr. Chianese?

19  A.   Yes.

20  Q.   And he was your boss at Surfside 3?

21  A.   Yes.  He was the general manager.

22  Q.   Okay.  And when Mr. Chianese received letters on

23  these types of issues, did he typically forward them on to

24  you?

25  A.   Oh, yes.  That was my job.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   So if we can go back one page to page 3.

2       Top of the page -- additional damage caused by repair

3  people.

4       Do you recall the situation where repair people came

5  and there were complaints by Mr. Mains about damage that

6  the repair people had caused, in Mr. Mains's view?

7  A.   Yes, sir.

8  Q.   All right.  What, if anything, did you do to respond

9  to that?

10 A.   Well, with a concern like that, I would have gone to

11 visit the boat, see if the concerns were warranted, and

12 basically try to rectify them.

13 Q.   And the concerns that there was scratches, for

14 example, on black rubber treads, these are pads that

15 people typically step on?

16 A.   Yes.

17 Q.   Stainless steel threshold, that's also essentially a

18 step?

19 A.   That's correct.

20 Q.   Fuel fill labels, are those are things like "Unleaded

21 Fuel Only," that kind of thing?

22 A.   Yes, sir.

23 Q.   Let's go on to -- let's go on to page 4.  There's a

24 complaint here about salon table; do you see that?

25 A.   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Did you investigate that?

2    A.    Yes, we would.

3    Q.    And what did you do or what did you find?

4    A.    We would just try to tighten up the screws or replace

5    the screws and make it stable.

6    Q.    Now, do you recall a time when some repair people

7    came from Atlantic Boat Company to perform certain repairs

8    to the Mainses' boat?

9    A.    Yes, sir.

10   Q.    All right.  And do you recall Mr. Mains complaining

11   about them not -- people from Atlantic Boat not cleaning

12   up well?

13   A.    Yes.

14   Q.    And what, if anything, did you do about that when you

15   found out about it?

16   A.    Well, ultimately, I would have gone up there and

17   tried to clean up as best we could for them to rectify

18   that situation.

19   Q.    Do you recall Mr. Mains at some point in time

20   complaining about water leaking into the bilge?

21   A.    Yes.

22   Q.    All right.  And did you go up to his boat?  Did you

23   observe what was happening?

24   A.    I observed that with him.  He would have been there

25   and showed me what his concern was.

1    Q.    Can you describe what you saw when you went up there?

2    A.    Yeah.  Small area in the engine compartment that a

3    little bit of water was weeping out of an area, small

4    amount of water.  We would dry it up and a couple minutes

5    later, a small amount of water would appear there.  I

6    don't remember if it was saltwater or fresh water.

7    Q.    Did you have a discussion with Mr. Mains about the

8    volume of water you were looking at or seeing?

9    A.    Yes.  And I felt that it was pretty insignificant,

10    and I didn't feel that the boat was leaking.

11    Q.    If we can now go to Plaintiffs' Exhibit 13.

12        The first bullet item says, Starboard cockpit

13    compartment has severe water leak during rainstorm.

14        And did you do anything to investigate that

15    complaint?

16    A.    Yeah.  In that case, starboard cockpit we would have

17    probably checked the caulking on the side of the boat,

18    checked the canvass fit and that type of thing.  And if it

19    was practical, we would try to hose the boat down and

20    recreate the leak.

21    Q.    Do you recall there came a point in time when

22    Mr. Mains had his boat returned from -- had his boat sent

23    to Knoxville and then returned from Knoxville to

24    Connecticut?

25    A.    Yes.

1   Q.   All right.  And do you recall that Mr. Mains had

2   complaints about the condition of the boat when it came

3   back from Knoxville?

4   A.   Yes, sir.

5   Q.   Why don't we go to Plaintiffs' Exhibit 20.

6        Do you recall there being a complaint of a starboard

7   exhaust bullet?

8   A.   Yes.

9   Q.   All right.  And had you been made aware of Mr. -- by

10  the way, did you go out to the Mainses' boat in response

11  to this?

12  A.   Yes.

13  Q.   All right.  And had you been made aware of a concern

14  that Mr. Mains had regarding the starboard exhaust bullet?

15  A.   Yes.  He had let us know that item was damaged and we

16  had ordered another one quickly to replace it because it

17  had to be replaced before the boat went into the water.

18  Q.   You said it had to be replaced quickly.  Did you get

19  a replacement starboard exhaust bullet before you went to

20  his boat?

21  A.   Yes.  That one shipped to us and I brought it with me

22  prepared to change it.

23  Q.   And when you got to Mr. Mains' boat, did you actually

24  make the change?

25  A.   No.  Because I got there and found that the other one

1   had just scratched paint on it and it didn't warrant

2   changing.  At that point I felt it was in our best

3   interest to not change it.  And so I didn't to it.

4   Q.   All right.  And did you tell Mr. Mains that you

5   weren't going to replace the starboard exhaust bullet?

6   A.   Right.

7   Q.   Did you tell him why?

8   A.   Yes.

9   Q.   What did you tell him?

10  A.   I told him it was just lightly scratched on the paint

11  and that it was a big job to change that and it didn't

12  warrant changing it.  Even though I had the part, I

13  wasn't -- I didn't want to do it.

14  Q.   Now, the starboard exhaust bullet, this is a piece

15  that goes on the bottom of the boat; is that correct?

16  A.   Yes.

17  Q.   Is it a piece when the boat is in the water it's

18  literally underwater?

19  A.   Yes, it is.

20  Q.   So Mr. Mains had found a scratch on the piece of the

21  boat that would normally be under the water and nobody

22  could see it?

23  A.   Right.

24  Q.   And you decided that it didn't need to be replaced?

25  A.   No, it did not.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Okay.  Did you do anything else when you went up to

2    Mr. Mains' boat, see Mr. Mains' boat at that time?  Were

3    there any other complaints or concerns that you addressed

4    or reviewed with him?

5    A.    Well, whenever we went to the boat, I would have

6    looked at every item on his list.  And if there were items

7    there that we could address at that time and rectify, we

8    would do that.  I'd have to read this thing and figure out

9    specifically what we may have done.

10   Q.    Would you read through it for a second.

11   A.    We would have looked at any of the leaks or the

12   portholes that may have been leaking at that point and

13   looked at anything that might cause water damage.  Because

14   that's, you know, a concern.  So any of those items we

15   would have.  I certainly wouldn't have tried to address

16   any fiberglass issues because I wasn't really trained to

17   do that.

18        And we would have -- so if there are small items that

19   we could address at that time, we would do that.

