1                    UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF CONNECTICUT

3

4    - - - - - - - - - - - - - - - x
                                   :
5    PETER D. MAINS and LORI M. MAINS:  No. 3:01CV2402(AWT)
                                   :
6                      Plaintiffs,   :
                                   :
7              vs                   :
                                   :
8    SEA RAY BOATS, INC.           :
                                   :  HARTFORD, CONNECTICUT
9                      Defendant.   :  APRIL 4, 2008
                                   :
10   - - - - - - - - - - - - - - - x

11

12

13                        **JURY TRIAL**

14                        **VOLUME IV**

15

16        BEFORE:

17                   HON. ALVIN W. THOMPSON, U.S.D.J.

18

19                    and a Jury of Nine

20

21

22

23                              Diana Huntington, RDR-CRR
                                Official Court Reporter
24

25

Vol. IV - Page 549

```
 1   APPEARANCES:

 2        FOR THE PLAINTIFFS:

 3                JOHN L. SENNING, ESQ.
                     16 Saybrook Road
 4                   Essex, Connecticut 06426

 5                HERRICK NIKAS, LLP-CA
                     1201 Dove Street, Suite 560
 6                   Newport Beach, California 92660
                  BY:  RACHEL D. LEV, ESQ.
 7                     RICHARD J. NIKAS, ESQ.

 8        FOR THE DEFENDANT:

 9                DAY PITNEY, LLP
                     CityPlace I
10                   Hartford, Connecticut 06103-3499
                  BY:  JAMES H. ROTONDO, ESQ.
11                     DANIEL J. FOSTER, ESQ.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          TABLE OF CONTENTS

2

3    PLAINTIFFS'
     WITNESS          DIRECT    CROSS    REDIRECT    RECROSS
4
     THOMAS WICANDER     --       --
5        (Resumed)                          557        578

6    DAVID WADE          661      708       719         --

7


8    DEFENDANT'S
     WITNESS          DIRECT    CROSS    REDIRECT    RECROSS
9
     GREGORY DAVIS
10       (Resumed)       587      614       --          --

11   GREGORY WILSON      721      730       --          --

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **9:06 A.M.**

2              THE COURT:  A couple of things I'm going to

3    squeeze in before we bring the jury in and pick up with

4    our redirect examination.

5              Just so you all know, based on discussions, I'm

6    planning that we'll have closing arguments on Monday and

7    I'm hoping to get the charge in.  If I don't finish it on

8    Monday, I'll finish it on Tuesday morning.  For a case

9    like this, typically closings are about an hour for each

10   side.  I will try to remember before we leave today to

11   give you some -- I have some procedures for closing.  I

12   will try to give you those before you go today so that

13   over the weekend you have time to fine tune your thinking

14   about how you do that.

15             I have some questions concerning what I read in

16   the jury charge.  I'm going to do that -- I'll fit that --

17   I can do it more efficiently if I wait until after lunch

18   because I didn't have time to organize my notes on that.

19             As to the matter we discussed last night at some

20   length -- I seem to be missing one folder.  Let me see if

21   I can find it on my desk.  Sorry.

22             I did get defense counsel's letter and I've gone

23   back and looked at the documents.

24             Defense counsel cites to the Paolitto case,

25   151 F.3d 60, which happens to also cite to Rosa, which was

PDF created with pdfFactory trial version www.pdffactory.com

1    pointed out by plaintiffs' counsel last night, and it says

2    that -- let me see.  Rosa had more complete language on

3    that point.

4         Rosa said the rule of opening the door or

5    curative admissibility -- we're talking about

6    admissibility there -- gives the trial court discretion to

7    permit a party to introduce otherwise inadmissible

8    evidence on issue:  A, when the opposing party has

9    introduced inadmissible evidence on the same issue; and B,

10   when it is needed to rebut a false impression that may

11   have resulted from the opposing party's evidence.

12        The defense did not admit inadmissible evidence

13   yesterday during the cross, so the first prong for

14   application of the curative admissibility standard is not

15   met.

16        Also I have serious questions as to whether the

17   second prong is satisfied based on going back and looking

18   at these documents to the extent I've been able to

19   determine what they say.  There's some I can't find model

20   numbers, but I do see the years.  They are very clearly

21   spelled out.

22        So this is what I'm going to do.

23   Plaintiffs' 33, the pickling area, plaintiffs' counsel

24   will be allowed to inquire, but I don't think we've had

25   the door opened for admissibility.

PDF created with pdfFactory trial version www.pdffactory.com

1           On the compression test issue where defense

2    counsel used Defendant's 95, if plaintiffs' counsel wants

3    to inquire into that area, I ordinarily let counsel

4    inquire.  It seems to me, though, from what I've looked at

5    in terms of the years of the documents, I haven't been

6    able to find engine models.  But I'm going to just leave

7    that to counsel to put in front of the jury.  The years

8    and engine models, if plaintiffs' counsel wants to go into

9    it, they can, and then defense counsel can go into it

10   also.  Now, that's 74, 112, and 113.

11           150, I'm not allowing inquiry on because it's

12   incomplete.  I think it jumps from page 1 to page 10.

13           And then when we get to the flushing

14   instructions, I believe I said there was nothing that was

15   presented in terms of opening the door there.

16           And with respect to the location of the

17   discharge hose and the exhaust elbow, the conditions for

18   admitting Plaintiffs' 38 have not been satisfied under the

19   curative admissibility doctrine.

20           I will allow plaintiffs' counsel to inquire as

21   to Plaintiffs' 28, but only with respect to the points

22   that were addressed on cross-examination, not with respect

23   to this -- the point that's mentioned in the last

24   paragraph of defense counsel's letter.

25           And then Plaintiffs' 47, plaintiffs' counsel can

PDF created with pdfFactory trial version www.pdffactory.com

1   inquire.

2           Plaintiffs' 49, plaintiffs' counsel cannot

3   inquire.  I haven't received any showing that it's not

4   barred by a protective order.

5           Plaintiffs' 60, plaintiffs' counsel can inquire.

6           So that's where we are.

7           MR. NIKAS:  Your Honor, if I may?

8           THE COURT:  Yes.

9           MR. NIKAS:  I'd like to state for the record

10  that yesterday afternoon we requested the opportunity to

11  provide a more detailed analysis of our arguments.

12  Following court we were informed that the Court would not

13  permit such analysis.

14          We received this morning an ex parte

15  communication in the form of a letter from defense counsel

16  to the Court.  This is not filed on PACER, it was not

17  filed as a pleading, but rather to perform a

18  correspondence.  Within such letter was contained

19  testimony regarding the contents of certain documents and

20  representations as to their appropriate use therein.

21          Plaintiff objects to the Court's consideration

22  of this ex parte communication.

23          Plaintiff further objects to the Court's

24  determination that Exhibit 38 is barred by the doctrine of

25  collateral -- excuse me.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  Curative.

2          MR. NIKAS:  -- curative admissibility.

3          THE COURT:  I didn't say it was barred.  I said

4   it was not permitted to be admitted pursuant to the

5   doctrine.

6          MR. NIKAS:  It should be permitted due to the

7   doctrine of waiver since defense counsel actually showed

8   the witness the exhibit in the presence of the jury for

9   the purpose of impeaching his prior testimony.

10          Furthermore, given that defense counsel has been

11   able to testify as to the contents as to the admissibility

12   of certain documents, any document marked "subject to

13   protective order," more than enough testimony has been

14   received from the various witnesses that all these

15   documents are available to anybody on the internet with

16   access to MercNet, and whatever copies that were provided

17   were done so in the interest of convenience because extra

18   copies were available.  If the Court so wishes, we can

19   provide them copies obtained from other sources that do

20   not have any indication as to their use in prior cases.

21          THE COURT:  Are you representing that

22   Plaintiffs' 49 is not subject to a protective order?

23          MR. NIKAS:  It's not, Your Honor, because if we

24   obtained it from separate sources --

25          THE COURT:  In that case, you can inquire as to

PDF created with pdfFactory trial version www.pdffactory.com

1  Plaintiffs' 49.  My understanding was that you were asked

2  about the issue of protective order, had not responded to

3  it.

4            Let me just say one thing or two things.

5            I think plaintiffs' counsel was allowed to give

6  an explanation for their position.  We got the transcript,

7  we were here in court for I don't know how long, but we

8  had quite an extensive discussion.  Plaintiffs' counsel

9  made several arguments where they persuaded me to head in

10 a direction that would have allowed the admissibility of

11 some of these documents.  And they told me that the use of

12 those documents was necessary to correct the misleading

13 impression that had been created by the defense.  And for

14 that reason, I indicated I was giving more latitude, but

15 defense counsel didn't have copies of the documents, so I

16 said defense counsel can look at the documents and if

17 defense counsel disagreed with where I was going, submit

18 something to me.  And the letter was faxed in, and I

19 specifically said, "Fax it in, do not e-mail it."  We had

20 that conversation.

21            In addition, it was not ex parte because it was

22 copied to opposing counsel.

23            Let's bring the jury in.

24            We'll have our witness retake the stand.  And

25 we'll finish up with his redirect.

PDF created with pdfFactory trial version www.pdffactory.com

1          (Whereupon, the jury entered the

2          courtroom.)

3      THE COURT:  Please be seated everyone.

4      I just need one second to get to my notes.

5          (Pause.)

6      THE COURT:  Mr. Nikas, whenever you're ready.

7

8              THOMAS WICANDER,

9      called as a witness, having been previously duly

10     sworn, was examined and testified further as follows:

11

12          REDIRECT EXAMINATION (Resumed)

13  BY MR. NIKAS:

14  Q.   Good morning, Mr. Wicander.

15  A.   Good morning.

16  Q.   Before your testimony was interrupted yesterday, I

17  believe we were talking about your procedures that you

18  used when pickling the engine; is that correct?

19  A.   I believe so, yeah.

20  Q.   Mr. Rotondo went into great detail about the issue of

21  sparkplugs and whether new sparkplugs were purchased on

22  the 11th or the 13th or some time period in between; do

23  you remember that?

24  A.   Yes, I do.

25  Q.   Do you know why the MerCruiser procedures state that

1  plugs should be changed when an engine has suffered water

2  ingestion from hydrolocking?

3  A.   I assume they want to make sure there's a dry set of

4  plugs in the engine.

5  Q.   Is that to allow the engine to start?

6  A.   Yes, to allow it to run properly.

7  Q.   In this case were you able to start the engines

8  without having to put in new plugs?

9  A.   Yes, we were.

10 Q.   Mr. Rotondo showed you an exhibit yesterday which was

11 Defendant's 109.  And I believe he described this as a

12 ledger -- that may be your term for it.

13      On the 31st of July, what test did you perform on the

14 vessel?

15 A.   I don't recall if it was the 31st, that's when that

16 was billed.  We performed a water ingestion checklist.

17 Q.   What else?

18 A.   We had -- actually in order to do that, we had

19 launched the boat and had done a monometer test.

20 Q.   A what?

21 A.   Monometer.  Establishes water line inside the bilge

22 of the boat.

23 Q.   Why is that important?

24 A.   That's what we based all our measurements of the

25 exhaust system on.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   When you measure the exhaust system and the relative

2    heights contained therein, you did that with the boat in

3    the water?

4    A.   Yes, we did.

5    Q.   That's the appropriate procedure per MerCruiser?

6    A.   Absolutely.

7            MR. NIKAS:   Your Honor, I'd like to approach the

8    witness.

9            THE COURT:   You may.

10   BY MR. NIKAS:

11   Q.   Did Mr. Rotondo show you this diagram yesterday?

12   A.   Yes, he did.

13   Q.   And did he ask you -- his question was:  Have you

14   ever seen a Mercury publication showing a discharge hose

15   above the height of an exhaust elbow?

16       And you replied, No.

17       And then he showed you this exhibit to refresh your

18   recollection.  And you answered, Kind of hard to tell in

19   this picture, to be honest.

20       Where is the exhaust elbow on the picture?

21       It's not very clear.  It does show that in this

22   manual.

23       Mr. Rotondo followed up with, So that manual does

24   show exhaust elbow height which is lower than a discharge

25   hose; is that correct?

PDF created with pdfFactory trial version www.pdffactory.com

1          And you said, It does show that.

2          Do you remember that?

3    A.    Yes, I do.

4    Q.    On the same sheet of paper where this sketch is, what

5    does that point right there say?

6    A.    The exhaust hoses and pipes must not be higher than

7    the exhaust elbows at any point.

8    Q.    Is that consistent with what you believed?

9    A.    Yes, it is.

10   Q.    So now that we've answered that question, when you

11   measured the exhaust system, what was your purpose in

12   doing that?

13   A.    To establish, to make sure that the proper exhaust

14   elbow heights were on this boat.

15   Q.    And why would that have been important in a water

16   ingestion case?

17   A.    Well, if the exhaust elbow height is below the

18   minimum, water can be easily ingested.

19            MR. NIKAS:  Your Honor, I just want to confirm

20   that 47 is acceptable?

21            THE COURT:  As to inquiry?

22            MR. NIKAS:  As to inquiry.

23            THE COURT:  Yes.  Plaintiffs' 47, so the record

24   is clear.

25            MR. NIKAS:  Sorry, Plaintiffs' 47.

PDF created with pdfFactory trial version www.pdffactory.com

1  BY MR. NIKAS:

2  Q.   Mr. Wicander, have you seen the installation manual

3  published by MerCruiser for the 7.4-liter engine?

4  A.   Yes, I have.

5  Q.   Just so we're clear, what's the distinction between a

6  7.4-liter Blue Water engine and a 7.4-liter Horizon

7  engine?

8  A.   What's the distinction?  Horsepower and warranty

9  packages that are permitted with it.

10  Q.   Is the block the same?

11  A.   Yes, they are.

12  Q.   Engines are the same, dimensions are the same?

13  A.   Yes, they are.

14  Q.   Exhaust systems the same?

15  A.   Yes.

16  Q.   In fact, does MerCruiser actually make this block?

17  A.   No, it's made by General Motors.

18  Q.   And this is the classic General Motors long block?

19  A.   454 block, yes.

20  Q.   And when you talk about 8.1-liter engines and other

21  derivatives thereof, is it the same block?

22  A.   Yes, it is.

23  Q.   And they obtained different capacities how?

24  A.   Through cylinder heads and fuel injection, that sort

25  of thing.

PDF created with pdfFactory trial version www.pdffactory.com

Vol. IV - Page 562

1    Q.   They could increase the stroke, I guess?

2    A.   Yes.

3    Q.   Increase the bore?

4    A.   Absolutely, yes.

5    Q.   Dimensions never change, do they?

6    A.   External no, definitely not.

7    Q.   When looking at that installation manual, can you

8    recall what it says about the importance of the exhaust

9    system to the issue of water ingestion?

10              MR. ROTONDO:  Objection.

11              THE COURT:  I'll allow the question.

12              THE WITNESS:  Can you repeat that?

13   BY MR. NIKAS:

14   Q.   Sure.

15        In reviewing the installation manual for the

16   7.4-liter engine, can you recall what MerCruiser states or

17   what the manual states is the importance of the exhaust

18   system to the issue of water intrusion?

19   A.   Yes.  That the exhaust system must be properly

20   installed to their specifications to not allow water

21   ingestion.

22   Q.   What do they say happens if it's not properly

23   installed?

24              MR. ROTONDO:  Objection.

25              THE COURT:  Sustained.

1  BY MR. NIKAS:

2  Q.   Well, when you did this exhaust system measurement on

3  the boat, you did it for a reason, correct?

4  A.   Yes.

5  Q.   And you stated the reason was because it was

6  important to the issue of water ingestion if we an engine

7  that ingests water, correct?

8  A.   Yes.

9  Q.   So obviously it's important to know why it's

10  important.  Correct, Mr. Wicander?

11        THE COURT:  The question is scope and the

12  objection's sustained.

13  BY MR. NIKAS:

14  Q.   Do you recall what that installation manual says

15  should be the relationship between the exhaust outlet and

16  the exhaust elbow?

17  A.   Yes.  No part of the exhaust system should ever be

18  higher than the exhaust elbow.

19  Q.   The reason for that is what?

20  A.   To prevent --

21        MR. ROTONDO:  Objection.

22        THE COURT:  Sustained.

23        MR. NIKAS:  Mr. Rotondo yesterday --

24        THE COURT:  Sustained.  We had a long discussion

25  about this.  I made it clear what the scope was.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. NIKAS:  Forty-nine?

2          THE COURT:  Subject to the same limitations.

3          MR. NIKAS:  Actually, Your Honor, does defense

4   counsel have any objection to showing this?

5          MR. ROTONDO:  I don't think -- I do object.  I

6   don't think it's within the scope.  And the other

7   objections that were stated.

8          MR. NIKAS:  Your Honor, can I show the witness

9   this sheet of paper?

10         THE COURT:  Show the witness, certainly.

11  BY MR. NIKAS:

12  Q.   Mr. Wicander, what's on that paper?

13  A.   Diagram of a collector exhaust system.

14  Q.   Can you at least describe verbally what is depicted

15  in that diagram?

16         MR. ROTONDO:  Objection.  It is beyond the

17  scope, the purpose of the document.

18         THE COURT:  It is.  Sustained.

19         You can refine your question, perhaps.

20  BY MR. NIKAS:

21  Q.   Well, I'd like to show you, then, another page of

22  that exhibit.  And can you tell me what's in this diagram?

23  A.   Lift style exhaust system.

24  Q.   And a lift style exhaust is the kind of exhaust that

25  was on board the boat at the time that it had the water

PDF created with pdfFactory trial version www.pdffactory.com

1   ingestion, correct?

2   A.   Yes, that's correct.

3   Q.   And is that diagram consistent, looking at it with

4   your understanding that the hose angle should all be

5   downhill or down?

6   A.   It should be, yes.

7   Q.   And there's nothing in that diagram published by

8   Sea Ray which contradicts that understanding?

9           MR. ROTONDO:  Objection.

10          THE COURT:  I haven't seen the diagram.  So I am

11  at a bit of a loss.  What exhibit are we in?

12          MR. NIKAS:  We are in 49.

13          THE COURT:  What's your objection, Mr. Rotondo?

14          MR. ROTONDO:  The scope related to the elbow

15  height, not to down angles.  That's what the question is

16  about.

17          THE COURT:  Why don't you make it height just so

18  I'm sure we're in the right ballpark there.

19          MR. NIKAS:  Your Honor, if I may, we

20  specifically made it clear yesterday that the issue was

21  not elbow height, it was the exhaust system measurements,

22  not just the height of the elbow.  Mr. Rotondo

23  specifically asked about the relationship between the

24  outlet and the elbow.  That implies an angle.

25          THE COURT:  I'll allow that question.

1  BY MR. NIKAS:

2  Q.   If I can recall that question, is there anything in

3  that document published by Sea Ray which diagrams the

4  water lift system which contradicts your testimony that

5  the angles should be flowing downhill out the boat?

6  A.   No.

7           MR. NIKAS:  Your Honor, may I take a brief

8  moment?

9           THE COURT:  Yes.

10              (Pause.)

11          MR. NIKAS:  Your Honor, I wanted to confirm on

12  scope.

13  BY MR. NIKAS:

14  Q.   Mr. Rotondo talked yesterday about the necessity of

15  speed, that the MerCruiser checklist for water intrusion

16  response or pickling, it is emphatic that speed is of the

17  essence; do you remember that?

18  A.   Yes.

19  Q.   On Monday the 11th when you started the engine, I

20  believe you testified that you expelled the water,

21  correct?

22  A.   Yes.

23  Q.   And then you ran the engine, correct?

24  A.   That's correct.

25  Q.   And I believe the next -- I seem to recall -- let me

PDF created with pdfFactory trial version www.pdffactory.com

1    just say this then.  Is running the engine consistent with

2    MerCruiser's procedures for pickling the engine?

3    A.    Yes, it is.

4    Q.    And in fact, isn't it true that the MerCruiser

5    service bulletin on gasoline engines and water intrusion

6    says to check for water and start the engine?

7    A.    Yes.

8    Q.    Now, after it was clear that having performed the

9    compression and leak down test that the engine was

10   unhealthy, I believe -- what determination did you make

11   about the engines?

12   A.    That we needed to disassemble them to determine what

13   the damage was.

14   Q.    Now, have you been able to locate any document

15   published by MerCruiser which states what the compression

16   of the engine should be rather than minimums?

17   A.    Not under that particular engine number.

18   Q.    Have you been able to locate compression ratios for

19   similar V8 engines that MerCruiser builds or has used in

20   some time?

21   A.    Yes.

22   Q.    What is the spec or the specified compression ratio

23   for those engines?

24            MR. ROTONDO:  Objection.

25            THE COURT:  Sustained.  The question was not

1    this engine but, quote, similar engines.  Is that the

2    question?

3              MR. NIKAS:  Let me rephrase the question,

4    Your Honor.

5    BY MR. NIKAS:

6    Q.   Are the compression ratios that you cited as being

7    necessary, your compression test, consistent with the

8    MerCruiser standards for the V8 engines that are published

9    with a specified compression ratio?

10             MR. ROTONDO:  I'm going to object to that

11   open-ended question.

12             THE COURT:  Sustained.

13   BY MR. NIKAS:

14   Q.   I'll just ask this:  Is there a specified compression

15   ratio that you can find that MerCruiser publishes for this

16   engine?

17             MR. ROTONDO:  Objection.

18             THE COURT:  For this engine.  I'll allow that

19   question.

20   A.   For a 454 block, the compression pressure for a new

21   block should be around 150 psi.

22   BY MR. NIKAS:

23   Q.   Is that the number that you used when performing your

24   compression test?

25   A.   That's the number we rate it on, yes.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Now, kind of lost in the testimony yesterday, I

2    guess, was approximately how many operating hours are on

3    this engine?

4    A.    I believe 180.  I'm not certain of the exact number.

5    I believe it's around 180.

6    Q.    In terms of a marine engine, where is that in the

7    life span of the designed life span of that engine?

8    A.    Probably about 10 percent.  Usually marine engine

9    with closeness in cooling like this, fourteen, 1600 hours

10   at least, depending on how they're run.

11   Q.    So we're about 10 percent of the way along?

12   A.    Yeah, about that.

13   Q.    When you pulled the head and were able to look inside

14   the cylinders, you testified that you saw scoring,

15   correct?

16   A.    That's correct.

17   Q.    I believe there were some criticism yesterday about

18   your efforts to preserve the engine.  What did you do

19   following the disassembly of the engine and why did you do

20   it?

21   A.    Well, after we disassembled the engines and

22   discovered the excessive scoring and the severity of the

23   scoring in the cylinders, we deemed the engines not

24   serviceable.

25   Q.    Why is that?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    At that point those engines could not be reused.

2    Q.    What is it about the cylinder scoring that makes that

3    engine block unrepairable or irreparable?

4    A.    The scoring was so deep it would have had to be

5    machined and oversized pistons and would not bring it to

6    specs.

7    Q.    So when you say "machined," what did that mean?

8    A.    Means removing the engine blocks from the boat and

9    put them on a boring machine, actually changing the engine

10   block.

11   Q.    Changing it how?

12   A.    Dimensions of the cylinders.

13   Q.    How would they change?

14   A.    They'd have to be increased.  I don't any if they

15   could have been increased enough to even have those engine

16   blocks work.

17   Q.    So it's like repairing a gouge by sanding it and

18   sanding it until you get to where you can't see it

19   anymore?

20   A.    Correct.

21   Q.    Does that require the use of different pistons then?

22   A.    Yes, it would, definitely.

23   Q.    Different rings?

24   A.    Definitely.

25   Q.    And in terms of good practice, would you just -- I

PDF created with pdfFactory trial version www.pdffactory.com

1    guess on one engine it was seven of the eight were scored,

2    but four of the eight on the other.   Would you just

3    overbore some cylinders and not others?

4    A.    No, you can't do that.

5    Q.    Why is that?

6    A.    The engine won't have the same power, it won't run

7    right, it won't be balanced.

8    Q.    That's why you decided to halt your preservation

9    efforts?

10    A.    Absolutely.

11    Q.    Now, you were talking to Mr. Rotondo about the

12    scoring and he asked you about the conclusion about

13    hydrolocking that you had in your first inspection report

14    done before the heads were removed; do you remember that?

15    A.    Yes.

16    Q.    The flushing of the system performed by Peter Mains

17    took place with the engine not returning, correct?

18    A.    That's correct.

19    Q.    Could the scoring have occurred with the engine not

20    running?

21    A.    Definitely not.

22    Q.    Any possibility?

23    A.    No.   No possibility.

24    Q.    Why is that?

25    A.    Because when an engine's hydrolocked, it cannot

PDF created with pdfFactory trial version www.pdffactory.com

1    rotate.  So the pistons cannot go up and down inside their

2    cylinders.

3    Q.   Is it possible that when you were turning the engine

4    over for the compression test and the leak down test and

5    to expel the water which was part of the pickling process,

6    that that operation caused the scoring of the cylinders?

7    A.   Absolutely not.

8    Q.   Why is that?

9    A.   The engine wasn't under load and it was slow cranking

10   speed.  And this is something that occurs over a long

11   time, long period.

12   Q.   So the hydrolocking could not have caused the

13   scoring?

14   A.   No, definitely not.

15   Q.   And the scoring of the cylinders, cylinder walls, was

16   fatal to these engines?

17   A.   Yes, it was.

18   Q.   And the water that flooded the cylinders came from

19   where or came through where?

20          MR. ROTONDO:  Objection -- I'll withdraw the

21   objection.  I don't know if we're talking about the

22   flushing from Mr. Mains or talking about something else.

23   So I object to the question.

24          THE COURT:  He just wants the question refined.

25

1    BY MR. NIKAS:

2    Q.    In every case, what is the path of ingress of water

3    through these engines?

4    A.    Through the exhaust system.

5    Q.    Specifically through the elbows?

6    A.    Yes, exactly.

7    Q.    And that would have been true, just to save

8    Mr. Rotondo some time, in the hydrolocking instance and in

9    the historical water ingestion; is that true?

10    A.    Yes, that's correct.

11    Q.    And the hydrolocking instance where we're flushing

12    the entire system through with fresh water, that water

13    fills up and I guess you testified that it rolled back?

14    A.    Yes.  It flowed back into the engines, yes.

15    Q.    Now, this engine block essentially could not have

16    been saved, correct?

17    A.    That's correct.

18    Q.    The elbows could be saved I guess you testified,

19    correct?

20    A.    Yes.

21    Q.    Manifold?

22    A.    Typically, yes.

23    Q.    Heads?

24    A.    They'd have to be reworked.

25    Q.    Valves?

1   A.   Again, that's part of the cylinder heads, so yes.

2   Q.   What about the rockiers?

3   A.   I'm sure, yep.

4   Q.   Crank?

5   A.   Probably.  Don't know that, but --

6   Q.   So what you would be repurchasing is a new, I guess,

7   long block?

8   A.   Yes.

9   Q.   And that would mean that all these other appertinents

10  could just all go onto the long block and the long block

11  would have new cylinders, pistons and everything else as

12  new, correct?

13  A.   Yes, that's correct.

14  Q.   What's the cost of a new 454?

15          MR. ROTONDO:  Objection.

16          THE COURT:  Basis?

17          MR. ROTONDO:  Outside the scope and not

18  disclosed.

19          THE COURT:  Sustained.

20          MR. NIKAS:  May I respond, Your Honor?

21          THE COURT:  It's outside the scope.  I'm

22  sustaining it on that basis.  Can you point to me -- just

23  give me a page number and I'll look at it to see where it

24  is in the scope.

25          And then I guess the second objection was not

 1   disclosed.

 2            MR. ROTONDO:  Correct.

 3            THE COURT:  I assume we're talking about

 4   Plaintiffs' 27.

 5            MR. ROTONDO:  Correct.

 6            MR. NIKAS:  In his expert report --

 7            THE COURT:  Let's not speak to the jury.  It's

 8   Plaintiffs' 27.

 9            MR. NIKAS:  Last sentence of his expert report,

10   Your Honor.

11            THE COURT:  Okay.

12            Objection's sustained.

13   BY MR. NIKAS:

14   Q.   Mr. Rotondo asked you if you visited the Sea Ray

15   factory; is that correct?

16   A.   Yes, he did.

17   Q.   I'm not sure he made that clear in the question --

18   how many times have you been to the factory?

19   A.   I believe it's four times.

20   Q.   And this is a Sea Ray factory?

21   A.   Yes, it is.

22   Q.   In Tennessee?

23   A.   Yes, Knoxville.

24   Q.   That's where this boat was built, right?

25   A.   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

Vol. IV - Page 576

1    Q.    When you were at the Sea Ray factory, did you see

2    MerCruiser personnel at that factory?

3                MR. ROTONDO:  Objection.

4                THE COURT:  Sustained.

5                MR. NIKAS:  Your Honor, does not page 5, line 23

6    through page 6, line 2 --

7                THE COURT:  It does not.  I'm looking at it.  It

8    doesn't.  And this is your expert witness, okay?

9    BY MR. NIKAS:

10   Q.    When you were pickling the engine, on page 11, line

11   16, Mr. Rotondo asked you if you removed the sparkplugs

12   and then turned the engine over.  Do you recall that?

13   A.    Yes.

14   Q.    You removed the sparkplugs for what purpose?

15   A.    So that the water would have someplace to go.

16   Q.    How do you turn the engine over then?

17   A.    With a starter motor, just like you would start your

18   car.

19   Q.    So the starter -- starter is mechanical, isn't it?

20   A.    Mechanical and electrical.

21   Q.    Electrical impulse pushes the starter -- injects the

22   starter and the starter gear turns?

23   A.    Yes, that's correct.

24   Q.    So when you push the starter without the sparkplugs,

25   what happens?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   The engine rolls over freely.

2  Q.   And does that enable you to move the pistons and the

3  cylinders?

4  A.   Yes, that's correct.

5  Q.   So you can actually look at each cylinder as you're

6  doing that process?

7  A.   We can see what comes out, yes.

8  Q.   And then when you remove the heads you can do the

9  same thing?

10  A.   Yes, that's correct.

11  Q.   You can turn it so you can see the cylinders?

12  A.   Yes, that's correct.

13  Q.   And is that the process you used when you determined

14  the extent of the scoring?

15  A.   Yes.

16  Q.   By the way, when you were seated at the helm of the

17  boat to turn the starter over --

18  A.   Yes.

19  Q.   -- how far is it to the engine?

20  A.   Maybe 4 or 5 feet at the most.

21  Q.   Can you see that far?

22  A.   Yes, I can.

23        MR. NIKAS:  No further questions, Your Honor.

24        THE COURT:  Thank you.

25        Mr. Rotondo, you can start whenever you're

PDF created with pdfFactory trial version www.pdffactory.com

1    ready.

2              Do you want to take that exhibit off the screen?

3              MR. NIKAS:  Certainly.

4              THE COURT:  Is that your copy or the official

5    copy?

6              MR. NIKAS:  My copy.

7              THE COURT:  Thank you.

8

9                      RECROSS-EXAMINATION

10   BY MR. ROTONDO:

11   Q.   Mr. Wicander, did you testify this morning that the

12   specification for compression for this particular engine

13   was 150 psi; was that your testimony?

14   A.   For a 454, that was my testimony, yes.

15   Q.   Plaintiffs' 26, which I believe is your mechanical.

16        All right.  If we can go up to the top part of

17   Plaintiffs' 26.  Where it says "acceptable."

18        At the time you were doing these tests you thought

19   the acceptable compression pressures were 130; is that

20   right?

21   A.   That would be acceptable for a used engine.

22   Q.   That's what you testified to, correct?

23   A.   Yes.

24   Q.   And in fact, when you testified yesterday about this

25   report, that's the number you used, 130 psi, isn't it?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   That was -- yes.

2   Q.   You didn't testify about 150 yesterday, did you?

3   A.   No.

4   Q.   And when you testified at your deposition about

5   compression tests in 2004, you used the number 130 again,

6   didn't you?

7   A.   Yes, I did.

8   Q.   And yesterday when you testified, do you recall being

9   asked a question about what MerCruiser, what its service

10  bulletins indicate that the compressions should be?

11  A.   As far as a minimum, yes.

12  Q.   Well, do you remember being asked the question

13  yesterday, Are you aware that MerCruiser service bulletin

14  indicates that compressions above 100 pounds per square

15  inch are acceptable?

16  A.   Yes.

17  Q.   And you said, Acceptable, yeah, that is their

18  specification.  Wasn't that what you said?

19  A.   Yeah, I believe it is.

20  Q.   And so today your opinion is that it's 50 percent

21  higher than what you said yesterday; is that right?

22  A.   I believe the question that I was asked was what a

23  new 454 would have for compression.  That was the way I

24  understood it.

25  Q.   A new one.  But didn't you say yesterday that this

PDF created with pdfFactory trial version www.pdffactory.com

1  MerCruiser service bulletin indicates compressions above a

2  hundred pounds per square inch are acceptable?

3  A.   Yes, that's correct.

4  Q.   And you knew that?

5  A.   Yes.

6  Q.   And it's true that every single one of those

7  cylinders that you tested, all 16 of them were above a

8  hundred pounds per square inch; isn't that right?

9  A.   That's correct.

10 Q.   We can go back to 26.

11      The bottom sentence of your -- on page 2 states, On

12 the basis of the mechanical inspections reported above, we

13 are of the opinion that both engines have been seriously

14 damaged as a result of hydrolocking that occurred on or

15 about June 9, 2001 and require replacement.  Correct?

16 A.   Yes.

17 Q.   And you told us yesterday that the hydrolocking

18 occurred because of fresh water being put in the system?

19 A.   Yes.

20 Q.   And you're not aware of those engines never -- let me

21 not have three negatives in one sentence.

22      You're not aware of any situation where the engines

23 did not work before June 10, 2001; isn't that correct?

24 A.   That's correct.

25 Q.   You were asked some questions about pickling; do you

PDF created with pdfFactory trial version www.pdffactory.com

1    recall that?

2    A.    Yes.

3    Q.    All right.  And you told us yesterday that both --

4    that you and MerCruiser had the same protocol?

5    A.    Yes.

6    Q.    And that you understood that the protocol required

7    you, when you were pickling, to put in new sparkplugs and

8    run the engine until you got to 1300 rpms and you were at

9    the normal engine temperature; isn't that right?

10   A.    I don't recall the changing of the sparkplugs.  We

11   always try to get the engines running first.

12   Q.    But we talked about this yesterday.  You understood

13   the protocol required you to change the sparkplugs, right?

14   A.    At some point, yes.

15   Q.    And you did not change the sparkplugs on June 11 when

16   you got the engine running; isn't that right?

17   A.    That is correct.

18   Q.    And you did not -- you told us yesterday that the

19   engine was not running well?

20   A.    That's correct.

21   Q.    And you also told us yesterday that you thought there

22   might be moisture in those sparkplugs, correct?

23   A.    I believe so, yeah.

24   Q.    You were looking at your ledger when you were talking

25   to Mr. Nikas; do you recall that?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.   Yes.

2    Q.   And he pointed out to you an entry for 7/31?

3    A.   Yes.

4    Q.   And it was a reference to launching a boat?

5    A.   Yes.

6    Q.   All right.  You did your measurements -- you told us

7    yesterday that you did your measurements on or before

8    July 10, correct?

9    A.   I don't remember the date.

10   Q.   Let me just show you your transcript.

11   A.   If I said it, I said it, that's fine.

12   Q.   If I can ask you to turn to page 74 of your

13   transcript.  Look at lines 12 through 16.

14        Does that refresh your recollection that you

15   performed those measurements of the exhaust system at some

16   point on or before --

17   A.   Yes, I faxed in the results, correct.

18             MR. ROTONDO:  I don't have anything further,

19   thank you.

20             THE COURT:  Whenever you're ready, Mr. Nikas.

21

22                  FURTHER REDIRECT EXAMINATION

23   BY MR. NIKAS:

24   Q.   Very quickly and hopefully we'll get you out of here

25   never to return.

1       Going back to the issue that Mr. Rotondo started

2   with, if we can go back a little bit further and give it

3   some context.  The cylinders you said the other day go up

4   and down, they turn the crank shaft which is in turn

5   connected to the propeller shaft which moves the boat

6   through the water, correct?

7   A.    Yes.

8   Q.    These parts rotate?

9   A.    Yes, they do.

10  Q.    Is that the correct term?

11  A.    Yes.

12  Q.    And when things are moving around in a circle, is

13  balance important?

14  A.    Very important.

15  Q.    How important?

16  A.    Extremely important.  It's like having a tire out of

17  balance on your car, you'll feel it thumping and

18  vibrating.  An engine definitely has to be balanced.

19  Q.    Does the fact that the compression ratios in the port

20  engine vary as much as -- these are the same figures that

21  appear in your inspection report.  The high is what on

22  this port engine?

23  A.    135.

24  Q.    And the low is?

25  A.    105.

PDF created with pdfFactory trial version www.pdffactory.com

Vol. IV - Page 584

1    Q.    Is that a significant difference?

2    A.    Yes, it is.

3    Q.    That would be a threat -- would that difference be a

4    threat to the long-term integrity and operation of the

5    engine?

6    A.    Absolutely.

7    Q.    What about on the starboard engine?

8    A.    Not as bad, no.

9    Q.    So the starboard engine was relatively in good shape

10   compared to the port?

11   A.    Yes.

12           MR. NIKAS:  Your Honor, at this time we'd like

13   to introduce Plaintiffs' 33 into evidence.  It's now been

14   referenced by Mr. Rotondo --

15           THE COURT:  You can just -- you want to offer 33

16   because it's been referenced by Mr. Rotondo?

17           MR. NIKAS:  Twice now.

18           THE COURT:  That's not a sufficient basis.

19           MR. NIKAS:  In the Second Circuit it should

20   constitute waiver, Your Honor.

21           THE COURT:  I said that's not a sufficient

22   basis.  You made your waiver argument outside the presence

23   of the jury and it was rejected.  Don't repeat it now.

24   It's preserved.

25

 1  BY MR. NIKAS:

 2  Q.    Mr. Rotondo went through the protocols contained in

 3  Exhibit 33, which is the MerCruiser service bulletin on

 4  gasoline engines and water intrusion?

 5            MR. ROTONDO:   Objection.

 6            THE COURT:   Sustained.   Why don't you go to what

 7  he asked.

 8  BY MR. NIKAS:

 9  Q.    Well, he started with the first few steps of the

10  pickling procedure, correct?

11  A.    Yes.

12  Q.    Which would be determine if there was water present,

13  try to expel the water, start the engine, run it at 1300

14  rpms until it reaches normal operating temperature; do you

15  recall that?

16            MR. ROTONDO:   I object.   One or two questions

17  that were asked today about putting the sparkplugs and

18  1300 rpms, but I didn't go through the whole list today.

19            THE COURT:   That's correct.   I have notes as to

20  exactly what's covered.   Sustained.

21            MR. NIKAS:   Under Rule 106, Your Honor --

22            THE COURT:   Sustained.   It's outside the scope.

23            MR. NIKAS:   No further questions.

24            MR. ROTONDO:   Nothing further.

25            THE COURT:   Thank you, sir.   You may step down.

1           THE WITNESS:  Thank you.

2           THE COURT:  Mr. Rotondo, I thought the witness

3   was sort of fast yesterday.

4           MR. ROTONDO:  Ask him to slow down?

5           THE COURT:  Yes, please.

6           MR. NIKAS:  Your Honor, one moment, please.

7               (Pause.)

8           MR. ROTONDO:  Your Honor, we had Mr. Davis wait

9   outside.  So we just went to get him.

10          THE COURT:  We're not sequestering witnesses.

11          MR. ROTONDO:  Mr. Nikas and I agreed that we

12  would keep our expert witnesses outside.

13          THE COURT:  Okay.  Thank you.  I didn't know

14  that.

15          Could I have our witness take the stand, please.

16          THE CLERK:  May I remind you, sir, that you

17  remain under oath.

18          THE WITNESS:  Yes.

19

20

21

22

23

24

25

1                         GREGORY DAVIS,

2           called as a witness, having been previously duly

3           sworn, was examined and testified further as follows:

4

5                    DIRECT EXAMINATION (Resumed)

6    BY MR. ROTONDO:

7    Q.    Mr. Davis, I'd like to pick up where we left off

8    yesterday, but I'd like to ask you to slow down just a

9    little bit when you speak.

10   A.    Okay.

11   Q.    All right.  We've reviewed a fair amount of your

12   background, Mr. Davis, and you told us a lot of different

13   types of survey work that you do.  You mentioned that you

14   also do something called appraisals --

15   A.    Yes.

16   Q.    -- is that correct?

17         What are appraisals?

18   A.    It's a damage appraisal.  We generally get hired by

19   the insurance company when there's been a claim reported

20   to the insurance company, some type of damage to the boat

21   or the motors.  And we will go out and look at the damage

22   to assess what the cause was.  And then we'll write an

23   estimate to complete the repairs and submit that

24   information to the insurance company.

25   Q.    And what different types of boats do you do

PDF created with pdfFactory trial version www.pdffactory.com

1  appraisals on?

2  A.    Mostly recreational boats.

3  Q.    What different parts of the boat do you do those

4  appraisals on?

5  A.    We do them both on the hull and also on the

6  machinery, the engines and the equipment, whether it be an

7  inboard, a stern drive, or an outboard.

8  Q.    For how long have you done that kind of work?

9  A.    Since the company started, so 34 years -- 31 years.

10  Q.    And you told us that you've looked at, I believe you

11  said, thousands of boats?

12  A.    Yes.

13  Q.    All right.  And of those sort of -- of that number,

14  how many, breakdown roughly between surveys and

15  appraisals?  Surveys as in talking to people who are

16  buying or selling a boat as apposed to appraising for

17  damage?

18  A.    The majority of our work is done for insurance

19  companies on damage appraisals.  70 percent, probably, of

20  our total volume is done as damage appraisals for

21  insurance companies.

22  Q.    Do you have any professional certifications?

23  A.    Yes, I do.

24  Q.    And what are they?

25  A.    I'm a certified marine surveyor by the National

PDF created with pdfFactory trial version www.pdffactory.com

1    Association of Marine Surveyors.  I was certified in 1978.

2    And I have other certifications in other things, but

3    they're not directly related to being a marine surveyor.

4    Q.    And what is the National Association of Marine

5    Surveyors?

6    A.    National Association of Marine Surveyors is the

7    oldest professional organization for marine surveyors in

8    the United States.  There are members outside of the

9    United States.  It was founded in 1960.  And it is a

10   professional association for education of its members

11   and -- the members participate in various organizations,

12   other organizations related to boating safety or the

13   manufacture or safety standards recommended for both

14   recreational boats, commercial hall, and then also cargo.

15   Q.    Have you held any positions in the National

16   Association of Marine Surveyors?

17   A.    Yes, I have.

18   Q.    Can you describe what positions you've held?

19   A.    I have been the chairman of their Insurance

20   Committee, which is organized to solicit benefits for the

21   members from a professional insurance basis and also

22   health insurance, whatever.  I'm currently chair of the

23   Yachts and Small Craft Technical Committee.  I am also

24   currently chair of the Education Committee.  I have served

25   in the past on the Communications Committee.  And I was

PDF created with pdfFactory trial version www.pdffactory.com

1    recently elected the national vice president and will take

2    office in about a week as national vice president.

3    Q.    Do you belong to any other professional groups other

4    than the National Association of Marine Surveyors?

5    A.    I'm a member of the Society of Naval Architects and

6    Marine Engineers and I serve on the Safety Committee for

7    them also.

8    Q.    And what does your work on the Safety Committee

9    entail?

10   A.    It has to do with fire safety standards on

11   passenger-carrying vessels.

12   Q.    And did you go on to any other professional groups?

13   A.    Yes.  I'm a member of the National Association of

14   Fire Investigators, I'm a certified fire and explosion

15   investigator.

16        I have -- the company is a member of the American

17   Boat and Yacht Council.  They write the safety standards

18   for recreation boats.  I have served on their board of

19   directors and currently serve on their technical board.

20        I'm a member of the International Association of

21   Arson Investigators.

22        And there are others that are not coming to mind off

23   the top of my head.

24   Q.    You said you have served on two different technical

25   committees, the American Boat and Yacht --

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Council.

2    Q.    -- Council and then the National Association of

3    Marine Surveyors; is that right?

4    A.    Yes.

5    Q.    What does your work on those committees generally

6    involve?

7    A.    The National Association of Marine Surveyors, Yachts

8    and Small Craft Technical Committee, I chair that, and

9    it's my job to disseminate information to our membership

10   that pertains to yachts and small craft, answer questions

11   from our members when they're out on survey.  I get calls

12   asking for technical advice.  I host a web site for the

13   Yachts and Small Craft Technical Committee as a part of my

14   company's web site, which is available through -- to our

15   members through the organization's web site.

16        The American Boat and Yacht Council is a nonprofit

17   organization.  And as I said earlier, their job is to

18   author and maintain safety standards regarding

19   recreational boats.  There's a process for that.  The

20   compliment -- there's a requirement in the American Boat

21   and Yacht Council that the members of their organization

22   be -- there are boat manufacture members, there are

23   government members, and then there are members that

24   represent the public.  And in my position as a marine

25   surveyor I am the, quote/unquote, public representative

PDF created with pdfFactory trial version www.pdffactory.com

