Vol. V - Page 791

1                    UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF CONNECTICUT

3

4     - - - - - - - - - - - - - - - x
                                    :
5     PETER D. MAINS and LORI M. MAINS:  No. 3:01CV2402(AWT)
                                    :
6                     Plaintiffs,   :
                                    :
7             vs                    :
                                    :
8     SEA RAY BOATS, INC.           :
                                    :  HARTFORD, CONNECTICUT
9                     Defendant.    :  APRIL 7, 2008
                                    :
10    - - - - - - - - - - - - - - - x

11

12

13                        **JURY TRIAL**

14                        **VOLUME V**

15

16        BEFORE:

17

18                HON. ALVIN W. THOMPSON, U.S.D.J.

19                    and a Jury of Nine

20

21

22

23                              Diana Huntington, RDR-CRR
                               Official Court Reporter
24

25

1   APPEARANCES:

2       FOR THE PLAINTIFFS:

3               JOHN L. SENNING, ESQ.
                    16 Saybrook Road
4                   Essex, Connecticut 06426

5               HERRICK NIKAS, LLP-CA
                    1201 Dove Street, Suite 560
6                   Newport Beach, California 92660
                BY:  RACHEL D. LEV, ESQ.
7                    RICHARD J. NIKAS, ESQ.

8       FOR THE DEFENDANT:

9               DAY PITNEY, LLP
                    CityPlace I
10                  Hartford, Connecticut 06103-3499
                BY:  JAMES H. ROTONDO, ESQ.
11                   DANIEL J. FOSTER, ESQ.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

## TABLE OF CONTENTS

2

3                                                        PAGE

4    CLOSING ARGUMENT BY THE PLAINTIFFS............. 823

5    CLOSING ARGUMENT BY THE DEFENDANT............. 842

6    REBUTTAL ARGUMENT BY THE PLAINTIFFS........... 873

7    JURY CHARGE................................... 877

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **9:05 A.M.**

2              THE COURT:  Good morning.

3              We have a few thing to cover this morning.  I'm

4    going to try to cover them in a certain order, but if I

5    miss one, let me know at the end.

6              First, I should mention to defense counsel that

7    Attorney Nikas called chambers on Saturday around 5:00.  I

8    was the only one here, I answered the phone.  The whole of

9    our conversation was that he told me that at that point he

10   had no objections to the charge, he was trying to reach my

11   law clerk, and I believe that was the end of the

12   conversation.

13             MR. ROTONDO:  Thank you, Your Honor.

14             THE COURT:  Secondly, in terms of the objections

15   to the charge, we sent an e-mail out from chambers and

16   there was a request by each side with respect to

17   definition of "revocation."  Both sides had the same first

18   sentence.  I used the second sentence from the defendant's

19   request and then I used language from White and Summers'.

20   It was page 572 of the 5th Edition.  So that's the

21   definition of "revocation" that we have in the charge.

22             The objections to the verdict form were by

23   Sea Ray.  I think you now have the revised draft and you

24   should have a markup of the draft showing the changes that

25   were made.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. ROTONDO:  Yes, Your Honor.

2          THE COURT:  I did make one change or a couple of

3    changes that weren't mentioned.  I changed the language,

4    which I did not mention before this morning, in paragraph

5    IV.C to say what percentage is the plaintiffs' share.  And

6    I just want to make sure I flag that for counsel's

7    attention because I did not mention that before this

8    morning.  I thought it read better that way.

9          And I think the other objections to the verdict

10   form I agreed with the defendant's first objection which

11   related to Question I.C, and I just shortened that.

12          The second objection wanted me -- was a request

13   that I break down the question into two parts.  I thought

14   it would be more consistent to simply break down and make

15   in the charge the section on revocation similar in format

16   to breaking down the elements in the charge on strict

17   liability and breach of express warranty.  And having done

18   that, I don't believe it's appropriate to break it down in

19   the verdict form.  I didn't catch it when we were doing

20   the charge Friday night.

21          Objections to the charge, the duty to warn, you

22   read the Giglio vs. CL&P case, 180 Conn. 235, which cited

23   to Prosser on law of torts.  I also read a Second Circuit

24   case, Basko vs. Sterling Drug Company -- I think the

25   language that is cited to by the defendant is correct,

PDF created with pdfFactory trial version www.pdffactory.com

1    there must be evidence that there was a danger which the

2    defendant knew or should have known.  And here there is no

3    evidence that the defendant knew or should have known of

4    unreasonable dangers involved with use of the boat.

5           And I think the defendant is also correct that

6    this claim or theory, rather, of the products liability

7    claim was not included in the joint trial memorandum.  We

8    had some discussion about that on Friday.  Plaintiffs'

9    counsel pointed to a footnote.  Having gone back and

10   looked at that, that footnote is in the defendant's

11   request, which makes it clear it's only based on three

12   theories of liability.  I think it's inappropriate for the

13   plaintiffs to argue that that somehow included a request

14   on a duty to warn theory.

15          Objection number two dealt with comparative

16   responsibility.  And I did make a change but not the

17   language that the -- I made it consistent with the

18   instruction on comparative negligence, but I think the

19   language there that was suggested or requested by the

20   defendant doesn't make it as consistent as the language

21   that I used, and I'll point that out to you.

22          Objection number three dealt with revocation.  I

23   said on page 22 I do agree with the first point in terms

24   of the revocation is for purchase of the boat, not seeking

25   to do so in the lawsuit.  That's a more accurate

PDF created with pdfFactory trial version www.pdffactory.com

1    formulation.

2              Page 24, that is the definition of "revocation"

3    or the language describing revocation.  And I used the

4    White and Summers', I discussed that earlier.

5              And then objection number four dealt with

6    damages on page 25.  And I think that objection was a

7    valid one.

8              Counsel should have gotten now the final draft

9    of the charge.

10             The next thing I pointed out to you was that in

11   revocation, what I did to -- when I said I was making it

12   consistent, if you look at the current draft on pages 22

13   to 25, you'll see that I have the introductory paragraph

14   at the bottom of page 22.  And I added the language on

15   page 23 on revocation.  Then I put "first" instead of that

16   paragraph.  And then we had language on notice within a

17   reasonable time, you put "second" in front of that.  And I

18   then I put "third" on the top of page 24, and then

19   "fourth" and "fifth," just so it's consistent with the

20   form at I used -- well, it's my normal format.  I was

21   following what was in the request.

22             So that's the -- that covers my responses to the

23   things that were filed.

24             Now, I believe there's a request from the

25   plaintiffs for two additional charges.  Do I understand it

PDF created with pdfFactory trial version www.pdffactory.com

1    to be missing witness and failure to produce evidence,

2    specifically service bulletins?

3            MR. NIKAS:  That's correct, Your Honor.

4            THE COURT:  Let's talk about the missing

5    witness.  You said Mr. Marlow, I understand?

6            MR. NIKAS:  Mr. Marlow, Mr. Stooksbury and

7    Mr. Brown were the three Sea Ray exhibit identified on

8    their witness list but did not testify at trial.

9    Specifically, Mr. Marlow's referenced by one of the

10   defendant's witnesses, the expert witness, Gregory Davis.

11   And he did not testify later that afternoon when trial

12   closed.  We should be entitled to the inference that any

13   testimony he would have provided would have been

14   unfavorable or else he would have testified.

15           THE COURT:  I understood it was Marlow, so I

16   went through and did a search for when Mr. Marlow was

17   mentioned.  Mr. Marlow was mentioned on April 2nd.  It was

18   by the plaintiff in terms of the discussions with

19   Mr. Marlow.  Mr. Marlow was mentioned by Mr. Davis.  I

20   think he's on a committee with Mr. Marlow.  That's the

21   note that I have.

22           MR. NIKAS:  And described him as a personal

23   friend.

24           THE COURT:  Yes.

25           And then Mr. Wade was talking about who was on a

1   conference call and he mentioned Marlow, Luster, and the

2   plaintiffs and himself.

3           How does that justify a missing witness

4   instruction?

5           MR. NIKAS:  The fact that he was party to many

6   of the actions which are subject to this case, ostensibly

7   has knowledge, was listed by defendants in their witness

8   list, was under their sole control.  And by not calling

9   him, removed the availability of him for

10  cross-examination, should entitle us to an adverse

11  interest.

12          THE COURT:  Can you take out of your analysis

13  the fact that he was on their witness list?  Because the

14  trial memorandum order says you have to list people who

15  you may call.  So if you don't list them, you can't call

16  them.  So the fact that they're on the trial memorandum

17  order and not called doesn't mean anything.

18          So he was mentioned as being involved in some

19  conversations.  Other than that, I didn't catch everything

20  you said.

21          MR. NIKAS:  As I understand the rule, generally

22  counsel in a civil trial may comment on the failure of a

23  party to call an available witness whose testimony the

24  party would naturally be expected to provide if available

25  to him.  It is presumed that if Mr. Marlow would have

PDF created with pdfFactory trial version www.pdffactory.com

1   testified, that he would have provided favorable evidence

2   for Sea Ray.

3          THE COURT:  Are you asking for permission to

4   make reference to him in your closing or are you asking

5   for a missing witness instruction in the jury charge?

6          MR. NIKAS:  I ask for two things.  One, I'd like

7   to make note in closing that he did not testify even

8   though he was listed as a possible witness.

9          THE COURT:  You can't mention he was listed as a

10   possible witness.

11          MR. NIKAS:  I'd like to mention that he did not

12   testify despite his mention by other witnesses having been

13   a party to some of these telephone conversations and

14   certainly the Mainses discussed that he was a party to

15   these conversations.  Both plaintiffs and defendant's

16   exhibits have letters from Mr. Marlow to the plaintiffs.

17          THE COURT:  Okay.

18          MR. NIKAS:  Additionally, Mr. Wade mentioned

19   Mr. Stooksbury, who was a supervisor to whom he testified

20   went to when he was having discussions as to whether to

21   replace the collector-style exhaust with the water lift

22   exhaust.  In fact, that's the only person he had

23   conversations with regarding the background as to that

24   change.  The fact that he did not testify we should be

25   allowed to comment on.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  But I still don't see how we merit a

2    charge on it, though.

3          MR. NIKAS:  If I can mention it in closing,

4    we'll take that.

5          THE COURT:  Then the second point, I understood

6    there was going to be a request for charge on failure to

7    produce evidence.  Is that a request for charge or is that

8    an argument issue?

9          MR. NIKAS:  We'd like to reference it both in

10   closing and, if possible, to get an instruction on it.

11   But given the fact that defendants specifically referenced

12   these materials, used them to attempt to impeach

13   plaintiffs' witnesses but then refused to allow the

14   documents to be submitted into evidence so that we could

15   discuss what else is contained within those materials

16   should entitle us to a presumption that the failure to

17   produce that available evidence --

18          THE COURT:  When you say "that available

19   evidence," what are you talking about?

20          MR. NIKAS:  Referred to by Mr. Rotondo.

21          THE COURT:  Defendants' Exhibit 59?

22          MR. NIKAS:  2001-13 service bulletin.  Two

23   different service bulletins he referred to.  One goes to

24   the list of compression ratios on engine specifications,

25   the second goes to water ingestion procedures, pickling

1    procedures.  And actually the third one, which is the

2    diagram of the exhaust system, side view.  The Court will

3    recall that we were only allowed to point out the

4    diagramming system on that page and there was language on

5    that page that contradicted that diagram.  There was other

6    information on that page which we felt would have been

7    important to prove notice of the defect but because

8    defendants chose to refer to it but not produce it in

9    evidence, we should be allowed to refer to that and also

10   get a positive charge.

11            THE COURT:  That was the pressure ratio, the

12   diagram and the --

13            MR. NIKAS:  2001-13 service bulletin, water

14   ingestion, entitled "Gasoline Engines and Water

15   Ingestion."

16            THE COURT:  I'm going over the topics.

17            MR. NIKAS:  First one --

18            THE COURT:  It was the diagram.

19            MR. NIKAS:  First one is engine specifications

20   is what the service bulletin is.

21            THE COURT:  That deals with compression ratio.

22            MR. NIKAS:  Correct.

23            THE COURT:  What does the second deal with?

24            MR. NIKAS:  The second is gasoline engines and

25   water ingestion.

PDF created with pdfFactory trial version www.pdffactory.com

1           THE COURT:  What was the question he asked about

2    that?

3           MR. NIKAS:  Well, it was partially used to

4    discuss the first few steps of the water ingestion,

5    pickling procedure.  Mr. Rotondo limited his questions

6    only to the first steps and did not discuss the rest of

7    the bulletin.

8           THE COURT:  And he mentioned the service

9    bulletin at that point?

10          MR. NIKAS:  He showed it to the witness.

11          THE COURT:  Okay.

12          MR. NIKAS:  And the third is --

13          THE COURT:  The diagram.

14          MR. NIKAS:  Which had the text on the left-hand

15   side.

16          THE COURT:  It's not necessary when counsel uses

17   a document to impeach a witness that it be introduced.

18   And in fact, in many circumstances it cannot be introduced

19   because that witness is not competent to bring it in.

20          MR. NIKAS:  We understand that, Your Honor,

21   but --

22          THE COURT:  So you're not going to get a missing

23   evidence instruction, okay?  You haven't satisfied the

24   grounds for missing evidence instruction.

25          MR. NIKAS:  Appears the grounds are a party

```
 1    fails to produce evidence under his control and reasonably

 2    available to him and not reasonably available to the

 3    adverse party, then you may infer the evidence is

 4    unfavorable to the party who could have produced it but

 5    did not.

 6              THE COURT:  So you want the instruction and you

 7    want to refer to it in your closing?

 8              MR. NIKAS:  Correct, Your Honor.

 9              THE COURT:  What do you want to say in your

10    closing, just so I can get it all responded to at once?

11              MR. NIKAS:  Well, all I want to say is -- and

12    I'll even be exceedingly cautious, that you had witnesses

13    shown various service bulletins.  We were not allowed to

14    review the full content of those bulletins with the

15    witnesses.

16              THE COURT:  You can't say that.  You're

17    commenting on my ruling.  That's why you weren't allowed.

18              MR. NIKAS:  Then we'd like to point out that the

19    defendant did not proffer those exhibits into evidence

20    given -- I'd like to refer to them by title at least.

21              THE COURT:  Is that in evidence?

22              MR. NIKAS:  I think it's in the record.  I know

23    we referred to 2001-13 as gasoline engines and water

24    ingestion.

25              THE COURT:  Who referred to that by that title?
```

PDF created with pdfFactory trial version www.pdffactory.com

1            MR. NIKAS:  It was the title which the document

2    was identified.  When we were identifying the document,

3    that's what it was identified as.  It's the pickling

4    procedures.

5            THE COURT:  And the title of the document was

6    used?

7            MR. NIKAS:  I believe so, Your Honor.

8            THE COURT:  By Mr. Rotondo?

9            MR. NIKAS:  I don't know, Your Honor.  Either I

10   or he did.  I don't know how he did it, but I know I did.

11           THE COURT:  So what do you want to argue again?

12           MR. NIKAS:  We'd like to bring the jury's

13   attention to the fact that there were other materials

14   contained in those documents that were never reviewed by

15   the witnesses or presented to the jury.

16           THE COURT:  That's the basic point you want to

17   make?

18           MR. NIKAS:  Correct.

19           THE COURT:  Other materials were contained in

20   those documents which have not been admitted into

21   evidence.

22           Mr. Rotondo?

23           MR. ROTONDO:  It's clear, Your Honor, that

24   Mr. Nikas wants to use the documents for improper purpose.

25   He wants to comment and argue about things which are not

PDF created with pdfFactory trial version www.pdffactory.com

1    in the record, and he's not allowed to do that.

2            To go through -- there are four exhibits for

3    identification that Mr. Nikas is referring to.  The first

4    one is a list of compression ratios, which is Defendant's

5    Exhibit 95.  The second is the pickling procedures, which

6    is Plaintiffs' Exhibit for Identification 33.  The diagram

7    in the side drawn that was reference is Plaintiffs'

8    Exhibit for Identification 38.

9            THE COURT:  38 is which one?

10            MR. ROTONDO:  It's the diagram of the elbow

11    height.

12            THE COURT:  Okay.

13            MR. ROTONDO:  Plaintiffs' 38 for identification.

14            And this water ingestion service bulletin was

15    Plaintiffs' Exhibit 36 for identification.

16            To go in reverse order, Plaintiffs' Exhibit 36,

17    I never used that document.  I never referenced that

18    document.  I never showed that document to anybody.

19    That's a document that plaintiffs apparently want to use.

20    There's nothing I did that would in any way open the door

21    to the plaintiffs.

22            MR. NIKAS:  I only referenced three documents,

23    not four.  I didn't reference that document.  Three

24    documents, not four.

25            THE COURT:  But I thought you were talking about

1    water ingestion procedures.  And you said the title was

2    used, if you didn't use it, Mr. Rotondo did.

3              MR. NIKAS:  That's the 33 document, Your Honor.

4              MR. ROTONDO:  Okay.  I may have misunderstood.

5              With respect to 38, Your Honor, we had a long

6    argument about Exhibit 38 for identification.  And based

7    on my cross-examination of Mr. Wicander, plaintiff was

8    specifically given the opportunity to introduce parts of

9    that evidence into evidence and the plaintiff elected not

10   to do it.  So there's no basis for plaintiff to now to get

11   some sort of negative inference against defendant for not

12   introducing into evidence a document which he had in front

13   of him --

14             THE COURT:  Isn't Plaintiffs' 38 -- wasn't -- I

15   have a slightly different recollection.  I want to check.

16             MR. NIKAS:  Again, Your Honor --

17             THE COURT:  One second, please.

18                  (Pause.)

19             THE COURT:  You're talking about plaintiffs'

20   Exhibit 38?

21             MR. ROTONDO:  Yes, Your Honor.

22             THE COURT:  We had the discussion in the

23   evening, and then the defense went back and then sent a

24   letter and the responses.  The defense cited to the -- I'm

25   going to mispronounce this -- Paolitto case.  I came in

1    the next morning and I said that the conditions for

2    curative admissibility had not been satisfied so the

3    plaintiff was limited to inquiring about it but not

4    permitted to admit it.

5         MR. ROTONDO:  You're right, I'm sorry.  You're

6    right.  The plaintiff was allowed to inquire.

7         THE COURT:  But not admit it.

8         MR. ROTONDO:  Plaintiff was allowed to inquire

9    and did inquire about it.

10        THE COURT:  Yes.

11        MR. ROTONDO:  With respect to the pickling

12   procedures, that's Plaintiffs' Exhibit 33, plaintiff was

13   again allowed to inquire about the pickling procedures

14   with respect to Mr. Wicander.  And I don't remember

15   whether they did or they did not, but they had full access

16   to do the same thing that I did, which was to inquire

17   about the pickling procedures.

18        And then with respect to Exhibit -- Defendant's

19   Exhibit 95 for identification, different compression

20   ratios, I asked the question of the witness was he aware

21   that Mercury had a compression ratio of 100 psi, and he

22   said that he was aware of it.  I don't think I could have

23   established the evidentiary basis to get that document in

24   through Mr. Wicander.

