UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PETER D. MAINS and LORI M. MAINS | : | CIVIL ACTION NO.: |
| | : | |
| Plaintiffs, | : | 3:01CV2402 (AWT) |
| | : | |
| v. | : | |
| | : | |
| SEA RAY BOATS, INC., | : | |
| | : | |
| Defendant. | : | June 6, 2008 |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR
JUDGMENT AS A MATTER OF LAW**

**I.**

**INTRODUCTION**

Upon close of evidence in the captioned trial on April 4, 2008, Defendant Sea Ray

Boats, Inc., (hereinafter referred to as "Defendant" or "Sea Ray") moved on oral

application for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of

Civil Procedure.  Presumably, the same motion was filed in written form on April 5,

2008.  See Defendant's Motion for Judgment as a Matter of Law (Docket Number 173).

Plaintiffs filed their opposition on April 7, 2008.  See Plaintiffs' Opposition to

Defendant's Motion for Judgment as a Matter of Law (Docket Number 179).

On April 8, 2008, the jury reached a unanimous verdict finding Sea Ray

negligent and liable for breach of an express warranty under the Connecticut Product

Liability Act.  For each of these two claims, Plaintiffs were awarded $15,500.00 in

compensatory damages and were allocated three percent of the comparative

responsibility.  See Special Verdict Form (Docket Number 187).

1

This Court entered judgment reflecting the jury's verdict on April 14, 2008.  See Judgment dated April 14, 2008 (Docket Number 188).

On May 2, 2008, Defendant renewed its motion for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure.  Following an unopposed motion for enlargement of time, this Court granted Plaintiffs leave to file an opposition on or before June 6, 2008.  See Docket Number 192, dated May 28, 2008.

For the reasons set forth more fully herein, Plaintiffs respectfully request that this Court deny Defendant's renewed motion for judgment as a matter of law.

## II.

### THE MOTION FILED BY DEFENDANT WAS UNTIMELY

Rule 50(b) of the Federal Rules of Civil Procedure provides that motions for judgment as a matter of law should be renewed no later than 10 days after the entry of judgment:

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), *the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions* (emphasis added) raised by the motion.  No later than 10 days after the entry of judgment - or if the motion addresses a jury issue not decided by a verdict, no later than 10 days after the jury was discharged – the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. . . .

Fed. R. Civ. P. 50(b).  The language of the statute, on its face, suggests that the ten-day time limit applies even should the Court reserve its ruling on any motion for judgment as a matter of law filed prior to receipt of the jury verdict.

This ten-day time limit may not be extended by stipulation of the parties, and Courts may not extend the time to act under Rule 50(b). See Fed. R. Civ. P. 6(b)(2); United States Leather, Inc. v. H &W Partnership, 60 F.3d 222, 225 (5th Cir. 1995).

Judgment was entered on April 14, 2008. Defendant did not file the subject motion until May 2, 2008, well beyond the ten-day deadline, nor did it renew its motion in open court after the jury verdict was read.  Record at 933-935 (attached hereto as Exhibit "A").

As such, Defendant's renewed motion for judgment as a matter of law should be denied.  See Weissman v. Dawn Joy Fashions, Inc., 214 F.3d 224, 230-232 (2nd Cir. 2000)(District Court lacked jurisdiction to modify jury verdict because defendant filed motion pursuant to Rule 50 outside of ten-day time limit); Hodge ex rel. Skiff v. Hodge, 269 F.3d 155, 157 (2nd Cir. 2001).

## III.
## JUDGMENT AS A MATTER OF LAW MAY ONLY BE GRANTED IN VERY LIMITED CIRCUMSTANCES

The jury's finding that Defendant had breached an express warranty is well supported by the evidence and should not be disturbed.

Judgment as a matter of law should be granted cautiously and sparingly, and the evidence must be viewed in the light most favorable to the non-movant, "deferring to the jury's assessment of the evidence and all reasonable inferences the jurors could draw from the evidence." Meloff v. New York Life Ins. Co., 240 F.3d 138, 145 (2nd Cir. 2001).

> [T]here must be either an utter lack of evidence supporting the verdict, so that the jury's findings could only have resulted from pure guess-work, or the evidence must be so

overwhelming that reasonable and fair-minded persons
could only have reached the opposite result.