20   Otherwise, I would go through the list and make sure that

21   the -- that I understood what the complaints were at that

22   time.

23   Q.    I'd like to show you something that's been marked as

24   Exhibit 20-23.

25            THE COURT:  Defendants' exhibit?

 1          MR. ROTONDO:  Defendant's Exhibit 20-23.

 2     BY MR. ROTONDO:

 3     Q.   Is that the starboard bullet that you are were

 4     talking about?

 5     A.   Yes.

 6     Q.   Is this the scratches and the paint that you were

 7     talking about?

 8     A.   Yes.  I would say -- well, actually, that picture

 9     looks a little different.  But, yeah, it was a bullet and

10     it would have had one scratch in the paint and that's

11     about it.

12     Q.   This was taken a couple of years later, this was

13     taken in 2003?

14     A.   Right.

15     Q.   Did you see Mr. Mains' boat at any time after May of

16     2001?

17     A.   I'd have to be honest, I'm not a hundred percent sure

18     with that date.  So I couldn't say for sure if that was

19     the last time I saw the boat or not.

20          MR. ROTONDO:  Thank you very much.  I don't have

21     any further questions.

22          THE COURT:  Start whenever you are a ready,

23     Mr. Nikas.

24          MR. NIKAS:  Thank you, Your Honor.

25

```
 1                    CROSS-EXAMINATION

 2   BY MR. NIKAS:

 3   Q.   God morning, sir -- good afternoon.

 4        I believe you stated you were a mechanic for three

 5   years at Surfside 3 and then you were the service manager?

 6   A.   Yes.

 7   Q.   What years were you the service manager?

 8   A.   '97 to 2007.

 9   Q.   So at the time that Lori and Peter Mains purchased

10   this boat, you were the service manager?

11   A.   Yes, sir.

12   Q.   The boat they purchased was new?

13   A.   Yes.

14   Q.   And it was in your inventory at the time of its

15   purchase?

16   A.   I don't remember that.  I don't remember if it was a

17   boat that was in inventory or if it was a special order

18   boat.

19   Q.   One of the first things you discussed with

20   Mr. Rotondo was, I guess, an inspection that you performed

21   wherein you completed Plaintiffs' Exhibit Number 2, which

22   was the inservice checklist.  Is that right?

23   A.   Yes, sir.

24   Q.   Would the inservice checklist be completed when the

25   boat arrived from the factory or only when it had been
```

PDF created with pdfFactory trial version www.pdffactory.com

1   sold and was going to the hands of the consumer?

2   A.   We actually filled this checklist out while the

3   customer was there.

4   Q.   Is that the first inspection that takes place on a

5   boat when it arrives from the factory?

6   A.   No.

7   Q.   So this just happened to be the record of the

8   inspection that was conducted with the owner?

9   A.   That inservice checklist is really a checklist that

10  shows that we went over all these items so our customers

11  understood how to use the boat.

12  Q.   But it looks like many of these items checked appear

13  to go towards the operability of the item rather than the

14  an explanation of how the item works.  If you look at Oil

15  Leaks, it says, None found.  If you look at Alignment, it

16  says, Completed.

17  A.   Right.

18  Q.   If you look at Fresh Water System, it says, No leaks.

19  That wouldn't be explaining to the owner how oil leaks

20  work, right?  That would be checking physically for oil

21  leaks?

22  A.   No.  We go over the whole boat with the customer when

23  we deliver it.  We show them this.  Last thing we do is

24  take them out and run on the water.  That's in the bottom

25  right-hand corner we have performance specifications like

1    top speed attained or maximum rpm.  And because we show

2    them that the boat operates the way it should.

3    Q.   Can you show me where you would have indicated or

4    where you did indicate things like top speed attained and

5    maximum rpm?

6    A.   It would be -- should be in the bottom right-hand

7    corner.  I can't see the writing from here.

8            MR. NIKAS:  Your Honor, may I approach?

9            THE COURT:  You may.

10   A.   Okay, I don't see those numbers here.

11   BY MR. NIKAS:

12   Q.   Did you do that in this case?

13   A.   Well, we did that on every boat.  We are required to

14   do that.

15   Q.   So you took Mr. Mains out on a sea trial?

16   A.   Yes, sir.

17   Q.   I guess you were saying before we talked about this

18   checklist that you completed other inspections of the boat

19   when it arrived at the factory?

20   A.   Well, for the most part when the boat arrives from

21   the factory, we have to put a certain amount of items

22   together.

23   Q.   Right.  You told Mr. Rotondo that you had to, I

24   guess, reinstall some components?

25   A.   We have to put the propellers on.  We have to put the

Vol. III - Page 510

1    arch on.  Any items that would be mounted on the arch,

2    like radar antenna or GPS antenna, we would have to put

3    all that back on and wire it.  We would have to put all

4    the canvass back on the boat.  It would generally take one

5    man about eight hours to put the boat together when we

6    received it from the factory.

7    Q.    Did it come with propellers and those things, or are

8    those things installed from your inventory?

9    A.    No, the boat came complete.

10   Q.    They're just removed for transportation?

11   A.    Yes.

12   Q.    How does the boat get there?

13   A.    Truck.

14   Q.    In a cradle?

15   A.    Yes.  And it's lifted off of the hoist and then

16   generally we would put the boat on dry land and put it

17   together.  Sometimes we would pick them up in the hoist,

18   put them together, and set them in the water and finish

19   them in the water.

20   Q.    Now, you were the service manager at this time.  So

21   would this reinstallation of these peripheral components

22   have been part of your responsibility?

23   A.    No.  Not at that point.  We would have had -- we had

24   three or four different rigors, mechanics that would do

25   those functions.

1  Q.    So these are people that work for you under your

2  supervision?

3  A.    Yes.

4  Q.    And after all these components were installed on

5  board the boat, then at any time did you ever conduct an

6  inspection to make sure that everything was complete and,

7  I guess, correct?

8  A.    After the boat was put together, we would have to --

9  the mechanic would have to drive it, fill it up with fuel,

10  and test run it.  And then when the boat came back before

11  we cleaned it and detailed it for the customer, it was

12  part of my responsibility to go down and go over the boat

13  and check that the boat was in nice condition and that

14  everything would work.  And I would make checks, I would

15  start up the boat at the dock, you know, run all the

16  systems, and just make sure that it was good to go.

17  Q.    Would that be before it was sold, like when it was in

18  inventory?

19  A.    No.  Generally it would be -- my final check would be

20  a day or two before the customer came to pick it up.

21  Q.    When the boats are being shown to customers or

22  customers are looking at the boats, do they take them out

23  and sea trial them?