```
 1  compliment they have to have for validity to their

 2  standards.

 3       On their technical board, it is my job on the

 4  technical board to review all of the standards that come

 5  through each year in cycle for renewal.  Once they've been

 6  completed by a committee, the technical board reviews each

 7  one of the standards and can make specific line item

 8  suggestions or you don't make any line item suggestions

 9  and you approve or don't approve the standard prior to it

10  being published.  That publishing cycle is coming through

11  for July of this year, so so far since about November I've

12  reviewed about 28 standards and there will be 34 that will

13  come up for publication in this cycle in July.

14  Q.   Have you ever testified as an expert witness before?

15  A.   Yes.

16  Q.   And is that in state court or federal court, or both?

17  A.   It's both.

18       MR. ROTONDO:  Your Honor, I'm not sure if your

19  practice requires it, but if it does, we offer Mr. Davis

20  as an expert witness.

21       THE COURT:  He's accepted as such unless you

22  want to voir dire.

23       MR. NIKAS:  I would like to voir dire, actually.

24       THE COURT:  Oh, okay.

25
```

1                    VOIR DIRE EXAMINATION

2    BY MR. ROTONDO:

3    Q.   Good morning, Mr. Davis.

4    A.   Good morning.

5    Q.   I just wanted to clear up some things that were said

6    yesterday during your initial examination.

7         You were in what position when you started in the

8    marine industry?

9    A.   I started out -- marine industry, as a surveyor.

10   Marine surveyor.

11   Q.   Did you have a mechanical background before that or a

12   licensed officer's background before that, or any other

13   background?

14   A.   No.

15   Q.   What training did you have, then -- what specialty do

16   you have, actually, in surveying?

17   A.   Yachts and small craft.

18   Q.   Do you have any instruction in naval architecture?

19   A.   No.

20   Q.   Do you have any instruction in construction of small

21   boats?

22   A.   No.

23   Q.   Do you have any instruction in the installation of

24   component systems on small craft?

25   A.   No.

1  Q.   Do you have any instruction in engineering?

2  A.   No.

3  Q.   Did you have any instruction in mechanics?

4  A.   No.

5  Q.   Have you ever had any instruction on exhaust system

6  installation?

7  A.   No.

8  Q.   Have you ever had any instruction on inspection of

9  fiberglass composite systems?

10  A.   Yes.

11  Q.   What instruction have you had?

12  A.   Review of the Marine Survey Manual by Gibbs & Cox in

13  1960 and then instruction on the job be as an apprentice

14  under other senior surveyors.

15  Q.   That's the FRP Manual by Gibbs & Cox?

16  A.   Yes.

17  Q.   Published?

18  A.   1960.

19  Q.   Forty-eight years ago?

20  A.   Yes.

21       There are other manuals out there that I've reviewed,

22  other books.

23  Q.   To whom did you serve your apprenticeship prior to

24  becoming a marine surveyor?

25  A.   The companies that I worked for, my job designation

1    was marine surveyor, okay, even though I was apprenticing.

2    When I worked for the British firm, I apprenticed under

3    two surveyors.  One was Homer Marxer and the other was

4    Irv Frigon.

5    Q.    What was the British firm?

6    A.    Graham, Miller & Company.

7    Q.    What was your -- isn't Graham, Miller & Company a

8    cargo surveying firm?

9    A.    Yes.

10   Q.    Correct me if I'm wrong, but Graham Miller doesn't do

11   any recreational craft, at least they did not at that

12   time, correct?

13   A.    They did in the office in Chicago.

14   Q.    You've been retained to offer an opinion on what

15   topics?

16           MR. ROTONDO:  Objection, Your Honor.

17           THE COURT:  Sustained.

18           MR. NIKAS:  It goes to the issue of his

19   qualifications.

20           THE COURT:  Sustained.

21   BY MR. NIKAS:

22   Q.    Did you perform the mechanical inspection on board

23   this vessel?

24   A.    No.

25   Q.    How long have you been a member of NAMS?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   Since 1978.

2          MR. ROTONDO:  Objection, Your Honor.  This is

3   going beyond the basic voir dire.

4          THE COURT:  He asked how long has he been a

5   member of this association.

6   BY MR. NIKAS:

7   Q.   How long have you been a member of the ABYC?

8   A.   You know, I can't tell you for sure because I don't

9   remember exactly when I joined.  But it's at least 20

10  years.

11  Q.   And what's the BoatU.S. Speakers Bureau listed on

12  your CV?

13  A.   That's an organization BoatU.S. actually invites you

14  to participate in their speakers bureau.  They set up the

15  arrangements, basically groups contact them looking for

16  speakers to speak before them.

17  Q.   And just so the jury understands, what is BoatU.S.?

18  A.   BoatU.S. is the boat owners association of the United

19  States.  It is a nonprofit organization set up in the

20  '70s, I believe, sometime in the early '70s, with an

21  interest in being a boater's advocate on Capitol Hill.

22  They have another division called the Insurance Division

23  where they offer insurance to their members at preferred

24  rates.  And that's how I got to know them, was through

25  their Insurance Division.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.    They're pretty much like AAA?

2   A.    In some ways, yes, I'd say it's a lot like AAA.

3   Q.    They lobby, they advocate, they publish technical

4   things, they provide insurance, they do all sorts of

5   things, correct?

6   A.    Correct.

7   Q.    Are you a member of BoatU.S.?

8   A.    Yes.

9   Q.    How long have you been a member?

10  A.    Since the '80s.  I have the membership card in my

11  wallet, I can look.

12  Q.    It's all right.  Long time?

13  A.    Yeah.

14  Q.    You testified -- you told Mr. Rotondo that you've

15  been an expert before?

16  A.    Yes.

17  Q.    In the last 12 months how many times have you been

18  retained to provide expert testimony?

19  A.    How many times retained?  Fifteen or 20, somewhere in

20  there.

21          MR. NIKAS:  I have no objection to this witness

22  being certified.

23          THE COURT:  I want to be certain based on one of

24  the questions that was just asked, the defendants

25  disclosed the expert report to the plaintiffs?

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. ROTONDO:  Yes.

2          THE COURT:  Do you have an extra copy in case I

3     need one?

4          MR. ROTONDO:  I do believe I have an extra copy.

5     I don't think there are any marks on there.

6          THE COURT:  Thank you.  He's qualified as an

7     expert.

8

9               DIRECT EXAMINATION (Resumed)

10    BY MR. ROTONDO:

11    Q.   Mr. Davis, by whom were you hired in this case?

12    A.   We were hired by your law firm.

13    Q.   And you knew that we were representing Sea Ray; is

14    that correct?

15    A.   Yes.

16    Q.   Have you ever been hired by either a lawyer or by

17    Sea Ray in connection with any other case?

18    A.   Yes.

19    Q.   All right.  And have you ever had a case adverse to

20    Sea Ray?

21    A.   Yes.

22    Q.   And in general terms, what were you asked to do in

23    this case?

24    A.   We were asked to inspect Mr. Mains' vessel, his boat,

25    and to render an opinion on the condition and the value of

1   that boat at the time we inspected it.  And then an

2   opinion as to the cause of the damage and repair costs for

3   all the damage.

4   Q.   And what steps did you take to carry that out?

5   A.   We came out here to Hartford.  And myself and an

6   employee, Jerry Starczowsky, met up with an attorney from

7   your office.  And then we went to Brewer Pilots Point,

8   Mr. Mains met us there.  And we completed an inspection of

9   the boat and the engines in the boat.  The inspection that

10  I completed was what I would do if I was doing a condition

11  inspection on a used boat for a potential purchaser.

12       And then after that was completed, we followed or --

13  I believe we followed Mr. Mains to his home, I know we got

14  to his home, I wasn't driving, and inspected the engine

15  parts in the basement of his house.  Those parts that had

16  been removed.  Not all of the engine parts.  Some of the

17  engine was still in the boat.  Inspected those parts in

18  the basement of his house.  And then we went back to the

19  airport and ultimately wrote our report.

20  Q.   Approximately how long did the inspection take?

21  A.   We were here in Hartford for one day.

22  Q.   And did you make an assessment of the overall

23  condition of the boat?

24  A.   Yes, I did.

25  Q.   And I'm going to put down on the screen here

PDF created with pdfFactory trial version www.pdffactory.com

1   Exhibit 20-1.  Is that one of your photographs?

2   A.   Yes, it is.

3   Q.   And when you were doing your inspection of the boat,

4   did you walk around the boat?

5   A.   Yes, I did.

6   Q.   All right.  And did you -- were you aware of concerns

7   about moisture content, moisture in parts of the boat?

8   A.   Yes, I was.

9   Q.   All right.  And what did you do to assess -- let me

10  ask you this.  First of all, you inspected the entire boat

11  as part of your inspection?

12  A.   Yes, I did.

13  Q.   And what did you do to investigate the concerns or

14  issues about moisture?

15  A.   The boat was examined visually, sounded with a

16  phenolic hammer, which is a plastic hammer, and then it

17  was tested for moisture with a GRP33 moisture meter.

18  Q.   Why did you use a hammer?

19  A.   Hammer sounding is to test for delamination.  You'll

20  get a dull retort.  Retort is like the ringing of a bell.

21  If the -- the fiberglass material that the boat's made out

22  of is a cloth, fiberglass cloth, and then a liquid resin,

23  which is like a glue.  Those two materials don't have very

24  good structural properties by themselves, but joined

25  together they do.  It's kind of like reinforced concrete

PDF created with pdfFactory trial version www.pdffactory.com

1    would be the principle behind it.  If you don't get a good

2    bond -- and these are done in individual layers, there's a

3    lay-up schedule in how you build a boat -- if you don't

4    have a bond between those layers, you'll get a dull sound

5    and also you've lost strength in the hull.  That's why you

6    hit it with a hammer to determine if there's any

7    delaminations because that can be an area where you've got

8    a problem structurally with the boat.

9    Q.    And you talked about a moisture meter.  Is this a

10   picture of the moisture meter?  It's 20-26.

11   A.    Yes, it is.

12   Q.    Did you put the moisture meter on different parts of

13   the boat; is that how it works?

14   A.    Yes, the moisture meter was run over all of the

15   surfaces of the boat except where the bottom paint was at

16   on the bottom of the point.  I put the moisture meter on

17   the bottom of the boat, the meter has a scale from zero to

18   15.  This is a relative scale.  The meter is actually

19   gauged out for dry, moist, and wet.  Placing the meter on

20   the bottom of the boat pegged the meter up in the wet

21   range, up in the 15 area.  That is indication that there

22   is metal in the bottom paint.  Bottom paints often have

23   metal in them.  Bottom paints are there to keep algae and

24   barnacles and marine growth from growing on the bottom of

25   the boat.  Since the meter was getting pegged no matter

PDF created with pdfFactory trial version www.pdffactory.com

1    where I put in on the bottom where the bottom paint was

2    at, I did not test the bottom of the boat because I was

3    getting skewed results.  But I did test all the other

4    areas of the boat.

5    Q.    Showing you now what's been marked as Defendant's

6    Exhibit 20-28, that's your moisture meter in a particular

7    location.  Can you tell us what's shown here?

8    A.    What I've done here is underneath this particular

9    windshield wiper arm base, which is at the mid-top of that

10   photograph, just underneath the brownish area which is a

11   canvass that's covering the wind screen, I've marked out

12   the water or the wet area that's shown up on that meter at

13   that particular location.  So the triangle that's marked

14   in the tape is what came out wet.  And then when you go

15   outside of the tape area, it's dry, the meter's reading

16   dry.

17   Q.    And can you tell us what the size of that area is?

18   A.    I think the -- the tape area is less than 1 square

19   foot.  And total area of that portion of the deck, that's

20   the top of the deck house, what I did is estimated the

21   total area of the deck at 130 square feet because that's

22   all one part, the deck is made separately from the hull.

23   Q.    Let me just -- let me show you what's marked as

24   30-34.  Does this show the total area of the deck?  Is

25   that this part here?

PDF created with pdfFactory trial version www.pdffactory.com

Vol. IV - Page 603

1    A.    Yes.   The total area of the deck is from that area

2    all the way up to the pointy part, the bow.

3    Q.    And so what was the point, then, in putting the tape

4    and the measurements in 20-28?

5    A.    Well, the first reason for putting the tape there was

6    to determine what's the size of the wet area that I'm

7    getting with the meter.   And then once that's determined,

8    I'm looking at that particular size of area in

9    relationship to the total deck area to get an idea of

10   what's the scope of the potential problem.

11   Q.    And what did you find?

12   A.    It's less than -- well, there are two areas -- three

13   areas that had moisture.   And in total, those three areas

14   are less than 1 percent of the total square foot area of

15   the deck.

16            THE COURT:   When you're at a good point, it will

17   be time for our morning break.   Is this a good time?

18            MR. ROTONDO:   Yes, Your Honor.

19            THE COURT:   We'll take a 20-minute recess.

20                (Whereupon, a recess followed.)

21

22            THE COURT:   Please be seated everyone.

23            Bring the jury in.

24                (Whereupon, the jury entered the

25                courtroom.)

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  Please be seated everyone.

2    BY MR. ROTONDO:

3    Q.    Before we broke, Mr. Davis, I think we were talking

4    about the area near the windshield that you talked about;

5    do you recall that?

6    A.    Yes.

7    Q.    I think you said you found another area on the deck

8    you said had a moisture reading of some sort.  I'm going

9    to show you what's been marked as 20-31.

10   A.    Yes.

11   Q.    Okay.  And can you tell us what that depicts?

12   A.    In the far right of that photograph, the shiny round

13   object is the anchor windlass.  And directly behind that

14   all the way to the left in the photograph is the bow

15   cleat.  And the yellow tape areas are where the meter read

16   moisture or wet.

17   Q.    All right.  Does 20-30 give you a better orientation

18   in terms of where that area is?

19   A.    Yes.  If you look all the way forward of the wooden

20   stick, you can actually see the tape over to the left of

21   the cleat.

22   Q.    Okay.  So the two areas that you've identified are

23   the two areas where you found elevated moisture on the

24   deck; is that correct?

25   A.    Yes.

1  Q.   Again, if I look at 20-34, that was a small

2  percentage of the area on the deck; is that correct?

3  A.   Yeah, less than 1 square foot.

4  Q.   And of what significance did you find that moisture

5  on the deck to be?

6  A.   Every used boat that we look at, there are areas of

7  moisture on the deck that we find, every boat that we look

8  at.  In this instance with the areas that were found, this

9  is a much smaller area than we find generally on used

10  boats that we look at.  So, in my opinion, the moisture

11  readings are insignificant.

12  Q.   You also looked at the bottom of the boat; is that

13  correct?

14  A.   Yes.

15  Q.   And we have a few pictures of the bottom of the boat.

16  I'd like to find them and show them to you.

17      This is one photograph showing conditions of the

18  bottom of the boat; is that right?

19  A.   Yes.  That photograph is indicating a nick area where

20  the tape is at from striking something in the water while

21  the boat was under way.

22  Q.   What did you determine the condition of the bottom of

23  the boat?

24  A.   The bottom paints need to be renewed.  There's too

25  many coats.  It's poor application, it's peeling off.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   Other than that, there is some collision damage on the
 2   bottom of the boat, minor collision damage from operating.
 3   That was it.
 4   Q.   You also examined the bilge or the engine area of the
 5   boat; is that correct?
 6   A.   Well, there's a bilge in the cabin area, I looked at
 7   that.   Then there's a bilge in the engine room.
 8   Q.   Let's start with the bilge in the cabin area.
 9   A.   Okay.
10   Q.   Showing you 20-47, what does that show?
11   A.   That is the box to the left of the photograph is a
12   sump for the shower drain.   The tape that's in the
13   bilge -- the bilge is the bottom of the boat where water
14   that accumulates in the normal operation of the boat, the
15   boat will sweat due to temperature differences between the
16   inside of the boat and the water that it's in.   You can
17   get water leaks inside boats.   That water is designed to
18   go in this area.   The tape is marking out an air where
19   repairs have been done and there's brush strokes in the
20   gelcoat, which is the gray color that you're looking at.
21   Instead of paint it's actually a resin-based material
22   called gelcoat, and it's got brush strokes in it.
23   Q.   Why is that significant?
24   A.   It shouldn't have brush strokes in it.   It's a
25   poorly-completed repair.
```

1    Q.    So that was one of the things you took into account

2    in doing your analysis?

3    A.    Yes.

4    Q.    And what did you determine the overall condition of

5    the boat to be?

6    A.    Overall the boat was in what we call bristol

7    condition.    The definition of bristol is excellent

8    condition, bristol being very shiny or great in

9    appearance.

10   Q.    Did you make a determination of the value of the

11   boat?

12   A.    Yes, I did.

13   Q.    And how did you go about doing that?

14   A.    Actually, I computed a value.    The methodology used

15   was twofold.

16        The first set of methodology in valuation was using

17   valuation books.    The first one I used was BUC, which is

18   often used by boat brokers in determining value on what's

19   called a yacht, anything pretty much over 25-foot.

20        The BUC book publishes -- the BUC data comes from

21   brokers that report the data back into the BUC system, BUC

22   member brokers.    And then BUC has an algorithm, which is

23   proprietary, that they use to adjust the prices based on

24   each year, it's some type of depreciation scheme.

25        I took the model boat with the engines that were in

PDF created with pdfFactory trial version www.pdffactory.com

1    it based upon what the book said, and it will have a

2    published high and a published low.  Then I adjusted that

3    to the area that the boat is in.  And then I made a

4    condition adjustment to it based upon the bristol

5    condition that I found the boat to be in when I looked at

6    it.  And that gave me a range of roughly 122,000 to

7    134,000, roughly.

8    Q.   Let me stop you there.

9         Before you made your bristol adjustment, what was

10   the -- using the BUC system, what was the range that you

11   came up with?

12   A.   I don't have those figures with me, the working

13   figures.  I'm going based on what's in my report.  They

14   would have been -- usually the area adjustment can be

15   anywhere from the published figures up to 10 to

16   15 percent, depending on what area of the country you're

17   in.  The condition adjustment can range from minus, if

18   it's in bad condition, to plus 25 to -- I believe 25 might

19   be the top end of condition, and I added 25 percent for

20   condition.

21   Q.   If you added 25 percent and came up with something --

22   A.   122 to roughly 134.

23   Q.   Before you made the bristol adjustment, the number

24   would have been around $99,000; is that right?

25   A.   Somewhere in there.

1    Q.    Did you use any other kind of book analysis?

2    A.    Yes.  I used NADA, which is the abbreviation for the

3    National Automobile Dealers Association.  They publish a

4    used boat price guide.  I used this -- my report was being

5    done in October of 2004.  So I used the book that was

6    specific for September-December of 2004.  The average

7    retail in that book was roughly $99,000.  And then I added

8    for optional equipment that this boat had on it, using the

9    formula that you're supposed to use that NADA tells you

10   use.  That value with the adjustments came out to roughly

11   $106,000.

12   Q.    And then was there any other type of book analysis

13   that you considered for the value?

14   A.    The third book is published by a company called ABOS

15   and it's commonly referred to as the blue book because the

16   cover of the book is blue.  And I used -- that one

17   published an average retail value of roughly $99,000.  And

18   after condition adjustment, I came up with roughly

19   $124,000 in value.