25        THE COURT:  You could not have.

1         MR. ROTONDO:  I don't think there's any sort of

2    negative inference in my not doing so.

3         MR. NIKAS:  Mr. Wicander could have gotten the

4    documents in.  He did testify in his direct testimony that

5    he was a MerCruiser certified mechanic, that he did have

6    access to service bulletins, that he did have access to

7    MercNet, that he did read the service bulletins and relied

8    on the service bulletins.  And in fact --

9         THE COURT:  Let me say this.  The posture that

10   we're in now is that the plaintiff didn't or could not

11   have gotten certain evidence in in its case on direct

12   examination of this witness.  The plaintiff then argued

13   that the documents were admissible under the doctrine of

14   curative admissibility.  After reviewing the law, I ruled

15   it was not.  So it's now inappropriate for the plaintiff

16   to comment on the fact that the document's not in when the

17   reason they're not in is because of my rulings, my

18   evidentiary rulings.  It's a comment on my rulings, not a

19   comment on the defendant's actions in this case.

20        So the answer is no.  I will not give an

21   instruction and it would be inappropriate to comment on

22   anything that is not in evidence.

23        MR. NIKAS:  I can refer to the fact that the

24   witnesses were examined about the service bulletins?

25        THE COURT:  You can talk about things that are

1    in evidence.

2              MR. NIKAS:  And their testimony certainly --

3              THE COURT:  I'm not going to rule now as to

4    what's in evidence because I don't have a transcript in

5    front of me.

6              So we've taken care of that.  And now we have

7    to -- before I lose track of this, I have two other

8    things.

9              Each side has an hour.  Plaintiffs' counsel, I

10   assume, is going to reserve some of that for rebuttal?

11             MR. NIKAS:  We will.

12             THE COURT:  You're responsible for keeping track

13   of that.  I track the time.  If people go over, I cut them

14   off.

15             MR. NIKAS:  We will not come anywhere close to

16   that hour.

17             Did the Court rule on the missing witness?

18             THE COURT:  I did.  I said there is no basis for

19   missing witness instruction.

20             MR. NIKAS:  But you --

21             THE COURT:  In terms of your argument?

22             MR. NIKAS:  Correct.

23             THE COURT:  You're going to refer to certain

24   people whose names were mentioned and you didn't hear from

25   them, that's the argument?  I don't hear an objection and

PDF created with pdfFactory trial version www.pdffactory.com

1    I don't see a problem, depending on exactly what you say.

2    You've told me -- I think you've told me what you're going

3    to say.  At least I have an understanding of what you're

4    going to say based on what you've said, but I'm not

5    blessing in advance whatever you say.

6              MR. NIKAS:  I'm trying to be overly cautious.

7    I'd like to mention they did not testify and the jury is

8    free to draw whatever conclusions they want to from that

9    fact.

10             THE COURT:  Am I going to get an objection to

11   that, Mr. Rotondo?

12             MR. ROTONDO:  He is inviting the jury to

13   speculate and decide the case based on something that's

14   not in evidence, what people who weren't here didn't say.

15             MR. NIKAS:  The doctrine exists for some reason,

16   Your Honor.

17             THE COURT:  The doctrine exists to be used when

18   the groundwork is laid for it.

19             MR. NIKAS:  The jury's entitled to infer --

20             THE COURT:  They can't infer whatever they want

21   to.  They have to draw reasonable inferences and you have

22   to argue reasonable inferences.  You cannot argue

23   unreasonable inferences.  I mean, there are lots of people

24   who could have come to testify who didn't.

25             We need to go through the current draft of the

PDF created with pdfFactory trial version www.pdffactory.com

1    charge.  I'm going to try to point out to you where

2    changes were made.  Quickly, if I can.

3             Oh, another important point.  The juror who had

4    a question about a lemon law concerning boats has written

5    another -- he asked is there a lemon law concerning boats,

6    he asked that question before.  I am not giving a charge

7    on the law on a lemon law concerning boats.  And then

8    something about, do the conduct there a recall on motor

9    and exhausts if there is several -- this may say

10   propellers.  I'll have copies made of this note.

11            My answer is there will be no charge on the law

12   involving anything that would be called a lemon law on

13   boats.  And to be honest, I don't know if there is such a

14   thing, although I have never heard of one.

15            MR. ROTONDO:  I've never heard of one either.

16            THE COURT:  Mr. Senning, have you heard of one?

17   You're an expert in this area, Connecticut law.

18            MR. SENNING:  The Connecticut lemon law is

19   generally considered to pertain to vehicles.

20            THE COURT:  Just so there's no confusion --

21            MR. SENNING:  The language is a bit vague.  I

22   think that an argument might be made that it could, but

23   there's no case law that decided that.

24            THE COURT:  There's no claim here under any such

25   law.  So I'm going to just tell them no, just to make it

PDF created with pdfFactory trial version www.pdffactory.com

1    simple.  I don't want any speculation back in the jury

2    room.

3              And I don't understand the second half of the

4    question, so I'm going to let you all see it.

5              Are the plaintiffs going to be here soon?

6              MR. NIKAS:  They're waiting in the counsel's

7    office.

8              THE COURT:  Okay.  On page 16, just above the

9    caption, I revised that to say there are two theories,

10   strict liability and breach of express warranty.

11             On page 17, I took out duty to warn.

12             On page 19 under comparative responsibility,

13   four lines down -- no, three lines down it says all the

14   elements of one or both of their theories of liability.

15   And then that language, "and that defendant's actions

16   caused the plaintiffs to suffer damages."  That's the

17   language I put it which wasn't what the defense asked for,

18   but I think in substance covers that ground.

19             There's a typo on page 20, I won't bother you

20   with that.

21             Then we get to -- whoops, some pages are out of

22   order.

23             We took out the language that was in brackets

24   concerning including wrongful death.  My understanding is

25   that both sides agreed with me that it was not an issue in

PDF created with pdfFactory trial version www.pdffactory.com

1    this case.  Based on that, I believe it's appropriate to

2    take that out.

3            Page 22, revocation of acceptance.  The first

4    two paragraphs on 22 and 23 have a lot of changes in them.

5    And the paragraph at the bottom that says "second" has a

6    new first sentence.  And then after that it picks up with

7    what was there before.  So you all might want to focus on

8    that.  Do you all have time to read that now?

9            Then I added "third," I added "fourth" and I

10   added "fifth" on page 24.

11           Under "fifth," the second sentence is new

12   because I needed to make a transition, "thus the

13   plaintiffs must prove that they gave notice of revocation

14   prior to any substantial change in the condition of the

15   boat."

16           And then we have just a few other minor changes.

17           On page 26, Section E, first paragraph, the last

18   sentence I added "with the exception of the issue of

19   mitigation of damages, the plaintiffs have the burden of

20   proving damages by a preponderance of the evidence."

21           And those are the changes from the prior draft.

22           Usually I have counsel tell me what their

23   objections are, but I got written objections.  I think

24   I'll just take them -- why don't we get a list now just so

25   I'm sure there's no misunderstanding.

PDF created with pdfFactory trial version www.pdffactory.com

1          Plaintiffs' objections to the charge are as

2    follows.

3          MR. NIKAS:  Your Honor, we wish to renew our

4    objection as to the failure to warn issue.

5          We'd also like to direct the Court's attention

6    to an affidavit by Mr. Senning which is attached as an

7    exhibit to Plaintiffs' Opposition to Defendant's Motion

8    for Judgment as a Matter of Law which the Court received

9    this morning, which explains the factual circumstances

10   surrounding the drafting of the jury instructions and an

11   explanation for a footnote and the reference in the

12   footnote to Section Q and describes the circumstances

13   surrounding how those drafts were exchanged between

14   counsel immediately prior to submission of the joint trial

15   memorandum.

16          THE COURT:  Okay.

17          MR. NIKAS:  We'd also like to object on the

18   basis of the instruction as to the component of failure to

19   warn and the Connecticut products liability statute as a

20   separate component, a failure to warn and negligence cause

21   of action.  Both we feel should be present in the special

22   verdict form.

23          THE COURT:  Okay.

24          MR. NIKAS:  Those are our objections,

25   Your Honor.

PDF created with pdfFactory trial version www.pdffactory.com

1        THE COURT:  And defense objections you want to

2   preserve, Mr. Rotondo?

3        MR. ROTONDO:  Yes.  The written ones, yes, I do.

4        THE COURT:  Which ones?

5        MR. ROTONDO:  Your Honor, actually -- I don't

6   have any.

7        THE COURT:  Anything in your Rule 50 papers is

8   preserved so we have it simple for you all.

9        MR. ROTONDO:  I have no objections as to the

10  charge.

11        THE COURT:  So let's see if we can make heads or

12  tails out of this second sentence in the -- I told you

13  what I'm going to do on the first sentence.

14        MR. NIKAS:  The question, Your Honor, asked:  Do

15  they conduct a recall on motor and exhaust if there are

16  several problems?  I believe is how that should read.

17        THE COURT:  Or, Do they conduct a recall on a

18  motor and exhaust if there is several propellors --

19  problems.

20        MR. NIKAS:  Problems.

21        THE COURT:  Okay.  Upside down, okay.

22        MR. NIKAS:  Either of the first two words could

23  be interpreted under either of those readings.  But I

24  think it's "conduct recall on motors and exhausts if there

25  are several problems."

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  Okay.  That would seem to suggest

2     that if the plaintiff failed to put in evidence of a

3     recall, this juror would say, well, the plaintiff hasn't

4     produced evidence the plaintiff should have produced.

5     That would be improper for the juror to conclude -- to

6     draw any adverse inference because there's no evidence of

7     a recall.

8          MR. NIKAS:  And there are no nationwide recalls.

9     They're strictly voluntary under the Federal Building and

10    Safety Act.

11         THE COURT:  My answer to the first question, so

12    there's no potential for mischievous inferences, is a

13    simple no.

14         What's the clearest answer I can give to the

15    second question to achieve the same result?

16         MR. NIKAS:  It's a more complex answer because

17    it gets into issues of why there are no recalls in the

18    boat arena as there are in motor vehicle arena because

19    states -- in the maritime arena only Federal Building

20    Safety Act issues, which up to now are related to

21    propeller guards, are subject to those types of recalls.

22         THE COURT:  Maybe I should tell the jurors that

23    this is not an appropriate question or something like

24    that.

25         MR. ROTONDO:  Perhaps just tell the juror the

PDF created with pdfFactory trial version www.pdffactory.com

1    juror has to decide the case based on the evidence that

2    the juror has heard in the courtroom and the law given to

3    him by the Court.  Can't speculate as to other things.

4          THE COURT:  First part will be no.  I'll

5    reconfirm my understanding of the question.  I'll tell the

6    juror they must decide the case only on the evidence

7    submitted in the courtroom and my instructions on the law

8    and they cannot speculate as to other things.  Okay.

9          I think that was everything I had on my list to

10   address before we picked up.  I need a few minutes to

11   organize.  Are you all set in terms of --

12         MR. NIKAS:  Your Honor, we have -- I don't know

13   about Mr. Rotondo, but we have, I guess, four issues.

14         One is, we would like to use two demonstrative

15   exhibits, both of which are distillations of exhibits that

16   were used in testimony of the witnesses.  The first is a

17   better representation of Plaintiffs' Exhibit for I.D. 162

18   which shows the compression strokes of the engine.

19   Mr. Rotondo had a question about the photograph, we

20   removed that photograph.  It basically shows the side view

21   of the cylinder and then each of the four strokes,

22   compression cycle, and then identifies those parts.

23         THE COURT:  Okay.

24         MR. NIKAS:  The second is a larger

25   representation of the glass within the glass with the oil

PDF created with pdfFactory trial version www.pdffactory.com

1    and the water.

2            THE COURT:  The glass that Mr. Wicander was

3    using?

4            MR. NIKAS:  Correct.  Just a larger version of

5    that.

6            THE COURT:  Okay.

7            MR. NIKAS:  And then we understood, Your Honor,

8    that we would get written rulings on the Court's curative

9    admissibility findings.

10            THE COURT:  You will.

11            MR. NIKAS:  And then also on the inability to

12    introduce evidence on impeachment.  We just wanted to --

13            THE COURT:  That's all the same thing, isn't it?

14            MR. NIKAS:  Well, curative admissibility goes

15    to --

16            THE COURT:  I mean, that's all that same

17    discussion, isn't it?

18            MR. NIKAS:  Well, the impeachment issue didn't

19    arise until the day after the curative admissibility issue

20    arose.  The impeachment issue didn't arise until Friday

21    afternoon when we were attempting to impeach the witnesses

22    with documents and we were not allowed --

23            THE COURT:  I told you to go back and ask

24    whatever questions you wanted to ask.  So I ruled on --

25    you wanted me to say I'm going to let you do things, and I

1   said I don't see the basis for it.  And I told you to go

2   back and do whatever you wanted to do and I'll rule on

3   questions and objections as they came up.

4           MR. NIKAS:  If we could get a written ruling on

5   that.

6           THE COURT:  I'm not going to do a written ruling

7   on that, I don't know what questions to address.

8           MR. NIKAS:  Very well, Your Honor.

9           THE COURT:  Mr. Rotondo, any response to --

10          MR. ROTONDO:  With respect to the two

11  demonstrative objections?

12          THE COURT:  Or any objection, let me just ask.

13          MR. ROTONDO:  I was shown five or six things

14  these morning, diagrams, do I have objections because they

15  were not in evidence.  Now I'm told there are two.  I

16  didn't see a glass within a glass.

17          THE COURT:  The glass within the glass is

18  something that Mr. Wicander used.

19          MR. ROTONDO:  I didn't see a diagram of a glass

20  within a glass.

21          MR. NIKAS:  No, it's actually just a bigger

22  glass within a glass.

23          THE COURT:  I don't see a problem with that.

24          Let's talk about the first issue, then.

25  Plaintiffs' I.D. 162.

1          MR. NIKAS:  May I, Your Honor?

2          THE COURT:  Sure.

3          That's going to be used for demonstrative

4    purposes only?

5          MR. NIKAS:  If I can actually show the Court

6    162.

7          MR. ROTONDO:  I didn't make the connection.

8          THE COURT:  I didn't either.  I understand why

9    you say it's clearer.

10          MR. NIKAS:  I'll use them both in conjunction.

11          THE COURT:  And then say here's a clearer since

12    he did disclaim having artistic talented when he drew it.

13          MR. NIKAS:  Because we only had one question,

14    you can see the different colors, trying to distinguish

15    the four strokes.  This actually sets them out as four

16    different things rather than four things written on the

17    same cylinder.

18          THE COURT:  And he did testify about the

19    strokes, as I recall.

20          MR. NIKAS:  Several times, just to make sure

21    it's clear.  This way they at least can see it.

22          THE COURT:  I remember him testifying about it.

23    You can use that as a demonstrative exhibit.

24          So I think counsel will be ready in a few

25    minutes after I give the court reporter a break?

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. NIKAS:  Yes, Your Honor.

2          MR. ROTONDO:  Your Honor, is it your practice to

3     go immediately to plaintiffs', to defense, and back?

4          THE COURT:  I usually take plaintiffs', then

5     take a short break.  Depending on how long defense

6     argument is, I may go straight to rebuttal.

7          MR. ROTONDO:  Thank you.

8          THE COURT:  We'll take a ten-minute recess and

9     the courtroom deputy will let the jurors know we'll be

10    ready in about ten minutes.

11         Thank you.

12              (Whereupon, a recess followed.)

13

14         THE COURT:  Ready to bring the jury in?

15              (Whereupon, the jury entered the

16              courtroom.)

17         THE COURT:  Please be seated everyone.

18         We're going to move the thing here so I can see

19    all the jurors.

20         Good morning, ladies and gentlemen.

21         Ladies and gentlemen, I got a follow-up note

22    from a juror.

23         The first question of the note was:  Is there a

24    lemon law concerning boats?

25         And the answer is no.

PDF created with pdfFactory trial version www.pdffactory.com

1          I think the second question states something

2   like:  Do they conduct a recall on motor exhausts if there

3   are several problems?

4          And my response to you there is that you must

5   decide this case only on the evidence admitted here in the

6   courtroom and my instructions to you on the law.  And you

7   cannot speculate as to other things.  So that's the best I

8   can do in terms of responding to that question.

9          This morning you're going to hear closing

10  arguments of counsel.  Each side has up to an hour.

11  Counsel for the plaintiff goes first and reserves some

12  time for rebuttal.  So you'll hear from counsel for the

13  plaintiffs, then you'll hear from counsel for the

14  defendant, and then counsel for the plaintiffs will have

15  saved some time for rebuttal.

16         We'll probably take a break at the end of the

17  plaintiffs' first statement, and then we'll see how long

18  the defendant's statement is to determine whether we take

19  a break before we hear the rebuttal.  Most likely we'll go

20  straight through.

21         Mr. Nikas.

22         MR. NIKAS:  Good morning.

23         Just about a week ago we started this trial and

24  we heard from the first of our witnesses.  Given the time

25  that's past and given the weekend, I'd like to review the

PDF created with pdfFactory trial version www.pdffactory.com

1   testimony that you heard and go over the things that

2   everybody said so you can remember who said what and what

3   evidence is there before you.

4           The first person you heard from was Peter Mains.

5   And he told you that he bought this boat with his wife to

6   enjoy it with their daughter.  And having owned two

7   previous boats, he wanted to continue to enjoy an outdoor

8   activity.

9           Well, shortly after that, I guess we all heard

10  about the laundry list of problems that he had and the

11  complaints that he made.  And you saw the letters and we

12  saw the responses, and there were item after item after

13  item.  And it was a long list sometimes.

14          In fact, if you consider Peter's testimony in

15  light of some of the testimony you heard afterwards from

16  witnesses for both plaintiffs and the defendant, one thing

17  was clear:  Peter Mains was fussy.  He was very, very

18  fussy.  He and his wife paid just shy of $140,000 for this

19  boat.  And having returned their previous boat to Sea Ray

20  and having used that as a down payment on this one, he

21  testified that he had the expectation that he would be

22  able to get many years of use out of it.

23          They bought the boat in May of 1998.  From that

24  first week up until the time the engines failed in June of

25  2001, there were several repair attempts.  Sea Ray flew a

1    mechanic up.  The boat was taken to Haddam for repairs.

2    And finally in 2000 the boat disappeared for five and a

3    half months.  From the boating season supposedly lasting

4    six months, as Mr. Mains said, the boat was out of

5    commission for an awfully long time.

6            And when his wife, Lori, testified, she

7    corroborated that her husband was particular.  She

8    corroborated that the family used the boat with their

9    daughter, their daughter's friends and other relatives.

10   And everybody agreed that when these engines failed on

11   June 10, 2001, it was rather unexpected.  What was

12   unexpected was they had fewer than 180 hours on it.  One

13   expert testified that's about 10 percent of the expected

14   usage one would get from engines like these.

15           Well, that's two of the witnesses, both

16   plaintiffs.  Who else did we hear from?