Doctor's Associates, Inc. v. Weible, 92 F.3d 108, 112 (regarding judgment

notwithstanding the verdict). See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

250 (1986) (directed verdict should be granted only when, under governing law, there

can be "but one reasonable conclusion as to the verdict.").

> After a party presents its case, judgment as a matter of law
> is appropriate when 'there is no legally sufficient
> evidentiary basis for a reasonable jury to find for that party
> on that issue'. . . . Judgment as a matter of law is
> inappropriate unless:
> (1) there is such a complete absence of evidence supporting
> the verdict that the jury's findings could only have been the
> result of sheer surmise and conjecture, or
> (2) there is such an overwhelming amount of evidence in
> favor of the movant that reasonable and fair-minded
> [persons] could not arrive at a verdict against [it].

Meloff v. New York Life Ins. Co., 240 F.3d 138, 145 (2nd Cir. 2001). See also

Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 108 (2nd Cir. 2001).

In deciding whether to grant judgment as a matter of law, the Court should

review all of the evidence in the record and "draw all reasonable inferences in favor of

the nonmoving party." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150

(2000) (noting that court may not make credibility determinations or weigh evidence).

See also Anderson, 477 U.S. 242, 255 ("The evidence of the non-movant is to be

believed and all justifiable inferences are to be drawn in his favor.").

> Credibility determinations, the weighing of the evidence,
> and the drawing of legitimate inferences from the facts are
> jury functions, not those of a judge. (Emphasis added.)

Id. See also Meloff, 240 F.3d at 145 ("The court may not itself weigh the

credibility of witnesses or consider the weight of evidence.").

In reviewing the record, the court must disregard all evidence favorable to the moving party that the jury is not required to believe.  Reeves, 477 U.S. 133, 151.

The verdict of the jury must be upheld if, viewing the facts in the light most favorable to the nonmoving party, there is sufficient evidence for a reasonable jury to have found in favor of the nonmoving party.  See, e.g.  Lack v. Wal-Mart Stores, Inc., 240 F.3d 255, 259 (4th Cir. 2001); Johnson v. Paradise Valley Unified School Dist., 251 F.3d 1222, 1227 (9th Cir. 2001)("A jury's verdict must be upheld if it is supported by substantial evidence. . . . Substantial evidence is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence. . . . Thus, . . . [the court] must disregard all evidence favorable to the moving party that the jury is not required to believe.").

There is ample evidence to support the jury's verdict in the present matter.

## IV.
## JUDGMENT AS A MATTER OF LAW SHOULD NOT BE GRANTED AS TO PLAINTIFFS' BREACH OF EXPRESS WARRANTY CLAIMS

### A. **The jury reasonably concluded that the vessel was defective and unreasonably dangerous.**

Defendant has based its motion on the unfounded assertion that "There Is No Evidence That the Boat Was Defective or Unreasonably Dangerous."  See Defendant's Renewed Motion for Judgment as a Matter of Law, page 3, Section B.

The jury was instructed as follows:

> A product is unreasonably dangerous to the user when it has the potential for causing harm greater than that which the ordinary user who purchases the product would contemplate.  The seller of a product, however, is not an insurer.  The law does not require that a product be perfect or accident proof or incapable of causing harm.  Nor is a product seller required to incorporate the ultimate safety

features in its product.  In other words, a product seller is not required to use all means to make its product safe nor is it necessarily required to use the latest or the most modern means.  Rather, a product seller is required to use only such means as are necessary to make the product reasonably safe for its intended use.

Record at 895, lines 4-17 (attached hereto as Exhibit "B").

### 1.  The evidence supports the jury determination that the boat was defective.

In arguing that the jury could not reasonably conclude that the boat was defective, Defendant appears to have forgotten the testimony by Peter Mains, Lori Mains, David Wade, and Thomas Wicander, which leads to the reasonable inference that the vessel was defective.

Both Peter and Lori Mains referenced abnormal exhaust resonance emanating from the exhaust system during the initial period of the vessel's operation following delivery, which is indicative of defects in design or manufacture.  See, e.g. Record at 145, line 19 through 146, line 9; Record at 274, line 20 through 275, line 14 (attached collectively hereto as Exhibit "C").