24  A.    Typically, a customer could only sea trial a boat if

25  he had made -- he'd have to make a deposit on a particular

1    boat or if we had particular model in the water, then he
2    we could take them for a ride, yes.
3    Q.    Now, when you say you are a mechanic and then you're
4    the service manager, that would be for repairs on, I
5    guess, boats that you had either sold or that you service
6    as a maintaining dealer?
7    A.    Yes.
8    Q.    Are the majority of repairs that you performed as a
9    mechanic mechanical?  In other words, do they mostly
10   pertain to machinery installed on board?
11   A.    Most of it.  Most of the work we did was dealer prep
12   and not just the mechanical aspect but all the systems on
13   the boat.
14   Q.    Did you also perform like routine maintenance to or
15   for your customer's vessels?
16   A.    Yes.
17   Q.    So you work for a Sea Ray dealer, correct?
18   A.    That's correct.
19   Q.    Were you a certified Sea Ray technician?
20   A.    Sea Ray, we were a factory-trained technician.  They
21   didn't certify you to do that kind of work.
22   Q.    Okay.  Now, who built the engines that were installed
23   on these Sea Rays?
24   A.    MerCruiser Brunswick Corporation.
25   Q.    And they made all of them; is that correct?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   Well, they -- yeah, I mean, the motor was made by

2   General Motors, but they made it a marine motor.   Yes,

3   they made them all.

4   Q.   The General Motors you're referring to is just the

5   block?

6   A.   That's right.

7   Q.   So every Sea Ray with an inboard gas engine had a

8   MerCruiser engine?

9   A.   At the time I was working there, yes, they did.

10   Q.   So from whenever it was --

11   A.   '94 to 2007, MerCruiser.

12   Q.   Were you also a MerCruiser or Mercury-trained

13   technician or certified technician?

14   A.   I had gone to service school a couple of times when I

15   first started working for Surfside, yes.  But I was not

16   certified.   That's something that takes quite a while to

17   do.

18   Q.   So when you were a mechanic, you weren't certified?

19   A.   No.

20   Q.   And when you were a service manager, you weren't

21   certified?

22   A.   No, but our mechanics were.

23   Q.   When you were supervising -- how big was your Service

24   Department?

25   A.   At that time we had -- well, it varied.   Three to

PDF created with pdfFactory trial version www.pdffactory.com

Vol. III - Page 514

1    four mechanic rigors, which did both jobs.  We had four

2    boat cleaner laborers and two boat handlers.  So there was

3    ten people.

4    Q.    Pretty big department?

5    A.    Yes.  We sold quite a few boats.

6    Q.    You told Mr. Rotondo that when Mr. Mains sent you his

7    several lists for review by you to either remedy or, I

8    guess, pass up to Sea Ray --

9    A.    Yes.

10   Q.    -- that there were things like throttle position,

11   securing of the exhaust, exhaust resonance, I guess some

12   flexing in the floor, those types of things?

13   A.    Yes.

14   Q.    Mr. Chianese --

15   A.    Yes, Al Chianese.

16   Q.    If the letter was addressed to him as service

17   manager, would it have been immediately then delivered to

18   you?

19   A.    Yes.  He would have retained a copy for his file, and

20   then he would have sent that to me and we would have

21   created a work order and made an appointment with

22   Mr. Mains to go see his boat.

23   Q.    Mr. Chianese wouldn't have physically done any of

24   this work himself?

25   A.    No, not at all.

Vol. III - Page 515

1    Q.    In delivering it to you, you were expected or you

2    felt it was your duty to then go down to the boat with the

3    vessel owner, in this case Peter and Lori Mains, to try to

4    go through the list of things and determine whether they

5    could be fixed?

6    A.    Yes.

7    Q.    I think you said -- maybe you can clarify this.  You

8    evaluated the complaint and if you couldn't fix it, you

9    said, then you sent it to Sea Ray; is that right?

10   A.    Yes.  If we didn't -- for an example, the exhaust.

11   If we looked at the exhaust and found everything that we

12   saw on the exhaust to be intact and working, and if the

13   customer still felt there was something wrong, then we

14   would forward that complaint to Sea Ray and ask them if

15   they had any additional instructions or suggestions for

16   fixing it.

17   Q.    To whom would you pass those, I guess, items of

18   concern to?

19   A.    To customer service personnel at Sea Ray.

20   Q.    And do you remember to whom you spoke to at Sea Ray

21   regarding the boat owned by Peter and Lori Mains?

22   A.    I do not.

23   Q.    You didn't have at Surfside 3 one customer service

24   rep that dealt with just your dealership?

25   A.    No.

1   Q.   It was just whomever you got?

2   A.   Well, no.  They had five different plants.  And they

3   sold a lot of boats, so they had quite a number of service

4   representatives.

5   Q.   Did you have to send these concerns that you talked

6   about with Mr. Rotondo to the specific plant that -- that

7   this particular boat came from?

8   A.   Yes.

9   Q.   So on this boat, these concerns would have been sent

10  to where?

11  A.   I believe this boat, they were getting sent to

12  Merritt Island.

13  Q.   Which is in Florida?

14  A.   Florida.  Actually, they made this particular model

15  boat in two different plants.

16  Q.   Which are where?

17  A.   They were making them in Knoxville and in Merritt

18  Island, Florida.

19  Q.   When you're evaluating the list, especially let's

20  talk about the list provided to you by Peter and Lori

21  Mains.  This is Exhibit 3.  There are a number of items on

22  the first page and a few items on the second.  This is

23  Exhibit 4 and then it goes on.  Actually, that one does

24  not.  This is the one I think Mr. Rotondo spent some time

25  with, this is Plaintiffs' Exhibit 5.  And it goes on and

PDF created with pdfFactory trial version www.pdffactory.com

1   then it goes on again about the exhaust and water leaks.

2       When evaluating the complaints, because you said you

3   looked at them all to determine whether they could be

4   fixed or if they were -- did you ever determine for

5   Mr. Mains or for yourself going through this list that

6   something just wasn't a valid criticism?

7   A.    Well, I think -- we would have both.  Whenever I

8   worked on his boat, I would have been addressing all of

9   these complaints in his presence.  He was always there.

10  And so we would have discussed them.  And at some point I

11  would have said, "There's nothing more I can do with this.

12  This is what it is."  And at that point we would decide if

13  we -- if it was acceptable or if we needed to contact

14  Sea Ray and see if they could help us.

15  Q.    Was Mr. Mains always with you when you went through

16  this litany of concerns?