20   Q.    In addition to the book analyses that you just

21   described, did you do anything else to try to come up with

22   a value of the boat?

23   A.    Yes.

24   Q.    What was that?

25   A.    I checked the marketplace to see what were boats of

1  this type, this model, similar equipment actually selling

2  for.   First I looked at listings, what were they listed

3  for?   That's called a comparative market analysis.

4      And I found four Sea Rays in this general area, two

5  in New York and two in Rhode Island, from 400 hours on the

6  engines, that's use time on the engines, to 250 hours.

7  And they were listing for -- this is the asking price for

8  these boats -- at roughly $100,000 for one, $99,000 for

9  two of them, $105,000 for the last one.   That's asking

10  prices.

11      Then I looked -- we subscribe to a multiple listing

12  service called Sold Boats.   My company subscribes to it.

13  That has actual reports from brokers and dealers of what

14  they sold boats for, gives me the actual selling price.

15  Searching that out again for the same model, same year --

16  in this instance I only was able to get the hours for one

17  of these three selling prices.   That was 190 hours.   I

18  found one boat in Missouri selling for $125,000 in April

19  of 2003.   I found one in Florida, I don't know the number

20  of hours on the engine, selling for $129,000 in June of

21  2004.   And one in Connecticut selling in September of

22  2004, again I don't know the number of hours on the

23  engine, selling for $118,000.

24  Q.   So based on the book analysis and the comparative

25  analysis, did you reach a conclusion either as to a range

PDF created with pdfFactory trial version www.pdffactory.com

1    or specific number as to the value?

2    A.    Yes.   Weighting the comparables, the actual selling

3    prices and market listings, giving them more weight than

4    the book values because the information is more current, I

5    came up with a market value opinion of $125,000 low to

6    $130,000 high, with an average of roughly $127,000.

7    Q.    And did that valuation assume that certain types of

8    repairs were to be done on the boat?

9    A.    Yes, it does.

10   Q.    And did those repairs fall into two categories?

11   A.    Yes.

12   Q.    One would be the engine and one would be the hull?

13   A.    That's correct.

14   Q.    Did you form an opinion as to what it would cost to

15   acquire and install remanufactured engines?

16   A.    Yes.

17   Q.    What was that cost?

18   A.    Roughly $12,000.

19   Q.    What are remanufactured engines?

20   A.    Remanufactured engines are rebuilt engines,

21   essentially.   They come with a warranty from the

22   remanufacturer, the person who rebuilt the engines.

23   Q.    And why did you think remanufactured engines were

24   appropriate for this boat?

25   A.    It's a faster way to execute the repair.   It gets

PDF created with pdfFactory trial version www.pdffactory.com

1    completed relatively quickly.  Because the rebuilder gives

2    you a warranty you've got someone to go back to if the

3    engine fails within the warranty period.  It's just

4    quicker, simpler, easier.

5    Q.    And the other area of the repairs or work that would

6    be done would be to the hull; is that correct?

7    A.    That's correct.

8    Q.    Did you make a determination as to what the cost

9    would be to do those repairs to the hull?

10   A.    Yes.

11   Q.    And can you generally describe -- well, first, what

12   was the cost of that work to the hull?

13   A.    Roughly $5,000.

14   Q.    Can you generally describe what was involved in that

15   work?

16   A.    There was some damage at the stern of the vessel,

17   that's the back, the flat part of the back of the boat.

18   There are two eye rings at the stern of the boat.  One of

19   them damaged -- actually both had some damage, but there

20   was damage to the fiberglass adjacent to those rings.

21   That was, in my opinion, related to transport of the

22   vessel on the truck when they lashed it down.  That needed

23   to be repaired.  So I estimated repairing that.

24        I estimated the repairs to the bottom of the boat

25   from the, in my opinion, striking an object, some type of

1    submerged object while the boat was under way.

2        I estimated replacing the anchor windlass because

3    there was a part that was broken in it.

4        And I estimated repairing the brush strokes and other

5    areas of damage in the bilge both in the cabin and the

6    engine room that were poor repairs that had been executed

7    by Sea Ray's people, poorly completed.

8        And that's what constituted my $5,000 of repair.

9    Q.    When you're talking about those repairs, you're

10   talking about the things like the brush strokes that you

11   mentioned earlier?

12   A.    Yes.

13   Q.    So.  You concluded that the value of the boat was

14   approximately what?

15   A.    Roughly $127,000.

16   Q.    And that it would cost what to make the repairs to

17   put it into that condition?

18   A.    Roughly $17,000.

19        MR. ROTONDO:  Thank you very much.  I don't have

20   anything further.

21        THE COURT:  Whenever you're ready, Mr. Nikas.

22        MR. NIKAS:  Thank you, Your Honor.

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com

1                      CROSS-EXAMINATION

2   BY MR. NIKAS:

3   Q.   Good morning.

4   A.   Good morning.

5   Q.   Going back to your report and I guess the CV that

6   accompanied that report, Mr. Rotondo asked whether you'd

7   worked for Sea Ray before; is that correct?

8   A.   Yes.

9   Q.   How many times have you been retained by Sea Ray?

10  A.   I think I have personally done three projects.

11  Q.   How many times has your firm been retained by Sea

12  Ray?

13  A.   Probably around eight times.

14  Q.   Were any of those water ingestion cases?

15  A.   Not that I'm aware of.

16  Q.   How many times has your firm handled a water

17  ingestion case for an owner?

18          MR. ROTONDO:  Objection.

19          THE COURT:  Sustained.

20  BY MR. NIKAS:

21  Q.   Mr. Davis, the report that you prepared and provided

22  to Mr. Rotondo, is that a survey report?

23  A.   Yes.

24  Q.   What type of survey report is it?

25  A.   Condition and value survey.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   Does it state that somewhere?

2   A.   The purpose of the report is stated on page 2 under

3   the caption "Purpose."

4   Q.   You're a member of NAMS.

5   A.   Yes.

6   Q.   Are you aware of the NAMS guidelines for condition

7   and valuation surveys for small craft and yachts?

8   A.   Yes.

9   Q.   And are you familiar with requirement that the title

10  of the survey appear on the top of the document so as not

11  to be misleading?

12  A.   I think you're confusing the SAMS regulations or

13  guidelines for survey reports with NAMS.  They aren't the

14  same.  Two different organizations.

15  Q.   Let me show you a document that may help refresh your

16  recollection.  In fact, I'll show you two.

17       These are both NAMS documents, are they not?

18  A.   Yes, they are.

19  Q.   If you go through the NAMS documents, one of the main

20  criteria for survey is the objectivity of the survey,

21  correct?

22  A.   Yes.

23  Q.   And in fact, one of the requirements is to disclose

24  owner's information, at whose request the survey is

25  performed for, the documents used, the guidelines, the

PDF created with pdfFactory trial version www.pdffactory.com

1    standards used to evaluate your opinions.  Do you see the

2    list of guidelines that are recommended or that could be

3    used to help form a surveyor's opinions?

4    A.    Yes.

5    Q.    ABYC.  What else is there?

6    A.    National Fire Protection Association.

7    Q.    Which you're a member of?

8    A.    Yes.

9    Q.    And you're a member of ABYC?

10   A.    Yes.

11   Q.    What else is listed there?

12   A.    United States Coast Guard requirements.

13   Q.    Anything else?

14   A.    State and local laws.

15   Q.    Now, when you were asked to perform this inspection

16   of the vessel, did you consult any guidelines that may be

17   germane?

18   A.    Specifically for this inspection?  No.

19   Q.    You were informed generally of the condition of the

20   boat, correct?

21   A.    Yes.

22   Q.    What were you advised?

23   A.    We were told that Mr. Mains had indicated there were

24   problems with his boat.  Essentially what's the substance,

25   I guess, of this lawsuit.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Were they specific about the problems?

2    A.    Well, the specifics that we had were we were aware

3    that there was moisture in the deck and that had been

4    inspected already by other parties.  We were aware that

5    the boat had been returned to the factory and repairs done

6    there and brought back to Connecticut, so we had some

7    sense of what the situation was.

8    Q.    When you were informed about the repairs that took

9    place at the factory, what repairs were those?  What were

10   you advised?

11   A.    Well, we were advised that the boat had been returned

12   to the factory for repairs and then brought back to

13   Connecticut.  Specifically what was done, we weren't

14   specifically told exactly what was done at the factory.

15   Just that it had been returned and brought back here.

16   Q.    Did you read the report of Tom Greaves?

17   A.    Yes.

18   Q.    And have you looked at his recommendations?

19   A.    Yes.

20   Q.    Do you disagree with any of them?

21   A.    I don't understand the question.

22   Q.    Well, this is in evidence, actually.  It's

23   Plaintiffs' 23.  And by our collective difficulty in

24   understanding Mr. Greaves, in written form these are his

25   recommendations.  Looking at these recommendations, do you

1    disagree with any of the conclusions as to the opinions

2    raised therein?

3    A.    I don't agree with some of the recommendations in

4    relationship to what I saw.

5    Q.    Which ones?

6    A.    I agree with number 1.

7          I agree with number 2.

8          I agree that number 3, the bottom paint needs to be

9    stripped and refinished, but I don't think it has anything

10   to do with the transport of the boat or anything.

11   Q.    What's the job of a marine surveyor?

12   A.    As indicated in the purpose of this survey report, we

13   were to complete an inspection of the vessel and render an

14   opinion as to present condition and value, an opinion as

15   to the cause of the damage found, and an opinion as to the

16   repair cost.

17   Q.    And it's her condition and value, correct?

18   A.    Yes, the vessel's.

19   Q.    What difference would it make whether bottom paint

20   affected transport if we're trying to assess the

21   condition, the overall condition and value of the vessel?

22   A.    Part of our job is to also determine the cost.

23   Q.    Right.  I just said, do you disagree with any of the

24   repair recommendations made by Mr. Greaves?

25   A.    Just as far as condition goes?

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   As far as these 12 recommendations go, is there any

2   recommendation that you disagree with?

3   A.   No.   They all can be done, certainly.

4   Q.   So every recommendation you agree with?

5   A.   Yes.

6   Q.   And you also agree in your report with number 6,

7   correct, regarding the improper installation of the

8   exhaust?

9   A.   I don't believe so because the engine exhaust system

10   had been disassembled when we inspected the boat.

11   Q.   Really?

12   A.   Yes.   The engines, actually the heads were off and

13   the exhaust systems would have to be removed in order to

14   get the heads off.

15   Q.   Can you turn to page 5 of your report?

16   A.   Yes.

17   Q.   Eighth paragraph.

18   A.   Yes.

19   Q.   It says, The installation of the water separating

20   lift mufflers has reduced the accessibility to the trim

21   tab oil reservoirs and rutter stuffing boxes in

22   relationship to the previous muffler system.

23   A.   Yes.

24   Q.   So Mr. Greaves in his report talked about the

25   difficulty that the new installation made -- in fact his

1    exact words were -- in fact, we can look at them.

2         "New exhaust installation prohibits access to

3    interior transom area, rudder ports, strut bolts and trim

4    tab reservoir without system removal."

5         Isn't that the exact same conclusion you reached?

6    A.    That's correct.

7    Q.    So you agree with that too?

8    A.    I agree with that statement, yes.

9    Q.    But how could you have come to that conclusion, you

10   just said that it wasn't there when you looked at it?

11   A.    The question that I believe -- my understanding of

12   your question was about the exhaust system.  This

13   particular statement of Mr. Greaves and also of myself in

14   this report relates to the exhaust canister, which is a

15   part of the exhaust system.

16   Q.    Actually, the question was the installation of the

17   exhaust system.

18   A.    Correct.

19   Q.    Where it was installed impeded the access to the

20   engine compartment.

21   A.    I misunderstood your question.  My understanding --

22   if the question is, is the exhaust canister in this

23   particular location, then yes, I agree, it obstructs the

24   ability to access other mechanical portions of the boat

25   that need to be maintained.

PDF created with pdfFactory trial version www.pdffactory.com

Vol. IV - Page 621

1   Q.    Okay.  Now, when we first talked this morning, I

2   believe you had said that you hadn't received any

3   education in naval architecture, construction,

4   installation, mechanics, engineering, et cetera.  What was

5   your specific role in this survey that you performed that

6   was the substance of your report that was submitted to

7   Mr. Rotondo?

8   A.    First off, the question that you asked me earlier was

9   about instruction.  I have no formal instruction.  That

10  doesn't mean I don't have any education in those areas.

11       My job on this assignment was to inspect the hull,

12  complete the survey on the hull.  And Jerry Starczowsky,

13  my employee, completed the inspection of the engine and

14  the engine parts.

15  Q.    So you provided an opinion to Mr. Rotondo as to the

16  cause of damage?

17  A.    For the hull, yes.

18  Q.    You didn't mention hydrolocking?

19  A.    No, not in my testimony this morning.

20  Q.    It's in your report.

21  A.    Yes.  My employee Jerry Starczowsky was in charge of

22  the mechanical inspection and the mechanical opinions.

23  Q.    You're in charge of the value portion?

24  A.    I'm in charge of the entire project.  I'm supervising

25  my employee.  I wrote the report.  But the inspection of

1   the mechanical parts was completed by Jerry Starczowsky

2   and the opinion on the mechanical parts is from Jerry

3   Starczowsky, my employee, under my supervision.

4   Q.   Does it say that in your report?

5   A.   Yes.

6   Q.   Where?

7   A.   Well, in the surveyor's worksheet it states it in

8   notes.

9   Q.   Where?

10  A.   In the notes section of the surveyor's worksheet,

11  page 3.  That's the enclosure of surveyor's worksheet

12  where the estimates are.

13  Q.   I see the estimate was prepared by Mr. Starczowsky.

14  A.   For the mechanical portion.

15  Q.   What about the report?

16  A.   The report has both of our signatures on it.  And I'm

17  the one who is writing the report.

18  Q.   Is there anything in the report, the body of the

19  report, that makes clear that Mr. Starczowsky did the

20  engine analysis and engine inspection and you did

21  something else?

22  A.   I'm not sure.

23  Q.   Can you find it?

24  A.   I am not finding a specific reference in the report

25  stating that.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   Is there a general reference anywhere in there?

2  A.   The only general reference that I could say is Jerry

3  Starczowsky's signing off on it as the ABYC gasoline

4  engine certified technician.

5  Q.   Isn't that just a listing of what his qualifications

6  are?

7  A.   Yes.

8  Q.   Well, okay.  When you came up with a value, I believe

9  you told Mr. Rotondo this vessel was bristol?

10  A.   Yes.

11  Q.   And just so I don't misquote you, what was your

12  definition of bristol?

13  A.   Better than average, excellent condition, shiny like

14  new, something along those lines.

15  Q.   First thing you said was better than average,

16  correct?

17  A.   Yes.

18  Q.   And then you said excellent condition and then shiny

19  like new?

20  A.   Yes.

21  Q.   At least one of those three appears to be in conflict

22  with the other, would you agree?

23  A.   No.

24  Q.   You used the term bristol to mean excellent

25  condition, correct?

1    A.    Yes.

2    Q.    Not better than average?

3    A.    Better than average could be excellent condition.

4    Q.    Could be, but isn't the real definition of bristol --

5    in fact, where did you get that definition?

6    A.    It's right in the BUC book.  The term bristol is in

7    the BUC book.

8    Q.    When's the first time you heard that term?

9    A.    Oh, probably when I was eight or ten years old.  I'm

10   56 right now.  Forty-some years ago.

11   Q.    Forty-eight years ago?  What was your understanding

12   then?

13   A.    Excellent condition, above average.

14   Q.    Would you agree the definition of bristol is well

15   found, excellent in all respects and seaworthy?

16   A.    I don't know that to be a fact.  I don't know that I

17   saw in the BUC book seaworthy.  And I don't know that I've

18   seen it in any other texts seaworthy.  Seaworthy is an

19   extremely broad term, has a lot more to do than just a

20   boat.

21   Q.    You're a marine surveyor, right?

22   A.    Yes.

23   Q.    And to you and I seaworthy has a specific meaning,

24   correct?

25   A.    I have my idea of what seaworthy is.  I'm not sure I

 1   know what yours is.

 2   Q.   What's seaworthy?

 3   A.   Seaworthy has to do with the fitness of a vessel for

 4   any particular voyage or use that it's defined for, but

 5   seaworthy is affected by the actions of the crew on board

 6   the vessel at any time during the voyage.  So it is a very

 7   broad term and it's one that we do not use in any reports

 8   that we issue.  When we inspect a hull, we never refer to

 9   it as being seaworthy.

10   Q.   Let's use the first definition you used, which was --

11   help me out again, fit for its use?

12   A.   For seaworthy?  A vessel that's fit for its intended

13   or specified purpose.

14   Q.   What was the specified purpose of this vessel?  What

15   is she?

16   A.   Recreational boat.

17   Q.   Which means?

18   A.   It's used for recreational purposes.  It's not

19   engaged in congress.

20   Q.   And by "use," we mean transport on navigable waters?

21   A.   Well, this boat could be used on more than navigable

22   waters.  While afloat.  Use while afloat.

23   Q.   While moving?

24   A.   Well, okay.  Moving preferable under her own power.

25   Q.   Motor boat, right?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Right.

2    Q.    Not a row boat?

3    A.    Yes.

4    Q.    When you assessed this vessel's condition as bristol,

5    was she in fact capable of any usage at all for her

6    intended purpose?

7    A.    The engines would have to have been --

8    Q.    As -- yes or no, as you found her during your

9    inspection, was she capable of her intended use?

10   A.    At that moment in time, no.

11   Q.    Now, when you went ahead and did your conditioned

12   calculation, you actually increased the value of the

13   vessel by a quarter, correct?

14   A.    Yes.  Well, in the books' value, yes.  In the books.

15   Q.    You took the BUC or NADA or ABOS value, correct?

16   A.    Yes.

17   Q.    And you adjusted it up?

18   A.    That's correct.

19   Q.    For the vessel's condition?

20   A.    Yes.

21   Q.    Meaning she was incredibly well-maintained?

22   A.    Yes.

23   Q.    Shiny like new?

24   A.    Yes.

25   Q.    And I think you noted in your report, just so I'm

PDF created with pdfFactory trial version www.pdffactory.com

1    clear, The vessel's in excellent condition except for the
2    current engine condition?
3    A.    Pardon me?
4    Q.    Except for the current engine condition.  The first
5    line of the opinion, page 4.
6    A.    Yes.
7    Q.    So in your experience, how many valuation surveys do
8    you do a year?
9    A.    Personally, around 60, 80, somewhere in there.
10   Q.    How many does your firm do a year?
11   A.    About 850.
12   Q.    A lot, right?
13   A.    Yes.
14   Q.    What's the value of a fiberglass recreational yacht
15   with inoperable engines, generally?  How significantly
16   does that affect value?
17   A.    Oh, it can have a fairly significant impact on value.
18   Q.    What's fairly significant?
19   A.    Well, depending on the overall condition of the boat
20   and the engines, if the engines are inoperable, it could
21   drop the value of the vessel not dollar for dollar for the
22   cost to repair, but somewhere in that dollar figure, that
23   frame, that dollar frame of mind, it will drop the value.
24   Q.    Mr. Davis, it's your testimony that a vessel -- a
25   motor boat with inoperable engines is diminished in value

PDF created with pdfFactory trial version www.pdffactory.com

1    only by the amount of repairs -- actually less the amount

2    of repairs?

3    A.    The antithesis is equally true.  If I have a boat

4    that's worth $60,000 and I put $20,000 worth of repair and

5    electronics, that doesn't give me an $80,000 boat.

6        If I have a $60,000 boat that needs $10,000 in engine

7    repairs, just because I put $10,000 in repairs doesn't

8    make the $60,000 boat worth $70,000.

9    Q.    Right.  But in your great experience, are there a lot

10   of buyers for boats that don't go anywhere unless they

11   need repairs?

12   A.    There are buyers for them, but not a lot.

13   Q.    Supply and demand, doesn't that mean the values would

14   be even more reduced?

15   A.    Given the -- the values can get reduced based upon

16   the circumstances of any particular sale.  The valuation

17   computations that I have done are based on a willing buy,

18   a willing seller with no undue influences.

19   Q.    So, actually, the opinion you have here isn't even

20   this boat.

21   A.    It is for this boat.

22   Q.    Let me do this.  Can you provide me your best opinion

23   as to the current value of this vessel in the condition

24   that you saw her in rather than the condition that you

25   hypothetically placed her in?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.    Today?  Is that the question you're asking me?

2  Because I don't have any materials here to be able to

3  compute that today.

4  Q.    Give me your educated analysis, having done this for

5  40 years, you're the head of the largest marine surveying

6  company in the country, you do this 80 times a year

7  personally.  You've got, as an attachment, the values,

8  right?

9  A.    Yes.

10  Q.    You should be able to extrapolate based on your

11  experience, consistent with the guidelines that NAMS

12  provides you.

13  A.    So you're asking me to extrapolate based upon the

14  inspection that was done in 2004.

15  Q.    Yes.

16  A.    Not today sitting here in this chair.

17  Q.    What was the value -- what was the actual value of

18  the vessel, as you saw it?

19  A.    Well, the assumptions in the value that I presented

20  here include that the equipment and cushions and

21  accessories that have been removed from the boat, the

22  electronics, et cetera, that were in the basement of

23  Mr. Mains' house are available and can be put back.  Are

24  you asking me to make my value determination on exactly

25  what I saw at the time I was on that boat with all of that

1    equipment gone?

2    Q.   I want you to render an opinion consistent with what

3    you wrote word-for-word on page 2 of your report.   Under

4    "Purpose," it said, "To complete an inspection of the

5    subject vessel and render an opinion as to her present" --

6    is that what you used, the word?

7    A.   Yes.

8    Q.   -- "present condition and value."

9         Isn't it true that the value that you opined on on

10   page 4 is inconsistent with the purpose you stated on

11   page 2?

12   A.   No, I don't think it is.

13   Q.   What does "present" mean?

14   A.   "Present" means what were the facts at hand at the

15   time I looked at that boat.

16   Q.   What does "condition" mean?

17   A.   What condition was it in at the time I looked at that

18   boat.

19   Q.   So facts of the time, condition when you saw it.   Is

20   the opinion that you express on page 4 of 6 consistent

21   with what you just told me?

22   A.   Yes.

23   Q.   Read the first word of the second sentence in

24   Opinion.

25   A.   Once.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    What does that word mean to you?

2    A.    Upon.  To be.  Something along those.

3    Q.    To be.

4    A.    Yes.

5    Q.    Something that happens in the future?

6    A.    Yes.

7    Q.    Right?  That's not present.

8    A.    Well, there are many definitions to "present."  If

9    the definition is present being here, that's what I'm

10   using.  Given these circumstances that all of this

11   equipment, although it's not on the boat, is present, the

12   radar, the microwave, the cushions, all of those things

13   were not on the boat when I looked at it but they were

14   present in the basement of Mr. Mains' house.

15   Q.    What about the engines?

16   A.    The engine blocks were present.

17   Q.    Okay.

18   A.    Other parts of the engine were in Mr. Mains'

19   basements, so they are present.

20   Q.    Fine, engine blocks were present.  Let's go to the

21   value of those engine blocks.  What type of engines?

22   A.    7.4-liter MerCruisers.

23   Q.    Wet liner cylinders or dry?

24   A.    I'm not the mechanical person.

25   Q.    I understand that Mr. Starczowsky did the mechanical

PDF created with pdfFactory trial version www.pdffactory.com

1  component, but I presume, since you testified that the

2  most significant factor affecting value was the

3  operability of the engine, and you just said the engine

4  blocks are there so they're present, you said you were

5  going to assess the condition of the parts presents.  What

6  was the condition of that engine block?

7  A.    The heads were removed.  There was oil and water

8  present on top of the cylinders.  There was rust present

9  on the valves and on the heads.  There was scoring in the

10  cylinder walls.

11  Q.    Okay.  Now, all the other stuff can be wiped off,

12  right?

13  A.    What other stuff?

14  Q.    Oil on top of whatever, okay.

15      Rust can be scaled off.  Rust isn't normally fatal,

16  correct?  Depends on where it is?

17  A.    The engines need to be rebuilt.

18  Q.    Okay.  You saw the scoring, right?

19  A.    Yes.

20  Q.    With your own eyes?

21  A.    Yes.

22  Q.    How did you do that?

23  A.    Looked at it with my eyes.

24  Q.    Looked at it?

25  A.    Yes.

1    Q.   What did you think when you saw that scoring?

2    A.   That there was water in the engine.

3    Q.   Okay.  Is that it?

4    A.   Yes.

5    Q.   You're a professional surveyor.  I think your

6    qualification actually is, if I get this right, you're a

7    fellow of the American --

8    A.   -- College of Forensic Examiners.

9    Q.   Fellow of the American College of Forensic Examiners?

10   A.   Yes.

11   Q.   What is a forensic examiner?

12   A.   It's our job to look at things that are broken and

13   determine why they broke.

14   Q.   Okay, that's true.

15        And then look at your report, page 2, first

16   subordinate clause, what does it say?

17   A.   What do you mean by "first subordinate"?

18   Q.   Sorry.  After the first comma.

19   A.   What line is it that you're referring to?

20   Q.   There's only one sentence under Purpose on page 2.

21             THE COURT:  You only said page 2.  You didn't

22   say under Purpose.

23             MR. NIKAS:  I apologize.

24   A.   Where are we at again?

25

PDF created with pdfFactory trial version www.pdffactory.com

Vol. IV - Page 634

1   BY MR. NIKAS:

2   Q.   Under Purpose.

3   A.   Yes.

4   Q.   That's the reason you were there, right?

5   A.   Correct.

6   Q.   So this was the whole point about going out there?

7   A.   That's correct.

8   Q.   Okay.  After the comma.

9   A.   Yes.

10  Q.   When what did you say your job was?

11  A.   An opinion as to the cause of damage(s) found.

12  Q.   An opinion as to the cause of the damage found?

13  A.   Yes.

14  Q.   That was your job?

15  A.   Yes.

16  Q.   I assume Mr. Rotondo or somebody else -- in fact, I

17  think you actually say Deborah Russo, right?

18  A.   That's correct.

19  Q.   At Mr. Rotondo's firm contacted you on behalf of the

20  firm and asked you to do what's found under Purpose,

21  correct?

22  A.   That's correct.

23  Q.   Is scoring in a cylinder damage?

24  A.   Yes.

25  Q.   Significant damage, isn't it?

1    A.    It can be, yes.

2    Q.    You know what the tolerance of these cylinders to the

3    pistons are?

4    A.    No.

5    Q.    Did you see?

6          You looked?

7    A.    Yes.

8    Q.    Were they extremely tight tolerances?

9    A.    I didn't measure the tolerances.

10   Q.    I didn't ask you what the measurement was.  Were they

11   extremely tight?

12   A.    Well, a piston rides inside the cylinder with three

13   rings.  So the rings are there to -- well, there's an oil

14   ring, a compression ring, and another oil ring.  So those

15   tolerances are going to be close, they have to be.

16   Q.    Very close, right?

17   A.    Yes.

18   Q.    So scoring in a cylinder, right, would indicate what?

19   A.    There was water present on the top of the piston --

20   Q.    What causes scoring?

21   A.    There can be a number of things that cause scoring.

22   Q.    Actually, I'll ask you something and you agree with

23   me.  Not what caused the conditions that allowed the

24   scoring to occur, but what causes scoring:  Isn't it true

25   that scoring can only occur, at least in an engine like

1    this, through metal-to-metal contact or metal-to-debris

2    contact?

3            MR. ROTONDO:  There's about four questions

4    there.  Can we have one question?

5    BY MR. NIKAS:

6    Q.   Doesn't scoring indicate metal-to-metal or

7    metal-to-foreign body conduct?

8    A.   I will agree that there's a foreign substance in

9    there that is causing the scoring, yes.

10   Q.   Has to be a foreign substance of grit or something,

11   abrasive substance?

12   A.   Something that has a greater hardness than the liner

13   of the cylinder, which is either steel or chrome, which is

14   pretty tough stuff.  Chrome is very hard.

15   Q.   This is a marine engine, right?

16   A.   Yes.

17   Q.   Marine engines operate for long periods at a time,

18   correct?

19   A.   Yes.

20   Q.   So they're designed to be reliable, correct?

21   A.   Yes.

22   Q.   And do you know enough about engine operation to

23   determine whether the extent of the scoring that you saw

24   would have had a significant impact on the operation of

25   the engines?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.    No.

2   Q.    So when you looked into the engines and you noticed

3   the scoring, that was it?  You didn't think about anything

4   else?

5   A.    Well, we looked at more than just the pistons and

6   cylinders.

7   Q.    Did you ask yourself what caused this damage?

8   A.    Yes.

9   Q.    So you did, right?

10  A.    Yes.

11  Q.    I thought you would have.  It doesn't make sense,

12  with your background, not to have.  What did you

13  determine?

14  A.    It's our conclusion that the engine had become

15  hydrolocked.  Water on top of the pistons, water won't

16  compress so the engine won't turn over.

17  Q.    Are you familiar with friction?

18  A.    Yes.

19  Q.    For friction to occur, you need what?

20  A.    We have to have close tolerance, things have to be

21  very close together without any lubrication.

22  Q.    You just need movement, right?

23  A.    Yes.

24  Q.    And in fact, in your report -- let me find it.

25        On page 5 again -- sorry to bring you back to that

1    page.  The second to last paragraph, right?

2    A.    Yes.

3    Q.    You blame the hydrolocking and the water ingestion on

4    the flushing, correct?

5    A.    That's correct.

6    Q.    And you in fact go so far to say the instructions

7    weren't followed, right?

8    A.    Yes.

9    Q.    You do say that, right?

10   A.    Yes.

11   Q.    So you consulted the instructions, right?

12   A.    Yes.

13   Q.    What instructions did you consult when forming this

14   opinion?

15   A.    There's a set of instructions from Mercury for fresh

16   water flushing on water lift muffler systems.  And then

17   there's a set of instructions from Mercury for flushing --

18   fresh water flushing of this engine with the water

19   separating water lift muffler system.

20   Q.    What instructions did you consult?

21   A.    Both.

22   Q.    And where did you find them?

23   A.    The water lift muffler instructions, we actually had

24   those in our office.

25          The water separating water lift muffler instructions

1  were supplied to us by Deborah Russo.

2  Q.   Okay.  What instructions were supplied with the boat?

3  A.   As I understand it, the water lift muffler

4  instructions were supplied with the boat.

5  Q.   Wow.  Sea Ray was so prescient that three years

6  before that exhaust system was installed on board this

7  boat they happened to put a copy of those instructions on

8  board for the owner?

9  A.   I think you're misunderstanding.  I said for the

10  water lift muffler, which was the muffler system that was

11  originally on that boat.  I believe that the instructions

12  were shown to us by Mr. Mains when we were in the basement

13  of his house.

14  Q.   Were you the picture taker?

15  A.   Yes.

16        MR. NIKAS:  May I approach?

17        THE COURT:  You may.

18  BY MR. NIKAS:

19  Q.   These are your photographs I believe marked

20  Defendant's Exhibit 20 through 35.  And these are color so

21  they're probably more legible.

22     See if you can find something that shows what type of

23  exhaust was installed on board.

24  A.   There's no photographs of the exhaust system that we

25  took.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   Did you take any pictures of the engine?

2    A.   There's a photograph of the engine, that's

3    Exhibit 20-56, with the sheets over the top of it.

4    Q.   All right.  I'm informed by my colleague that maybe

5    you should look at page 2 of your report, maybe that will

6    help refresh your recollection.

7    A.   Page 2 of --

8    Q.   Your report.  First full sentence.

9    A.   Yes.

10   Q.   Maybe you could read it to yourself.

11   A.   Yes.

12   Q.   Does it help refresh your recollection that when

13   built this boat had a collector exhaust?

14   A.   That is a water lift muffler.

15   Q.   Do you have a distinction between -- in your sentence

16   you say the exhaust system mufflers were changed to water

17   separating?

18   A.   Yes.  That's a different muffler than the water lift

19   muffler.

20   Q.   How does Sea Ray describe this exhaust system?

21   A.   I don't have any paperwork from them on what words

22   they used.