17           We heard from Thomas Wicander.  Even though he

18   testified as an expert on the basis of his background,

19   Thomas Wicander was contacted by Sea Ray to coordinate the

20   repairs that would have started the date after these

21   engines failed.  They failed on June 10, 2001.  Work was

22   supposed to begin on June 11.  And he was the person that

23   was charged with doing this work.

24           He didn't get a chance to because on June 10

25   Peter Mains tried to start the engines and could not.  Why

1    not?  Well, initially I guess Mr. Wicander, Mr. Mains all

2    thought it was because the engine had hydrolocked.  The

3    boat was meticulously maintained.  In fact, I think

4    Mr. Wicander testified that even when both engines were

5    not working and apart, Mr. Mains went down with his family

6    to go wash the boat while it was in dry storage.  I guess

7    he did that so often that Mr. Wicander testified he had to

8    give him a pool key to get him to go away sometimes.

9            But why did the boat hydrolock?  Well, when

10   Peter and Lori bought the boat, it came with a

11   collector-style exhaust.  And I know you've heard those

12   terms a lot: collector-style and water lift.  But the

13   collector-style exhaust was the exhaust system that the

14   boat came with.  And when the boat was at the factory,

15   unbeknownst to Mr. Mains or his wife or anybody else, at

16   least as far as the owners are concerned, Sea Ray decided

17   to change out that exhaust system.

18           I'm going to skip ahead a little bit.

19           The second to last witness we heard from on

20   Friday was a gentleman named David Wade.  David Wade was

21   the customer service rep from Sea Ray.  And you'll recall

22   when he was asked, Were you aware that the flushing

23   procedures for the collector-style exhaust and the

24   flushing procedures for the water lift muffler were

25   different, he replied, No, I didn't know that.  I didn't

PDF created with pdfFactory trial version www.pdffactory.com

1   recall that.  Why is that important?  Well, if you're

2   going to flush the collector-style, the engines should not

3   be running.  If you're going to flush it with the water

4   lift, which is what Sea Ray installed when the boat was

5   back at Tennessee, it should be running.

6           Thomas Wicander and Thomas Greaves, who was the

7   marine surveyor with the Irish accent, both testified that

8   the exhaust hoses were higher than the exhaust elbows.

9   And you'll recall with the rolled-up tube of poster board

10  and the tennis ball, when that happens, it allowed water

11  to run downhill into the exhaust elbows and into the

12  engine.  And all that water, you recall Thomas Wicander

13  say, was sitting on top of that piston preventing it from

14  moving up.  That's the hydrolock.

15          At this time Thomas Wicander's only a mechanic.

16  Granted, he was a Mercury-certified mechanic, he was a

17  Sea Ray-certified technician, but his only role up until

18  now was to try to find out what was wrong with these

19  engines.  He turned them over, got water to come out,

20  started them.  And at this point nothing tells him --

21  there's no evidence before him to suggest anything other

22  than those engines had hydrolocked.  Why is that?  Well,

23  if you remember, in his drawing he said the pistons are

24  sitting in the cylinders and the head sits over both.  He

25  couldn't see through the head until it's removed.  And

1    until it's removed nobody -- not Mr. Mains, not

2    Mr. Wicander, not the Sea Ray people that Mr. Mains had

3    spoken to, not the people at the dealership -- nobody had

4    any idea that there was a problem beyond the hydrolocking.

5           When Mr. Wicander pulled that head off and was

6    able to look into the cylinders, what did he find?  You

7    heard this term.  He found scoring.  One engine, seven

8    cylinders out of eight were scored, and the other, half.

9    Why was that significant?  He testified that the scoring

10   proved that the ingestion occurred when the engine was

11   running.  Without the engine running, the water just

12   stayed on top of the piston, preventing it from starting,

13   sure, that's a problem, but not causing the internal

14   damage.  And when he looked into the cylinders, he found

15   significant scoring that was historical, meaning it

16   happened over time that those engines had been ingesting

17   water.  What were they ingesting water through?  The

18   exhaust elbow sitting right on top of the cylinder.  And

19   given the layout, allowing water to flow back.

20          The scoring was significant.  And he testifying

21   that there was no way possible that that scoring could

22   have occurred without the engine running.

23          He also testified that in their attempts to

24   follow the MerCruiser procedures and pickle the engine and

25   start it, that the level of scoring found could not have

1   been caused by that.

2           How'd the water get in?  This is a better

3   example of the picture you have there.  The red and blue

4   things are the valves, the "I" is the intake valve, the

5   "E" is the exhaust valve; the "P" is the piston.  With one

6   of those valves open, water is allowed to go through, sit

7   on top of the piston.  And when the engine is running, it

8   ate away the oil that protects the piston as it moves

9   through the cylinder.  After enough time, that water

10  eroded away the lubrication and allowed metal-to-metal

11  contact.

12          Let's fast forward just a bit to defendant's

13  expert, Mr. Davis.  Even though Mr. Davis said he didn't

14  really look at the engines, in fact somebody else

15  completed that part of his report, he said the only thing

16  that can scratch the cylinder walls, which he said was

17  hard metal, was something harder than that.  Water is not

18  harder than metal.  Neither is salt.  You know that.  The

19  only thing that's harder than the metal in the cylinder

20  wall would have been the metal in the piston adjacent to

21  it.  And after time, with that lubrication worn away by

22  the water, it allowed the piston to contact the cylinder

23  and scratch it.  The tolerance, unlike our pitcher in the

24  vase, is one-thousandths of an inch.  That scoring

25  prevented the repair of the block and, Mr. Wicander

PDF created with pdfFactory trial version www.pdffactory.com

1    testified, would eventually have led to catastrophic

2    failure of the engines.

3            It was fortunate that the engines failed where

4    they did, at the dock.  If they had failed at sea, if

5    they'd failed in heavy weather, if they'd failed at night,

6    what would the Mainses have done?  That danger presented

7    by the failure of the engines -- well, that's a problem.

8            Thomas Wicander explained how the process

9    worked.  He drew pictures.  He tried to explain how water

10   got into the engine, and he explained how it was

11   impossible to tell at the time the original diagnosis was

12   made what the problem was.  Because without removing the

13   head, there was no way to be able to look down into those

14   cylinders.

15           Well, this was a big problem.

16           The boat had other problems.  You heard about

17   gelcoat cracks and water in the core and anchor windlasses

18   and all sorts of things.

19           Well, Thomas Greaves was the marine surveyor.

20   At the time that he was hired, that's all he was: a marine

21   surveyor.  He inspected the boat within two weeks of its

22   failure.  He wasn't an expert witness.  He was just trying

23   to give an accurate description of the condition of the

24   boat.  And what did he find?  He found water in the core.

25   He found handrails that were improperly secured.  He found

1   that as small a man as he was, he testified he couldn't

2   access the parts of the engine that you needed to access

3   to inspect the boat.  He was forthright.  He listed them

4   all in 12 bullet points.

5           Well, how serious were those problems?  How

6   accurate were they?  If you don't believe Thomas Greaves,

7   let's go to defendant's expert, Mr. Davis.

8           Mr. Davis, when asked, Do you agree with all the

9   conclusions in Mr. Greaves report, he said, Not all of

10  them.  I want you to remember, as we walk through that

11  list, 1 through 12, that he conceded that he agreed with

12  each and every one, including the issue of the exhaust

13  system restricting his access to the engine compartment.

14  Each and every one.

15          Well, what was Mr. Davis's job?  You'll recall

16  that he had a lot of credentials, but he didn't look at

17  the engines except superficially.  I asked him, What was

18  the purpose of you being hired as an expert?  And he said,

19  To complete inspection of the subject vessel and render an

20  opinion as to her present condition and value.  That was

21  one.  Two, provide an opinion as to the cause of the

22  damage found.  And three, provide an opinion as to the

23  repair cost.

24          Let's take those in order.

25          Let's talk about his opinion as to her present

1    condition and value.  Maybe you remember the discussion

2    about "to be" and "once."  Because the fact of the matter

3    is, the value that Mr. Davis concluded was not based on

4    the condition of the boat as he inspected her on.  The

5    value he provided was a boat with two good engines.

6            And then he went so far as to corroborate the

7    care that Peter and Lori took of the boat.  Remember he

8    came up with a value.  And then he said it was in such

9    excellent condition that he increased the value by

10   25 percent.  Increased the value of a boat in good

11   condition by a quarter because it was in excellent

12   condition.  And I asked him what his opinion was.  His

13   opinion was the vessel is in excellent condition except

14   for the current condition of the engines.  That's a lot

15   like, Other than that, Mrs. Lincoln, how was the play?

16           He testified that the purpose of this boat was

17   to be able to provide transportation on the water.  And

18   ever since June 9, 2001, the only time the boat had seen

19   water was to run tests on her.  It's been almost seven

20   years since she's been used for her intended purpose.

21           Well, the second thing he was asked to do was to

22   provide an opinion as to the cause of the damage found.

23   Remarkably, he found that the cause of the water in the

24   hull core was by water.  And he never provided an opinion

25   as to the cause of the water in the engines other than to

PDF created with pdfFactory trial version www.pdffactory.com

1    state that he was informed it was because it was

2    hydrolocked.

3              He was critical of the pickling procedures that

4    Tom Wicander used even though they followed the MerCruiser

5    guidelines.  He was critical even though he didn't see the

6    boat until more than two years after Tom Wicander removed

7    the heads.  And Tom Wicander himself said at the point at

8    which he saw the scoring on the cylinders there was no

9    point in going any further.

10             And then the last thing he was asked to do was

11   provide an opinion as to the repair cost.  What was his

12   solution to this?  The boat, he said, was in excellent

13   condition.  Had less than 200 hours on the engines.  So

14   his recommendation was we get remanufactured engines and

15   we put them in there for I think he said $12,000, and the

16   boat will be worth $127,500 if we do that.

17             So let's replace the engines that came with it

18   from the factory that had less than 10 percent of their

19   expected life used, and that is supposed to make sense.

20             Well, not a lot made sense.  The biggest problem

21   with the boat was the engines and the water that was in

22   the engines.  He never provided us with an opinion, a

23   guess, even a whim as to how that had happened.

24             That's Greg Davis.  That was witness number one

25   for the defendant.  He was the expert.  At least he was

1    candid.  He told us that David Marlow at Sea Ray, who was

2    the director of customer service and he corresponded with

3    Peter Mains, was a personal friend of his.  He said that.

4    And he admitted that, well, we didn't come up with an

5    opinion as to the water damage.  And the value we got,

6    well, that's for a boat in a different condition other

7    than the one he looked at.

8         Well, who was witness number two?  Well, Dean

9    Beckman.  Dean Beckman worked at the dealership.  What did

10   Dean Beckman say?  Well, let's try to remember.  So Dean

11   Beckman is from the dealership.  He said that he had all

12   but a handful of customers that were as knowledgeable and

13   as attentive and contacted him as much as Peter Mains.

14   All that's consistent with what everybody else said.  Said

15   he got along with him.  Talked at the factory about

16   Peter's problems with the boat.  That was pretty much the

17   testimony.

18        Now we get to David Wade.  David Wade testified

19   for plaintiff even though he was an employee of defendant.

20   It was his job to deal with the boat when it got to

21   Tennessee.  He had a long list of items.  They did hull

22   repairs.  They put in a new stringer.  They sprayed on

23   some gelcoat.

24        And oh, yeah, David Wade said he decided to

25   change the exhaust.  David Wade was a customer service

1    rep.  When asked if David consulted any engineers, he said

2    no.  When asked if he consulted any materials, any

3    literature, any service bulletins, any technical manuals

4    before he suggested this repair, he said no.  When I asked

5    him, Then why did you change this exhaust system, he said,

6    To deal with Peter's complaint about noise.  How would he

7    know that this new different exhaust would even address

8    those concerns about noise?  He didn't know anything about

9    the exhaust.  He didn't know the purpose behind it.  He

10   didn't consult any materials.  He didn't consult any

11   engineers.  And he didn't consult MerCruiser.  And we're

12   to believe he made this decision all by himself, changing

13   a major component of the boat because nothing was wrong

14   with it, he just did it because he thought it would fix

15   the noise.  All on his own.  Didn't tell anybody, didn't

16   talk to anybody.  He said he went to his boss and the

17   change was made.  Didn't tell Peter and Lori.  I know you

18   brought your car in for a flat tire, we thought we'd

19   change the interior, too, because you complained about the

20   smell.  Well, it would have been helpful to Peter and Lori

21   if David Wade understood the difference in the flushing

22   procedures.  Because remember when I started, I asked him,

23   Do you know the difference?  He said, No.

24        Well, a month later, Peter uses the boat the

25   first time.  He uses the boat the first time since it gets

1  back from Tennessee.  It runs for an hour and a half.

2          You heard about Peter's tendencies towards

3  cleanliness.  He flushes the exhaust using the procedure

4  that he was provided with at the factory.  Except that

5  procedure no longer works.  Why doesn't it work?  Because

6  Sea Ray changed the exhaust.  When David Wade was asked

7  whether he notified Peter, he said no.  Didn't appreciate

8  why he should have notified him.

9          By the way, the boat failed to start on June 10,

10  2001.  The MerCruiser engine warranty expired about two

11  weeks earlier.

12          And even though -- let's think about this.  It's

13  the first time Peter and Lori have used the boat.  What

14  about the repairs in Tennessee?  They happened after the

15  Sea Ray warranty had supposedly expired.  The hull

16  repairs.  The gelcoat.  Changing the exhaust.  Did Lori

17  and Peter pay for that?  No.  Sea Ray did.  A year after

18  the warranty had supposedly expired.

19          Well, surely there's got to be another witness

20  that helps explain all this.  There's got to be another

21  witness that explains why the exhaust was changed,

22  explains why the water got in the engine when it was

23  running.  There's got to be a witness that explains why

24  all the repairs have been covered.  There's got to be a

25  witness that makes sense of all this.  Who is the last

PDF created with pdfFactory trial version www.pdffactory.com

1    witness for defendant?  Who is it?  It is Greg Wilson.

2    Last witness we heard from.

3              He's in the area.  He gets a call to go out to

4    the boat to deal with this exhaust noise issue.  He's

5    going to install some baffles to try to fix this problem.

6    Does he refer to any materials?  Does he refer to any

7    service bulletins?  Does he contact MerCruiser?  No.  Does

8    he know why the water lift muffler and exhaust was

9    exchanged for the collector?  He says no.  Did you see the

10   boat when it was in Tennessee?  He says yes.  But I just

11   looked at it.

12             So the remainder of the questions that

13   Mr. Wilson answers, do you remember what they were?  They

14   were about his shoes.  He had to take off his shoes.  He

15   was wearing boat shoes and he had to take off his shoes.

16   He said it was like standing on river rock.  I don't know

17   what that has to do with water in the engine, but it is

18   consistent with the type of care that Peter and Lori took

19   of the boat.  They were incredibly meticulous.

20             Well, surely Davis, Beckman, Wade, and Wilson,

21   none of those witnesses helps us understand this problem.

22   Maybe ours do.

23             Peter Mains, on corrosion, is asked about

24   sparkplugs.  When were the sparkplugs purchased?  Four

25   days after the hydrolocking incident.

PDF created with pdfFactory trial version www.pdffactory.com

1           Tom Wicander explains, We started the engine

2     with the old plugs.  I wouldn't put new plugs in, he said,

3     until after the problem had been fixed.

4           Thomas Greaves, well, everything he said was

5     agreed to by Mr. Davis.

6           Well, who's left?

7           Tom Wicander said the scoring could only have

8     occurred while the engine was running.  It could only have

9     occurred while the engine was running and the damage that

10    he saw could not have occurred from the hydrolocking.  Did

11    any Sea Ray witness testify to the contrary?

12          Both Tom Greaves and Tom Wicander said even

13    after the change of exhaust, the outlet was higher than

14    the elbow which would allow water to roll back into the

15    engine.  Did any witness from Sea Ray contradict that

16    testimony?

17          Tom Greaves and defendant's expert, Greg Davis,

18    both testified that the new exhaust system prevented

19    access to the engine compartment and prevented access to

20    the parts that needed to be inspected.  Not only did no

21    witness from Sea Ray contradict that, their expert agreed.

22          Did we hear from David Marlow, who is the

23    director of customer service who wrote Peter the letter,

24    who was there at the factory?

25          Did we hear Mr. Todd Stooksbury, who was David

1    Wade's boss who supposedly was the only other person that

2    this exhaust change was discussed?  We didn't.

3            Tom Wicander, Tom Greaves, Greg Davis, to the

4    extent that he agreed with everything that Tom Greaves

5    said, all concurred.  The water got in the engine when it

6    was running.  It scored the cylinders preventing the

7    engine blocks from being reused and damaging them fatally.

8    That's the evidence you heard.  And that's the evidence

9    nobody contradicted.  Instead, they came after Peter for

10   being fussy, for making people take off their shoes, and

11   for buying sparkplugs four days too late.

12           They responded to the water ingestion with shoes

13   and sparkplugs.

14           And as fussy as he was and, yeah, the two prior

15   boats had been returned, and yeah, the list of repairs

16   that he wanted were long, think about this:  Did you hear

17   one witness, from the mechanic that worked on the boat to

18   defendant's expert to the two Sea Ray employees, did

19   anybody say Peter was wrong?  Did anybody ever say that

20   the list of items he wanted repaired were not valid?

21   Think about it.  They put the boat on a trailer and they

22   took it 1200 miles to Tennessee and it was there almost

23   six months repaired at their expense.  They did this for

24   customer service?  That's really good customer service.  A

25   year after the warranty expires.  They'll fix all the hull

PDF created with pdfFactory trial version www.pdffactory.com

1    items, they'll address all those issues.  And by the way,

2    we through in a whole new exhaust system for you, hope it

3    works.

4              Well, after the engines had failed, they went

5    back and forth with Sea Ray.  Peter said, Take back the

6    boat, I want another one.  And they offered him money.  By

7    their own admission they offered him $105,000.  By their

8    own expert, he said he thought the boat was worth 130.

9    That's not a very good deal.  They wanted to send the boat

10   back.  In fact, from the first week until the last, they

11   went back and forth, back and forth.

12             What did they get?  They got a boat that doesn't

13   run.  They got a boat that could have stopped running at

14   sea.  And they have a boat that's been on dry land for

15   almost seven years.

16             When you deliberate, think about the testimony

17   you heard and then think if anybody contradicted that

18   testimony.  That's your universe of witnesses for the

19   defense.  The expert, the guy from the dealership that all

20   he testified was that Peter was fussy, appeared

21   knowledgeable, and was around an awful lot.  David Wade,

22   who talked to nobody, read nothing, consulted nothing, and

23   changed the second biggest component in that engine

24   department.  And then Greg Wilson, who had to take off his

25   shoes.