They also testified to, among other things, water saturation in the bilge area and design defects which restricted their access to key exhaust system and engine components. See, e.g. Record at 153, lines 12-15; Record at 128, line 4 (attached collectively hereto as Exhibit "D").

Furthermore, Plaintiffs' expert, Thomas Wicander, testified that leak down and compression tests revealed: (1) divergent and disparate compression readings; (2) evidence of rust streaking, consistent with persistent water intrusion; and (3) severe salt water scoring in the cylinder liners indicative of a long-term, chronic water ingestion problem which was present well prior to the first attempted repair by defendant.  See,

e.g. Record at 308, lines 9-23; Record at 331, lines 6-10; Record at 370, line 22 through 371, line 3; Record at 384, lines 23-25; Record at 387, lines 3-22; Record at 571, lines 16-25 (attached collectively hereto as Exhibit "E").

This testimony supports the reasonable inference that the vessel was defective at the time of purchase and delivery.

Defendant cites Abraham v. Volkswagen of America, Inc., 795 F.2d 238, 250 (2nd Cir. 1986) for the proposition that all parts wear out sooner or later and thus have a limited effective life. This argument is unpersuasive in the present case, in which the engines had fewer than two hundred hours of operation (approximately ten percent of their expected lifespan) when the defects caused serious and substantial damage to the power plant.

Indeed, Wicander testified that the water ingestion affecting the engines was historic, and given their limited use must have suffered damage over an extended period of time. Record at 569, lines 4-12 (attached hereto as Exhibit "F"). Based on these facts, any jury could reasonably have concluded that the defects in the exhaust system and the damage caused therefrom far exceeded normal "wear and tear."

### 2. The evidence supported the jury determination that the vessel was unreasonably dangerous.

The evidence demonstrates the unreasonably dangerous nature posed by the design and manufacture of the yacht, as viewed by either expert or layman. See Sharp v. Wyatt, Inc., 31 Conn. App. 824, 833 (1993)(product is "defective" for purposes of Connecticut product liability statute when unreasonably dangerous to consumer or user).

The vessel was defective if "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge

common to the community as to its characteristics."  Potter v. Chicago Pneumatic Tool

Co., 241 Conn. 199, 214-215.

Plaintiffs were not required to proffer evidence regarding the feasibility

alternative designs.  Rather, "Connecticut courts . . . have consistently stated that a jury

may, under appropriate circumstances, infer a defect from the evidence without the

necessity of expert testimony."  Id at 217.

The modified consumer expectation test alluded to in Defendant's renewed

motion only applies where complex products designs are involved such that an ordinary

consumer may not be able to form expectations of safety. Id at 119.  Such is not the case

with the boat in question.

> [W]e emphasize that we do not require a plaintiff to present
> evidence relating to a product's risks and utility in every
> case.  As the California Court of Appeals has stated: "There
> are certain kinds of accidents – even where fairly complex
> machinery is involved – [that] are so bizarre that the
> average juror, upon hearing the particulars, might
> reasonably think: 'Whatever the user may have expected
> from that contraption, it certainly wasn't that.'" . . . .
> Accordingly, the ordinary consumer expectation test is
> appropriate when the everyday experience of a particular
> product's users permits the inference that the product did
> not meet minimum safety expectations.

Id at 222.

Common sense suggests that any defects which results in internal damage to the

moving components of an engine or even catastrophic failure are unreasonably

dangerous  because they necessarily place the consumer at risk of serious injury or death

while adrift due to the multitude of dangers posed while unable to maneuver a vessel at

sea. That such harm (absent the engine damage suffered) did not occur, is irrelevant to

the question of whether the vessel posed the risk of unreasonable danger.

8

This logical inference does not require the support of expert testimony.  Indeed, it was clearly highlighted for the jury by laywitness Lori Mains:

> Q. What was your reaction to these exhaust resonance noises that you heard?
> A. Was there something wrong? Is this a safety issue?
> Q. Why would you be concerned about safety when you hear that?
> [The Court allowed the question over Defendant's objection.]
> A. The concern about safety mainly is when you're out on the water, something goes wrong, technically you could become injured or drown. . . .