17  A.    I would have to say yes.  He -- normally on our boats

18  if we had work to do on a boat we'd send out one of the

19  mechanics.  And Mr. Mains didn't want one of the

20  mechanics.  He wanted me to come since I was in charge of

21  that department.  And so I always -- we got along well and

22  I always did that.  I took time out of my schedule to go

23  and do that.  So I can't -- the only time I can recall

24  that I ever went to his boat without him was maybe one

25  time to look at it after the subcontractors had left it a

1   mess -- left it messy.

2   Q.   Was it messy?

3   A.   Yes.

4   Q.   That's unusual, then, for you to actually yourself go

5   down and deal with these concerns?

6   A.   Well, it was because we sold 200 boats a year.

7   That's a lot of customers.

8   Q.   So that would be 17 a month or so, give or take?

9   A.   Yeah.  Well, the boat business, you'd have to deliver

10  all 200 in about four months.  So you would be very busy.

11  Q.   Here nothing in the winter and then, I assume, spring

12  and fall stuff happens.  Of all those boats you sold, and

13  I assume that's 200 a year, so over your 15 or so years

14  you've got a lot of customers?

15  A.   Yes, sir.

16  Q.   How many of them did you personally attend to to

17  address any concerns they had?

18  A.   Probably two or three, four per year.

19  Q.   Out of a couple of hundred or so?

20  A.   Yeah.

21  Q.   So was Mr. Mains, I guess, a difficult customer?

22  A.   Well, I wouldn't --

23  Q.   How would you describe him?

24  A.   He was picky I guess you could say and -- but he was

25  a very good guy to work with.  And probably more demanding

PDF created with pdfFactory trial version www.pdffactory.com

1   than most of our customers.

2   Q.   The great majority of them?

3   A.   Yes.

4   Q.   All but two or three?

5   A.   Yes, sir.

6   Q.   Was he pretty knowledgeable?

7   A.   Yes.

8   Q.   Did you find yourself with him during these times or

9   receiving these complaints that he drafted out having to

10  research or determine how to fix some of these things?

11  A.   No.  They were pretty common items.  We didn't -- I

12  don't think there was too many items that we never really

13  completed.  No, I won't say a lot of research went into

14  it, no.

15  Q.   When you were service manager, did you consult

16  whatever technical materials were available to you on a

17  fairly regular basis?

18  A.   Yes.

19  Q.   And by viewing these materials, you were able to

20  perform your job function of supervising both mechanics,

21  the rigors and dealing with customer complaints?

22  A.   Yes.

23  Q.   I assume that -- how do you distinguish in your

24  service facility between hull items, I guess, and then

25  mechanical items?  Do rigors that you talked about work on

1    substantials and rigging and tackle and that type of

2    stuff, and then mechanics only work on the power plant?

3    A.    Most of the time in the marine business you would

4    have a rigger would be the guy that put the boat together.

5    Then he would also be a trained mechanic and would work on

6    the engine also.

7    Q.    So he would do both?

8    A.    Yes, sir.

9    Q.    If he was going to be consulting any technical

10   materials on, say, on rigging issue, say how a stanchion

11   was put together or a wind screen was installed, the

12   textbook materials would be published by whom?

13   A.    It would be on the internet, on the web site.

14   Q.    It he was also trained as a mechanic what material

15   would he consult?

16   A.    We had -- well, we had service manuals for the engine

17   in print form, but then we also would have the items

18   either on the internet or on compact disk.

19   Q.    And on the internet or compact disk, what is that

20   called, that system?

21   A.    For MerCruiser it was Midas.  And for Sea Ray it was

22   called Compass.

23   Q.    What's MercNet?

24   A.    MercNet is the -- MercNet is the order and parts.

25   MercNet would be all of our parts manual on line and

PDF created with pdfFactory trial version www.pdffactory.com

Vol. III - Page 521

1    ability to order the parts.

2    Q.    And you can go on line and look at, I guess,

3    literature produced by Mercury?

4    A.    Oh, yeah, we could look at the literature.  All the

5    literature service bulletins, warranty claims on a

6    particular boat.

7    Q.    Just one thing, right?

8    A.    Yes.

9    Q.    So there would be no real distinction, then, between

10   whether a material or a technical manual was issued by

11   Sea Ray or whether it was issued by MerCruiser, was there?

12            MR. ROTONDO:  Objection.

13   BY MR. NIKAS:

14   Q.    Was there any distinction or did you draw any

15   distinction as to whether a particular manual or bulletin

16   had been drafted by Sea Ray or MerCruiser?

17            MR. ROTONDO:  Objection.

18            THE COURT:  Sustained.

19   BY MR. NIKAS:

20   Q.    You consulted both Sea Ray and MerCruiser manuals in

21   your work, correct?

22   A.    Yes.

23   Q.    And if it was hull related, you consulted Sea Ray

24   manuals?

25   A.    Yes.

1  Q.    And if it was engine related, you consulted

2  MerCruiser manuals?

3  A.    Yes.

4  Q.    When you received the concern about exhaust

5  resonance --

6  A.    Yes.

7  Q.    -- you told Mr. Rotondo that you couldn't find

8  anything you thought was defective, loose, or leaking; is

9  that right?

10  A.    That's correct.

11  Q.    How did you perform that evaluation of the exhaust

12  system?

13  A.    By physically climbing in the engine compartment,

14  looking at it, physically tightening hose clamps, and then

15  observing the motor when it was running with Mr. Mains.

16  And then later taking the boat out for a test drive on the

17  river.

18  Q.    You physically got in the engine compartment?

19  A.    Oh, yes, quite often.

20  Q.    And you had the ability to do that?  You had the

21  room, the space?

22  A.    Yeah.  For the most part.  It's never easy.

23  Q.    Not a place for a really big guy, but you could do

24  it?

25  A.    Yeah.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Do you recall what type of exhaust system the boat

2    had on the occasions that you inspected it or you were in

3    the engine compartment?

4    A.    Had the Sea Ray factory-installed exhaust system.

5    Q.    Do you know what type of exhaust that is, how to

6    describe it?  I mean, there are different types of exhaust

7    systems.  Can you describe this one?

8    A.    Yeah.  This boat was equipped with Sea Ray's

9    underwater exhaust.  Had an exhaust pod on it and it had

10   an exhaust port out the side of the boat.

11   Q.    Are you familiar with the term "water lift"?

12   A.    Yes.

13   Q.    Did this have a water lift exhaust?

14   A.    I think originally when he -- let's see.  Yes.  I

15   think originally when he got the boat, it had an exhaust,

16   and then -- it had one exhaust, and then when it went back

17   to the factory and came back, they had tried to address

18   Mr. Mains' concerns about the sound, I think they put a

19   water lift muffler in it.