23   Q.   How many Sea Rays have you inspected?

24   A.   Quite a few.

25   Q.   Over a hundred, I assume, in your career?

1    A.    Yes.

2    Q.    Over a couple hundred?

3    A.    Yes.

4    Q.    I'd like to show you a document just to refresh your

5    recollection and for no other purpose.

6              MR. ROTONDO:  Can I ask if this document has

7    been marked as an exhibit?

8              MR. NIKAS:  It has been.

9                 (Pause.)

10   BY MR. NIKAS:

11   Q.    How does Sea Ray identify these mufflers or this

12   exhaust?

13   A.    Is the diagram in this photograph the muffler system

14   that you're referring to?

15   Q.    Yes.

16   A.    On one page that you've given me there's a diagram

17   and it says a water lift exhaust system.

18        And on the other page it's a collector or horizontal

19   collector exhaust system.

20   Q.    Let's use those names.  When built at the factory,

21   what exhaust system was on this boat?

22   A.    The horizontal collector.

23   Q.    When you saw it, it had a water lift, correct?

24   A.    It had a water lift -- what was the term I used?

25   Q.    The term you used was water lift-type muffler.

1  Page 5 of your report, second paragraph.

2  A.    It's a water lift exhaust -- water separating water

3  lift muffler is what it had on it.

4  Q.    Can you show me where you use that terminology

5  anywhere in your report?

6  A.    Page 3 of 6, last paragraph, second sentence.

7  Q.    Water separating lift type.  All right.

8        So if you use the flushing procedures for the exhaust

9  system that was installed on this boat at the factory,

10 what would happen?

11 A.    Are you referring to the original exhaust system?

12 Q.    Yes.  I'm referring to your paragraph on page 5 of 6

13 where you say, Water ingestion during engine flushing is

14 probable if the MerCruiser flushing instructions for

15 engines with water lift type --

16            MR. ROTONDO:  I object as being outside of the

17 scope of direct.

18            THE COURT:  He says he's referring to

19 something -- what paragraph are you on on page 5 of 6?

20            MR. NIKAS:  Second to the last paragraph on

21 page 5.

22            THE COURT:  And your objection, Mr. Rotondo?

23            MR. ROTONDO:  Outside the scope of direct.

24            MR. NIKAS:  Goes to value, Your Honor.

25            THE COURT:  That's your basis?  Overruled.  Your

1    argument's overruled.  Objection's sustained.

2    BY MR. NIKAS:

3    Q.   Let's go back to the original value question then.

4         The engine blocks, if the hydrolocking occurred or if

5    the scoring occurred during hydrolocking, when this engine

6    was flushed, were the engines running?

7    A.   No.

8    Q.   If the engines weren't running, how did the scoring

9    happen?

10            MR. ROTONDO:  Objection, again outside the scope

11   of direct.

12            THE COURT:  Do you want to give me something

13   that fits within the scope?

14            MR. NIKAS:  He stated on direct that these

15   engines should be replaced and remanufactured.  I'm going

16   to establish that the damage --

17            THE COURT:  Don't tell me what you're going to

18   establish.  That's what he stated and that's what you're

19   basing --

20            MR. NIKAS:  Yes.

21            THE COURT:  Objection's sustained.

22   BY MR. NIKAS:

23   Q.   You talked about remanufactured engines, correct?

24   A.   Yes.

25   Q.   You said that was great because there was someone --

PDF created with pdfFactory trial version www.pdffactory.com

1    what was the term?

2    A.    One, there's a warranty.

3    Q.    Right, a warranty.  Who is the warranty offered by?

4    A.    Depends on who remanufactured the engines.  We used

5    remanufactured engines from MerCruiser in our estimate.

6    Q.    And the cost of the remanufactured engines you found

7    was $6,000 apiece or so?

8    A.    Roughly $12,000.

9    Q.    Installation?

10   A.    That's included.

11   Q.    Exhaust?

12   A.    Putting it back together is included.

13   Q.    Is there any effect on value caused by the

14   replacement engines?

15   A.    Well, the remanufactured engines -- I think I have

16   reference in here.

17   Q.    You'd have to disclose that, right, when you sold it?

18   A.    I don't know that you have to disclose anything, but

19   I think you should disclose it.

20   Q.    Well, do boats have an odometer?

21   A.    They have an hour meter.

22   Q.    They have an hour meter.

23         So let's say in 2001 the boat was three years old,

24   right?

25   A.    That's correct.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    And with remanufactured engines, the hour meter would

2    show --

3    A.    The hour meter won't change.  The hour meter at the

4    time we looked at the boat was roughly 150 hours.  There's

5    a different between the two engines but roughly 150 hours.

6    And the remanufactured engine would have zero hours on it.

7    It's similar to a brand new engine but it isn't because

8    some used parts are used in remanufactured engines.

9    Q.    What used parts are reused?

10   A.    It's up to whoever the remanufacturer is.  Sometimes

11   they'll use an old engine block.  This estimate that we

12   prepared is predicated on returning the blocks that are in

13   the engine, it's called a core credit, it's a thousand

14   dollars per engine.

15   Q.    I'm sorry?

16   A.    Returning the engines that are there, just the blocks

17   have to be sent back to get a core credit.

18   Q.    Your estimate actually was based on using these

19   engines?

20   A.    No, no, no, no, no.  The estimate is based upon new

21   remanufactured engines complete.  But you have to

22   return -- you have to send the old engines back to the

23   factory, the person that you bought them, because they'll

24   rebuild those themselves.  But you're not using those over

25   again, you're getting all different components.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Does the price you quoted include a core?

2    A.    Yes, it includes a core credit.

3    Q.    Did you disclose that?

4    A.    That's part of remanufacturing.  That's how you do an

5    estimate for remanufactured engines.

6    Q.    What happens -- let's say I want to return brake

7    drums, brake disks, something with a core deposit.

8    A.    Yes.

9    Q.    And the component is too damaged to be rebuilt.  What

10   happens?

11   A.    There would be an increase in the cost because you

12   wouldn't get the core credit.

13   Q.    In this case, how much would the cost have increased

14   if these engines could not be remanufactured?

15   A.    The core credit is a thousand dollars per engine.

16   Q.    Okay.  And what led you to believe that these engines

17   could be submitted as cores?

18   A.    Well, we wrote this estimate two ways.  We also wrote

19   it to rebuild the existing engines.  It's our opinion that

20   the engines can be rebuilt so there shouldn't be any

21   problem with the core credit.

22   Q.    It's your opinion that these engines could be

23   rebuilt?

24   A.    Yes.

25   Q.    How?

1    A.    Same way you rebuild any engine.

2    Q.    I don't want to know about any engine.  I'm very

3    limited.  I can only talk about this one.  How would you

4    rebuild this one?

5    A.    You'd remove the engine blocks, take the parts out of

6    them.  Get a debris machine and clean all of the block

7    parts.  Clean up the crank shaft and camshaft.  Put in new

8    bearings, new pistons with new rings.  And put it all back

9    together and off you go.

10    Q.    What about the scoring?

11    A.    That's part of the machining, honing down the

12    cylinder walls.

13    Q.    So what pistons would you put in there?

14    A.    Well, depending on what the machining was, you can

15    either go with slightly oversized or from 10-thousandths

16    to 20- or 30-thousandths, depending what the machining

17    turned up.

18    Q.    You'd have to put in oversized pistons, right?

19    A.    Yes.  Depending on how badly -- how much machining

20    has to be done.  If you're just honing the cylinders,

21    which means you're just cleaning the inside of them, you

22    could go back with the original pistons.  But if the

23    damage is severe where you have to take down more

24    material, then you're going to have to go with oversized

25    pistons if you rebuilt this engine.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    You saw the scoring?

2    A.    Yes.

3    Q.    Did you believe from the scoring that you saw that

4    the cylinders could be honed?

5    A.    Yes.

6    Q.    That's your opinion?

7    A.    Yes.

8    Q.    When considering value, you also have to consider the

9    marketplace, correct?

10   A.    Yes.

11   Q.    And just like with automobiles, there are certain

12   automobiles that have a bigger demands than others,

13   correct?

14   A.    Yes.

15   Q.    And you have to consider those factors when

16   determining the value, right?

17   A.    Yes.

18   Q.    And in cases where boats have known problems, you

19   have to adjust for that, correct?

20   A.    Yes.

21   Q.    Big Uniflite built in the early '70s, super big

22   blisters, everybody knows it, what happens to the value?

23   A.    Value goes down.

24   Q.    When considering value in this case, were there any

25   factors that you considered regarding the market or

1  regarding demands or any factors that would affect demand?

2  A.    Those factors are considered in the valuation

3  computation because I'm using actual selling prices so I

4  know what that model with those engines is selling for at

5  the time the value was completed, so those market

6  considerations are already taken into account.

7  Q.    So you never adjust personally for market

8  considerations?

9  A.    I will make an adjustment for market considerations

10 if I do not have current selling prices for the particular

11 boat that I'm dealing with.  But if I've got current

12 selling prices, then I've got a true reflection of what

13 the market is telling me it will sell for.  Those are

14 actual selling prices.

15 Q.    How many exemplars did you have?  How many examples

16 of other sold boats did you rely on?

17 A.    It's in my report.  There are four boats used for

18 market listings, that's asking prices.  And I had three

19 boats in that time frame that I had selling prices on.

20 Q.    Over about a year and something months -- actually,

21 more than a year and a half you had three examples to look

22 at, right?

23 A.    The data was pulled up at the time the report was

24 written.

25 Q.    Right.  And the report was written in when?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    October of 2004.

2    Q.    Okay.  And your range of sales goes from April of

3    2003 to October of 2004?

4    A.    Actually, September of 2004.

5    Q.    Okay.  Nine months.  That's a year and a half, right?

6    A.    Yes.  Those are the most current sales for that

7    particular model that I could pull up.

8    Q.    I'm not disputing that.  So you had three exemplars

9    with which to compare this boat, right?

10   A.    Yes.

11   Q.    Then you also compared this boat with four other

12   boats that were actually offered for sale, correct?

13   A.    Yes.

14   Q.    Was this boat really comparable to those?

15   A.    It's the same model, same engines.  So it's

16   comparable, yes.

17   Q.    Same condition?

18   A.    Well, the particular boats that I have listed there,

19   there's one at 250 hours, which is roughly 100 more hours

20   of use than the subject.  And the one with the most number

21   of hours is 400 hours.  So I would say all of these boats

22   have more use on them than the subject boat.

23   Q.    That's right.  In fact, isn't it true that this boat

24   had less than half and some more usage than the highest

25   hour boat and had, just like you said, a hundred fewer

PDF created with pdfFactory trial version www.pdffactory.com

1   hours than the next closest boat?

2   A.   Of the market value boats, yes.

3   Q.   Of the boats you compared it with?

4   A.   On the market listing boats, yes.

5   Q.   You testified to Mr. Rotondo, and I didn't catch it

6   all, something about disseminating information.  Can you

7   refresh my recollection as to what that was?

8   A.   I'm sorry, I don't understand the question.

9   Q.   One of your jobs, you said you disseminated

10  information maybe from one of your organizations or one of

11  your committees?

12  A.   I disseminate information to other yacht and small

13  craft surveyors that are members of the National

14  Association of Marine Surveyors as a part of my duties as

15  chair of the Yachts and Small Craft Technical Committee.

16  Q.   What kinds of stuff do you disseminate?

17  A.   Actually, I publish a web site for the surveyor

18  members.  And the information on there is links to

19  organizations both in the United States, Canada, Britain,

20  and the European union where their duties as yachts and

21  small craft surveyor would put them in contact with the

22  rules or regulations or whatever that these organizations

23  disseminate.  I publish information guidelines for

24  surveyors that are part of NAMS structure or just general

25  guidelines.  Sometimes I -- I believe I have some NAVECS,

1  which are U.S. Coast Guard publications pertaining to

2  particular things with particular types of vessels, it's

3  technical publications.  Things along those lines.

4  Q.   So you've got a pulse on the entire recreational

5  marine industry?

6  A.   I try to keep in touch, yes.

7  Q.   If you're distributing this information out, you're,

8  gosh, a member of 20 or so committees and organizations?

9  A.   Yes.

10  Q.   And you're distributing information out to other

11  surveyors, right?

12  A.   Yes.

13  Q.   And then one of the things that you're considering,

14  right, one of the biggest jobs of a surveyor is to issue

15  condition and value surveys?

16  A.   It is a function of the job.  It's not the biggest

17  job for us, but it is a function of being a marine

18  surveyor.

19  Q.   Okay.  What do you know about the installation of

20  water lift mufflers into Sea Rays?

21          MR. ROTONDO:  Objection, outside the scope.

22          THE COURT:  Can you tie it to the scope somehow?

23          MR. NIKAS:  I can, if I can just get --

24          THE COURT:  No, you tell me first, what are we

25  talking about in terms of the direct?

PDF created with pdfFactory trial version www.pdffactory.com

 1          MR. NIKAS:  It's going to go to value as to the

 2    suppression of demand in the marketplace due to the 2001

 3    conversion to the water lift muffler.

 4          THE COURT:  As long as it stays narrowly on that

 5    track.

 6    A.   Can you repeat the question?

 7    BY MR. NIKAS:

 8    Q.   Sure.

 9         What do you know about Sea Ray's adoption of the

10    water lift muffler in 2001?

11    A.   All I know is that they started installing water lift

12    mufflers.

13    Q.   Do you know why?

14          MR. ROTONDO:  Objection, Your Honor.

15          THE COURT:  Sustained.

16    BY MR. NIKAS:

17    Q.   You're a member of BoatU.S., right?

18    A.   Yes.

19    Q.   In fact, did the ABYC or the consumer -- or general

20    public -- what was it, representative?

21    A.   How their rules are set up, yeah, I would essentially

22    be the public, representing the public.

23    Q.   Because the ABYC, the membership is divided amongst

24    architects, engineers, licensed officers, right?

25    A.   Not in ABYC it's not, no.

1    Q.    How is ABYC divided?

2    A.    The structure for ABYC, it's set up to represent

3    essentially three segments of the industry.  One is the

4    manufacturer, they participate.  So figure it's one-third.

5    This is the ideal:  One-third manufacturer; one-third

6    government or industry, maybe insurance would be part of

7    that; and then one-third public.  And all of the

8    subcommittees are supposed to have that kind of complement

9    so when you're making these safety standards, essentially,

10   that you don't have the agenda of any one segment of the

11   industry unduly influencing the safety standard.  That's

12   the goal.

13   Q.    Were you president of the ABYC?

14   A.    Was I president?  No.  I was on their board of

15   directors and I'm on their technical board.

16   Q.    Board of directors, that's big?

17   A.    Yes.

18   Q.    In fact, ABYC is probably the oldest organization of

19   its kind in the U.S., right?

20   A.    Yes, they are.

21   Q.    In fact, ABYC actually promulgates the standards used

22   by most manufacturers, right?

23   A.    Yes, they do.

24   Q.    In fact, MerCruiser actually states that they adhere

25   to ABYC standards, don't they?

1   A.    I don't know specifically if MerCruiser does say

2   that.

3   Q.    You're on the technical committee?

4   A.    Yes.

5   Q.    So the ABYC actually publishes technical standards,

6   right?

7   A.    That's correct.

8   Q.    And they print them?

9   A.    Yes.

10  Q.    And they publish them for use by boat builders,

11  engine manufacturers, ship yards, mechanics, surveyors,

12  attorneys?

13  A.    Yes.

14  Q.    Do you look at all the standards that come out?

15  A.    Yes, I do.

16  Q.    And in fact, in the NAMS guidelines for preparation

17  of a survey, they actually recommend that you look at the

18  ABYC guidelines, correct?

19  A.    That's correct.

20  Q.    In fact, is it the first thing listed, I think?

21  A.    It is 2(a), so the first one in the sublist.

22  Q.    You know this boat had a water ingestion problem,

23  right?

24           MR. ROTONDO:  Objection.

25           THE COURT:  Sustained.

1  BY MR. NIKAS:

2  Q.   When you inspected the boat, you saw that it ingested

3  water, right?

4  A.   There was water on top of the pistons.  It had

5  ingested water, yes.

6              THE COURT:  Are we still on the track for

7  valuation?  Because it's taking a long time to get to the

8  point.

9              MR. NIKAS:  Well, let me skip ahead and I'll

10 actually move this along.

11             THE COURT:  It's 12:09, by the way.

12             MR. NIKAS:  12:15 is my --

13             THE COURT:  Yes.

14 BY MR. NIKAS:

15 Q.   There are ABYC standards for the exhaust, right?

16 A.   Yes, there are.

17 Q.   And they do recommend -- withdrawn.

18      Do you read BoatU.S. publications?

19 A.   Yes, I do.

20 Q.   Do you read BoatU.S. Consumer Protection Bureau

21 bulletins and reports?

22 A.   Yes.

23 Q.   That would be a necessary part of actually providing

24 research and background for your values, correct?

25 A.   Yes.

1    Q.    Did you ever read an article called *Engine Blocks*

2    *Choke on Water*?

3              MR. ROTONDO:  Objection, Your Honor.

4              THE COURT:  Sustained.

5    BY MR. NIKAS:

6    Q.    Mr. Davis, is BoatU.S. the largest boating

7    organization in the world?

8    A.    I don't know if they are in the world.  But they're

9    about 650,000 members, so certainly the largest in the

10   U.S.

11   Q.    And it's comprised almost entirely of recreational

12   boaters, correct?

13   A.    That's my understanding, yes.

14   Q.    And those 700,000, slightly less than, 650,000

15   members, are potential buyers in the marketplace for this

16   boat, are they not?

17   A.    Yes.

18   Q.    And if BoatU.S. were to publish something regarding a

19   defect in the condition of a boat, given the size of the

20   organization, wouldn't that have a significant impact on

21   the value of the boat in question?

22             MR. ROTONDO:  Objection.

23             THE COURT:  Sustained.

24             MR. NIKAS:  It's a hypothetical.

25             THE COURT:  Sustained.

```
1   BY MR. NIKAS:
2   Q.   Mr. Davis, in any of the committees that you serve on
3   in the organizations you belong to, any Sea Ray people on
4   those boards or those committees with you?
5   A.   Yes.
6   Q.   Who?
7   A.   Dave Marlow.
8   Q.   How many?
9   A.   How many what?
10  Q.   How many committees does he serve on with you?
11  A.   Two.
12  Q.   How long have you known him?
13  A.   About ten years.
14  Q.   Friend?
15  A.   Yes.  Personal friend, yes.
16  Q.   Good friend?
17  A.   Yeah, he's a good friend of mine.
18           MR. NIKAS:  No further questions.
19           THE COURT:  It's 12:12 so I think I'll let the
20  jurors take their break.
21           Are you going to have redirect, Mr. Rotondo?
22           MR. ROTONDO:  If I do, it will be very short.
23  I'd like to think about it over lunch.
24           THE COURT:  Okay.
25           You're not excused yet, sir.
```

PDF created with pdfFactory trial version www.pdffactory.com

1           We'll let the jurors go next door to lunch.

2           I'll have a question for counsel just in terms

3    of who the other witnesses are.

4               (Whereupon the jury left the courtroom.)

5           THE COURT:  You can step down, sir.

6           THE WITNESS:  Thank you.

7           THE COURT:  Mr. Rotondo, how are we doing in

8    terms of your projection in terms of the schedule?

9           MR. ROTONDO:  There are two witnesses left for

10   today.  Mr. Wade, who plaintiffs are going to call as a

11   result of Your Honor's order, and Mr. Wilson.

12          THE COURT:  How about Monday?

13          MR. ROTONDO:  At the end of the day today we

14   should be able to tell the Court whether we're going to

15   call any other witnesses.

16          THE COURT:  Thank you.

17          I expect everybody to be back at 1:15 because

18   the jury will be in the box about a minute after that if

19   you're not.

20          MR. NIKAS:  Does that mean Mr. Wade will

21   testify?

22          MR. ROTONDO:  He's in the courtroom.

23          THE COURT:  We'll recess.

24              (Whereupon, a recess followed.)

25

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  We'll bring the jury in.

2          Are we going to continue with this witness?

3          MR. ROTONDO:  No, Your Honor.  We decided not to

4   do any redirect on Mr. Davis.

5          The next witness the plaintiff is calling is

6   David Wade.

7                   (Whereupon, the jury entered the

8                   courtroom.)

9          THE COURT:  Please be seated everyone.

10          Ladies and gentlemen, you will recall that I

11   believe yesterday we said that the plaintiff was resting

12   subject to finishing the redirect and also calling a

13   witness, Mr. Wade, I believe.

14          At this time, Mr. Nikas, you can call your

15   witness.

16          MR. NIKAS:  Plaintiffs would like to call

17   Mr. Wade, please.

18          THE CLERK:  Raise your right hand, sir.

19

20                   DAVID WADE,

21      called as a witness, having been first duly

22      sworn, was examined and testified as follows:

23

24          THE CLERK:  Please be seated.

25          Could you state your name and spell your last

1    name for the record, please.

2              THE WITNESS:  David Wade.  Last name is W-a-d-e.

3              THE CLERK:  City and state your of your

4    residence.

5              THE WITNESS:  Seymour, Tennessee.

6              THE CLERK:  Thank you, sir.

7

8                        DIRECT EXAMINATION

9    BY MR. NIKAS:

10   Q.   Good afternoon, Mr. Wade.

11   A.   Good afternoon.

12   Q.   Mr. Wade, can you tell us what your current

13   occupation is?

14   A.   Yeah, my current position is working with Sea Ray

15   Boats as a product quality manager.

16   Q.   And what facility do you work at?

17   A.   I work out of the corporate office.

18   Q.   Which is where?

19   A.   Knoxville, Tennessee.

20   Q.   Is the corporate office also located at the same

21   facility as the production facility in which this boat was

22   built?

23   A.   No.  It's adjacent to it.

24   Q.   By adjacent, how close is that?

25   A.   A quarter mile.

1    Q.    You stated your position was?

2    A.    Product quality manager.

3    Q.    What are the duties of a product quality manager?

4    A.    Currently I work with the plant's quality teams to

5    look at product quality issues such as if there is a light

6    switch that continues to fail on us, we will work with

7    those suppliers to try and improve the quality on those

8    items.

9    Q.    And do your duties extend to the whole of the vessel?

10   A.    Yeah.  I do have some leeway for the entire vessel,

11   yes.

12   Q.    So there are no components that are excluded from

13   your responsibilities?

14   A.    No.

15   Q.    So it's safe to assume, then, that you have

16   responsibility then for the engines and the quality of the

17   engines?

18   A.    I don't have responsibility for the quality of the

19   engines.  I have responsibility if there are issues with

20   those engines of working with the manufacturer to correct

21   issues.

22   Q.    So I understand, is your position reactive rather

23   than pro-active, meaning you respond to only to complaints

24   rather than trying to ensure that certain quality

25   standards are adhered to?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yeah, I respond to -- respond to.

2    Q.    So you're not like quality control like on the

3    factory floor as things are being built to determine --

4    A.    No.

5    Q.    So you respond just to either customer concerns or

6    identification of problem areas by factory employees?

7    A.    Correct.

8    Q.    At your facility, which is the Sea Ray headquarters,

9    you maintain an office there?

10   A.    Yes.

11   Q.    How often are you at the factory?

12   A.    I go out to the facilities -- I'm usually in one of

13   the facilities at least once a week.

14   Q.    So it's fair to state that you actually work at both

15   places?

16   A.    No, I actually work at the corporate office.

17   Q.    Is it fair to say that your job responsibilities take

18   you to the factory on a regular basis?

19   A.    Yes.

20   Q.    Now, when were you appointed the product quality

21   manager for Sea Ray?

22   A.    Approximately last October.

23   Q.    Which would have been '07?

24   A.    '07, correct.

25   Q.    And before then, what was your job title?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Gelcoat quality manager.

2    Q.    And when you were gelcoat quality manager, were you

3    subordinate to the person that was the product quality

4    manager?

5    A.    No, I was subordinate to another gentleman who was

6    with our technology center.

7    Q.    What were your responsibilities then as the gelcoat

8    quality manager?

9    A.    It was to review fiberglass gelcoat issues and to

10   work with the plants on action items to try and improve

11   gelcoat quality.

12   Q.    And when did you get that job as gelcoat quality

13   manager?

14   A.    Approximately April 2007.

15   Q.    And before April 2007, were you employed by Sea Ray?

16   A.    Yes.

17   Q.    And what was your position then?

18   A.    Manager of the dealer service team.

19   Q.    Manager of the dealer service team?

20   A.    Yes.

21   Q.    And what were the duties of the manager of the dealer

22   service team?

23   A.    To administer the warranty policy for the product.

24   Q.    What does that mean?

25   A.    I supervised the employees, the warranty

PDF created with pdfFactory trial version www.pdffactory.com

1   representatives who fielded the dealer calls and worked

2   through warranty claims.

3   Q.   And would that be dealing with the dealerships

4   directly or would that be dealing with the customers

5   directly?

6   A.   Dealerships.

7   Q.   Is it typical in your job or in your job then that a

8   customer would have a repair item under warranty and they

9   would take it to the dealer?

10  A.   Correct.

11  Q.   And then the dealer would contact you?

12  A.   Yes.

13  Q.   And would they be contacting you for technical

14  assistance?

15  A.   At times.

16  Q.   Would they be contacting you for payment?

17  A.   Yes.

18  Q.   What other items would they be contacting you with?

19  A.   Sometimes just pre-approval for the item prior to the

20  payment.

21  Q.   And so for every repair performed under warranty for

22  a Sea Ray boat, did that warranty claim go through your

23  department?

24  A.   Yes.

25  Q.   And you held that position up until April of 2007?

1    A.    Correct.

2    Q.    When did you start in that position?

3    A.    Approximately early 2005.

4    Q.    First quarter?

5    A.    Yeah, first quarter.

6    Q.    And prior to the first quarter of 2005, were you

7    employed by Sea Ray?

8    A.    Yes.

9    Q.    Good advancement at Sea Ray.

10         Prior to that point, what was your job at Sea Ray?

11   A.    I was a customer service representative.

12   Q.    And when were you hired in that position?

13   A.    I was hired in that position, I'm going to say

14   mid-'90s.  '95, '96.

15   Q.    So approximately ten years?

16   A.    Yeah, approximately.

17   Q.    So '95 through somewhere in 2005?

18   A.    Uh-huh.

19   Q.    And was that your first job at Sea Ray?

20   A.    No.

21   Q.    No.  What was your first job at Sea Ray?

22   A.    I was hired in quality control in 1981.

23   Q.    Was that at the Knoxville facility?

24   A.    Yes.

25   Q.    And did you hold that position in quality control

PDF created with pdfFactory trial version www.pdffactory.com

1  from 1981 to 1995?

2  A.   No.

3  Q.   What was your second position at Sea Ray?

4  A.   Second position, I transferred to the mold

5  maintenance department.

6  Q.   Mold maintenance department?

7  A.   Mold maintenance department, yes.

8  Q.   I assume that's maintaining the fiberglass molds?

9  A.   Yes, that's maintaining the molds.

10  Q.   Just in case somebody on the jury isn't familiar with

11  the process, can you just very briefly explain how the

12  fiberglass boats are made?

13  A.   Yes.  The boats or the molds?

14  Q.   The boats.  I assume you use the molds to make the

15  boats?

16  A.   Yes.

17       In short, the molds are, in essence, you take like a

18  cup or a dish and you're going to make a jello dish.  The

19  molding process for the boats is very similar.  You wax

20  the mold to where it's a very slick surface.  You would

21  spray the mold with gelcoat.  Then you wold laminate

22  layers of fiberglass over the gelcoat until you build up

23  sufficient thickness.  Then you would add bracing.

24  Depending on the structure of the item you're building,

25  whether it's the hull or the deck, you would add the

PDF created with pdfFactory trial version www.pdffactory.com

1    bracing and supports as needed.  And then you would

2    eventually pull them out of the mold and release them.

3    And then you would marry the two parts together to make

4    the boat.

5    Q.   And Mr. Wade, if I can give you this pointer.  That

6    photograph there, the two parts you're talking about

7    marrying, is that the topsides and the hull?

8    A.   Yes, that would be the topside deck structure and the

9    hull.

10   Q.   So that's the, I guess, outside body of the boat,

11   right?

12   A.   Correct.

13   Q.   And so you were in charge, I guess, with maintaining

14   the molds to make sure that after repeated usage they

15   still held their form?

16   A.   Yes.  The mold maintenance position, basically, we

17   recycled the molds and reconditioned them so they would

18   last longer through the production phase.

19   Q.   Did they eventually wear out?

20   A.   Yes.

21   Q.   Now, following that job as the mold maintenance

22   supervisor, what did you do?

23   A.   I was actually a mold maintenance technician, I was

24   not supervisor.

25   Q.   Sorry.  Mold maintenance technician, what did you do

1  then for Sea Ray?

2  A.    I moved to the PI department.  PI is what we call

3  piece inspection.  That's where you -- after the parts go

4  through the lamination process, you pull them out of the

5  mold, we would look at the parts to ensure that the parts

6  were free of any major defects or anything like that and

7  we would correct those items or fix them on line in

8  process before the hull and the deck and the small parts

9  went to the assembly building.

10  Q.    So these are fiberglass pieces?

11  A.    Correct.

12  Q.    And following that position, what was your job at

13  Sea Ray?

14  A.    I don't recall exactly the order.  I moved to the

15  final finish area.  Final finish was the last assembly

16  station where we did all the finish work on the boat after

17  it went through the assembly process to basically clean

18  the boat up, fix any damages that may have occurred on the

19  line from dragging a screw gun or dropping something like

20  that, we would make those repairs.  And then we would

21  clean, detail and prep the boat for shipment to the

22  dealer.

23  Q.    Now, when these two parts are married that you talked

24  about, the hull and the topsides, the boat's empty inside,

25  right?

1  A.    No.

2  Q.    What's inside?

3  A.    Before it got to the point where those parts would

4  actually be married together, they would go through

5  pre-build on the deck line to where some of the hardware

6  components to be installed.

7  Q.    Like handrails?

8  A.    Handrails.  Windshields in some applications were

9  even set prior to capping the entire structure.  Inside

10  the hull it would have the carpets laid in some area of

11  the floor.  The engine bilge area would have the engine

12  set.  It would have all of the wiring harnesses and fuel

13  tanks already laid in place and secured.  And the main

14  interior structure of the boat was put together.

15  Q.    So you say the engines were set?

16  A.    Yes.

17  Q.    Who installed the engines?

18  A.    The engine team at one of the hull stations.

19  Q.    Sea Ray installed the engines?

20  A.    Yes.

21  Q.    And Sea Ray installed the exhaust?

22  A.    Yes.

23  Q.    Who makes the gasoline engines for Sea Rays?

24  A.    We use MerCruiser.

25  Q.    And MerCruiser is another Brunswick entity?

 1   A.    Yes.

 2   Q.    And does MerCruiser have a presence at the Knoxville

 3   plant?

 4   A.    They do currently, yes.

 5   Q.    How long have they been there?

 6   A.    I don't know that for sure.

 7   Q.    More than ten years?

 8   A.    I really don't know.

 9   Q.    If you have questions about the engines, who do you

10   go to?

11   A.    We would probably contact MerCruiser directly.

12   Q.    Would that involve just walking around to wherever

13   they were?

14   A.    No.   Because they weren't -- at that time I don't

15   know if they were on site.   I know they are currently.

16   There is one rep that handles -- there's three plants in

17   the Tennessee area.   There is one MerCruiser technician

18   that is stationed up in the Tennessee area to service our

19   facilities if any questions come up.

20   Q.    Now, in your role -- actually, in your roles for

21   quality control and management of product quality and

22   customer service and all the other positions you've held

23   at Sea Ray for almost 30 years, I guess, you have to

24   determine whether the product, as constructed, is

25   constructed right, correct?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Correct.

2    Q.    How would you do that?

3    A.    I guess -- what do you mean?  As far as from a

4    standpoint of when I was in quality control or in my job

5    current?

6    Q.    When you were actually in quality control rather than

7    being the manager -- supervisor of that department, how

8    would a quality control inspector or technician inspect

9    something for quality?  Would they look at it?  How would

10   they do it?