PDF created with pdfFactory trial version www.pdffactory.com

1          That's all there is.  There were no other
2    witnesses.
3          The burden here is by a preponderance of the
4    evidence.  It's not a reasonable doubt.  It's not a
5    certainty.  It's just more likely than not.  If you put
6    them on a scale and both sides are exactly equal and if a
7    feather landed on one side of the scale, that would be a
8    preponderance of the evidence.  That may be helpful, maybe
9    not.
10          But look at those witness and think, what did
11    they say?
12          You all can remember Davis, the expert.  He gave
13    an opinion based on a condition that didn't exist, he gave
14    an opinion as to cause except for the big one, and he gave
15    repair cost based on remanufactured engines in place of
16    two new factory installed, high-output Horizon engines.
17          And just remember David Wade.  You only heard
18    from two Sea Ray employees and he was the one that didn't
19    take off his shoes, he didn't know the difference in
20    flushing instructions, he didn't know why he changed the
21    exhaust other than to say to take care of the noise.  How
22    did it take care of the noise?  How would it take care of
23    the noise?  Gee, I don't know.  Had he ever heard the term
24    "water ingestion"?  He said no.  Had he ever seen service
25    bulletins that dealt with the topic?  He said no.  Had he

 1   seen the installation manual?  He said no.  Had he ever

 2   seen the diagram of the two components he was swapping

 3   out?  He said no.  And despite the fact that he didn't

 4   know anything about the exhaust, he didn't ask anybody

 5   either.  And when Peter and Lori got the boat, he didn't

 6   tell them about the instructions, didn't tell them why

 7   other than to say, Well, I hope this fixes your problem.

 8   Well, we know what happened then.

 9           Peter was fussy, but not wrong, and they came

10   after us with sparkplugs and shoes.

11           I'm sure you can all figure this out.  Thanks.

12           THE COURT:  Thank you, Mr. Nikas.

13           We'll take a short break.  We'll take a

14   15-minute recess.

15               (Whereupon, a recess followed.)

16

17           THE COURT:  By my tally, the plaintiffs' closing

18   went from 10:19 to 11:08, so I count 11 minutes left for

19   rebuttal.

20           We'll bring the jury in.

21               (Whereupon, the jury entered the

22               courtroom.)

23           THE COURT:  Please be seated everyone.

24           Mr. Rotondo, whenever you're ready.

25           MR. ROTONDO:  May it please the Court, members

1  of the jury:

2          On behalf of the defendant, Sea Ray, I'd like to

3  thank each of you for the time that you've spent sitting

4  here as jurors listening to the evidence and to the

5  attention that you've paid to the evidence in the case.

6          This is my only opportunity to review the

7  evidence with you and to describe to you what we think the

8  evidence in this case has shown.  In the course of my

9  comments, I may refer from time to time to different legal

10  principles, and the judge is the final arbiter of what the

11  law is.  If what I say differs from what the judge says,

12  you obviously have to follow what the judge says.

13          The plaintiffs have just told you that the

14  defense case here was about sparkplugs and stocking feet.

15  That's not what the defense's case here was at all.  And

16  what I'd like to do is review the claims with you and to

17  discuss the evidence under the different claims that

18  you're going to have to decide in this case.

19          And there are three different claims that you're

20  going to have to decide in this case.  You're going to

21  have to decide claims relating to what's called product

22  liability, negligence, and revocation of contract.  And so

23  that's the order in which I would like to review them.

24          I'll start with sort of an overview, which is

25  that there's no evidence in this case that the boat itself

PDF created with pdfFactory trial version www.pdffactory.com

1    was unreasonably dangerous and defective at the time it

2    was sold.  Plaintiffs haven't presented any evidence of

3    that.

4            Second, plaintiffs are not entitled to what's

5    called revocation of contract.  They're not entitled to a

6    revocation of contract because the plaintiffs didn't have

7    a contract with Sea Ray to buy the boat.  They had a

8    contract with Surfside 3.

9            In addition, this claim of revocation wasn't

10   timely.  Plaintiffs had used the boat for three years.

11           And finally, the damages here that you've heard

12   so much about are at most $17,000.  That's what the

13   damages are.  For the non-engine work, it's $5,000.  And

14   to replace the engines with remanufactured engines is

15   $12,000.

16           Starting with the product liability claim, to

17   make things perhaps even a little more confusing, there

18   are two parts to the product liability claim.  There's

19   something called strict liability and then there's breach

20   of express warranty.  Those are two different theories

21   under product liability.  I'm going to start with the

22   strict liability theory.

23           And going back to what I said before, there's no

24   evidence that this boat was defective and unreasonably

25   dangerous back in May of 1998.

PDF created with pdfFactory trial version www.pdffactory.com

1           What evidence do you have of that?  You have the

2   affirmative evidence that the plaintiffs safely used the

3   boat for three boating seasons.  They had 170 hours on the

4   boat.  They took trips as far south as New York and as far

5   north as Cape Cod and Martha's Vineyard.  They didn't have

6   any injuries.  They didn't have any accidents.  The boat

7   didn't sink.  And they weren't stranded at sea.

8           We could take it from the other side.  Who came

9   into this courtroom and testified that this boat was

10  defective and unreasonably dangerous?  The answer is

11  clear:  No one.  No one testified that this boat was

12  unreasonably dangerous and defective.

13          Mr. Mains' complaints -- and we can talk about

14  those because there obviously were a lot of them.  But his

15  complaints don't prove the existence of a defect and they

16  certainly don't prove the existence of something that is

17  unreasonably dangerous and defective.  In addition, his

18  complaints were all unrelated to what now is the

19  plaintiffs' theory of the case.  His complaints related to

20  what people sometimes call -- well, a lot of them were

21  cosmetic.  A lot of them related to gelcoat.  A lot of

22  them related to seats.  There were a laundry list of

23  complaints.  But they didn't relate to the performance of

24  the engines, which is now what plaintiffs want to have you

25  believe this whole case is all about.  The fact is that

1    the engines worked well until June 10, 2001 when there was

2    this fresh water hydrolock and a failure to properly

3    pickle the engines.  The engines worked fine until that

4    point.  In fact, there were no complaints about the engine

5    the day before.

6            Mr. and Mrs. Mains testified that on June 9 they

7    went from their home marina, which I believe was in

8    Haddam, went down to Pilots Point in Westbrook and the

9    engines worked fine, they didn't hear any of this exhaust

10   resonance which they described as being annoying.

11           So that then takes us to Mr. Wicander.  He's the

12   plaintiffs' engine expert.

13           Now, it's our position, as you can tell from

14   cross-examine, that he improperly pickled the engines.

15   I'll talk more about that later.  But if we just focus on

16   some of the other things that he did here, he performed

17   tests a week after he tried to start the engines.  He

18   performed those tests on June 18.

19           And in looking at Mr. Wicander, I think it's

20   important to look at what he said about those tests.  On

21   direct examination, he said, I could tell that the

22   compression tests were off and I could tell that they were

23   off because I didn't get a consistent reading of

24   130 pounds per square inch on the compression read.  If

25   you look at his report which is in evidence, you'll see

1  one engine really is very close to being at around 130

2  because there's a plus or minus part to this, and the

3  other one does show a lot of variation.

4          Then on cross-examination Mr. Wicander agreed

5  that in fact the specification or the acceptable limit

6  wasn't 130, it wasn't his number, but that Mercury had

7  said it was 100.  And all of the readings were well above

8  100.

9          So then what happens?  Well, on redirect

10  examination the next day, Mr. Wicander says, It was 150.

11  That's what you're really looking for, 150.

12          But then on recross, he admitted, no, the

13  acceptable limit is 100.

14          So we have this back-and-forth testimony by

15  Mr. Wicander.

16          So then if we take the time line, in June of

17  2001 he does his compression leak tests.  Then he

18  shrinkwraps or has somebody in his yard shrinkwrap the

19  boat.  And they leave it on land a couple hundred feet

20  from the shore for over two years.  And then Mr. Wicander

21  comes back two years later and disassembles the engine,

22  he's got another mechanic with him, may have been the same

23  one who worked with him before, they disassemble the

24  engines.  This time he finds rust.  He says that is

25  significant.  I found rust in all sorts of different

PDF created with pdfFactory trial version www.pdffactory.com

1    places, and he found that to be important.

2            But on cross-examination he admitted, yeah, it

3    was right near the ocean for two years, that's a very

4    corrosive environment, and metal rusts in a corrosive

5    environment.  So what did that rust prove?  We submit it

6    proved nothing.

7            So let's look at Mr. Wicander.  He says that in

8    2003 -- again, this is two years after his examination, he

9    says he saw scoring on the cylinders that he attributed to

10   water ingestion over time.  That was his testimony.  He

11   saw scoring that he attributed to water ingestion over

12   time.

13           Let's look at what he didn't say.  He didn't say

14   the engine and exhaust system were defective, he didn't

15   use those words.  He didn't say that water ingestion

16   equals a defect, he didn't say that.  He didn't say that

17   it was possible to prevent all water ingestion through the

18   exhaust.  And the very fact that there was a standard

19   protocol, he testified there was a standard protocol that

20   he used and that Merc had, he said they were the same,

21   isn't consistent with the idea that that's the only

22   possible explanation for water ingestion.  And he didn't

23   say that the water ingestion related to the intermittent

24   exhaust noise that Mr. Mains complained about.

25           One other important aspect of this, Mr. Wicander

PDF created with pdfFactory trial version www.pdffactory.com

1    never saw the original exhaust installation.  Mr. Wicander

2    saw the exhaust system in this boat and this engine for

3    the first time in 2001.  There's been a lot of testimony,

4    a lot of discussion about the retrofit or the new exhaust

5    system that was put on in 2001.  And there's no dispute

6    that it was different than the one that had been put on in

7    1998.  Mr. Wicander never testified about the original

8    exhaust system, the original collector-style system.  He

9    didn't give any testimony about that at all.

10          So there is an inference, a suggestion in the

11   plaintiffs' case that the water ingestion is somehow

12   related to Mr. Mains' complaints about exhaust noise.  And

13   we submit that the connection between those two is

14   complete speculation.  Mr. Wicander never said it existed.

15   Mr. Wicander never heard that exhaust noise.  So there's

16   no logical connection between those two things.

17          Looking again at Mr. Wicander, it's important to

18   recognize that what he said at different times was very

19   different.

20          In 2001 he testified unequivocally -- let me

21   back up.

22          In 2001 he indicated that the engine stopped

23   because of water that came into the system as a result of

24   flushing when Mr. Mains did his fresh water flush on

25   June 9 after he finished the trip, that the water

1    ingestion there, that was a fresh water ingestion.  And he

2    said he could tell.  Mr. Wicander said he could tell the

3    difference between fresh water and saltwater.  And he knew

4    that the water that he saw come out of those cylinders,

5    the cylinder heads, was fresh water because there was a

6    consistency of fresh water as opposed to saltwater.

7         In addition, Mr. Wicander wrote a report that's

8    in evidence, it's Plaintiffs' Exhibit 26.  And

9    Mr. Wicander said that "On the basis of the mechanical

10   inspections reported above, we are of the opinion that

11   both engines have been seriously damaged as a result of

12   the hydrolocking that occurred on or about June 9, 2001

13   and require replacement."

14        So Mr. Wicander concluded in 2001 that the

15   hydrolocking occurred because of fresh water, not because

16   of saltwater, and that the engines had been damaged and

17   needed to be replaced.  That was his statement.  And at

18   trial he admitted that he knew that the water that he saw

19   coming out of those cylinders was fresh water, he could

20   tell that because of its consistency.

21        Let's roll forward two years.  So in 2003,

22   Mr. Wicander does an inspection.  He does another

23   inspection after the boat's been sitting for two years,

24   sitting near the ocean on land, he does an inspection to

25   search for damage.  What he said in 2001 was these engines

1  have been seriously damaged.  So when he goes to look for

2  the damage to the engines, it's curious that he didn't

3  look to the damage to the engines as a result of the

4  hydrolock.  He testified that he knew that when you have

5  damage from a hydrolock, you have damage to the bearings,

6  connection rods, and valves.  But Mr. Wicander didn't look

7  for that.  He didn't even look for damage relating to the

8  hydrolock.  Instead he said he saw scoring of the

9  cylinders that would at some point in time lead to the

10  failure of the engines.  That's what he said.

11       All right.  And ask yourself, what difference

12  does that make?  Why is that in any way relevant

13  whatsoever?  He had already determined that the engines

14  had been damaged from hydrolock.  So now what he's saying

15  is, hey, I found this other damage that could at some

16  point in time lead these engines to fail.

17       The engines were already broken.  He testified

18  that the engines were broken.  He indicated in his report

19  in 2001 that the engines needed replacement.  He knew

20  that.  He knew they needed replacement.  So his opinion

21  about this scoring in the cylinders is irrelevant to what

22  happened to these engines.  Because these engines worked

23  each and every time until Mr. Mains flushed the engines on

24  the night of June 9 and they didn't start on the morning

25  of June 10, 2001.

PDF created with pdfFactory trial version www.pdffactory.com

1          Let's talk about the exhaust noise.  There's no

2    doubt that Mr. Mains complained about the exhaust noise.

3    There's a lot of evidence about the exhaust noise.

4    Mr. Mains testified that it was annoying.  He testified

5    that he had telephone conversations about this exhaust

6    noise.  And Mr. Mains felt strongly enough about this so

7    that he included his complaints about exhaust noise in two

8    of his letters.  In September of 2001, Plaintiffs' Exhibit

9    Number 6, he said, Six times during our four-hour return

10   trip from Massachusetts in 3-foot seas, a loud resonant

11   exhaust noise would appear.  And then he says in order to

12   stop it, he had to take all these procedures.

13         And then you heard evidence that Mr. Beckman

14   went out and road with Mr. Mains on his boat.  And

15   Mr. Beckman didn't hear it.  Mr. Beckman said it sounded

16   completely normal.  Mr. Beckman said there was nothing

17   unusual about it.  You heard plaintiffs argue today that

18   no one ever disputed any of Mr. Mains' complaints.

19   Mr. Beckman disputed one of their key complaints that

20   there was something wrong with their exhaust system in

21   1998, early on.  Mr. Beckman didn't have to get up and

22   say, I'm arguing with you, but he said he didn't hear it,

23   he didn't see anything wrong with it.

24         Now, these complaints about the exhaust didn't

25   go away.  And you'll recall that Mr. Wilson testified, in

PDF created with pdfFactory trial version www.pdffactory.com

1    fact, Mr. Mains agreed that Mr. Wilson came out and put on

2    some sort of football muffler kind of exhaust arrangement.

3    And Mr. Wade called it a football.  I believe Mr. Wilson

4    referred to it as something else.  But anyway, sometime

5    around 1999 Mr. Wilson went out to the boat and put on

6    this new exhaust system.  Not exhaust system, a new

7    feature which Mr. Wade described as a football.  That

8    didn't work.

9         And Mr. Mains complained -- you've got this as

10   Plaintiffs' Exhibit 16, a February 12, 2001 letter.

11   That's the letter that was written while the boat was in

12   Knoxville, Tennessee, for a series of repairs.  So what

13   does Mr. Mains say then?  He says, The intermittent

14   suddenly loud exhaust noise problem has been unremedied

15   after new fiberglass resonators and 4 X 4 exhaust baffles

16   were installed.  That's the work that Mr. Wilson did.

17        So what we have here is complaints about the

18   exhaust system that are not verified.  No one else other

19   than Mr. Mains says he hears these things.  And Mr. Mains

20   admitted in a telephone conversation with Mr. Wade that

21   these complaints were not performance related.  But even

22   though Mr. Mains said that to Mr. Wade, Sea Ray was still

23   trying to fix the problem, the problem being Mr. Mains'

24   complaint.

25        Now, that's a strict warranty claim, strict

PDF created with pdfFactory trial version www.pdffactory.com

1   liability claim.  I'd like to turn now to express warranty

2   claim.

3           And the evidence that you've heard about an

4   express warranty in this case is really one thing.  The

5   express warranty that you heard in this case is

6   Exhibit 94.  That's the only express warranty that you've

7   seen in this case.  And that's the Sea Ray express limited

8   warranty.  Sea Ray warranted to original retail purchasers

9   to repair or replace -- I highlighted the part that I

10  thought to be important.  But you can look at the entire

11  document and see if there are other things that you find

12  to be important.

13          "Repair or replace any parts to be found

14  defective in factory material or workmanship within one

15  year of the date of delivery."

16          "The obligation of Sea Ray Boats under this

17  warranty shall be limited to the repair or replacement of

18  parts."

19          "The remedy described in this paragraph shall be

20  the exclusive and sole remedy" -- that's under "Warranty."

21  It continues and has some other language.

22          It says, This warranty does not apply to:

23  Engines, stern drives, cosmetic gelcoat finish, cracks or

24  crazing, and other limitations, all other warranties are

25  expressly excluded.

PDF created with pdfFactory trial version www.pdffactory.com

1          That's the warranty in this case.  And there's

2     no doubt but that Sea Ray, in responding to Mr. Mains'

3     complaints, did do things like make arrangements for

4     cosmetic gelcoat finishes and cracks and things like that.

5     In fact, you heard testimony from Mr. Davis that's one of

6     the things he didn't like.  Mr. Davis being Sea Ray's own

7     expert, said he didn't like some of the gelcoat repairs.

8     You heard him say that yesterday.

9          So what I'd like to do now is to turn to the

10    next claim, which is the negligence claim.  There are two

11    parts to this, in our view.

12          First you have the punch lists, and these are

13    Mr. Mains' letters which has all of these different items

14    on it.  I believe Mr. Wilson referred to it as a punch

15    list too.  And then the engines.

16          And the complaints before April 30th of 2001,

17    generally were these punch lists.  And what I've done here

18    is list out all of the dates of either the initial -- this

19    was the initial checklist when Mr. and Mrs. Mains were at

20    the dealer, May 21st.  May 27th is one of Mr. Mains'

21    letters, and we've got all these different dates of

22    letters.  And if you look at the dates of the letters,

23    you'll recall that Mr. Mains testified that the season was

24    six months long, it ended on October 30th, so it must have

25    begun around April 30th.  And many of these complaints

PDF created with pdfFactory trial version www.pdffactory.com

1  were written near the end of the season, at the end of the

2  season, near the end of the season or while the season is

3  over.

4         Now, there is also no dispute that Sea Ray paid

5  for all this work to be done.  Plaintiffs have suggested

6  to some ulterior motive.  It couldn't have been to satisfy

7  the customer, which is what Mr. Wade said, We're trying to

8  do this to satisfy the customer.  There's no dispute that

9  Sea Ray paid for this work even beyond the one-year

10 warranty and it also addressed work that wasn't covered

11 under the warranty, such as the gelcoat work.

12        Now, if you look at the complaints and think

13 about the testimony you heard.  You heard testimony about

14 engine noise.  And Mr. Mains testified that the engine

15 noise was annoying.  In his letters he described it as

16 annoying, but also told Mr. Wade it was not performance

17 related.  He also complained about the flex in the floor.

18 And you heard testimony I believe from Mr. Beckman that it

19 wasn't observed.  They didn't observe this flexing.  You

20 heard complaints about decals, decals on the engines were

21 scratched.  And you heard complaints about dirty shoes.

22 And Mr. Mains was described as being picky or demanding,

23 one lawyer referred to him as being fussy.  This goes to

24 the plaintiffs' argument this morning, he was required to

25 work in his socks.  Well, the fact that he was required to

PDF created with pdfFactory trial version www.pdffactory.com

1    work in his socks really shows two things:  One, it shows

2    the extent to which Mr. Mains was fussy, the extent to

3    which he required people to do certain things; and also

4    what Sea Ray was willing to do to try to respond.