Record at 276, lines 11-20 (attached hereto as Exhibit "G").

Furthermore, the jury could observe the causal relationship of water ingestion and engine failure from the testimony regarding the hydrolock incident.  See, e.g. Record at 177-180 (attached hereto as Exhibit "H.")

Even assuming for argument's sake that the technical complexities posed by these facts required expert guidance, Wicander provided more than sufficient evidence from which the jury could conclude that the vessel was unreasonably dangerous.

Wicander provided the jury with detailed explanations of the damage caused by the presence of water in the cylinder and the manner that such intrusion would prevent proper operation of the engines.  Record at 338, lines 14-25 (attached hereto as Exhibit "I").

Wicander testified that the severity and extent of the scoring and the continued ingress of water would not have occurred had salt water not entered through the exhaust system leading to catastrophic engine failure, rendering consumers "stuck wherever they are" due to the inoperability of the engines.  Record at 343, lines 10-17; Record at 398, line 8 through 399, line 2 (attached collectively hereto as Exhibit "J").

This condition was described in his testimony "fatal" to the engines, clearly rendering the vessel unfit for its intended use and unreasonably dangerous to consumers at sea.  See Record at 572, lines 15-17 (attached hereto as Exhibit "K").

As such, there is clear evidence that the product was dangerous and defective, regardless of whether any expert testimony was required, notwithstanding the sufficiency of the expert testimony heard by jury.

> **3. Defendant's demeanor and the behavior and testimony of its witnesses supports the jury's determination that the vessel was dangerous and defective.**

On its own, the inability or unwillingness of Defendant to explain the unrequested replacement of the exhaust system supports the jury finding that the original exhaust system installed by Sea Ray was defective.  See Record at 670, lines 19-22 (attached hereto as Exhibit "L") (Sea Ray, not MerCruiser, installed the engines and exhaust system in the boat).

The testimony of Peter Mains, Lori Mains, and David Wade all indicate that, despite requests and assurances that Plaintiffs could inspect the vessel while it was at the factory, the exhaust system overhaul was performed without notice to Plaintiffs and in the absence of their consent.  See, e.g. Record at 167, lines 6-23; Record at 280-281 (attached collectively hereto as Exhibit "M").

Aside from the generic explanation that the exhaust system was replaced in an attempt to remedy the exhaust resonance in an effort to placate a disgruntled customer, neither Wade nor any other witnesses was able to explain how or why the retrofit exhaust system was expected to cure the exhaust resonance problem.  See, e.g. Record at 281, lines 23 through 282, line 5; Record at 680, lines 16-17; Record at 685, lines 7-

23; Record at 694, line 4 through 695, line 23; Record at 735, lines 4-7 (attached collectively hereto as Exhibit "N").

Furthermore, the jury is free to question the credibility of Wade's testimony, especially considering the unlikelihood that such an extreme and costly repair would have been authorized solely in the name of customer satisfaction without technical or engineering support that the repair would remedy the complaint.    Record at 692, lines 1-8; Record at 694, line 4 through 695, line 23; Record at 705, lines 12-15 (attached collectively hereto as Exhibit "O").

Wade's testimony might have seemed more credible had not other witnesses (namely, Dean Beckman) that exhaust concerns are taken seriously due to the potential danger posed to consumers:

> We would have looked into that because anything that has to do with exhaust could be potentially dangerous because of carbon monoxide.  Any complaint that we would have about exhaust would be pretty serious.

Record at 495, lines 12-15 (attached hereto as Exhibit "P").

Moreover, Wade's consistent failure to recall various interactions with the Plaintiffs and with other members of his organization in late 2000 is legitimate grounds for the jury to question his credibility, especially when coupled with his seemingly lucid memory of events predating the transportation of the vessel to the Sea Ray factory in Tennessee prior to the time that his memory had faltered.  Compare Record at 711, lines 17-25 (detailed recollection prior to factory repairs) to Record at 692 ("don't recall" consulting anybody else aside from his boss); Record at 697, line 10; Record at 703, lines 13-16; Record at 707, lines 7-8 (attached collectively hereto as Exhibit "Q").   The

jury is permitted to consider both the credibility and memory of Wade in reaching its verdict.