20   Q.    Okay.  So were you aware that this boat that you had

21   serviced in '98, '99, 2000, 2001 had been sent back to the

22   factory for attempted repairs?

23   A.    Oh, yeah.  I was one of the people that was an

24   advocate to do that.

25   Q.    You were actually involved in that process?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   Well, that's -- I, in working with Mr. Mains and

2   working with Sea Ray, I was more responsible for his first

3   boat going back to the factory.  The second boat I don't

4   know if I suggested that or not.  But I know specifically

5   the first boat I worked with Mr. Mains and told him I was

6   going to be an advocate for doing that.

7   Q.   What happened with the first boat?

8   A.   We sent it back to the factory so they could repair

9   some items on it that we felt we didn't need to address or

10  couldn't address in the field as a dealer.

11  Q.   When you say you served as an advocate, what does

12  that mean?  To advocate what?

13  A.   I told Mr. Mains I felt that that boat should go back

14  to the factory for some cosmetic defects to be repaired.

15  Q.   Were there any other defects other than cosmetic

16  ones?

17  A.   No, I don't believe that either boat had any defects

18  other than cosmetic.

19  Q.   Okay.  So when you were examining the exhaust system

20  to try to address the complaints that Mr. Mains had, did

21  you follow any procedure?

22          MR. ROTONDO:  Objection.

23          THE COURT:  Sustained.

24          You can rephrase the question, if you like.

25

1    BY MR. NIKAS:

2    Q.    How did you inspect the exhaust system?  What steps

3    did you take?

4    A.    Physically looking at the exhaust, checking the fit

5    and the hose clamps and tightening them and looking for --

6    making sure it didn't have any leaks.  And then later

7    taking the boat for a ride with the customer to listen to

8    the resonance, which we didn't find.

9    Q.    What did you understand that term to mean,

10   "resonance"?

11   A.    Resonance?  The noise that the exhaust system made

12   when the boat was being operated.

13   Q.    Okay.  And did you consult -- would you have

14   consulted a Sea Ray manual or a MerCruiser manual if you

15   wanted to look up technical information on the exhaust?

16          MR. ROTONDO:  Objection.

17          THE COURT:  Want to lay a foundation?

18          MR. NIKAS:  Sure.

19   BY MR. NIKAS:

20   Q.    I assume every component on this boat has some

21   literature attached to it, correct?

22   A.    Yes.

23   Q.    Certainly all of the systems have some literature or

24   some manual attached to it, correct?

25   A.    Yes, although they wouldn't give you directions how

1   to inspect an exhaust system.  You would only get that at

2   a point where they had issued a service bulletin.

3   Q.   Did you consult any service bulletins?

4            MR. ROTONDO:  Objection, relevance.

5            THE COURT:  Sustained.

6   BY MR. NIKAS:

7   Q.   Well, you said that there are no procedures for

8   inspecting the exhaust, but if there were, they'd be in

9   service bulletins.  Is that what you said?

10  A.   No, generally they didn't issue a service bulletin

11  unless they were redesigning something.

12           THE COURT:  I think the problem here is we're

13  talking about what did this witness do, not general

14  procedures.  So let's focus on what this witness did.

15           MR. NIKAS:  I asked him specifically did you

16  consult the service.

17           THE COURT:  The question is:  Did he do this

18  kind of work?  When I said lay a foundation, I meant start

19  there.

20  BY MR. NIKAS:

21  Q.   You addressed personally the concerns on this list,

22  correct?

23  A.   Yes.

24  Q.   And you personally conducted the inspection of the

25  exhaust, correct?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes.

2    Q.    So in doing that inspection either before or at the

3    same time, did you look to see whether there was a

4    procedure for inspecting the exhaust system?

5    A.    I don't recall.  However, I didn't find anything

6    wrong with the exhaust system.  And when we demonstrated

7    the boat -- I think for the most part the complaint about

8    the exhaust and the resonance was actual exhaust venting,

9    getting louder if you were turning the boat one way or the

10   other.  And that was a condition that just happens

11   occasionally depending on how the boat's loaded or how the

12   water is.  And I don't think that the exhaust ever had any

13   problems where a manual needed to be consulted.

14   Q.    You said you looked at the exhaust and it looked

15   right?

16   A.    Yes, sir.

17   Q.    Maybe I mischaracterized that, maybe you said you

18   found nothing wrong.  What was your frame of reference for

19   making that determination?

20   A.    Dozens of dozens of boats that we had in the same

21   model that we had rigged and prepped and driven.  Just a

22   number of boats we had worked on.