11   A.    At the various stations we had various check points

12   to do quality control inspections.  Depending on the

13   station, there is some criteria of whether or not

14   something is just a hard stop, meaning this either is

15   fixed or the boat doesn't move, or this can be corrected

16   but yeah, you can correct it off the line, it is still

17   written up as a gig on line but it has to be completed

18   before the boat would be signed off and moved either

19   through the testing or at the end of the process to the

20   dealer, it would have to be corrected.  Some of the areas

21   are cosmetic in nature, meaning when you build the boat

22   and you have the interior and the cabinets and the

23   cushions, how some of those things fit into the boat, some

24   of that turns into perception and it's learned based on

25   your experience with the product and working with the

PDF created with pdfFactory trial version www.pdffactory.com

1  management staff on where they set some of those quality

2  standards.

3  Q.   Now, a boat is a pretty complex piece of equipment,

4  correct?

5  A.   Uh-huh.

6  Q.   Sea Ray does not manufacture all of the components,

7  correct?

8  A.   Correct.

9  Q.   I assume the electronics come from various

10  electronics manufacturers?

11  A.   Yes.

12  Q.   And the engine is built by MerCruiser?

13  A.   Uh-huh.

14  Q.   Are there other subcontractors for major components?

15  A.   Yeah.

16  Q.   Who determines what the procedures are for the

17  installation of those components?

18  A.   That's left up to our PD&E and engineering staff to

19  determine those.

20  Q.   When you're inspecting for quality, though, how do

21  you determine whether something has been installed

22  correctly?

23  A.   We would refer to the prints.

24  Q.   What are the prints?

25  A.   The construction diagrams for building the boat.

1   Q.   That's how you check?

2   A.   That's how some of those areas would be checked.

3   Q.   In this case how would you check, say, the

4   installation of the exhaust?

5   A.   We didn't check the installation of the exhaust on

6   the line with the exception of verifying and making sure

7   that all the clamps were in place and secured, and that

8   the components were in the boat and in place.

9   Q.   Was it ever your responsibility to inspect the engine

10  installation?

11  A.   Yes.  During one period it was, yes.

12  Q.   And certainly now, as manager of this department,

13  that would be within your area of responsibility, correct?

14  A.   Not directly.

15  Q.   How indirectly would it be?

16  A.   Indirectly from the standpoint that the plants

17  themselves at this time are responsible for the

18  installation of the product into the boat.  I work to

19  facilitate when there's issues that arise on the boat as a

20  result of field issues or internal issues that they have

21  as they're building the boat.

22  Q.   Okay.  So when you were inspecting the exhaust

23  system, what were you looking for again?  Clamps?

24  A.   I would look for clamps to be tightened in proper

25  distance.  As far as when you slide it up on an exhaust

1    elbow, there's a predetermined place where the hose will

2    fit.  And making sure it wasn't too short on there to

3    where it improperly engaged the entire flange or it wasn't

4    pushed up too hard on it that it got up on like a rib that

5    when you tightened the clamp it wouldn't sufficiently

6    clamp down and result in a leak.

7    Q.   Why was it important to properly inspect the exhaust

8    system to ensure the exhaust system was properly

9    installed?

10   A.   I'm not sure what you mean.

11   Q.   You're inspecting this component for a reason,

12   correct?

13   A.   Right.

14   Q.   Why was it important to ensure the exhaust system was

15   properly installed?

16   A.   We checked it for the typical installation items that

17   we would normally do, the setup and -- the initial setup

18   of it was all given to us from PD&E from an engineering

19   staff.  For that stuff we would have limited amounts that

20   we would be able to check.

21   Q.   Did you ever know why it was important to check?

22   A.   Through experience I learned why, yes.

23   Q.   Why?

24   A.   I mean, as I said, for the exhaust hoses and clamps

25   and things of that nature, we checked for those.  And that

1    was the gist.  We made sure the engines ran properly.  You

2    would check also too to make sure that once the engines

3    were running the tank or whatever that you didn't have oil

4    leaks that showed up immediately on the product.

5    Q.    Well, whose responsibility is it to install the

6    engine and exhaust properly?

7    A.    The technicians at the engine station were

8    responsible for installing the engines and the exhaust.

9    Q.    That's Sea Ray, correct?

10   A.    Correct.

11   Q.    And do you agree that it's important to determine the

12   correct installation of the exhaust system to prevent

13   water ingestion?

14            MR. ROTONDO:  Objection.

15            THE COURT:  Basis?

16            MR. ROTONDO:  Outside the scope of what this

17   witness has been disclosed to testify, factual

18   description.

19            MR. NIKAS:  Mr. Wade will be asked to testify --

20            THE COURT:  Why don't I read -- tell me what

21   paragraph.

22            MR. ROTONDO:  Page 16, Your Honor, bottom of the

23   page.

24            MR. NIKAS:  With no objection.

25            THE COURT:  What page was that?

1          MR. NIKAS:  Page 16 of the joint trial

2    memorandum.

3          THE COURT:  Sustained for now.  You'll have to

4    lay a foundation if you want to get to where you are.

5          MR. NIKAS:  Well --

6          THE COURT:  Are you reading the second line of

7    that disclosure?  You need to lay a foundation.

8    BY MR. NIKAS:

9    Q.   You were the customer service rep when Lori and Peter

10   Mains provided you their criticisms regarding this boat,

11   correct?

12   A.   That's correct.

13   Q.   And you had primary responsibility for dealing with

14   those criticisms, correct?

15   A.   Correct.

16   Q.   And to whom did you speak to regarding these

17   criticisms?

18   A.   Various people within the department, one, just

19   because with certain things you would maybe bounce

20   something off somebody else from an experience standpoint

21   at times.  And also just to the extent of it.  But for the

22   most part I had called up to a certain point on most of

23   the issues.

24   Q.   There were a lot of criticisms, correct?

25   A.   Yes.

1  Q.    List upon list upon list, right?

2  A.    Correct.

3  Q.    Some of the criticisms were relatively minor,

4  correct?

5  A.    Yes.

6  Q.    Cosmetic issues?

7  A.    Uh-huh.

8  Q.    Would you agree that the two most serious criticisms

9  voiced by Lori and Peter Mains were the issues regarding

10  the integrity of the structure of the fiberglass and

11  issues regarding the exhaust; is that fair?

12  A.    You need to be more specific.

13  Q.    Well, of those concerns that they had, which did you

14  feel were most serious?

15  A.    Of the concerns that they raised, they had a

16  continuing complaint of a weak cockpit floor, which was

17  the area between the helm seat and the dash area where a

18  customer would oftentimes stand to operate the boat.  That

19  area right there was a concern.

20      There was a concern regarding some water leaking out

21  of the bilge, which is the engine area in between the

22  engines.  The engines rest on stringers and there was an

23  area in between there where there was a complaint of water

24  weeping out of that area to the degree we didn't know at

25  the time.

 1       Those were the two main concerns.  The one other

 2  concern that he brought up was loud exhaust noise.

 3  Q.   Let me put it this way:  This boat was at your

 4  factory in Tennessee?

 5  A.   Yes.

 6  Q.   After it was built?  Meaning, it came back for

 7  repairs in 2001?

 8  A.   Yes, that's correct.

 9  Q.   And when it came back to you for repairs, you were

10  the customer service representative in charge of this

11  account, correct?

12  A.   Correct.

13  Q.   In fact, you arranged for the transportation of this

14  boat from Connecticut to Tennessee?

15  A.   Correct.

16  Q.   You had possession of the list of complaints

17  presented to you by the owners, right?

18  A.   Yes.

19  Q.   Of those repairs that were completed while the boat

20  was in Tennessee, which of the repairs were the most

21  significant in terms of time and money expended?

22  A.   I would say the cockpit floor, time-wise and

23  cost-wise, was probably the most costly.  The change out

24  of the exhaust system would have been the second.  And

25  then the repair to the bilge would have been the last.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   So when the boat went in for repairs, what type of

2   exhaust did it have?

3   A.   It had a collector-style exhaust.

4   Q.   When it left, what did it have?

5   A.   It had a lift-style exhaust.

6   Q.   Before the repair was completed, did you ever

7   disclose to Lori and Peter Mains that that change was

8   going to be made?

9   A.   Can you repeat the question, please?

10  Q.   Before the water lift exhaust was installed on this

11  boat, did you ever inform Lori and Peter Mains that that

12  change would be made?

13  A.   I really do not recall if I informed them before that

14  was changed out or not.

15  Q.   Why was that change made?

16  A.   The change was made simply in response to the loud

17  exhaust noise that they had complained about since early

18  on.

19  Q.   What effect -- actually, before you went through the

20  expense of changing out the type of exhaust, did you check

21  to see whether it had been properly installed, the

22  original exhaust?

23  A.   No.  I mean, I didn't personally.

24  Q.   Did you ever ask anybody to?

25  A.   As I recall, I know that we sent a technician up to

PDF created with pdfFactory trial version www.pdffactory.com

1    his boat on a couple different occasions to look at the

2    exhaust.

3    Q.   And did he report to you that the exhaust was

4    properly installed?

5    A.   Yeah, I don't recall any abnormalities to it.

6    Q.   Why would it have been important to determine if the

7    exhaust was properly installed on this boat?

8    A.   I'm not sure what you mean.

9    Q.   Why would it have been important for the exhaust to

10   have been properly installed on this boat?  What effect

11   would an improper installation have had?

12   A.   Well, when I said we looked at it, we would have gone

13   up and looked for the typical things that we would have

14   looked for on an initial inspection through the facility.

15   We would have looked at the clamp situation, make sure

16   those were good.  We would have checked for leaks if a

17   boat was in a position where we could have ran it.  And

18   they would have gone through those checks.

19   Q.   Why?  Why would you have done all those things?  Why

20   is it important to check these things?

21   A.   To see if there was something they could just -- if

22   there was something there that they could point to that

23   says that's the reason for a loud exhaust noise.

24   Q.   I'd like to show you page 13 of Exhibit 145 which may

25   refresh your recollection as to the importance of the

PDF created with pdfFactory trial version www.pdffactory.com

1   proper installation of the exhaust.  Actually, let me give

2   you the entire document.

3              MR. NIKAS:  Your Honor, can I refer to this

4   document by name?

5              THE COURT:  Why don't -- I assume it's not in

6   evidence?

7              MR. NIKAS:  It's not in evidence.

8              THE COURT:  No, you cannot.

9   BY MR. NIKAS:

10  Q.   Does that refresh your recollection as to why it's

11  important to have the proper installation of the exhaust?

12  A.   No.

13  Q.   Was water ingestion ever a concern of yours?

14  A.   No.

15  Q.   Never?

16             MR. ROTONDO:  Objection, Your Honor.  The

17  question -- first question presumably related to re -- if

18  it didn't relate to Peter or Lori Mains, that's

19  irrelevant.

20             THE COURT:  I'll sustain the objection.

21             And you can start over again and be more clear

22  with the question, Mr. Nikas.

23  BY MR. NIKAS:

24  Q.   You have a complaint about an exhaust system,

25  correct?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.    Yes, a loud exhaust noise.

2   Q.    Did that tip you off as to anything that might be

3   causing that?

4   A.    No.

5   Q.    You were at Sea Ray from 1981 until 2001 when this

6   boat came in 20 years, correct?

7   A.    Correct.

8   Q.    And is it your testimony that when a customer, in

9   this case Peter Mains, came to you with a complaint about

10  exhaust noise, that that did not in any way set off any

11  alarm bell regarding water ingestion?

12  A.    No.

13          THE COURT:  To be clear, the question was is

14  that your testimony.  So can we --

15          MR. NIKAS:  Yes, I'll correct it.

16  BY MR. NIKAS:

17  Q.    That was your testimony?

18  A.    Repeat the question.

19  Q.    Your testimony was that you did not think about water

20  ingestion when you heard the complaint voiced by Mr. Mains

21  about the exhaust?

22  A.    That's correct.

23  Q.    In 2001 how many people were in the customer service

24  department?

25  A.    I want to say approximately six or seven.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    How were you guys situated?

2    A.    Cubicles.

3    Q.    One right next to the other?

4    A.    Yeah.  We were in a small trailer and pretty much

5    lined up down one side.

6    Q.    What kind of engine was on -- what kind of engines

7    were installed on the boat owned by the Mainses?

8    A.    7.4 V-drive inboards.

9    Q.    MIEs?

10   A.    If that stands for V-drive inboards, then yes.

11   Q.    When it left the factory, what type of exhaust did it

12   have?

13   A.    Which time?

14   Q.    The first time, when it was built.

15   A.    Collector style.

16   Q.    When every boat that had a 7.4-liter engine with

17   inboard installation left the factory in 1997, did it have

18   a collector-style exhaust?

19   A.    I wouldn't know that a hundred percent.

20   Q.    In 1998 did every Sea Ray with a 7.4-liter inboard

21   engine leave the factory with a collector-style exhaust?

22   A.    I do not know.

23   Q.    In 2000 did every Sea Ray with a 7.4-liter engine

24   leave the factory with an inboard exhaust?

25   A.    Repeat that question again, please.

1  Q.   In the year 2000 did every Sea Ray built with a

2  7.4-liter engine with an inboard installation leave the

3  factory with a collector-style exhaust?

4  A.   I do not know.

5  Q.   2001, same answer?

6  A.   Yes, I don't know.

7  Q.   This boat came with a collector-style exhaust and

8  when it came to the factory in 2001 it had a

9  collector-style exhaust, and what it left five and a half

10  months later it had a water lift; true?

11  A.   True.

12  Q.   As a customer service rep, why would they have

13  changed the original equipment the boat was manufactured

14  with?

15       MR. ROTONDO:   Objection to the form.   I'm

16  objecting to the question.

17       THE COURT:   Could you rephrase that, please.

18  BY MR. NIKAS:

19  Q.   Why did they change the style of the exhaust on this

20  boat from the one that it had when it originally left the

21  factory?

22  A.   To try and correct his complaint regarding loud

23  exhaust noise.

24  Q.   Was Mr. Mains' boat the only boat that came back for

25  repairs in the factory in 2001 that came in with a

PDF created with pdfFactory trial version www.pdffactory.com

1    collector-style exhaust and left with a water lift?

2              MR. ROTONDO:  Objection.

3              THE COURT:  Because of --

4              MR. ROTONDO:  Prior rulings.

5              THE COURT:  Sustained.

6    BY MR. NIKAS:

7    Q.   Does the phrase "water ingestion team" or "water

8    ingestion subcommittee" mean anything to you?

9              MR. ROTONDO:  Objection.

10             THE COURT:  Sustained.

11   BY MR. NIKAS:

12   Q.   Did Sea Ray use a water lift exhaust prior to 2001?

13   A.   I don't know.

14   Q.   I'd like to show you an exhibit to refresh your

15   recollection.

16             THE COURT:  Could you tell me what number we're

17   dealing with?

18             Is the answer he doesn't know or he doesn't

19   recall?  Can we clarify that before you go down that road?

20   And can I have a number?

21             MR. NIKAS:  Thirty-six.

22             THE COURT:  Thank you.

23   BY MR. NIKAS:

24   Q.   Presumably you would have seen boats built that year,

25   correct, in 2001?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.    I'm sure I would have seen some built, yes.

2  Q.    You would have seen them leaving the factory, you

3  would have seen them as part of your job, correct?

4  A.    Yes, at times.

5  Q.    And do you remember if prior to that time whether you

6  ever saw a water lift muffler in a Sea Ray boat with a

7  7.4-liter engine?

8  A.    I don't recall.

9  Q.    Can you remember?

10  A.    I don't.  I don't recall.

11        THE COURT:  I think that's sufficient to refresh

12  his recollection.

13  BY MR. NIKAS:

14  Q.    I'd like to show you a document, Plaintiffs' Exhibit

15  Number 36, it has not been introduced into evidence but

16  I'd like to use it to refresh your recollection.  Spend

17  some time with it.

18        Does that refresh your recollection?

19  A.    I'm not sure what you're asking.

20  Q.    Well, does that refresh your recollection that

21  sometime in 2001 there may have been a change from the

22  collector style to the water lift?

23  A.    Yes, that refreshes my recollection.

24  Q.    And in 2001 was there a change?

25  A.    Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   Why was the change made?

2              MR. ROTONDO:  Objection.

3              THE COURT:  Let's, first of all, remove the

4    document since he's not supposed to be testifying from the

5    document.

6              And then your objection is based on?

7              MR. ROTONDO:  Scope of what they've indicated

8    the witness is supposed to testify about, which is his

9    dealings with the Mainses.

10             THE COURT:  Sustained.

11             MR. NIKAS:  Your Honor, this goes to why the

12   exhaust in the Mainses' boat was changed in 2001.

13             THE COURT:  You get to it that way as opposed to

14   with a broad question, then.  Although I think you've

15   asked him that.

16             MR. NIKAS:  He didn't remember then.

17             THE COURT:  He did remember.  He gave you a

18   specific answer twice.  Third time will be the last time

19   we'll go over this.

20   BY MR. NIKAS:

21   Q.   Why was the exhaust changed on the boat owned by Lori

22   and Peter Mains?

23   A.   In response to his loud exhaust noise.

24   Q.   That's the complaint.  What was wrong -- strike that.

25             As a customer service representative, it's your job

1   both to, A, keep the customer happy, correct?

2   A.   Correct.

3   Q.   And B, ensure that Sea Ray doesn't end up repairing

4   every niggling concern that a customer might have bleeding

5   the company dry, correct?

6   A.   No, I wouldn't -- I didn't view my position that way.

7   Q.   If a customer hypothetically came to you saying I

8   have a noise in my engine, without determining the cause

9   of the noise you would replace the engine?

10  A.   No.

11  Q.   So why in this case was there no determination made

12  by you as to what was causing the noise?

13  A.   We couldn't find the reason for it.

14  Q.   What did you do to check?

15  A.   As I said, we sent a representative up to his boat a

16  couple times.

17  Q.   When the boat got back to the factory, now it's

18  here --

19  A.   Right.

20  Q.   -- in front of you with all the technical knowledge

21  that implies, the people that built the boat were there,

22  the people who built the motor were there.  Is your

23  testimony that there was never any inquiry into the actual

24  cause of the complaint, not one?

25         THE COURT:  You mean the cause of the noise?

1           MR. NIKAS:  Excuse me, the noise.

2           THE WITNESS:  Can you repeat the question,

3    please?

4    BY MR. NIKAS:

5    Q.    Sure.

6          You sent a technician up to Connecticut?

7    A.    Right.

8    Q.    When the boat got back to Tennessee to the place of

9    its birth, where the people that built it were located,

10   where the people that built its engine had a

11   representative and it was in front of you physically, did

12   you ever make an inquiry into the cause of the noise?

13   A.    When it was back at the factory I know the issue was

14   discussed.  Whether or not the plant -- because the boat,

15   as it was back, was in the care of the plant for repair.

16   Yes, I was communicating with them what the customers'

17   concerns were, what their main concerns.  In regard to

18   that, I don't know what steps or measures they went to at

19   that point to make any other determinations.

20   Q.    As a customer service rep, was it your job to try to

21   investigate the merit of the claims?

22   A.    In most instances, yes.

23   Q.    As customer service rep, was it your job to try to

24   find solutions to the concerns of your customers?

25   A.    Not in every case, no.

1    Q.    I said "try to find"; I didn't say "find."

2    A.    I guess at times, yes.

3    Q.    In this case, in this specific case involving the

4    boat owned by Peter and Lori, what did you do to determine

5    what could be done about their concern?

6    A.    Beyond sending the inspections, I don't know what may

7    have been done while it was back at the plant.

8    Q.    Do you read MerCruiser service bulletins?

9    A.    Do I, as in every day?

10    Q.    No, but do you regularly consult them?  If a customer

11    comes to you with a complaint or a concern about engine

12    component, would you consult a service bulletin to see if

13    perhaps the engine manufacturer had some instruction for

14    you?

15    A.    I have read MerCruiser service bulletins.

16    Q.    And would that be a logical step you would have taken

17    if you had a concern about an engine component?

18    A.    It's a logical step.

19    Q.    Did you take it in this case?

20    A.    I didn't look at it from an engine standpoint.

21    Q.    Did you look at it from an exhaust standpoint?

22    A.    I looked at it from something that could cause a loud

23    exhaust noise.

24    Q.    And what could that something be?

25    A.    Beyond our normal checks, I don't know.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   Did you look at any written material?  Did you ever

2    ask anybody in the factory, anybody from MerCruiser,

3    anybody about the exhaust noise complained of by Peter and

4    Lori?

5    A.   I know that it was discussed at the factory.  I do

6    not recall -- at the factory, meaning internally with my

7    boss at the time.  But beyond that, I don't recall

8    consulting anybody else.

9    Q.   With whom did you discuss this issue with?

10   A.   I don't recall.

11   Q.   How many people are at the Sea Ray headquarters?

12   A.   At headquarters?

13   Q.   That you would deal with in the ordinary course of

14   your business.

15   A.   Are you talking at that time or now?

16   Q.   At that time, 2001 whenever the boat got there, how

17   many people would have been involved, possibly, in this

18   decision?

19   A.   I don't know that anybody at the corporate level

20   would have been.  That would have been handled at the

21   plant level between myself and probably Todd Stooksbury,

22   who was my boss.

23   Q.   So at the plant, how big is the galaxy of people you

24   would have discussed this with or could have discussed

25   this with?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    I don't know.  I mean, there's -- the basic chain of

2    command would have been at that point from myself to Todd,

3    who was my boss.  And then Todd would have taken that

4    probably to engineering and then to the management staff,

5    which would have been probably the plant manager.

6    Q.    If you wanted to change a major component of the

7    boat, would you have had to justify that decision to

8    anybody?

9    A.    If I wanted to personally?

10    Q.    Sure.

11    A.    Yeah, I would have to -- I would have to discuss that

12    with my boss.

13    Q.    And would you have to justify that decision?

14    A.    I would have just quantified it by saying we have the

15    opportunity with a customer's boat here at the facility.

16    This is one of his concerns of loud exhaust noise.

17    Potentially this exhaust we were told would be quieter.

18    While it was back at the factory, the decision was made to

19    install it in the boat.

20    Q.    Who made the decision?

21    A.    Between myself and Todd Stooksbury, we probably did.

22    Q.    Do you remember?

23    A.    I remember that the recommendation came from me.

24    Q.    Why did you recommend it other than a customer had a

25    complaint?

1    A.    Simply because in some cases we try to satisfy the

2    customer almost to whatever end we need to to try and

3    satisfy them.

4    Q.    I want to make sure you understand this.  So in 2001

5    your testimony is when the decision was made to replace

6    this exhaust, it was made entirely as a result of a

7    customer complaint with no other factors coming into that

8    decision?

9    A.    Yes, the customer complained of loud exhaust noise.

10    Q.    And that decision was based solely on that complaint

11    and nothing else?

12    A.    That's correct.

13         MR. NIKAS:  Your Honor, just out of an abundance

14    of caution, and I know this is unfavored but I don't want

15    to potentially prejudice anything, can we have a very

16    brief sidebar?

17         THE COURT:  Okay.

18              (Sidebar discussion off the record.)

19    BY MR. NIKAS:

20    Q.    You testified that changing the exhaust system to the

21    water lift collector was a response to the concern voiced

22    by Peter Mains about exhaust noise, correct?

23    A.    Correct.

24    Q.    And you made that decision yourself?

25    A.    I made that recommendation.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Yourself?

2    A.    Yes.

3    Q.    Without consulting any other materials?

4    A.    Yeah, based on my knowledge and knowing that I had

5    sent a technician up there to look at the boat, yes.

6    Q.    How did the water lift muffler remedy that complaint?

7    A.    I don't know.

8    Q.    You said you made that recommendation based on your

9    experience and on the fact that the technician you sent up

10   to Connecticut didn't have anything negative to say, so

11   how would the installation of this different type of

12   exhaust system remedy the complaint voiced by Peter Mains?

13   A.    As I recall, there was -- we never could substantiate

14   the initial claim of loud exhaust noise.  He had just had

15   it as a complaint several times over the life of the boat.

16   We never substantiated.  We could not duplicate it to that

17   effect.  So I don't know if this ultimately corrected it

18   or not.

19   Q.    Why did you replace it with a collector?

20   A.    Because there was nothing wrong with the collector.

21   Q.    If you knew there was nothing wrong with it, why did

22   you change it?

23   A.    Customer satisfaction.

24   Q.    Mr. Wade, does the term "water ingestion

25   subcommittee" mean anything to you?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.    No.

2  Q.    In 2001 did you review any Mercury service bulletins?

3  A.    I don't recall.

4  Q.    Mr. Wade, your current position is product quality

5  manager?

6  A.    Yes.

7  Q.    And you have responsibility for dealing with all

8  customer complaints?

9  A.    No.  Currently?

10  Q.    What's your current responsibility?

11  A.    My responsibility is to review the data that comes in

12  from warranty failures as well as internal plant concerns

13  and work with those suppliers to correct issues.

14  Q.    As customer service rep, the title of the person you

15  reported to was what?

16  A.    At that time just referred to him as a supervisor.

17  It may have technically been called a team leader.  I

18  always referred to it as supervisor.

19  Q.    That's Mr. Stooksbury?

20  A.    That's correct.

21  Q.    That would have been to determine warranty repairs,

22  whether warranty repairs were acceptable?

23  A.    I don't understand what you're asking.

24  Q.    I think you said that person determines whether a

25  repair will be covered under warranty, dealing with the

PDF created with pdfFactory trial version www.pdffactory.com

1  dealers; is that right?

2  A.   No.   At that time I would also -- part of the job

3  scope at that time within customer service was also

4  reviewing dealer claims as well.  So we would do that as

5  well.  Each individual claim.  It was not my supervisor's

6  responsibility to review each claim.  That was our job as

7  customer service and dealer service representatives.

8  Q.   In 2001, did you review any service bulletins in

9  regards to exhaust systems or water ingestion?

10  A.   I don't recall.

11  Q.   I'd like to show you Plaintiffs' Exhibit 33, which

12  may help refresh your recollection.  Review it carefully.

13      Do you recall having seen that document?

14  A.   No, I do not.

15  Q.   What's the Sea Ray warranty?

16  A.   In general terms, it's 12 months from the original

17  date of purchase or from the inservice checklist date and

18  five years structural hull.

19  Q.   It says, We'll repair or replace any defects which

20  exist within one year of purchase; is that right?

21  A.   Yes, something to that effect.

22  Q.   One year?

23  A.   Correct.

24  Q.   2001, same year Peter's boat was there?

25  A.   Uh-huh.

1    Q.   Did Sea Ray extend the warranty or at least offer the

2    repair and replacement of major components beyond that

3    one-year date?

4              MR. ROTONDO:  Objection.

5              THE COURT:  Sustained.  Are you talking about

6    the plaintiffs?

7    BY MR. NIKAS:

8    Q.   At the time that Peter Mains' boat was at the

9    factory, when was that?

10   A.   What time frame?

11   Q.   Sure.  In 2001, how long did you have it?

12   A.   As I recall, I think it may have come back late

13   2000 and the repairs were made and it was returned early

14   2001.

15   Q.   May, late April?

16   A.   Yeah.

17   Q.   You had the boat about five and a half months?

18   A.   That sounds about right.

19   Q.   You were aware that the Horizon package provides an

20   extended warranty of two additional years beyond the first

21   for a total of three years, correct?

22   A.   I do recall that.

23   Q.   That's something you looked at?

24   A.   With some of the engine packages, yes.

25   Q.   As a customer service rep trying to satisfy the

1    customer, that would have been something you would have

2    looked at, right?

3    A.    I'm not sure what you mean.

4    Q.    If a boat comes back to the factory for repairs, you

5    would have looked at the warranties to determine whether

6    they were going to be paid for by the customer or paid for

7    by you, correct?

8    A.    If you're talking Sea Ray's warranty or MerCruiser's

9    warranty, the boat coming back to the facility was based

10   on Sea Ray's customer relations trying to satisfy the

11   customer.

12   Q.    And if it had needed an engine repair, it would have

13   been done there, correct?

14   A.    We didn't have that there, so we wouldn't have had to

15   cross that bridge.  There was no repair I was aware of.

16   Q.    If it needed an exhaust repair, it would have been

17   done there, correct?

18   A.    Yes.

19   Q.    It was done there, right?

20   A.    Not a repair.  We changed out the exhaust in response

21   to his loud exhaust complaint.

22   Q.    You removed and replaced it?

23   A.    Correct.

24   Q.    Who paid for those repairs?

25   A.    Sea Ray.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    When did his warranty expire?

2    A.    His one-year warranty would have expired 12 months

3    after his date of purchase.

4    Q.    Which would have been when?

5    A.    I don't recall the actual date.  I want to say

6    somewhere around May of '98, something like that.

7    Q.    That's about right, I think.  So would have expired

8    in May of --

9    A.    2000 -- or excuse me, May of '99.

10    Q.    May of '99.

11        And the Sea Ray warranty covers everything but the

12    engines, right, and any other component that has its own

13    warranty like the electronics or some other thing, right?

14    A.    Yeah, and some pro-rating on blistering and things of

15    that nature.

16    Q.    The hull repairs that you did, right?

17    A.    Okay, what hull repairs?

18    Q.    Well, let me ask.  What did you do to the boat when

19    it was there five and a half months?

20    A.    I remember there was a tick list of some issues that

21    had some concerns.  The main concern again was the cockpit

22    sole being weak and spongy as it was described a couple

23    different tiles.  The exhaust, loud exhaust noise.  And

24    some water still weeping in the bilge, as I recall.  Those

25    were the main issues.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Wouldn't those repairs have been outside the warranty

2    period?

3    A.    Technically outside of the warranty period, yes, but

4    not outside of our -- as a customer service rep and

5    outside of what Sea Ray will try to do to satisfy a

6    customer.

7    Q.    You're talking about, gosh, more than a year, right?

8    A.    Uh-huh.

9    Q.    Well, did you promise -- did you talk to Mr. Mains a

10   lot?

11   A.    Yeah.

12   Q.    How much?

13   A.    We talked quite a bit.

14   Q.    More than other customers?

15   A.    Yes, more than most.

16   Q.    A lot more than most, right?

17   A.    Yep.

18   Q.    And was he knowledgeable?

19   A.    Seemed to be, yes.

20   Q.    Knew the boat?

21   A.    Yep.

22   Q.    And in fact, he actually wanted to go visit the

23   factory while the boat was repaired, right?

24   A.    I don't recall that.

25   Q.    Do you recall him -- do you recall you promising him

1    that he would have an opportunity to come down --

2    A.    I don't recall that.

3    Q.    Would that have been an unusual request to grant?

4    A.    No.  We've had customers at the plant before.

5    Q.    Well, given your experience of dealings with

6    Mr. Mains, right, wouldn't he seem to be the type of

7    customer that would have wanted to go see the boat being

8    repaired?

9              MR. ROTONDO:  Objection.

10             THE COURT:  I'll allow that question.

11   A.    I don't know.

12   BY MR. NIKAS:

13   Q.    Mr. Wade, collectively during your time as customer

14   service rep, how many customers did you talk to more than

15   Peter Mains?

16   A.    I would have no way of knowing.

17   Q.    A lot, not many, a handful?

18   A.    I would say there's probably only a few that I talked

19   to more than him.

20   Q.    And everybody believes you on that.

21         So --

22             MR. ROTONDO:  Your Honor, I move to strike that.

23   That's unfair.

24             THE COURT:  Motion granted.

25             MR. NIKAS:  Not fair to my client.

1  BY MR. NIKAS:

2  Q.   In talking to him -- on a fairly regular basis, is

3  that fair?

4  A.   Yeah.

5  Q.   -- would you keep him apprized of what was happening

6  with the boat?

7  A.   In regard to what time frame?

8  Q.   Every time he called, I'm sure he asked what was

9  happening with the boat.

10  A.   Are you talking when the boat was back for repairs?

11  Q.   Yes, when it was with you for that five and a half

12  months.

13  A.   We would some.  I don't recall the extent of that,

14  but yeah, I mean there was calls and conversations.  I

15  don't recall to what degree.  There would have been some

16  communication.

17  Q.   And it would have been about the boat, right?

18  A.   Yeah.

19  Q.   You weren't friends?

20  A.   No.  It would have been about the boat.

21  Q.   So do you recall when you told him that the exhaust

22  had been replaced?

23  A.   No, I don't.

24  Q.   Do you know why -- let me ask you this.  Were you

25  aware that with the change in the exhaust system from the

PDF created with pdfFactory trial version www.pdffactory.com

1    collector to the water lift, the flushing procedures were

2    completely different?