5    Mr. Wilson didn't say, No, I'm not doing that.  I'm not

6    walking on river rock in stocking feet.  He did it.  In

7    fact, he did it twice.

8              After April 2001, Mr. Mains wrote a letter dated

9    April 30, you have it in evidence, showing 18 complaints.

10   Mr. Beckman traveled to the boat, he testified about that.

11   Mr. Beckman testified that there was something called an

12   exhaust bullet that had been shipped up to him overnight

13   or somehow expressed to him.  And that he brought this

14   with him to put on the boat when he went out there.  And

15   then -- because it had been crushed, damaged, according to

16   Mr. Mains.

17             But then when Mr. Beckman got there and when he

18   looked at it, he said it wasn't crushed, there was a

19   scratch on a paint on a bronze piece that sits in the

20   water and he wasn't going to do it, he wasn't going to put

21   this new piece on.  So Mr. Beckman also described doing

22   other work at the scene when he went out.

23             So then we have Mr. Wade's letter, which is

24   Sea Ray Exhibit Number 17.  And Mr. Mains -- excuse me,

25   Mr. Wade identified 18 complaints that Mr. Mains had put

PDF created with pdfFactory trial version www.pdffactory.com

1    into his April 30 letter because Mr. Wade was trying to

2    come up with a list.  And that letter, Exhibit 17, also

3    then identifies 14 new items that Mr. Mains had complained

4    about in May.  So he listed those out.  And Sea Ray was

5    still trying to satisfy this customer.

6            We're now two years out of the warranty period

7    because the boat was purchased in 1998, the warranty

8    period was a year.  So it ended in 1999.  Now we're two

9    years out of the warranty.  Mr. Wade is still offering to

10   do these things.  He said that Sea Ray would make

11   arrangements to have Brewers perform upon a final

12   agreed-upon list.  It also include bottom paint, would

13   include cleaning and detailing, slip fees and rental fees.

14           So think about the response that Mr. Wade gets

15   to this letter when he makes this offer.  And the response

16   is in the letter dated June 6, 2001, Plaintiffs'

17   Exhibit 121.  And the response is, This is a deceptive,

18   rhetorical trick showing a complete lack of ethics.

19           Now, when Mains when he testified, I asked him,

20   I went through that list, each of those four or five items

21   and said, Is this a deceptive, rhetorical trick?  Was that

22   a deceptive, rhetorical trick?  What was his answer?  Hey,

23   I didn't write the letter, my wife wrote the letter.

24   That's what he said.

25           I also ask you to consider the fact that this

PDF created with pdfFactory trial version www.pdffactory.com

 1    kind of letter was similar to his letter to Chris Craft

 2    years earlier, which is Defendant's Exhibit 1.  And in

 3    that letter, Mr. Mains said, A test ride would be arranged

 4    only upon Statewide -- who was the dealer -- receiving a

 5    $6,000 nonrefundable deposit.  This seemed highly

 6    unethical.  Then he said, We feel this product was

 7    misrepresented to us.

 8            So if we go back now to the June 6 letter, Mr.

 9    and Mrs. Mains capped that off, they end that by saying,

10    We've got 13 new complaints for you.

11            Now, there was a lot of discussion this morning

12    about why did Mr. Wade make arrangements to change the

13    exhaust system.  Why didn't he do this?  Why didn't he do

14    that?  Mr. Wade told you, you sat here and listened to him

15    and heard him say that the reason for the exhaust change

16    was that Mr. Mains complained about it.  He complained

17    about it repeatedly.  He said he was trying to satisfy the

18    customer by providing what he thought was a quieter

19    exhaust system.  That's what he said.  He was asked that

20    question five or six times by plaintiffs' counsel and that

21    was his answer each and every time.

22            I'd like you to go back -- we talked about this

23    before, but Mr. Mains repeatedly had these complaints.  He

24    wrote the letter dated September 1 where he complained

25    about the loud resonant exhaust system on his four-hour

1    boat ride or six-hour boat ride back from somewhere in

2    Massachusetts.  And Mr. Beckman testified that he was

3    unable to find the problem.  Mr. Wilson testified that he

4    installed this baffle.  Plaintiffs acknowledge that the

5    baffle was installed.

6         We then have the February 12, 2001 letter,

7    Plaintiffs' Exhibit 16.  The boat is now in Knoxville.

8    The boat was picked up in November, was returned --

9    November of 2000 and was returned in April of 2001,

10   April 20th.  Mr. Mains again repeats his complaint about

11   the intermittent suddenly loud exhaust noise problem,

12   saying it's been unremedied.  What did Mr. Mains expect

13   Sea Ray to do about this problem that Mr. Mains is writing

14   about?  Mr. Mains said he expected Sea Ray to address that

15   complaint.

16        Plaintiffs have suggested that there was

17   something secret about the way Mr. Wade worked.  Well,

18   Mr. Wade testified, in fact Mr. Mains testified that

19   Mr. Wade advised Mr. Mains of the change before the boat

20   was received back in Connecticut.  And this was not a

21   change that anybody could slip by anybody.  You heard

22   testimony by Mr. Mains and by Mr. Greaves that this new

23   exhaust system was bigger and it was in the engine

24   compartment and it made access to things tighter.  So it

25   wasn't like this was something you could slip by anybody.

1    It was obvious.  But in any event, there's no dispute that

2    Mr. Wade told Mr. Mains about this change before the Mains

3    received the boat back.

4          And then there was a suggestion that, Hey, I

5    wanted to come down and look at the boat to make sure it

6    met my requirements.  That's Mr. Mains' suggested

7    something along those lines.  And Mr. Wade said he never

8    called Mr. Mains -- recall Mr. Mains ever making such a

9    request.  If you look at the February 12, 2001 letter

10   where Mr. Mains makes a complaint about the exhaust noise,

11   there's no request in that letter that Mr. Mains be

12   allowed to come down and look at it.  And Mr. Wade said

13   it's not uncommon for owners to come down to the factory

14   or plant and look at these kinds of things, if that's what

15   you recall.  He just didn't recall whether Mr. Mains ever

16   made such a request.

17         All right.  Now he we get pack to the hydrolock

18   incident again.  And it happened on June 10th,

19   Mr. Wicander said it was fresh water in the engines, had

20   the consistency of fresh water.  And you heard testimony

21   that there were different flushing instructions.  That's

22   what you heard.  Plaintiffs didn't introduce either set of

23   instructions.  There's no evidence that Mr. Wade knew

24   about these instructions.  It's important to recognize

25   that these instructions were Mercury instructions, they

PDF created with pdfFactory trial version www.pdffactory.com

 1   were not Sea Ray instructions.  There was a standard

 2   protocol to deal with the situation which was you have to

 3   de-water the engines and Mr. Wicander was very clear on

 4   this.  He said that he and MerCruiser had the same sets of

 5   protocols.

 6           MR. NIKAS:  Your Honor, we object his reference

 7   to plaintiffs not introducing either set of instructions.

 8   Both sets of instructions were subject to the Court's

 9   order that we could not introduce them.

10           THE COURT:  That's an improper objection.  The

11   jury is instructed to disregard it.

12           MR. ROTONDO:  Let me take a step back.

13           Standard protocol to deal with the situation

14   required de-watering -- it required speed.  And it

15   required de-watering.  It required new sparkplugs and

16   running the engines to 1300 rpm at normal engine

17   temperature.

18           And what happens when the pickling occurs in

19   June of 2001?  The so-called standard protocol is not

20   followed.  It's not followed because the engines didn't

21   run well on June 11 when Mr. Wicander was doing his

22   pickling.  The new sparkplugs weren't purchased by

23   Mr. Mains -- there's no dispute that Mr. Mains purchased

24   the sparkplugs.  They weren't purchased by him until

25   June 11, and that's Sea Ray Exhibit 105.  And that's four

1    days after the effort was made to put the -- to run the

2    engines.  The engines were never run with the new

3    sparkplugs on June 11 and the engines weren't run at 1300

4    rpms up to normal engine temperature on June 11.  Those

5    were the things that were required to be done.  And the

6    engines were damaged by June 18, 2001 when Mr. Wicander

7    did his tests, whatever you may think of his tests.

8            The evidence shows that the engines were damaged

9    as a result of Mr. Wicander failing to properly pickle the

10   engines.

11           All right.  Let's talk about damages.  Let's

12   talk about the damages that the plaintiffs have proven or

13   haven't proven in this case.  What have they shown?

14           All right.  And I'm going to break this down

15   into the engine and non-engine repairs.  Non-engine is the

16   first item.

17           Plaintiffs' expert was Mr. Greaves.  And

18   plaintiffs argued this morning Mr. Greaves found water in

19   the core.  And this is a little bit of a detour from what

20   I have on the screen here and what I was going to talk

21   about.  But plaintiffs argued that Mr. Greaves found water

22   in the core.  And we submit to you that's not what

23   Mr. Greaves said.  It's not what Mr. Greaves testified to.

24   And it's not in Mr. Greaves' report.  Mr. Greaves said he

25   found certain areas of high moistures with a moisture

PDF created with pdfFactory trial version www.pdffactory.com

1    meter.  To figure without whether there was damage in the

2    core, he had to do drilling and he didn't do that drill,

3    so he didn't know.

4          But in any event, Mr. Greaves was the

5    plaintiffs' expert on non-engine issues.  He offered no

6    recommendations on the cost of the work that he

7    recommended.  You got his report, you've go those 12

8    recommendations, there's no number there.  But he

9    acknowledged that all that work was repairable.  All those

10   things could be done to repair the boat.

11         The only evidence on cost of the non-engine

12   repairs came from Mr. Davis.  And Mr. Davis has 34 years

13   as a marine surveyor.  You heard about his qualifications,

14   what he's done, how he's seen thousands of boats over the

15   years, how he's examined boats for purposes of a survey

16   between buyers and sellers to figure out what the value of

17   a boat is.  He's examined boats when he's been hired by

18   insurance companies to figure out what the cost should be

19   to repair boats.  What did he testify to about the

20   non-engine cost of repairs?  He said that to repair those

21   items -- and he didn't disagree with Mr. Greaves about

22   Mr. Greaves' list.  He said to repair those non-engine

23   things was $5,000.  That's what he said.

24         So let's turn to the engine repairs.  We do have

25   some sources of information about this.  Mr. Mains

PDF created with pdfFactory trial version www.pdffactory.com

1    testified that he'd looked into this himself and he'd done

2    research and he determined that the cost of new engines

3    was $42,000.  That's what he said.

4            And then when we probed a little bit on

5    cross-examination, we asked him, What's this research that

6    you're talking about?  And then it turned out that he had

7    two phone conversations with people who didn't come to

8    court, who we don't any what they did, who we don't know

9    what kind of engines they were talking about, we don't

10   know anything about them.  But they didn't come to court

11   to testify about what the cost of the repairs would be.

12           Then we have Mr. Wicander.  He didn't agree with

13   Mr. Mains and he didn't agree with the report.  He didn't

14   testify that new engines were required.  He said you

15   needed new something called long blocks.  That's what he

16   felt was needed.  And he indicated certain parts could be

17   reused, but he didn't testify about what the cost of that

18   work was.

19           So now we have Mr. Davis again.  And plaintiffs,

20   by the way, argued that Mr. Davis criticized the way the

21   pickling procedure worked.  We ask you to go back and

22   think about Mr. Davis' testimony and ask yourself whether

23   Mr. Davis said anything about the pickling procedures.  We

24   submit that he could not.  Obviously, your memories

25   govern.

PDF created with pdfFactory trial version www.pdffactory.com

1           In any event, on the cost of the engine repairs,

2    Mr. Davis said it cost $12,000 to purchase and install

3    remanufactured engines.  These engines would come with a

4    one-year warranty from the manufacturer.  He thought that

5    was an appropriate solution.  And there's no dispute here

6    that the Mains' boat was not brand new at the time this

7    happened.  The engines -- the boat was three years old.

8           Now what I'd like to do is to turn to the

9    plaintiffs' other theory in this case and that's the

10   so-called revocation theory.  Under this doctrine, the

11   plaintiffs are seeking a return of a purchase price of

12   their boat.  And you heard evidence that the purchase

13   price was about $133,000 in 1998.  And a revocation is

14   either an annulment or a cancellation or a reversal of

15   some original contract.  And requires that the buyer

16   notify a seller in a timely fashion that he's cancelling

17   acceptance.  And the buyer needs to do more that simply

18   notify the seller of an alleged breach.

19          So what do we have here?  Now, Sea Ray obviously

20   manufactured the boat, put the boat together.  But Sea Ray

21   wasn't the seller, the direct seller of the boat to the

22   Mainses.  When you look at the evidence in this case, you

23   will not see a contract between Mr. and Mrs. Mains and

24   Sea Ray to buy the boat.  You'll see that Surfside 3 --

25   it's undisputed that Surfside 3 is the entity that sold

PDF created with pdfFactory trial version www.pdffactory.com

1    the boat to the Mainses.  Mr. and Mrs. Mains both

2    testified that they bought the boat in 1998 from

3    Surfside 3.  They didn't suggest they bought it from

4    anybody else.  They bought that boat from Surfside 3 from

5    a dealer just like they bought their other boats from

6    dealers.  They bought the 1996 boat from Surfside 3.  And

7    they bought the Chris Craft from a dealer known as

8    Stateside, I believe.  And that's in Exhibit 1, the letter

9    that I referred to earlier.

10            In addition, Mr. Mains is very knowledgeable

11   about these arrangements.  He testified that he himself

12   had been a salesman for a dealer, a boat dealer called

13   Connecticut Marine One or Serino's Marine.

14            And in addition to the testimony, the documents

15   themselves establish that the agreement here to buy the

16   boat was between Surfside 3 and the Mainses.  And you've

17   got two documents in particular, Sea Ray Exhibit 3, which

18   is the trade-in agreement, and there's been a lot of

19   testimony about that, and Plaintiffs' Exhibit 2, which is

20   the checklist.  And this is a -- you've got the complete

21   document.  What I've done here is to cut off -- this is

22   the top portion of the trade-in agreement.  This is the

23   bottom portion of the trade-in agreement.  Defendant's

24   Exhibit 3, you've got the whole thing.  That trade-in

25   agreement was entered into in February of 1998.  And the

PDF created with pdfFactory trial version www.pdffactory.com

1    parties to that were the dealer, and that's Al Chianese's

2    signature, we've heard about him, and the customers, Peter

3    and Lori Mains.  So that was who was involved in this

4    agreement.

5           In addition, you have Defendant's Exhibit 2,

6    which is the -- I'm sorry, Plaintiffs' Exhibit 2, which is

7    the inservice checklist.  And again what we've done just

8    to fit it on the screen is to give you the top half of it

9    here, cut out the middle, and this is the bottom half.

10   Plaintiffs' Exhibit 2, this is actually the second page.

11          In any event, this is the inservice checklist

12   where the Mainses are accepting, customer's acceptance,

13   they're accepting the boat.  And they sign on the line

14   that says, "I have inspected the boat and find the boat

15   acceptable as per our sales agreement."  Their signatures

16   are below it.  Their names are here.  And again, the

17   dealer signs there.

18          So the contract -- the parties to the contract

19   are the ones that can revoke the agreement.  And Sea Ray

20   was not the seller within this contract.  That was a deal

21   between Surfside 3 and the Mainses.

22          Now, we also submit that this revocation wasn't

23   timely, that the plaintiffs had to make a timely

24   revocation.  Even if Sea Ray had sold the boat to the

25   Mainses, which it didn't, that it had to be timely.

PDF created with pdfFactory trial version www.pdffactory.com

1    That's because the Mainses used the boat for three years,

2    they used it for its intended purpose, for family outings

3    with their young daughter, and they complained about it --

4    and you've heard a lot about those complains, I'm not

5    going to review them.  There are nine different letters.

6    Those letters all seek to have work done by Sea Ray, not

7    to have the boat taken back.  None of them revoke

8    acceptance of the boat.  There were requests -- and you

9    heard about them -- to have Sea Ray provide a new boat at

10   no cost to them.  That's not -- that kind of a request is

11   not revocation.

12           In addition, there's no evidence -- this is

13   another element of the revocation claim.  There's no

14   evidence that the condition of the boat at the time of the

15   sale substantially impaired the value.  The engines worked

16   fine until the failure as a result of the failure to

17   properly pickle after the hydrolock.  And the hydrolock

18   didn't occur because of a condition of the boat at the

19   time of sale.  The plaintiffs' claim is that the hydrolock

20   occurred because of these two -- because of changes in

21   flushing instructions.  That's their claim.  And those

22   changes in flushing instructions came about, according to

23   the plaintiffs, because of the new exhaust system.

24           I'd like to talk to you about the buy-back

25   offer, you've heard about it.  The evidence has been that

1   there was an impasse.  There were discussions between the

2   plaintiffs and a number of different people at Sea Ray.

3   And those discussions reached an impasse in June.  And the

4   evidence was that Sea Ray took the initiative and offered

5   to buy the boat back.  The evidence was not that the

6   plaintiffs cancelled the agreement.

7           Now, the plaintiffs have made an argument, hey,

8   where was Mr. Marlow?  Where was Mr. Stooksbury?  Well,

9   ask yourself, what role -- what did they have to say that

10  would make any difference?  You heard the testimony from

11  Mr. Wade about what Mr. Stooksbury did, and Mr. Wade said

12  he made the recommendation to put the new exhaust system

13  on it and he did that in response to complaints about the

14  exhaust noise and that he talked to his boss.  That was

15  it.

16          Mr. Marlow, what -- you know, what was the

17  testimony about Mr. Marlow?  Mr. Marlow had discussions

18  and Mr. Wade was part of those discussions in June of

19  2001.  Mr. Mains made statements about somehow

20  Mr. Marlow -- you may remember this on direct

21  examination -- said Mr. Marlow was trying to dupe him

22  because Mr. Marlow is saying pickle the engines, the

23  engines should be fine.  And Mr. Mains said, You know

24  what?  We've got test results that show that's not true.

25  You may recall that.  But then Mr. Mains on corrosion

1    admitted that in fact the last time he ever talked to

2    Mr. Marlow was on June 14, 2001.  And those tests that he

3    was talking about weren't done until four days later.  So

4    those test results didn't exist at the time he talked with

5    Mr. Marlow.

6              Now, just on Sea Ray's offer of $105,000, that

7    was rejected.  They offered to buy back the boat and the

8    plaintiffs said gee, what about Mr. Davis?  Mr. Davis came

9    up with a higher number.  Remember what Mr. Davis said.

10   Mr. Davis said his methodology was to look at various book

11   sources first.  He called it BUC and then NADA.  And those

12   estimates started around $99,000 and worked their way up.

13   Mr. Davis arrived at his figure after adding 25 percent

14   for the bristol condition of the boat and that was after

15   the repairs that he had talked about, work that he had

16   talked about, both engine and non-engine parts were done.