The fact that Defendant did not preserve or provide any evidence regarding the quality, configuration, or design of the original exhaust system may reasonably be deemed suspicious and could lead the jury to draw the inference that the original exhaust system was defective.  See, e.g. Record at 168, lines 3-5; Record at 280, lines 5-25 (plaintiffs denied inspection despite prior requests)(attached collectively hereto as Exhibit "R").

This testimony, when coupled with the unjustified and unexplained replacement of the exhaust system could lead the jury to reasonably conclude that the original collector style exhaust installed on board the vessel was defective. See Record at 279, lines 10-15; Record at 281, line 20 through 282, line 5 (attached collectively hereto as Exhibit "S").

The jury may also have noticed Wade's repeated attempts to establish eye contact with Defendant's general counsel during his examination.  Additionally, the jury also could have placed greater reliance on Plaintiffs' testimony, given their attention to detail and general knowledge.  See, e.g. Record at 701, lines 18-19 (Peter Mains seemed knowledgeable) (attached hereto as Exhibit "T").

These reasonable inferences and determinations of credibility drawn from the above referenced testimony and behavior should neither be disregarded nor disturbed by the Court.  See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150.

**B.  The jury reasonably concluded that Sea Ray had breached its express warranty.**

Plaintiffs' vessel was covered by the Sea Ray Express Limited Transferable Warranty (hereinafter referred to as the "Express Warranty"), which was referred to by multiple witnesses and entered into evidence as Defense Exhibit 94. See Defense Exhibit 94; Record at 221, line 15 through 222, line 14 (attached collectively hereto as Exhibit "U").

Therein, Defendant expressly promised to repair any structural fiberglass deck or hull defect and to repair or replace any parts found to be defective in factory material or workmanship:

> Sea Ray Boats, Inc. ("SEA RAY") warrants to the original retail purchasers of its 1998 model boats if purchased from an authorized SEA RAY dealer, and operated under normal, noncommercial use, that the selling dealer will (a) repair any structural fiberglass deck or hull defect which occurs within five (5) years of the date of delivery; (b) repair or replace any parts found to be defective in factory material or workmanship within one (1) year of date of delivery; and (c) repair any gel coat surface of the hull that has laminate blisters which occurred as a result of defects in material and workmanship within five (5) years of the date of delivery . . .

Defendant's Exhibit 94 ("Express Limited Warranty" section).

### 1. The evidence supports a finding that Sea Ray breached its warranty.

Plaintiffs purchased their boat from an authorized Sea Ray dealer in May 1998. Record at 121, line 12 through 122, line 3; Record at 133, lines 15-18 (attached collectively hereto as Exhibit "V").

During the ensuing five years, Sea Ray was notified of numerous defects in the structural fiberglass hull and deck, including but not limited to a crushed rubstrip, fractured fiberglass, a collapsing cockpit floor, an engine hatch that was difficult to open, plenums in poor condition, cracks in the gel coat, and water leaks from laminated

areas.  See, e.g. Record at 124, lines 4 -14; Record at 130, lines 19-22; Record at 135, line 1; Record at 141, lines 4-5; Record at 144, lines 15-20; Record at 145, line 5; Record at 153, lines 12-15; Record at 163, lines 21-25; Record at 172, lines 1-13 (attached collectively hereto as Exhibit "W").

Throughout the first year of operation, Plaintiffs repeatedly notified Sea Ray of problems with the installation and operation of the exhaust system.  See, e.g. Record at 137, lines 13-20 (operating range of motors); Record at 145, line 19 through 146, line 9 (atypical exhaust resonance) (attached collectively hereto as Exhibit "X").