23   Q.    You said you checked the connections, correct?

24   A.    Yes, sir.

25   Q.    How did you -- by connections --

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              MR. NIKAS:  Your Honor, may I approach?
 2              THE COURT:  You may.
 3   BY MR. NIKAS:
 4   Q.    You're talking -- what connections were you checking?
 5   A.    Well, this would be the riser on the top of the
 6   motor.  Actually, there would be rubber hoses here.  And
 7   there would be two hose clamps and it would go to
 8   fiberglass parts of the muffler system.  And everywhere
 9   there was a joint, there would be hose clamps.  And that's
10   what we would be checking.
11   Q.    So how the hoses attached to the elbow?
12   A.    Yes.  From here until it went out the bottom or the
13   side of the boat.
14   Q.    Did you just check for tightness?  Is this a band
15   clamp?
16   A.    Yes.
17   Q.    So it's just a circle with some notches that you
18   tighten the screw and that makes it tighter?
19   A.    That's correct.
20   Q.    Did you just check for tightness or did you check to
21   see how the hose was installed on the elbow?
22   A.    Well, that would have -- you would have looked to see
23   how the hose was installed on the whole system.  I know
24   that Mr. Mains, one of the things on his list was the hose
25   clamps weren't even.  So I believe at some point I
```

1  loosened them all up, evened the gaps between the two hose

2  clamps so everything was nice and even, and then

3  retightened all the hose clamps on both motors.

4  Q.   When you did that, how did you position -- to do

5  that, you actually had to kind of move the hose, right?

6  A.   No, we really just moved the hose clamps.

7  Q.   Did you check to see whether the hose was properly

8  seated on the elbow?

9  A.   Yes.  I would have to say we would -- you just push.

10  You can clearly see -- you can clearly see on this piece

11  that the hose would come up to here and stop.  You'd have

12  just enough room here for two hose clamps.  So if the hose

13  wasn't in the right position, you couldn't get both clamps

14  on.

15  Q.   Did you check whether the reference line on the

16  exhaust hoses was parallel to the crankshaft center line?

17  A.   Nos.

18  Q.   Did you check whether the center line of the exhaust

19  hose were at the same plane?

20           MR. ROTONDO:  Objection, relevance.

21           THE COURT:  I'll allow it.  It's within the

22  scope.

23           THE WITNESS:  Could you repeat that question?

24  BY MR. NIKAS:

25  Q.   Did you check to see whether the center line of the

1    exhaust outlet and hose were on the same plane?

2    A.    No, sir.

3    Q.    Did you check to see whether the hose was at a

4    7-degree down angle?

5    A.    I don't remember if we would have done that or not.

6    Q.    Did you consult any MerCruiser literature or manuals

7    regarding how the hose should be attached to the elbow?

8    A.    It's pretty much common knowledge throughout the

9    industry, and we had a gauge that we would put on the

10   exhaust to check the down angles of the exhaust.

11   Q.    Did you check the down angles on this exhaust system?

12   A.    You know, I don't remember that.  The most specific

13   thing I remember about this exhaust system is checking all

14   the hose clamps and making sure they were all even for

15   Mr. Mains.

16   Q.    Whether the clamps were even, not the hoses?

17   A.    That's correct.

18   Q.    Are you familiar with the MerCruiser Inboard

19   Technician Guide?

20   A.    Yes, sir.

21   Q.    And you consult that?

22   A.    We did.  We had them in our offices and used them

23   fairly regularly.

24   Q.    Because that's the manufacturer's what?  What is --

25   what are in the contents of this technician guide?

1  A.   Engine alignments, engine settings, general

2  instructions as to how to put things together that are

3  actually already together when we get the boat.

4  Q.   So they're together when you get the boat.  And if

5  you're going to alter, adjust around remover anything you

6  should go back and consult the manual?

7  A.   Yeah, generally we didn't alter anything on a boat,

8  on a new boat.  It was our job to just make sure that it

9  was up and running and everything was adjusted correctly.

10  But we did not redesign or alter the way Sea Ray built the

11  boat.

12  Q.   I'd like to show the witness an excerpt from the

13  MerCruiser Inboard Technician Guide, which was originally

14  Plaintiffs' Number 157.  And show him the --

15          THE COURT:  Why don't we not have a speech and

16  let's have questions and answers.

17          MR. NIKAS:  I'd like to show him the exhaust

18  connection guidelines.

19          THE COURT:  What exhibits do you want to show

20  him?

21          MR. NIKAS:  Page 531 of that exhibit.

22          THE COURT:  Show him page 531 and we'll take it

23  from there.

24          MR. ROTONDO:  I object on the grounds of

25  relevance, Your Honor.

 1          THE COURT:  Sustained.

 2    BY MR. NIKAS:

 3    Q.   We're talking about the exhaust hoses on the elbows,

 4    correct?

 5    A.   Well, actually, I thought we were talking about the

 6    exhaust resonance and the position of the clamps.

 7          THE COURT:  What I'm going to ask you to do,

 8    because I'm not sure how you're within the scope of the

 9    direct, is as you're teeing up on line of questioning,

10    refer back to something that was asked on direct.

11          MR. NIKAS:  I did.  I said you told Mr. Rotondo

12    that you had checked the exhaust system to try to address

13    Mr. Mains' concerns about exhaust resonance.  And then the

14    witness said, I did.  And then with Mr. Rotondo he talked

15    about looking through and he couldn't find anything.  What

16    he specifically said was, I didn't find anything, I

17    thought, he thought was a defect, loose, or leaking.

18          THE COURT:  You're still within that?

19          MR. NIKAS:  Yes.

20          THE COURT:  We started that line quite a while

21    ago.  You're still within that line?

22          MR. NIKAS:  I'm talking about his inspection.

23          THE COURT:  You're still within that line?

24          MR. NIKAS:  Yes, Your Honor.

25          THE COURT:  That's why I sustained the

Vol. III - Page 533

1    objection, okay?

2            MR. NIKAS:  Because I'm still within the line?

3            THE COURT:  No, because you've more than

4    exhausted the line and you were going well outside the

5    scope with the question you asked.

6            MR. NIKAS:  Okay, Your Honor.

7    BY MR. NIKAS:

8    Q.   Would it surprise you to know that there's specific

9    procedure for tightening the hoses on that exhaust elbow?

10   A.   No.

11           MR. ROTONDO:  Objection.

12           THE COURT:  I'll allow that question and then

13   that's it.

14           MR. NIKAS:  For questions or for just this line?

15           THE COURT:  That line.  That line.  If you're

16   going to start a new line, let me know, please.

17   BY MR. NIKAS:

18   Q.   So no, it would not surprise you?

19   A.   No, sir.

20   Q.   Now, when the boat went back to the factory, was it

21   your understanding that it was going back solely for

22   cosmetic repairs?

23   A.   At that time I think Mr. Mains had really started

24   corresponding with Sea Ray directly and I knew we were

25   going to prep the boat for going back to Sea Ray, and they

PDF created with pdfFactory trial version www.pdffactory.com

1    were taking it back to do some work.  But I'm not aware of

2    what the whole scope of the repairs were going to be, no.

3    I can't recollect.

4    Q.    You prepped the boat for transport back to the

5    factory?

6    A.    Yeah, I believe we would have had to take off the

7    radar and the antennas off the arch and pulled the

8    propellers off the boat.  If we did that.  That was eight

9    years ago and a lot of boats.  I can't remember that

10   specific.  And I can't remember a hundred percent if we

11   did that or not.