3    A.    No, I was not aware.

4    Q.    Would it surprise you to know that on the collector

5    system flushing is done with the engine not running and

6    with the water lift, the flushing must be done with the

7    engine running?

8    A.    I was not aware either way.

9    Q.    Weren't you concerned -- you said that your goal, and

10   I'm paraphrasing you, was to satisfy your customers?

11   A.    Yes.

12   Q.    And in fact, you went so far as to pay for these

13   repairs more than a year after the expiration of the

14   warranty?

15   A.    Yes.

16   Q.    Why didn't you investigate at least whether the

17   change to this new type of exhaust system that you thought

18   was going to cure this noise required a completely

19   different maintenance procedure than the one that he had?

20   A.    I was simply not aware.

21   Q.    But don't you look at the MerCruiser materials?

22   A.    Not in depth, no.

23   Q.    Are they available to you?

24   A.    Not directly.  I mean, I wouldn't be able to just

25   pull one out.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.    Is there a library?

2   A.    No.

3   Q.    There's no technical library at the factory?

4   A.    Probably the closest thing to that would probably be

5   the engineering department.  But I don't know if that even

6   existed over there.

7   Q.    When the change was made to the water lift from the

8   collector, did you ever discuss it with anybody from

9   MerCruiser?

10  A.    Can you repeat that again, please?

11  Q.    When you made the decision to change the muffler

12  system, the exhaust system on Peter and Lori's boat, did

13  you consult anybody from MerCruiser prior to arriving at

14  that decision?

15  A.    No, I don't recall talking with MerCruiser regarding

16  that.

17  Q.    At any time following the installation of the new

18  exhaust system into Peter and Lori's boat, did you discuss

19  that with anybody from MerCruiser in case there were any

20  issues regarding the ownership or operation of that

21  exhaust?

22  A.    Not until after we were informed that he had

23  hydrolocked the engine.

24  Q.    Isn't that a little late?

25  A.    That's the first time I recall a conversation per

PDF created with pdfFactory trial version www.pdffactory.com

1    your question.

2    Q.   Well, did you ever read the report prepared by the

3    surveyor hired by your attorneys, Greg Davis?

4    A.   Did I read that report?  No, I did not.

5    Q.   When you found out this news, did you feel any

6    responsibility for it?

7    A.   Not initially.

8    Q.   How about later?

9    A.   No, not later.

10   Q.   Were you eventually informed that the procedures for

11   flushing the two exhausts are completely different?

12   A.   I'm aware of the documents out there, but I don't

13   know the relevance to them.  I don't know that part of it.

14   Q.   Hypothetically, if you assume that the two procedures

15   are completely different --

16            THE COURT:  Sustained.

17   BY MR. NIKAS:

18   Q.   You were made aware, though, that the boat had

19   hydrolocked, correct?

20   A.   Correct.

21   Q.   How were you made aware?

22   A.   I believe via a phone call, I believe.  As I recall.

23   Q.   Were you informed that the boat had hydrolocked after

24   just about an hour and a half of operation?

25   A.   I knew that it was after one of the initial times

PDF created with pdfFactory trial version www.pdffactory.com

1    Mr. Mains had run the boat after it returned.

2    Q.   With the new exhaust system that had been installed?

3    A.   Correct.

4    Q.   Did you at any time, in the interest of customer

5    service, think about calling Mr. Mains or Mrs. Mains and

6    extending an offer to replace the damaged components?

7    A.   I don't recall -- I don't recall anything along those

8    lines at that point.

9    Q.   I assume at the factory you guys have specific terms

10   for words that are specific to your industry or specific

11   to boat building; is that right?

12   A.   I found there's a lot of terminology in the marine

13   industry, in general, and in boat building, yes.

14   Q.   Like stringers and transoms and through holes and

15   plinths and pintles and gudgeons.

16        Have you ever heard the term "resonance"?

17   A.   Heard the term.

18   Q.   In what context did you hear that term or where were

19   you employed when you heard that term?

20   A.   I was employed at Sea Ray.  But the first time I

21   heard it was with the comment of the loud exhaust noise.

22   Q.   What is resonance?  What do you understand it to be?

23   A.   I just took it as a loud shrill, a change in the

24   exhaust noise to where it was annoying and bothersome.

25   Q.   You never understood that to be a term of art?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    No.

2    Q.    You never asked anybody what that meant?

3    A.    No, I can't recall asking.

4            MR. NIKAS:  I have no further questions at this

5    time, Your Honor.

6            THE COURT:  Are you going to have any questions?

7            MR. ROTONDO:  I will have some questions and it

8    will take me probably -- why don't --

9            THE COURT:  Why don't we get started.

10           Just so we clear, we had the witness examined in

11   the plaintiff's case.  Is this going to be a cross or

12   combined cross and direct?

13           MR. ROTONDO:  I think that Mr. Nikas has covered

14   most of the topics I planned to ask about, so I think it

15   would be in the form of cross.

16           MR. NIKAS:  We would never object, Your Honor,

17   as far as scope.

18           THE COURT:  Okay.

19

20                    CROSS-EXAMINATION

21   BY MR. ROTONDO:

22   Q.    Good afternoon, Mr. Wade.

23   A.    Good afternoon.

24   Q.    You work at the Sea Ray plant.  You said that you

25   worked there 27 years?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   A.   Yes.

 2   Q.   All right.  And are you married?

 3   A.   Yes, I am.

 4   Q.   Do you have any children?

 5   A.   Yes, two.

 6   Q.   And you've described for the members of the jury all

 7   of the different jobs that you've had; is that correct?

 8   A.   Most of them.

 9   Q.   At Sea Ray?

10   A.   Yes.

11   Q.   And you indicated you had a number of communications

12   with Peter and Lori Mains; is that correct?

13   A.   Yes, I have.

14   Q.   And you talked about sending one or more people out

15   to deal with issues concerning their boat; is that

16   correct?

17   A.   Yes.

18   Q.   Was one of those people who was sent out the group

19   from Atlantic Boat Repair?

20   A.   Yes, that's correct.

21   Q.   Who was the principal or the person you dealt with

22   there?

23   A.   Tim Mills.

24   Q.   What type of work did Mr. Mills do?

25   A.   Their basic background was to do fiberglass repair.
```

1    Q.   And did you also make arrangements to send someone

2    from the Sea Ray factory or plant --

3    A.   Yes.

4    Q.   -- to look at Mr. Mains' boat?

5    A.   Yes, I did.

6    Q.   Who was that?

7    A.   Greg.  Greg Wilson.

8    Q.   And if you recall, what was his position at the time?

9    A.   His position was -- he did various ones as fill-in,

10   but the main one he was used for at that time was our S&U

11   crew, which is service and utility.  He was often called

12   upon to go out to dealers to help them with difficult

13   issues or warranty issues they might have.

14   Q.   Now, when you sent people like Tim Mills or Greg

15   Wilson out to look at the customer's boat, what was the

16   purpose of doing that?

17   A.   In most cases sometimes it was to go investigate the

18   issues.  Like in Greg's case, at times we would send him

19   to go investigate the issues.  If we had a list of the

20   issues, at times we would make sure that he took items

21   with him that he could make certain repairs, if he felt he

22   could do it in a timely manner and it was conducive to the

23   environment.  Usually with someone like Tim Mills or

24   whatever, we pretty much had an idea what the scope of the

25   repairs were and the amount that we were going to

1  contribute toward that, and we would go ahead and make

2  that arrangement and send them and use their services for

3  repairs.

4  Q.    You talked with Mr. Nikas about Mr. Mains' complaints

5  about loud exhaust noise?

6  A.    Uh-huh.

7  Q.    Did you have discussions with Mr. Mains about that

8  subject?

9  A.    Yeah, we had some conversations about it.

10  Q.    And did Mr. Mains ever tell you that the loud exhaust

11  noise was annoying but not performance-related?

12  A.    Yes.  I do recall that.

13  Q.    Now, you said that you sent a technical person out

14  to -- on one occasion to deal with Mr. Mains' complaint

15  about an exhaust noise.  Do you recall who that was?

16  A.    Yeah, Greg Wilson.

17  Q.    And do you have a memory of what Mr. Wilson -- do you

18  have a memory what it was he was going to do when he was

19  out there?

20  A.    Yeah.  Just basically take a look at the exhaust

21  system, and one of the exhaust components is a small

22  bypass muffler which we often refer to it as a football

23  muffler just because of its size and shape.  We had looked

24  at the possibility of installing a slightly larger one to

25  see if that would help reduce this loud exhaust noise he

PDF created with pdfFactory trial version www.pdffactory.com

Vol. IV - Page 712

1    complained about.

2    Q.   Did that effort prove to be successful?

3    A.   I don't recall if that actually ever was installed.

4    I mean, there was some issues with getting it installed

5    and we had to send up a second set.  So I'm a little

6    unclear if we actually ever got that installed on the boat

7    or not.

8    Q.   Did Mr. Mains continue to have complaints or raise

9    issues with you concerning the loud exhaust noise?

10   A.   Yeah, it seems to me we did continue to have a

11   complaint on that.

12   Q.   If we can pull up Plaintiffs' Exhibit 16.

13        Mr. Wade, this is a letter to you -- let me see if I

14   have a copy.

15        This is a letter that was written to you by Mr. Mains

16   on February 12, 2001.  Do you recall having received this

17   letter?

18   A.   Yes.

19   Q.   And at this point Mr. Mains' boat was already back in

20   Knoxville; is that correct?

21   A.   Yes, I believe so.

22   Q.   And if we can go to page 2 of the letter.  And the

23   middle of the page, fourth bullet point.

24        As of February 12, 2001, Mr. Mains was still making a

25   complaint about the intermittent sudden loud exhaust

1    noise?

2    A.    That's correct.

3    Q.    And did you -- when you read this, did you expect he

4    wanted you to do something about that?

5    A.    Yeah, as I did with everything else on the list.

6    Q.    Now, while the boat was in Knoxville, did you have

7    occasion to look at it?

8    A.    Yeah.

9    Q.    All right.  And were you doing an inspection or was

10   people just working on it when you happened to be around?

11   A.    Yeah, it was more just going out to look and see how

12   the boat was progressing as far as repairs and what was

13   being done on it.

14   Q.    Who was doing the work on the boat?

15   A.    That was in the charge of the assembly department.

16   Q.    And these would be the regular production --

17   A.    Regular production line workers, yes.

18   Q.    And you're aware that the boat was returned back to

19   Mr. Mains?

20   A.    Uh-huh.

21   Q.    And that Mr. Mains then had complaints about the

22   condition of the boat when it was returned?

23   A.    Correct.

24   Q.    Did you have discussions with Mr. Mains about his

25   complaints and concerns about the condition of the boat

PDF created with pdfFactory trial version www.pdffactory.com

Vol. IV - Page 714

1   after it was returned?

2   A.   Yeah, I remember having discussions about it.

3            MR. ROTONDO:  If we could pull up Defendant's

4   Exhibit 17.

5            THE COURT:  Actually, it's 2:45, so why don't we

6   start with that after we come back from our break?  We'll

7   take a 20-minute break.

8                 (Whereupon, a recess followed.)

9

10           THE COURT:  We'll have our witness retake the

11  stand and bring the jury in.

12                (Whereupon, the jury entered the

13                 courtroom.)

14           THE COURT:  Please be seated everyone.

15           Whenever you're ready, Mr. Rotondo.

16  BY MR. ROTONDO:

17  Q.   Mr. Wade, I'm going to ask you some questions about

18  some letters.  Let me give them to you.

19       Mr. Wade, after the boat was sent back from Knoxville

20  to Connecticut, you received a letter from Mr. Mains

21  regarding complaints and concerns that he had regarding

22  the boat; is that correct?

23  A.   Correct.

24  Q.   That was set forth in what's marked as Plaintiffs'

25  Exhibit 18?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   Yes.

2   Q.   All right.  And if we can now go to Defendants'

3   Exhibit 17.

4        In response to that letter and other communications

5   you had with Mr. Mains, did you then write what's been

6   marked as Defendants' Exhibit 17 to your letter of May 24,

7   2001?

8   A.   Yes.

9   Q.   And in connection with that -- pull out the center

10  section where it says, "In order."

11       You made an offer to Peter and Lori Mains about what

12  Sea Ray would be willing to do in connection with their

13  boat; is that right?

14  A.   Correct.

15  Q.   And this was pay for repairs by Brewers per an

16  agreed-upon list of items?

17  A.   That's correct.

18  Q.   And why is it that you wanted an agreed-upon list of

19  items?

20  A.   Just so we knew exactly what our target was to try to

21  make the customer satisfied.  We wanted a list to know

22  everything that was on the list so we could address it at

23  one time.

24  Q.   So you wanted a final list?

25  A.   Correct.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   Was the reason you wanted a final list?

2  A.   Yeah, just because we continued to get lists and

3  every conversation we had with Mr. Mains there always

4  seemed to be something that got added to it.

5  Q.   And you also agreed to pay for the bottom paint to

6  the hull and pay to clean and detail the boat and then two

7  months' boat fees and slip fees, correct?

8  A.   Correct.

9  Q.   If we can go to the second page of Defendant's

10  Exhibit 17.

11      On the second page you begin the list of -- you have

12  a list running from 1 to 11 here.  Did that list

13  essentially track the items that Mr. Mains had put in his

14  letter to you?

15  A.   As I recall, it was from that.

16  Q.   And this is the -- the bullet points underneath the

17  list were your action steps; is that right?  So for

18  example, number 1 said, "Replace transducer."  And you

19  wrote, "Part was mailed next day air to Essex Marine"?

20  A.   Yes, that's correct.

21  Q.   "Replace stainless rubrail insert."

22      And then "Parts to be sent."

23      "Repair gel crack under caulk."

24      "Mr. Mains to show or provide location of the crack

25  to Brewers."

1      And so on.

2    A.   Correct.

3    Q.   And then "Sand and Re-bed starboard exhaust bullet."

4      And there's a note, "We do not feel this should be

5    changed.  No evidence that it is loose or the sealant is

6    broken."

7      Is that based on reports you got back from Dean

8    Beckman?

9    A.   Correct.

10   Q.   If we can go to the next page on Exhibit 24.

11      And then we go down to 18, and these are the 18 items

12   that Mr. Mains had identified in his letter of April 30,

13   correct?

14   A.   Correct.

15   Q.   And then again here the bullets are your action

16   points where you identified action points?

17   A.   Yes.

18   Q.   And then there's a dotted line that goes right here.

19      And then you have -- it says, "Items per Monday,

20   May 21st phone conversation and conference call Wednesday,

21   May 23rd."

22   A.   Yes.

23   Q.   And then there was eight new items here; is that

24   right?

25   A.   Yes, I believe so.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   And these were not items that had been on the

2   previous list?

3   A.   Correct.

4   Q.   Okay.  And if we go to the next page, there is

5   another four or five items; is that right?

6   A.   Yes.

7   Q.   And was that one of the reasons why you wanted an

8   agreed-upon list in your letter of May 24?

9   A.   Yes.

10        THE COURT:  I think you may have called this

11   Exhibit 24.  Is it 17?

12        MR. ROTONDO:  It's Exhibit 17, it's a May 24

13   letter.  I apologize.

14   BY MR. ROTONDO:

15   Q.   After this May 24 letter, you became aware of a

16   situation where the Mainses called you and said that there

17   had been a hydrolock situation related to flushing?

18   A.   I recall that afterward, yes.

19   Q.   And after that conversation where they told you about

20   that situation, did you have a series of -- you and other

21   people from Sea Ray have a series of discussions with the

22   Mainses about what should be done?

23   A.   Yes.

24   Q.   And did those discussions quickly reach an impasse on

25   how to deal with their particular boat?

 1   A.   Yes.

 2   Q.   And if we can now pull up Defendant's Exhibit 19.

 3        If we can -- is this a letter that you wrote dated

 4   June 14 -- letter you signed dated June 14, 2001 addressed

 5   to Mr. and Mrs. Mains?

 6   A.   Yes, that is.

 7   Q.   In the middle paragraph here you made a formal offer

 8   to Mr. and Mrs. Mains to buy back their boat --

 9   A.   Yes.

10   Q.   -- for $105,000?

11   A.   That's correct.

12             MR. ROTONDO:  I don't have anything further,

13   Your Honor.

14             THE COURT:  Any redirect?

15

16                  REDIRECT EXAMINATION

17   BY MR. NIKAS:

18   Q.   When you made the offer that Mr. Rotondo was just

19   talking about in Exhibit Number 19, was that an offer that

20   you made on your own?

21   A.   No.  That was a letter that we sent in follow-up to a

22   phone conversation, as I recall, where there was a couple

23   other people on the phone on a conference call.

24   Q.   Who was on that conference call?

25   A.   I believe Mr. and Mrs. Mains.  At Sea Ray it was

PDF created with pdfFactory trial version www.pdffactory.com

1    myself, Dave Marlow, and I think Nancy Luster.

2    Q.    What's Nancy Luster's position?

3    A.    At that time I believe her position was Director of

4    Customer Dealer Service.

5    Q.    And what was your role in developing this offer?

6    A.    Basically to distribute the letter.

7    Q.    Were you involved in any of the discussions?

8    A.    I was involved in the discussions with them in regard

9    to the offer, but, you know, when I believe Mr. Marlow

10   made the actual offer or whatever, then my letter is just

11   confirmation of that.

12              MR. NIKAS:  I have no further questions.

13              THE COURT:  Anything further, Mr. Rotondo?

14              MR. ROTONDO:  Not of Mr. Wade.

15              THE COURT:  Thank you, sir.  You may step down.

16              MR. ROTONDO:  Your Honor, I take it the

17   plaintiff is going to now rest?

18              THE COURT:  I think that completes the

19   plaintiffs' case.  Any motions can be made later.

20              MR. ROTONDO:  That's fine, later.

21              THE COURT:  All rights are preserved.  We won't

22   waste the jury's time at this time.

23              We'll take the defense next witness.

24              MR. ROTONDO:  Greg Wilson, please.

25              THE CLERK:  Please raise your right hand, sir.

```
 1                      GREGORY WILSON,

 2          called as a witness, having been first duly

 3          sworn, was examined and testified as follows:

 4

 5              THE CLERK:  Please be seated.

 6              Would you state your name and spell your last

 7   name, sir.

 8              THE WITNESS:  Gregory P. Wilson, W-i-l-s-o-n.

 9              THE CLERK:  Your city and state of residence,

10   please?

11              THE WITNESS:  Seymour, Tennessee.

12              THE CLERK:  Thank you.

13

14                   DIRECT EXAMINATION

15   BY MR. ROTONDO:

16   Q.   Good afternoon, Mr. Wilson.

17   A.   Good afternoon.

18   Q.   Where is Seymour, Tennessee?

19   A.   South of Knoxville.

20   Q.   I take it you're a native of Tennessee?

21   A.   Yes, sir.

22   Q.   Were are you employed at the present time?

23   A.   I am at the Knoxville plant.

24   Q.   Of Sea Ray?

25   A.   Yes.
```

1  Q.   How long have you worked there?

2  A.   Be 21 years this year, since '87.

3  Q.   Are you married?

4  A.   Yes.

5  Q.   Do you have any children?

6  A.   Two kids.

7  Q.   Boys or girls?

8  A.   Two boys.

9  Q.   What's your current position at Sea Ray?

10 A.   A yacht specialist.

11 Q.   What does that mean?

12 A.   Basically just supporting a new yacht coming up from

13 Florida, supporting a line, getting it up going.

14 Something new for us that we're starting to build this

15 year.

16 Q.   Is a yacht a power boat?

17 A.   Yes.

18 Q.   Is it just longer than most other boats?

19 A.   It's bigger.

20 Q.   And can you generally describe what other positions

21 you've held at the company over the past 21 years?

22 A.   Well, I started out in the hulls, working on the

23 hulls, the motorails, putting in gas tanks, water systems,

24 electrical systems, doing 110, set the head units, I set

25 the galleys in.  Basically built the boat from the front

PDF created with pdfFactory trial version www.pdffactory.com

1    to the back before it was capped, married together.

2         Worked in that three years, then I went to the front

3    line, basically doing all the material and glass and

4    putting the cabinets in.  Worked in there for about three

5    years.  Come back to the motors and set motors for about

6    six years.

7         And then I went into service and utility.  I've

8    worked in service and utility about four years.  I've been

9    back in the plant where I am now.

10   Q.   Were you in service and utilities between 1998 and

11   2000, 2001?

12   A.   Yes.

13   Q.   And in general terms, what were your responsibilities

14   in service and utilities?

15   A.   We went out in the field and assisted in warranty

16   stuff, warranty claims, helping the dealers trying to do

17   repairs and stuff.

18   Q.   Between 1998 and 2001 or so, in that time frame, did

19   you have any contact with Peter Mains and his 1998

20   Sundancer boat?

21   A.   Yes.

22   Q.   Can you generally describe the contact you had?

23   A.   The first time we went up sometime in '99, I think, I

24   can't remember what dates it was, but the first trip we

25   went was to follow up on a sublet we had who had left the

1    boat dirty and stuff.  And I went up to meet him at the

2    sublet, which is Atlantic Boat Repairs and I met him at

3    the boat.  We cleaned the boat up, done some other repairs

4    that was on it.

5    Q.    All right.  And if we can pull up Plaintiffs'

6    Exhibit 11.  I'm going to show you what has been marked as

7    Plaintiffs' Exhibit 11.

8         And do you recognize what's been marked as

9    Plaintiffs' Exhibit 11?

10   A.    Yes, sir.

11   Q.    Okay.  And when you went up to Connecticut in the

12   spring of 1999, was this document or a version of this

13   document something you had in your possession?

14   A.    Yes.  It was something that we normally got prior to

15   making a trip, we would get this, a punch list to gather

16   parts or look at what we had to do, get us prepared for

17   the trip.

18   Q.    How long were you up in Connecticut in the spring of

19   1999?

20   A.    I believe we were there for about three or four days.

21   Q.    And did you deal with the punch list that was

22   contained in --

23   A.    Yes, sir.

24   Q.    -- Plaintiffs' Exhibit 11?

25   A.    Yes, sir.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Now, so you were then on the Mainses' boat for some

2    period of time between two or three or four days,

3    something like that?

4    A.    Yes, sir.

5    Q.    Did you have any discussion -- and you were doing

6    work on the boat?

7    A.    Yes, sir.

8    Q.    And Mr. Mills was doing work on the boat?

9    A.    Yes, sir.

10    Q.    Did he have anybody else with him?

11    A.    He had another employee with him.

12    Q.    And what was the weather like when you were doing the

13    work?

14    A.    About like it is now.  Kind of cool in the mornings,

15    warmed up in the afternoon or whatever.

16    Q.    And how were you dressed when you went to work on the

17    boat?

18    A.    Well, they took the boat inside the shop.  Wore a

19    jacket in the morning and short sleeves in the afternoon

20    once it started warming up.

21    Q.    Did you have any discussion with Mr. Mains about what

22    you should be wearing on your feet when you were working

23    on his boat?

24    A.    He didn't want any shoes or nothing on his boat.

25    Q.    Can you describe what kind of work shoes you had?

1   A.   I wore tennis shoes and docksides, boat shoes.

2   Q.   So you were wearing boat shoes in the first place?

3   A.   I can't remember if I was using tennis shoes or boat

4   shoes, either one.

5   Q.   Either way Mr. Mains insisted that --

6   A.   Take our shoes off.

7   Q.   Did that apply both to you and Mr. Mills?

8   A.   Yes.

9   Q.   And if we can now go to the second page of

10  Exhibit 11.

11      Actually, why don't he go to the last page.

12      And there's a signature there at the bottom?

13  A.   Yes, sir.

14  Q.   And do you recognize what's written here?

15  A.   Yes, sir.

16  Q.   And what does it say?

17  A.   It says, "Repairs completed to satisfaction."

18  Q.   All right.  And do you know how that came to be

19  written at the bottom?

20  A.   Tim Mills was -- he was the one doing the repairs the

21  first time.  And I come in to make sure he done it right

22  the second time.  And he made Peter Mains -- he wrote that

23  up there and that's Peter Mains' signature below it.

24  Q.   And when you say he made him, did he put him in a

25  headlock?

1  A.   No, sir.  He just requested that he do it.

2  Q.   Okay.  Now, there are some initials -- let me put it

3  this way.  At some point in time was the work completed

4  when you were there?

5  A.   Yes, sir.

6  Q.   And did you go through the boat with Mr. Mains?

7  A.   Yes, sir.

8  Q.   And do you know how these initials P.M. came to be

9  placed in different spots?

10  A.   That's where Peter Mains was signed making sure we

11  were doing the repairs.  After we completed the repairs on

12  the boat, it's just like we do at the plant when we have

13  employees come up and do repairs, we make them sign their

14  initials beside saying they agree with the repairs that

15  were done.

16  Q.   Now if we can scroll down page 3, does that apply to

17  all the other initials that are here?

18  A.   Yes.

19  Q.   I see some asterisks in spots, two or three, maybe

20  four down here and one up here and another one up here.

21  Do you know what those are about?

22  A.   That's something that I've made for years.  When I'm

23  looking over a repair sheet and I'm going out there like I

24  maybe started doing this on Monday, doing this repair, and

25  that's something I would have made that little mark saying

1   that I didn't do it, I would come back later and address

2   it.

3   Q.   Later, when you're talking about later in the same

4   visit?

5   A.   Later in the same visit.  Something I had to order a

6   part for or get something to work on it with.

7   Q.   And the initials again here mean the same thing, at

8   the end of the work that you did, Mr. Mains initialed

9   these items?

10  A.   Right.

11  Q.   If we can scroll back to page 2.

12       The asterisk on this page, the two of them, the same,

13  those are your marks?

14  A.   Yes.

15  Q.   Again the initials?

16  A.   Yes.  Completed the work.

17  Q.   How long did this process take where Mr. Mains walked

18  through the boat with you and Mr. Mills and initialed the

19  page?

20  A.   After we cleaned it up that day, Mr. Mains was there.

21  We got him to come in the boat and look it over.  We spent

22  another hour or so looking over the boat and making sure

23  the repairs were made.  Hour, two hours, something like

24  that.

25  Q.   Now, did you make any other trips to see Mr. Mains'

1    boat?

2    A.    Yes, I did make a second trip.

3    Q.    And was that a special trip to deal with his boat or

4    was that part of some other project?

5    A.    I was up -- actually, I was up north at another boat

6    looking at it.  And since I was close, David wanted me to

7    come by since he was complaining about the exhaust noise

8    and try some new football mufflers in it.

9    Q.    When you say "David," who are you referring to?

10   A.    David Wade.

11   Q.    Now, did you have this football muffler, however you

12   refer to it, did you have it with you?

13   A.    I didn't have it with me.  They sent it up here UPS.

14   Q.    Did you do any -- did you install it?  What did you

15   do when you got there?

16   A.    The ones I originally had the first day I was there

17   was too big.  They overnighted me some more and I had them

18   the next day.

19   Q.    Then what did you do?

20   A.    I went in and put the other ones in, they were small

21   enough to go in there.

22   Q.    Where was the boat when you did this?

23   A.    Deep River, the marina where he kept it at.

24   Q.    Was it in the water or on land?

25   A.    Out of the water.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    Did you take the boat out and try to verify the

2    complaint about the exhaust noise?

3    A.    No, sir.

4    Q.    Now, on the second trip did you work outside the boat

5    or inside the boat?

6    A.    Worked inside the motorail.

7    Q.    Motorail, is that sometimes called the engine bilge?

8    A.    Engine room, right.

9    Q.    How long were you there doing that work?

10   A.    Couple days.

11   Q.    And what's the surface like inside that engine area?

12   A.    Kind of rough.  Like walking around on river rock,

13   whatever.

14   Q.    What were you wearing on your feet when you did that

15   work?

16   A.    Sock feet.

17   Q.    What was that?

18   A.    No shoes on the boat.

19          MR. ROTONDO:  I have nothing further.

20          THE COURT:  Whenever you're ready, Mr. Nikas.

21

22                    CROSS-EXAMINATION

23   BY MR. NIKAS:

24   Q.    Mr. Wilson --

25   A.    Yes, sir.

1  Q.   -- you told Mr. Rotondo that you made some

2  preparations for making the trip before going out to see

3  the boat owned by Peter and Lori; is that correct?

4  A.   Yes, sir.

5  Q.   What preparations were those?

6  A.   Just making sure that we was going to have the parts

7  that we were going to need when we get there to repair it.

8  Q.   How would you know before you arrived what types of

9  parts or equipment would be needed to effect a repair?

10  A.   We had a repair sheet.

11  Q.   And would that be the list provided by Mr. Mains?

12  A.   Yes, sir.

13  Q.   And when he listed this issue regarding exhaust

14  noise, did you respond by attempting to address that

15  issue?

16  A.   This wasn't on my first trip.  That was the second

17  trip.

18  Q.   So on the second trip, what did you do to prepare to

19  address that issue?

20  A.   I didn't even have a repair sheet or nothing.  I was

21  in the area and David wanted me to go by and put these

22  mufflers in.

23  Q.   Were these mufflers or baffles?

24  A.   Baffles.

25  Q.   And when you got the phone call, you had no idea you

PDF created with pdfFactory trial version www.pdffactory.com

1   were going to stop by?

2   A.    I think David had been preparing for the trip, but it

3   was kind of -- I was up here and I didn't know if he was

4   going to send somebody else in service or utility or what.

5   I was in the area and he said go ahead and get it up here

6   since you're there and take care of it.

7   Q.    And did you have the baffles with you?

8   A.    No.

9   Q.    Where did you pick them up?

10  A.    They were sent to the marina.

11  Q.    And for the jury's benefit, unless they're boat

12  owners or drive Harley Davidsons, what exactly are

13  baffles?

14          MR. NIKAS:   Your Honor, may I approach?

15          THE COURT:   You may.

16  BY MR. NIKAS:

17  Q.    They would be further down the line from this, but

18  they're familiar with this component.

19  A.    Basically this has nothing to do with a baffle.   The

20  baffle's on the two and a half inch pipe that's coming

21  from the collector resonator.

22  Q.    The only component we've actually seen are those

23  elbows.   So the elbows were on top of the engine, the

24  exhaust hose comes out from the elbow into the collector?

25  A.    Right.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   And then the baffles were installed where from there?

2  A.   There's -- there's the football type of muffler

3  baffle is on the 2-inch exhaust, it leaves that and goes

4  outside of the boat.

5  Q.   The baffle is really just a component that's inserted

6  into the tubing to try to break up the resonance of the

7  exhaust?

8  A.   No.  It's a fiberglass muffler.  You have to cut the

9  hose to actually put it inside of.  Not inside of, but

10  actually it's on the outside.  You got to push the hose on

11  both sides of the two clamps and you can see the mufflers.

12  It's about the size of two milk jugs end to end.

13  Q.   How does it work?

14  A.   Fills up with water and baffles the sound.

15  Q.   And the water comes from the elbow right there?

16  A.   Yes, sir.

17  Q.   And did you physically yourself install these

18  baffles?

19  A.   Yes, sir.

20  Q.   When you did that, you paid particular attention to

21  ensure that at least at the time you were on board -- I

22  want to make clear, the time you were on board this boat

23  had what type of exhaust system?

24  A.   Resonator exhaust system.

25  Q.   Collector?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Collector.  Not the water lifting.

2    Q.    So it had the exhaust system it had when it heft the

3    factory after it was built?

4    A.    Yes.

5    Q.    And you never saw the boat after the water lift

6    muffler had been installed?

7    A.    When it was at the factory, yes.

8    Q.    What was your involvement with this boat at the

9    factory?

10   A.    I didn't work on the boat at the factory.  I overseen

11   some of the stuff like David Wade would.  I'd go inside of

12   it and make sure they were doing the work, but most of the

13   time I was out on the road.  Just when I was at the plant

14   I may touch base and see if anybody needed help.  I didn't

15   work on the assembly line.

16   Q.    So you were just ensuring the work was done properly?

17   A.    Not really.  We had inspectors doing that.

18   Q.    Maybe you can clarify, what was your job there?

19   A.    Service and utility.

20   Q.    What was your role with this boat?  When you went to

21   go look at it, what were you doing that for?

22   A.    When I come up to make the trip up here?

23   Q.    No, no.  In the factory.

24   A.    I didn't have a role in this boat, no.  I would

25   just -- if I was in the factory for a couple days, I was

1    support.  When I was not on the road, I was support there.

2    So I didn't work on the boat.  I would just -- basically

3    walking by and seeing how it was going.

4    Q.    Were you ever informed of the reason for the change

5    from the collector to the water lift exhaust?

6    A.    I was aware they done the change trying to take care

7    of the noise problem.

8    Q.    And did you have an opinion whether that would be

9    effective?

10   A.    We were just told that the water lift was a quieter

11   type exhaust.

12   Q.    Who were you told that by?

13   A.    Just from their engineering department.

14   Q.    Whose engineering department?

15   A.    Sea Ray's.

16            MR. NIKAS:  No further questions.

17            MR. ROTONDO:  No redirect, Your Honor.

18            THE COURT:  Thank you, sir.  You may step down.

19            MR. ROTONDO:  Your Honor, the defense rests.

20            THE COURT:  Let's caucus at the sidebar for a

21   minute.

22            (Sidebar discussion off the record.)

23            THE COURT:  Ladies and gentlemen, I should put

24   on the record, no rebuttal witnesses, so the evidence is

25   now closed.  And Monday morning you will come in and we

PDF created with pdfFactory trial version www.pdffactory.com