17             Now, plaintiffs said that they were given the

18   opportunity to respond to Sea Ray's initiative where they

19   said we'll make you an offer to buy the boat back.  But

20   they didn't say, okay, you know, we want our purchase

21   price back.  No, they said two things.  They said they

22   wanted $175,000, 40-some-odd thousand dollars more than

23   they paid for the boat.  And they also demanded that

24   Sea Ray provide them with a new 2001 Sundancer that was

25   worth $206,000 at no cost to them.  We submit to you those

PDF created with pdfFactory trial version www.pdffactory.com

1   kind of demands are not revocation.

2          Plaintiffs have failed to prove their revocation

3   claim.  They've failed to prove that there was a contract

4   between Sea Ray and the Mainses, and they can't prove

5   there was a contract between Sea Ray and the Mainses

6   because the contract was between -- the purchase of this

7   boat was between the Mainses and Surfside 3.  They can't

8   prove that their demand was timely, they used the boat for

9   three years, and they cannot prove that the condition that

10  they're complaining about existed at the time of the sale.

11         So in conclusion, we submit to you that at most

12  the plaintiffs have shown that work that was done by

13  Sea Ray in 2001 caused problems.  And that the cost of

14  that work was $5,000 for the non-engine repairs, $12,000

15  for the engine repairs, for a total of $17,000.  That's

16  what they have a shown at most.  That's what the evidence

17  shows.

18         The plaintiffs have failed to prove, however,

19  that the boat was defective and unreasonably dangerous at

20  the time it was sold, and they have failed to prove that

21  they're entitled to revocation of the contract and return

22  of the purchase price.

23         Now, I cannot anticipate everything that

24  plaintiffs' counsel will say in his rebuttal period.  He

25  has some period of time to make comments, but we submit to

PDF created with pdfFactory trial version www.pdffactory.com

1    you that all of the answers to these issues and arguments

2    that he makes can be found in the evidence that you've

3    heard in this case so far.  So we request that the --

4    after you hear the judge's charge, his instructions, that

5    you decide the case in accordance with the instructions of

6    law that you will be receiving and in accordance with the

7    evidence that you've heard so far.

8              Thank you very much.

9              THE COURT:  Thank you, Mr. Rotondo.

10             I think we can go to the rebuttal.

11             Mr. Nikas.

12             MR. NIKAS:  Well, Mr. Rotondo repeated the

13   testimony.  Tom Wicander did say that he saw fresh water.

14   He saw fresh water because it was fresh water.

15             You also heard him say that until the cylinder

16   head was removed from the engine, there was no way to tell

17   about the scoring in the cylinder.  The scoring in the

18   cylinder rendered the engine irreparable, not the

19   hydrolocking.

20             You heard Mr. Davis, you heard Mr. Wicander talk

21   about having to rebore the cylinders.  That's not

22   acceptable.

23             But what about this issue of what the defect

24   was?  You heard Tom Wicander tell you the scoring had to

25   have occurred when the engine was running.  The engine was

1  not running at the time the flushing occurred.  All that

2  water was just sitting there on top of the piston.  Just

3  sitting there on top of the piston.  And until the piston

4  goes up and down, that water doesn't have a chance to

5  remove that oil and score the cylinder wall.

6              Let's go back and ask ourselves:  Mr. Mains

7  admitted that this exhaust resonance which he complained

8  about from day one, from the time he had the boat, he

9  complained about this exhaust noise.  Now, he's not an

10  engineer.  Mr. Rotondo pointed that out.  He conceded it

11  was not performance related.  He had no idea what it was.

12  Let's ask.  Did somebody at the factory know?  David Wade

13  said he didn't know what resonance was, maybe it related

14  to noise.  Hadn't read anything about water ingestion.

15  Yet somehow out of good customer service they replace this

16  exhaust system.  And you ask yourself:  Why didn't they

17  replace it with a new one of the same type?  If something

18  was wrong with it, that makes sense.  How did this new

19  exhaust system come into being in 2001?  Where'd it come

20  from?

21              And Sea Ray was so committed to good customer

22  service that they had David Wade, who is not an engineer,

23  never read a service bulletin, never looked at the

24  manuals, never looked at the guides, they had him make the

25  decision to not only replace the exhaust in response to

1    this concern for noise, but he replaced it with a

2    completely different system that he thought would be

3    quieter.  What does he base that on?  Nothing.  Did he

4    know it was quieter?  Did he know it would fix the

5    problem?  No.  They would have you believe that it's just

6    coincidence when that boat was in the factory in response

7    to this request about noise that without telling the owner

8    they changed it and they changed it to a new exhaust, a

9    different system.  But they didn't talk to anybody about

10   it, didn't consult anything, never heard of water

11   ingestion.

12          That water was historical.  The boat had barely

13   been run.  Twenty-one days of eight-hour running, that's

14   it.

15          Sure, the engine ran fine and it would have

16   until those engines failed.  Whether the compression ratio

17   was 150, 130, 100, 70, you heard that the issue is the

18   relationship of the compression ratios to the other

19   cylinders.  The parts move in rotation.  They had to be

20   balanced.

21          And this talk about Sea Ray not being involved

22   in this transaction, let's remember they had another boat,

23   a '96, that went back to the factory.  The new boat is

24   delivered to the dealer and who paid the dealer?  Do you

25   remember?  Sea Ray paid the dealer.  Not the Mainses.

PDF created with pdfFactory trial version www.pdffactory.com

1  That sounds an awful lot like Sea Ray is involved in that

2  transaction.  In fact, look at the exhibits, it says the

3  boat is delivered at the dealer.  No money came out of

4  their pocket, it came out of Sea Ray's.

5          You're allowed to make reasonable inferences.

6          The cylinders were scored and it had been

7  happening for a long period of time.  You can talk about

8  the hydrolocking, you can talk about the fresh water.  It

9  didn't matter.  The cylinder's been scored by saltwater

10  ingestion, they got in through the elbows.  The outlet was

11  higher than the elbows.  And it only had been run an hour

12  and a half.  Where did that water come in before?  It

13  could only have come in through the exhaust.  The problem

14  had existed and existed for a long time, and the warranty

15  says they'll repair defects within one year of the date of

16  delivery, if it exists within one year of the date of the

17  delivery.  That defect existed the day that boat was

18  built, the day that boat was delivered, and it existed

19  every single day of their ownership until those engines

20  failed.  That warranty should have covered this.  This

21  problem should have been disclosed and should never have

22  happened in the first place.

23          I thank you for your time.

24          THE COURT:  Thank you, Mr. Nikas.

25          I'm going to let the jurors go next door for

1    five minutes.  Your lunch isn't due until 1:00.  I'll

2    start the charge and get through the first third of it.

3    If your lunch is here, we'll stop, and then I'll pick up

4    with the rest of the charge after lunch.  So if you go

5    next door for five minutes, I'll get all set up to give

6    the charge, okay?

7                    (Whereupon the jury left the courtroom.)

8              THE COURT:  Well, it's a three- or four-minute

9    recess because the courtroom will be sealed in case

10   anybody needs water or anything like that.

11             MR. NIKAS:  Courtroom being sealed meaning?

12             THE COURT:  People cannot get in or out.

13             We'll take a three-minute recess.

14                   (Whereupon, a recess followed.)

15

16             THE COURT:  We'll bring the jury in.  The CSO

17   seem to be missing but the courtroom deputy will make sure

18   no one comes in.

19                   (Whereupon, the jury entered the

20                    courtroom.)

21             THE COURT:  Ladies and gentlemen, now that

22   you've heard the evidence and the arguments of counsel for

23   each party, it is my duty to give you the instructions of

24   the Court as to the applicable law in this case.

25             You have faithfully discharged your duty to

1    observe and listen carefully to each witness who

2    testified.  I have been impressed by how attentive you've

3    been.  I ask that you give me that same careful attention

4    as I instruct you on the law.

5            My instructions will be delivered in three

6    parts, some of which will be a reminder and some of which

7    will be new:

8            First, I will give you some instructions on

9    general rules that define and control the role of the

10   Court and the duty of the Jury in a civil case.

11           Second, instructions that define the issues in

12   this case and set out the specific questions of fact that

13   you must answer from the evidence that has been introduced

14   at trial.

15           Third, some instructions for your deliberations.

16           I'm going to cover the first third, and then

17   we're going to break for lunch on the assumption that your

18   lunch will have arrived by then.

19           A few moments ago you were given a copy of the

20   verdict form and you should feel free to refer to that

21   verdict form as I go through the second part of the

22   instructions.  And in the third part of the instructions,

23   I will review the verdict form with you.

24           When I finish giving you these instructions and

25   you retire to deliberate, please leave the copies that you

PDF created with pdfFactory trial version www.pdffactory.com

1  are now reviewing in your seat to be collected by the

2  courtroom deputy.  And you should also leave them when you

3  take the break in the middle of the charge.

4       While you are deliberating, you will have with

5  you in the jury room the original verdict form along with

6  the exhibits that have been admitted in this case.  And

7  you will also have a copy of these instructions that I'm

8  now giving to you.

9       For the moment, I hope that your brief review of

10  the verdict form will help you better understand these

11  instructions and the tasks that you will perform when you

12  retire to deliberate.  And as I mentioned, as I go through

13  the second part of the instructions, you shall feel free

14  to refer to the verdict form as I give you those

15  instructions.

16       I want to give you some instructions about the

17  province of the Court and that of the Jury.

18       It is your duty as jurors to follow the law as I

19  shall state it to you and to apply that law to the facts

20  as you find them from the evidence in the case.  You are

21  not to single out one instruction alone as stating the

22  law, but you must consider these instructions as a whole.

23       You will determine the facts from all of the

24  testimony you have heard and from the other evidence that

25  has been admitted.  You are the sole and exclusive

PDF created with pdfFactory trial version www.pdffactory.com

1    weighers of the facts, and in that area neither I nor are

2    anyone else may invade your province.  On the other hand,

3    and with equal emphasis, I instruct you that you are bound

4    to accept the rules of law that I give you whether or not

5    you agree with them.

6            The law of the United States permits the judge

7    to comment on the evidence in the case during the trial or

8    in instructing the jury, but these comments are only

9    expressions of the judge's opinion of the facts.  You may

10   disregard any such comments entirely, since you are the

11   sole judges of the facts in this case.

12           Now, counsel have quite properly referred to

13   some of the governing rules of law in their arguments.

14   If, however, any difference appears to you between the law

15   as stated by counsel and that stated by the Court in these

16   instructions, you are to be governed by the Court's

17   instructions.

18           Similarly, statements as to the facts made by

19   counsel during the course of the trial or in closing

20   argument, including those statements made in the form of a

21   question, do not constitute evidence, and

22   characterizations of the evidence by counsel should be

23   considered by you only if supported by your recollection

24   of the evidence.

25           I have tried to preside impartially and not to

PDF created with pdfFactory trial version www.pdffactory.com

1    express an opinion one way or the other as to what you

2    should find the facts to be.  You must not infer from any

3    ruling I have made or from anything I have said or done

4    during the course of the trial that I hold any views for

5    or against any party.

6          Also, nothing I say in these instructions is to

7    be taken as an indication that I have any opinion about

8    the facts of the case or what the opinion is.  Again, it

9    is not my function, but yours, to determine the facts.

10         Let me talk about how important it is that there

11   be no bias on the part of any member of the jury.

12         Your verdict must be based solely upon the

13   evidence developed at this trial or the lack of evidence.

14   You must perform your duties as jurors without bias or

15   prejudice as to any party.  It would be improper for you

16   to consider any personal feelings you may have about the

17   race, religion, national origin, sex, age, wealth,

18   life-style, or other features of the parties.  It would

19   also be improper for you to allow any feelings you may

20   have about the nature of the claims against the defendant

21   to influence you in any way.

22         You have been chosen to try the issues of fact

23   and reach a verdict on the basis of the evidence presented

24   here.  If you let sympathy for, or prejudice against, any

25   party interfere with your clear thinking about the facts,

PDF created with pdfFactory trial version www.pdffactory.com

1    there is a risk that you will not arrive at a just

2    verdict.

3            The parties to this case must be regarded as

4    equals by you.  That is the agreement you made when you

5    were selected as jurors and it is the position that must

6    guide your deliberations.  Each of the parties must be

7    viewed as equal in your eyes and in your deliberations.

8    In this case, the defendant is a corporation.  This fact

9    must not influence your decision in this case.  In the

10   eyes of the law, a corporation is entitled to the same

11   fair trial at your hands as a private individual.  All

12   parties stand equal under the law and are to be dealt with

13   as equals in a court of justice.

14           Also, I want to remind you that it is the duty

15   of the attorney on each side of a case to object when the

16   other side offers testimony or other evidence that the

17   attorney believes is not properly admissible.  Counsel

18   also have the right and duty to ask the Court to make

19   rulings of law and to request conferences at the bench out

20   of the hearing of the jury.  All those questions of law

21   must be decided by the Court.  You must not show any bias

22   against an attorney or his or her client because the

23   attorney objected to the admissibility of evidence or

24   asked for a conference out of the hearing of the jury or

25   asked the Court for a ruling on the law.

1          Next I want to talk with you about evidence.

2          You must consider only the evidence or lack of

3    evidence in deciding this case.  You may, however, draw

4    reasonable inferences from the testimony and other

5    evidence as you feel are justified in the light of common

6    experience.  You may make deductions and reach conclusions

7    that principles of reason and common sense lead you to

8    make from all of the evidence presented.

9          There are two kinds of evidence that you may

10   consider.  One is direct evidence.

11         Direct evidence is where a witness testifies to

12   what he or she saw, heard, or observed.  In other words,

13   when a witness testifies about what the witness asserts is

14   known to the witness of his or her own knowledge by virtue

15   of his or her own senses -- what the witness claims he or

16   she saw, felt, touched or heard -- that is called direct

17   evidence.

18         The other kind of evidence is called indirect or

19   circumstantial evidence.

20         Circumstantial evidence is the proof of certain

21   circumstances that tends to prove or disprove the presence

22   or lack of certain other facts.  To remind you of the

23   example I gave you in the preliminary charge, if you see

24   water on the street outside your window, you can infer

25   that it has rained.  On the other hand, there might be

PDF created with pdfFactory trial version www.pdffactory.com

1    other plausible reasons for water being on the street.

2    The point being made here is that you may infer on the

3    basis of reason and experience and common sense from an

4    established fact the existence or nonexistence of some

5    other relevant fact.  It is a general rule that the law

6    makes no distinction between direct and indirect evidence.

7    The law, rather, requires that the jury find the facts

8    from the evidence, including direct and indirect evidence,

9    and leaves it to the discretion of the jury to make such

10   findings.

11           Now, the evidence from which you are to decide

12   what the facts are comes in two forms:

13           First, there is the sworn testimony of witnesses

14   both on direct and cross-examination.

15           Second, there are the exhibits that have been

16   received into the trial record.

17           Now, certain things are not evidence and are not

18   to be considered as such:

19           First, arguments or statements by lawyers are

20   not evidence.  They are designed and permitted to give the

21   lawyers the opportunity to tell you how they think you

22   should evaluate the evidence.

23           Second, the questions to the witnesses are not

24   evidence.  I instructed you earlier, in substance, that my

25   questions and comments are not evidence.  Let me also

PDF created with pdfFactory trial version www.pdffactory.com

1    emphasize that a lawyer's question is not evidence.  At

2    times a lawyer on cross-examination may have incorporated

3    into a question a statement which assumed certain facts to

4    be true and asked the witness if the statement was true.

5    If the witness denied the truth of a statement and if

6    there is no evidence in the record proving that the

7    assumed fact is true, then you may not consider the fact

8    to be true simply because it was contained in the lawyer's

9    question.  In short, questions are not evidence; answers

10   are.

11         Third, objections and arguments are not

12   evidence.

13         Fourth, testimony that has been excluded,

14   stricken, or that you have been instructed to disregard is

15   not evidence and must be disregarded.  You should have no

16   concern with the reasons for any rulings I have made as to

17   evidence, and you are not to draw any inferences from my

18   rulings.  Issues concerning the admissibility of evidence

19   are questions of law for the Court to decide.  In

20   admitting evidence to which objection has been made, the

21   Court does not determine what weight should be given to

22   the evidence in question or pass on the credibility of the

23   evidence.  These are matters for you to decide.  You must

24   disregard any evidence that has been ruled out of the case

25   by the Court and you must refrain from speculation about

1    any communications between the lawyers and the Court that

2    were held out of your presence or hearing.

3         Fifth, any exhibits marked for identification

4    but not admitted as evidence may not be considered as

5    evidence.  And where I have given any limiting instruction

6    about evidence that you heard or saw, you must follow it.

7         Sixth and finally, anything you may have seen or

8    heard outside the courtroom is not evidence and must be

9    disregarded entirely.

10        You are to decide the case solely on the

11   evidence offered and received in the trial.  Of course,

12   you should consider the evidence presented in light of

13   your own common sense and experience.  And you may draw

14   reasonable inferences from evidence.  However, your

15   verdict must be based solely on the evidence presented in

16   this courtroom in accordance with my instructions.  I

17   remind you that you must completely disregard any media

18   reports or other material outside the courtroom regarding

19   this matter or any similar matter.  It would be unfair to

20   consider any such materials since they are not evidence

21   and the parties have no opportunity of challenging their

22   accuracy or otherwise explaining them away.  Indeed, it

23   would be a violation of your oath as jurors to allow

24   yourselves to be influenced in any manner by any

25   information you received outside the courtroom about this

1    case or any similar matter.

2            Also, I note that you are not permitted to bring

3    anything into the courtroom for the purpose of assisting

4    in your deliberations without the prior permission of the

5    Court and notice to the parties.

6            Next I want to talk with you about credibility

7    of witnesses.

8            In deciding the facts of this case, you will

9    have to decide which witnesses to believe and which

10   witnesses not to believe.  You, as jurors, are the sole

11   judges as to the credibility of the witnesses and the

12   weight that their testimony deserves.  You may accept as

13   true everything a witness says, only part of it, or none

14   of it.

15           In deciding what part of a witness's testimony

16   to believe, you may consider a number of factors,

17   including the following:

18           1) the witness's ability to see or hear or know

19   the things to which the witness testified;

20           2) the quality of the witness's memory;

21           3) any bias the witness may have;

22           4) the witness's manner while testifying;

23           5) whether the witness was contradicted by

24   anything the witness said or wrote before trial or by

25   other evidence; and

1              6) how reasonable was the witness's testimony

2    when considered in light of other evidence which you

3    believe.

4              Inconsistencies or discrepancies in the

5    testimony of a witness or between the testimony of

6    different witnesses may or may not cause you to discredit

7    such testimony.  Two or more persons witnessing an

8    incident or a transaction may see or hear it differently.

9    An innocent misrecollection, like failure of recollection,

10   is not an uncommon experience.  In weighing the effect of

11   a discrepancy, always consider whether it pertains to a

12   matter of importance or an unimportant detail, and whether

13   the discrepancy results from innocent error or intentional

14   falsehood.

15             In evaluating the credibility of the witnesses,

16   you should take into account any evidence that the witness

17   who testified may benefit in some way from the outcome of

18   this case.  Such interest may sway the witness to testify

19   in a way that advances his or her own interest.