Sea Ray was informed of the defects on several occasions, and was provided notice of their existence during throughout its period of operation.  Despite numerous repair attempts and promises to address these issues, the evidence shows that Defendant breached the Express Warranty by failing to do so.  See, e.g. Record at 205-206 (Sea Ray denied warranty coverage); Plaintiffs' Exhibit 7 (discussion in Record at 148, lines 14-25); Plaintiffs' Exhibit 11 (discussion in Record at 236-237); Plaintiffs' Exhibit 14; Plaintiffs' Exhibit 17; Plaintiffs' Exhibit 18 (discussion in Record at 166, lines 8-20 and at 278, lines 10-14).  See also  Record at 151, lines 14-16; Record at 155, lines 13-18; Record at 158, lines 11-16; Record at 163, lines 12-25; Record at 242-243; Record at 271, lines 9-11 (Plaintiffs paid mechanic for diagnostic and repair services); Record at 279, lines 3-7; Record at 282, lines 12-13; Record at 324, lines 14-23 (attached collectively hereto as Exhibit "Y").

The two marine surveyors confirmed the continued existence of these problems following Sea Ray's attempted repairs.  See, e.g. Record at 450, line 10 (Greaves survey was June of 2001); Record at 461-462 (gel coat cracks and delamination); Record at

470-472 (stress cracks, defective remote spotlight and windlass, exhaust system configuration). See also Record at 618-620 (Defense expert agreed completely wiuth surveyor Greaves that defects continued to exist after Sea Ray attempted repairs) (attached collectively hereto as Exhibit "Z").

By failing to satisfactorily remedy these defects in the hull, fiberglass deck, parts, and workmanship, Defendant breached its Express Warranty.

### 2. The ambiguities in the Express Warranty preclude Sea Ray from arguing that any claims fell outside of the warranty period.

The Express Warranty provides in pertinent part that the selling dealer will "(a) repair any structural fiberglass deck or dull defect which occurs within five (5) years of the date of delivery; (b) repair or replace any parts found to be defective in factory material or workmanship within one (1) year of date of delivery . . . "  See Defense Exhibit 94 ("Express Limited Warranty" section).

The warranty is ambiguous as to its scope in that it does not require that the defective product be delivered for repair or service within either one or five years of delivery.   Rather section (a) suggests merely that the defect itself must have existed or manifested itself within five years of delivery for warranty coverage.  Similarly, section (b) suggests that the warranty covers the product as long as the defect in factory material or workmanship existed within the first year following delivery.

These ambiguities should be interpreted in favor of Plaintiffs and against Defendant, who drafted the contract.   See Hartford Electric Applicators of Thermalux, Inc. v. Alden, 169 Conn. 177, 182 (1975)("When there is ambiguity, we must construe contractual terms against the drafter.").  See also Cantonbury Heights Condominium Association, Inc. v. Local Land Development, LLC, 273 Conn. 724, 735 (2005).

As such, applicable warranty period has not lapsed.

    **3. Defendant's concealment of the defects in the vessel extends the warranty until such time as the Plaintiffs discovered the defects.**

<u>Spoliation and Concealment of Evidence</u>

Defendant failed to allow Plaintiffs to attend the factory to inspect the repairs to their vessel despite requests and assurances that Plaintiffs would be able to do so. Instead, Defendant overhauled the exhaust system, replacing it with a materially different retrofit model without first consulting Plaintiffs.

In replacing the original exhaust system without allowing Plaintiffs a prior explanation or inspection, Defendant effectively destroyed the evidence of the defective installation, parts, and workmanship in the vessel as it was delivered to Plaintiffs in 1998.  Sea Ray should not be permitted to profit from this behavior by so inhibiting and delaying the discovery of defects which should be covered under the Express Warranty.

This spoliation and concealment of evidence entitles Plaintiffs to an inference that the defects existed at the time of delivery and should extend Plaintiffs' warranty to encompass the date of discovery of the defect.  See Fed. R. Civ. P. 37.  See also, <u>Kronisch v. U.S.</u>, 150 F.3d 112, 126 (2nd Cir. 1998); <u>West v. Goodyear Tire & Rubber Co.</u>, 167 F.3d 776, 779 (2d Cir. 1999).

The Second Circuit defines "spoliation of evidence" as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation," West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999). Courts commonly remedy the prejudicial effects of spoliation by invoking the adverse inference rule against the destroying party. It is well-established that intentional destruction of evidence relevant to proof of an issue at trial may

support an adverse inference that the evidence would have been unfavorable to the spoliating party, Kronisch v. U.S., 150 F.3d 112, 126 (2d Cir. 1998).