12   Q.    Do you know whether you also received the boat when

13   it came back from the factory?

14   A.    No, I believe that boat went directly to his marina,

15   not to us.

16   Q.    How then were you made aware that the exhaust system

17   had been changed?

18   A.    I think that we had been told about that by a Sea Ray

19   representative that would have been corresponding with our

20   manager, Al Chianese, and in an effort to address

21   Mr. Mains' concerns about the resonance or noise that the

22   exhaust system made.

23   Q.    Was that a concern that he voiced to you just once or

24   is that something he discussed with you several times?

25   A.    No, I think we talked about it a couple of times.

PDF created with pdfFactory trial version www.pdffactory.com

1   And I believe we went for a ride, he and I, in his boat in

2   Deep River once or possibly twice to really check it out

3   and see if we could duplicate the concerns or if I felt

4   there was a defect there.  And at that time I told him I

5   felt it was just like every other 33 Sea Ray that we had

6   had.  It sounded the same.  I didn't feel it was a issue.

7   Q.    Had you ever been informed by MerCruiser or seen a

8   service bulletin that discussed exhaust resonance?

9   A.    No, sir.

10  Q.    Do you read all the service bulletins?

11  A.    We would try to read as many as we possibly could,

12  yes.

13  Q.    In a given year, service bulletins are identified

14  with a two-digit number that would indicate the year that

15  it came out?

16  A.    Yes.

17  Q.    And then a dash?

18  A.    And two more digits.

19  Q.    Which is how many have come out?

20  A.    Yes.

21  Q.    For a typical year, how many service bulletins do you

22  receive from the factory?

23          MR. ROTONDO:  Objection, relevance.

24          THE COURT:  Sustained.

25

PDF created with pdfFactory trial version www.pdffactory.com

1    BY MR. NIKAS:

2    Q.   Well, as the service manager, was it your

3    responsibility to disseminate service bulletins?

4    A.   Yes.  Well, when we got them in, we put them in a

5    folder and we had them out in our Service Department so

6    all the mechanics could leaf through them and look at

7    them.

8    Q.   And you did that?

9    A.   Yes, sir.

10   Q.   And you never found a service bulletin that talked

11   about resonance?

12   A.   I can't recall, no.

13   Q.   You said something earlier I wanted to follow up

14   really quickly.  You said you checked the down angle on

15   the exhaust system, you said you had a tool for that?

16   A.   Yes.

17   Q.   What was the name of the tool?

18   A.   It was a magnetic angle finder that you -- I don't

19   know if it had a specific name.  We bought ours at the --

20   I think we got it from MerCruiser.

21   Q.   What was magnetic about it?

22   A.   Had a magnetic base.  I mean, you used it for not

23   just exhaust, but you could use it for a number of things.

24   Q.   Where would you measure on the exhaust system?

25   A.   Off of this -- this item here, you would measure the

1  hose coming off of here and going down with the exhaust.

2  Q.   The hose is rubber though, right?

3  A.   Yes.

4  Q.   You'd have to hold it there?

5  A.   Yes.

6  Q.   Do you know when you started to check for that angle,

7  what year that was?

8           MR. ROTONDO:  Objection, scope.

9           THE COURT:  Sustained.

10  BY MR. NIKAS:

11  Q.   Do you know if you did it in 1998 when this boat was

12  sold?

13           MR. ROTONDO:  Objection, relevance.

14           THE COURT:  Can you show me what you're talking

15  about in terms of the scope of the direct?

16           MR. NIKAS:  It's one of the components he

17  discussed with Mr. Rotondo on his checklist.

18           THE COURT:  Okay.  Fine.

19           Do you disagree, Mr. Rotondo?

20           MR. ROTONDO:  I don't remember there being any

21  item of the checklist about angle.

22           MR. NIKAS:  It's larger, engine and engine

23  compartment.

24           THE COURT:  Sustained.

25           MR. NIKAS:  I have no further questions.

1              MR. ROTONDO:  I have nothing further,

2    Your Honor.

3              THE COURT:  You may step down, sir.

4              It's 4:17.  Do we have time to make a meaningful

5    start on another witness or not?

6              MR. ROTONDO:  Whatever's Your Honor's pleasure.

7    We could start with Mr. Davis and do qualifications.

8              THE COURT:  Sure, why don't we do the

9    qualifications.

10             THE CLERK:  Please raise your right hand.

11

12                        GREGORY DAVIS,

13          called as a witness, having been first duly

14          sworn, was examined and testified as follows:

15

16             THE CLERK:  Please be seated.

17             Please state your name and spell your last name.

18             THE WITNESS:  Gregory G. Davis, D-a-v-i-s.

19             THE CLERK:  Please state your city or state of

20    residence.

21             THE WITNESS:  Aurora, Illinois.

22

23                     DIRECT EXAMINATION

24    BY MR. ROTONDO:

25    Q.   Good afternoon, Mr. Davis.

1    A.    Good afternoon.

2    Q.    How are you employed, Mr. Davis?

3    A.    I'm a marine surveyor.

4    Q.    And what is a marine surveyor?  What do you do?

5    A.    A definition of marine surveyor is an impartial

6    party, one of good personal integrity who is hired by one

7    party of two usually involved in some type of transaction

8    to accomplish a particular purpose.  Most often what I get

9    hired to do is ascertain the cause of why a boat's or

10   engine's been damaged, and then what the cost of repair

11   will be.  That's generally for insurance companies on

12   damage appraisals.  And then I also do inspections for

13   people that are buying used boats.  Those are condition

14   surveys to determine what shape the boat's in, in general,

15   and then make recommendations on things that I believe

16   need to be corrected.  And then for used boat purchases,

17   there's a value component to that where we'll run a

18   comparative market analysis and render an opinion on what

19   the market value is for the boat.

20   Q.    And for how long have you been employed as a marine

21   surveyor?

22   A.    This is my 35th year.

23   Q.    How did you get into this line of work?

24   A.    Pretty much by accident.  I grew up around boats,

25   worked in a boat yard as a smaller young child.  Fixed

1    boats along with my father, who was a licensed marine

2    engineer, he was a merchant seaman during World War II.  I

3    race sailboats and things like that.

4        When I got older and into college, got interested in

5    girls, went off to college and did my thing there, and

6    when I got back I was working in the insurance adjusting

7    business.  And sitting in the lunch room and the marine

8    guy, the boat expert in the office, was sitting talking

9    about a particular boat inspection that he had done, I

10   made the mistake of voicing my opinion.  And all of a

11   sudden I became the boat expert for that particular

12   office.

13   Q.   So at that point in time -- let me take a step back.

14   What did you get your degree in in college?

15   A.   I have a Bachelor of Arts with a composite history

16   major and a science minor.

17   Q.   And what school did you receive your degree from?

18   A.   College of Santa Fe, Santa Fe, New Mexico, in 1973.

19   Q.   You said at some point in time you were working for

20   an insurance company and you became involved in some

21   discussions about marine work, and did you then begin

22   investigating claims involving boats?

23   A.   Because of putting my two cents in, I ended up

24   getting most of the boat claims that came into the office.

25   I liked them.  I enjoyed it much more than what they hired

1    me for.  And I left that company after about a year and

2    went to work for a British company that specialized just

3    in marine.  And worked for them until November of 1972

4    where they laid me off at the end of November.  And I had