```
 1  will have closing arguments of counsel and my instructions
 2  to you on the law.
 3        I do want to build in some time for us to --
 4  when I say "us," I mean counsel and myself to talk about
 5  the instructions and the law.  We have to have a
 6  conference to review them.  And I think we'll probably
 7  have that conference 8:30 on Monday.  So that we don't
 8  keep you waiting or at least waiting too long, why don't
 9  we plan on you being here at 9:30.  If you want to get
10  here earlier, fine.  We'll try and get extra coffee.
11        The other thing I think is we'll make sure that
12  they fill out orders for lunch so we can make sure you
13  don't waste time standing in line any place on Monday,
14  you'll be provided with lunch.
15        I do want to remind you that although you've
16  heard all the evidence, you have not yet heard the
17  arguments of counsel or my instructions to you on the law.
18  And therefore you should not come to any conclusions.
19        You should also continue not to discuss the case
20  amongst yourselves or with anyone else.  You should not
21  have any contact with the parties, attorneys, or
22  witnesses.  And you should not be exposed to anything
23  outside this courtroom relating to this case or any
24  similar matter.  It is essential that your verdict in this
25  case be based solely on the evidence that has been
```

PDF created with pdfFactory trial version www.pdffactory.com

1    admitted here in the courtroom.

2           I want to thank you all for your hard work this

3    week and we'll see you Monday morning at 9:30.

4                 (Whereupon the jury left the courtroom.)

5           THE COURT:  We'll take a 20-minute recess and

6    come back and argue the Rule 50 motion.  Okay?  After that

7    we'll talk about my questions on the charge.

8                 (Whereupon, a recess followed.)

9

10          THE COURT:  What I think I'd like to do is do it

11   count by count.

12          MR. ROTONDO:  May I begin?

13          THE COURT:  Yes.

14          MR. ROTONDO:  Your Honor, with respect to Count

15   One, which is the product liability count, Sea Ray submits

16   that it's entitled to judgment as a matter of law with

17   respect to that count because the plaintiff has an

18   obligation to prove that the product is defective and

19   unreasonably dangerous to the consumer or user, and that's

20   under Sharp v. Wyatt, 31 Conn. App. 824, 833.

21          This case involves mechanical issues and issues

22   relating to maritime engines and exhaust systems, which

23   are subjects to which an ordinary consumer is not able to

24   form expectations of safety.  And the plaintiff has

25   offered no expert testimony that the boat was unreasonably

PDF created with pdfFactory trial version www.pdffactory.com

1    dangerous and defective.  Mr. Wicander simply testified

2    that he thought the cylinders had scored as a result of

3    water ingestion over some period of time that pre-dated

4    the hydrolock incident, but didn't offer any testimony as

5    to causation of that, when that occurred, how that

6    occurred, or that the ingestion was in fact the result of

7    any sort of a defect.

8         In addition, plaintiffs haven't offered any

9    expert testimony that the boat itself was unreasonably

10   dangerous.  And there's been a fair amount of testimony to

11   the fact that plaintiffs thought the boat was safe and

12   acted as if the boat was safe by taking their family out

13   on it.

14        In the addition, to the extent the plaintiffs

15   tried to curl the negligible repair claims under the

16   Product Liability Act, those claims are expressly barred

17   by the Product Liability Act because the issue is the

18   condition of the boat at the time it was sold and not

19   repairs that took place later.

20        THE COURT:  Can you say that part again?  I was

21   just thinking, we have three theories under the Product

22   Liability Act claim:  Strict liability, implied warranty

23   merchantability, and express warranty.

24        MR. ROTONDO:  Yes.

25        With respect to the --

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              THE COURT:  Yes, Mr. Nikas?
 2              MR. NIKAS:  Excuse me, Your Honor.  Actually
 3    also a fourth one, which is failure to warn that was pled.
 4              THE COURT:  I know it was pled, but I was
 5    operating on what the parties put in the trial memo and
 6    requested in the jury charge.
 7              MS. LEV:  The joint trial memorandum references
 8    Section (q) of the Product Liability Act, which is that
 9    section, failure to warn.
10              THE COURT:  I didn't get a request to charge on
11    it.  I guess I'll want you all to get me one if it's in.
12              MR. ROTONDO:  The next argument is --
13              THE COURT:  Failure to warn is what you're
14    saying?
15              MS. LEV:  Yes, subsection (q).
16              THE COURT:  I know what you're talking about.  I
17    just -- I got a joint proposal for jury instructions and
18    it said there were three theories.
19              So can we go back to the point -- I got lost,
20    I'm sorry.
21              MR. ROTONDO:  I was about to start my next
22    argument with respect to the express warranty claim.
23              THE COURT:  What was the second point you were
24    making, though?
25              MR. ROTONDO:  The second point I was making was
```

PDF created with pdfFactory trial version www.pdffactory.com

1  that to the extent that the claims of negligence in the

2  first count related to repairs, those claims are in fact

3  outside the scope of the Product Liability Act.

4          THE COURT:  Because that's the negligence count,

5  which is Count Two.

6          MR. ROTONDO:  Right.

7          THE COURT:  Okay.  Thank you.

8          MR. ROTONDO:  With respect to the express

9  warranty count, there's an express warranty claim within

10  the product liability count.  And with respect to that

11  claim, the only evidence of an express warranty here by

12  Sea Ray is that there was a one-year warranty and that

13  one-year warranty was an express limited transferable

14  warranty, and it indicates it doesn't cover repairs after

15  the applicable period of time.  And it's expired.  It was

16  one year and it expired.  And we rely on Abraham v.

17  Volkswagen of America, 795 F.2d 250 for that proposition.

18          With respect to the claim of breach of implied

19  warranty of merchantability, we submit there's no evidence

20  to support the plaintiffs' claim that Sea Ray breached an

21  implied warranty of merchantability, because to be

22  merchantable means that it has to pass without objection

23  in the trade under a contract description fit for the

24  ordinary purpose for which such goods are used.  In fact,

25  this boat was used for an extended period of time.  The

PDF created with pdfFactory trial version www.pdffactory.com

1    complaints that the plaintiffs are really making are not

2    with respect to the condition -- the reason they're

3    claiming the boat did stop working is the hydrolock which

4    occurred in 2001 unrelated to the condition of the boat as

5    it was originally sold.  And in support of that

6    proposition, we rely on Standard Structural Steel Company

7    v. Bethlehem Steel, 597 F.Supp. 164, 185.

8             THE COURT:  On the implied merchantability, one

9    of the things I wanted to know whether I had to do,

10   Defendant's 49 --

11            MR. ROTONDO:  Defendant's 49?

12            THE COURT:  I think it's 49.

13            MR. ROTONDO:  94, Your Honor, the exhibit?

14            THE COURT:  The warranty itself.

15            MR. ROTONDO:  I think it's 94.

16            THE COURT:  That's the language containing the

17   express warranty, but it also has a disclaimer in it.

18            MR. ROTONDO:  It does.

19            THE COURT:  And when I was writing the charge, I

20   didn't know if I should be putting in the standard

21   language about if there's no disclaimer -- that's what

22   I've been researching.

23            The second sentence under "Other Limitations," I

24   was trying to decide how to draft the charge language

25   because that's in the document, but from the research I

PDF created with pdfFactory trial version www.pdffactory.com

1    had seen, that's a question of law as to whether there's

2    been an adequate disclaimer.  That's what I've been

3    checking on.  That was one of the things I wanted to

4    mention to you all.

5            MR. ROTONDO:  Okay.

6            THE COURT:  I started on this because I had a

7    question because the request to charge used the same

8    formulation in terms of -- sort of as the summary.

9    Defective and unreasonably dangerous as sort of the

10   touchstone for all three of strict product liability and

11   express warranty and implied warranty of merchantability.

12   And just reading the language, I wound up looking at some

13   cases.  And I ran across one that mentioned -- I was

14   looking to see whether it is in fact accurate to

15   articulate it in the same terms.  And I did find a Second

16   Circuit case that was actually from the District of

17   Connecticut from 1969, Basko v. Sterling Drug which says

18   it is the same.  So I would have to go back and change

19   what I put in my draft.

20           But it led me to the threshold question of

21   whether, when I was trying to write in the -- describe

22   disclaiming, whether it might be error of law for me to

23   submit that to the jury, I think.  That's what I'm

24   concerned about.

25           MR. NIKAS:  Your Honor --

 1          THE COURT:  Yes?

 2          MR. NIKAS:  Isn't the Connecticut Product

 3 Liability Act a state statute?

 4          THE COURT:  Yes, it is.

 5          MR. NIKAS:  Would it not be interpreted by

 6 Connecticut state law?

 7          THE COURT:  Yes, it is.  And we have a

 8 Connecticut Supreme Court case.  And if I start with the

 9 state cases, I think that claim just drops out altogether.

10          MR. NIKAS:  You'll explain your basis?

11          THE COURT:  I can tell you.  If there's a

12 disclaimer under 2 dash 3 -- hold on.  I didn't bring my

13 state statutes in with me.

14          2-316(2) is the standard.  And the cases that I

15 had been reading said it's a question of law for the Court

16 to decide.  So that may moot the question I was starting

17 to look at.

18          And there's also a Connecticut Supreme Court

19 case where they decided not to -- they discussed it but

20 didn't reach a formal conclusion.

21          Can you all get me a charge on the failure to

22 warn?  I didn't get that from the parties.

23          MR. ROTONDO:  That was not provided, Your Honor.

24          Can I address that failure?  Maybe I ought to

25 hear what the failure to warn claim is, because I'm not so

PDF created with pdfFactory trial version www.pdffactory.com

1    sure what the failure to warn claim is that the plaintiffs

2    are asserting.  If they're claiming a failure to warn of

3    water ingestion, I don't think there's any basis for that

4    as a product liability claim.  There's simply no evidence

5    to support there's a defect, just simply --

6              THE COURT:  I'm sorry.  We don't do that here.

7              MR. NIKAS:  I apologize, Your Honor.

8              MR. ROTONDO:  There's no basis for asserting

9    that failure to warn of water ingestion is a defect here.

10   There's no testimony to that effect.

11             To the extent that the plaintiffs are claiming

12   failure to warn about the changeover from the so-called

13   collector style to the water lift style, if that's the

14   claim, that's a repair that was made later and doesn't

15   give rise to a product liability claim.

16             Unless they have some other failure to warn

17   claim, I can't see how they establish a failure to warn

18   claim for purposes of the Product Liability Act.

19   Mr. Nikas may --

20             THE COURT:  Okay.  Do you want to address the

21   Product Liability Act, Mr. Nikas?  Take them one theory at

22   a time, if you don't mind.  Strict liability first, if you

23   don't mind.