20   Therefore, if you find that any witness whose testimony

21   you are considering may have an interest in the outcome of

22   this trial, then you should bear that factor in mind when

23   evaluating the credibility of his or her testimony.  This

24   is no to suggest that a witness who has an interest in the

25   outcome of this case will testify falsely.  It is for you

PDF created with pdfFactory trial version www.pdffactory.com

1    to decide to what extent, if at all, the witness's

2    interest has affected or colored his or her testimony.

3            Also, the weight of the evidence is not

4    necessarily determined by the number of witnesses

5    testifying to the existence or nonexistence of any fact.

6    You may find that the testimony of a small number of

7    witnesses as to any particular fact is more credible than

8    the testimony of a larger number of witnesses to the

9    contrary.

10           Next I want to talk with you about the concept

11   of impeachment of a witness.

12           A witness may be discredited or impeached by

13   contradictory evidence by showing that he or she testified

14   falsely concerning a material matter or by evidence that

15   at some other time the witness had said or done something

16   or has failed to say or do something which is inconsistent

17   with the witness's present testimony.  If you believe that

18   any witness has been so impeached, then it is your

19   exclusive decision to give the testimony of that witness

20   such credibility or weight, if any, as you think it

21   deserves.

22           In determining the weight to give the testimony

23   of a witness, you should ask yourself whether there was

24   evidence tending to prove that the witness testified

25   falsely about some important fact or whether there was

PDF created with pdfFactory trial version www.pdffactory.com

1   evidence that at some other time the witness said or did

2   something or failed to say or do something that was

3   different from the testimony he or she gave at the trial.

4   Where a witness testified inaccurately and you do not

5   think that the inaccuracy was consciously dishonest, you

6   should bear this inaccuracy in mind and scrutinize the

7   whole testimony of the witness.  If, however, you conclude

8   that a witness has not only testified inaccurately but

9   that he or she has done so intentionally or willfully,

10   this casts a very serious doubt on all of his or her

11   testimony, and you are entitled to conclude that you

12   cannot accept any of the witness's testimony.  Whether you

13   should disregard all the witness's testimony or believe

14   some parts of it is for you to decide.

15        You should remember that a simple mistake by a

16   witness does not necessarily mean that the witness was not

17   telling the truth.  People may tend to forget some things

18   or remember other things inaccurately.  If a witness has

19   made a misstatement, you must consider whether it was

20   simply an innocent lapse of memory or an intentional

21   falsehood, and that may depend upon whether it concerns an

22   important fact or an unimportant detail.

23        And lastly in this section, I want to talk with

24   you about expert witnesses.

25        The rules of evidence ordinarily do not permit

PDF created with pdfFactory trial version www.pdffactory.com

1  witnesses to testify about opinions or conclusions.  An

2  exception to this rule exists for those whom we call

3  expert witnesses.  Witnesses who, by education, training

4  or experience, have become expert in some art, science, or

5  profession may state their opinions as to relevant matters

6  in which they profess to be expert, and also may state the

7  reasons for their opinions.  You should consider each

8  expert opinion received during the trial and give it such

9  weight as you think it deserves.  If you should decide

10  that an expert witness's opinion is not based upon

11  sufficient education, training or experience, or if you

12  conclude that the reasons given in support of the opinion

13  are not sound, or if you feel that the expert's testimony

14  is outweighed by other evidence, you are free to disregard

15  the testimony just as you are free to disregard the

16  testimony of any other witness you do not find reliable.

17          We're going to take a break for lunch now.  I'll

18  ask the courtroom deputy to go in and find out for you how

19  long you want for lunch and we'll wait here to hear.

20              (Whereupon the jury left the courtroom.)

21          THE COURT:  Please be seated everyone.

22          They've been given a choice between 45 minutes

23  and an hour.  We'll see what their preference is.

24          MR. ROTONDO:  Your Honor, page 15, I may have

25  missed it when you said it, but breach of duty to warn is

Vol. V - Page 892

1    still on page 15.

2          THE COURT:  I'll have to correct that.  Thank

3    you.

4          MR. ROTONDO:  Okay.

5          THE COURT:  And the "S" on the second and third

6    should be capitalized also.

7          Forty-five minutes.  We'll be back in 45

8    minutes.

9              (Whereupon, a recess followed.)

10

11         THE COURT:  We'll bring the jury in and continue

12   on.

13             (Whereupon, the jury entered the

14             courtroom.)

15         THE COURT:  Please be seated everyone.

16         Ladies and gentlemen, I'm now going to the

17   second section of the charge which relates to the issues

18   in this case.  And you will see some similarity between

19   the structure of this section of the instructions and the

20   structure of the verdict form.

21         You are being asked to consider three claims

22   being made by the plaintiffs, Peter Mains and Lori Mains,

23   against the defendant, Sea Ray, as follows:

24         First, the plaintiffs' claim that the defendant

25   is subject to liability pursuant to the Connecticut

PDF created with pdfFactory trial version www.pdffactory.com

1  Product Liability Act, based on two separate theories:

2              (i) strict liability, and

3              (ii) breach of express warranty.

4              Second, the plaintiffs claim that the defendant

5  was negligent during the course of making repairs to their

6  boat.

7              Third, the plaintiffs seek -- I have to just

8  check the wording on one thing there.

9              The plaintiffs claim that they revoked their

10 contract for the purchase of the boat because the boat was

11 not in the condition that they understood it would be in

12 when they agreed to purchase it.

13             First I want to talk with you about the claim

14 under the Connecticut Product Liability Act.

15             The plaintiffs claim that their boat was damaged

16 because it was defective and unreasonably dangerous at the

17 time they purchased it, and their first claim is brought

18 pursuant to a Connecticut law known as the Connecticut

19 Product Liability Act.  Under the Connecticut Product

20 Liability Act, one who sells a product in a defective

21 condition, unreasonably dangerous to the user, is subject

22 to liability for harm caused by the product.  A product

23 liability claim is the exclusive claim that can be

24 asserted against product sellers for harm caused by a

25 product, and for that reason, plaintiffs may base a

PDF created with pdfFactory trial version www.pdffactory.com

1    product liability claim on various theories, for example,

2    negligence, strict liability, and warranty.  Here, the

3    plaintiffs base their product liability claim on two

4    theories:  (i) strict liability; and (ii) breach of

5    express warranty.

6              First I'm going to talk with you about the two

7    theories of liability.  And the first theory is strict

8    liability.

9              To prevail on their product liability claim

10   under the theory of strict liability, the plaintiffs must

11   prove each of the following elements by a preponderance of

12   the evidence:

13             First, that the defendant sold the boat at

14   issue;

15             Second, that the boat was expected to and did

16   reach the plaintiffs without substantial change in its

17   condition from the time of its sale by the defendant;

18             Third, that the boat was in a defective

19   condition that was unreasonably dangerous to the ordinary

20   consumer;

21             Fourth, that the defective condition existed at

22   the time the boat was sold by the defendant; and

23             Fifth, that defective condition of the boat was

24   the proximate cause of the harms for which the plaintiffs

25   seek compensation.

1      Even if you find that the boat was deficient in

2  some respect, you may only find that the boat was

3  defective if you find that the boat was unreasonably

4  dangerous.  A product is unreasonably dangerous to the

5  user when it has the potential for causing harm greater

6  than that which the ordinary user who purchases the

7  product would contemplate.

8      The seller of a product, however, is not an

9  insurer.  The law does not require that a product be

10  perfect or accident proof or incapable of causing harm.

11  Nor is a product seller required to incorporate the

12  ultimate safety features in its product.  In other words,

13  a product seller is not required to use all means to make

14  its product safe nor is it necessarily required to use the

15  latest or the most modern means.  Rather, a product seller

16  is required to use only such means as are necessary to

17  make the product reasonably safe for its intended use.

18      I now want to talk about the theory of breach of

19  express warranty.

20      To prevail on their product liability claim

21  under the theory of breach of express warranty, the

22  plaintiffs must prove the following elements by a

23  preponderance of the evidence:

24      First, that the defendant made a statement of

25  fact or a promise to the plaintiffs that the boat was safe

PDF created with pdfFactory trial version www.pdffactory.com

1    and effective for its intended use; and

2          Second, that at the time of sale the boat was

3    not safe and effective for its intended use because it was

4    defective and unreasonably dangerous.

5          The plaintiffs do not claim that the defendant

6    stated or promised that the boat would be perfect.  In any

7    event, the plaintiffs cannot prevail on their claim for

8    breach of express warranty merely by proving that the boat

9    was not perfect.

10          I want to talk with you now about the definition

11    of the term "harm."

12          Under the Connecticut Product Liability Act, the

13    plaintiffs may only recover damages for harm caused by a

14    product.  The product in this case is the boat.  "Harm"

15    includes damage to property, including the product itself,

16    and personal injuries.  The plaintiffs do not claim that

17    they have suffered any personal injuries or that the boat

18    has caused property damage other than the alleged harm to

19    the boat itself.  If you find that the condition of the

20    boat at the time of sale was defective and unreasonably

21    dangerous and you find that the defective and unreasonably

22    dangerous condition of the boat caused harm to the boat

23    itself, you may award damages to the plaintiffs for those

24    damages to the boat that were caused by any defective and

25    unreasonably dangerous condition.

1          Not every kind of alleged problem with the boat,

2     however, is a kind of harm caused by the boat.  If you

3     find that the boat suffered from some form of deficiency

4     at the time of sale, you may not award damages to the

5     plaintiffs for that deficiency under the Product Liability

6     Act because that deficiency would not be harm caused by

7     the boat.  In addition, if you find that the boat suffered

8     from a deficiency that was caused by a defective and

9     unreasonably dangerous condition of the boat, but you also

10    find that the deficiency was merely cosmetic, you may not

11    award damages to the plaintiffs for that cosmetic

12    deficiency under the Product Liability Act.

13          Now, we've been dealing with Part I of the

14    verdict form and subparts A, B, and C.  I'm now going to

15    go on to what relates to Part II of the verdict form, and

16    I want to talk to you about comparative responsibility.

17          The defendant denies that the boat was defective

18    or unreasonably dangerous.  If the plaintiffs prove by a

19    preponderance of the evidence all the elements of one or

20    both of their theories of liability and that the

21    defendant's actions caused the plaintiffs to suffer

22    damages, then the defendant has the burden of proving its

23    claim that any damages the plaintiffs may have sustained

24    were caused in whole or in part by the plaintiffs' own

25    negligence.  Under such circumstances, if you find that

PDF created with pdfFactory trial version www.pdffactory.com

1    the plaintiffs sustained damages that were caused in part

2    by the defective and unreasonably dangerous condition of

3    the boat and in part by the plaintiffs' own negligence,

4    then you may award damages to the plaintiffs, but any

5    damages that you award must be reduced in proportion to

6    the degree to which the plaintiffs were responsible for

7    those damages.

8         I'm now going to go to Part III of the verdict

9    form and deal with the plaintiffs' second claim, which is

10   a claim for negligence.

11        First I want to talk with you about the

12   plaintiffs' burden, which is Part III of the verdict form,

13   and then I will talk with you about Part IV, which is

14   comparative negligence.

15        The plaintiffs claim that the defendant was

16   negligent during the course of making repairs to the boat,

17   and that the defendant's negligence caused them to suffer

18   damages.  This claim is separate and distinct from the

19   plaintiffs' claim that the boat was defective and

20   unreasonably dangerous when it was first sold by the

21   defendant.

22        Negligence is the doing of something which a

23   reasonably prudent person would not do under the

24   circumstances, or the omitting to do what a reasonably

25   prudent person would do under the circumstances.  It is

PDF created with pdfFactory trial version www.pdffactory.com

1   the breach of a legal duty owed by one person to another,

2   and such legal duty is the exercise of reasonable care.

3   The use of proper care in a given situation is the care

4   which an ordinarily prudent person would use in view of

5   the surrounding circumstances.

6           The plaintiffs claim that the defendant was

7   negligent in making repairs to the boat in the following

8   ways:

9           A) by failing to perform a proper inspection of

10  the boat;

11          B) by failing to supervise repairs done to the

12  boat by others to make ensure that those repairs were done

13  in an appropriate and workmanlike manner;

14          C) by performing repairs itself that were not

15  done in an appropriate and workmanlike manner;

16          D) by failing to properly instruct, warn and

17  inform the plaintiffs of the repairs and changes made to

18  the boat;

19          E) by failing to properly secure and safeguard

20  the boat while it was in its possession; and

21          F) by failing to provide proper instructions for

22  flushing the boat's engines after the defendant replaced

23  the exhaust system.

24          To prevail on their claim for negligence, the

25  plaintiffs must prove that the defendant was negligent in

PDF created with pdfFactory trial version www.pdffactory.com

1    making the repairs to the boat in at least one of the six

2    ways I have just reviewed.

3            I want to talk with you about the concept of

4    comparative negligence, and I'm in Part IV of the verdict

5    form now.

6            The defendant denies that it was negligent, and

7    it also claims that any damages that the plaintiffs may

8    have sustained were caused in whole or in part by the

9    plaintiffs' own negligence in failing to de-water the

10   engines after they became hydrolocked.  If the plaintiffs

11   prove to you by a preponderance of the evidence that the

12   defendant was negligent in one or more of the ways I have

13   just reviewed, and that the defendant's negligence caused

14   the plaintiffs to suffer damages, then the defendant has

15   the burden of proving its claim that any damages were

16   caused in whole or in part by the plaintiffs' own

17   negligence.  If you find that the defendant was not

18   negligent, then you must render a verdict for the

19   defendant on this count.  If you find that the plaintiffs'

20   share of the responsibility for causing those damages is

21   51 percent or more, then you must find in favor of the

22   defendant on the plaintiffs' negligent claim.  If you find

23   that the plaintiffs sustained damages that were caused

24   partly by their own negligence but that those damages were

25   caused primarily by the defendant's negligence, then you

1    may award damages to the plaintiffs, but any damages that

2    you award must be reduced in proportion to the degree to

3    which the plaintiffs were responsible for those damages.

4         And that's Part IV of the verdict form, and

5    you'll see Part A and B and C, and that tracks the

6    structure of what I've just covered with you.  You'll see

7    in B the reference to 51 percent or more, and you'll see

8    in C, if you get to C, you would put in the percentage.

9         I now want to go to the plaintiffs' third claim,

10   revocation of acceptance.

11        The plaintiffs claim that they revoked their

12   contract for the purchase of the boat because the boat was

13   not in the condition that they understood it would be in

14   when they agreed to purchase it.  When a seller delivers

15   to a buyer a product that does not conform with the terms

16   agreed to, the buyer may revoke his or her acceptance of

17   the product within a reasonable time after the buyer

18   discovers or should have discovered the ground for

19   revoking the contract, and have the purchase price

20   returned to the buyer.

21        To prevail on their claim for revocation of

22   acceptance, the plaintiffs must prove five elements by a

23   preponderance of the evidence.

24        First, the plaintiffs must prove that they

25   revoked their contract for the purchase of the boat.  A

1    revocation is an annulment, cancellation, or reversal.

2    Revocation requires more than notifying the seller of the

3    goods -- I'm sorry, I'll start over again.  Revocation

4    requires more than notifying the seller that the goods are

5    in breach of the purchase agreement.  The notice must

6    unequivocally inform the seller that the buyer does not

7    wish to keep the goods.  If the buyer equivocates in word

8    or in deed, the purported revocation may be invalid.

9    While the buyer's notice of revocation needs to be

10   unequivocal, it need not be formal.  And if the buyer,

11   after sending a valid notice of revocation, thereafter

12   reaccepts the goods, the earlier revocation notice will be

13   superseded.  Such a re-acceptance need not be explicit but

14   may be implied from conduct such as continued use of the

15   goods.

16        Second, the plaintiffs must prove that they gave

17   notice of revocation within a reasonable time after they

18   discovered or should have discovered the ground for

19   revoking the contract.  What is a reasonable time for

20   taking action to revoke acceptance depends on the nature,

21   purpose, and circumstances of such action.

22        Third, in order to revoke acceptance, the

23   plaintiffs must prove more than that the boat was

24   nonconforming.  They must show that the boat's

25   nonconformity substantially impaired its value to them and

PDF created with pdfFactory trial version www.pdffactory.com

1    that they initially accepted the nonconformity because

2    they reasonably expected the seller to cure any

3    deficiencies or because they could not immediately

4    discover such deficiencies.

5            Fourth, in addition, the law allows revocation

6    only against the person who sells the product in question.

7    It is not enough that the defendant manufactured the boat

8    if the plaintiffs bought the boat from another entity.  To

9    be entitled to the remedy of revocation, there must be a

10   buyer-seller relationship between the plaintiffs and the

11   defendant.

12           Fifth, a buyer may only revoke acceptance before

13   there is any substantial change in the condition of the

14   product other than a substantial change caused by the

15   product's own defects.  Thus, the plaintiffs must prove

16   that they gave notice of revocation prior to any such

17   substantial change in the condition of the boat.  The

18   defendant claims that the boat underwent a substantial

19   change in condition before the plaintiffs attempted to

20   revoke their acceptance of the boat in that the engine

21   suffered extensive rusting because the plaintiffs

22   permitted the boat's engines to sit with water in them for

23   an extended period.  The plaintiffs claim that the boat

24   did not undergo any substantial change that was not caused

25   by the product's own defects before they gave notice of

PDF created with pdfFactory trial version www.pdffactory.com

1   revocation, and that if the boat underwent any substantial

2   change in its condition that was not caused by the

3   product's own defects, that change was after the time the

4   plaintiffs gave notice of revocation.

5          Next I'm going to talk with you about the

6   concept of proximate cause.

7          If you find that the boat was defective and

8   unreasonably dangerous or that the defendant was negligent

9   in making repairs, you may not award a recovery for the

10   plaintiffs on that basis alone. The plaintiffs also must

11   prove to you by a fair preponderance of the evidence that

12   they were harmed by the alleged defect or by the

13   defendant's misconduct, and that that defect or misconduct

14   was both the cause in fact and the proximate cause of the

15   alleged damages.

16          To determine whether cause in fact exists, you

17   must ask yourself whether the damages would have occurred

18   were it not for the claimed defect or misconduct. A

19   finding of cause in fact alone does not mean that the

20   defendant is legally responsible for the plaintiffs'

21   damages. Cause in fact is only one part of the two-part

22   inquiry you must make to determine whether the defendant

23   is legally responsible for the plaintiffs' damages. You

24   must also determine whether the defendant's alleged

25   misconduct was the proximate cause of those damages. To

PDF created with pdfFactory trial version www.pdffactory.com

 1   make that determination, you must decide whether the

 2   alleged defect or misconduct was a substantial factor in

 3   causing the damages complained of by the plaintiffs.  A

 4   substantial factor is one that continues down to the

 5   moment of damage or at least down to the setting in motion

 6   of the final active injurious force which immediately

 7   produced the damage.  Unless you find that the alleged

 8   defect or misconduct is both the cause in fact and a

 9   proximate cause of the damages complained of, you must

10   find that the defendant is not legally responsible for any

11   damages to the plaintiffs.