Estoppel

Principles of fairness and equity suggest that a party should be precluded from benefiting from conduct that has induced reliance to the detriment of another or lured another into a false sense of security. Estoppel advances the goals of equity and good conscience under the particular circumstances of a case. See, generally, Boyce v. Allstate Ins. Co., 236 Conn. 375, 383-384 (1996).

> Estoppel has its roots in equity and stems from "the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed . . . as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse."

Boyce, 236 Conn. at 383-384 (citing to 3 Pomeroy, Equity Jurisprudence (5th Ed. 1941) § 804, p. 189).

Because Defendant precluded Plaintiff from questioning the overhaul of the exhaust system before it was effected; and because Sea Ray prevented Plaintiffs from gaining access to the factory to inspect or document the dismantling of the original exhaust system; Plaintiffs were unfairly deprived of this earlier opportunity to discover the defects in their purchase. Having been denied this opportunity, the cause of the water ingestion defects were not fully discoverable until 2001, when the exhaust system and cylinder head were removed following the hydrolocking incident.

Defendant should be estopped from taking advantage of its own conduct to now argue that Plaintiffs did not raise these warranty claims earlier or that Plaintiffs have not proven that a defect existed in the originally installed exhaust system.

    **4. Defendant waived any time restrictions relating to the warranty by repeatedly reassuring Plaintiffs that it would cure the previously discovered defects.**

The evidence has shown that Plaintiffs preserved their warranty claims by regularly advising Defendant of their concerns regarding the vessel construction and exhaust resonance sounds.  See, e.g. Plaintiffs' Exhibits 3,4, 5, 7, 8, 9, 11, 14, 16, 17, 18, 19, 20, 21.

Additionally, Defendant waived any time restrictions relating the warranty by providing Plaintiffs with repeated assurances that it would cure the previously discovered defects. See, e.g. Record at 278, lines 17-19 (attached hereto as Exhibit "AA").

Notwithstanding the focus on the dangers posed by the exhaust system and the defects which cause them, the jury could also have reasonably relied on the defects in the gel coat, laminate, hull, and structural fiberglass deck of Plaintiffs' yacht in determining that defects were clearly within the warranty period of five years of delivery.

As such, the jury's finding of breach of express warranty should survive the renewed motion for judgment as a matter of law.

**V.**
**INTEREST**

**A. <u>Plaintiffs do not waive their right to any post-judgment interest that might accrue</u>.**

Plaintiffs acknowledge that post-judgment interest has not yet begun to accrue. Nonetheless, Plaintiffs do not waive their right to any post-judgment interest that might come due in the future.

**B. Prejudgment interest.**

Plaintiffs concede that, under the present circumstances, they are not entitled to prejudgment interest on the awards for breach of express warranty and negligence.

## VI.
### PLAINTIFFS CONCEDE THAT THE AWARD SHOULD BE REDUCED ACCORDING TO THE JURY DETERMINATION OF COMPARATIVE NEGLIGENCE

Plaintiffs do not dispute that the jury apportioned three percent (3%) of the fault to Plaintiffs under the theory of comparative negligence. As such, Plaintiffs should recover $30,070.00 of the $31,000.00 judgment, plus interest.

## VII.
### CONCLUSION

This Court lacks jurisdiction to hear the renewed motion for judgment as a matter of law because it was not filed within the ten-day period prescribed by Rule 50(b). Fed. R. Civ. P. 50(b).

Had the motion been timely renewed, it should be denied for the reasons set forth above.

Respectfully submitted,

PLAINTIFFS,
PETER D. MAINS and LORI M. MAINS

By _____/s/ Rachel D. Lev_____
  Rachel D. Lev, Esq.
  Connecticut Federal Bar Number PHV02527
  HERRICK NIKAS
  1201 Dove Street, Suite 560
  Newport Beach, California 92660
  Telephone: (714) 546-1400
  Facsimile: (714) 546-4111

rlev@herricknikas.com
Their Attorney

## CERTIFICATION

I hereby certify that on this date a copy of the foregoing **Plaintiffs' Opposition to Defendant's Renewed Motion for Judgment as a Matter of Law** was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

_____/s/ Rachel D. Lev_____
Rachel D. Lev
Connecticut Federal Bar Number  PHV02527