5    actually met an attorney in the course of my work and he

6    became something of a mentor for me.  And he advised me to

7    set up a business on my own, which I did January 1st of

8    1977.  I've been in business now 34 years.

9    Q.   What's the name of your company?

10   A.    It's Davis & Company.

11   Q.   I take it you're the Davis, you started it?

12   A.    I'm the Davis.

13   Q.   And how many professionals work there now?

14   A.    Between the survey company, which is the larger part

15   of us, and then we have the Davis Consulting Group, which

16   is engineers, primarily, we have about 86 people total

17   that work for us.  We're the largest of our type of

18   company in North America.

19   Q.   And what types of boats does your company survey?

20   A.    The bulk of what we look at is recreational boats,

21   similar to the one in question here today.  All the way

22   down to very small boat, 16-foot, to boats that are 65 to

23   120 feet.  We also work in commercial vessels through the

24   engineering side on boats that are much larger.  We do

25   ferry boat inspections, dinner cruise boat inspections.

PDF created with pdfFactory trial version www.pdffactory.com

1    We've inspected the ferry boats that go out to Block

2    Island for an insurance carrier, as an example.  But the

3    bulk of what we do is recreational boats.

4    Q.    You said you've been doing this work for 35 years.

5    How many boats have you surveyed?

6    A.    I couldn't give you an exact figure.  Last year the

7    company, it's around September 1st we got to 50,000 on

8    inspections that we had completed, different boats that

9    we'd looked at.  Since we went to computer records and

10   computer records went into place at about 1989, and right

11   now we're at about 54,000.  So we've gone that much

12   further over that.

13       I'm not directly involved in -- I'm not out in the

14   field as much on inspections as I used to be, but I look

15   at, on average, 100 to 130 boat surveys a the year.  Over

16   my career I had to have done somewhere between ten and

17   20,000.

18   Q.    And the bulk of these have been pleasure boats?

19   A.    The bulk is pleasure boats, yes.  80 percent of the

20   inspections are pleasure boats.

21   Q.    And have you surveyed -- is that the right word,

22   "surveyed"?  Have you surveyed boats made by a number of

23   different manufacturers?

24   A.    Yes.

25   Q.    And who are some of the major manufacturers of

PDF created with pdfFactory trial version www.pdffactory.com

1  pleasure boats in North America?

2  A.    Well, Sea Ray would be one.  We see quite a few of

3  theirs because they're the number one selling recreational

4  boat manufacturer in the country and have been for at

5  least ten years, possibly more than that.  I'm going based

6  upon recollection.  So we've looked at quite a few of

7  their boats just because there's a lot of them out there.

8  We've looked at Bayliner, we've looked at Wall Craft.

9  Regal, Crownline, Classic, Reinell -- more so many years

10  ago.  They were a large manufacturer then, they're back in

11  business now.  That's an example of some that I can think

12  of off the top of my head.

13  Q.    And I think you said when you do a survey, you can do

14  a survey in a couple of different situations, one is where

15  someone either wants to buy or sell a boat and you may be

16  hired by the buyer or seller?

17  A.    Yes, hired by either.  In a practical instance we are

18  hired most of the time, 99 percent of the time, by the

19  buyer of the used boat.

20  Q.    And when you're hired by a buyer of a used boat, what

21  is it you're looking to determine?

22  A.    The point that we get involved in being hired, this

23  buyer has decided they want to purchase this particular

24  boat.  And they've signed a contract.  They've put a

25  deposit down and the contract says subject to survey.  The

1    analogy that I would use for you is similar to a home

2    inspection.  If you were buying a house, you would have a

3    home inspection.  That's the condition part of the survey.

4    And then the bank, your lender, probably wants an

5    appraisal.  They want to know what the market value is.

6    That's the value side of this particular type of survey

7    inspection.  That's the services we're providing for that

8    particular buyer.

9        If the survey comes in and there's a lot of things,

10   recommendations, things that we found that need to be

11   corrected, the deal may terminate just like in a house

12   purchase.  If the value comes in at substantially lower,

13   they may renegotiate the price under the contract.  If it

14   comes in higher, then I'm going to assume the buyer of the

15   boat is kind of happy because you qualify for a higher

16   loan but also getting a really good deal.

17   Q.   And when you make these surveys in a situation where

18   you are hired by the prospective buyer, do you

19   recommend -- do you identify the condition of the boat?

20   A.   Yes.

21   Q.   All right.  And do you also recommend things that

22   need to be fixed?

23   A.   Yes.  We make recommendations on what needs to be

24   repaired.

25   Q.   And does that apply to the hull and to the engines

1    and all the systems on the boat?

2    A.    In a condition and value survey, generally we are not

3    completing an engine survey.  So we are oftentimes looking

4    at the boat out of the water only.  It's not in the water.

5    So the engines and the equipment can't be operated.  So

6    we're doing a visual inspection on the boat to tell the

7    buyer what potential problems exist.  The buyer doesn't

8    own the boat either, so there's limitations on how far we

9    can go on the testing that we're doing.  Generally we are

10   not doing any mechanical testing at all unless the boat's

11   afloat.  If it is, then we will take the boat out for a

12   sea trial, assuming the buyer has asked for that service

13   to be done as part of the engagement.

14   Q.    In that situation you would do that kind of

15   evaluation?

16   A.    Yes.

17            THE COURT:  And we're at a good spot.

18            MR. ROTONDO:  We can stop right here,

19   Your Honor.  I can pick it up right here tomorrow morning.

20            THE COURT:  Okay.  The witness may step down.

21            Ladies and gentlemen, before you leave, I do

22   want to remind you that you've only heard some of the

23   evidence and you have to hear all the evidence, the

24   arguments of counsel, and my instructions to you on the

25   law before you come to any conclusions.

1           And I remind you not to have any discussions

2    about the case amongst yourselves or with anyone else, not

3    to have any contact with the parties, attorneys, or

4    witnesses, and not to be exposed to anything in the media

5    concerning this case or any similar matter.

6           Thank you very much for your hard work today.

7    We'll see you tomorrow morning at 9 o'clock.

8                (Whereupon the jury left the courtroom.)

9           THE COURT:  We'll take a 20-minute recess.  I

10   want you all to come back and be prepared -- maybe you can

11   talk with my law clerk.  We'll end the transcript here.

12   I'll tell the law clerk what I want you all to discuss.

13               (Proceedings adjourned at 4:30 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com

1

2

3                         C E R T I F I C A T E

4

5

6

7          I, Diana Huntington, RDR, CRR, Official Court

8   Reporter for the United States District Court for the

9   District of Connecticut, do hereby certify that the

10  foregoing pages are a true and accurate transcription of

11  my shorthand notes taken in the aforementioned matter to

12  the best of my skill and ability.

13

14

15

16

              /s/_____
17
                 DIANA HUNTINGTON, RDR, CRR
18                  Official Court Reporter
                  450 Main Street, Room #225
19                Hartford, Connecticut 06103
                     (860) 547-0580
20

21

22

23

24

25