24             MR. NIKAS:  As to strict liability, Your Honor,

25   there's uncontroverted testimony by Mr. Wicander that the

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   physical evidence that was discovered during the
 2   inspection of the engine following its failure on July 9
 3   was longstanding.  And given the fact that there's no
 4   evidence to the contrary that the water entered the engine
 5   through anything other than the exhaust elbow, the jury is
 6   entitled to infer that that condition would not have
 7   occurred absent defective product.  And given the duration
 8   of it, the jury should be allowed to determine whether
 9   that defect existed at the time of its sale.
10          As to the warranty limiting the duration of the
11   time that defect would be covered --
12          THE COURT:  You're moving to express warranty
13   now?
14          MR. NIKAS:  Correct, Your Honor.
15          It's clear that that would toll, based on the
16   fact that the warranty guarantees that the product will be
17   free from defect for a period of at least one year.  In
18   Standard Alliance v. Black Clawson Company,
19   587 F.2d 813 --
20          THE COURT:  Slow down for a second, please.
21          MR. NIKAS:  Standard Alliance v. Black Clawson
22   Company, 587 F.2d 813, Sixth Circuit, 1978, the court held
23   that the future performance exception to a warranty time
24   period applies when the seller explicitly agrees to warn
25   its product for a defined period of time.  Moreover,
```

1    because the defect was not discoverable during the time

2    period argued by defendant, the court should be allowed --

3    the warranty is tolled until the defect manifests itself

4    and it's possible to determine what the defect is.  That

5    is Pacific Gas & Electric Company v. Westinghouse, 1

6    Fed.Appx. 623, Ninth Circuit, 2001.  Also Kaiser Cement &

7    Gypsum v. Allis-Chalmers, 35 Cal.App.3d. 948, 1973,

8    determining that it was prospective warranty because it

9    stated the goods will operate in a specified fashion for a

10   period extending into the future and that the warranty

11   will not expire until it's reasonably discoverable, the

12   defect or the failure of the goods performance is

13   reasonably discoverable to the party bringing the claim.

14          THE COURT:  Okay.  And did you want to address

15   implied warranty?  And also failure to warn.

16          MR. NIKAS:  The defendant's own expert testified

17   that the vessel was not fit for its intended purpose and

18   usage certainly at the time of its inspection dating back

19   to the time of its failure.  Plaintiffs also testified

20   that they were unable to use the vessel as intended in

21   that the concealment of the defect which caused this

22   failure should toll any warranty period or any attempted

23   waiver of that implied warranty due to the fact that the

24   defect existed prior to the time of the sale to

25   plaintiffs.  And the jury can reasonably infer such facts

PDF created with pdfFactory trial version www.pdffactory.com

 1  from the uncontroverted testimony that was proffered.

 2          Similarly, defendants did not warn plaintiff

 3  regarding propensity or the possibility of the ingestion

 4  of water through the exhaust system and exhaust elbows and

 5  that Mr. Wicander testified without contest that the

 6  engine scoring in the cylinder walls would eventually lead

 7  to decreased engine performance and possibly catastrophic

 8  engine failure.  Such failure, if it occurred at sea,

 9  would necessarily cause an unreasonable danger of injury

10  to either the owners or any other persons on board.

11          THE COURT:  Ms. Lev was going to point out

12  something to me in the joint trial memorandum, and I just

13  want to make a note as to where that is.

14          MS. LEV:  Yes, Your Honor, at the bottom of

15  page 4, the citations to the Connecticut General Statute

16  pertaining to product liability cite to Section 52-572q,

17  which is the failure to warn statute.  Specifically it's

18  the liability --

19          THE COURT:  I'm going to read, okay?

20              (Pause.)

21          THE COURT:  Did you say the bottom of page 4?

22          MS. LEV:  Yes, it's in Footnote 6.

23          THE COURT:  I'm looking at the joint trial

24  memorandum dated May 29.

25          MS. LEV:  I'm sorry, Your Honor.  I was

1    referring to the proposed jury instructions.  It's on

2    page 4 of those proposed jury instructions.  I apologize.

3              THE COURT:  The problem I have with what you're

4    telling me is that you've got a footnote that cites the

5    Act and then on the next page it says the plaintiffs have

6    brought their claim under the Act on three different

7    grounds: strict liability, breach of implied warranty

8    merchantability, and breach of express warranty.  To say

9    that that little citation to the --

10             MS. LEV:  Your Honor, this is coupled with

11   assertions made --

12             THE COURT:  That's a citation to the Act as a

13   whole.  Under that theory you would have claimed in the

14   joint trial memorandum, you told me you were going to

15   be -- you could pull out any theory you want you find

16   anywhere in the Act.  That's totally deceptive.

17             MS. LEV:  Your Honor, this is coupled with

18   assertions that have been made since the original

19   Complaint was filed and throughout --

20             THE COURT:  Why do I have a set of jury

21   instructions that tell me there are going to be three

22   theories?

23             MS. LEV:  I can't explain that.  I didn't draft

24   those, Your Honor.

25             THE COURT:  Can you explain that, Mr. Rotondo,

1    why I have three theories and I don't have anything about

2    failure to warn here?

3              MR. ROTONDO:  I think that, at least from our

4    perspective, we prepared what we thought the issues in the

5    case were based on what the evidence was.  And plaintiffs

6    didn't suggest anything different.

7              MR. SENNING:  Your Honor, I was involved solely

8    in the case at the time the joint trial memorandum had

9    been finalized.  I thought that that had been included.

10   And I saw the section cited at the bottom of 6 and I was

11   thinking, because of that, knowing what that section

12   meant, I was thinking that that was included.  I didn't

13   catch the three theories on the next page.

14             THE COURT:  Well, you didn't see also that there

15   was no section on failure to warn anywhere in the charge?

16             MR. SENNING:  No, I didn't, Your Honor.

17             THE COURT:  What is the claim in the -- I'm

18   looking -- I just don't like having people switch things

19   on me, okay?

20             Where in the text of the plaintiffs' contentions

21   is the reference to failure to warn so I know exactly what

22   was claimed?

23             MR. NIKAS:  Page 5 at the end of Section A,

24   line 3.

25             THE COURT:  You're in the joint trial

 1    memorandum?

 2              MR. NIKAS:  Correct, Your Honor.

 3              THE COURT:  Page 5.

 4              MR. NIKAS:  Page 5, last paragraph of section

 5    (a).

 6              THE COURT:  Let me read that.

 7                    (Pause.)

 8              THE COURT:  Are you claiming all of those?

 9              MS. LEV:  Your Honor, the last sentence of that

10    paragraph says explicitly --

11              MR. NIKAS:  Third line, breach of or failure to

12    discharge a duty to warn or instruct.

13              THE COURT:  It also says misrepresentation or

14    nondisclosure.

15              MS. LEV:  That pertains to the negligence claim

16    as well, Your Honor, but that would fall under subsection

17    (q).

18              THE COURT:  In the Complaint where's the duty to

19    warn allegation?  Maybe page 14, subparagraph (b), (c).

20              MR. NIKAS:  Page 14, paragraph 60(b), (c),

21    ostensibly (d).

22              THE COURT:  I see fail to warn in (b).  I see

23    fail to warn in (c).  And I don't see fail to warn --

24              MR. NIKAS:  Misrepresented regarding the safety

25    and fitness for use.

1          THE COURT:  Which paragraph are you reading

2     there?

3          MR. NIKAS:  That's the paragraph immediately

4     following, the (d) paragraph.

5          THE COURT:  I'm going to go with where it says

6     fail to warn.  That's pled properly.

7          So the answer to the question as to what the

8     claims are in terms of failure to warn are paragraph 60(b)

9     and (c).

10          Do defense counsel have the Complaint there?

11          MR. ROTONDO:  In front of us, yes, Your Honor.

12          THE COURT:  Everybody now is on the same page as

13     to what the failure to warn claims are?

14          MR. ROTONDO:  Yes.

15          THE COURT:  Okay.  Good.  Let me mark that page.

16          And you think you covered one of those in your

17     argument, Mr. Nikas, and the other one is apparent to me.

18          MR. NIKAS:  Furthermore, Your Honor, in regards

19     to the product liability claims, the fact that defendants

20     made literally from the first nine days of operation of

21     the vessel until well over almost a year and several

22     months past the expiration of the purported warranty

23     expiration date, continued to make warranty repairs to

24     this vessel on their own and extended the warranty past

25     the expiration date should act as a waiver of any attempt

1   to limit the warranty to a one-year period.

2           Additionally, the repeated repair attempts from

3   the first nine days of the vessel's operation should also

4   serve to explain plaintiffs' reliance on those repeated

5   promises that were testified to by both plaintiffs and the

6   two Sea Ray witnesses as well as the dealership witness

7   about repeated attempts to satisfy the concerns raised by

8   plaintiffs.

9           THE COURT:  I'd like to make sure you all get me

10  a charge on the duty to warn pretty soon.  Okay?  Or I'll

11  send you a charge with a blank spot in it.  It all sort of

12  flows, so I need it.

13          Okay, let's go to Count Two.  I'm reserving

14  ruling on those, but if the implied warranty

15  merchantability drops out of the draft that you get, it

16  was intentional, okay?

17          MR. ROTONDO:  May I respond to one of the points

18  made by Mr. Nikas?

19          THE COURT:  Yes.

20          MR. ROTONDO:  With respect to the warranty

21  claim, first of all, Exhibit 94 says that the warranty

22  says that Sea Ray will repair and it's not a future

23  performance warranty.  It doesn't guarantee or even say

24  that the product is not defective.

25          THE COURT:  Okay.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. ROTONDO:  The second thing, to respond

2     perhaps to Your Honor's question directly of me a couple

3     of minutes ago when you talked about the difference --

4     perhaps different standards that might apply under the

5     Product Liability Act with regard to the strict liability

6     and the --

7          THE COURT:  Implied.

8          MR. ROTONDO:  I think, Your Honor, since they're

9     bringing the claim under the Product Liability Act, they

10    still have to meet the standard of it being defective and

11    unreasonably dangerous.  That's what they have to prove

12    because it's a Product Liability Act claim.  They might be

13    able to make a claim that there is a -- or can make the

14    claim that there's either implied or express warranty, but

15    the standard in terms of what the requirements of the Act

16    are are the same, at least in terms of the issue of

17    defect.

18         MR. NIKAS:  Excuse me, what did you say?

19         MR. ROTONDO:  What I said was the standard of

20    defect is still the same.

21         MR. NIKAS:  Your Honor, may I respond just to

22    that point?

23         THE COURT:  Yes.

24         MR. NIKAS:  The jury's entitled, in fact the

25    Supreme Court has said credibility determination is a

1    weighing of the evidence and the drawing of legitimate

2    inferences from the facts are jury functions, not those of

3    the judge.  The only evidence as to the issue of danger

4    was provided by plaintiffs' expert witness, that testimony

5    was unconverted.  The jury should be allowed, in fact,

6    since there's no evidence to the contrary, to determine

7    the severity of the risk or the existence of the danger.

8              THE COURT:  I don't think you understood the

9    point.  He was talking about what the standard is, not

10   whether I decide it or not.  Okay?

11             I had said I was reserving ruling on those with

12   the possible exception of the implied warranty claim,

13   which I think our law says is a matter for the Court to

14   decide.

15             MR. ROTONDO:  To respond to that last point, I

16   understand Your Honor's reserving ruling, but so the

17   record is clear, Mr. Wicander's testimony that the

18   cylinders or the engine may at some point fail in the

19   future doesn't constitute a harm within the meaning of the

20   Act.  You actually have to have a failing.  So this water

21   ingestion theory, while being nice, it doesn't constitute

22   a harm.

23             And in addition, the Abraham v. Volkswagen of

24   America case I cited before, 795 F.2d 238, 250 makes clear

25   that a manufacturer does not have an obligation to design

PDF created with pdfFactory trial version www.pdffactory.com

1    a product in such a way that it will never wear out in the

2    future.  So Mr. Wicander, in the first place, didn't say

3    it was defective.  He didn't use the magic words, he

4    wasn't disclosed to use the magic words, he doesn't get

5    them across the line with respect to the issue of

6    defective design.

7              MS. LEV:  Your Honor, may I respond?

8              THE COURT:  I'm reserving.  They'll file their

9    papers; you can file some.

10             I gather the argument that I'm hearing is

11   that -- first of all, there was an objection filed by the

12   plaintiffs as to the definition of "harm."  And I do find

13   persuasive the plaintiffs' version of the definition of

14   "harm," it's right out of the statute.  Includes harm to

15   the product.

16             MR. ROTONDO:  Correct.

17             THE COURT:  Okay.

18             MR. ROTONDO:  But Mr. Wicander -- the issue

19   there is really -- the issue there was really the issue of

20   whether or not the hydrolocking, the fact that the engine

21   stopped, whether or not that constitutes harm.

22   Mr. Wicander's testimony that there's scoring that doesn't

23   result in a failure, it's our position that that doesn't

24   constitute harm.  Some gradual process by itself literally

25   isn't harm within the meaning of the Act.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  I understand.  I think I want to

2    have a transcript and go through things to make a decision

3    on that myself.

4          MR. ROTONDO:  With respect to the negligence

5    claim, Your Honor, we submit that there are two

6    deficiencies with respect to that.

7          First, the plaintiffs haven't introduced any

8    expert evidence that Sea Ray breached any applicable

9    standard of care here with respect to the issue of

10   negligence.  And expert testimony is required when a

11   request involved goes beyond the fields of the ordinary

12   knowledge and intent of jurors.  We rely on the LePage v.

13   Horne case.

14         THE COURT:  Just so we're clear here, the

15   gravamen of the negligence claim is not supervising

16   repairs done to the boat, performing repairs that were not

17   done in appropriate and workmanlike manner, failing to

18   provide proper instructions for flushing the boat's

19   engines.  And I think the plaintiffs had objected to

20   certain other -- four other items not being included.

21         I did have a question about the first thing that

22   was added by the plaintiffs, Mr. Senning.

23         MR. SENNING:  Yes, Your Honor?

24         THE COURT:  In your objection, I think you're

25   referring to things from paragraph 58 of the Complaint.

1    And you're saying that you'd like four additional items

2    added.  If you have the joint trial memo and the jury

3    charge instructions, your objections at the end, Objection

4    Number 4.  And you reference paragraph 58 of the

5    Complaint.

6              MR. SENNING:  What page, Your Honor?

7              THE COURT:  Your objections.  Your objections

8    are only three pages.  I'm on the second page at the top.

9              So Objection Number 4.

10             MR. SENNING:  Yes, Your Honor.

11             THE COURT:  The first bullet point, when?  What

12   point in time are we talking about?

13             MR. SENNING:  We're talking about when the boat

14   was at the Sea Ray facility in Knoxville.  There was no

15   evidence --

16             THE COURT:  When when it was at the Sea Ray

17   facility?  Was it there when it was made?

18             MR. SENNING:  I'm sorry, when it was returned to

19   Sea Ray.

20             THE COURT:  So that would have been in 2000,

21   2001?

22             MR. SENNING:  That's correct.  Also when the

23   boat was constructed there's no evidence --

24             THE COURT:  Well, isn't the construction date

25   past the statute?

1          MR. SENNING:  Well, if you can't discover the

2     defect, then the statute is tolled.

3          THE COURT:  Well, if there's a possibility of a

4     finding on this one, I'm going to want to have a special

5     interrogatory -- if there were to be a finding on this

6     basis, I need to know which basis it was on.

7          I thought the negligence claim -- actually, I

8     withdraw the question.  Because it really can only be the

9     2000, 2001 period because I believe it says negligent in

10    making repairs to the boat.  Okay.  So that would be in

11    2000, 2001.  Okay.

12          I'm sorry, I cut you off, Mr. Rotondo.

13          MR. ROTONDO:  The other argument, Your Honor, is

14    plaintiffs --

15          THE COURT:  Your first argument was no expert

16    testimony --

17          MR. ROTONDO:  About a breach of the applicable

18    standard of care.

19          Second argument was plaintiffs have introduced

20    no evidence that Sea Ray acted negligently in relying on

21    the original flushing instructions provided by MerCruiser

22    or not supplementing those original instructions.  Those

23    are the two arguments with respect to negligence,

24    Your Honor.

25          THE COURT:  Okay.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. NIKAS:  Your Honor, there's no expert
2  testimony required when Mr. Wade, who was the customer
3  service director charged with supervising repairs,
4  disclosed that he made no inquiry as to whether the
5  instructions had changed.  He made no inquiry as to
6  whether the retrofitted exhaust system was even necessary
7  or even recommended as a replacement for the
8  collector-style exhaust.  In fact, I think he stated that
9  he consulted nobody, he consulted nothing, and then failed
10  to notify plaintiffs that the modification had even been
11  made.  And then once the modification had been made, he
12  said, well, he didn't know that it required different
13  maintenance.  And so the failure to do so resulted in use
14  by plaintiff of the existing instructions having no notice
15  that those instructions would no longer be effective for
16  this exhaust system which resulted in the hydrolocking
17  incident of June 9.  To argue that some form of expert
18  testimony is required for the jury to understand that's
19  negligent is just not reasonable.
20          Moreover, the entire process by which the vessel
21  was repaired, not just while it was at the factory, but
22  from the time the first repairs were attempted right after
23  Mr. Mains owned the boat, I think Mr. Rotondo put up
24  dozens and dozens of repair requests.  It's clear by the
25  fact that those requests kept on appearing again and again

PDF created with pdfFactory trial version www.pdffactory.com

1  and the fact that when the boat was returned following its

2  trip to Tennessee it had damage from incorrect lifting, it

3  had damage from contact, the negligence claim is

4  relatively clear without any referral to expert testimony.

5        And the simple fact of the matter is that

6  there's no testimony whatsoever contradicting the

7  testimony of plaintiffs, the testimony of Mr. Wicander,

8  the testimony of Mr. Greaves.  In fact, the testimony of

9  their expert confirms in its entirety the conclusions

10  drawn by Mr. Greaves.  And Mr. Wade testified that he did

11  nothing and Mr. Wilson testified that he did nothing past

12  that point.

13        THE COURT:  I'm going to reserve ruling on that

14  count.

15        MR. ROTONDO:  Your Honor, with respect to Count

16  Three, there are really two arguments.

17        THE COURT:  And before you start, I think this

18  is another one that there was an objection filed by

19  Mr. Senning.  It had to do with the concept of agency.

20        MR. ROTONDO:  Yes.

21        THE COURT:  Okay.

22        MR. ROTONDO:  Another three arguments, I guess.

23        First of all, relying on the Conte v. Dwan

24  Lincoln-Mercury case, Your Honor, 172 Conn. 112, we submit

25  that the plaintiffs must prove that there must be a

PDF created with pdfFactory trial version www.pdffactory.com

1    buyer-seller relationship.  Must be privity in order to

2    invoke this remedy.  In addition -- and there isn't any

3    privity, the testimony was uncontradicted that the

4    plaintiffs bought the boat from Surfside 3.  There's no

5    dispute about that.

6            To respond to the second, to the agency concept

7    that's in the plaintiffs' objection, there's no evidence

8    that Surfside 3 was acting as an agent with respect to

9    this transaction with respect to the sale for Sea Ray.

10   There's simply no evidence whatsoever to support that.

11           Third, the plaintiffs under the Conte case must

12   prove revocation within a reasonable time after a

13   nonconformity was discovered.  There is absolutely no

14   evidence whatsoever in this case of a revocation.  And

15   without that evidence, they're not entitled -- Sea Ray's

16   entitled to judgment as a matter of law with respect to

17   that claim.

18           THE COURT:  Whenever you're ready, Mr. Nikas.

19           MR. NIKAS:  There's no evidence, Your Honor,

20   that there is no privity between Sea Ray and plaintiffs.

21   Sea Ray's witness was queried as to whether plaintiffs

22   ordered the boat directly from Sea Ray or from the dealer.

23   And he was unable to recall what the circumstances of that

24   purchase were.

25           THE COURT:  Don't we have to have something that

PDF created with pdfFactory trial version www.pdffactory.com

1   would support a jury concluding that that requirement has

2   been satisfied?

3          MR. NIKAS:  Which would then go back to the

4   plaintiffs' original testimony which was consistent --

5          THE COURT:  You said no evidence from Sea Ray --

6   I misheard you, okay.

7          MR. NIKAS:  Which was consistent that the

8   representations that were made and that the assurances

9   that he relied upon in that the individuals he had

10  discussions with were from Sea Ray, because this is unlike

11  a typical transaction in which a boat would be purchased.

12  This transaction was actually arranged by the factory

13  because the 1996 Sea Ray was being returned due to the

14  conditions that existed in it, and the witnesses testified

15  that that was arranged for by the factory.  And in fact,

16  the witness from Surfside 3 testified only that this boat

17  was dropped off at his facility and that the entire

18  transaction had been arranged for by Sea Ray.

19         THE COURT:  That's Mr. Beckman?

20         MS. LEV:  Beckman.

21         MR. NIKAS:  Because plaintiffs testified, and

22  you could just read the joint trial memo to see what the

23  anticipated testimony was of the Sea Ray witnesses that

24  weren't called, and you can look at Mr. Wade's testimony

25  today that plaintiffs had that '96 330 Sundancer as an

1    accord of satisfaction, some sort of settlement, they

2    turned that vessel in to the factory where they received

3    credit for it which makes them privy -- have direct

4    privity with the factory rather than with the dealership,

5    and that should overcome any issue.

6              THE COURT:  Do I need to include the agency

7    language in the charge?

8              MR. NIKAS:  I don't think so.  I don't think

9    it's been contested that that transaction was arranged for

10   through the factory.

11             THE COURT:  So I won't bother researching a

12   charge for that.

13             MR. NIKAS:  Moreover, as to the revocation,

14   timeliness of that revocation, the vessel failed on

15   June 9, 2001, which is the first time it had become

16   apparent that there was something wrong with the engines

17   installed on board.  Within a year of that time, in fact

18   substantially less than one year, the Complaint was filed

19   requesting revocation.

20             THE COURT:  I think the Complaint was filed

21   December 2001, right?  That would be six months.

22             MR. NIKAS:  Within one year of the failure.  And

23   that was explicitly set forth in the text of the Complaint

24   that that was a remedy sought for.

25             MR. ROTONDO:  May I respond briefly, Your Honor?

PDF created with pdfFactory trial version www.pdffactory.com

1           THE COURT:  Yes.

2           MR. ROTONDO:  The fact that the plaintiffs in

3    their Complaint alleged the revocation doesn't mean

4    there's any evidence in front of this jury upon which they

5    could conclude there was a revocation.  The Complaint

6    isn't evidence because it wasn't put into evidence.

7           Second, with respect to this triangular

8    arrangement that Mr. Nikas has argued about, both of the

9    plaintiffs testified clearly and unequivocally that they

10   purchased this boat from Surfside 3.  There was no

11   equivocation about that whatsoever.  And both the statute,

12   which is Section 42a-2-608 and the Conte case, which I

13   mentioned before, are clear that there must be a

14   buyer-seller relationship.

15          THE COURT:  That part of the arguments I would

16   reserve on.  But I am concerned about the point in terms

17   of there being evidence of revocation because the

18   Complaint is not in front of the jury.  So maybe Mr. Nikas

19   can address that.

20          MR. NIKAS:  Mr. Mains in his direct testimony --

21   in fact, if I recall correctly, it was actually in his

22   cross-examination by Mr. Rotondo, Mr. Rotondo put forth

23   evidence that following the engine failures on June 9 that

24   Mr. Mains had attempted to get a new boat or otherwise get

25   a refund for the money that was paid for the boat.  And

1    the jury can reasonably infer that as a revocation of the

2    original sales contract, given that the vessel had just

3    failed, and then contacted Sea Ray asking for either

4    replacement or reimbursement of those monies.  And that

5    was on cross-examination.

6             THE COURT:  So it sounds like I need a

7    definition of "revocation."

8             MS. LEV:  Your Honor, it's also evidenced by the

9    fact that --

10             THE COURT:  Well, I said I need a definition of

11    "revocation," so I'm going to reserve on that.  But I will

12    want a definition of "revocation."  I'll let you know if I

13    find one.

14             MR. ROTONDO:  We will look for one.

15             If we come up with additional authority, Your

16    Honor, should we fax that to the Court?

17             THE COURT:  Yes.

18             MR. ROTONDO:  And plaintiffs' counsel.

19             THE COURT:  Since we may be -- I'll be checking

20    the docket.  Why don't we just file everything.  I'll have

21    my computer with me.

22             MR. ROTONDO:  As to the Fourth Count,

23    Your Honor --

24             THE COURT:  I'm sorry, just let me finish making

25    a note.

PDF created with pdfFactory trial version www.pdffactory.com

1          Now we're on Count Four, which is the CUTPA

2    claim.

3          MR. ROTONDO:  Yes.

4          THE COURT:  Maybe before we start the argument

5    on that, I can hear from the plaintiffs what the basis is

6    for the CUTPA claim.  We do have a pretty clear line in

7    terms of the statute of limitations.  I don't want to

8    spend time talking about that if we don't have to.

9          So what is the conduct that is the basis for the

10   CUTPA claim that falls within the statute, within the

11   three-year period?

12         MR. NIKAS:  The unfair trade practice alleged is

13   that under the guise of returning the vessel back to

14   Tennessee for cosmetic repairs, defendants, without the

15   authorization or even notice to plaintiffs, decided to

16   remove a substantial component of the vessel structure and

17   replace it with another without offering any consideration

18   as to its suitability, as to its operability, or as to its

19   safety in this specific instance, such that when plaintiff

20   attempted to maintain that component, it failed, which

21   resulted in the exposure of the underlying defect which

22   was the historical water ingestion causing scoring into

23   the engines, that defendant's misrepresentations as to

24   whether this repair would be effected --

25         THE COURT:  Well, what are you talking about in

PDF created with pdfFactory trial version www.pdffactory.com

1  terms of misrepresentations as to whether this repair
2  would be effected?
3           MR. NIKAS:  Effected, meaning performed.
4           Mr. Mains testified that the items that they
5  discussed with individuals from Sea Ray and from the
6  dealership all dealt with the fiberglass pouring, dealt
7  with the cosmetics, dealt with gelcoat issues.  At no time
8  did anybody from the factory inform them that they were
9  going to be removing this component and replacing it with
10  another without, A, notice, or B, an explanation as to why
11  it was going to be performed other than "we did it for
12  you."  Not one witness has testified as to the cause for
13  the change other than to go into the circular argument
14  that it was in response to the Complaint.  Not one witness
15  testified for the defense as to the justification behind
16  this change.  And the jury should be reasonably allowed to
17  infer that a party would not typically make a change like
18  that for no reason at all unless there was some unfair
19  trade practice or some attempt to mislead the consumer by
20  changing this component without notice.
21           THE COURT:  Doesn't all of this come down to
22  your evidence that the change was made without consulting
23  with the plaintiff in advance?  And then you're saying
24  from that, well, that's evidence that there was some
25  nefarious motive to -- when you say "under the guise" --

PDF created with pdfFactory trial version www.pdffactory.com

 1   what's the evidence other than the fact that the change

 2   was made without specific notification to the plaintiffs

 3   that there was going to be a substitution of the systems?

 4            MR. NIKAS:  Because they didn't consult

 5   anything.  Both Sea Ray witnesses, in fact Mr. Wade

 6   primarily, because Mr. Wilson testified he had very little

 7   involvement other than to look at it, Mr. Wade testified

 8   that he made the decision to install the water lift

 9   muffler in replace of the collector-style exhaust.

10            THE COURT:  Only one person argues, Ms. Lev.

11   You can sit down.

12            MR. NIKAS:  And he testified that he consulted

13   no individual, no reference materials, no standards, no

14   nothing.  He just arbitrarily made this decision to

15   replace this major component.

16            THE COURT:  He didn't testify that he

17   arbitrarily made it.  I want to focus on the evidence, not

18   the arguments you're going to make from the evidence.  And

19   the evidence I hear is that the change was made without

20   notice to the plaintiff in advance that it would be done.

21            MR. NIKAS:  And --

22            THE COURT:  But the evidence is also undisputed,

23   because it's in the plaintiff's own letter, that he was

24   complaining about that system, the resonance in the

25   system.  And it's also undisputed that there was no effort

PDF created with pdfFactory trial version www.pdffactory.com

1    to hide it from him before the boat got back to him.  If

2    I'm remembering the testimony correctly, he didn't learn

3    about it until the boat was about to come back from the

4    factory.  That's the evidence that I see.

5            MR. NIKAS:  Mr. Wade testified that he had

6    regular conversations with plaintiff as to the condition

7    of the boat and the status of repairs.  And at no time

8    except immediately prior to the time the boat was already

9    on its way --

10           THE COURT:  You're just repeating what I said.

11           MR. NIKAS:  -- did he report that it was done.

12           It's also true that he testified that he did not

13   consult anybody or anything to determine if this was even

14   an appropriate response to plaintiffs' complaint.

15           THE COURT:  That wasn't his testimony.  Okay.

16           Let me hear from Mr. Rotondo.

17           MR. ROTONDO:  Your Honor, this argument is based

18   on complete speculation.  There's absolutely nothing

19   whatsoever about what Mr. Nikas has said in support of

20   this claim that in any way supports it.  He talks about

21   things that are concealed.  He talks about

22   misrepresentations.  He talks about things that were

23   hidden.  There's no evidence whatsoever to support this

24   claim whatsoever.  In order to satisfy the standard, the

25   plaintiff must prove that there was some sort of immoral,

PDF created with pdfFactory trial version www.pdffactory.com

1     unethical, oppressive or unscrupulous practice or conduct,

2     and that's under Williams Ford v. Hartford Courant.  And

3     Williams Ford also makes clear that simple negligence or

4     breach of contract doesn't rise to the level of a CUTPA

5     claim.  And we also rely on Boulevard Associates v.

6     Sovereign Hotels.

7             The evidence in this case is clear that

8     Mr. Mains complained and complained and complained about

9     this exhaust resonance.  And the evidence is also clear

10    that Sea Ray tried to respond in one fashion or another.

11    There was testimony by Mr. Beckman that he went out, road

12    the boat with Mr. Mains, didn't hear anything, tightened

13    belts up and hoses and whatnot, nothing happened, didn't

14    make any change.

15            Then there's testimony by Mr. Wilson that he

16    went out and added this device and that didn't make any

17    change, Mr. Mains still complained.  Then we have the boat

18    going back and Mr. Mains writes his letter of February 12,

19    which is -- I don't remember what exhibit number it is,

20    but it's February 12, 2001 where he complains again about

21    the exhaust resonance and talks about possibly there was

22    some footer or something that could be done.  Mr. Mains

23    said he wanted something to be done, that's why he

24    included it in his letter.

25            Mr. Nikas has talked about somehow Mr. Wade

1    hiding this.  Mr. Wade said he didn't recall discussions

2    with Mr. Mains on this particular issue.  That's what he

3    said.  Mr. Mains recalls that he wasn't consulted

4    beforehand on this, but he was told when the boat was

5    coming back.  There's nothing whatsoever that supports an

6    unfair trade practice claim here.  Mr. Wade was very clear

7    in his testimony that the reason he did this was because

8    he was trying to find some solution to Mr. Mains'

9    complaint about exhaust resonance and he thought this

10   exhaust system would be quieter.  That was his testimony.

11          We have raised, Your Honor, the issue of the

12   statute of limitations based on the fact that Sea Ray's

13   sale of the boat -- well, they've made it clear they --

14          THE COURT:  Well, that's why I asked first so I

15   know whether we need to deal with the sale of the boat and

16   we don't.

17          MR. ROTONDO:  Next, Your Honor, we submit that

18   plaintiffs -- the plaintiffs haven't suffered any harm

19   compensable under CUTPA with respect to this.  They have

20   to show an ascertainable loss.  Macquire v. Citicorp.

21   Retail Services, 147 F.3d. 232, 238, says a plaintiff

22   claiming damages has the burden --

23          THE COURT:  You can give me the name of the

24   case -- I've got it.

25          MR. ROTONDO:  I gave you the name already?

1           THE COURT:  Yes.

2           MR. ROTONDO:  In addition, the loss the

3    plaintiffs are really claiming here, Your Honor, if they

4    state a viable product liability claim, which we've

5    disputed, but if they do state a viable product liability

6    claim, that product liability claim preempts and bars and

7    occupies the field.  And there are a number of Connecticut

8    Supreme Court cases that are on point with respect to

9    that, I hope they're cited here.

10           THE COURT:  I have some.  I have a CUTPA

11   treatise.

12           MR. ROTONDO:  In addition, Your Honor, the

13   plaintiffs -- this is the more general point.  If we're

14   done arguing the CUTPA claim, I've got some more general

15   points.

16           Plaintiffs failed to prove the amounts of their

17   alleged damages.  In order for the plaintiffs to recover

18   damages, they must present evidence that provides the

19   finder of fact a reasonable basis upon which to calculate

20   the damages.  What the plaintiffs have essentially done

21   here is to leave any award of damages to speculation in

22   terms of their presentation of the evidence.  And we would

23   rely on Sir Speedy v. L & P Graphics, 957 F.2d 1033, 1038

24   and Gaudio v. Griffin Health Services Corp., 249 Conn.

25   523, 554.

PDF created with pdfFactory trial version www.pdffactory.com

1            In that regard, we would rely on the Restatement

2    (Second) Torts.  The plaintiffs in some respects would

3    need to prove either the diminution of value of the boat

4    or the cost of repairs.  Here the plaintiffs have just

5    rejected the whole idea of cost of repairs.  They've said

6    they don't want it repaired and haven't offered into

7    any -- they have not offered into evidence any evidence of

8    the diminution in value of the boat.

9            To the extent the plaintiffs are seeking to

10   recover for loss of use, plaintiffs have not provided any

11   evidence of loss of use of the boat.  They haven't offered

12   it in terms of what they didn't do, what they would have

13   done, what they could have done.

14           To the extent that the plaintiffs had an

15   alternate form of evidence with respect to the loss of

16   use, that might have been something such as rental value

17   for the period for which the boat wasn't used, but they

18   haven't offered any evidence of that.  And we would cite

19   to Johnson v. Flammia, 169 Conn. 491 and Restatement

20   (Second) Torts Section 928.

21           Finally, Your Honor, the plaintiffs have sought

22   to recover punitive damages, interest, attorneys' fees or

23   costs, and we submit there's no basis for awarding any of

24   those damages in light of the evidence and, more

25   accurately, the lack of evidence in this case.  In order

PDF created with pdfFactory trial version www.pdffactory.com

1    to award punitive or exemplary evidence, the evidence must

2    reveal a reckless indifference to the rights of others or

3    intentional, wanton violation of those rights.  And in

4    support of that, we rely on Gargano v. Heyman,

5    203 Conn. 616, 622, and that sets forth the standard for

6    punitive damages under CUTPA.  And Berry v. Loiseau,

7    223 Conn. 786, which is a standard for punitive damages

8    under common law.  And also Connecticut General Statutes

9    52-240b.

10           In addition, even if the plaintiffs -- even if

11   the level of conduct could somehow be interpreted to the

12   level to warrant attorneys' fees, which we obviously

13   dispute, the plaintiffs haven't presented any evidence of

14   attorneys' fees in this case and therefore cannot collect.

15   Connecticut imposes a requirement that the reasonableness

16   of attorneys' fees and costs be proven by evidence by the

17   finder of fact.  And we cite Smith v. Snyder,

18   267 Conn. 456.

19           THE COURT:  Can you give me that cite again?

20           MR. ROTONDO:  I'm sorry, 267 Conn. 456.

21           Case law is also clear that for purposes of

22   punitive damages under state law that plaintiffs must

23   introduce evidence of attorneys' fees as part of their

24   case in chief.  They haven't done that.

25           I have one last argument, Your Honor.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  Sure.

2          MR. ROTONDO:  Which is that plaintiffs have

3   attempted to -- well, plaintiffs have presented a case and

4   they're going to argue that this is a water ingestion

5   case, the boat started failing from day one.  And they

6   talk about Mr. Wicander's scoring of the cylinders and the

7   boat would -- the engines at some date in the future would

8   fail.

9          The testimony from Peter Mains was that the boat

10  was used on the Connecticut River, on the Thames River, in

11  Long Island Sound, down as far as New York, up to Cape Cod

12  and Martha's Vineyard, and all those other places.  The

13  reason that I asked those questions, Your Honor, is

14  because if they rely on this theory of water ingestion,

15  which is what they set their stock on, that they have put

16  this case squarely within maritime jurisdiction, because

17  the water ingestion occurred on navigable waters.  It

18  occurred on the Connecticut River.  It occurred on the

19  Thames River.  It occurred on Long Island Sound and the

20  Atlantic Ocean.  These were issues that we raised at the

21  outset in the motion to dismiss.  The Court dismissed it

22  finding that --

23          THE COURT:  Denied it.

24          MR. ROTONDO:  I'm sorry, rejected the argument,

25  finding that we hadn't established our case at that point

PDF created with pdfFactory trial version www.pdffactory.com

1    with respect to this issue.  But the plaintiffs have

2    provided the basis for this in their own testimony with

3    respect to their theory of the case, which is water

4    ingestion, which is water coming in while the boat is on

5    navigable waters.  And the focus for this, Your Honor, is

6    not where these repairs were made, the focus is where the

7    injury occurs.  And here the injury occurs, this water

8    ingestion occurs while they're on navigable waters.  And

9    our authority for this, Your Honor, we cite a number -- a

10   number of different cases that we rely on.

11          THE COURT:  Are these different than what was in

12   the motion?

13          MR. ROTONDO:  There are at least one or two

14   other cases that have come out.  I apologize, I can't

15   remember exactly which cases we've cited.

16          MR. NIKAS:  Your Honor, what motion are you

17   referring to?

18          THE COURT:  There was a motion to dismiss, I

19   believe.

20          MR. ROTONDO:  Motion to dismiss in 2001.

21          THE COURT:  Early on in the case.

22          MR. NIKAS:  Based on lack of jurisdiction?

23          THE COURT:  Yes.

24          MR. SENNING:  May I clarify that, Your Honor?  I

25   believe the motion was that the defendant was arguing

1   that --

2           THE COURT:  Well, it doesn't matter.  I think

3   our court reporter has probably heard enough.  You're

4   going to submit something in writing at some point?

5           MR. ROTONDO:  Yes.

6           THE COURT:  Okay.  This will be in your written

7   submission and then the plaintiffs can reply.  Okay.

8           That's an interesting point.

9           I think I'm going to ask counsel to start

10  thinking about -- I may take a crack at a verdict form,

11  but I always try to identify issues where I'm going to

12  want to have special interrogatories.  I think this might

13  be one where I am going to want one.

14          I have some things I want to discuss with you

15  all about argument.  I think we'll take a short break for

16  the court reporter's sake.

17          MR. NIKAS:  Am I not allowed to respond to the

18  last argument made by Mr. Rotondo?

19          THE COURT:  About the navigable waters?

20          MR. NIKAS:  No, I wouldn't even attempt to argue

21  that.  Loss of use, amount of damages, the water

22  ingestion.

23          THE COURT:  The only one that I'm really

24  prepared to focus on at this point would be punitive

25  damages.  I want to think about that, so we'll talk about

PDF created with pdfFactory trial version www.pdffactory.com

1   that when we come back from our break, okay?

2               (Whereupon, a recess followed.)

3               THE COURT:  Mr. Nikas, you had one more point

4   you were going to address?

5               MR. NIKAS:  Actually, I'll let Ms. Lev make it.

6               THE COURT:  Okay.

7               MS. LEV:  Your Honor, Mr. Rotondo went through a

8   great list of things, including loss of use, damages,

9   punitive damages, addressal of the scoring in the

10  testimony of witnesses.

11              First off, just to go through the list really

12  quickly, to explain the unfair trade practices that we're

13  referring to, there's a failure, although it seems clear

14  that Mr. Wade testified that he was responding to

15  sounds -- complaints of sounds of exhaust --

16              THE COURT:  We finished the unfair trade

17  practices.  We're now on the miscellaneous category.

18              MS. LEV:  Okay.  Then I believe next Mr. Rotondo

19  addressed the loss of use claiming that we had not shown

20  any evidence of loss of use.  It was very clear from both

21  the Mainses' testimony that their intended use of this

22  vessel from day one was to be able to take the boat out

23  and enjoy it with their family, their relatives, and their

24  friends.  Not only were they inhibited in their ability to

25  do that between 1998 and 2000 when the boat was taken to

1    Tennessee for repairs by all of the damages, the problems

2    that were occurring with the vessel at the time, and the

3    fact that it was subject to repairs at so many points

4    during those years, but furthermore after the vessel was

5    returned from the factory, they were only able to use it

6    on one voyage before the loss of use was complete in June

7    of 2009.  Since June of 2009 they have not been able to

8    use the vessel once.  That seems to be clear evidence of

9    loss of use.

10              Moving on to the fact that Mr. Rotondo addressed

11   damages claiming that we did not discuss damages or a

12   value of the vessel or value of damages, we believe we did

13   that.

14              First of all, there were multiple opinions given

15   as to the value of the vessel even by defense's own expert

16   claiming that I believe he said somewhere between, what

17   was it, 125, $142,000.  I might be slightly off on

18   numbers, but it was in that ballpark.

19              We also discussed the value that was paid for

20   the vessel.  That was introduced by the defense

21   themselves.  Those values could very reasonably be

22   considered by a jury to address damages.  Furthermore, a

23   jury could attribute damages to the inability of the

24   plaintiffs to use their property, to interest from not

25   having been able to use their property this whole time,

PDF created with pdfFactory trial version www.pdffactory.com

1    from a failure to get a refund earlier.  There are many

2    inferences that can be drawn by the jury with regard to

3    damages just based on the sales price and the valuations

4    of the expert alone.

5          With reference to punitive damages, the defense

6    themselves referenced that one of the bases for punitive

7    damages was reckless indifference to the rights of others.

8    We're dealing in this matter with a vessel that's

9    operating on water, which means that safety is at issue,

10   which means that when you have a factory that is making

11   repairs without giving any explanation for why they have

12   tried to replace a whole entire system in order to rectify

13   something as basic as a noise.  To do so indicates that

14   there's -- and without informing plaintiffs of that fact

15   and asking their permission to do so or keeping them

16   abreast despite their request to come to factory and

17   inspect the vessel, these are things that the Mains

18   testified to when they took the stand.  When you're doing

19   these things in conjunction with a vessel that's operated

20   on water where plaintiffs have testified that if something

21   goes wrong, they can't do anything about it.  You can't

22   just park a vessel at the side of the road like you can a

23   car.

24          They've stated in addition that by replacing the

25   exhaust system, defendant inhibited plaintiffs' access to

 1   the key mechanisms and machinery on board the vessel that

 2   they would need in order to respond to problems.  Their

 3   replacement at the factory without notifying plaintiffs of

 4   that and having their consent with regard to the nature of

 5   the changes that were being made and the nature of the

 6   alterations that were being done was very recklessly

 7   indifferent to the rights of plaintiffs to make decisions

 8   that would affect their welfare in their subsequent use of

 9   the vessel and the welfare of those on board with them.

10           Finally, I believe Mr. Rotondo discussed the

11   scoring, asserting that Mr. Wicander merely testified that

12   the scoring was caused over a -- or had occurred over a

13   long period of time.  But the jury is free to infer, based

14   on the facts in this case, that when the boat has only

15   been used once since its return from the factory and you

16   have an expert witness testifying that scoring occurred

17   over a long period of time, that that scoring occurred

18   prior to the boat's being brought into the factory.

19   Indeed, we have testimony from the plaintiffs and from

20   other experts indicating that the total hours on this

21   vessel before it became completely inoperable in June of

22   2001 was somewhere around 150 miles -- excuse me,

23   150 miles, is that right?

24           THE COURT:  Hours, I thought.

25           MS. LEV:  Which is insignificant over a period

1  of three years.  We have testimony that that's only

2  10 percent of the life of an engine is 150 hours.  And the

3  fact that this -- the fact that the vessel was only used

4  about an hour and a half total from the journey upon being

5  returned to the factory to the marina where the

6  hydrolocking occurred and where it remains today is clear

7  evidence that can be inferred -- the jury can clearly

8  infer from that that the scoring, coupled with that

9  information on the hours of the vessel, coupled with the

10  information on the fact that only an hour and a half of

11  use occurred after the return from the factory, that an

12  inference can clearly be made by the jury that there was

13  long-term defects, that there was evidence of longer-term

14  problems with the vessel than just the hydrolocking

15  itself.

16         THE COURT:  Is that part of your punitive

17  damages argument or is that another point that you're

18  addressing?

19         MS. LEV:  I wasn't clear as to whether

20  Mr. Rotondo was bringing that up as part of his punitive

21  damages.

22         THE COURT:  He wasn't arguing for them, I don't

23  think.

24         MS. LEV:  I agree.  I wasn't clear, Your Honor,

25  as to whether he was bringing that up as to the discussion

```
 1   on punitive damages or if I -- I more had the impression

 2   that he brought it up as a side point.  Correct me if I'm

 3   wrong.

 4             THE COURT:  I guess I will put in the charge the

 5   jury's not being asked to consider the issue of attorneys'

 6   fees because there is no evidence on them.  I'm not going

 7   to say that, I'll just -- my standard charge says they're

 8   not being asked to look at attorneys' fees.

 9             Okay.  Let me go over a few procedural points

10   with counsel, because customs vary from district to

11   district.

12             When I have counsel from out of the district, I

13   give them -- we're going to have closing statements, I

14   always hand them my little thing I have in my little

15   folder for closings so you know what is in my head in

16   terms of what I'm expecting and not expecting or hoping I

17   don't see.  So I thought you might want that.

18             I also have a couple of idiosyncrasies that I'll

19   explain to you.  You may think there are more than a

20   couple, but at least relating to the closings and the

21   charge conference, I have a couple of things.

22             I'm just checking to see if I addressed all of

23   the objections that the plaintiff had to the -- there is a

24   sixth objection that the plaintiff filed to the proposed

25   jury instructions, and I thought what the plaintiff was
```

PDF created with pdfFactory trial version www.pdffactory.com

1   asking for was appropriate because it really sort of

2   balanced things and I will be adding that -- not

3   necessarily the same formulation because I didn't use

4   exactly what was in the request, but I will have some

5   language that balances it.

6           And I think I forget what the fifth objection

7   was.  But I have it here.  Hold on.

8           Oh, we covered that.  We don't need to do

9   anything on that one.

10          Okay.  We go to my checklist for this.

11          I guess we did have some objections during the

12  openings, I guess I would prefer not to have to rule on

13  any objection -- I hope there aren't any.  If there are

14  any, I think what I would do is if you have an objection,

15  you can stand, just state objection.  And I'll note it.

16  And we'll keep going, and then I'll deal with them at the

17  end.  I'll discuss some with counsel if we have them and

18  decide what to do.  If I think a curative instruction is

19  necessary, I'll give one.  Or some other technique I've

20  used in the past I would use if necessary.

21          You'll have a copy of the charge in pretty much

22  final form if we get our work done this weekend.

23          And I prefer that counsel not tell the jury

24  basically, "the judge is going to tell you this."  Because

25  I don't like to be used to prop up anybody's argument.

PDF created with pdfFactory trial version www.pdffactory.com

1   And I have had situations where people have been a little

2   casual -- the reason I adopted this procedure is I had

3   people say, "the judge is going to tell you this" and they

4   got it wrong, and I can't manage to sit by quietly when

5   that happens.  So my procedure is that you can certainly

6   tell the jury what you think the law is.  You can

7   certainly explain -- and most people will explain to the

8   jury that the judge will be explaining the law.  If I say

9   something different, what the judge says counts because

10  I'll be emphasizing that anyway.  And then they can go on

11  and talk about the law.  But I don't want people to say,

12  "the judge is going to tell you this" and I don't want

13  people to say something like "the charge will say,"

14  because I view that as my -- that's mine.  And that's

15  between me and the jury, and I don't like the lawyers

16  getting in that relationship.

17           Same thing with the verdict form.  I don't like

18  lawyers to use the verdict form.  I like to explain the

19  verdict form to the jury myself.  I don't want them

20  confused by getting instructions from counsel.

21           When you all have time, and maybe today would be

22  a good time to do it because you'll want to use the

23  exhibits in your closings, you should go over with the

24  courtroom deputy what's a full exhibit.  Although she may

25  not want to do it right now.

PDF created with pdfFactory trial version www.pdffactory.com

1          And then the other thing you should be aware of
2   is I send the charge in to the jury room.
3          With that, I guess I'm looking for a couple
4   things from counsel.  I don't know -- I could give you all
5   what I use as a sort of a general format for a verdict
6   form or I could try and get something up, and then it
7   would be good if counsel could get the charge and confer.
8   And if there are changes you agree on, let me know and
9   send me a consolidated submission as to what I have to
10  consider.
11         And I think what I'm looking for is definition
12  of "revocation" and a charge on the failure to warn.
13         Where did you all get the products liability
14  charge that you submitted?
15         MR. ROTONDO:  I believe that we drafted it and
16  Mr. Senning either assented to it or objected to it.
17         THE COURT:  All right.  So maybe people could
18  start working on that quickly.
19         Okay, I think we're all set then.
20         MR. ROTONDO:  Your Honor, you indicated we
21  should file the motion, that's electronical?
22         THE COURT:  Yes, I'll have my computer with me.
23         MR. ROTONDO:  Is there any particular time by
24  which you need to have us file that?
25         THE COURT:  This is the responses to the charge?

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. ROTONDO:  No.  This is the Rule 50 papers

2    that we talked about.

3          THE COURT:  Whenever.

4          MR. ROTONDO:  What about the responses to the

5    charge?

6          THE COURT:  I'd like to have those by the end of

7    Saturday.

8          MR. ROTONDO:  And do we understand correctly you

9    reserved on all of the oral argument?

10          THE COURT:  When I send out the charge, I'll

11    tell you any that I've decided to act on.

12          MR. ROTONDO:  Thank you.

13          MR. NIKAS:  So, Your Honor, will we be allowed

14    an opportunity to provide written responses?

15          THE COURT:  I usually don't get written briefs.

16    So I'm -- if I make a decision, it's based on my analysis

17    based on the oral argument.  On the matters I've reserved

18    on, I will be looking at the written decision, but I won't

19    be making any decision -- I'm sorry, written submission.

20    But I would not be making any decision based on that

21    written submission until you've had a chance to file

22    something in writing too.

23          MR. NIKAS:  What's the procedure for doing so,

24    Your Honor?

25          THE COURT:  Well, I would get it in as soon as

1    you can, but you won't have it in before closings.

2              MR. NIKAS:  I meant, Your Honor, is it faxed to

3    your chambers?

4              THE COURT:  File it electronically.  We're

5    talking about your response to their written Rule 50

6    motion?

7              MR. NIKAS:  Correct.

8              THE COURT:  They're going to file it now and

9    then you'll file also.

10             MR. NIKAS:  And we send a courtesy copy by fax?

11             THE COURT:  I think a courtesy copy by mail will

12   be fine.

13             MR. NIKAS:  Very well.

14             THE COURT:  But for -- I'd like to know, in

15   terms of the reactions to the charge, you know, whether we

16   have a lot of stuff to discuss Monday morning or not.  I

17   mean, I'm hoping that we won't because I have pretty much

18   followed the joint submission with the exception of the

19   places where I've told you I've adopted the objection that

20   was made by the plaintiffs.  And I haven't seen the duty

21   to warn, but I assume you all can confer on that and get

22   me something that's not too controversial.  Since you were

23   able to work out something on the other ones, I'm hopeful

24   there.  Okay?

25             MR. ROTONDO:  Thank you, Your Honor.

PDF created with pdfFactory trial version www.pdffactory.com

Vol. IV – Page 789

1          THE COURT:  And my law clerk has cell phone

2     numbers so she can track you all down if I'm anxious to

3     hear from you.  Cell phone, e-mail, whatever you guys use.

4     Thank you.

5               (Proceedings adjourned at 6:00 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com

1

2

3                          C E R T I F I C A T E

4

5

6

7           I, Diana Huntington, RDR, CRR, Official Court

8   Reporter for the United States District Court for the

9   District of Connecticut, do hereby certify that the

10  foregoing pages are a true and accurate transcription of

11  my shorthand notes taken in the aforementioned matter to

12  the best of my skill and ability.

13

14

15

16

                     /s/_____

17

                       DIANA HUNTINGTON, RDR, CRR

18                        Official Court Reporter
                       450 Main Street, Room #225

19                     Hartford, Connecticut 06103
                           (860) 547-0580

20

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com