12           Next I want to talk with you about the concept

13   of damages.  And here we're in Part VII of the verdict

14   form.

15           If you find the defendant is liable to the

16   plaintiffs, you must then consider the issue of damages.

17   In this regard, please note that the mere fact that I

18   instruct you on damages does not mean that you should

19   award damages or that I have any opinion as to whether you

20   should award damages.  Also, please note that you are not

21   to consider whether anyone other than the defendant did

22   anything wrong.  With the exception of the issue of

23   mitigation of damages, the plaintiffs have the burden of

24   proving damages by a preponderance of the evidence.

25           Based on the claims you are considering, the

1    only type of damages you can award to the plaintiffs are

2    compensatory damages.  Compensatory damages are intended

3    to make a plaintiff whole; that is, to fairly and justly

4    compensate him for any injury he sustained as a direct

5    result of the responsible party's unlawful actions.

6            You may not award damages in this case that

7    cover any period beyond the date of your verdict.  Nor may

8    you award in this case any damages for emotional harm to

9    the plaintiffs, such as emotional distress, pain,

10   suffering, personal indignity, fear, anxiety, or anguish

11   the plaintiffs suffered.  Also, you may not award as a

12   component of damages any sum intended to cover prejudgment

13   interest or any sum intended to cover attorneys' fees that

14   may have been incurred by the plaintiffs in this lawsuit.

15   These issues will be dealt with, if necessary, in a

16   separate proceeding.

17           You are also instructed that the plaintiffs have

18   a duty under the law to mitigate their damages; that is,

19   to exercise reasonable diligence under the circumstances

20   to minimize their damages.  Therefore, if you find that

21   the defendant has proven by a preponderance of the

22   evidence that the plaintiffs failed to seek out or take

23   advantage of an opportunity to minimize their damages that

24   was reasonably available to them, you must reduce their

25   damages by the amount they reasonably could have avoided

PDF created with pdfFactory trial version www.pdffactory.com

1    if they had sought out or taken advantage of such

2    opportunity.  On the issue of mitigation of damages, the

3    defendant has the burden of proof.

4         The plaintiffs are entitled to compensatory

5    damages only for injuries caused by unlawful acts.

6    Damages must not be based on speculation or sympathy.

7    They must be based on the evidence presented at trial.

8         The damages you award should be proportional to

9    the actual loss sustained and should not result in double

10   recovery with respect to any one item of damage.

11        And when you look at Part VII of the verdict

12   form, you'll see that there are -- there's a line for

13   Connecticut Product Liability Act, there's a line for

14   negligence.  And then there's a line that makes reference

15   to not double-counting and filling in a number without any

16   double-counting.

17        That's the end of the second section of the

18   instructions.

19        I now have some instructions for your

20   deliberations.  First I want to talk to you about the

21   concept of burden of proof.

22        I will now explain to you certain rules that

23   apply in civil cases generally.  In a civil action such as

24   this, the plaintiffs must prove the facts on which they

25   rely by a preponderance of the evidence.  On the issues of

PDF created with pdfFactory trial version www.pdffactory.com

1    comparative responsibility, comparative negligence, and

2    mitigation of damages, however, the defendant has the

3    burden of proof.

4         This rule does not require proof to an absolute

5    certainty.  Proof to an absolute certainty is seldom

6    possible in any case.  This rule does not even require

7    proof beyond a reasonable doubt, which is the rule in

8    criminal cases.  In a civil case, such as this one, you

9    must weigh the evidence in support of a particular claim

10   against the evidence opposed to it and consider which

11   evidence is more convincing.  To prove a fact by a

12   preponderance of the evidence means to prove that the fact

13   is more likely true than not true.

14        It may be helpful to ask yourselves, with

15   respect to each disputed issue of fact, how all the

16   credible evidence would balance if you placed it on an

17   imaginary pair of scales.  If all the evidence presented

18   by both sides on a particular issue of fact would cause

19   the scales to strike an even balance, then the party with

20   the burden of proof would have failed to meet their or its

21   burden of proof with regard to that issue of fact.  On the

22   other hand, if the evidence would cause the scales to tip

23   in favor of the party with the burden of proof, then they

24   or it would have met their or its burden of proof on that

25   issue of fact.

1    I now want to talk to you about your duty to

2    deliberate.

3    The verdict must represent the considered

4    judgment of each juror.  To return a verdict, it is

5    necessary that each juror must agree.  Thus, your verdict

6    must be unanimous.

7    It is your duty, as jurors, to consult with one

8    another and to deliberate with a view toward reaching an

9    agreement, if you can do so without compromising

10   individual judgment.  You must each decide the case for

11   yourself, but only after an impartial consideration of the

12   evidence in the case with your fellow jurors.  In the

13   course of your deliberations, do not hesitate to reexamine

14   your own views, and change your opinion, if convinced it

15   is erroneous.  But do not surrender your honest conviction

16   as to the weight or effect of evidence solely because of

17   the opinion of your fellow jurors or for the mere purpose

18   of returning a verdict.

19   Remember at all times that you are not

20   partisans.  You are judges, because in this case you are

21   the judges of the facts.  And your sole interest is to

22   seek the truth from the evidence in this case.

23   Please remember my instructions about notes

24   given at the beginning of the case.  When you retire to

25   deliberate, if a fellow juror claims that a certain fact

1    exists because he or she has it written down on his or her

2    notepad, remember that it is your own recollection that

3    must control, as that person simply may have made some

4    inaccurate notes.  Similarly, none of you must use the

5    mere fact that you took notes to try and influence any

6    other juror.  Notes can be used to refresh one's own

7    recollection, but it is what each of you remembers that

8    counts, not anyone's notes.

9           Let me talk about electing a foreperson and

10    using the verdict form.

11           Upon retiring to the jury room, you will select

12    one person to act as your foreperson.  The foreperson will

13    preside over your deliberations and will speak for you

14    here in court.

15           Any communications with the Court during

16    deliberations must be in writing and signed by the

17    foreperson.  No member of the jury should ever attempt to

18    communicate with me except by a writing signed by the

19    foreperson.

20           I will never communicate with any member of the

21    jury on any subject touching the merits of the case other

22    than orally here in open court in the presence of counsel

23    and the parties.

24           Now, if you do send a note to me, please do not

25    disclose in your note or otherwise anything about your

PDF created with pdfFactory trial version www.pdffactory.com

1    deliberations.  Specifically, do not disclose to anyone --

2    not even to me -- how the jury stands, numerically or

3    otherwise, on the question of the liability of the

4    defendant until after you have reached a unanimous

5    verdict.

6         A verdict form has been prepared for your

7    convenience.  You will note that the interrogatories or

8    questions call for either a "yes" or "no" answer or, if

9    appropriate, a dollar amount or a percentage.

10        Your foreperson will write the unanimous answer

11   of the jury in the space provided for each question, will

12   date and sign the completed verdict form, and then return

13   to the courtroom with the verdict form.

14        As I mentioned earlier, you will have with you

15   in the jury the original verdict form.  I hope you will

16   find it to be straightforward, but I will now summarize

17   the form for you, and I invite you to review it with me.

18        You will recall that when I went through

19   Section II of the instructions which relates to the issues

20   in this case, I told you that there were three claims

21   being brought by the plaintiffs.  The first claim is the

22   claim under the Connecticut Product Liability Act.  And

23   Question 1.A asks you whether the plaintiffs have proven

24   the defendant is liable to them pursuant to the

25   Connecticut Product Liability Act.  You will recall that I

PDF created with pdfFactory trial version www.pdffactory.com

1    explained that there were two theories for the plaintiffs'

2    claim under the Product Liability Act: Strict Liability

3    and Breach of Express Warranty.  So Section I.B, you would

4    get to if you answer "yes" to I.A.  And at that point you

5    would be asked to say "yes" or "no" with respect to each

6    of the two theories.  If you answer "no" in I.A -- in

7    other words, the plaintiffs did not prove the defendant is

8    liable to them under the Act -- you would proceed to

9    Part III because you would be going on to discuss the

10   second claim.  Now, if you answer "yes" to Part I.A, you

11   would not only answer I.B, but you would also answer I.C,

12   which is an interrogatory that asks have the plaintiffs

13   proven the boat was defective and unreasonably dangerous

14   at the time they purchased it.  And then whether you

15   answer that "yes" or "no," you would go to Part II.

16          And you'll see that II.A says has the defendant

17   proven -- and you may recall that when I was explaining to

18   you who has the burden of proof on what, I explained that

19   the defendant has the burden of proof on comparative

20   responsibility, comparative negligence, and mitigation of

21   damages.  So that's why II.A says has the defendant

22   proven, and you reach the issue of comparative

23   responsibility, you have to answer "yes" or "no" whether

24   the defendant has proven the plaintiffs were comparatively

25   responsible for the damages they sustained.  If you answer

1    "yes," then you have to go to Part B and fill in the

2    percentage.  If you answer "no," then you would go to Part

3    III, which is the plaintiffs' second claim, Negligence.

4    And either way you eventually get to Part III, which is

5    the second claim.

6           When you get to the second claim, you have to

7    answer whether the plaintiffs have proven that the

8    defendant was negligent during the course of making

9    repairs to the boat and that the defendant's negligence

10   caused them to suffer damages.  If you answer "no," then

11   you would skip over Part IV and go to Part V, which is the

12   third claim.  If you answer "yes," you would then have to

13   address the issue of comparative negligence.

14          When you look at the first line of Part IV.A,

15   which is Comparative Negligence, you'll see once again it

16   says has the defendant proven, as opposed to have the

17   plaintiffs proven.  And if you answer "no" to IV.A, you

18   would go on to the third claim in Part V of the verdict

19   form.  If you answer "yes," then you would have to go to B

20   and answer the question with respect to the plaintiffs'

21   share of responsibility and whether it was 50 percent --

22   51 percent or more.  If you answer "yes," you would skip

23   down to Part V, because if it's 51 percent or more, the

24   defendant cannot be held responsible.  If it's "no," then

25   you would go to Part C and you would fill in the

PDF created with pdfFactory trial version www.pdffactory.com

1   percentage.

2           Then no matter how you go through these

3   questions, you get to the third claim, which is Part V,

4   Revocation of Acceptance.

5           And there the question is:  Have the plaintiffs

6   proven by a preponderance of the evidence that they

7   revoked their contract for purchase of the boat?

8           And then you proceed to Part VI.  And it says,

9   If you have concluded the defendant is not liable on any

10  of their claims -- any of the plaintiffs' claims -- you

11  proceed to Part VIII, which tells you to sign and date the

12  verdict form.  If you conclude there is liability, you

13  would continue on to Compensatory Damages.  And you'll see

14  for Revocation of Acceptance what the plaintiffs seek is

15  simply return of the purchase price.  You don't have to

16  compute that.  For the Connecticut Product Liability Act,

17  you would have to determine what amount of compensatory

18  damages you determine to be fair, just, and reasonable.

19  And if you find for the plaintiffs on Negligence, you

20  would also have to complete that.

21          And then if you found for the plaintiffs on both

22  of these claims and awarded damages, there's a question

23  here that makes sure there's no double-counting of any

24  damages that are awarded.  All of the numbers that would

25  go into this section of the verdict form would be after

PDF created with pdfFactory trial version www.pdffactory.com

1    any percentage reduction that would be appropriate for you

2    to make.

3            Then in any event, you get to the last part of

4    the verdict form, which should say Part VIII.  I think

5    we'll fix that little typo.  It says, You have now

6    completed your deliberations.  Please sign and date this

7    form.

8            At the completion of your deliberations, the

9    foreperson should communicate to the Court through a

10   signed writing indicating that a unanimous verdict has

11   been reached.  The foreperson should not give the verdict

12   form to the courtroom deputy or to the court security

13   officer for this purpose, but should write a separate

14   signed note to me indicating that a unanimous verdict has

15   been reached.  And you would simply bring the verdict form

16   in with you and hold it until I ask to have it handed over

17   to the courtroom deputy at the appropriate time.

18           We've now reached the point where the jury

19   should retire to the jury room.  When you go into the jury

20   room, please to not begin to deliberate until you receive

21   from the courtroom deputy all of the exhibits you are to

22   consider.  And when she does that, she will give you a

23   formal direction to begin your deliberations.  I think

24   she'll probably be bringing in the exhibits in about five

25   minutes.

PDF created with pdfFactory trial version www.pdffactory.com

1          I'd like to thank you all very much for your

2    attention, and you can retire to the jury room at this

3    time.

4               (Whereupon the jury left the courtroom.)

5          THE COURT:  Please be seated everyone.

6          I think people put their objections to the

7    charge on the record earlier and those are preserved.

8          I have a couple of additional changes that I

9    thought -- I tried to catch them as I was going through,

10   and I'll have these made before it goes in to the jury

11   room.

12         I guess on page 15 we have two separate

13   theories, we take out breach of duty to warn and then

14   capitalize "second" and "third."

15         On page 16 at the top, that first full sentence

16   was a generic sentence, and when I delivered it, I said

17   "and for that reason plaintiffs may base a product

18   liability claim."

19         And then the caption on page 16 instead of

20   saying "The Three," should say "The Two" theories of

21   liability.

22         On page 18, first sentence under Definition of

23   "Harm," I added the word under "the" Connecticut Product

24   Liability Act.

25         On page 21, just above the caption where it says

1    "one of six ways," I inserted the word "the" six ways.

2             And on page 32, first full paragraph, I made it

3    defendant, singular.  And in the next paragraph I added in

4    the second sentence after a dollar amount or a percentage.

5             And there's one thing I must not have put a flag

6    on -- oh, on page 15, I conformed that because I recognize

7    that I have not -- under third, the draft said the

8    plaintiffs seek to revoke their contract.  I went back to

9    page 22 and read the first sentence.  I'm going to say the

10   plaintiffs claim that they revoked their contract for the

11   purchase of the boat.

12             MR. NIKAS:  Your Honor --

13             THE COURT:  Yes, let me just finish a note,

14   please.

15             Mr. Nikas, yes?

16             MR. NIKAS:  Just for the record, on

17   Section II.A --

18             THE COURT:  Yes?

19             MR. NIKAS:  -- last sentence, under the

20   Connecticut Product Liability Act one who sells a product

21   in defective condition.

22             THE COURT:  You're in the last -- when you

23   say -- what page are you on?

24             MR. NIKAS:  Page 15, Section II, Heading A,

25   heading has Connecticut Product Liability Act.  That last

1    sentence is not a complete sentence.  Under the

2    Connecticut Product Liability, one who sells a product in

3    defective condition, we would like to state for the record

4    that the Act defines product seller as any person or

5    entity including a manufacturer, wholesaler, distributor,

6    or retailer.

7            THE COURT:  Okay.  That's accurate.

8            Mr. Rotondo, do you have anything?

9            MR. ROTONDO:  I don't have anything with respect

10   to the charge, Your Honor.  I did have a general comment

11   with respect to the verdict form.

12           THE COURT:  Okay.

13           MR. ROTONDO:  And that is, Your Honor, I think

14   that the plaintiff is not entitled to recover both

15   revocation and damages.  So that if the plaintiff were to

16   recover -- I read the form incorrectly when I read it

17   before, but that would lead me to the subject of

18   post-trial motions as to whether the plaintiffs would be

19   entitled to recover for both.

20           THE COURT:  Yes, Mr. Nikas?

21           MR. NIKAS:  I guess I see Mr. Rotondo's point.

22   I guess the question is, does the jury get an instruction

23   to decide all claims independently from one another such

24   that there could be an election or some other event so

25   that does not happen?

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  Well, I think this does require them

2    to do that.  I mean, they have to decide revocation.

3    They're not asked to put any dollar amount down for

4    revocation because that's a set dollar amount.  And then

5    if they award damages for Connecticut Product Liability

6    Act or negligence, we would know exactly how much went to

7    each claim.  So I figured we would be able -- I was trying

8    to -- I always try and ask myself what might I have to

9    answer once this is over?  And I think I could answer the

10   questions.  From this verdict form would you be able to

11   answer the questions or point to the information that

12   should be looked at to answer the questions?

13          MR. ROTONDO:  Yes, I think you could.

14          THE COURT:  Mr. Nikas, would you, too?

15          MR. NIKAS:  I think so, Your Honor.

16          THE COURT:  You were just making a point.

17          MR. ROTONDO:  Yes.  It may have been obvious to

18   everybody, but I just wanted to make it.

19          THE COURT:  I never assume that anything is

20   obvious to everybody.

21          Okay, I'm going to go ahead and make these

22   changes then.

23          Have you all finished going over the exhibits

24   with the courtroom deputy?

25          MR. ROTONDO:  Not today, Your Honor.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  Why don't you double-check that.

2     While you're doing that, I'll get the verdict form

3     revised.  I'll have Amy come in, show you the final and my

4     markup so you can see where the changes were made.  Okay.

5     Obviously I need someone to help me proofread it.  All

6     right.  We'll recess.

7               (Recess while jury deliberates.)

8

9          THE COURT:  We'll be excusing the jury for the

10    day.

11          Bring the jury in.

12               (Whereupon, the jury entered the

13               courtroom.)

14          THE COURT:  Please be seated everyone.

15          Ladies and gentlemen, I've been informed that

16    you want to report tomorrow morning at 8:45, which is

17    fine.

18          I'll just remind you that you should not discuss

19    the case with anyone else and you should not allow anyone

20    to discuss it in your presence.  You should continue to

21    not have any contact with the parties, attorneys, or

22    witnesses in the case, and also you should not allow

23    yourself to be influenced by anything outside the evidence

24    in the case.  In other words, don't be influenced by

25    anything in the media concerning this matter or any

PDF created with pdfFactory trial version www.pdffactory.com

1  related matter.

2           Other than that, I just want to say thank you

3  very much for your hard work.  We all appreciate it.  And

4  when you come in tomorrow at 8:45, you should just get

5  right to work as soon as everybody is here.

6           Have is restful evening.

7                (Whereupon the jury left the courtroom.)

8           THE COURT:  Please be seated everyone.

9           At this stage of the proceeding, we reverse the

10  order, the lawyers get to come later.  If you're here by

11  9:30, I think that should be fine.

12           I'll just ask you to wait for maybe ten minutes

13  or so to let the jurors clear the building so you minimize

14  the risk of running into anyone.

15           See you all tomorrow morning.  Have a restful

16  evening, at least more restful than the past few days.

17  Good night.

18                (Proceedings adjourned at 4:32 p.m.)

19

20

21

22

23

24

25

Vol. V - Page 922

1

2

3                         C E R T I F I C A T E

4

5

6

7              I, Diana Huntington, RDR, CRR, Official Court

8    Reporter for the United States District Court for the

9    District of Connecticut, do hereby certify that the

10   foregoing pages are a true and accurate transcription of

11   my shorthand notes taken in the aforementioned matter to

12   the best of my skill and ability.

13

14

15

16

              /s/_____
17
                 DIANA HUNTINGTON, RDR, CRR
18                  Official Court Reporter
                 450 Main Street, Room #225
19               Hartford, Connecticut 06103
                    (860) 547-0580
20

21

22

23

24

25